IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DICK ANTHONY HELLER, *et al.* | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Case No. 1:08-cv-01289 |
| | ) | Hon. Ricardo M. Urbina |
| THE DISTRICT OF COLUMBIA, *et al.* | ) | |
| | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Dick Anthony Heller, Absalom Jordan, William Carter, and Mark Snyder, by

counsel, hereby submit the following memorandum of points and authorities in support of their

Motion for Summary Judgment.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.     Registration, Expiration, and Re-Registration Provisions . . . . . . . . . . . . . . . . . 2

      B.     Prohibition of Commonly-Possessed Firearms Denigrated as
            "Assault Weapons" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      C.     Prohibition of Commonly-Possessed Magazines for Firearms . . . . . . . . . . . . . 9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I.     THE REGISTRATION, EXPIRATION, AND RE-REGISTRATION
      REQUIREMENTS VIOLATE THE SECOND AMENDMENT . . . . . . . . . . . . . . . . . 13

      A.     *Heller* Reaffirms *Miller's* Premise that Second
            Amendment Protection Precludes Registration . . . . . . . . . . . . . . . . . . . . . . . . 15

      B.     A Person May Not Be Required to Register
            to Exercise a Core Constitutional Right . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      C.     Registration is Not Justified by Any Standard Higher
            than Rational Basis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      D.     Registration Is Not a Traditional Regulation . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      E.     The District's Registration Provisions Have No Militia Purpose . . . . . . . . . . . 20

II.     THE DISTRICT'S PROHIBITION OF COMMONLY-POSSESSED
      FIREARMS VIOLATES THE SECOND AMENDMENT . . . . . . . . . . . . . . . . . . . . 21

III.     THE RESTRICTIONS ARE NOT AUTHORIZED BY D.C. CODE § 1-303.43 . . . . . 27

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

i

# TABLE OF AUTHORITIES[*]

**CASES**                                                                      **Page**

*Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. District of Columbia*,
  919 F.2d 148 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800 (1988) . . . . . . . . . . . . . . . . . . . 22

*City of Mobile, Ala. v. Bolden*, 446 U.S. 55 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Crane v. District of Columbia*, 289 F. 557 (D.C. App. 1923) . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*\*District of Columbia v. Heller*, 128 S. Ct. 2783 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*District of Columbia v. John R. Thompson Co., Inc.*, 346 U.S. 100 (1953) . . . . . . . . . . . . . . . 28

*Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Harmelin v. Michigan*, 501 U.S. 957 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966) . . . . . . . . . . . . . . . . . . . . . . 19

*Kennedy v. Louisiana*, 128 S. Ct. 2641 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*La Forest v. Board of Commissioners of the District of Columbia*,
  92 F.2d 547 (D.C. Cir. 1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Maryland & D.C. Rifle & Pistol Association v. Washington*,
  442 F.2d 123 (D.C. Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*McIntosh v. Washington*, 395 A.2d 744 (D.C. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 28

*Moore v. District of Columbia*, 12 App. D.C. 537 (1898) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Murdock v. Com. of Pennsylvania*, 319 U.S. 105 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Near v. Minnesota*, 283 U.S. 697 (1931) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Nordyke v. King*, 563 F.3d 439 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

_____

[*] Authorities upon which we chiefly rely are marked with asterisks.

*O'Neill v. State*, 16 Ala. 65 (1849) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*\*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007), *aff'd*,
 *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008) . . . . . . . . . . . . . . . . . . . . . . . . 21, 26

*Ratzlaf v. United States*, 510 U.S. 135 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Reynolds v. District of Columbia*, 614 A.2d 1285 (D.C. 1992) . . . . . . . . . . . . . . . . . . . . . 32

*Rinzler v. Carson*, 262 So. 2d 661 (Fla. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir.), *cert. denied*, 540 U.S. 1046 (2003) . . . . . . . . . 23

*Staples v. United States*, 511 U.S. 600 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 28

*State v. Mendoza*, 82 Hawaii 143, 920 P.2d 357 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Stenberg v. Carhart*, 530 U.S. 914 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Thomas v. Collins*, 323 U.S. 516 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Ullman v. District of Columbia*, 21 App. D.C. 241 (1903) . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Ullmann v. United States*, 350 U.S. 422 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Carolene Products Co.*, 304 U.S. 144, 58 S. Ct. 778,
 82 L. Ed. 1234 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001), *cert. denied*, 536 U.S. 907 (2002) . . 13

*United States v. Hart*, 324 F.3d 740 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Miller*, 307 U.S. 174 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 24, 26

*United States v. Panter*, 688 F.2d 268 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Valley Forge Christian College v. Americans United for Separation of
 Church & State, Inc.*, 454 U.S. 464 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Warren v. District of Columbia*, 444 A.2d 1 (D.C. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*,
 536 U.S. 150 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Welsh v. United States*, 398 U.S. 333 (1970)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**CONSTITUTION**

U.S. Const., Amendment I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16, 24

U.S. Const., Amendment II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const., Amendment IV  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16, 24, 29

U.S. Const., Amendment VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**STATUTES**

Brady Handgun Violence Prevention Act, P.L. 103-159, 107 Stat. 1536 (1993)  . . . . . . . . . 14, 31

Firearm Owners' Protection Act, P.L. 99-308, 100 Stat. 449 (1986)  . . . . . . . . . . . . . . . . . . . . 30

Freedmen's Bureau Act, 14 Stat. 173 (1866)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29-30

Gun Control Act, § 101, P.L. 90-618, 82 Stat. 1214 (1968)  . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

National Firearms Act, 48 Stat. 1236 (1934)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Property Requisition Act, P.L. 274, 55 Stat., pt. 1, 742 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . 30

Protection of Lawful Commerce in Arms Act,  P.L. 109-92, 119 Stat. 2095 (2005).  . . . . . . . . 30

Violent Crime Control and Law Enforcement Act, P.L. 103-322, 108 Stat. 1796 (1994),  . . . . 22

18 U.S.C. § 921  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

18 U.S.C. § 921(a)(30) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

18 U.S.C. § 922(g)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

18 U.S.C. § 922(n)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 531

18 U.S.C. § 922(t)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 14, 31

18 U.S.C. § 922(t)(2)(C)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 31

18 U.S.C. § 922(v) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

18 U.S.C. § 926(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

26 U.S.C. § 1132c . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

26 U.S.C. § 1132d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

26 U.S.C. § 5841(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

36 U.S.C. § 40722 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Ca. Penal Code § 12280 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Ca. Penal Code § 12285 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Ca. Penal Code § 11186 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Conn. Gen. Stat. § 53-202a(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Conn. Gen. Stat. § 53-202d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Conn. Gen. Stat. § 53-202m . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Conn. Gen. Stat. § 53-202n . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Conn. Gen. Stat. § 53-2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

D.C. Code § 1-206.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 30

D.C. Code § 1-303.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

D.C. Code § 1-303.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

D.C. Code § 1-303.03 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

D.C. Code § 1-303.43 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 32

D.C. Code § 7-2501.01(3A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

D.C. Code § 7-2501.01(3A)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

D.C. Code § 7-2501.01(3A)(A)(V) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

D.C. Code § 7-2501.01(3A)(A)(IV) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9

D.C. Code § 7-2501.01(3A)(A)(VII) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

D.C. Code § 7-2501.01(3A)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

D.C. Code § 7-2501.01(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

D.C. Code § 7-2501.01(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

D.C. Code § 7-2502.01(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

D.C. Code § 7-2502.02(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

D.C. Code § 7-2502.03(a)(10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

D.C. Code § 7-2502.03(a)(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

D.C. Code § 7-2502.03(a)(13)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

