UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                      )
DICK ANTHONY HELLER, *et al.*              )
                                                      )
                              Plaintiffs,        )
                                                      )
                   v.                              )          Civil Action No. 08-01289 (RMU)
                                                      )
DISTRICT OF COLUMBIA, *et al.*,           )
                                                      )
                              Defendants.      )
_____)

<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Fed. R. Civ. P. 56(b), defendants (collectively, "the District") hereby move this Honorable Court for summary judgment on the claims in this consolidated matter.

The grounds and the reasons are set forth more fully in the accompanying Memorandum of Points and Authorities and proposed Order. As required by LCvR 56.1, a Statement of Material Facts As to Which There is No Genuine Issue ("SMF") has been provided.

The Court should grant summary judgment to the District, because its regulation of firearms does not violate either the Second Amendment or *Heller v. District of Columbia*, ___ U.S. ___, 128 S. Ct. 2783 (Jun. 26, 2008). "Like most rights, the right secured by the Second Amendment is not unlimited. [T]he right [i]s not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id*. at 2816.

The District firearms scheme is squarely in the mainstream and is eminently reasonable, minimally intruding on the right announced in *Heller* to bear arms for the protection of "hearth and home," *id*. at 2821, while at the same time attempting to safeguard public safety under traditional police powers.

As the Supreme Court has indicated, *see id.* at 2822, there are a variety of viewpoints expressed on this important issue, which result in a range of attempted solutions to the serious problem of gun violence. The District's reasonable attempts to accommodate all concerns should be accorded the deference they deserve, and accordingly upheld.

DATE: August 5, 2009                     Respectfully submitted,

                                         PETER J. NICKLES
                                         Attorney General for the District of Columbia

                                         GEORGE C. VALENTINE
                                         Deputy Attorney General, Civil Litigation Division

                                         _____/s/ Ellen A. Efros_____
                                         ELLEN A. EFROS, D.C. Bar No. 250746
                                         Chief, Equity Section I
                                         441 Fourth Street, N.W., 6th Floor South
                                         Washington, D.C. 20001
                                         Telephone: (202) 442-9886
                                         Facsimile: (202) 727-0431

                                         _____/s/ Andrew J. Saindon_____
                                         ANDREW J. SAINDON, D.C. Bar No. 456987
                                         Assistant Attorney General
                                         Equity I Section
                                         441 Fourth Street, N.W., 6th Floor South
                                         Washington, D.C. 20001
                                         Telephone: (202) 724-6643
                                         Facsimile: (202) 727-0431
                                         andy.saindon@dc.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

DICK ANTHONY HELLER, *et al.*                )
                                             )
              Plaintiffs,                    )
                                             )
       v.                                    )        Civil Action No. 08-01289 (RMU)
                                             )
DISTRICT OF COLUMBIA, *et al.*,              )
                                             )
              Defendants.                    )
_____)

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants (collectively, "the District"),[1] pursuant to Fed. R. Civ. P. 56(b), move this Court for summary judgment. This memorandum of points and authorities is provided in support of the defendants' dispositive motion in accordance with LCvR 7.1(a). As required by LCvR 56.1, a Statement of Material Facts As to Which There is No Genuine Issue ("SMF") has been provided, as well as an Appendix ("Appx") with the challenged portions of District law, and selected examples of similar provisions from other jurisdictions.

I. Factual and Procedural Background

In *District of Columbia v. Heller*, ___ U.S. ___, 128 S. Ct. 2783 (Jun. 26, 2008) ("*Heller*"), the Supreme Court concluded that the Second Amendment protects the right to possess a firearm for the purpose of self-defense within the home and invalidated two provisions

---

[1]        Defendants in No. 08-1289 are the District of Columbia and the Mayor, the Honorable Adrian M. Fenty. Defendants in No. 09-454 are the District of Columbia and Cathy Lanier, Chief of the Metropolitan Police Department ("MPD"). On August 5, 2009, plaintiffs in No. 09-0454 voluntarily dismissed their suit.

of the District's Firearms Control Regulations Act of 1975 ("1975 Act"), D.C. Law 1-85, *codified as amended at* D.C. Official Code § 7-2501.01 *et seq.* (2001 ed.): the District's ban on handguns and the "safe storage" provision. *Heller*, 128 S.Ct. at 2818; SMF ¶ 1. The Court ruled out "rational basis" review but otherwise declined to establish a level of scrutiny for examining firearms regulation under the Second Amendment. *Heller*, 128 S.Ct. at 2817–18 & n.27; SMF ¶ 5.

The Court confirmed that the Second Amendment has various limits. "[T]he Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 128 S.Ct. at 2816 (citing *United States v. Miller*, 307 U.S. 174 (1939)); SMF ¶ 2. "Like most rights, the right secured by the Second Amendment is not unlimited [and] not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 128 S.Ct. at 2816; SMF ¶ 3. The Court explicitly noted that it was *not* exhaustively analyzing the scope of any right guaranteed by the Second Amendment, but did reaffirm "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools or government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 128 S.Ct. at 2816–17 & n.26; SMF ¶ 4. The Court also acknowledged the "problem of handgun violence in this country," and that "[t]he Constitution leaves the District of Columbia a variety of tools for combating that problem . . . ." *Heller*, 128 S.Ct. at 2822; SMF ¶ 6.

A. <u>District Law After Heller</u>

In response to *Heller*, the Council of the District of Columbia acted swiftly to amend the District's gun laws, adopting a number of emergency and temporary measures to bring the

District into compliance. *See* Council of the District of Columbia, Committee on Public Safety and the Judiciary, Report on Bill 17-843, the "Firearms Control Amendment Act of 2008," November 25, 2008, at 2 ("Comm. Rep.") (*available online at* http://www.dccouncil.washington. dc.us/images/00001/20090513152155.pdf (as of July 22, 2009)); SMF ¶ 7.

The Council held a number of public hearings on amending the District's gun laws, "in order to receive as much public comment as possible . . . ." Comm. Rep. at 3; SMF ¶ 8. The Council heard from dozens of witnesses, including two of the instant plaintiffs and their counsel, and defendant Cathy Lanier, Chief of the MPD. Comm. Rep. at 11–12; SMF ¶ 8. It used such testimony to help craft "laws that reflect standard gun safety practices." Comm. Rep. at 2.

The Council's actions culminated in the Firearms Registration Amendment Act of 2008, Act 17-708 ("the Act"), which was passed unanimously and signed by the Mayor on January 28, 2009. *See* 56 D.C. Reg. 1380 (Feb. 13, 2009); SMF ¶ 10.[2] The Act was transmitted to Congress for review about February 10, 2009. 155 Cong. Rec. S2319-05 (Feb. 13, 2009). After Congress did not disapprove the Act, the law became effective on March 31, 2009. *See* 56 D.C. Reg. 3438 (May 1, 2009); SMF ¶ 11. The Act did many things not at issue here, including allowing the registration of most semi-automatic handguns and rifles. Comm. Rep. at 2; SMF ¶ 9. The provisions at issue concern the following:

*Registration*

The Act leaves in place the longstanding requirement that firearms be registered. D.C. Official Code §§ 7-2502.01 *et seq*. The Council noted that several States and many major cities

---

[2]     Some provisions of the 1975 Act were amended or repealed by earlier emergency or temporary legislation, and unchanged by the current Act, but are nevertheless challenged here. For ease of reference, the District will refer only to the law as currently codified.

have long required registration of some or all firearms. Comm. Rep. at 3 (citing Legal Community Against Violence, *Regulating Guns in America: An Evaluation and Comparative Analysis of Federal, State and Selected Local Gun Laws* (Feb. 2008) ("LCAV") at 190).[3]

> The Committee believes that the District must maintain a strong firearms' [sic] registration law because it is part of a sound gun policy. Registration is critical because it: gives law enforcement essential information about firearm ownership, allows officers to determine in advance whether individuals involved in a call may have firearms, facilitates the return of lost or stolen firearms to their rightful owners, assists law enforcement in determining whether registered owners are eligible to possess firearms or have fallen into a prohibited class, permits officers to charge individuals with a crime if an individual is in possession of an unregistered firearm, and permits officers to seize unregistered weapons.

Comm. Rep. at 3–4. Chief Lanier testified in favor of registration requirement:

> I think that the registration process for firearms is vital and enhances public safety. It enables MPD to verify eligibility through a local background check, a process that has been found to reduce homicide rates. It also provides an opportunity to educate registrants about vital laws, responsibilities, and safety. The registration certificate helps MPD to identify illegal firearms . . . .

*Hearing on the Firearms Control Amendment Act of 2008 Before the Council of the District of Columbia Committee on Public Safety & the Judiciary* (Oct. 1, 2008) (Testimony of Cathy L. Lanier, Chief of Police) at 5 (attached to the Committee Report).

*Ballistics*

The Act requires applicants to transport a firearm submitted for registration to MPD for a ballistics identification procedure.[4] D.C. Official Code §§ 7-2502.03(d), 7-2502.04(c); 24 DCMR

---

[3]     Jurisdictions requiring some form of registration include Hawaii, California, Connecticut, Maryland, New Jersey, Louisiana, Chicago, Cleveland, New York City, and Omaha. LCAV at 262. Many other cities also have registration requirements. *See* Appx at 10–12.

