IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DICK ANTHONY HELLER, *et al.* | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Case No. 1:08-cv-01289 |
| | ) | Hon. Ricardo M. Urbina |
| THE DISTRICT OF COLUMBIA, *et al.* | ) | |
| | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Dick Anthony Heller, Absalom Jordan, William Carter, and Mark Snyder, by

counsel, hereby submit the following in opposition to defendants' Motion for Summary Judgment.

Attached to this memorandum of points and authorities are Plaintiffs' Statement of Genuine Issues

Necessary to be Litigated, exhibits, and a proposed Order.  Plaintiffs incorporate by reference their

Statement of Undisputed Material Facts previously filed herein.  An oral hearing is requested.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.  STRICT SCRUTINY, NOT RATIONAL OR REASONABLE BASIS,
IS THE STANDARD OF REVIEW FOR RESTRICTIONS ON THE
SECOND AMENDMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.  THE DISTRICT'S FIREARM REGISTRATION REQUIREMENTS
SERVE NO COMPELLING STATE INTEREST AND
ARE NOT NARROWLY TAILORED OR REASONABLE  . . . . . . . . . . . . . . . . . . . . 9

A.  Registration, Expiration, and Re-Registration  . . . . . . . . . . . . . . . . . . . . . . . . 10

B.  Fees to Exercise a Core Constitutional Right  . . . . . . . . . . . . . . . . . . . . . . . . . 15

C.  Training, Testing, and Vision Requirements  . . . . . . . . . . . . . . . . . . . . . . . . . 16

D.  One Gun Per Month  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

E.  Fingerprints and Photographs  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

F.  Ballistics Testing  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

III.  THE DISTRICT'S PROHIBITIONS ON COMMONLY-POSSESSED
FIREARMS MISNAMED "ASSAULT WEAPONS" AND MAGAZINES
HOLDING MORE THAN TEN ROUNDS VIOLATE THE SECOND
AMENDMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

A.  "Assault Weapons"  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

B.  "Large Capacity Ammunition Feeding Devices"  . . . . . . . . . . . . . . . . . . . . . . 29

IV.  THE DISTRICT'S PROHIBITIONS ARE NOT "USUAL AND
REASONABLE" REGULATIONS AS REQUIRED BY D.C. CODE § 1-303.43  . . . . 31

V.  CERTAIN OF PLAINTIFFS' CLAIMS ARE MOOT  . . . . . . . . . . . . . . . . . . . . . . 35

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

# TABLE OF AUTHORITIES[*]

## CASES                                                                Page

*Aptheker v. Secretary of State*, 378 U.S. 500 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Bleiler v. Chief, Dover Police Department*, 155 N.H. 693, 927 A.2d 1216 (2007) . . . . . . . . . . 6

*Brown v. Barry*, 710 F. Supp. 352 (D. D.C. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Bsharah v. United States*, 646 A.2d 993 (D.C. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Bulova Watch Co. v. United States*, 365 U.S. 753 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Chicago v. Morales*, 527 U.S. 41 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Christensen v. Harris County*, 529 U.S. 576 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*City of Lakewood v. Pillow*, 180 Colo. 20, 501 P.2d 744 (1972) . . . . . . . . . . . . . . . . . . . . . . . 5

*Cox v. New Hampshire*, 312 U.S. 569 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Crawford v. Marion County Election Board*, 128 S. Ct. 1610 (2008) . . . . . . . . . . . . . 12, 16, 17

*\* District of Columbia v. Heller*, 128 S. Ct. 2783 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) . . . . . . . . . . . . . . . . . . . . 32

*Firemens Insurance Co. of Washington, D.C. v. Washington*, 483 F.2d 1323
 (D.C. Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Ford v. Turner*, 531 A.2d 233 (D.C. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992) . . . . . . . . . . . . . . . . . . . . . . . . 15

*Gillespie v. City of Indianapolis*, 185 F.3d 693 (7th Cir. 1999),
 *cert. denied*, 528 U.S. 1116 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Green v. District of Columbia*, 710 F.2d 876 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . 33

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

*Greene v. Dalton*, 164 F.3d 671 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966) . . . . . . . . . . . . . . . . . . . . . 16

*Hendricks v. Geithner*, 568 F.3d 1008 (D.C. Cir. 2009), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Howerton v. United States*, 964 A.2d 1282 (D.C. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Justice v. Town of Cicero*, 2009 WL 2477644 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . 18

*Karriem v. District of Columbia*, 717 A.2d 317 (D.C. 1998),
 *cert. denied*, 526 U.S. 1147 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Kolender v. Lawson*, 461 U.S. 352 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Maryland & D.C. Rifle & Pistol Association v. Washington*, 442 F.2d 123 (D.C. Cir. 1971) . 34

*McIntosh v. Washington*, 395 A.2d 744 (D.C. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*Mosby v. Devine*, 851 A.2d 1031 (R.I. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 17

*Mosher v. City of Dayton*, 48 Ohio St. 2d 243, 358 N.E.2d 540 (1976) . . . . . . . . . . . . . . 14, 15

*Murdock v. Com. of Pennsylvania*, 319 U.S. 105 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*NAACP v. Alabama*, 377 U.S. 288 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-6

*National Rifle Association v. City of Chicago*, 567 F.3d 856 (7th Cir. 2009),
 petition for cert. filed, No. 08-1497 (June 3, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Near v. Minnesota*, 283 U.S. 697 (1931) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*New State Ice Co. v. Liebmann*, 285 U.S. 262 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Newsweek Magazine v. District of Columbia Commission on Human Rights*,
 376 A.2d 777 (D.C. 1977), *cert. denied*, 434 U.S. 1014 (1978) . . . . . . . . . . . . . . . . . . . . . . 34

\* *Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007), *aff'd, District of
 Columbia v. Heller*, 128 S. Ct. 2783 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Peoples Rights Organization v. City of Columbus*, 152 F.3d 522 (6th Cir. 1998) . . . . . . . . . . 27

*Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

iii

*San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1973) . . . . . . . . . . . . . . . . 2

*Silveira v. Lockyer*, 312 F.3d 1052, *reh. denied*, 328 F.3d 567 (9th Cir. 2003),
 *cert. denied*, 540 U.S. 1046 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 26, 29

*Sims v. United States*, 963 A.2d 147 (D.C. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Smith v. District of Columbia*, 436 A.2d 53 (D.C. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975) . . . . . . . . . . . . . . . . . . . . . . 25

*Staples v. United States*, 511 U.S. 600 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*State of West Virginia ex rel. City of Princeton v. Buckner*, 180 W. Va. 457,
 377 S.E.2d 139 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*State v. Mendoza*, 920 P.2d 357 (Haw. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*United States* v. *Emerson*, 270 F.3d 203 (5th Cir. 2001),
 *cert. denied*, 536 U.S. 907 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Engstrum*, 609 F. Supp.2d 1227 (D. Utah 2009),
 *rev'd on other grounds*, 2009 WL 2475139 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Marzzarella*, 595 F. Supp.2d 596 (W.D. Pa. 2009) . . . . . . . . . . . . . . . . . . . 7

*United States v. Menasche*, 348 U.S. 528 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Miller*, 307 U.S. 174 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 31

*United States v. Moore*, 2009 WL 1033363 (W.D. N.C. 2009), . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Salerno*, 481 U.S. 739 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Valley Forge Christian College v. Americans United for Separation of Church
 & State, Inc.*, 454 U.S. 464 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Washington State Grange v. Washington State Republican Party*, 128 S. Ct. 1184 (2008) . . . . . 8

**CONSTITUTION**

U.S. Const., Amendment I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 12, 25

U.S. Const., Amendment II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**STATUTES**

Act of July 8, 1932, Pub. L. No. 72-275, 47 Stat. 650 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Brady Handgun Violence Prevention Act, P.L. 103-159, §§ 102(b), 103,
 107 Stat. 1536 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

National Firearms Act, Pub. L. No. 474, 48 Stat. 1236 (1934) . . . . . . . . . . . . . . . . . . . . . . . . 30

NICS Improvement Amendments Act, Pub. L. No. 110-180, § 103(f),
 121 Stat. 2559 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Second Firearms Control Emergency Amendment Act of 2008 (D.C. Act 17-502) . . . . . . . 20

Violent Crime Control and Law Enforcement Act, Title XI, Subtitle A,
 Pub. L. 103-322, 108 Stat. 1796 (1994, expired 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 30

18 U.S.C. § 921(a)(31)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

18 U.S.C. § 922(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

18 U.S.C. § 922(t) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 12, 19

18 U.S.C. § 922(t)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 19

18 U.S.C. § 926A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

26 U.S.C. § 5845(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

36 U.S.C. § 40722 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Ca. Penal Code § 12020(a)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Ca. Penal Code § 12280 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Ca. Penal Code § 12285 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Ca. Penal Code § 11186 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Conn. Gen. Stat. § 53-202a(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Conn. Gen. Stat. § 53-202d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Conn. Gen. Stat. § 53-202m . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Conn. Gen. Stat. § 53-202n . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Conn. Gen. Stat. § 53-202o . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

