UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
DICK ANTHONY HELLER, *et al.*                       )
                                                    )
                        Plaintiffs,                 )
                                                    )
            v.                                      )            Civil Action No. 08-01289 (RMU)
                                                    )
DISTRICT OF COLUMBIA, *et al.*,                     )
                                                    )
                        Defendants.                 )
_____)

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Defendants (collectively, "the District"), by and through undersigned counsel, hereby submit this Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Summary Judgment, in accordance with LCvR 7(b) and (d).

As required by LCvR 56.1, defendants' Opposition to Plaintiffs' Statement of Undisputed Material Facts has also been provided, as well as a proposed Order.

I. Introduction and Summary of Argument

The Court should deny plaintiffs' motion, which advocates a wholesale rejection of District of Columbia firearms laws. Plaintiffs' absolutist view finds no support in *Heller v. District of Columbia*, ___ U.S. ___, 128 S. Ct. 2783 (Jun. 26, 2008) or any other controlling case. Plaintiffs primarily rely on outdated or inapposite case law (citing "history"), or scraps of

language stripped of context, for each of their propositions.[1] Plaintiffs' obsession with selected portions of historical documents does not support their arguments.

Moreover, plaintiffs have not cited any controlling or persuasive case decided in the 15 months since *Heller* that supports their arguments. The two declarations plaintiffs submit, one from the "Research Coordinator" of the National Rifle Association and one from the president of a company that manufactures semiautomatic weapons, do not help their cause. Neither is of value in resolving the *legal* questions here. The first cites primarily government sources regarding "the production and availability of firearms in the United States," and provides no information material to the resolution of the instant dispute. *See* Declaration of Mark Overstreet (July 23, 2009). The second is even less helpful, going into great detail on the technical specifications and features of various assault weapons, and making a number of conclusory assertions about how such weapons provide "better accuracy than a handgun" and are "commonly possessed" for "personal protection in the home" just like high-capacity ammunition magazines, which are "preferable for self protection . . ." *See* Affidavit of Mark Westrom (July 27, 2009). Notwithstanding the accuracy of the facts presented, a manufacturer of semiautomatic weapons simply is not objective.

Neither declaration is probative of the reasonableness of the District's firearms law, despite plaintiffs' broad contentions otherwise.[2]

---

[1]  The District avers that, as discussed *infra*, there is some confusion between the Second Amended Complaint ("SAC"), which challenged almost every substantive provision of the District's firearms law, and plaintiffs' instant motion, which directly addresses only a handful of those provisions.

[2]  No less than former Chief Justice Warren Burger recognized that "[t]he Gun Lobby's interpretation of the Second Amendment is one of the greatest pieces of fraud, I repeat the word fraud, on the American People by special interest groups that I have ever seen in my lifetime." Warren E. Burger, "The Right to Bear Arms," PARADE (Jan. 14, 1990). *See also Shell*

Further, plaintiffs fail to recognize that the legislative judgments and policies embodied in the disputed legislation here are entitled to considerable deference. As discussed herein, the legislative history and subsequent case law surrounding innumerable federal and local laws establish this basic principle.

In their SAC, plaintiffs challenged virtually all material conditions imposed by the District's gun laws.[3] However, in the instant motion, plaintiffs focus only on "registration" generally, and not all of the specific provisions they challenged in the SAC, failing to cite any decisions where registration requirements similar to the District's have been struck down as unconstitutional.[4] Consequently, it is not clear whether plaintiffs have abandoned some of their previous claims. *See Environmental Defense v. United States Corps of Army Engineers*, 515 F.Supp.2d 69, 74 & n.1 (D.D.C. 2007) (claim raised in Second Amended Complaint not addressed in motion for summary judgment "is therefore considered to have been abandoned").

