IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DICK ANTHONY HELLER, *et al.* | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Case No. 1:08-cv-01289 |
| | ) | Hon. Ricardo M. Urbina |
| THE DISTRICT OF COLUMBIA, *et al.* | ) | |
| | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

**REPLY MEMORANDUM TO DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Dick Anthony Heller, Absalom Jordan, William Carter, and Mark Snyder, by counsel, pursuant to LcvR 7(d), hereby submit this reply to Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Summary Judgment.

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

I.   THE DISTRICT HAS ADMITTED PLAINTIFFS' FACTS, CANNOT
     SUSTAIN ITS BURDEN JUST BY CITING THE COMMITTEE REPORT,
     AND PROPOSES A STANDARD OF REVIEW *HELLER* REJECTED . . . . . . . . . . . 1

     A.    The District Has Admitted the Facts in Plaintiffs' Statement of
           Material Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     B.    *Heller* Took a Categorical Approach and Rejected Reliance on the
           Committee Report and Empirical Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     C.    The Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.  THE REGISTRATION REQUIREMENTS VIOLATE THE SECOND
     AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III. THE DISTRICT MAY NOT BAN COMMONLY-POSSESSED
     FIREARMS BY CALLING THEM "ASSAULT WEAPONS" . . . . . . . . . . . . . . . . . . 16

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

# TABLE OF AUTHORITIES[*]

## CASES                                                                    Page

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Bach v. Pataki*, 408 F.3d 75 (2nd Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Burdick v. Takushi*, 504 U.S. 428 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Coalition of N.J. Sportsmen v. Whitman*, 44 F. Supp.2d 666 (D. N.J. 1999)),
 *aff'd*, 263 F.3d 157 (3rd Cir. 2001), *cert. denied*, 534 U.S. 1039 (2001) . . . . . . . . . . . . . . . . 18

*Cox v. New Hampshire*, 312 U.S. 569 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Crawford v. Marion County Election Bd.*, 128 S. Ct. 1610 (2008) . . . . . . . . . . . . . . . . . . . . . . . 1

* *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Goldman v. Bequai*, 19 F.3d 666 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Harmelin v. Michigan*, 501 U.S. 957 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966) . . . . . . . . . . . . . . . . . . . . . . 11

*Haynes v. United States*, 390 U.S. 85 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Justice v. Town of Cicero*, 2009 WL 2477644 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . 13

*M.L.B. v. S.L.J.*, 519 U.S. 102 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760*, 377 U.S. 58 (1964) . . . . . . . 3

*NRA v. Chicago*, 567 F.3d 856 (7th Cir. 2009), *petitions for cert. filed*,
 77 USLW 3679, 3691 (Jun. 3 & 9, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Olympic Arms v. Buckles*, 301 F.3d 384 (6th Cir. 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

* *Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007), *aff'd, District of
 Columbia v. Heller*, 128 S. Ct. 2783 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

ii

*People v. Prince*, 146 N.Y.S. 253 (Sup. Ct., N.Y. County 1911) . . . . . . . . . . . . . . . . . . . . . . 13

*Peoples Rights Organization v. City of Columbus*, 152 F.3d 522 (6th Cir. 1998) . . . . . . . . . . . 18

*Pointer v. Texas*, 380 U.S. 400 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Republic of Hawaii v. Clark*, 10 Haw. 585, 1897 WL 1622 (Sup. Ct. Rep. Haw. 1897) . . . . . . 13

*Robertson v. Baldwin*, 165 U.S. 275 (1897) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Robinson v. Cheney*, 876 F.2d 152 (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Russo v. Parker*, 49 So. 124 (Fla. 1909) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Shell Oil v. Iowa Dept. of Revenue*, 488 U.S. 19 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Silveira v. Lockyer,* 312 F.3d 1052 (9th Cir. 2003), *cert. denied*, 540 U.S. 1046 (2003) . . . . . 3, 7

*Staples v. United States*, 511 U.S. 600 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*State v. Mendoza*, 920 P.2d 357 (Haw. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Strickland v. State*, 137 Ga. 1, 72 S.E. 260 (1911) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Thomas v. Collins,* 323 U.S. 516 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Darrington*, 351 F.3d 632 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001), *cert. denied*,
536 U.S. 907 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Freed*, 401 U.S. 601 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Lopez*, 514 U.S. 549 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Miller*, 307 U.S. 174 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Wells*, 519 U.S. 482 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Watson v. Stone,* 148 Fla. 516, 4 So.2d 700 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**CONSTITUTION**

U.S. Const., Art. I, § 4, cl. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

U.S. Const., Amendment I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10

U.S. Const., Amendment II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const., Amendment V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

U.S. Const., Amendment VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

**STATUTES**

Ch. 339, § 7, 31 Stat. 141, 142-43 (1900) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Printing Act of 1662, 14 Car. II, ch. 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Violent Crime Control and Law Enforcement Act, Title XI, Pub. L. 103-322,
 108 Stat. 1796 (Sept. 13, 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

18 U.S.C. § 921(a)(30) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

18 U.S.C. § 922(v) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Ca. Penal Code § 11186 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Ca. Penal Code § 12280 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Ca. Penal Code § 12285 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Conn. Gen. Stat. § 53-202a(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Conn. Gen. Stat. § 53-202d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Conn. Gen. Stat. § 53-202m . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Conn. Gen. Stat. § 53-202n . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Conn. Gen. Stat. § 53-202o . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

