Expert Report of Cathy L. Lanier
April 18, 2013
*Heller v. District of Columbia*, No. 08-01289 (JEB)

## BACKGROUND AND QUALIFICATIONS

I am the Chief of Police of the Metropolitan Police Department of the District of Columbia ("MPD"), a position I have held since 2007. I have worked in the MPD for my entire law enforcement career, dating back to 1990.

During my tenure as Chief, I have overseen MPD's efforts to develop and implement better strategies to prevent gun violence, and arrest and prosecute violent criminal offenders. In November 2007, I reinstituted the Gun Recovery Unit, which had been disbanded in the 1990s, and staffed it with officers with enhanced training on identifying and recovering illegal guns. In March 2008, the District began a collaborative information-sharing process among local criminal justice agencies, including police, prosecutors, Superior Court, and the Court Services and Offender Supervision Agency ("CSOSA") and the D.C. Pretrial Services Agency. The collaboration tracks gun cases from arrest to prosecution, allowing these agencies to identify repeat offenders, follow trends, and create law-enforcement strategies to prevent gun-related crimes. During my tenure as Chief, MPD has continued its long-running efforts to get illegal guns off of the street, and has successfully recovered more than 12,000 illegal firearms since 2007.

Prior to serving as Chief, I served in a number of positions within MPD that gave me extensive experience analyzing terrorist threats in and to the District and developing ways to combat them. Between 2002 and 2006, I served as Commander of MPD's Special Operations Division ("SOD"), where I managed the Special Events/Dignitary Protection Branch, Emergency Response Team, Aviation and Harbor Units, Horse Mounted and Canine Units, and Civil Disturbance Units. During my tenure as SOD Commander, I established the agency's first Homeland Security/Counter-Terrorism Branch and created an agency-wide chemical, biological, radiological response unit known as the Special Threat Action Team.

In 2006, I was named the first Commanding Officer of MPD's Office of Homeland Security and Counter-Terrorism ("OHSCT"). In this role, I worked extensively with a multi-agency taskforce of local and federal law enforcement agencies to plan and implement security for critical events like the Presidential Inaugural. In addition, I took the lead role in developing and implementing coordinated counter-terrorism strategies for all units within the MPD and launched Operation TIPP ("Terrorist Incident Prevention Program").

Prior to these positions, I served in uniformed patrol, including as Commander of the Fourth District, one of the largest and most diverse residential patrol districts in the city. I have also served as the Commanding Officer of the Department's Major Narcotics Branch and Vehicular Homicide Units.

Expert Report of Cathy L. Lanier
April 18, 2013
*Heller v. District of Columbia*, No. 08-01289 (JEB)

I am a graduate of the FBI National Academy and the federal Drug Enforcement Administration's Drug Unit Commanders Academy. I have Bachelor's and Master's Degrees in Management from Johns Hopkins University, and a Master's Degree in National Security Studies from the Naval Postgraduate School in Monterey, California.

**MATERIALS REVIEWED**

I have completed review of the following documents related to this matter:

Plaintiffs' Third Amended Complaint (For Declaratory Judgment, Injunctive Relief, and Writ of Mandamus) July 31, 2012.

The parties' written responses and documents provided in discovery in this case.

D.C. Official Code §§ 7-2501.01 et seq. (2012 Supp.), as amended.

Title 24, D.C. Municipal Regulations, Ch. 23, as amended.

The materials found at the Metropolitan Police Department's website regarding firearms registration, *http://mpdc.dc.gov/service/firearm-registration-district-columbia*, including the Online Firearms Safety Training Course and "Firearms Registration: General Requirements and Study Guide" (*available at* http://mpdc.dc.gov/node/225052).

Anything otherwise referenced in this report.

The opinions that I render in this report are based on my experience, my review of numerous studies and books, the District of Columbia's firearms laws and regulations, and discovery materials from this case made available to me. The materials I used to formulate my opinions are listed above and are not exhaustive. I anticipate reviewing additional materials as they become relevant and available and reserve the right to amend my report, opinion, and testimony as necessary.

