UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                              )
DICK ANTHONY HELLER, *et al.*,                )
                                              )
                    Plaintiffs,               )
                                              )
          v.                                  )          Civil Action No. 08-01289 (JEB)
                                              )
DISTRICT OF COLUMBIA, *et al.*,               )
                                              )
                    Defendants.               )
_____)

<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

Defendants the District of Columbia and Mayor Vincent C. Gray (collectively, the "District"),[1] by and through their undersigned counsel, pursuant to Fed. R. Civ. P. 56(b), respectfully move this Court for summary judgment. Plaintiffs challenge various aspects of the District's firearms registration law on the grounds that they impermissibly infringe on the right protected by the Second Amendment to the Constitution. The record, however, demonstrates that the challenged registration provisions are—at most—a minimal burden on Plaintiffs' Second Amendment right and are substantially related to important government interests. Accordingly, the District is entitled to an award of summary judgment upholding these provisions as constitutional.

A Memorandum of Points and Authorities fully explaining the grounds for the District's request, as well as a Statement of Material Facts as to Which There Is No Genuine Dispute and a proposed Order for the Court's consideration, accompany this Motion.

---

[1]     Defendants are the District of Columbia and the Mayor, the Honorable Vincent C. Gray, per Fed. R. Civ. P. 25(d). Mayor Gray is sued in his official capacity only. It is well-settled that a suit against a government official in his or her official capacity is, in actuality, a suit against the employing government. *Walker v. Washington*, 627 F.2d 541, 544 (D.C. Cir. 1980).

Date: November 5, 2013

Respectfully submitted,

IRVIN B. NATHAN
Attorney General for the District of Columbia

ELLEN A. EFROS
Deputy Attorney General
Public Interest Division

_____/s/ Grace Graham_____
GRACE GRAHAM, D.C. Bar No. 472878
Chief, Equity Section
441 Fourth Street, NW, 6th Floor South
Washington, DC 20001
Telephone: (202) 442-9784
Facsimile: (202) 741-8892
Email: grace.graham@dc.gov

_____/s/ Andrew J. Saindon_____
ANDREW J. SAINDON, D.C. Bar No. 456987
Assistant Attorney General
Equity Section
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Facsimile: (202) 730-1470
andy.saindon@dc.gov

_____/s/ Chad A. Naso_____
Chad A. Naso [1001694]
Assistant Attorney General
Office of the Attorney General, DC
441 Fourth Street, NW
Sixth Floor South
Washington, DC 20001
(202) 724-7854 (o)
(202) 741-8951 (f)
chad.naso@dc.gov

*Counsel for Defendants*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
DICK ANTHONY HELLER, *et al.*,          )
                                        )
                Plaintiffs,             )
                                        )
        v.                              )        Civil Action No. 08-01289 (JEB)
                                        )
DISTRICT OF COLUMBIA, *et al.*,         )
                                        )
                Defendants.             )
_____)

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT

Defendants (collectively, "the District"), pursuant to Fed. R. Civ. P. 56(b), move this

Court for summary judgment.[2] This memorandum of points and authorities is provided in

support of the defendants' dispositive motion in accordance with LCvR 7(a). As required by

LCvR 7(h), a Statement of Material Facts As to Which There is No Genuine Dispute ("SMF")

has been provided.

## PROCEDURAL AND FACTUAL BACKGROUND

### a.  The District's Firearm Laws pre-*Heller*

Shortly after the commencement of Home Rule, the Council for the District of Columbia

(the "Council") adopted the Firearms Control Regulations Act of 1975 (the "1975 Act," D.C.

Law 1-85, *codified as amended at* D.C. OFFICIAL CODE § 7-2501.01, *et seq.*), which imposed a

broad regulatory scheme on the acquisition, possession, and transfer of firearms. Notably, the

1975 Act provided that "no person or organization in the District shall possess or control any

firearm, unless the person or organization holds a valid registration certificate for the firearm."

_____

[2]         *See* n.1, *supra.*

1

D.C. OFFICIAL CODE § 7-2502.01(a) (2013). The 1975 Act also set forth restrictions on the registration of firearms by certain individuals, including minors, those convicted of violent, drug-related, or "intrafamily" offenses, or the insane or "chronic alcoholic[s]." *Id.*, §§ 7-2502.03(a)(1)–(6).

In addition, until 2008, District law prohibited all private individuals from registering a handgun, and included "safe storage" provisions that required residents to keep their lawfully owned firearms, such as registered long guns, "unloaded and disassembled or bound by a trigger lock or similar device" unless they are located in a place of business or are being used for lawful recreational activities. *Id.*, §§ 7-2502.02(a)(4), 7-2507.02 (2001 ed.).

### b.  The *Heller* Decision

In *District of Columbia v. Heller*, 554 U.S. 570 (2008) ("*Heller I*"), the Supreme Court invalidated the District's ban on the registration of handguns and the "safe storage" provisions. *Heller I*, 554 U.S. at 635. After an extended historical discussion, the Court held that the Second Amendment protects the right to possess a useable firearm for the purpose of self-defense within the home, *id.*, but confirmed that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625 (citing *United States v. Miller*, 307 U.S. 174 (1939)). In addition, the Court made clear that its opinion should not be read to cast doubt upon the constitutionality of longstanding regulations, such as "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27. The Court noted that these "presumptively lawful regulatory measures" were only examples, and that "our list does not purport to be exhaustive." *Id.* at 627, n.26.

### c.   The District's Firearm Registration Laws Post-*Heller*

In response to the Supreme Court's decision in *Heller I*, the Council acted swiftly to amend the District's gun laws, adopting a number of emergency and temporary measures to bring the District into compliance. SMF ¶ 1; COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON PUBLIC SAFETY & THE JUDICIARY, REPORT ON BILL 17-843, the "Firearms Control Amendment Act of 2008," Nov. 25, 2008, at 2 ("2008 REPORT") (copy in Appendix starting at 33).[3] On September 18, 2008 and October 1, 2008, the Council's Committee on Public Safety and the Judiciary held public hearings[4] during which it heard the testimony of twenty-one witnesses— both for and against the legislation—and considered the written statements of four others "in order to receive as much public comment as possible in crafting [the] bill." SMF ¶ 2; 2008 REPORT at 3, 11–14. Based on this testimony, the Committee made specific findings regarding, *inter alia*, the District's need for a "strong firearms' registration law," a ban on assault weapons and high-capacity ammunition magazines, and a one-gun-per-month registration limitation. 2008 REPORT at 3–4, 7–8, 9, 10.

The Committee's efforts culminated in the Firearms Registration Amendment Act of 2008 (the "2008 Act," D.C. Law 17-372), which was passed by the Council, and signed by then-Mayor Adrian Fenty on January 28, 2009. SMF ¶ 3; 56 D.C. REG. 3438 (May 1, 2009). After Congress declined to disapprove of the 2008 Act during the prescribed period of congressional review, it became law on March 31, 2009. SMF ¶ 4; 56 D.C. REG. 3438 (May 1, 2009).

---

[3]     Attached hereto as Exhibit ("Ex.") A is an Appendix ("App.") setting forth relevant excerpts of the legislative history of the District's firearms registration laws, including the 2008 REPORT, together with supporting testimony and written statements, and other documents, as referenced herein. The 2008 REPORT is also available online at http://dcclims1.dccouncil.us/images/00001/20090513152155.pdf (last visited Nov. 4, 2013).

[4]     The Committee Report states that, in addition, the Committee held "one hearing on gun control generally." 2008 REPORT at 3.

### d.   The 2008 Firearms Registration Act

The 2008 Act retained the District's general registration scheme, but amended the law to explicitly permit the registration of a pistol by "[a]ny person . . . for use in self-defense within that person's home." D.C. OFFICIAL CODE § 7-2502.02(a)(4)(C). The 2008 Act also set forth certain qualification and information requirements for firearm registration, including that an applicant must: (i) "demonstrate satisfactorily a knowledge of the laws of the District of Columbia pertaining to firearms and, in particular, the safe and responsible use, handling, and storage of the same" (*id.*, § 7-2502.03(a)(10)); (ii) have "vision better than or equal to that required to obtain a valid driver's license under the laws of the District of Columbia . . . ." (§ 7-2502.03(a)(11)); (iii) complete a firearms training or safety course taught by a certified instructor, with a minimum of one hour of firing training at a firing range and at least four hours of classroom instruction (§ 7-2502.03(a)(13)(A)); and (iv) submit his or her pistol for a ballistics identification procedure, provide fingerprints and a photograph, and appear in person to obtain the registration certificate (§§ 7-2502.03(d), 7-2502.04). In addition, the 2008 Act provided that "the Chief [of Police] shall register no more than one pistol per registrant during any 30-day period" except that the Chief may permit "a person first becoming a District resident to register more than one pistol if those pistols were lawfully owned in another jurisdiction for a period of 6 months prior to the date of the application" (§ 7-2502.03(e)).

Each firearm registration "shall be accompanied by a nonrefundable fee" to "reimburse the District of the cost of services" provided in connection with registration. *Id.*, § 7-2502.05. Registration certificates are valid for three years, and may be renewed. *Id.*, § 7-2502.07(a). Holders of registration certificates must notify the Metropolitan Police Department ("MPD") in writing immediately upon the loss, theft, or destruction of the certificate or the firearm, *id.*, § 7-

2502.08(1)(A), and must keep the certificate in his or her possession when in possession of the firearm, and exhibit the certificate upon demand by a law enforcement officer. *Id.*, § 7-2502.08(c).

In addition, the 2008 Act prohibited the registration of certain types of firearms, including "assault weapon[s]," and also banned the possession, sale or transfer of large-capacity magazines capable of holding more than 10 rounds of ammunition. *Id.*, §§ 7-2502.02(a)(6), 7-2506.01(b).

### e.   Plaintiffs Commence Lawsuit in 2008 and the District Wins Summary Judgment

On July 28, 2008—approximately two weeks after the District enacted its first emergency legislation in response to the Supreme Court's decision in *Heller I*—Plaintiffs Dick Heller and Absalom F. Jordan, Jr.,[5] residents of the District, commenced this lawsuit. On March 25, 2009, subsequent to the enactment of the 2008 Act, Plaintiffs filed a Second Amended Complaint ("SAC"), which added two additional District residents, William Carter and Mark Snyder, as Plaintiffs, and challenged almost every substantive provision of the District's gun laws as "unduly burdensome" and "onerous." *See* SAC ¶¶ 4–5, 68–69. The District answered the SAC on April 8, 2009 (Doc. No. 16), and the parties thereafter filed cross-motions for summary judgment. Doc. Nos. 23, 25, 26–28, 30.

On March 26, 2010, the district court granted summary judgment in favor of the District. Doc. No. 32. The Plaintiffs subsequently appealed.

### f.   The D.C. Circuit Affirms the District Court In Part and Remands for Further Development of the Record

---

[5]     An additional plaintiff was removed as of the First Amended Complaint, which was filed on July 29, 2008.

On October 4, 2011, the D.C. Circuit issued an opinion affirming the District Court in part and remanding in part for further proceedings because "the record is insufficient to inform our resolution of the important constitutional issues presented." *Heller v. District of Columbia*, 670 F.3d 1244, 1248 (D.C. Cir. 2011) ("*Heller II*"). Specifically, the D.C. Circuit upheld as constitutional the District's ban on "assault weapon[s]," D.C. OFFICIAL CODE § 7-2502(a)(6), and of magazines holding more than ten rounds of ammunition, *id.* § 7-2506.01(b). *Heller II*, 670 F.3d at 1262–64. In addition, the D.C. Circuit upheld the District's basic requirement of registration as applied to handguns, including the requirement that an applicant disclose certain information about himself and his firearm, as set forth in D.C. Official Code §§ 7-2502.01(a) and 7-2502.03(b). *Id.* at 1253–55.

With respect to the registration requirements set forth in D.C. Official Code §§ 7-2502.03(a)(10) (demonstration of knowledge), 7-2502.03(a)(11) (vision test), 7-2502.03(a)(13)(A) (4 hours of classroom instruction and 1 hour of firing range training), 7-2502.03(d) (ballistics identification), 7-2502.03(e) (one-pistol-per-30-days), 7-2502.04 (requirement to appear in person and be photographed and fingerprinted), and 7-2502.07a (re-register after three years), 7-2502.07a(d) (undergo background check every six years), and all the registration requirements (including the basic registration requirements in §§ 7-2502.01(a) and 7-2502.03(b)) as they apply to long-guns, the Circuit vacated the District Court's judgment and remanded for further development of the factual record. 670 F.3d at 1264. The Court found that these requirements were "novel," as opposed to long-standing, and determined that intermediate scrutiny, rather than strict scrutiny, should be applied to determine whether they are constitutionally acceptable. *Id.* at 1255–58. That is, the Circuit held that the above-referenced

6

registration requirements are constitutional under the Second Amendment if the District can show that they are "substantially related to an important governmental objective." *Id.* at 1258.