D.C. Code § 7-2502.03(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

D.C. Code § 7-2502.03(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

D.C. Code § 7-2502.03(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

D.C. Code § 7-2502.04(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

D.C. Code § 7-2502.04(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

D.C. Code § 7-2502.04(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

D.C. Code § 7-2502.05(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

D.C. Code § 7-2502.07a(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

D.C. Code § 7-2502.07a(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

D.C. Code § 7-2502.07a(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

D.C. Code § 7-2502.07a(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

D.C. Code § 7-2502.07a(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

D.C. Code § 7-2502.08 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

D.C. Code § 7-2502.08(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

D.C. Code § 7-2502.08(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

D.C. Code § 7-2502.09(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

D.C. Code § 7-2506.01(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

D.C. Code § 7-2507.06 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4

D.C. Code § 49-401 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

D.C. Municipal Regulations, § 24-2305 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

D.C. Municipal Regulations, § 24-2311.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Haw. Rev. Stat. § 134-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

M.G.L., Ch. 140 § 121 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

M.G.L., Ch. 140 § 131 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

N.J. Rev. Stat. § 2C:39-1w . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

N.J. Rev. Stat. § 2C:58-12a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

N.J. Rev. Stat. § 2C:58-12b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

N.Y. Consl. Laws § 265(22) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

N.Y. Consl. Laws § 265(22)(e)(v) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## OTHER AUTHORITIES

Bureau of Alcohol, Tobacco, Firearms & Explosives, *State Laws & Published Ordinances - Firearms*, ATF Pub. 5300.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 23

H. Johnson, *Small Arms Identification & Operation Guide Eurasian Communist Countries* (Defense Intelligence Agency 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

M. O'Shea, The Right to Defensive Arms after *District Of Columbia v. Heller*,
111 W. Va. L. Rev. 349, 388 (Winter 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

S. Halbrook, *That Every Man Be Armed* (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

S. Halbrook, *Firearms Law Deskbook: Federal and State Criminal Practice*
(Thomson/West Group, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 23

*Websters New World Dictionary* (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## Introduction

This is a challenge under the Second Amendment to the U.S. Constitution to certain provisions of the District of Columbia's Firearms Control Amendment Act of 2008 (hereafter "the Act"), which Mayor Fenty signed on December 28, 2008, and which became effective on April 1, 2009.  Statement of Undisputed Material Fact ("UMF") 1.  The Act was preceded by now-expired or repealed ordinances enacted in the wake of *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008), which held that the Second Amendment right of the people to keep and bear arms prohibits the District from banning firearms which are commonly kept for lawful purposes and which invalidated the District's handgun ban.[1]

Plaintiffs challenge the Act's provisions requiring that all firearms be registered, providing that the registrations expire after three years, and requiring that they be re-registered.  Plaintiffs also challenge the Act's prohibitions on possession of what it calls "assault weapons" and on magazines holding over ten rounds, which are commonly possessed throughout the United States by law-abiding persons for lawful purposes.  These provisions raise not only Second Amendment issues but also whether they are authorized by Congress' delegation to the District to enact "usual and reasonable" regulations regarding firearms.

---

[1]After *Heller* was decided, the District continued to prohibit most handguns, based on an unusual definition of semiautomatic pistols as "machine guns."  After this litigation ensued, it repealed that prohibition but enacted the instant ordinance, which included a prohibition on possession of any pistol which is not listed on a certain California Roster.  That prohibition has been ameliorated by promulgation of rules which render moot the issues raised thereunder, both in this case and in *Tracey Hanson et al. v. District of Columbia*, No. 09-CV-0454-RMU, with which this case was consolidated.  Another issue was the Act's definition of "assault weapon" to include reference only to the designer's name, which has been rendered moot by a regulation requiring similarity to a specific model or feature.

## STATEMENT OF FACTS

### A.  Registration, Expiration, and Re-Registration Provisions

The District requires that a person register to exercise Second Amendment rights: "no person . . . shall possess or control any firearm, unless the person . . . holds a valid registration certificate for the firearm."  D.C. Code § 7-2502.01(a).  Violation is punishable by one year's imprisonment and a $1,000 fine, and by five year's imprisonment and a $5,000 fine for a second offense.  § 7-2507.06.[2]

The Act added onerous new requirements to pre-*Heller* law making it far more burdensome to register a firearm of any kind with the Metropolitan Police Department (MPD).  To register a firearm, the applicant must demonstrate knowledge of D.C. firearms laws, including the use and handling of firearms in accord with tests prescribed by the MPD.  § 7-2502.03(a)(10).  The applicant must pass a written test, of a type and content "at the sole discretion" of the MPD.  D.C. Municipal Regulations § 24-2311.3.  The applicant must have "vision better than or equal to that required to obtain a valid driver's license . . . ."   D.C. Code § 7-2502.03(a)(11).  The applicant must complete a training course by a certified instructor with at least one hour of firing training at a firing range and four hours of classroom instruction.  § 7-2502.03(a)(13)(A).  No public firing range exists in the District.  UMF 2.

The applicant must disclose, *inter alia*, any business or occupation in which he or she has engaged the previous five years, the intended use of the firearm, and "Such other information as the Chief determines is necessary to carry out the provisions of this unit."  § 7-2502.03(b).

The applicant must be fingerprinted, submit photographs, and appear in person with the

---

[2]All citations are to the D.C. Code unless otherwise noted.

2

firearm as directed by the Chief.[3]  § 7-2502.04(a)-(c).  Further, the "Chief shall require any registered pistol to be submitted for a ballistics identification procedure and shall establish a reasonable fee for such procedure."  § 7-2502.03(d).  The applicant must also pay "a nonrefundable fee to be established by the Mayor . . . ."  § 7-2502.05(b).  No limit is set on the amount of either fee.

"The Chief shall register no more than one pistol per registrant during any 30-day period," with an exception for new residents.  § 7-2502.03(e).  That multiplies the fees to pay and the burdens to undergo.  By application dated July 6, 2009, Plaintiff Jordan applied to register a Model 59 S&W pistol to be used for "personal protection, sporting activities, recreation," and paid the required fees therefor.  The MPD issued the registration on the same date.  UMF 8.  Jordan stores outside the District two other pistols which he wished to apply to register at the same time as the above application, but could not do so because of the above prohibition.  As a result, he is required to undertake the effort and expense of submitting registration applications on two more occasions, with a minimum 30-day period between the dates on which the Chief registers each pistol.  UMF 9.

Registration certificates expire every 3 years and must be renewed.  § 7-2502.07a(a), (b).  To renew, the applicant must submit a statement attesting to his or her possession of the firearm, address, and "continued compliance with all registration requirements . . . ."  § 7-2502.07a(c).  However, this duplicates information already in the original registration and in any notice of changed information filed pursuant to existing § 7-2502.08(1).  The applicant "may be charged a reasonable fee" for the renewal.  § 7-2502.07a(f).  No limit is set on the amount of the fee.  A new background check is required every 6 years.  § 7-2502.07a(d).

---

[3]At least two appearances are required – the initial application process and, after notification by mail, the completion of the process.  No time limit is prescribed.  D.C. Municipal Regulations, §§ 24-2305 *et seq*.

Each registrant must: "Have in his possession, whenever in possession of a firearm, the registration certificate for such firearm, and exhibit the same upon the demand of a member of the Metropolitan Police Department, or other law enforcement officer."  § 7-2502.08(3).

"In addition to any other criminal or civil sanctions that may be imposed, including section 706 [*sic*]," a registrant is subject to the following for any "violation or omission of the duties . . . imposed by section 208 [D.C. Code § 7-2502.08]": (1) for the first instance, a fine of $100; (2) for the second, a fine of $500, revocation of the registration, and prohibition of possessing a firearm for five years; and (3) for the third, a fine of $500, revocation of the registration, and a permanent prohibition on possessing any firearm.  § 7-2502.09(b).

Thus, a registrant may be prohibited from firearm possession for failure to notify the Chief of any change, *e.g.*, his or her occupation, or for failure to exhibit a registration certificate on the demand of a law enforcement officer.  If a registration expires and is inadvertently not renewed, possession of an unregistered firearm is punishable by one year's imprisonment and a $1,000 fine, and by five year's imprisonment and a $5,000 fine for a second offense.  § 7-2507.06.