[4]     "All firearms leave unique markings on the bullets and shell casings they fire. Ballistic identification laws enable law enforcement to link bullets and shell casings recovered at crime scenes to the firearm that fired them by test firing the firearm." Comm. Rep. at 5. The Act

§ 2320.3(g); 24 DCMR § 2399.1. MPD will test fire all weapons submitted for registration, and retain ballistics information in the form of expended casings. Comm. Rep. at 6. Chief Lanier also testified in favor of the ballistics testing requirements: "ballistics testing can help MPD to investigate and solve crimes." Testimony of Chief Lanier at 5.

*Assault Weapons*

The Act prohibits the registration or possession of assault weapons, *i.e.*, "military-style weapons made for offensive military use. They are designed with military features to allow rapid and accurate spray firing. They are not designed for sport, but to kill people quickly and efficiently." Comm. Rep. at 7. The Act, like the previous federal ban, *see* 34–35, *infra*, prohibits the ownership or possession of certain models and variations of assault weapons by name, and also has a "feature test" provision, banning other weapons having certain military-style features. *Cf.* D.C. Official Code § 7-2501.01(3A)(A). *Cf.* 18 U.S.C. § 921(a)(30) (repealed 2004).[5] As the Council explained:

> The proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens of the District. Assault weapons are military-style weapons of war, made for offensive military use. The Committee concurs with the federal Bureau of Alcohol, Tobacco, Firearms and Explosives' (ATF) description

---

also requires that, beginning on January 1, 2011, semi-automatic pistols manufactured in the District or sold by a District firearms dealer are "microstamp-ready." D.C. Official Code § 7-2505.03. Microstamping technology engraves microscopic markings on the internal parts of a firearm, so that when the arm is fired, those markings are stamped onto the expended cartridge, allowing law enforcement to identify the make, model, and serial number of the weapon. *See* Comm. Rep. at 5–6.

[5]     The Act exempts from the definition of assault weapon "antique firearms" and certain pistols "designed expressly for use in Olympic target shooting events." D.C. Official Code § 7-2501.01(3A)(B). The Act's definition also incorporates the assault weapons named in the Assault Weapon Manufacturing Strict Liability Act of 1990, D.C. Official Code § 7-2551.01 *et seq.* (2008 Repl.).

of assault weapons as "mass produced mayhem," and ATF's finding that assault weapons are disproportionately likely to be used by criminals. [A]ssault weapons have no legitimate use as self-defense weapons, and would in fact increase the danger to law-abiding users and innocent bystanders if kept in the home or used in self-defense situations.

Comm. Rep. at 7 (citations omitted).

"Assault weapons are preferred by terrorists, and would pose extraordinary risks to citizens, government officials, visiting dignitaries, and law enforcement if they were allowed in the District of Columbia." *Id*. at 7–8.[6] Such weapons "are a minute fraction of the firearms available in the United States, they have never been in common use, they are dangerous and unusual, and they pose an especial problem for public safety in the nation's capital." *Id*. at 8.[7] *See also District of Columbia v. Beretta, U.S.A., Corp.*, 872 A.2d 633, 651 (D.C. 2005), *cert. denied*, 546 U.S. 928 (2005) (assault weapons are "a class of weapons [that the Council] found have little

---

[6]     *See also Hearing on the Impact of Proposed Legislation on the District of Columbia's Gun Laws Before the House Comm. on Oversight & Government Reform* (Sept. 9, 2008) (Testimony of Cathy L. Lanier, Chief of Police) at 2:

> [P]rotecting government officials and infrastructure is a challenge for every city in the United States. But in Washington, DC, the likelihood of attack is higher, and the challenges to protecting the city are greater.
>
> [I]n attempted and successful assassinations around the world, the first step in attacking a motorcade is frequently to take out the security detail with semi-automatic and automatic firearms.
>
> [I]magine how difficult it will be for law enforcement to safeguard the public, not to mention the new President at the Inaugural Parade, if carrying semi-automatic rifles were to suddenly become legal in Washington.

*Id*. (a copy of Chief Lanier's congressional testimony is also attached to the Committee Report).

[7]     The Committee noted that it adopted language from California, one of seven states currently banning assault weapons. *Id*. (citing also New Jersey, Hawaii, Connecticut, Maryland, Massachusetts, and New York). *See also* LCAV at 259. A number of major cities also ban assault weapons, including Boston, Chicago, Cleveland, Columbus, New York City, and Denver. *See* Appx. at 24–30.

or no social benefit but at the same time pernicious consequences for the health and safety of District residents and visitors").

The Act also prohibits possession or sale of "large capacity ammunition feeding devices . . . to prevent the ability of an individual to fire a large quantity of ammunition without having to pause to reload." Comm. Rep. at 2; D.C. Official Code § 7-2506.01(b).[8]

> [T]he Committee agrees with the Chief of Police that the 2 or 3 second pause to reload can be of critical benefit to law enforcement, and that magazines holdings over 10 rounds are more about firepower than self-defense. Limiting fire power and desiring to advantage the police, especially given homeland security issues in the District, the Committee recommends the ban on extended clips.

Comm. Rep. at 9.

*Unsafe Handguns*

The Act also prohibited the sale, transfer, ownership, or possession of "unsafe pistols," statutorily defined by reference to the "California Roster" in California Penal Code § 12131. D.C. Official Code § 7-2505.04.[9] The Act authorizes the Chief to revise, by rule, the roster of approved handguns. D.C. Official Code § 7-2505.04(f). On June 17, 2009, the Chief accordingly adopted emergency regulations establishing the District Roster of Handguns Determined Not to

---

[8]     A "large capacity ammunition feeding device" is a device "that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition." *Id*., § 7-2506.01(b). The Act's drafters "borrow[ed] language from the now-lapsed federal assault weapons ban and current California law." Comm. Rep. at 9.

[9]     California law prohibits the manufacture or sale of handguns within the State unless the handgun has passed a series of firing, safety, and drop tests. *See* CAL. PENAL CODE § 12130. *See also, e.g., Fiscal v. City & County of San Francisco*, 158 Cal.App.4th 895, 912, 70 Cal.Rptr.3d 324, 336 (Cal.Ct.App., 1st Div. 2008) (discussing California Unsafe Handgun Act, enacted to regulate "low cost, cheaply made handguns"; "one of the goals of the UHA included curbing handgun crime, as well as promoting gun safety.").

be Unsafe ("District Roster"). *See* 56 D.C. Reg. 4782–4873 (June 19, 2009); SMF ¶ 12.[10] The

regulations include within the District Roster handguns listed on similar rosters from California,

Massachusetts, and Maryland, "unless such pistol is an unregisterable firearm" pursuant to D.C.

Official Code § 7-2502.02. *See* 24 DCMR § 2323.2; SMF ¶ 13. The emergency regulations also

deem included on the District Roster those pistols cosmetically similar to other, listed handguns.

*See* D.C. Official Code § 2323.3; SMF ¶ 13.

> A pistol shall be deemed to be included on the District Roster of Handguns
> Certified for Sale if another pistol made by the same manufacturer is already
> listed and the unlisted pistol differs from the listed firearm only in one or more of
> the following features:
>
> (a)      Finish, including, but not limited to, bluing, chrome-plating, oiling, or
> engraving.
>
> (b)      The material from which the grips are made.
>
> (c)      The shape or texture of the grips, so long as the difference in grip shape or
> texture does not in any way alter the dimensions, material, linkage, or functioning
> of the magazine well, the barrel, the chamber, or any of the components of the
> firing mechanism of the pistol.
>
> (d)      Any other purely cosmetic feature that does not in any way alter the
> dimensions, material, linkage, or functioning of the magazine well, the barrel, the
> chamber, or any of the components of the firing mechanism of the pistol.

D.C. Official Code § 2323.3.

Finally, the regulations also contain provisions allowing an application to register a pistol

not otherwise included on the District Roster and to appeal the denial of any such application. 24

DCMR §§ 2323.4, 2323.5; SMF ¶ 13.

---

[10]      Under District law, emergency regulations are effective immediately, and will
expire in 120 days or the publication of a Final Rulemaking, whichever occurs first. *See* D.C.
Official Code § 2-505(c).

On June 25, 2009, the MPD promulgated additional emergency regulations to "exemp[t] certain single action pistols manufactured before 1985 from the application of section 504 of the Act, and establishes that certain other types of pistols manufactured before 1985 are deemed included on the newly created District Roster of Handguns Determined Not to be Unsafe." *See* 56 D.C. Reg. 5434 (July 3, 2009); SMF ¶ 14. "The rulemaking will make the District's safe gun laws identical to the State of Maryland as to Pre-1985 pistols." 56 D.C. Reg. at 5434.