D.C. Code § 1-203.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

D.C. Code § 1-206.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

D.C. Code § 1-206.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

D.C. Code § 1-206.03 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

D.C. Code § 1-303.01(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

D.C. Code § 1-303.03 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

D.C. Code § 1-303.43 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32, 33, 34

D.C. Code § 22-4501(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

D.C. Code § 7-2501.01(3A)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

D.C. Code § 7-2501.01(10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

D.C. Code § 7-2502.05(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

D.C. Code § 7-2502.07(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

D.C. Code § 7-2502.08(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

D.C. Code § 22-4501(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

D.C. Code § 22-4504(a-1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

D.C. Code 1973, § 1-227 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

vi

D.C. Code 1978 Supp., § 1-124 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

Fla. Stat. § 790.33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Ga. Code Ann. § 16-11-129(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Ga. Code § 16-11-184 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Haw. Rev. Stat. § 134-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Haw. Rev. Stat. § 134-4(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

La. Rev. Stat. § 1781 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

La. Rev. Stat. § 1783 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Mass. Gen. L. ch. 140, § 131(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Md. Code § 4-303 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Md. Code § 5-101(p) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Md. Code § 5-129 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Md. Code§ 5-128(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

M.G.L., Ch. 140 § 121 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

M.G.L., Ch. 140 § 131 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Mich. Comp. Laws § 28.429 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

N.J. Rev. Stat. § 2C:58-12(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

N.Y. Consl. Laws § 265(22) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

N.Y. Consl. Laws § 265(22)(e)(v) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

N.Y. Penal Law § 400.00 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Ohio R.C. § 9.68 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Ohio R.C. § 2923.126 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

18 Pa. C.S. § 6120 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Va. Code § 18.2-308.2:2(P)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**OTHER AUTHORITIES**

C. S. Koper, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003* (Report to the National Institute of Justice, U.S. Dep't. of Justice 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Council of the District of Columbia, Committee on Public Safety & the Judiciary, Report on Bill 17-843, the "Firearms Control Amendment Act of 2008," Nov. 25, 2008 . . . . . 1

Defense Intelligence Agency, *Small Arms Identification and Operation Guide – Eurasian Communist Countries* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

J. Ayliffe, A New Pandect of *Roman* Civil Law 195 (1734) . . . . . . . . . . . . . . . . . . . . . . . . . 18

Legal Community Against Violence, *Regulating Guns in America: An Evaluation and Comparative Analysis of Federal, State & Selected Local Gun Laws* (Feb. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

National Firearms Act, Hearings Before Com. on Ways & Means, 73rd Cong., 2nd Sess., 1 (1934) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

NRA Inst. for Legislative Action, *Compendium of State Firearms Laws* . . . . . . . . . . . . . . . . 14

*Websters New World Dictionary* (3rd College Ed. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**Introduction**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." F.R.Civ.P. 56(c). "Material facts are those that might affect the outcome of the suit under governing law; genuine issues are those in which the evidence before the court is such that a reasonable trier of fact could find for the moving party." *Hendricks v. Geithner*, 568 F.3d 1008, 1012 (D.C. Cir. 2009).[1]

Here, Defendants District of Columbia *et al.* ("the District") make assertions of fact in their Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgement ("Def. Mem."), but these assertions are not supported by any evidence offered in Defendants' Statement of Material Facts. If this Court nonetheless considers these assertions as facts, then the District has still failed to meet its initial burden to demonstrate the absence of a genuine issue of material fact.

Defendants' Statement of Material Facts consists solely of references to a Supreme Court decision and to legislative history. Specifically, it quotes from *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008); traces the legislation leading to the enactment at issue; and quotes from the committee report – Council of the District of Columbia, Committee on Public Safety & the Judiciary, Report on Bill 17-843, the "Firearms Control Amendment Act of 2008," Nov. 25, 2008 ("Com. Rep."). The committee report contains overly-generalized allegations lacking factual support.

As the District correctly notes, a court "need not consider wholly conclusory statements for

---

[1] "[T]he movant has the initial burden of demonstrating the absence of a genuine issue of material fact. Upon such demonstration, the burden shifts to the opposing party to 'come forward with "specific facts showing that there is a *genuine issue for trial*."'" *Id.*

which no supporting evidence is offered." Def. Mem. 13, citing *Greene v. Dalton*, 164 F.3d 671, 674–75 (D.C. Cir. 1999). In any event, regardless of whether its conclusory statements in its memorandum are considered, the District is not entitled to summary judgment.

In addition to the attached Statement of Genuine Issues ("SGI"), plaintiffs rely on their previously-filed Statement of Undisputed Material Fact ("UMF"). The evidence does not show that the District is entitled to judgment as a matter of law. To the contrary, as in *Heller*, there is no genuine issue as to any material fact and plaintiffs are entitled to judgment as a matter of law.

## I.  STRICT SCRUTINY, NOT RATIONAL OR REASONABLE BASIS, IS THE STANDARD OF REVIEW FOR RESTRICTIONS ON THE SECOND AMENDMENT

The Second Amendment right to keep and bear arms is a fundamental right, and restrictions thereon are subject to strict scrutiny. See Plaintiffs' Mem. in Support of Mot. For Sum Jud. ("Pl. Mem.") 12-13. A right is "fundamental" if it is "explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny." *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 17, 33 (1973). The District has articulated no rationale for why this Bill of Rights guarantee is somehow "less 'fundamental' than" the others. *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 484 (1982).

"By the time of the founding, the right to have arms had become fundamental for English subjects." *District of Columbia v. Heller*, 128 S. Ct. 2783, 2798 (2008). Yet the District asserts that *Heller* did not determine that the right to have arms is a fundamental right. Def. Mem. 16. It seems bizarre to suggest that the right was fundamental at the founding, but is not so today.

Nor does the District articulate any basis for asserting that the right is not fundamental. Def. Mem. 16. The pre-*Heller*, lower court decisions cited by the District thought the right not to be

2

fundamental because they denied that it was even a personal "right," and recast it as a state militia power.[2] *E.g.*, *Gillespie v. City of Indianapolis*, 185 F.3d 693, 710 (7th Cir. 1999), *cert. denied*, 528 U.S. 1116 (2000) ("the right protected is limited, one that inures not to the individual but to the people collectively").

The District argues for application of "reasonableness review," under which "a legislature has articulated proper reasons for acting, with meaningful supporting evidence," and the law does not interfere with the "core right" the Second Amendment protects "by depriving the people of reasonable means to defend themselves in their homes." Def. Mem. 15. In the alternative, the District argues for "intermediate scrutiny."

The challenged provisions do not even survive this formulation of "reasonableness review," in that the D.C. Council articulated *no* reasons for acting – the enactment includes no findings of any kind. No meaningful supporting evidence has been presented, as is evidenced by the lack of any pertinent facts in the District's Statement of Material Facts. All that the District offers is a committee report, which was not adopted by the Council and which lacks any meaningful supporting evidence.

It is unclear how the proposed "reasonableness" test differs from the rational basis test rejected by *Heller*. The definition of "reasonable" states that the term is a synonym of "rational." *Webster's New World Dictionary* (3rd College Ed. 1991), 1118. *Heller* rejected not only the "rational basis" test, but also Justice Breyer's proposed "'interest-balancing inquiry' that 'asks whether the

---

[2]Despite it being a federal enclave and not a state, the District argues: "The Defendants here preserve the argument that the Second Amendment should not apply to the District if it is not incorporated against the States, as the District argued in *Heller*." Def. Mem. 16 n.14. The basis for this argument is unclear, in that the Bill of Rights applies directly to the District, and *Heller* resolved this very issue against the District.

statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'" *Heller*, 128 S. Ct. at 2821. That is indistinguishable from the District's proposed "reasonableness" test.

The District concedes that *Heller* rejected rational basis review. Def. Mem. 17, citing *Heller*, 128 S. Ct. at 2817-18 & n.27. In dissent, Justice Breyer suggested that the majority "implicitly" rejected strict scrutiny, because in dictum it approved restrictions on concealed weapons, possession by criminals and the insane, possession in sensitive locales, and commercial sales. *Id.* at 2851 (Breyer, J., dissenting). Yet one could easily articulate a compelling state interest in these restrictions. Not so with the District's draconian prohibitions focused against law-abiding citizens, requiring them to register to exercise Second Amendment rights and banning them from mere possession of common firearms in any manner and at all places, even the home.

Core rights under the Second Amendment, like those under the First, are fundamental and subject to strict scrutiny.[3] As suggested by *Heller*'s approval of the above traditional regulations, the right to arms (like free speech) is not absolute and may be subject to reasonable time, place, and manner restrictions. The fact that the term "reasonable restrictions" may be used in such analyses does not imply, as the District suggests, that the strict scrutiny test is inapplicable to the core right. See Def. Mem. 17.

*Parker v. District of Columbia*, 478 F.3d 370, 399 (D.C. Cir. 2007), which *Heller* affirmed,

---

[3]As *Heller* states, *id*. at 2821:

> Like the First, it [the Second Amendment] is the very *product* of an interest-balancing by the people . . . . And whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.

stated: "The protections of the Second Amendment are subject to the same sort of reasonable restrictions that have been recognized as limiting, for instance, the First Amendment." *Id*., citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Contrary to the District, this is not a carte blanch for *any* prohibition a legislature asserts is "reasonable." As *Ward*, which involved a sound-amplification system used in public, held:

> [E]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."