---

*Oil v. Iowa Dept. of Revenue*, 488 U.S. 19, 29 (1988) ("the fears and doubts of the opposition are no authoritative guide to the construction of legislation.") (citations and quotation marks omitted); *NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760*, 377 U.S. 58, 66 (1964) (The Supreme Court has often "cautioned against the danger, when interpreting a statute, of reliance upon the views of its legislative opponents. In their zeal to defeat a bill, they understandably tend to overstate its reach.").

[3]     Plaintiffs concede that their claims regarding the "California Roster" and the "manufacturer name" provision (in the assault-weapons prohibition) are now moot. P.Mem. at 1 n.1, 21 n.20.

[4]     The specific claims raised by plaintiffs in the SAC, and not addressed in their motion, are: the requirement to demonstrate knowledge of use, handling, and storage of firearms (District of Columbia Official Code § 7-2502.03(a)(10)); the vision requirement (*Id.*, § 7-2502.03(a)(11)); the requirement to complete a training or safety course (*Id.*, § 7-2502.03(a)(13)(A)); the "self-reporting" requirement (*Id.*, § 7-2502.03(b)); the ballistics testing and fee requirement (*Id.*, § 7-2502.03(d)); the prohibition on registration of more than one pistol per 30 days (*Id.*, § 7-2502.03(e)); the submission of fingerprints and photographs, and the personal appearance of the applicant (*Id.*, § 7-2502.04); the requirement to exhibit the registration certificate on demand of a law enforcement officer (*Id.*, § 7-2502.08(3)). *See* SAC ¶¶ 71–72.

Apparently, plaintiffs' claim is that, in aggregate, the District's registration requirements are unconstitutionally "onerous," but cite no case for that proposition either. In any event, plaintiffs' motion fails. They have not met their burden to show that they are entitled to summary judgment.

## II. Argument

*A. Plaintiffs Are Not Entitled to Summary Judgment.*

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

In considering plaintiffs' motion, all evidence and the inferences to be drawn from it must be considered in the light most favorable to the District. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 579 (D.C. Cir. 1998). Moreover, "the evidence offered by [the District] must be accepted as correct, and all justifiable inferences must be drawn in [its] favor." *Goldman v. Bequai*, 19 F.3d 666, 672 (D.C. Cir. 1994) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

Summary judgment may not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Where more than one plausible inference can be drawn from the undisputed facts, summary judgment is not appropriate. *See United States v. Spicer*, 57 F.3d 1152, 1160 (D.C. Cir. 1995).

All the evidence and inferences drawn from it here show that the defendants are entitled to summary judgment, as they amply demonstrated in their Motion for Summary Judgment.

*Standard of Review*

Plaintiffs argue, erroneously, that the right to keep arms is "fundamental" and thus government regulation challenged under the Second Amendment is subject to "strict scrutiny." P.Mem. at 12. The Supreme Court has never determined—and did not determine in *Heller*—that the right to bear arms is a "fundamental right" under the Constitution. As the District demonstrated in its Motion for Summary Judgment (incorporated by reference herein), this Court should apply reasonableness review, the standard applied in this Circuit, and virtually every court to directly address the issue. *See Parker v. District of Columbia*, 478 F.3d 370, 399 (D.C. Cir. 2007) ("The protections of the Second Amendment are subject to the same sort of reasonable restrictions that have been recognized as limiting, for instance, the First Amendment.") (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).[5]

Moreover, plaintiffs cite *United States v. Emerson*, 270 F.3d 203, 261 (5th Cir. 2001), as setting forth the standards for "strict scrutiny" review, because the right is "fundamental." P.Mem. at 13. But that decision did neither of those things. *See United States v. Darrington*, 351 F.3d 632 (5th Cir. 2003):

> [E]*merson* is a carefully and laboriously crafted opinion, and if it intended to recognize that the individual right to keep and bear arms is a "fundamental right," in the sense that restrictions on this right are subject to "strict scrutiny" by the courts and require a "compelling state interest," it would have used these constitutional terms of art.

*Id*. at 635.