D.C. Code § 1-303.43 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

iv

D.C. Code § 7-2501.01(3A)(A)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

D.C. Code § 7-2501.01(3A)(A)(IV)(aa) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

D.C. Code §§ 7-2501.01(3A)(A)(V) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

D.C. Code § 7-2502.01(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

D.C. Code § 7-2502.03(a)(10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

D.C. Code § 7-2502.03(a)(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

D.C. Code § 7-2502.03(a)(13)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

D.C. Code § 7-2502.03(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

D.C. Code § 7-2502.03(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

D.C. Code § 7-2502.03(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

D.C. Code § 7-2502.04(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

D.C. Code § 7-2502.04(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

D.C. Code § 7-2502.04(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

D.C. Code § 7-2502.05(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

D.C. Code § 7-2502.07a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

D.C. Code § 7-2502.08(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

D.C. Code § 7-2502.08(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Haw. Rev. Stat. § 134-4(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Md. Code § 4-303 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

N.Y. Consl. Laws § 265(22) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

N.Y. Consl. Laws § 265(22)(e)(v) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

M.G.L., Ch. 140 § 121 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

M.G.L., Ch. 140 § 131 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Ohio R.C. § 9.68 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Ohio R.C. § 2923.126 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**LEGISLATIVE MATERIALS**

*Code of Laws for the District of Columbia* (1819) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Council of the District of Columbia, Committee on Public Safety & the Judiciary,
 Report on Bill 17-843, the "Firearms Control Amendment Act of 2008,"
 Nov. 25, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

Hearing and Disposition before the House Committee on the District of
 Columbia, 94th Cong., 2d Sess., on H. Con. Res. 694, Ser. No. 94-24 (1976) . . . . . . . . . . . . . 5

*Revised Code of the District of Columbia* (1857) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**OTHER AUTHORITIES**

B. Harcourt, "On Gun Registration . . .," 73 FORDHAM L. REV. 653 (2004) . . . . . . . . . . . . . . . 12

Blackstone, *Commentaries* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

L. W. Brown, *Free Negroes in the District of Columbia, 1790-1846* (1972). . . . . . . . . . . . . . 11

W. E. Burger, "The Right to Bear Arms," PARADE (Jan. 14, 1990) . . . . . . . . . . . . . . . . . . . . . . 3

## I.  THE DISTRICT HAS ADMITTED PLAINTIFFS' FACTS, CANNOT SUSTAIN ITS BURDEN JUST BY CITING THE COMMITTEE REPORT, AND PROPOSES A STANDARD OF REVIEW *HELLER* REJECTED

### A.  The District Has Admitted the Facts in Plaintiffs' Statement of Material Facts

The District has admitted each and every fact set forth by Plaintiffs.  Defendants' Opposition to Plaintiffs' Statement of Undisputed Material Facts ("Def. Opp. Pl. State. Facts") includes only two types of responses: "the District does not dispute" the fact, or "the District objects to" the fact. Almost all of the responses add that the fact is "not material,"[1] and some add that the fact "contains argument" or "legal conclusions."[2]  However, *none* of the facts are denied, and the District produces no evidence or facts of its own.  Nor was any evidence offered in Defendants' Statement of Material Facts.

LcvR 7(h) provides that an opposition to a motion for summary judgment "shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement."  The District has set forth *no* facts and makes *no* references to the record.  LcvR 7(h) further provides: "In determining a motion for summary judgment, the court may assume that facts identified by the moving party in its

---

[1]For instance, the District "objects to paragraph 12 . . . because it is not material . . . ."  That paragraph states: "Since being introduced in 1963, roughly two million AR-15 type rifles have been manufactured."  Yet that fact is material to whether such rifles are in common use and thus constitutionally protected under *District of Columbia v. Heller*, 128 S. Ct. 2783, 2816-17 (2008).

[2]For instance, the District objected to paragraph 20 as containing "argument and legal conclusions."  However, it is purely factual: "This type of pistol grip allows the rifle to be accurately shot from the shoulder without excessive muzzle rise.  In his Marine Corps training, Carter was instructed to fire the M16 (which has a similar pistol grip) only from the shoulder and was never trained to fire it from the hip."

1

statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." Accordingly, since none of the facts in Plaintiffs' Statement of Undisputed Facts are controverted, this Court may assume that each such fact is admitted.

The District argues that Plaintiffs' Statement is devoid of "any specific, objective evidence, instead simply repeating the generally undisputed factual allegations of the Second Amended Complaint, and tacking on paragraph after paragraph of 'statistics,' which are little more than arguments and legal conclusions masquerading as facts." Def. Opp. Pl. State. Facts 1. Yet the statistics, which show production figures for firearms and magazines, are based primarily on hard data from the Bureau of Alcohol, Tobacco, Firearms and Explosives and similar sources.

The District admits as much in reference to the Declaration of Mark Overstreet, which "cites primarily government sources regarding 'the production and availability of firearms in the United States,'"[3] but why this "provides no information material to the resolution of the instant dispute" is unclear. Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Summary Judgment ("Def. Opp.") at 2. After all, under the Second Amendment "the sorts of weapons protected were those 'in common use at the time,'" i.e., weapons "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 128 S. Ct. at 2816-17.