**LAWS AT ISSUE**

Plaintiffs' Third Amended Complaint ("TAC") alleges, generally, that the District's firearm-registration requirements are "unduly burdensome" as to their right to "keep and bear arms" as set forth in the Second Amendment of the U.S. Constitution. *See* TAC at 4.

District of Columbia law requires that an applicant seeking to register a firearm must demonstrate satisfactory knowledge of District firearms laws, including storage and transport. D.C. Official Code § 7-2502.03(a)(10). Applicants must provide evidence of the completion of a firearms training and safety class. *Id.*, § 7-2502.03(a)(13). Applicants may not register more than one pistol in any 30-day period, except for new residents. *Id.*, § 7-2502.03(e). Applicants are also

Expert Report of Cathy L. Lanier
April 18, 2013
*Heller v. District of Columbia*, No. 08-01289 (JEB)

required to submit photographs and fingerprints, and appear in person with the firearm sought to be registered. *Id.*, § 7-2502.04.

District of Columbia law also requires that firearms registration must be renewed every three years, by the submission of "a statement attesting to the registrant's possession of the registered firearm, address," and "continued compliance with all registration requirements set forth in § 7-2502.03(a)." TAC ¶ 47 (citing also § 7-2502.07a(c)). District law also requires firearms registrants to notify the Chief of Police immediately in writing immediately of the loss, theft, or destruction of a firearm, or of any change in name or address; registrants must notify the Chief in writing of the sale, transfer or other disposition of the firearm within 2 business days. D.C. Official Code § 7-2502.08(a). Firearms registrants also must maintain, when they have the firearm in their possession, a copy of the registration certificate, and present it on demand of law enforcement. *Id.*, § 7-2502.08(c).

**EXPERT FINDINGS**

*The District Presents Unique Law Enforcement Challenges*

Washington, DC poses unique security challenges for law enforcement given its status as the Nation's Capitol. Protecting government officials and infrastructure is a challenge for every city in the United States, but in the District – where the likelihood of terrorist attack is higher – the challenges to law enforcement are even greater.

The District's high concentration of iconic structures – such as the national monuments, the White House, and the Capitol – provide obvious targets for would-be terrorists, both foreign and domestic. In addition, the District hosts 176 foreign embassies, as well as the headquarters of many international organizations, trade unions, non-profit organizations, lobbying groups, and professional associations. As we have learned from the bombing of the Murrah Federal Building in Oklahoma City and the 1993 shootings outside of CIA headquarters at Langley, Virginia, any Federal building or career public servant can be a potential target. Indeed, just since I've been a member of MPD, there have been no less than three incidents in which multiple shots have been fired at the White House (in 1994, 2001, and 2011), at least two of which involved a semi-automatic rifle.

Further, the District offers no shortage of high-profile human targets, including the President, members of Congress, and Supreme Court justices. In addition to members of the U.S. government, approximately 3,000 foreign dignitaries spend time in the District each year, including more than 400 who make official visits each year. Moreover, approximately 8,000 delegates come to Washington from around the world each Fall for a meeting of the Boards of Governors of the International Monetary Fund and World Bank. Indeed, the sheer volume of secure motorcades traveling in Washington on any given day – including the daily movement of

Expert Report of Cathy L. Lanier
April 18, 2013
*Heller v. District of Columbia*, No. 08-01289 (JEB)

the President, Vice President, and their families – present a substantial security challenge, distinct from other American cities.

In addition to assisting in the secure movement of government officials and protecting foreign dignitaries, MPD also provides security support for more than 4,000 special events annually, including the Fourth of July celebration on the National Mall, the National and Marine Corps Marathons, large demonstrations involving hundreds of thousands of participants and frequently counter protests, and the Presidential Inauguration.