The Court noted that, based on the record before it, the District had advanced "two important governmental interests it may have in the registration requirements, *viz.,* to protect police officers and to aid in crime control." *Id.* The Court concluded, however, that the factual record "as it stands" was not sufficient to allow the District to demonstrate "a close fit between those requirements and its governmental interests." *Id*.

### g. The 2012 Firearms Amendment Act

After the D.C. Circuit's decision in *Heller II*, the Council revisited the District's firearm registration laws by enacting Bill 19-614, the Firearms Amendment Act of 2012 (the "2012 Act," D.C. Law 19-170), which made various changes to the District's firearms registration law "primarily to effect clarity and reduce the burden on a firearms registrant." SMF ¶ 5; *see* COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON PUBLIC SAFETY & THE JUDICIARY, REPORT ON BILL 19-614, at 23 (Feb. 29, 2012) ("2012 REPORT") (copy in App. starting at 120).[6] As relevant here, the 2012 Act repealed the requirements that an applicant submit "for ballistics identification procedure" each pistol to be registered (§ 7-2502.03(d)) and undergo a background check every six years (§ 7-2502.07a). SMF ¶ 6; 2012 REPORT at 13–14, 18. In addition, the 2012 Act: revised the vision requirement to require only that a firearms registrant "[i]s not blind" (§ 7-2502.03(a)(11)); eliminated the 5-hour training requirement with the range and classroom components, and instead directed the Chief of MPD to provide free safety training to firearms applicants (§ 7-2502.03(a)(13)(A)); clarified that the requirement to demonstrate knowledge of

---

[6]     The 2012 REPORT is available online at http://dcclims1.dccouncil.us/ images/00001/20120430145205.pdf (last visited Nov. 4, 2013).

the District's firearms laws is a one-time requirement (§ 7-2502.03(a)(10)); and extended the time frame to create a system for re-registration of firearms until January 1, 2014. SMF ¶¶ 7a–7d; 2012 REPORT at 23–24.

On January 30, 2012, the Council's Committee on the Judiciary held a public hearing to receive testimony on the 2012 Act, as well as on "the gun laws of the District" in general. SMF ¶ 8; *see* 58 D.C. REG. 50 (Dec. 16, 2011); 2012 REPORT, at 22–23. At this hearing, the Committee received oral testimony from 14 witnesses, including: Plaintiffs Dick Heller and Absalom Jordan; MPD Chief Cathy Lanier; Daniel W. Webster, the Co-Director of the Johns Hopkins Center for Gun Policy and Research; Benjamin Van Houten, the Managing Attorney at the Legal Community Against Violence; Daniel R. Vice, a Senior Attorney with the Brady Center to Prevent Gun Violence; George L. Lyon, Jr., the President of the D.C. Chapter, Community Association for Firearms Education ("CAFE"); Ricardo Royal, the National President & Chief Training Counselor for CAFE; and other members of the public. SMF ¶ 9; 2012 REPORT at 21–23. The Committee also received written statements concerning the District's firearm registration laws from these and other individuals, which were filed in the record. SMF ¶ 10; App. at 156–197 (selected written testimony and comments).

On February 29, 2012, the Committee issued a 29-page report setting forth various legislative findings concerning the 2012 Act and the District's firearm registration requirements in general. SMF ¶ 11; *see generally* 2012 REPORT. The Committee's report discussed the District's need for a firearms registration system generally, 2012 REPORT at 5–8, and also made specific findings, based on the legislative record, concerning, *inter alia*, the requirements that an applicant: (i) appear in-person, be fingerprinted and photographed (*id.* at 8–10); (ii) re-register a firearm after three years (*id.* at 10–11); (iii) complete a firearms training or safety course (*id.* at

11–12); (iv) register no more than one pistol in a thirty-day period (*id.* at 14-16); (v) demonstrate knowledge of the District's firearms laws (*id.* at 16–17); and (vi) not be legally blind (*id.* at 17). In addition, the Committee's report addressed the District's need to register long gun as well as handguns (*id.* at 19–20).

The 2012 Act was unanimously adopted by the Council and subsequently signed by Mayor Vincent C. Gray on May 15, 2012. SMF ¶ 12; Third Amended Complaint ("TAC") ¶ 16. After the expiration of the prescribed period for Congressional review, the law became effective on September 26, 2012. SMF ¶ 13.[7]

### h. Implementation of the District's Firearm Registration System

Under District law, MPD is responsible for processing and issuing firearms registrations, and for verifying that applicants are eligible to register firearms. Declaration of Jon Shelton (Oct. 8, 2013) ("Shelton Decl.," attached as Ex. B) ¶ 9. In response to the mandates of the 2012 Act, MPD effectively created a system from scratch, including developing a computer database to allow it to track and process applications. *Id*. MPD personnel, including information-technology personnel, worked for many months to develop the database, repeatedly revising and fine-tuning it to incorporate existing records, and accommodate current and possible future needs. *Id*. ¶ 10. MPD ran many tests on the registration database before it went "live," and continues to do so, to ensure that the data it contains are complete, accurate, and reliable. *Id*.

To implement the fingerprinting requirement, MPD uses the "LiveScan" system, a device that can scan a person's fingerprints and send them electronically to the FBI in West Virginia. *Id*. ¶ 11. Using this system, MPD typically receives a return from the FBI on a criminal background

---

[7]  *See*  http://dcclims1.dccouncil.us/lims/legislation.aspx?LegNo=B19-0614&Description=%22FIREARMS+AMENDMENT+ACT+OF+2011%22.&ID=41306 (last visited Nov. 4, 2013).

check on a set of fingerprints in about 15 minutes. *Id.* By contrast, it previously took MPD up to 4 months to receive a similar return using an ink-and-paper system. *Id.*

As part of the background check for registering a firearm, the MPD conducts a check of applicants against a number of databases, including the Washington Area Law Enforcement System ("WALES") and the National Criminal Information Center ("NCIC"). *Id.* ¶ 12. WALES contains criminal background information, including outstanding warrants and protective or restraining orders, from local law-enforcement agencies, while the NCIC contains similar information on a national basis. *Id.* MPD also checks information it receives periodically from the D.C. Superior Court, *i.e.*, information on mental-health commitments and domestic-violence convictions. *Id.*

MPD has determined that personally identifiable information provided by applicants on firearms-registration forms is exempt from disclosure to the public as a "clearly unwarranted invasion of personal privacy." SMF ¶ 16; Shelton Decl. ¶ 13; *see also* D.C. OFFICIAL CODE § 2-534(a)(2) (2011 Repl.). The MPD's firearms-registration database can only be accessed by authorized personnel within the Firearms Registration Section; it cannot be accessed through MPD's intranet or the Internet. Shelton Decl. ¶ 13.

To satisfy the law's mandate, MPD offers applicants an online Firearms Safety Training Course. *See* MPD Firearms Safety Training Course, *available at* https://dcfst.mpdconline.com/ (last visited Nov. 4, 2013). The course, which may be completed by an applicant online anywhere, including at MPD, takes between 30 minutes and one hour to complete. *See* Defs' Responses to Pltfs' Requests for Documents ("DC RFP Res," attached as Ex. C), Response No. 2; Declaration of Mark Jones (Sept. 22, 2013) ("Jones Decl," attached as Ex. D) ¶ 26; *see*

https://dcfst.mpdconline.com/ (stating that safety course "should only take you approximately 30 minutes to complete").

MPD charges $35 to take and process an applicant's fingerprints, and $13 per firearm for the registration itself.[8] SMF ¶ 17; Shelton Decl. ¶ 8. Between July 2008 and the end of August, 2013, MPD has disseminated 5,675 firearms-registration applications to the public, with 3,748 total firearms registered.[9] Shelton Decl. ¶ 5. There have been 2,453 handguns registered (365 revolvers and 2088 semi-automatic handguns) and 66 handgun-registration applications have been denied. *Id*. There have been 1,295 long guns (*i.e.*, rifles or shotguns) registered (1,070 non-semi-automatic and 225 semi-automatic), and 17 long gun applications denied. *Id*.

### i.   Plaintiffs File Third Amended Complaint

On July 31, 2012, in light of the enactment of the 2012 Act, Plaintiffs filed their TAC. The TAC joined two District residents, Asar Mustafa and William Scott, as Plaintiffs. TAC ¶¶ 7–8. Subsequent to the filing of the TAC, Plaintiffs voluntarily dismissed Mark Snyder from the lawsuit. *See* Minute Order (Apr. 1, 2013).

In Count One of the TAC, Plaintiffs challenge the following provisions of the District's firearms registration law, facially and as applied, on the grounds that they "substantially and unduly burden, impede, and infringe" upon the right protected by the Second Amendment:

- the basic registration requirement, as set forth in §§ 7-2502.01(a) and 7-2507.06;

- the requirement that an applicant demonstrate knowledge of use, handling, and storage of firearms, as set forth in § 7-2502.03(a)(10);

---

[8]      In enacting the registration fee requirements, the Committee on Public Safety & the Judiciary noted its concern that "the total cost to register a firearm not be unduly burdensome." 2008 REPORT, at 9.

[9]      These numbers do not include those guns "grandfathered" since the 1975 Act. Shelton Decl. ¶ 6.

- the requirement that an applicant must not be blind, as set forth in § 7-2502.03(a)(11);

- the requirement that an applicant complete a firearms training or safety course, or provide evidence of another form of training, as set forth in § 7-2502.03(a)(13);

- the requirement that an applicant disclose certain information about himself and his firearm, as set forth in § 7-2502.03(b);

- the prohibition on registration of more than one newly acquired pistol per registrant during any 30 day period, as set forth in § 7-2502.03(e);

- the submission of fingerprints and photographs, and the personal appearance of the applicant, as set forth in § 7-2502.04;

- the requirement that an applicant pay a registration fee establish by the Mayor, as set forth in § 7-2502.05(b);

- the three-year registration certificate expiration period, and renewal fee, as set forth in § 7-2502.07a;

- the requirement that a registrant notify the Chief of Police of the loss, theft, or destruction of a firearm, of any change of name or address, and of the sale, transfer or other disposition of the firearm within 2 business days, as set forth in § 7-2502.08(a);

- the requirement that a registrant exhibit the registration certificate on demand of a law enforcement officer, as set forth in § 7-2502.08(c);

- "[s]ubjecting registrant to fine, revocations of registration, and prohibitions on possession of firearms for violations or omission under § 7-2502.08"; and

- "[e]xposure to disclosure of registration information."

*See* TAC ¶ 78.

In Count Two of the TAC, Plaintiffs challenge the District's prohibitions on the registration of "assault weapons" (§ 7-2502.02(6)) and the possession, sale, and transfer of an ammunition feeding device with a capacity of more than ten rounds (§ 7-2506.01(b)) as unconstitutional, both on their face and as applied. TAC ¶ 82.

Plaintiffs Dick Anthony Heller, Absalom F. Jordan, Jr., William Carter, William L. Scott, and Asar Mustafa are allegedly "eligible under the laws of the United States and of the District of Columbia to receive and possess firearms." TAC ¶¶ 2–4, 5–8. None of the Plaintiffs are

"blind" for purposes of § 7-2502.03(a)(11). SMF ¶ 14; Pltfs' Responses to Defs' Req. for Admissions ("Pltfs RFA Res.," attached as Ex. E), Response No. 3. In fact, all of the Plaintiffs have successfully registered at least one firearm in the District of Columbia. SMF ¶ 15; TAC ¶ 78a; Pltfs' Responses to Defs' Interrogatories ("Pltfs Interrog. Res.," attached as Ex. F), Response No. 4.

### j. Discovery Proceedings

Between September 24, 2012 and July 31, 2013, the parties engaged in discovery, including discovery of expert witnesses. During the course of discovery, the parties exchanged written discovery, including requests for documents, interrogatories and requests for admissions. The District produced more than 9700 pages of documents to Plaintiffs.