The registration requirements cause Plaintiffs to incur expenses, to suffer burdens, and cost them time to exercise the constitutional right to keep arms.  The burdensome nature of the requirements is exemplified by Plaintiff Mark Snyder, who wished to purchase a .22 caliber bolt action target rifle.  UMF 3.  On January 20, 2009, he was advised of the registration requirements by the MPD.  UMF 4.  He ordered the rifle from a dealer.  On February 2, he received the registration paperwork from the MPD, filled it out and sent it to the dealer, who returned it on February 11.  UMF 5.  On February 17, he attempted to deliver his registration paperwork to the MPD, which informed him that he would have to take the firearms course.  He then placed telephone calls to

4

persons on the District's certified instructors roster and left messages. On February 19, at the MPD, he took the required written test, submitted fingerprints, completed the mental health form, and paid the fees. On February 21, he paid $125 and took the D.C.-approved course consisting of four hours of class and one hour of range time. The course consisted of handgun training. On February 25, he called the MPD to learn that his registration was approved and proceeded to the MPD to pick up the registration papers. UMF 6.

Finally, he returned to the dealer, which conducted a records check on him for criminal convictions, mental disability, or other prohibited category under the National Instant Background Check System (NICS), 18 U.S.C. § 922(t), and then transferred the rifle to him. UMF 7.

## B. Prohibition of Commonly-Possessed Firearms Denigrated as "Assault Weapons"

The Act prohibits possession of a wide array of commonly-possessed rifles, shotguns, and pistols which it calls "assault weapons." "A registration certificate shall not be issued for a: . . . (6) An assault weapon . . . ." D.C. Code § 7-2502.02(a)(6).

"Assault weapon" is defined to include firearms with specified model names and others with certain generic features. § 7-2501.01(3A)(A). The list begins with: "(I) All of the following specified rifles," following which are named models such as "Colt AR-15 series" and "Armalite AR-180." The term also includes: "(VIII) All other models within a series that are variations, with minor differences, of those models listed . . ., regardless of the manufacturer . . . ."

The term "Colt AR-15 series" refers to different models of a rifle manufactured by Colt's Defense and its predecessor companies. "AR-15" is commonly used as a generic term to describe the same or similar rifles made by other manufacturers. UMF 10.

AR-15 rifles are semiautomatic, meaning that they are designed to fire only once when the

trigger is pulled. They have the capacity to accept a detachable magazine. Standard magazines hold 20 or 30 rounds of ammunition, but magazines of other capacities are also available. They also have a pistol grip typically 3¾ to 4 inches in length that protrudes at a rearward angle beneath the action of the rifle. UMF 11.

Since being introduced in 1963, roughly two million AR-15 type rifles have been manufactured. UMF 12. AR-15s accounted for 14.4 percent of rifles made in the U.S. for the domestic market in 2007. UMF 13. A projected 2,145,162 AR-15 type rifles will have been produced and not exported from 1986 through 2009. UMF 14.

Plaintiff Heller applied to register a Bushmaster XM-15-E2S .223 caliber rifle, "For use in the Civilian Marksmanship Program [CMP]." The MPD found it to be an "assault weapon" and denied the application. The rifle resembles a "Colt AR-15 series" rifle or "variation, with minor differences" thereof, and has "a pistol grip that protrudes conspicuously beneath the action of the weapon." UMF 15.

Such rifles are eligible for use in, and are widely used in, the CMP. Heller has received training by the CMP and has been issued a certificate of completion. UMF 16. The CMP functions, as provided by 36 U.S.C. § 40722:

> (1) to instruct citizens of the United States in marksmanship;
> (2) to promote practice and safety in the use of firearms; [and]
> (3) to conduct competitions in the use of firearms and to award trophies, prizes, badges, and other insignia to competitors . . . .

"In carrying out the Civilian Marksmanship Program, the corporation shall give priority to activities that benefit firearms safety, training, and competition for youth and that reach as many youth participants as possible." *Id.* § 40724.

6

Plaintiff Jordan applied to register an Armalite AR-180 .223 caliber rifle to be used for "personal protection."   The MPD found it to be an "assault weapon" and denied the application. UMF 17.

The Armalite AR-180 is a semiautomatic rifle which uses a detachable magazine and has a pistol grip that protrudes about 4 inches beneath the action.   Rifles of this type are commonly possessed for protection, target shooting, competitions, and sporting purposes.   UMF 18.

"Assault weapon" is further defined as: "A semiautomatic, [sic] rifle that has the capacity to accept a detachable magazine and any one of the following:", following which are generic listings including "(aa) A pistol grip that protrudes conspicuously beneath the action of the weapon; (bb) A thumbhole stock; (cc) A folding or telescoping stock . . . ."  D.C. Code § 7-2501.01(3A)(A)(IV).

Plaintiff Carter applied to register an LMT Defender 2000 .223 caliber semiautomatic rifle, which has a pistol grip that protrudes beneath the action of the weapon and a telescoping stock, to be used for "recreational activity, NRA range."   The MPD found it to be an "assault weapon" and denied the application.  UMF 19.

This type of pistol grip allows the rifle to be accurately shot from the shoulder without excessive muzzle rise.[4]  In his Marine Corps training, Carter was instructed to fire the M16 (which has a similar pistol grip) only from the shoulder and was never trained to fire it from the hip.  UMF 20.  Neither the pistol grip nor the telescoping stock makes the rifle more powerful or dangerous. Numerous persons possess such rifles throughout the United States for target shooting and other lawful purposes.  UMF 21.

---

[4]Protruding pistol grips are used on single-shot Olympic air rifles and .22 caliber rifles.  UMF 22.

The ArmaLite AR-180, M15, and AR-10 semiautomatic rifles are similar in design and function to the Colt AR-15 rifle.  UMF 23.  These rifles have a pistol grip typically 3 3/4 to 4 inches in length that protrudes at a rearward angle beneath the action of the rifle.  The pistol grip, in conjunction with the straight-line stock, allows the rifle to be fired accurately from the shoulder with minimal muzzle-rise.  Most AR-15 rifles have fixed stocks, but some have a telescoping stock which allows adjustment to the person's physique.  UMF 24.

ArmaLite has manufactured approximately 100,000 M15 rifles/rifle receivers, 45,000 AR-10 rifles/rifle receivers, and 10,000 AR-180 rifles.  Another 10,000 AR-180 rifles were imported into the United States.  UMF 25.

The ArmaLite M15, AR-180, and AR-10 rifles are commonly possessed for law enforcement, sport (including target shooting, both informally and in formal competitions), and security, including personal protection in the home.  Features allowing varied iron and optical sights further reflect their increased use in sport and hunting.  UMF 26.  The accuracy and light recoil of these rifles make them extremely useful for hunting small and medium-sized game and varmint hunting.  UMF 28.

Because of their accuracy, the ArmaLite M15 rifle and the AR 10 rifle have almost totally replaced preceding models at the National Matches and other formal target shooting venues.  The M15 and similar models are the main Service Rifle in formal competition these days.  Their use in less formal target shooting is widespread.  UMF 27.

ArmaLite has experienced a broad acceptance of these rifles for security and personal protection purposes both among police and private owners due to both operational and safety concerns.  A carbine or rifle provides better accuracy than a handgun, and the small caliber round of the M15 and AR-180 tends to break up rather than penetrate multiple walls and objects.  UMF

8

29.

The term "assault weapon" is also defined to include: "Any firearm that the Chief may designate as an assault weapon by rule, based on a determination that the firearm would reasonably pose the same or similar danger to the health, safety, and security of the residents of the District as those weapons enumerated in this paragraph." D.C. Code § 7-2501.01(3A)(A)(iii).  This empowers the Chief to ban any firearm without regard to any defined feature.[5]

### C.  Prohibition of Commonly-Possessed Magazines for Firearms

The Act enacted § 7-2506.01(b), which prohibits possession of any "large capacity ammunition feeding device," which includes any magazine or other device that "has a capacity of . . . more than 10 rounds of ammunition."  Violation is punishable by a $1,000 fine and one year in prison.  § 7-2507.06.