*Other Provisions*

The Council noted its concern that "the total cost to register a firearm not be unduly burdensome . . . ." Comm. Rep. at 9. Consequently, the legislation emphasized "that the government must hold down the cost to the private citizen." *Id*. Each application for registration is subject to a fee established to "reimburse the District for the cost of services provided . . . ." D.C. Official Code § 7-2502.05(b). The current fee to register a firearm is $13, the fee for the ballistics test is $12, and the fee for fingerprinting (and the FBI background check) is $35. 24 DCMR § 2320. *See also* Metropolitan Police Department, "Firearm Registration: Fee Schedule." *Available online at* http://mpdc.dc.gov/mpdc/cwp/view,a,1237,q,566996.asp (as of August 5, 2009).

The District maintains qualification and information requirements for firearm registration; an applicant must "demonstrate satisfactorily a knowledge of the laws of the District of Columbia pertaining to firearms and, in particular, the safe and responsible use, handling, and storage of the same . . . ." D.C. Official Code § 7-2502.03(a)(10). Applicants must also have "vision better than or equal to that required to obtain a valid driver's license under the laws of the District of Columbia . . . ." *Id.*. § 7-2502.03(a)(11). Applicants are required to complete a

firearms training or safety course taught by a certified instructor, with a minimum of one hour of firing training at a firing range and at least four hours of classroom instruction. *Id.*, § 7-2502.03(a)(13)(A). An applicant must submit his or her pistol for a ballistics identification procedure, provide fingerprints and a photograph, and appear in person to obtain the registration certificate. *Id.*, § 7-2502.03(d), 7-2502.04.

Applicants may not register more than one pistol per 30-day period. *Id.*, § 7-2502.03(e). The Council maintained the one-gun-per-month registration provision because

> Studies show that laws restricting multiple purchases or sales of firearms are designed to reduce the number of guns entering the illegal market and to stem the flow of firearms between states. Jurisdictions with weaker firearms laws may attract gun traffickers who make multiple purchases and resell the guns in jurisdictions with stronger firearms laws. Studies also show that handguns sold in multiple sales to the same individual purchaser are frequently used in crime.

Comm. Rep. at 10.

Registration certificates are good for three years, and may be renewed. D.C. Official Code § 7-2502.07(a). Holders of certificates must notify MPD in writing immediately upon the loss, theft, or destruction of the certificate or the firearm, *id.*, § 7-2502.08(1)(A), and must keep the certificate in his or her possession when in possession of the firearm, and exhibit the certificate upon demand by a law enforcement officer. *Id.*, § 7-2502.08(3).

The Committee on Public Safety and the Judiciary noted its belief that the District's firearms laws "comply with [*Heller*], while at the same time allow[ing] the District to protect its citizens and maximize public safety with reasonable and sensible gun policy." Comm. Rep. at 10.

B. <u>The Challenges</u>

The first suit challenging the District's efforts to comply with *Heller* was filed a month after that decision, two weeks after the District's first emergency legislation. *See* Comm. Rep. at 2. Plaintiffs in No. 08-1289, residents of the District, bring suit under 42 U.S.C. § 1983 and challenge almost every substantive provision of the District's gun laws under the Second Amendment and *Heller*. *See* Second Amended Complaint ("SAC") ¶¶ 68–69.[11] Specifically, in Count One, plaintiffs allege that the following provisions of District law, facially and as applied, are "unnecessary, arbitrary, and capricious":

- the registration requirement (D.C. Official Code §§ 7-2502.01(a), 7-2507.06).
- the requirement to demonstrate knowledge of use, handling, and storage of firearms (*Id*., § 7-2502.03(a)(10)).
- the vision requirement (*Id*., § 7-2502.03(a)(11)).
- the requirement to complete a training or safety course (*Id*., § 7-2502.03(a)(13)(A)).
- the "self-reporting" requirement (*Id*., § 7-2502.03(b)).
- the ballistics testing and fee requirement (*Id*., § 7-2502.03(d)).
- the prohibition on registration of more than one pistol per 30 days (*Id*., § 7-2502.03(e)).
- the submission of fingerprints and photographs, and the personal appearance of the applicant (*Id*., § 7-2502.04).
- the registration fee (*Id*., § 7-2502.05(b)).
- the three-year registration certificate expiration period, and renewal fee (*Id*., §§ 7-2502.07a(a), (f)).
- the requirement of a background check every six years (*Id*., § 7-2502.07a(d)).
- the requirement to exhibit the registration certificate on demand of a law enforcement officer (*Id*., § 7-2502.08(3)).
- fines, revocations, or prohibitions on possession, for violations "or omissions" of the Act (*Id*., §§ 7-2502.08, 7-2502.09(b)).

*See* SAC ¶¶ 71–72.

---

[11]  The District's laws (like most other jurisdictions') contain restrictions on ownership/possession of firearms by certain individuals, including minors, D.C. Official Code § 7-2502.03(a); those convicted of violent, drug-related, or "intrafamily" offenses, *id*., § 7-2502.03(a)(2)–(4); or the insane or "chronic alcoholic[s]." *Id*., § 7-2502.03(a)(5)–(6). Plaintiffs do not challenge these provisions.

In Count Two, plaintiffs challenge the Act's prohibition on certain firearms and magazines. Specifically, plaintiffs allege that the District "prohibits three classes of items which are commonly possessed by law-abiding persons throughout the United States for lawful purposes[,]" SAC ¶ 74, *i.e.*, pistols not listed on the California Roster, assault weapons, and magazines capable of holding more than 10 rounds. *Id*. Plaintiffs assert that these provisions violate the Second Amendment, facially and as applied.

In Count Three, plaintiffs assert that the challenged provisions exceed the Council's authority under D.C. Official Code § 1-303.43, in which Congress authorized the District to make and enforce "all such usual and reasonable police regulations . . . necessary for the regulation of firearms . . . ." SAC ¶ 78.[12]

## II. Summary of Argument

The District's regulation of firearms is subject to "reasonableness" review. The specific provisions challenged survive Second Amendment review, because they have ample permissible applications, and were based, in part, on the collective experiences of many other jurisdictions. The District was well within the authority delegated to it by Congress when it enacted the provisions disputed here.

In enacting those provisions, the Council responded to the dangers posed by handguns, and sensibly concluded that a registration and licensing scheme substantially similar to those currently operating in scores of other jurisdictions would mitigate those potential dangers, while still allowing the exercise of the right enunciated in *Heller*. Because these judgments about how

---

[12] In their Second Amended Complaint, plaintiffs in No. 08-1289 reference no provision of the Constitution other than the Second Amendment, and do not indicate any particular standard of review under which the District's law should be analyzed.

best to protect public health and safety were reasonable and entitled to substantial deference, the Act should be upheld.

Here, the Council reasonably found that it could reduce the tragic harms caused by guns by regulating which weapons are available to District residents, and requiring the registration and licensing of guns, within a system to test for minimal competency in the safe handling of such potentially dangerous items. The Council properly acted to reduce harms while still allowing residents to exercise their Second Amendment rights. Its reasonable legislative judgment should be upheld.

## III. Argument

### A. Summary Judgment Principles and Principles Related to Facial and As-Applied Challenges

While a court "must assume the truth of all statements proffered by the party opposing summary judgment," it need not consider wholly conclusory statements for which no supporting evidence is offered. *Greene v. Dalton*, 164 F.3d 671, 674–75 (D.C. Cir. 1999). It is insufficient, to avoid summary judgment, that some factual issues remain in the case; an issue must be both *genuine* and *material* to preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248 (1986).

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "complete failure of proof concerning an essential element of the non-moving party's case necessarily renders other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Plaintiffs allege that the District's firearms provisions, facially, and as applied to them, violate the Second Amendment and *Heller*. It remains axiomatic that "[a] facial challenge to a legislative Act is . . . the most difficult to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). If the First Amendment is not implicated, a party can demonstrate that a statute is facially invalid *only* by showing that it is unconstitutional in all of its applications. *See, e.g., Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 699–700 (1995). "[A] facial challenge must fail where the statute has a "'plainly legitimate sweep.'" *Washington State Grange v. Washington State Republican Party*, ___ U.S. ___, 128 S. Ct. 1184, 1190 (Mar. 18, 2008) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 739–40 & n.7 (1997) (Stevens, J., concurring in judgments)). *See, e.g., Howerton v. United States*, 964 A.2d 1282, 1288 (D.C. 2009) (rejecting appellant's facial Second Amendment challenge, based on *Heller*, to his conviction under firearms registration and licensing laws); *Sims v. United States*, 963 A.2d 147, 150 (D.C. 2008) (same). "Where, as here, a statute or regulation has some concededly constitutional applications, a successful challenger must demonstrate that the statute is unconstitutional as 'applied to the particular facts of [its] case.'" *Steffan v. Perry*, 41 F.3d 677, 693 (D.C. Cir. 1994) (*en banc*).