*Ward*, 491 U.S. at 791.

The District fails to mention that, to be reasonable, time, place, and manner restrictions must be narrowly tailored. And as *Parker* states, "reasonable regulation" of firearms must not "impair the core conduct upon which the right was premised." *Parker*, 478 F.3d at 399. That is why it invalidated the District's prohibition on an entire class of commonly possessed firearms.

The District cites selected state court decisions, but ignores others which recognize the narrow-tailoring rule. Def. Mem. 18. *City of Lakewood v. Pillow*, 180 Colo. 20, 501 P.2d 744 (1972), invalidated an ordinance which prohibited firearms from being transported or possessed in a vehicle or place of business for self defense based on the following:

> A governmental purpose to control or prevent certain activities, which may be constitutionally subject to state or municipal regulation under the police power, may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms. . . . Even though the governmental purpose may be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.

*Id*. at 23, citing *Aptheker v. Secretary of State*, 378 U.S. 500 (1963); *NAACP v. Alabama*, 377 U.S.

5

288 (1964).

Similarly, *State of West Virginia ex rel. City of Princeton v. Buckner*, 180 W.Va. 457, 463, 377 S.E.2d 139 (1988), invalidated a law imposing onerous licensing requirements to carry a firearm, explaining that "the legitimate governmental purpose in regulating the right to bear arms cannot be pursued by means that broadly stifle the exercise of this right where the governmental purpose can be more narrowly achieved." *Id*. at 464.

Although *Mosby v. Devine*, 851 A.2d 1031, 1044 (R.I. 2004), applied a "reasonableness" test instead of strict scrutiny, it upheld a law on carrying handguns as follows: "Because the Firearms Act provides for both discretionary and mandatory licensing to qualified applicants, the constitutional guarantee to keep and bear arms is fulfilled." *Id*. at 1047 (also noting that the plaintiff "was entitled to a carrying permit from the licensing authority"). By contrast, the District generally prohibits the carrying of arms.[4]

And *Bleiler v. Chief, Dover Police Dep't.*, 155 N.H. 693, 699, 927 A.2d 1216, 1222 (2007), upheld the requirement of a license to carry a concealed weapon as "reasonable" because it "does not prohibit carrying weapons; it merely regulates the manner of carrying them. . . . Even without a license, individuals retain the ability to keep weapons in their homes or businesses, and to carry weapons in plain view." The same could not be said for the District.

The District cites two federal district court decisions which it argues found strict scrutiny inappropriate as applied to felon possession and possession of a firearm with an obliterated serial number. Def. Mem. 19. Neither case involved exercise of the core right by law-abiding citizens.

---

[4]*Bsharah v. United States*, 646 A.2d 993, 996 n.12 (D.C. 1994) ("licenses to carry pistols have not been issued in the District of Columbia for many years and are virtually unobtainable.").

6

*United States v. Moore*, 2009 WL 1033363, *1 (W.D. N.C. 2009)*,* upheld the ban on felon possession of firearms based on *Heller*, without mentioning any standard of review.  2009 WL 1033363, *1.  It applied intermediate scrutiny to an equal protection challenge.  *Id*. at *3-4.

*United States v. Marzzarella*, 595 F. Supp.2d 596, 606 (W.D. Pa. 2009), stated that it was applying intermediate scrutiny to the prohibition on possession of a firearm with an obliterated serial number, finding that "firearms with intact serial numbers are the norm in this society and are readily available to citizens who are otherwise permitted under the law to possess guns. . . . Thus, the regulation is narrowly tailored . . . ."  Again, not so in the District, the ordinances of which bans firearm which are the norm in this society and which are anything but narrowly tailored.

Strict scrutiny was applied in *United States v. Engstrum*, 609 F. Supp.2d 1227, 1233 (D. Utah 2009), *rev'd on other grounds*, 2009 WL 2475139 (10th Cir. 2009).  According to *Engstrum*, "the *Heller* Court declared that the right is a fundamental right . . . ."  *Id*. at 1230 & n.18, citing *Heller*, 128 S. Ct. at 2798.  The court continued:

> Although not expressly stated by the *Heller* Court, strict scrutiny appears the appropriate level of scrutiny for two reasons. First, the *Heller* Court described the right to keep and bear arms as a fundamental right that the Second Amendment was intended to protect. . . . [W]here fundamental rights are at stake, strict scrutiny is to be applied. Second, the *Heller* Court categorized Second Amendment rights with other fundamental rights which are analyzed under strict scrutiny.

*Id*. at 1231.

*Engstrum* held that the prohibition on firearm possession by persons convicted of domestic violence "is narrowly tailored to serve a compelling government interest . . . ."  *Id*. at 1232.  By contrast, the District's provisions at issue apply to law-abiding persons and are not

limited to persons with criminal convictions.

As a fallback position, the District argues: "At most, intermediate scrutiny would be appropriate. To survive intermediate scrutiny, the challenged provision must be substantially related to the achievement of important government interests." Def. Mem. 20. But that too sounds like the *Heller* dissent's "judge-empowering 'interest-balancing inquiry,'" asking the identical question of whether "important governmental interests" outweigh the burdens on a protected interest. *Heller*, 128 S. Ct. at 2821.

Finally, plaintiffs challenge the District's restrictions facially and as applied. As to the former, the District states that a facial challenge requires showing that no set of circumstances exist under which a law would be valid. Def. Mem. 14, citing *United States v. Salerno*, 481 U.S. 739, 745 (1987). "To the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of this Court, including *Salerno* itself . . . ." *Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999) (invalidating ordinance on its face, even though no constitutional right was involved, because "vagueness permeates the ordinance").[5]

While the Court has at times been divided on the application of *Salerno*, "all agree that a facial challenge must fail where the statute has a 'plainly legitimate sweep.'" *Washington State Grange v. Washington State Republican Party*, 128 S. Ct. 1184, 1190 (2008) (double quotation marks deleted). The provisions challenged here have an illegitimate sweep as they apply largely

---

[5]*See Kolender v. Lawson*, 461 U.S. 352, 358-59 n.8 (1983) ("where a statute imposes criminal penalties, the standard of certainty is higher. . . . This concern has, at times, led us to invalidate a criminal statute on its face even when it could conceivably have had some valid application.").

against law-abiding citizens. The cases cited by the District, both involving "plain error" analysis, involved defendants convicted of far more serious charges than an unregistered firearm, a typical "piling on" misdemeanor charge. *Howerton v. United States*, 964 A.2d 1282, 1284 (D.C. 2009) (convicted of assault with a dangerous weapon and other felonies); *Sims v. United States*, 963 A.2d 147, 148 (D.C. 2008) (convicted of carrying a pistol without a license, a felony).

In sum, the Second Amendment protects the core, fundamental right to keep commonly-possessed firearms in the home. Plaintiffs' challenges in this case are limited to prohibitions on mere possession of firearms, including in the home. Such prohibitions are subject to strict scrutiny review, not to the thinly-disguised rational-basis tests proposed by the District.

## II. THE DISTRICT'S FIREARM REGISTRATION REQUIREMENTS SERVE NO COMPELLING STATE INTEREST AND ARE NOT NARROWLY TAILORED OR REASONABLE

Plaintiffs do not challenge the types of regulation that the District shares with the States generally and with the United States. *Heller* referred to "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." 128 S. Ct. at 2816-17. The District is inaccurate in referring to "the absolutist view urged by plaintiffs here" that any regulation infringes the Second Amendment. Def. Mem. 21. The restrictions challenged here may not be found in Federal law or in the laws of any (or virtually any) of the States.

Federal law requires all persons acquiring a firearm from a federally-licensed firearms dealer to undergo a check under the FBI's National Instant Criminal Background Check System ("NICS"), which accesses nationwide databases of persons ineligible to possess firearms by reason of criminal

convictions, mental commitments, unlawful drug use, and other disabilities.  See 18 U.S.C. § 922(t);

Brady Handgun Violence Prevention Act, P.L. 103-159, §§ 102(b), 103, 107 Stat. 1536 (1993).  The

FBI conducts NICS checks without charging any fee.[6]  Once a person is found to be eligible, records

on his or her identity are required to be destroyed, and it is prohibited to use NICS "to establish any

system for the registration of firearms, firearm owners, or firearm transactions or dispositions," other

than regarding prohibited persons.  *Id.*, § 103(I).

Since District gun buyers are subject to background checks by NICS, the District's

registration requirements have no basis to the extent their ostensible purpose is to prevent ineligible

persons from obtaining firearms.

### A.  Registration, Expiration, and Re-Registration

The District argues that registration is critical in part because it "permits officers to charge

individuals with a crime if an individual is in possession of an unregistered firearm, and permits

officers to seize unregistered weapons."  Def. Mem. 4, quoting Com. Rep. at 3–4.  While it is a

truism that making exercise of a constitutional right a crime does permit officers to bring charges

and seize property, that is not a compelling governmental interest or even a reasonable basis for

violation of the constitutional right.