---

[5]     Although plaintiffs cite the now-vacated panel decision of *Nordyke v. King*, 563 F.3d 439 (9th Cir. 2009), for the proposition that the right is "fundamental," *id*. at 457, they fail to note that that decision *also* mandated reasonableness review of the regulations in dispute. *Id*. at 460 (the challenged law "does not meaningfully impede the ability of individuals to defend themselves in their homes with usable firearms, the core of the right as *Heller* analyzed it.").

As the District has argued, reasonableness review is appropriate. Under that test, as urged by the United States in its *amicus* brief in *Heller*, "the 'rigorousness' of the inquiry depends on the degree of burden on protected conduct, and important regulatory interests are typically sufficient to justify reasonable restrictions." U.S. Brief at 8, 20–27 (citing *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). Here, the challenged regulations do not unreasonably burden the exercise of the core right identified in *Heller*, and the important public-safety interests are more than sufficient to justify them.

*The District's Registration Requirements Are Reasonable.*

Plaintiffs assert that *Heller* "reaffirms" the proposition that "Second Amendment protection precludes registration." P.Mem. at 14. Notwithstanding that *Heller* itself implicitly acquiesced, generally, to registration requirements when it directed the District "to register [plaintiff's] handgun," 128 S.Ct. at 2822, plaintiffs are incorrect as a matter of law, and are attempting the impossible by trying to prove a negative.

Plaintiffs assert that, if the Supreme Court had intended to indicate that registration was "consistent" with the Second Amendment, it would have "simply" noted that conclusion, rather than focus on the "character of the weapon[.]" P.Mem. at 15. The Supreme Court explicitly noted that its decision in *Heller* was not meant to reveal everything the Second Amendment *allowed*, 128 S.Ct. at 2816, but was about the *one* thing before the Court that it prohibited—the District's law which "totally bans handgun possession in the home." *Id.*, 2817.

Plaintiffs' claim that a person may not be required to register to "exercise a core constitutional right," P.Mem. at 16, is indisputably incorrect. The Constitution has long permitted "registration" prior to exercising the right to vote, or to exercise the right to free

speech. Even if the right declared in *Heller* were a "core" right, the act of registration itself, like registering to vote, is not impermissible unless it "severely restrict[s]" the exercise of the right. *Crawford v. Marion County Election Bd*., ___ U.S. ___, 128 S.Ct. 1610, 1624 (2008) (citing *Burdick*, 504 U.S. at 433–34). *See also, e.g., Cox v. New Hampshire*, 312 U.S. 569, 576–77 (1941) (First Amendment freedoms not infringed by requirement of parade permit). *Cf. United States v. Freed*, 401 U.S. 601, 605 (1971) (gun-registration requirement does not violate Fifth Amendment's right against self-incrimination)

Unfortunately, in their fervor, plaintiffs state that the registration fees here are like the "poll taxes of a bygone era." P.Mem. at 18. Such a comparison is, at the very least, insulting to those generations denied the right to vote solely on the basis of race. The fees here are a valid recoupment of the government's costs, and in no way unconstitutionally "burden" the exercise of any Second Amendment rights.

Plaintiffs argue baldly that the District may not charge any fee at all here. *See* P.Mem. at 18 (citing *Murdoch v. Pennsylvania*, 319 U.S. 105, 113 (1943)). Plaintiffs are wrong again. Fees may, of course, be charged for "enjoyment of" constitutional rights, provided that the fees are tied to the government's administrative costs. *M.L.B. v. S.L.J.*, 519 U.S. 102, 123–24 & n.14 (1996) ("a State may exact fees from citizens for many different kinds of licenses.") (quoting *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 668 (1966)). Here, because the fees "reimburse the District for the cost of services provided," D.C. Official Code § 7-2502.05(b), they are constitutionally permissible.

Plaintiffs never define the term "registration," but appear to assume that it means providing information to "the government" regarding the weapon and the purchaser/possessor.

This is (at least implicitly) contrasted with a license, which apparently is assumed to be, somehow, categorically different than registration.