The District also criticizes the Affidavit of Mark Westrom because he is the President of a

---

[3]Since the District fails to question Mr. Overstreet's compilation of this government data, it is unclear why the District looks askance at his employment as a Research Coordinator for the National Rifle Association. If the District's purpose is to suggest that Mr. Overstreet is not credible, the District raises an irrelevant issue since "credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts" are for the finder of fact at trial, not for the court when ruling on a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

company that manufactures rifles that the District bans as "assault weapons."  Def. Opp. 2.  Mr. Westrom relates production statistics bearing on the "common-use" issue and explains the uses of such rifles and magazines holding over ten rounds for self-defense, sport, and hunting.  The District remarks: "*Notwithstanding the accuracy of the facts presented*, a manufacturer of semiautomatic weapons simply is not objective."  Def. Opp. 2 (emphasis added).  On a motion for summary judgment, however, a court may not consider credibility: "A party may not defeat a properly supported motion for summary judgment merely by raising generalized questions as to the credibility of the movant's affiants."  *Robinson v. Cheney*, 876 F.2d 152, 162 (D.C. Cir. 1989).

Asserting that "[n]either declaration is probative," the District saw fit to add: "No less than former Chief Justice Warren Burger recognized that '[t]he Gun Lobby's interpretation of the Second Amendment is one of the greatest pieces of fraud, I repeat the word fraud, on the American People by special interest groups that I have ever seen in my lifetime.'" Def. Opp. 2 n.2, purporting to quote Warren E. Burger, "The Right to Bear Arms," PARADE (Jan. 14, 1990).[4]  Burger's article appeared in that cited issue of *Parade*, at 4-6, but it contains no such quotation.  A case containing the same mis-citation stated that Burger was referring to "the traditional individual rights view" of the Second Amendment, but condemned the alleged statement.  *Silveira v. Lockyer,* 312 F.3d 1052, 1063 (9th Cir. 2003) ("we in no way share Chief Justice Burger's view that Second Amendment enthusiasts are guilty of fraud"), *cert. denied*, 540 U.S. 1046 (2003).

It is unclear if the District is directing the quoted remark against the above two declarants,

---

[4]The District also cited to *Shell Oil v. Iowa Dept. of Revenue*, 488 U.S. 19 (1988), and *NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760*, 377 U.S. 58 (1964), apparently suggesting that little weight should be given to Mr. Overstreet and Mr. Westrom's declarations. These cases are wholly inapposite, however, as both spoke to statements made by *legislators* during the consideration of legislation.

3

who did not mention the Second Amendment, or against the *Heller* decision, which adopted the traditional individual rights view of the Amendment.[5]  If the former, it is irrelevant as it purports to attack the declarant's credibility.  If the latter, the statement is contradicted by *Heller*.

### B. *Heller* Took a Categorical Approach and Rejected Reliance on the Committee Report and Empirical Studies

Here, only the Plaintiffs have produced evidence, the District has produced none.[6]  The District virtually rests its entire case on  the committee report – Council of the District of Columbia, Committee on Public Safety & the Judiciary, Report on Bill 17-843, the "Firearms Control Amendment Act of 2008," Nov. 25, 2008 ("Com. Rep.").  Plaintiffs have produced evidence refuting the overly-general factual allegations in the committee report, Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Pl. Opp.") 20-31, but the District has not supplemented the record with any evidence of its own.

*Heller* took a categorical approach and, without *any* consideration of the committee report which sought to justify the 1976 handgun ban or the subsequent empirical studies, held:

> The handgun ban amounts to a prohibition of an entire class of "arms" that is overwhelmingly chosen by American society for that lawful purpose. The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute. Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family," . . ., would fail constitutional muster.

*Heller*, 128 S. Ct. at 2817-18.

---

[5]The District also makes several generalizations without a clear context, such as: "Plaintiffs' obsession with selected portions of historical documents does not support their arguments."  Def. Opp. 2.  Plaintiffs are at a loss to know what historical documents are being referenced.

[6]Accordingly, there is no evidence for the court to "accept[ ] as correct . . . ." *Goldman v. Bequai*, 19 F.3d 666, 672 (D.C. Cir. 1994).

4

*Heller* rejected rational basis analysis, *id*. at 2818 n.27, as well as Justice Breyer's proposed "judge-empowering 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'" *Id*. at 2821.  The District seeks to take Justice Breyer's approach in this case.

Justice Breyer relied first and foremost on the committee report which proposed the handgun ban in 1976 and which, like the report the District now cites, was filled with data on the misuse of the type of firearm it sought to justify banning.[7] *Heller*, 128 S. Ct. at 2854-55 (Breyer, J., dissenting). Justice Breyer next cited empirical studies about the alleged role of handguns in crime, injuries, and death.  *Id*. at 2855-57.  Contrary empirical studies questioning the effectiveness of the handgun ban and focusing on lawful uses of handguns, in his view, would not suffice to overcome the legislative judgment.  *Id*. at 2857-61.

*Heller* rejected the dissent's above reliance on the committee report and empirical studies as follows:

> After an exhaustive discussion of the arguments for and against gun control, Justice BREYER arrives at his interest-balanced answer: because handgun violence is a problem, because the law is limited to an urban area, and because there were

---

[7]Justice Breyer began his analysis of the report, *id*. at 2854, as follows:

> First, consider the facts as the legislature saw them when it adopted the District statute. As stated by the local council committee that recommended its adoption, the major substantive goal of the District's handgun restriction is "to reduce the potentiality for gun-related crimes and gun-related deaths from occurring within the District of Columbia." Hearing and Disposition before the House Committee on the District of Columbia, 94th Cong., 2d Sess., on H. Con. Res. 694, Ser. No. 94-24, p. 25 (1976) (hereinafter DC Rep.) (reproducing, *inter alia,* the Council committee report).

somewhat similar restrictions in the founding period (a false proposition that we have already discussed), the interest-balancing inquiry results in the constitutionality of the handgun ban. QED.