As a law enforcement officer, my immediate concern is to protect the public. In the District, where a terrorist incident, no matter how small, would garner world-wide attention and could have significant international implications, the stakes are even higher. Moreover, as Chief, the safety of the men and women of MPD serving this city and country are my responsibility, and I take this responsibility very seriously. In my professional opinion, the District's firearms-registration laws, identified above, significantly aid MPD's efforts to prevent violent crime, ensure the security of the Nation's Capitol, and protect the safety of law enforcement officers and members of the public.

### *The District's Firearms Registration Laws Aid MPD's Law Enforcement Efforts*

The District's firearm-registration process serves four key objectives: (i) verifying the eligibility of the owner to legally possess the firearm; (ii) ensuring that owners have a common body of knowledge of firearms laws, responsibilities, and safety; (iii) providing law enforcement with the information necessary to readily identify legal firearms and their rightful owners; and (iv) preventing the illegal trafficking of firearms into the District.

*Verifying Eligibility*

The first objective of the District's firearms regulations is to keep firearms out of the hands of individuals who, experience has shown, pose the greatest threat to the public, such as felons and the mentally ill. For example, the assault on Congresswoman Gabrielle Gifford in January 2011, during which six individual were killed, the Virginia Tech massacre, during which 33 people were killed, and the 2012 shooting at a movie theater in Aurora, Colorado, during which 12 were killed, were all committed by individuals with a history of mental illness.

In the District, an attempt was made on the life of the President as recently as 2011 by a man with a history of mental illness who used a high-powered rifle to shoot at the White House. More famously, John Hinkley – whose mental health issues are now well known – nearly succeeded in assassinating President Regan outside of the Washington, D.C. Hilton in 1981.

An initial in-person registration and background check are the best means to verify an applicant's eligibility to possess a firearm. Further, the criminal background check performed by MPD, which is based on fingerprints, is more effective than that performed by a gun dealer, which is

4

Expert Report of Cathy L. Lanier
April 18, 2013
*Heller v. District of Columbia*, No. 08-01289 (JEB)

merely based on a social security number. Identity theft is rampant, and gun dealers are not necessarily well trained in identifying false documents. Indeed, a 2008 study found that states that perform local-level background checks for firearms have lower rates of homicide and suicide than states that simply rely on a federal background check.[1]

In addition to verifying eligibility at the time of registration, law enforcement has a strong interest in ensuring that a registrant does not become ineligible to possess a firearm over time. For example, if a registrant is convicted of a felony or domestic violence, or is committed by the court, the District needs to know where the firearm is so that, if the registrant does not voluntarily surrender the firearm as required by law, police can take possession of it.

*Ensuring a Common Body of Knowledge*

Anyone who possesses and registers a firearm should be aware of the laws and requirements for responsible gun ownership, as well as key safety principles. Even if a firearm is only kept in the home, the government has an interest in reducing accidental discharges, ensuring that guns are safely stored, and ensuring that owners are aware of the laws governing firearms. Moreover, in order to make registrants more clearly accountable under the law, it is important to be able to demonstrate that they were taught and aware of the requirements. These are common-sense requirements that have been adopted elsewhere. Currently, California, Connecticut, Hawaii, Massachusetts, and Michigan all have laws requiring some sort of training or safety certification as part of the registration process, and other jurisdictions are considering instituting similar requirements.

The District's requirement that an applicant provide evidence of the completion of a firearms training and safety class, which can be completed online, and demonstrate knowledge of the District's laws pertaining to firearms, "in particular, the safe and responsible use, handling, and storage of the same" is, in my opinion, a reasonable and effective means of reducing gun-related accidents.

*Providing Law Enforcement Officers With Critical Information*

More law enforcement officers are killed by firearms than any other cause. In 2011, 71 officers were fatally shot, the highest single year total in the past decade. The District's firearms-registration requirements also serve to provide law enforcement officers with critical information needed to protect their safety and the safety of the public.