The District identified four expert witnesses who each offered opinion testimony in support of the specific firearms registration requirements that are being challenged here:

- Cathy L. Lanier, the MPD Chief of Police, with over 20 years of law-enforcement experience in the District, who is responsible for overseeing MPD's efforts to prevent gun violence, and arrest and prosecute violent criminal offenders. Declaration of Cathy L. Lanier (Oct. 7, 2013) ("Lanier Decl.," attached as Ex. G) ¶¶ 4–9. Chief Lanier offered testimony explaining the need for the District's requirements that a firearms owner appear in-person and be fingerprinted and photographed as part of registration; demonstrate knowledge of the District's firearm laws and complete a safety training course; and report the loss, theft, sale, transfer or disposition of his firearm. *Id.* ¶¶ 19–29. Chief Lanier also testified as to the benefits of the District's one-gun-per-month registration provision and the need for the District to register long-guns, as well as handguns. *Id.* ¶¶ 30–36. In Chief Lanier's professional opinion, these firearms-registration laws "significantly aid MPD's efforts to prevent violent crime, ensure the security of the Nation's Capital, and protect the safety of law enforcement officers and members of the public." *Id.* ¶ 16.

- Mark D. Jones, a former agent for 20 years with the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), who was assigned to the District of Columbia for more than 7 years and has participated in more than 100 Federal, state and/or local law enforcement arrests involving unlawful firearms possession, illegal firearms trafficking, misuse of firearms and firearm-related violence. Jones Decl. ¶¶ 3–7. Mr. Jones testified as to the importance of requiring firearms

13

registrants to appear in-person, re-register every three years, demonstrate knowledge of the District's firearm laws, complete a training or safety course, and notify law enforcement of the loss, theft, destruction, sale or transfer of their firearm. *Id.* ¶¶ 21–28. Mr. Jones believes, based on his experience, that the District's firearms registration laws "serve the goals of enhancing public safety and reducing firearm-related crime." *Id.* ¶ 10.

- Joseph J. Vince, Jr., a former ATF agent with nearly 30 years experience investigating the illegal trafficking of firearms and diverting firearms for illegal purposes, who is also the head of the Criminal Justice Program at Mount St. Mary's University, and the President of Crime Guns Solutions, LLC, a private consulting firm dedicated to assisting and training law enforcement in reducing firearm-related violent crime. Declaration of Joseph J. Vince, Jr. (Oct. 1, 2013) ("Vince Decl.," attached as Ex. H) ¶ 4. Mr. Vince provided testimony supporting the District's requirements to register long-guns; limit the number of handguns that may be registered in a given period; require firearms registrants to appear in-person; re-register every three years; demonstrate knowledge of the District's firearm laws and complete a training or safety course; and notify law enforcement of the loss, theft, destruction, sale or transfer of their firearm. *Id.* ¶¶ 14–22. In general, Mr. Vince believes that "[t]he District's firearms laws and regulations are a reasonable, practicable, and enforceable manner of reducing firearms-related violence and protecting the safety of the District's residents, visitors, and law enforcement professionals." *Id.* ¶ 9.

- Daniel W. Webster, ScD, MPH,  the Co-Director of the Johns Hopkins Center for Gun Policy, has directed numerous empirical studies related to gun violence and its prevention. Declaration of Daniel W. Webster (Oct. 29, 2013) ("Webster Decl.," attached as Ex. I) ¶¶ 6–9. Dr. Webster testified as to the public health and safety benefits of laws requiring firearms owners to appear before law enforcement and be fingerprinted, promptly report theft, loss, or transfer of registered firearms to law enforcement, renew firearms registration every three years, and complete a safety training course and be knowledgeable about the firearms laws. *Id.* ¶¶ 9–34. Dr. Webster believes that the District's law enhances public safety, and that empirical research and data provide "compelling evidence" that gun registration laws like those in place in the District "are effective at preventing the diversion of firearms to criminals and other prohibited persons, as well as the trafficking of guns across state lines." *Id*. ¶ 35.

Plaintiffs did not identify any affirmative expert witnesses on their behalf, but rather provided disclosures concerning a rebuttal expert. Each of the above witnesses was deposed

during the course of discovery. In addition, Plaintiffs took the deposition of Lieutenant Jon

Shelton, the branch commander in charge of MPD's firearms registration section.[10]

## ARGUMENT

## I.    LEGAL STANDARDS

### a.   The Second Amendment Two-Step Analysis

The D.C. Circuit—like almost every other Circuit—has explicitly adopted a "two-step"

analysis to determine the constitutionality of challenged gun laws. *Heller II*, 670 F.3d at 1252.

First, a court must ask whether the provision infringes a protected right, keeping in mind that

"longstanding" regulations are "'presumptively lawful,' that is, they are presumed not to burden

conduct within the scope of the Second Amendment." *Id*. (quoting *Heller I*, 554 U.S. at 626–27

& n.26). Second, a court must determine whether the provision withstands the appropriate level

of scrutiny. *Id*. The Circuit has held that, even assuming that the provisions challenged here

infringe upon conduct within the scope of the Second Amendment, they should be examined

under "intermediate scrutiny." *Id*. at 1253.

### b.   Intermediate Scrutiny

"[A] regulation that imposes a substantial burden upon the core right of self-defense

protected by the Second Amendment must have a strong justification, whereas a regulation that

imposes a less substantial burden should be proportionately easier to justify." *Heller II*, 670 F.3d

at 1257 (citations omitted).

Here, the D.C. Circuit determined that intermediate scrutiny is the appropriate standard of

review to apply because "none of the District's registration requirements prevents an individual

---

[10]    Lt. Shelton was deposed in his individual capacity, rather than as a Rule 30(b)(6) witness on behalf of the District. Hence, while the testimony he provided is correct, it does not bind the District.

from possessing a firearm in his home or elsewhere, whether for self-defense or hunting, or any other lawful purpose." *Heller II*, 670 F.3d at 1258. Under intermediate scrutiny, a challenged provision will be constitutional if it is "substantially related to an important governmental objective." *Id.* (quoting *Clark v. Jeter*, 486 U.S. 456, 461 (1988)). "[T]he fit between the challenged regulation and the asserted objective [need only] be reasonable, not perfect." *Schrader v. Holder*, 704 F.3d 980, 990 (D.C. Cir. 2013) (quoting *Marzzarella*, 614 F.3d 85, 98 (3rd Cir. 2010)). In assessing this "fit," a court must afford "substantial deference to the predictive judgments" of the legislature because, "[i]n the context of firearm regulation, the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Id.* (quoting *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 665 (1994) ("*Turner I*"), and *Kachalsky v. County of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012)).

The D.C. Circuit remanded this matter for the District to show that its firearms-registration provisions are "not necessarily the least restrictive means, but . . . a means narrowly tailored to achieve the desired objective." *Heller II*, 670 F.3d at 1258 (quoting *Board of Trustees of SUNY v. Fox*, 492 U.S. 469, 480 (1989)).[11] "[N]arrow tailoring" does not mandate that the District's firearms requirements "'be the least intrusive means of achieving the relevant government objective[s], or that there be no burden whatsoever on' [plaintiff's] Second Amendment right." *Woollard v. Gallagher*, 712 F.3d 865, 878–79 (4th Cir. 2013) (quoting

---

[11]     The D.C. Circuit and other courts have made clear that "narrow tailoring" in this context is not the same as narrow tailoring for strict-scrutiny purposes. Rather, as in the First Amendment context cited, *see Fox*, 492 U.S. at 480, it is more lenient.

*United States v. Masciandaro*, 638 F.3d 458, 474 (4th Cir. 2011)).[12] Rather, the District need only present "some meaningful evidence" that its firearms-registration requirements "can reasonably be expected to promote" an important governmental interest. *Heller II*, 670 F.3d at 1259.[13] As discussed herein, the record is replete with such evidence. *Cf. Turner II*, 520 U.S. at 196 ("[C]omplete factual support in the record for the [agency's] judgment or prediction is not possible or required . . . .") (quoting *FCC v. National Citizens Comm. for Broad.*, 436 U.S. 775, 814 (1978)).

On remand to supplement the record, the parties before the district court in *Turner* generated "tens of thousands of pages" of additional evidence, comprising, *inter alia*, information acquired by Congress during hearings about the challenged legislation, additional expert declarations and testimony, documents from the regulated industry, and other "studies and

---

[12]     *See also Ward v. Rock Against Racism*, 491 U.S. 781, 782–83 (1989) ("The requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation, and the means chosen are not substantially broader than necessary to achieve that interest").

[13]     Even in cases challenging statutes under the First Amendment,

The Supreme Court has also explained, however, that it does not require "empirical data . . . [to] come accompanied by a surfeit of background information . . . . We have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even . . . based solely on history, consensus, and simple common sense." [*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001)]; *see also Fla. Bar v. Went For It, Inc*., 515 U.S. 618, 628 (1995). Further, while "'[the legislature] must base its conclusions upon substantial evidence' . . . that 'substantiality is to be measured' by a 'deferential' standard . . . 'lest [the courts] infringe on traditional legislative authority to make predictive judgments.'" *Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 15 (D.C. Cir. 2009) (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195–96 (1997)) ["*Turner II*"].

*National Ass'n of Mfrs. v. SEC*, ___ F.Supp.2d ___, 2013 WL 3803918, *28 (D.D.C. July 23, 2013) (parallel citations omitted).

17

anecdotal evidence . . . ." *Turner II*, 520 U.S. at 187 (citing *Turner Broad. Sys. v. FCC*, 910 F.Supp. 734, 742–55 (D.D.C. 1995)). So too here: the parties engaged in full discovery and the District has generated extensive evidence in support of the challenged legislation.[14]

### c.  Summary Judgment Standards

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "complete failure of proof concerning an essential element of the non-moving party's case necessarily renders other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

While a court "must assume the truth of all statements proffered by the party opposing summary judgment," it need not consider wholly conclusory statements for which no supporting evidence is offered. *Greene v. Dalton*, 164 F.3d 671, 674–75 (D.C. Cir. 1999). It is insufficient, to avoid summary judgment, that some factual issues remain in the case; an issue must be both *genuine* and *material* to preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248 (1986). "A fact is 'material' if a dispute over it might affect the outcome of a suit under the governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." *Lindell v. Landis Construction Co.*, 714

---

[14]     The District requested and received evidence from plaintiffs regarding their as-applied claims (including "hidden camera" video recorded by Mr. Heller at MPD). *See* Plaintiffs' Responses to Defendants' Interrogatories (Ex. No. F); Plaintiffs' Responses to Defendants' Requests for Production of Documents. In response to the District's numerous "contention interrogatories" and document requests for "all facts" underlying their allegations, plaintiffs produced two newspaper articles regarding their fear of public disclosure of their registration information, *see* Pltf. Interrog. Res., at Response No. 16, and some transcripts of hearings in Canada regarding that nation's repeal of its long-gun registration law. Plaintiffs produced no other affirmative evidence.

F.Supp.2d 103, 105 (D.D.C. 2010) (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)). There are no material facts in dispute here, and plaintiffs cannot "make a showing sufficient to establish the existence of an element essential to [their] case, and on which [they] will bear the burden of proof at trial," hence summary judgment is appropriate for the District. *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011) (citations omitted).

Plaintiffs allege that the District's firearms provisions, facially, and as applied to them, violate the Second Amendment. It remains axiomatic that "[a] facial challenge to a legislative Act is . . . the most difficult to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). If the First Amendment is not implicated, a party can demonstrate that a statute is facially invalid *only* by showing that it is unconstitutional in all of its applications. *See, e.g., Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 699–700 (1995). "[A] facial challenge must fail where the statute has a "'plainly legitimate sweep.'" *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 739–40 & n.7 (1997) (Stevens, J., concurring in judgments)). Similarly, "[w]here, as here, a statute or regulation has some concededly constitutional applications, a successful challenger must demonstrate that the statute is unconstitutional as 'applied to the particular facts of their case.'" *Steffan v. Perry*, 41 F.3d 677, 693 (D.C. Cir. 1994) (*en banc*) (quoting *Salerno*, 481 U.S. at 745 n.3).

The extensive legislative history here—and the discovery in this case—contain ample evidence demonstrating that the challenged registration provisions are substantially related to important government interests and are not unconstitutional on their face or as applied to

plaintiffs' particular factual situations.[15]

## II. THE DISTRICT'S FIREARMS REGISTRATION REQUIREMENTS DO NOT VIOLATE THE SECOND AMENDMENT.

When the D.C. Council first decided to regulate firearms almost 40 years ago, it

determined that:

> in order to promote the health, safety and welfare of the people of the District of Columbia it is necessary to:
>
> (1) Require the registration of all firearms that are owned by private citizens;
> (2) Limit the types of weapons persons may lawfully possess;
> (3) Assure that only qualified persons are allowed to possess firearms;
> (4) Regulate deadly weapons dealers; and
> (5) Make it more difficult for firearms, destructive devices, and ammunition to move in illicit commerce within the District of Columbia.