Magazines that have a capacity of more than 10 rounds of ammunition are commonly sold with and are available for numerous makes and models of pistols and rifles.  Such magazines are commonly possessed for self defense, target shooting, hunting, and sporting purposes.   The Model 59 S&W pistol, for instance, was originally sold with a magazine holding 14 rounds of ammunition. As a result of D.C. Code § 7-2506.01(b), which prohibits possession of any magazine with a capacity of more than 10 rounds of ammunition, Plaintiff Jordan cannot possess such magazine in the District

---

[5]"Assault weapon" is further defined to include firearms with specified features with no discernable nexus to dangerousness, *e.g.*, pistols which accept detachable magazines outside the pistol grip.  § 7-2501.01(3A)(A)(V).  Excluded are pistols designed for Olympic shooting events. § 7-2501.01(3A)(B), (C).  No exemption exists for pistols designed for other types of target shooting events, hunting, or self defense.  "Assault weapon" also includes shotguns with certain types of stocks and grips, or which accept a detachable magazine – which allows for safe unloading.  § 7-2501.01(3A)(A)(VI), (VII).  All of these banned firearms fire exactly the same cartridges as those that are not banned.

9

but must keep it stored elsewhere.  UMF 30.[6]

Many pistols and rifles are sold with magazines that hold more than 10 rounds, and such firearms are in wide use for self defense, target shooting, and other lawful purposes.  UMF 32.

Ammunition feeding devices that have a capacity of more than 10 rounds of ammunition are typically detachable box magazines designed for semiautomatic rifles or semiautomatic pistols, or tubular magazines designed for .22 rimfire caliber rifles.  Millions of such magazines have been manufactured in the United States and imported.  Such magazines are widely available in the commercial market and are in common use throughout the United States.  Magazines holding more than ten rounds are preferable for self protection, and are in common use for target shooting, competitions, and other sporting purposes.  UMF 34.

Of 1.5 million handguns made in the United States and not exported in 2007, 77 percent were semiautomatic pistols.  UMF 35.  Standard magazines for very commonly owned semiautomatic pistols hold up to 17 rounds of ammunition.  In 2007, about 2/3 of the 1.2 million pistols made and not exported were in calibers typically using magazines that hold over 10 rounds.  UMF 36.

Beginning with the M1 Carbine, introduced in the 1940s, rifles capable of accepting detachable magazines holding more than 10 rounds, and typically equipped with such magazines, have been increasingly common among private citizens in our country. More than six million M1 Carbine series rifles have been made since their introduction in the 1940s, and the standard magazines for them hold 15 or 30 rounds.  There are roughly two million AR-15 type rifles, and they are typically sold with between one and three standard magazines.  More than 800,000 Ruger Mini-

---

[6]Jordan is a Firearms Instructor certified by the National Rifle Association.  He formerly held a Federal Firearms License to engage in the business of dealing in firearms in the District, and was agent for Glock when the MPD evaluated and purchased the Glock Model 17 pistol.  UMF 31.

14 series rifles have been produced since their introduction in 1974, and many are equipped with standard magazines of with a capacity of 20 or 30 rounds. Numerous other rifle makes and models also have the capacity to accept, and are commonly equipped with, magazines holding more than 10 rounds. UMF 37.

In addition to magazines sold with firearms, many more magazines are widely available on the open market. UMF 38.

As of 1994, an estimated 18 percent of civilian-owned firearms, including 21 percent of civilian-owned handguns, were equipped with magazines holding over ten rounds, and 25 million guns were equipped with such magazines. Some 4.7 million such magazines were imported during 1995-2000. UMF 39. As of 1994, an estimated 40 percent of the semiautomatic handgun models and a majority of the semiautomatic rifle models manufactured and advertised were sold with, or had a variation that was sold with, a magazine holding over 10 rounds. UMF 40.

The usefulness of magazines holding more than 10 rounds for lawful defense of self and others is demonstrated by the fact that they are issued to the police. In 1989, the MPD adopted the Glock 17 as its service pistol, magazines for which hold 17 rounds, and later adopted the Glock 19, magazines for which hold 15 rounds. UMF 41.

Plaintiff Heller applied to register a Sig Sauer P226 9mm pistol with a magazine capacity of 15 rounds of ammunition for "self-defense in the home."[7] The MPD disapproved the application because the "15 round ammunition capacity is defined as a 'large capacity ammunition feeding device' and exceeds 10 rounds as required by D.C. Code 7-2506.01(b))." UMF 42.

---

[7]Heller is a Special Police Officer in the District, which licensed him to carry a pistol. He has provided security for United States judges at the Thurgood Marshall Federal Judicial Center and for various federal officials at other buildings in the District. UMF 33.

## ARGUMENT

### Standard of Review

The Second Amendment right to keep arms is a fundamental right and restrictions thereon are subject to strict scrutiny. Blackstone "cited the arms provision of the [English] Bill of Rights as one of the fundamental rights of Englishmen." *Heller*, 128 S. Ct. at 2798. "By the time of the founding, the right to have arms had become fundamental for English subjects." *Id*.

"[T]he Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right. The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed.'" *Id*. at 2797. As with other fundamental rights, the explicit nature of "the right of the people" to have arms precludes application of the rational-basis standard of review. As *Heller* states:

> Obviously, the same test could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms. See *United States v. Carolene Products Co.,* 304 U.S. 144, 152, n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938) ("There may be narrower scope for operation of the presumption of constitutionality [*i.e.,* narrower than that provided by rational-basis review] when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten amendments ...").

*Id*. at 2818 n.27.

*Heller* rejects a "judge-empowering 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'" *Id*. at 2821. Such a test would allow "arguments for and against gun control" and the upholding of a handgun ban "because handgun violence is a problem, [and] because the law is limited to an urban area . . . ." *Id*. *Heller* responds:

12

> We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "interest-balancing" approach. The very enumeration of the right takes out of the hands of government – even the Third Branch of Government – the power to decide on a case-by-case basis whether the right is *really worth* insisting upon. . . . Like the First, it [the Second Amendment] is the very *product* of an interest-balancing by the people . . . . And whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.

*Id*.

"To view a particular provision of the Bill of Rights with disfavor inevitably results in a constricted application of it. This is to disrespect the Constitution." *Ullmann v. United States*, 350 U.S. 422, 428-29 (1956). No constitutional right is "less 'fundamental' than" others, and "we know of no principled basis on which to create a hierarchy of constitutional values . . . ." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 484 (1982).

The fundamental character of the right still allows "limited, narrowly tailored specific exceptions or restrictions for particular cases that are reasonable and not inconsistent with the right of Americans generally to individually keep and bear their private arms . . . ." *United States* v. *Emerson*, 270 F.3d 203, 261 (5th Cir. 2001) (upholding prohibition of firearm by person subject to domestic violence restraining order), *cert. denied*, 536 U.S. 907 (2002). "The crucial role this deeply rooted right has played in our birth and history compels us to recognize that it is indeed fundamental, that it is necessary to the Anglo-American conception of ordered liberty that we have inherited." *Nordyke v. King*, 563 F.3d 439, 457 (9th Cir. 2009).

## I.  THE REGISTRATION, EXPIRATION, AND RE-REGISTRATION REQUIREMENTS VIOLATE THE SECOND AMENDMENT

Count One of the complaint alleges that the District's firearm registration, expiration, and

re-registration requirements, individually and collectively, and facially and as applied, unduly burden and infringe on plaintiffs' Second Amendment rights. Neither the United States nor any State in the United States imposes such burdensome requirements merely to possess a firearm.

The federal Gun Control Act, 18 U.S.C. § 921 *et seq*., and the D.C. Code both forbid categories of potentially dangerous persons to possess firearms. All persons who purchase a firearm from a federally-licensed dealer are screened by the National Instant Criminal Background Check System (NICS) or an equivalent state system, 18 U.S.C. § 922(t), which accesses records of criminal convictions and indictments, mental disabilities, illegal alien status, and other prohibited categories. Once a person is cleared, NICS must "destroy all records of the system with respect to the call (other than the identifying number and the date the number was assigned) and all records of the system relating to the person or the transfer." § 922(t)(2)(C).[8] These provisions ensure that plaintiffs are eligible lawfully to exercise their right to keep and bear arms without undue burdens such as a registration system, while at the same time screening out potentially dangerous persons.