## B. Certain of Plaintiffs' Claims are Moot.

After the complaints in these cases were filed, MPD took regulatory action to rectify some of the specific problems alleged by plaintiffs and then invited previously rejected applicants (including plaintiffs here) to reapply for registration. Plaintiffs' requests for declaratory and injunctive relief as to the California Roster are accordingly moot. *See, e.g., Nat'l*

*Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 349-50 (D.C. Cir. 1997) (declaratory and injunctive relief no longer appropriate where "limits" of old legislation were superseded, "and plaintiffs do not contend that these limits continue to have any residual effect.") (citing, *inter alia*, *Diffenderfer v. Central Baptist Church of Miami*, 404 U.S. 412, 414–15 (1972) (declaratory judgment as to constitutionality "is, of course, inappropriate now that the statute has been repealed.").[13]

Plaintiffs' claims as to certain guns are thus moot. *See, e.g., American Historical Ass'n v. Nat'l Archives & Records Admin.*, 516 F. Supp. 2d 90, 105 (D.D.C. 2007) ("in an action requesting injunctive or declaratory relief, such as the instant case, a demonstration of imminent, future injury is required to demonstrate standing.") (citations omitted).


C. The District's Firearms Laws Are Subject to "Reasonableness" Review.

In their now superseded motion for summary judgment, plaintiffs in No. 09-0454 argued that, although the Supreme Court in *Heller* "did not announce a specific standard of review," Mem. at 13, the Second Amendment guarantees a "fundamental right," hence "strict scrutiny" should apply. *Id*. That argument is incorrect as a matter of law. Instead, this Court should apply reasonableness review. Under that level of scrutiny, a firearm regulation should be upheld at least where a legislature has articulated proper reasons for acting, with meaningful supporting evidence, and the regulation or law does not interfere with the "core right" the Second Amendment protects by depriving the people of reasonable means to defend themselves in their homes. In the alternative, intermediate scrutiny at most should apply.

---

[13]     Plaintiffs here, of course, just like the plaintiffs in *Diffenderfer*, remain free to amend their complaint to incorporate any new legislation or regulations, or to bring a new challenge, but neither of those possibilities affects the mootness calculus here. 404 U.S. at 415.

The Supreme Court has never determined—and did not determine in *Heller*—that the right to bear arms is a "fundamental right" under the Constitution. In fact, prior to *Heller*, the federal circuits unanimously found that the right to bear arms under the Second Amendment was *not* fundamental. *See, e.g., Olympic Arms v. Buckles*, 301 F.3d 384, 388–89 (6th Cir. 2002) ("Sixth Circuit precedent does not recognize a fundamental right to individual weapon ownership"); *United States v. Hancock*, 231 F.3d 557, 565–66 (9th Cir. 2000) (same); *Gillespie v. City of Indianapolis*, 185 F.3d 693, 709 (7th Cir. 1999) (finding that the right to possess a firearm is not fundamental); *United States v. Toner*, 728 F.2d 115, 128 (2nd Cir. 1984) ("the right to possess a gun is clearly not a fundamental right"). *Compare Nordyke v. King*, 563 F.3d 439, 457 (9th Cir. 2009) (the right to keep and bear arms "is indeed fundamental"), *vacated pending rehearing* en banc (July 29, 2009), *with NRA v. Chicago*, ___ F.3d ____, 2009 WL 1515443, *3 (7th Cir. June 2, 2009) (disagreeing with *Nordyke*).[14]

The numerous jurisdictions that have concluded that the "right to bear arms" under state constitutions is not a fundamental right have consistently found that such a right "is not absolute and that reasonable regulatory control by the Legislature to promote the safety and welfare of its citizens uniformly has been upheld." *Mosby v. Devine*, 851 A.2d 1031, 1044 (R.I. 2004) (citing cases). The Court here should do the same.

Moreover, "[e]ven in jurisdictions that have declared the right to keep and bear arms to be a fundamental constitutional right, a strict scrutiny analysis has been rejected in favor of a reasonableness test . . . ." *Id.* Strict scrutiny analysis is not always applied to alleged incursions

---

[14]     The Ninth Circuit's panel opinion also found that the Second Amendment is incorporated against the States, a question bypassed by the Supreme Court. *Nordyke*, 563 F.3d at 457; *see Heller*, 128 S.Ct. at 2813 n. 23.
     The Defendants here preserve the argument that the Second Amendment should not apply to the District if it is not incorporated against the States, as the District argued in *Heller*.

on fundamental rights. Adam Winkler, *Fundamentally Wrong About Fundamental Rights*, 23 Const. Comment 227, 232 (2006). For instance, strict scrutiny is not always applied to restrictions on free speech and the free exercise of religion. *Id*. It thus would not necessarily follow that strict scrutiny is always (or even usually) proper under the Second Amendment, even if the right it protects is fundamental. As one court has explained, the constitutional text is subject to a rule of reason because the common law right to self-defense is subject to that rule. *Benjamin v. Bailey*, 662 A.2d 1226, 1232–35 (Conn. 1995).

As noted, the Supreme Court expressly declined to establish what standard of review was appropriate in Second Amendment cases, only ruling out "rational basis" review. *Heller*, 128 S.Ct. at 2817–18 & n.27. The Court found that many traditional types of firearm regulation would pass muster, *id*. at 2816–17 & n.26, but did not establish the standard to be used. As Justice Breyer noted in dissent, strict scrutiny apparently was rejected by the majority:

> Respondent proposes that the Court adopt a "strict scrutiny" test, which would require reviewing with care each gun law to determine whether it is "narrowly tailored to achieve a compelling governmental interest." But the majority implicitly, and appropriately, rejects that suggestion by broadly approving a set of laws—prohibitions on concealed weapons, forfeiture by criminals of the Second Amendment right, prohibitions on firearms in certain locales, and governmental regulation of commercial firearm sales—whose constitutionality under a strict scrutiny standard would be far from clear.

*Heller*, 128 S.Ct. at 2851 (Breyer, J., dissenting) (citations omitted).

Although the Supreme Court has not decided the proper standard of review, the standard has been established in the D.C. Circuit. In the decision affirmed in *Heller*, the Court stated: "The protections of the Second Amendment are subject to the same sort of *reasonable restrictions* that have been recognized as limiting, for instance, the First Amendment." *Parker v. District of Columbia*, 478 F.3d 370, 399 (D.C. Cir. 2007) (emphasis added) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). "[R]easonable regulations" of firearms "promote the

government's interest in public safety consistent with our common law tradition. Just as importantly, however, they do not impair the core conduct upon which the right was premised." *Id.* at 399. Because the Supreme Court's decision did not undercut that portion of the D.C. Circuit's decision, this Court must adhere to it.

Moreover, reasonableness would *still* be the proper standard of review, even if the D.C. Circuit had not so decreed. The rights protected by the Bill of Rights have "from time immemorial been subject to certain well-recognized exceptions arising from the necessities of the case." *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897). There can be little question that preventing crime and promoting public safety are important government goals. *See, e.g., Salerno*, 481 U.S. at 750; *Schall v. Martin*, 467 U.S. 252, 264 (1984).

State courts interpreting right-to-bear-arms provisions in state constitutions thus have uniformly applied a deferential reasonableness standard, in decisions going back decades.[15] It does not appear that *any* state's courts apply strict scrutiny or another type of heightened review to firearms laws. Winkler, *Scrutinizing the Second Amendment*, *supra*, at 686–87. *See, e.g., Bleiler v. Chief, Dover Police Dep't.*, 927 A.2d 1216, 1222 (N.H. 2007) ("We agree with every other state court that has considered the issue: strict scrutiny is not the proper test to apply" and "the New Hampshire state constitutional right to bear arms 'is not absolute and may be subject to restriction and regulation.'") (quoting *State v. Smith*, 571 A.2d 279, 281 (N.H. 1990)); *Mosby*, 851 A.2d at 1044 (strict scrutiny not appropriate; "the right to possess a handgun, whether a fundamental liberty interest or not, is not absolute and subject to reasonable regulation.");

---

[15]     *See* Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich.L.Rev. 683, 686–87 & n.12 (2007) (describing "hundreds of opinions" by state supreme courts with "surprisingly little variation" that have adopted the "reasonableness" standard of review for right-to-bear-arms cases).

*Robertson*, 874 P.2d at 331 (strict scrutiny not appropriate; "The right to bear arms may be regulated by the state under its police power in a reasonable manner."). *Cf. McIntosh v. Washington*, 395 A.2d 744, 756 (D.C. 1978) ("The Supreme Court has indicated that dangerous or deleterious devices or products are the proper subject of regulatory measures adopted in the exercise of a state's 'police powers.'") (citations omitted).

There is similar precedent in the federal courts in addition to the D.C. Circuit's decision in *Parker*. The Ninth Circuit in the now-vacated *Nordyke* panel opinion, 563 F.3d at 460, rejected a challenge to a county ordinance prohibiting possession of firearms on county property, finding that the law "does not meaningfully impede the ability of individuals to defend themselves in their homes with usable firearms, the core of the right as *Heller* analyzed it." As the Supreme Court has long recognized, "not every law which makes a right more difficult to exercise is, *ipso facto*, an infringement of that right." *Planned Parenthood of SE Pa. v. Casey*, 505 U.S. 833, 873 (1992) (joint opinion of O'Connor, Kennedy, & Souter, JJ.). *Cf. United States v. Moore*, ___ F.Supp.2d ___, 2009 WL 1033363, * 3 (W.D.N.C. Apr. 17, 2009) (strict-scrutiny review "not appropriate;" court joins "majority of courts" in using intermediate scrutiny for challenge to federal statute prohibiting convicted felons from possessing firearms); *United States v. Mazzarella*, 595 F.Supp.2d 596, 604 (W.D.Pa. 2009) (strict scrutiny not applicable to challenge of indictment for "knowingly possessing a firearm with an obliterated serial number").