The committee also asserted that registration "gives law enforcement essential information

about firearm ownership," but this vague generalization does not reveal why the information is

"essential."  Def. Mem. 4, quoting Com. Rep. at 3–4.  Registration "allows officers to determine in

advance whether individuals involved in a call may have firearms," *id.*, but that only applies to law-

---

[6]NICS Improvement Amendments Act, Pub. L. No. 110-180, § 103(f), 121 Stat. 2559, 2568 (2008) (codified at 18 U.S.C. 922 note).

abiding persons who are unlikely ever to be "involved in a call," and in any event police are trained

to assume a firearm may be present when responding to *any* call.  Registration "facilitates the return

of lost or stolen firearms to their rightful owners," *id.*, but this information is available on a

nationwide basis from the FBI's National Crime Information Center.[7]  Registration "assists law

enforcement in determining whether registered owners are eligible to possess firearms or have fallen

into a prohibited class," *id.*, but eligibility has already been determined by NICS, see 18 U.S.C. §

922(t).  Continued police monitoring of persons who have proven themselves in lawful exercise of

a constitutional right is not warranted under the guise that they may have "fallen into a prohibited

class."

The District offers no justification for why registrations must expire in three years.  Def.

Mem. 10; D.C. Code § 7-2502.07(a).  To the contrary, it notes the separate provision requiring that

the MPD be notified immediately if a firearm is lost, stolen, or destroyed.  § 7-2502.08(1)(A).  The

latter makes the expiration provision wholly redundant.

Whether making it a crime merely to possess a firearm in one's home without being

registered was not raised in or considered by *Heller*.  The Court's directive that the District register

plaintiffs's handgun did not purport to approve the constitutionality of the registration requirements

*sub silento*.  Cf. Def. Mem. 21, citing *Heller*, 128 S. Ct. at 2822.

Plaintiffs have explained in detail why registration violates the Second Amendment.  Pl.

Mem. 14-21.  The premise of *United States v. Miller*, 307 U.S. 174, 175 (1939), was that registration

would violate the Second Amendment if the arm was in common use and thus constitutionally

---

[7]"Categories of records in the system: . . . D. Stolen Gun File: 1. Stolen guns. 2. Recovered guns, when ownership of which has not been established." http://www.fas.org/irp/agency/doj/fbi/is/ncic.htm (visited Aug. 27, 2009).

protected.  Pl. Mem. 14-16.  One may not be required to register to exercise core First and Second Amendment rights.  *Id*. at 16-17.  Registration is not justified by any standard higher than rational basis, which *Heller* rejected.  *Id*. at 17-19.  Registration is not a long-standing restriction of the type approved by *Heller*.  *Id*. at 19-20.  Finally, the District's registration system has no militia purpose. *Id*. at 20-21.

The District argues that the requirement of registration, like registering to vote, is not impermissible unless it "severely restrict[s]" the exercise of the right.  Def. Mem. 21, quoting *Crawford v. Marion County Election Bd*., 128 S. Ct. 1610, 1624 (2008).  That quotation, however, is actually from the concurring opinion by Justice Scalia.  The Court only upheld the constitutionality of requiring presentation of a photo identification card when voting on election day as a valid measure to reduce voter fraud.  *Id*. at 1623.  Federal law requires presentation of a government-issued photo identification card as part of the NICS check to receive a firearm from a licensed dealer, 18 U.S.C. § 922(t)(1)(C), thereby allowing a valid background check.  Registration of firearm owners is unnecessary to accomplish this goal.

As the District correctly notes, Federal law requires persons to provide substantial personal information in order that background checks may be conducted and ineligible persons denied.  See 18 U.S.C. §§ 922(g) (prohibited persons), 922(t) (background checks).  However, such records are stored by the dealer and may not be used to establish any system of firearm registration. 18 U.S.C. § 926A; § 103(i) of the Brady Handgun Violence Prevention Act, P.L. 103-159, 107 Stat. 1536 (1993).

The District cites *Parker*, 478 F.3d at 399, as suggesting that registration would be reasonable.  Def. Mem. 22.  Yet the justification related to knowing "how many people would be

12

armed for militia service if called up," would not include others who have Second Amendment rights but have traditionally been excluded from the militia – "physically disabled persons" as well as "men over the age of forty-five and women." *Id*. The District, however, has renounced any militia nexus for its onerous registration requirements.[8]  Pl. Mem. 20-21. Thus, the registration requirement, not being based on any militia purpose, serves no governmental interest.

The District argues that universal firearm registration is not unusual. However, the committee report states: "Hawaii and the District are the only states that require all firearms to be registered." Com. Rep. at 3. Aside from the District not being a state, this demonstrates that requiring all firearms to be registered is indeed unusual. *State v. Mendoza*, 920 P.2d 357, 368 (Haw. 1996), found Hawaii's requirements to be "rationally related" to a legitimate government objective, and not to violate that State's arms guarantee. *Heller* explicitly rejected the "rational basis" test. 128 S. Ct. at 2818.

Not to be outdone, the District stands alone in providing that registrations expire after three years and requiring the re-registration of all firearms. "Hawaii does not require renewal of the registration." Legal Community Against Violence, *Regulating Guns in America: An Evaluation and Comparative Analysis of Federal, State & Selected Local Gun Laws* (Feb. 2008) ("LCAV") at 191.[9]

The District seeks to ameliorate its lonely position by asserting that "several States and many major cities have long required registration of *some or all* firearms." Def. Mem. 3-4 (emphasis

---

[8]The District states: "Knowing the details of who can serve in a militia is, of course, the first step in organizing such a body." Def. Mem. 23.  If authorized by law, the District could enact an ordinance similar to the federal Selective Service System (see http://www.sss.gov/) to register persons liable to militia service, but has not done so.

[9]While not always accurate, this source – on which the District primarily relies – is correct on this point.

added).  States requiring registration of "some" firearms typically restrict them to narrow categories.

Five states are listed that require registration of "Pre-Ban Assault Weapons or 50 Caliber Rifles."[10]

LCAV at 190 (CA, CN, HI, MD, NJ).  "Other State Registration Laws" include a state only requiring

registration of short barreled shotguns and machine guns,[11] and a state which actually "does not

require registration per se."[12]  LCAV at 190, 192.  In contrast to Hawaii, nine states explicitly

prohibit registration of firearms.  Com. Rep. at 3.

The District claims that 15 States require a license, permit, or "other prerequisite" to purchase

a handgun, and 8 States require registration of handguns or rifles (actually "assault weapons").  Def.

Mem. 22, citing NRA Inst. for Legislative Action, *Compendium of State Firearms Laws*, & n.9–n.15.

Yet a review of the actual laws of these States reveals that none even come close to the onerousness

of the District's requirements.  The only State to require registration of all firearms is Hawaii, and

its registrations do not expire.

Blurring over its extreme differences with even the most restrictive States, the District claims

that "such restrictions" have been held "reasonable."  Def. Mem. 22.  Yet it cites *Mendoza*, 920 P.2d

357, 368, a decision in clear conflict with *Heller*.  It also cites *Mosher v. City of Dayton,* 48 Ohio

St.2d 243, 358 N.E.2d 540, 543 (1976), but the ordinance in that case "does not limit the bearing of

arms, but only requires that anyone who wishes to acquire a weapon first obtain an identification

card in order to demonstrate that he is entitled to possess such a weapon . . . ."  Such entitlement is

---

[10]A "50 caliber rifle" would have a bore diameter of 50 inches.  The correct number is .50 caliber, meaning one-half inch.

[11]La. Rev. Stat. §§ 1781, 1783.

[12]Mich. Comp. Laws § 28.429 (requiring police safety inspection of pistols and retention of certificate).

now demonstrated by the NICS check.

As for the "many major cities" allegedly requiring registration, only Chicago appears to require registration of all firearms.  See the District's Appendix ("App.") 10-12.  The District cites four cities purporting to require registration of handguns, *id*., but their ordinances are preempted by state law and are thus invalid.[13]

### B.  Fees to Exercise a Core Constitutional Right

"A state may not impose a charge for the enjoyment of a right granted by the federal constitution."  *Murdock v. Com. of Pennsylvania*, 319 U.S. 105, 113 (1943).  Despite that unambiguous admonition, registration applications must be "accompanied by a nonrefundable fee to be established by the Mayor; provided, that such fee shall, in the judgment of the Mayor, reimburse the District for the cost of services provided under this subchapter."  D.C. Code § 7-2502.05(b), Def. Mem. 9, 26.  Separate fees are charged for the application to register, the ballistics test, and fingerprinting/FBI background check.  Def. Mem. 9.  The amount of the fees are "left to the whim of the administrator."  *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 133 (1992).

It is a stretch to characterize these impositions as "services provided" to the applicant who merely wishes to exercise a constitutional right.  As noted, the FBI conducts NICS checks without charging any fee, and District residents must undergo NICS checks before receiving firearms.