To the extent plaintiffs argue that the "only" historical precedent for firearm registration began "in the same era" as the National Firearms Act, 48 Stat. 1236 (1934), *see* P.Mem. at 19 & n.16, they are wrong. Even a cursory review of cases reveals ample authority showing otherwise.

> Every person selling a pistol, revolver or other firearm of a size which may be concealed upon the person, whether such seller is a retail dealer, pawnbroker or otherwise, shall keep a register, in which shall be entered at the time of sale the date of sale, name, age, occupation and residence of every purchaser of such a pistol, revolver or other firearm, together with the caliber, make, model, manufacturer's number or other mark of identification on such pistol, revolver or other firearm.

*People v. Prince*, 146 N.Y.S. 253, 254 (Sup.Ct., N.Y. County 1911) (quoting 195 N.Y. Penal Law § 1897 (1911)).[6]

Plaintiffs' clumsy attempt to shoehorn the registration issue into *Heller*'s historical analysis fails.[7] Plaintiffs grudgingly acknowledge that the Circuit in *Parker* suggested that registration of firearms is a "reasonable restriction," 478 F.3d at 399, but fail to distinguish that

---

[6]     *See also, e.g.,* Bernard Harcourt, "On Gun Registration, The NRA, Adolf Hitler, and Nazi Gun Laws: Exploding the Gun Culture Wars (A Call to Historians)," 73 FORDHAM L. REV. 653, 661–62 (2004) ("[T]he Anglo-American tradition of gun registration dates back to seventeenth-century England." *Cf. Strickland v. State*, 72 S.E. 260, 261 (Ga. 1911) (upholding law requiring license for "having or carrying . . . any pistol or revolver"); *Russo v. Parker*, 49 So. 124, 125 (Fla. 1909) (rejecting challenge to state law requiring license "to carry a pistol, Winchester or other repeating rifle"); *Republic of Hawaii v. Clark*, 10 Haw. 585, 1897 WL 1622 (Sup.Ct. Rep. Haw. 1897) (law required license to "possess, carry or use any fire-arm").

[7]     Plaintiffs' citations do, however, highlight some of the internal contradictions of "originalism." *See* P.Mem. at 17, 24 (compare *Heller*, 128 S.Ct. at 2821 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them . . .") and *id*. at 2791–92 ("Just as the First Amendment protects modern forms of communications, . . . and the Fourth Amendment applies to modern forms of search, . . . the Second Amendment extends  prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.")).

court's discussion. Moreover, the Seventh Circuit has recently said, albeit in *dictum*, that registration does not violate the Second Amendment. *Justice v. Town of Cicero*, ___ F.3d ___, 2009 WL 2477644, * 5 (7th Cir. Aug. 14, 2009) (town's gun-registration requirement "which leaves law-abiding citizens free to possess guns, appears to be consistent with the ruling in *Heller*.").

Plaintiffs make the fundamentally flawed argument that the District's requirements are "onerous" because no other State has as many "restrictions." P.Mem. at 18–19. But that argument has long been foreclosed, and mischaracterizes decades of constitutional jurisprudence.

Firearms regulations that are appropriate in densely populated urban areas may not be necessary or desirable in other parts of the country. Nor may stricter control of firearms in certain sensitive areas, such as the nation's capital, be appropriate for other jurisdictions. But as long as the challenged regulations do not prevent the exercise of the "core right" identified in *Heller*, state and local governments should be allowed to develop reasonable gun regulations for the safety and welfare of their citizens according to local conditions. *See, e.g., United States v. Lopez*, 514 U.S. 549, 581 (1995) (Kennedy, J., concurring) (under "the theory and utility of our federalism . . . States may perform their role as laboratories for experimentation to devise various solutions where the best solution is far from clear"). *See also NRA v. Chicago*, 567 F.3d 856 (7th Cir. 2009), *petitions for cert. filed*, 77 USLW 3679, 3691 (Jun. 3 & 9, 2009):

> [T]he Constitution establishes a federal republic where local differences are to be cherished as elements of liberty rather than extirpated in order to produce a single, nationally applicable rule. [F]ederalism is an older and more deeply rooted tradition than is a right to carry any particular kind of weapon.