We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "interest-balancing" approach. The very enumeration of the right takes out of the hands of government – even the Third Branch of Government – the power to decide on a case-by-case basis whether the right is *really worth* insisting upon.

*Id*. at 2821.

This case is in the same posture as *Heller*, and should be resolved in the same manner by rendering summary judgment for plaintiffs.  See *id*. at 2819, 2821-22.

## C.  The Standard of Review

The right to keep and bear arms is a fundamental right subject to the strict scrutiny test.  See Plaintiffs' Memorandum in Support of Motion for Summary Judgment ("Pl. Mem.") 12-13; Pl. Opp. 2-9.  The District continues to ignore *Heller*'s statement: "By the time of the founding, the right to have arms had become fundamental for English subjects."  128 S. Ct. at 2798.

The District repeats its argument for a "reasonableness test," Def. Opp. 5, although it fails to articulate how it differs from rational basis.  While it is a truism that all restrictions on all constitutional rights must be "reasonable," use of that term hardly ends the matter.  That is exemplified by the following statement in *Parker v. District of Columbia*, 478 F.3d 370, 399 (D.C. Cir. 2007): "The protections of the Second Amendment are subject to the same sort of reasonable restrictions that have been recognized as limiting, for instance, the First Amendment."  To be "reasonable," however, restrictions on core First Amendment rights must pass the strict scrutiny test and, even where exercised in a public forum with public impact (where reasonable time, place, or manner restrictions may apply), the restrictions must be "narrowly tailored to serve a significant

governmental interest . . . ."  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).  The District

cites *Ward* but is silent on its holding.

*United States v. Emerson*, 270 F.3d 203, 261 (5th Cir. 2001), *cert. denied*, 536 U.S. 907

(2002), stated that the right is not violated by "limited, narrowly tailored specific exceptions or

restrictions for particular cases that are reasonable and not inconsistent with the right of Americans

generally to individually keep and bear their private arms . . . ."  The District cites *United States v.*

*Darrington*, 351 F.3d 632, 635 (5th Cir. 2003), which in *dictum* questioned whether *Emerson* held

the right to be fundamental and subject to strict scrutiny.  Since "we read *Emerson* as excluding

felons as a class from the Second Amendment's protection," *id.*, the standard of review as applied

to law-abiding persons was not even relevant in *Darrington*.

The District suggests that under reasonableness review, "the 'rigorousness' of the inquiry

depends on the degree of burden on protected conduct, and important regulatory interests are

typically sufficient to justify reasonable restrictions."  Def. Opp. 6.  This review is indistinguishable

from the *Heller*-rejected "'interest-balancing inquiry' that 'asks whether the statute burdens a

protected interest in a way or to an extent that is out of proportion to the statute's salutary effects

upon other important governmental interests.'"  *Heller*, 128 S. Ct. at 2821.

## II.  THE REGISTRATION REQUIREMENTS VIOLATE THE SECOND AMENDMENT

The District faults Plaintiffs for "failing to cite any decisions where registration requirements

similar to the District's have been struck down as unconstitutional."  Def. Opp. 3.  Yet no State in

the entire United States has (or has ever had) registration requirements as draconian as the District's.

See Pl. Opp. 10-20.  Moreover, until *Heller*, many courts read the Second Amendment as not even

protecting individual rights, *e.g.*, *Silveira*, 312 F.3d 1052, or as requiring nothing more than a

7

rational basis for restrictions.  *E.g.*, *State v. Mendoza*, 920 P.2d 357, 368 (Haw. 1996).

The District suggests that "in the instant motion, plaintiffs focus only on 'registration' generally, and not all of the specific provisions they challenged in the [Second Amended Complaint]," possibly waiving the latter.  Def. Opp. 3 & n.4.  To the contrary, Plaintiffs' motion for summary judgment challenges each and every one of the provisions in question.[8]  Indeed, each such provision is a component of "registration" – the District will not issue a registration certificate without the requirements of those provisions having been met.

In this same connection, the District avers: "Plaintiffs never define the term 'registration,' but appear to assume that it means providing information to 'the government' regarding the weapon and the purchaser/possessor."  Def. Opp. 7.  But the District itself defines the term – "no person . . . shall possess or control any firearm, unless the person . . . holds a valid registration certificate for the firearm."  D.C. Code § 7-2502.01(a).  Registration entails disclosing personal information, including previous occupations, § 7-2502.03(b); passing tests prescribed by the MPD, § 7-2502.03(a)(10); passing the vision test, § 7-2502.03(a)(11); completing a training course, § 7-2502.03(a)(13)(A); fingerprinting, photographs, and personal appearance, § 7-2502.04(a)-(c); ballistics test and fees therefor, § 7-2502.03(d); registration fees, § 7-2502.05(b); one gun a month, § 7-2502.03(e); exhibition of registration certificate on police demand, § 7-2502.08(3); notice of changed information, § 7-2502.08(1); and expiration and re-registration, § 7-2502.07a.  This is what

---

[8]Plaintiffs explicitly challenge each of the specific requirements.  Pl. Mem. 2-3.  It next demonstrates how the individual Plaintiffs have been burdened by these provisions.  Pl. Mem. 3-5. It then demonstrates why registration may not be required to exercise the core Second Amendment right, referring not just to the registration requirement per se, but also to the fees, ballistics tests, and the training and testing requirements.  Pl. Mem. 14-21.  The provisions are also challenged in Pl. Opp. 9-20.