For example, a registration certificate with photo identification, as required by District law, is critical to protecting the safety of police officers and the public. Although an individual with a legally registered firearm may pose less danger to an officer than someone with an illegal

---

[1] Medical College of Wisconsin (2008, June 3). Firearm Suicide and Homicide Rates Associated with Level of Background Check. *ScienceDaily*. http://www.sciencedaily.com/releases/2008/06/080603155227.htm

5

Expert Report of Cathy L. Lanier
April 18, 2013
*Heller v. District of Columbia*, No. 08-01289 (JEB)

firearm, a certificate with a photo helps to quickly and safely communicate this to an officer. Without this, in many instances it would be far more difficult for officers to readily distinguish between a registered owner legally transporting a firearm, and someone transporting an illegal firearm. This photo identification, in turn, helps to keep both the officer and the registrant safe.

In addition, the requirement that a registrant notify the Chief when a registered weapon is lost, stolen, sold, transferred, or otherwise disposed of, provides law enforcement officers with important information. The notification provides law enforcement with the opportunity to investigate and potentially recover the weapon, and at the very least can help protect the registrant from being associated with a crime later committed with that firearm.

*Preventing Gun Trafficking*

In addition to tracing legal guns used in crime, the District has a strong interest in preventing the trafficking of illegal firearms into the District. Firearms recovered in the District are traced overwhelmingly to neighboring states, such as Maryland or Virginia. In 2011, these two neighboring states accounted for 63% of the total number of successful traces.[2] Studies have shown that laws restricting the registration or purchase of multiple firearms in a given period are effective in disrupting illegal interstate trafficking of firearms.[3] Accordingly, in my opinion, the District's restriction on registering more than one firearm in a thirty-day period is helpful in controlling the trafficking of firearms into the District.

**Long guns v. Handguns**

In my professional opinion, the objectives of the District's firearm registration laws are just as applicable to long guns as they are to handguns. Particularly in light of the District's unique security concerns, I believe that long guns in the District should be subject to the same regulations as handguns. Historically, high-powered rifles have been the preferred tool of political assassins, as they typically are more accurate over a longer range. Indeed, as discussed above, a high-powered rifle was used by Oscar Ortega in 2011 to make an attempt on the life of the President by shooting at the White House from the National Mall. Also, in 2009, a man used a .22 caliber rifle in a fatal shooting at the Holocaust Museum.

Although handguns may be a more frequent weapon of choice for criminals on the street (and for homeowners), for their easier use and concealability, long guns can also be used with deadly precision. And if an assailant is traveling by vehicle, as the shooters in the above examples were, there is no need to try to hide a gun in a pocket. It is not just "lone-wolf" gunmen who use long guns. Although they are less commonly used in the commission of crimes in the District than

---

[2] Metropolitan Police Department, *Annual Report 2011*, at 27, available at http://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/ar_2011_0.pdf

[3] See D. WEIL, R. KNOX, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275:22 JAMA 1759-1761 (1996).

Expert Report of Cathy L. Lanier
April 18, 2013
*Heller v. District of Columbia*, No. 08-01289 (JEB)

handguns, they are used, and in this urban environment, their longer range can make them even more dangerous than a handgun. There are few, if any, areas of the city that have the open space for which long guns are typically used in more rural areas, such as for recreational target shooting. Moreover, hunting has been illegal in the District since 1906. In the city, when you miss your target with a long gun, it is very likely to hit an unintended target. For example, the March 2010 South Capitol Street shooting, in which 10 young people were wounded and four were killed, was committed with an AK-47 shot from within a moving vehicle. While fewer criminals may choose to use long guns as opposed to handguns, they are still dangerous and potentially deadly weapons, and should be regulated accordingly.

## SUMMARY

In summary, I think that the District's firearm-registration process is vital to MPD's efforts to secure the Nation's Capitol, and it clearly enhances the safety of both law enforcement and the public.

I submit my report subject to revision if so required by the provision of further information or additional documents.

Date: __APR 1 9 2013__

_____
Cathy L. Lanier