2012 REPORT at 5–6 (Ex. A [App.] at 124–125) (quoting the 1975 Act , D.C. Law 1-85, § 2).

"Each of these findings remains true today." *Id*. at 6.

Although in 1975, when most of the District's firearms-registration provisions were first

enacted, the courts did not recognize any individual, Second Amendment right to a handgun

(hence no need existed for the Council to make explicit findings to support an "intermediate

---

[15]    The evidence resulting from discovery here was, obviously, not before the Council when it enacted the challenged legislation. But what *Turner I* and *Turner II* teach is that intermediate scrutiny can be satisfied with evidence not before the legislature at the time of enactment. *See Turner*, 910 F.Supp. at 751 ("Additional evidence produced during the remand proceedings confirms Congress' judgments.") (footnote omitted).

       Like other forms of constitutional analysis, this Court is to use intermediate scrutiny to determine whether a narrow fit exists between the means chosen and the important government objective, not whether the Council knew all these facts. The Court is not deciding whether the Council was making a smart decision, but whether the law itself is constitutional. *See Turner II*, 520 U.S. at 211 ("The question is not whether [the legislature], as an objective matter, was correct to determine [that the disputed law] is necessary to prevent [the feared harms]. Rather, the question is whether the legislative conclusion was reasonable and supported by substantial evidence in the record . . . .") (quoting *Turner I*, 512 U.S., at 665–66).

scrutiny" analysis),[16] the legislative history of that law nonetheless amply reflects the need for—

and goals of—the statute: "The goals of this legislation are twofold: (1) to reduce the potentiality

for gun-related crimes and gun-related deaths from occurring within the District of Columbia;

and (2) to strengthen the capacity of the District of Columbia government to monitor the traffic

in firearms and ammunition within this jurisdiction." *See* COUNCIL OF THE DISTRICT OF

COLUMBIA, COMMITTEE ON THE JUDICIARY AND CRIMINAL LAW, REPORT ON BILL 1-164, the

"Firearms Control Act of 1975," Apr. 21, 1976, at 2 ("1976 REPORT") (App. at 2).[17]

---

[16]        *See also, e.g., Drake v. Filko*, 724 F.3d 426, 437–38 (3d Cir. 2013):

New Jersey's inability to muster legislative history indicating what reports, statistical information, and other studies its legislature pondered . . . is unsurprising. First, at each relevant moment in the history of New Jersey gun laws, spanning from 1905 to 1981, the legislature could not have foreseen that [its regulations] could run afoul of a Second Amendment that had not yet been held to protect an *individual* right to bear arms, given that the teachings of *Heller* were not available until that landmark case was decided in 2008. [S]imply put, New Jersey's legislators could not have known that they were potentially burdening protected Second Amendment conduct, and as such we refuse to hold that the fit here is not reasonable merely because New Jersey cannot identify a study or tables of crime statistics upon which it based its predictive judgment.

*Id*. (footnotes omitted).

[17]        *See* 1976 REPORT at 6 ("[T]he most effective gun control must eventually be applied at the national level. In the absence of such national action however, it becomes necessary for local governments to act to protect their citizens, and certainly the District of Columbia as the only totally urban statelike jurisdiction should be strong in its approach."). *Cf.* 2008 REPORT, at 3 ("There is no comprehensive federal system of firearm registration. Federal law prohibits the use of the National Instant Criminal Background Check System (NICS) to create any system for the registration of firearms or firearms owners.") (citing 28 C.F.R. § 25.9(b)(3)); Statement of Joseph J. Vince, Jr. (Jan. 30, 2012), at 3–4 (App. at 192–193):

In my opinion, firearms must primarily be regulated on a local level, as national agencies, such as the ATF, have different focuses, when they are not actually prohibited from taking action. [T]he ATF, in my opinion, does not have the resources to properly oversee the firearms dealers and manufacturers it regulates, much less to regulate the average gun owner. Those efforts must come from local authorities.

Plaintiffs do not dispute—because they cannot—that preventing crime and promoting public safety are each important and legitimate government interests. SMF ¶ 28; Pltfs RFA Res., Response No. 4. *See also, e.g., Salerno*, 481 U.S. at 750; *Schall v. Martin*, 467 U.S. 252, 264 (1984); *Kwong v. Bloomberg*, 723 F.3d 160, 168 (2d Cir. 2013) ("New York has substantial, indeed compelling, governmental interests in public safety and crime prevention.") (quoting *Kachalsky*, 701 F.3d at 97).

Moreover, it cannot be reasonably disputed that the District has a real need to address gun violence. *See* 2012 REPORT, at 3 (noting that between 2008 to 2011, the percentage of homicides in the District involving guns ranged from 71% to 76%). Annually, the District has more than twice as many firearm homicides as motor-vehicle deaths.[18] The District's age-adjusted rate of firearms deaths (intentional and unintentional) for 2010 was 14.62 per 100,000, considerably higher than the national rate (10.07) and the rate in neighboring jurisdictions (9.26 for Maryland, and 10.69 for Virginia). *Id.* The news is even worse for young, African-American males: The firearm death rate for black men aged 15 to 24 in the District is *more than double* that of the United States as a whole, and more than the rate for Maryland and Virginia *combined*.[19]

---

[18]     Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, Web-based Injury Statistics Query and Reporting System ("WISQARS"), *available online at* www.cdc.gov/ncipc/wisqars (accessed Nov. 4, 2013). In 2010, the District had 38 motor-vehicle deaths, compared to 84 firearms homicides. *Id.*

[19]     The rates of death by firearm, per 100,000 people, in 2010, for black males aged 15 to 24:

| | |
|---|---|
| District of Columbia: | 152.43 |
| United States: | 73.80 |
| Maryland: | 69.70 |
| Virginia: | 53.71 |

WISQARS (accessed Nov. 4, 2013).

As discussed below, the record is replete with evidence that the District's firearm registration requirements advance the District's interests in crime prevention and public safety in numerous ways—by permitting only responsible persons to register guns, by allowing law enforcement to distinguish criminals from law-abiding citizens, by holding firearms owners accountable for their weapons, by attempting to ensure a minimal level of knowledge of the safe handling and storage of these deadly instruments, and by preventing the illegal trafficking of guns into or out of the District. *See* 2012 REPORT, at 6 (quoting statement of Benjamin Van Houten, Managing Attorney, Legal Community Against Violence, at 3); *id.* at 8; Lanier Decl. ¶ 17. All of these requirements help reduce the diversion of guns to criminal uses and lower the risk of accidental discharge, which results in a safer public and less risk to law enforcement.

A.      **The Need for and Benefits of Firearms Registration Are Equally Applicable to Long-Guns**

The D.C. Circuit has already upheld the constitutionality of a registration requirement as applied to handguns. *See Heller II*, 670 F.3d at 1264 (affirming the judgment of the district court with respect to "the requirement of mere registration as applied to handguns and expressed in D.C. Code §§ 7-2502.01(a) and 7-2502.03(b)"). The need for and benefits of firearm registration laws accrue equally for handguns and long guns alike. *See* 2012 REPORT, at 20 ("The justifications that exist for registration of firearms in general . . . apply equally with regard to long arms."); Lanier Decl. ¶ 31 ("In my professional opinion, the objectives of the District's firearm registration laws are just as applicable to long guns as they are to handguns.); Jones Decl. ¶ 13 ("The type of firearm being discussed is largely irrelevant for purposes of registration and other regulatory efforts. All firearms, be they rifles, shotguns or handguns, pose a similar threat to public safety in the wrong hands and, in my opinion, should be regulated similarly."); Vince Decl. ¶ 15 ("The same benefits of firearms registration (enhanced public safety, violence

prevention, and law enforcement) apply to long guns as well as hand-guns. Both types of weapons present the same risks, so it makes sense to subject them to the same regulatory requirements.").

The record reflects that long-guns give rise to legitimate public safety and security concerns in the District. *See* 2012 REPORT, at 19 (finding that "[t]here is ample evidence to support the need to require registration of long guns based on the perceived dangers that they can pose to this city—the nation's capital"). One out of every six illegal firearms recovered by MPD in 2010 was a long gun. 2012 REPORT, at 19 (citing testimony of Daniel W. Webster). Moreover, long-guns indisputably are more lethal than handguns. Ex. M (Deposition Trans., Gary Kleck (July 2, 2013)), at 27:5–21 (discussing why long guns are "more lethal" than handguns). *See also* 2012 REPORT, at 20 (noting that "the most violent incident in this city in over a decade" involved long-guns); Lanier Decl. ¶ 34 (citing the same incident).[20]

Such lethality is all the more dangerous in an urban environment such as the District. *See* Lanier Decl. ¶ 34 ("In the city, when you miss your target with a long gun, it is very likely to hit an unintended target."); *cf.* Lee T. Dresang, MD, *Gun Deaths in Rural and Urban Settings: Recommendations for Prevention*, 14 J. AM. BD. FAM. MED. 107, at 108 (Mar. 2001) (*available online at* http://www.jabfm.org/content/14/2/107.full.pdf+html) (accessed Nov. 4, 2013) (App. at

_____

[20]     The Chief's Declaration and the Committee Report were drafted before the mass homicide at the Navy Yard, which was committed with a shotgun. *See* Ashley Halsey III, Peter Hermann and Clarence Williams, *D.C. Navy Yard gun attack kills 12, injures 8*, WASH. POST., Sept. 16, 2013 (*available online at* http://www.washingtonpost.com/local/dc-navy-yard-rampage-leaves-14-dead-alleged-shooter-killed-idd-as-aaron-alexis/2013/09/16/d084842e-1ef9-11e3-94a2-6c66b668ea55_story.html) (accessed October 1, 2013); Peter Hermann and Ann E. Marimow, *Navy Yard shooter Aaron Alexis driven by delusions*, WASH. POST., Sept. 25, 2013 (*available online at* http://www.washingtonpost.com/local/crime/fbi-police-detail-shooting-navy-yard-shooting/2013/09/25/ee321abe-2600-11e3-b3e9-d97fb087acd6_story.html) (accessed October 1, 2013).

215) (noting that "homicide gun deaths in the United States are more of an urban than a rural problem"); Matthew Miller, Deborah Azrael, & David Hemenway, *Firearms and Violent Death in the United States, in* REDUCING GUN VIOLENCE IN AMERICA: INFORMING POLICY WITH EVIDENCE AND ANALYSIS 4 (Daniel W. Webster & Jon S. Vernick eds., 2013), *available at* http://jhupress.files.wordpress.com/2013/01/1421411113_updf.pdf (accessed Nov. 4, 2013) ("The U.S. homicide rate is much higher in urban than rural areas, as are rates of all violent crimes."); Vince Decl. ¶ 12 (noting that "firearms homicide rates are highest among young men in urban areas and have been increasing in this population"). And although other American locales have a long and treasured history of using long guns for their original purpose, hunting, *see Heller II*, 670 F.3d at n.__ ("a rifle or shotgun is the firearm of choice for hunting"), Congress largely prohibited hunting in the District in 1906 and it remains prohibited today. *See* 34 Stat. 808 (June 30, 1906);[21] 19 D.C. Mun. Regs. Ch. 15 (2013).