As the following demonstrates, *Heller* reaffirms precedent that Second Amendment protection precludes registration. Generally, a person may not be required to register to exercise a core constitutional right. Registration is not justified by any standard higher than rational basis. It is not the kind of traditional regulation approved by *Heller*. The District's registration provisions have no militia purpose.

### A. *Heller* Reaffirms *Miller*'s Premise that Second Amendment Protection Precludes Registration

---

[8]See also § 103(i) of the Brady Handgun Violence Prevention Act, P.L. 103-159, 107 Stat. 1536 (1993) (NICS records may not be transferred to any federal or state facility, and may not be used "to establish any system for the registration of firearms").

The indictment in *United States v. Miller*, 307 U.S. 174, 175 (1939), charged defendants with transportation of a short-barreled shotgun in interstate commerce "not having registered said firearm" and "not having in their possession a stamp-affixed written order for said firearm," as required by the National Firearms Act.[9]  The issue was thus whether the *registration requirement* was consistent with the Second Amendment – the firearms at issue were not banned outright.[10]

*Miller* pointed to "the absence of any evidence," and its inability to take "judicial notice," of whether the weapon was "ordinary military equipment," and thus "we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument."  *Id*. at 178.  *Heller* notes: "Had the Court believed that the Second Amendment protects only those serving in the militia, it would have been odd to examine the character of the weapon rather than simply note that the two crooks were not militiamen."  128 S. Ct. at 2814.  Similarly, had the Court believed that the Second Amendment is consistent with registration, it would have been odd to examine the character of the weapon rather than simply note that registration does not violate the Second Amendment.  But because the Court was concerned with the character of the weapon, it is apparent that its overarching concern was whether the weapon was of a type which could constitutionally be subjected to registration.

---

[9]26 U.S.C. § 1132d required registration of the firearm, including the registrant's name, address, place of storage, and place of business.  26 U.S.C. § 1132c required a written order to transfer a firearm, including identification of the transferee, fingerprints and photograph, and the identification mark of the firearm.  *Miller*, 307 U.S. at 175 n.1.

[10]"But even as to this class of firearms there is not a word in the National Firearms Act which expressly prohibits the obtaining, ownership, possession or transportation thereof by anyone if compliance is had with the provisions relating to registration, the payment of taxes, and the possession of stamp-affixed orders . . . ."  Brief for the United States, *United States v. Miller*, O.T. 1938, No. 696, at 6-7.

*Heller* read *Miller* to hold that "the Second Amendment right . . . extends only to certain types of weapons," those that are commonly possessed, and not to "only those weapons useful in warfare." *Id*. at 2815. The latter "would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on machineguns . . . might be unconstitutional . . . ." *Id*. What are "the National Firearms Act's restrictions on machineguns"? The Act requires machineguns and other narrowly-defined "firearms" to be registered.[11] *Heller* and *Miller* thus presuppose that requiring registration of commonly-possessed arms would violate the Second Amendment.

*Heller* continues: "We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Id*. at 2815-16. Protect such weapons from what? Registration, as required by the National Firearms Act. The premise of *Miller* and *Heller* alike is that an arm protected by the Second Amendment may not be required to be registered.

### B. A Person May Not Be Required to Register to Exercise a Core Constitutional Right

*Heller* treats the Second Amendment on a par with other constitutional rights. "[I]t has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right." *Heller*, 128 S. Ct. at 2797. *See id*. at 2818 n.27 (rejecting rational-basis test to evaluate regulation of "a specific, enumerated right, be it the freedom of speech . . . or the right to keep and bear arms."). Just as a person may not be required to register to exercise

---

[11]"The Secretary shall maintain a central registry of all firearms in the United States which are not in the possession or under the control of the United States." 26 U.S.C. § 5841(a). See § 5845(a) (restricting definition of "firearm" to machineguns and other narrow classes).

16

religion, to engage in free speech, or to assemble peaceably, a person may not be required to register merely to possess a firearm in his or her home.

"If the exercise of the rights of free speech and free assembly cannot be made a crime, we do not think this can be accomplished by the device of requiring previous registration as a condition for exercising them . . . ." *Thomas v. Collins,* 323 U.S. 516, 539-40 (1945). *See Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 169 (2002) (finding it "unlikely that the absence of a permit would preclude criminals" from violating the law and invalidating a canvassing registration requirement).[12]  Similarly, requiring law-abiding citizens to register firearms does not prevent criminals from committing crimes with unregistered firearms.

### C.  Registration is Not Justified by Any Standard Higher than Rational Basis

"Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home 'the most preferred firearm in the nation to "keep" and use for protection of one's home and family,' . . . . would fail constitutional muster." *Heller*, 128 S.Ct. at 2817-18.  *See id*. at 2818 n.27, 2821 (rejecting rational-basis scrutiny and "a judge-empowering 'interest-balancing inquiry'").

"Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id*. at 2821.  It cannot be imagined that the Americans of the founding generation would have deemed any requirement that all of their firearms be registered with the Crown or, later, any government entity, as consistent with their right to possess firearms, any more than they would have

---

[12]*See also Near v. Minnesota,* 283 U.S. 697, 722 (1931) (rejecting argument for prior restraint based on the possibility that unlicensed speech could "provoke assaults and the commission of crime.").

viewed speaker registration consistent with the right to utter opinions.[13]

Even if a simple registration requirement passed constitutional muster, the District's complex procedures do not.  These onerous requirements appear calculated to discourage persons from registering firearms to begin with and, for those who do so, to snare them with expiration and re-registration deadlines that, if missed, render gun owners into criminal violators and their guns into contraband.

The District requires payment of fees to register, to have pistols ballistically tested, and to re-register.  "A state may not impose a charge for the enjoyment of a right granted by the federal constitution." *Murdock v. Com. of Pennsylvania*, 319 U.S. 105, 113 (1943) (invalidating $7 per week solicitation fee as applied to religious group).[14]  Moreover, the amount of the fees are unconstitutionally "left to the whim of the administrator." *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 133 (1992) (invalidating parade permit fee).

The fees imposed merely to possess a firearm recall the poll taxes of a bygone era.[15] "[W]ealth or fee paying has, in our view, no relation to voting qualifications; the right to vote is too

---

[13]"[T]he project of muffling the press, which was publicly vindicated in this town [Boston], so far as to compel the writers against the government, to leave their names for publication, cannot be too warmly condemned."  "The Scheme of Amendments," *Independent Gazetteer*, March 23, 1789, at 2, col. 1, quoted in S. Halbrook, *That Every Man Be Armed* (1984), 225.

[14]*Murdock* contrasted "a registration system under which those going from house to house are required to give their names, addresses and other marks of identification to the authorities." *Id.* at 113.  While by analogy that may sanction the requirement of a license or registration to carry a firearm in public, it would not sanction the requirement to register in order to exercise a constitutional right in one's home.

[15]Similarly, the testing and training requirements recall the old literacy tests. *See City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 83 (1980) (Stevens, J., concurring) ("practices such as poll taxes or literacy tests that deny individuals access to the ballot").

18

precious, too fundamental to be so burdened or conditioned." *Harper v. Virginia State Board of Elections*, 383 U.S. 663, 670 (1966) (invalidating $1.50 poll tax). The same applies to exercise of the right to keep and bear arms.

### D.  Registration Is Not a Traditional Regulation

*Heller* notes that 19th-century courts "held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues."  128 S. Ct. at 2816.  Moreover, "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 2816-17.  By contrast, registration is not a traditional regulation for mere possession of ordinary firearms in the United States.[16]

A State-by-State survey reveals that no State in the United States imposes requirements as onerous as the District's.[17]  Not a single State requires registration of all firearms, with the sole exception of Hawaii, and even that State does not provide that registrations expire and must be

---

[16]The only historical precedent for registration of firearms relates to machineguns and other narrow classes of firearms. Such registration schemes excluded commonly possessed firearms. The National Firearms Act, 48 Stat. 1236 (1934), was the first such federal law, and similar laws were passed by states beginning in the same era. *See* Uniform Machine Gun Act Drafted by the National Conference of Commissioners on Uniform State Laws (1932), § 4. http://www.cs.cmu.edu/afs/cs/usr/wbardwel/public/nfalist/1932_uniform_machine_gun_act.txt.