It appears that only one federal or state decision reached after *Heller* has applied strict scrutiny, but it *still* upheld the challenged regulation. *See United States v. Engstrum*, 609 F.Supp.2d 1227, 1231 (D.Utah 2009) (applying strict scrutiny, but rejecting challenge to federal statute prohibiting possession of firearms by those with domestic-violence convictions).

The deference due to legislative judgments inherent in reasonableness review is particularly appropriate given the intensity of views about gun control. As one court explained:

> [M]ost legislation will assert broad safety concerns and broad gun control measures to match, covering both 'good' and 'bad' gun possessors and 'good' and 'bad' guns. Such legislation cannot be narrowly tailored to reach only the bad people who kill with their innocent guns. [D]ue to the intensity of public opinion on guns, legislation is inevitably the result of hard-fought compromise in the political branches. To expect such legislation to reflect a tight fit between ends and means is unrealistic.

*United States v. Miller*, 604 F.Supp.2d 1162, 1172 n.13 (W.D. Tenn. 2009) (quotation marks and citations omitted). Thus, the United States advocated a form of reasonableness review in its *amicus* brief in *Heller*. U.S. Brief at 8, 20–27 ("Under that intermediate level of review, the 'rigorousness' of the inquiry depends on the degree of burden on protected conduct, and important regulatory interests are typically sufficient to justify reasonable restrictions.") (citing *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)).

At most, intermediate scrutiny would be appropriate. To survive intermediate scrutiny, the challenged provision must be substantially related to the achievement of important government interests. *Hutchins v. District of Columbia*, 188 F.3d 531, 541 (D.C. Cir. 1999) (*en banc*) (citing *Craig v. Boren*, 429 U.S. 190, 197 (1976) and *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)). *See also Clark v. Jeter*, 486 U.S. 456, 461 (1988) ("To withstand intermediate scrutiny, a statutory classification must be substantially related to an important government objective.").

D. The District's Regulation of Firearms is Reasonable.

Scores of American jurisdictions regulate firearms with provisions similar (if not identical) to those challenged here. For plaintiffs to claim that they are *all* unreasonable is simply

untenable. *Heller* itself rejected the absolutist view urged by plaintiffs here—that *any* difficulty imposed by the government on the use of *any* firearm infringes the Second Amendment. *Heller*, 128 S.Ct. at 2816. *See, e.g., Nebraska v. EPA*, 331 F.3d 995, 998 (D.C. Cir. 2003) (rejecting facial constitutional challenge statute; plaintiffs "fall well short of satisfying that considerable burden.") (citing and quoting *Salerno*). The District's requirements are no more onerous than those of many other jurisdictions, and are entirely consistent with similar federal law.

*Registration/Licensing*

     *Heller* itself expressly contemplated registration, when it directed the District to register plaintiff's handgun. 128 S.Ct. at 2822. Even assuming the rights guaranteed by the Second Amendment are "fundamental," the act of registration itself, like registering to vote, is not impermissible unless it "severely restrict[s]" the exercise of the right. *Crawford v. Marion County Election Bd.*, ___ U.S. ___, 128 S.Ct. 1610, 1624 (2008) (citing *Burdick*, 504 U.S. at 433–34). The District's registration provisions come nowhere near "severely restricting" the right asserted here.

     Federal law requires applicants to provide substantial personal information to federally licensed firearms dealers prior to the purchase of weapons, to determine if the applicant is ineligible pursuant to 18 U.S.C. § 922. That provision generally prohibits the sale of firearms to minors, convicted felons, the "mentally defective," etc. *Cf.* n.11, *supra*. Applicants must provide, *inter alia*, name, sex, residence address (including county), date and place of birth; height, weight, gender, race, birth date and place of birth, and a "certification" that the applicant is not prohibited from purchasing or receiving the weapon. 27 C.F.R. § 478.124. Applicants must also provide valid, government-issued photo identification, and the dealer then conducts a criminal

background check on the applicant. *See* 18 U.S.C. § 922(t); "Firearms Transaction Record Over-The-Counter," ATF Form 4473 (5300.9) Part I (revised Aug. 2008), United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms & Explosives (*available online at* http://www.atf.gov/forms/pdfs/f4473.pdf).

The Circuit in *Parker* suggested that registration of firearms is a "reasonable restriction." 478 F.3d at 399. Numerous States and cities require registration or licensing for firearms purchase or possession.[16] The National Rifle Association identifies at least 15 States that require a license, permit, or "other prerequisite" to purchase a handgun, and some eight States where registration of handguns or rifles is required. *See* NRA Inst. for Legislative Action, *Compendium of State Firearms Laws* ("NRA Compendium"), and n.9–n.15 (available online at http://www.nraila.org/GunLaws/Federal/Read.aspx?id=74 (as of June 11, 2009)).[17] Such restrictions have long been held to be reasonable. *See, e.g., State v. Mendoza*, 920 P.2d 357, 368 (Haw. 1996) (rejecting challenge to state law requiring permit prior to acquiring firearm, which requirement was "rationally related to the legitimate government interest of ensuring that only those who are mature, law abiding, competent citizens possess firearms."); *Mosher v. Dayton*, 358 N.E.2d 540, 543 (Ohio 1976) (upholding an ordinance requiring identification cards prior to purchase of handguns; "[The ordinance] is no more restrictive than regulations which require application for building permits, drivers' licenses, dog licenses, and many other matters. [A]ny such restriction imposes a restraint or burden upon the individual, but the interest of the governmental unit is, on balance, manifestly paramount.").

---

[16]        *See* Appx. at 7–12; LCAV at 177–195.

[17]        The NRA also identifies 18 States that require records of firearms sales to be reported to State or local government. *Id.*

A registration requirement is, moreover, consistent with the Second Amendment's militia purpose. *See, e.g., Parker*, 478 F.3d at 386–88. The *Heller* Court did not dispute that protection of the militia was at least a central purpose of the Second Amendment. 128 S.Ct. at 2791. Interpreting the Second Amendment to preclude effective militia organization is thus exactly backwards. Knowing the details of *who* can serve in a militia is, of course, the first step in organizing such a body. *See id.* at 2802 ("For Congress retains plenary authority to organize the militia, which must include the authority to say who will belong to the organized force.").


*Fingerprints/Photos*

A number of jurisdictions require the submission of fingerprints and photos for license or registration of non-concealed firearms. *See* GA. CODE ANN. § 16-11-129(c) (fingerprints required for pistol license); HAW. REV. STAT. §§ 134-2 (2008) (applicant for permit to acquire firearm must be fingerprinted and photographed); MASS. GEN. L. ch. 140, § 131(e) (same); N.Y. PENAL LAW § 400.00 (McKinney 2009) (photos and fingerprints required for license to carry, possess, repair, or dispose of firearm); ATLANTA CODE OF ORD. § 106-271 (fingerprint of right hand index finger required for each person purchasing a firearm); N.Y.C. ADMIN. CODE § 10-303 (2008) (fingerprints and photos required for permit for purchase or possession of rifle or shotgun). Just like requiring registration, requiring the fingerprints and photos of applicants for gun registration is a reasonable method to garner important information.


*Testing/Training*

Plaintiffs' allegations that the District's training requirements are "onerous" turns history on its head, as militia service itself was predicated on training. *See Heller*, 128 S.Ct. at 2800,

2802; *Miller*, 307 U.S. at 178–80. Further, the Circuit in *Parker* implicitly approved testing requirements for firearms possession. 478 F.3d at 399 ("Reasonable firearm proficiency testing would . . . promote public safety . . . .").

As with registration and licensing, numerous jurisdictions require some knowledge of the use, handling, or storage of firearms. At least seven states require some proof of safety training prior to purchase of a handgun. *See* NRA Compendium (California, Connecticut, Hawaii, Maryland, Michigan, New York, and Rhode Island); *Mosby*, 851 A.2d at 1048 (upholding Rhode Island's license requirement of a "minimum qualification score."). *See* Appx. at 15–16. *Cf.* DETROIT CODE OF ORD. §§ 38-10-2, 38-10-17.1 (safety training required prior to purchase or registration of handguns); MIAMI-DADE COUNTY, FLA., CODE § 21-20.16 (handgun purchasers must receive safety instruction and demonstrate knowledge of laws by passing written examination). Such requirements have an obvious and direct link to public safety. Nor do they affect the core right protected by the Second Amendment. Rather, if anything, they promote the proper exercise of that right and are eminently reasonable.[18]

*Ballistics*

A number of States require ballistics identification procedures, another reasonable method to collect information that may prove crucial in crime-prevention and law-enforcement efforts. *See* MD CODE ANN., PUB. SAFETY § 5-131 (manufacturer must provide spent casing from all handguns sold, transferred, or rented in State, and dealer must forward to state police on completion of transaction); N.Y. GEN. BUS. LAW § 396-ff (same; state police to maintain

---

[18]    The District is also not alone in imposing a vision requirement for firearms licensing. *See* CHICAGO MUN. CODE § 8-20-060(a)(4) (2008); CICERO, ILL., CODE OF ORD. § 62-262(a)(4) (2008). That requirement too is obviously reasonable on its face.

electronic identification databank). Although plaintiffs challenge the District's ballistics-identification requirement, it is difficult to determine exactly what interest such a requirement infringes, as the requirement has no apparent impact on a gun owner's ability to defend his or her home or family.