Law-abiding persons who purchase firearms after NICS checks are capable of quietly keeping their firearms in their homes without any bother or expense to the public.  This is quite unlike the fees which are permissible to defray the government's administrative costs for parades and

---

[13]Fla. Stat. § 790.33; Ga. Code § 16-11-184; Ohio R.C. §§ 9.68 & 2923.126; 18 Pa. C.S. § 6120 (all preempting local regulation of firearms).

demonstrations on the public streets and other public places.  See Def. Mem. 27; *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941) (license fee for parade on public road justified based on the "public expense of policing the spectacle" and "the maintenance of public order").  Not so with merely keeping a firearm in one's home.

The District argues that its fees are reasonable because it costs $60 to register a handgun and $48 to register a rifle or shotgun, compared to a New York City handgun license costing $340 plus $94.25 for fingerprinting.  Def. Mem. 25-26 & n.19.  But more severe violation of a constitutional right by another jurisdiction does not make the District's violation reasonable.  Perhaps the District could justify a poll tax in such amounts on the basis that some other jurisdiction charges a higher poll tax.  "[W]ealth or fee paying has, in our view, no relation to voting qualifications; the right to vote is too precious, too fundamental to be so burdened or conditioned." *Harper v. Virginia State Board of Elections*, 383 U.S. 663, 670 (1966) (invalidating $1.50 poll tax); *accord*, *Crawford*, 128 S. Ct. at 1615-16.

### C.  Training, Testing, and Vision Requirements

The District requires testing on firearm laws and handling, vision equal to that required for a driver's license, training in a course, ballistics tests, fingerprints, and personal appearances with the MPD.  Def. Mem. 9-10.  In addition to the issue of imposing these requirements merely to exercise a constitutional right, the requirements are unnecessary and may be difficult or impossible to fulfill by some good citizens.  For instance, an 80-year old widow inherits her husband's shotgun and wishes to keep it as a family heirloom for her grandchild when the latter attains a suitable age.  Her vision may be poor and she cannot take a handgun-training course, but all she wants to do is

keep the gun in the same locked closet where it has been stored for the last thirty years.[14]

The District argues an analogy with voting, but it cannot be required that a voter prove literacy and take a course and a test about the responsibilities of citizenship. *Crawford*, 128 S. Ct. at 1615-16 ("even rational restrictions on the right to vote are invidious if they are unrelated to voter qualifications.").

The District suggests that the characterization of its training requirements as "onerous" "turns history on its head, as militia service itself was predicated on training." Def. Mem. 23. This fails to distinguish between the keeping of arms as a constitutional right and the compulsory duty to bear arms in a militia when required by law. To the extent authorized by Congress, the District is free to require enrollment and training in the militia, but only as to persons subject to militia service.

To promote "a well regulated Militia," *Parker* suggested: "Reasonable firearm proficiency testing would both promote public safety and produce better candidates for military service." 478 F.3d at 399. But since the right also extends to "a person who is unsuitable for militia service," *id.*, such testing cannot be required for exercise of the core right to possess a firearm.

The District categorizes seven States as requiring safety training "prior to purchase of a handgun." Def. Mem. 24. But the District far more broadly requires training and testing to *possess any* firearm. *Mosby v. Devine*, 851 A.2d 1031, 1048 (R.I. 2004), mentioned the requirement of meeting "the minimum firing qualification score" in connection with a permit to *carry* a handgun.

The District cites no State that imposes a vision requirement to possess a firearm, but cites Chicago and Cicero, Illinois, as having such requirement. Both of those jurisdictions maintain that

---

[14]*See Ford v. Turner*, 531 A.2d 233 (D.C. 1987) (collectible firearms seized by the police from deceased sister's apartment without notice to the administratrix of the estate).

the Second Amendment has no application there.[15]  The requirement is unreasonable in that persons

with poor eyesight still have a right to "keep arms," including as family heirlooms, collections, and

valuable property.  "'Keep arms' was simply a common way of referring to possessing arms . . . ."

*Heller*, 128 S. Ct. at 2792.[16]

### D.  One Gun Per Month

The District prohibits registration of more than one pistol per month because unnamed

"studies" allegedly show that such laws somehow "reduce the number of guns entering the illegal

market" and "stem the flow of firearms between states."  Def. Mem. 10, quoting Com. Rep. 10.[17]

The District lists five States as restricting the number of firearms which may be purchased

or registered to between seven and thirty days.  Def. Mem. 25.  It fails to justify how exercise of a

constitutional right may be rationed other than to suggest that a new acquisition does not enhance

self defense.  By that logic, the District could delay acquisition of new books because the reader

already has enough books.

---

[15]*National Rifle Association v. City of Chicago*, 567 F.3d 856 (7th Cir. 2009), petition for cert.
filed, No. 08-1497 (June 3, 2009); *Justice v. Town of Cicero*, 2009 WL 2477644, *4 (7th Cir. 2009).

[16]*Heller, id.* at 2792 n.7, cites the following to show this linguistic usage, which exemplifies
the various purposes for which arms may be kept:

> See, *e.g.,* . . . J. Ayliffe, A New Pandect of *Roman* Civil Law 195 (1734) ("Yet a
> Person might keep Arms in his House, or on his Estate, on the Account of Hunting,
> Navigation, Travelling, and on the Score of Selling them in the way of Trade or
> Commerce, or such Arms as accrued to him by way of Inheritance") . . . .

[17]The committee report states that California, Maryland, and Virginia have such laws.  *Id*.
In contrast with the District's absolute prohibition, these states have important exemptions for
persons who have had a firearm lost or stolen, collectors, permit holders, and other legitimate
acquisitions.  Ca. Penal Code § 12020(a)(9); Md. Code Public Safety § 5-128(a); Va. Code § 18.2-
308.2:2(P)(2).

## E. Fingerprints and Photographs

Identity of a firearm transferee is established for NICS background checks based in part on presentation of a government-issued photo identification card.  18 U.S.C. § 922(t)(1)(C).  The District requires the presentation of fingerprints and photographs, even though District residents undergo NICS checks.

The District cites purported examples of States which require fingerprints and photos "for license or registration of non-concealed firearms," but the examples are inapposite.  Def. Mem. 23.  The first example is "GA. CODE ANN. § 16-11-129(c) (fingerprints required for pistol license)," but that is for a license to *carry* a pistol on one's person outside one's home or place of business.  No license to possess is required.

MASS. GEN. L. ch. 140, § 131(e), requires fingerprints with an "application for a license to carry or possess firearms," but the term "firearm" is restricted to a handgun.  *Id*. § 121 ("Firearm").  N.Y. PENAL LAW § 400.00 requires photos and fingerprints for a license to carry and possess pistols and revolvers, but not rifles and shotguns.   Only HAW. REV. STAT. §§ 134-2 requires fingerprints and a photograph for a acquisition permit for any kind of firearm.

## F. Ballistics Testing

The District contends that "ballistics testing can help MPD to investigate and solve crimes." Def. Mem. 5, quoting Testimony of Chief Lanier at 5.  It is unclear how testing of firearms owned by law-abiding persons would solve any crime.  The only concrete evidence was the report of the Maryland State Police that Maryland's ballistics database resulted in "failure . . . to provide any meaningful hits. There have been no criminal investigations that have been enhanced or expedited through the use of [this technology]."  Com. Rep. at 6.

19

The District asks what interest the ballistics test requirement infringes.  Def. Mem. 25.  The answer is simple: a person may not lawfully possess a pistol without a ballistics test, since it is required for registration.  Exercise of a core constitutional right cannot be made dependant on government testing and recordation of an object which itself is constitutionally protected, whether it be a pistol or a printing press.

### III.  THE DISTRICT'S PROHIBITIONS ON COMMONLY-POSSESSED FIREARMS MISNAMED "ASSAULT WEAPONS" AND MAGAZINES HOLDING MORE THAN TEN ROUNDS VIOLATE THE SECOND AMENDMENT

#### A.  "Assault Weapons"

After the *Heller* decision, the District initially passed emergency legislation which "allowed for the registration of most semi-automatic handguns and rifles."[18]  Com. Rep. 2.  However, the subsequently-enacted Firearms Registration Amendment Act of 2008, Act 17-708, which is at issue here, prohibits numerous semiautomatic rifles and handguns specified in lengthy listings of model names, brand names in all models, and generic definitions encompassing many characteristics.  D.C. Code § 7-2501.01(3A)(A).  The District inaccurately states that the latter enactment "allow[ed] the registration of most semi-automatic handguns and rifles," Def. Mem. 3, when in fact it *prohibited* large numbers of such firearms.

The District includes no evidence in its Statement of Material Facts concerning the semiautomatic rifles and other firearms it chooses to call "assault weapons" or concerning ammunition feeding devices (magazines) that hold more than ten rounds.  Instead of presenting

---

[18]"[T]he Council passed . . . the Second Firearms Control Emergency Amendment Act of 2008 (D.C. Act 17-502) on September 16th [, 2008], which was signed into law by the Mayor on the same day.  D.C. Act 17-502 changed the definition of machine gun. This allowed for the registration of most semi-automatic handguns and rifles."  Com. Rep. 2; Plaintiffs' Statement of Genuine Issues ("SGI")  11.

factual evidence, it relies on unsupported allegations in the committee report.

The committee report claims that "assault weapons" are "military-style weapons made for offensive military use. They are designed with military features to allow rapid and accurate spray firing. They are not designed for sport, but to kill people quickly and efficiently."  Def. Mem. 5 & 30-31, quoting Com. Rep. at 7.