*Id*. at 860 (citations omitted).

Plaintiffs make similar arguments in attempting to show that the District's actions here are not "usual and reasonable" pursuant to D.C. Official Code § 1-303.43 (2006 Repl.). *See*

P.Mem. at 27. Plaintiffs cite a few of the many cases confirming the broad scope of the power granted to the District by Congress, but fail to distinguish them, falling back on dictionary definitions and inapt comparisons to federal laws.

Congress expressly limited the application of those laws, however, in light of the limits on Congress' authority under the Commerce Clause to preempt the States' police powers over firearms. *See United States v. Lopez*, 514 U.S. 549, 551 (1995) (Gun-Free School Zones Act of 1990 was unconstitutional because it "neither regulates a commercial activity nor contains a requirement that the possession be connected in any way to interstate commerce."). But no such limitations adhere to Congress' plenary authority over the District, and while congressional inaction is not usually accorded much consideration, the fact that Congress has historically approved the District's gun-control regime should not go unnoticed by the Court.

Plaintiffs argue that the District's firearms laws are not "usual," and analogize to the Eighth Amendment's prohibition on "cruel and unusual punishment." P.Mem. at 29. Again, plaintiffs push the analogy too far. The constitutionality of any given jurisdiction's laws cannot be measured by the *least restrictive* of the means chosen by *other* jurisdictions.

Plaintiffs correctly state the obvious—that "unusual" means "not [in] common use." *Id*. (quoting *Harmelin v. Michigan*, 501 U.S. 957, 976 (1991)). But that comparison breaks down, not least because in the Eighth Amendment context, the term encompasses punishments that are so far outside the mainstream as to be "cruel." The District's gun laws—individually, if not collectively—are well within the range of reasonable state and local practices, as the District's dispositive motion amply demonstrated. Plaintiffs' position appears to be that *any* deviation from what "most" jurisdictions do is unconstitutional. That conclusion is fatally flawed, logically, and from the standpoint of constitutional law. Were it otherwise, no jurisdiction could enact laws that

varied "too much" from what was approved by voters elsewhere. *See, e.g., Bell v. Wolfish*, 441 U.S. 520, 554 (1979) ("Certainly, the Due Process Clause does not mandate a 'lowest common denominator' . . . standard, whereby a practice permitted at one [place] must be permitted [everywhere].");

Plaintiffs' implications aside, *Heller*, by its very language, established the *minimum* protections of the Second Amendment. The States may allow *additional* practices to those identified in *Heller*, but the District's alleged failure to do so here is simply not unconstitutional. *See Davenport v. Washington Ed. Ass'n*, 551 U.S. 177, 185 (2007) ("The constitutional floor . . . is not also a constitutional ceiling for state-imposed restrictions."); *Bracy v. Gramley*, 520 U.S. 899, 904 (1997) (distinguishing the "constitutional floor" from the ceiling of state law).[8] *Cf. Caperton v. A.T. Massey Coal Co., Inc.*, ___ U.S. ___, 129 S.Ct. 2252 (June 8, 2009) (States may adopt "standards more rigorous than due process requires.") (citation omitted).