"registration" means to the District, and this is what Plaintiffs challenge.

*United States v. Miller*, 307 U.S. 174, 178-79 (1939), addressed the issue of whether the requirement of registration under the National Firearms Act violated the Second Amendment by asking whether the firearm could have militia uses and was in common use, and thus was constitutionally guaranteed. By focusing on the type of arm, a premise of *Miller* was that a person who is not in a militia has Second Amendment rights. *Heller*, 128 S. Ct. at 2814. Another premise was that the registration requirement would violate the Second Amendment if and only if the arm was protected. Pl. Mem. 14-16.

While the District is correct in noting that *Heller*'s holding did not address registration, Def. Opp. 6, it ignores *Miller*'s above premise and the acceptance of that premise by *Heller*. If registration would not violate the Second Amendment, the entire discussion in *Miller* would have been a useless exercise. Rather than dwell on the type of firearm, *Miller* could have simply held that registration of constitutionally-protected arms does not violate the Second Amendment.[9]

The District disputes Plaintiffs' argument that a person may not be required to register to exercise a core constitutional right, Pl. Mem. 16, and contends: "The Constitution has long permitted 'registration' prior to exercising the right to vote, or to exercise the right to free speech." Def. Opp. 6-7. It ignores precedents such as *Thomas v. Collins,* 323 U.S. 516, 539-40 (1945), which held: "If the exercise of the rights of free speech and free assembly cannot be made a crime, we do not think

_____

[9]The District cites *United States v. Freed*, 401 U.S. 601, 605 (1971), as holding that certain firearm registration requirements (under the National Firearms Act) did not violate the Fifth Amendment right against self-incrimination. Def. Opp. 7. However, that Act's prior registration provisions were held violative of the right against self-incrimination because the required information could be used to prosecute the registrant. *Haynes v. United States*, 390 U.S. 85 (1968). Felons thus have a potential Fifth Amendment defense against prosecutions for possession of unregistered firearms.

this can be accomplished by the device of requiring previous registration as a condition for exercising them . . . ."  Nor does it cite any precedent for its implication that registration may be required to exercise the rights to religion, speech, press, assembly,[10] petition, or security from unreasonable search and seizure.

The District argues that fees may "be charged for 'enjoyment of' constitutional rights, provided that the fees are tied to the government's administrative costs." Def. Opp. 7.  But the case cited, *M.L.B. v. S.L.J.*, 519 U.S. 102 (1996), said no such thing.  It merely stated that a "State may exact fees from citizens for many different kinds of licenses," for example, the State "can demand from all an equal fee for a driver's license." *Id*. at 124, n.14.  Notably, *M.L.B.* held that the State could not charge a fee to appeal an order terminating parental rights.

Charging for the enjoyment of a constitutional right would apply only when a specific person exercises a right which imposes a cost on society, such as a march requiring closure of streets and the need for traffic control.  The government may not condition exercise of a core constitutional right in one's home – such as worshiping, speaking, writing, keeping a gun, and keeping the police out of one's home without a warrant – on a registration regime and then justify imposing "administrative costs" to pay for it.

It verges on the frivolous to compare exercise of the right to vote, which is inconceivable without a list of qualified voters, to exercise of Bill of Rights guarantees, which requires no list of qualified persons.  "The Times, Places and Manner of holding Elections for Senators and

---

[10]Exercise of First Amendment rights in public places with impact on the public may require special permits, but that is not the norm for exercise of the core rights without such special circumstances. *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941) (license fee for parade on public road justified based on the "public expense of policing the spectacle").

10

Representatives, shall be prescribed in each State by the Legislature thereof . . . ." U.S. Const., Art.

I, § 4, cl. 1.  The exercise of core Bill of Rights guarantees is not subject to such legislative

prescription.  "[A]s a practical matter, there must be a substantial regulation of elections if they are

to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic

processes."  *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (citation omitted).  *See Crawford v.*

*Marion County Election Bd.*, 128 S. Ct. 1610, 1623 (2008) (upholding requirement of showing

identification when voting).

The District drops the analogy to voting when it comes to paying fees to exercise Second

Amendment rights.  "[W]ealth or fee paying has, in our view, no relation to voting qualifications;

the right to vote is too precious, too fundamental to be so burdened or conditioned."  *Harper v.*

*Virginia State Board of Elections*, 383 U.S. 663, 670 (1966) (invalidating $1.50 poll tax).  The

District asserts that any analogy of the registration fees to poll taxes is "insulting to those generations

denied the right to vote solely on the basis of race."  Def. Opp. 7.

Yet historically, invidious firearm restrictions were also based on race.  In *Heller*, the District

lauded its long history of firearm restrictions,[11] but its first prohibition on mere possession thereof

was: "No slave shall, in the said District . . . keep nor carry away any gun, powder, shot, club, or

other weapon offensive or defensive . . . ."  *Code of Laws for the District of Columbia* 290-91

(1819).  In addition, "No negro or mulatto whatsoever, in the said District, shall keep or carry any

gun, powder, shot, club, or other weapon, offensive or defensive . . . ."  *Id*. at 300.[12]  A later version

---

[11]Brief for Petitioners, *District of Columbia v. Heller*, No. 07-290, at 3-4.