Further, over and above their "everyday" lethality, long-guns pose a special threat to the District given its status as the Nation's capital. Long guns' "accuracy at long range poses a special threat to government officials, diplomats, and motorcades." 2012 REPORT at 20 (quoting Testimony of Daniel R. Vice, at 5 (App. at 169)). *See also* Lanier Decl. ¶ 32 ("Historically, high-

---

[21]     "[T]he object of this bill is to prohibit hunting in the District of Columbia, in the interests of public safety . . . ." (remarks of Rep. Campbell) Cong. Rec. 7569 (May 28, 1906). *See also* H.R. Rep. No. 4207, 59th Cong., 1st Sess., at 4 (1906) ("the advantage to be gained is the freedom from accident from indiscriminate discharge of firearms within the territory of the District of Columbia [that] will safeguard human life and property to a large degree, which is now impossible.").
        By this law, Congress also "authorized and empowered [the District] to make and enforce all such usual and reasonable police regulations . . . as they may deem necessary for the regulation of firearms, projectiles, explosives, or weapons of any kind in the District of Columbia." 34 Stat. 808 at § 4 (*currently codified at* D.C. OFFICIAL CODE § 1-303.43 (2008 Supp.)). In *Heller II*, the D.C. Circuit upheld this Court's decision that "the challenged laws do not exceed the District's authority under local law because they are usual and reasonable police regulations within the meaning of the 1906 Act." *Heller II*, 670 F.3d at 1250.

powered rifles have been the preferred tool of political assassins, as they typically are more accurate over a longer range."). Indeed, Chief Lanier has repeatedly echoed these concerns, in her testimony before the Council and Congress. *See, e.g.*, 2008 REPORT, at 3 (quoting Testimony of Cathy L. Lanier, Hearing on the Impact of Proposed Legislation on the District of Columbia's Gun Laws, United States House of Representatives, Committee on Oversight & Government Reform, Honorable Henry A. Waxman, Chair, September 9, 2008, at 2).[22] Long guns

> pose[] a distinct type of threat within the confines of the Nation's capital. Rifles, by their nature, are designed to deliver longer range, generally more accurate fire than handguns. [F]irearms with such capabilities greatly increase the risk of a "standoff" assassination attempt against political and government leaders, and are thus of great concern to those entities charged with protection of such persons. In my opinion the District bears a unique responsibility to provide a safe and secure environment to carry out the Nation's business of government, and the regulation of firearms—especially those demonstrably more effective at longer ranges—is integral to that effort.

Jones Decl. ¶ 15.

As the Committee noted, requiring the registration of long-guns "enables a modicum of necessary oversight by the Metropolitan Police Department." 2012 REPORT 19. The historic record contains numerous references to registration laws applying to long guns. *See Republic of Hawaii v. Clark*, 10 Haw. 585 (Haw. Rep. 1897) (discussing Act 64, Laws of 1896, which required "a license to possess, carry or use a pistol, rifle, carbine, shotgun or other fire-arm," for which the applicant must provide his name, nationality, address, and make and serial number of the firearm); *Russo v. Parker*, 49 So. 124, 125 (Fla. 1909) (declining to address constitutionality

---

[22]    Copies of both statements from the Chief are appended to the 2008 REPORT, and available online at *http://dcclims1.dccouncil.us/images/00001/20090513152155.pdf*) (accessed Nov. 4, 2013). *See also* Vince Decl. ¶ 16 ("In light of the dense concentration of high-ranking government officials, ambassadors, and visiting foreign dignitaries in the District, it makes particular sense for the District to require the registration of long guns in order to track their presence and keep them out of the hands of criminals and terrorists.").

of Section 3268 of the General Statutes of 1906, which authorized county commissioners to

grant a license "to carry a pistol, Winchester or other repeating rifle"); *An Act to Regulate the*

*Carrying of Firearms*, Fla. Stat. ch. 4147 (June 2, 1893) (applicant for license must "give a bond

running to the Governor of the State in the sum of one hundred dollars, conditioned on the proper

and legitimate use of the gun with sureties to be approved by the County Commissioners").[23]

Further, laws requiring the registration of certain types of long guns at the federal level has

proven "highly successful" in reducing the use of such long-guns in crime. *See* Vince Decl. ¶ 14.

To date, Plaintiffs have not articulated any pertinent reasons to treat handguns differently

than long guns for registration purposes. [24] Accordingly, as the public safety and public health

benefits of the District's firearms registration requirements apply equally to long-guns, such

---

[23]     *Cf.* "An Act to authorize the Justices of the Inferior Courts of Camden, Glynn and Effingham counties to levy a special tax for county purposes, and to regulate the same," 1866 Ga. Law 27, §3 (imposing a tax of "one dollar a piece on every gun or pistol, musket or rifle over the number of three"), cited in Mark Frassetto, *Firearms and Weapons Legislation Up to The Early Twentieth Century*, at 80 (Jan. 15, 2013) (*available online at* http://ssrn.com/abstract=2200991 (accessed Sept. 25, 2013)).

[24]     If registration is good enough for American soldiers, it should be good enough for District residents. *See, e.g.*, Lisa R. Rhodes, *Post requires registration of all firearms*, U.S. Army News Archives (May 5, 2011) (*available online at* http://www.army.mil/article/56041/) (accessed Oct. 3, 2013) (Fort Meade regulation 190-13 requires residents to register all privately owned firearms within 72 hours of establishing residency, "[t]o guarantee the safety of Fort Meade residents and personnel who live and work here . . . ."). Other installations have similar registration requirements. *See, e.g.*, Fort Sill, OK (http://www.army.mil/article/109740/ Regulation_requires_vehicles_be_locked_on_post/); Fort Belvoir, VA (http://www.army.mil/ article/97436/Firearm_registration_required_for_gun_owners/); Fort Rucker, AL (http://www.army.mil/article/44940/fort-rucker-gun-laws-differ-from-state/); Fort Bragg, NC (http://www.army.mil/article/32659/fort-bragg-offers-guidance-to-increase-weapon-registration-awareness/). *See also* Camp Pendleton, CA (Marines) (http://www.pendleton.marines.mil/ NewPersonnel/WeaponsRegistration.aspx); Marine Corps Base Quantico, VA (http://www.marinecorpstimes.com/article/20110108/NEWS/101080305/Quantico-revamps-weapons-regulations).

27

requirements are substantially related to important government interests and are thus constitutional under the Second Amendment.

### B.   The District's Additional Registration Requirements Are Constitutional Because They Are, At Most, A *De Minimis* Burden on Plaintiffs' Second Amendment Rights

Once the basic registration requirement is accepted as constitutional, the additional registration requirements challenged by Plaintiffs must also be upheld because the record demonstrates that they do not constitute anything more than a *de minimis* burden on Plaintiffs' Second Amendment rights. *See Marzzarella*, 614 F.3d at 94 (rejecting challenge to federal statute prohibiting possession of firearm with obliterated serial number; "Because the presence of a serial number does not impair the use or functioning of a weapon in any way, the burden on Marzzarella's ability to defend himself is arguably *de minimis*.").

There is no dispute that all of the Plaintiffs have been able to legally register at least one—and in many cases, more than one—firearm in the District. SMF ¶ 15; TAC ¶ 78.a; Ex. F [Pltfs' Responses to Defs' Interrogatories], Response No. 4. None of the Plaintiffs contend that their registration certificates have been revoked as a result of their failure to comply with any of the above-referenced requirements, or that these requirements have otherwise prevented them from possessing a firearm for the purpose of self-defense within the home. *See Heller I*, 554 U.S. at 635.

None of the Plaintiffs are "blind" for purposes of the District's firearm laws, and none have yet been required to re-register any of their firearms.  SMF ¶ 14; Ex. E [Pltfs RFA Res.], Response No. 3; *see* 2012 REPORT at 11 (noting that the 2012 Act extended MPD's time to establish a re-registration system until January 2014, and provided that "no registration renewals will be required until that time"). Indeed, MPD has not yet even finalized the re-registration

procedures that it will seek to implement.   Lanier Decl. ¶ 22. Plaintiffs, therefore, cannot demonstrate that they have experienced *any* burden from either of these requirements.

Moreover, the record demonstrates that MPD's firearm registration is process is minimally burdensome and that each of the challenged requirements may be completed in a matter of minutes.   *See, e.g.*, Shelton Decl. ¶ 12 (noting that MPD is able to complete a fingerprint-based background check in approximately 15 minutes); Ex. K [Heller Tr.], at 54:16–55:3 (stating that it took Plaintiff Heller 10–15 minutes to complete a written test to demonstrate his knowledge of the District's firearm laws); Jones Decl. ¶ 26 (the required safety training course, which is provided by MPD free of charge, may be completed online and takes approximately one hour to complete).[25]

In addition, although Plaintiffs challenge various incidental aspects of the District's registration regime—such as establishing fees for registration and fingerprinting (§ 7-2502.05(b)), requiring that a registrant notify MPD if the firearm is lost, stolen, or destroyed (§ 7-2502.08(a)) and exhibit a registration certificate upon demand of law enforcement (§ 7-2502.08(c)),[26] and the imposition of fines and penalties for violations—the D.C. Circuit has already determined that these "administrative and enforcement provisions" are "lawful insofar as the underlying regime is lawful and hence enforceable." *Heller II*, 670 F.3d at 1249 n._.

---

[25]     Plaintiff Heller testified that he was not required to complete any training course in connection with his registration, due to his current employment. Ex. K [Heller Tr.], at 54:16–55:3.

[26]     Plaintiff Heller appears to be the only plaintiff to have been subject to these notification requirements, in light of the fact that he returned to the manufacturer a pistol that he had registered with the District in 2012. Ex. K [Heller Tr.], at 22:14–27:1. Heller testified at his deposition that he was able to satisfy this requirement, § 7-2502.08(a)(3), by providing a short, handwritten note to MPD. *See id.*; Ex. L [Heller 00011].

Accordingly, the Court need not even reach the issue of whether the specific registration requirements challenged herein survive intermediate scrutiny because the record demonstrates that they are, at most, a *de minimis* burden on Plaintiffs' Second Amendment rights, and are therefore constitutional.

### C.   The District's Requirements of In-Person Appearance, Fingerprinting and Re-Registration Allow MPD to Verify An Applicant's Eligibility to Possess Firearms

#### i.   *In-Person Appearance and Fingerprinting*

The record demonstrates that the District's requirements that an individual appear in person and be fingerprinted as part of registration (§§ 7-2502.04(a), (c)) are substantially related to the District's interest in ensuring that an individual is eligible to possess a firearm.

The Committee found that

> [t]he initial fingerprinting requirement is fundamental for the Department to fulfill its public safety obligations in registering firearms—being able to screen the registrant to ensure that he or she is not disqualified from possessing a firearm, and then later, to be able to ensure that the individual has not fallen into a "prohibited person" category.

2012 REPORT at 8 (citing Testimony of Daniel W. Webster) (App. at 127–128). "The use of fingerprints provides MPD with a means of biometric identification, which ensures that the applicant is who he says he is and that MPD is performing a background check on the correct person." SMF ¶ 21; Lanier Decl. ¶ 20. Further, firearms-registration or purchasing schemes that require fingerprints and in-person appearances before law enforcement reduce the diversion of guns to criminals. *See* Webster Decl. ¶¶ 14–18 (discussing his study of Missouri's repeal of its permit-to-purchase law); SMF ¶ 18.

Indeed, "[o]ne of the most effective ways to ensure that criminals do not circumvent the firearm-registration process is to require in-person appearance and ID verification as part of

registration." Vince Decl. at ¶ 19. Requiring registrants to appear in person will deter the use of false identification or other attempts by unauthorized persons to circumvent the registration requirements. *Id.* ¶ 20. In fact, the firearms industry itself has long endorsed the in-person approach. *See id.* (citing "Don't Lie for the Other Guy," a firearms-industry initiative, started in 2000, to help firearms retailers identify and discourage illegal straw purchases) (*see* http://www.dontlie.org/history.cfm) (accessed Nov. 4, 2013).

In-person registration has the simple benefit of "the indisputable identification of the aspiring registrant as the actual owner of the firearm in question, thus limiting the ability of one person to impersonate another to defeat the legal registration program." Jones Decl. ¶ 22. *See also id.*, ¶ 21 ("Thirty years in law enforcement have confirmed for me that it is more difficult for someone to lie 'in person,' as opposed to simply submitting false or incomplete documents."). Indeed, a study by the U.S. General Accounting Office concluded that "the instant background checks [required by federal law] do not positively identify purchasers of firearms," and "cannot ensure that the prospective purchaser is not a felon." SMF ¶ 20; Webster Decl. ¶ 10; App. at 226.

Moreover, local-level background checks of an applicant's criminal and mental-health history—like those performed in the District—have been shown to be *more* effective at reducing firearm-related crime than just using the federal background check. SMF ¶ 19; Lanier Decl. ¶ 19 (citing Steven A. Sumner, *et al.*, *Firearm Death Rates and Association with Level of Firearm Purchase Background Check*, AM. J. PREV. MED. (July 2008); 35(1) 1–6 (App. at 244–49)); Shelton Decl. ¶ 12.

ii.   *Re-registration After Three Years*

Similarly, the record demonstrates that the re-registration requirement advances the District's interest in ensuring that lawful firearms owners "do not later fall into a prohibited category whereby they are no longer qualified to own or possess a firearm." 2012 REPORT at 11. *See also* Jones Decl. ¶¶ 23–24; Vince Decl. ¶ 22; Webster Decl. ¶ 30. As a result, this requirement has a clear and substantial relationship to an important government objective, and is therefore constitutional.