[17]*See* Bureau of Alcohol, Tobacco, Firearms & Explosives, *State Laws & Published Ordinances - Firearms*, ATF Pub. 5300.5 (revised 2008) (statutory texts); "State Firearms Laws," Appendix A to Stephen P. Halbrook, *Firearms Law Deskbook: Federal and State Criminal Practice* (Thomson/West Group, 2008) (State-by-State summary).

renewed.[18]  Not a single State requires mandatory training and a written test by the police for the possession of any firearm.

### E.  The District's Registration Provisions Have No Militia Purpose

Traditional militia laws provided for inspection of the arms carried by enrolled militiamen in service, but not for registration of all arms by all persons.  The First Militia Act provided that "every free able-bodied white male citizen" aged 18 to 44 years old shall "be enrolled in the militia." 1 Stat. 271 (1792), cited in *Heller*, 128 S. Ct. at 2800.  Every enrolled militiaman was required to "provide himself with a good musket or firelock."  1 Stat. at 271.  A brigade-inspector had a duty "to inspect their arms" and "to make returns" "reporting therein the actual situation of the arms" to the state adjutant-general.  *Id*. at 273.

Even if registration of one militia arm could be required of a militiaman, the District's registration provisions have no militia purpose.  As Justice Breyer noted in *Heller*:

> The question presented presumes that respondent is "*not* affiliated with any state-regulated militia." . . . I am aware of no indication that the District either now or in the recent past has called up its citizenry to serve in a militia, that it has any inkling of doing so anytime in the foreseeable future, or that this law must be construed to prevent the use of handguns during legitimate militia activities. Moreover, even if the District were to call up its militia, respondent would not be among the citizens whose service would be requested. The District does not consider him, at 66 years of age, to be a member of its militia. See D.C. Code § 49-401 (2001) (militia includes only male residents ages 18 to 45) . . . .

---

[18]Haw. Rev. Stat. § 134-3.  The Hawaiian Supreme Court has held that the Second Amendment does not apply to the States.  *State v. Mendoza*, 82 Hawai'i 143, 146, 920 P.2d 357 (1996).  The court applied the "rational basis" test to uphold, under its State arms guarantee, a conviction for unlawful possession of a firearm without a police permit.  *Id*. at 154.  *Heller* rejects the rational-basis test as applied to the Second Amendment.

*Heller*, 128 S. Ct. at 2861-62 (Breyer, J., dissenting).[19]

*Parker v. District of Columbia*, 478 F.3d 370, 399 (D.C. Cir. 2007), which *Heller* affirmed, suggested in dictum that registration "gives the government information as to how many people would be armed for militia service if called up." However, *Parker* also recognized that registration lacked any militia nexus as applied to persons not in the militia:

> A physically disabled person, for instance, might not be able to participate in even the most rudimentary organized militia. But this person would still have the right to keep and bear arms, just as men over the age of forty-five and women would have that right, even though our nation has traditionally excluded them from membership in the militia.

*Id*. at 399.

In sum, the District's registration provisions, taken as a whole and individually, violate the right to keep and bear arms and are void.

## II.  THE DISTRICT'S PROHIBITION OF COMMONLY-POSSESSED FIREARMS VIOLATES THE SECOND AMENDMENT

As alleged in Count Two of the complaint, the District prohibits two classes of arms or parts thereof which are commonly possessed by law-abiding persons throughout the United States for lawful purposes: firearms the District pejoratively calls "assault weapons," and magazines that have the capacity to accept more than 10 rounds of ammunition.[20] Those provisions, facially and as applied, violate the Second Amendment.

----

[19]The District eschews reliance on a militia power to justify its registration requirements. *See* Brief for Petitioners, *District of Columbia v. Heller*, No. 07-290, at 4, 7 (2008).  Instead, it relies on its authority to make "usual and reasonable police regulations" to regulate firearms.  *McIntosh v. Washington*, 395 A.2d 744, 746, 752 (D.C. 1978) (citing D.C. Code § 1-227, current § 1-303.43).

[20]Court Two also challenged the prohibition on pistols that are not on the California Roster, but the District has ameliorated that prohibition by regulation to the extent that it is now moot.

"The AR-15 is the civilian version of the military's M-16 rifle, and is, unless modified, a semiautomatic weapon. The M-16, in contrast, is a selective fire rifle that allows the operator, by rotating a selector switch, to choose semiautomatic or automatic fire." *Staples v. United States*, 511 U.S. 600, 603 (1994).[21]  Acknowledging "a long tradition of widespread lawful gun ownership by private individuals in this country," *Staples* noted: "Even dangerous items can, in some cases, be so commonplace and generally available that we would not consider them to alert individuals to the likelihood of strict regulation."  *Id*. at 610.  Indeed, as shown above, roughly two million AR-15s have been manufactured for the domestic market.

The term "assault weapon" originally referred to a weapon that fires both fully automatically and semiautomatically.[22] The expired federal law defined the term to include a *short* list of named firearms as well as certain firearms with *two* specified generic characteristics.[23]  The District defines the term to include a *long* list of named firearms as well as certain firearms with *only one* specified generic characteristic.  The term "assault weapon" is thus a classic case of "an Alice-in-Wonderland world where words have no meaning."  *Welsh v. United States*, 398 U.S. 333, 354 (1970) (Harlan, J., concurring).[24]  Pejorative labels aside, the firearms at issue are commonly possessed and are

---

[21]*See Christianson v. Colt Industries Operating Corp*., 486 U.S. 800, 804 (1988) (describing the M-16 *selective fire* rifle as the "standard assault rifle").

[22]"Assault rifles are . . . selective-fire weapons . . . . Assault rifles . . . are capable of delivering effective full automatic fire . . . ."  Harold E. Johnson, *Small Arms Identification & Operation Guide – Eurasian Communist Countries* (Defense Intelligence Agency 1980), p. 105.

[23]Chapter XI, Subchapter A of the Violent Crime Control and Law Enforcement Act of 1994, P.L. 103-322, 108 Stat. 1796 (1994), codified at 18 U.S.C. §§ 921(a)(30), 922(v) (expired 2004).

[24]"Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists to expand the category of 'assault rifles' so as to allow an attack on as many additional firearms as possible on the basis of undefined 'evil'

protected by the Second Amendment.

A State-by-State survey reveals that no State in the United States prohibits possession of what the District labels "assault weapons," with the following four qualifications and exceptions.[25]

California prohibits "assault weapons," but provides some exemptions, including allowing the registration thereof by specified deadlines.  Ca. Penal Code §§ 12280, 12285, 11186.  The ban was upheld under the "collective rights" theory of the Second Amendment.  *Silveira v. Lockyer,* 312 F.3d 1052, 1056 (9th Cir.), *cert. denied*, 540 U.S. 1046 (2003).  That theory was rejected in favor of the individual rights interpretation.  *Heller, passim.*

Connecticut defines "assault weapon" generically to require two specified features, rather than only one as does the District.  Conn. Gen. Stat. § 53-202a(a)(3).  It allows possession of such firearms under several circumstances, including possession of any such firearm which was manufactured before 1994.  *Id*. §§ 53-202d, -m, -n, -o.

New Jersey defines "assault firearm" primarily by name, not generically.  N.J. Rev. Stat. § 2C:39-1w.  Assault firearms "used for legitimate target-shooting purposes," including "any . . . assault firearm used in competitive shooting matches sanctioned by the Director of Civilian Marksmanship," § 2C:58-12a, could be registered if purchased by a certain deadline by a member of a rifle or pistol club.  § 2C:58-12b.

New York defines "assault weapon" generically to require two specified features, rather than

---

appearance." *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting) (citation omitted).