*Multiple Guns*

Similarly, several States and cities restrict the number of firearms that may be purchased or registered in a given time period. *See, e.g.*, NRA Compendium (California (10 days), Connecticut (14 days), Minnesota, and Rhode Island (7 days)); LCAV at 134–142; MD CODE ANN., PUB. SAFETY, § 5-128(b) (2008) (person may not purchase more than one "regulated firearm" (*i.e.*, handgun or assault weapon) in 30-day period); PHILADELPHIA CODE § 10-831(2) (purchasers may obtain no more than one handgun in any 30-day period). Such a restriction is reasonable because it does not meaningfully intrude on the core of the right recognized in *Heller*—the defense of "hearth and home"—as each acquisition of a new firearm has successively less effect on one's self-defense abilities.

*Fees*

Plaintiffs claim that the fees charged by the District violate the Constitution because "[n]o limit is set on" the fee the Chief may impose. SAC ¶¶ 19, 22. Such a claim is meritless. The District's fee structure puts it squarely in the reasonable range of fees charged.[19]

---

[19]    In the District, it costs $60 to register a handgun, and $48 to register a rifle or shotgun. 24 DCMR § 2320. *See also* MPD, "Firearm Registration: Fee Schedule," http://mpdc.dc.gov/mpdc/cwp/view,a,1237,q,566996.asp (as of August 5, 2009). *See* Appx. at 8–11. In comparison, the fee for a New York City handgun license is currently $340, plus $94.25 for fingerprinting. *See* http://www.nyc.gov/html/nypd/html/permits/handgun_licensing_

Under *Salerno*, plaintiffs are precluded from challenging the Act merely because it *might* be applied unconstitutionally by the Chief; rather, because the statute is capable of being applied constitutionally, plaintiffs can challenge it only as applied to them. Plaintiffs cannot show that the fees actually charged are of constitutional moment. Of course, the government cannot prohibit the exercise of constitutional rights altogether through fee requirements. *See, e.g., M.L.B. v. S.L.J.*, 519 U.S. 102, 123–24 (1996). But that general proposition does not mean what plaintiffs imply—that fees may *never* be required for activity protected by the Constitution. Because the fees here are tied to the "costs of services provided," D.C. Official Code § 7-2502.05(b), they are clearly permissible. *See M.L.B.*, 519 U.S. at 123 & n.14 ("fee requirements ordinarily are examined only for rationality.") ("a State may exact fees from citizens for many different kinds of licenses.") (quoting *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 668 (1966)).

Even if the Second Amendment guarantees a "fundamental right," the government would *still* be entitled to reimbursement for the reasonable expenses incurred in regulating that right. In other words, the government is not required to subsidize an individual's exercise of a constitutional right. *See Ysursa v. Pocatello Ed. Ass'n*, ___ U.S. ___, 129 S.Ct. 1093, 1098 (Feb. 24, 2009) ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny.") (quoting *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 549 (1983) (rejecting organization's First Amendment and equal protection claims of a right to receive tax deductible contributions to support its lobbying activity)).

---

application.shtml (as of August 5, 2009). The fee for a rifle/shotgun permit in New York City is currently $140, plus a $94.25 fingerprint fee. *See* http://www.ci.nyc.ny.us/html/nypd/html/permits/rifle_licensing_information.shtml (as of August 5, 2009).

Indeed, even for First Amendment speech regulations subject to "strict scrutiny," such as prior government approval in the form of parade permits, fees have long been permissible to defray the government's administrative costs. *Cox v. New Hampshire*, 312 U.S. 569, 576–77 (1941); *cf. Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 130–34 (1992) (finding a local parade fee unconstitutional where there was no standard governing the administrator's discretion on how much to charge).[20]

*"Assault Weapons" and Large Capacity Ammunition Feeding Devices*

Plaintiffs claim that the District's prohibition on assault weapons, and refusal to register other "commonly possessed" firearms violates the Second Amendment and *Heller*. SAC ¶ 74–76.

These arguments, seizing on unqualified language from *Heller*, are fundamentally flawed. The Supreme Court stated that weapons in common use are "protected" in the sense that their regulation requires Second Amendment analysis. Plaintiffs apparently assert that the reasoning in *Heller*—that handguns "as a class" may not be banned—equally means that *any* commonly possessed firearm may not be. *Heller* does not establish any rule other than that handguns as a class may not be banned. The Supreme Court's reasoning turned on the premise that the District had a flat ban on handguns, with no exceptions. Now, however, the District's law allows the registration of thousands of such weapons. Alternative means of exercising a right need not be precisely equivalent to the banned or burdened means, as First Amendment

---

[20]    There are only two areas in which the Supreme Court generally invalidates government fees; "The basic right to participate in political processes as voters and candidates cannot be limited to those who can pay for a license. Nor may access to judicial processes in cases criminal or 'quasi criminal in nature' turn on ability to pay." *M.L.B.*, 519 U.S. at 124 (citations omitted). Neither of those two situations obtains here.

jurisprudence establishes. *See, e.g., Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 53–54 (1986). The Second Amendment's self-defense purpose is concerned with the practical realities of protecting hearth and home—not guaranteeing an unlimited choice of any weapon that plaintiffs contend is "commonly possessed."

Plaintiffs' arguments, carried to their logical extreme, would require an unworkable analysis. At this stage of the litigation, plaintiffs have not indicated how they think one could determine which weapons are implicated in this broad language. How would courts (or a government) determine which arms are "in common use?" Conduct a poll? Would the poll be nationwide, or limited to specific regions or the jurisdiction at issue? How common must a firearm be for its proscription to be unconstitutional? Would the popularity of a firearm be inversely proportional to the permissible amount of regulation? The Supreme Court explicitly declined to answer these questions. *Heller*, 128 S.Ct. at 2821 ("since this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field . . . . And there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us.").

Plaintiffs' "test" would also freeze gun technology in place as of the day of *Heller*, preventing States and the District from adopting additional, reasonable safety regulations.[21]

---

[21]     Although plaintiffs' California Roster claims are now moot, *see* 15–16, *supra*, plaintiffs in No. 09-0454 had claimed that the "overwhelming majority" of handguns lack chamber-load indicators and magazine disconnect devices. Carrying this argument out to its logical conclusion, neither California nor any other jurisdiction could *ever* require any *new* safety device. This argument is akin to saying that, regardless of the potential public safety benefits, because the overwhelming majority of cars in the late 1960s lacked adequate "passive occupant restraint systems," the government could *never* mandate any new systems to improve safety, such as automatic seatbelts or airbags. *See, e.g., Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 34–35 (1983). Fortunately, however, that is not the law, and government may continue to experiment in its quest to fulfill its primary objective, to protect public health and safety. *See e.g., Gonzalez v. Raich*, 545 U.S. 1, 42 (2005) (O'Connor, J.,

Constitutional law should not be subject to the "popularity contest" envisioned by plaintiffs' apotheosis of the Supreme Court's choice of language. Indeed, plaintiffs' argument would completely vitiate the prime concern of federalism—allowing local legislatures to address local concerns. Would thinly populated states such as Alaska and Wyoming, with gun ownership rates around 58%, be able to "drive" the determination of which guns are "in common use" at the expense of denser jurisdictions like Massachusetts and New Jersey, with gun ownership rates around 12%?[22] Such an analysis would be utterly unworkable.

The District's law, even if read strictly, allows the registration of thousands of different models of handguns.[23] Plaintiffs thus cannot seriously complain that they do not have ample alternative methods under which to exercise the right enunciated in *Heller*. *Cf. Benjamin*, 662 A.2d at 1234 (courts compare "the number and nature of the weapons subject to the ban with the number and nature of the weapons that remain available for the vindication of the right."). *Compare also, e.g., Henderson v. Kennedy*, 253 F.3d 12, 17 (D.C. Cir. 2001) (rejecting challenge

---

dissenting) ("One of federalism's chief virtues, of course, is that it promotes innovation by allowing for the possibility that 'a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.'") (quoting *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting)).

[22] *See* "Gun Ownership by State," *available online at* http://www.washingtonpost.com/wp-ssrv/health/interactives/guns/ownership.html (citing a nationwide survey in 2001 by the North Carolina State Center for Health Statistics, Behavioral Risk Factor Surveillance System; *see* http://www.schs.state.nc.us/SCHS/brfss/2001/us/firearm3.html) (as of June 9, 2009).