"Assault weapons are preferred by terrorists . . . ."  Def. Mem. 6, quoting Com. Rep. 7-8. Such weapons "are a minute fraction of the firearms available in the United States, they have never been in common use, they are dangerous and unusual . . . ."  Def. Mem. 6, quoting Com. Rep. 8.

The District quotes the testimony of Chief Lanier that worldwide assassinations involve attacking security details "with semiautomatic and automatic firearms," and that it would be difficult to safeguard the public "if carrying semi-automatic rifles were to suddenly become legal in Washington."  Def. Mem. 6 n.6.  She ignored that carrying *any* rifle is already unlawful in the District.  D.C. Code § 22-4504(a-1) ("no person shall carry within the District of Columbia a rifle or shotgun"; penalties of 5 years imprisonment and $5000 fine).

The committee report fails to suggest what features make the banned firearms so dangerous other than the claim: "Pistol grips help stabilize the weapon during rapid fire and allow the shooter to spray-fire from the hip position."  Com. Rep. at 7.  It asserts that "[a]ssault weapons have no legitimate use as self-defense weapons," but offers no reason why.  Comm. Rep. at 7.

None of the above allegations of the committee are accurate.  Contemporary military rifles are selective fire "assault rifles."   Selective fire means that the rifle has the capability to fire both fully automatic, meaning that it continues to fire as long as the trigger is pulled, as well as semiautomatic, meaning that a separate pull of the trigger is required for each shot.  Statement of

Genuine Issues ("SGI") 1.[19]   Today's military forces throughout the world continue to utilize selective-fire rifles as their standard service rifles.  SGI 4.

Semiautomatic rifles, including all of those designated by the D.C. Code as "assault weapons," are not made or designed for offensive military use.  They are not used as service rifles by any military force in the world, nor are they preferred by irregular forces or terrorists.  They do not allow rapid and spray firing.  SGI 5.

Since they fire only once per trigger pull, semiautomatic rifles are useful, and are widely used throughout the United States, for target shooting, competitions, some forms of hunting, and self defense.  SGI 6.

Some of the rifles designated by the D.C. Code as "assault weapons" have cosmetic similarities with military rifles.  For instance, some have a pistol grip that protrudes beneath the action, which allows the rifle to be fired accurately from the shoulder.  Such pistol grips are *not* designed to allow the shooter to spray-fire from the hip position.  SGI 7.

The D.C. Code designates certain semiautomatic pistols and shotguns, by name or by generic definition, as "assault weapons."  None of these are designed for offensive military use and none are known to be issued to any military force in the world.  SGI 8.

As plaintiffs previously demonstrated, firearms the District labels as "assault weapons" are in common use.  Pl. Mem. 21- 27.  Since being introduced in 1963, roughly two million AR-15 type rifles have been manufactured.  Statement of Undisputed Material Fact ("UMF") 12.  AR-15s accounted for 14.4 percent of rifles made in the U.S. for the domestic market in 2007.  UMF 13.

---

[19]As stated in the Defense Intelligence Agency publication *Small Arms Identification and Operation Guide – Eurasian Communist Countries*: "Assault rifles are short, compact, selective-fire weapons . . . . Assault rifles . . . are capable of delivering effective full automatic fire . . . ."  SGI 3.

It was in the context of a case involving an AR-15 rifle that *Staples v. United States*, 511 U.S. 600, 610 (1994), noted: "Even dangerous items can, in some cases, be so commonplace and generally available that we would not consider them to alert individuals to the likelihood of strict regulation."

The plaintiffs in this case exemplify the legitimate uses of the banned rifles. Plaintiff Heller was denied registration of an AR-15 type rifle with a protruding pistol grip which he wished to use in the Civilian Marksmanship Program ("CMP"). UMF 15. The CMP was established by Congress to instruct citizens in marksmanship, promote firearm safety, and conduct competitions. 36 U.S.C. § 40722. The CMP "give[s] priority to activities that benefit firearms safety, training, and competition for youth and that reach as many youth participants as possible." *Id*. § 40724.[20]

Heller participated in a CMP sanctioned clinic which included participants in the Junior classification, ranging in age from eleven years old to teenagers. SGI ¶ 9. The clinic covered safety, firing range procedures, rifle target marksmanship skills, and hours of rifle training with each person firing 80 or more rounds at competition targets. The AR-15 rifle was used exclusively in this clinic in preparation for CMP Sanctioned Shooting Matches in the AR-15 category. SGI ¶ 10.

Similarly, Plaintiff Jordan was denied registration of an Armalite AR-180 .223 caliber rifle to be used for "personal protection." UMF 17. Rifles of this type are commonly possessed for protection, target shooting, competitions, and sporting purposes. UMF 18.

Plaintiff Carter was denied registration of an LMT Defender 2000 .223 caliber semiautomatic rifle, which has a pistol grip that protrudes beneath the action and a telescoping stock, to be used for

---

[20]"[T]he policy Congress has adopted . . . is to provide for a well regulated militia by putting guns in young people's hands and teaching them how to handle them safely and how to shoot them." *Silveira v. Lockyer,* 328 F.3d 567, 587-88 (9th Cir. 2003) (Kleinfeld, J., dissenting from denial of rehearing).

23

"recreational activity, NRA range." UMF 19. In his Marine Corps training, Carter was instructed to fire the fully automatic M16 (which has a similar pistol grip) only from the shoulder and was never trained to fire it from the hip. UMF 20. Numerous persons possess semiautomatic rifles with such pistol grips throughout the United States for target shooting and other lawful purposes. UMF 21.

The District denies that *Heller* held that commonly possessed firearms may not be banned, and instead limited its ruling to handguns. Def. Mem. 27. Yet the premise of *Heller*'s ruling that handguns could not be banned is that they are in common use: "the sorts of weapons protected were those 'in common use at the time.'" 128 S. Ct. at 2817. *Heller* suggests that full automatics like the M-16 machinegun may be restricted as may "sophisticated arms that are highly unusual in society at large," *id.*, but makes no such comment about ordinary semiautomatic firearms. The common-use test is clear in the Court's characterization of the District's handgun ban as "a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose [self-defense]." *Id.* at 2817. What the District labels as "assault weapons" is also an entire class of arms, mostly rifles, that Americans commonly possess for lawful purposes.

"The modern handgun – and for that matter the rifle and long-barreled shotgun – is undoubtedly quite improved over its colonial-era predecessor, but it is, after all, a lineal descendant of that founding-era weapon, and it passes *Miller's* standards." *Parker*, 478 F.3d at 398. The Act here bans many such rifles and shotguns as well as ordinary magazines for rifles and pistols.

The District repeats its losing argument in *Heller* that a ban may be enacted if "[a]lternative means of exercising a right" are available. Def. Mem. 27-28, citing *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 53–54 (1986). But *Renton* involved a zoning regulation for adult theaters, not a

24

ban on a type of expression.  The First Amendment rule more applicable here is that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."  *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556 (1975).  *Heller* already resolved this issue: "It is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.,* long guns) is allowed."  128 S. Ct. at 2818.  The District is now arguing that it can label long guns as "assault weapons" and ban them because handguns are available.

The District asks how is it determined which arms are in common use, whether a poll would be conducted, and whether the poll would be nationwide or limited to the jurisdiction at issue.  Def. Mem. 28.  *Heller* obviously did not limit its enquiry to what was in common use in the District and instead took the nationwide approach – "handguns are the most popular weapon chosen by Americans for self-defense in the home."  128 S. Ct. at 2818.  The rifles that the District calls "assault weapons" are in common use by any definition – some two million AR-15 type rifles alone have been manufactured – as are the untold millions of magazines holding more than ten rounds. Pl. Mem. 6-11.

Appealing to "federalism" concerns, the District cites the "States-as-laboratories" dictum in favor of allowing localities to decide which arms are not constitutionally protected.  Def. Mem. 28-29 & n.21, quoting *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting).  Yet the words of the majority in that case resound today: "The principle is imbedded in our constitutional system that there are certain essentials of liberty with which the state is not entitled to dispense in the interest of experiments."  285 U.S. at 279-80, citing, *inter alia*, *Near v. Minnesota*, 283 U.S. 697 (1931) ("the theory of experimentation in censorship was not permitted to

interfere with the fundamental doctrine of the freedom of the press.").

The District argues: "Constitutional law should not be subject to the 'popularity contest' envisioned by plaintiffs' apotheosis of the Supreme Court's choice of language." Def. Mem. 29. Yet the Court's word choice was plainly "common use," 128 S. Ct. at 2817, and plaintiffs have done nothing to create an "apotheosis" of those easily-understood words.

The District seeks to justify banning an entire class of rifles it calls "assault weapons" because it "allows the registration of thousands of different models of handguns." Def. Mem. 29. In *Heller*, the District made the reverse of this argument: the handgun ban "do[es] not disarm the District's citizens, who may still possess operational rifles and shotguns." Brief for Petitioners, No. 07-290, at 11.[21]   The Court rejected this argument, just as it would reject an argument that books could be banned if thousands of newspapers remain available.