Here, the plain fact that the District has adopted "more rigorous" firearms laws than other jurisdictions does not violate the Second Amendment, because the laws reasonably allow the exercise of the "core right" identified in *Heller*. What another jurisdiction may or may not do is of no moment. *Cf. Bach v. Pataki*, 408 F.3d 75, 92 n.33 (2nd Cir. 2005) (in rejecting challenge to New York's gun laws, "the constitutionality of one State's statutes . . . [cannot] depend upon the present configuration of the statutes of another State.") (quoting *Lunding v. New York Tax Appeals Tribunal*, 522 U.S. 287, 314 (1997)); *In re Two Seized Firearms*, 602 A.2d 728, 729

---

[8]     *See also Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1269 (3rd Cir. 1992) ("the states are free to extend more sweeping constitutional guarantees to their citizens than does the federal law, as federal constitutional law constitutes the floor, not the ceiling, of constitutional protection.") (citing *Michigan v. Long*, 463 U.S. 1032, 1040 (1983)); *LeCroy v. Hanlon*, 713 S.W.2d 335, 338 (Tx. 1986) ("The federal constitution sets the floor for individual rights; state constitutions establish the ceiling.").

(N.J. 1992) ("New Jersey need not observe the lowest common denominator of gun control among the various states.").

*Assault Weapons & High-Capacity Magazines*

Plaintiffs argue that the District's prohibition on assault weapons and high-capacity magazines violates the Second Amendment. But that argument clashes with the text of *Heller* itself. That decision contradicts plaintiffs' arguments here, because it affirmed the historical tradition on prohibitions of "dangerous and unusual weapons." 128 S.Ct. at 2817.  Plaintiffs, sensibly, prefer to focus on the word "unusual" in that phrase, and ignore any discussion of the "danger" posed by those weapons. Thus, even if plaintiffs' presentation of statistics regarding the numbers of semiautomatic weapons sold or used in the United States were relevant to decoding *Heller*'s "commonly possessed" language, those numbers say nothing of the inherent threat to public health and safety presented by those weapons.

If a State can prohibit a "dangerous" or "unusual" weapon, it is a question of *degree*, not "class." Fully automatic machine guns have been tightly regulated since 1934, so clearly *some* guns may be more strictly regulated than others. The decision as to *which* is the very definition of a legislative judgment.

Despite the longstanding proscription that "it is not the function of courts to substitute their evaluation of legislative facts for that of the legislature," *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464 (1981), plaintiffs here seek to do just that, arguing that the District's definition is impermissibly narrow, and that the specified features of such weapons do not make them "more powerful or dangerous." P.Mem. at 7; *id*. at 21.

Similar arguments were presented and rejected in numerous challenges to the federal assault-weapons ban. *See* Violent Crime Control and Law Enforcement Act, Title XI, Pub.L. 103-322, 108 Stat. 1796 (Sept. 13, 1994).[9] That law focused on guns with "physical features and characteristics designed for military applications . . . ." H.R. Rep. No. 489, 103rd Cong., 2nd Sess. (1994), 1994 U.S.C.C.A.N. 1820 (quoting U.S. Dep't of the Treasury, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles" (July 1989) ("ATF Report")). "The net effect of these military combat features is a capability for lethality—more wounds, more serious, in more victims—far beyond that of other firearms in general, including other semiautomatic guns." *Id.* (citing Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice (April 25, 1994) (Statement and testimony of Dr. David Milzman, Associate Director, Trauma Services, Georgetown Univ. Med. Center); ATF Report, at 6).

The fact that that law had a ten-year sunset provision does not mean that those legislative facts are not valid now; it is simply a result of the political compromises necessary to pass the bill in the first place. *Id.* at 586–89. The facts remain as true today as when they were first set out in the extensive legislative history of that law, and the many similar State and local laws.[10]

The District avers that "[t]he rational link between public safety and a law proscribing the possession of assault weapons is so obvious that it would seem to merit little serious discussion."

---

[9] For a comprehensive discussion of the legislative history of the federal ban, written by the Counsel to the Senate Judiciary Committee at the time, see Michael G. Lenett, "The Assault Weapons Ban: Taking a Bite Out of Violent Crime," 20 U. DAYTON L. REV. 573 (1995).

[10] *See Heller*, 128 S. Ct. at 2865 (Breyer, J., dissenting) (citing over 20 State and municipal laws banning assault weapons).