[12]Free blacks in the District were "prohibited from voting, from holding office, from testifying against white people in court, from serving on juries, and from bearing arms."  Letitia W. Brown, *Free Negroes in the District of Columbia, 1790-1846*, at 140 (1972).

provided: "No slave shall be permitted, within this District, to carry any gun or other offensive weapon off his master's land, without a license from such master . . . ." *Revised Code of the District of Columbia* 174 (1857).

While Plaintiffs do not claim that the District today supports any such policies, it endorses laws which lent themselves to such abuses. Arguing "historical precedent for firearm registration," it cites a Florida law "requiring [a] license 'to carry a pistol, Winchester or other repeating rifle.'" Def. Opp. 8 & n.6, quoting *Russo v. Parker*, 49 So. 124, 125 (Fla. 1909). Defendant omits the fact that "[t]he Act was passed for the purpose of disarming the negro laborers . . . . [T]here had never been . . . any effort to enforce the provisions of this statute as to white people, because it has been generally conceded to be in contravention of the Constitution . . . ." *Watson v. Stone,* 148 Fla. 516, 524, 4 So.2d 700 (1941) (Buford, J., concurring).

The District avers that "the Anglo-American tradition of gun registration dates back to seventeenth-century England." Def. Opp. 8 & n.6, quoting Bernard Harcourt, "On Gun Registration . . .," 73 FORDHAM L. REV. 653, 661-62 (2004). That source cites a 1660 law requiring gunsmiths to produce records on persons who purchased firearms. *Id*. at 661. That was followed by a law authorizing officials "to search for and seize all arms in the . . . possession of any person . . . whom the said lieutenant . . . shall judge dangerous to the peace of the kingdom . . . ." 13 & 14 Car. II c.3 (1662).[13] These were some of the laws the Stuart Kings, Charles II and James II, used "to suppress political dissidents, in part by disarming their opponents," and "what the Stuarts had tried to do to

---

[13]Similarly, the Printing Act of 1662, 14 Car. II, ch. 33, required licenses for the press. About such laws Blackstone wrote: "To subject the press to the restrictive power of a licenser . . . is to subject all freedom of sentiment to the prejudices of one man . . . ." 4 Blackstone, *Commentaries* *152 & n. The District could just as well aver that "the Anglo-American tradition of press registration dates back to seventeenth-century England."

their political enemies, George III had tried to do to the colonists." *Heller*, 128 S. Ct. at 2798-99. The Second Amendment was designed to prevent these very abuses.

The District's other "historical precedents" for firearm registration are not substantiated by the cases it cites. Def. Opp. 8 & n.6. A requirement that a firearm seller keep a record is not the same as the government keeping the record. *People v. Prince*, 146 N.Y.S. 253, 254 (Sup. Ct., N.Y. County 1911) ("Every person selling a pistol . . . whether such seller is a retail dealer, pawnbroker or otherwise, shall keep a register"). The law in *Strickland v. State*, 137 Ga. 1, 72 S.E. 260, 261 (1911), required a license for "having or carrying about his person . . . any pistol or revolver," not for mere possession thereof. *Id*. at 264.[14]

Nor is the *dictum* cited by the District in other cases apposite. Def. Opp. 8. *Parker v. District of Columbia*, 478 F.3d 370, 399 (D.C. Cir. 2007), suggested that registration *keyed to knowing "how many people would be armed for militia service if called up"* may be reasonable, but that would *not* apply to persons traditionally excluded from the militia – "physically disabled persons" as well as "men over the age of forty-five and women." *See also Justice v. Town of Cicero*, 2009 WL 2477644, *4 (7th Cir. 2009) (pro se challenge holding that the Second Amendment does not apply to the States).

While it is not a State, the District appeals to "federalism" concerns. Def. Opp. 9. In addition to the fact that "federalism" concerns are wholly irrelevant to the District, "to deny to the States the power to impair a fundamental constitutional right is not to increase federal power, but,

---

[14]An 1896 Hawaii law required a license to "possess, carry or use any fire-arm," *Republic of Hawaii v. Clark*, 10 Haw. 585, 1897 WL 1622 (Sup. Ct. Rep. Haw. 1897). But Hawaii was at that time an independent state, and did not become a U.S. territory until 1900, at which time specified penal laws concerning "Firearms" were repealed. Ch. 339, § 7, 31 Stat. 141, 142-43 (1900).

rather, to limit the power of both federal and state governments in favor of safeguarding the fundamental rights and liberties of the individual." *Pointer v. Texas*, 380 U.S. 400, 414 (1965) (Goldberg, J., concurring).

The District claims that "[F]ederalism is an older and more deeply rooted tradition than is a right to carry any particular kind of weapon."  Def. Opp. 9, quoting *NRA v. Chicago*, 567 F.3d 856, 860 (7th Cir. 2009), *petitions for cert. filed*, 77 USLW 3679, 3691 (Jun. 3 & 9, 2009).  On this, the Seventh Circuit was plainly wrong as the Second Amendment embodied a right "inherited from our English ancestors," *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897), while "federalism was the unique contribution of the Framers to political science and political theory."  *United States v. Lopez*, 514 U.S. 549, 575 (1995) (Kennedy, J., concurring).