As the record shows that the District's requirements of in-person registration, fingerprinting, and re-registration advance the District's interest in crime control and public safety by allowing MPD to verify the eligibility of an individual to possess a firearm, the District is entitled to judgment that these requirements are constitutional.

**D.     The District's Requirements that A Registrant Demonstrate Knowledge of the Firearm Laws and Complete a Safety and Training Course Serve to Increase Accountability and Reduce Accidents**

The record demonstrates that the requirements that an individual demonstrate knowledge of the District's firearm laws (§ 7-2502.03(a)(10)) and complete a firearms safety and training class (§ 7-2502.03(a)(13)) serve to make firearms owners more accountable and reduce the risk of potentially fatal accidents. Several States require safety training or a safety exam prior to issuance of a firearm license or permit. *See* CAL. PENAL CODE §§ 31625, 31645; CONN. GEN. STAT. § 29-36f(b); HAW. REV. STAT. § 134-2(g); MD. CODE PUB. SAFETY § 5-134(b)(14); MASS. GEN. LAWS ch. 140, § 131P; N.Y. PENAL LAW § 400.00(9) (Westchester County); R.I. GEN. LAWS § 11-47-35(b)–(d). Further, training in the safe use, handling and storage of firearms is a simple, common-sense requirement, which will, if nothing else, reduce the risk of accidental shootings. SMF ¶ 23; Vince Decl. ¶ 23 ("Because every firearm has the potential to seriously

injure or kill, those who want to use such weapons should be trained in how to do so safely, to reduce the risk of accidental discharges."); Jones Decl. ¶ 25 ("Understanding the risks inherent to firearms ownership is common sense and may assist in reducing unintentional discharges and injuries."). Both of these experts believe that such training is a key component of responsible firearms ownership. Vince Decl. ¶ 23; Jones Decl. ¶ 26. *See also* Lanier Decl. ¶ 23 ("Even if a firearm is only kept in the home, the government has an interest in reducing accidental discharges, ensuring that guns are safely stored, and ensuring that owners are aware of the laws governing firearms."). Similarly, in order to make registrants more clearly accountable under the law, it is important to be able to demonstrate that they were taught and aware of firearm safety requirements. Lanier Decl. ¶ 24. In light of the above, the District is entitled to judgment that these common sense requirements are constitutional.

### E. Displaying a Registration Certificate with a Photograph Allows Law Enforcement to Safely Identify a Registered Firearms Owner

Plaintiffs contend that the District's requirements that a firearms registrant be photographed as part of the registration process (§ 7-2502.04(b)) and exhibit his registration certificate on demand of a law enforcement officer (§ 7-2502.08(c)) are unconstitutional because they "impose a substantial burden upon Plaintiffs' exercise of the core right of self-defense in the home." TAC ¶¶ 75, 78g. These requirements do not violate Plaintiffs' Second Amendment right because they are substantially related to the government's important interest in public safety and preventing the diversion of firearms to criminals.

Section 7-2502.04(b) provides that "[t]he Chief shall take a digitalized, full-face photograph of each applicant, other than an organization, to be included as part of a person's firearms registration application. The photo shall be taken simultaneously with the filing of the

application."[27] D.C. Code § 7-2502.04(b). Once an applicant is approved by MPD, the application serves as his firearms registration certificate, which includes the photograph of the registrant. 24 D.C. Mun. Regs. § 2314.4 (2013).

The Committee on the Judiciary recognized that "an important purpose for the registration of firearms is . . . to separate law abiding citizens of the District from those who wish to possess and use firearms for criminal purposes." 2012 REPORT, at 6. Individuals who legally register their firearms in the District are much less likely to use those firearms for criminal purposes. SMF ¶ 22; Lanier Decl. ¶ 27. *See also* Shelton Decl. ¶ 8 ("In my experience, the vast majority of applicants to register firearms are law-abiding people with no disqualifying factors."). Indeed, between July 17, 2008 and Oct. 19, 2012, a total of only 37 firearms registered to private individuals were recovered from crime scenes. Dec. 5, 2012 Ltr. from Def to Pltfs, attached as Ex. J; *cf.* Lanier Decl. ¶ 5 (stating that MPD has recovered more than 13,000 unregistered firearms since 2007). As a result, an individual with a legally registered firearm may pose less danger to an officer than someone in possession of an illegal firearm. Lanier Decl. ¶ 27.

The Committee on the Judiciary relied on testimony provided by Chief Lanier concerning the importance of an individual being able to present a registration certificate with a photograph when encountering a law enforcement officer.[28] 2012 REPORT, at 9. According to Chief Lanier, such a certificate allows law enforcement officers to quickly and safely determine whether a given individual is in possession of a legally registered firearm. *See* App. at 160 (written

---

[27]    The Firearms Registration Amendment Act of 2012 removed "from the registrant the burden of submitting a photograph for purposes of registration," and instead required the MPD to photograph the applicant at the time of registration. 2012 Report, at 9.

[28]    Plaintiff Heller testified at his deposition that he has never been asked by a District official to present any of his firearm registration certificates. Ex. K [Heller Tr.], at 65:5–8.

testimony of Cathy L. Lanier, at 4 (Jan 30, 2012) (copy appended to 2012 REPORT)) ("Lanier Testimony"); Lanier Decl. ¶ 27. Without a certificate with photo identification, it would, in many instances, be far more difficult for officers to readily distinguish between a registered owner legally transporting a firearm, and someone transporting an illegal firearm—who potentially may pose a greater safety risk to the officer. Lanier Decl. ¶ 28. These requirements, therefore, help "to keep both the officer and the registrant safe." 2012 REPORT at 9 (citing Lanier Testimony, at 4); Lanier Decl. ¶ 27.

Accordingly, because the above requirements are substantially related to the District's interest in public safety and preventing the diversion of firearms to criminals, the District is entitled to judgment that they are constitutional.

### F. Requiring Registrants to Promptly Report Theft, Loss, or Transfer of Registered Firearms Is Substantially Related to the District's Interest in Crime Control and Public Safety

Plaintiffs also challenge the requirement that "[e]ach person or organization holding a registration certificate . . . shall:

> (1) Notify the Chief in writing of the loss, theft, or destruction of . . . a registered firearm (including the circumstances, if known) immediately upon discovery of such loss, theft, or destruction;
> (2) Notify the Chief in writing within 30 days of a change in the registrant's name or address as it appears on the registration certificate;
> (3) Notify the Chief in writing of the sale, transfer, or other disposition of the firearm within 2 business days of such sale, transfer, or other disposition.

D.C. OFFICIAL CODE § 7-2502.08(a); TAC ¶ 78j. A failure to comply with the above-referenced requirements will subject registrants to a civil fine of $100 for the first violation, and increasing penalties for additional violations. D.C. OFFICIAL CODE § 7-2502.08(e).

The notification requirements set forth in § 7-2502.08(a) are substantially related to the government's interest in preventing the diversion of firearms to prohibited persons. Data gathered by the ATF and the Bureau of Justice Statistics indicate that guns used in crime are overwhelmingly obtained from private sources, not directly from federally licensed gun dealers.[29] Webster Decl. ¶ 27.[30] Promptly notifying law enforcement when a registered firearm is lost or stolen provides law enforcement with the opportunity to investigate and potentially recover the firearm *before* it is used in a crime.[31] SMF ¶ 24; *See* Lanier Decl. ¶ 28; Vince Decl. ¶ 24. Further, requiring a gun owner to notify law enforcement when he or she is no longer in possession of a registered firearm increases the accountability of the owner and provides law enforcement with a tool to combat illegal straw purchases.[32] *See* Jones Decl. ¶ 28 (reporting requirements "take[] away an excuse commonly used by straw purchasers—that the guns just purchased were later stolen or lost"). This measure of accountability has been found to significantly reduce gun trafficking, as jurisdictions with laws requiring private gun owners to

---

[29]     As a means of combating trafficking, federal law requires that licensed firearms dealers report "the theft or loss of a firearm from the licensee's inventory or collection, within 48 hours after the theft or loss is discovered[.]" 18 U.S.C. § 923(g)(6); Webster Decl. ¶ 27.

[30]     *See also* DEP'T OF TREASURY, ATF, *Crime Gun Trace Reports (2000): The Youth Crime Gun Interdiction Initiative*, "General Findings," at 29 (2002), *available at* http://www.atf.gov/files/publications/download/ycgii/2000/ycgii-report-2000-general-findings.pdf (last visited Nov. 4, 2013); U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS, *Survey of Inmates in State Correctional Facilities (SISCF)* (2004).

[31]     Additionally, the notification requirement can help protect an innocent registrant from being associated with a crime that is later committed with his firearm. Lanier Decl. ¶ 29.

[32]     The Committee on the Judiciary noted that an important purpose of a firearms registration system is to "create accountability for gun owners." 2012 REPORT, at 7–8. *See also* Webster Decl. ¶ 27 ("The most effective firearms regulations are designed to hold firearm sellers and owners accountable for their firearms, to prevent the diversion of those firearms to criminals or other prohibited users.").

36

promptly report theft or loss of firearms have been associated with a 30% lower rate of exporting guns to criminals across state borders. Webster Decl. ¶ 28; App. at 255–58. This data supports "the hypothesis that laws such as the District of Columbia's requiring private gun owners to promptly report to law enforcement when their firearms are lost or stolen help curtail the diversion of guns to criminals." Webster Decl. ¶ 28.

Separately, the requirement that a registrant notify the Chief within 30 days of "a change in the registrant's name or address as it appears on the registration certificate," serves to advance the basic public-safety goals of the registration process by ensuring that the data retained by the District is accurate and up-to-date. Indeed, the Committee on the Judiciary found that "a registration system for firearms is most effective if the data retained by the Metropolitan Police Department is current." 2012 REPORT at 10. For example, as discussed above, one important purpose of the registration certificate is to protect the safety of law enforcement officers and the public by allowing an individual to quickly and safely communicate to a law enforcement officer that he is the lawful owner of a legally register firearm. *See supra*, at 34. This purpose would be hampered if the information set forth on the certificate was no longer accurate, or potentially conflicted with other credentials presented by the individual.

Accordingly, in light of the record demonstrating the important interests served, the District is entitled to summary judgment that the notification requirements in § 7-2502.08(a) are constitutional.

### G.     The District's Prohibition on Registering More Than One Pistol Per Registrant in A Thirty-Day Period Serves to Prevent Illegal Trafficking

Section 7-2502.03(e) provides that

[t]he Chief shall register no more than one pistol per registrant during any 30-day period; provided, that the Chief may permit a person first becoming a District

resident to register more than one pistol if those pistols were lawfully owned in
another jurisdiction for a period of 6 months prior to the date of the application.

D.C. OFFICIAL CODE § 7-2502.03(e). Plaintiffs contend that this limitation impermissibly

infringes on their Second Amendment right to keep and bear arms. TAC ¶¶ 75, 78f. This claim

fails, however, because the record clearly establishes a substantial relationship between this

registration limitation and the government's important interest in preventing the trafficking of

firearms into or out of the District. *See* 2012 REPORT, at 8 ("The government's interest in prevent

the trafficking of guns—i.e., the acquisition of guns by criminals—cannot be overstated.").

As an initial matter, the one-pistol-per-30-day registration limitation does not

substantially burden the Second Amendment right. Indeed, unlike the law held unconstitutional

by the Supreme Court in *Heller I*, this limitation does not *prohibit* a person from possessing as

many handguns as he or she wants, but rather merely limits the number of handguns that may be

registered in a particular time period. Further, this limitation does not prevent a person from

keeping a commonly used weapon for protection in the home or for hunting, whether a handgun

or a long-gun.

In any case, the District's interest in preventing the trafficking of firearms is clearly

supported by the fact that the vast majority of illegal firearms found in the District are illegally

trafficked from other states. SMF ¶ 25; *see* MPD, *Annual Report 2011*, at 27 (April 30, 2011)

(only 23 out of 430 of the illegal guns successfully traced by MPD in 2011 were traced to the

District), *available at* http://mpdc.dc.gov/sites/default/files/dc

/sites/mpdc/publication/attachments/ar_2011_0.pdf; Metropolitan Police Department, *Annual

Report 2012*, at 29 (June 28, 2012) (only 25 out of 598 of the illegal guns successfully traced by

MPD in 2012 were traced to the District), *available at* http://mpdc.dc.gov/sites/default/files/dc/

sites/mpdc/publication/attachments/2012_AR_1.pdf.