[25] *See* Bureau of Alcohol, Tobacco, Firearms & Explosives, *State Laws & Published Ordinances - Firearms*, *supra* (statutory texts); "State Firearms Laws," Appendix A to Halbrook, *Firearms Law Deskbook*, *supra* (State-by-State summary).

only one as does the District.  N.Y. Consl. Laws § 265(22).  It excludes from the definition any firearm lawfully possessed before 1994.  § 265(22)(e)(v).[26]

Of the above four States, all allow some form of registration of "assault weapons," however limited.  Two of them exempt any firearm made before 1994.  Only California defines the term as broadly as the District to include only one specified generic feature.

"The term ['Arms'] was applied, then [18th Century] as now, to weapons that were not specifically designed for military use and were not employed in a military capacity."  *Heller*, 128 S. Ct. at 2791.  "Just as the First Amendment protects modern forms of communications, . . . and the Fourth Amendment applies to modern forms of search, . . . the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."  *Id*. at 2791-92.

*Miller* held that judicial notice could not be taken that a short-barreled shotgun "is any part of the ordinary military equipment," precluding it from deciding "that the Second Amendment guarantees the right to keep and bear such an instrument." *Miller*, 307 U.S. at 178 (quoted in *Heller*, 128 S. Ct. at 2814).  *Heller* explains:

> We think that *Miller*'s "ordinary military equipment" language must be read in tandem with what comes after: "[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." 307 U.S., at 179, 59 S.Ct. 816. The traditional militia was formed from a pool of men bringing arms "in common use at the time" for lawful purposes like self-defense. . . . We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.

*Id*. at 2815-16.

---

[26]Massachusetts defines and restricts a "large capacity weapon," but "any person" is eligible to obtain a license. M.G.L., Ch. 140 § 121 (definition), 131 (license).

*Heller* adds that "the sorts of weapons protected were those 'in common use at the time.' . . . We think that limitation is fairly supported by the historical tradition of prohibiting the *carrying* of 'dangerous and unusual weapons.'"[27]  *Id*. at 2817 (emphasis added).  Under this test, the Court suggests that full automatics like the M-16 machinegun may be restricted as may "sophisticated arms that are highly unusual in society at large."  *Id*.  Other than that, *Heller* refers to longstanding restrictions, but none involve a prohibition on firearm possession by law-abiding persons.  *Id*. at 2816-17.

The firearms and firearm parts that the District bans, including "assault weapons" like the AR-15 semiautomatic rifle and magazines holding over ten rounds, are very much in "common use" and are quite "usual." Millions of such items are possessed by millions of Americans for lawful purposes, including self-defense, hunting, competition, target shooting, and collecting.[28]  Nor does this case pose any question of *carrying* firearms.

*Heller* found: "The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose [self-defense]."  *Id*. at 2817. "It is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.,* long guns) is allowed."  *Id*. at 2818.  Moreover, "handguns are the

---

[27]*Heller* cites, *inter alia*,  4 Blackstone 148-149 (1769) ("The offense of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land");  *O'Neill v. State*, 16 Ala. 65, 67 (1849) ("if persons arm themselves with deadly or unusual weapons for the purpose of an affray, and in such manner as to strike terror to the people, they may be guilty of this offence, without coming to actual blows").  The offense thus involved "going armed" with such weapons to terrify others, not on possessing them in the home.

[28]Protected arms are those that "are commonly kept and used by law-abiding people for hunting purposes or for the protection of their persons and property, such as semi-automatic shotguns, semi-automatic pistols and rifles."  *Rinzler v. Carson*, 262 So. 2d 661, 666 (Fla. 1972).

25

most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Id.* The same reasoning applies here.

*Parker*, which *Heller* affirmed, applied *Miller*'s "common use" test and found that "most handguns (those in common use) fit that description then and now." *Parker*, 478 F.3d at 397 (citing *Emerson,* 270 F.3d at 227 n.22). *Emerson* "assum[ed] that a Beretta pistol passed the *Miller* test." *See id.* at 216, 273 (describing a Beretta 9mm semiautomatic pistol). The Beretta M9, used by the U.S. military, has a 15-shot magazine. UMF 36. *Parker* rejected the suggestion "that only colonial-era firearms (e.g., single-shot pistols) are covered by the Second Amendment," which instead "protects the possession of the modern-day equivalents of the colonial pistol." 478 F.3d at 398.

"The modern handgun – and for that matter the rifle and long-barreled shotgun – is undoubtedly quite improved over its colonial-era predecessor, but it is, after all, a lineal descendant of that founding-era weapon, and it passes *Miller* 's standards." *Parker*, 478 F.3d at 398. The Act here bans many such rifles and shotguns as well as ordinary magazines for rifles and pistols.

The Act's prohibition on numerous firearms and magazines cannot be defended on the basis that it does not prohibit others:

> The District contends that since it only bans one type of firearm, "residents still have access to hundreds more," and thus its prohibition does not implicate the Second Amendment because it does not threaten total disarmament. We think that argument frivolous. It could be similarly contended that all firearms may be banned so long as sabers were permitted. Once it is determined – as we have done – that handguns are "Arms" referred to in the Second Amendment, it is not open to the District to ban them.

*Parker* at 400.

In sum, the Act prohibits "assault weapons" and magazines holding more than ten cartridges, which are "widely owned by private citizens today for legitimate purposes. The growth in popularity

26

of the AR-15 and similar carbines (*i.e.*, compact rifles) for self-defense, hunting, and target shooting

has attracted national media attention." Michael P. O'Shea, "The Right to Defensive Arms after

*District Of Columbia v. Heller*," 111 W. Va. L. Rev. 349, 388 (Winter 2009). As O'Shea concluded:

> These rifles usually come equipped with standard, detachable magazines
> holding twenty to thirty rounds. . . . Their modern features . . . may appear startling
> to those unfamiliar with firearms or the American gun culture. But that cannot
> change the fact that the arms are indeed "in common use" at this time for a broad
> range of legitimate purposes. . . . These arms, too, should be deemed constitutionally
> protected against federal prohibition or restrictions that would cripple their
> effectiveness.

*Id.* at 389.

### III.  THE RESTRICTIONS ARE NOT AUTHORIZED BY D.C. CODE § 1-303.43

Count Three of the complaint alleges that the provisions at issue are not authorized by

Congress.  Congress empowered the District to regulate firearms in D.C. Code § 1-303.43, which

provides:

> The Council of the District of Columbia is hereby authorized and empowered
> to make, and the Mayor of the District of Columbia is hereby authorized and
> empowered to enforce, all such usual and reasonable police regulations, in addition
> to those already made under §§ 1-303.01 to 1-303.03 as the Council may deem
> necessary for the regulation of firearms,  projectiles, explosives, or weapons of any
> kind in the District of Columbia.

The provisions of the D.C. Code alleged to infringe on Second Amendment rights in Counts

One and Two above are not "usual and reasonable police regulations" which could be "deem[ed]

necessary for the regulation of firearms."  Such provisions do not exist in the laws of the United

States and are non-existent or extremely unusual in the laws of the States.  Accordingly, such

provisions are not authorized by § 1-303.43 and are beyond the District's power to enact.

Section 1-303.43 defines and limits the Council's power to regulate firearms. "The Council

shall have no authority to pass any act contrary to the provisions of this chapter except as specifically provided in this chapter . . . ."  D.C. Code § 1-206.02.

The Firearms Registration Amendment Act of 2008, § 2, declares that "The Firearms Control Regulations Act of 1975 . . . is amended as follows," following which are the provisions at issue here.  Section 1-303.43 was "the section on which the Council relied for its authority to enact the Firearms Act [of 1975]."  *McIntosh v. Washington*, 395 A.2d 744, 750 n.11 (D.C. 1978).[29]  Thus, the 2008 Act is valid only if consistent with § 1-303.43.

The requirement that firearm regulations be "usual and reasonable" must be given meaning and may not be treated "essentially as surplusage – as words of no consequence."  *Ratzlaf v. United States*, 510 U.S. 135, 140-41 (1994).  *See United States v. Hart*, 324 F.3d 740, 746 (D.C. Cir. 2003) ("all words in a statute are to be assigned meaning").