[23] As of August 5, 2009, the California Roster lists 1326 models. *See* http://certguns.doj.ca.gov. Massachusetts currently lists over 600 models. *See* http://www.mass.gov/Eeops/docs/chsb/firearms/Approved Firearms Roster 04-2009.pdf (as of July, 2009). Maryland is believed to list about 1,400 models on its roster. *See* http://www.mdsp.org/services/handgun.asp. Moreover, these totals do not account for the untold number of handguns allowed under the emergency regulations of June 25, 2009.

by evangelical Christians to National Park Service's regulations banning sales of message-bearing t-shirts in certain areas of the National Mall; because the regulation is "at most a restriction on one of a multitude of means" plaintiffs can use to spread their message, it is not a "substantial burden" on their exercise of religion).

State decisions upholding prohibitions on the sale or possession of assault weapons are particularly instructive on this point. The Supreme Court of Ohio, in *Arnold v. City of Cleveland*, 616 N.E.2d 163, 173 (Ohio 1993), upheld Cleveland's prohibition on assault weapons, noting that while the ordinance broadly prohibits "a class of firearms," it does not violate an Ohioan's right to bear arms because it does not prohibit "*all* firearms." Similarly, in *Robertson v. City & County of Denver*, 874 P.2d 325, 331 (Colo. 1994) (*en banc*), the Supreme Court of Colorado upheld Denver's prohibition on assault weapons, finding that while the prohibition implicates "a small category of arms which cannot be used for purposes of self-defense [and] undoubtedly limits the ways in which the right to bear arms may be exercised," the prohibition did "not significantly interfere with this right" because "there are ample weapons available for citizens to fully exercise their right to bear arms in self-defense." *Id*. at 333. The firearms provisions at issue here thus do not materially infringe the exercise of the "core right" identified in *Heller*.

Moreover, the District clearly had legitimate reasons to enact these provisions. The Supreme Court itself "acknowledged 'the problem of handgun violence in this country . . . .'" Comm. Rep. at 3 (quoting *Heller*, 128 S. Ct. at 2822). Maintaining public safety and preventing crime are clearly important (if not paramount) government interests. *See, e.g., Salerno*, 481 U.S. at 750; *Schall*, 467 U.S. at 264. The Act thus prohibits the registration or possession of assault weapons, *i.e.*, "military-style weapons made for offensive military use" that are "designed with military features to allow rapid and accurate spray firing" and that are "not designed for sport,

but to kill people quickly and efficiently." Comm. Rep. at 7. The District can substantially restrict such weapons, almost universally acknowledged to be particularly harmful to public safety, because individuals have access to literally thousands of *other* weapons that provide fully adequate protection for "hearth and home." *Heller*, 128 S.Ct. at 2821. Similarly, banning weapons that have particular potential to cause havoc because they shoot more than 10 bullets without reloading does not unreasonably restrict self-defense, given the access to thousands of other weapons capable of shooting up to 10 bullets at a time. *See* n.24, *supra*. *Cf. Fesjian v. Jefferson*, 399 A.2d 861, 864 (D.C. 1979) ("A gun, whether clip-fed or otherwise, capable of firing 13 rounds or more without reloading, may reasonably be considered a greater public threat than firearms of more limited capacity.").[24]

In reviewing the constitutionality of a statute, "courts must accord substantial deference to the predictive judgments" of the legislature. *Turner Broadcasting Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (quoting *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 665 (1994)). Such deference is due because the legislature "'is far better equipped than the judiciary to 'amass and evaluate the vast amounts of data' bearing upon' legislative questions." *Id*. (quoting *Walters v. National Ass'n of Radiation Survivors*, 473 U.S. 305, 331, n.12 (1985)). *See also Gonzalez v. Carhart*, 550 U.S. 124, 163–64 (2007) (legislature should receive deference in absence of expert

---

[24]    Legislation enacted by Congress in 1932 and still applicable to the District embodies the view that guns capable of shooting more than 12 bullets at a time without reloading are particularly dangerous. *See* the Act of July 8, 1932, Pub.L.No. 72-275, 47 Stat. 650. *See also, e.g., United States v. Pritchett*, 470 F.2d 455, 456–58 (D.C. Cir. 1972) (describing legislative history, including intent to prohibit weapons with no legitimate use); *Worthy v. United States*, 420 A.2d 1216, 1218 (D.C. 1980) ("Congress enacted this provision to enforce drastically a prohibition against carrying particular dangerous weapons within the District of Columbia."); *United States v. Brooks*, 330 A.2d 245, 247 (1974) (these weapons "are so highly suspect and devoid of lawful use that their mere possession is forbidden"). That definition and ban remain legally operative. D.C. Official Code §§ 22-4501(c), 22-4514; *cf. Turner v. United States*, 684 A.2d 313, 314–16 (D.C. 1996) (defendant may be convicted for violating both bans).

consensus). "Even in the realm of First Amendment questions . . . deference must be accorded to [the legislature's] findings as to the harm to be avoided and to the remedial measures adopted for that end . . . ." *Turner*, 520 U.S. at 665. "Local officials, by virtue of their proximity to, and their expertise with, local affairs, are exceptionally well qualified to make determinations of public good 'within their respective spheres of authority.'" *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 544 (1989) (quoting *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 244 (1984)).

Here, the District properly relied on a variety of evidence, from a number of sources, to craft its updated firearms regime, including the similar experiences of many other jurisdictions. *See, e.g.*, Comm. Rep. at 2–3, 5–8. In fact, even a First Amendment challenge "does not require a city . . . to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *Renton*, 475 U.S. at 51–52 (city is "entitled to rely on the experiences of Seattle and other cities" in enacting an adult theater ordinance); *see City of Erie v. Pap's A.M.*, 529 U.S. 277, 297 (2000) (*plurality opinion*) (citing *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 393, n. 6 (2000)).[25] This Court, like the Supreme Court in these First Amendment cases, should uphold the provisions at issue here, because the District conducted numerous hearings and relied on the experiences of many other jurisdictions, *Renton*, 475 U.S. at 44, relied on the "evidentiary foundation" in prior judicial opinions, *Pap's*

---

[25]      In *Renton*, the Supreme Court upheld location restrictions on adult theaters, which were not aimed at the "content" of the films shown, but on the "secondary effects" of the theaters on the surrounding community. *Id.*, 47–49. The Court held that while the city must provide some evidence supporting a link between the concentration of theaters and the asserted negative effects, "a municipality may rely on any evidence that is 'reasonably believed to be relevant' for demonstrating a connection between speech and a substantial, independent government interest." *Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002) (quoting *Renton*, 475 U.S., at 51–52)). Moreover, a city need not conclusively prove such a connection, nor does it need to prove that its chosen method will be effective. *Alameda Books*, 535 U.S. at 437.

*A.M.*, 529 U.S. at 296–97, and relied on its own earlier studies, *Alameda Books*, 535 U.S. at 430.[26]

The District is not breaking new ground here. In 1994, Congress passed the Violent Crime Control and Law Enforcement Act, which imposed a 10-year ban on the "manufacture, transfer, and possession" of certain semiautomatic firearms designated as assault weapons, and "large capacity ammunition feeding devices." Title XI, Subtitle A, Pub.L. 103-322 (Sept. 13, 1994), 108 Stat. 1796. "[B]y passing the 1994 bans on semiautomatic assault weapons and large capacity ammunition feeding devices, Congress sent a strong signal that firearms with the ability to expel large amounts of ammunition quickly are not sporting; rather, firearms with this ability have military purposes and are a crime problem." Bureau of Alcohol, Tobacco & Firearms, *Department of the Treasury Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles*, at 2–3 (Apr. 1998).[27] *See id.*, at 3 ("[W]e did not find any evidence that the ability to accept a detachable large capacity military magazine serves any sporting purpose.").

Not accidentally, the language in the District Act mirrors the language of the federal law, as does the language of the ordinances of many other jurisdictions which currently maintain

---

[26]   For instance, in 1999, the MPD, working with the federal ATF, organized a public gun "buy-back" program. *See* ATF, "Washington Metropolitan Police Department's Gun Buy Back Program Summary Report" (Nov. 1999), *available online at* http://www.atf.gov/pub/fire-explo_pub/buyback/buy_back.htm. Even with the "significant restrictions" then in place on the possession of firearms in the District, the program recovered a "remarkable" 2,912 guns in seven days. *Id*. More than 75% of the guns recovered were handguns. *Id*. Approximately 17% of the guns could be successfully traced back to licensed dealers in 44 States and Canada, and those guns had an "average street age" of about 15 ½ years. *Id*. The program also recovered 63 firearms with the serial numbers obliterated and 45 guns that had been reported stolen. *Id*.

[27]   Available online at *http://www.atf.gov/pub/treas_pub/assault_rifles/index.htm* (as of July 23, 2009).

prohibitions on assault weapons as a class.[28] The federal law, like the District law, banned certain models and variations of assault weapons by name, and also had a "feature test" provision, banning other weapons having certain military-style features. *See* Christopher S. Koper, *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003*, at 1, Jerry Lee Center of Criminology, University of Pennsylvania (June 2004).[29] Not all semiautomatic weapons were prohibited under the federal ban, but only those "having features that appear useful in military and criminal applications but unnecessary in shooting sports or self-defense." *Id*. at 4.