The District claims that seven states ban assault weapons, Def. Mem. 6 n.7, but not one of the cited states has as complete a ban as does the District.   California exempts registered assault weapons.  Ca. Penal Code §§ 12280, 12285, 11186.[22]   The same with New Jersey, which required promulgation of a list of "assault firearms" which are "used for legitimate target-shooting purposes. This list shall include, but need not be limited to, the Colt AR-15 and any other assault firearm used in competitive shooting matches sanctioned by the Director of Civilian Marksmanship of the United

---

[21]The District further argued that "the Council acted based on plainly reasonable grounds. It adopted a focused statute that continues to allow private home possession of shotguns and rifles, which some gun rights' proponents contend are actually the weapons of choice for home defense." *Id*. at 54.

[22]The California law was upheld under the "collective rights" theory of the Second Amendment which *Heller* would reject.  *Silveira v. Lockyer,* 312 F.3d 1052, 1056, *reh. denied*, 328 F.3d 567 (9th Cir. 2003), *cert. denied*, 540 U.S. 1046 (2003).

States Department of the Army."  N.J. Rev. Stat. § 2C:58-12(a).

Hawaii restricts transfer, not possession, of "assault pistols" but not rifles or shotguns.  Haw. Rev. Stat. § 134-4(e).  Connecticut defines "assault weapon" to require two specified features, rather than only one as does the District, Conn. Gen. Stat. § 53-202a(a)(3), and allows possession thereof under various circumstances, including any such firearm made before 1994.  *Id*. §§ 53-202d, -m, -n, -o.

Maryland does not ban rifles and shotguns designated as assault weapons at all, and instead regulates them similar to handguns, Md. Code §§ 5-101(p), 5-129 *et seq*.; it bans "assault pistols," but exempts registered ones. § 4-303.  Massachusetts restricts a "large capacity weapon," but "any person" is eligible to apply for a license. M.G.L., Ch. 140 §§ 121, 131.  New York defines "assault weapon" to require two specified features, rather than only one as does the District, and excludes from the definition any firearm lawfully possessed before 1994.  N.Y. Consl. Laws §§ 265(22), 265(22)(e)(v).[23]

For its far more draconian prohibitions, the District sees as precedent the expired Federal law prohibiting manufacture of new "assault weapons" (which were defined far more narrowly, Pl. Mem. 22) and "large capacity ammunition feeding devices," but allowing lawful possession of the millions of such items that were already privately owned.  Def. Mem. 33, citing the Violent Crime Control and Law Enforcement Act, Title XI, Subtitle A, Pub. L. 103-322, 108 Stat. 1796 (1994, expired 2004).  If the expired Federal law is the standard, with its narrow definitions and grandfathering of

---

[23]The District also cites a handful of cities that ban assault weapons.  While none have been subjected to a *Heller* challenge, some may be preempted by state law or otherwise invalid.  Compare App. 27-28 with *Peoples Rights Organization v. City of Columbus*, 152 F.3d 522 (6th Cir. 1998) (ordinance vague and violative of equal protection).

preexisting firearms and magazines, the District's complete prohibition would be invalid.

The District quotes the politicized 1994 report of the Bureau of Alcohol, Tobacco and Firearms that such firearms are not "sporting," Def. Mem. 33, but the Second Amendment is not limited to arms which a federal agency approves as "sporting."   Indeed, the Second Amendment protects "ordinary military equipment" "of the kind in common use," and "popular weapon[s] chosen by Americans for self-defense."   *Heller*, 128 S. Ct. at 2815-16, 2818,

Contrary to the District, Def. Mem. 6, such firearms are not disproportionately used in crime. The District quotes from, but ignores, key findings in the study Christopher S. Koper, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003* (Report to the National Institute of Justice, U.S. Dep't. of Justice 2004), http://www.sas.upenn.edu/jerrylee/research/aw_final2004.pdf.   Koper notes: "AWs [assault weapons] were used in only a small fraction of gun crimes prior to the ban: about 2% according to most studies and no more than 8%. Most of the AWs used in crime are assault pistols rather than assault rifles."  *Id.* at 2.

The study noted a reduction in gun crime involving assault weapons in selected cities "[f]ollowing implementation of the ban," *id.* at 2, and did not state, as the District asserts, that "the federal ban resulted in" this drop.  Def. Mem. 34.  Indeed, since all preexisting "assault weapons" were grandfathered, the quantity in civilian hands did not decrease.  Koper candidly concluded, at 3:

> Should it be renewed, the ban's effects on gun violence are likely to be small at best and perhaps too small for reliable measurement. AWs were rarely used in gun crimes even before the ban. LCMs [large capacity magazines] are involved in a more substantial share of gun crimes, but it is not clear how often the outcomes of gun attacks depend on the ability of offenders to fire more than ten shots (the current

magazine capacity limit) without reloading.

The District cites state court decisions which rejected what it calls "nearly identical attacks on assault weapons bans," Def. Mem. 34-35, but not a single one of them involved a challenge under the Second Amendment.  The Ninth Circuit upheld California's ban based on the view, which *Heller* would repudiate, that "the Second Amendment does not provide an individual right to own or possess guns or other firearms . . . ."  *Silveira,* 312 F.3d at 1066.

### B.  "Large Capacity Ammunition Feeding Devices"

As plaintiffs have demonstrated, many pistols and rifles are sold with magazines that hold more than 10 rounds, and such firearms are in wide use for self defense, target shooting, and other lawful purposes.  UMF 32.  Millions of such magazines have been manufactured in the United States and imported, and are preferable for self protection.  UMF 34.

Standard magazines for commonly owned semiautomatic pistols hold up to 17 rounds of ammunition.  In 2007, about 2/3 of the 1.2 million pistols made and not exported were in calibers typically using magazines that hold over 10 rounds.  UMF 36.  Millions of rifles are commonly equipped with magazines holding more than 10 rounds.  UMF 37.

The committee report conceded that  "semiautomatic pistols are a common and popular weapon," and "the Committee heard testimony that magazine capacity of up to 20 rounds is not uncommon and 'reasonable.'"  Com. Rep. at 9.

However, "the Committee agrees with the Chief of Police that the 2 or 3 second pause to reload can be of critical benefit to law enforcement, and that magazines holdings over 10 rounds are more about firepower than self-defense."  *Id.*, quoted in Def. Mem. 7.  Yet not having to pause to reload, particularly in a stressful situation, can be of critical benefit to the law-abiding citizen as well.

Indeed, MPD officers are issued Glock pistols with magazines holding 15 or 17 rounds for the very purpose of self-defense.  UMF 41.

Impeding the lawful use of firearms by requiring a persons in a dire emergency to "pause to reload" is analogous to the invalid District law requiring firearms to be bound by a trigger lock and unloaded at all times: "This makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional."  *Heller*, 128 S. Ct. at 2818.

It is claimed that the Act's drafters "borrow[ed] language from the now-lapsed federal assault weapons ban . . . ."  Comm. Rep. at 9, quoted in Def. Mem. 7 n.8.  Yet the federal law was limited to magazines "manufactured after the date of enactment of the Violent Crime Control and Law Enforcement Act of 1994 . . . ."  18 U.S.C. § 921(a)(31)(A) (expired).  The countless millions of magazines manufactured before that date were not restricted at all.[24]

The District seeks to justify banning firearms with magazines which will shoot more than ten rounds based on there being "thousands" of other weapons that will shoot no more than ten rounds.  Def. Mem. 31.  This is just another version of its prior argument – rejected by *Heller* – that it may ban handguns because long guns are available.

---

[24]The District argues the "dangerousness" of firearms which shoot more than twelve times by reference to the obsolete definition of "machine gun" in the Act of July 8, 1932, Pub. L. No. 72-275, 47 Stat. 650.  Def. Mem. 31 n.24.  It stated: "Machine gun,' as used in this chapter, means any firearm which shoots automatically or semiautomatically more than 12 shots without reloading."  D.C. Code § 22-4501(3) (repealed).  That definition excluded real machine guns that automatically fired no more than 12 shots or that were not equipped with magazines.  The same definition was proposed for the National Firearms Act ("NFA"), until it was pointed out that "if you use those [machine] guns with magazines holding only 11 shots they would not be, within the terms of this bill, a machine gun."  National Firearms Act, Hearings Before Com. on Ways & Means, 73rd Cong., 2nd Sess., 1, 39 (1934) (testimony of NRA President Karl T. Frederick).  The definition was corrected to include only firearms that would shoot "more than one shot, without manual reloading, by a single function of the trigger."  National Firearms Act, Pub. L. No. 474, 48 Stat. 1236 (1934).  Current D.C. Code §§ 7-2501.01(10) & § 22-4501(3) conform to the definition in the NFA, 26 U.S.C. § 5845(b).