*Coalition of N.J. Sportsmen v. Whitman*, 44 F.Supp.2d 666, 686 (D.N.J. 1999), *aff'd*, 263 F.3d 157 (3rd Cir. 2001), *cert. denied*, 534 U.S. 1039 (2001).[11] Indeed, plaintiffs want to retread ground that was thoroughly covered long ago. Federal courts rejected similar challenges to the federal assault-weapons ban, which asserted that the ban was "irrational" because the listed guns were "nearly identical" to other, unprohibited guns. *See, e.g., Olympic Arms v. Magaw*, 91 F.Supp.2d 1061, 1072 (E.D. Mich. 2000) ("An initial determination of what is different and what is the same falls within the ambit of the legislature, not the judiciary.") (citing *Texas v. Certain Named and Unnamed Undocumented Alien Children*, 457 U.S. 202, 216 (1982)), *affirmed sub. nom.*, *Olympic Arms v. Buckles*, 301 F.3d 384, 390 (6th Cir. 2002) ("[T]he ability of the plaintiffs to find experts that may disagree with the congressional findings does not mean that the choices made were irrational.") (citing *Vacco v. Quill*, 521 U.S. 793, 806 (1997)).[12]

Plaintiffs complain that the District's defined features for assault weapons have "no discernable nexus to dangerousness . . . ." P.Mem. at 9. Plaintiffs' "features" arguments must fail, not only because they seek to subvert the legislative judgment of the Council (and Congress and many other State legislatures before it), but because wading into the technical minutiae is clearly unworkable. Would plaintiffs propose that legislatures (or worse, courts) engage in a gun-by-gun review for "dangerous" features? Such an exercise raises the specter of "dueling experts" disfavored in the regulatory context. *See, e.g., Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 545 (2005) (finding that trial judge's determination that one party's expert was "more persuasive"

---

[11]    *Cf.* Lenett, *supra*, at 576 (between 1986 to 1993, assault weapons were about 16 times as likely to be traced to crime than other weapons).

[12]    Similarly, "Congress is not obligated, under equal protection, to regulate all semiautomatic assault weapons in order to regulate some of them; nor is Congress restricted to achieving its legitimate ends of public safety and reducing crime in one statute." *Magaw*, 91 F.Supp.2d at 1073.

than the other, and that legislature's chosen strategy "would not actually achieve its objectives" was "remarkable, to say the least").

Even if some assault weapons could fall outside the District's definition, such a result is not of constitutional moment. Mere underinclusiveness is not actionable. *Katzenbach v. Morgan*, 384 U.S. 641, 657 (1966) ("[A] statute is not invalid under the constitution because it might have gone farther than it did [and] reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind."). "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." *Metropolis Theatre Co. v. Chicago*, 228 U.S. 61, 69–70 (1913).

Plaintiffs argue, in essence, that because there are millions of assault-weapons in use, the District may not strictly regulate them, focusing solely on *Heller*'s "commonly possessed" language. But simple logic defeats the proposition. If plaintiffs were correct, Congress or the Council could ban the possession of a particularly dangerous weapon only immediately after it was invented or made publicly available, but *not* if its dangerousness became clear after widespread usage. Such a result violates common sense and the import of *Heller*.

### III. Conclusion

Plaintiffs' wholesale attack on the District's firearms-registration requirements must be rejected. As a matter of law, plaintiffs have failed to carry the burden on their motion for summary judgment. Their motion should be denied, and judgment entered for the District on all counts.

DATE: September 15, 2009          Respectfully submitted,

PETER J. NICKLES
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division

_____/s/ Ellen A. Efros_____
ELLEN A. EFROS, D.C. Bar No. 250746
Chief, Equity Section I
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 442-9886
Facsimile: (202) 727-0431

_____/s/ Andrew J. Saindon_____
ANDREW J. SAINDON, D.C. Bar No. 456987
Assistant Attorney General
Equity I Section
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Facsimile: (202) 727-0431
andy.saindon@dc.gov