The District avers: "the fact that Congress has historically approved the District's gun-control regime should not go unnoticed by the Court."  Def. Opp. 10.  Congress has not "approved" this regime, it has simply not acted to disapprove it.  "[I]t is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law . . . ."  *United States v. Wells*, 519 U.S. 482, 496 (1997) (citation omitted).  The District's handgun ban had been on the books since 1976 without Congress' disapproval, but the Supreme Court did not hesitate to declare it violative of the Second Amendment in 2008.

Plaintiffs have demonstrated that the ordinances challenged here are unusual and unreasonable, contrary to D.C. Code § 1-303.43, in which Congress authorized the District to make "usual and reasonable police regulations . . . for the regulation of firearms . . . ."  Pl. Mem. 27-32.  District concedes "the obvious – that 'unusual' means "not [in] common use."  Def. Opp. 10, quoting *Harmelin v. Michigan*, 501 U.S. 957, 976 (1991) (analyzing "cruel and unusual" in Eighth

14

Amendment).   The comparison breaks down, the District suggests, "because in the Eighth Amendment context, the term encompasses punishments that are so far outside the mainstream as to be 'cruel.'" But this ignores the conjunction "and."   "Severe, mandatory penalties may be cruel, but they are not unusual in the constitutional sense, having been employed in various forms throughout our Nation's history."   *Harmelin*, 501 U.S. at 994-95.   By the same token, firearm regulations must be both "usual *and* reasonable," not just "reasonable" in the District's view.

The District seeks to absolve its regulations from the requirement of being "usual" by arguing that the "constitutionality of any given jurisdiction's laws cannot be measured by the *least restrictive* of the means chosen by *other* jurisdictions."   Def. Opp. 10.   Plaintiffs do not argue that the District's laws are not constitutional because they are not "usual and reasonable," but that the District's laws violate D.C. Code § 1-303.43 because they are not "usual and reasonable."   Thus, the District's argument that Plaintiff's position is "fatally flawed, logically, and from the standpoint of constitutional law" (Def. Opp. 10) is without any foundation. The issue is whether the District's restrictions are beneath the *statutory* floor of being "usual and reasonable" or the *constitutional* floor of being infringements on Second Amendment rights.   That the constitutional floor is not the constitutional ceiling, see Def. Opp. 12, is not relevant to this analysis.

The District asserts that its laws "are well within the range of reasonable state and local practices, as the District's dispositive motion amply demonstrated."   Def. Opp. 10.   On the contrary, the few laws it cited demonstrated that the District's laws are novel and unique, and, while a tiny minority of states have adopted a few elements of the District's laws, none have gone as far as the District.

The District cites *Bach v. Pataki*, 408 F.3d 75, 92 n.33 (2nd Cir. 2005), for the proposition

that, in rejecting a challenge to New York's gun laws, "the constitutionality of one State's statutes . . . [cannot] depend upon the present configuration of the statutes of another State." But that related only to a claim under the Privileges-or-Immunities Clause, not to the Second Amendment, which *Bach* held inapplicable to the States. *Id*. at 88.

### III.  THE DISTRICT MAY NOT BAN COMMONLY-POSSESSED FIREARMS BY CALLING THEM "ASSAULT WEAPONS"

Plaintiffs have demonstrated that what the District maligns as "assault weapons" are ordinary firearms commonly possessed for lawful purposes. Pl. Mem. 21-27; Pl. Opp. 20-29. Moreover, countless millions of what it calls "large capacity ammunition feeding devices" are commonplace throughout the United States. Pl. Mem. 21-27; Pl. Opp. 29-31.

*Heller* instructs that "the sorts of weapons protected were those 'in common use at the time.' . . . We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous *and* unusual weapons.'" 128 S. Ct. at 2817 (emphasis added). This justified restrictions on the M-16 machinegun and "sophisticated arms that are highly unusual in society at large." *Id*. Other than that, *Heller* refers to longstanding restrictions, but none involve a prohibition on firearm or magazine possession by law-abiding persons. *Id*. at 2816-17.

The District seeks to delete "and unusual" out of "dangerous and unusual" and argues that the District may ban any firearm it labels as "dangerous" "even if plaintiffs' presentation of statistics regarding the numbers of semiautomatic weapons sold or used in the United States were relevant to decoding *Heller*'s 'commonly possessed' language . . . ." Def. Opp. 12. It transforms *Heller*'s conjunctive "and" to its own disjunctive "or" as follows: "a State can prohibit a 'dangerous' *or* 'unusual' weapon . . . ." *Id*. (emphasis added).

16

It goes without saying that any firearm can be dangerous, particularly when possessed by a criminal or other irresponsible person. "Even dangerous items can, in some cases, be so commonplace and generally available that we would not consider them to alert individuals to the likelihood of strict regulation. . . . [D]espite their potential for harm, guns generally can be owned in perfect innocence." *Staples v. United States*, 511 U.S. 600, 611 (1994). "Automobiles . . . might also be termed 'dangerous' devices . . . ." *Id*. at 614. Contrasting ordinary firearms, such as the AR-15 semiautomatic rifle involved in that case, from "machineguns, sawed-off shotguns, and artillery pieces," the Court noted that "guns falling outside those [latter] categories traditionally have been widely accepted as lawful possessions . . . ." *Id*. at 612.