Further, the Committee on the Judiciary was persuaded by "ample analyses" that "multiple gun sales enable gun trafficking, and that one-gun-per-month restrictions frustrate trafficking." 2012 REPORT, at 16. In particular, the Committee relied on evidence submitted by the Brady Center to Prevent Gun Violence[33] and the Legal Community Against Violence[34] that:

- Firearms sold to the same purchaser via multiple sales are frequently used in crime. *See* Mona Wright, *et al*., *Factors Affecting a Recently Purchased Handgun's Risk for Use in Crime Under Circumstances That Suggest Gun Trafficking*, 87 J. URBAN HEALTH: BULL. OF THE NEW YORK ACAD. OF MED. 352, 356 (2010) (App. at 267) (finding that handguns involved in bulk purchases were 33% more likely to be used in crime that those purchased individually.

- Virginia's one-handgun-per-month limit reduced by 66% the odds that a crime gun recovered in the northeastern U.S. was purchased in Virginia rather than another southeastern state. *See* Douglas Weil & Rebecca Knox, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275 J. AM. MED ASS'N 1759, 1760 (1996) (App. 277) (concluding that one-gun-per-month restriction is an effective means of disrupting the illegal interstate transfer of firearms); *see also* Douglas Weil & Rebecca Knox, *Evaluating the Impact of Virginia's One-Gun-A-Month Law*, The Ctr. to Prevent Handgun Violence 1, 4–6 (Aug. 1995).[35]

---

[33]   *Bill 19-614, Firearms Amendment Act of 2011: Hearing Before the Council of the District of Columbia Committee on the Judiciary*, Jan. 30, 2012, at 4 (written testimony of Daniel R. Vice, Senior Attorney, Brady Center to Prevent Gun Violence) ("Vice 1.30.12 Testimony") (App. at 168).

[34]   *Bill 19-614, Firearms Amendment Act of 2011: Hearing Before the Council of the District of Columbia Committee on the Judiciary*, Jan 30, 2012, at 3 (written supplemental statement of Benjamin Van Houten Managing Attorney, Legal Community Against Violence ("Van Houten 2.13.12 Supplemental Statement") (App. at 188).

[35]   Unfortunately, last year, Virginia repealed its law. *See, e.g.*, Bob Lewis, *Virginia ends monthly one-gun purchase limit*, RICHMOND TIMES-DISPATCH, July 2, 2012 ("After 19 years, the one-handgun-a-month law that ended Virginia's reputation as the East Coast arsenal for criminals has passed quietly into history."), *available online at* http://www.timesdispatch.com/news/virginia-ends-monthly-one-gun-purchase-limit/article_ 55c95c91-8638-5973-bdb5-c13f93813447.html (accessed Nov. 4, 2013). *Cf.* Editorial Board, *Repealing a gun law that worked*, WASH. POST, Feb. 13, 2012:

> In 1995, a pro-gun lawmaker gave the Virginia State Crime Commission the task of studying the limit's impact. The commission found that the law had significantly reduced the number of Virginia guns found at crime scenes beyond its borders.

- Maryland's one-handgun-per-month law could greatly reduce the risk of bulk-sale guns being recovered from crimes, because multiple-gun sales were up to 64% more likely to be used in crime. *See* Christopher S. Koper, *Crime Gun Risk Factors: Buyer, Seller, Firearm, and Transaction Characteristics Associated with Gun Trafficking and Criminal Gun Use*, REPORT TO THE NATIONAL INSTITUTE OF JUSTICE 6, 83 (2007), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/221074.pdf (lasted visited Nov. 4, 2013).

- Gun trace data from the Bureau of Alcohol, Tobacco, and Firearms demonstrated that, in 1999, 22% of all handguns recovered in crime had been involved in a multiple sale, and other gun trace data demonstrated that, in 2000, 20% of retail handguns recovered in crime were part of a multiple sale. *See* Bureau of Alcohol, Tobacco and Firearms, U.S. Department of the Treasury, *Youth Crime Gun Interdiction Initiative, Crime Gun Trace Reports (2000) National Report* 52 (Jul. 2002), *available at* http://www.atf.gov/files/publications/download/ycgii/2000/ycgii-report-2000-general-findings.pdf (last visited Sept. 16, 2013); Bureau of Alcohol, Tobacco and Firearms, U.S. Department of the Treasury, *Youth Crime Gun Interdiction Initiative, Crime Gun Trace Reports (1999) National Report* 40, *available at* https://www.atf.gov/sites/default/files/assets/pdf-files/ycgii-report-1999-general-findings.pdf (last visited Nov. 4, 2013).

Moreover, the record, as supplemented in discovery, further supports the Committee's determination that the District's one-pistol-per-30-day registration limit will help frustrate firearms trafficking. SMF ¶ 26; *see* Vince Decl. ¶¶ 17–18 ("one of the most effective methods of disrupting illegal interstate trafficking of firearms are state and local laws that limit the quantity of firearms that can be purchased or registered during a given time period"); Jones Decl. ¶¶ 18–20 ("In my experience, laws that limit the quantity of firearms that can be purchased or registered during a given time period make it more difficult for firearms traffickers to acquire and resell guns from that municipality or state."); Lanier Decl. ¶ 30 ("In my opinion, the District's one-gun-per-month registration provision provides important benefits in terms of deterring and controlling the trafficking of firearms into or out of the District.").

---

[T]o discard a law that has been effective for almost 20 years makes no sense.

*Id.*(available online at http://articles.washingtonpost.com/2012-02-13/opinions/35445098_1_number-of-virginia-guns-gun-law-handgun-purchases) (accessed Nov. 4, 2013).

Based on the above, it is clear that the District's one-pistol-per-30-day registration limitation in § 7-2502.03(e) is substantially related to the government's important interest in frustrating the trafficking of firearms into and out of the District. Accordingly, the District is entitled to summary judgment that this provision is constitutional.

### H.    Other Provisions

Plaintiffs also complain of the financial burden of registering their weapons.[36] TAC ¶ 78g. But it costs just $48 to register a firearm, with $35 of that a one-time fee for MPD to take and process an applicant's fingerprints. Shelton Decl. ¶ 8.[37] That amount is less than it costs to get a driver's license, 18 DCMR § 103.8 (2011), and less than the cheapest speeding ticket, *id*., § 2600.1. Indeed, the Court need do little more than read the *Kwong* case to uphold the registration fee here. In that case, decided in July 2013, the Second Circuit upheld against a Second Amendment challenge New York City's $340 fee for a three-year residential handgun license. 723 F.3d at 169. The Second Circuit confirmed—contrary to the instant plaintiffs' arguments— that it is perfectly permissible for the government to impose licensing fees for the exercise of constitutional rights, so long as the fees "are designed to defray (and do not exceed) the administrative costs of regulating the protected activity." *Id*. at 165 (citing, *inter alia*, *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941)).[38] Moreover, the Second Circuit determined that, as here,

---

[36]    As noted previously, the D.C. Circuit has found that requiring fees for registration and fingerprinting is lawful to the extent the underlying registration regime is lawful. *Heller II*, 670 F.3d at 1249 n._

[37]    The fees have gone *down* since the last round of briefing, as the Council repealed the ballistics-test provision, which had imposed a cost of $12 per gun. *See* Doc. No. 25 at 9.

[38]    On its face, then, the District's fee provision is constitutional. *See* D.C. OFFICIAL CODE § 7-2502.05(b) ("such fee shall, in the judgment of the Mayor, reimburse the District for the cost of services provided under this subchapter.").

the fee "was not prohibitive or exclusionary as applied to these individual Plaintiffs because they were all able to obtain" the licenses they sought. *Id*.

The Court should find that the minimal fee here is not an unconstitutional burden on Plaintiffs' Second Amendment rights. *See, e.g., Gonzalez v. Carhart*, 550 U.S. 124, 157–58 (2007) ("The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to [exercise the right] cannot be enough to invalidate it.") (quoting *Planned Parenthood of SE Pa. v. Casey*, 505 U.S. 833, 874 (1992) (*plurality op.*)); *Nordyke v. King*, 644 F.3d 776, 787–88 (9th Cir. 2011) ("[A] law does not substantially burden a constitutional right simply because it makes the right more expensive or more difficult to exercise."), *affirmed*, 681 F.3d 1041 (9th Cir. 2012) (*en banc*)).

Similarly, Plaintiffs' fear that their registration information might be publically exposed, TAC ¶ 78m, is entirely speculative and belied by the facts. *See* Shelton Decl. ¶ 13 (MPD has determined that firearms-registrants' personal information is exempt from disclosure).

## II.   The Court Must Dismiss Count II of the TAC in Its Entirety, and Count I In Part, Pursuant to the D.C. Circuit's Prior Ruling

Count II of the TAC challenges the constitutionality, both facially and as applied, of the District's prohibition on the registration of certain semi-automatic weapons designated as "assault weapon[s]" (§ 7-2502.02(6)), and the possession, sale, or transfer of ammunition feeding devices with a capacity of more than ten rounds (§ 7-2506.01(b)). TAC ¶ 82. In addition, Count I of the TAC, in part, challenges the basic registration requirement as it applies to handguns (§ 7-2502.01(a)), as well as the requirement that an applicant disclose, as part of the registration process, certain information about himself and the firearm (§ 7-2502.03(b)). TAC ¶ 78a, e.

The Court must summarily dismiss these challenges because the D.C. Circuit *affirmed* the prior judgment of the District Court upholding the constitutionality of these provisions.[39] *See Heller II*, 670 F.3d at 1264 (affirming the judgment of the district court with respect to "the ban on 'assault weapons' and large-capacity magazines, as they are defined in §§ 7-2502.02(a)(6), 7-2501.01(3A)(A)(i)(I), (IV), and 7-2506.01(b)").

None of these provisions have been amended since the Circuit's decision. Plaintiffs have not—and cannot—identify any *other* basis upon which they are entitled to relief on these challenges in light of the Circuit's prior decision in this matter. Therefore, in accordance with controlling law of this Circuit, the Court must summarily dismiss Count II of the TAC in its entirety, and Count I to the extent it challenges the requirements set forth in §§ 7-2502.01(a) and 7-2502.03(b).

### III. Plaintiffs Lack Standing to Challenge the District's Vision Requirement (D.C. Code § 7-2502.03(a)(11))

Plaintiffs' challenge to the District's registration requirement that an applicant "[i]s not blind" (§ 7-2502.03(a)(11)) must be dismissed because they lack standing to challenge that provision. The doctrine of standing requires "federal courts to satisfy themselves that 'the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction.'" *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (citing *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)). In order to have standing, a plaintiff "must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal

---

[39]     An "even more powerful version" of the law-of-the-case doctrine applies when a district court acts on a case on which the court of appeals has previously ruled. *See LaShawn A. v. Barry*, 87 F.3d 1389, 1393 n.3 (D.C. Cir. 1996) (discussing "mandate rule").

citations omitted). A plaintiff "cannot rest his claim on the rights or interests of third parties" or assert a harm that is a generalized grievance "shared in substantially equal measure by all or a large class of citizens." *Warth*, 422 U.S. at 499.

It is well-established that "a plaintiff must separately prove standing 'for each claim he seeks to press.'" *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 47 n.15 (1st Cir. 2011) (quoting *DamlerChrysler v. Cuno*, 547 U.S. 332, 352 (2006)). It is axiomatic that the "party invoking federal jurisdiction bears the burden of establishing the[ ] elements" of constitutional standing. *Lujan*, 504 U.S. at 561.

Here, Plaintiffs lack standing because they have not suffered an injury-in-fact as a result of § 7-2502.03(a)(11). As this Court previously recognized in this case, "in federal court, a constitutional challenge to a statute obviously requires a plaintiff who alleges injury from it." Doc. No. 55 [Mem. Op.] at 6. Yet, the TAC does not allege that any of the Plaintiffs were denied the ability to register a firearm in the District because they are "blind." In fact, Plaintiffs *explicitly admit* that none of them are blind for purposes of the law. SMF ¶ 14; *see* Pltfs' RFA Responses No. 3. As none of the Plaintiffs are blind, none of them have been or will be injured by the application of D.C. Official Code § 7-2502.03(a)(11).[40] Consequently, as none of the Plaintiffs can show an injury as a result of the vision requirement in § 7-2502.03(a)(11), they do not have standing to challenge it. *See, e.g., Pennell v. City of San Jose*, 485 U.S. 1, 8 (1988) ("[a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement.") (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)); *Conference Group, LLC v. FCC*, 720 F.3d 957, 964 (D.C. Cir. 2013) ("a

---

[40]     As discussed above, in light of the fact that *none* of the Plaintiffs have been injured by the application of D.C. Code § 7-2502.03(a)(11), they certainly cannot show that this requirement has "substantially burdened" their Second Amendment rights. *See* TAC ¶ 78c.