The provisions at issue are not "usual," which means "such as is in common or ordinary use; such as is most often seen, heard, used, etc."[30]  *Webster's New World Dictionary* (1991), at 1470.  As shown above, under the laws of the United States and of virtually every State in the Union, a law-abiding citizen may possess a firearm without being subjected to onerous registration and re-registration provisions like those imposed by the District.  *See Staples,* 511 U.S. at 613-14 ("owning

---

[29]The District's authority to regulate firearms subject to § 1-303.43 was previously recognized in *Maryland & D.C. Rifle & Pistol Ass'n v. Washington*, 442 F.2d 123 (D.C. Cir. 1971).  Neither case considered the validity of specific provisions of the laws at issue.

[30]The terms entail comparison with other subjects of like kind.  *E.g.*, *Ullman v. District of Columbia*, 21 App.D.C. 241 (1903) ("To keep a record of transactions is now usual, we may say, almost universal, in all classes of business"); *Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. District of Columbia*, 919 F.2d 148, 150 (D.C. Cir. 1990) (factors were "usual and reasonable" where group given permit to march "on grounds traditionally made available to permit holders"); *District of Columbia v. John R. Thompson Co., Inc.*, 346 U.S. 100, 114 (1953) (anti-discrimination law valid as "reasonable and usual police regulation" of restaurants).

28

a gun is usually licit and blameless conduct.  Roughly 50 percent of American homes contain at least

one firearm").  The United States and all but a tiny handful of States allow possession of the firearms

that the District bans.

By contrast, "unusual" – such as used in the Eighth Amendment's prohibition on "cruel and

unusual punishment" – means "such as does not occur in ordinary practice" or "is not common use."

*Harmelin v. Michigan*, 501 U.S. 957, 976 (1991) (citing dictionaries) (brackets eliminated).

Mandatory penalties "are not unusual in the constitutional sense, having been employed in various

forms throughout our Nation's history. . . . They were also common in the several States . . . ."  *Id.*

at. 994-95.  That could not be said about the District's firearm prohibitions.[31]

Nor are the District's prohibitions "reasonable."  That term too must be given meaning, as

it has elsewhere in the law.  *E.g.*, U.S. Const., Amend. IV (right against "unreasonable searches").

Each one of the prohibitions at issue, when viewed in its particulars, is unreasonable.  For instance,

given that a registrant is required to notify the Chief if a firearm is no longer in the District, the

expiration/re-registration requirements every three years are unreasonable.  Only a handful of states

ban "assault weapons," but even those states allow at least limited registration and possession

thereof.

The provisions at issue would not have been understood by Congress as being "reasonable."

---

[31]By contrast, the death penalty was held cruel and unusual for child rape where 44 States did not authorize it, and as applied to the mentally retarded and juveniles where 30 States did not authorize it.  *Kennedy v. Louisiana*, 128 S.Ct. 2641, 2652, 2653 (2008).  The provisions of the District's firearms prohibitions are issue are far more "unusual," in that they exist in no, or almost no, States, depending on the specific prohibition.

Historically, Congress has passed laws against firearm bans as a civil rights violation,[32] prohibited

construction of a law to authorize firearm registration,[33] declared against undue burdens on firearm

owners,[34] and passed legislation to ensure the availability of firearms to consumers.[35]

Two acts of Congress are of particular note in demonstrating that the District's registration

scheme is not usual and reasonable.  First, the Firearms Owners' Protection Act recognized "the

rights of citizens . . . to keep and bear arms under the second amendment to the United States

Constitution." §1(b), P.L. 99-308, 100 Stat. 449 (1986).  Accordingly, it enacted 18 U.S.C. § 926(a)

as follows:

> No such rule or regulation prescribed after the date of the enactment of the Firearms
> Owners' Protection Act may require that records required to be maintained under this
> chapter or any portion of the contents of such records, be recorded at or transferred

---

[32]To counteract the southern Black Code prohibitions on possession of firearms by newly freed slaves, the Freedmen's Bureau Act declared: "the right . . . to have full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and [estate], including the constitutional right to bear arms, shall be secured to and enjoyed by all the citizens . . . ."  § 14, 14 Stat. 173, 176-77 (1866).

[33]When the Nazi threat arose, Congress prohibited preparedness legislation from being construed "to authorize the requisitioning or require the registration of firearms possessed by any individual for his personal protection or sport (and the possession of which is not prohibited or the registration of which is not required by existing law)," or "to impair or infringe in any manner the right of any individual to keep and bear arms."  Property Requisition Act, P.L. 274, 55 Stat., pt. 1, 742 (1941).

[34]In regulating commerce in firearms, Congress declared that "it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms" and "this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes."  Gun Control Act, § 101, P.L. 90-618, 82 Stat. 1214 (1968).

[35]The Protection of Lawful Commerce in Arms Act was passed in part "to preserve a citizen's access to a supply of firearms and ammunition for all lawful purposes, including hunting, self-defense, collecting, and competitive or recreational shooting." § 2(b)(2), P.L. 109-92, 119 Stat. 2095 (2005).

to a facility owned, managed, or controlled by the United States or any State or any political subdivision thereof, nor that *any system of registration of firearms, firearms owners*, or firearms transactions or dispositions be established.  (Emphasis added.)

Secondly, in establishing the National Instant Criminal Background Check System (NICS), § 103(i) of the Brady Handgun Violence Prevention Act, P. L. 103-159, 107 Stat. 1536 (1993), provided:

> No department, agency, officer, or employee of the United States may –
> (1) require that any record or portion thereof generated by the system established under this section be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or political subdivision thereof; or
> (2) use the system established under this section to establish *any system for the registration of firearms, firearm owners*, or firearm transactions, except with respect to persons, prohibited by section 922(g) or (n) of title 18, United States Code or State law, from receiving a firearm.  (Emphasis added.)

Under both of the above enactments, Congress strictly forbade any firearm registration system.  Further, any records generated on firearm owners, such as in the course of background checks, were prohibited from being transferred to any government entities, which would include the District.  The background check records themselves are required to be destroyed.  18 U.S.C. § 922(t)(2)(C).

Finally, the provisions at issue are not "usual and reasonable" given that "the right to defend oneself from a deadly attack is fundamental," *United States v. Panter*, 688 F.2d 268, 271 (5th Cir. 1982), and that the District has "no general duty to provide . . . police protection, to any particular individual citizen."  *Warren v. District of Columbia*, 444 A.2d 1, 3 (D.C. 1981) (women raped and assaulted despite repeatedly calling police).

"If it be shown and determined that the regulations, or any material parts thereof, are unusual *or* unreasonable, they would be inoperative and void, to the extent that they are so unusual or

unreasonable, because, in such case they would not be within the power delegated by Congress."

*Moore v. District of Columbia*, 12 App. D.C. 537, 540 (1898) (emphasis added).[36]

Accordingly, the prohibitions at issue, being neither usual nor reasonable, are not authorized

by D.C. Code § 1-303.43 and are thus void.

## CONCLUSION

The Court should grant summary judgment in favor of plaintiffs.

Date: July 31, 2009

Respectfully Submitted,


/s/ Stephen P. Halbrook
STEPHEN P. HALBROOK, D.C. Bar No. 379799


/s/ Richard E. Gardiner
RICHARD E. GARDINER, D.C. Bar No. 386915
3925 Chain Bridge Road, Suite 403
Fairfax, VA  22030
(703) 352-7276

Counsel for Plaintiffs

---

[36] *See Reynolds v. District of Columbia*, 614 A.2d 1285, 1288-89 (D.C. 1992) (holding regulation not to be "a reasonable regulation designed to control traffic"); *La Forest v. Board of Commissioners of the District of Columbia*, 92 F.2d 547, 549-50 (D.C. Cir. 1937) ("if such a case [of unreasonable regulations] should arise the right of review by this court insures protection against such abuse of power"); *Crane v. District of Columbia*, 289 F. 557, 560-61 (D.C. App. 1923) (ban on unlicensed vendors selling goods at public places held "unusual and unreasonable").