That study stated the obvious: that attacks with assault weapons "result in more shots fired, more persons hit, and more wounds inflicted per victim than do attacks with other firearms." *Id*. at 3. The study found that the federal ban resulted in a 17% drop in the number of gun crimes involving assault weapons in the cities studied . *Id*. at 2.

Many state courts have rejected nearly identical attacks on assault weapons bans. *Kasler v. Lockyer*, 2 P.3d 581, 590–92 (Cal. 2000); *Benjamin*, 662 A.2d at 1230–35; *Robertson*, 874 P.2d at 331–33; *City of Cincinnati v. Langan*, 640 N.E.2d 200, 205–206 (Ohio 1994); *Arnold*, 616 N.E.2d at 169–73. *See also Coalition of N.J. Sportsmen, Inc. v. Whitman*, 44 F.Supp.2d 666, 684–86 (D.N.J. 1999) (rejecting constitutional challenges to New Jersey law), *aff'd w/o opinion*, 263 F.3d 157 (3rd Cir. 2001), *cert. denied*, 534 U.S. 1039 (2001).[30] *Cf. Olympic Arms*, 301 F.3d

---

[28]     *See* Appx. at 18–30.

[29]     This study was funded by a grant from the United States Department of Justice, and is available online through the National Criminal Justice Reference Service at *http://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf* (as of July 23, 2009).

[30]     The district court in *Coalition of N.J. Sportsmen* rejected constitutional challenges to New Jersey's prohibition on assault weapons and large capacity ammunition magazines. The New Jersey law, like the District's, prohibits certain weapons by category, including specific makes and models, those "substantially identical" to listed weapons, and those possessing certain features. *Id*. at 670.

at 390 (rejecting equal-protection challenge to federal ban on assault weapons). This Court similarly should upheld the provisions at issue as reasonable.[31]

E. The District Properly Exercised its Legislative Powers.

Plaintiffs allege that the challenged provisions exceed the limits of D.C. Official Code § 1-303.43, in which Congress authorized the District to make and enforce "all such usual and reasonable police regulations . . . necessary for the regulation of firearms . . . ." SAC ¶ 78. Plaintiffs' argument fails, both on its face, and because plaintiffs fail to note other sources of legislative authority that make reliance on the section they cite unnecessary.

Congress broadly delegated legislative authority to the District government by enacting the District of Columbia Home Rule Act ("HRA"), D.C. Official Code §§ 1-201.01 *et seq.* (2008 Supp.).

> [T]he legislative power of the District shall extend to all rightful subjects of legislation within the District consistent with the Constitution of the United States and the provisions of this chapter subject to all the restrictions and limitations imposed upon the states by the 10th section of the 1st article of the Constitution of the United States.

*Id.*, § 1-203.02.[32]

---

[31]     For similar reasons, the provisions would survive intermediate-scrutiny review. They are substantially related to important government interests, because, *inter alia*, they give law enforcement "essential information" about gun ownership, Comm. Rep. at 3, can assist the police in investigating and solving crimes, and help keep unsafe firearms and firearms with "no legitimate use as self-defense weapons" (*i.e.*, assault weapons) off the streets. *Id.* at 7. "[T]he substantial relationship test does not demand that every aspect of the [challenged law] advance the asserted government interests equally." *Hutchins*, 188 F.3d at 545 n.6.

[32]     Decades before the HRA, the Supreme Court noted that Congress had previously delegated the full extent of the police power to the District. *District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 110 (1953) (authority granted to District by the Organic Act of 1871 (February 21, 1871, 16 Stat. 419) to enact all "rightful subjects of legislation' . . . was as broad as the police power of a state . . . .").

Local courts and the legislative history of the HRA recognize that that law grants the District broad sovereign legislative power "analogous to the powers of the States . . . ." *District of Columbia v. Owens-Corning Fiberglas Corp.*, 572 A.2d 394, 406 (D.C. 1989). *See also* H.R. Report No. 93-482, 93rd Cong., 1st Session; Markup Sessions for H.R. 9056, 93rd Cong., 1st Session (July 11 and 18, 1973). Among the stated purposes of the HRA were to "grant the inhabitants of the District of Columbia powers of local self-government . . . and, *to the greatest extent possible*, consistent with the constitutional mandate, relieve Congress of the burden of legislating upon essentially local District matters." D.C. Official Code § 1-201.02(a) (emphasis added). *See Firemen's Ins. Co. of Washington, D.C. v. Washington*, 483 F.2d 1323, 1327 (D.C. Cir. 1973) (District possesses "a broad delegation of police power from Congress.") (citing, *inter alia*, *Maryland & D.C. Rifle & Pistol Ass'n v. Washington*, 442 F.2d 123, 126 n.14 (D.C. Cir. 1971)).

Courts have narrowly construed restrictions on the Council's legislative authority. Indeed, even before the HRA, the Circuit found "ample warrant" in the exact provision cited by plaintiffs here (now D.C. Official Code § 1-303.43) for the Council to enact "a comprehensive scheme of control over firearms kept or traded within the District." *Maryland & D.C. Rifle*, 442 F.2d at 125–26. "We perceived no absurdity in a grant of authority to the District to regulate firearms for the protection of its people . . . ." *Id*. at 127. Because the delegation of authority in § 1-203.02 is plainly sufficient for the provisions at issue, this Court need not consider the argument that the provisions exceed the authority in § 1-303.43.

In any event, that argument fails. In *Firemen's Insurance*, the Circuit interpreted what is now D.C. Official Code § 1-303.03, which parallels the language cited by the instant plaintiffs, and provides that the District may make and enforce "all such reasonable and usual police regulations . . . as the Council may deem necessary for the protection of lives, limbs, health,

comfort, and quiet of all persons and the protection of all property within the District of Columbia." 483 F.2d at 1327.[33] In that case, plaintiff challenged insurance regulations that prohibited geographic discrimination in the provision of insurance, enacted after an "epidemic of cancellations" of policies held by inner-city dwellers after the riots of the late 1960s. *Id.* at 1325 & 1327 n.6. The Circuit held that "the regulation of auto insurance is essential to the protection of the lives, limbs, and health of citizens in the District." *Id.* at 1327 (footnote omitted).

To put it bluntly, if the regulation of insurance is "essential" for the protection of persons within the District, surely the reasonable regulation of *firearms* is similarly necessary. "The police power is not restricted or limited to present applications, but is a flexible and dynamic concept which changes and expands as society becomes more complex." *Id.* at 1328.

Further, as demonstrated herein none of the challenged provisions is unreasonable or unusual. Congress and many States and cities, in the exercise of their police powers, regulate weapons in ways identical to the District's. Indeed, safety was one of Congress's particular concerns in enacting what is now D.C. Official Code § 1-303.43 over a century ago. *See* S.Rep. No. 59-4338, at 3 (1906) (law will promote "freedom from accident from indiscriminate discharge of firearms").

Plaintiffs make the near-specious claim that, with respect to the challenged provisions, "[n]o such provisions exist in the laws of the United States or of any of the States, with the

---

[33]     This language precisely corresponds to the traditional police-power authority of the States. *See, e.g., United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Management Authority*, 550 U.S. 330, 342 (2007) ("The States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.") (quoting *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985)). *See also Gonzalez v. Raich*, 545 U.S. at 42–43 (O'Connor, J., dissenting) ("The States' core police powers have always included the authority to define criminal law and to protect the health, safety, and welfare of their citizens.") (citing *Brecht v. Abrahamson*, 507 U.S. 619, 635 (1993)).

exception of a very few number of States in regard to certain provisions only." SAC ¶ 79. Obviously, no jurisdiction will have the *exact* same combination of regulations of firearms as any other jurisdiction. But *every single one* of the District's challenged provisions has been used in some similar form in other jurisdictions, often for decades, without successful challenge. Indeed, the success of these different measures is among the reasons they were adopted here. *See Hutchins*, 188 F.3d at 544 ("Of course no city is exactly comparable to any other, but it would be folly for any city not to look at experiences of other cities."). For plaintiffs to suggest that the District's law is in any sense "unusual" thus defies logic, as well as common sense.

## IV. <u>Conclusion</u>

There are a variety of views on firearms regulation. There are just as many views on how the government may undertake that goal to comply with the Constitution. Such a diversity of viewpoints reflects the range of permissible options open to the District, and the deference its legislative decisions should receive. "Imperfect or even unwise regulations are not necessarily illegal, however." *John Doe, Inc. v. DEA*, 484 F.3d 561, 573 (D.C. Cir. 2007). Here, regardless of plaintiffs' views of the issue, the District's law is eminently reasonable and fits well within the boundaries of acceptable constitutional legislation.

For the foregoing reasons, defendants move for summary judgment. A proposed Order is attached hereto.

DATE: August 5, 2009                Respectfully submitted,

PETER J. NICKLES
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division

      /s/ Ellen A. Efros

ELLEN A. EFROS, D.C. Bar No. 250746
Chief, Equity Section I
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 442-9886
Facsimile: (202) 727-0431

      /s/ Andrew J. Saindon

ANDREW J. SAINDON, D.C. Bar No. 456987
Assistant Attorney General
Equity I Section
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Facsimile: (202) 727-0431
andy.saindon@dc.gov