*Parker* directly addressed Second Amendment protection of modern semiautomatic firearms, which are commonly equipped with magazines holding more than ten rounds.  It applied *Miller*'s "common use" test and found that "most handguns (those in common use) fit that description then and now."  *Parker*, 478 F.3d at 397 (citing *United States* v. *Emerson*, 270 F.3d 203, 227 n.22 (5th Cir. 2001), *cert. denied*, 536 U.S. 907 (2002)).  *Emerson* "assum[ed] that a Beretta pistol passed the *Miller* test."  *See id.* at 216, 273 (describing a Beretta 9mm semiautomatic pistol).  The Beretta M9 pistol, used by the U.S. military, has a 15-shot magazine.  UMF 36.  *Parker* rejected the suggestion "that only colonial-era firearms (e.g., single-shot pistols) are covered by the Second Amendment," which instead "protects the possession of the modern-day equivalents of the colonial pistol."  478 F.3d at 398.

In sum, the District has presented no fact or legal principle that would justify its prohibition on commonly possessed magazines or ammunition feeding devices which hold more than ten rounds.  Such items are constituent parts of firearms which are protected by the Second Amendment.

## IV.  THE DISTRICT'S PROHIBITIONS ARE NOT "USUAL AND REASONABLE" REGULATIONS AS REQUIRED BY D.C. CODE § 1-303.43

Plaintiffs have demonstrated that the ordinances challenged here are unusual and unreasonable, contrary to D.C. Code § 1-303.43, in which Congress authorized the District to make "usual and reasonable police regulations . . . for the regulation of firearms . . . ."  Pl. Mem. 27-32.  The District argues that it is not bound by such specific provisions and may legislate without limit based on § 1-203.02, which provides in part: "Except as provided in §§ 1-206.01 to 1-206.03, the legislative power of the District shall extend to all rightful subjects of legislation within the District consistent with the Constitution of the United States and the provisions of this chapter . . . ."  Def.

31

Mem. 35.

However, § 1-206.01 provides that "the Congress of the United States reserves the right, at any time, to exercise its constitutional authority as legislature for the District, by enacting legislation for the District on any subject . . . ." That includes preexisting enactments such as § 1-303.43.

Section 1-303.43 specifies and limits how the District may regulate firearms. "It is familiar law that a specific statute controls over a general one . . . ." *Bulova Watch Co. v. United States*, 365 U.S. 753, 758 (1961). "When a statute limits a thing to be done in a particular mode, it includes a negative of any other mode." *Christensen v. Harris County*, 529 U.S. 576, 583 (2000).

The District's reading would nullify § 1-303.43. "It is our duty 'to give effect, if possible, to every clause and word of a statute,' . . . rather than to emasculate an entire section, as the Government's interpretation requires." *United States v. Menasche*, 348 U.S. 528, 539 (1955). *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (court must determine "whether Congress has specifically addressed the question at issue").

Consistent with the Council's own interpretation of the source of its powers, § 1-303.43 (codified then as § 1-227) was "the section on which the Council relied for its authority to enact the Firearms Act." *McIntosh v. Washington*, 395 A.2d 744, 750 n.11 (D.C. 1978). It did so again in the enactment at issue – the Firearms Registration Amendment Act of 2008, § 2, declares that "The Firearms Control Regulations Act of 1975 . . . is amended as follows," following which are the provisions at issue here.

*McIntosh*, 395 A.2d at 750 n.11, explained the interplay between § 1-203.02 and § 1-303.43 as follows:

The Home Rule Act, D.C. Code 1978 Supp., § 1-124 [current § 1-203.02], delegates

to the Council legislative power over "all rightful subjects of legislation within the District," and § 1-144(a) [current § 1-204.04] of that Act, D.C. Code 1978 Supp., vests the Council with all legislative functions granted to or vested in its predecessor District of Columbia Council.  One of these functions is provided for in D.C. Code 1973, § 1-227 [current § 1-303.43][25] . . ., the section on which the Council relied for its authority to enact the Firearms Act.  Council of the District of Columbia Report, Bill No. 1-164, April 21, 1976, at 6-7.

Accordingly, "The central controversy presented on this appeal is whether the Firearms Act constitutes a legitimate exercise of the authority vested in the Council by D.C. Code 1973, § 1-227, or whether its enactment contravenes the limitation imposed on the Council's legislative authority by § 1-147(a)(9) of the Home Rule Act, D.C. Code 1978 Supp." 395 A.2d at 750.  As to the former issue, *McIntosh* noted: "Whether the Firearms Act is a valid measure under the Home Rule Act is a question of statutory construction requiring an analysis of the following provisions: (1) Section 1-227 (regulation relative to firearms, explosives, and weapons) . . . ." *Id*.  Further, "legislative power transferred from the predecessor Council to the new Council necessarily included the function of enacting . . . gun control measures pursuant to § 1-227." *Id*. at 754.

The courts continue to determine whether the District has power to pass specific ordinances under pre-Home Rule enabling acts authorizing "reasonable and usual police regulations."[26]  *Green v. District of Columbia*, 710 F.2d 876, 877 (D.C. Cir. 1983) ("the background, *authority for*, and legal validity of" gambling regulation).  *Green* held that "Congress clearly authorized the Council

---

[25]Current § 1-303.43 was codified as § 1-227 in the 1973 Code, while current § 1-204.04 was § 1-227 in the 1981 Code.

[26]*E.g., Brown v. Barry*, 710 F. Supp. 352, 353 n.2 (D. D.C. 1989); *Karriem v. District of Columbia*, 717 A.2d 317, 321 (D.C. 1998), *cert. denied*, 526 U.S. 1147 (1999) (regulation of street vendors under current § 1-303.01(3)).

to make and enforce" that provision under current § 1-303.03.  *Id*. at 878.[27]  Similarly, the prohibitions at issue must stand or fall under § 1-303.43.

In the alternative, the District argues that the challenged provisions comply with D.C. Code § 1-303.43, which authorized enactment of "a comprehensive scheme of control over firearms kept or traded within the District."  *Maryland & D.C. Rifle & Pistol Ass'n v. Washington*, 442 F.2d 123, 125-26 (D.C. Cir. 1971), quoted in Def. Mem. 36.  However, that court did not consider specific provisions of the firearms ordinance at that time,[28] much less did it anticipate the enactment here.

The District cites *Firemen's Insurance Co. of Washington, D.C. v. Washington*, 483 F.2d 1323, 1327 (D.C. Cir. 1973), for the proposition that regulation of insurance is a reasonable and usual police regulation, and thus so must be regulation of firearms.  Def. Mem. 36-37.  The court rejected the claim that the District could not regulate insurance at all.  483 F.2d at 1328.  But the issue here is whether the specific provisions of the firearm regulations are reasonable and usual.

The District calls it a "near-specious claim" about its prohibitions that "[n]o such provisions exist in the laws of the United States or of any of the States, with the exception of a very few number of States in regard to certain provisions only."  Def. Mem. 37-38.  Yet of all these jurisdictions, only Hawaii requires the registration of all firearms, and the registrations in that State do not expire, as in the District.  Of the handful of States with "assault weapon" restrictions, all allow registered

---

[27]The same enabling act was applied in *Newsweek Magazine v. District of Columbia Comm'n on Human Rights*, 376 A.2d 777, 782 (D.C. 1977), *cert. denied*, 434 U.S. 1014 (1978) (racial discrimination); *Smith v. District of Columbia*, 436 A.2d 53, 55 & n.1 (D.C. 1981) (radar detector).

[28] "The precise question before us is narrow: the Council's power to promulgate regulations in the field of weapons control.  We neither investigate nor decide whether particular provisions of the regulations in suit, as distinguished from the regulations as a whole, exceed the Council's authority or conflict with the 1932 statute . . . ."  *Id*. at 125 n.9.

owners to possess such firearms as well as magazines holding over ten rounds.  The District is alone in imposing an absolute ban.  To say that the District's restrictions are "unusual" is an understatement.

## V.  CERTAIN OF PLAINTIFFS' CLAIMS ARE MOOT

Due to regulatory amendments by the District, certain firearms previously denied registration have now become registerable, and the claims based thereon have been rendered moot.  See also Def. Mem. 7-9, 14.  Specifically, a Smith & Wesson Model 59, 9mm caliber pistol is no longer prohibited from registration because it is not on the California Roster, see Second Amended Complaint ¶ 43, and a Baby Eagle UZI, 9mm semiautomatic pistol is no longer considered an "assault weapon" merely by reason of the "UZI" marking, see Second Amended Complaint ¶s 53-54.

Accordingly, the following portions of the Second Amended Complaint may be dismissed as moot: ¶s 36-47 in toto; ¶ 74 (only the phrase "pistols that are not on the California Roster of Handguns Certified for Sale"); ¶ 75 (only the phrase "the District denied an application by plaintiff Jordan to register a pistol because it is not on the California Roster"); ¶ 76 (only the phrase "§ 504 of the D.C. Firearms Registration Amendment Act of 2008, which prohibits pistols not on the California Roster"); and ¶s 53-54 in toto.

## CONCLUSION

The Court should deny defendants' motion for summary judgment.

Date: September 14, 2009

Respectfully Submitted,

/s/ Stephen P. Halbrook
STEPHEN P. HALBROOK, D.C. Bar No. 379799

 /s/ Richard E. Gardiner
RICHARD E. GARDINER, D.C. Bar No. 386915
3925 Chain Bridge Road, Suite 403
Fairfax, VA  22030
(703) 352-7276

Counsel for Plaintiffs

36