The District continues that "similar arguments" were "rejected in numerous challenges to the federal assault-weapons ban. *See* Violent Crime Control and Law Enforcement Act, Title XI, Pub. L. 103-322, 108 Stat. 1796 (Sept. 13, 1994)." Def. Opp. 13 (citing snippets from legislative history but no judicial decisions). But the District may not legitimately ride piggy back on the expired federal law, which defined "assault weapon" to include a *short* list of named firearms as well as certain firearms with *two* specified generic characteristics, and even excluded any firearm lawfully possessed before the date of enactment.[15] The District defines "assault weapon" to include a *long* list of named firearms as well as certain firearms with *only one* specified generic characteristic, and including even "[a]ny firearm that the Chief may designate as an assault weapon by rule . . . ." D.C. Code § 7-2501.01(3A)(A)(iii). Just by using the word "assault weapon," the District may not thereby rely on what it calls the "legislative facts" set out in the "legislative history" of the federal law (or

---

[15] 18 U.S.C. §§ 921(a)(30), 922(v) (expired 2004).

some unknown "legislative history" of unnamed "State and local laws").  Def. Opp. 13.[16]

"[T]he [rational-basis] test could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms."  *Heller*, 128 S. Ct. at 2818 n.27. Despite that clear language, the District persists in arguing in favor of, and citing cases that applied, the rational-basis test to "assault weapon" laws.  Def. Opp. 14, citing *Coalition of N.J. Sportsmen v. Whitman*, 44 F. Supp.2d 666, 686 (D. N.J. 1999) ("plaintiffs cannot meet their heavy burden in showing that this law bears no rational relationship to a legitimate state interest"), *aff'd*, 263 F.3d 157 (3rd Cir. 2001), *cert. denied*, 534 U.S. 1039 (2001); *Olympic Arms v. Buckles*, 301 F.3d 384, 390 (6th Cir. 2002) ("[T]he ability of the plaintiffs to find experts that may disagree with the congressional findings does not mean that the choices made were irrational.").  Neither of these cases raised Second Amendment issues.

The District defines "assault weapon" to include firearms with specified features with no discernable nexus to dangerousness, *e.g.*, rifles with conspicuously protruding pistol grips, and pistols which accept detachable magazines outside the pistol grip.   D.C. Code §§ 7-2501.01(3A)(A)(IV)(aa), (V).  Instead of offering any basis for banning firearms with such features,

---

[16]The District refers to *Heller*, 128 S. Ct. at 2865 (Breyer, J., dissenting) (citing State and municipal laws banning assault weapons).  Def. Opp. 13 n.10.  None of the six States cited have absolute bans as does the District.  Hawaii and Maryland only require "assault pistols" to be registered. Haw. Rev. Stat. § 134-4(e); Md. Code § 4-303.  Connecticut and New York require some to be registered and exempt others.  Conn. Gen. Stat. §§ 53-202a(a)(3), 53-202d, -m, -n, -o; N.Y. Consl. Laws §§ 265(22), 265(22)(e)(v).  Massachusetts allows any person to apply for a license to possess. M.G.L., Ch. 140 §§ 121, 131.  California exempts registered assault weapons.  Ca. Penal Code §§ 12280, 12285, 11186.  Of the municipalities cited, the four from Ohio are preempted by State law, Ohio R.C. §§ 9.68 & 2923.126, and one of these was also declared unconstitutionally vague.  *Peoples Rights Organization v. City of Columbus*, 152 F.3d 522 (6th Cir. 1998).

the District asks: "Would plaintiffs propose that legislatures (or worse, courts) engage in a gun-by-gun review for 'dangerous' features?" Def. Opp. 14. This begs the question – the District cannot ban a constitutionally-protected object and then refuse to explain why. Nor is there any need for a "gun-by-gun" review – commonly-possessed firearms are protected, including those with the features the District dislikes.

This brings us back to the District's rejection of *Heller*'s holding that "commonly-possessed" firearms – which include the millions of semiautomatic firearms the District labels "assault weapons" – are guaranteed. It repeats the argument it unsuccessfully made in *Heller* in support of its handgun ban:[17] "If plaintiffs were correct, Congress or the Council could ban the possession of a particularly dangerous weapon only immediately after it was invented or made publicly available, but *not* if its dangerousness became clear after widespread usage." Def. Opp. 15. That was also Justice Breyer's argument. *Heller*, 128 S. Ct. at 2869 (Breyer, J., dissenting) ("once it [a weapon] becomes popular Congress will no longer possess the constitutional authority to [ban it]"). The Court rejected that view.

In sum, the millions of firearms and magazines of the types that the District bans are "in common use" throughout the United States and are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 128 S. Ct. at 2816-17. As if by waving a magic wand, the District may not justify banning them by calling them a pejorative name.

## CONCLUSION

The Court should grant plaintiffs' motion for summary judgment.

---

[17]Brief for Petitioners, *District of Columbia v. Heller*, No. 07-290, at 44.

19

Date: September 24, 2009

Respectfully Submitted,

/s/ Stephen P. Halbrook
STEPHEN P. HALBROOK, D.C. Bar No. 379799

 /s/ Richard E. Gardiner
RICHARD E. GARDINER, D.C. Bar No. 386915
3925 Chain Bridge Road, Suite 403
Fairfax, VA  22030
(703) 352-7276

Counsel for Plaintiffs