'sincere, vigorous interest in the action challenged, or in the provisions of law allegedly violated, will not do to establish standing' because to satisfy Article III standing there must be an injury-in-fact") (quoting *Capital Legal Found. v. Commodity Credit Corp.*, 711 F.2d 253, 258 (D.C. Cir. 1983). Accordingly, Plaintiffs' challenge to § 7-2502.03(a)(11) must be dismissed for lack of standing.[41]

## CONCLUSION

Since *Heller I*, 99% of applicants have been able to register their handguns, and 99% of applicants have been able to register their long guns. Shelton Decl. ¶ 5.

At bottom, the District's firearms-registration requirements are not onerous or unduly burdensome, and they do not violate the Second Amendment, even assuming they impinge on some "core" aspect of that right. The evidence amply supports the constitutionality of the District's firearms law. As explained herein, the minimal restrictions imposed by the District's regulation of firearms are substantially related to the compelling government objectives of public safety and crime prevention.

The irony of plaintiffs' position is astonishing: Plaintiff Jordan is quoted on the front page of the Washington Post complaining about gun violence in his neighborhood, but plaintiffs fail to acknowledge the obvious—that making guns *easier* to get and register will *not* have a positive impact on a city that records an average of 17 gunshots fired *per day*. *See* Andras Petho, David S. Fallis, & Dan Keating, *Guns in America: Acoustic sensors reveal hidden depth of gun use in D.C.*, WASH. POST, Nov. 3, 2013, at A1, A18.

---

[41]     Regardless of Plaintiffs' standing, the requirement that a firearms registrant "[i]s not blind" is clearly related to District's interest in public safety and preventing accidental shootings. As the Committee found, "there is an obvious correlation between not being blind and being able to handle a firearm safely, especially for defense in the home." 2012 REPORT, at 17. Plaintiffs cannot point to any facts in the record to rebut this common-sense conclusion.

Date: November 5, 2013

Respectfully submitted,

IRVIN B. NATHAN
Attorney General for the District of Columbia

ELLEN A. EFROS
Deputy Attorney General
Public Interest Division

       /s/ Grace Graham
GRACE GRAHAM, D.C. Bar No. 472878
Chief, Equity Section
441 Fourth Street, NW, 6th Floor South
Washington, DC 20001
Telephone: (202) 442-9784
Facsimile: (202) 741-8892
Email: grace.graham@dc.gov

       /s/ Andrew J. Saindon
ANDREW J. SAINDON, D.C. Bar No. 456987
Assistant Attorney General
Equity Section
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Facsimile: (202) 730-1470
andy.saindon@dc.gov

       /s/ Chad A. Naso
Chad A. Naso [1001694]
Assistant Attorney General
Office of the Attorney General, DC
441 Fourth Street, NW
Sixth Floor South
Washington, DC 20001
(202) 724-7854 (o)
(202) 741-8951 (f)
chad.naso@dc.gov

*Counsel for Defendants*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
DICK ANTHONY HELLER, et al.             )
                                        )
       Plaintiffs,                      )
                                        )
       v.                               )        Civil Action No. 08-01289 (JEB)
                                        )
DISTRICT OF COLUMBIA, et al.,           )
                                        )
       Defendants.                      )
_____ )

DEFENDANTS' STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE DISPUTE

Defendants the District of Columbia and Mayor Vincent C. Gray (collectively, "the District"), by and through their undersigned counsel, submit the following Statement of Material Facts As to Which There is No Genuine Dispute.

1.      In response to the Supreme Court's decision in *Heller v. Dist. of Columbia*, 554 U.S. 570 (2008), the Council of the District of Columbia amended the District's gun laws. *See* COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON PUBLIC SAFETY & THE JUDICIARY, REPORT ON BILL 17-843, the "Firearms Control Amendment Act of 2008," Nov. 25, 2008, at 2 ("2008 REPORT") (Ex. A [App.], starting at 33); (*available online at* http://dcclims1.dccouncil.us/images/00001/20090513152155.pdf (accessed Oct. 23, 2013).

2.      On September 18, 2008 and October 1, 2008, the Council's Committee on Public Safety and the Judiciary held public hearings during which it heard the testimony of twenty-one witnesses and considered the written statements of four others "in order to receive as much public comment as possible in crafting [the] bill." 2008 REPORT at 3, 11–14.

1

3.      The Firearms Registration Amendment Act of 2008 ("2008 Act") was passed by the Council, and signed by then-Mayor Adrian Fenty on January 28, 2009. *See* 56 D.C. REG. 3438 (May 1, 2009).

4.      After Congress declined to disapprove the 2008 Act during the prescribed period of congressional review, it became law on March 31, 2009. *See id.*

5.      After the D.C. Circuit's decision in *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011), the Council revisited the District's firearm registration laws by enacting Bill 19-614, the Firearms Amendment Act of 2012 (the "2012 Act," D.C. Law 19-170). *See* COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON PUBLIC SAFETY & THE JUDICIARY, REPORT ON BILL 19-614, at 23 (Feb. 29, 2012) ("2012 REPORT") (copy attached in App. starting at 120).

6.      The 2012 Act repealed the requirements that an applicant submit "for ballistics identification procedure" each pistol to be registered (§ 7-2502.03(d)) and undergo a background check every six years (§ 7-2502.07a). 2012 REPORT at 13–14, 18.

7.      In addition, the 2012 Act:

a.  revised the vision requirement to require only that a firearms registrant "is not blind" (§ 7-2502.03(a)(11));

b.  eliminated the 5-hour training requirement with the range and classroom components, and instead directed the Chief of MPD to provide free safety training to firearms applicants (§ 7-2502.03(a)(13)(A));

c.  clarified that the requirement to demonstrate knowledge of the District's firearms laws is a one-time requirement (§ 7-2502.03(a)(10)); and

d.  extended the time frame for MPD to create a system for re-registration of firearms until January 1, 2014. 2012 REPORT at 23–24.

8.     On January 30, 2012, the Council's Committee on the Judiciary held a public hearing to receive testimony on the proposed legislation, as well as on "the gun laws of the District" in general. *See* 2012 REPORT at 22–23; 58 D.C. REG. 50 (Dec. 16, 2011).

9.     At this hearing, the Committee received oral testimony from 14 witnesses, including: Plaintiffs Dick Heller and Absalom Jordan; MPD Chief Cathy Lanier; Daniel W. Webster, the Co-Director of the Johns Hopkins Center for Gun Policy and Research; Benjamin Van Houten, the Managing Attorney at the Legal Community Against Violence; Daniel R. Vice, a Senior Attorney with the Brady Center to Prevent Gun Violence; George L. Lyon, Jr., the President of the D.C. Chapter, Community Association for Firearms Education ("CAFE"); Ricardo Royal, the National President & Chief Training Counselor for CAFE; and other members of the public. 2012 REPORT at 21–23.

10.     The Committee also received written statements concerning the District's firearm registration laws from these and other individuals, which were filed in the record. 2012 REPORT, Attach. No. 2 (written testimony and comments).

11.     On February 29, 2012, the Committee issued a 29-page report, which made findings concerning the District's firearm-registration requirements. *See generally* 2012 REPORT.

12.     The 2012 Act was unanimously adopted by the Council and subsequently signed by Mayor Vincent C. Gray on May 15, 2012. TAC ¶ 16.

13.     After the expiration of the prescribed period for congressional review, the law became effective on September 26, 2012.

14.     None of the Plaintiffs in this matter are "blind" for purposes of D.C. OFFICIAL CODE § 7-2502.03(a)(11). Ex. E [Pltfs RFA Res.], Response No. 3.

15.     All of the Plaintiffs have successfully registered at least one firearm in the District of Columbia. TAC ¶ 78a; Ex. F [Pltfs Interrog. Res.], Response No. 4.

16.     MPD has determined that personally identifiable information provided by applicants on firearms-registration forms is exempt from disclosure to the public pursuant to D.C. OFFICIAL CODE § 2-534(a)(2), as a clearly unwarranted invasion of personal privacy. Shelton Decl. ¶ 13.

17.     MPD charges $35 to take and process an applicant's fingerprints, and $13 per firearm for the registration itself. Shelton Decl. ¶ 8.

18.     Empirical evidence suggests that in-person registration for firearm purchasers reduces the diversion of guns to criminals. Webster Decl. ¶¶ 14–18.

19.     Local-level background checks of an applicant's criminal and mental-health history have been shown to be more effective at reducing firearm-related crime than just using the federal background check. Lanier Decl. ¶ 19 (citing Steven A. Sumner, *et al*., *Firearm Death Rates and Association with Level of Firearm Purchase Background Check*, AM. J. PREV. MED. (July 2008); 35(1) 1–6 (App. at 244–49)); Shelton Decl. ¶ 12.

20.     A study by the U.S. General Accounting Office concluded that "the instant background checks [required by federal law] do not positively identify purchasers of firearms," and "cannot ensure that the prospective purchaser is not a felon." Webster Decl. ¶ 10; App. at 226.

21.     The use of fingerprints provides MPD with a means of biometric identification, which ensures that the applicant is who he says he is and that MPD is performing a background check on the correct person. Lanier Decl. ¶ 20.

22.     Individuals who legally register their firearms in the District are less likely to use those firearms for criminal purposes, and thus may pose less of a danger to law enforcement. Lanier Decl. ¶ 27; Shelton Decl. ¶ 8.

23.     Training with respect to the safe handling and storage of a firearm reduces the risk of accidental discharges. Vince Decl. ¶ 23; Lanier Decl. ¶ 23; Jones Decl. ¶ 25.

24.     Promptly notifying law enforcement when a registered firearm is lost or stolen provides law enforcement with the opportunity to investigate and potentially recover the firearm before it is used in a crime. Lanier Decl. ¶ 28; Vince Decl. ¶ 24.

25.     The majority of illegal firearms recovered in the District are illegally trafficked from other states. Vince Decl. ¶ 18; Lanier Decl. ¶ 29.

26.     State and local laws that limit the purchase or registration of firearms by an individual to one gun in a 30-day period are effective in disrupting illegal interstate trafficking of firearms. Vince Decl. ¶¶ 17–18; Jones Decl. ¶¶ 18–20; Lanier Decl. ¶ 30. *See also* Douglas Weil & Rebecca Knox, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275 J. Am. Med Ass'n 1759, 1760 (1996) (App. at 277) (concluding that one-gun-per-month restriction is an effective means of disrupting the illegal interstate transfer of firearms); *see also* Douglas Weil & Rebecca Knox, *Evaluating the Impact of Virginia's One-Gun-A-Month Law*, The Ctr. to Prevent Handgun Violence 1, 4–6 (Aug. 1995).

27.     Historically, high-powered rifles have been the preferred tool of political assassins as they typically are more accurate over a longer range. Vince Decl. ¶ 16; Lanier Decl. ¶ 32; Jones Decl. ¶ 15.

28.     Preventing crime and promoting public safety are each important and legitimate government interests. Ex. E [Pltfs RFA Res.], Response No. 4.

Date: November 5, 2013                    Respectfully submitted,

                                          IRVIN B. NATHAN
                                          Attorney General for the District of Columbia

                                          ELLEN A. EFROS
                                          Deputy Attorney General
                                          Public Interest Division

                                          _____/s/ Grace Graham_____
                                          GRACE GRAHAM, D.C. Bar No. 472878
                                          Chief, Equity Section
                                          441 Fourth Street, NW, 6th Floor South
                                          Washington, DC 20001
                                          Telephone: (202) 442-9784
                                          Facsimile: (202) 741-8892
                                          Email: grace.graham@dc.gov

                                          _____/s/ Andrew J. Saindon_____
                                          ANDREW J. SAINDON, D.C. Bar No. 456987
                                          Assistant Attorney General
                                          Equity Section
                                          441 Fourth Street, N.W., 6th Floor South
                                          Washington, D.C. 20001
                                          Telephone: (202) 724-6643
                                          Facsimile: (202) 730-1470
                                          andy.saindon@dc.gov

                                          _____/s/ Chad A. Naso_____
                                          Chad A. Naso [1001694]
                                          Assistant Attorney General
                                          Office of the Attorney General, DC
                                          441 Fourth Street, NW
                                          Sixth Floor South
                                          Washington, DC 20001
                                          (202) 724-7854 (o)
                                          (202) 741-8951 (f)
                                          chad.naso@dc.gov

                                          *Counsel for Defendants*