# EXHIBIT A

# Council of the District of Columbia
# Report

City Hall, 14th and E Streets, N.W.     Fifth Floor     638-2223 or Government Code 187-9806

| | |
|---|---|
| To | Members of the Council |
| From | Committee on the Judiciary and Criminal Law<br>David A. Clarke, Chairperson |
| Date | April 21, 1976 |
| Subject | Bill No. 1-164, the "Firearms Control Act of 1975" |

The Committee on the Judiciary and Criminal Law, to which Bill No. 1-164 was referred, having considered the same, reports favorably on the bill as amended.

## BACKGROUND OF THIS LEGISLATION

Bill No. 1-164, as amended, evolved from a series of "gun control" bills which have been introduced in this Council. On February 11, 1975, Councilmember John Wilson introduced the first bill (Bill No. 1-24) to amend the D.C. Police Regulations, Articles 50 through 55, dealing with comprehensive firearm bans, registration and licensing. On March 11, 1975, Councilmember Polly Shackleton introduced Bill No. 1-42, the "District of Columbia Handgun Control Act of 1975", which would have defined new crimes in the D.C. Code involving a comprehensive ban, except in certain circumstances, on handguns or handgun ammunition in the District of Columbia. On June 6 and 7, 1975, your committee conducted extensive public hearings concerning the above-described bills and concerning the more general issue of firearm controls. A copy of the notice and the witness list for such public hearings is attached hereto as "Exhibit A". Councilmember Wilson, who participated in the conduct of the aforementioned hearings, on July 22, 1975, introduced Bill No. 1-164 in lieu of his previous bill, in order to amend the D.C. Police Regulations, Articles 50 through 55. Your committee concentrated its attention to Bill No. 1-164 which basically was aimed at reforming the current, firearm registration and licensing regulations. In its major parts, original Bill No. 1-164 would have (1) expanded the registration and reporting requirements currently placed on firearm owners and/or dealers, (2) substantially increased the fees for registering firearms and for obtaining a license to deal in firearms, (3) placed specific duties on personnel of the Office of Corporation Counsel to prosecute

J-3172-75

Bill No. 1-164, the "Firearms Control act of 1975"
Page 2
April 21, 1976


and to monitor the firearm regulations, (4) increased the
penalties for violating the police firearm regulations,
(5) abolished judicial discretion in the process of meting
out punishment for violation of the firearm regulations, and
(6) mandated that the Chief of Police conduct an active
campaign to seize all prohibited firearms.  After lengthy
research with regard to original Bill No. 1-164 and
refinements of gun controls in the District of Columbia,
your committee conducted a roundtable discussion and
preliminary mark-up on Tuesday, April 6, 1976 to consider an
amendment in the nature of a substitute to Bill No. 1-164.
On Thursday, April 15, 1975, your committee conducted a
mark-up of such amendment.  The reported Bill No. 1-164, as
amended, is the product of the foregoing deliberations by
your committee.

## THE PURPOSE OF THIS LEGISLATION

     The goals of this legislation are twofold:   (1) to
reduce the potentiality for gun-related crimes and gun-
related deaths from occurring within the District of
Columbia; and (2) to strengthen the capacity of the District
of Columbia government to monitor the traffic in firearms
and ammunition within this jurisdiction.  Bill No. 1-164, as
amended, would circumscribe the persons eligible to register
firearms in the District of Columbia and would delineate the
types of firearms which could not be registered within the
District of Columbia.  The bill sets forth new and stringent
criteria in order to relegate guns with legitimate uses in
an urban area to demonstrably responsible types of persons.
This legislation would also place more expansive reporting
duties upon all firearm owners and dealers.  This increased
accountability would fortify the government's ability to
keep track of the guns which are within the District of
Columbia.  The increased penalties for violation of these

2.

Bill No. 1-164, the "Firearms Control act of 1975"
Page 3
April 21, 1976


new regulations are designed to deter avoidance of the new
requirements.

## THE NEED FOR THIS LEGISLATION

Your committee finds that, with reference to the
possession, sale, purchase and control of any firearm or
destructive device in the District of Columbia, the design
and scope tation of the current D.C. Police Regulations,
Articles 50 through 55, have not been sufficiently effective
in reducing the potentiality of gun-related deaths and gun-
related crimes from occurring within the District of
Columbia, and there is a need to significantly improve the
capacity of the District government to monitor the traffic
of firearms within this jurisdiction.

The easy availability of firearms in the United States
has been a major factor contributing to the drastic increase
in gun-related violence and crime over the past 40 years.
The number of deaths attributed to firearms grows each year.
Since 1900, more people have been killed by private citizens
using firearms than were killed in all our wars. One out of
every 100 deaths in the United States is the result of a
firearm. Guns are responsible for 69 deaths in this country
each day. Approximately 25,000 gun-deaths occur each year
and 200,000 individuals are wounded by firearms during this
same period. Close to 3,000 accidental deaths are caused by
firearms (1/4 of the victims are under 14 years of age).
For every intruder stopped by a homeowner with a firearm,
there are 4 gun-related accidents within the home.

The nationwide statistics dealing with handguns are even
more staggering. The number of handguns alone in the U.S.
is estimated to be as high as 40 million. (Congressional
findings in Proposed Federal Firearms Act of 1976 - H.R.
11193). That's approximately 1 handgun for every 5 citizens
in this country. And the supply of handguns may be
increasing by as much as 2 1/2 million each year.

Bill No. 1-164, the "Firearms Control act of 1975"
Page 4
April 21, 1976


    A crime committed with a pistol is 7 times more likely
to be lethal than a crime committed with any other weapon.
Over the last several years, statistics have shown that
handguns are used in roughly 54% of all murders, 60% of
robberies, 26% of assaults and 87% of all murders of law
enforcement officials.  In 1973, the FBI reported 19,510
murders in the United States, 53% of these homicides were
committed with handguns.  From 1964-1973 firearms were used
to commit 95% of the slayings of police officers - 613 by
handguns, 104 by rifles and 101 with shotguns.  (STATEMENT
OF DC. Delegate Walter E. Fauntroy).

    In 1973, Detroit police reported 751 deaths from all
criminal homicides, 24 more than the total number of
civilians killed in Northern Ireland during the entire 5 1/2
years of their civil strife.  The picture in the District of
Columbia is not bright either.  The Metropolitan Police
Department reported a record 285 murders in the District of
Columbia during 1974.  Handguns were responsible for 155 of
these homicides.  In other violent crimes in which firearms
were used in 1974-1975, handguns accounted for 88% of the
robberies and 91% of the assaults.

    Contrary to popular opinion on this subject, firearms
are more frequently involved in deaths and violence among
relatives and friends than in premeditated criminal
activities.  Most murders are committed by previously law-
abiding citizens, in situations where spontaneous violence
is generated by anger, passion or intoxication, and where
the killer and victim are acquainted.  (Murder and Gun
Control, American Journal of Psychiatry, 128 Jan. 1972:456
No. 7).  Twenty-five percent of these murders occur within
families.

    In addition to the inability of the present D.C.
firearms law to reduce the potentiality for gun-related
violence, the present regulations have not been sufficiently
effective in efficiently monitoring the traffic of firearms
and ammunition in the District.  The Metropolitan Police

Bill No. 1-164, the "Firearms Control act of 1975"
Page 5
April 21, 1976


Department reports that during the period of 1968-1975,
57,755 firearms were registered in the District of
Columbia.1/  Of this total, 41,015 were handguns. However,
in spite of the present regulations, less than 1/2 of 1% of
the total number of firearms (1974) used in crimes and
recovered by the police were registered in D.C. (Statement
of Maurice J. Cullinane, Chief of Police, Metropolitan
Police Department before Committee on Judiciary and Criminal
Law - 1975). Approximately 12% of the firearms recovered
from all crimes in D.C. are then registered and only 1.7% of
the above-mentioned firearms are registered by the person
from whom they were recovered.  In addition, pistols have
become easy for juveniles to obtain, although the existing
regulations prohibit possession of pistols by juveniles.

The startling statistics presented here emphasize the
inability of the present law to cope with the problems of
gun control in the District of Columbia.  This bill, as
amended, will strengthen the District Government's role in
firearm control by:

   (1)  making pistols and shotguns not registered
        according to the regulations in effect prior to the
        effective date of this bill unregisterable in a
        reasonable endeavor toward eventually freezing the
        pistol and shotgun population within the District
        of Columbia.

   (2)  providing more appropriate penalties for violation
        of these Regulations.

   (3)  providing a more stringent pre-clearance procedure
        to prevent the acquisition, possession and use of
        firearms by disqualified persons.

   (4)  providing for annual registration, which will
        enable the District Government to better monitor
        the traffic in firearms and provide additional
        revenue (from annual license and permit fees) to


1/The total number of firearms registered in the District
  of Columbia as of 11:00 a.m., March 26, 1976, was 61,089.
  This includes firearms owned and used by the Metropolitan
  Police Department.

Bill No. 1-164, the "Firearms Control act of 1975"
Page 6
April 21, 1976

        implement this comprehensive program of gun
        control.

   (5)   providing for a program of education in the
        District of Columbia designed to inform the
        community of the provisions of this act.

Your committee realizes the most effective gun control
must eventually be applied at the national level.  In the
absence of such national action however, it becomes
necessary for local governments to act to protect their
citizens, and certainly the District of Columbia as the only
totally urban statelike jurisdiction should be strong in its
approach.

## IMPACT ON EXISTING LEGISLATION

  A.   Effect Upon Title 22, D.C. Code and Related
       Authority Questions

        Bill No. 1-164 as amended, the "Firearms Control
Regulations act of 1975", is enacted for the purpose of
amending the existing District of Columbia Police
Regulations.  Specifically affected are Articles 50 through
55 of those Regulations.  This bill does not amend or
conflict with the provisions of Chapter 32 of Title 22 of
the D.C. Code.  It specifically provides as much in section
902.

        The authority for the Council of the District of
Columbia to amend the aforementioned D.C. Police Regulations
stems from not only the plenary delegation of section 302 of
the D.C. Self-Government and Governmental Reorganization Act
(hereinafter "Home Rule Act) (87 Stat. 787, D.C. Code, sec.
1-124) but also from the second sentence of section 404(a)
of that Act (D.C. Code, sec. 1-444(a)), which vests the
Council of the District of Columbia with all functions
granted to its predecessor District of Columbia Council,
including but not limited to the police regulatory powers

Bill No. 1-164, the "Firearms Control act of 1975"
Page 7
April 21, 1976

provided for in the Act of January 26, 1887 (D.C. Code §1-224), the health and welfare regulatory powers provided for in the Act of February 26, 1892 (D.C. Code §1-226), the firearm regulation powers provided for in the Act of June 30, 1906 (D.C. Code §1-227), and the penalty-creating powers provided for in the Act of December 17, 1942 (D.C. Code §1-224a).

The United States Court of Appeals for the District of Columbia Circuit has rendered a lengthy opinion delineating the relationship between the plenary power of Congress over District affairs and delegated the local government's powers (based on the pre-Home-Rule Act delegations) in the area of firearm control.  In Maryland and District of Columbia Rifle and Pistol Association, Inc. v. Washington, 142 U.S. App. D.C. 375, 442 F.2d 123 (1971), the U.S. Court of Appeals upheld the authority of the former D.C. Council to promulgate the current gun control regulations.

Those seeking a declaration of invalidity in that case claimed that the Congress had pre-empted the area of gun control by the passage of An Act to Control the Possession, Sale, Transfer and Use of Pistols and Other Dangerous Weapons in the District of Columbia (47 Stat. 650) (codified in Chapter 32 of Title 22 of the District of Columbia Code), and that, in the passage of those Regulations the old Council was treading on ground the Congress had reserved for itself.  The Court closely examined the legislative history of the various statutes noting that the 1932 statute was a substantial re-enactment of an 1892 statute (Act of July 13, 1892, 27 Stat. 116) predating the delegation of firearms regulatory powers.2/  The Court went on to note that Congress failed to repeal the regulatory powers when it passed the 1932 Act (now codified in Title 22 of the D.C. Code) finding therefrom and from the rest of its examination "a satisfying assurance that Congress, having dealt with some aspects of weapons control, left others for regulation by the District.  Indeed...[the Court could] not fathom any other purpose to be achieved by leaving Section 1-227 in

2/Act of June 30, 1906 (D.C. Code, sec. 1-227 (1973)).

Bill No. 1-164, the "Firearms Control act of 1975"
Page 8
April 21, 1976

force." (442 F.2d at 131).  The Court set forth the text as
follows:

> The important consideration, we
> think, is not whether the
> legislature and municipality
> have both entered the same
> field, but whether in doing so
> they have clashed.  Statutory
> and local regulation may
> coexist in identical areas
> although the latter, not
> inconsistently with the former,
> exacts additional requirements,
> or imposes additional
> penalties.  The test of
> concurrent authority, this
> court indicated many years ago,
> is the absence of conflict with
> the legislative will.  As the
> court declared in French v.
> District of Columbia, where
> [t]he subject [is] peculiarly
> within the scope of the
> [expressly delegated] police
> powers of the municipality, the
> exercise of authority ought not
> to be questioned unless clearly
> inconsistent with the expressed
> will of Congress.

Bill 1-164, as amended, would not clash at all with any
provision of Chapter 32 (or any other part) of Title 22 of
the Code.  Chapter 32 was not enacted to afford the right to
possess or carry weapons.  Absent some legislation to the
contrary, one could possess and carry a gun.  Rather Chapter
32 was enacted to restrict the ability to possess and carry
a gun.

Bill No. 1-164, the "Firearms Control act of 1975"
Page 9
April 21, 1976


Far from being in conflict with it, Bill 1-164 applies
to present day conditions, the same approach the 72nd
Congress took with respect to 1932 conditions.  Bill 1-164,
as amended, does not permit anything which Chapter 32 was
designed to prohibit.

The Corporation Counsel of the District of Columbia
argued in his brief in Maryland and D.C. Rifle and Pistol
Association, Inc. v. Washington.  That "since neither the
Act of July 8, 1932 [codified in Chapter 32 of Title 22 of
the Code], nor any other Act, deals with the registration of
pistols by private owners, Article 51, section 1 [of the
Police Regulations, prohibiting possession without regis-
tration], is not in conflict with any congressional
enactment... Merely because the District of Columbia
Council has added to the very limited congressional enact-
ments relating to possession and transfer of weapons in the
District of Columbia, does not mean that the additions are
in conflict with the original limited provisions of the 1932
Act." (Brief of Appellees, p. 14)

Thus it is clear that Bill 1-164, as amended, was within
the authority of the former D.C. Council to enact had it
seen fit to do so.

There is no "expressed will of Congress" in the Home
Rule Act to repeal the earlier delegations of gun control
authority to the city.  Any repeal would have to be by
implication, and it "is a well-settled rule of statutory
construction that there is a presumption against repeals by
implication.  See, Sutherland, Statutory Construction, sec.
2014 (3rd Ed., 1943).3/

The legislative history of the Home Rule Act clearly
indicates that it was the intent of Congress to transfer to
the new Council the full and immediate power of the old
Council in this area.  Both section 321(b) of S.1435, as
reported by the Senate Committee on the District of
Columbia, and the second sentence of section 404(a) of H.R.


3/Brief for Appellees, Maryland and D.C. Rifle and Pistol
   Association, Inc. v. Washington, U.S. App. D.C. No.
   22,927 (1969), p. 17, citing United States v. Greathouse,
   166 U.S. 601 (1897).

Bill No. 1-164, the "Firearms Control act of 1975"
Page 10
April 21, 1976


9682, as reported by the House Committee on the District of
Columbia, contain transfers of the authority of the old
Council to the new.  Both of the Reports indicate an intent
to carry forth the old authority.  Senate Report No. 93-219
says at p. 3:  "The powers of the present Council and Mayor-
Commissioner are transferred to the new Council and Mayor."
House Report No. 93-482 says on p.21:  "Section [sic] (a)
[of section 404] provides that the powers and functions of
the present Council and Commissioner are transferred to the
new Council and Mayor."  Neither of these bills included at
the time of their report to their respective houses the
contents of section 602(a)(9) of the Home Rule Act.  That
was added in conference, and thus the "except as otherwise
provided in this Act" language of the second sentence of
section 404(a) was not directed to section 602(a)(9).  It
was more probably directed to delegations by the Home Rule
Act of authority held by the old Council to other agencies
[S.1435, as reported, provided in the very next section
(sec. 322) for functions subdelegated by the old Council and
Mayor-Commissioner were not to be considered as transferred
pursuant to section 321 of the bill but to be recoupable by
specific Council or Mayoral action].  The gun control powers
delegated to the city by D.C. Code, sections 1-224, 1-224a,
1-226, and 1-227 conferred on the old Council by sections
401(1), 401(2), and 401(4) of the Reorganization Plan
Numbered 3 of 1967 were not subdelegated by the old Council
nor were they reassigned by the Home Rule Act.

     It would be absurd therefore to now conclude that the
Home Rule Act, designed and understood by all to have
expanded the authority of the local legislature, to have
repealed the powers delegated earlier.  "It is axiomatic
that a statute must not be construed to produce an absurd
result."  See Lange v. United States, 143 U.S. App. D.C.
305, 307-308, 443 F.2d 720, 722-723 (1971) 4/

     Furthermore, Congressional Delegate Walter E. Fauntroy,
former Chairman of the Subcommittee on the Judiciary of the
Committee on the District of Columbia of the United States


4/Memorandum of the District of Columbia, District of
   Columbia v. Smith, et. al., D.C.C.A. No. 8780 (1974),
   p. 5

Bill No. 1-164, the "Firearms Control act of 1975"
Page 11
April 21, 1976


House of Representatives, submitted for the record a legal
memorandum (Exhibit B) supporting this Council's authority
to pass Bill No. 1-42, which, as mentioned earlier, would
have amended the current firearms law in the District of
Columbia by creating a _statutory_ ban on handguns within the
District of Columbia.  And Attorney Harley Daniels, former
Counsel to the Subcommittee on the Judiciary of the
Committee on the District of Columbia of the United States
House of Representatives, also testified in support of this
Council's authority to enact Bill 1-42.  By contrast, Bill
No. 1-164 as reported herein, amends the current police
regulations passed by the former D.C. Council.  The scope of
Bill No. 1-164, as amended, is significantly more clearly
within the ambit of authority of this Council than Bill 1-
42.

    The following analysis of the major impact of this bill
upon the current firearms regulations illustrates the point
further.

    B.    More Stringent Provisions Regarding Firearm
Registration.

    Bill No. 1-164, as amended, abolishes the dual system
under the current regulations whereby persons who own rifles
or shotguns must both register and get a license for such
firearms.  Under the bill, a uniform system of registration
is required whereby the Chief obtains not only the same data
about the firearms and their owners as he does under the
current regulations; but, in addition, the Chief is
authorized to obtain information which supplements the
current data which he lawfully obtains.  For example, under
the bill, an applicant would have to inform the Chief as to
purpose for which he or she intends to use the firearm.

    The bill would require annual registration of firearms
as opposed to the current, one-time registration
requirement.

Bill No. 1-164, the "Firearms Control act of 1975"
Page 12
April 21, 1976

The bill would give the Chief 60 days within which to
rule upon a registration application in contrast to 30 days
under the current regulations.

The new regulations formulated in this bill would expand
the existing pre-requisites to be met by any person in order
to register his firearm.  For example, the class of
convicted persons ineligible to register a firearm has been
enlarged in this bill.  The bill disqualifies anyone from
registering who within the 5 years preceding the application
for registration was convicted of any weapons offenses (as
defined in the bill), violation of any narcotics or
dangerous drug laws, or violation of any laws regarding
assaults or threats so as to indicate a likelihood to make
unlawful use of a firearm.  The current regulations have
only a three-year disqualification period for persons
convicted of offenses similar to those listed above.  Unlike
any provisions in the existing regulations, the bill
disqualifies any person from registering who was
involuntarily committed to a mental hospital within the _five_
years prior to the application or who was adjudicated by any
court to be insane or to be a chronic alcoholic within the
five years prior to the application.  The bill requires a
medical certification of cure of the foregoing maladies
prior to a registration certificate ever being issued by the
Chief to such persons.

The bill changes the current fee schedule for regis-
tration certificates.  The public record indicates that the
$2.00 fee for a registration certificate under the current
regulations does not even approximate the cost to the
District of Columbia to administer the existing gun control
registration system.  This bill directs that the Mayor set
the fee for registration at whatever amount will meet the
cost to the government for administering the registration
system.

Just as in the current gun regulations, the bill
generally will not allow destructive devices, sawed-off

Bill No. 1-164, the "Firearms Control act of 1975"
Page 13
April 21, 1976

shotguns, machine guns, or short-barreled rifles to be
registered. Of course, the bill recognizes that on-duty
federal and local law enforcement officers are permitted to
possess the above noted weapons. Cf. D.C. Code §22-3214.

The bill adds a new category of generally unregisterable
firearms in the District of Columbia, namely pistols not
registered and shotguns not registered and licensed pursuant
to the regulations in effect immediately prior to the
effective date of this bill. Such provision denotes a
policy decision that of handguns and shotguns have no
legitimate use in the purely urban environment of the
District of Columbia while at the same time avoiding any
conflict with constitutional doctrines which might require
compensation for materials declared to be illegal but which
were legally possessed prior to the declaration. Moreover,
the bill reflects a legislative decision that, at this point
in time and due to the gun-control tragedies and horrors
enumerated previously in this report, pistols and shotguns
are no longer justified in this jurisdiction. During the
Congressional review period of thirty legislative days,
there will be adequate time for any current possessor of a
pistol or shotgun, who is otherwise eligible, to register
the same and thus be eligible for registration under the new
regulations. Under section 203(c) of the bill, and Article
52, section 414 of the current regulations, his or her
application cannot be used to prosecute him or her for
illegal possession. If there is any fear that possibly
there will be a flurry of firearm purchases or registrations
of currently unregistered pistols and shotguns in the
District of Columbia prior to this bill completing the full
legislative process, it should be noted that the Police
Department can provide the Council with daily statistics
concerning recent registrations of firearms and with less
frequent reports on the inventories of local firearm
dealers. If the basis for the above-noted fears becomes a
reality based on law enforcement reports, then this Council
or the Congress can take further appropriate action prior to
the bill being enacted.

Bill No. 1-164, the "Firearms Control act of 1975"
Page 14
April 21, 1976


Another innovation of the registration provisions of
this bill would be the requirement in section 203(a)(10)
whereby applicants would have to demonstrate to the Chief
that they are knowledgeable of the District of Columbia
firearms laws and that they can safely use the firearm which
they seek to register.

C.    Expanded Licensure Provisions.

Bill No. 1-164, as amended, creates two classes of
business licensees whereas only one class now exists.  The
impact of such classification is to freeze at the current
level of fourteen the number of dealers who can sell regis-
terable firearms to the public.

The bill would extend from the current 30 days to 60
days the time allotted to the Chief to rule upon appli-
cations for licenses.

The bill requires that applicants for licenses meet the
same expanded eligibility requirements as are placed on
persons applying for a registration certificate.

A major revision contemplated in this bill is the
establishment of a process whereby a licensed dealer can
dispose of his inventory in the event that he receives an
unfavorable response to his application for renewal of his
license.  This is to avoid any constitutional problems of
confiscation.  The current regulations do not address the
situation of what a dealer should do if his license is
revoked.  Under the provisions of this bill, if a denial or
revocation becomes final, then the dealer would have to do
any one of the following:  register any registerable
firearms in his possession, surrender to the Chief those
firearms not registered plus all destructive devices, or
lawfully dispose of or remove from the District of Columbia
any firearms in which he has an interest.

Bill No. 1-164, the ...
Page 15
April 21, 1976


Bill No. 1-164 as amended contemplates more accounta-
bility in the reporting requirements than are presently
required of licensees under Article 54, sec. 5(c) of the
D.C. Police Regulations. Whereas a licensed dealer is
currently required to submit "periodic" reports, Bill No. 1-
164, as amended sec. 410), would require the maintenance of
very detailed monthly records by the licensee. The licensee
would be required to keep the records current and to open
them to inspection upon demand by the Chief.

D.   Delineation of Sales or Transfers of Firearms.

In both this bill and the current regulations, the
range of firearms which may be generally sold or transferred
coincides with the range of firearms which may be lawfully
registered in the District of Columbia. However, Article 5
of Bill No. 1-164 provides that all sales and transfers of
registerable firearms be accomplished only through a
licensed dealer to a qualified purchaser.

E.   Ammunition Transfers.

Article 6 of Bill No. 1-164 substantially follows
Article 53 of the current D.C. Police Regulations. Beyond
this, section 602 of the bill sets out in detail the precise
universe of lawful possessors of firearm ammunition; namely,
licensees, authorized government personnel, certified
collectors, and registrants of firearms of the same caliber
as the ammunition possessed.

F.   Registration of Firing Range Operators.

Section 703 provides that for the first time in
this jurisdiction that firing ranges shall be registered
with the Chief.

Bill No. 1-164, the "Firearms Control act of 1975"
Page 16
April 21, 1976

G.   Expanded Enforcement Provisions.

        Under the present Regulations (Article 55, sec. 2)
no penalty will befall a person who voluntarily surrenders
to the Police a firearm which is not registered, so long as
a proclaimed amnesty period is in effect.  This bill would
abolish the current amnesty and redemption regulations and
allow for surrender of firearms to the Chief at any police
station and at any time.  The same provision is made
regarding the voluntary surrender of ammunition.

        This bill also provides in section 803 that the Chief of
Police publicize certain aspects of the Police regulations
concerning firearms.  These matters include:  the elements
of lawful possession, the limitations placed on holders of
permits, the provisions for enforcement of the regulations,
the provisions for voluntary surrender, and the means by
which persons may aid the Police in enforcing the firearms
regulations.

        The bill sets a new mandatory minimum penalty of 10 days
imprisonment and a $300 fine for violation of certain key
sections of the bill (section 201 (re:  prohibition of
possession of a destructive device or unregistered firearm),
section 401 (re:  prohibition of engaging in firearms
business without firearms business license), section 501
(re:  limitations on sale or transfer of firearms), section
601 (re:  limitations on the sale of ammunition), and
section 602 (re:  limitations on the possession of
ammunition)).  Under the current regulations there are no
such mandatory sentencing provisions.  The Committee
reluctantly rejected higher penalties in an effort to remain
within the delegated powers of D.C. Code, secs. 1-224, 1-
224a, 1-226, and 1-227 so as to be certain of the Council's
authority.

        The foregoing considered, it should be apparent that
this bill would not cause a confiscation law, would not
amend any existing gun laws beyond the current D.C. Police

Bill No. 1-164, the "Firearms Control act of 1975"
Page 17
April 21, 1976


Regulations governing firearms, and would take nothing away
from sportsmen and collectors.

## EXECUTIVE POSITION

   The Executive Branch position on Bill 1-164 is far from
clear.  From the time of its introduction on July 22, 1975
until March, 1976, there was no communication from the
Branch on this particular bill.

   On March 17, 1976, the Chairperson of your Committee
sent a copy of a working draft containing most of the
provisions of this bill, as amended, to the then Acting
Corporation Counsel and to the Chief of Police inviting
general comments, criticisms, and recommendations specifi-
cally requesting in each case certain information (Exhibit
C).  Copies of the letters were sent to the Mayor's Special
Assistant for Legislation.  It was requested that any
information be provided by March 23, 1976 at a roundtable
discussion to be conducted by your committee.

   On March 23, 1976, a memorandum was received from the
Acting Corporation Counsel the only critical comment of
which was directed to a provision of the draft which would
have limited prosecutorial plea bargaining (Exhibit D).
That provision is not part of the bill as amended.

   On March 23, 1976, a memorandum was also received from
the Chief of Police claiming inability to complete the
statistical data and analysis by that time (Exhibit E).  The
March 23, 1976 meeting was cancelled.

   On March 30, 1976, a six page memorandum was received
from the Chief of Police responding to so many of the
specific requests contained in the letter of March 17, 1976
as addressed themselves to standards and procedures used in
the enforcement of current regulations and to statistics
(Exhibit F).

Bill No. 1-164, the "Firearms Control act of 1975"
Page 18
April 21, 1976


On April 6, 1976, when a mark-up session of your
committee had been called, a memorandum was received from
the Mayor's Special Assistant for Legislation indicating "a
number of legally objectionable and administratively
defective provisions" in the working draft--a nearly
identical version of which was moved at that meeting as an
amendment in the nature of a substitute (Exhibit G).  The
memorandum indicated that the Executive Branch was preparing
a draft bill for the Committee's consideration "in the very
near future".  At the meeting, Mr. Chauncey Williams of the
Office of Legislation declined to cite what the Executive
Branch found to be legally objectionable and/or adminis-
tratively deficient.  The only "much needed change" in the
existing law which Mr. Williams would identify was the
requirement that persons register their firearms within
forty-eight hours of arrival in the city.  That meeting was
recessed to give Mr. Williams a chance to ascertain by what
time the Executive Branch could produce its draft bill.
When the meeting resumed, Mr. Williams was unable to state a
time but responded to an inquiry as to the ability of being
ready in a week by saying that it could be done if one
person worked upon the matter full time.  The Committee
thereupon set the matter over to April 15, 1976 requesting
that it be provided with the Executive Branch's draft bill
and other materials by the close of business on April 14,
1976.

No draft bill or other response from the Executive
Branch was received by or on April 15, 1976 other than
further response from the Chief of Police addressing the two
sections of the Bill (203 and what is now 410) which had
been specifically mentioned in the letter of March 17, 1976
(Exhibit H).  Mr. Robert Greenberg of the Office of General
Counsel of the Metropolitan Police Department appeared at
the mark-up session on April 15, 1976 and was of great
assistance.  Of the 27 points in the Chief's memorandum, the
Committee made amendments consistent with the Chief's
comments to the amendment-in-the-nature-of-a-substitute
before it in all respects except the following five (in none

Bill No. 1-164, the "Firearms Control act of 1975"
Page 19
April 21, 1976

of which are the Committee's positions any less stringent
than the current regulations):

1)   The Committee rejected the suggestion that persons
convicted of violation of provisions of the bill be later
permitted to register firearms after a period of disquali-
fication sirilar to that required of those convicted of
narcotics offenses.  Your committee felt that one violation
of the provisions of the bill was so serious as to indicate
a permanent disability to safely and lawfully handle
firearms.

2)   Your committee rejected the suggestion that persons
voluntarily entering mental hospitals should be as ineli-
gible as those committed involuntarily.  Your committee
feels that mere admission to a mental hospital does not
indicate incapacity and that the fact of the voluntariness
may indicate more of a presence of mind than an involuntary
commitment.

3)   Your committee and the Executive Branch represen-
tatives present at the meeting were unable to formulate at
the meeting any more specific standards for a disabling
physical defect than are in the current regulations and
which would be continued by the bill.

4)   The committee declined to make production of the
firearm at a station at the time of application mandatory
but chose to vest the Chief with discretion as in the
current regulations.  The Committee did not want to
encourage guns on the streets in any fashion and felt that,
if law enforcement needs dictated such production, the
discretion afforded the Chief enables it.

5)   Your committee rejected the suggestion that one
charged with a misdemeanor of assault or threats should, by
virtue of being so charged, be ineligible to register a
firearm.  Your committee accepted the idea of disquali-
fications upon indictment because there is a judicial

Bill No. 1-164, the "Firearms Control act of 1975"
Page 20
April 21, 1976

finding of probable cause. Your committee was here
concerned with the interdependent eligibility-to-register
and revocation sections which, if the Chief's suggestion
were adopted, could unfairly result in a citizen's regis-
tration being revoked merely upon a charge of assault by
another citizen.

In the last footnote of the document, the Chief says:
"These comments, as previously noted, were specifically
requested. While we believe adoption of the suggestions
made would greatly improve §§203 and 408, we continue to
believe the bill to be similarly deficient elsewhere to
preclude supporting its passage. (Memorandum of Judy Rogers
to Councilman Clarke dated April 6, 1976)."

Nevertheless, after repeated invitation, no repre-
sentative of the Executive Branch would specify any
objection or deficiency other than as hereinbefore
mentioned.5/

## FISCAL IMPACT

The bill would permit the Mayor to set application fees
for firearm registration and firearms business licenses at
whatever is needed to pay costs of administering the
provisions of the bill. Therefore its administration would
entail no cost except approximately $2500 for publication of
information pursuant to the publicity program mandated by
the bill.

There would be a net savings, as the current
registration fee is set at $2.00 by the current regulations.
The Chief of Police estimated that cost at $20.00 to
register a gun. At the current rate of about 4,000
registrations per year, we are now sustaining a loss of
about $72,000 per year. Thus the fiscal effect of passage
of this bill over the next five years would be approximately
a plus $357,500.
($72,000 x 5 = $360,000 - $2,500 = $357,500).

5/The hearings on Bills 1-24 and 1-42, the then Corporation
   Counsel questioned as to the Council's authority to pass
   either of those measures (both of which had penalty sections
   beyond the scope of the old Council's authority to provide).
   The Office of Corporation Counsel has not addressed the
   authority to enact Bill 1-164. The question of the Council's
   authority to enact Bill 1-164, as amended, is treated in the
   section of this Report on "Impact on Existing Legislation",
   supra.

Bill No. 1-164, the "Firearms Control act of 1975"
Page 21
April 21, 1976


## SECTION-BY-SECTION ANALYSIS

Section 101 of the bill sets forth the definitions of essential terms used in the bill.

Subsection (a) of section 201 provides for a general ban on destructive devices and directs that no person shall own, possess, or have under his control a firearm in the District of Columbia without a valid registration certificate being issued therefor to such person. In the case of an organization which owns any firearm, section 201 directs that dual registration be obtained both in the name of the organization and in the name of the president or chief executive of such organization. This provision is intended to establish personal responsibility at a high level within the organization for compliance with this Article. Subsection (b) of section 201 of the bill would provide an exception for licensees in that they would not be bound by the general registration requirements in subsection (a) with respect to firearms kept by them purely as inventory in their businesses.

Section 202 describes certain firearms which are unregisterable, namely any sawed-off shotgun, machine gun, short-barreled rifle and pistol not registered, or shotgun not registered and licensed, to the applicant pursuant to the regulations in effect immediately prior to the effective date of this bill.

Section 203 identifies the criteria and processes by which persons and chief executives in any organization owning firearms shall conform in order to obtain a registration certificate. Subsection (a) of section 203 lists the criteria which must be met by applicants registration certificate. cates. The personal criteria set forth in subsection (a) of section 203 are designed to promote a situation in the District of Columbia wherein registerable firearms, being lethal by nature, can only be registered to persons whose personal and social histories do not indicate

Bill No. 1-164, the "Firearms Control act of 1975"
Page 22
April 21, 1976

a susceptibility on their parts to use any firearm in a
manner which would be dangerous to themselves or to other
persons.  Subsection (b) of section 203 specifies the data
which each applicant must provide for the Chief prior to his
issuing any registration certificate.  The burden is upon
the applicant to provide the factual data required by
subsection (b) to the Chief in order that the Chief be able
to perform his duties under this bill.  Subsection (c) of
section 203 prohibits any information contained in an
application from being used as evidence in a crivinal
proceeding against the applicant, except for prosecutions
for perjury in violation of D.C. Code §22-2501 or for
violation of section 705 of this bill as amended.
Subsection (c) of section 203 also provides that if a final
determination has been made to deny the issuance of an
application for a firearm, then the applicant shall have
seven days within which to surrender the firearm, lawfully
remove it from the District of Columbia, or otherwise
lawfully dispose of such firearm.  Subsection (d) of section
203 affords the Chief the option of fingerprinting and
taking a photograph of an applicant for a firearm
registration certificate.  Subsection (e) authorizes the
Chief, whenever he deems it advisable, to require an
applicant to appear in person and to bring the firearm in
question to the police department prior to the Chief's
ruling on the application.  Subsection (f) of section 203
mandates that each application be executed in duplicate and
that each application be attested to by the applicant.

     Section 204 provides that the registration certificate
shall have an effective life-span of one year, thus
establishing a system of annual registration.

     Section 205 authorizes and directs the Mayor to set the
fee scale for any services rendered pursuant to sections 201
through 210 of this bill in order to cover the cost to the
District of Columbia government for providing such services
such as the processing of registration applications.

Bill No. 1-164, the "Firearms Control act of 1975"
Page 23
April 21, 1976


Section 205 specifically makes fees for registration
applications non-refundable.

Section 206 establishes strict time frames within which
applications must be filed.  In particular, firearms
registered or licensed under the Police Regulations in
effect prior to the effective date of this bill must be
registered within 60 days of the date upon which this bill
becomes law.  Otherwise a firearm must be registered within
48 hours after it is legally received or acquired or brought
into the District of Columbia.  Of course a firearm
registered pursuant to this bill must be re-registered prior
to the expiration of the registration certificate.

Section 207 sets a sixty-day time frame within which the
Chief shall make a ruling upon an application for a regis-
tration certificate.  The Chief shall have 120 days to rule
upon applications for a registration certificate which have
been filed within the first sixty days after the effective
date of this bill.

Section 208 prescribes the grounds upon which a regis-
tration certificate shall be revoked.  Generally, revocation
shall be caused by a firearm becoming unregisterable under
section 202, by the registrant becoming ineligible for
registration under section 203(a), by failure to perform the
duties set forth in section 210, or by the intentional
falsification of information given to the Chief by the
registrant.

Subsection (a) of section 209 sets forth the procedures
to be followed for the denial of a registration application
or the revocation of a registration certificate.  Subsection
(a) provides due process protections to all registrants or
applicants affected by this Article.  The provision does not
alter the doctrine that ownership of a firearm is a
privilege and not a right.  Subsection (b) of section 209
delineates the legally permissible options available to an
applicant or registrant after an order of denial or revo-

Bill N₀. 1-164, the "Firearms Control act of 1975"
Page 24
April 21, 1976

cation has become final.  Subsection (c) of section 209
requires the Chief to destroy all firearms which are not
needed as evidence by any prosecutorial authorities of any
jurisdiction or which cannot be lawfully returned to the
rightful owner thereof.

Subsection (a) of section 210 of the bill sets forth
additional duties placed upon each person who has registered
a firearm pursuant to these Regulations.  Specifically,
registrants shall report in writing to the Chief concerning
the loss, theft, or destruction of the registration
certificate or of the registered firearm within 48 hours of
such event.  Registrants shall also report within 48 hours
any change of name or address from that recorded on the
registration certificate.  This latter duty is especially
noteworthy for the president or chief executive of any
organization which has registered its firearms.  It is the
intent of this subsection to insure that the Chief is kept
well-informed of any change in the identity of the officer
or an organization who is personally responsible for the
oversight of the use of such organization's firearm(s).
Registrants must also inform the Chief in writing of the
sale or transfer or other disposition of the firearm by the
firearm by the registrant.  Simultaneous with the notice to
the Chief of the loss, theft, or other disposition of a
firearm, registrants must return to the Chief the regis-
tration certificate for any firearm which has been stolen,
lost, destroyed, sold, or otherwise disposed of.  Finally, a
registrant must have in his possession a valid registration
certificate and an applicant, whose application has not yet
been acted upon pursuant to section 207, must have in his
possession his application for a registration certificate
for each firearm possessed.  Such registrants and applicants
must exhibit the certificate or application, as the case may
be, upon the lawful demand of any law enforcement officer.
Subsection (b) of section 210 directs the Chief to inform
each applicant for a registration certificate of the duties
which flow from the provisions of this bill and which govern
such applicant.

Bill No. 1-164, the "Firearms Control act of 1975"
Page 25
April 21, 1976


Section 301 of the bill establishes the duties of
executors and administrators of estates containing firearms.
If the estate contains a validly registered firearm, the
fiduciary has an obligation to report the death of the
registrant to the Chief.  If such report is timely, then the
registration certificate remains valid until the lawful
distribution or transfer of the firearm in question.  In the
case of an estate containing a validly registered firearm,
the fiduciary is charged with all of the duties which this
bill would have imposed upon the decedent if he or she were
still alive, for example, the duties listed in section 210
of the bill.  In the case of an estate containing a firearm
which is not validly registered, the fiduciary shall have
the duty to surrender the firearm or lawfully dispose of
such firearm as provided in subsection (b) of section 209 or
in section 801 of the bill.  However the executor or
administrator shall not be liable for the criminal penalties
set forth in section 802 of the bill.

Section 401 prohibits any person or organization from
engaging in the business of selling, purchasing, or
repairing firearms, ammunition, or destructive devices
without first obtaining a license and limits the lawful
scope of such business according to the class of the license
issued to the licensee.

Section 402 defines the two classes of firearms business
licenses:  (1) a Class A license authorizes a business to
engage in the sale, transfer, repair, and purchase of
firearms and ammunition to any persons or organizations in
accordance with the provisions of this bill, and (2) a Class
B license authorizes a business to engage in the sale,
transfer, repair, and purchase of firearms, ammunition and
destructive devices only where the other party to the trans-
action is another licensee, as defined in the bill, or
specified agents of the District of Columbia or the federal
governments.

Bill No. 1-164, the "Firearms Control act of 1975"
Page 26
April 21, 1976

Section 403 specifies who is eligible to obtain each
class of license described in section 402, above.  Class B
licenses may be issued to persons who or to organizations
whose officers meet the registration eligibility require-
ments and do not fail to perform any of the duties set forth
in this bill.  Class A licenses are "grandfather" licenses
which can only be issued to firearms businesses which have
been licensed pursuant to the D.C. regulations in effect
prior to the effective date of this bill and which qualify
for a Class A license in accordance with the provisions of
this bill.

Subsection (a) of section 404 regulates the contents of
applications for firearms business licenses.  Subsection (b)
of section 404 provides a qualified evidentiary immunity for
information elicited in applications for licenses.

Section 405 sets a sixty-day time frame within which the
Chief shall make a ruling upon an application for a license.
The Chief shall have one-hundred and twenty days to rule
upon applications for a license which have been filed within
the first sixty days after the effective date of this bill.

Section 406 authorizes and directs the Mayor to set the
fee scale for any services rendered pursuant to sections 401
through 413 of the bill in order to cover the cost to the
District of Columbia government for providing such services
such as the processing of applications for licenses.
Section 406 specifically makes fees for license applications
non-refundable.

Section 407 provides that the license shall have an
effective life span of one year.

Section 408 prescribes the grounds upon which a regis-
tration certificate shall be revoked.

Subsection (a) of section 409 sets forth the procedures
to be followed with respect to denial of a license appli-

Bill No. 1-164, the "Firearms Control act of 1975"
Page 27
April 21, 1976


cation or the revocation of a license.  Subsection (a)
provides due process protections to all licensees and
applicants affected by this Article.  Such provision does
not alter the patent reality that carrying on a firearms
business is a privilege and not a right.  Subsection (b) of
section 408 delineates the legally permissible options
available to an applicant or licensee after an order of
denial or revocation has become final.  Subsection (c) of
section 409 directs the Chief to inform each applicant for a
license of the duties which flow from the provisions of this
bill and which govern the applicant.

     Section 410 specifies the types of monthly records which
must be maintained by each licensee concerning the nature of
the inventories kept and the sales, transfers, and repairs
conducted in the course of his, her or its business.  The
Chief is directed to monitor such records at reasonable
regular intervals.  Each record is to be kept for one year
after the event recorded.

     Section 411 indicates the permissible manner for a
licensee to keep or display his inventory.

     Section 412 provides that all firearms with which a
licensee deals shall have identifying markings imbedded
therein.

     Section 413 directs that licensees shall display their
licenses in a prominent place where customers may easily see
them.

     Section 501 of this bill specifically limits sales and
transfers of firearms and destructive devices within the
District of Columbia to the provisions contained in sections
209(b) (re:  legal disposition of firearm after denial or
revocation of registration), 502 (re:  permissible sales and
transfers), and 801 (re:  voluntary surrender) of this bill.

Bill No. 1-164, the "Firearms Control act of 1975"
Page 28
April 21, 1976

Section 502 defines the permissible sales or transfers
within the District of Columbia under the bill.  Permissible
sales under section 502 generally conform to the scope of
the registration and licensing provisions of this bill.
Subsection (a) of section 502 permits the sale or transfer
of any registerable firearm to a Class B licensee.
Subsection (b) of section 502 respects licit sales of any
registered rifle to any Class A licensee.  Subsection (c) of
section 502 allows any Class A licensee to sell or transfer
any pistol or shotgun, which is lawfully part of his
inventory on the effective date of this bill, to any
firearms business licensed by a non-D.C. jurisdiction so
long as the delivery of the pistol or shotgun to the
purchaser or transferee is made outside the District of
Columbia.  Subsection (d) of section 502 allows any Class A
licensee to sell or transfer any pistol or shotgun which is
lawfully part of such licensee's inventory on the effective
date of this bill to any Class B licensee.  Subsection (e)
of section 502 warrants the sale or transfer of a rifle by
any licensee to any person or organization provided that at
least three days pass between the time the transaction is
initiated by the prospective transferee's exhibition of an
application(s) to register the subject rifle(s) to the
transferor and the time the transaction is finally consum-
mated by delivery of the rifle(s).  The three-day hold on
the transaction affords the Chief the opportunity to review
the registration application of the transferee and to stop
or suspend the transaction in cases where the Chief finds
cause to deny the registration application.  Subsection (f)
of section 502 generally permits any licensee to sell or
transfer a firearm or destructive device to any on-duty
agent or employee of the federal or District of Columbia
governments when such agent is acting within the scope of
his duties in acquiring such firearm or destructive device.
THUS THE ONLY FIREARM PURCHASABLE BY THE GENERAL PUBLIC
WOULD BE A RIFLE.

Section 601 regulates the sale and transfer of firearm
ammunition with the District of Columbia and provides

Bill No. 1-164, the "Firearms Control act of 1975"
Page 29
April 21, 1976

generally that only licensees can sell ammunition to non-
licensees. The necessary conditions for any sale or
transfer of ammunition by licensees are:  (1) the trans-
action must be made in a face-to-face transaction;  (2) the
purchaser or transferee must sign a receipt for the ammun-
ition and return such receipt for safe-keeping by the
licensee; (3) the purchaser or transferee must show a
legally authorized registration certificate to the licensee
for the firearm for which ammunition is being sought; and
(4) the ammunition being sold or transferred must be of the
same caliber or gauge as the firearm described in the regis-
tration certificate.  The latter two conditions would not
apply in two cases:  (a) where the purchaser or transferee
is an on-duty agent of the federal or District of Columbia
governments who is acting within the scope of his duties
when acquiring such ammunition, or (b) when the purchaser or
transferee is a certified ammunition collector who is
purchasing ammunition for his collection.

Section 602 of this bill specifies the persons who may
possess ammunition within the District of Columbia; namely,
licensees, on-duty agents of the federal and District of
Columbia governments, holders of valid registration certifi-
cates for firearms of the same gauge or caliber as the
ammunition being possessed, and locally certified ammunition
collectors.

Section 701 provides that no firearm or ammunition may
be used as security in a transaction and that no person may
loan, borrow, give, or rent any firearm except to the person
who is the registrant for such firearm.

Section 702 specifies that all firearms shall be kept
unloaded and disassembled in the District of Columbia except
when such firearms are being used at registered firing
ranges in D.C. and used at such ranges for recreational
purposes.

Bill No. 1-164, the "Firearms Control act of 1975"
Page 30
April 21, 1976


Section 703 requires that any person who operates a
firing range in the District of Columbia shall register the
same with the Chief.

Section 704 discloses that the provisions of this bill
shall not apply to on-duty officers, agents, or employees of
the federal or District of Columbia governments when such
persons are acting within the scope of their erployment.

Section 705 prohibits the intentional giving of false
information in course of applying for a registration
certificate or license or in the course of supplying any
information pursuant to these regulations.  Section 706 also
makes it unlawful to forge or alter any application, regis-
tration certificate, license, or temporary evidence of
registration generated pursuant to this bill.

Section 801 provides a mechanism for the lawful
surrender or abandoning of any firearm or ammunition to the
Chief or to a Metropolitan police officer.  Section 801
provides immunity from arrest or prosecution for any person
who delivers any firearm or ammunition pursuant to the
provisions contained in such section, but section 801 does
not countenance the payment of any money to anyone in return
for making such a delivery.

Section 802 sets out two levels of penalties for
violation of the provisions of this bill.  Each violation of
section 201 (re:  prohibition of possession of a destructive
device or unregistered firearm), section 401 (re:
prohibition of engaging in firearms business without
firearms business license), section 501 (re:  limitations on
sale or transfer of firearms), section 601 (re:  limitations
on the sale of ammunition), or section 602 (re:  limitations
on the possession of ammunition) is subject to the strict
mandatory penalty of ten days imprisonment and a $300 fine.
Any other violation of the bill is subject to a penalty of
imprisonment of up to ten days or a fine of up to $300 or
both.

Bill No. 1-164, the "Firearms Control act of 1975"
Page 31
April 21, 1976


Section 804 mandates a publicity program to be contin-
uously conducted by the Chief in order to inform the
citizens of the District of Columbia of the provisions of
this bill and related matters.

Section 901 repeals the current firearms regulations
which are to be replaced by the provisions of this bill.
This section also repeals the regulation authorizing a
bounty to be paid as a redemption for firearms turned in to
the Chief by members of the public.

Section 902 fixes  the supplementary nature of the
requirements and penalties of this bill in relation to the
requirements and penalties contained in statutes of the
District of Columbia and of the United States dealing with
similar subject matter.

Section 903 makes the individual sections or provisions
of this bill severable from each other in terms of survival
from any attack upon their validity.

Section 904 provides the effective date for the enact-
ment of this bill.

<u>COMMITTEE ACTION</u>

On April 15, 1975, your committee convened in order to
mark-up Chairperson Clarke's amendment in the nature of a
substitute to Bill No. 1-164.  On that date, your committee
voted to report to the Council a bill which was basically
comprised of the Clarke amendment-in-the-nature-of-a-
substitute with the incorporation of many of the changes
suggested by the Chief of Police (as discussed in the
"Executive Position" section of this report).  The committee
vote was as follows:  two (2) in favor (Clarke and Dixon),
none opposed.  The committee also unanimously voted to
direct the staff to prepare a draft report on the reported
bill for later consideration by the committee.  On
Wednesday, April 21, 1976, your committee met to approve

Bill No. 1-164, the "Firearms Control act of 1975"
Page 32
April 21, 1976

this report and to affirm certain amendments to the reported
bill of April 15. The following amendments were approved:
(1) provision in sec. 201(b) that licensees would not be
required to register their inventories; (2) provision in
sections 401 and 402(b) that destructive devices could be
sold by Class B licensees; (3) allowance in section 404(b)
for evidentiary immunity for information contained on
applications for licenses; (4) provision in section 410(c)
to require licenses to preserve their section 410 records
for 1 year; and (5) expansion of the limitations on
ammunition sales or transfers in section 601 to all persons
instead of merely to licensees.  The foregoing amendments
and this report were approved unanimously; the vote being:
two (2) in favor (Clarke and Dixon), none opposed.

# COUNCIL OF THE DISTRICT OF COLUMBIA
# COMMITTEE ON PUBLIC SAFETY AND THE JUDICIARY
## COMMITTEE REPORT
**1350 Pennsylvania Ave, NW 20004**

**TO:**        All Councilmembers

**FROM:**     Councilmember Phil Mendelson,
                 Chairman, Committee on Public Safety and the Judiciary

**DATE:**       November 25, 2008

**SUBJECT:**   Report on Bill 17-843, "Firearms Registration Amendment Act of 2008"

The Committee on Public Safety and the Judiciary, to which Bill 17-843, the "Firearms Registration Amendment Act of 2008" (introduced as the Firearms Control Amendment Act of 2008) was referred, reports favorably thereon with amendments, and recommends approval by the Council.

## CONTENTS

| | | |
|---|---|---|
| I. | Background and Need | 1 |
| II. | Legislative Chronology | 10 |
| III. | Position of the Executive | 11 |
| IV. | Summary of Testimony | 11 |
| V. | Impact on Existing Law | 14 |
| VI. | Fiscal Impact | 14 |
| VII. | Section-by-Section Analysis | 14 |
| VIII. | Committee Action | 16 |
| IX. | Attachments | 16 |

## I.    BACKGROUND AND NEED

Bill 17-843, the Firearms Registration Amendment Act of 2008, amends the District of Columbia Firearms Control Regulations Act of 1975, in light of the United States Supreme Court decision in *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008).

### Heller case; Council emergency bills

On June 26, 2008, the United States Supreme Court issued a 5-4 decision in *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008), which held that the Second Amendment guarantees an individual's right to possess a firearm for the lawful purpose of self-defense within the home. In *Heller*, the Court struck down two provisions of the District's Firearms Control Regulations Act of 1975 (1975 Act) as unconstitutional.[1]  First, the Court overturned the District's total ban on handguns.  Second, the Court found that the District's safe storage provision, requiring that all firearms including rifles and shotguns, be kept "unloaded and disassembled or bound by a trigger

---

[1] D.C. Law 1-85; D.C. Official Code § 7-2501.01 *et seq.*

locks", is unconstitutional because it does not contain an explicit exception for self-defense. The Court stated: "[i]n sum, we hold that the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense."[2]

The Council acted swiftly in response to the *Heller* case by adopting the Firearms Control Emergency Amendment Act of 2008 (D.C. Act 17-422) on July 15th, which was signed into law by the Mayor on July 16th. D.C. Act 17-422 permitted the registration of pistols and explicitly allowed an immediate self-defense exception to the safe storage provision of the law.

However, another provision of the 1975 Act, which had not been challenged in *Heller* and which was not addressed by the Supreme court, effectively prohibited the registration of most semi-automatic pistols because the typical semi-automatic can be fitted with a large ammunition magazine (containing over 12 rounds) and thus is considered a machine gun as that term is defined in the 1975 Act. Pursuant to law, machine guns are prohibited weapons in the District of Columbia.

In order to address this concern, the Council passed a subsequent piece of emergency legislation, the Second Firearms Control Emergency Amendment Act of 2008 (D.C. Act 17-502) on September 16th, which was signed into law by the Mayor on the same day. D.C. Act 17-502 changed the definition of machine gun. This allowed for the registration of most semi-automatic handguns and rifles. D.C. Act 17-502 also clarified the law's safe storage provisions.

Although the District noted during litigation of the *Heller* case that there had never been any prosecutions under this provision, the Council believes that a safe storage requirement is an important statement of policy and direction consistent with accepted firearms training. The District was, and continues to be, concerned about a potential increase in accidental shootings in the home and wants laws that reflect standard gun safety practices. Best practices in other states are to impose penalties for the reckless storage of firearms when a minor accesses, or could access, the firearm. Given the lack of prosecution under the District's 1975 safe storage law, and the primary goal of reducing the likelihood of accidental shootings, the Council believes that the child access prevention ("CAP") law is the better approach.

D.C. Act 17-502 also prohibits large capacity ammunition feeding devices (such as a magazine or ammunition feed strip) similar to a provision in the now-lapsed federal assault weapons ban, so as to prevent the ability of an individual to fire a large quantity of ammunition without having to pause to reload. This change became necessary because the Council changed the definition of machine gun within the D.C. Official Code. D.C. Act 17-502 also limited the number of handguns any one individual may register at one time. Both Maryland and Virginia generally limit handgun purchases to one-per-30-days, per individual. The Council adopted similar language in D.C. Act 17-502.

---

[2] *District of Columbia v. Heller*, 128 S. Ct 2783, 2821-2822 (2008).

## Bill 17-843

The Committee held one hearing on gun control generally, and two public hearings on Bill 17-843 specifically, in order to receive as much public comment as possible in crafting this bill. The District shares the problem of gun violence with other dense, urban jurisdictions – a problem which is quite different than the experience in suburban and rural America. The District, however, has a unique distinction: as the nation's capital it hosts a large presence of government and diplomatic officials. The Committee is cognizant of its duty to give law enforcement every tool to protect all citizens from violence, but also to protect these officials from assassination. Cathy Lanier, Chief of the Metropolitan Police Department, testified to this fact before Congress on September 9, 2008.[3]

On the last page of its *Heller* opinion, the Supreme Court acknowledged "the problem of handgun violence in this country," and the Court noted that, "The Constitution leaves the District of Columbia a variety of tools for combating that problem, including some measures regulating handguns."[4] Keeping this in mind, the Committee has kept most of the provisions from D.C. Act 17-502 intact, and has added several additional provisions. The primary provisions of Bill 17-843 are discussed below.

### *Registration*

There is no comprehensive federal system of firearm registration. Federal law prohibits the use of the National Instant Criminal Background Check System (NICS) to create any system for the registration of firearms or firearms owners.[5] Nationally, however, seven states and the District of Columbia require registration of some or all firearms. Nine states have statutes prohibiting them from maintaining a registry of firearms.[6] Hawaii and the District are the only states that require all firearms to be registered. However, many major cities, including Chicago, Cleveland, and New York, have a system of firearm registration.

The Committee believes that the District must maintain a strong firearms' registration law because it is part of a sound gun policy. Registration is critical because it: gives law enforcement essential information about firearm ownership, allows officers to determine in advance whether individuals involved in a call may have firearms, facilitates the return of lost or stolen firearms to their rightful owners,  assists law enforcement in determining whether

---

[3] Chief Lanier stated, "The terrorist attacks of September 11th, 2001, demonstrated something that we have known for some time: government facilities, dignitaries, and public servants are prime targets for terrorists, both foreign and domestic. Protecting government officials and infrastructure is a challenge for every city in the United States. But in Washington, DC, the likelihood of attack is higher, and the challenges to protecting the city are greater.
The District's high concentration of iconic structures—such as the national monuments, the White House, and, of course, the Capitol—make it a highly attractive target." Testimony of Cathy L. Lanier, *Hearing on the Impact of Proposed Legislation on the District of Columbia's Gun Laws*, United States House of Representatives , Committee on Oversight & Government Reform, Honorable Henry A. Waxman, Chair, September 9, 2008, Page 2.
[4] Id. at 2822.
[5] 28 C.F.R. § 25.9(b)(3).
[6] Legal Community Against Violence, *Regulating Guns in America: An Evaluation and Comparative Analysis of Federal, State and Selected Local Gun Laws* (hereafter "LCAV") (2d ed. 2008) at 190.

registered owners are eligible to possess firearms or have fallen into a prohibited class, permits officers to charge individuals with a crime if an individual is in possession of an unregistered firearm, and permits officers to seize unregistered weapons.

Some critics of gun registration complain that only law abiding citizens comply. Let's assume arguendo that they are correct. Registration is enormously beneficial to law enforcement because it readily identifies criminals, and provides a means to readily arrest them. Registration also provides a means to enhance criminal penalties. For instance, police suspect gang activity, obtain a warrant, search a house, but find only unregistered weapons. Because of registration, the police can make an arrest. Or, police apprehend an armed-robbery suspect. Not only will he do time for the robbery, but he will do additional time because of the registration law. By separating the law abiding from the criminal, registration gives police additional law enforcement power.

Juliet Leftwich with the Legal Community Against Violence ("LCAV"), testified during the October 1, 2008 hearing that while the District has a good registration law in place, it needs to be strengthened. In LCAV's opinion, the most important way to strengthen the law would be to require that registration be renewed annually. The Committee believes that annual registration may be too burdensome for gun owners, and instead believes that registrants should attest to their address and possession of the firearms every three years. In addition, registrants should undergo a background check every six years. By having renewable registration of firearms, the District will be able to better track where firearms are located and allow MPD to have a better sense of whether a registered gun owner has become ineligible to own a firearm (e.g. due to a felony conviction or CPO in another state).

In developing this provision with the Executive, the Committee envisions that re-registration may be relatively easy. The attestation of address and firearms in possession could be done by mail or on-line. MPD should notify the applicant but, much like DMV, the burden is on the registrant to re-register regardless of notice. The sexennial background check would entail a fee (the FBI processing charge) but might be handled again by mail or on-line. The background check is critical, in our view, because it is more genuine than NICs check (the former being based on fingerprints, the latter based on identification card, which may be false).

### Safe Storage Law -- CAP

As stated earlier, in D.C. Act 17-502, in order to ensure compliance with the ruling in *Heller*, the Council amended the District's safe storage provision. Bill 17-843 adopts the language of D.C. Act 17-502. The language is based on the CAP law in Connecticut. The provision states that a person may not keep or store a firearm on any premises they control if a minor can gain access to the firearm, unless the person keeps the firearm in a securely locked box, secured container, or in a location which a reasonable person would believe to be secure, or if the person carries the firearm on his person or within such close proximity that he can readily retrieve and use it as if he carried it on his person. The person faces civil and criminal penalties

if they fail to take these precautions and either a minor gains access to the firearm or injures themselves or others.[7]

Bill 17-843 makes two changes from the second emergency regarding the CAP provision. First, the provision applies to all firearms, not just loaded firearms. Second, it increases the age of the minor from under 16 to under 18 years of age. The Committee believes that the child access prevention provision is necessary and useful because the research shows that CAP laws are effective at reducing unintentional firearm deaths among children. LCAV testified before the Committee that the presence of unlocked guns in the home increases the risk of both accidental gun injuries and intentional shootings. They cited a study showing that more than 75% of the guns used in youth suicide attempts and unintentional injuries were stored in the residence of the victim, a relative, or a friend.[8]   LCAV also found that in states where CAP laws had been in effect for at least one year, unintentional firearm deaths fell by 23% from 1990-94 among children under 15 years of age.[9]   They also cite a 2005 study finding that the practice of keeping firearms locked and unloaded serves as a protective measure to reduce youth suicide and unintentional injury in homes with children and teenagers where guns are stored.[10]

While there are no CAP laws at the federal level, there are more than two dozen states that have enacted laws to keep guns out of the hands of children. The CAP laws throughout the country range from imposing criminal liability when a minor gains access to an improperly stored firearm, to merely prohibiting persons from directly providing a firearm to a minor. Fourteen states, including Maryland, California, Connecticut, and Texas, have CAP laws that impose criminal liability when a minor gains access to an improperly stored firearm. Additionally, fifteen states define the term 'minor' as someone under the age of 18. The Committee believes that the CAP law in Bill 17-843 is a sensible alternative to the problematic 1975 safe storage provision, and that it is vital in order to safeguard the lives of children.

## Ballistics and Microstamping

All firearms leave unique markings on the bullets and shell casings they fire. Ballistic identification laws enable law enforcement to link bullets and shell casings recovered at crime scenes to the firearm that fired them by test firing the firearm. During the October 1st hearing, Josh Horwitz, Executive Director of the Educational Fund to Stop Gun Violence ("Ed Fund"), testified on ballistics identification – specifically on a technology called "microstamping." Microstamping can identify the serial number of a firearm directly from an expended cartridge case found at a crime scene. It utilizes laser technology to engrave microscopic markings (in the form of alpha and geometric codes) on the internal parts of a firearm, e.g. the breech face and the tip of the firing pin. When the firearm is fired, the markings are stamped onto the cartridge.

---

[7] The Committee Print retains language originally from the 1975 Act as a statement of policy – that it is the policy of the District that all firearms, regardless of child access, should be stored unloaded and either disassembled or secured – but no criminal penalty attaches to this and it uses the word "should."
[8] Juliet Leftwich, Legal Community Against Violence, *Testimony on Bill 17-843, Firearms Control Amendment Act of 2008*, October 1, 2008, at 6.
[9] *LCAV*, (2d ed. 2008), at 233.
[10] *Id.*

According to the Ed Fund, microstamping is superior to traditional methods of ballistic identification because the markings are intentionally stamped onto the cartridge, versus relying on unintentional markings. The markings identifying important information about the firearm, such as make, model, and serial number of the weapon.[11]  The goal of microstamping is to identify a firearm the first time it is used to commit a crime.[12]  On October 13, 2007, California became the first state mandating the microstamping of all new models of semiautomatic handgun models sold in the state beginning in 2010. The legislation was supported by 65 police chiefs throughout California.

Traditional methods of ballistic identification involve focusing on the tool marks on the interior surface of a firearm that are transferred from the firearm to an expended cartridge when the firearm is fired. These unintentional marks are a product of the manufacturing process. For decades, ballistic identification has relied on highly trained firearm examiners to analyze the marks by hand to make matches between a cartridge and a recovered firearm. Around 10 years ago the federal government created the national Integrated Ballistic Information Network (NIBIN) program to allow for computer-assisted searches of digital images of cartridges found at crime scenes. According to the Ed Fund, the problem with NIBIN is that it "relies on the same unintentional markings used by firearm examiners and cannot lead investigators directly to a specific firearm and its serial number, unless that weapon is eventually recovered."[13]  Unless a weapon has been used before in a crime, and recovered, and therefore entered into NIBIN, law enforcement will learn relatively little from a newly-recovered shell casing.  With microstamping, however, law enforcement will almost immediately know the precise gun and its purchaser from the newly recovered shell casing, if from a semiautomatic pistol, even if never before used in a crime, and even if never having been entered into NIBIN.

This problem is highlighted by what has occurred in the State of Maryland over the past eight years. Maryland created the Maryland Integrated Ballistics Identification System ("MD-IBIS") program in 2000, at a cumulative cost of $2.5 million. A September 2004 report by the Maryland State Police Forensic Science Division found that "[c]ontinuing problems include the failure of the MD-IBIS to provide any meaningful hits. There have been no crime investigations that have been enhanced or expedited through the use of MD-IBIS...It is recommended that this Program be suspended..."[14]

Despite the results in Maryland, MPD insists that a DC-IBIS will work better. At the October 1st hearing, Chief Lanier testified that she believes that the District will have better success than Maryland because MPD would use trained firearms examiners (unlike what occurred in Maryland) and since MPD is test-firing all weapons to retrieve ballistics, the District would not have the problem of dealers not submitting authentic casings (as was the case in Maryland). In addition, Chief Lanier testified that the District would have better representation of crime scene evidence than either Maryland or New York because local jurisdictions process

---

[11] Testimony of Joshua Horwitz, Executive Director, Educational Fund to Stop Gun Violence, *Public Hearing on Bill 17-843, Firearms Control Amendment Act of 2008*, October 1, 2008, at 2.
[12] *Id.*
[13] *Id* at 1.
[14] Maryland State Police, Forensic Science Division, *MD-IBIS Progress Report*, September 2004.

most crime scenes.  Chief Lanier stated that because MPD would be tracking both registered guns and crime scene evidence, there will be increased probability of a hit.  Additionally, microstamping is not as useful for revolvers (since rarely are revolver shell casings left at a crime scene), and microstamping will apply only to newly manufactured pistols.  For the reasons articulated by Chief Lanier during the hearing, the Committee has decided to retain the emergency acts' requirement that MPD conduct ballistic identification as part of the registration process for all handguns.

### Assault Weapons

The proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens of the District.  Assault weapons are military-style weapons of war, made for offensive military use.  The Committee concurs with the federal Bureau of Alcohol, Tobacco, Firearms and Explosives' (ATF) description of assault weapons as "mass produced mayhem,"[15] and ATF's finding that assault weapons are disproportionately likely to be used by criminals. The Committee also agrees with ATF that assault weapons "are not generally recognized as particularly suitable or readily adaptable to sporting purposes" under the test established by the federal Gun Control Act of 1968.[16]  Assault weapons have no legitimate use as self-defense weapons, and would in fact increase the danger to law-abiding users and innocent bystanders if kept in the home or used in self-defense situations.

As stated in the above paragraph, assault weapons are military-style weapons made for offensive military use.  They are designed with military features to allow rapid and accurate spray firing.  They are not designed for sport, but to kill people quickly and efficiently.  Assault weapons also have features such as pistol grips and the ability to accept a detachable magazine. Pistol grips help stabilize the weapon during rapid fire and allow the shooter to spray-fire from the hip position.  Assault weapons are generally equipped with large-capacity ammunition magazines that allow the shooter to fire many more rounds than conventional firearms.  In addition, features such as barrel shrouds on assault pistols protect the shooter's hands from the heat generated by firing many rounds in rapid succession.

During the Committee's October 1, 2008 hearing, Brian Siebel, Senior Attorney with the Brady Center to Prevent Gun Violence testified on behalf of the Brady Center on the need for an assault weapons ban.  The Brady Center testified that law enforcement officers are at particular risk from assault weapons due to their high firepower – which often times leaves officers outgunned by criminals.  They cited several high-profile shootings involving law enforcement against criminals with assault weapons – including a 1994 incident at MPD headquarters that left one MPD officer and two FBI agents dead and another FBI agent seriously wounded.[17]  The Brady Center further testified that assault weapons pose a risk to civilians and homeland security – the latter being a problem that is unique to the District, since it is the nation's capital. Assault weapons are preferred by terrorists, and would pose extraordinary risks to citizens, government

---

[15] ATF, *Assault Weapons Profile* 19 (1994).

[16] *Id*. at 20.

[17] Testimony of Brian J. Siebel, Senior Attorney, Brady Center to Prevent Gun Violence, *Bill 17-843*, October 1, 2008 at 3.

officials, visiting dignitaries, and law enforcement if they were allowed in the District of Columbia.

Further, the proliferation and use of .50 BMG rifles, as defined in Bill 17-843, poses a clear and present terrorist threat to the health, safety, and security of all residents of, and visitors to, the District, based upon findings that those firearms have such a high capacity for long distance and highly destructive firepower that they pose an unacceptable risk of death and serious injury of human beings, destruction or serious damage of vital public and private buildings, civilian, police, government and military vehicles, power generation and transmission facilities and transportation infrastructure. The Committee also finds that these weapons are particularly dangerous and have no legitimate use for self-defense.

Seven states currently ban assault weapons – California, New Jersey, Hawaii, Connecticut, Maryland, Massachusetts, and New York. California expanded its ban in 2000 to include all semiautomatic rifles or pistols that have the ability to accept a detachable magazine and contain one of a series of military-style features. The Committee has adopted the California language in Bill 17-843.

In adding an assault weapons ban to Bill 17-843, the Committee believes that it has not impinged on the Constitutional rights of law-abiding citizens of the District of Columbia to own and use legitimate self-defense firearms within the home. The Committee finds that assault weapons and .50 BMG rifles are a minute fraction of the firearms available in the United States, they have never been in common use, they are dangerous and unusual, and they pose an especial problem for public safety in the nation's capital.

_Unsafe Pistols_

During the October 1, 2008 hearing on Bill 17-843, Daniel Webster, Co-Director of the Johns Hopkins Center for Gun Policy and Research, testified on numerous aspects of firearms laws. Mr. Webster suggested the Committee prohibit "unsafe handguns." These are a category of handguns characterized by their very small size, concealability, and poor construction, e.g. "saturday night specials." Unsafe handguns are more prone to accidental discharge, lack safety devices to prevent unintended discharge, misfire, and are prone to firing when dropped. In addition, these types of guns are disproportionately favored by criminals (because of their cheapness and concealability), and are less accurate and less reliable for self defense. Mr. Webster also testified that five states, including Maryland, have banned these unsafe guns. He stated that his research on Maryland's ban on these guns shows that the law was associated with 40 fewer homicides per year during the first 9 years the law was in place.

California has enacted a comprehensive scheme to identify and test handguns to ensure that they meet minimum standards for safety. Testing includes: identification of safety devices, a firing requirement to assess the propensity for misfiring, and a drop test to assess the propensity to fire when dropped. Pursuant to California Penal Code section 12131, the California Department of Justice developed and updates a roster of approved firearms that may lawfully be sold in California because they have met all standards to determine that they are not unsafe

handguns.  The Committee has added a provision in Bill 17-843 that states that no handgun that is not on the California Roster of Approved Firearms as of January 1, 2009, may be manufactured, sold, given, loaned, exposed for sale, transferred, or imported into the District of Columbia.  In addition to incorporating the current California roster, the Committee Print authorizes the Chief of Police to continually update the roster through rulemaking.

### *Other Provisions*

In addition to the above mentioned provisions, Bill 17-843 also includes provisions dealing with a number of other public safety issues.  Some of the more significant of these are discussed below.  See the section-by-section analysis for others.

Bill 17-843 would make permanent revisions made in the Second Emergency (D.C. Act 17-502) permitting the registration of semiautomatic pistols.  The 1975 law defined "machine gun" by capacity (over 12 rounds) rather than action (automatic v. semiautomatic).  Thus, "machine gun" included almost all semiautomatic weapons because they are capable of taking (although not originally sold with) extended magazines.  To fix this problem, since semiautomatic pistols are a common and popular weapon, Bill 17-843 redefines "machine gun." To deal with the capacity issue, the bill prohibits large capacity magazines ("large capacity ammunition feeding devices"), borrowing language from the now-lapsed federal assault weapons ban and current California law.  Although the Committee heard testimony that magazine capacity of up to 20 rounds is not uncommon and "reasonable," and that an expert could reload 10 round clips within "seconds," the Committee agrees with the Chief of Police that the 2 or 3 second pause to reload can be of critical benefit to law enforcement, and that magazines holdings over 10 rounds are more about firepower than self-defense.  Limiting fire power and desiring to advantage the police, especially given homeland security issues in the District, the Committee recommends the ban on extended clips.

The committee print also updates the law regarding disqualifications to registration.  In the 1975 act, the Council prohibited felons and mentally ill, for instance, from being allowed to register a firearm.  Bill 17-843 adds to the disqualifications being convicted of an intrafamily offense.  Research shows there is a higher incidence of gun violence by perpetrators of domestic violence.  Similarly, being the respondent to a civil protection order correlates to domestic violence (and higher risk for gun violence).  In this regard the bill tracks federal law with some modifications.  The bill also specifies that "mental disorder" (not just commitment) is a disqualification.  The Committee makes these changes because it believes a more effective approach to controlling gun violence in lieu of complete prohibition, post-Heller, is to disqualify individuals at higher risk of misusing a firearm (e.g. in suicide, or rage).

The committee print retains authorization, first enacted in D.C. Act 17-422, for the Chief of Police to set a fee for conducting ballistic identification procedures.  The Committee is concerned that the total cost to register a firearm not be unduly burdensome, and it is expected that the aggregate cost will be close to $100.  But there is a cost for fingerprinting, the ballistic test, processing, and to maintain a database.  The print uses the phrase "reasonable fees" to emphasize that the government must hold down the cost to the private citizen.

The committee print also retains, from the second emergency, the one-gun-per-month registration provision. Studies show that laws restricting multiple purchases or sales of firearms are designed to reduce the number of guns entering the illegal market and to stem the flow of firearms between states. Jurisdictions with weaker firearms laws may attract gun traffickers who make multiple purchases and resell the guns in jurisdictions with stronger firearms laws. Studies also show that handguns sold in multiple sales to the same individual purchaser are frequently used in crime. Three states, California, Maryland, and Virginia, have laws limiting firearm purchases or sales to one per month.

*Conclusion*

The Committee believes that the above stated provisions in Bill 17-843 comply with the United States Supreme Court's decision in *District of Columbia v. Heller*, while at the same time allow the District to protect its citizens and maximize public safety with reasonable and sensible gun policy. The Committee recommends approval of Bill 17-843, the "Firearms Control Amendment Act of 2008" as amended.

## II.   LEGISLATIVE CHRONOLOGY

June 26, 2008        United States Supreme Court decides *District of Columbia v. Heller*.

July 1, 2008         Bill 17-843, the "Firearms Control Amendment Act of 2008 is introduced by Councilmember Mendelson, and is co-introduced by Chairman Gray and Councilmembers Alexander, Barry, Bowser, Brown, Catania, Cheh, Evans, Graham, Schwartz, Thomas, and Wells.

July 2, 2008         Committee holds public oversight hearing on "The United States Supreme Court's decision in *District of Columbia v. Heller*."

July 11, 2008        Notice of Intent to Act on Bill 17-843 is published in the *D.C. Register*.

July 15, 2008        Council unanimously adopts D.C. Act 17-422, the "Firearms Control Emergency Amendment Act of 2008."

August 1, 2008       Notice of Public Hearing is published in the *D.C. Register*.

August 22, 2008      Notice of a Second Public Hearing is published in the *D.C. Register*.

September 16, 2008   Council unanimously adopts D.C. Act 17-502, the "Second Firearms Control Emergency Amendment Act of 2008."

September 18, 2008   The Committee on Public Safety and the Judiciary holds a public hearing on Bill 17-843.

October 1, 2008    The Committee on Public Safety and the Judiciary holds a second public hearing on Bill 17-843.

October 7, 2008    Council unanimously adopts (on final reading) D.C. Act 17-536, the "Firearms Control Temporary Amendment Act of 2008."

November 25, 2008  The Committee on Public Safety and the Judiciary marks-up Bill 17-843.

### III.    POSITION OF THE EXECUTIVE

Peter Nickles, Attorney General for the District of Columbia, and Cathy Lanier, Chief of Police of the Metropolitan Police Department, testified on behalf of the Executive.    The Executive supports Bill 17-843, as amended.

### IV.    SUMMARY OF TESTIMONY

The Committee on Public Safety and the Judiciary held two public hearings on Bill 17-843.  The first hearing was on Thursday, September 18, 2008 and the second hearing was on Wednesday, October 1, 2008.  The testimony summarized below is from both hearings.  In addition, the Committee received several written statements from individuals and organizations unable to testify during the September 18th hearing.  These statements are summarized below and as well.

*September 18, 2008*

*David White, Public Witness*, testified that he supports less restrictive gun laws so that he can better protect himself and his family.  He stated that he was pleased with the steps the Council had taken so far.

*Dick Anthony Heller, Public Witness*, testified that he supports less restrictive gun laws because criminals don't follow laws, and since terrorists have weapons, citizens should have them as well in order to defend themselves.

*Ron Moten, Co-Founder, Peaceoholics*, testified in support of stricter gun laws.  Mr. Moten stated that he is in favor of stricter penalties for persons who sell guns to children.

*Dane vonBreichenruchardt, President, U.S. Bill of Rights Foundation*, testified in support of less restrictive gun laws.  Mr. vonBreichenruchardt stated that his views are similar to Mr. Heller and that he wants the Council to obey the U.S. Supreme Court's decision in the *Heller* case.

*Robert Moore, Public Witness*, testified that he wanted to see the process to register long-arms made more convenient or abolished.

*Tim Little, Public Witness*, testified as to the problems he encountered with the registration process and urged MPD to consider a streamlined process. He also stated that he supports the actions the Council has taken to comply with *Heller*, especially the child access prevention provision.

*Deborah Jane Anderson, Public Witness*, testified that she supports less restrictive gun laws. Ms. Anderson stated that she has been a crime victim more than once, and for that reason wants the Council to pass gun laws that would allow all persons the right to carry their guns outside of the home.

*Mark Anderson, Public Witness*, testified that he supports less restrictive gun laws. Mr. Anderson stated that the Council should not make gun ownership overly inconvenient and expensive, and that safe storage provisions can not be adequately addressed through legislation.

*Amy McVey, Co-Founder and President, CapitalGunOwners.org*, testified that gun ownership does not make one a criminal, and that she supports less restrictive gun laws. Specifically, Ms McVey stated that she wants the law changed to allow open carry, and that she would like the firearm registration process streamlined.

*George Lyon, Co-Founder, CapitalGunOwners.org*, testified that he had a number of suggestions for the permanent legislation, including repealing the prohibition on defensive use of firearms by citizens, adopting gun safety programs for the public schools, adopting a nondiscretionary provision for licensing persons to carry handguns, streamlining the gun registration process, and repealing the limitation on non-lethal weapons.

*Paula Miller, CapitalGunOwners.org*, testified in support of less restrictive gun laws.

*Gillian St. Lawrence, CapitalGunOwners.org*, testified that she supports the Council's efforts to allow the registration of semiautomatic handguns, but that she would like to see other changes made to the law, namely streamlining the gun registration process.

*Ricardo Royal, National President, Community Association for Firearms Education*, testified the Committee should amend the law so that the District's transportation laws are in line with federal standards, and that the law should be strengthened regarding training requirements.

*J. Bradley Jansen, Director, Center for Financial Privacy and Human Rights*, testified that the Council must approach the gun control question as it would the rest of the enumerated rights, such as the right to freedom of speech, assembly, association, etc. He stated that failure to act appropriately may jeopardize home rule for the District.

*Richard Gardner, Attorney for Mr. Heller*, testified that he supports less restrictive gun laws and that the Council should fully comply with the *Heller* decision.

*Janae Grant, ANC Commissioner, 5A11*, submitted a written statement in general support of Bill 17-843. Ms. Grant suggested lengthen the number of days before a registrant can

register additional firearms, from 30 days to 90 days. She also supports ballistic testing, the safe storage provision, and training requirements.

*Alex Sutono*, submitted a written statement in support of allowing semiautomatic handguns to be registered in the District.

*Lee Foullon*, submitted a written statement in support of revising Bill 17-843 to permit the sale or transfer of Curio and Relic firearms.

*Jake McGuigan, Director of Government Relations, National Shooting Sports Foundation, Inc.*, submitted several statements and information papers. The National Shooting Sports Foundation does not support ballistic testing, microstamping, or one-gun-per-month laws.

*October 1, 2008*

*Joshua Horwitz, Executive Director, Educational Fund to Stop Gun Violence*, testified in support of Bill 17-843, with amendments. Specifically, Mr. Horwitz testified to the benefits of microstamping and why it augments traditional methods of ballistic identification. Mr. Horwitz stated that microstamping enhances traditional methods of ballistic identification because the intentional markings are designed to be stable and easily extractable.

*Juliet Leftwich, Legal Director, Legal Community Against Violence*, testified in support of Bill 17-843, with amendments. Ms. Leftwich testified on the benefits of registering firearms, licensing of gun owners, firearms safety training, better regulation of firearms dealers, safe storage – specifically child access prevention laws, and waiting periods. Ms. Leftwich suggested that the Committee amend Bill 17-843 so that the CAP provision applies to children under the age of 18, versus under the age of 16, as is in the emergency and temporary legislation.

*Brian Siebel, Senior Attorney, Brady Campaign to Prevent Gun Violence*, testified in support of Bill 17-843, with amendments. Mr. Siebel testified on the dangerousness of assault weapons, specifically how these weapons pose a threat to citizens, law enforcement, and homeland security. He also testified on the need to ban the .50 caliber BMG sniper rifle because of the huge risk this weapon poses to public safety.

*Daniel Webster, Co-Director, Johns Hopkins Center for Gun Policy and Research*, testified in support of Bill 17-843, with amendments. Mr. Webster testified that the Committee should amend Bill 17-843 to prohibit domestic violence offenders from being able to possess firearms, and that the bill should prohibit "junk guns" – such as Saturday night specials – because of the unique danger such weapons pose to the public.

*Peter Nickles, Acting Attorney General, District of Columbia*, testified in support of Bill 17-843, with amendments. Mr. Nickles testified that Bill 17-843 be amended to: (1) align the District's transportation laws with federal standards; (2) provide for the revocation of firearms registrations for all person subject to a CPO; (3) clarify that public and private property owners in the District have the authority to prohibit the possession of firearms on their property; (4)

extend the provisions of the CAP law to other classes of individuals; and (5) strengthen penalties for possessing unlawful ammunition and illegally possessing firearms outside of a person's home.

**Cathy Lanier, Chief of Police, Metropolitan Police Department**, testified in support of Bill 17-843, with amendments. Chief Lanier testified that she believes that MPD should continue to perform ballistic testing on registered firearms, and that the CAP laws should be reinforced with an educational component. Further, Chief Lanier testified that the registration process for firearms is vital and enhances public safety, and that there would be real public safety benefits to requiring firearms to be re-registered.

## V.    IMPACT ON EXISTING LAW

Bill 17-843 would amend the Firearms Control Regulations Act of 1975 effective September 24, 1976 (D.C. Law 1-85; D.C. Official Code § 7-2501.01, *et seq.*) In understanding legislative intent, it is important to read as well this Committee's report on Bill 17-593, the "Inoperable Pistol Amendment Act of 2008." Bill 17-593 is being recommended together with Bill 17-843, both dealing with the regulation of firearms in the District.

## VI.    FISCAL IMPACT

The Committee has requested a Fiscal Impact Statement from the Chief Financial Officer. Attached, however, is the CFO's fiscal impact statement on the Second Firearms Control Emergency Amendment Act -- an emergency version of Bill 17-843. The Committee believes that funds are sufficient in the FY 2009 budget and the proposed FY 2010 through FY 2013 budget and financial plan to implement Bill 17-843.

## VII.    SECTION-BY-SECTION ANALYSIS

Section 1      states the short title of Bill 17-843.

Section 2      (a) amends definitions.
   (1) Revises "firearm"; see Bill 17-593.
   (2) Adds "intrafamily offense."
   (3) Revises "machine gun."
   (4) Revises "pistol" consistent with the Committee's work on Bill 17-593.
   (5) Revises "shotgun" to allow the same barrel length (18 inches) as permitted under federal law. By requiring a 20 inch barrel, the District has been out of step with common practice.
   (6) Adds "assault weapon," "magazine," "capacity," ".50 BMG rifle," and ".50 BMG Cartridge."

(b)(1) Revises transport requirements to be consistent with the provisions in D.C. Code Title 22, Chapter 45.

(2) Adds provision allowing temporary possession within a home by another person, for immediate self-defense, if the other person within the home is not otherwise prohibited from possessing firearms. The reason for this provision is to allow a person within the home, who is not the registrant of the firearm, to use the firearm for self-defense.

(c) Revises 7-2502.02 to permit the registration of handguns, pursuant to Heller, and to prohibit the registration of unsafe firearms, assault weapons, and .50 BMG rifles.

(d)(1) Changes from 5 years to 10 years the prohibition on registration of firearms various prohibited classes of persons, and adds persons convicted of "intrafamily offense" being prohibited from registering firearms. Adds mental disorder within immediately preceding 5 years as a disqualification to registration. Revises test applicants must take to emphasize familiarity with use, handling, and storage. Adds as a disqualification to registration/possession the registrant having been the subject of a CPO.

(2) Requires Chief of Police to conduct a ballistics test for each pistol being registered, limits registration to one pistol per registrant per 30 day period, and authorizes the Chief to establish a reasonable fee.

(e)(1) The Chief may require any person applying for a registration certificate to be fingerprinted if, in his judgment, this is necessary to conduct an efficient and adequate investigation into the matters described in § 7-2502.03. Any person who has been fingerprinted by the Chief within 6 years (changing from 5 years) prior to submitting the application need not, in the Chief's discretion, be fingerprinted again if he offers other satisfactory proof of identity.

(2) Revises transport requirements to be consistent with the provisions in § 22-4501 et seq.

(f) Authorizes the Chief to offer a discount on registration fees of up to 50% for any registrant who has completed a course in firearms safety and proficiency. The Committee wants the public policy to encourage gun owners to be knowledgeable in firearms safety and proficient in their use. Thus, an earlier subsection ((d)(1)) revises the emphasis of the registration test, and this subsection allows a small financial incentive for greater training.

(g) Provides for re-registration, by requiring that registration certificates expire three years from the date of issuance. Although MPD shall mail renewal notices to registrants, the requirement is analogous to motor vehicle registration: the duty to renew is solely on the registrant regardless of what MPD or the U.S. Mail does. This subsection also requires that all existing registrations (pre-Heller) be re-registered within three years. In this way, the MPD shall have on up-to-date registration database.

(h) This subsection amends the existing law to establish a two-tier system of penalties for failure to report a change of address or a lost, missing, or stolen firearm. The first offense is a civil fine of $500. The second offense shall result in revocation of the registration.

(i) Requires microstamping on all semiautomatic pistols sold after December 31, 2010.

(j) Prohibits unsafe firearms (a defined term) from being brought into the District or registered after December 31, 2008. A felony penalty attaches to this provision.

(k) Prohibits possession of large capacity ammunition feeding devices.

(l) Revises the safe storage requirement to be a child access prevention law, consistent with many other states. A felony penalty attaches is violation leads to injury or death.

(m) Codifies right of the District government and private property owners to prohibit or restrict the possession of firearms on their property. Although there are few instances where this issue could arise, given the restrictions on carrying firearms in Title 22 as amended, on situation could be a residential landlord who does not want his tenants carrying firearms within their apartments.

(n) Amends D.C. Code § 7-2551.01 to conform the definition of "assault weapon" to the new definition in § 7-2501.01.

Section 3          Savings clause.

Section 4          Fiscal impact statement.

Section 5          Effective date.

## VIII.  COMMITTEE ACTION

On November 25, 2008, the Committee on Public Safety and the Judiciary met to consider Bill 17-843, the "Firearms Registration Amendment Act of 2008." The meeting was called to order at 10:50 a.m., and Bill 17-843 was number seven on the agenda. After ascertaining a quorum (Chairman Mendelson and Councilmembers Alexander, Bowser, Cheh, and Evans present), he moved the print with leave for technical changes. During the opportunity for discussion, Councilmember Cheh raised concerns with provisions dealing with public and private property owners, training, reporting lost or stolen firearms, and persons with mental illness being prohibited from registering.  Chairman Mendelson agreed to work with Councilmember Cheh on amendments to the print for first reading. After the opportunity for discussion, the vote on the print was unanimous (Chairman Mendelson and Councilmembers Alexander, Bowser, Cheh, and Evans voting aye). He then moved the report with leave for staff to make technical and editorial changes. After opportunity for discussion, the vote was unanimous (Chairman Mendelson and Councilmembers Alexander, Bowser, Cheh, and Evans voting aye). The meeting adjourned at 11:53 a.m.

## IX.   ATTACHMENTS

1.      Bill 17-843 as introduced.
2.      Selected testimony and comments.

Committee on Public Safety and the Judiciary
Report on Bill 17-843

3.     Fiscal Impact Statement for Second Emergency.
4.     Committee Print for Bill 17-843.

## COUNCIL OF THE DISTRICT OF COLUMBIA
### 1350 Pennsylvania Avenue, N.W.
### Washington, D.C. 20004

**Memorandum**

To:        Members of the Council

From:      Cynthia Brock-Smith, Secretary to the Council

Date:      July 7, 2008

Subject:   Referral of Proposed Legislation

Notice is given that the attached proposed legislation was introduced in the Legislative Meeting on Tuesday, July 01, 2008. Copies are available in Room 10, the Legislative Services Division.

TITLE: "Firearms Control Amendment Act of 2008", B17-0843

INTRODUCED BY: Councilmembers Mendelson, Evans, Schwartz, Catania, Brown, Graham, Cheh, Thomas, Wells, Barry, Bowser, Alexander and Chairman Gray

The Chairman is referring this legislation to the Committee on Public Safety and the Judiciary.

Attachment

cc: General Counsel
    Budget Director
    Legislative Services

Councilmember Phil Mendelson

Councilmember Carol Schwartz

Councilmember Yvette Alexander

Chairman Muriel Bowser

Councilmember Jack Evans

Councilmember Mary Cheh

Councilmember Tommy Wells

Chairman Vincent C. Gray     1
     2

     3
Chairman Jim Graham     4

     5
Councilmember Marion Barry     6

     7
Councilmember Kwame Brown     8

     9
Councilmember Harry Thomas, Jr.    10

    11
Councilmember David Catania    12

   13
   14

   15

A BILL    16

   17

IN THE COUNCIL OF THE DISTRICT OF COLUMBIA    18
   19
   20

     Chairman Vincent Gray, Councilmembers Phil Mendelson, Carol Schwartz, Jim Graham    21
Yvette Alexander Marion Barry, Muriel Bowser, Jack Evans, Harry Thomas, Jr., Mary Cheh, and    22
David Catania introduced the following bill, which was referred to the Committee on    23
_____.    24

To amend the Firearms Control Regulations Act of 1975 to repeal the prohibition on the    25
     registration of pistols, to require a ballistics record for each registered pistol, to require a    26
     waiting period when registering a firearm, and to establish a self-defense exception to the    27
     requirement for safe storage of firearms in the home.    28

     BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, that this    29

Act may be cited as the "Firearms Control Amendment Act of 2008".    30

1

Section 2.  The Firearms Control Regulations Act of 1975, effective September 24, 1976     1

(D.C. Law 1-85; D.C. Official Code § 7-2501.01, *et seq.*) is amended as follows:     2

    (a) Section 202 (D.C. Official Code § 7-2502.02) is amended as follows:     3

       (1) Subsection (a)(4) is repealed; and     4

       (2) Subsection (b) is repealed.     5

    (b) A new section 203a is added to read as follows:     6

       "203a.  Ballistics Record.     7

       "For each pistol subject to an application for a registration certificate the     8

Chief shall obtain an accurate ballistics print.".     9

    (c) Section 206(a) (D.C. Official Code § 7-2502.06(a)) is amended to read as     10

follows:     11

       "(a) An application for a registration certificate shall be filed, and a     12

registration certificate issued, prior to a person or organization having possession of the firearm     13

in the District.  The Chief may authorize possession of a firearm without a registration certificate     14

having been issued only if an application for a registration certificate has been filed and such     15

other requirements have been met as the Chief prescribes by regulation.".     16

    (d) Section 702 (D.C. Official Code § 7-2507.02) is amended to read as follows:     17

       "Sec. 702.  Except for law enforcement personnel described in section     18

201(b)(1), each registrant shall keep any firearm in his or her possession unloaded and either     19

disassembled or bound by a trigger lock or similar device unless such firearm is kept at his or her     20

place of business, or while being used for lawful recreational purposes within the District of     21

Columbia, or for the purpose of immediate self-defense in his or her home.".     22

2

Sec. 3. Fiscal Impact Statement.                                                                    1

The Council adopts the fiscal impact statement in the committee report as the fiscal          2

impact statement required by section 602(c)(3) of the District of Columbia Home Rule Act,      3

approved December 24, 1974 (87 Stat. 813, D.C. Official Code § 1-206(02(c)(3)).                4

Section 4.  Effective Date.                                                                     5

This Act shall take effect following approval by the Mayor (or in the event of veto by the     6

Mayor, action by the Council to override the veto), a 30-day period of Congressional review as  7

provided in section 602(c)(2) of the District of Columbia Home Rule Act, approved December      8

24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(2)), and publication in the District of  9

Columbia Register.                                                                             10

3

APPENDIX 000053



educational fund to

# STOPGUNVIOLENCE

*imagine a future free from gun violence*

Testimony of
# Joshua Horwitz
## Executive Director

## *Public Hearing on the "Firearms Control Amendment Act of 2008"*

## Committee on Public Safety and the Judiciary
## Council of the District of Columbia

## October 1, 2008

John A. Wilson Building
1350 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

Good morning, Chairman Mendelson and members of the Committee on Public Safety and the Judiciary. I appreciate this opportunity to speak to you today on the critical issue of firearm laws in the District of Columbia.

My name is Joshua Horwitz and I am the Executive Director of the Educational Fund to Stop Gun Violence (Ed Fund). The Ed Fund is a national non-profit organization in Washington, D.C., that seeks to secure freedom from gun violence through research, strategic engagement and effective policy advocacy.

I would like to focus my remarks today on the topic of comprehensive ballistics identification—specifically on a technology called "microstamping." We recommend that the District of Columbia require all new semiautomatic pistols sold in the city to be microstamped starting in 2011. This would assist law enforcement in identifying gun traffickers, discourage straw purchasers, and help solve gun crimes. Equally important, microstamping is an inexpensive technology that requires no new databases and produces no burden for law-abiding gun owners. The technology is utilized only when a gun is used in a crime.

Currently deployed ballistics technology focuses on the tool marks on the interior surface of a firearm that are transferred from the firearm to an expended cartridge during the firing process. These unintentional tool marks are a by-product of the manufacturing process. For over 100 years, highly trained firearm examiners examined these marks by hand to make matches between a cartridge(s) found at a crime scene and a recovered firearm. Starting about ten years ago, the federal government created the National Integrated Ballistic Information Network (NIBIN) program to allow for computer-assisted searches of digital images of cartridges found at crime scenes.

NIBIN, however, relies on the same unintentional markings used by firearm examiners and cannot lead investigators directly to a specific firearm and its serial number, unless that weapon is eventually recovered. A firearm serial number is a key investigative tool because law enforcement uses it to trace a weapon back to its original seller and purchaser.

1

Microstamping represents an evolution in ballistic identification because it can identify the serial number of a firearm directly from an expended cartridge case found at a crime scene. Originally created in the 1990s by Todd Lizotte and Orest Ohar, microstamping uses precise laser technology to engrave intentional microscopic markings on the internal mechanisms of a semiautomatic pistol (e.g., the breech face and the tip of the firing pin). When the handgun is fired, these engravings are stamped onto the cartridge—identifying essential information including the make, model and serial number of the weapon in the form of alphanumeric and geometric codes. Information extracted from these codes can be used to trace a firearm used in a violent crime, even if the crime gun itself is never recovered.

The elegance of the technology is that it uses the same natural forces that create the unintentional markings traditionally analyzed by firearm examiners. By *intentionally* stamping a code on cartridges, however, microstamp-equipped firearms provide investigators with more deliberate information than unintentional marks ever could. The goal of microstamping is to identify a firearm the *first* time it is used to commit a crime.

That's an important goal in a country where approximately 40% of homicide cases go unsolved.[1] At many shooting scenes, a crime gun is never recovered, and far too often NIBIN fails to exploit ballistic evidence that *is* recovered (i.e., expended cartridge casings). For example, the city of Boston reported a total of 1,301 crimes involving shootings in 2006. Investigators at 636 of these crime scenes recovered only shell casings, and not the crime gun itself.[2] In cases such as these, microstamping can provide essential leads to investigators.

With any new, innovative technology, there are going to be questions concerning the effectiveness and durability of the process and microstamping has not been immune to naysayers. One line of criticism has focused on whether the technology can withstand wear and tear under the violent conditions that exist within the chamber of a firearm. In order to

---

[1] *New York Times* Editorial, "A Crime-Fighting Opportunity," February 15, 2008, http://www.nytimes.com/2008/02/15/opinion/15fri3.html
[2] Boston Police Department

2

answer such claims, the technology has undergone numerous, rigorous tests with firearms including the Colt .45 (1911), S&W 4006, Ruger Mark III, SIG P229, AR-15, and AK-47.[3]

A series of studies conducted by microstamping's inventors have shown that firearms utilizing the latest generation of the technology consistently produce identifiable codes even after thousands of rounds of firing. For example, in 2007 Lizotte and Ohar fired over 2,500 rounds from a microstamped Smith and Wesson .40 caliber semiautomatic handgun using five different brands of ammunition. The results were impressive, with all eight digits of the alphanumeric code legible 97% of the time using both optical microscopy and scanning electron microscopy and with breech face markings successfully transferred to cartridge casings 96% of the time.[4] Taking firing pin and breech face markings together, all eight digits were identifiable in every single case.

Lizotte and Ohar were subsequently able to fire the same Smith & Wesson handgun in excess of 5,000 rounds and still produce identifiable marks. They also recently tested a used .45 Colt semi-automatic pistol with over 1,500 rounds and achieved identifiable marks over 95% of the time using optical microscopy.[5]

Independent forensic scientist Lucien Haag has also tested the durability of microstamping and found that even with the firearms involved operating under extremely high pressure, the microstamped impressions made on cartridges were still visible even after thousands of rounds were fired.[6]

---

[3] Todd E. Lizotte and Orest Ohar, "Forensic Firearm Identification of Semiautomatic Handguns Using Laser Formed Microstamping Elements," Peer-reviewed paper presented at the 2008 SPIE (The International Society for Optical Engineering) Annual Optics and Technology Conference, San Diego, California, September 3, 2008, http://www.csgv.org/atf/cf/%7B79FD0842-518D-42AC-8228-AE59B7990689%7D/Forensic%20Firearm%20Identification%20of%20Semiautomatic%20Handguns%20-%20Lizotte.pdf

[4] Press Release from NanoMark Technologies, "New Test Affirms Validity of Microstamping Technology," May 24, 2007, http://www.csgv.org/atf/cf/%7B79FD0842-518D-42AC-8228-AE59B7990689%7D/LIZOTTE%20TEST%20RELEASE%205-25-07.PDF

[5] Lizotte and Ohar, "Forensic Firearm Identification of Semiautomatic Handguns Using Laser Formed Microstamping Elements"

[6] Lucien Haag, "Ballistic ID Tagging and Microstamping—Performance in Practice," Presentation before Third Meeting of the Committee on Assessing the Feasibility, Accuracy, and Technical Capability of a National Ballistics Database," December 9, 2004

3

These endurance challenges achieved impressive results even though they test-fired far more rounds than would be expended by the typical crime gun. In reality, semiautomatic handguns have the shortest median "time-to-crime" of any firearm type[7] and crime guns are frequently recovered with fewer than 20 total rounds fired.[8]

Additionally, microstamped engravings on the firing pin and breech face of a handgun contain several "counter-measures" in order to prevent against tampering. These include redundant gear and/or radial marks on the firing pin, as well as marks on the breech face. Simply eradicating any one set of these marks (which is no easy feat for the common criminal) is insufficient to defeat the technology.

Microstamped semiautomatic pistols would also serve as a deterrent to illegal gun trafficking. First, the technology would help to curb "straw purchases." In a straw purchase, a prohibited purchaser recruits an individual(s) with a clean criminal record to pass a background check and purchase firearms for him/her. Microstamping would allow police to automatically link a shell casing found at a crime scene to this original purchaser. Straw purchasers would be far less likely to purchase firearms for convicted felons and other prohibited buyers if they believed those guns could be easily traced back to them after being used in crimes. Second, microstamping would help identify traffickers by providing more crime gun trace data for law enforcement to analyze.

I would also stress the ease with which microstamping technology can be integrated into the District's current ballistics systems. Microstamping does not require the creation of *any* new database of gun owners or ballistics information. It simply improves the usefulness of an existing tracing system by adding more information to that system. Microstamping does not collect any new personal information from gun owners or limit gun ownership in any way, and therefore has no Second Amendment implications whatsoever.

---

[7] Department of Justice, Bureau of Alcohol, Tobacco and Firearms, "Crime Gun Trace Reports (2000): National Report," July 2002, p. 32, http://www.atf.gov/firearms/ycgii/2000/
[8] Fox Butterfield, "Sniper Case Fuels a Debate Over Firearm Fingerprinting," *New York Times*, October 18, 2002, http://query.nytimes.com/gst/fullpage.html?res=9C02E0DE133DF93BA25753C1A9649C8B63&n=Top/Reference/Times%20Topics/Subjects/I/Identification%20Devices

4

APPENDIX 000058

The cost of implementing the technology is minimal as well.  Laser Light Technologies, Inc., a laser micromachining and engraving company based in Missouri, has priced the microstamp engraving process at a maximum of $6.00 per handgun.  As an additional benefit to manufacturers, the patent holders of the technology have announced they will provide a royalty-free license for the microstamping of semiautomatic handguns sold for civilian use in the United States and its territories.

Enthusiasm for the technology is spreading rapidly across the country.  On October 13, 2007, California Governor Arnold Schwarzenegger signed first-of-its-kind microstamping legislation into law, mandating the microstamping of all new models of semiautomatic handgun models sold in the state beginning in 2010.  The legislation was publicly supported by 65 police chiefs and sheriffs across California, including L.A. County Sheriff Lee Baca who stated, "The Los Angeles County Sheriff's Department Homicide Bureau has hundreds of unsolved cases where the only evidence left at the scene of the crime were expended bullet casings.  If these casings had imprinted information on them from the firearm, our investigators would have an exceptional chance of solving these heinous crimes."[9]  The California Police Chiefs Association (CPCA) and the Peace Officers Research Association of California (PORAC) also supported the bill.

Following the example set by California, several other states are now considering microstamping legislation, including Wisconsin, New Jersey, Illinois, and Connecticut and New York (where a bill passed the state assembly earlier this year).  Microstamping bills have also been introduced in the U.S. Senate and House of Representatives by Senator Edward M. Kennedy and Respective Xavier Becerra, respectively.

As this committee works to change the District's firearms laws in the wake of the Supreme Court's decision in *District of Columbia v. Heller*, I would strongly advise you to consider the multiple benefits of microstamping.  It is a forward-thinking technology that holds

---

[9] Press Release from Assemblyman Mike Feuer, "Gun Microstamping Demonstration Conducted Today," August 14, 2007, http://democrats.assembly.ca.gov/members/a42/newsroom/20070814AD42PR01.htm

5

**APPENDIX 000059**

tremendous promise to augment the city's crime-solving capabilities and bring peace and justice to victims and survivors of gun violence.

I thank you for conducting this hearing for the benefit of your constituents and look forward to you questions.

6



**Legal Community Against Violence**
expertise, information & advocacy to end gun violence

# Testimony of
# Juliet A. Leftwich
# Legal Director
# Legal Community Against Violence

# Bill 17-843
# "Firearms Control Amendment Act of 2008"

# Committee on Public Safety and the Judiciary
# Council of the District of Columbia
# Phil Mendelson, Chairperson

# October 1, 2008

# John A. Wilson Building
# 1350 Pennsylvania Ave., N.W.
# Washington, D.C.  20004

Good morning.  My name is Juliet Leftwich and I am the Legal Director of Legal Community Against Violence (LCAV), a national law center formed in the wake of an assault weapon massacre at a San Francisco law firm in 1993.  We provide free legal assistance to state and local governments seeking to adopt or defend laws to reduce gun violence.  We also track all federal, all state and many local gun laws.  In addition, we engage in educational outreach and advocacy, producing reports, analyses and model laws.[1]  LCAV's website, www.lcav.org, is the most comprehensive resource on U.S. firearms laws in either print or electronic form.

LCAV has helped many state and local policymakers develop and draft strong, legally defensible laws to reduce firearm-related deaths and injuries.  I'm pleased to be here today to provide our recommendations regarding the ways Washington, D.C. can strengthen its gun laws in the aftermath of the U.S. Supreme Court's decision in *District of Columbia v. Heller*.

Although I support each of the ideas discussed by the other expert witnesses on this panel today, my testimony will focus on laws relating to registration of firearms, licensing of gun owners/firearms safety training, firearms dealers, safe storage and waiting periods.

Registration of Firearms

Strong registration laws are the cornerstone of responsible gun policy.  These laws are critical because they

- Furnish law enforcement with essential information about firearm ownership, facilitating fast and reliable tracing of crime guns;
- Protect law enforcement officers responding to calls for assistance (e.g., in domestic violence incidents) by allowing the officers to determine, in advance, whether the individuals involved possess firearms;
- Facilitate the return of lost or stolen firearms to their lawful owners;
- Reduce illegal guns sales and possession by ensuring, through periodic background checks, that all registered owners are eligible to possess firearms under applicable federal, state and local law; and
- Permit law enforcement to charge an individual with a crime if he or she is in possession of an unregistered gun, and to seize the unregistered weapon.

Opinion polls show overwhelming public support for registration laws.  A 2001 national poll showed 83% of respondents, including 72% of gun owners, favor registration for newly-purchased handguns.[2]

Although the District of Columbia currently has a firearm registration system in place, registration is only required on a one-time basis.  As a result, persons who initially pass a

---

[1] See, e.g., Legal Community Against Violence, *Regulating Guns in America: An Evaluation and Comparative Analysis of Federal, State and Selected Local Gun Laws* (2d ed. 2008).

[2] Lake, Snell, Perry & Associates, Inc. Poll, *Educational Fund to Stop Gun Violence* (May 15-21, 2001).

background check may subsequently become ineligible to possess firearms (e.g., because of a criminal conviction), yet remain in possession of those firearms.

The most important way to strengthen the District's registration laws would be to require that registration be renewed annually after the owner undergoes a background check. This would help ensure that persons who have fallen into a prohibited class do not continue to possess firearms. It would also increase gun owner accountability and responsibility by requiring gun owners to account for their firearms on a yearly basis. Annual renewal of registration would not impose an undue burden on gun owners – it could be completed through the mail at a reasonable cost.

This recommendation is consistent with the Supreme Court's ruling in the *Heller* decision. In that decision, the Court narrowly held that the Second Amendment guarantees the right of individuals to possess handguns in the home for self-defense. Registration laws do not interfere with that right.

A variety of registration laws have been adopted by state and local governments throughout the nation, including Hawaii, California, Michigan,[3] Chicago, Cleveland, New York City and Omaha.[4]

Licensing Gun Owners/Firearms Owner Safety Training

Laws requiring gun owners to obtain a license (or permit) and to undergo safety training have two primary goals: 1) to reduce the number of unintentional shootings by ensuring that gun owners know how to safely use and store firearms; and 2) to increase compliance with existing firearms laws by requiring gun owners to demonstrate knowledge of those laws.

Americans strongly support licensing laws. A nationwide poll conducted in 2001 found that 85% of respondents – including 73% of gun owners – favored laws requiring purchasers to obtain a permit before buying a handgun.[5]

Although the District does not currently require gun owners to obtain a separate license, the District's registration laws contain some license-like provisions. Specifically, those laws require an applicant for a registration certificate to "demonstrate satisfactorily a knowledge of the laws of the District of Columbia pertaining to firearms and the safe and

---

[3] **Mich. Comp. Laws § 28.429. While Michigan does not require registration *per se*, it does require persons acquiring handguns to present the handgun to local law enforcement for a safety inspection. If the person presenting the handgun is eligible to possess it, a certificate of inspection will be issued reflecting his or her name, age, address, description and signature, as well as a full description of the handgun. Copies of the certificate are kept by state and local law enforcement, thereby creating a record of all legally acquired handguns possessed in the state and their owners.**

[4] **See Legal Community Against Violence, *supra* note 1, at 190-195.**

[5] **Lake, Snell, Perry & Associates, Inc., *supra* note 2.**

responsible use of the same in accordance with tests and standards prescribed by the Chief."[6]

The District's laws could be strengthened through the enactment of either a separate licensing law or an amendment to the existing registration provisions requiring applicants to successfully complete a firearms safety training course. We recommend that the course include classroom instruction on the safe handling, use and storage of firearms, and on federal and District laws pertaining to gun sales, possession, transportation and self-defense use. The course should also include live firing instruction to ensure that the applicant knows how to safely fire the weapon. Applicants should be required to pass written and hands-on tests prior to completing the course.

Reasonable licensing/firearms safety training laws have been adopted widely by state and local governments throughout the United States,[7] and do not violate the *Heller* decision.

Licensing laws are most effective when combined with registration laws (discussed above). A 2001 study analyzing the firearm tracing data of crime guns recovered in 25 U.S. cities revealed that states with some form of both registration and licensing systems have greater success keeping firearms initially sold by dealers in the state from being recovered in crimes than states without such systems in place.[8] This suggests that licensing and registration laws may make it more difficult for criminals, juveniles and other prohibited purchasers to obtain guns.

An Opinion Research Corporation International poll in 2001, found that 82% of the respondents supported laws requiring the licensing and registration of handguns.[9] A nationwide poll conducted in May of 2001 found that 70% of the respondents mistakenly believed that a system of licensing and registration already exists.[10]

Firearms Dealers

Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) records from November 2007 indicate that 5 firearms dealers operated in the District at that time.[11] We would anticipate that that number would grow in response to the *Heller* decision.

---

[6] D.C. Code Ann. § 7-2502.03(a)(10).
[7] See Legal Community Against Violence, *supra* note 1, at 178-186.
[8] Daniel W. Webster et al., *Relationship Between Licensing, Registration, and Other Gun Sales Laws and the Source State of Crime Guns*, 7 Inj. Prevention 184, 188-89 (2001). The study included jurisdictions with concealed carry permits and dealer sales reporting, which have elements of licensing or registration but are not comprehensive licensing or registration systems.
[9] Lois Hess, Editorial, *Bush Undermining Gun Control Laws*, Balt. Sun, July 31, 2001, at 11A, *available at* http://www.commondreams.org/views01/0731-03.htm.
[10] Lake, Snell, Perry & Associates, Inc., *supra* note 2.
[11] Bureau of Alcohol, Tobacco, Firearms & Explosives, U.S. Department of Justice, *Federal Firearms Licensee List (Class 01 Dealers)* (report issued Nov. 16, 2007).

It is very important that the District regulate dealers because so little regulation exists at the federal level, and because dealers are a significant source of crime guns nationwide. Current federal dealer regulations – and the enforcement of those regulations – are insufficient to ensure that the public is safe from unscrupulous dealers.  In June of 2000, ATF issued a comprehensive report of firearms trafficking in this country.  That report analyzed 1,530 trafficking investigations during the period July 1996 through December 1998, involving more than 84,000 diverted firearms.[12]  ATF found that firearms dealers were associated with the largest number of trafficked guns – over 40,000 – and concluded that the fact that dealers have "access to large numbers of firearms makes them a particular threat to public safety when they fail to comply with the law."[13]

Moreover, a 2004 report of the U.S. Department of Justice Office of the Inspector General found that ATF's compliance inspections of firearms dealers are "infrequent and of inconsistent quality, and follow-up inspections and adverse actions have been sporadic," even where numerous or serious violations were found.[14]  Another study found that in 2000-2002, ATF prosecuted only 88 corrupt gun dealers nationwide.[15]

The District already regulates firearms dealers to some extent.  Existing District laws could be significantly strengthened, however, by requiring dealers to:

- Conduct employee background checks (currently, there is no way for a dealer to know whether his/her employees are prohibited from possessing firearms);
- Immediately report the loss/theft of all firearms or ammunition;
- Conduct an annual inventory of all firearms and ammunition and provide a sworn affidavit with the inventory list to the Police Department;
- Videotape all firearm sales transactions;
- Install burglar alarms on their premises;
- Post a conspicuous notice advising customers of the District's safe storage laws, and that background checks are required for all gun transfers; and
- Sell a trigger lock or other locking device with each firearm (ideally the law would require that the locking device be on the roster of devices approved by California, Maryland or Massachusetts, since the quality of locking devices varies greatly).

Laws regulating firearms dealers are consistent with the Second Amendment.  In fact, the *Heller* decision explicitly sanctioned laws imposing conditions on the commercial sale of firearms.[16]

---

[12] Bureau of Alcohol, Tobacco and Firearms, U.S. Department of the Treasury, *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers* ix (June 2000).
[13] *Id.* at x.
[14] Office of the Inspector General, Evaluation and Inspections Division, U.S. Department of Justice, *Inspection of Firearms Dealers by the Bureau of Alcohol, Tobacco, Firearms and Explosives* i (July 2004).
[15] Americans for Gun Safety Foundation, *The Enforcement Gap: Federal Gun Laws Ignored 4* (May 2003).
[16] *District of Columbia v. Heller*, 128 S. Ct. 2783, 2817 (2008).

Many state and local laws throughout the United States regulate firearms dealers.[17]

Safe Storage Laws

Researchers have found that millions of children live in homes with easily accessible guns. A 2000 study of firearm storage patterns in U.S. homes found that "[o]f the homes with children and firearms, 55% were reported to have 1 or more firearms in an unlocked place," and 43% reported keeping guns without a trigger lock in an unlocked place.[18] A 2005 study on adult firearm storage practices in U.S. homes found that over 1.69 million children and youth under age 18 are living in homes with loaded and unlocked firearms.[19]

The presence of unlocked guns in the home increases the risk of both accidental gun injuries and intentional shootings. One study found that more than 75% of the guns used in youth suicide attempts and unintentional injuries were stored in the residence of the victim, a relative, or a friend.[20] At least two studies have found that the risk of suicide increases in homes where guns are kept loaded and/or unlocked.[21]

In October of 2000, the U.S. Secret Service published a study of 37 school shootings in 26 states. That study found that in more than 65% of the cases, the attacker got the gun from his or her own home or that of a relative.[22]

Daniel Webster, another expert on this panel, has also provided the Committee with citations to several studies demonstrating that safe storage laws, also known as Child Access Prevention (CAP) laws, help prevent unintentional injuries to children.[23]

The Second Emergency Legislation enacted by the District requires individuals to store loaded guns safely if they know or should know that a child 15 years of age or younger might gain access to those weapons.

---

[17] See Legal Community Against Violence, *supra* note 1, at 149-159.

[18] Mark A. Schuster et al., *Firearm Storage Patterns in U.S. Homes with Children*, 90 Am. J. Pub. Health 588, 590 (Apr. 2000).

[19] Catherine A. Okoro et al., *Prevalence of Household Firearms and Firearm-Storage Practices in the 50 States and the District of Columbia: Findings from the Behavioral Risk Factor Surveillance System, 2002*, 116 Pediatrics e370, e371-e372 (Sept. 2005), *at*
http://pediatrics.aappublications.org/cgi/content/full/116/3/e370.

[20] David C. Grossman, Donald T. Reay & Stephanie A. Baker, *Self-Inflicted and Unintentional Firearm Injuries Among Children and Adolescents: The Source of the Firearm*, 153 Arch. Pediatr. Adolesc. Med. 875, 875 (Aug. 1999).

[21] Matthew Miller & David Hemenway, *The Relationship Between Firearms and Suicide: A Review of the Literature*, 4 Aggression & Violent Behavior 59, 62-65 (1999) (summarizing the findings of multiple studies).

[22] United States Secret Service, U.S. Department of the Treasury, *An Interim Report on the Prevention of Targeted Violence in Schools* 6 (Oct. 2000).

[23] See, e.g., Peter Cummings et al., *State Gun Safe Storage Laws and Child Mortality Due to Firearms*, 278 JAMA 1084, 1084 (Oct. 1997) (finding that in twelve states where CAP laws had been in effect for at least one year, unintentional firearm deaths fell by 23% from 1990-94 among children under 15 years of age).

The District could significantly strengthen its CAP law by making two changes. First, we recommend that the law apply to all firearms – loaded or unloaded – because even an unloaded gun in the hands of a child is extremely dangerous. Second, the law should apply to children who are under the age of 18 (rather than those 15 years of age and under), because older teenagers are in a particularly high risk age group for gun violence.[24]

Laws requiring that firearms be stored safely do not violate the Second Amendment. In fact, in *Heller,* the Supreme Court stated that its decision should not be read to suggest "the invalidity of laws regulating the storage of firearms to prevent accidents."[25] The District's safe storage law is consistent with *Heller* because it allows gun owners, as one of the storage options, to carry their guns on their person or within such close proximity that they can readily retrieve and use them as if the guns were carried on their person. Thus, the law allows for guns to be used in self-defense.

More than two dozen states have enacted laws to help keep guns out of the hands of children.[26]

Waiting Periods

Laws imposing waiting periods require that a certain number of days elapse between the time a firearm is purchased and is physically transferred to the purchaser. The purpose of a waiting period is to: 1) give law enforcement officials sufficient time to perform a background check; and 2) provide a "cooling off" period to help guard against impulsive acts of violence.

Washington, D.C. currently has a 48-hour waiting period.[27] We recommend that this waiting period be extended (e.g., for a period of at least 5 days). Reasonable waiting periods do not violate the Second Amendment.

Twelve states have enacted waiting periods that apply to the purchase of some or all firearms. Those waiting periods range in length from 24 hours (for the sale of long guns in Illinois) to 14 days (for the sale of all firearms in Hawaii).[28]

---

[24] In 2005, 2,623 teens ages 15 through 19 were killed with firearms. U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, Web-Based Injury Statistics Query & Reporting System (WISQARS), *WISQARS Injury Mortality Reports, 1999-2005* (2008), at http://webappa.cdc.gov/sasweb/ncipc/mortrate10_sy.html.
[25] *District of Columbia v. Heller, supra* note 16, at 2820.
[26] See Legal Community Against Violence, *supra* note 1, at 234-240.
[27] D.C. Code Ann. § 22-4508.
[28] See Legal Community Against Violence, *supra* note 1, at 134-138.

Conclusion

LCAV applauds Washington, D.C. for its long history of leadership in the important and challenging area of gun violence prevention. We believe the District has a great opportunity here – to look at its laws with a fresh eye, and to enact strong, legally defensible laws to protect those who live and work in and visit our nation's Capitol.

LCAV knows that policymakers across the country will be looking to the laws the District enacts as models for their own legislation. We pledge to assist the District in any way we can as it moves forward during this process.

Thank you very much for allowing me to address you today.



# Brady Center

## To Prevent Gun Violence

**Testimony of Brian J. Siebel**
**Senior Attorney**
**Brady Center to Prevent Gun Violence**
**Before the Council of the District of Columbia**
**October 1, 2008**

Thank you, Chairman Mendelson and other members of the Council, for inviting the Brady Center to Prevent Gun Violence to speak at this important committee hearing.

The Brady Center to Prevent Gun Violence and the Brady Campaign to Prevent Gun Violence are the nation's largest organizations working for sensible gun policies. The Legal Action Project of the Brady Center represents victims of gun violence and defends gun laws in the courts.

In addition to the other measures being suggested here today, which we support, the Brady Center and Brady Campaign strongly urge the Council to pass an assault weapons ban, a ban on .50 caliber sniper rifles, and retain its recently-passed ban on high-capacity ammunition magazines, as part of its process of strengthening the District's gun laws in light of the *Heller* decision.

### The Need for An Assault Weapons Ban

Assault weapons had been banned for more than 30 years under the broader D.C. ban on all semiautomatic weapons. However, now that that ban has been repealed, an assault weapon ban is needed to protect the people of the District, visitors, and law enforcement from these particularly dangerous weapons. An assault weapons ban would continue to allow law-abiding citizens to have common pistols in their homes for self-defense, and would remain in compliance with the *Heller* decision. We believe it is imperative for the Council, now that it has legalized common semiautomatic pistols, to restore a ban on military-style assault weapons.

### Assault Weapons Are "Mass Produced Mayhem"

Assault weapons are semiautomatic versions of fully automatic guns designed for military use. Even semiautomatic assault weapons unleash extraordinary firepower. When San Jose, California, police test-fired an UZI, a 30-round magazine was emptied in slightly less than two seconds on full automatic, while the same magazine was emptied in just five seconds on semiautomatic.

The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") has described assault weapons in stark terms.

Assault weapons were designed for rapid fire, close quarter shooting at human beings. That is why they were put together the way they were. You will not find these guns in a duck blind or at the Olympics. **They are mass produced mayhem.**[1]

Assault weapons have distinct features that separate them from sporting firearms.[2] While hunting rifles are designed to be fired from the shoulder and depend upon the accuracy of a precisely aimed projectile, the military features of semiautomatic assault weapons are designed to enhance their capacity to shoot multiple human targets very rapidly. Assault weapons are generally equipped with large-capacity ammunition magazines that allow the shooter to fire 20, 50, or even more than 100 rounds without having to reload. Pistol grips on assault rifles and shotguns help stabilize the weapon during rapid fire and allow the shooter to spray-fire from the hip position. Barrel shrouds on assault pistols protect the shooter's hands from the heat generated by firing many rounds in rapid succession. Far from being simply "cosmetic," these features all contribute to the unique function of any assault weapon to deliver extraordinary firepower. They are uniquely military features, with no sporting purpose whatsoever.

Accordingly, ATF has concluded that assault weapons "are not generally recognized as particularly suitable for or readily adaptable to sporting purposes" and instead "are attractive to certain criminals."[3] ATF's analysis of guns traced to crime showed that assault weapons "are preferred by criminals over law abiding citizens eight to one.... Access to them shifts the balance of power to the lawless."[4]

It is no accident that when a madman, Gian Luigi Ferri, decided to assault the law offices at 101 California Street in San Francisco, he armed himself with two TEC-9 assault weapons with 50 round magazines, which enabled him to kill eight people and wound six others.[5] Or that the Columbine high school shooters who killed 12 students and a teacher included a TEC-9 assault weapon in their arsenal. Or that James Huberty used an UZI assault pistol and a shotgun to kill 21 people and wound 19 others at a McDonald's in San Ysidro, California.[6] Or that Patrick Purdy used an AK-47 assault rifle to kill five children and wound 29 others and a teacher at an elementary School in Stockton, California. Equipped with a 75-round "drum" magazine, Purdy was able to shoot 106 rounds in less than two minutes.[7] The list goes on.

---

[1] ATF, *Assault Weapons Profile* 19 (1994) (emphasis added).

[2] *Id.* at 20.

[3] DEP'T OF TREASURY, *Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles* 38 (1998).

[4] ATF, *Assault Weapons Profile, supra* note 1, at 19-20.

[5] *Ferri Used Guns That California Ban Does Not Forbid*, SAN FRANCISCO EXAMINER, July 4, 1993.

[6] *Satellite College Campus Helps to Heal the Scars at San Ysidro Massacre*, LOS ANGELES TIMES, Mar. 30, 1989; *A 77-Minute Moment in History That Will Never Be Forgotten*, LOS ANGELES TIMES, July 16, 1989.

[7] *The Kinds of Guns School Killer Used*, SAN FRANCISCO CHRONICLE, Jan. 19, 1989; Michael Taylor & Leslie Guevarra, *Mysterious Scrawlings and Slogans, School Killer's Last Days, Toy Army in his Room*, SAN FRANCISCO CHRONICLE, Jan. 19, 1989.

**Assault Weapons Threaten Law Enforcement**

Law enforcement officers are at particular risk from these weapons because of their high firepower, which often leaves them outgunned by criminals. A researcher for the Department of Justice found that

> assault weapons account for a larger share of guns used in mass murders and murders of police, crimes for which weapons with greater firepower would seem particularly useful.[8]

Assault weapons have even been used in a brazen attack at D.C. Police Headquarters. On November 22, 1994, a man armed with a MAC-11 assault pistol walked into Metropolitan Police headquarters and shot and killed Sergeant Henry Daly and FBI Agents Mike Miller and Martha Martinez. The shooter seriously wounded FBI Agent John Kuchta and shot at couches, walls, computers, and desks before shooting and killing himself with Agent Martinez's gun.[9]

In addition, numerous law enforcement officers have been killed with high-firepower assault weapons. Here are a few recent examples:

- **Philadelphia, PA. May 3, 2008.** Officer Stephen Liczbinski was shot and killed by an assault rifle as he was responding to a robbery at a Bank of America branch. Three men robbed the bank and were fleeing when Officer Liczbinski stopped their car and exited his patrol car. At that time, one of the bank robbers opened fire with an SKS assault rifle, striking Liczbinski numerous times. One suspect was eventually shot and killed by police and the other two suspects were arrested and charged with murder.[10]

- **Miami, Florida. September 13, 2007.** Police spotted a vehicle driving erratically and followed it until it stopped in a residential complex. The suspect got out and hopped a fence to the rear of the home; the officers exited their patrol car and went to the front of the home and were granted permission to search by a female resident. The suspect grabbed a high-powered, military-grade rifle and fired at the police officers through a window, killing Officer Jose Somohano. The suspect then exited the house and shot three other officers as he escaped. The shooter was caught later that day but would not relinquish his assault rifle so he was shot and killed by police officers.[11]

---

[8] Christopher S. Koper, *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, U. Penn. Jerry Lee Center of Criminology 87 (June 2004).

[9] Brian Reilly, *Cop killers' guns similar; handgun converted to fiercer weapon*, THE WASHINGTON TIMES, May 1, 1995.

[10] Joseph A. Gambardello, *Liczbinski suspect's girlfriend to stand trial*, PHILADELPHIA INQUIRER, July 17, 2008; *Officer shot, killed after bank robbery*, NBC 10.COM, May 3, 2008; Sergeant Stephen Liczbinski, www.odmp.org, *available at*: http://www.odmp.org/officer/19359-sergeant-stephen-liczbinski (last visited Sept. 30, 2008).

[11] David Ovalle et. al., *The murder and the manhunt started in a South Miami-Dade townhouse, zigzagged...*, MIAMI HERALD, Sept. 15, 2007.

- **Chantilly, Virginia. May 8, 2006.** A teenager with an AK-47 and 5 handguns engaged in a firefight at a police station in suburban Virginia, killing Detective Vicky Armel immediately and wounding two other officers, one of whom, Officer Michael Garbarino, died nine days later from his injuries.[12]

The threat posed to law enforcement is one reason why major law enforcement organizations are united in supporting bans on assault weapons.

## Assault Weapons Threaten Civilians

Assault weapons have also been used to massacre and terrorize civilians. Who can forget the nightmare we lived through in the District of Columbia and surrounding communities during the attacks committed by the D.C. snipers. Their weapon of choice? A Bushmaster XM-15 assault rifle.

There have been hundreds of other shootings committed with semiautomatic assault weapons. Here, we list just a few recent examples:

- **Arvada & Colorado Springs, Colorado. December 9, 2007.** One man with an assault rifle attacked a missionary training center in Arvada and a church in Colorado Springs. He killed two people and injured two others in Arvada, and killed two and injured three others, including two teenage sisters, in Colorado Springs. He died after being shot by a security guard and then shooting himself.[13]

- **Omaha, Nebraska. December 5, 2007.** Nine people were shot to death and five others were injured after a 20-year-old shooter, armed with a military-style assault rifle, attacked shoppers in a department store in a Nebraska mall.[14]

- **Indianapolis, Indiana. June 2, 2006.** Seven family members, four adults and three children, were shot and killed in their home by a robber armed with an assault rifle. Nearly 30 shell casings were found.[15]

- **Tyler, Texas. February 25, 2005.** A gunman with a history of domestic violence and a felony conviction, who was reportedly fighting with his ex-wife over child support for their two youngest children, shot over 50 rounds from an SKS assault rifle on the steps of his local courthouse when his ex-wife exited the building. His ex-wife was killed along with a bystander who tried to shoot the gunman. The shooter's 23-year-old son and three law enforcement officers were wounded during the shooting, including a 28-year-old deputy who

---

[12] Ian Urbina, *Fatal police station attach shocks tranquil community,* NEW YORK TIMES, May 10, 2006; *Officer Killed,* BOSTON GLOBE, May 18, 2006.

[13] Erin Emery, *Report details church shooting, the document chronicles the days leading up to the Dec. 9 deaths of four young people,* DENVER POST, Mar. 13, 2008.

[14] *The American Way,* REGISTER-GUARD, Dec. 17, 2007.

[15] Ashley M. Heher, *Suspect in slaying of 7 family members surrenders / Indianapolis police say he had nowhere else to go,* HOUSTON CHRONICLE, June 4, 2006.

was in grave condition. The gunman fled the scene but was pursued and shot by police when he exited his car and shot toward officers. [16]

- **Akron, Ohio. February 24, 2005.** A man shot and killed his girlfriend and her seven-year old son using an AR-15 assault weapon, then fired more than one hundred rounds at a dozen law enforcement officers as he fled the murder scene. The gunman was arrested the next morning inside the apartment of a Kent State University student, who he also murdered with the AR-15 assault weapon. Police subsequently seized 21 weapons kept by the suspect, including an Uzi and an AK-47.[17]

### Assault Weapons Threaten Homeland Security

These weapons pose particular and severe risks for homeland security here in the Nation's Capital. The extraordinary firepower of these weapons could wreak havoc at any number of high-profile sites or events that occur in Washington, or victimize any number of high-profile targets, from government officials to foreign dignitaries.

And make no mistake: these weapons have great appeal for terrorists. The oft-seen file footage of Osama Bin Laden, aiming his AK-47 at an unknown target, is now a familiar reminder of the incontrovertible connection between terrorism and assault weapons.

The *Chicago Tribune* has reported that, found among the mounds of rubble at a training facility in Kabul for a radical Pakistan-based Islamic terrorist organization, was a manual entitled "How Can I Train Myself for Jihad" containing an entire section on "Firearms Training."[18] Tellingly, the manual singles out the United States for its easy availability of firearms and stipulates that al-Qaeda members living in the United States "obtain an assault weapon legally, preferably AK-47 or variations."

Terrorists have used assault weapons in numerous attacks. I am going to mention just one that is close to home.

- **Langley, Virginia, January 25, 1993.** Pakistani national Mir Aimal Kasi killed two CIA employees and wounded three others outside the entrance to CIA headquarters in Langley, Virginia. Kasi used a Chinese-made semiautomatic AK-47 assault rifle equipped with a 30-round magazine purchased from a Northern Virginia gun store.[19] After fleeing the country, he was arrested in Pakistan in 1997.[20]

---

[16] Bill Hanna & Jack Douglas Jr., *Rampage in Tyler leaves three dead, four wounded*, FORT WORTH STAR-TELEGRAM, Feb. 25, 2005; Jack Douglas Jr. & Bill Hanna, *Police order emergency trace on weapon used in shootings*, FORT WORTH STAR-TELEGRAM, FEB. 26, 2005.

[17] Ed Meyer, *Police eye semiautomatic rifles, Brimfield officials want to be prepared after recent shooting rampage that killed 3 people*, AKRON BEACON JOURNAL, Feb. 24, 2005.

[18] Paul Salopek, *A Chilling Look into Terror's Lair*, CHICAGO TRIBUNE, Nov. 18, 2001.

[19] *CIA Killings Prompt Scrutiny on 2 Fronts; Fairfax Loophole Expedited Gun Purchase*, WASHINGTON POST, Feb. 11, 1993.

[20] Robert O'Harrow, Jr., *Kansi's Shadowy Stay in U.S. Leaves a Hazy Portrait*, WASHINGTON POST, Mar. 3, 1993.

### .50 Caliber Sniper Rifles Pose Serious Dangers

Fifty caliber sniper rifles also pose an extraordinary risk in the District. In 1987, Barrett Firearms Manufacturing Inc., patented its self-described "armor-penetrating" .50 caliber BMG sniper rifle.[21] Capable of destroying armored personnel carriers, aircraft and bulk fuel and ammunition sites, the .50 caliber sniper rifle is now proliferating in the civilian market.[22] Accurate at up to 2,000 yards, it can inflict effective damage to targets over four miles away.[23] With more power on impact then any other semi-automatic rifle legally available on the civilian market,[24] the .50 caliber represents a serious threat to local law enforcement and national security. A 2004 report on airport security at Los Angeles International Airport warned that terrorists could use .50-caliber sniper rifles to target parked and taxiing airplanes "firing over 50 shots in five minutes."[25] The Council should take action to prohibit the possession of these weapons in civilian hands.

### High-Capacity Magazines Increase Firepower

The threat posed by military-style assault weapons is increased significantly if they can be equipped with high-capacity ammunition magazines, defined as those accepting more than ten rounds. The 1994-2004 federal ban on assault weapons also banned these magazines. By permitting a shooter to fire more than ten rounds without reloading, they greatly increase the firepower of mass shooters. For example, the shooter at Virginia Tech equipped himself with numerous high-capacity magazines of up to 30 rounds, which enabled him to get off nearly 200 rounds in his attack. In self-defense situations, too much firepower is a hazard, because the tendency is for defenders to keep firing until all bullets have been expended, which poses grave risks to others in the household, passersby, and bystanders.

### Assault Weapons Bans Already In Place

Six states currently ban assault weapons. Those include California, which passed the nation's first statewide ban in May 1989, as well as New Jersey (1990), Hawaii (1991), Connecticut (1993), Maryland (1994), Massachusetts (1998), and New York (2000). California expanded its ban in 2000 to include all semiautomatic rifles or pistols that have the ability to accept a detachable magazine and contain any one of a series of military-style features. We strongly support that legislation as a model for the District of Columbia.

---

[21] Carolyn Marshall, *California Bans Large Caliber Guns, and the Battle is on*, NEW YORK TIMES, Jan. 4, 2005.

[22] *See*, Government Accounting Office for U.S. House of Representatives, Committee on Government Reform, *Long Range 50 Caliber Sniper Weapons* 4 (May 3, 1999).

[23] *Id.*

[24] *Id.* at 3.

[25] Donald Stevens, *Near Term Options for Improving Security at Los Angeles International Airport*, RAND (2004).

In addition, from 1994-2004, there was a federal ban on assault weapons. Plus, as mentioned above, ATF currently bans assault weapons from being imported into this country because they are not weapons suitable for sporting purposes.

## Banning Assault Weapons and Sniper Rifles Is Consistent with *Heller*

A ban on assault weapons and .50 caliber sniper rifles would be constitutional and consistent with the Supreme Court's decision in *District of Columbia v. Heller*. In *D.C. v. Heller*, the Supreme Court narrowly defined the Second Amendment as protecting the right of law-abiding citizens to keep and use guns in the home for self-defense. At the same time, the Court indicated that the right to keep and bear arms is limited in a number of ways. The Court made clear that the Second Amendment does not entitle citizens to any and all guns. Certainly, military-style assault weapons and .50 caliber sniper rifles are not a part of this right. The Court held that not all "arms" are protected.

> We also recognize another important limitation on the right to keep and carry arms. [*U.S. v.*] *Miller* said, as we have explained, that the sorts of weapons protected were those **"in common use at the time."** We think that limitation is fairly supported by the historical tradition of prohibiting carrying of **"dangerous and unusual weapons."**[26]

Assault weapons and .50 caliber sniper rifles are certainly "dangerous and unusual weapons" according to any reasonable analysis of that phrase. They are military-style offensive weapons designed to slaughter human beings. This differentiates them from all hunting rifles and shotguns, as well as common handguns, which are often used in crime but have also been used in self-defense.

Moreover, assault weapons and .50 caliber sniper rifles are not "in common use." As semiautomatic versions of machine guns developed for use during the World Wars of the 20th Century, assault weapons are a relatively recent invention. Plus, ATF has twice concluded, after thorough analyses in 1989 and 1998, that assault weapons have no sporting purpose. And the Barrett .50 caliber sniper rifles was patented a mere twenty-one years ago, and was made for military, not civilian use.

Finally, assault weapon bans have been challenged in court, but have never been struck down as unconstitutional under the Second Amendment or under right to bear arms provisions in state constitutions.[27]

## Conclusion

Outside of the military or law enforcement, assault weapons and .50 caliber sniper rifles have no place in civilized society. We would urge the D.C. Council to adopt a ban on these weapons. Thank you.

---

[26] *District of Columbia v. Heller*, 128 S.Ct. 2783 (2008).

[27] *See, e.g., Benjamin v. Bailey*, 662 A.2d 1226 (Conn. 1995); *Robertson v. Denver*, 874 P.2d 325 (Colo. 1994); *Arnold v. City of Cleveland*, 616 N.E.2d (Ohio 1993).

**Daniel W. Webster, Co-Director, Johns Hopkins Center for Gun Policy and Research**
**Testimony on firearm sales regulations before the District of Columbia's Council Committee on**
**Public Safety and the Judiciary, October 1, 2008**

Chairman Mendelson and council members, thank you for inviting me to testify today. I am here to urge the Council to develop a comprehensive set of policies and procedures for regulating guns that are grounded in the best available science relevant to protecting public safety. I am an associate professor and co-director of the Center for Gun Policy and Research at the Johns Hopkins Bloomberg School of Public Health. I have studied gun violence and its prevention for 20 years and have worked with several cities on their efforts to curb gun violence.

The primary goal of the District's gun laws should be to maximize public safety without preventing truly law-abiding, mentally-stable adults to possess firearms. The most effective gun policies will 1) proscribe the most dangerous people from possessing firearms; and 2) establish accountability measures to discourage illegal transfer to and acquisition by those proscribed individuals. Unfortunately, federal law and most state laws allow criminals convicted of misdemeanor crimes involving violence, weapons, drugs, and alcohol abuse to legally acquire as many firearms as they please. Current law in the District of Columbia wisely prohibits criminals convicted of crimes involving violence and/or guns or anyone convicted of an offense involving illegal drugs within the past five years to possess firearms regardless of whether the convictions were for felonies or misdemeanors. Prior research has shown that young men with misdemeanor convictions who were legally able to purchase handguns went on to commit crimes involving violence at a rate that was 2- to 10-times higher (depending on the prior offense) than that of men who were truly law-abiding when they purchased a handgun.[1] Prohibitions of firearm ownership by violent misdemeanants is associated with lower rates of violence by this high-risk group[2] and has broad public support, even among gun owners.[3]

While the standards for firearm registrants in the District of Columbia are appropriate, they could be improved by denying registration to individuals who have 2 or more violations for driving while intoxicated. In addition to having demonstrated a history of reckless behavior that threatens public safety, repeat DUI/DWI offenders have very high rates of substance abuse and other psychiatric disorders.[4, 5, 6] Such offenders have less self-control[7] and have higher rates of repeated arrests[8] - not a group that should be trusted with firearms.

Another group of individuals who should be prohibited from possessing firearms (but aren't currently prohibited) because they are a clear threat to others, including innocent children, are domestic violence offenders. I co-authored a large study to determine what factors most contributed to lethal outcomes from domestic violence. Abuser's ownership of a firearm increased the risk of homicide five-fold, more than any other risk factor we identified.[9] Federal law and many state laws prohibit firearm possession by persons restrained by protective orders issued by courts to protect victims of domestic violence. Research has demonstrated that these policies save lives.[10] Because these orders rarely last more than 12 months despite a more enduring threat, I recommend that the offender should be proscribed from possessing firearms in the District for a five-year period as is the case now for drug offenders.

In addition to setting high standards for legal firearm ownership, the District should have a set of regulations and enforcement procedures to reduce the likelihood that dangerous people can obtain firearms. My own research demonstrates that the rate at which new guns are diverted to criminals can be significantly reduced by regulation, oversight, and scrutiny that retail gun shops receive.[11, 12, 13, 14, 15] The District should set the highest of standards for obtaining and retaining a license to sell firearms. In addition to standard record-keeping requirements to ensure accountability, I urge the Council to make most of the firearms sales policies that Wal-Mart (the world's largest retail seller of firearms) is implementing mandatory for all firearm dealers. These include point-of-sale security cameras, criminal

background checks of employees, requirements that dealers safely lock up their guns, employee training to identify fake IDs and illegal straw purchases, and regular audits of inventory. Twenty gun stores agreed to adopt these measures after they were caught making gun sales of questionable legality as part of their legal settlement with New York City. I analyzed sales and crime gun recovery data for the dealers who had been keeping individualized gun sales records and documented a dramatic decrease in the risk that a gun sold by the dealers would subsequently be recovered from criminals.[15]

In Maryland and Virginia and throughout the U.S., there have been cases in which gun dealers were allowed to retain their licenses for many years despite racking up hundreds of firearm sales violations, failing to account for hundreds of guns, and being a well-known conduit for guns into the criminal market. The District should avoid such travesties by requiring gun dealers to conduct and submit a list of guns in their inventory when they renew their licenses annually, and to report any loss or theft of firearms immediately upon discovering missing firearms. In addition, the District should allow the Metropolitan Police Department to suspend, revoke, or deny renewal of a license to sell firearms to gun dealers who do not comply with regulations.

Private gun owners must be held accountable for selling to individuals who do not have a valid license to own a firearm and who have not passed a background check. Gun owners should also be required to keep their guns locked up when they are not being used to prevent access to children, teens, or thieves. In addition to reducing accidental shootings,[16, 17, 18] my research has shown that safe gun storage laws significantly reduce adolescent suicides.[19] Some of this research has indicated that so-called Child Access Prevention laws are most effective when penalties are strong.[17, 18] Thus, I believe there is good justification to allow for felony prosecution when a gun owners' failure to comply with the CAP law results in injury to others, to penalize unsafe gun storage that enables a minor to access the firearm, and to require gun dealers to post signs reminding gun purchasers of their duty to keep guns safely stored to prevent child access.

The final recommendation, supported by research I have led, is that the District of Columbia should ban the sale and possession of "junk guns" – a category of handguns characterized by their very small size and concealability and poor construction. Five states, including Maryland, have banned junk guns (though through somewhat different approaches or criteria) because they are prone to misfire, fire when dropped, and are disproportionately involved in crime. My colleagues and I studied the effect of a large gun dealer near Milwaukee who, after receiving bad publicity for the large number of his guns that were being linked to violent crimes, voluntarily decided to stop selling junk guns. We found that this change in sales policy led to 77% reduction in the number of new guns sold by the dealer that were soon recovered from criminals.[12] My research on Maryland's ban of these guns demonstrated that the law was associated with 40 fewer homicides per year during the first 9 years the law was in place.[20]

# References

[1] Wintemute GJ, Drake CM, Beaumont JJ, Wright MA. Prior misdemeanor convictions as a risk factor for later violent and firearm-related criminal activity among authorized purchasers of handguns. JAMA. 1998;280:2083-7.

[2] Wintemute GJ, Wright MA, Drake CM, Beaumont JJ. Subsequent criminal activity among violent misdemeanants who seek to purchase handguns: risk factors and effectiveness of denying handgun purchase. *Journal of the American Medical Association* 2001;285:1019-1026.

[3] Teret SP, Webster DW, Vernick JS, et al. Support for new policies to regulate firearms. Results of two national surveys. N Engl J Med. 1998;339:813-8.

[4] Shaffer HJ, Nelson SE, LaPlante DA, LaBrie RA, Albanese M, Caro G. The epidemiology of psychiatric disorders among repeat DUI offenders accepting a treatment-sentencing option. *Journal of Consulting and Clinical Psychology* 2007;75:795-804.

[5] Lapham SC, Baca JC, McMillan GP, Lapidus J. Psychiatric disorders in a sample of repeat impaired-driving offenders. *Journal of Studies on Alcohol.* 2006;67: 707-713.

[6] Lapham SC, Smith E, Baca JC, Chang IY, Skipper BJ, Baum G, Hunt WC. Prevalence of psychiatric disorders among persons convicted of driving while impaired. Archives of General Psychiatry 2001;58:943-949.

[7] Keane C, Maxim PS, Teevan JJ. Drinking and driving, self-control, and gender – testing a general-theory of crime. Journal of Research in Crime and Delinquency. 30(1):30-46; 1993.

[8] Lucker GW, Kruzich DJ, Holt MT, Gold JD. The prevalence of antisocial behavior among U.S. Army DWI offenders. Journal of Studies on Alcohol. 52(4):318-20; 1991.

[9] Campbell JC, Webster DW, Koziol-McLain J, et al. Risk factors for femicide within physically abusive intimate relationships: Results from a multi-site case control study. *American Journal of Public Health* 2003; 93:1089-1097.

[10] Vigdor ER, Mercy JA. Do laws restricting access to firearms by domestic violence offenders prevent intimate partner homicide? *Evaluation Review* 2006;30:313-346.

[11] Webster DW, Bulzacchelli MT, Zeoli AM, Vernick JS. Effects of undercover police stings of gun dealers on the supply of new guns to criminals. *Injury Prevention.*2006; 12:225-230.

[12] Webster DW, Vernick JS, Bulzacchelli MT. Effects of a gun dealer's change in sales practices on the supply of guns to criminals. *Journal of Urban Health* 2006; 83:778-787.

[13] Webster DW, Vernick JS, Bulzacchelli MT. The association between state regulation of gun dealers, law enforcement practices, and the supply of guns to criminals. Presented at the Annual Meeting of the American Society of Criminology, Atlanta, November 2007.

[14] Webster DW. Supplemental expert report submitted for City of New York V. A-1 Jewelry & Pawn, Inc. *et al.*, 06 CV 2233, City of New York V. Bob Moates' Sport Shop, INC., *et al.*, 06 CV 6504, May 27, 2008.

[15] Vernick JS, Webster DW, Bulzacchelli MT. Regulating firearms dealers in the United States: an analysis of state law and opportunities for improvement. *Journal of Law, Medicine, and Ethics* 2006;34:765.

[16] Hepburn L, Azrael D, Miller M, Hemenway D. The effect of child access prevention laws on unintentional child firearm fatalities, 1979-2000. *Journal of Trauma* 2006;61:423-428.

[17] Webster DW, Starnes M. Reexamining the association between child access prevention gun laws and unintentional firearm deaths among children, *Pediatrics*, 2000;106:1466-1469.

[18] Cummings P, Grossman DC, Rivara FP, Koepsell TD. State gun safe storage laws and child mortality due to firearms. *Journal of the American Medical Association* 1997;278:1084-6.

[19] Webster DW, Vernick JS, Zeoli AM, Manganello JA. Effects of youth-focused firearm laws on youth suicides. *JAMA* 2004; 292:594-601.

[20] Webster DW, Vernick JS, Hepburn LM. Effects of Maryland's law banning Saturday night special handguns on homicides. *American Journal of Epidemiology* 2002;155:406-412.

**Office of the Attorney General for the District of Columbia**

**Before the**

**COMMITTEE ON PUBLIC SAFETY AND THE JUDICIARY**
**Phil Mendelson, Chairperson**

**Bill 17-0843, the "Firearms Control Amendment Act of 2008"**



**Peter J. Nickles**
**Acting Attorney General for the District of Columbia**

**Wednesday, October 1, 2008**
**10:00 a.m.**
**Room 500**
**John A. Wilson Building**
**1350 Pennsylvania Avenue, N.W.**

Good morning Chairman Mendelson, members of the Committee on Public

Safety and the Judiciary, members of the Council of the District of Columbia, and guests.

I am Peter J. Nickles, Acting Attorney General for the District of Columbia, and I am

pleased to appear before you this morning to discuss Bill 17-843, the "Firearms Control

Amendment Act of 2008."

On June 26, 2008, the U.S. Supreme Court issued its decision in *District of*

*Columbia v. Heller.* As you know, the Court held that two particular aspects of District

law violated the Second Amendment. The first was a broad ban on private possession of

handguns. The second was a provision on safe storage of firearms that was found to have

no self-defense exception, so that homeowners could never use a gun in self-defense.

Immediately upon receipt of the decision, the Mayor and the Council began a process to

address both issues and to consider what other legislative or regulatory actions should be

taken to achieve the necessary balancing of competing interests between gun owners and

the public's right to be protected from increased gun violence. As a first step, emergency

legislation was passed and emergency regulations were promulgated which both became

effective on July 16th — less than three weeks after the decision — to address the two

issues specifically covered by the *Heller* decision. Pursuant to that emergency action,

many residents, including Mr. Heller, began and completed a registration process that

resulted in those residents obtaining registrations for pistols for use in self-defense within

their homes.

In addition to the new pistol registration legislation, it was determined that the

District needed to revise its zoning regulations as they applied to retail gun dealers.

Emergency regulations to require retail gun dealers to complete a special exception

process and to satisfy reasonable siting and safety requirements were submitted to the Zoning Commission, which approved them and set the permanent regulation for a public hearing.

Those two actions were the first step in the District's response to the *Heller* decision. The second step occurred when the Mayor and the Council recognized that the initial emergency actions required additional provisions to address legitimate concerns raised by District residents on both sides of this issue. The concerns focused on whether the emergency measures were overly restrictive and whether the District's laws should be revised to address these concerns. In response, the Mayor and the Council agreed on revisions that were enacted in the Second Firearms Control Emergency Amendment Act of 2008 on September 16, 2008. Those revisions included: 1) providing authority for the registration of semi-automatic firearms which are not equipped with a high capacity ammunition feeding device; 2) outlawing ammunition feeding devices that can hold more than 10 shots of ammunition; and 3) revising the District's safe storage laws to move to a Child Access Prevention prohibition to provide criminal liability for gun owners who fail to keep their firearms secured when minors are present.

This hearing, and the one the Committee conducted on September 18, 2008, represents the third step in the District's ongoing process to revise its firearms laws. The Committee has heard a number of suggested changes or additions to our laws. I would like to suggest the following changes: 1) aligning the method of transporting registered firearms with federal standards and providing that only registered owners may legally transport firearms; 2) providing for the revocation of firearms registrations for all persons subject to a Civil Protection Order as that term is defined in District law; 3) clarifying

3

that public and private property owners in the District have the authority to prohibit the possession of firearms on their property; 4) extending the provisions of the Child Access Prevention (CAP) prohibition to other classes of individuals that a gun owner should reasonably know might have access to the owner's firearms, such as persons with mental health issues and convicted felons, and revising the age of minority regarding CAP provisions in the current emergency act to raise it from 16 to 18 years of age; and 5) strengthening penalties for possessing unlawful ammunition and illegally possessing firearms outside of a person's home.

**CONCLUSION**

I appreciate the opportunity to present my views at this point in the process. I pledge the full support of my Office to assist the Mayor and Council with any legal assistance and advice that is required as the District continues the process of revising its firearms statutes and regulations. I am happy to answer any questions you may have.

## Government of the District of Columbia



# Metropolitan Police Department

Testimony of
# Cathy L. Lanier
Chief of Police

# Bill 17-843
# *Firearms Control Amendment Act of 2008*

Committee on Public Safety & the Judiciary
Phil Mendelson, Chair
Council of the District of Columbia

October 1, 2008

John A. Wilson Building
1350 Pennsylvania Avenue, NW
Washington, DC 20004

Good morning, Chairman Mendelson, Council members, community members, and guests. My name is Cathy Lanier, and I am Chief of the Metropolitan Police Department. I am pleased to testify before you today about the important issue of firearms regulation in the District of Columbia.

The District has long wrestled with the epidemic of gun violence that plagues our neighborhoods. The Metropolitan Police Department and our partners in the criminal justice system are continually working to develop and implement better strategies to prevent gun violence, and arrest and prosecute violent criminal offenders. Among the initiatives are the Gun Recovery Unit and the GunStat program. In November 2007, I reinstituted the Gun Recovery Unit, staffed with officers with enhanced training on identifying and recovering illegal guns. In March of this year, Mayor Fenty launched the GunStat program, a collaborative information sharing process among local criminal justice agencies, including police, prosecutors, Superior Court, Court Services and Offender Supervision Agency (CSOSA) and DC Pretrial Services Agency. GunStat tracks gun cases from arrest to prosecution, allowing criminal justice partners to identify repeat offenders, follow trends, and create law enforcement strategies to prevent gun-related crimes. We are seeing positive results from these and other efforts; so far in 2008, violent gun crimes are down 12 percent.

However, we have found ourselves faced with a new challenge since the Supreme Court issued its decision in *District of Columbia vs. Heller.* Let there be no misunderstanding: there is no question of whether we will comply with the Court ruling. The Metropolitan Police Department has worked closely with Mayor Fenty, Acting Attorney General Nickles and others in the Administration to ensure that our laws and policies are in compliance with the Court decision. But we are still working to determine the appropriate level of regulation for legally owned firearms. For example, what steps might have the greatest benefits for public safety? Which ones will be the most cost-effective? We are still exploring these questions as we work to bring the firearms registration process into the 21st century.

As you know, there are no easy consensus answers on this hotly debated topic. The laws and regulations vary greatly from state to state, and in some cases, from city to city. The impact of firearms on communities also varies among jurisdictions, but some studies have found common outcomes that suggest a direct link between access to legal guns and increased violence. According to the Bureau of Alcohol, Tobacco, Firearms and Explosives – more commonly known as ATF – most guns used in crimes are obtained from legitimate channels – gun stores or gun shows. A 2007 study conducted by the Harvard Injury Control Research Center found a direct relationship between legal gun ownership and homicide rates. This first nationally representative study found that gun-related homicide rates among children, and among women and men of all ages, are higher in states where more households have guns. According to the researchers, the results suggest that "household firearms may be an important source of guns used to kill children, women and men, both on the street and in their homes."[1] These findings suggest that the issues we are grappling with today regarding regulating guns will have a direct impact on public safety.

The fact that  very few legal guns have been involved in crimes in the District, because there are so few legally owned firearms, should not change this conclusion. The majority of handguns

---

[1] Harvard School of Public Health (2007, January 14). *States With Higher Levels of Gun Ownership Have Higher Homicide Rates. Science Daily.* http://www.sciencedaily.com/releases/2007/01/070111181527.htm

registered in DC over the past decade are in the possession of former law enforcement officers and licensed security agencies, a group with a higher level of training and understanding of the need to safeguard firearms than the general public. Therefore it would be a serious mistake to assume that we do not need to be concerned about legally registered firearms based on this limited experience. We have made real progress in driving down the homicide rate in the District over the past several years; we want to do everything possible to continue that trend.

In addition to the violent crime that we see in our city everyday, we must also guard against potential terrorist acts. I will not spend too much time on this today, but as I testified in September before the House Committee on Oversight & Government Reform, terrorists will take great steps to ensure they stay within the law up to and until they attempt a terrorist attack. For instance, the 9/11 Commission found that many of the 9/11 hijackers acquired some form of legal U.S. identification.

Therefore, it does seem appropriate for DC to consider gun registration as a viable means to reduce potential gun violence. The District's registration process serves four key purposes: verifying the eligibility of the owner to legally possess the firearm; ensuring that owners have a common body of knowledge; providing a certificate that enables law enforcement to readily identify legal firearms and the rightful owners; and establishing a means of tracking legal firearms that may be lost, stolen, or used in a crime.

It is critical that the city be able to verify the eligibility of a person to possess a firearm. The criminal background check performed by MPD, which is based on fingerprints, is more effective than that performed by a gun dealer, which is merely based on a social security number. Indeed, a study published this summer found that states that perform local-level background checks for firearms have lower homicide and suicide rates than states that rely only on a federal background check. Local-level checks were associated with a 22-percent lower homicide rate and a 27 percent lower suicide rate in adults aged 21 years or older.[2]

Two goals of the registration process are very similar to standard driver's license processes. First, it is a means of ensuring that all registrants share the same basic level of knowledge. I think we all agree that gun registrants should know the relevant laws and regulations. In addition, two issues that merit further consideration are whether the city also needs to ensure that owners share a common understanding of safety measures, as well as a certain level of proficiency at using guns. I am not ready to suggest that the city require firearm proficiency to own one. Unlike a driver's license, firearm registration does not give the owner permission to use the gun on public space in the city.

However, I believe the city has an important role in providing education on firearms safety to a registrant. In addition to criminal gun violence, the city should also be very concerned about a potential increase in accidental injuries and their impact on public health and economic outcomes. For instance, a 2007 survey of families with children and household firearms found that less than 30 percent store their firearms safely in their residence.[3] Moreover, parents need to be concerned not

[2] Medical College of Wisconsin (2008, June 3). Firearm Suicide and Homicide Rates Associated with Level of Background Check. *ScienceDaily*. http://www.sciencedaily.com/releases/2008/06/080603155227.htm
[3] Wake Forest University Baptist Medical Center (2007, June 5). Few Families Report Safe Firearm Storage, According to Survey. *ScienceDaily*. http://www.sciencedaily.com/releases/2007/06/070604090250.htm

just with their own firearms, but with firearms in homes where their children visit. Although I think the child access provisions that are currently law are sound, they should be reinforced with education. I would recommend that some safety information be communicated specifically to gun registrants, in addition to broader public information campaigns. One option is to mirror the Maryland requirement that applicants watch a video before receiving their registration. This could potentially be done at firearms dealers, online, or at the MPD Firearms Registration Section.

Also similar to the driver's license process, MPD issues a certificate with a photograph of the owner to all firearms registrants. Registrants are required to have this certificate in their possession whenever they have the firearm in their possession. A registrant must also exhibit the license upon request of a law enforcement officer. I firmly believe that this certificate with photo identification is critical to public safety in the District. Without this, in many instances it will be far more difficult for officers to readily distinguish between a registered owner legally transporting a firearm, and someone carrying an illegal firearm.

Lastly, the registration process allows us to identify and track legal firearms that may be lost, stolen, or used in a crime. Given that legal guns are indeed used in crimes and associated with higher homicide rates, I think there is a clear reason for the District to continue to register firearms. However, there is some debate about whether the technology is capable of helping us to link legal guns to gun crimes. The debate focuses on the potential of two technologies to help make this link: one uses ballistics images and the other, microstamping.

The ATF uses ballistics images to help solve crimes by supporting a National Integrated Ballistic Information Network – or NIBIN, a national database of essentially digital pictures of bullets and cartridge casings. When new ballistics images of crime scene evidence is entered into NIBIN, trained firearms examiners look for "hits," a linkage of two different crime scene investigations through NIBIN where previously there had been no known connection. According to the ATF, there have been tens of thousands of "hits" through NIBIN, linking criminals to multiple crimes, enabling us to hold offenders accountable and to bring closure to victims and their families. MPD has recorded more than 800 hits over the past seven years.

To be clear, the NIBIN method compares ballistics across crime scenes, not to ballistics records for legally purchased firearms. Maryland and New York, however, use an Integrated Ballistic Identification System – or IBIS, to track ballistics images of legally registered firearms. It has been reported that they have had very few hits against registered firearms from crime scene evidence. I will explain in a moment some of the reasons why this might be. But it is important to note that MPD was able to get solid evidence in a high-profile case based on crime scene evidence run through Maryland's database on registered firearms. I am sure many of you remember the triple homicide that occurred in the Colonel Brooks' Tavern in 2003. MPD was able to link the offenders to the crime when the crime scene evidence hit against a firearm legally registered in Maryland. The gun had been purchased by the cousin of one of the perpetrators. Despite the fact that we did not have the gun that was used, the ballistics and other evidence was so strong that one suspect committed suicide and two pled guilty. The only suspect who went to trial was convicted.

While Maryland and New York may not have had many hits using the IBIS method, I believe that the District may have better results with such a system for a couple of reasons. The science of

firearms examination is based on the unique "toolmarks" that a firearm leaves on a fired bullet and casing. Extensive experience in the criminal justice field indicates that the toolmarks left by a firearm are so distinct as to be essentially unique. On a practical level, this means that although there is no mathematical certainty of a "match" generated by NIBIN or IBIS, the program narrows the search, and then trained professionals compare images. Maryland and New York may have limited success with IBIS because of practices that increase the error rates in the "hits." For instance, in Maryland, laboratory technicians who were not qualified firearms examiners captured the ballistics images, which overall probably decreased the quality of the images. In contrast, MPD would use trained firearms examiners. Another issue may be the authenticity of the cartridge casings entered into the database of registered firearms. Both Maryland and New York enter casings submitted by gun dealers, and Maryland has found at least one dealer that was not submitting authentic casings. Since MPD is firing all weapons to retrieve the ballistics, we would not have that problem. We are also able to increase the likelihood of matches by firing two types of bullets: both copper and nickel. Because the metallic composition of the bullet can have an impact on the image, having images from multiple types of bullets would make the District database more robust.

The District would also have a more robust representation of crime scene evidence than either Maryland or New York. The Maryland and New York State Police maintain their databases for the legally registered firearms, but local jurisdictions process most crime scenes. Many of them, including New York City, do not enter all crime scene ballistics against IBIS. In the District, MPD would be tracking both the registered guns and the crime scene evidence, thereby increasing the probability of a hit.

Thus I think there are several ways that MPD could improve the use of IBIS and achieve better results. Nevertheless, before we purchase an IBIS system for use with our firearms registration, I want to be sure that we will be able to use it efficiently. One potential drawback to the IBIS system is that our ability to use old ballistics evidence already in NIBIN may be limited. The Department would need to request permission from ATF to bring NIBIN data into IBIS. I am submitting this request to ATF at the same time that my staff is talking with New York and Maryland about other procedures they may be using.

Although there are several concerns about the value of using ballistics to link crime scene evidence with registered firearms, it does not seem that microstamping is ready to replace ballistics testing yet. Microstamping technology uses a laser to etch a pattern or code onto the head of a firing pin or another internal surface of a firearm. Like the traditional firearms tool marks, microstamps leave a mark on a cartridge case. It appears that several studies on microstamping have reached different conclusions. Most recently, a study by the Forensic Science Graduate Group at University of California—Davis indicated that the technology is feasible, but its performance and durability varied.[4] There were some questions about the validity of the study when the findings were first released. The fact that the findings were released at a politically sensitive time – during the debate in the California legislature on microstamping – may have contributed to a sharp reaction to it. But the study has now been subject to peer review and has been officially released with the support of the university president.

---

[4] University of California – Davis (2008, May 16). Firearms Microstamping Feasible but Variable, Study Finds. *ScienceDaily.* http://www.sciencedaily.com/releases/2008/05/080514092333.htm

After reading materials on this technology, I can only come to the same conclusion as UC—Davis as well as the well-regarded National Research Council: more research should be conducted before we adopt the technology. The Department will certainly continue to explore it. As you know, I am strongly committed to ensuring that MPD has the technology that supports our mission. I look forward to meeting with some of the proponents of the technology here today. In the meantime, until more questions about the technology are answered, I strongly recommend that MPD continue to collect ballistics samples for registered firearms for the time being. Rest assured, I certainly want to resolve this question expeditiously, but I do not want to make a hasty decision. It would be foolish to act too precipitously and lose the opportunity to capture the casings from the firearms being registered now.

In conclusion, I think that the registration process for firearms is vital and enhances public safety. It enables MPD to verify eligibility through a local background check, a process that has been found to reduce homicide rates. It also provides an opportunity to educate registrants about vital laws, responsibilities, and safety. The registration certificate helps MPD to identify illegal firearms, while the ballistics testing can help MPD to investigate and solve crimes.

Beyond the value of the initial registration, I think there would be real public safety benefits to requiring firearms to be re-registered every five years. This would enable MPD to verify that the owner has maintained eligibility, and to update the registration certificate with the owners current address and picture. It would also help to ensure that people accurately report when firearms are lost or stolen. We would not, however, need to conduct another ballistics test during this process. But I believe it is sound public policy to establish the requirement now, with the commitment to develop an efficient and effective process in the future.

Thank you for the opportunity to present this statement for the record. I will be happy to answer any questions that you have.

**Government of the District of Columbia**



# Metropolitan Police Department

Testimony of
# Cathy L. Lanier
# Chief of Police

# *Hearing on the Impact of Proposed Legislation on the District of Columbia's Gun Laws*

United States House of Representatives
Committee on Oversight & Government Reform
Honorable Henry A. Waxman, Chair

September 9, 2008

U.S. House of Representatives
Washington, DC 20515

Chairman Waxman, members of the Committee, staff, and guests: my name is Cathy Lanier, and I am the Chief of Police of the Metropolitan Police Department of the District of Columbia. Thank you for the opportunity to present this statement on the likely impact of H.R. 6691 on public safety in the Nation's Capital.

To begin with, I would like to briefly share with you what has happened in Washington, DC, since the US Supreme Court issued its decision in *District of Columbia v. Heller*. The District government – both the Executive and the Legislative branches – fully respects the Supreme Court's decision. We have demonstrated that respect by taking quick action to pass legislation and emergency regulations to enable registration of handguns and to ensure that residents already possessing unregistered handguns could register them without fear of criminal liability under District law. The current legislation and regulations are only temporary—valid for 90 and 120 days, respectively—and remain works in progress. The Council of the District of Columbia will be holding a hearing next week to continue to elicit comment from the public and will amend the temporary legislation on September 16th and enact permanent legislation soon after. Today's hearing is another important opportunity to hear a variety of viewpoints on this issue.

After the Court ruling, I mobilized my staff to ensure that MPD's 4,000 sworn members and the public were immediately educated about the impact of the ruling. Within hours of the decision, I held a conference call with my Command Staff, and informed the entire force of the content of the decision via a teletype, our internal daily newsletter, and on "Temperature Boards," which are television screens at MPD facilities broadcasting vital information to the force 24-hours a day. This message was reinforced by a training video on the impact of the decision that officers began viewing within days of the ruling. At the same time, I issued a personal message to the public on community list-serves, posted information on our website, and created a 24-hour public hotline. Since the regulations were issued, the Department has registered 23 handguns. We expect this volume to increase now that there is a firearms dealer in the District of Columbia with a Federal Firearms License.

* * * *

Turning to H.R. 6691, I have grave concerns about the proposed bill, which would prevent the District of Columbia from registering firearms, or taking many other reasonable and commonly-used steps—taken by states and municipalities across the country—to regulate or limit possession and use of firearms. In layman's terms, this means that anyone not prohibited by Federal law from possessing a firearm could legally own a small, easily concealed, semi-automatic handgun, or could carry a semi-automatic rifle on the street, either of which could be capable of firing up to 30 rounds of ammunition without reloading.

In my professional opinion, if H.R. 6691 were passed, it would be far more difficult for MPD and Federal law enforcement agencies in the District of Columbia to ensure safety and security in the Nation's Capital. I say this not just as a police officer, but as someone with extensive experience in homeland security and counterterrorism. As Representative Norton mentioned, after September 11th, I served as the Commander of MPD's Special Operations Division for four years, and I was the first Commanding Officer of the Department's Office of Homeland Security and Counterterrorism. In that capacity, I worked extensively with a multi-agency taskforce of local and Federal law enforcement agencies to plan and implement security for critical events like the President Inaugural. In short, I have spent a great deal of time working with national experts to analyze terror threats and develop ways to combat them, especially here in the Nation's capital.

The terrorist attacks of September 11th, 2001, demonstrated something that we have known for some time: government facilities, dignitaries, and public servants are prime targets for terrorists, both foreign and domestic. Protecting government officials and infrastructure is a challenge for every city in the United States. But in Washington, DC, the likelihood of attack is higher, and the challenges to protecting the city are greater.

The District's high concentration of iconic structures—such as the national monuments, the White House, and, of course, the Capitol—make it a highly attractive target. The high-profile human targets—from the Nation's top elected leaders to the more than 400 foreign dignitaries that make official visits to DC each year—are also an obvious and attractive target. In addition, any Federal building or career public servant is a potential target. We have seen this in numerous

attacks—from the Oklahoma City bombing to the 1993 shootings outside of CIA headquarters at Langley. And oversees, even the families of high-profile leaders and public servants are a frequent target of terrorists. I hope that we never see that in the United States, but with the many important U.S. officials and foreign dignitaries here in the city, it is a possibility we need to recognize. Moreover, it is not just well-coordinated terrorist attacks we need to secure the city against. We must also consider the unsophisticated "lone wolf" terrorist, angry at the US Government for a seemingly small matter, such as the size of a tax refund.

The second key vulnerability is due to the sheer volume of secure motorcades traveling in Washington on any given day. Given the daily movements around the city of the President, Vice President, and their families, and the fact that almost 3,000 foreign dignitaries spend time in our city each year—the routes for their movements cannot be shut down, as they are in other cities. As you know from your own districts, when the President and Vice President travel outside of Washington, roads are cleared of all traffic, parked cars, and such, and spectators are often kept behind barricades. We don't do this in DC because shutting down the routes for every motorcade would make it virtually impossible to navigate much of the city on a continuous basis, and we don't want the Nation's capital to take on the character of an armed fortress. This freedom, however, comes with the cost of higher vulnerability—both for the officials and dignitaries, and the general population. In attempted and successful assassinations around the world, the first step in attacking a motorcade is frequently to take out the security detail with semi-automatic and automatic firearms. This forces the motorcade to stop, at which point the terrorist can use explosives to attack the armored vehicles carrying the targeted individual.

In addition to assisting the Secret Service with daily movements of the President and Vice President around the city, and protecting foreign dignitaries, MPD also provides security support for more than 4,000 special events annually. Some of the events are small—a low-profile protest or foot race—and the threat of a terrorist attack at one of these may be relatively low. However, the risks associated with other events are significant. I would ask you to consider, for example, two events familiar to almost every American, and, I believe, extremely important to the city and to the nation—the 4th of July celebration on the National Mall and the Presidential Inauguration. Hundreds of thousands of Americans will be here for these public events. Imagine how difficult

it will be for law enforcement to safeguard the public, not to mention the new President at the Inaugural Parade, if carrying semi-automatic rifles were to suddenly become legal in Washington.

As another example, I'd remind the Committee of the 8,000 delegates who come to Washington from around the world each fall for a meeting of the Boards of Governors of the International Monetary Fund and World Bank. The delegates stay at 16 hotels around the city. Even under current law, new challenges to protecting the delegates from terrorist threats arise each year. That risk would grow exponentially if we had to also protect them from a legally-armed "lone wolf" gunman staying in or working at one of their hotels.

If these scenarios scare you—they should. They scare me. We all have an immediate concern for any life threatened or lost in a terrorist event. But here in the Nation's Capital, we must also recognize that any terrorist incident, no matter how small, would garner world-wide attention and could have significant international implications. I am certain that the broader repercussions of an incident in the city is also of grave concern to everyone in this room.

Finally, on a personal level, the thought of a member of the Metropolitan Police Department or any law enforcement officer being injured or killed during such an incident worries me greatly. The safety of the men and women of MPD serving this city and country are my responsibility, and I take this responsibility very seriously. My Department devotes significant resources to trying to prevent such an event. Providing easy access to deadly semi-automatic firearms and high capacity ammunition clips and allowing them to be carried in a large number of places outside the home will make this job much more dangerous and difficult.

* * * *

It is clear to me and others engaged every day in securing DC against terrorism that our city is unique. The Federal government already acknowledges that authorizing the general public to carry firearms in certain places is not in the general interest. For instance, as a law enforcement officer, I can carry my gun almost everywhere in the country. I can carry it in schools, on

airplanes, and most public buildings. But ironically, upon entering the Supreme Court to hear the arguments in the *Heller* case, I learned that even the Chief of Police of the District of Columbia cannot carry a gun into the Court. The Federal Government considers the Court building to be so sensitive that, no matter who you are, you cannot wear your firearm in the building.

I would argue that similar caution should apply to the District of Columbia.  Supreme Court Justice Scalia, writing the majority decision for the Court, acknowledged that "[L]aws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are constitutional.

The District of Columbia, as the seat of the Federal government, with its multitude of critical official and symbolic buildings, monuments, and events, and high-profile public officials traversing its streets every day, is a city filled with "sensitive" places.  Our laws should reflect that reality.

Thank you again for the opportunity to appear before you today.  I would be pleased to answer any questions that you have.

<p style="text-align:center">* * * *</p>

# Government of the District of Columbia
# Office of the Chief Financial Officer



Natwar M. Gandhi
Chief Financial Officer

## MEMORANDUM

| | |
|---|---|
| **TO:** | **The Honorable Vincent C. Gray**<br>**Chairman, Council of the District of Columbia** |
| **FROM:** | Natwar M. Gandhi<br>Chief Financial Officer |
| **DATE:** | SEP 16 2008 |
| **SUBJECT:** | **Fiscal Impact Statement: "Firearms Control Temporary Amendment Act of 2008"** |
| **REFERENCE:** | **Bill Number 17-887, Amendment in the Nature of a Substitute** |

## Conclusion

Funds are sufficient in the FY 2008 budget and the proposed FY 2009 through FY 2012 budget and financial plan to implement the proposed legislation. Implementation of the proposed legislation would result in initial expenditures of $1.95 million and annual costs of $860,000. Resources will be made available to fund this legislation but the shift in resource use would have an operational impact on the Metropolitan Police Department (MPD). In addition, while a registration fee for registering firearms is not reflected in the proposed legislation, it is anticipated that a fee will be implemented in such a way to offset some of the future costs of firearms registration.

## Background

The proposed legislation would amend multiple sections of D.C. Official Code to allow District residents to register pistols for use in self-defense within the registrant's home. Specifically, the proposed legislation would:

- Allow a District resident to register a pistol for use in self-defense within the registrant's home (D.C. Official Code § 7-2502.02);

The Honorable Vincent C. Gray
Fiscal Impact Statement: B17-887, "Firearms Control Temporary Amendment Act of 2008," Amendment in the
Nature of a Substitute
Page 2 of 3

- Permit a District resident who holds a valid registration for a firearm to forgo obtaining a license to carry the firearm within the resident's abode, while the firearm is being used for recreational purposes, while the firearm is kept at the registrant's business, or while the firearm is in transport for a lawful purpose (D.C. Official Code § 7-2502.02);

- Require the Chief of the Metropolitan Police Department (Chief) to conduct a ballistics identification procedure on all registered pistols (D.C. Official Code § 7-2502.03);

- Limit registration to no more than one pistol per registrant during any 30-day period (D.C. Official Code § 7-2502.03);

- Prohibit a person from carrying a rifle or shotgun in the District (D.C. Official Code § 22-4504);

- Require each firearm registrant to keep that firearm in his or her possession unloaded and either disassembled or secured by a trigger lock, gun safe, locked box, or other secure device (D.C. Official Code § 7-2507.02);

- Clarify the District's firearms storage policy and provide for penalties for "reckless storage" of a firearm accessible by a minor (i.e. under 16 years of age) (D.C. Official Code § 7-2507.02);

- Revise the definition of "machine gun" to allow semi-automatic handguns to fall under "firearms" that are permitted to be registered (D.C. Official Code § 7-2501.01); and

- Prohibit any person in the District from possessing, selling, or transferring any large capacity ammunition feeding device (i.e. capable of accepting more than 10 rounds of ammunition) (D.C. Official Code § 7-2506.01).

**Financial Plan Impact**

Funds are sufficient in the FY 2008 budget and the proposed FY 2009 through FY 2012 budget and financial plan to implement the proposed legislation.   Implementation of the proposed legislation would result in initial expenditures of $1.95 million and annual costs of $860,000. Resources will be made available to fund this legislation but the shift in resource use would have an operational impact on the Metropolitan Police Department (MPD).

Initial costs to implement the legislation would total $1.95 million and would include the following, which would be incurred in FY 2008:

- **Ballistics Identification: $1,081,467**
    - Bullet testing component
    - Cartridge testing component
    - Wiring/cabling component

   o Testing supplies
   o Mobile bullet capturing devices

- **Personnel**: $608,202
   o 5 DS-9 Compensation for Firearms Examination Unit
   o 2 DS-9 Compensation for Gun Registration Unit

- **Examination Secure Space**: $258,000

MPD will use existing resources to fund $660,000 of the ballistics identification equipment. The additional funding ($422,000) required to purchase and implement the ballistics testing equipment would come from available funds in the master equipment lease purchase program. This proposed temporary amendment, like the emergency legislation approved in July 2008, would be implemented immediately, and existing personnel would be used to staff the firearms examination and gun registration units. Although the use of existing staff does not result in a fiscal impact, it does result in shifting resources away from other duties within MPD. The cost of additional space would be covered by funds from the Office of Property Management.

In addition, while a registration fee for registering firearms is not reflected in the proposed legislation, it is anticipated that a fee will be implemented in such a way to offset some of the future costs of firearms registration.

Committee Print
Committee on Public Safety and the Judiciary
November 25, 2008

<div align="center">A BILL</div>                                                                    1

<div align="center">17-843</div>                                                                    2

<div align="center">IN THE COUNCIL OF THE DISTRICT OF COLUMBIA</div>                                 3

<div align="center">_____</div>                                                        4

To amend the Firearms Control Regulations Act of 1975 to revise the definition of machine gun, to      5
add a definition of assault weapon and prohibit assault weapons, to provide a self-defense             6
exemption for possession of a firearm registered to another person within the home, to                7
provide for the registration of pistols for use in self-defense within the home, to provide that       8
a person holding a valid registration for a firearm shall not be required to obtain a license to       9
carry the firearm within the registrant's home or place of business, while being used for            10
lawful recreational purposes, or while being transported for a lawful purpose in accordance          11
with a District or federal statute, to extend the prohibition on registering firearms to persons     12
with drug convictions of ten years prior to application to persons who have committed an             13
intrafamily offense, and to persons with mental disorders and a history of violence, to              14
establish a registration limit of one pistol per registrant per 30 days, to clarify the process of   15
revocation of a registration certificate, to prohibit large capacity ammunition feeding devices,    16
to provide a process for the renewal of registration certificates, to provide that semi-             17
automatic pistols manufactured and sold in the District be microstamped, to clarify the              18
firearms storage policy, and to establish penalties for the reckless storage of a firearm            19
accessible by a minor; to provide a savings clause with regard to the revised definition of         20
machine gun.                                                                                          21

BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this                                 22

act may be cited as the "Firearms Registration Amendment Act of 2008".                              23

Sec. 2. The Firearms Control Regulations Act of 1975, effective September 24, 1976                  24

(D.C. Law 1-85; D.C. Official Code § 7-2501.01 *et seq.*), is amended as follows:                    25

(a) Section 101 (D.C. Official Code § 7-2501.01) is amended as follows:                             26

(1) Paragraph (9) is amended by striking the phrase "any weapon which will, or is                   27

<div align="center">1</div>

Committee Print
Committee on Public Safety and the Judiciary
November 25, 2008

designed or redesigned, made or remade, readily converted or restored, and intended to," and          1

inserting the phrase "any weapon, regardless of operability, which will, or is designed or          2

redesigned, made or remade, readily converted, restored, or repaired, or is intended to," in its          3

place.          4

(2) A new paragraph (9A) is added to read as follows:          5

"(9A) "Intrafamily offense" shall have the same meaning as provided in D.C.          6

Official Code § 16-1001(8).".          7

(3) Paragraph (10) is amended to read as follows:          8

"(10) "Machine gun" means any firearm which shoots, is designed to shoot, or can          9

be readily restored to shoot, automatically more than one shot, without manual reloading, by a          10

single function of the trigger.  The term "machine gun" shall also include the frame or receiver of          11

any such firearm, any part designed and intended solely and exclusively, or combination of parts          12

designed and intended, for use in converting a firearm into a machine gun, and any combination          13

of parts from which a machine gun can be assembled if such parts are in the possession or under          14

the control of a person.".          15

(4) Paragraph (12) is amended by striking the word "hand" and inserting the          16

phrase "hand or with a barrel less than 12 inches in length" in its place.          17

(5) Paragraph (15) is amended by striking the phrase "20 inches in length' both          18

times it appears and inserting the phrase "18 inches in length" in its place.          19

(6) Paragraphs (19) through (23) are added to read as follows:          20

2

Committee Print
Committee on Public Safety and the Judiciary
November 25, 2008

(19) "Assault weapon" means the following semiautomatic firearms designated in     1

paragraphs (a) through (d):     2

(a) All of the following specified rifles: (1) All AK series including, but not limited to,     3

the models identified as follows: (A) Made in China AK, AKM, AKS, AK47, AK47S, 56, 56S,     4

84S, and 86S. (B) Norinco (all models). (C) Poly Technologies (all models). (D) MAADI AK47     5

and ARM. (E) Mitchell (all models). (2) UZI and Galil. (3) Beretta AR-70. (4) CETME Sporter.     6

(5) Colt AR-15 series. (6) Daewoo K-1, K-2, Max 1, Max 2, AR 100, and AR110 C. (7) Fabrique     7

Nationale FAL, LAR, FNC, 308 Match, and Sporter. (8) MAS 223. (9) HK-91, HK-93, HK-94,     8

and HK-PSG-1 (10) The following MAC types: (A) RPB Industries Inc. sM10 and sM11. (B)     9

SWD Incorporated M11. (11) SKS with detachable magazine. (12) SIG AMT, PE-57, SG 550,     10

and SG 551. (13) Springfield Armory BM59 and SAR-48. (14) Sterling MK-6. (15) Steyer AUG,     11

Steyr AUG. (16) Valmet M62S, M71S, and M78S. (17) Armalite AR-180. (18) Bushmaster     12

Assault Rifle. (19) Calico M-900. (20) J&R ENG M-68. (21) Weaver Arms Nighthawk.     13

(b) All of the following specified pistols: (1) UZI. (2) Encom MP-9 and MP-45. (3) The     14

following MAC types: (A) RPB Industries Inc. sM10 and sM11. (B) SWD Incorporated —11.     15

Advance Armament Inc. M-11. (D) Military Armament Corp. Ingram M-11. (4) Intratec TEC-9     16

and TEC-DC9. (5) Sites Spectre. (6) Sterling MK-7. (7) Calico M-950. (8) Bushmaster Pistol.     17

(c) All of the following specified shotguns: (1) Franchi SPAS 12 and LAW 12. (2)     18

Striker 12. The Streetsweeper type S/S Inc. SS/12.     19

3

Committee Print
Committee on Public Safety and the Judiciary
November 25, 2008

(d) The term "series" includes all other models that are variations, with minor differences, 1
of those models listed in subdivision (a), regardless of the manufacturer. 2

(e) Notwithstanding paragraphs (a) through (d), "assault weapon" shall also mean any of 3
the following: (1) A semiautomatic, centerfire rifle that has the capacity to accept a detachable 4
magazine and any one of the following: (A) A pistol grip that protrudes conspicuously beneath 5
the action of the weapon. (B) A thumbhole stock. (C) A folding or telescoping stock. (D) A 6
grenade launcher or flare launcher. (E) A flash suppressor. (F) A forward pistol grip. (2) A 7
semiautomatic, centerfire rifle that has a fixed magazine with the capacity to accept more than 10 8
rounds. (3) A semiautomatic, centerfire rifle that has an overall length of less than 30 inches. (4) 9
A semiautomatic pistol that has the capacity to accept a detachable magazine and any one of the 10
following: (A) A threaded barrel, capable of accepting a flash suppressor, forward handgrip, or 11
silencer. (B) A second handgrip. (C) A shroud that is attached to, or partially or completely 12
encircles, the barrel that allows the bearer to fire the weapon without burning his or her hand, 13
except a slide that encloses the barrel. (D) The capacity to accept a detachable magazine at some 14
location outside of the pistol grip. (5) A semiautomatic pistol with a fixed magazine that has the 15
capacity to accept more than 10 rounds. (6) A semiautomatic shotgun that has both of the 16
following: (A) A folding or telescoping stock. (B) A pistol grip that protrudes conspicuously 17
beneath the action of the weapon, thumbhole stock, or vertical handgrip. (7) A semiautomatic 18
shotgun that has the ability to accept a detachable magazine. (8) Any shotgun with a revolving 19
cylinder. 20

4

Committee Print
Committee on Public Safety and the Judiciary
November 25, 2008

(f) The Council finds a significant public purpose in exempting pistols that are designed 1

expressly for use in Olympic target shooting events. Therefore, those pistols that are sanctioned 2

by the International Olympic Committee and by USA Shooting, the national governing body for 3

international shooting competition in the United States, and that are used for Olympic target 4

shooting purposes at the time the act adding this subdivision is enacted, and that would 5

otherwise fall within the definition of "assault weapon" pursuant to this section are exempt, as 6

provided in paragraphs (g) and (h). 7

(g) "Assault weapon" does not include either of the following: (1) Any antique firearm. 8

(2) Any of the following pistols, because they are consistent with the significant public purpose 9

expressed in subdivision (f): 10

| MANUFACTURER | MODEL | CALIBER | |
|---|---|---|---|
| BENELLI | MP90 | .22LR | 11 |
| BENELLI | MP90 | .32 S&W LONG | 12 |
| BENELLI | MP95 | .22LR | 13 |
| BENELLI | MP95 | .32 S&W LONG | 14 |
| HAMMERLI | 280 | .22LR | 15 |
| HAMMERLI | 280 | .32 S&W LONG | 16 |
| HAMMERLI | SP20 | .22LR | 17 |
| HAMMERLI | SP20 | .32 S&W LONG | 18 |
| PARDINI | GPO | .22 SHORT | 19 |
| PARDINI | GP-SCHUMANN | .22 SHORT | 20 |
| PARDINI | HP | .32 S&W LONG | 21 |
| PARDINI | MP | .32 S&W LONG | 22 |
| PARDINI | SP | .22LR | 23 |


| MANUFACTURER | MODEL | CALIBER | |
|---|---|---|---|
| BENELLI | MP90 | .22LR | 11 |
| BENELLI | MP90 | .32 S&W LONG | 12 |
| BENELLI | MP95 | .22LR | 13 |
| BENELLI | MP95 | .32 S&W LONG | 14 |
| HAMMERLI | 280 | .22LR | 15 |
| HAMMERLI | 280 | .32 S&W LONG | 16 |
| HAMMERLI | SP20 | .22LR | 17 |
| HAMMERLI | SP20 | .32 S&W LONG | 18 |
| PARDINI | GPO | .22 SHORT | 19 |
| PARDINI | GP-SCHUMANN | .22 SHORT | 20 |
| PARDINI | HP | .32 S&W LONG | 21 |
| PARDINI | MP | .32 S&W LONG | 22 |
| PARDINI | SP | .22LR | 23 |

5

Committee Print
Committee on Public Safety and the Judiciary
November 25, 2008

| | | | |
|---|---|---|---|
| PARDINI | SPE | .22LR | 1 |
| WALTHER | GSP | .22LR | 2 |
| WALTHER | GSP | .32 S&W LONG | 3 |
| WALTHER | OSP | .22 SHORT | 4 |
| WALTHER | OSP-2000 | .22 SHORT | 5 |

(h) The Mayor may exempt new models of competitive pistols that would otherwise    6

fall within the definition of "assault weapon" pursuant to this section from being classified as an    7

assault weapon. The exempt competitive pistols may be based on recommendations by USA    8

Shooting consistent with the regulations contained in the USA Shooting Official Rules or may    9

be based on the recommendation or rules of any other organization that the department deems    10

relevant.    11

(20) "Magazine" shall mean any ammunition feeding device.    12

(21) "Capacity to accept more than 10 rounds" shall mean capable of accommodating    13

more than 10 rounds, but shall not be construed to include a feeding device that has been    14

permanently altered so that it cannot accommodate more than 10 rounds.    15

(22) ".50 BMG rifle" means a center fire rifle that can fire a .50 BMG cartridge and is not    16

already an assault weapon or a machinegun, but does not include any antique firearm.    17

(23) ".50 BMG cartridge" means a cartridge that is designed and intended to be fired from    18

a center fire rifle and that meets all of the following criteria: (1) It has an overall length of 5.54    19

inches from the base to the tip of the bullet. (2) The bullet diameter for the cartridge is from .510    20

6

APPENDIX 000104

Committee Print
Committee on Public Safety and the Judiciary
November 25, 2008

to, and including, .511 inch. (3) The case base diameter for the cartridge is from .800 inch to, and     1

including, .804 inch. (4) The cartridge case length is 3.91 inches.     2

(b) Section 201(b) (D.C. Official Code § 7-2502.01(b)) is amended as follows:     3

(1) Paragraph (3) is amended by striking the phrase "that such weapon shall be     4

unloaded, securely wrapped, and carried in open view" and inserting the phrase "that such     5

weapon shall be transported in accordance with section 4b of An Act To control the possession,     6

sale, transfer and use of pistols and other dangerous  weapons in the District of Columbia, to     7

provide penalties, to prescribe rules of evidence, and for other purposes; or" in its place.     8

(2) A new paragraph (4) to read as follows:     9

"(4) Any person who temporarily possesses a firearm registered to another person     10

in the home of the registrant; provided, that the person is not otherwise prohibited from     11

possessing firearms and the person reasonably believes that possession of the firearm is necessary     12

to prevent imminent death or great bodily harm to himself or herself or to another person.".     13

(c)  Section 202 (D.C. Official Code § 7-2502.02) is amended as follows:     14

(1) Subsection (a) is amended as follows:     15

(A) Paragraph (3) is amended by striking the word "or" at the end.     16

(B) Paragraph (4) is amended to read as follows:     17

"(4) Pistol not validly registered to the current registrant in the District prior to     18

September 24, 1976, except that the prohibition on registering a pistol shall not apply to:     19

"(A) Any organization that employs at least one commissioned special     20

7

police officer or other employee licensed to carry a firearm and that arms the employee with a   1

firearm during the employee's duty hours;   2

                "(B) A police officer who has retired from the Metropolitan Police   3

Department; or   4

                "(C) Any person who seeks to register a pistol for use in self-defense   5

within that person's home; or".   6

             (C) A new paragraph (5) is added to read as follows:   7

         "(5) An unsafe firearm prohibited under section 504.".   8

       "6.  Assault weapon; or   9

       "7. .50 BMG rifle.   10

   (2) Subsection (b) is repealed.   11

                   (d) Section 203 (D.C. Official Code § 7-   12

2502.03) is amended as follows:   13

(1) Subsection (a) is amended as follows:   14

(A) Paragraph (4) is amended as follows:   15

(i) The lead-in language is amended by striking the phrase "5 years" and inserting the   16

phrase  "10 years" in its place.   17

(ii) Subparagraph (A) is amended by striking the word "or" at the end.   18

(iii) Subparagraph (B) is amended by adding the word "or" at the end.   19

8

Committee Print
Committee on Public Safety and the Judiciary
November 25, 2008

(iv) A new subparagraph (C) is added to read as follows:                                   1

"(C) Intrafamily offense;"                                                                  2

(B) A new subparagraph (6A) is added to read as follows:                                    3

"(6A) Within the 5 years immediately preceding the application, has not suffered from a     4

mental disorder, as defined by rule, and has a history of violent behavior against the      5

applicant or another person, unless the applicant has a physician's certificate that the    6

applicant is capable of possessing a regulated firearm without undue danger to the          7

applicant or to another person;".                                                           8

(C) Paragraph (10) is amended as follows:                                                   9

(i) Strike the phrase "use of the same in accordance with tests and standards" and          10

inserting the phrase "use, handling, and storage of the same in accordance with training,   11

tests, and standards" in its place.                                                         12

(ii) Strike the word "and" at the end.                                                      13

(D) Paragraph (11) is amended by striking the period at the end and inserting the phrase ";  14

and" in its place.                                                                          15

(E) A new paragraph (12) is added to read as follows:                                       16

"(12)(A) Has not been the respondent in an intrafamily proceeding in which a civil          17

protection order was issued against the applicant pursuant to D.C. Official Code § 16-      18

1005; provided, that an applicant who has been the subject of such an order shall be        19

9

Committee Print
Committee on Public Safety and the Judiciary
November 25, 2008

eligible for registration if the applicant has submitted to the Chief a certified court record    1

establishing that the order has expired or has been rescinded; or    2

"(B) Has not been the respondent in a proceeding in which a foreign protection order, as    3

that term is defined in D.C. Official Code § 16-1041, was issued against the applicant;    4

provided, that an applicant who has been the subject of such an order shall be eligible for    5

registration if the applicant has submitted to the Chief a certified court record establishing    6

that the order has expired or has been rescinded.".    7

(2) New subsections (d) and (e) are added to read as follows:    8

"(d) The Chief shall require any registered pistol to be submitted for a ballistics    9

identification procedure and shall establish a reasonable fee for such procedure.    10

"(e) The Chief shall register no more than one pistol per registrant during any 30-    11

day period.".    12

(e) Section 204) (D.C.  Official Code § 7-2502.04) is amended as follows:    13

(1) Subsection (a) is amended by striking the phrase "5 years" and inserting the phrase "6    14

years" in its place.    15

(2) Subsection (c) is amended by striking the phrase "shall be unloaded and securely    16

wrapped, and carried in open view" and inserting the phrase "shall be transported in    17

accordance with section 4b of An Act To control the possession, sale, transfer and use of    18

pistols and other dangerous  weapons in the District of Columbia, to provide penalties, to    19

10

Committee Print
Committee on Public Safety and the Judiciary
November 25, 2008

prescribe rules of evidence, and for other purposes" in its place.  1

(f) Section 205 (D.C. Official Code § 7-2502.05) is amended by adding a new subsection  2

(c) to read as follows:  3

"(c) The Chief may offer a discount on the registration fees of up to 50% for any  4

applicant who produces a certificate of completion of a firearms safety and proficiency  5

course from an approved instructor as determined by the Chief.".  6

(g) A new section 207a is added to read as follows:  7

"Sec. 207a. Expiration and renewal of registration certificate  8

"(a) Registration certificates shall expire 3 years after the date of issuance unless  9

renewed in accordance with this section for subsequent 3-year periods.  10

"(b) A registrant shall be eligible for renewal of registration of a firearm if the registrant  11

continues to meet all of the initial registration requirements set forth in section 203(a) and  12

follows any procedures the Chief may establish by rule.  13

"(c) For each renewal, a registrant shall submit a statement to the Metropolitan Police  14

Department attesting to:  15

"(1) Possession of the registered firearm; and  16

"(2) The registrant's address.  17

"(d) A registrant shall submit to a background check once every 6 years to confirm that  18

the registrant continues to qualify for registration under section 203.  19

11

"(e)(1)  The Metropolitan Police Department shall mail a renewal notice to each registrant    1

at his or her address of record at least 90 days prior to the expiration of the registration    2

certificate.    3

"(2) A renewal application shall be received by the Metropolitan Police    4

Department at least 60 days prior to the expiration of the current registration certificate.    5

"(f) An applicant for the renewal of a registration certificate may be charged a    6

reasonable fee to cover the administrative costs incurred by the Metropolitan Police    7

Department in connection with the renewal.    8

"(g) The Chief shall establish, by rule, a method for conducting the renewal of    9

registrations for all firearms registered prior to July 17, 2008. The renewals of all firearms    10

registered prior to July 17, 2008, shall be completed within 3 years of the effective date of    11

the Firearms Control Amendment Act of 2008.".    12

(h) Section 209 (D.C. Official Code § 7-2502.09) is amended as follows:    13

(1) Designate the existing text as subsection (a).    14

(2) The newly designated subsection (a) is amended as follows:    15

(A) Paragraph (2) is amended by adding the word "or" at the end.    16

(B) Paragraph (3) is amended by striking the phrase "false; or" and inserting the phrase    17

"false." in its place.    18

(C) Paragraph (4) is repealed.    19

Committee Print
Committee on Public Safety and the Judiciary
November 25, 2008

(3) A new subsection (b) is added to read as follows: 1

"(b)(1) A registrant shall be fined not more than $500 for the first violation or 2

omission of the duties, obligations, or requirements imposed by section 208. 3

"(2) A registrant's registration shall be revoked for a second violation or omission of the 4

duties, obligations ,or requirements imposed by section 208.". 5

(i) Section 408 (D.C. Official Code § 7-2504.08) is amended as follows: 6

(1) Designate the existing text as subsection (a). 7

(2) A new subsection (b) is added to read as follows: 8

"(b) Beginning on January 1, 2011, no licensee shall sell or offer for sale any 9

semiautomatic pistol manufactured on or after January 1, 2011 that is not microstamp 10

ready as required by and in accordance with section 503.". 11

(j) New sections 503 and 504 are added to read as follows: 12

"Sec. 503. Microstamping. 13

"(a)  For the purposes of the section, the term: 14

"(1) "Firearms dealer" means a person or organization possessing a dealer's license under 15

authority of Title IV 16

"(2) "Manufacturer" means any person in business to manufacture or assemble a firearm, 17

for sale or distribution. 18

13

Committee Print
Committee on Public Safety and the Judiciary
November 25, 2008

"(3) "Microstamp-ready" means a semiautomatic pistol that is manufactured to produce a
unique alpha-numeric or geometric code on at least 2 locations on each expended
cartridge case that identifies the make, model, and serial number of the pistol.

"(4) "Semiautomatic pistol" means a pistol capable of utilizing a portion of the energy of
a firing cartridge to extract the fired cartridge case and automatically chamber the next
round, and that requires a separate pull of the trigger to fire each successive round.

"(b) Except as provided in subsection (c) of this section, beginning on January 1, 2011, a
semiautomatic pistol falling into any of the following categories shall be micro-stamp
ready:

"(1) Manufactured in the District of Columbia;

"(2) Delivered or caused to be delivered by any manufacturer to a firearms dealer in the
District of Columbia; or

"(3) Sold, offered for sale, loaned, given, or transferred by a firearms dealer in the District
of Columbia.

"(c) This section shall apply only to semiautomatic pistols that:

"(1) Are manufactured  in the District of Columbia, or delivered or caused to be delivered
to a firearms dealer in the District of Columbia, on or after January 1, 2011; and

"(2) Have not been transferred to a person not licensed as a firearms dealer
pursuant to state or federal law.

14

APPENDIX 000112

"(d)(1) Intentionally defacing or altering a microstamp-ready semiautomatic pistol or a   1

portion of the pistol for the purpose of preventing law enforcement from identifying the   2

unique alpha-numeric or geometric code associated with that pistol is prohibited.   3

(2) Replacing a firing pin that has been damaged or otherwise in need of replacement for   4

the safe use of the semiautomatic pistol or for a legitimate sporting purpose shall not   5

alone be evidence that someone has violated this subsection.   6

"(e) (1) Beginning January 1, 2011, a manufacturer that delivers a semiautomatic pistol, or   7

causes a semiautomatic pistol to be delivered, to a firearms dealer for sale in the District of   8

Columbia shall certify that:   9

"(A) Each semiautomatic pistol offered for sale in the District will produce a unique alpha-   10

numeric code or a geometric code on each cartridge case that identifies the make, model, and   11

serial number of the semiautomatic pistol that expended the cartridge casing; and   12

"(B) The manufacturer will supply the Chief of Police with the make, model, and serial   13

number of the  semiautomatic pistol that expended the cartridge case, when presented with   14

an alpha-numeric or geometric code from a cartridge case; provided, that the cartridge case   15

was recovered as part of a legitimate law enforcement investigation.   16

"(f) The Chief of Police, pursuant to Title I of the District of Columbia Administrative   17

Procedure Act, approved October 21, 1968 (82 Stat. 1204; D.C.  Official Code § 2-501 *et*   18

*seq.*), shall issue rules to implement the provisions of this section.   19

15

Committee Print
Committee on Public Safety and the Judiciary
November 25, 2008

"(g) Any person who violates this section shall be guilty of a misdemeanor and, upon    1

conviction, shall be imprisoned not more than one year, fined not more than $1,000, or    2

both.    3

"Sec. 504. Prohibition on sale, transfer, ownership, or possession of designated unsafe    4

firearms.    5

"(a) Except as provided in subsections (c), (d), or (e) of this section, beginning January 1,    6

2009, a pistol that is not on the California Roster of Approved Firearms as of January 1,    7

2009, may not be manufactured, sold, given, loaned, exposed for sale, transferred, or    8

imported into the District of Columbia.    9

"(b) Except as provided in subsection (e) of this section, beginning January 1, 2009, a    10

firearm that is not on the California Roster of Approved Firearms as of January 1, 2009,    11

may not be owned or possessed within the District of Columbia unless that handgun was    12

lawfully owned and registered prior to January 1, 2009.    13

"(c) Except as provided in subsection (e) of this section, a District of Columbia resident    14

who is the owner of a handgun lawfully registered prior to January 1, 2009, that is not on    15

the California Roster of Approved Firearms as of January 1, 2009, and who wishes to sell    16

or transfer that handgun after January 1, 2009, may do so only by selling or transferring    17

ownership of the handgun to a licensed firearm dealer.    18

16

APPENDIX 000114

Committee Print
Committee on Public Safety and the Judiciary
November 25, 2008

"(d) Except as provided in subsection (e) of this section, beginning January 1, 2009, a     1

licensed firearm dealer who retains in the dealer's inventory, or who otherwise lawfully     2

acquires, any firearm  not on the California Roster of Approved Firearms as of January 1,     3

2009, may sell, loan, give, trade, or otherwise transfer the firearm only to another licensed     4

firearm dealer.     5

"(e) This section shall not apply to:     6

"(1) Firearms defined as curios or relics, as defined in 27 C.F.R. § 478.11;     7

"(2) The purchase of any firearm by a member of the Metropolitan Police Department and     8

other law enforcement personnel designated by the Mayor.     9

"(3) Pistols that are designed expressly for use in Olympic target shooting events as     10

defined by California Penal Code section 12132 (h);     11

"(4) Certain single action revolvers as defined by California Penal Code section 12133;     12

"(5) The sale, loan, or transfer of any firearm that is to be used solely as a prop during the     13

course of a motion picture, television, or video production by an authorized participant in     14

the course of making that production or event or by an authorized employee or agent of     15

the entity producing that production or event;     16

"(6) The temporary transfer of a lawfully owned and registered firearm for the purposes     17

of cleaning, repair, or servicing of the firearm by a licensed firearm dealer; or     18

17

Committee Print
Committee on Public Safety and the Judiciary
November 25, 2008

"(7) The possession of a firearm by a non-resident of the District of Columbia while    1

temporarily traveling through the District for a duration of [less than one day]; provided,   2

that the firearm is at all times stored unloaded and within a locked box or other locked    3

container.    4

"(f) The District of Columbia shall provide to the licensed firearm dealers within the    5

District information about how to obtain a copy of the California Roster of Approved    6

Firearms.    7

"(g) Any person, firm, corporation, partnership, or other association that violates this    8

section shall be guilty of a felony and, upon conviction, shall be imprisoned for no more    9

than 5 years, fined not more than $5,000, or both.".    10

(k) Section 601 (D.C. Official Code § 7-2506.01) is amended as follows:    11

(1) Designate the existing text as subsection (a).    12

(2) A new subsection (b) is added to read as follows:    13

"(b) No person in the District shall possess, sell, or transfer any large capacity    14

ammunition feeding device.  For the purposes of this subsection, the term "large capacity    15

ammunition feeding device" means a magazine, belt, drum, feed strip, or similar device    16

that has a capacity of, or that can be readily restored or converted to accept, more than 10    17

rounds of ammunition.  The term "large capacity ammunition feeding device" shall not    18

18

APPENDIX 000116

Committee Print
Committee on Public Safety and the Judiciary
November 25, 2008

include an attached tubular device designed to accept, and capable of operating only with,  1

.22 caliber rimfire ammunition.".  2

(l) Section 702 (D.C. Official Code § 7-2507.02) is amended to read as follows:  3

"Sec. 702. Responsibilities regarding storage of firearms.  4

"(a) It shall be the policy of the District of Columbia that each registrant should  5

keep any firearm in his or her possession unloaded and either disassembled or secured by  6

a trigger lock, gun safe, locked box, or other secure device.  7

"(b) No person shall store or keep any firearm on any premises  8

under his control if he knows or reasonably should know that a minor is likely to gain  9

access to the firearm without the permission of the parent or guardian of the minor unless  10

such person:  11

"(1) Keeps the firearm in a securely locked box, secured container, or in a  12

location which a reasonable person would believe to be secure; or  13

"(2) Carries the firearm on his person or within such close proximity that  14

he can readily retrieve and use it as if he carried it on his person.  15

"(c)(1) A person who violates subsection (b) of this section  is guilty of criminally  16

negligent storage of a firearm and, except as provided in paragraph (2) of this subsection,  17

shall be fined not more than $1,000, imprisoned not more than 180 days, or both.  18

19

Committee Print
Committee on Public Safety and the Judiciary
November 25, 2008

"(2) A person who violates subsection (b) of this section and the minor causes injury or    1

death to themselves or another shall be fined not more than $5,000, imprisoned not more    2

than 5 years, or both.    3

"(3) The provisions of paragraphs (1) and (2) of this subsection shall not apply if the    4

minor obtains the firearm as a result of an unlawful entry to any premises by any person.    5

"(d) For the purposes of this section, the term "minor" shall mean a person under    6

the age of 18 years.".    7

(m) A new section 702a is added to read as follows:    8

"Sec. 702a.  Prohibition of firearms from public or private property.    9

"(a) The District of Columbia may prohibit or restrict the possession of firearms on its    10

property and any property under its control.    11

"(b) Private persons or entities owning property in the District of Columbia may prohibit    12

or restrict the possession of firearms on their property.".    13

(n) Section 705(a) (D.C. Official Code § 7-2507.05(a)) is amended by striking the phrase    14

"shall be unloaded and securely wrapped in a package" and inserting the phrase "shall be    15

transported in accordance with section 4b of An Act To control the possession, sale,    16

transfer and use of pistols and other dangerous  weapons in the District of Columbia, to    17

provide penalties, to prescribe rules of evidence, and for other purposes" in its place.    18

20

APPENDIX 000118

Committee Print
Committee on Public Safety and the Judiciary
November 25, 2008

(n) D.C. Code § 7-2551.01 is amended by deleting ":(1) 'Assault weapon'" and all that    1

follows and replacing it with "'assault weapon' shall have the same meaning as in paragraph (19)    2

of § 7-2501.01."    3

Sec. 3. Savings clause.    4

Nothing in section 2(a)(3) shall affect any action, proceeding, or prosecution    5

commenced before September 16, 2008. Any such action, proceeding, or prosecution shall    6

continue, or may be enforced, in the same manner and to the same extent as if the amendment    7

made by that section had not been made.    8

Sec. 4. Fiscal impact statement.    9

The Council adopts the fiscal impact statement of the Chief Financial Officer as the fiscal    10

impact statement required by section 602(c)(3) of the District of Columbia Home Rule Act,    11

approved December 24, 1974 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(3)).    12

Sec. 5. Effective date.    13

This act shall take effect following approval by the Mayor (or in the event veto by the    14

Mayor, action by the Council to override the veto), a 30-day period of Congressional review as    15

provided in section 602(c)(1) of the District of Columbia Home Rule Act, approved December    16

24,  1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(1)), and publication in the District of    17

Columbia Register.    18

21

# COUNCIL OF THE DISTRICT OF COLUMBIA
# COMMITTEE ON THE JUDICIARY
# COMMITTEE REPORT
1350 Pennsylvania Avenue, NW, Washington, DC 20004

**TO:**      All Councilmembers

**FROM:**    Councilmember Phil Mendelson
             Chairman, Committee on the Judiciary

**DATE:**    Wednesday, February 29, 2012

**SUBJECT:** Report on Bill 19-614, "Firearms Amendment Act of 2012"

    The Committee on the Judiciary, to which Bill 19-614, the "Firearms Amendment Act of 2012" was referred, reports favorably thereon with amendments, and recommends approval by the Council.

<div align="center">CONTENTS</div>

| | | |
|---|---|---|
| I.    | Background and Need | 1 |
| II.   | Legislative Chronology | 21 |
| III.  | Position of the Executive | 21 |
| IV.   | Comments of Advisory Neighborhood Commissions | 21 |
| V.    | Summary of Testimony | 21 |
| VI.   | Impact on Existing Law | 23 |
| VII.  | Fiscal Impact | 24 |
| VIII. | Section-by-Section Analysis | 24 |
| IX.   | Committee Action | 28 |
| X.    | Attachments | 29 |

## I.    BACKGROUND AND NEED

**Summary**

    Bill 19-614, the Firearms Amendment Act of 2012, was introduced in response to concerns raised by the Community Association for Firearms Education. The city requires, as a prerequisite to registering a firearm, that a registrant complete a minimum of four hours classroom instruction in firearms safety and one hour of firing range training. Yet, under District law, "it is impossible for firearms trainers to effectively teach firearm safety to members of the public within the city, and for DC residents to obtain that training within the city."[1]

---

[1] Letter from Ricardo A. Royal, Nat'l President, Cmty. Ass'n for Firearms Educ. and George L. Lyon, DC Chapter President, Cmty. Ass'n for Firearms Educ., to Councilmember Phil Mendelson (Jul. 19, 2011) (on file with the Committee on the Judiciary and attached to this report).

Even as introduced, Bill 19-614 actually deals more broadly with firearms regulation than the single issue of ensuring the availability of training within the District's borders. The Committee has used this legislation to make a wide range of revisions to the law.

Bill 19-614 maintains core aspects of the District's gun control law: (1) all firearms must be registered; (2) certain types of weapons (e.g., automatic weapons) are prohibited; and (3) potentially dangerous persons (e.g., ex-felons or the mentally ill) may not possess a firearm. Among the more noteworthy changes, the bill:

- Enables firearms training within the District, both before and after registration;
- Eliminates the ballistics test now required of each firearm as a component of registration;
- Eliminates any vision requirement except for the legally blind;
- Eliminates the required 4-hour training course (plus 1-hour on a range);
- Delays microstamping until January 1, 2014 to give time for implementation in California;
- Delays re-registration until January 1, 2014 to give time for implementation by the MPD;
- Repeals the fee for re-registration;
- Authorizes (but does not require) the Mayor to act as an FFL if no other FFL is operating; and
- Eliminates most limitations on what ammunition a registrant may possess.

## A short history of gun control in the District of Columbia

The Committee has not undertaken an in-depth research of the history, but it is clear from the present law that Congress has long been concerned about gun violence in the nation's capital. Two years before adoption of the National Firearms Act of 1934, Congress enacted "An Act To control the possession, sale, transfer and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes."[2] Although amended from time to time, this statute remains in effect and is codified as Chapter 45 of Title 22 of the D.C. Official Code. Its provisions are frequently the basis for gun-related criminal prosecutions in the District of Columbia.

Thus, gun control had been on the books for over 40 years when the newly elected Home Rule Council adopted the Firearms Control Regulations Act of 1975.[3] Codified as chapter 25 of Title 7, this act imposes a broad regulatory scheme on the acquisition, possession, and transfer of firearms. The act requires registration of all firearms, restricts who may register a firearm (for instance, has not been voluntarily or involuntarily committed to any mental hospital or institution within 5 years preceding the registration application), and prohibits certain firearms entirely.

---

[2] 47 Stat. 650 (approved July 8, 1932) (codified at D.C. OFFICIAL CODE § 22-4501 *et seq.*).
[3] D.C. Law 1-85 (effective September 24, 1976) (codified at D.C. OFFICIAL CODE § 7-2501.01 *et seq.*).

Until 2008, the act prohibited all private individuals from registering (i.e., possessing) a handgun.

In 2008, the Supreme Court, in *District of Columbia v. Heller*, held that the Second Amendment of the Constitution guarantees an individual's right to possess a firearm for the lawful purpose of self-defense within the home.[4]  The Court invalidated the District's total ban on handguns.[5]  It also struck down the District's safe storage provision[6] – a provision that required all firearms including rifles and shotguns be kept unloaded and disassembled or bound by a trigger lock, because it lacked an explicit exception for self defense.  Since the *Heller* decision, there have been 2,158 firearms registered in the District (713 long guns and 1445 handguns).[7]

Following the *Heller* case, the Council revised the 1975 Firearms Control Regulations Act.[8]  There have been several challenges to this statute in the courts, but no provision has been overturned.  Last October the U.S. Circuit Court upheld several provisions of the law, and remanded others to the District Court for further proceedings "because the record is insufficient."[9]

## Context

The District is not unlike other major U.S. cities in the high incidence of crime and the percentage of those crimes that are committed by use of firearms.  The District's crime rate for the various violent crimes exceeds the national average – typical of urban centers.  Of these crimes, a significant percentage is committed with firearms:

Percentage of DC Index Crimes Involving Guns

|          | 2008 | 2009 | 2010 | 2011 |
|----------|------|------|------|------|
| Homicide | 75%  | 76%  | 75%  | 71%  |
| Robbery  | 34%  | 37%  | 33%  | 28%  |
| ADW      | 26%  | 26%  | 23%  | 21%  |

Cities across the country are grappling with gun violence.  Major cities such as New York and Chicago utilize a variety of gun control regulations.  Many cities have also tried unique initiatives, such as the Boston Gun Project's Operation Ceasefire, Richmond's Operation Exile, and Philadelphia's Gun Court.  The U.S. Department of Justice has published extensively about

---

[4] 554 U.S. 570, 635 (2008).
[5] *Id.*
[6] *Id.* at 571.
[7] Information provided by the Metropolitan Police Department, current as of February 27, 2012.
[8] *See* D.C. Law 17-372, Firearms Control Amendment Act of 2008 (effective Mar. 31, 2009).
[9] Heller v. District of Columbia, No. 10-7036, 2011 U.S. App. LEXIS 20130, at *3 (D.C. Cir. Oct. 4, 2011)

the many different strategies cities employ to combat gun violence.[10]  It is a substantial problem, both as a matter of public safety and public health.

But the District is unlike other cities in that it also hosts the federal government as well as the international diplomatic corps.

Two presidents have been assassinated by handguns in the District of Columbia: Abraham Lincoln and James Garfield.  At least three presidents have been shot or shot at with pistols in the District: Andrew Jackson, Harry S Truman, and Ronald Reagan.  In each of the last three Presidential administrations the White House has been the target of firearms: Bill Clinton (October 29, 1994), George W. Bush (February 7, 2001), and Barack Obama (November 11, 2011).  History has shown time and again that the successful assassination of a President is a fundamental, history-changing event for the United States of America.

Congress is not exempt from these threats.  In September 2010, U.S. Capitol Police shot a man after he brandished a weapon at them near the Capitol.[11]  In July 2009, Capitol Police shot and killed a man two blocks from the U.S. Capitol after he led officers on a brief car chase and pulled out a handgun when stopped.[12]  In February 2009, 64-year old Alfred Brock was arrested with a rifle near the Capitol after inquiring about President Obama's whereabouts "so he could deliver something."[13]  Over the last five years, according to arrest data provided by the Metropolitan Police Department, between one and six individuals have been arrested – each year – for possession of unregistered firearms within two blocks of the White House and another one to six individuals within three blocks of the U.S. Capitol.

In 1976 a car bomb assassinated an exiled Chilean diplomat, Orlando Letelier, while he rounded Sheridan Circle in Embassy Row.[14]  In October 2011, the United States indicted two Iranian men on charges they attempted to use a weapon of mass destruction to assassinate Saudi Arabia's ambassador in Washington.[15]  The Committee has not attempted to research the attacks on diplomats in Washington between these two dates.

---

[10] *See* Office of Justice Programs, National Institute of Justice, Topical Collection:  Gun Violence, http://nij.ncjrs.gov/App/publications/Pub_search.aspx?searchtype=basic&category=99&location=top&PSID=57 (last visited February 28, 2012).

[11] Debbi Wilgoren, *Police Shoot Armed Man Near U.S. Capitol*, WASH. POST, Sept. 17, 2010, http://voices.washingtonpost.com/local-breaking-news/crime-and-public-safety/police-shoot-armed-man-near-us.html.

[12] James Rowley and Lorraine Woellert, *Police Shoot Suspect Near U.S. Capitol After Chase (Update3)*, BLOOMBERG, Jul. 15, 2009, http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aPhjzh2PJiiw.

[13] *Armed man was looking for Obama: police*, THE SYDNEY MORNING HERALD, Feb. 11, 2009, http://news.smh.com.au/breaking-news-world/armed-man-was-looking-for-obama-police-20090211-84j8.html.

[14] *See* Transnational Institute, *Ex-Chilean Ambassador Killed by Bomb Blast* (citing Stephen J. Lynton and Lawrence Meyer, WASH. POST (1976)), http://www.tni.org/article/ex-chilean-ambassador-killed-bomb-blast.

[15] *See* Jerry Markon and Karen DeYoung, *Iran Behind Alleged Terrorist Plot, U.S. says*, WASH POST (updated Oct. 12, 2011), http://www.washingtonpost.com/world/national-security/iranian-charged-in-terror-plot/2011/10/11/gIQAiaYxcL_print.html.

Police Chief Cathy Lanier summarized the problem in her testimony before the Committee on Bill 19-614:

> Government facilities, dignitaries, and public servants are prime targets for terrorists, both foreign and domestic. Protecting government officials and infrastructure is a challenge for every city in the United States. But in Washington, DC, the likelihood of attack is higher, and the challenges to protecting the city are greater. In 2011 alone, we saw an assassination attempt on the president – where fortunately the only thing the shooter hit was the White House – and another shooter firing at military installations. Both of these incidents were carried out by a lone gunman, angry at one facet or another of the US government.
>
> The high-profile human targets – from the nation's top elected leaders to the more than 400 foreign dignitaries that make official visits to DC each year – are an obvious and attractive target. The District is also vulnerable due to the sheer volume of secure motorcades traveling in Washington on any given day. The daily movements around the city of the President, Vice President, and their families, and the approximately 3,000 foreign dignitaries spending time in our city each year means that all of our roadways are a challenge to secure.
>
> Two notable incidents also illustrate why long guns should be subject to the same level of regulation as handguns. Both Oscar Ortega-Hernandez, the White House shooter, and James Von Brunn, the assailant at the Holocaust Museum, chose to use long guns....[16]

On the last page of its *Heller* opinion, the Supreme Court acknowledged "the problem of handgun violence in this country," and the Court noted that "[t]he Constitution leaves the District of Columbia a variety of tools for combating that problem, including some measures regulating handguns."[17] Further, it ordered the District to permit Mr. Heller to register his handgun.[18]

## The District's Firearm Registration Requirements

In adopting the Firearms Control Regulations Act of 1975, the Council included a "findings and purpose" section:

> The Council of the District of Columbia finds that in order to promote the health, safety and welfare of the people of the District of Columbia it is necessary to:
>
> (1) Require the registration of all firearms that are owned by private citizens;
> (2) Limit the types of weapons persons may lawfully possess;
> (3) Assure that only qualified persons are allowed to possess firearms;

---

[16] *Bill 19-614, Firearms Amendment Act of 2011: Hearing Before the Council of the District of Columbia Committee on the Judiciary,* Jan. 30, 2012, at 2 (written testimony of Cathy L. Lanier, Chief of Police, Metropolitan Police Department ) [hereinafter Chief Lanier 1.30.12 Testimony].
[17] District of Columbia v. Heller, 554 U.S. 570, 635, 636 (2008).
[18] *Id.* at 635.

    (4)   Regulate deadly weapons dealers; and

    (5)   Make it more difficult for firearms, destructive devices, and ammunition to
         move in illicit commerce within the District of Columbia.[19]

Each of these findings remains true today. Indeed, in its written statement regarding Bill
19-614, the Legal Community Against Violence wrote:

> Registration laws are an essential component of responsible gun policy because they: 1)
> help law enforcement to quickly trace firearms recovered at crime scenes; 2) discourage
> illegal firearm sales by creating accountability for gun owners; 3) protect police officers
> responding to an incident by providing them with information about whether firearms
> may be present at the scene; and 4) facilitate the return of lost or stolen firearms to their
> rightful owners.[20]

Some critics of gun registration complain that only law abiding citizens comply. Let's
assume, *arguendo*, that they are correct. Registration, therefore, is a means to separate the law-
abiding from the criminal element. This is enormously beneficial to law enforcement because it
readily identifies criminals and provides a means to readily arrest them. When police find a
suspect in a robbery but cannot immediately obtain witness identification, they can nevertheless
immediately arrest the suspect if the suspect is armed. The charge is possession of an
unregistered firearm. Time and again, police are able to take known criminals off the street
immediately because they are caught with a gun. When 64-year old Alfred Brock was found
with a rifle near the Capitol after inquiring about President Obama's whereabouts, he could be
arrested immediately – and he was, because he could be charged with possession of an
unregistered firearm. Thus, an important purpose for the registration of firearms is indeed to
separate law abiding citizens of the District from those who wish to possess and use firearms for
criminal purposes.

A registration system provides local law enforcement with the ready ability to identify
whether an individual has a right to own or possess a firearm. The District's law prohibits many
classes of people from having a firearm: the mentally ill, felons, domestic violence abusers,
chronic drunk drivers, those with a history of violence, and others. It is difficult to conceive how
the District could effectively enforce these prohibitions without registration – that is, without the
ability *before* the gun purchase to say no. Without registration, the government would have to
trust that prohibited persons will in every instance comply with the law. And enforcement would
always have to be after-the-fact.

Similarly, a registration system enables local law enforcement to enforce the prohibitions
when a person becomes ineligible – say, a firearms registrant who becomes a convicted felon. If

---

[19] Firearms Control Regulations Act of 1975, D.C. Law 1-85, § 2 (effective September 24, 1976) (codified at D.C.
OFFICIAL CODE § 7-2501.01 *et seq.*).

[20] *Bill 19-614, Firearms Amendment Act of 2011: Hearing Before the Council of the District of Columbia
Committee on the Judiciary*, Jan. 30, 2012, at 3 (written supplemental statement of Benjamin Van Houten,
Managing Attorney, Legal Community Against Violence) (2.13.12) [hereinafter Benjamin Van Houten 2.13.12
Supplemental Statement].

someone who has lawfully registered a firearm falls into one of the prohibited categories, thus becoming a "prohibited person," the police need to be able to recognize that this individual no longer has the right to lawfully possess a firearm. Daniel Webster of the Johns Hopkins Center for Gun Policy and Research stated that "[a] number of states have handgun registries...[and] [l]aw enforcement officers in these states use the registries to identify and disarm persons who purchase firearms and subsequently become prohibited after committing a felony or being subject to a restraining order for domestic violence."[21]

The Chief of Police, during her testimony before the Committee on Bill 19-614, recognized that "[v]erifying the eligibility of the owner to legally possess the firearm" is one of the "key objectives" of the District's firearm registration process.[22] The goal, according to the Chief, is to "reduce the likelihood that individuals who are prohibited from owning firearms will have them." During her testimony before the Committee, the Chief pointed to the real risks of firearms falling into the hands of those legally prohibited and ill-suited to have them:

> Felons, the mentally ill, and other disqualified individuals pose the biggest threat to the public. For instance, both the assault on Congresswoman Gabrielle Gifford, during which six individuals were killed, and the Virginia Tech massacre, in which 33 people were killed, were committed by shooters with a history of mental illness.[23]

In written testimony submitted for the Committee record, Joseph J. Vince, Jr. spoke to the District's registration requirements as providing important tools to law enforcement for protecting both the public as well as police officers. He stated that a registration system increases the difficulty for prohibited persons, including criminals or juveniles, from acquiring guns, and that "[t]he stronger the firearms-registration system, the less the likelihood that those who are a threat to themselves or others will get access to firearms."[24]

A registration system for firearms also holds accountable those with lawful firearms in the District. Benjamin Van Houten of the Legal Community Against Violence, in a supplemental statement provided to the Committee, stated that one of the reasons that a registration system is an "essential component of responsible gun policy" is because such a system

---

[21] *See Bill 19-614, Firearms Amendment Act of 2011: Hearing Before the Council of the District of Columbia Committee on the Judiciary,* Jan. 30, 2012, at 1 (written testimony of Daniel W. Webster, ScD, MPH, Johns Hopkins Center for Gun Policy Research) [hereinafter Daniel W. Webster 1.30.12 Testimony] (citing *Attorney General Applauds Bill to Take More Prohibited Firearms off Streets,* TRI-CITY VOICE, Oct. 28, 2011, http://www.tricityvoice.com/articlefiledisplay.php?issue=2011-10-28&file=SB819+++TCV.txt).

[22] Chief Lanier 1.30.12 Testimony, *supra* note 16, at 3 (The other stated objectives were: "[e]nsuring that owners have a common body of knowledge of firearms laws, responsibilities, and safety; [p]roviding law enforcement with the information necessary to readily identify legal firearms and the rightful owners; and [e]stablishing a means of tracking legal firearms that may be lost, stolen, or used in a crime.").

[23] *Id.*

[24] *Bill 19-614, Firearms Amendment Act of 2011: Hearing Before the Council of the District of Columbia Committee on the Judiciary,* Jan. 30, 2012, at 2-3 (written statement of Joseph J. Vince) [hereinafter Joseph J. Vince Statement].

"discourage[s] illegal firearm sales by creating accountability for gun owners."[25]   Indeed, requiring registration of the firearm and subsequent registration renewal allows for the Metropolitan Police Department to generally be aware of the firearms' whereabouts.  This, in turn, frustrates straw purchasers and deters gun trafficking.   The government's interest in preventing the trafficking of guns – i.e., the acquisition of guns by criminals – cannot be overstated.

Registrations fulfills a number of needs important to the District's interest in public safety:  distinguishing criminals from law-abiding citizens, enabling police to arrest criminals immediately, facilitating enforcement against prohibited persons obtaining or continuing to possess firearms, reducing gun trafficking, and increasing the difficulty for criminals to acquire guns.   The challenge to the government, therefore, is to undertake registration without an unnecessary burden for the law-abiding citizen.

### Fingerprints, Photo Identification, and In-person Appearance

Bill 19-614 makes changes and clarifications to the requirements for a registrant's fingerprints and photograph for purposes of firearm registration.  First, the Committee Print clarifies that fingerprinting is a mandatory, one-time requirement.  Because the Committee Print also requires that the Chief of Police maintain a record of the fingerprints, additional fingerprinting is no longer required.[26]  The initial fingerprinting requirement is fundamental for the Department to fulfill its public safety obligations in registering firearms[27] – being able to screen the registrant to ensure that he or she is not disqualified from possessing a firearm, and then later, to be able to ensure that the individual has not fallen into a "prohibited person" category.  Several states – California, New York, New Jersey, Iowa, Massachusetts, and Hawaii – as part of their permit-to purchase licensing system require that applicants be photographed and fingerprinted prior to a background check.[28]

---

[25]Benjamin Van Houten 2.13.12 Supplemental Statement, *supra* note 20; *see also* Joseph J. Vince Statement, *supra* note 24, at 3 (asserting that "[f]irearm registration fosters greater accountability among gun owners, and provides important information for law enforcement….").

[26] "The Chief shall maintain a record of the fingerprints of sufficient quality to enable periodic investigation to ensure compliance with Section 203 [§ 7-2502.03]."  Bill 19-614, Firearms Amendment Act of 2012, Sec. 2(e) (Committee Print).  In other words, rather than the registrant appearing every 6 years for a background check, the MPD will periodically undertake the background check on its own initiative, and has the fingerprints to resubmit for this purpose if necessary.  It is expected that the fingerprints will be digitally stored by the MPD.  The Committee has learned that other states undertake periodic background checks of registrants – at the state's initiative – to ensure continued qualification, typically for carry permits.

[27] *See* Daniel W. Webster 1.30.12 Testimony, *supra* note 21, at 2 ("Law enforcement agencies conduct background checks for job applicants, individuals seeking to adopt a child, and many other purposes rely upon the applicant's fingerprints to ascertain an individual's prior involvement in crime," thus it does not appear unreasonable for the District to fingerprint applicants for the purpose of firearm registration.).

[28] *Id.* ("The rationale for these requirements is that verification of the identify and fitness of persons approved to legally possess firearms is a serious matter of public safety.").

Witnesses testified to the importance of requiring fingerprinting in order to be certain of the registrant's identification.   A prohibited person can evade detection and succeed in registration if he or she can mask his or her identify.  According to Chief Lanier:

> "[u]sing biometrics [i.e., fingerprints] to positively identify an individual is far more effective than relying simply on a name and social security number, as is done with the background checks conducted by federally licensed firearms dealers.  Identify theft is rampant, and gun dealers are not necessarily well trained in identifying false documentation."[29]

Daniel W. Webster of the Johns Hopkins Center for Gun Policy and Research testified to the risk of identity theft in a system that relies solely upon firearms dealers to handle the identification process, because they have a vested interest in a sale.[30]  Mr. Webster cited a study where U.S. General Accounting Office investigators attempted the purchase of firearms from licensed dealers in five states, using homemade false drivers licenses, where the system was such that the firearms dealers were relied upon to verify the identity of potential purchasers.[31]  The investigators experienced a 100 percent success rate in their efforts.[32]

Whether it is because dealers are eager for a sale, or are not well-trained, or because the false documents were well made, the fact remains that a law enforcement-conducted background check through the use of fingerprints is the optimal means for the District to ensure that an individual is eligible to register a firearm.

Bill 19-614 also removes from the registrant the burden of submitting a photograph for purposes of registration.  Instead, the Chief of Police is required to take a digitalized photograph of an individual applicant at the time of the filing of a registration application.  In her testimony before the Committee, Chief Lanier reaffirmed the importance of a registrant being able to present a registration certificate with a photograph, so police can quickly identify whether and to whom the firearm has been legally registered.[33]  While an individual with a legally registered firearm is likely less dangerous to an officer than someone with an illegal gun, "a certificate with a photo helps to quickly and safety [sic] communicate this to an officer" which "in turn, helps to keep both the officer and the registrant safe."[34]

An individual must make an initial, in-person appearance at MPD in order for a photograph and fingerprints to be taken.  However, The Committee encourages the Department to allow individuals to obtain and fill out applications and any other forms for firearm registration online on MPD's website.  This has the benefit of enabling registrants to be fully

---

[29] Chief Lanier 1.30.12 Testimony, *supra* note 16, at 3.
[30] Daniel W. Webster 1.30.12 Testimony, *supra* note 21, at 2.
[31] *Id.* (citing GENERAL ACCOUNTING OFFICE, PURCHASED FROM FEDERAL FIREARM LICENSEES USING BOGUS IDENTIFICATION, GAO-01-427NI (2001)).
[32] *Id.*
[33] *See* Chief Lanier 1.30.12 Testimony, *supra* note 16, at 4.
[34] *Id.*

prepared when they arrive at the police station, and minimizes the time they must take off from work.


## Re-registration

The Committee believes that a registration system for firearms is most effective if the data retained by the Metropolitan Police Department is current. Thus, a system whereby individuals are periodically notified by the Department that they are required to resubmit their basic registration information is necessary.[35]

Currently section 205 of the law requires registrants to notify MPD of any change in registration status.[36] But this has not been effective. Thousands of registrants have moved, died, disposed of their guns (perhaps lost them) and have not notified MPD. MPD has told the Committee that many registrants cannot be located. Since keeping the registration records up to date is best, it makes sense to overlay a re-registration requirement. The burden of this is minimized if the renewal process is easy.

Several witnesses testified to the importance of a system for re-registration. The Legal Community Against Violence testified that "[t]he requirement that firearm owners renew their registration every three years helps ensure that those who have fallen into a prohibited category, say by being convicted of a felony or a domestic violence misdemeanor, aren't allowed to continue to own or possess guns."[37]

Similarly, Daniel Webster of the Johns Hopkins Center for Gun Policy and Research testified to the "important potential public safety benefits" of re-registration requirements, stating that "[l]egal purchasers of firearms may go on to commit crimes or become subject to restraining orders for domestic violence that make them legally prohibited from possessing firearms."[38] As

---

[35] The law requires MPD to notify registrants when it is time to renew, but the law also requires that registrants have the responsibility to renew regardless of whether they get notice from MPD. *See* D.C. OFFICIAL CODE § 7-2502.07a (2011 Supp.).

[36] *See* D.C. OFFICIAL CODE § 7-2502.08. Several witnesses also testified that the re-registration requirement is unnecessary because of the existing requirement for a registrant to notify the Chief regarding the loss, theft, or destruction of the registration certificate or of a registered firearm, of a change in the registrant's name or address, or of the sale or transfer of the firearm. *See Bill 19-614, Firearms Amendment Act of 2011: Hearing Before the Council of the District of Columbia Committee on the Judiciary*, Jan. 30, 2012, at 6 (written statement of Charles H. Cunningham, Dir. of State and Local Affairs, Nat'l Rifle Ass'n of Am.) [hereinafter Charles H. Cunningham Written Statement] ("If a registrant has not notified the Chief of any change, the District should simply assume the person is still lawfully in possession of the firearm...."); *see also Bill 19-614, Firearms Amendment Act of 2011: Hearing Before the Council of the District of Columbia Committee on the Judiciary*, Jan. 30, 2012, at 2 (supplemental written statement of Emily Miller) ("The law already dictates that a gun owner has to notify the registry office with a change of address or gun sale....").

[37] *See Bill 19-614, Firearms Amendment Act of 2011: Hearing Before the Council of the District of Columbia Committee on the Judiciary*, Jan. 30, 2012, at 1-2 (written testimony of Benjamin Van Houten, Managing Attorney, Legal Community Against Violence [hereinafter Benjamin Van Houten 1.30.12 Testimony].

[38] Daniel W. Webster 1.30.12 Testimony, *supra* note 21, at 2.

stated above, an important purpose for maintaining a firearms registration system in the District is for law enforcement to have the data regarding firearms and their registered owners in order to ensure that lawful owners do not later fall into a prohibited category whereby they are no longer qualified to own or possess a firearm.  This purpose is frustrated if registration information is not current.

Another important goal of the re-registration system is to determine when firearms have been lost or stolen.  In order for MPD, to the best of its ability, to track a gun that has been lost or stolen, up-to-date information about the firearm's last legal whereabouts is crucial.  The re-registration requirement can also act as a means for enforcement, in two ways:  first, it likely causes the owner to look for his or her gun if it hasn't been used, and this assures that the gun has not been lost or stolen.  Second, in the act of re-registering, an individual is affirming continued possession of the firearm, which could prohibit an individual from later asserting that he or she did not know that the firearm was lost or stolen.  The Committee notes that the reasons for maintaining the re-registration requirement apply equally to long guns as they do for handguns.

While supporting the general objective of re-registration, Chief Lanier testified before the Committee that creating such a system has a financial cost to the government.[39]  However, the Committee Print for Bill 19-614 extends the time period for the Department to establish a robust renewal system, and a system must be established by January 1, 2014.  Furthermore, no registration renewals will be required prior to that time to allow for the requisite infrastructure to be put into place.  The Committee believes that the re-registration process is important enough that the Department should be allocated sufficient resources to establish the system.

The Committee Print clarifies that the re-registration process is simple – the Chief of Police will provide a form for renewal, and submission can occur either online via MPD's website, by mail, or in person.  The renewal form need not be notarized, and seeks only to ascertain four basic facts:  that the registrant still exists, possesses the firearm, lives at the specified address, and is still eligible to possess a firearm (e.g., has not become a felon).  Failure to re-register will result in the cancelation of the firearms registration.

## Training

Current law requires that an individual complete a firearms training or safety course or class that provides at a minimum, a total of at least one hour of training at a firing range and at least 4 hours of classroom instruction.  Bill 19-614 substantially revises this requirement – primarily, by eliminating the 5 hour requirement with the range and classroom components.

The Committee has found that the 5-hour requirement is expensive and cannot be met within the District.  The legislation maintains a training requirement, but it will be provided free

---

[39]Chief Lanier 1.30.12 Testimony, *supra* note 16 (asserting that in light of limited resources, "establishing and maintaining the systems and processes to regularly track this information may cost more than the potential benefit").

of charge and entail far less time.  The Committee Print leaves to the discretion of the Chief of Police as to how best to provide it, but the Committee expects, based on conversations with MPD, that the new training and safety class will be comparable to what Maryland requires.  In Maryland, a video is shown to individuals who purchase firearms.  In her testimony before the Committee, Chief Lanier stated that the Department "urge[s] the Council to consider [the Department's] original proposal to allow MPD to provide a video on firearms safety and laws that registrants can watch at MPD or online."[40]

The Committee believes training in the safe handling and use of firearms is important, and it makes no sense that anyone would acquire a firearm and then not know how to use it.  But training ought to occur over many sessions over a period of time and, for now, that would not seem viable to require as a matter of law.  So, the Print adopts the Chief's recommendation/Maryland approach.  Further, the Committee Print clarifies that this training requirement is a one-time requirement per registrant, and need not be completed again for successive firearm registrations.

Additionally, the Committee Print exempts from the training requirement an individual who can demonstrate that he or she has received firearms training in the U.S. military, has a license from another state that included training at least equal to MPD's, or can otherwise demonstrate that a firearms training or safety course has been completed that is at least equal to that provided by MPD.  MPD testified that in practice, it was already exempting many of those individuals from the current 5-hour training requirement.[41]

The Committee Print resolves a catch-22 that existed in current law, which restricted an individual from possessing a firearm in the District that was not registered to him or her, yet required that individual to perform training with a firearm prior to registration.  Bill 19-614 exempts from the registration requirement an individual who temporarily possesses a firearm while participating in a firearms training and safety class conducted by a firearms instructor.  By making this change to the law, the Committee recognizes that an individual, prior to the application process for registering a firearm, may still want (and ought) to engage in training at a firing range.  The Committee Print makes this possible, and also makes a similar change regarding ammunition: that an individual may temporarily possess ammunition for purposes of participation in a firearms training and safety class.  Also, the Committee Print clarifies that for persons who travel in the District to participate in any "lawful recreational firearm-related activity," that phrase includes a firearms training and safety class.[42]

---

[40] Chief Lanier 1.30.12 Testimony, *supra* note 16.

[41] *Id.* (asserting that "we agree with clarifying in the legislation that which we already do in practice:  waiving the current training requirement for individuals who can prove they have already been trained in the military or law enforcement, or certified as trained by another jurisdiction.").

[42] *See* D.C. OFFICIAL CODE § 7-2502.01(b)(3) (2011 Supp.); § 22-4504.01(2) (2011 Supp.).

**Ballistics Testing and Microstamping**

In 2008, the Committee discussed at length the ballistics testing requirement under current law:

> All firearms leave unique markings on the bullets and shell casings they fire. Ballistic identification laws enable law enforcement to link bullets and shell casings recovered at crime scenes to the firearm that fired them by test firing the firearm. During the October 1st [2008] hearing, Josh Horwitz, Executive Director of the Educational Fund to Stop Gun Violence ("Ed Fund"), testified on ballistics identification – specifically on a technology called "microstamping." Microstamping can identify the serial number of a firearm directly from an expended cartridge case found at a crime scene. It utilizes laser technology to engrave microscopic markings (in the form of alpha and geometric codes) on the internal parts of a firearm, e.g. the breech face and the tip of the firing pin. When the firearm is fired, the markings are stamped onto the cartridge. According to the Ed Fund, microstamping is superior to traditional methods of ballistic identification because the markings are intentionally stamped onto the cartridge, versus relying on unintentional markings. The markings identifying [sic] important information about the firearm, such as make, model, and serial number of the weapon.[43] The goal of microstamping is to identify a firearm the first time it is used to commit a crime.[44] ...

> Traditional methods of ballistic identification involve focusing on the tool marks on the interior surface of a firearm that are transferred from the firearm to an expended cartridge when the firearm is fired. These unintentional marks are a product of the manufacturing process. For decades, ballistic identification has relied on highly trained firearm examiners to analyze the marks by hand to make matches between a cartridge and a recovered firearm. Around 10 years ago the federal government created the national Integrated Ballistic Information Network (NIBIN) program to allow for computer-assisted searches of digital images of cartridges found at crime scenes. According to the Ed Fund, the problem with NIBIN is that it "relies on the same unintentional markings used by firearm examiners and cannot lead investigators directly to a specific firearm and its serial number, unless that weapon is eventually recovered."[45] Unless a weapon has been used before in a crime, and recovered, and therefore entered into NIBIN, law enforcement will learn relatively little from a newly-recovered shell casing. With microstamping, however, law enforcement will almost immediately know the precise gun and its purchaser from the newly recovered shell casing, if from a semiautomatic pistol, even if never before used in a crime, and even if never having been entered into NIBIN.[46]

---

[43] *Bill 17-843, Firearms Control Amendment Act of 2008: Hearing Before the Council of the District of Columbia Committee on the Judiciary*, Oct. 1, 2008, at 2 (written testimony of Joshua Horwitz, Executive Director, Educational Fund to Stop Gun Violence).

[44] *Id.*

[45] *Id* at 1.

[46] Bill 17-843, Firearms Control Amendment Act of 2008, Report of the Committee on the Judiciary, at 5 (Nov. 25, 2008) [hereinafter 2008 Committee Report]. The 2008 Committee Report also cited problems experienced in Maryland with its own ballistics program:

Ballistics testing and microstamping are two approaches to firearms identification.  Bill 19-614 repeals the ballistics test requirement for firearms registration but retains the microstamp requirement for newly manufactured semi-automatic pistols.  The Committee Print, however, extends the time period for this procedure to be implemented by one year, that is, to January 1, 2014.

Currently, MPD uses the NIBIN/IBIS system for guns used in crime, and it is an important law enforcement tool.  The same efficacy is not possible in the firearm registration process.  The Committee believes that microstamping will prove to be a more effective means of identifying many of the guns used in crime.  Thus, the use of NIBIN and the development of microstamping should be sufficient to help police solve gun-related crimes.

The Print postpones implementation of microstamping only because the District is a tiny market.  Once California implements microstamping, which is already their law, microstamping will become more feasible for implementation here.

## One Pistol per Thirty Days

The District's firearms laws currently state that the Chief of Police shall register no more than one pistol per registrant during any 30-day period.[47]  Generally, laws restricting the number of firearms purchased prevent gun traffickers from purchasing guns in bulk sales to in turn sell those guns to prohibited purchasers.[48]  This helps to reduce the flow of guns both into the illegal market and between state lines.[49]  At the hearing on Bill 19-614, several witnesses testified to the importance of the District's one pistol per-month limitation.  Daniel R. Vice, Senior Attorney for the Brady Center to Prevent Gun Violence and Benjamin Van Houten of the Legal Community Against Violence, in their testimony and supplemental statements, provided the following statistics:

---

This problem is highlighted by what has occurred in the State of Maryland over the past eight years.  Maryland created the Maryland Integrated Ballistics Identification System ("MD-IBIS") program in 2000, at a cumulative cost of $2.5 million.  A September 2004 report by the Maryland State Police Forensic Science Division found that "[c]ontinuing problems include the failure of the MD-IBIS to provide any meaningful hits.  There have been no crime investigations that have been enhanced or expedited through the use of MD-IBIS...It is recommended that this Program be suspended. (citing Maryland State Police, Forensic Science Division, *MD-IBIS Progress Report*, September 2004).

[47] *See* D.C. OFFICIAL CODE § 7-2502.03(e) (2011 Supp.) (The law includes an exception to the one pistol per 30 days requirement for new District residents who lawfully owned more than one pistol in another jurisdiction for 6 months).
[48] LEGAL COMMUNITY AGAINST VIOLENCE, MODEL LAWS FOR A SAFER AMERICA 67 (2011).
[49] *Id.*; *see also* 2008 Committee Report, *supra* note 46, at 10 ("Studies show that laws restricting multiple purchases or sales of firearms are designed to reduce the number of guns entering the illegal market and to stem the flow of firearms between states.").

- Firearms sold to the same purchaser via multiple sales are frequently used in crime,[50] and one study found that handguns involved in bulk purchases were 33% more likely to be used in crime than handguns purchased individually.[51]

- According to another study, Virginia's one handgun per month limit reduced by 66% the odds that a crime gun was purchased in Virginia rather than elsewhere in the Southeast.[52]

- Another study found that Maryland's one handgun per month law could greatly reduce the risk of bulk-sale guns being recovered from crimes, because multiple-gun sales were up to 64% more likely to be used in crime.[53]

- Gun trace data from the Bureau of Alcohol, Tobacco, and Firearms demonstrated that in 1999, 22% of all handguns recovered in crime had been involved in a multiple sale,[54] and other gun trace data demonstrated that in 2000, 20% of retail handguns recovered in crime were part of a multiple sale.[55]

     Currently, California, Maryland, New Jersey, Chicago, and New York City are the other jurisdictions that limit multiple purchases of firearms.[56]   Virginia just repealed its own

---

[50] Benjamin Van Houten 2.13.12 Supplemental Statement, *supra* note 20, at 3 (citing Bureau of Alcohol, Tobacco and Firearms, U.S. Department of the Treasury, *Youth Crime Gun Interdiction Initiative, Crime Gun Trace Reports (2000) National Report* 52 (Jul. 2002), *available at:* http://www.atf.gov/publications/download/ycgii/2000/ycgii-report-2000-general-findings.pdf; Bureau of Alcohol, Tobacco and Firearms, U.S. Department of the Treasury, *Youth Crime Gun Interdiction Initiative, Crime Gun Trace Reports (1999) National Report* 40 (Nov. 2000), *available at:* http://www.atf.gov/publications/download/ycgii/1999/ycgii-report-1999-general-findings.pdf [hereinafter ATF Reports].

[51] *Bill 19-614, Firearms Amendment Act of 2011: Hearing Before the Council of the District of Columbia Committee on the Judiciary*, Jan. 30, 2012, at 4 (written testimony of Daniel R. Vice, Senior Attorney, Brady Center to Prevent Gun Violence) [hereinafter Daniel R. Vice 1.30.12 Testimony] (citing Mona Wright et al, *Factors Affecting a Recently Purchased Handgun's Risk for Use in Crime Under Circumstances That Suggest Gun Trafficking*, 87 J. URBAN HEALTH:  BULL. OF THE NEW YORK ACAD. OF MED. 352, 356 (2010)).

[52] *Id.* (citing Douglas Weil & Rebecca Knox, *Effects Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275 J. AM. MED. ASS'N 1759, 1760 (1996))); *see also* Benjamin Van Houten 2.13.12 Supplemental Statement, *supra* note 20, at 3 ("After the law's adoption, the odds of tracing a gun originally acquired in the Southeast to a Virginia gun dealer (as opposed to a dealer in a different southeastern state) dropped by 71% for guns recovered in New York, 72% for guns recovered in Massachusetts, and 66% for guns recovered in New Jersey, New York, Connecticut, Rhode Island and Massachusetts combined." (citing Douglas S. Weil & Rebecca Knox, *Evaluating the Impact of Virginia's One-Gun-A-Month Law*, The Center to Prevent Handgun Violence 1, 4-6 (Aug. 1995))).  Mr. Van Houten points out that "despite this evidence of the law's effectiveness," the Virginia legislature recently repealed the state's one gun per month law.  *Id.* at 3, n.14.

[53] *Id.* (citing Christopher S. Koper, *Crime Gun Risk Factors: Buyer, Seller, Firearm, and Transaction Characteristics Associated with Gun Trafficking and Criminal Gun Use*, Report to the National Institute of Justice 6, 83 (2007), *available at* http://www.ncjrs.gov/pdffiles1/nij/grants/221074.pdf); *see also* Benjamin Van Houten 2.13.12 Supplemental Statement, *supra* note 20, at 3 (citing the same study and also adding that "handguns sold in multiple sales accounted for about a quarter of crime guns").

[54] Benjamin Van Houten 2.13.12 Supplemental Statement, *supra* note 20 (citing ATF reports, *supra* note 50).

[55] *Id.*

[56] *See* LEGAL COMMUNITY AGAINST VIOLENCE, *supra* note 48, at 67, 69 (2011) (In California, New Jersey, and Chicago, the limitation is one handgun every 30 days;  in Maryland, the limitation is one handgun or assault weapon

restriction.[57]   This action appears to have been motivated by political – that is, popular – sentiment rather than by evidence-based analysis.   In that regard, a recent opinion piece was published in The Washington Post challenging the assertion that Virginia's one gun per month restriction only burdens law-abiding citizens who wish to own a firearm:

> The gun lobby is fond of saying that gun laws only burden law-abiding citizens — that criminals will always be able to get guns. The analysis of ATF's gun-trace data proves that proposition is not true. The Virginia law applies to retail gun sales, but the impact, both large and immediate, was on illegal gun trafficking. The law places virtually no burden on individuals who are legally entitled to purchase a handgun. It isn't a prohibition against the purchase or possession of firearms. It doesn't limit the number of guns an individual can own. It doesn't increase the time needed to complete a background check. The law burdens gun traffickers and the straw purchasers they hire to supply them with guns, and it makes it more difficult for the rare dirty gun dealer who is willing to look the other way when a single individual walks in to his store asking to buy five or 10 or even 20 or more inexpensive handguns to be sold on the street.[58]

The Committee is persuaded by the ample analyses that multiple gun sales enable gun trafficking, and that one-gun-per-month restrictions frustrate trafficking.   Since other states permit multiple gun sales – including, now, Virginia – our District law remains important. Indeed, the other states should follow, so as to erect a wide web to frustrate the traffickers.


**Demonstrated Knowledge Requirement**

The registration requirements for firearms in the District of Columbia require an applicant to "demonstrate satisfactorily a knowledge of the laws…pertaining to firearms and, in particular, the safe and responsible use, handling, and storage of the same in accordance with training, tests, and standards prescribed by the Chief…."[59]   Bill 19-614 clarifies that this knowledge test is a one-time requirement, such that once an individual successfully completes the requirement for a given registration application, her or she does not have to take it again to register additional firearms or to renew an existing registration certificate(s).

In her testimony before the Committee, Chief Lanier stated that "[a]nyone who possesses and registers a firearm should be aware of the laws and requirements for responsible gun ownership, as well as key safety principles."[60] The Chief went on to point out the important

---

every 30 days; and in New York city, all firearm purchases are limited to one per 90 days.  The Committee notes that at the time of the LCAV report's publication, Virginia was also reported to have a 30-day restriction.)

[57] *See* VA HB 940 and SB 323 (the measures each passed in the Senate and House, and are awaiting signature by Virginia Governor Robert F. McDonnell, who has indicated an intent to sign the legislation).

[58] Douglas Weil, *A Law that Gun-Rights Advocates Should be Fighting to Keep*, WASH. POST, Feb. 17, 2012, http://www.washingtonpost.com/opinions/a-law-that-gun-rights-advocates-should-be-fighting-to-keep/2012/02/16/gIQAvcASKR_story.html.

[59] D.C. OFFICIAL CODE § 7-2502.03(a)(10) (2011 Supp.).

[60] Chief Lanier 1.30.12 Testimony, *supra* note 16.

public safety interest in requiring registrants to demonstrate basic firearm safety knowledge by asserting that:

> [e]ven if a firearm is only kept in the home, the government has an interest in reducing accidental discharges, ensuring guns are safely stored, and ensuring owners are aware of the laws governing firearms. Moreover, in order to make registrants more clearly accountable under the law, it is important to be able to demonstrate that they were taught and aware of the requirements."[61]

The Metropolitan Police Department is tasked with ensuring the safety of District residents and visitors. Regulating firearms – weapons that have the easy potential to be lethal,[62] whether used deliberately or accidentally – is a part of MPD's public safety responsibility, and ensuring that those District residents who lawfully register firearms in the District have at least a basic level of knowledge regarding the District's firearms laws and firearm safety is a central component of this responsibility.

However, the Committee is concerned with the continuing complaint that some of the test questions are useless or irrelevant to gun ownership. MPD must ensure that the subject matter it chooses to test is that which is most pertinent to an applicant for firearm registration, and that which best serves the Department's interests in ensuring the safety of the registrant and the public. If this requires MPD to revisit the material it is currently using in its written test, then the agency should do so. To prod such a revisit, the Committee Print specifies that the test should cover "in particular, the requirements of [registration], the responsibilities regarding storage, and the requirements for transport...."[63]

## Vision Requirement

In order to register a firearm at present under District law, an individual must demonstrate that their vision is at least equal to that required to obtain a driver's license in the District.[64] The Committee does not believe a vision test should be a prerequisite to owning a firearm. Other states don't do this. Therefore, Bill 19-614 revises this requirement to simply state that a registrant must not be legally blind. Maintaining such a clear requirement is logical: there is an obvious correlation between not being blind and being able to handle a firearm safely, especially for self-defense in the home.

---

[61] *Id.*

[62] *See* Daniel R. Vice 1.30.12 Testimony, *supra* note 51, at 5 (analogizing the written knowledge test requirements an individual must meet in order to obtain a license to drive a car).

[63] D.C. OFFICIAL CODE § 7-2502.03(a)(10) as revised by Bill 19-614, "Firearms Amendment Act of 2012," Sec. 2(d)(1) (Committee Print).

[64] *See* D.C. OFFICIAL CODE § 7-2502.03(a)(11) .

**Background Checks**

Under current law, an individual who has lawfully registered a firearm in the District is required to submit to a background check once every 6 years to confirm that he or she continues to qualify for registration.[65]   Chief Lanier testified before the Committee that an in-person appearance by the registrant at the outset in order to submit to background check is important in ascertaining that the registrant is in fact statutorily eligible to register a firearm in the District.[66] However, with three years of experience with registrations since the *Heller* decision, MPD has determined that it has the ability to streamline this process. Rather than require registrants to submit to follow-up background checks every 6 years, the Department is able to conduct its own internal background checks periodically,[67] perhaps even more frequently.   This has a concomitant benefit of eliminating a burden on registrants.  During Chief Lanier's testimony before the Committee, the Department assured the Committee that it has sufficient authority to conduct periodic checks on its own initiative without change to the law.

**Federal Firearms Licensee**

Under federal law, no person may purchase a handgun in a state outside their residence without transferring the handgun via a Federal Firearms Licensee (FFL).   Since there are currently no gun dealers in the District, all District registrants must go through an FFL to acquire a handgun lawfully.  Unfortunately, there is currently only one individual in the District of Columbia – Charles Sykes – who is commercially operating as an FFL.  There was a moment of uncertainty from late April through mid-July 2011, when Mr. Sykes temporarily lost his lease, and the District did not have a commercially available FFL.[68]  This temporarily prevented any individual from obtaining a handgun.  The Committee recognizes market forces were the cause, and those forces also are largely to blame for the fact that there was, and still is, only one entity operating commercially as an FFL in the District.[69]

However, to ensure that individuals who wish to register a handgun in the District are not prevented from doing so again because no privately-run FFL is available, the Committee Print for Bill 19-614 provides a fall-back option.  The Committee has added language to the registration law providing that whenever there is no active Federal Firearms Licensee commercially operating in the District, the District government may seek a license to operate as an FFL in order for eligible District residents to lawfully obtain handguns.  Ultimately the decision is discretionary by the Mayor.  Pursuant to the Committee amendment, the District would only act as an FFL until another active FFL opened up for operation in the District.  These

---

[65] *See* D.C. OFFICIAL CODE § 7-2502.07a (2011 Supp.).

[66] Chief Lanier 1.30.12 Testimony, *supra* note 16, at 3.

[67] *Id.*

[68] Since last summer, Mr. Sykes has been operating as an FFL at MPD headquarters at 300 Indiana Ave NW.

[69] According to information obtained from MPD, 1445 handguns have been registered since *Heller*.  After an initial surge, the pace slowed.  Mr. Sykes informed the Committee last July that he handles 6-10 people per month.

protective provisions will ensure that in the event that there is temporarily no commercially-operating FFL in the District – as occurred last year – the District government will be able to step in to fill the void and ensure that residents lawfully eligible to register handguns in the District are able to have their guns go through the required federal transfer prior to possession.

The Committee also notes that witnesses testified on Bill 19-614 that they were not aware at the outset of the registration process that an FFL is required, for which there is a fee.  MPD must inform applicants and potential applicants of the requirement that their firearm be transferred through an FFL if they are registering a handgun in the District.  Information that would be most helpful to the public would include:  what an FFL is, who is currently operating as an FFL in the District and where to locate them, and the costs that are involved in having a handgun transferred through an FFL.  This information should be made available to an applicant or potential applicant on the MPD website and in an information packet provided at the outset of the registration process.

**Long Guns**

The District currently requires the registration of long guns as well as handguns.  There is ample evidence to support the need to require registration of long guns based on the perceived dangers that they can pose to this city – the nation's capital.  Registration enables a modicum of necessary oversight by the Metropolitan Police Department.   While handguns are more commonly used in crime, during 2006-2010, over 4,000 murders in the United States occurred through the use of rifles and shotguns.[70]  Furthermore, 17 percent, or 260 illegal firearms out of 1545 recovered by the Metropolitan Police Department during 2010 were long guns.[71]  While long guns were used in a minority of crimes, 260 is not an inconsequential number.  Various witnesses testified to the importance of a system that includes registration of long guns, based on their lethality and actual use in serious crimes in the District.  Chief Lanier, in her testimony before the Committee, pointed out that both Oscar Ortega-Hernandez, the man who shot at the White House this past November, as well as James Von Brunn, the shooter at the Holocaust Museum in June of 2009, used long guns.[72]  According to the Chief:

---

[70] Daniel R. Vice 1.30.12 Testimony, *supra* note 51, at  6 (citing Federal Bureau of Investigations, *Expanded Homicide Data Table 8, Murder Victims, by Weapon, 2006-2010*, available at: http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/tables/10shrtbl08.xls); *see also* Daniel W. Webster 1.30.12 Testimony, *supra* note 21 ("Nationally, long guns were used to kill 10 percent of individuals who were murdered with firearms") (citing FEDERAL BUREAU OF INVESTIGATION, U.S. DEPARTMENT OF JUSTICE, CRIME IN THE UNITED STATES, 2010 (2011), *available at:* http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-2010).

[71] Daniel W. Webster 1.30.12 Testimony, *supra* note 21 (citing Bureau of Alcohol, Tobacco, Firearms and Explosives, Firearms Trace Data – District of Columbia.  U.S. Department of Justice, BATFE, Office of Strategic Intelligence and Information, *available at:* http://www.atf.gov/statistics/download/trace-data/2010/2010-trace-data-district-of-columbia.pdf. ).

[72] Chief Lanier 1.30.12 Testimony, *supra* note 16, at 2 (stating that while criminals may more often choose to use handguns in the commission of crimes, and homeowners may more often choose to own handguns, "long guns can also be used with deadly precision," and "if an assailant is traveling by vehicle, as Ortega-Hernandez and Von Brunn were, there is no need to try to hid a gun in a pocket.").

> It is not just lone-wolf gunmen who use long guns. Although they are less commonly
> used in the commission of crimes in the District than handguns, they are used, and in this
> urban environment, their longer range can make them even more dangerous than a
> handgun. There are few if any areas of the city that have the open space for which long
> guns are typically used in more rural areas, such as for hunting or recreational target
> shooting. In the city, when you miss your target with a long gun, it is very likely to hit an
> unintended target....While fewer criminals may choose to use long guns, they are still
> dangerous and potentially deadly weapons, and should be regulated accordingly.[73]

President John F. Kennedy was assassinated by gunfire from a long gun. Indeed, rifles
are more effective than handguns if one wants to target a motorcade, and the nation's capital is
full of motorcades. Chief Lanier cited other examples involving the White House and Holocaust
Museum, and this report also mentions Alfred Brock near the Capitol (See note 13). But the
criminal use of long arms is not limited to national targets; they are used in street crime. The
most violent incident in this city in over a decade involved both a rifle and a shotgun: the March
30, 2010 shooting of eight young persons huddled in a doorway off South Capitol Street, SE,
which killed three. Two other murders were linked closely to this shooting, one of which
utilized a rifle.

The Brady Center to Prevent Gun Violence testified to the importance of long gun
registration for public safety and crime prevention.[74] Daniel Vice of the Brady Center spoke to
the particular risk of the use of long guns in the District of Columbia, "where their accuracy at
long range poses a special threat to government officials, diplomats, and motorcades."[75]

The justifications that exist for registration of firearms in general – including the unique
nature of the District as the nation's capital, providing law enforcement with the information
necessary to ensure that gun owners do not fall into the prohibited persons categories, and
differentiating lawful gun owners from illegal gun owners – apply equally with regard to long
arms.

The Committee believes that Bill 19-614 strikes an acceptable balance between ensuring
public safety and minimizing the burden on law-abiding citizens. Certainly the present bill
reduces the burden on gun owners from what has been the law. What burden remains fulfills the
important objectives of enabling police to better target criminals and arrest them quickly,

---

[73] *Id.* (Chief Lanier also testified to two specific incidents – one recent shooting by masked men on E Street NE
where an 8-year old girl was shot that include a long gun, and at least one recent robbery in the 4th Police District
involved the use of a shotgun).

[74] Daniel R. Vice 1.30.12 Testimony, *supra* note 51, at 5 (citing Brady Center to Prevent Gun Violence, *Capital
Under Fire*, Sept. 2008, *available at:* http://www.bradycenter.org/xshare/pdf/reports/capital-under-fire.pdf . (Mr.
Vice also testified to the need for law enforcement to have knowledge as to whether a person living in an apartment
building that overlooks a government building, motorcade route, or other sensitive place maintains large numbers of
long-range rifles).

[75] *Id.*

keeping prohibited persons such as the mentally ill from having firearms, and minimizing gun trafficking.  The Committee recommends approval of Bill 19-614.

## II.   LEGISLATIVE CHRONOLOGY

| | |
|---|---|
| December 6, 2011 | Bill 19-614, "Firearms Amendment Act of 2011," is introduced by Councilmember Phil Mendelson, co-sponsored by Councilmembers Thomas, Jr. and Chairman K. Brown, and is referred to the Committee on the Judiciary. |
| December 16, 2011 | Notice of Intent to Act on Bill 19-614 is published in the *District of Columbia Register.* |
| December 16, 2011 | Notice of a Public Hearing is published in the *District of Columbia Register.* |
| January 30, 2012 | The Committee on the Judiciary holds a public hearing on Bill 19-614. |
| February 29, 2012 | The Committee on the Judiciary marks-up Bill 19-614. |

## III.   POSITION OF THE EXECUTIVE

Cathy L. Lanier, Chief of the Metropolitan Police Department, testified on behalf of the Executive at the January 30, 2012 hearing.  The Chief spoke to the unique nature of the District as a potential target for attack, stating that the laws need to reflect that reality.  She stated that certain firearm registration processes could be streamlined, such as background checks, training, and ballistics tests.  She noted that an issue with re-registration is funding the cost.  In general, Chief Lanier's testimony was supportive of the bill.

## IV.   COMMENTS OF ADVISORY NEIGHBORHOOD COMMISSIONS

Although there was testimony from individual Commissioners, no Advisory Neighborhood Commission submitted recommendations and comments on Bill 19-614.

## V.   SUMMARY OF TESTIMONY

The Committee on the Judiciary held a public hearing on Bill 19-614 on Monday, January 30, 2012.  The testimony summarized below is from that hearing.

*Emily Miller* testified in support of several provisions of Bill 19-614, including the elimination of the ballistics test and providing that MPD will take the photographs. Ms. Miller spoke to the barriers she sees to registering a legal handgun in the District, including the safety class and costs of registration. She urged that the bill go farther to make owning a gun easy.

*James R. Collier* testified regarding his years of firearm ownership. Mr. Collier recommended amendments to Bill 19-614, including expanding permissible reasons for handgun registration to include hunting and competition, and adding definitions to the Code to help MPD determine whether a particular style of rifle is legal to own in DC.

*Daniel Webster, Professor, Johns Hopkins Bloomberg School of Public Health*, testified to the importance of registering long guns, requiring photo identification and fingerprinting, and maintaining re-registration.

*Absalom Jordan* testified regarding a perceived unfairness of the District's firearm registration scheme because it touches upon a constitutional right. Mr. Jordan spoke against several provisions of the bill, including the demonstrated knowledge requirement and defining a firearms instructor as one certified by the Chief of Police. He did not support the bill, or the underlying law.

*Daniel Vice, Senior Attorney, Brady Center to Prevent Gun Violence,* testified in support of the District's existing, "strong" gun laws. Specifically, Mr. Vice stated support for registration of firearms in general, the District's specific registration requirements including the one handgun per month limit, restrictions on carrying guns in public, and the ban on assault weapons.

*Benjamin Van Houten, Managing Attorney, Legal Community Against Violence,* testified in support of the District's firearms registration system. Mr. Van Houten specifically cited support for the application of the registration system to long guns, re-registration requirements, the one-gun-per-month limitation, and a strong firearms training requirement.

*George L. Lyon, Jr., President, DC Chapter Community Association for Firearms Education (CAFE)* testified in support of Bill 19-614. Mr. Lyon described basic gun safety rules. He proposed that Bill 19-614 go further, including abolishing re-registration, issuing licenses to carry, and repealing the microstamping requirement.

*Ricardo Royal, National President & Chief Training Counselor, CAFE,* testified in support of Bill 19-614's changes to permit firearms training to be conducted in the District. Mr. Royal urges several additional changes, including repealing the current prohibition of unregistered ammunition for firearms owners and repealing the microstamping requirement.

*Dick Heller* testified about the unnecessary hurdles presented by the District's current gun registration and ownership procedure in the wake of the *Heller* I decision. Mr. Heller also

spoke to evolving trends in firearms technology, and stated that the District is outside the mainstream regarding concealed-carry laws.

*Commissioner Sandra Seegars, ANC 8E02,* testified in support of Bill 19-614 generally. Commissioner Seegars stated that she had issues with repealing the vision test, with a knowledge test being exclusively written and not verbal, the ability of low-income individuals to access training, and with training being conducted exclusively by the Chief of Police.

*Erik Smith* testified to the difficulty and high cost of lawfully registering firearms in DC, and the risks presented by living in a high-crime neighborhood. Mr. Smith also spoke to the lack of transparency in the registration process, and the benefits of an online training course similar to Maryland's.

*Kevin Carnahan* testified that individuals who are blind should be able to register firearms. Mr. Carnahan also stated that he tried to purchase a gun to register in DC, but was deterred by the difficulty of the process. He also said that ordinary citizens should be able to carry a firearm outside of their home.

*Jack Donald* testified regarding the one gun per month limitation. He said gun running outside DC is not an issue. He also testified that the microstamping requirement should be looked at carefully because of its cost and questionable efficacy, and training should be kept reasonable such as in Maryland.

The Committee received other statements regarding Bill 19-614. All of the statements and testimony are filed with the record of the bill.

## VI.   IMPACT ON EXISTING LAW

Bill 19-614 amends D.C. Official Code § 7-2501.01 *et seq.* to make a number of changes to the firearms registration laws, primarily to effect clarity and reduce the burden on a firearms registrant. Section 7-2502.01 is amended to exempt from the registration requirements an individual who temporarily possesses a firearm while participating in a firearms training and safety class; and § 7-2502.02(a)(4) is amended to exempt a firearms instructor or an organization that employs a firearms instructor from the prohibition against pistol registration, for use in firearms training. Bill 19-614 also amends § 7-2502.03 to clarify that certain misdemeanor convictions that occurred within 5 years prior to a firearm registration application, including intrafamily offenses, preclude an individual from registering a firearm. Amendments to this section also provide that an individual is not eligible to register a firearm if he or she is legally blind; revise the training requirement and provide exceptions; clarify that the knowledge test is a one-time requirement, and repeal the requirement for a ballistics test of every firearm registered.

Section 7-2502.04 is amended to require the Chief to photograph and fingerprint every person who applies to register a firearm.   Section 7-2502.07a is amended to repeal the requirement for a background check every 6 years, and to extend the time frame for MPD to create a system for re-registration of firearms until January 1, 2014.  Bill 19-614 also amends § 7-2504.08 and § 7-2505.03 to extend by one year the requirement that all semi-automatic pistols manufactured after that date and that are sold or transferred in the District be microstamp-ready.  A new section is also added providing that the District may act temporarily as a federal firearms licensee (FFL) in the absence of a commercially-operating FFL.  Bill 19-614 also amends D.C. Official Code § 7-2506.01 to exempt from the prohibition against unregistered ammunition an individual who has lawfully registered a firearm in the District or who temporarily possesses ammunition while participating in a training and safety class.

Bill 19-614 amends D.C. Official Code § 22-4501.01 *et seq.* to clarify that unlawful possession of a firearm includes a conviction within the past 5 years of an intrafamily offense punishable as a misdemeanor. Bill 19-614 also removes outdated language regarding the granting of licenses to carry weapons, clarifies that special police officers lawfully granted authority to carry a firearm are excepted from the carry prohibition, and reduces somewhat the waiting period from 10 days following "application" to 10 days following "purchase."

Finally, Bill 19-614 amends D.C. Official Code § 23-1331(3)(A) to make a technical correction to a cross reference to § 7-2501.01 *et seq.*

## VII.   FISCAL IMPACT

The Committee adopts the attached February 29, 2012 fiscal impact statement from the District's Chief Financial Officer (CFO), which states that funds are sufficient in the FY 2012 through FY 2015 budget and financial plan to implement the bill. According to the CFO, those provisions that reduce or eliminate some of the requirements for firearm possession in the District are not likely to have a significant financial impact.  If the District chooses to register as an FFL, it might have to pay costs to do so, but those costs must be accounted for in the budget prior to doing so.  However, MPD has stated its preference for assisting a private entity or entities to act as an FFL, so this may never be an issue.

## VIII.   SECTION-BY-SECTION ANALYSIS

Section 1            States the short title of Bill 19-614.

Section 2            Amends various provisions of the District's firearm registration laws.

Subsection (a)    Makes technical changes in the definitions of "intrafamily offense" and "crime of violence," and adds a definition for "firearms instructor."

*Subsection* (b)       Clarifies that a firearm registration certificate may be issued to a person who complies with the registration requirements, and adds a provision that firearms instructors (or an organization that employs them) may also obtain registration certificates.   This subsection also carves out an exemption to the registration requirements for temporary possession of a firearm while participating in a firearms training and safety class.  Finally, this subsection clarifies that for non-District residents, their participation in a firearms training and safety class is a lawful recreational firearm-related activity.

*Subsection* (c)       Adds a firearms instructor or an organization that employs a firearms instructor for use in firearms training, to the list of exceptions to the prohibition against registering a pistol.

*Subsection* (d)       Clarifies that certain convictions, if a misdemeanor (including misdemeanor intrafamily offenses), are a 5-year bar to registration rather than a lifetime bar.   This subsection also clarifies that the written knowledge test is a one-time requirement; provides that an individual who is legally blind is prohibited from registering a firearm; revises the training requirement for firearm registration, lists several exceptions to the training requirement; and repeals the subsection requiring a ballistics test of every registered pistol.   The Committee Print requires the Police Chief to provide a "firearms training and safety class," which the Committee expects (based on conversations with MPD officials) will be a video at police headquarters similar to what Maryland now has.  The exceptions to the training requirement fall in line with the Department's current practice.  As with the written test, the training provided by MPD is a one-time requirement.   Regarding the written test, the Committee is concerned about testimony that the current questions are useless, superfluous, or outdated; the point should be to test that which is relevant to possession, storage, and transport of firearms, and language reflecting this has been added to the Committee Print.

*Subsection* (e)       Currently an applicant must provide non-digitalized photos.  The Print amends the photograph requirement to require that the Chief take a digitalized photo of each individual applicant at the time a registration application is filed.  The Print enables better recordkeeping and amends the fingerprinting requirement to require that the Chief keep a record of the fingerprints – probably digitalized. The Committee Print makes these changes to the fingerprinting provisions in order that MPD can periodically conduct its own background check of registrants to determine if anyone has become an ineligible registrant.  By putting this burden on MPD, it becomes possible to eliminate the current 6-year background check required of registrants. In order for MPD to conduct its own

periodic background checks internally, it must have the fingerprints of each individual applicant at the outset and maintain those fingerprints on file.

*Subsection (f)*  Establishes in the law that MPD cannot require applicants to notarize documents (with a minor exception). This makes registration easier. However, this section states that any declaration, certificate, verification, or statement made for purposes of firearm registration shall be made under penalty of perjury. This may result in a more serious penalty should an applicant be untruthful.

*Subsection (g)*  Repeals an outdated provision regarding the re-registration of firearms registered prior to September 24, 1976.

*Subsection (h)*  Eliminates the requirement for a background check every 6 years and specifies that a registrant can renew his or her registration either online, by mail, or in person; repeals the requirement of a fee for re-registration; and extends the time for re-registration to January 1, 2014. It is the intent that re-registration should be easy: simply requiring affirmative confirmation that a registrant still exists in the District, possesses the firearm, lives at the specified address, and is still eligible to possess a firearm. The commencement of re-registration is extended to 2014 to enable MPD to create an automated system for re-registration (as we had hoped with Bill 17-843[76]).

*Subsection (i)*  Makes a technical change to clarify that this section refers to penalties as well as duties of registrants.

*Subsection (j)*  Extends the time period for when newly manufactured semi-automatic pistols offered for sale must be microstamp-ready to January 1, 2014.

*Subsection (k)*  Provides that when there is no commercially-available, active federal firearms licensee (FFL) in the District, the District government may seek a license to act as an FFL, but only for the purpose of transferring handguns to lawful District registrants and only until another FFL becomes commercially available and open for operation. The District may charge a fee for such function. The Committee has added this language to avoid a gap in service to District residents wishing to lawfully obtain possession of firearms in the event that a privately-operated FFL were to become unavailable.

---

[76] D.C. Law 17-372, Firearms Control Amendment Act of 2008 (effective Mar. 31, 2009).

| | |
|---|---|
| *Subsection* (l) | Changes to January 1, 2014 the date by when newly-manufactured semiautomatic pistols shall be micro-stamp ready. |
| *Subsection* (m) | Provides that an individual who has lawfully registered a firearm in the District is exempt from the prohibition against possession of ammunition. Additionally, this subsection allows for temporary possession of ammunition while participating in a training and safety class.  In all instances, however, the possession of restricted pistol bullets – sometimes called "cop killer" bullets – is prohibited.  The Committee implemented these changes based on testimony at the hearing on Bill 19-614[77] that it is common practice for gun owners to try out the guns of other shooters at a range or to try out a new gun at the range before purchasing it, so it is common for individuals engaged in recreational shooting to possess ammunition of a caliber different from the firearm they have registered with MPD.  Since one purpose of registration is to separate law-abiding individuals from criminals, it is not necessary to prohibit the law-abiding from handling different kinds of ammunition.  Also, in resolving the catch-22 that existed for possession of a firearm for training purposes prior to registration, the Committee is resolving this issue for ammunition for training purposes as well. |
| *Subsection* (n) | Makes technical changes to the section of the law pertaining to the safe storage of firearms. |
| *Subsection* (o) | Makes a technical clarification regarding applicable penalties in this statute. |
| Section 3 | Amends the Congressional act of 1932 regulating the possession, sale, transfer, and use of weapons. |
| *Subsection* (a) | Makes a technical correction to the formatting of D.C. Code § 22-4501. |
| *Subsection* (b) | Makes D.C. Code § 22-4503 consistent with the 1975 Firearms Control Regulations Act (§ 7-2502.03); it is unlawful to possess a firearm if convicted within the past five years of an intrafamily offense punishable as a misdemeanor. |
| *Subsection* (c) | Removes outdated language in § 22-4504 regarding the granting of licenses to carry weapons. |

---

[77] *See, e.g.*, Written Statement of George L. Lyon, Jr. on Bill 19-614, at 3; Written Testimony of Ricardo A. Royal on Bill 19-614, at 2.

| *Subsection* (d) | Reformats § 22-4505(a), which provides exceptions to the carry prohibition, clarifies that special police officers and campus police officers lawfully granted authority to carry a firearm are also exempted from the prohibition, and clarifies that traveling with a firearm is permitted to or from a lawful recreational firearm-related activity – if transporting the firearm is compliant with the requirements specified in § 22-4504.02. |
|---|---|
| *Subsection* (e) | Updates and makes technical changes to § 22-4508, which pertains to the transfer of firearms.  It revises the 10-day waiting period from the "time of the application" to the "date of the purchase" in order to reduce the time, which currently can take weeks. (*See* D.C. Act 19-69 which effected this on an emergency basis.) |
| Section 4 | Amends § 23-1331(3)(A) of the D.C. Official Code to make a technical correction regarding the cross reference to the firearms control provisions now in Title 7 of the Code. |
| Section 5 | Adopts the Fiscal Impact Statement. |
| Section 6 | Establishes the effective date by stating the standard 60-day Congressional review language. |

## IX.   COMMITTEE ACTION

On February 29, 2012, the Committee on the Judiciary met to consider Bill 19-614, the "Firearms Amendment Act of 2012." The meeting was called to order at 1:07 pm, and Bill 19-614 was the only item on the agenda. After ascertaining a quorum (Chairman Mendelson and Councilmembers Bowser and Evans present, Councilmembers Barry and Cheh absent), Chairman Mendelson moved the print with an amendment with leave for staff to make technical changes.  The amendment struck provisions that would have permitted unregistered firearm, unlawful possession of ammunition, or possession of a single restricted pistol bullet to be prosecuted as infractions rather than criminal misdemeanors.  During an opportunity for discussion, Councilmember Bowser asked whether the Committee Print included any changes to the penalties associated with gun registration, including for unregistered firearms or possession of a firearm in a vehicle.  Chairman Mendelson explained that those provisions have not changed, although the Print makes technical corrections regarding penalties.  After an opportunity for further discussion, the vote on the print (with the amendment) was unanimous (Chairman Mendelson and Councilmembers Bowser and Evans voting aye, Councilmembers Barry and Cheh absent).  The Chairman then moved the report with leave for staff to make technical and editorial changes. After an opportunity for discussion, the vote on the report was unanimous (Chairman Mendelson and Councilmembers Bowser and Evans voting aye, Councilmembers Barry and Cheh absent).  The Chairman stated that he would bring Bill 19-614

before the full Council at the Tuesday, March 6, 2012 legislative meeting.   The meeting adjourned at 1:14 pm.

## X.   ATTACHMENTS

1.      Bill 19-614 as introduced.

2.      Written testimony and comments (additional comments are filed with the record).

3.      Fiscal Impact Statement

4.      Committee Print for Bill 19-614.

**COUNCIL OF THE DISTRICT OF COLUMBIA**
1350 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

**Memorandum**

To:        Members of the Council

From:      Nyasha Smith, Secretary to the Council

Date:      December 8, 2011

Subject:   Referral of Proposed Legislation

Notice is given that the attached proposed legislation was introduced in the Legislative Meeting on Tuesday, December 06, 2011. Copies are available in Room 10, the Legislative Services Division.

TITLE:  "Firearms Amendment Act of 2011", B19-0614

INTRODUCED BY:  Councilmember Mendelson
CO-SPONSORED BY:   Chairman K. Brown and Councilmember Thomas

The Chairman is referring this legislation to the Committee on the Judiciary.

Attachment

cc: General Counsel
    Budget Director
    Legislative Services

Councilmember Phil Mendelson

A BILL

_____

IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

_____

Councilmember Phil Mendelson introduced the following bill, which was referred to the Committee on _____.

To amend the firearms laws of the District of Columbia to define "firearm instructor" and allow a person to temporarily possess a firearm while participating in a firearms training and safety course; to clarify that the requirement to demonstrate knowledge of the District's firearms laws is a one-time requirement per applicant; to repeal the requirement for a vision test; to repeal the requirement that each pistol be submitted for ballistic identification as part of the registration process; to harmonize various provisions in the laws pertaining to firearms; and to make other technical corrections and clarifications.

BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this act may be cited as the "Firearms Amendment Act of 2011".

Sec. 2.   The Firearms Control Regulations Act of 1975, effective September 24, 1976 (D.C. Law 1-85; D.C. Official Code § 7-2502.01 et seq.), is amended as follows:

(a)   Section 101 (D.C. Official Code § 7-2501.01) is amended as follows:

(1)   Paragraph (9A) is redesignated as (9B) and is amended to read as follows:

"(9B)   "Intrafamily offense" shall have the same meaning as provided in § 16-1001.".

1

1    (2) A new paragraph (9A) is added to read as follows:

2     "(9A) "Firearm instructor" means an individual who is certified by the Chief to be

3 qualified to teach firearms training and safety courses.".

4   (b) Section 201 (D.C. Official Code § 7-2502.01(b)) is amended as follows:

5    (1) Subsection (a) is amended as follows:

6     (A) Paragraph (2) is amended by striking the word "or" at the end.

7     (B) Paragraph (3) is amended by striking the period at the end and

8 inserting a semicolon and the word "or" in its place.

9     (C) A new paragraph (4) is added to read as follows:

10     "(4) To a person who complies with, and meets the requirements of, this

11 act.".

12    (2) Subsection (b) is amended as follows:

13     (A) Paragraph (3) is amended by striking the word "or" at the end.

14     (B) Paragraph (4) is amended by striking the period at the end and

15 inserting a semicolon and the word "or" in its place.

16     (C) A new paragraph (5) is added to read as follows:

17     "(5) Any person who temporarily possesses a firearm while participating

18 in a firearms training and safety course conducted by a firearm instructor.".

19    (3) A new subsection (c) is added to read as follows:

20    "(c) For purposes of paragraph (b)(3) of this section, the term "recreational

21 firearm-related activity" includes a firearms training and safety course.".

22   (c) Section 203 (D.C. Official Code § 7-2502.03) is amended as follows:

23    (1) Subsection (a) is amended as follows:

2

1          (A)  Paragraph (2) is amended to read as follows:

2                  "(2)  Has not been convicted of a crime of violence, a weapons offense (but

3    not a misdemeanor violation under Section 702 or 706), or a felony in this or any other jurisdiction

4    (including a crime punishable by imprisonment for a term exceeding one year);".

5          (B)  Paragraph (3) is amended to read as follows:

6                  "(3)  Is not under indictment for a crime of violence or any weapons

7    offense.".

8          (C)  Paragraph (4) is amended as follows:

9                  (1)  Subparagraph (B) is amended to read as follows:

10                  "(B)  A violation of § 22-404 regarding assaults and threats, or §

11   22-407, regarding threats to do bodily harm, or a violation of any similar provision of the law of

12   another jurisdiction;".

13                  (2)  Subparagraph (C) is amended to read as follows:

14                  "(C)  Two or more violations of § 50-22012.05(b) or, in this or any

15   other jurisdiction, any law restricting driving under the influence of alcohol or drugs;".

16                  (3)  Subparagraph (D) is amended to read as follows:

17                  "(D)  Intrafamily offense punishable as a misdemeanor, including

18   any similar provision in the law of another jurisdiction; or".

19                  (4)  A new subparagraph (E) is added to read as follows:

20                  "(E)  Misdemeanor violation pursuant to Section 702 or 706.".

21          (D)  Paragraph (10) is amended to read as follows:

22                  "(10)  Has not failed to demonstrate satisfactorily a knowledge of the

23   laws of the District of Columbia pertaining to firearms and, in particular, the safe and responsible

3

1   use, handling, and storage of the same in accordance with training, tests, and standards

2   prescribed by the Chief; provided, that once this determination is made with respect to a given

3   applicant for a particular firearm, it need not be made again for the same applicant with respect

4   to a subsequent application for a firearm or for the renewal of a registration certificate pursuant

5   to Section 207a.".

6              (E)   Paragraph (11) is amended to read as follows:

7                    "(11)   Is not blind, as defined in § 7-1009;".

8              (F)   Paragraph (13) is amended as follows:

9                    (1)   Subparagraph (A) is amended to read as follows:

10                   "(13)(A)   Has completed a firearms training and safety course

11   conducted by a certified firearm instructor, that provides, at a minimum, a total of at least one

12   hour of firing training at a firing range and a total of at least 4 hours of classroom instruction.".

13                   (2)   Subparagraph (B) is amended by striking the phrase "certified

14   successful completion" and inserting the phrase "successful completion" in its place.

15                   (3)   A new subparagraph (C) is added to read as follows:

16                   "(C)   Evidence provided by the applicant that he or she has received

17   military training, or has received a license from another state for which training is required,

18   where the training is at least that specified in subparagraph (A), shall be accepted in lieu of the

19   requirement of subparagraph (A)."

20             (2)   Subsection (d) is repealed.

21         (d)   Section 204(b) (D.C. Official Code § 7-2502.04(b)) is amended to read as follows:

22             "The Chief shall take a digitalized, full-face photograph of each applicant, other than an

23   organization, to be included as part of the applicant's firearms registration application.   Such

4

1     photo shall be taken simultaneous with the filing of the application.".

2        (e)    Section 206(b) (D.C. Official Code § 7-2502.06(b)) is repealed.

3        (f)    The lead-in sentence of section 208 (D.C. Official Code § 7-2502.08) is amended to

4     read as follows:

5        "§ 7-2502.08. Duties of registrants. Penalties.".

6        (g)    Section 503(c)(1) (D.C. Official Code § 7-2505.03(c)(1)) is amended by striking the

7     phrase "2013 that" and inserting the phrase "2013, that" in its place.

8        (h)    Section 702 (D.C. Official Code § 7-2507.02) is amended as follows:

9             (1)    The lead-in sentence of section 702 is amended to read as follows:

10           "§ 7-2507.02. Responsibilities regarding storage of firearms. Penalties.".

11           (2) A new subsection (e) is added to read as follows:

12           "(e)    The provisions of section 706 shall not apply to this section.".

13       Sec. 3.    An Act To control the possession, sale, transfer and use of pistols and other

14     dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of

15     evidence, and for other purposes, approved July 8, 1932 (47 Stat. 650; D.C. Official Code § 22-

16     4501.01 *et seq.*), is amended as follows:

17        (a)    Section 1(2A) (D.C. Official Code § 22-4501(2A)) is amended as follows:

18             (1)    Strike the paragraph designation "(1)" and insert the subparagraph

19     designation "(A)" in its place.

20             (2)    Strike the paragraph designation "(2)" and insert the subparagraph

21     designation"(B)" in its place.

22             (3)    Strike the paragraph designation "(3)" and insert the subparagraph

23     designation"(C)" in its place.

APPENDIX 000154

1     (b)   Section 3(a)(6) (D.C. Official Code § 22-4503(a)(6)) is amended to read as follows:

2     "(6)   Has been convicted within the past five years of an intra-family offense punishable

3   as a misdemeanor, or any similar provision in the law of another jurisdiction.".

4     (c)   Section 4(a) (D.C. Official Code § 22-4504(a)) is amended by striking the phrase

5   "without a license issued pursuant to District of Columbia law," wherever it appears.

6     (b)   Section 5(a) (D.C. Official Code § 22-4505(a)) is amended by striking the word

7   "including" and replacing it with the phrase "including special police officers and campus police

8   officers who carry a firearm in accordance with D.C. Official Code § 5-129.02 and rules

9   promulgated pursuant to that section,".

10    Sec. 4.   Fiscal impact statement.

11    The Council adopts the fiscal impact statement in the committee report as the fiscal impact

12   statement required by section 602(c)(3) of the District of Columbia Home Rule Act, approved

13   December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(3)).

14    Sec. 5.   Effective date.

15    This act shall take effect following approval by the Mayor (or in the event of veto by the

16   Mayor, action by the Council to override the veto), a 60-day period of Congressional review as

17   provided in section 602(c)(2) of the District of Columbia Home Rule Act, approved December

18   24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(2)), and publication in the District of

19   Columbia Register.

6

# Government of the District of Columbia



## Metropolitan Police Department

Testimony of

# Cathy L. Lanier
# Chief of Police

## *Gun Offender Pretrial Detention &Supervision Act of 2011*
### *(Bill 19-485)*
### *and*

## *Firearms Amendment Act of 2011*
### *(Bill 19-614)*

Committee on the Judiciary
Phil Mendelson, Chair
Council of the District of Columbia
January 30, 2012

John A. Wilson Building
1350 Pennsylvania Avenue, NW
Washington, DC 20004

Good afternoon, Councilmember Mendelson, members of the Committee, and guests. Thank you for the opportunity to testify at this hearing on the *Gun Offender Pretrial Detention and Supervision Act of 2011* and the *Firearms Amendment Act of 2011* (Bill 19-614). These two important pieces of legislation will help the Metropolitan Police Department (MPD) and the criminal justice system with our continuing efforts to reduce gun violence in the District.

## Gun Offender Pretrial Detention and Supervision Act of 2011

There are two purposes of Bill 19-485, the Gun Offender Pretrial Detention and Supervision Act of 2011. Section 2(a) would require that a person charged with any firearm related offense wear a detection device if released pending trial. Section 2(b) would require pretrial detention for any individual who commits a firearm related offense while on release: pending trial, probation, parole, supervised release, imposition of sentence, or pending appeal.

The overall policy of the bill is to increase the level of supervision for violators of the District's firearms laws while the violator's charges are being adjudicated. I applaud this proposed legislation, because I see too many people in the District victimized by offenders who are already under the supervision of the court, in either a pre- or post-adjudication status. Members of the community and officers on the street are also tired of seeing dangerous offenders arrested one day and out on the street the next. Our justice system is built on a presumption of innocent until proven guilty, however it also recognizes the role of the court in protecting our communities from repeat violent offenders. This bill would strengthen that role.

However, in reviewing the current language of the bill, the Office of the Attorney General (OAG) has indicated that they have some concerns. The OAG will submit a letter containing a fuller analysis of these concerns and any suggested revision to the language of bill.

## Firearms Amendment Act of 2011

In October 2008, I testified before the Council about the District's efforts to identify the appropriate level of regulation for legally owned firearms. For example, what steps might have the greatest benefits for public safety? Which ones will be the most cost-effective? The answers to these questions are not self-evident, as demonstrated by the heated debate on this issue. Councilmember Mendelson's *Firearms Amendment Act of 2011* represents the next step in our efforts to ensure that the District strikes the appropriate balance between respecting Second Amendment rights and serving legitimate government interests in public safety.

I would like to begin by reminding the audience that the Supreme Court, in *District of Columbia v. Heller*, affirmed the authority of the government to regulate firearms. Supreme Court Justice Scalia, writing the majority decision for the Court, underscored that authority under the Second Amendment when he stated:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast

1

doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. *District of Columbia v. Heller*, 128 S. Ct. 2783, 2817 (U.S. 2008).

He also acknowledged that "[L]aws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are constitutional. The District of Columbia, as the seat of the Federal government, with its multitude of critical official and symbolic buildings, monuments, and events, and high-profile public officials traversing its streets every day, is a city filled with "sensitive" places. Our laws should reflect that reality.

Government facilities, dignitaries, and public servants are prime targets for terrorists, both foreign and domestic. Protecting government officials and infrastructure is a challenge for every city in the United States. But in Washington, DC, the likelihood of attack is higher, and the challenges to protecting the city are greater. In 2011 alone, we saw an assassination attempt on the president – where fortunately the only thing the shooter hit was the White House – and another shooter firing at military installations. Both of these incidents were carried out by a lone gunman, angry at one facet or another of the US government.

The high-profile human targets—from the Nation's top elected leaders to the more than 400 foreign dignitaries that make official visits to DC each year—are an obvious and attractive target. The District is also vulnerable due to the sheer volume of secure motorcades traveling in Washington on any given day. The daily movements around the city of the President, Vice President, and their families, and the approximately 3,000 foreign dignitaries spending time in our city each year means that all of our roadways are a challenge to secure.

Two notable incidents also illustrate why long guns should be subject to the same level of regulation as handguns. Both Oscar Ortega-Hernandez, the White House shooter, and James Von Brunn, the assailant at the Holocaust Museum, chose to use long guns. Although handguns may be a more frequent weapon of choice for criminals on the street (and for homeowners), long guns can also be used with deadly precision. And if an assailant is traveling by vehicle, as Ortega-Hernandez and Von Brunn were, there is no need to try to hide a gun in a pocket.

It is not just lone-wolf gunmen who use long guns. Although they are less commonly used in the commission of crimes in the District than handguns, they are used, and in this urban environment, their longer range can make them even more dangerous than a handgun. There are few if any areas of the city that have the open space for which long guns are typically used in more rural areas, such as for hunting or recreational target shooting. In the city, when you miss your target with a long gun, it is very likely to hit an unintended target. In a recent long gun shooting by masked men on E Street, an eight year old girl was shot. At least one of the recent robberies in the Fourth District was committed with a shotgun. While fewer criminals may choose to use long guns, they are still dangerous and potentially deadly weapons, and should be regulated accordingly.

2

Overall, the District's firearm-registration process serves four key objectives:
(1) Verifying the eligibility of the owner to legally possess the firearm;
(2) Ensuring that owners have a common body of knowledge of firearms laws, responsibilities, and safety;
(3) Providing law enforcement with the information necessary to readily identify legal firearms and the rightful owners; and
(4) Establishing a means of tracking legal firearms that may be lost, stolen, or used in a crime.

These objectives, I would note, are equally valid for both handguns and long guns. But after three years of experience with the process, we have determined that, in some instances, the means for accomplishing the objectives can be streamlined, or the cost of accomplishing the objective may exceed the benefits.

The first objective for the regulations is to reduce the likelihood that individuals who are prohibited from owning firearms will have them. Felons, the mentally ill, and other disqualified individuals pose the biggest threat to the public. For instance, both the assault on Congresswoman Gabrielle Gifford, during which six individuals were killed, and the Virginia Tech massacre, in which 33 people were killed, were committed by shooters with a history of mental illness. In order to properly identify individuals applying to register a handgun, they must appear in person to register it so that they can be fingerprinted. Using biometrics to positively identify an individual is far more effective than relying simply on a name and social security number, as is done with the background checks conducted by federally licensed firearms dealers. Identity theft is rampant, and gun dealers are not necessarily well trained in identifying false documentation.

Another benefit for conducting this local registration process is greater access to a variety of local data. A study found that jurisdictions that perform local-level background checks for firearms have lower homicide and suicide rates than states that rely only on a federal background check. Local-level checks were associated with a 22 percent lower homicide rate and a 27 percent lower suicide rate in adults aged 21 years or older.[1]

While the District still believes it is necessary to have an initial in-person registration and background check in order to best meet the first objective, we believe we can streamline the process by eliminating subsequent visits for follow-up background checks. The Department is working with the courts to ensure better access to information to identify when someone with a registered firearm becomes ineligible to possess it, such as individuals committed by the court. The Department can also begin actively running follow-up background checks on individuals to identify disqualifying convictions, protection orders, and such. This will reduce the burden on the legal registrants while still serving a critical public safety objective.

---

[1] Medical College of Wisconsin (2008, June 3). Firearm Suicide and Homicide Rates Associated with Level of Background Check. *ScienceDaily*. http://www.sciencedaily.com/releases/2008/06/080603155227.htm

3

The District can also streamline the registration process by revisiting the training requirements to meet the second objective. Anyone who possesses and registers a firearm should be aware of the laws and requirements for responsible gun ownership, as well as key safety principles. Even if a firearm is only kept in the home, the government has an interest in reducing accidental discharges, ensuring guns are safely stored, and ensuring owners are aware of the laws governing firearms. Moreover, in order to make registrants more clearly accountable under the law, it is important to be able to demonstrate that they were taught and aware of the requirements.

As an initial matter, we agree with clarifying in the legislation that which we already do in practice: waiving the current training requirement for individuals who can prove they have already been trained by the military or law enforcement, or certified as trained by another jurisdiction. However, as we discussed in 2008, I believe that requiring registrants to take a 4-hour class is not reasonable simply for firearm possession in the home. Instead, we urge the Council to consider our original proposal to allow MPD to provide a video on firearms safety and laws that registrants can watch at MPD or online. While requiring outside training is perhaps easier for MPD to administer than producing the video and establishing mechanisms for viewing it, the training requirement goes beyond what is needed for safe handling in the home and for learning the law. Certainly individuals can learn more in a hands-on training course. But a 4-hour training class is more than is needed for basic safe handling, yet less than what is needed if someone were to actually use a firearm outside the home. I urge the Council to reconsider this issue.

I would like to reaffirm the importance of individuals having a registration certificate with a photo that enables law enforcement to readily identify legal firearms and the rightful owners. More law enforcement officers are killed by firearms than any other cause. Last year, 71 officers were fatally shot, the highest single year total in the past decade. Although an individual with a legally registered firearm probably poses less danger to an officer than someone with an illegal firearm, a certificate with a photo helps to quickly and safety communicate this to an officer. This, in turn, helps to keep both the officer and the registrant safe.

In addition, I urge the Council to reconsider how the District meets the final objective of tracking legal firearms that may be lost, stolen, or used in a crime. As an initial matter, I agree that the objective is valuable. In order to effectively address the issue of registrants who may become ineligible to possess a firearm, the Department needs good information about the location of the firearms. If a registrant is convicted of a felony or domestic violence, or is committed by the court, the government has a strong interest in knowing where the firearm is so that, if the registrant does not voluntarily surrender the firearm as required by law, police can take possession of it.

However, given limited government resources, establishing and maintaining the systems and processes to regularly track this information may cost more than the potential benefit. Currently the law requires all registrants to certify every three years that they are still in possession of the firearm. The District envisioned a minimally burdensome process that could easily be done by mail or online. However, in order to accomplish this, the city needs a robust information system tracking users, potentially with multiple firearms and multiple addresses, capable of initiating reminders, late

4

notices, and the like. Although we had hoped to be able to build this in-house, this goal was perhaps overly optimistic. A robust system would be similar to the very complex systems used to track vehicle registration and driver licensing. This effort needs either to be properly funded, or we need to reconsider whether the city can afford this requirement.

Again, I appreciate the opportunity to testify on this critical issue. Although I am not able to stay for the entire hearing, I will be happy to submit written responses for the record to questions raised during the hearing.

5

**Testimony Concerning the District of Columbia's Gun Laws**
**District of Columbia Council Hearing**
**January 30, 2012**

**Daniel W. Webster, ScD, MPH**
**Johns Hopkins Center for Gun Policy and Research**

Thank you for the opportunity to testify. My name is Daniel Webster. I am a professor of health policy at the Johns Hopkins Bloomberg School of Public Health and co-director of the Johns Hopkins Center for Gun Policy and Research. The views and opinions I offer today are mine alone and do not necessarily reflect positions held by Johns Hopkins University.

I have been studying gun violence and efforts to prevent it for more than 20 years. I have published numerous articles on gun violence and gun policy in scientific, peer-reviewed journals and consulted with a number of cities on the best ways to combat gun violence. I will focus my testimony today on scientific evidence relevant to provisions in the District of Columbia's gun laws that are under legal challenge.

**Registration of Long Guns**

The justification for the District of Columbia registering long guns (rifles and shotguns) and owners of long guns is no different than the justification for registering handguns. Rifles and shotguns are highly lethal weapons that, as a group, are just as lethal, if not more lethal than handguns. In fact, at close range, shotguns can produce massive wounds likely to be more lethal than that of most handguns. When fired from long distances, most military and hunting rifles deliver much more kinetic energy than do handguns. One does not need much imagination to appreciate the unique danger rifles pose in our nation's capital.

Although handguns are more likely than long guns to be used in crime, 17 percent (260 of 1545) of guns recovered by the District's Metropolitan Police Department were long guns.[1] Long guns account for 40 percent of crime guns in Maryland[2] and 34 percent in Virginia. Nationally, long guns were used to kill 10 percent of individuals who were murdered with firearms.[3]

A number of states have handgun registries for handguns including Maryland, Massachusetts, New York, New Jersey, and California. Law enforcement officers in these states use the registries to identify and disarm persons who purchase firearms and subsequently become prohibited after committing a felony or being subject to a restraining order for domestic violence.[4] I am collaborating with colleagues on an evaluation of a project in two California counties to have law enforcement proactively disarm individuals who have been issued domestic violence restraining orders. Officers routinely use California's handgun registry to identify armed and prohibited domestic violence offenders, but they learn of prohibited individuals with long guns only through tips from victims or voluntary surrenders by prohibited persons. Recognizing the value of their handgun registry to law enforcement and the importance of keeping all firearms – long guns as well as handguns – from prohibited individuals, with the support of law enforcement, California recently passed new legislation requiring the registration of newly purchased rifles and shot guns. Canada also requires long guns to be registered, and law enforcement officers use that system an average of 14,000 times a day in their efforts to ensure that firearms do not get into the hands of prohibited individuals.[5]

1

**Requiring Photo Identification and Fingerprinting by Law Enforcement for Firearm Purchasers and Possessors**

A number of states (Connecticut, Hawaii, Iowa, Massachusetts, New Jersey, New York) that have permit-to-purchase licensing systems require applicants to apply directly to a state or local law enforcement agency where they are photographed and fingerprinted before conducting a background check.  The rationale for these requirements is that verification of the identity and fitness of persons approved to legally possess firearms is a serious matter of public safety.  Systems that rely upon firearm sellers, who stand to profit from any approval, to verify the identity of potential firearm purchasers are vulnerable to the use of false identification.  Investigators from the U.S. Congress' General Accounting Office, using homemade false drivers' licenses, had a 100 percent success rate in attempts to purchase firearms from licensed firearms dealers in five states which rely upon firearm dealers to verify the identity of firearms purchase applicants. [6] Law enforcement professionals recognize that criminals commonly lie about their identity, sometimes using fraudulent identification documents and that the best way to determine if someone has prior criminal convictions is by using the person's fingerprints.  Law enforcement agencies  conduct background checks for job applicants, individuals seeking to adopt a child, and many other purposes rely upon the applicant's fingerprints to ascertain an individual's prior involvement in crime.  It does not seem unusual or unreasonable for the District of Columbia to fingerprint applicants who want to register to purchase or possess a firearm in the District.

Studies have found that a significant percentage of federally licensed firearm dealers demonstrated a willingness to sell firearms to individuals who made telephone calls to ask whether they could buy a handgun because their boyfriend or girlfriend needed them to buy it for them – a scenario that indicates an illegal straw purchase. The percentage of such dealers indicating a willingness to make these illegal sales was more 52 percent in a national study[7] versus 20 percent in a study of licensed gun dealers in California,[8] a state with a relatively robust system for regulating and overseeing the practices of licensed gun dealers. Further, Chicago, Detroit, and New York have targeted licensed gun dealers linked to many of those cities' crime guns for undercover stings and found most were willing to make blatantly illegal straw sales.[9, 10, 11]

It seems likely that many criminals considering using fake IDs in order to purchase firearms, or persons who are considering serving as straw purchasers of guns for criminals, would be deterred from doing so if they had to apply in person to a law enforcement agency which would photograph and fingerprint them.  I have led research showing that guns recovered from criminals and crime scenes in jurisdictions which have both handgun registration and permit-to-purchase systems were far more likely to have originated from sales in other states than was the case in jurisdictions which lacked these regulations.  We also found that the greater the share of crime guns originating from sales outside the state border the lower the level of gun availability to criminals.[12]

**Renewing Firearm Registration Every Three Years**

Requirements for re-registration of firearms have important potential public safety benefits as well.  Legal purchasers of firearms may go on to commit crimes or become subject to restraining orders for domestic violence that make them legally prohibited from possessing firearms. Ideally, there would be an immediate notification system that would alert law enforcement if a gun owner becomes a prohibited gun possessor and an up-to-date firearm registry could be used to disarm prohibited persons.

2

## References

[1] Bureau of Alcohol, Tobacco, Firearms and Explosives.  Firearms Trace Data – District of Columbia. U.S. Department of Justice, BATFE, Office of Strategic Intelligence and Information. http://www.atf.gov/statistics/download/trace-data/2010/2010-trace-data-district-of-columbia.pdf.

[2] Bureau of Alcohol, Tobacco, Firearms and Explosives.  Firearms Trace Data – Maryland. U.S. Department of Justice, BATFE, Office of Strategic Intelligence and Information. http://www.atf.gov/statistics/download/trace-data/2010/2010-trace-data-maryland.pdf.

[3] Federal Bureau of Investigation. Crime in the United States, 2010.  U.S. Department of Justice, Washington, DC, 2011.  http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-2010.

[4] Tri-City Voice.  Attorney General applauds bill to take more prohibited firearms off streets.  Oct. 28, 2011. http://www.tricityvoice.com/articlefiledisplay.php?issue=2011-10-28&file=SB819+++TCV.txt.

[5] MacCharles T. New report shows police rely on long-gun registry. *The Star.*  Jan 25, 2012. http://www.thestar.com/article/1120862--new-report-shows-police-rely-on-long-gun-registry

[6] General Accounting Office. *Purchased From Federal Firearm Licensees Using Bogus Identification.* GAO-01-427NI, Washington, DC, Mar 21, 2001.

[7] Sorenson SB, Vittes KA.  Buying a handgun for someone else: firearm dealers' willingness to sell. *Injury Prevention.* 2003;9;147-150.

[8] Wintemute GJ.  Firearm retailers' willingness to participate in an illegal gun sale. *Journal of Urban Health* 2010;87:865-878.

[9] Webster DW, Zeoli AM, Bulzacchelli MT, Vernick JS.  Effects of police stings of gun dealers on the supply of new guns to criminals. *Injury Prevention* 2006;12:225-230.

[10] Mayors Against Illegal Guns.  New York City's Gun Dealer Lawsuit. http://www.mayorsagainstillegalguns.org/html/investigations/investigations.shtml

[11] Webster DW. Supplemental expert report submitted for City of New York V. A-1 Jewerly & Pawn, Inc. et al., 06 CV 2233, City of New York V. Bob Moates' Sport Shop, INC., et al., 06 CV 6504, May 27, 2008.

[12] Webster DW, Vernick JS, Hepburn LM.  The relationship between licensing, registration and other state gun sales laws and the source state of crime guns. *Injury Prevention* 2001;7:184-189.

3



# Brady Center

## To Prevent Gun Violence

**Testimony of Daniel R. Vice, Senior Attorney**
**Brady Center to Prevent Gun Violence**
**On Bill 19-614, Firearms Amendment Act of 2011**
**Before the Council of the District of Columbia, January 30, 2012**

Thank you for inviting the Brady Center to Prevent Gun Violence to speak at this important committee hearing.

My name is Daniel Vice, Senior Attorney at the Brady Center to Prevent Gun Violence's Legal Action Project.[1] The Brady Center to Prevent Gun Violence and the Brady Campaign to Prevent Gun Violence are the nation's largest organizations working for sensible gun policies. The Legal Action Project of the Brady Center represents victims of gun violence and defends gun laws in the courts, including Washington, D.C.'s gun laws.

## Introduction

The District's strong gun laws protect public safety, prevent gun crimes, and are constitutional under the Second Amendment.

The Brady Center supports the District's strong gun laws which keep guns away from dangerous people. Laws such as the District's limit of one pistol registration per month are crucial for stopping gun trafficking and bulk straw purchases of firearms for distribution in the illegal gun market. The District's registration requirements help to

---

[1] I have more than a decade of experience in gun violence prevention and am an author of numerous Brady Center reports analyzing the impact of gun laws and policies that prevent gun violence, including *Hollow Victory? Gun Laws Survive Three Years After District of Columbia v. Heller, Yet Criminals and the Gun Lobby Continue Their Legal Assault* (2011), *Missing Guns: Tens of Thousands of Guns Leave Gun Shops Without Checks or Records* (2011), *Officers Gunned Down: How Weak Gun Laws Put Police at Risk* (2011), *Exporting Gun Violence: How Our Weak Gun Laws Arm Criminals in Mexico and America* (2009), *Unintended Consequences: What the Supreme Court's Second Amendment Decision in D.C. v. Heller Means for the Future of Gun Laws* (2008), *Guns for Gangs: Profile of a Rogue Gun Dealer* (2007), *The NRA: A Criminal's Best Friend — How The National Rifle Association Has Handcuffed Federal Gun Law Enforcement* (2006), *Death Valley: Profile Of A Rogue Gun Dealer* (2006), *Trading in Death: Profile of a Rogue Gun Dealer* (2006), *On Target: The Impact of the 1994 Federal Assault Weapon Act* (2004), and others. I have been counsel in numerous cases against irresponsible gun dealers and manufacturers, deposed gun industry executives, and coordinated with law enforcement to prepare testimony concerning law enforcement strategies to prevent gun violence. I have filed legal briefs around the nation in defense of strong gun laws and my briefs have been cited by courts including the U.S. Supreme Court in *United States v. Hayes*, 555 U.S. 415, 427 (2009), as evidence that strong gun laws prevent gun crimes.

**APPENDIX 000165**

ensure that only law abiding, responsible people may possess guns. Restrictions on assault weapons and public gun carrying protect communities from gun violence.

The District has some of the strongest gun laws in the nation, and these tough gun laws have helped achieve dramatic declines in violent crime, including the lowest homicide levels in nearly 50 years. The District's gun laws also help address the flood of illegal guns trafficked into D.C. from states with weak gun laws, allowing police to remove an average of 2,000 illegal guns from D.C. streets each year.

In addition to enhancing public safety and reducing crime, the District's gun laws are entirely constitutional under the Second Amendment. The Supreme Court in *District of Columbia v. Heller* declared a limited right to keep and bear arms in the home for self-defense, but also made clear that (a) the right extends only to individuals who are "law-abiding [and] responsible," (b) the Second Amendment does not encompass "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," and (c) broad classes of firearms regulations are "presumptively lawful." In *McDonald v. City of Chicago*, the Court "repeat[ed] those assurances" concerning the constitutionality of reasonable gun laws.

Since *Heller*, criminals and the gun lobby have brought more than 400 challenges to gun laws, yet the courts have overwhelmingly rejected those cases.[2] One of those cases was a further challenge to the District's gun laws filed by Mr. Heller (*Heller II*). In that ruling, the U.S. Court of Appeals for the D.C. Circuit – the same court that struck down the District's gun ban in the decision upheld by the Supreme Court in *Heller I*[3] – did not strike down *any* of D.C.'s gun laws. Instead, it upheld the District's assault weapons ban and the requirement to register handguns, and asked the trial court to examine evidence supporting other gun laws.[4]

Although the trial court will examine D.C.'s specific registration requirements and will rule on whether they are constitutional, the D.C. Circuit has said that the District's burden of proof is not great because "none of the District's registration requirements prevents an individual from possessing a firearm in his home or elsewhere...."[5] Thus, the District simply must supply "reasonable inferences" based on "some meaningful evidence," such as citing witness testimony or law enforcement expertise that "these requirements can reasonably be expected to promote" public safety or "studies [that] show[] the laws achieved their purpose."[6] The D.C. Circuit upheld the assault weapons ban in part based on testimony provided by the Brady Center to the D.C. Council at a similar hearing in 2008.

---

[2] Brady Center to Prevent Gun Violence, *Hollow Victory? Gun Laws Survive Three Years After District of Columbia v. Heller, Yet Criminals and the Gun Lobby Continue Their Legal Assault* (2011), available at http://www.bradycenter.org/xshare/pdf/reports/Hollow_Victory.pdf.

[3] *District of Columbia v. Heller*, 554 U.S. 570 (2008).

[4] *Heller v. District of Columbia*, --- F.3d ----, 2011 WL 4551558, *10 (D.C. Cir. 2011).

[5] *Id.*

[6] *Id.*

2

We urge the Council to adopt further legislative findings based on the evidence submitted today in support of the District's gun laws, specifically stating that each of the District's registration requirements is based on evidence including the expert witness testimony and studies presented today.

## The District's Limit of One Pistol Registration Per Month Helps Prevent Gun Trafficking

The District's limit of one pistol registration every month is a vital tool to stop gun trafficking. Law enforcement regards the purchase of multiple handguns as an indicator of gun trafficking, and handguns sold in multiple sales have accounted for 20% of all handguns sold and traced.[7] DC's one handgun per month law blocks these dangerous sales.

Traffickers frequently use straw buyers who can pass background checks to obtain large quantities of guns that can be quickly resold into the illegal gun market. One gun per month limits are crucial because they cut off access at the gun shop, preventing traffickers from obtaining bulk quantities of handguns from gun dealers. Because criminals prefer new guns to older guns that may have a history of use in crime, this cuts off traffickers' prime source of guns to be trafficked.[8]

Gun trafficking prosecutions often involve traffickers who have stocked their inventories by engaging in multiple handgun sales, and the Brady Center has litigated many cases involving multiple handgun purchases. These include *McGuire v. Will Jewelry and Loan*, where a gun shop in West Virginia sold a dozen guns to a straw buyer. The guns were trafficked to New Jersey and used to shoot two police officers. Similarly, in *Williams v. Beemiller*, we represent a teenager shot in the stomach with a gun sold in an 87 gun sale to a straw buyer. Our investigation of these and other cases has confirmed that these sales would have been blocked by one handgun per month laws, resulting in the prevention of crime, gun injury, and loss of life.

Maryland and Virginia both currently limit handgun sales to one handgun per month, which has reduced crime gun sales and exporting of crime guns to other states. If D.C. did not have a one handgun per month law, traffickers and straw buyers could well come to D.C. to make the bulk handgun sales barred in those neighboring jurisdictions. Police generally would have no way to refuse registration for these bulk sales. Those straw buyers could then illegally sell those guns on the street, reporting them "lost or stolen" if needed to excuse their disappearance from the registered owner. Only D.C.'s one gun per month limit ensures that this cannot happen.

---

[7] Bureau of Alcohol, Tobacco, and Firearms, *Crime Gun Trace Reports (2000) National Report* (July 2002), at 52.

[8] Christopher Koper, *Crime Gun Risk Factors: Buyer, Seller, Firearm, and Transaction Characteristics Associated with Gun trafficking and Criminal Gun Use* 83 (2007).

3

The District's one gun per month law also sends a powerful message to states that allow bulk sales of cheap, junk handguns that D.C. is doing its part, and they must follow. D.C.'s law was an important example in convincing New Jersey to pass a similar state law two years ago.

One handgun per month limits such as the District's have been proven to reduce gun trafficking and studies have confirmed this.  One study found that handguns purchased in bulk were 33% more likely to be used in crime than handguns purchased one at a time.[9] Another study found that Virginia's one handgun per month limit reduced by 66% the odds that a crime gun was purchased in Virginia relative to dealers elsewhere in the Southeast.[10] Similarly, a study found that Maryland's one handgun per month law could greatly reduce the risk of multiple-sale guns being recovered in crime, because guns sold in multiple sales were up to 64% more likely to be used in crime.[11]

At the same time, a one handgun a month law does not infringe on the rights of law-abiding, responsible citizens who choose to buy a gun for self-defense, as it continues to allow them to buy a handgun – indeed, a dozen a year.  Law-abiding citizens do not need to buy 87 handguns in a single purchase, only gun traffickers do.

In *National Shooting Sports Foundation v. Jones*, 2012 WL 112206 (D.D.C. Jan. 13, 2012), a federal court recently ruled "that multiple sales of … guns is a strong indicator of gun trafficking."  This court ruling supports a finding that laws limiting bulk sales are reasonable and constitutional because they limit sales that are strongly associated with gun trafficking.

## The District's Gun Registration System Protects Public Safety and is Constitutional

The D.C. Circuit in *Heller II* confirmed that the District's handgun registration law is constitutional.  The trial court will be tasked with examining specific requirements of D.C.'s registration law and its long gun registration requirement.  The evidence presented here, including our expertise on this issue, law enforcement expertise, and expert studies, all show that these registration requirements under current D.C. law are important for public safety and entirely constitutional.

Registration helps to ensure that only law-abiding, responsible persons who do not pose a danger to the public may possess firearms.  The District's gun registration law also helps police solve crimes by allowing them to determine the last known owner of a firearm

---

[9] Mona Wright et al., Factors Affecting a Recently Purchased Handgun's Risk for Use in Crime Under Circumstances That Suggest Gun Trafficking, 87 J. URBAN HEALTH: BULL. OF THE NEW YORK ACAD. OF MED. 352, 356 (2010).

[10] Douglas Weil & Rebecca Knox, Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms, 275 J. AM. MED. ASS'N 1759, 1760 (1996).

[11] Koper, *Crime Gun Risk Factors* at 6.

4

that has been trafficked or used in crime.  Registration laws have been proven to prevent crime and aid in solving crime.

Requirements of a **vision test, a written test demonstrating knowledge about firearms, and a gun use test** – similar to requirements that a car driver must pass to get a license – allow the District to ensure that gun owners are the "law-abiding" and "responsible" persons described in *Heller* that have a Second Amendment right to a gun in the home.  Studies demonstrate that states with registration and licensing requirements do a better job of preventing guns sold initially in-state from being recovered in crime.[12] Similarly, requiring that an applicant appear in person and provide basic personal details is a strong deterrent to criminal gun possession and attempts by straw buyers to obtain firearms for use in gun trafficking.  These personal details, including fingerprinting and applicant photographs, also help police solve crimes when a gun has been recovered in crime and traced to its owner.  All together, these requirements prevent gun possession by irresponsible people who have not been properly trained or do not meet minimum standards necessary to safely possess firearms.

Similarly, **requiring gun owners to re-register provides important public safety benefits.**  Law enforcement may periodically re-check the criminal records of gun registrants for new felonies or other prohibiting restrictions.  **Recurring background checks** are crucial for disarming illegal gun possessors.  In Utah, for example, law enforcement re-checking of names in the Utah Department of Public Safety's database has uncovered gun owners who had previously qualified to have a gun but were later charged with felonies including murder, stalking, arson, assault, kidnapping, and rape of a child.[13] Re-registration ensures that law enforcement has current residence information allowing them to quickly find and confiscate guns when police determines that a registrant has committed a crime and/or is illegally possessing guns.  It also requires gun owners to confirm that they still have their guns, serving as a reminder to gun owners to store guns securely away from children and depriving traffickers of a claim that they "lost" guns when questioned about their guns that have been traced to a crime.  Re-registration prevents gun crimes, helps prevent the theft of guns for use in crime, helps prevent gun accidents, and greatly aids police in solving crime.

Likewise, **requiring the registration of long guns in addition to handguns is important for public safety and crime prevention.**  Long guns pose a particular danger in the District of Columbia, where their accuracy at long range poses a special threat to government officials, diplomats, and motorcades.[14]  It is crucial that law enforcement know, for example, if a person living in an apartment overlooking a government building,

---

[12] D.W. Webster et al., *Relationship Between Licensing, Registration, and Other Gun Sales Laws and the Source State of Crime Guns*, 7 Injury Prevention 184 (2001).

[13] Utah Department of Public Safety, *Concealed Firearm Permit and Brady Bill Statistical Data*, available at: http://publicsafety.utah.gov/bci/brady_statistics.html.

[14] *See* Brady Center to Prevent Gun Violence, *Capital Under Fire*, Sept. 2008, available at: http://www.bradycenter.org/xshare/pdf/reports/capital-under-fire.pdf.

**APPENDIX 000169**

embassy, or motorcade route is stockpiling long-range rifles. Long gun registration also helps police solve crimes committed with rifles or shotguns. In just five years, more than 4,000 people have been murdered in the United States with rifles and shotguns.[15]

In examining the importance of a long gun registration requirement in Canada, the Royal Canadian Mounted Police found that long gun registration was, "an important tool for law enforcement. It also serves to increase the accountability of firearms owners for their firearms, by linking registered firearms to licensees...."[16] Canadian law enforcement cited an encounter where police were recovering firearms from a subject who pointed a rifle at a co-worker and threatened to kill him. A check revealed that the suspect had nine long guns registered. "Owing to the registration of the firearms, it was possible to successfully enforce the warrant because investigating officers had accurate knowledge of the number and type of firearms they were required to seize."[17] The Canadian Supreme Court upheld that country's registry, stating, "Guns cannot be divided neatly into two categories – those that are dangerous and those that are not dangerous. All guns are capable of being used in crime. All guns are capable of killing and maiming. It follows that all guns pose a threat to public safety."[18]

The District's **ballistics identification** requirement for registered pistols also serves an important public safety purpose. It allows law enforcement to more quickly trace guns used in multiple crimes, and trace more crimes back to the original owner (such as when shell casings are left at the scene, but the gun is missing). It also acts as a deterrent to those who would use their guns in crime—if they know that their gun is on file, they will be less likely to use it in crime.[19]

The District's **registration requirements are constitutional**. In *Heller*, the Supreme Court specifically allowed the registration of firearms, ruling that the "the District must permit [Mr. Heller] to register his handgun...." Since that ruling, gun criminals and the gun lobby have challenged laws requiring gun registration more than a dozen times, and the courts have rejected those challenges.

The courts have recognized the importance of gun registration laws to public safety and rejected claims that these laws violate the Second Amendment. For example, in *Justice v. Town of Cicero*, the United States Court of Appeals for the Seventh Circuit upheld a law

---

[15] Federal Bureau of Investigations, *Expanded Homicide Data Table 8, Murder Victims, by Weapon, 2006–2010*, at http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/tables/10shrtbl08.xls.

[16] Royal Canadian Mounted Police, *Canadian Firearms Program Evaluation*, Feb. 2010, at 44, available at: http://www.rcmp-grc.gc.ca/pubs/fire-feu-eval/eval-eng.pdf.

[17] *Id.* at 47.

[18] *Id.* at 18.

[19] Daniel W. Webster, *Comprehensive Ballistic Fingerprinting of New Guns: A Tool for Solving and Preventing Violent Crime* 2 ( 2002).

requiring the registration of firearms because it "leaves law-abiding citizens free to possess guns" as long as they register them, and so it does not violate the Second Amendment.

## The District's Prohibition on Public Gun Carrying Protects Public Safety and is Constitutional

Since June 2008, the gun lobby has attempted to vastly expand the decision in *Heller* to invalidate sensible state and local gun laws that restrict the carrying of hidden, loaded firearms in public.

When firearms are carried out of the home and in public, the safety of a broader range of individuals is threatened. While guns in the home are primarily a threat to their owners, family members, friends, and houseguests,[20] firearms carried in public are a threat to strangers, law enforcement officers, random passersby, and other private citizens. Guns in public expose all members of society to great risks, as guns are used "far more often to kill and wound innocent victims than to kill and wound criminals ... [and] guns are also used far more often to intimidate and threaten than they are used to thwart crimes."[21] Another study has shown that in the last four years, concealed handgun permit holders have shot and killed at least 11 law enforcement officers and 289 private citizens.[22] States have a stronger need to protect their citizens from individuals carrying guns in public than they do from individuals keeping guns in their homes.

The carrying of guns in public is not a useful or effective form of self-defense and, in fact, repeatedly has been shown to *increase* the chances that one will fall victim to violent crime. Most states that enact laws broadly allowing concealed carrying of firearms in public appear to "experience increases in violent crime, murder, and robbery when [those] laws are adopted."[23] Laws broadly allowing concealed carrying of weapons "have resulted,

---

[20] *See, e.g.*, Matthew Miller, David Hemenway, Deborah Azrael, *State-level homicide victimization rates in the US in relation to survey measures of household firearm ownership, 2001-2003*, SOCIAL SCIENCE & MEDICINE (2006) ("States with higher rates of firearm ownership had significantly higher homicide victimization rates"); Lisa M. Hepburn, David Hemenway, *Firearm availability and homicide: A review of the literature*, 9 AGGRESSION & VIOLENT BEHAVIOR 417 (2004) ("households with firearms are at higher risk for homicide, and there is no net beneficial effect of firearm ownership"); Matthew Miller, et al., *Rates of Household Firearm Ownership and Homicide Across US Regions and States, 1988-1997*, 92 AM J. PUBLIC HEALTH 1988 (Dec 2002) ("in areas where household firearm ownership rates were higher, a disproportionately large number of people died from homicide); Mark Duggan, *More Guns, More Crime*, 109 J. POL'Y. ECON. 1086 (2001); Matthew Miller, et al., *Firearm availability and unintentional firearm deaths*, 33 ACCIDENT ANALYSIS & PREVENTION 477 (Jul. 2000) ("A statistically significant and robust association exists between gun availability and unintentional firearm deaths.").

[21] David Hemenway & Deborah Azrael, The Relative Frequency of Offensive and Defensive Gun Uses: Results From a National Survey, 15 VIOLENCE & VICTIMS 257, 271 (2000).

[22] Violence Policy Center, *Concealed Carry Killers* (2011), available at http://vpc.org/ccwkillers.htm.

[23] John J. Donohue, *The Impact of Concealed-Carry Laws*, in EVALUATING GUN POL'Y: EFFECTS ON CRIME AND VIOLENCE 289, 320 (2003).

**APPENDIX 000171**

if anything, in an *increase* in adult homicide rates."[24]  Likewise, "firearms homicides increased in the aftermath of [enactment of these] laws," and may "raise levels of firearms murders" and "increase the frequency of homicide."[25]  Similarly, "[f]or robbery, many states experience increases in crime" after concealed carry laws are enacted.[26]  Several different statistical approaches to the question "indicate a rather substantial increase in robbery," while "policies to *discourage* firearms in public may help prevent violence."[27] Another study found that "gun possession by urban adults was associated with a significantly increased risk of being shot in an assault," and that "guns did not protect those who possessed them from being shot in an assault."[28]  Likewise, another study found that:

> Two-thirds of prisoners incarcerated for gun offenses reported that the chance of running into an armed victim was very or somewhat important in their own choice to use a gun.  Currently, criminals use guns in only about 25 percent of noncommercial robberies and 5 percent of assaults.  If increased gun carrying among potential victims causes criminals to carry guns more often themselves, or become quicker to use guns to avert armed self-defense, the end result could be that street crime becomes more lethal.[29]

Moreover, the carrying of firearms in public has other negative implications for a number of social issues and societal ills that are not impacted by the private possession of handguns in the home.  When the carrying of guns in public is restricted, "possession of a concealed firearm by an individual in public is sufficient to create a reasonable suspicion that the individual may be dangerous, such that an officer can approach the individual and briefly detain him in order to investigate whether the person is properly licensed." *Commonwealth v. Robinson*, 600 A.2d 957, 959 (Pa. Super. Ct. 1991); *see also Commonwealth v. Romero*, 673 A.2d 374, 377 (Pa. Super. Ct. 1996) ("officer's observance of an individual's possession of a firearm in a public place in Philadelphia is sufficient to create reasonable suspicion to detain that individual for further investigation").  Law enforcement's ability to protect the public could be greatly restricted if officers were required to effectively presume that a person carrying a gun in public was doing so lawfully.  Under such a legal regime, it is possible that an officer would not be deemed to have cause to arrest, search, or stop a person seen carrying a loaded gun, even though far less risky behavior could justify police intervention.  Law enforcement should not have to

---

[24] Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data*, 18 INT'L REV. L. & ECON. 239 (1998) (emphasis in original).

[25] David McDowall, et. al., *Easing Concealed Firearms Laws: Effects on Homicide in Three States*, 86 J. CRIM. L. & CRIMINOLOGY 193, 202-203 (1995).

[26] Hashem Dezhbakhsh & Paul Rubin, *Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws on Crime*, THE ECON. OF GUN CONTROL 473 (May 1998).

[27] John Donohue, *Guns, Crime, and the Impact of State Right-To-Carry Laws*, 73 FORDHAM L. REV. 623 (2004).

[28] Charles C. Branas, *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, AMER. J. PUB. HEALTH, vol. 99, No. 11 at 1, 4 (Nov. 2009).

[29] Philip Cook, et al., *Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. REV. 1041, 1081 (2009).

wait for a gun to be fired before protecting the public. Further, if drivers are allowed to carry loaded guns, road rage can become a more serious and even potentially deadly phenomenon.[30] And an increase in gun prevalence in public may cause an intensification of criminal violence.[31]

Courts have long recognized the danger of publicly carried guns. As early as 1897, the Supreme Court itself held that "the right of the public to bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons." Following that ruling, the *Heller* Court stressed that its ruling was limited to "defense of hearth and home," and the *McDonald* Court cautioned that "reasonable firearms regulations" remain permissible, yet gun criminals and gun lobby groups have filed legal challenges against laws regulating the carrying of guns in public. The courts have overwhelmingly rejected those challenges.

In *Heller*, the Court's 5-4 majority decision recognizing a Second Amendment right to have a gun in the home was controversial but narrow; the Court made clear that the Second Amendment does not include the "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Indeed, the Supreme Court specifically noted that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." Two years later, the Court in *McDonald* "repeat[ed] those assurances" that it had "made [] clear" in *Heller* about the continued validity of "longstanding prohibitions on the possession of firearms."

This month, federal courts in New Jersey and California upheld restrictions on the public carrying of weapons. These legal decisions follow recent rulings by at least a dozen other courts around the nation declaring that the Second Amendment right to possess firearms is limited to the home. In New Jersey, a federal judge threw out a lawsuit challenging the state's strong restrictions on the public carrying of guns, holding that the Second Amendment "is unique among all other constitutional rights to the individual because it permits the user of a firearm to cause serious personal injury – including the ultimate injury, death – to other individuals, rightly or wrongly."[32] The judge also stated that "the Second Amendment does not include a general right to carry handguns outside the home."[33] One day later, in California, a federal judge upheld Los Angeles County's strong concealed carry laws.[34]

In March 2011, for example, the United States Court of Appeals for the Fourth Circuit explicitly declined to extend the Second Amendment right beyond the home, refusing to "push Heller beyond its undisputed core holding." In *United States v.*

[30] *See* David Hemenway, *Road Rage in Arizona: Armed and Dangerous*, 34 ACCIDENT ANALYSIS AND PREVENTION 807-14 (2002).

[31] *See* Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, J. PUB. ECON. 379, 387 (2006).

[32] *Piszczatoski v. Filko*, Civ. No. 10-06110 (WHW) *2 (D.N.J. Jan. 12, 2012).

[33] *Id.* at 3.

[34] *Birdt v. Beck*, 2:10-cv-08377-JAK –JEM (C.D.Cal. Jan. 13, 2012).

*Masciandaro*, the court rejected a claim that there is a constitutional right to possess a loaded handgun in a car in a national park. The court held, "This is serious business. We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights." The Fourth Circuit cautioned further that the danger posed by guns "would rise exponentially as one moved the right from the home to the public square. If ever there was an occasion for restraint, this would seem to be it. There is much to be said for a course of simple caution."

In another case, the gun lobby challenged a California law that requires applicants who wish to carry concealed firearms in public to be of good moral character, be a resident of or spend substantial time in the county in which they apply, demonstrate good cause, and take a firearms course in order to be issued a concealed carry permit. "Good cause" is defined as "a set of circumstances that distinguishes the applicant from other members of the general public and causes him or her to be placed in harm's way." The court upheld California's restrictions on carrying concealed weapons, ruling that the government had an "important and substantial interest in public safety and in reducing the rate of gun use in crime. In particular, the government has an important interest in reducing the number of concealed weapons in public in order to reduce the risks to other members of the public who use the streets and go to public accommodations." The court also cited the government's "important interest in reducing the number of concealed handguns in public because of their disproportionate involvement in life-threatening crimes of violence, particularly in streets and other public places."

Numerous other courts have similarly held that the right found in Heller is limited to the home, and does not include a right to carry firearms in public:

- o "*Heller* specifically limited its ruling to interpreting the amendment's protection of the right to possess handguns in the home, not the right to possess handguns outside of the home in case of confrontation." – Illinois Court of Appeals[35]

- o "*Heller* does not hold, nor even suggest, that concealed weapons laws are unconstitutional." – Massachusetts federal district court [36]

- o "[T]he United States Supreme Court has not held or even implied that the Second Amendment prohibits laws that restrict carrying of concealed weapons." – New Jersey Appeals Court [37]

---

[35] *People v. Dawson*, 934 N.E.2d 598, 605-06 (Ill. App. Ct. 2010).

[36] *United States v. Hart*, 725 F. Supp. 2d 56, 60 (D. Mass. 2010).

[37] *In re Factor*, 2010 WL 1753307, at *3 (N.J. Super. Ct. App. Div. Apr. 21, 2010).

o "The Supreme Court has never held that the Second Amendment protects the carrying of guns outside the home." – Wisconsin federal district court [38]

o "*Heller* refers to outright 'prohibition on carrying concealed weapons' as 'presumptively lawful....'" – New Hampshire federal district court [39]

o "[P]ossession of a firearm outside of the home or for purposes other than self-defense in the home are not within the 'core' of the Second Amendment right as defined by *Heller*." – West Virginia federal district court [40]

o "It is clear that the [*Heller*] Court was drawing a narrow line regarding the violations related solely to use of a handgun in the home for self-defense purposes." – Kansas Appeals Court [41]

## The District's Assault Weapons Ban and High-Capacity Magazines Ban Protect Public Safety and Are Constitutional

Following the Supreme Court's ruling in *Heller*, the plaintiff who filed the case, Dick Heller, was able to register a firearm in Washington, D.C. for use in his home. Soon after, he filed another lawsuit, this time claiming that he had a constitutional right to possess semi-automatic assault weapons and high-capacity assault clips.

The nation's capital and other states have banned civilian possession of semi-automatic assault weapons based on the severe danger they pose. Although assault weapons have made up less than 1% of guns in circulation in the United States, they have long been recognized as particularly dangerous and unusual weapons.

Law enforcement reports show that semi-automatic assault weapons with high capacity ammunition magazines have a "distinctively military configuration" and are "designed for killing and disabling the enemy," which has "distinguished the[se] rifles from traditional sporting rifles."

In *Heller v. District of Columbia* ("*Heller II*"), a federal district court rejected Mr. Heller's new lawsuit that sought to strike down a host of new firearms ordinances enacted in the wake of *Heller*, including rejecting his claim to a constitutional right to arm himself with military-style assault weaponry. The court ruled that the U.S. Supreme Court's decision in *Heller* was a limited ruling, and only applied to "those weapons 'in common use' and 'typically possessed by law-abiding citizens for lawful purposes,' ... as opposed to

---

[38] *Gonzalez v. Village of W. Milwaukee*, No. 09CV0384, 2010 WL 1904977, at *4 (E.D. Wis. May 11, 2010).

[39] *Teng v. Town of Kensington*, No. 09-cv-8-JL, 2010 WL 596526, at *5 (D.N.H. Feb. 17, 2010).

[40] *United States v. Tooley*, 717 F. Supp. 2d 580, 596 (S.D. W. Va. 2010).

[41] *State v. Knight*, 218 P.3d 1177, 1189 (Kan. Ct. App. 2009).

11

weapons considered 'dangerous and unusual.'"   The Court of Appeals for the D.C. Circuit affirmed the trial court's ruling and upheld the assault weapon and high-capacity ammunition magazine ban.

The *Heller II* court noted that the nation's capital chose to ban semi-automatic assault weapons and high-capacity assault clips "after concluding that they are 'military-style weapons of war, made for offensive military use.'"   The court further noted that these assault weapons are particularly dangerous because they "place law enforcement officers at a particularly grave risk due to their high firepower."   Thus, the *Heller II* court held, "it is beyond dispute that public safety is an important-indeed, a compelling-governmental interest," and "there is at least a substantial fit between that goal and the bans on assault weapons" and assault clips.

Similarly, other courts have also rejected challenges to assault weapon bans.  In *People v. James*,[42] a California man subject to a restraining order was convicted of possessing numerous assault weapons, including a blowgun, a .50 caliber BMG rifle, and a 12-gauge shotgun.  In holding that possession of assault weapons is not protected under the Second Amendment as construed by Heller, the California Court of Appeal noted that the assault weapons prohibited under California law are "not the types of weapons that are typically possessed by law-abiding citizens for lawful purposes, such as sport-hunting or self-defense; rather, these are weapons of war."

Likewise, in *People v. Millon*,[43] a man was convicted of possessing two unregistered assault rifles following a domestic violence incident. The California Court of Appeal held that assault weapons are not "a class of arms that is overwhelmingly chosen by the American people for the lawful purpose of self-defense," and so California's ban on possession of assault weapons does not infringe activity protected by the Second Amendment.

These rulings confirm that the District's assault weapons ban and high-capacity ammunition magazine ban are constitutional.

## Conclusion

The Brady Center continues to support the efforts of jurisdictions like the District of Columbia to stem the tide of gun violence that ravages this country.  Washington, D.C.'s gun laws allow law-abiding citizens to keep and bear arms for the limited purpose of self-defense in the home – the right recognized by the Supreme Court in *Heller* – while keeping such weapons out of the hands of those who should not have them.  Just as importantly, we believe that the laws as written each serve a vital role in protecting innocent life.

---

[42] 174 Cal.Rptr.3d 576 (Cal. Ct. App. 2009).

[43] 2011 WL2436148 (Cal. Ct. App. 2011).

12

We support the District's strong gun laws, including its current registration requirement, one handgun per month limit, assault weapons ban, and restrictions on carrying guns in public.  We urge the Council to incorporate the evidence presented today into the record as support for the District's current gun laws so that courts examining DC's gun laws have a complete record of the legislative findings supporting these laws.

APPENDIX 000177



## **B r a d y   C e n t e r**

### **To Prevent Gun Violence**

**2012 FEB -9  PM 3: 40**

**COUNCILMEMBER MENDELSON**

**Supplemental Testimony of Daniel R. Vice, Senior Attorney**
**Brady Center to Prevent Gun Violence**
**On Bill 19-614, Firearms Amendment Act of 2011**
**Before the Council of the District of Columbia, February 9, 2012**

Once again, thank you for the opportunity to provide testimony at the committee hearing on January 30 on the proposed Firearms Amendment Act and the District's gun laws. As requested, I am submitting additional information requested at the hearing, including cases and studies supporting the constitutionality of the District's strong gun laws. I have attached these materials and also offer the following summaries for your convenience.

### **Data Showing That Gun Ownership Rates Have Steadily Declined For Decades**

In response to questions at the hearing, I discussed data showing that gun ownership rates have been steadily declining for decades. Gun ownership rates have dropped from a high of 54.0% of gun owning households in 1977 to a low of 32.3% in 2010.[1] This data is contained in the General Social Survey conducted by the National Opinion Research Center at the University of Chicago. This survey has tracked gun ownership for four decades and is one of the most comprehensive and frequently analyzed sources of information in the social sciences.[2]

### ***West Virginia Citizens Defense League v. City of Charleston* Case – Legal Briefs Support the Constitutionality of the District's One Pistol Per Month Limit**

In *West Virginia Citizens Defense League v. City of Charleston*, Civ. Action No. 2:11-cv-0048 (S.D.W.Va. 2011), the gun lobby argued that Charleston gun ordinances, including a one handgun per month limit, violated the Second Amendment. The City of Charleston filed a motion to dismiss the case, and the Brady Center filed an amicus brief in support of that motion. Both of those briefs are attached. The City's motion is still pending before the court.

---

[1] Violence Policy Center, *A Shrinking Minority- The Continuing Decline of Gun Ownership in America* (2011), available at http://www.vpc.org/studies/ownership.pdf.

[2] The National Data Program for the Sciences  NORC, *About GSS*, available at http://www3.norc.org/gss+website/about+gss/about+gss.htm.

1

**APPENDIX 000178**

The City's brief and the Brady Center's brief point out that the U.S. Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008), held that "laws imposing conditions and qualifications on the commercial sale of arms," such as the one handgun per month limit, are "presumptively lawful" under the Second Amendment.  The Brady Center's brief also cited studies referenced in my initial testimony showing that one handgun per month limits have been proven to reduce gun trafficking.

### *Lane v. Holder* Case – Court Rejected a Lawsuit Claiming a Right for District Residents to Buy Handguns Outside the District

In *Lane v. Holder*, Civ. Action No. 1:11cv503 (E.D.Va. 2011), a D.C. resident sued to enjoin enforcement of a federal statute prohibiting the sale or transfer of handguns by federal firearms licensees  to persons that the licensee "knows or has reasonable cause to believe does not reside… in the state where the licensee's business is located." 18 U.S.C. § 922(b)(3).  Gun dealers may, however, transfer handguns to a dealer in the purchaser's state of residence, but the plaintiff argued that this was unduly burdensome and violated the Second Amendment.

The U.S. Attorney General responded that the law falls outside the scope of the Second Amendment because laws placing conditions on commercial sales are deemed "presumptively lawful," and that even if it did implicate the Second Amendment, it is reasonable because it reduces interstate firearms trafficking while allowing states to enforce their own firearms regulations.  On July 15, 2011, the court agreed with the Attorney General and dismissed the case.

### *NSSF v. Jones* Case – Court Cited Link Between Multiple Sales of Firearms and Gun Trafficking, Dismissing Challenge to Multiple Rifle Sale Reporting Requirement

In *National Shooting Sports Foundation v. Jones*, 2012 WL 112206 (D.D.C.  2012), the gun lobby sued to block a federal requirement that gun dealers in states along the Mexico border report more than one sale of certain semi-automatic rifles, such as AK-47 assault rifles, to the same person within a five business day period.  On January 13, 2012, the court dismissed the case, finding that the requirement was reasonable because "multiple sales of such guns is a strong indicator of gun trafficking."

As these studies and legal decisions show, the District's strong gun laws, such as limiting pistol registrations to one per month, protect public safety and are constitutional under the Second Amendment.  Thank you again for the opportunity to submit testimony supporting the District's gun laws that protect our communities from gun violence.

2

**Violence Policy Center**



1730 Rhode Island Avenue, NW      202.822.8200 voice
Suite 1014                        202.822.8205 fax
Washington, DC 20036              www.vpc.org web

# A Shrinking Minority

## The Continuing Decline of Gun Ownership in America



Gun ownership in America is declining.   This is the unavoidable conclusion from new, comprehensive, national data spanning nearly 40 years contained in the General Social Survey (GSS) conducted by the National Opinion Research Center (NORC) at the University of Chicago.  The GSS started in 1972 and completed its 28th round in 2010.  According to NORC, "Except for the U.S. Census, the GSS is the most frequently analyzed source of information in the social sciences."[1]

---

[1]      General Social Survey (GSS) gun ownership data contained in this study was obtained in March 2011 from the National Opinion Research Center (NORC) by the Violence Policy Center. According to NORC, "The General Social Survey (GSS) is one of NORC's flagship surveys and our longest running project...For the last third of a century the GSS has been monitoring social change and the growing complexity of American society.  The GSS is the largest project funded by the Sociology Program of the National Science Foundation.  Except for the U.S. Census, the GSS is the most frequently analyzed source of information in the social sciences...It is the only survey that has tracked the opinions of Americans over an extended period of time.  The GSS is also a major teaching tool.  We know of over 14,000

# Household Gun Ownership

Since the early 1970s the General Social Survey has asked the question: "Do you happen to have in your home (if house: or garage) any guns or revolvers?"   According to the GSS data available[2] for the years 1973 to 2010 detailed in the chart below:

- From 1977 to 2010, the percentage of American households that reported having any guns in the home dropped more than 40 percent.

- During this period household gun ownership hit its peak in 1977, when more than half (54 percent) of American households reported having any guns.  By 2010, this number had dropped more than 20 percentage points to a low during this period of 32.3 percent of American households reporting having any guns in the home.

- In 2010, less than a third of American households reported having a gun in the home.

| Graphic II:  Household Gun Ownership in the United States, 1973 to 2010 | | | | | |
|---|---|---|---|---|---|
| Year | Percent Households | Year | Percent Households | Year | Percent Households |
| 1973 | 49.1 | 1987 | 48.6 | 1998 | 36.7 |
| 1974 | 47.9 | 1988 | 43.4 | 2000 | 34.3 |
| 1976 | 49.7 | 1989 | 48.9 | 2002 | 36.4 |
| 1977 | 54.0 | 1990 | 45.8 | 2004 | 37.3 |
| 1980 | 50.8 | 1991 | 43.7 | 2006 | 34.5 |
| 1982 | 48.9 | 1993 | 45.5 | 2008 | 36.0 |
| 1984 | 48.5 | 1994 | 44.0 | 2010 | 32.3 |
| 1985 | 48.0 | 1996 | 43.4 | | |

research uses such as articles in academic journals, books, and Ph.D. dissertations based on the GSS and about 250,000 students annually who use it in their classes."   See http://www.norc.org/gss+website/about+gss/about+gss.htm, downloaded April 14, 2011.

[2]       Data contained in chart represent years for which the question was asked during the period cited.

2

## Personal Gun Ownership

Since 1980, General Social Survey respondents who state that they have a gun in their home are then asked, "Do any of these guns personally belong to you?" The GSS data available for the years 1980 to 2010[3] detailed in the chart below presents information on overall personal gun ownership, male personal gun ownership, and female personal gun ownership.

| Graphic III:  Personal Gun Ownership in the United States, 1980 to 2010 | | | | | | | |
|---|---|---|---|---|---|---|---|
| *Year* | *Percent Overall Personal Ownership* | *Percent Male Personal Ownership* | *Percent Female Personal Ownership* | *Year* | *Percent Overall Personal Ownership* | *Percent Male Personal Ownership* | *Percent Female Personal Ownership* |
| 1980 | 29.0 | 51.7 | 10.5 | 1994 | 28.4 | 46.3 | 12.6 |
| 1982 | 29.1 | 47.2 | 14.3 | 1996 | 27.2 | 44.1 | 12.5 |
| 1984 | 25.5 | 45.2 | 10.8 | 1998 | 22.6 | 37.7 | 10.7 |
| 1985 | 30.7 | 51.9 | 11.9 | 2000 | 22.3 | 37.7 | 9.3 |
| 1987 | 28.3 | 47.4 | 12.6 | 2002 | 26.3 | 37.5 | 11.8 |
| 1988 | 25.2 | 44.2 | 11.1 | 2004 | 25.5 | 41.3 | 11.6 |
| 1989 | 27.4 | 49.4 | 9.3 | 2006 | 21.6 | 34.9 | 10.6 |
| 1990 | 28.7 | 52.4 | 9.5 | 2008 | 23.6 | 38.4 | 10.9 |
| 1991 | 27.3 | 47.7 | 10.1 | 2010 | 20.8 | 33.2 | 9.9 |
| 1993 | 29.4 | 48.5 | 13.6 | | | | |

### *Overall Personal Gun Ownership*

- From 1985 to 2010, the  percentage of Americans who reported personally owning a gun dropped more than 32 percent.

- During this period, personal gun ownership hit its peak in 1985, when 30.7 percent of Americans reported personally owning a gun. By 2010, this number had dropped nearly 10 percentage points to a low during this period of 20.8 percent.

- In 2010, slightly more than one out of five Americans reported personally owning a gun.

---

[3]   Data contained in chart represent years for which the question was asked during the period cited.

3

*Male Personal Gun Ownership*

■    From 1990 to 2010, the percentage of males who reported personally owning a gun dropped nearly 37 percent.

■    During this period, male gun ownership hit its peak in 1990, when 52.4 percent of males reported personally owning a gun.  By 2010, this number had dropped more than 19 percentage points to a low during this period of 33.2 percent.

■    In 2010, only one out of three American males reported personally owning a gun.

*Female Personal Gun Ownership*

■    Female personal gun ownership remained relatively rare, fluctuating within a narrow range with no recent signs of increase.  Female personal gun ownership peaked at 14.3 percent in 1982.  In 2010, the female personal gun ownership rate was 9.9 percent.

■    In 2010, only one out of 10 American females reported personally owning a gun.

## Reasons for the Decline

Key factors contributing to the continuing decline in household and personal gun ownership in America include the following.

■    The aging of the current-gun owning population—primarily white males—and a lack of interest in guns by youth.

■    The end of military conscription.

■    The decreasing popularity of hunting.

■    Land-use issues that limit hunting and other shooting activities.

■    Environmental and zoning issues that force shooting ranges to close and limit new range construction.

■    The increase in single-parent homes headed by women.

4

**APPENDIX 000183**



**Legal Community Against Violence**

expertise, information & advocacy to end gun violence

**Comments Offered by Benjamin Van Houten on Behalf of
Legal Community Against Violence at Hearing Regarding Bill 19-614,
The Firearms Amendment Act of 2011**

Good afternoon, Chairman Mendelson. My name is Ben Van Houten and I am the Managing Attorney at Legal Community Against Violence. LCAV is a national law center founded in the aftermath of an assault weapons massacre at a San Francisco law firm. We work with state and local governments across the country on the development and defense of common sense laws to prevent gun violence. We also monitor all Second Amendment litigation nationwide.

Over the past several years, we have worked closely with the District of Columbia on its firearm laws. We filed our own brief in support of the District's handgun ban in the U.S. Supreme Court's *Heller* case, and, following the *Heller* decision, we worked with District policymakers and others to develop a comprehensive system of strong firearms laws that was consistent with the Supreme Court's mandate.

The firearm registration system is a cornerstone of this strong framework. Registration systems help law enforcement to quickly trace firearms recovered at crime scenes and discourage illegal firearm sales. They also protect police officers responding to incidents by informing them about whether firearms may be present at the scene, and aid in the return of lost or stolen firearms to their rightful owners.

Among the critical components of the District's registration system is that it applies to all firearms, including handguns and long guns. I'm from California, the state with some of the strongest laws in the country, and the California Legislature has recognized that long guns play a significant role in our gun violence epidemic and therefore need to be regulated just like handguns.

Last year, the California Legislature adopted a bill that LCAV co-sponsored that will require the California Department of Justice to retain records of long gun sales in a state database that previously only preserved records of handgun sales. The Legislature enacted this bill based on clear evidence of the role of long guns in firearms crime in California. Of the 26,682 crime guns recovered by California law enforcement in 2009, 43% were long guns. Additionally, the California Department of Justice conducted a series of sweeps over the past several years to seize firearms that were illegally possessed by convicted criminals. In these sweeps, DOJ found that the criminals were in possession of almost equal numbers of illegal handguns and long guns.

In sum, long guns are, like handguns, deadly weapons that are frequently recovered in crimes and possessed by dangerous criminals. Registration of long guns is therefore critical to protecting public safety and the safety of law enforcement.

Other aspects of the District's registration system are also crucial to public safety. The requirement that firearm owners renew their registration every three years helps ensure that those

who have fallen into a prohibited category, say by being convicted of a felony or a domestic violence misdemeanor, aren't allowed to continue to own or possess guns. In fact, in LCAV's recent publication, *Model Laws for a Safer America*, we recommend annual renewal of registration to ensure that guns don't remain in the wrong hands for long.

The District's law prohibiting a person from registering more than one handgun in a 30-day period is an important measure to prevent the trafficking of firearms. What need could a person possibly have to buy more than one handgun a month? Studies show that firearms sold in multiple sales to the same purchaser are frequently trafficked for use in later crimes. DC's law is consistent with the practices in several states. California, Maryland, New Jersey and Virginia all limit handgun purchases to one every thirty days. In fact, New York City limits all firearm purchases to one every ninety days.

Finally, a strong firearms training requirement helps ensure that gun owners know how to safely use and store firearms, thereby reducing the number of unintentional shootings, firearm thefts, and incidents in which unauthorized persons, such as children and criminals, gain access to guns.

While these provisions are all important public safety measures, it's worth pointing out that they are also completely consistent with the Second Amendment's guarantee of a law-abiding, responsible citizen's right to possess a firearm in the home for self-defense. Since *Heller*, courts have upheld licensing and registration laws, and we are confident that these provisions will be found similarly constitutional.

I want to conclude by commending the District Council. The District's firearms laws are some of the strongest in the nation, drawing from best practices adopted all over the country. Thank you very much for your time today. I also will be submitting written testimony to supplement these remarks and am available to answer any questions.

2



**Legal Community Against Violence**

expertise, information & advocacy to end gun violence

February 13, 2012

Committee on the Judiciary
Council of the District of Columbia
1350 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

**Written Statement Regarding Bill 19-614, the Firearms Amendment Act of 2011, from
Benjamin Van Houten on Behalf of Legal Community Against Violence**

Members of the Judiciary Committee,

     Please find herein written comments regarding Bill 19-614, the Firearms Amendment Act of 2011, submitted on behalf of Legal Community Against Violence. These comments build upon and are intended to supplement the remarks I offered at the Committee's hearing on this legislation on Monday, January 30, 2012.

     My name is Benjamin Van Houten and I am the Managing Attorney at Legal Community Against Violence. LCAV is a national law center founded in the aftermath of an assault weapons massacre at a San Francisco law firm. We work with state and local governments across the country on the development and defense of common sense laws to prevent gun violence. We also monitor all Second Amendment litigation nationwide.

     Over the past several years, we have worked closely with the District of Columbia on its firearm laws. We coordinated the filing of *amicus* briefs in support of the District's handgun ban in the U.S. Supreme Court's *District of Columbia v. Heller* case, and also filed our own brief in the litigation. Following the *Heller* decision,[1] we worked with District policymakers and others to develop a comprehensive system of strong firearms laws that was consistent with the Supreme Court's mandate.

     The firearm registration system is a cornerstone of this strong framework. Registration laws are an essential component of responsible gun policy because they: 1) help law enforcement to quickly trace firearms recovered at crime scenes; 2) discourage illegal firearm sales by creating accountability for gun owners; 3) protect police officers responding to an incident by providing them with information about whether firearms may be present at the scene; and 4) facilitate the return of lost or stolen firearms to their rightful owners.[2]

---

[1] *District of Columbia v. Heller*, 554 U.S. 570 (2008).
[2] *See also* Daniel W. Webster et al., *Relationship Between Licensing, Registration, and Other Gun Sales Laws and the Source State of Crime Guns*, 7 Inj. Prevention 184, 188-89 (2001) (finding that states with some form of licensing and registration systems have greater success keeping firearms initially sold by dealers in the state from being recovered in crimes than states without such systems in place). The study included jurisdictions with concealed carry permits and dealer sales reporting, which have elements of licensing or registration but are not comprehensive licensing or registration systems.

APPENDIX 000186

Given these benefits, it is unsurprising that the American public strongly supports laws requiring gun registration. A nationwide survey conducted in January 2011, for example, found that 66% of respondents favor laws requiring every gun owner to register each gun he or she owns as part of a national gun registry.[3] A 2008 poll found that 68% of voters, including 60% of gun owners, support the registration of guns.[4] A poll conducted in May 2001 found that 70% of respondents mistakenly believe that a registration system already exists in the United States.[5]

Among the critical components of the District's registration system is that it applies to all firearms, including handguns and long guns. Legal Community Against Violence is based in California, the state with some of the strongest laws in the country. The California Legislature has recognized that long guns play a significant role in our gun violence epidemic and therefore need to be regulated just like handguns.

Last year, the California Legislature adopted a bill that LCAV co-sponsored that will require the California Department of Justice to retain records of long gun sales in a state database that previously only preserved records of handgun sales.[6] The Legislature enacted this bill based on clear evidence of the role of long guns in firearms crime in California. Of the 26,682 crime guns recovered by California law enforcement in 2009, 43% were long guns.[7] Additionally, the California Department of Justice conducted a series of sweeps over the past several years to seize firearms that were illegally possessed by convicted criminals. In these sweeps, DOJ found that the criminals were in possession of almost equal numbers of illegal handguns and long guns.[8]

In sum, long guns are, like handguns, deadly weapons that are frequently recovered in crimes and possessed by dangerous criminals. Registration of long guns is therefore critical to protecting public safety and the safety of law enforcement.

Other aspects of the District's registration system are also crucial to public safety. The requirement that firearm owners renew their registration every three years helps ensure that those who have fallen into a prohibited category, say by being convicted of a felony or a domestic violence misdemeanor, aren't allowed to continue to own or possess guns. In fact, in LCAV's recent publication, *Model Laws for a Safer America*, we recommend annual renewal of registration to ensure that guns don't remain in the wrong hands for long.[9]

---

[3] American Viewpoint and Momentum Analysis for Mayors Against Illegal Guns, *Results From A National Survey of 1003 Registered Voters* (January 2011), at
http://www.mayorsagainstillegalguns.org/downloads/pdf/maig_poll_01_18_2011.pdf.
[4] Penn, Schoen, & Berland Associates, Inc. for Brady Campaign to Prevent Gun Violence, *Post-Election Analysis: Sensible Gun Laws Builds Bridges not Burns [sic] Them to Moderates, McCain, and Even Gun Owners in Post-Heller World* (Nov. 18, 2008), available at: http://www.bradycampaign.org/xshare/pdf/memo-11-18-08.pdf.
[5] Lake, Snell, Perry & Associates, Inc. Poll, *Educational Fund to Stop Gun Violence* (May 15-21, 2001), at http://www.commondreams.org/news2001/0612-05.htm.
[6] AB 809, 2011-12 Regular Session (Cal. 2011)
[7] Data provided by the California Department of Justice on April 6, 2010.
[8] Data provided by the California Department of Justice on March 4, 2010.
[9] Model Laws for a Safer America: Seven Regulations to Promote Responsible Gun Ownership and Sales can be downloaded at http://lcav.org/model_laws_for_a_safer_america.asp.

2

The District's law prohibiting a person from registering more than one handgun in a 30-day period is an important measure to prevent the trafficking of firearms. What legitimate need could a person possibly have to buy more than one handgun a month?

Firearms sold in multiple sales to the same individual purchaser are frequently used in crime.[10]  ATF crime gun trace data revealed that 22% of all handguns recovered in crime in 1999 had been transferred to a purchaser involved in a multiple sale.[11]  Crime gun trace data from 2000 showed that 20% of all retail handguns recovered in crime were purchased as part of a multiple sale.[12]  A study of the sale and subsequent criminal use of handguns sold in Maryland in the 1990s revealed that handguns sold in multiple sales accounted for about a quarter of crime guns and were up to 64% more likely to be used in crime than handguns sold in single sales.[13]

Similarly, a review of Virginia's one-gun-a-month law demonstrated that the law was effective in reducing the number of crime guns traced to Virginia dealers. Virginia adopted its law in 1993 after the state became recognized as a primary source of crime guns recovered in states in the northeastern U.S.  After the law's adoption, the odds of tracing a gun originally acquired in the Southeast to a Virginia gun dealer (as opposed to a dealer in a different southeastern state) dropped by 71% for guns recovered in New York, 72% for guns recovered in Massachusetts, and 66% for guns recovered in New Jersey, New York, Connecticut, Rhode Island and Massachusetts combined.[14]

The American public strongly supports laws limiting the number of guns that may be purchased at one time.  A national poll conducted for Mayors Against Illegal Guns in the spring of 2008 found that 65% of Americans favor limiting the number of handguns an individual is allowed to purchase to one gun per month.[15]

Finally, a strong firearms training requirement helps ensure that gun owners know how to safely use and store firearms, thereby reducing the number of unintentional shootings, firearm thefts, and incidents in which unauthorized persons, such as children and criminals, gain access to guns.

---

[10] *See, e.g.,* Bureau of Alcohol, Tobacco and Firearms, U.S. Department of the Treasury, *Youth Crime Gun Interdiction Initiative, Crime Gun Trace Reports (2000) National Report* 52 (July 2002), *at:* http://www.atf.gov/publications/download/ycgii/2000/ycgii-report-2000-general-findings.pdf; Bureau of Alcohol, Tobacco and Firearms, U.S. Department of the Treasury, *Youth Crime Gun Interdiction Initiative, Crime Gun Trace Reports (1999) National Report* 40 (Nov. 2000), *at:* http://www.atf.gov/publications/download/ycgii/1999/ycgii-report-1999-general-findings.pdf.

[11] *Id.*

[12] *Youth Crime Gun Interdiction Initiative, Crime Gun Trace Reports (2000) National Report, supra* note 10.

[13] Christopher S. Koper, *Crime Gun Risk Factors:  Buyer, Seller, Firearm, and Transaction Characteristics Associated with Gun Trafficking and Criminal Gun Use,* Report to the National Institute of Justice 6, 83 (2007), at http://www.ncjrs.gov/pdffiles1/nij/grants/221074.pdf.

[14] Douglas S. Weil & Rebecca Knox, *Evaluating the Impact of Virginia's One-Gun-A-Month Law,* The Center to Prevent Handgun Violence 1, 4-6 (Aug. 1995).  Despite this evidence of the law's effectiveness, the Virginia Legislature recently voted to repeal the state's one-gun-a-month law.

[15] Greenberg Quinlan Rosner Research & the Tarrance Group for the Mayors Against Illegal Guns, *Americans Support Common Sense Measures to Cut Down on Illegal Guns* 6 (Apr. 10, 2008), *at:* http://www.mayorsagainstillegalguns.org/downloads/pdf/polling_memo.pdf.

**APPENDIX 000188**

While these provisions are all important public safety measures, it's worth pointing out that they are also completely consistent with the Second Amendment's guarantee of a law-abiding, responsible citizen's right to possess a firearm in the home for self-defense. Since *Heller*, courts have upheld licensing and registration laws, and we are confident that these provisions will be found similarly constitutional.[16] For example, in a 2009 decision, the Seventh Circuit upheld a firearm registration law as constitutional, finding that the law "merely regulated gun possession," instead of prohibiting it.[17] The District's registration system operates in a similarly constitutional fashion.

At the hearing on this bill, Chairman Mendelson requested information about the extent to which other states require individuals seeking to purchase firearms to undergo fingerprinting or provide photographs to law enforcement as part of the process of registering a firearm or acquiring a license to purchase a firearm. At least five states, Hawaii, Massachusetts, New Jersey, Connecticut, and New York, require purchase permit applicants to either be fingerprinted, or be photographed, or both.[18,19]

I want to conclude by commending the District Council. The District's firearms laws are some of the strongest in the nation, drawing from best practices adopted all over the country. Thank you very much for your consideration of these comments. Please do feel free to contact me if you have any questions or require any additional information.

Sincerely,

Benjamin Van Houten
Managing Attorney
Legal Community Against Violence

---

[16] For more on trends in Second Amendment litigation, please refer to LCAV's *Post*-Heller *Litigation Summary*, which can be found at http://www.lcav.org/content/post-heller_summary.pdf.

[17] *Justice v. Town of Cicero*, 577 F.3d 768, 774 (7th Cir. 2009), *cert. denied*, 177 L. Ed. 2d 323 (2010).

[18] Hawaii (Haw. Rev. Stat. § 134-2: law enforcement must fingerprint applicant and take photographs), Massachusetts (Mass. Gen. Laws ch. 140, §§ 122, 129B(2): fingerprinting), New Jersey (N.J. Stat. Ann. § 2C:58-3(e): fingerprinting), Connecticut (Conn. Gen. Stat. § 29-36g(a): fingerprinting), and New York (N.Y. Penal Law § 400.00(3): fingerprinting and applicant must submit photographs). Additionally, Iowa requires handgun purchase permit applicants to deliver their applications to law enforcement and display an identification card when submitting the application. Iowa Code § 724.17. Note that in Hawaii, Massachusetts and New Jersey, the permit requirements apply to individuals seeking to acquire any firearm. In the other states listed above, a purchase permit is only required to purchase a handgun.

[19] Additionally, Chairman Mendelson requested information regarding whether any states require an individual to meet a vision requirement in order to purchase a handgun. My review has not identified any state with such a requirement.

**APPENDIX 000189**

Statement of
**Joseph J. Vince, Jr.**

Bill 19-614
Firearms Amendment Act of 2011

Committee on the Judiciary
Councilmember Phil Mendelson, Chairperson
Council of the District of Columbia


January 30, 2012
11:00 a.m., Council Chamber, John A. Wilson Building
1350 Pennsylvania Avenue, NW
Washington, DC 20004


## 1) INTRODUCTION

I was invited by the Office of the Attorney General for the District of Columbia to submit a
written statement regarding the "gun control laws of the District." I submit this statement
voluntarily, without payment of any kind from anyone, and this statement reflects my
personal views on these matters, gained from decades of relevant law-enforcement
experience.

I appreciate the opportunity to provide the Council with my views concerning the District's
current firearms laws, which I believe, as a whole, are reasonable and in the best interest of
public safety.


## 2) QUALIFICATIONS

I am the head of the Criminal Justice Program at Mount St. Mary's University in
Emmitsburg, Maryland. I am also the President of Crime Guns Solutions, LLC, a private
consulting firm dedicated to assisting and training law enforcement and other groups in
reducing firearm-related violent crime.

Prior to my current positions, I spent the majority of my career with the U.S. Bureau of
Alcohol, Tobacco, Firearms, and Explosives ("ATF"), where I held several positions over the
course of nearly 30 years, including Chief of the Firearms Enforcement Division and Chief
of the Crime Gun Analysis Branch.

During my time at the ATF, I oversaw numerous investigations targeting the illegal
trafficking of firearms, including by organized crime figures, major narcotic distributors, and

1

domestic and foreign terrorists. My later work at the ATF focused on crime-gun tracing and analysis, including leading the Youth Crime Gun Interdiction Initiative, a program in which a number of cities agreed to submit information on crime guns recovered by local law enforcement agencies to the ATF for tracing, to develop information about illegal trafficking of firearms. Despite its name, the YCGII was not limited to guns recovered from youth. Beginning with 17 cities in 1996, the program concluded in 2000 with 55 cities participating, and allowed those communities to develop sound gun-enforcement strategies for proactive use in firearms investigations, as well as provided useful data for researchers studying firearms violence. The tracing of firearms through serial numbers provides information on the "chain of sale" for law enforcement officials. The ATF's maintenance of a database of this trace information—the Firearms Tracing System—has been "of great assistance to local and national law enforcement."[1]

Because of my experience involving the diversion of firearms for illegal purposes, I was appointed the United States' representative to the United Nations Working Group on Small Arms Proliferation, and was also assigned to the U.S. negotiating team under the direction of the Office of National Drug Policy to attempt to obtain an agreement with Mexico regarding the cross-border flow of drugs and guns. I have provided training to law enforcement officials throughout the United States, as well as in Europe, South America, and Mexico.

I have testified as an expert with regards to firearms-related violent crime in a number of cases in federal and local courts, and currently am a member of the Firearms Committee of the International Association of Chiefs of Police. I am familiar, generally, with most of the major empirical studies regarding firearms and cite those studies, articles, and court decisions supporting my views here.

## 3) THE DISTRICT'S FIREARMS LAWS

Based on my experience in law enforcement, I believe that the registration requirements currently in place in the District are an effective means of keeping firearms out of the hands of criminals, giving law enforcement the tools it needs to prevent and solve crime and protecting the safety of law enforcement officials, and the public in general.

### a) The District's Firearms Registration Requirements Are An Effective Means of Keeping Firearms Out of the Hands of Criminals

One of the most important benefits of strong firearm-registration requirements is to keep weapons out of the hands of criminals or others who pose a safety risk to themselves or the

---

[1]*NAACP v. AcuSport, Inc.*, 271 F.Supp.2d 435, 448 (E.D.N.Y. 2003).

2

public.[2] Firearm registration fosters greater accountability among gun owners, and provides important information for law enforcement, allowing officials to identify persons who subsequently become disqualified from ownership. Registration requirements make it more difficult for criminals, juveniles, and other prohibited persons to acquire guns.[3] The stronger the firearms-registration system, the less the likelihood that those who are a threat to themselves or others will get access to firearms. Registration makes it easier to trace guns used in crime to their last known legal owner, and to investigate possible illegal transactions. It pains me to say that, last year, gunfire was the number one cause of police fatalities.[4]

States and cities with strong firearms registration laws—like those of the District—do a far better job at preventing guns from falling into the hands of criminals, than states and municipalities without such laws.[5] Moreover, registration of firearms provides law-enforcement officers with critical information to track firearms when investigating gun crimes and gun smuggling.

*Federal vs. Local*

In my opinion, firearms must primarily be regulated on a local level, as national agencies, such as the ATF, have different focuses, when they are not actually prohibited from taking action. The ATF regulates the firearms market on a national level, licensing and inspecting federal firearms licensees ("FFLs"), and working with firearms manufacturers and distributors to combat straw purchases and the illegal diversion of guns.[6] The federal Firearms Owners Protection Act of 1986 prohibits the establishment of a federal registration system for firearms, and limits the ATF to a maximum of one unannounced inspection per

---

[2] D.W. Webster, J.S. Vernick, J.M. Hepburn, *Relationship between licensing, registration, and other gun sales laws and the course state of crime guns*, 7 Injury Prevention, 184–189 (2001) (available online at *http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1730734/pdf/ v007p00184.pdf*).

[3] D.W. Webster, J.S. Vernick, and M.T. Bulzacchelli, *Effects of State-Level Seller Accountability Policies on Firearm Trafficking*, 86 J. of Urban Health 525–537 (2009) (available online at *http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2704273/*).

[4] Carol Cratty, *Report: 173 law enforcement officers killed on duty in 2011*, CNN.COM (Dec. 28, 2011) (available online at *http://www.cnn.com/2011/12/28/us/law-enforcement-deaths/index.html?hpt=hp_t2*).

[5] *See* n. 2, n.3, *supra.*

[6] *See, e.g., NAACP, supra.*

3

FFL per year;[7] on average, the ATF inspects each licensee about once every 17 years.[8] The ATF, in my opinion, does not have the resources to properly oversee the firearms dealers and manufacturers it regulates, much less to regulate the average gun owner. Those efforts must come from local authorities.

*Urban v. Rural*

The burden of firearm-related death, crime, and injury is not evenly distributed through the population. Numerous studies have shown—and it has certainly been my experience—that urban, poorer neighborhoods have higher rates of gun violence than more wealthy, rural areas.[9] In fact, while homicide rates and violent crime has generally been falling nationwide, firearms homicide rates are highest among young men in urban areas and have been increasing in this population.[10] It is thus very important for cities, like the District, to have strong firearms laws.

### i) Long-Gun Registration

Long guns, like rifles and shotguns, are the most popular type of firearm in the United States, amounting to almost two-thirds of all privately owned guns.[11] Moreover, surveys show that most handgun owners also own one or more long guns.[12] Consequently, the benefits of strong firearm-registration requirements are true with respect to long guns, as well as hand-guns. Indeed, the United States has required the registration of certain types of long-guns, such as machine guns, since the 1930s. This has proved highly effective in reducing the use of automatic weapons in crime.

---

[7] 18 U.S.C. §§ 926(a), 923(g)(1)(B).

[8] Brian Bennett, *Turning a Blind Eye to Gun Dealers*, Time (May 8, 2007) (available online at *http://www.time.com/time/nation/article/0,8599,1618392,00.html*).

[9] J.S. Vernick, J.G. Hodge, Jr., and D.W. Webster, *The Ethics of Restrictive Licensing for Handguns: Comparing the United States and Canadian Approaches to Handgun Regulation*, 35 J. L. Med. & Ethics 668 (Winter 2007).

[10] *See* n.3, *supra.*

[11] L. Hepburn, M. Miller, D. Azrael, and D. Hemenway, *The U.S. gun stock: results from the 2004 national firearms survey*, 13 Injury Prevention 15–19 (2007) (available online at *http://injuryprevention.bmj.com/content/13/1/15.full*).

[12] *Id.*

4

**APPENDIX 000193**

Canada has required the registration of long guns for decades.[13] There have been a number of unsuccessful efforts to eliminate this requirement as "ineffective at reducing crime."[14] After an extensive recent study, the Royal Canadian Mounted Police has determined that firearms registration generally (and of long guns particularly) provides crucial public-safety and law-enforcement benefits.[15]

In addition, the registration of long-guns makes particular sense here, given the District's unique status as the Nation's Capitol. History has shown that high-powered rifles are the preferred tool of political assassins. In light of the dense concentration of high-ranking government officials, ambassadors, and visiting foreign dignitaries in the District, it makes particular sense for the District to require the registration of long guns in order to track their presence and keep them out of the hands of criminals and terrorists.

## ii) Restricting Handgun Registration to One Per 30-Day Period

I have found that one of the most effective methods of disrupting illegal interstate trafficking of firearms are state and local laws that limit the quantity of firearms that can be purchased or registered during a given time period. For example, there is strong evidence that state and local laws that limit the purchase of firearms by an individual to one gun in a 30-day period are highly effective in disrupting illegal interstate trafficking of firearms.[16] Put another way, handguns purchased in multiple-gun purchases on the same day were more likely to be traced by the ATF than were single-purchase handguns.[17]

Based on this evidence and my own experience, I believe that the District's current law, which limits an individual to registering no more than one pistol during a 30-day period, is an effective means of limiting the illegal trafficking of guns into (or out of) the District.

---

[13] See n.2, *supra. See also Reference re: Firearms Act*, 1 S.C.R. 783 (Can. Jun. 15, 2000) (available online at *http://scc.lexum.org/en/2000/2000scc31/2000scc31.html*).

[14] Royal Canadian Mounted Police, *RCMP Canadian Firearms Program: Program Evaluation* (Feb. 2010) (available online at *http://www.rcmp-grc.gc.ca/pubs/fire-feu-eval/eval-eng.pdf*).

[15] *See* n.14, *supra.*

[16] D. Weil, R. Knox, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275:22 JAMA 1759–1761 (1996). *See also* n.2, *supra.*

[17] M. A. Wright, G.J. Wintemute, and D.W. Webster, *Factors Affecting a Recently Purchased Handgun's Risk for Use in Crime under Circumstances That Suggest Gun Trafficking*, 87 J. of Urban Health 352–364 (2010) (available online at *http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2871090/?tool=pubmed*).

**APPENDIX 000194**

Further, this requirement makes particular sense for the District given the fact that the majority of illegal firearms found in the District are illegally trafficked from other states. Indeed, when Virginia—previously a major supplier of illegal handguns to New York City—enacted a law limiting multiple sales to the same person, it almost immediately reduced that supply by a substantial amount.[18]

### iii) In-Person Registration

In addition, I have found that one of the most effective ways to ensure that criminals do not circumvent the firearm-registration process, is to require in-person appearance and ID verification as part of registration. Accordingly, I believe that the District's requirement that a registrant appear in-person is entirely reasonable. In my experience, jurisdictions that do not require in-person registration and ID verification are far less effective at preventing the diversion of firearms for illegal purposes. Indeed, a recent study by New York City found that almost two-thirds of online firearms dealers were willing to sell to individuals who admitted that they would probably not pass a background check.[19] While the in-person registration requirement will clearly not prevent *all* unauthorized persons from obtaining guns, it will certainly assist in deterring all but the most desperate.

### b) The District's Firearms Laws Give Law Enforcement the Tools It Needs to Prevent and Solve Crime

In addition to preventing criminals from obtaining firearms, strong firearms-registration laws like those in place in the District also prove effective in providing law enforcement with information essential to preventing and solving crime. A comprehensive firearms-registration system provides law enforcement with basic information, such as who has firearms, what type, and where they're kept. Every firearm has the potential to kill. In my opinion, requiring this minimal information in exchange for the privilege of owning a dangerous weapon is justified.

### i) Requiring Fingerprints and Photographs of Registrants

The District's requirements of in-person registration, and requiring that a firearms registrant be fingerprinted and photographed and submit to a background check as

---

[18] See *NAACP, supra* and n.14, *supra*.

[19] Michelle Nichols, *Bloomberg sets sights on illegal gun sales online*, Reuters (Dec. 14, 2011) (available online at *http://www.reuters.com/article/2011/12/15/us-usa-guns-online-idUSTRE7BE01Z20111215*).

APPENDIX 000195

part of the registration process provide law enforcement with exactly this sort of basic information, which is often essential to preventing or solving a crime.

### ii) Registration and Background Check

Law enforcement officials also must be able to rely on the information they obtain as part of the registration process. Background checks are a very effective way to keep guns out of the hands of prohibited individuals. Additionally, it is eminently reasonable for the District to require that the owner of a firearm notify the District of any change in owner information or the loss, theft, or sale of the firearm, and for individual registrants to undergo a criminal background check. These requirements are minimally burdensome, consistent with the registration requirements of other licenses issued by the government (*e.g.*, drivers' licenses), and provide law enforcement officials with some basic assurance that the information is accurate and current. Moreover, requiring registrants to update their information helps ensure that gun owners who have fallen into a prohibited category are not allowed to continue to possess firearms.

### c) The District's Firearms Laws Protect the Safety of Law Enforcement Officers and the Public in General

Finally, based on my experience, strong firearms-registration laws are effective at improving the safety of law enforcement officers in the field, as well as the public in general. Basic requirements like those in place in the District that a gun owner be trained in the proper use and storage of firearms, and demonstrate knowledge of the District's firearms laws, are important methods of reducing the accidental use or misuse of firearms.

Over the past few years, we have seen a spike in the number of firearm-related fatalities among law enforcement officers.[20] Based on my experience, I believe this trend will only continue as more firearms are introduced into communities such as the District. In order to combat this problem, gun-owners must know how to use their weapons and understand the District's firearms laws, which law enforcement officers are charged with enforcing.

## 4) BILL 19-614

The legislation currently before the Council, the Firearms Amendment Act of 2011, would, among other things, repeal the requirement that pistols be submitted for a "ballistics

---

[20] *See* n.4, *supra.*

7

identification procedure." D.C. Code § 7-2502.03(d). In my opinion, the repeal of this provision will not have a significant impact on public safety. The other information collected at registration—like fingerprints and the serial number of the firearm—is more valuable and important for tracing purposes.

8

The Washington Post

# *Local* OPINIONS

washingtonpost.com/localopinions

localopinions@washingtonpost.com

**WRITE FOR US**
Local Opinions, a place for commentary about where we live, is looking for submissions of 300 to 500 words on timely local topics. Submissions must include name, e-mail address, street address and phone number, and they will be edited for brevity and clarity. To submit your article, please go to **washingtonpost.com/localopinions**.



## DOUGLAS WEIL

# A law that gun-rights advocates should be fighting to keep

In July 1993, a Virginia law took effect limiting the number of handguns an individual could purchase to one gun every 30 days. Not to one gun a year, or one gun a lifetime — but one gun a month. The impact of this law on interstate gun trafficking was immediate, it was significant and it is impossible to refute. Prior to the law, Virginia gun dealers were the most important source of crime guns illegally trafficked along Interstate 95, also known as the "iron pipeline" from the Southeast to the states in the Northeast corridor.

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) routinely traces the origin of crime guns from the location where they have been recovered by the police back to the firearms dealers who first sold the guns. In the 5 ½-year period beginning in September 1989, 14,606 guns that were sold by dealers in one of the

eight southeastern states were later recovered by the police and traced to their origin by ATF. An analysis of the trace data that I conducted with my colleague Rebecca C. Knox revealed that the odds that any of these guns would be traced back to a Virginia gun dealer fell by a third after the one-gun-a-month law took effect.

Our analysis, published in 1996 in the Journal of the American Medical Association, showed that the impact of the law on gun trafficking was even more dramatic along the iron pipeline. Specifically, the odds that a crime gun used in the Northeast would be traced to a gun dealer in Virginia fell by two-thirds.

Despite this, the Virginia General Assembly has voted to repeal the one-gun-a-month restriction, and Gov. Robert F. McDonnell has indicated that he will sign the legislation. Their logic appears to

be that since exemptions to the law have been created (e.g., for law-enforcement officers and holders of concealed-carry permits), the state should exempt everyone. But there is simply no public health or public safety rationale for repealing the law.

The gun lobby is fond of saying that gun laws only burden law-abiding citizens — that criminals will always be able to get guns. The analysis of ATF's gun-trace data proves that proposition is not true. The Virginia law applies to retail gun sales, but the impact, both large and immediate, was on illegal gun trafficking. The law places virtually no burden on individuals who are legally entitled to purchase a handgun. It isn't a prohibition against the purchase or possession of firearms. It doesn't limit the number of guns an individual can own. It doesn't increase the time needed to complete a back-

ground check. The law burdens gun traffickers and the straw purchasers they hire to supply them with guns, and it makes it more difficult for the rare dirty gun dealer who is willing to look the other way when a single individual walks in to his store asking to buy five or 10 or even 20 or more inexpensive handguns to be sold on the street.

One-gun-a-month's fate is now in McDonnell's hands, and one hopes he will take an objective look at the impact of the law before acting. Rather than repealing this law, Virginia should be touting its success to encourage other states and ultimately the federal government to follow its lead and enact similar legislation.

The writer was research director for the Center to Prevent Handgun Violence, which is now known as the Brady Center, from 1994 to 2001.

# Government of the District of Columbia
## Office of the Chief Financial Officer



**Natwar M. Gandhi**
Chief Financial Officer

<u>**MEMORANDUM**</u>

**TO:**            **The Honorable Kwame R. Brown**
                   **Chairman, Council of the District of Columbia**

**FROM:**          **Natwar M. Gandhi**
                   **Chief Financial Officer**

**DATE:**          **February 29, 2012**

**SUBJECT:**       **Fiscal Impact Statement – "Firearms Amendment Act of 2012"**

**REFERENCE:**     **Bill 19-614, Committee Print as shared with OCFO on February 27, 2012**

---

**Conclusion**

Funds are sufficient in the FY 2012 through FY 2015 budget and financial plan to implement the bill.

**Background**

In 2008, the Supreme Court held the District of Columbia's ban on handgun possession in one's home was a violation of the Second Amendment.[1] Thus, the Council of the District of Columbia passed the Firearms Registration Amendment Act of 2008[2] to legalize the registration of a handgun for in-home possession for self-defense. The Metropolitan Police Department (MPD) facilitates firearms registration in the District for both residents and security personnel.[3]

The bill amends the Firearms Control Regulations Act of 1975.[4] The main components reduce or eliminate some restrictions associated with possessing a firearm in the District, alter the registration renewal process, and designate certain firearm related violations as infractions. Examples of these provisions include:

---

[1] District of Columbia et al. v. Heller, 554 U.S. 570 (2008).
[2] Effective March 31, 2009 (D.C. Law 17-372; D.C. Official Code §§ 2-1831.03 and 7-2501.01 et seq.).
[3] See the MPD firearms registration website
(http://mpdc.dc.gov/mpdc/cwp/view.a.1237.q.547431.mpdcNav_GID.1523.mpdcNav.l.asp).
[4] Effective September 24, 1976 (D.C. Law 1-85; D.C. Official Code § 7-2501.01 et seq.)

The Honorable Kwame R. Brown
FIS: B19-614, "Firearms Amendment Act of 2012," Committee Print as shared with OCFO on February 27, 2012

- Allowing an individual to temporarily possess a firearm during a training and safety class in the District;
- Eliminating the needs to reaffirm knowledge of District firearms laws for each subsequent firearms registration and to fulfill a background check every six years;
- Repealing the need for a ballistics identification on a registered firearm and for a registrant to pass a vision test;
- Requiring MPD to take a digital photo of a registrant rather than requiring the submission of a photo;
- Expanding the number of options for a registrant to show or obtain appropriate firearms training;[5] and
- Allowing the possession of any legal ammunition by a valid registrant[6], including temporary possession during a training and safety class.

The bill also adjusts the registration renewal requirements to ensure there are multiple ways for a registrant to submit a renewal and delays the renewal requirement until January 2014. Current law requires comprehensive registration renewal procedures to be completed by March 2012.[7]

The bill designates that a non-resident found in violation of possessing an unregistered firearm or ammunition[8] or possessing a single restricted bullet shall be prosecuted as an infraction with a maximum penalty of $500.

Lastly, the bill allows for (but does not mandate) the District to register as a federal firearms licensee (FFL). A FFL is a person or business licensed by the Bureau of Alcohol, Tobacco, Firearms, and Explosives as a manufacturer, dealer, or importer of firearms. Currently the District has one FFL which is privately held and operates out of MPD headquarters.[9] The bill authorizes the Mayor to seek FFL status in the event there is no commercially active[10] FFL in the District.

**Financial Plan Impact**

Funds are sufficient in the FY 2012 through FY 2015 budget and financial plan to implement the bill.

The provisions that reduce or eliminate some of the restrictions for firearm possession in the District are unlikely to have a significant financial impact.

---

[5] Current law requires four hours of classroom instruction and one hour of training at a firing range. The bill's options include a training and safety class provided by the MPD Chief, military training, a license from another state, or successful completion of a private firearms training or safety course, provided the latter two options have equal or greater training requirements as the District.
[6] Current law (D.C. Official Code § 7-2506.01(a)(3)) requires the ammunition to be the same gauge or caliber as the registered firearm.
[7] D.C. Official Code § 7-2502.07a.
[8] So long as the violator is not concurrently being charged with another criminal offense.
[9] The private FFL does not sell firearms. It facilitates the transfer of handguns owned or purchased outside the District into the District.
[10] Defined as a person or business holding a federal firearms license and open for business to the general public to receive and transfer handguns for third parties into the District.

Page 2 of 3

The Honorable Kwame R. Brown
FIS: B19-614, "Firearms Amendment Act of 2012," Committee Print as shared with OCFO on February 27, 2012

Should the District choose to register as an FFL, it may have to pay for registration costs, but such costs must be accounted for in the budget prior to registration. Additionally, the District accommodated the private FFL in 2011 to facilitate firearms transfer and the District prefers and would continue to foster the private sector in this capacity in the future.[11]

---

[11] Based on a February 2, 2012 conversation with MPD.

Page 3 of 3

**APPENDIX 000201**

1   COMMITTEE PRINT

2   Committee on the Judiciary

3   February 29, 2012

4
5
6
7
8                                    A BILL
9
10
11                                   <u>19-614</u>
12
13
14             IN THE COUNCIL OF THE DISTRICT OF COLUMBIA
15
16                          _____
17
18
19   To amend the firearms laws of the District of Columbia to define "firearms instructor" and allow
20          a person to temporarily possess a firearm while participating in a firearms training and
21          safety class; to clarify that a registration certificate may be issued to a firearms instructor
22          or organization employing a firearms instructor, or to a person who complies with the
23          registration requirements; to provide that a firearms instructor or organization that
24          employs a firearms instructor my register a pistol;  to clarify that the requirement to
25          demonstrate knowledge of the District's firearms laws is a one-time requirement per
26          applicant; to repeal the requirement for a vision test and provide that an individual who is
27          legally blind may not register a firearm; to revise the training requirement for firearms
28          registration and provide for certain exceptions; to repeal the requirement that each pistol
29          be submitted for ballistic identification as part of the registration process; to eliminate the
30          requirement that registrants produce photographs and instead require the Chief of Police
31          to take a digitalized photograph and fingerprints at the time of registration; to eliminate
32          the requirement that registrants submit to a background check every 6 years; to clarify
33          that registration may be renewed online, by mail, or in person; to require the creation of a
34          system for registration renewal by January 1, 2014; permit the District to temporarily act
35          as a federal firearms licensee when one is not commercially available; to extend to
36          January 1, 2014 the date by when semiautomatic pistols must be microstamp-ready; to
37          exempt a person who has lawfully registered a firearm from certain prohibitions against
38          unregistered ammunition; to allow for temporary possession of ammunition while
39          participating in a firearms training and safety class; to harmonize various provisions in
40          the laws pertaining to firearms; and to make other technical corrections and clarifications.
41
42          BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this

43   act may be cited as the "Firearms Amendment Act of 2012".

1

1    Sec. 2.  The Firearms Control Regulations Act of 1975, effective September 24, 1976

2   (D.C. Law 1-85; D.C. Official Code § 7-2501.01 *et seq.*), is amended as follows:

3        (a)  Section 101 (D.C. Official Code § 7-2501.01) is amended as follows:

4            (1)  Paragraph (5) is amended to read as follows:

5            "(5)  "Crime of violence" means a crime of violence as defined in D.C. Official

6   Code § 23-1331(4).".

7            (2)  Paragraph (9A) is redesignated as (9B) and is amended to read as follows:

8            "(9B)  "Intrafamily offense" shall have the same meaning as provided in D.C.

9   Official Code § 16-1001.".

10            (3)  A new paragraph (9A) is added to read as follows:

11            "(9A)  "Firearms instructor" means an individual who is certified by the Chief to

12   be qualified to teach firearms training and safety courses.".

13        (b)  Section 201 (D.C. Official Code § 7-2502.01) is amended as follows:

14            (1)  Subsection (a) is amended as follows:

15                (A)  Paragraph (2) is amended by striking the word "or" at the end.

16                (B)  Paragraph (3) is amended by striking the period at the end and

17   inserting a semicolon followed by the word "or" in its place.

18                (C)  New paragraphs (4) and (5) are added to read as follows:

19                "(4)  To a firearms instructor, or to an organization that employs a

20   firearms instructor, for the purpose of conducting firearms training;

21                "(5)  To a person who complies with, and meets the requirements of, this

22   unit.".

23            (2)  Subsection (b) is amended as follows:

2

1                (A)  Paragraph (3) is amended by striking the word "or" at the end.

2                (B)  Paragraph (4) is amended by striking the period at the end and

3  inserting a semicolon followed by the word "or" in its place.

4                (C)  A new paragraph (5) is added to read as follows:

5                "(5)  Any person who temporarily possesses a firearm while participating

6  in a firearms training and safety class conducted by a firearms instructor.".

7           (3)  A new subsection (c) is added to read as follows:

8                "(c)  For purposes of paragraph (b)(3) of this section, the term "recreational

9  firearm-related activity" includes a firearms training and safety class.".

10      (c)  Section 202(a)(4) (D.C. Official Code § 7-2502.02(a)(4)) is amended as follows:

11          (1)  Subparagraph (B) is amended by striking the word "or" at the end.

12          (2)  Subparagraph (C) is amended by inserting the word "or" at the end.

13          (3)  A new subparagraph (D) is added to read as follows:

14                "(D)  A firearms instructor, or an organization that employs a firearms instructor,

15  for the purpose of conducting firearms training.".

16      (d)  Section 203 (D.C. Official Code § 7-2502.03) is amended as follows:

17          (1)  Subsection (a) is amended as follows:

18                (A)  Paragraph (2) is amended to read as follows:

19                "(2)  Has not been convicted of a weapons offense (but not an infraction or

20  misdemeanor violation under sections 208, 702, 706, or 807) or a felony in this or any other

21  jurisdiction (including a crime punishable by imprisonment for a term exceeding one year);".

22                (B)  Paragraph (4) is amended as follows:

3

1        (1)  Subparagraphs (B), (C), and (D) are amended to read as

2   follows:

3        "(B)  A violation of § 22-404, regarding assaults and threats, or

4   § 22-407, regarding threats to do bodily harm, or a violation of any similar provision of the law

5   of another jurisdiction;"

6        "(C)  Two or more violations of § 50-2201.05(b) or, in this or any

7   other jurisdiction, any law restricting driving under the influence of alcohol or drugs;"

8        "(D)  Intrafamily offense punishable as a misdemeanor, including

9   any similar provision in the law of another jurisdiction; or".

10       (2)  A new subparagraph (E) is added to read as follows:

11       "(E)  Misdemeanor violation pursuant to sections 702 or 706;".

12   (C)  Paragraph (10) is amended to read as follows:

13       "(10)  Has not failed to demonstrate satisfactorily, in accordance with a

14   test prescribed by the Chief, a knowledge of the laws of the District of Columbia pertaining to

15   firearms and, in particular, the requirements of this unit, the responsibilities regarding storage,

16   and the requirements for transport; provided, that once this determination is made with respect to

17   a given applicant for a particular firearm, it need not be made again for the same applicant with

18   respect to a subsequent application for a firearm or for the renewal of a registration certificate

19   pursuant to section 207a;".

20   (D)  Paragraph (11) is amended to read as follows:

21       "(11)  Is not blind, as defined in section 8 of An Act To enable the blind

22   and the otherwise physically disabled to participate fully in the social and economic life of the

23   District of Columbia, approved October 21, 1972 (86 Stat. 971; D.C. Official Code § 7-1009);".

4

1          (E)  Paragraph (13) is amended as follows:

2               (1)  Subparagraph (A) is amended to read as follows:

3                    "(A)  Has completed a firearms training and safety class provided

4     free of charge by the Chief; or".

5               (2)  Subparagraph (B) is amended to read as follows:

6                    "(B)  Has submitted evidence of any of the following:

7                         "(i)  Evidence that the applicant has received firearms

8     training in the United States military;

9                         "(ii)  A license from another state for which firearms

10    training is required, where the training, as determined by the Chief, is equal to or greater than

11    that provided under subparagraph (A); or

12                        "(iii)  Evidence that the applicant has otherwise completed

13    a firearms training or safety course conducted by a firearms instructor that, as determined by the

14    Chief, is equal to or greater than that conducted under subparagraph (A); and

15              (2)  Subsection (d) is repealed.

16         (e)  Section 204 (D.C. Official Code § 7-2502.04) is amended as follows:

17              (1)  Subsection (a) is amended to read as follows:

18                   "(a)  The Chief shall require any person applying for a registration certificate to

19    be fingerprinted in order to conduct an efficient and adequate investigation into the matters

20    described in section 203 and to effectuate the purposes of this unit.  The Chief shall maintain a

21    record of the fingerprints of sufficient quality to enable periodic investigation to ensure

22    compliance with section 203.".

23              (2)  Subsection (b) is amended to read as follows:

5

APPENDIX 000206

1        "(b)  The Chief shall take a digitalized, full-face photograph of each applicant,

2    other than an organization, to be included as part of a person's firearms registration application.

3    Such photo shall be taken simultaneously with the filing of the application.".

4        (f)  Section 205 (D.C. Official Code § 7-2502.05) is amended by adding a new subsection

5    (c) to read as follows:

6        "(c)  Any declaration, certificate, verification, or statement made for purposes of firearm

7    registration under this subchapter shall be made under penalty of perjury pursuant to D.C. Code

8    § 22-2402.  Except for section 203(a)(1), no document shall be required to be notarized.".

9        (g)  Section 206(b) (D.C. Official Code § 7-2502.06(b)) is repealed.

10       (h)  Section 207a (D.C. Official Code § 7-2502.07a) is amended as follows:

11           (1)  Subsection (d) is amended to read as follows:

12           "(d)  The statement submitted pursuant to subsection (c) of this section shall be on

13    a form provided by the Chief that can be submitted on-line via the Metropolitan Police

14    Department website, by mail, or in person.".

15           (2)  Subsection (f) is repealed.

16           (3)  Subsection (g) is amended by striking the phrase "within 3 years of March 31,

17    2009" and inserting the phrase "by January 1, 2014." in its place.

18           (4)  A new subsection (h) is added to read as follows:

19           "(h)  Notwithstanding subsection (a), no registration renewal shall be required

20    earlier than January 1, 2014.".

21       (i)  The lead-in sentence of section 208 (D.C. Official Code § 7-2502.08) is amended to

22    read as follows:

23       "Sec. 208.  Duties of registrants.  Penalties.".

6

1    (j)  Section 408(b) (D.C. Official Code § 7-2504.08(b)) is amended by striking the phrase

2   "January 1, 2013" wherever it appears and inserting the phrase "January 1, 2014" in its place.

3    (k)  A new section 410 is added to read as follows:

4   "Sec. 410.  District as Federal Firearms Licensee.

5    "(a)  Whenever there is no active federal firearms licensee commercially operating within

6   the District of Columbia, the Mayor is authorized to seek from federal authorities a license for

7   the District to act as a federal firearms licensee, solely for the benefit of any District resident

8   eligible and seeking to obtain a lawful handgun.

9    "(b)  The Mayor shall delegate the authority under subsection (a) to a subordinate agency

10   for the purpose of the interstate transfer of handguns.

11    "(c)  The District shall act under the license pursuant to subsection (a) only until such

12   time as there is an active federal firearms licensee commercially available and operating for

13   residents of the District of Columbia to utilize.

14    "(d)  The District may charge a fee to recover the cost of acting as a federal firearms

15   licensee pursuant to subsection (a) by charging $125 or actual costs, whichever is less, for each

16   handgun.

17    "(e)  For the purposes of this section, the term "active federal firearms licensee" means a

18   person or business who has applied and received a federal firearms license pursuant to 18 U.S.C.

19   923, and who is holding himself or herself out as open for business to the general public and is

20   receiving and transferring handguns for third parties in the District of Columbia.".

21    (l)  Section 503 (D.C. Official Code § 7-2505.03) is amended as follows:

22    (1)  Subsection (b) is amended striking the phrase "January 1, 2013" wherever it

23   appears and inserting the phrase "January 1, 2014" in its place.

7

**APPENDIX 000208**

1     (2)  Subsection (c)(1) is amended by striking the phrase "2013 that" and inserting

2 the phrase "2014, that" in its place.

3     (3)  Subsection (e) is amended striking the phrase "January 1, 2013" wherever it

4 appears and inserting the phrase "January 1, 2014" in its place.

5   (m)  Section 601(a) (D.C. Official Code § 7-2506.01(a) is amended as follows:

6     (1)  Paragraph (3) is amended to read as follows:

7     "(3)  He is the holder of a valid registration certificate for a firearm pursuant to

8 subchapter II of this unit; except, that no such person shall possess restricted pistol bullets;".

9     (2)  Paragraph (4) is amended by striking the period at the end and inserting a

10 semicolon followed by the word "or" in its place.

11     (3)  A new paragraph (5) is added to read as follows:

12     "(5)  He temporarily possesses ammunition while participating in a firearms

13 training and safety class conducted by a firearms instructor.".

14   (n)  Section 702 (D.C. Official Code § 7-2507.02) is amended as follows:

15     (1)  The lead-in sentence of section 702 is amended to read as follows:

16     "Sec. 702.  Responsibilities regarding storage of firearms. Penalties.".

17     (2)  A new subsection (e) is added to read as follows:

18     "(e)  The provisions of section 706 (D.C. Official Code § 7-2507.06) shall not

19 apply to this section.".

20   (o)  Section 706 (D.C. Official Code § 7-2507.06) is amended by striking the phrase

21 "Any person convicted of a violation of any provision of this unit," and inserting the phrase

22 "Except as provided in sections 205, 208, 702, and 807, any person convicted of a violation of

23 any provision of this unit" in its place.

APPENDIX 000209

1

2      Sec. 3.  An Act To control the possession, sale, transfer and use of pistols and other

3  dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of

4  evidence, and for other purposes, approved July 8, 1932 (47 Stat. 650; D.C. Official Code § 22-

5  4501 *et seq.*), is amended as follows:

6      (a)  Section 1(2A) (D.C. Official Code § 22-4501(2A)) is amended as follows:

7          (1)  Strike the paragraph designation "(1)" and insert the subparagraph

8  designation "(A)" in its place.

9          (2)  Strike the paragraph designation "(2)" and insert the subparagraph

10  designation"(B)" in its place.

11          (3)  Strike the paragraph designation "(3)" and insert the subparagraph

12  designation"(C)" in its place.

13      (b)  Section 3(a)(6) (D.C. Official Code § 22-4503(a)(6)) is amended to read as follows:

14  "(6)  Has been convicted within the past five years of an intra-family offense, as defined

15  in D.C. Official Code § 16-1001, punishable as a misdemeanor, or any similar provision in the

16  law of another jurisdiction.".

17      (c)  Section 4(a) (D.C. Official Code § 22-4504(a)) is amended by striking the phrase

18  "without a license issued pursuant to District of Columbia law," wherever it appears.

19      (d)  Section 5(a) (D.C. Official Code § 22-4505(a)) is amended to read as follows:

20  "(a)  The provisions of § 22-4504 shall not apply to:

21          (1)  Marshals, sheriffs, prison or jail wardens, or their deputies, policemen or

22  other duly appointed law enforcement officers, including special agents of the Office of Tax and

23  Revenue, authorized in writing by the Deputy Chief Financial Officer for the Office of Tax and

9

1   Revenue to carry a firearm while engaged in the performance of their official duties, and

2   criminal investigators of the Office of the Inspector General, designated in writing by the

3   Inspector General, while engaged in the performance of their official duties;

4         (2)  Special police officers and campus police officers who carry a firearm in

5   accordance with chapter 422 of An act Making appropriations to provide for the expenses of the

6   government of the District of Columbia for the fiscal year ending June thirtieth, nineteen

7   hundred, and for other purposes, approved March 3, 1899 (30 Stat. 1057; D.C. Official Code § 5-

8   129.02) and rules promulgated pursuant to that section;

9         (3)  Members of the Army, Navy, Air Force, or Marine Corps of the United States

10   or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled

11   members of any organization duly authorized to purchase or receive such weapons from the

12   United States, provided such members are at or are going to or from their places of assembly or

13   target practice;

14         (4)  Officers or employees of the United States duly authorized to carry a

15   concealed pistol;

16         (5)  Any person engaged in the business of manufacturing, repairing, or dealing in

17   firearms, or the agent or representative of any such person having in his or her possession, using,

18   or carrying a pistol in the usual or ordinary course of such business; and

19         (6)  Any person while carrying a pistol, transported in accordance with § 22-

20   4504.02, from the place of purchase to his or her home or place of business or to a place of repair

21   or back to his or her home or place of business or in moving goods from one place of abode or

22   business to another, or to or from any lawful recreational firearm-related activity.".

23       (e)  Section 8 (D.C. Official Code § 22-4508) is amended to read as follows:

10

1    "No seller shall within the District of Columbia deliver a firearm to the purchaser thereof

2    until 10 days shall have elapsed from the date of the purchase thereof, except in the case of sales

3    to marshals, sheriffs, prison or jail wardens or their deputies, policemen, or other duly appointed

4    law enforcement officers, and, when delivered, said firearm shall be transported in accordance

5    with § 22-4504.02. At the time of purchase, the purchaser shall sign in duplicate and deliver to

6    the seller a statement containing his or her full name, address, occupation, date and place of

7    birth, the date of purchase, the caliber, make, model, and manufacturer's number of the firearm

8    and a statement that the purchaser is not forbidden by § 22-4503 to possess a firearm. The seller

9    shall, within 6 hours after purchase, sign and attach his or her address and deliver 1 copy to such

10   person or persons as the Chief of Police of the District of Columbia may designate, and shall

11   retain the other copy for 6 years. No machine gun, sawed-off shotgun, or blackjack shall be sold

12   to any person other than the persons designated in § 22-4514 as entitled to possess the same, and

13   then only after permission to make such sale has been obtained from the Chief of Police of the

14   District of Columbia. This section shall not apply to sales at wholesale to licensed dealers.".

15       Sec. 4. Section 23-1331(3)(A) of the D.C. Official Code is amended to read as follows:

16       "(A) Any felony offense under An Act To control the possession, sale, transfer and use

17   of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to

18   prescribe rules of evidence, and for other purposes, approved July 8, 1932 (47 Stat. 650; D.C.

19   Official Code § 22-4501 *et seq.*) (Weapons) or the Firearms Control Regulations Act of 1975,

20   effective September 24, 1976 (D.C. Law 1-85; D.C. Official Code § 7-2501.01 *et seq.*) (Firearms

21   Control);".

22       Sec. 5. Fiscal impact statement.

11

1       The Council adopts the fiscal impact statement in the committee report as the fiscal

2   impact statement required by section 602(c)(3) of the District of Columbia Home Rule Act,

3   approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(3)).

4       Sec. 6.  Effective date.

5       This act shall take effect following approval by the Mayor (or in the event of veto by the

6   Mayor, action by the Council to override the veto), a 60-day period of Congressional review as

7   provided in section 602(c)(2) of the District of Columbia Home Rule Act, approved December

8   24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(2)), and publication in the District of

9   Columbia Register.

10

11

**APPENDIX 000213**

# Gun Deaths in Rural and Urban Settings: Recommendations for Prevention

*Lee T. Dresang, MD*

***Background:*** **Family physicians can play a vital role in preventing gun violence, and better data on which to base their interventions might result in more effective prevention efforts. Using Washington State data, two assumptions on which interventions can be based were tested: compared with urban areas, rural areas have (1) a higher percentage of gun deaths from shotguns and rifles, and (2) a higher percentage of gun deaths from suicides and accidents**

***Methods:.*** **From 1990 to 1996, 4,271 gun deaths on Washington death certificates were classified as rural or urban. The data were retrospectively sorted and analyzed by gun type (handguns, rifles, shotguns, or other) and by intent (suicide, homicide, or accidental death).**

***Results:*** **Compared with urban settings, rural areas had a higher percentage of gun deaths from shotguns and rifles and a higher percentage from suicides and accidents ($P < .01$). Two similarities, however, stand out as more important than the confirmed hypothesized differences: handguns accounted for more than 50% of gun deaths, and suicides accounted for nearly 70% of gun deaths in both urban and rural areas.**

***Conclusions:*** **Family physicians might want to focus their firearm safety efforts on preventing handgun deaths and suicides, which accounted for most gun deaths in rural and urban areas. Also, data from this study suggest that deaths from shotguns and rifles as well as accidental and suicide gun deaths deserve special attention in rural areas.(J Am Board Fam Pract 2001;14:107–15.)**

Gun violence in the United States is a public health epidemic. In a study of firearm deaths from 1968 to 1991, the number of firearm-related deaths in 1991 exceeded the number of motor-vehicle-related deaths in 7 states and Washington, DC.[1] For male teenagers, firearm-related deaths exceed the number of deaths from all natural causes combined.[2] Recent school shootings in Littleton, Colo, and Conyers, Ga, have intensified US public awareness of tragedies associated with gun violence in general and have focused attention on issues specific to rural and urban areas.

According to a 1996 study, "few patients report that their physician has ever discussed firearm safety with them, and only 30% of physicians surveyed report ever counseling patients about firearm safety."[3] In another study, 80% of physicians be-lieved they should counsel on firearm safety, but only 38% did so. Of those who did counsel, only 20% counseled more than 10% of the families they saw.[4] Parents "indicate that they would acknowledge gun ownership if their pediatrician asked about guns in the home."[5] This finding suggests that family physicians can play a bigger role in combating the epidemic of gun violence.

Better data on which to base interventions could result in more effective efforts. "Our knowledge about firearm injury in rural areas is limited compared with urban settings. Yet rural areas have high levels of firearm access and mortality."[6] Nationally, rates of firearm violence have been declining since 1993. The so-called Boston miracle has received much attention: "a combination of gang-based interventions, identification and prosecution of firearms traffickers, and other measures has been associated in a preliminary evaluation with a more than 60% decrease in juvenile and youth homicide and a reduction in weapon carrying."[7] Some legislation has been effective. For example, background checks under the Brady Handgun Violence Prevention Act and related statutes prevent the sale of firearms to 70,000 to 80,000 felons per year.[7] Still, more work needs to be done. "The homicide rate for persons

Submitted, revised, 16 August 2000.

From the Department of Family Medicine, University of Wisconsin Medical School, and the St. Luke's Family Practice Residency, Mitchell Point Family Health Center, Milwaukee. Address reprint requests to Lee T. Dresang, MD, Mitchell Point Family Health Center, 1225 W. Mitchell St, Suite 200, Milwaukee, WI 53204.

This article was developed and written when the author was a fellow at the Tacoma Family Medicine Rural Health Fellowship, Tacoma, Wash.

aged 15 through 24 years remains high; the rate in 1995 was 71% higher than a decade earlier."[8] More information comparing and contrasting rural and urban gun deaths might make it possible to develop more effective interventions.

Nationally, studies to date generally support the hypothesis that the greater number of rural gun deaths are from rifles or shotguns, whereas the greater number of urban gun deaths are from handguns. Among 122 gunshot wounds in a rural Wisconsin trauma center between 1981 and 1991, 39% were inflicted by rifles, 21% by shotguns, and 20% by handguns (16% were not specified, and 4% were inflicted by other).[9] In contrast, among guns used for homicides and suicides in Milwaukee between 1990 and 1994, 85% were handguns, 7% were shotguns, and 6% were rifles.[10] In Tennessee between 1978 and 1988, 59% of deaths in urban areas and 33% in rural areas involved handguns.[11] During a 5-year period in Philadelphia, a handgun was used in more than 90% of homicides.[12] An exception to the above pattern is a rural North Carolina county, where between 1990 and 1991, 51% of gun deaths were inflicted by handguns, 26% by rifles, and 23% by shotguns.[6]

This study also categorized gun deaths by suicide, homicide, and accidental shootings. According to statistics from the Centers for Disease Control and Prevention (CDC), suicides, homicides, and unintentional shootings accounted for 49%, 45%, and 1% of gun deaths, respectively, in the United States in 1994.[13] That year, firearms were responsible for 70% of all homicides and 60% of all suicides.[14] Washington State had the 19th highest suicide rate in the United States in 1990.[15]

In general, homicide gun deaths in the United States are more of an urban than a rural problem. "Half of all homicides occurred in 63 cities with 16% of the nation's population; within those cities, homicides were largely clustered in certain neighborhoods."[7] For example, in Milwaukee, two inner-city zip codes, 53204 and 53215, have homicide rates of 89.1 per 100,000 and 38.8 per 100,000, respectively, compared with a homicide rate of 10.5 per 100,000 for the state in general.[16]

Just as regionally comparative studies suggest that firearm homicides are more of an urban problem, they generally show that firearm-related suicides and accidents are a bigger problem in rural areas. In rural Kentucky, between 1988 and 1993 the relative risk and confidence intervals (CIs) for pediatric gun deaths by suicide and unintentional injuries were 3.07 (1.85–4.29) and 1.66 (1.04–2.27), respectively.[17] In Oklahoma, between 1982 and 1983 the pediatric unintentional gun death rate was four times higher in rural counties.[18] In Texas, between 1984 and 1988 the pediatric death rate for unintentional shootings was 2.9 times greater in rural counties, whereas the pediatric death rate for homicides was 2.4 times greater in metropolitan areas.[19] In a rural North Carolina county, between 1990 and 1991, 59% of gun deaths were suicides, and none was unintentional.[6]

This study has two hypotheses: (1) compared with urban Washington, rural Washington has a higher percentage of gun deaths from shotguns and rifles; and (2) compared with urban Washington, rural Washington has a higher percentage of gun deaths from suicides and accidents. The former focuses on gun type, whereas the latter focuses on intent. This study does not investigate why certain types of gun deaths are more common.

## Methods

Gun death statistics were gathered from death certificates of the Washington State Department of Health, Center for Health Statistics, and from the Forecasting Division of the Washington State Office of Financial Management. Counties were classified as urban or rural based on codes developed by the Economic Research Service of the United States Department of Agriculture.[20] Deaths were analyzed by place of residence rather than place of occurrence, because place of residence was more reliably reported on death certificates. Data were compiled from 1990 to 1996, but the total gun death rates by gun type are from 1995 to 1996 only because Washington started an improved system for reporting gun type in 1995.

The chi-square test was then used to assess whether the overall distribution of gun deaths by gun type and by intention was significantly different in rural and urban Washington. $P < 0.05$ was considered statistically significant.

A MEDLINE search was performed using the key words "rural health," "urban health," "firearms," "violence," "homicide," "suicide," "gun ownership" and "legislation." Other resources included Physicians for Social Responsibility, the HELP Network of Concerned Professionals, and the CDC.



**Figure 1. Rural vs urban Washington gun deaths per 100,000 (1980–1996).**

## Results

Figure 1 shows that the total gun death rate was higher for rural than urban Washington. Figure 2 and Figure 3 show the overall distribution of gun deaths by type and intention, respectively.

The difference in overall distribution of gun deaths by gun type was statistically significant ($\chi^2 = 50.275$, 8 $df$, $P < .01$ (Figure 2). Compared with urban Washington, rural Washington had a larger percentage of gun deaths by shotguns and rifles and a smaller percentage by handguns. Within rural Washington, however, the percentage of deaths by handguns still overshadowed the percentage of deaths by shotguns and rifles.

The difference in overall distribution of gun deaths by intent was also statistically significant with a chi-square $P$ value of $< .01$ (Figure 3). Rural Washington had a greater percentage of gun deaths

by suicide and accidental shootings and a smaller percentage by homicide when compared with urban Washington. As Figure 3 shows, most gun deaths in rural and urban Washington were suicides—nearly 70% of deaths in both areas. The percentage of rural gun deaths caused by accidental shootings was only 3%.

## Discussion

While the hypothesized differences between rural and urban gun deaths are supported by study data, the unforeseen similarities are more impressive. Handguns accounted for more than 50% of rural and urban gun deaths (Figure 2), and suicides accounted for about 70% of gun deaths in both areas (Figure 3). Consequently, efforts to prevent handgun and suicide gun deaths have the potential to



Chi-square *P* <.01

**Figure 2. Rural vs urban Washington gun deaths by gun type (1995–1996).**



**Figure 3. Rural vs urban Washington gun deaths by intention (1990–1996).**

prevent most gun deaths. Nevertheless, the differences between rural and urban gun deaths were statistically significant and are worth noting as violence prevention strategies relevant to the clinical setting are developed.

To avoid wasting time and effort on ineffective or even harmful interventions, interventions should be evidence-based when possible. Unfortunately, in gun death prevention, well-designed outcome studies in many areas are still lacking. Such studies are hard to design given the myriad of biopsychosocial factors that play a role in gun deaths. This problem is not unique to gun death prevention: "for many decisions, there is simply no evidence available."[21] Lack of evidence, however, does not mandate inaction. Ideally, if an intervention lacking evidence is considered, physicians should implement the intervention in the context of a well-designed outcome study so that others can learn from the experience.

Family physicians can play an important role in promoting violence prevention through work in their communities and through legislation. The following discussion, however, will focus on gun death prevention strategies that can be applied in a clinical setting.

### Handgun Death Prevention in Rural and Urban Areas

Handguns were the weapons most often involved in both rural and urban Washington gun deaths (Figure 2). Figure 4 and Figure 5 show that the high percentage of rural Washington deaths by handguns contrasts with findings in Tennessee and Wis-



**Figure 4. Wisconsin vs Washington rural gun deaths.**

APPENDIX 000217



**Figure 5. Tennessee vs Washington handgun deaths.**

consin but is consistent with the North Carolina data. This study did not address why the Washington rural handgun death rate was higher than expected. Regardless of the reason for the high rural handgun death rate in this study, the finding indicates a need to stress handgun safety not only in urban but also in rural areas. Strategies can range from discouraging gun ownership and usage to promoting gun safety for patients who own or plan to own guns. Many strategies to prevent handgun deaths are relevant to preventing gun deaths in general.

In clinical work, family physicians have the opportunity to educate patients on the dangers of owning a handgun. Well-designed studies have shown that, contrary to popular belief, it is not safer to have a gun in the house. A gun in the home is 43 times more likely to kill a family member or friend than it is to kill in self-defense.[22] Kellerman found "the presence of one or more guns in the home was. . . associated with an increased risk of suicide (adjusted odds ration (OR) 4.8; 95% CI 2.7–8.5)."[23] Kellermann and other researchers have similarly found an increased risk of gun death by homicide when a gun is in the home.[22,24] In contrast, guns are rarely used for self-protection[22,25,26] even though 75% of persons who own a handgun give protection as their reason for owning the gun.[27] Perhaps many would rethink gun ownership if a physician presented them with these statistics. Outcomes research can evaluate the impact of physician counseling regarding the relative risks of having a gun in the home.

Several approaches to office-based intervention are effective in preventing handgun and other gun deaths. The HELP Network for Concerned Professionals developed the acronym GUNS as a guide for questions to ask as part of every medical history (Figure 6).[28] Responses to these routine questions give the physician information on risk factors for gun violence and misconceptions of gun safety. Counseling can be individualized, based on the answers to these questions. The GUNS pneumonic can serve as a good teaching device if medical education is part of the practice. Future research could examine whether simply using the GUNS acronym at each visit results in decreased handgun or other gun deaths.

Another mnemonic used to remember recent recommendations from the American Academy of Pediatrics (AAP) for clinical violence prevention and management is EnLiST: *e*arly *n*urturing, *l*imit-setting, *s*creening for risk and assurance of *s*afety, and *t*reatment of the physical and psychologic consequences of violence.[29]

The AAP recommendations are "a historic step because it makes pediatrics the first medical specialty to fully embrace the idea that violence is a health issue and that the responsibility for violence prevention does not rest solely in the hands of the criminal justice system."[30] Family physicians now also have a historic opportunity to evaluate the effectiveness of the AAP recommendations.

Because most family physicians provide primary care for children, we need to look at what clinical interventions are most effective in preventing pediatric gun deaths. Patterson and Smith[31] noted that "play involving toy guns is thought to contribute to the behavior patterns seen in gun-related deaths in children." In one study of accidental shootings, "the most common activity associated with the fatalities was playing with a gun."[11] Per-

Is there a **G**un in your home?

Are you around **U**sers of alcohol or other drugs?

Do you feel a **N**eed to protect yourself?

Do any of these **S**ituations apply to you?

Have you Seen or been involved in acts of violence?

Have you or someone you know experienced Sadness, depression or mental illness?

Do you have School-age children or adolescents in your home?

**Figure 6. GUNS acronym. Developed by the HELP Network of Concerned Professionals.[28] Reprinted with permission.**

haps counseling parents on ways to discourage their children from playing with guns can have an impact. Future outcomes research can look at which prevention strategies are most effective with children.

Promoting gun locks and safety storage mechanisms might help reduce gun deaths, whether by shotguns and rifles or handguns. Physicians can familiarize themselves with the latest in safety technology and pass this along to their patients. Safety devices include gun locks, lockable plastic boxes, metal lock boxes, security cabinets, and gun safes.[32] At a gun store in Milwaukee, one can buy a trigger lock for only $9.99 or spend $1,499.99 to purchase a fire-resistant, 800-pound storage cabinet. The effectiveness of different gun lock and storage mechanisms can be compared and contrasted in future outcome studies.

In clinical practice physicians can incorporate secondary prevention strategies such as education and intervention after an injury. These strategies might prevent gun deaths resulting from revictimization and revenge violence. Moments after a gunshot injury a patient might be more open to life-changing modifications that will reduce the chance of future gun death or injury. Prothrow-Stith[33] in Boston recommends that all patients inflicted with intentional injuries be assessed for (1) circumstances of the injury event, (2) victim's relationship to the assailant, (3) use of drugs or alcohol, (4) underlying emotional or psychosocial risk, (5) history of intentional injuries or violent behaviors, (6)

predisposing biologic risk factors, and (7) intent to seek revenge. Future research could examine whether simply asking and following up on these questions has an impact on gun deaths.

Times of crisis can provide an excellent intervention opportunity for preventing violence. In Milwaukee, for example, Project Ujima, out of the Children's Hospital of Wisconsin, uses trained counselors on call to intervene whenever a youth gun victim arrives in the emergency department. After the initial contact, a multidisciplinary team follows the youth into the community to provide medical, psychiatric, and social support to make major life modifications. Most health systems have secondary prevention protocols when someone arrives at the emergency department who is suicidal or who has chest pain. These protocols are designed to prevent the patient from committing suicide or having a heart attack after they leave the hospital. Physicians have the opportunity to intervene with victims of violence to reduce their risk of being revictimized or seeking revenge after recovering from their acute injury. Outcome studies could be designed for such secondary prevention programs.

### Suicide Prevention in Rural and Urban Areas
Findings from this study strongly suggest that suicide is the major cause of gun deaths in rural and urban Washington (Figure 3). National data indicate that suicide is a greater cause of US gun deaths than homicide, which is especially true in Wash-

ington in both urban and rural areas. These findings counter popular assumptions that homicide is uniformly the leading cause of gun deaths in cities and that accidents are the major cause of gun deaths in rural areas. Given this information, family physicians might want to place extra emphasis on suicide prevention when trying to reduce gun deaths wherever they live and work. Unfortunately, well-designed outcome studies of office-based interventions to prevent suicide gun deaths are lacking.

The low percentage of rural gun deaths from accidents and high percentage of rural gun deaths from suicides contrast with the studies cited in the introduction. Unlike the Oklahoma, Kentucky, and Texas studies, this study showed the accidental gun death rate to be low and approximately equal in rural (0.4 per 100,000) and urban (0.3 per 100,000) Washington. Also, contrasting with these studies, the percentage of gun deaths from suicides was high and approximately equal in rural and urban Washington (Figure 3). A North Carolina study did not contrast urban and rural gun deaths, but reported a low accidental rural gun death rate, a finding similar to that of this study. As with handgun deaths, this study did not examine why suicide gun death rates are so high in rural and urban areas, but the results suggest a need to focus efforts on preventing gun deaths by suicide in rural and urban areas.

Suicide prevention most likely requires traditional interventions to screen for and treat mental illnesses, substance abuse, and domestic violence. One study found that 81.9% of adolescent suicides involved diagnosis of bipolar disorder, affective disorder with comorbidity, lack of previous mental health treatment, or availability of firearms in the house.[34] Usually patients see a physician within a few months before committing suicide.[35] Physicians need to have both primary and secondary prevention strategies in place for suicide prevention, whether in a rural or urban area. Outcomes research can be used to decide which clinical interventions are most effective in preventing gun deaths by suicide.

Suicide prevention in clinical practice can also involve some of the general gun safety measures discussed above. In one study, "the presence of a gun in the home, particularly if the gun was loaded, seemed to be most closely associated with suicide in the absence of a diagnosable psychiatric condition."[36] There are about 200 million guns in the United States. An increase in the suicide rate in recent years can be attributed mostly to an increase in suicide by firearms.[37,38] Women attempt suicide more often than men, but men die from suicide more often because men are more likely to use a gun with a suicide attempt. Outcome studies can help evaluate how to incorporate most effectively general gun death prevention measures into suicide prevention measures.

### Special Issues Regarding Rural Gun Deaths

This study supports the hypotheses that compared with urban Washington, rural Washington has a higher percentage of gun deaths from shotguns and rifles (Figure 2) and that rural Washington has a higher percentage of gun deaths from suicides and accidents (Figure 3). These results agree with those of national studies discussed in the introduction.

In reality, the occurrence of shotgun and rifle deaths in rural areas might be even greater for Washington state than this study indicates. The data in this study were from place of residence of the gun death victim because these data were more reliable. If data based on place of occurrence of gun deaths had been used, those who were killed by a shotgun or rifle when they traveled from an urban area to hunt in a rural area would have been included as a rural rather than urban gun death.

Good outcome data are again needed to show how to reduce shotgun and rifle gun deaths as well as suicide and accidental gun deaths in rural areas. Some of the measures to prevent handgun deaths might apply to preventing shotgun and rifle deaths. The interventions to reduce rural gun deaths from shotguns and rifles could be important in reducing rural gun deaths from suicides. Brent found that "long-guns in the home were associated with suicide only in rural areas."[36] Accidental deaths account for a minority of gun deaths in rural and urban areas, but each one is tragic. Trigger locks and other devices that do not require behavioral change could be especially effective in preventing these deaths.

### Future Research

This study, as do many, poses at least as many questions as it answers. Future research can focus both on collecting better epidemiologic data on which to base interventions and on assessing the effectiveness of various interventions.

As mentioned, the data in this study were from place of residence of death victims, rather than place of death. A study comparing results using place of residence and place of occurrence data might provide useful insights.

This study was retrospective. A better research design would be a controlled prospective study. Although more than 13,000 gun deaths per year is alarmingly high, gun death rates in individual communities are low enough that getting a sufficient number of participants in intervention studies to give a study significant power could be difficult. A national gun death registry could help coordinate data collection and improve the potential power of studies that are undertaken.

Because of a new gun death reporting system in Washington State and the desire to collect relatively recent statistics, data were collected for a relatively short period. Future studies can compare rural and urban gun deaths within different periods and in different regions of the country and look for trends with time. The scope of the study could be expanded to compare rural and urban nonfatal firearm injuries. This study looked at gun deaths, but as many as two thirds of firearm injuries are not fatal.[6]

This study does not address why some of the Washington data differ from national data. Perhaps demographics in rural Washington are different from rural demographics in Wisconsin and Tennessee but are similar to those in North Carolina. Furthermore, why rural and urban gun death rates differ within a given state was not addressed. Future research could be designed to assess possible causes for differences in gun death rates. Demographics, such as age, sex, ethnicity, income level, and education, could be assessed. Future research could also assess the subset of gun deaths related to domestic violence and investigate potential legal, transportation, confidentiality, and financial barriers to domestic violence prevention in rural and urban areas.

Many interventions for gun death prevention lack outcome studies, though there are several areas of intervention where outcome data are needed. Given the magnitude of the gun death epidemic and the variety of interventions to consider, research is warranted to document which interventions are most effective. Such research can look at what family physicians are already doing in addition to testing new strategies. It is hoped that a continued partnership between research and interventions will help control the current violence epidemic in the United States.

## Summary

As hypothesized, compared with urban Washington, rural Washington had a higher percentage of gun deaths from shotguns and rifles and a higher percentage of gun deaths from suicides and accidents. Similarities overshadow differences, however, between rural and urban gun deaths in this study. Handguns accounted for more than 50% of rural and urban gun deaths, and suicides accounted for about 70% of gun deaths in both areas. The differences and similarities have implications for violence prevention interventions and suggest many areas for further research.

David Acosta, MD, Doug Keck, and Doug Schaad, PhD, contributed support and assistance.

## References

1. Effectiveness in disease and injury prevention: deaths resulting from firearm- and motor-vehicle-related injuries–United States, 1968–1991. MMWR Morbid Mortal Wkly Rep 1994;43:37–42.
2. Physicians for Social Responsibility Slide Show. Firearm violence: community diagnosis and treatment. Washington, DC: Physicians for Social Responsibility, 1995.
3. Camosy PA. Incorporating gun safety into clinical practice. Am Fam Physician 1996;54:971–8.
4. Barkin S, Duan N, Fink A, Brook RH, Gelberg L. The smoking gun: do clinicians follow guidelines on firearm safety counseling? Arch Pediatr Adolesc Med 1998;152:749–56.
5. Becher EC, Christakis NA. Firearm injury prevention counseling: are we missing the mark? Pediatrics 1999;104(3 Pt 1):530–5.
6. Sadowski LS, Munoz SR. Nonfatal and fatal firearm injuries in a rural county. JAMA 1996;275:1762–4.
7. Wintemute GJ. The future of firearm violence prevention: building on success. JAMA 1999;282:475–8.
8. Fingerhut LA, Ingram DD, Feldman JJ. Homicide rates among US teenagers and young adults: differences by mechanism, level of urbanization, race and sex, 1987 through 1995. JAMA 1998;280: 423–7.
9. Dodge GG, Cogbill TH, Miller GJ, Landercasper J, Strutt PJ. Gunshot wounds: 10- year experience of a rural, referral trauma center. Am Surg 1994; 60:401–4.
10. Hargarten SW, Karlson TA, O'Brien M, Hancock J, Quebbeman E. Characteristics of firearms involved in fatalities. JAMA 1996;275:42–5.

11. Harruff RC. So-called accidental firearm fatalities in children and teenagers in Tennessee, 1961–1988. Am J Forensic Med Pathol 1992;13:290–8.

12. McGonigal MD, Cole J, Schwab CW, Kauder DR, Rotondo MF, Angood PB. Urban firearm deaths: a five-year perspective. J Trauma 1993;35:532–6.

13. Ikeda RM, Gorwitz R, James SP, Powell KE, Mercy JA. Fatal firearm injuries in the United States, 1964–1994. Violence surveillance summary series, no. 3. Atlanta: Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, 1997.

14. National Center for Health Statistics. Vital statistics mortality data, underlying cause of death, 1994 [Machine-readable public-use data tapes]. Hyattsville, Md: US Department of Health and Human Services, Centers for Disease Control and Prevention, 1996.

15. Suicide in the United States 1980–92. Atlanta: Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, 1995.

16. The Wisconsin assessment information manager. Milwaukee: Wisconsin Department of Health and Family Services, Division of Public Health, 1999. Available at http://www.dhfs.state.wi.us/AIM/index.htm.

17. Svenson JE, Spurlock C, Nypaver M. Pediatric firearm-related fatalities: not just an urban problem. Arch Pediatr Adolesc Med 1996;150:583–7.

18. Keck JK, Istre GR, Coury DL, Jordan F, Eaton AP. Characteristics of fatal gunshot wounds in the home in Oklahoma: 1982–1983. Am J Dis Child 1988;142: 623–6.

19. Patterson PJ, Holguin AH. Firearm-related deaths among children in Texas: 1984–1988. Tex Med 1990;86:92–7.

20. Butler MA, Calvin LB. Rural-urban continuum codes for metro and nonmetro counties, 1993. Staff report no. 9425. Washington, DC: Agriculture and Rural Economy Division, Economic Research Service, US Department of Agriculture, September 1994.

21. Culpepper L, Gilbert TT. Evidence and ethics. Lancet 1999;353:829–31.

22. Kellermann AL, Reay DT. Protection or peril? An analysis of firearm-related deaths in the home. N Engl J Med 1986;314:1557–60.

23. Kellermann AL, Rivara FP, Somes G, et al. Suicide in the home in relation to gun ownership. N Engl J Med 1992;327:467–72.

24. Kellermann AL, Rivara FP, Rushforth NB, et al. Gun ownership as a risk factor for homicide in the home. N Engl J Med 1993;329:1084–91.

25. Kellermann AL, Westphal L, Fischer L, Harvard B. Weapon involvement in home invasion crimes. JAMA 1995;273:1759–62.

26. Weil DS, Hemenway D. Loaded guns in the home: analysis of a national random survey of gun owners. JAMA 1992;267:3033–7.

27. Blendon RJ, Young JT, Hemenway D. The American public and the gun control debate. JAMA 1996; 275:1719–22.

28. GUNS acronym. HELP Network of Concerned Professionals. Chicago: Children's Memorial Medical Center, date.

29. Christoffel KK. Useful mnemonic for remembering the AAP's suggestions for clinical violence prevention and management. Pediatrics 1999;104(5 Pt 1): 1171.

30. Mercy JA. Advocating for children: the pediatrician's role in violence prevention. Pediatrics 1999;103:157.

31. Patterson PJ, Smith LR. Firearms in the home and child safety. Am J Dis Child 1987;141:221–3.

32. Pearce L. Five ways to store guns safely. Shooting Times 1999:Oct:81–8.

33. Prothrow-Stith D. Can physicians help curb adolescent violence? Hosp Pract Off Ed 1992;June:193–207.

34. Brent DA, Perper JA, Goldstein CE, et al. Risk factors for adolescent suicide: a comparison of adolescent suicide victims with suicidal inpatients. Arch Gen Psychiatry 1988;45:581–8.

35. Berkow R, editor-in-chief. The Merck manual of diagnosis and therapy. 15th ed. Rahway, NJ: Merck Sharp & Dohme Research Laboratories, 1987:1545.

36. Brent DA, Perper JA, Moritz G, Baugher M, Schweers J, Roth C. Firearms and adolescent suicide: a community case-control study. Am J Dis Child 1993; 147:1066–71.

37. Boyd JH. The increasing rate of suicide by firearms. N Engl J Med 1983;308:872–4.

38. Boor M. Methods of suicide and implications for suicide prevention. J Clin Psychology 1981;37:72–5.

United States General Accounting Office

GAO

The Honorable Henry A. Waxman,
Ranking Minority Member, Committee on
Government Reform, House of
Representatives

March 2001

# FIREARMS

# Purchased From Federal Firearm Licensees Using Bogus Identification





GAO-01-427

**APPENDIX 000223**

**APPENDIX 000224**



**G A O**
Accountability * Integrity * Reliability

**United States General Accounting Office**
**Washington, D.C. 20548**

March 19,  2001

The Honorable Henry A. Waxman
Ranking Minority Member
Committee on Government Reform
House of Representatives

Dear Mr. Waxman:

This report responds to your request and subsequent conversations with
your office that we conduct an investigation that demonstrates the
difficulty that law enforcement officials have in preventing the illegal
purchase of firearms. The Brady Handgun Violence Prevention Act of 1993[1]
required the Attorney General of the United States to establish the National
Instant Criminal Background Check System, known as NICS. Referred to as
an instant background check, NICS is a computerized system operated by
the Federal Bureau of Investigation (FBI). Based on inquiries from federal
firearm licensees (FFL),[2] NICS searches the backgrounds of prospective
firearm purchasers for criminal or other information that would disqualify
them from purchasing firearms.

Specifically, you asked that we attempt to purchase firearms, acting in an
undercover capacity and using counterfeit identification, in states that rely
on the instant background check and do not require fingerprinting or a
waiting period[3] for such purchases. In addition, you requested that we
determine how easily firearms can be purchased using the Internet.

The five states that we selected to purchase firearms in—Virginia, West
Virginia, Montana, New Mexico, and Arizona—conformed to the Brady
Act's minimum requirements, relying on an instant background check.
They do not have additional requirements for fingerprinting or waiting
periods. Some other states impose such requirements for purchasing

---

[1] 18 U.S.C. § 922(t).

[2] A federal firearm licensee (FFL) is a person licensed by the Bureau of Alcohol, Tobacco
and Firearms (ATF) as a manufacturer, dealer, or importer of firearms. 28 C.F.R. § 25.2.

[3] A waiting period generally refers to the period of time between the date an individual
applies to purchase a firearm and the date the individual is allowed to take delivery of it.

firearms in addition to those of the Brady Act. These requirements include, among others, the successful completion of firearm safety or training courses, approval of license applications by the local police commissioners or chiefs of police, waiting periods as long as 2 weeks, and fingerprinting.

To address your concerns, we created counterfeit state driver's licenses for the five states with fictitious names, dates of birth, and/or social security numbers using off-the-shelf software, a scanner, a laminator, and a color laser printer. Two special agents acting in an undercover capacity used the counterfeit driver's licenses in attempts to purchase firearms from gun stores and pawnshops that were licensed by the federal government to sell firearms in the five selected states. We selected these gun stores and pawnshops at random from the yellow pages of local telephone directories.

We also searched an Internet Web site that labels itself as a "directory service," contacted 10 advertisers of firearms, and attempted to purchase firearms from 2 individuals. Neither individual would send firearms through the mail, but both were willing to complete the transactions in person. As agreed with your office, we did not attempt to complete these transactions. We performed our investigation from late October 2000 through February 2001 in accordance with investigative standards established by the President's Council on Integrity and Efficiency.

## Results in Brief

We purchased firearms in five selected states—Virginia, West Virginia, Montana, New Mexico, and Arizona—using counterfeit driver's licenses with fictitious identifiers. In these states, the FFLs we contacted, with the possible exception of one, adhered to existing federal and state law regarding the mechanics of such a purchase. We will refer the matter relating to that FFL to the appropriate law enforcement agency.

Consistent with the Brady Act, in the five states we found that the instant background check does not positively identify purchasers of firearms. Rather, it is a negative check that cannot ensure that the prospective purchaser is not a felon or other prohibited person whose receipt and possession of a firearm would be unlawful. Similarly, in one state—Virginia—the additional step of requiring a state criminal history check was also a negative check. Further, in one state when we purchased a revolver,

APPENDIX 000226

the salesperson advised us that the NICS check was not required because the firearm had been manufactured over 100 years ago, in approximately 1893.[4]

We also easily made inquiries of private entities that advertised firearms on the Internet. Of the 10 advertisers we contacted, 2 individuals agreed to sell us their firearms with no identification required if we met face-to-face.

# Brady Act Requirements

The Brady Act requirement for instant background checks pertains to prospective purchasers of firearms that were manufactured after 1898, i.e., firearms that are not considered antiques. To accomplish this, the NICS Operations Center searches three separate databases:[5]

- the NICS Index, which contains records on persons known to be disqualified under federal law from possession of firearms;
- the National Crime Information Center, a computerized information system of criminal justice data established by the FBI, which contains records on protective orders, deported felons, and fugitives from justice; and
- the Interstate Identification Index, which contains criminal history records.

In certain states, a point-of-contact state agency serves as an intermediary between those licensed to sell firearms and the NICS. A state that is operating as a point of contact for NICS checks may simultaneously search available databases in state and local law enforcement agencies.

Bureau of Alcohol, Tobacco and Firearms (ATF) regulations implementing the Brady Act provide that before an FFL may sell or deliver a firearm, the prospective purchaser must provide photo-identification issued by a government entity. The identification must contain the purchaser's name, state of residence, age, gender, and race.[6] Because driver's licenses are

---

[4] Antique firearms, which include weapons manufactured before 1899, are not subject to NICS checks. 18 U.S.C. § 921(a)(3) and 27 C.F.R. § 178.11.

[5] 28 C.F.R § 25.6 (c)(1)(iii).

[6] 28 C.F.R. § 25.7.

issued by individual states, prospective purchasers of firearms frequently use them as a form of identification.

ATF regulations provide that prior to the transfer of a firearm to a prospective purchaser, the purchaser must complete, sign, and date section A of ATF Form 4473, "Firearms Transaction Record Part I – Over-the-Counter."[7] (See app. I.) The form requests the purchaser's name, gender, height, weight, race, residence address, birth date, and place of birth. It also requires "yes" or "no" answers to 12 personal background questions. To avoid misidentification of firearm purchasers as felons or other prohibited persons, the ATF form also solicits certain optional information about the purchaser, such as the purchaser's social security number.[8]

Upon receiving an FFL's request for an instant background check, the NICS Operations Center or state point of contact[9] must provide one of three responses:

- "Proceed" means that no disqualifying or negative information is in the system to indicate that a firearm purchase would be unlawful and the transaction may proceed.
- "Denied" means that the purchase would be unlawful and prohibits the FFL from transferring the firearm to the purchaser.
- "Delayed" means that the transferee must delay the transaction until contacted again by NICS or 3 business days have elapsed. [10] If NICS does not provide a response after 3 business days, the FFL may transfer the firearm.

Accordingly, if there is no disqualifying or negative information to indicate that the sale may be unlawful, the sale may take place.

---

[7] 27 C.F.R. § 178.124(a).

[8] 27 C.F.R. § 178.124(c)(2).

[9] In some instances, states acting as points of contact may use terms other than those used by NICS. For example, an "approve" response may be the equivalent of a "proceed" response, a "pended" response may be the equivalent of a "delayed" response, and a "non-approval" response may be equivalent to a "denied" response.

[10] An ATF official and several FFLs informed us that the most common reason for a delay is that the gun purchaser's name and identification are similar to the name and identification of a prohibited individual.

## Undercover Agents Purchased Firearms Using Counterfeit Driver's Licenses With Fictitious Identifiers

In Virginia, West Virginia, Montana, New Mexico, and Arizona, special agents acting in an undercover capacity purchased a total of seven firearms and a number of magazines. One firearm was a semiautomatic assault weapon, and some of the magazines exceeded 10 rounds of ammunition.[11] All purchases were made from FFLs at gun stores, pawnshops, and a sporting goods store. The agents used counterfeit driver's licenses with fictitious names and identifiers as identification. With the possible exception of one in New Mexico, the FFLs we contacted complied with both the Brady Act and respective state laws when they sold the firearms to the undercover agents.

## Virginia Purchase

An undercover agent, using a counterfeit Virginia driver's license and a counterfeit earnings and leave payroll statement[12] in the same fictitious name, purchased a Smith & Wesson Model 6906 9mm stainless steel semiautomatic pistol with two 12-round ammunition magazines from a gun store in Richmond, Virginia. (See fig. 1.) The salesperson told the agents that this firearm was part of a group of firearms sold to the gun store by a Virginia police department for resale.

---

[11] The sale of either semiautomatic assault weapons or magazines containing more than 10 rounds is illegal unless, as here, the weapons and magazines were manufactured before Sept. 13, 1994. 18 U.S.C. § 922(v) and (w); 27 C.F.R. § 178.40(a) and (b)(1); and 27 C.F.R. § 178.40a.

[12] Virginia state law requires two forms of identification. Virginia Code Ann. § 18.2-308.2:2 B.1.

**Figure 1:   Richmond, Virginia, Purchase**



Model 6906 Smith & Wesson 9mm Stainless Steel Semiautomatic Pistol With 12-Round Ammunition Magazine

The gun store salesperson requested that the agent complete ATF Form 4473 and a Virginia State Police firearm purchase form. After checking both forms to make sure information provided was identical and complete, the salesperson ran the standard instant background check on the fictitious name, date of birth, and social security number provided by the undercover agent. He also provided the same information to the Virginia State Police for a state criminal record check. The records checks by both NICS and the Virginia State Police immediately came back with a proceed-to-sell response, meaning that no criminal record was associated with the

information provided. The agent paid for the firearm and, with a fellow agent, departed the store, carrying the firearm and ammunition magazines.

Virginia requires an additional background check not required by the Brady Act. Under Virginia law, a prospective firearm purchaser must consent in writing to having an FFL telephone the Virginia State Police to check for a criminal history record.[13] In checking for a criminal history, the FFL must provide essentially the same identifying information to the Virginia State Police as it provides to the NICS. The state police are to inform the FFL whether the sale is prohibited or it may proceed with the sale. Under Virginia law, the state police are encouraged to provide a response "to the requesting dealer [FFL] during the dealer's call or by return call without delay." Also under Virginia law, an FFL may proceed with the sale of a firearm without penalty if the FFL has not heard from the Virginia State Police by the end of the next business day following the criminal history request. An FFL's ability to make the sale under this condition is contingent on NICS's having advised the FFL that it may proceed.

## West Virginia Purchase

An undercover agent used a counterfeit West Virginia driver's license with a fictitious name to purchase a Bresa .380 semiautomatic pistol and a box of .380 ammunition from a sporting goods store in Beckley County, West Virginia. (See fig. 2.)

---

[13] Virginia Code Ann. § 18.2-308.2:2.

**Figure 2:   Beckley County, West Virginia, Purchase**



.380 Bresa Semiautomatic Pistol With 8-Round Magazine and .380 Ammunition

The agent presented a counterfeit West Virginia driver's license and completed the ATF Form 4473. The initial NICS check by the salesperson came back with a delay response, indicating that the system was either down or that the name, date of birth, and/or social security number submitted was similar to ones associated with a criminal history. The salesperson told the agent that NICS had 3 business days from the time he called in the name-check to respond and that if NICS did not respond within that period, he could sell the firearm to the agent. During this transaction, the salesperson stated that his main concern about a delay notification from the NICS was the potential loss of the sale. In this case, the proceed-to-sell order came back from NICS in less than 24 hours. The agent returned to the sporting goods store, paid for the firearm and ammunition, and departed the store with the merchandise and a companion agent.

## Montana Purchases

An undercover agent purchased (1) a Russian Samozariadnyia Karabina Simonova (SKS) 7.62mm semiautomatic rifle with a bipod rest and a 4x scope and (2) a .22 caliber semiautomatic rifle with a folding stock, 4x scope, and a 10-shot magazine. (See fig. 3.) The agent purchased the firearms from a Billings, Montana, pawnshop and filled out the ATF Form

4473 using a counterfeit Montana driver's license. The initial NICS check by the salesperson came back as a delay, and the salesperson explained that he could sell the firearms to the agent if NICS did not respond after the required 3 business days. During this transaction, the salesperson told us that his main concern in getting the delay notification from the NICS was the potential loss of the sale. When the proceed-to-sell order came back from NICS, in less then 24 hours, the agent and a companion agent returned to the pawnshop, paid for the firearms and ammunition, and left with the merchandise.

At a second pawnshop in Billings, Montana, the two agents also purchased 2 boxes of 7.62mm Russian-made ammunition and a box of .22 caliber ammunition along with a 30-round "banana clip," or magazine, for the Russian SKS and 2 additional 10-shot magazines for the .22 caliber. No identification or paperwork was required to purchase the ammunition or magazines. (See fig. 3.)

**Figure 3:  Billings, Montana, Purchases**



7.62mm Russian-Manufactured Samozariadnyia Karabina Simonova Semiautomatic Rifle With Bipod Rest, 4x Scope, 30-Round Banana Clip, and 7.62mm Ammunition (Top)

.22 Caliber Semiautomatic Rifle With Folding Stock, 4x Scope, 3 10-Shot Magazines, and .22 Caliber Ammunition (Bottom)

## New Mexico Purchase

An undercover agent attempted to purchase an Intratec 9mm semiautomatic pistol, model AB-10, and a 32-shot magazine from a pawnshop in Santa Fe, New Mexico. New Mexico requires only a valid state photo-identification and the completion of the ATF Form 4473. On the first day, the salesman's attempt to contact NICS was unsuccessful because the circuits were busy. When the agent called the next day, the salesman told the agent that he had contacted NICS and received a delay message.

Later that same day, the undercover agent and a fellow agent returned to the pawnshop. At that time, the salesperson suggested that the individual accompanying the agent could purchase the firearm and transfer it to the first agent using a bill of sale. The second agent, also using a counterfeit New Mexico driver's license, filled out the ATF Form 4473. The salesperson checked the second agent's form against his license for accuracy and initiated the NICS background check, which came back immediately as a proceed-to-sell response. The first agent then used his credit card to purchase the previously selected firearm and magazine in the second agent's name. The first agent also used his credit card to purchase a box of 9mm 124-grain Hydra-Shok jacketed hollow-point ammunition. This purchase was based on the salesperson's statement that it was the best ammunition he had in stock to penetrate a bulletproof vest similar to those worn by police officers. (See fig. 4.)

**APPENDIX 000234**

**Figure 4:  Santa Fe, New Mexico, Purchase**



Model AB-10 Intratec 9mm Semiautomatic Pistol With 32-Shot Magazine
and 9mm 124-Grain Hydra-Shok Jacketed Hollow-Point Ammunition

FFLs are required to make entries on the ATF Form 4473 for the sale of
firearms and include on the form the name of the intended recipient of the
firearm. Title 18 U.S.C. § 924(a) provides that whoever knowingly makes
any false statement or representation in the records required to be kept for
the sale of firearms shall be fined, imprisoned for 5 years, or both. Further,
instructions for ATF Form 4473 warn that "[A] licensee who knowingly
delivers a firearm to an individual who is not buying the firearm for himself
or herself or as a gift violates the law by maintaining a false ATF F [Form]
4473." In this instance, the FFL may have violated the law by selling a
firearm to an individual who he knew was not the intended recipient.

## Arizona Purchases

An undercover agent used a counterfeit Arizona driver's license to
purchase (1) a Spanish-manufactured half-break .38 caliber 5-shot revolver,
circa 1893, with a box of Smith & Wesson .38 caliber ammunition and (2) an

Italian-manufactured .25 caliber semiautomatic pistol from a gun store in Tucson, Arizona. (See fig. 5.)

**Figure 5:   Tucson, Arizona, Purchases**



.38 Caliber Spanish-Manufactured Half-Break 5-Shot Revolver, Circa 1893, With .38 Caliber Ammunition (Top)

Model GT27 Italian-Manufactured .25 Caliber Semiautomatic Pistol With 7-Shot Magazine (Bottom)

Prior to purchasing the firearms, the agent completed the ATF Form 4473. Arizona requires an individual wanting to purchase a firearm to show a valid photo-identification. The NICS check by the salesperson came back with a proceed-to-sell response. Because Arizona is a point-of-contact state, the salesperson contacted the Arizona Department of Public Safety for the NICS check. The department simultaneously searched available state and local law enforcement files. Both searches were negative, allowing the sale to proceed.

During the transaction, the salesperson stated that he was required to do an NICS check only on the .25 caliber semiautomatic handgun because the .38 caliber revolver was over 100 years old and was considered a "curio."

The agent paid for the weapons and ammunition, and he and a companion agent departed the store with the merchandise.

## Attempt to Purchase a Firearm Over the Internet

We also investigated the possibility of purchasing a firearm over the Internet by searching a Web site that labels itself a directory service.[14] An agent acting in an undercover capacity responded to 10 of 21 advertisements offering firearms for sale; 8 of the advertisers were FFLs and 2 were individuals. The FFL advertisers would ship the firearm offered for sale to only an FFL and refused to ship it to an individual. We also attempted to purchase firearms from the two advertisers we determined to be individuals but did not complete the transactions.

One individual, in Warner Robbins, Georgia, advertised a Smith & Wesson .45 caliber firearm for sale for $390. An agent acting in an undercover capacity contacted the individual by telephone and told him he was calling from the Northern Virginia area. After verifying that the firearm was for sale, the agent attempted to convince the individual to mail the firearm to him; but he refused to mail the firearm to anyone other than an FFL. The agent then told the individual that he would be in the Warner Robbins area in a few days, and the individual readily agreed to sell the firearm to the agent in a "face-to-face" transaction. The individual asked the agent if he was a criminal; the agent assured him that he was not and provided a fictitious name. The individual then agreed to sell the firearm for cash and stated that he would not require any identification. He then asked the agent to call him for directions to his home when he arrived in Warner Robbins.

In a second advertisement, an individual in Orlando, Florida, offered to sell a 9mm semiautomatic firearm for $339. An undercover agent telephoned the individual; stated that he was calling from the Washington, D.C., area; and verified that the firearm was for sale. The seller refused to send the firearm through the mail but agreed to meet the agent to complete the transaction. He stated that he would sell the firearm for cash and would not require identification.

---

[14] The site notes that it makes no warranty that the seller or the guns actually exist and that all gun transfers must comply with ATF and shipping regulations.

As arranged with your office, unless you disclose its contents earlier, we plan no further distribution of this report until 30 days after the letter's date. At that time, we will send copies of the report to interested congressional committees, the Secretary of the Treasury, the Attorney General, and the Directors of the FBI and ATF. The report will also be available on GAO's home page at www.gao.gov. If you have any questions, please call Assistant Director Patrick Sullivan at (202) 512-6722. Senior Special Agents John Cooney, Woodrow Hunt, William McDaniel, and Thomas Wiley and Senior Attorney Barry Shillito made key contributions to this investigation and report.

Sincerely yours,

Robert H. Hast
Managing Director
for Special Investigations

APPENDIX 000239

Appendix I

# Bureau of Alcohol, Tobacco and Firearms Form 4473

OMB NO. 1512-0129

**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
**FIREARMS TRANSACTION RECORD PART I - OVER-THE-COUNTER**

TRANSFEROR'S TRANSACTION SERIAL NUMBER

NOTE: Prepare in original only. All entries on this form must be in ink. **See Important Notices, Definitions and Instructions**

**SECTION A - MUST BE COMPLETED PERSONALLY BY TRANSFEREE (BUYER)**

1. TRANSFEREE'S *(Buyer's)* NAME *(Last, First, Middle)*

   ☐ MALE  ☐ FEMALE

2. HEIGHT   3. WEIGHT   4. RACE

5. RESIDENCE ADDRESS *(No., Street, City, County, State, ZIP Code)*

6. BIRTH DATE   MONTH   DAY   YEAR

7. PLACE OF BIRTH *(City)*   STATE OR FOREIGN COUNTRY

8. **OPTIONAL INFORMATION** - The information requested in this item (8) is strictly **optional** but will help to ensure the lawfulness of the sale and avoid the possibility of being misidentified as a felon or other prohibited person.

SOCIAL SECURITY NUMBER   ALIEN REGISTRATION NUMBER   A___ ___ ___ ___ ___ ___ ___ ___   MISCELLANEOUS NUMBER *(Military ID, etc.)*

9. CERTIFICATION OF TRANSFEREE *(Buyer)* - Questions a. through l. must be answered with a "yes" or a "no" in the box at the right of the question.

a. Are you the actual buyer of the firearm indicated on this form? If you answer "no" to this question the dealer cannot transfer the firearm to you. *(See Important Notice 1.)*

b. Are you under indictment or information in any court for a crime for which the judge could imprison you for more than one year? An information is a formal accusation of a crime made by a prosecuting attorney.

c. Have you ever been convicted in any court of a crime for which the judge could have imprisoned you for more than one year, even if the judge actually gave you a shorter sentence? *(See Important Notice 5 and EXCEPTION.)*

d. Are you a **fugitive** from justice?

e. Are you an unlawful user of, or addicted to, marijuana, or any depressant, stimulant, or narcotic drug, or any controlled substance?

f. Have you ever been adjudicated mentally defective or have you been committed to a mental institution?

g. Have you been discharged from the Armed Forces under **dishonorable** conditions?

h. Are you an alien **illegally** in the United States?

i. Have you ever renounced your United States citizenship?

j. Are you subject to a court order restraining you from harassing, stalking, or threatening an intimate partner or child of such partner? *(See Important Notice 6 and Definition 4.)*

k. Have you been convicted in any court of a misdemeanor crime of domestic violence? This includes any misdemeanor conviction involving the use or attempted use of physical force committed by a current or former spouse, parent, or guardian of the victim or by a person with a similar relationship with the victim. *(See Definition 5.)*

l. Are you a citizen of the United States?

m. What is your State of residence? _____ *(State)*

If you are not a citizen of the United States, you have a State of residence only if you have resided in the State for at least 90 days prior to the date of this sale. *(See Definition 6.)*

I CERTIFY THAT THE ABOVE ANSWERS ARE TRUE AND CORRECT. I UNDERSTAND THAT A PERSON WHO ANSWERS "YES" TO QUESTION 9b IS PROHIBITED FROM PURCHASING A FIREARM. I UNDERSTAND THAT A PERSON WHO ANSWERS "YES" TO ANY OF THE QUESTIONS 9c THROUGH 9k IS PROHIBITED FROM PURCHASING OR POSSESSING A FIREARM. I ALSO UNDERSTAND THAT THE MAKING OF A FALSE ORAL OR WRITTEN STATEMENT OR THE EXHIBITING OF ANY FALSE OR MISREPRESENTED IDENTIFICATION WITH RESPECT TO THIS TRANSACTION IS A CRIME PUNISHABLE AS A FELONY. I FURTHER UNDERSTAND THAT MY REPETITIVE PURCHASE OF FIREARMS FOR THE PURPOSE OF RESALE FOR LIVELIHOOD AND PROFIT WITHOUT A FEDERAL FIREARMS LICENSE IS A VIOLATION OF LAW. (SEE IMPORTANT NOTICE 7.)

TRANSFEREE'S *(Buyer's)* SIGNATURE   DATE

ATF F 4473 (5300.9) PART I (10-98) PREVIOUS EDITIONS ARE OBSOLETE

## Ordering Information

The first copy of each GAO report is free. Additional copies of reports are $2 each. A check or money order should be made out to the Superintendent of Documents. VISA and MasterCard credit cards are accepted, also.

Orders for 100 or more copies to be mailed to a single address are discounted 25 percent.

Orders by mail:
U.S. General Accounting Office
P.O. Box 37050
Washington, DC  20013

Orders by visiting:
Room 1100
700 4th St. NW (corner of 4th and G Sts. NW)
U.S. General Accounting Office
Washington, DC

Orders by phone:
(202) 512-6000
fax: (202) 512-6061
TDD (202) 512-2537

Each day, GAO issues a list of newly available reports and testimony. To receive facsimile copies of the daily list or any list from the past 30 days, please call (202) 512-6000 using a touchtone phone. A recorded menu will provide information on how to obtain these lists.

Orders by Internet:
For information on how to access GAO reports on the Internet, send an e-mail message with "info" in the body to:

info@www.gao.gov

or visit GAO's World Wide Web home page at:

http://www.gao.gov

## To Report Fraud, Waste, or Abuse in Federal Programs

Contact one:
• Web site: http://www.gao.gov/fraudnet/fraudnet.htm
• e-mail: fraudnet@gao.gov
• 1-800-424-5454 (automated answering system)

PRINTED ON ♻ RECYCLED PAPER

**APPENDIX 000242**

**United States**
**General Accounting Office**
**Washington, D.C. 20548-0001**

**Official Business**
**Penalty for Private Use $300**

**Address Correction Requested**

**Presorted Standard**
**Postage & Fees Paid**
**GAO**
**Permit No. GI00**



**APPENDIX 000243**

**Research Articles**

# Firearm Death Rates and Association with Level of Firearm Purchase Background Check

Steven A. Sumner, BS, Peter M. Layde, MD, MSc, Clare E. Guse, MS

**Background:** Past ecologic analyses of firearm deaths have studied the effects of various gun-control laws; however, no study has analyzed the effects of the differences among states in the background checks required for firearm purchase. Some states utilize a federal agency to conduct the background checks; others use a state agency; still others use a local agency. The information potentially available to checking agencies at different levels of government varies; the consequence of this variation is not known.

**Methods:** In 2007, negative binomial regression models were used to assess the association between the Department of Justice classification of agencies conducting firearm background checks for each state in 2002–2004 and firearm suicide and homicide rates for the same years from the National Center for Injury Prevention and Control while controlling for age, race, unemployment, crime, income inequality, poverty, alcohol consumption, urbanization, and divorce rate.

**Results:** Performing local-level background checks was associated with a 27%-lower firearm suicide rate (incidence rate ratio [IRR]=0.73, 95% CI=0.60, 0.89) and a 22%-lower homicide rate (IRR=0.78, 95% CI=0.61, 1.01) in adults ≥21 years.

**Conclusions:** Using local-level agencies to perform firearm background checks is associated with reduced rates of firearm suicide and homicide. Methods to increase local-level agency background checks, such as authorizing local police or sheriff's departments to conduct them, or developing the capability to share local-level records with federal databases, should be evaluated as a means of reducing firearm deaths.
(Am J Prev Med 2008;35(1):1–6) © 2008 American Journal of Preventive Medicine

## Background

The Brady Handgun Violence Prevention Act mandates background checks on individuals who purchase firearms from federally licensed firearm dealers. Under the Brady Act, which establishes the federal minimum for gun-control laws, a person is disqualified from purchasing a firearm if he or she is under indictment or convicted of a crime punishable by more than 1 year in prison, is a fugitive from justice, is unlawfully a user of a controlled substance, has been adjudicated as a mental defective or committed to a mental institution, was dishonorably discharged from the armed services, has renounced U.S. citizenship, is subject to a restraining order, or has been convicted of domestic violence.[1] Any of the above criteria is manda-tory grounds for rejection of a firearm purchase; however, the agencies that conduct background checks often lack the data necessary to conduct a complete search.[2] The digitization of state records may be partial, and information may not be made available to federal databases because of either budgetary constraints on the state level or legal restrictions that prevent the sharing of local data.[2,3]

The effect of the Brady Act on suicide and homicide rates has been analyzed and found to have limited impact except for certain subpopulations.[4] Several additional state regulations, including age-specific restrictions, one-gun-a-month laws, junk-gun laws, and concealed-weapon laws do not appear to confer a significant benefit.[5–7] Nonetheless, differences in interstate firearm mortality exist that have not been fully explained by previously studied factors.

To the best of our knowledge, no study has evaluated the effect of the quality of a state's firearm background check on firearm death rates. State-by-state differences in the level of background checks, and hence the detail and availability of the data that a check accesses, may determine whether the check is fully effective at preventing firearm sales to individuals who are prohibited by law from purchasing a gun.

From the Injury Research Center (Sumner, Layde, Guse), the Department of Population Health (Layde), and the Department of Family and Community Medicine (Guse), Medical College of Wisconsin, Milwaukee, Wisconsin

Address correspondence and reprint requests to: Peter M. Layde, MD, MSc, Injury Research Center, Medical College of Wisconsin, 8701 Watertown Plank Road, Milwaukee WI 53226-0509. E-mail: playde@mcw.edu.

The full text of this article is available via AJPM Online at www.ajpm-online.net; 1 unit of Category-1 CME credit is also available, with details on the website.

**APPENDIX 000244**
0749-3797/08/$–see front matter
doi:10.1016/j.amepre.2008.03.023
**1**

When an individual desires to purchase a gun from a federally licensed dealer, the dealer uses telephone, mail, or electronic communication to contact the agency that the state has designated as being responsible for conducting firearm background checks. The agency that is contacted will be one of three possibilities: the FBI, a single state agency, or a local law enforcement department such as a municipal police or sheriff's office. The designated agency then conducts the background check and informs the dealer if the sale can proceed. Each state, whether it utilizes a federal, state, or local checking agency, accesses the National Instant Criminal Background Check System (NICS), a system that scans federal databases and is the minimum check that must be performed. However, states that utilize a state or local office for background checks "have access to all of the information available to the FBI through NICS, plus some . . . have additional information available only to their respective state."[2] Therefore, depending on which agency is conducting the background check, additional records may be accessed,[1] resulting in a more detailed and effective check.

In 2004, approximately 8,084,000 applications were received for firearm transfers nationwide and 126,000, or 1.6%, were rejected.[8] Also in that year, firearms were involved in 29,036 deaths.[9] Suicides and homicides constituted 57.2% and 38.7% of the firearm deaths, respectively.

This study analyzed the effect of conducting federal-, state-, or local-level background checks on firearm death rates. It was hypothesized that states that conduct background checks on a more local level would be associated with lower suicide and homicide rates because local agencies, with access to more-detailed criminal reports and records that are not readily available to the federal government, would be able to perform more thorough background checks.

## Methods

### State Classifications

The level of the background checks performed by each of the 50 states was classified using the annual Bureau of Justice Statistics published table of agencies conducting firearm background checks.[10] This table, and the publication containing it, detail the level of government involved in conducting either the entire background check or a significant portion (i.e., handgun checks or checks separate from the NICS)[11] as determined by state law. For the analysis, states were classified according to the background check agency reported in the Bureau of Justice Statistics publication: federal level if the background check agency was the FBI, state level if the agency was a centralized state agency, or local level if the background check agency was a municipal police or sheriff's office.

The data analysis was performed in 2007; the time period analyzed was 2002–2004. This time period was chosen because the level of the background checks performed by each state remained unaltered with the exception of only two states. Vermont switched from using a state-level to a federal-level check on February 2, 2002, and Arizona switched on August 22, 2002. These states were included in the analysis at the federal-level category because they switched background-check levels very early in the study period and their inclusion would only support the null hypothesis that there exists no benefit to performing more local background checks. Furthermore, analyses were performed excluding these states; overall trends remained unaltered (results not shown).

The time period of the study could not be expanded past 2004 because federal statistics on firearm death rates were not available beyond that year. Because only three states have changed background-check levels since 1999, the first full year in which the permanent Brady Act and NICS were in place, it was not possible to create a longitudinal analysis comparing the states pre- and post-changes in background-check levels. Therefore, the study design compared states to one another.

### Outcome Variables

Aggregated rates of firearm suicide and homicide mortality per 100,000 population for 2002 to 2004 were calculated for each state from the National Center for Injury Prevention and Control's Web-based Injury Statistics Query and Reporting System (WISQARS).[12] Rates were calculated for individuals aged 21 or older because federal law prohibits a federally licensed firearm dealer from selling a handgun to anyone under age 21.[1] Studying the firearm suicide rates for individuals aged 21 or older allows a more precise analysis of the effectiveness of the Brady Act because it excludes younger individuals who may have committed suicide with a gun that they did not purchase. Additionally, looking at firearm homicide deaths in individuals aged ≥21 also provides a more refined analysis because the ages of homicide victims and perpetrators are correlated.[4,13] Homicide deaths due to legal intervention were excluded from the analysis.

### Statistical Analyses

Negative binomial regression was used to evaluate the association between a state's firearm suicide and homicide rates and its level of background checks while controlling for potential confounders. Negative binomial regression is useful when rates are skewed and variances are greater than the mean, as is typical of death rates.[14] Likelihood ratio tests were performed, revealing that the distribution was not Poisson. Regression analyses were performed in Stata 9.2.

The multivariate analyses controlled for potentially confounding factors commonly identified in the literature as being associated with a state's homicide or suicide rate: percentage of the population unemployed[15]; robbery rate[16]; income inequality level (as measured by the Gini coefficient)[17]; percentage of individuals living in poverty[18]; per capita alcohol consumption[19,20]; percentage of the population living in metropolitan areas[21,22]; divorce rate[23,24]; age (percentage aged ≥65 for suicide and percentage aged 15–29 for homicide)[25,26]; and race (percentage white for suicide and percentage black for homicide).[26,27]

All data for potential confounders were obtained from the U.S. Census Bureau's Statistical Abstract[28] except for alcohol consumption data, which were taken from the National



**Figure 1.** Level of agency involved in conducting state background checks and unadjusted firearm suicide and homicide rates, 2002–2004.

Institute on Alcohol Abuse and Alcoholism,[29] and the robbery rate, which was taken from the FBI's Uniform Crime Reports.[30] Most data used in the regression models were measured annually. The percentage of the population living in metropolitan areas and the income-inequality level were available only for the 2000 Census data. Divorce rates were available only for 2003 and 2004. In two states, California and Hawaii, divorce rate data were not reported in 2003 or 2004, so rates from the most recently available year were used—the 1990 and 2000 censuses, respectively. The state of Indiana does not report divorce rate data, and was therefore dropped from the analysis, with 49 states remaining in the final model. The divorce rate was included as a potential confounder because it is highly associated with rates of both firearm suicide and homicide.

For more targeted investigation, the effect of the level of background checks on firearm suicide and homicide rates in age groups (0–14, 15–24, 25–34, 35–44, 45–54, 55–64, and ≥65) was examined by plotting rates over the age groups for each level of background check.

## Results

Figure 1 shows the level of each state's firearm background check (federal, state, or local) and presents each state's crude firearm suicide and homicide rate. Background checks were classified as federal level for 21 states, as state level for 17 states, and as local level for 12 states. The crude rates of firearm suicide showed a distinct reduction as background checks were performed on a more local level (Table 1); the rates for federal, state, and local classifications were 11.64, 8.45, and 5.74 per 100,000 population, respectively. Firearm

homicide rates also showed a trend of reduced rates as background checks were performed at a more local level; for federal, state, and local classifications, the rates were 4.28, 4.02, and 2.81 per 100,000 population, respectively.

Figures 2 and 3 show the association of background checks with firearm suicide and homicide rates for the various age groups analyzed. Local checks showed a lower rate for both homicide and suicide across all age groups. The difference between federal and local checks was most distinct in homicides for people aged 15–44, while firearm suicide rates were distinctly lower in states with local checks compared to those with federal checks for people aged 15–24 and older.

**Table 1.** Unadjusted firearm suicide and homicide rates and IRRs in states with federal, state, or local firearm purchase background checks, individuals aged ≥21, 2002–2004

| Background-check level | Rate per 100,000 population | IRR (95% CI) |
|---|---|---|
| **Firearm suicides** | | |
| Federal | 11.64 | 1.0 (ref) |
| State | 8.45 | 0.73 (0.58, 0.92) |
| Local | 5.74 | 0.50 (0.38, 0.64) |
| **Firearm homicides** | | |
| Federal | 4.28 | 1.0 (ref) |
| State | 4.02 | 0.93 (0.62, 1.40) |
| Local | 2.81 | 0.65 (0.42, 1.02) |

IRR, incidence rate ratio

**APPENDIX 000246**



**Figure 2.** Firearm suicide rate per 100,000 population by age, within state firearm background check groups, 2002–2004.

Table 2 presents the multivariate analysis that adjusted for potentially confounding variables. These results demonstrated similar patterns with decreasing firearm suicide and homicide rates as background checks were performed by a more-local agency, but only the incidence rate ratio (IRR) for suicide in states conducting local checks had a CI that excluded 1.0. Using federal-level checks as the reference group, when local agencies conducted background checks, firearm suicide rates showed an IRR of 0.73 (95% CI=0.60, 0.89), indicating that states with a local agency conducting background checks had a firearm suicide rate that was 27% lower than states with a federal agency conducting background checks.

## Discussion

This study provided evidence that states that utilize local-level agencies to conduct firearm background



**Figure 3.** Firearm homicide rate per 100,000 population by age, within state firearm background check groups, 2002–2004.

**Table 2.** Adjusted IRRs for firearm suicide and homicide by state firearm background-check levels, individuals aged ≥21, 2002–2004

| Background-check level | Firearm suicides[a] IRR (95% CI) | Firearm homicides[b] IRR (95% CI) |
|---|---|---|
| Federal | 1.0 (ref) | 1.0 (ref) |
| State | 0.97 (0.79–1.19) | 0.84 (0.65–1.08) |
| Local | 0.73 (0.60–0.89) | 0.78 (0.61–1.01) |

[a]Adjusted for percent unemployed, robbery rate, income inequality level, percent living in poverty, per capita alcohol consumption, percentage living in metropolitan areas, divorce rate, percent aged ≥65, and percent white
[b]Adjusted for percent unemployed, robbery rate, income inequality level, percent living in poverty, per capita alcohol consumption, percentage living in metropolitan areas, divorce rate, percent aged 15–29, and percent black
IRR, incidence rate ratio

checks have reduced rates of firearm suicide and, possibly, firearm homicide.

A significant reduction in firearm suicide rates with local-level background checks was seen for all subgroups of age, except for the group aged 0–14. This is consistent with the legal reality that individuals in that age group cannot purchase a firearm from a federally licensed firearm dealer, so they theoretically should not be able to commit suicide with their own weapon.[1] Gun availability is highly correlated with firearm suicide rates.[31]

The reduction in firearm suicide rates associated with local-level background checks could have an important public health and economic impact. Individuals who attempt suicide with a firearm are far more successful than individuals who attempt suicide by other means.[32] Suicide attempted by firearm is also associated with markedly increased financial burdens on patients and healthcare systems compared to suicide attempted by other means.[32]

Firearm homicide rates were not as strongly associated with local background checks as were suicide rates. Homicide rates were reduced in states that conduct state and, to a greater degree, local background checks, but the CIs of the IRR included 1.0, and these findings could be attributable to chance.

As with suicides, the reduction in firearm homicide rates associated with local-level background checks would also have an important impact on public health and economic outcomes. Assaults involving a firearm are more lethal and more costly for patients and hospital systems than nongun assaults.[33,34]

The greater reduction observed in firearm suicide rates compared to firearm homicide rates is consistent with the belief that more people who commit homicide obtain their guns from nonfederally licensed dealers compared to those who commit suicide.[35] Nonetheless, the study findings suggest that firearm homicide rates may be reduced by local background checks, which is consistent with studies showing that gun-control laws create friction in illegal markets.[36]

Some noteworthy limitations of this study should be addressed. This study failed to discover any significant benefit to the performance of background checks by state-level agencies compared to federal-level checks. It is possible that some large, centralized state-level agencies have just as little access to local-level records as federal background-check agents do because of the great variability in state procedures.[1] A federal-level check performed by the FBI accesses the NICS, which performs the federally required minimum-level background check using national databases. States that are mandated by state law to conduct their own background checks also have an NICS check, but may search additional state records.[1] Unfortunately, it is difficult to quantify what additional data are accessed, the regularity of access, and the completeness of those data. Furthermore, for the states that perform local-level background checks, it is also difficult to clarify the quality and quantity of data that these local-level agencies are accessing, because there are more than 2800 such agencies.

It would have been ideal to conduct a longitudinal analysis in which the states that experienced changes in the level of their background checks were compared to themselves, pre- and post-change. However, since 1999 (the first full year in which the permanent Brady Act and NICS were in place), only Arizona, Vermont, and South Carolina have switched background-check levels in the time periods for which data are available. Furthermore, as South Carolina's switch occurred during the first year of data availability, there would not be sufficient pre- and post- data available for analysis of this state.

Nonetheless, this study has detected a strong association between more local-level background checks and lower firearm-suicide fatality rates, and it was hypothesized that this may be due to more-thorough background checks performed by local agencies. Indeed, the existence and potential problems of state-to-state differences in background-check detail have been raised by Congress,[2,37] and may be a plausible explanation for some of the variability in state firearm death rates.

It should also be mentioned that local-level background checks could possibly be acting as a proxy for other unmeasured factors. For example, states that involve local-level agencies in background checks may place an added political or societal value on firearm control and be devoting more financial, police, or legal resources to the issue. Some states routinely conduct federal- or state-level background checks on firearms but conduct more local-level checks when a gun purchaser is applying to carry a concealed weapon.[1] In other words, many states know which purchases are especially high-risk and are willing to divert more resources into evaluating those purchases. Results from this study suggest that it may be beneficial for states to

allocate resources to permit local police or sheriff's departments to conduct all background checks, or for states to develop the legal and fiscal capabilities to share all of their local-level records with federal databases.

Studies on the implementation of the Brady Act or other gun-control laws have generated inconclusive evidence on the association between such actions and suicide and homicide rates.[4,6,38] This ecologic study suggests a potential explanation for some of the inconsistencies in previous studies. State-by-state differences in the level of background checks—and hence the depth and availability of the data that the checks access—may be responsible for an important portion of the de facto effectiveness of gun-control attempts; these differences merit further investigation.

The authors thank Esther Kelty for designing Figure 1. This work was supported, in part, by CDC Grant R49 CCR519614.

No financial disclosures were reported by the authors of this paper.

## References

1. Regional Justice Information Service. Survey of state procedures related to firearm sales, midyear 2004. Washington DC: Bureau of Justice Statistics, August 2005, NCJ 209288.
2. U.S. General Accounting Office. Gun control: options for improving the National Instant Criminal Background Check System. Washington DC: U.S. General Accounting Office, Report to Congressional Requesters, April 2000. GAO/GGD-00-56. www.gao.gov/archive/2000/gg00056.pdf.
3. Marks A. Congress to revisit background checks for gun buyers. The Christian Science Monitor. April 23, 2007. www.csmonitor.com/2007/0423/p02s02-ussc.htm.
4. Ludwig J, Cook PJ. Homicide and suicide rates associated with implementation of the Brady Handgun Violence Prevention Act. JAMA 2000;284:585–91.
5. Webster DW, Vernick JS, Zeoli AM, Manganello JA. Association between youth-focused firearm laws and youth suicides. JAMA 2004;292:594–601.
6. Rosengart M, Cummings P, Nathens A, Heagerty P, Maier R, Rivara F. An evaluation of state firearm regulations and homicide and suicide death rates. Inj Prev 2005;11:77–83.
7. Webster DW, Vernick JS, Hepburn LM. Effects of Maryland's law banning "Saturday night special" handguns on homicides. Am J Epidemiol 2002;155:406–12.
8. Regional Justice Information Service. Background checks for firearm transfers, 2005. Washington DC: Bureau of Justice Statistics, November 2006, NCJ 214256.
9. Miniño A, Heron P, Smith B. Deaths: preliminary data for 2004. Natl Vital Stat Rep 2006;54:1–49.
10. Regional Justice Information Service. Agencies conducting firearm background checks, Table 12 or Appendix B. Survey of state procedures related to firearm sales, midyear 2002, 2003, 2004. Washington DC: Bureau of Justice Statistics; 2003–05, NCJ 198830, 203701, 209288.
11. Hargarten SW, Karlson TA, O'Brien M, Hancock J, Quebbeman E. Characteristics of firearms involved in fatalities. JAMA 1996;275:42–5.
12. CDC, National Center for Injury Prevention and Control. Web-based Injury Statistics Query and Reporting System (WISQARS) [online]. 2005. www.cdc.gov/ncipc/wisqars.
13. Federal Bureau of Investigation website. Crime in the U.S. 2004. Murder, Table 2.7. www.fbi.gov/ucr/cius_04/offenses_reported/violent_crime/murder.html.
14. Lawless JE. Negative binomial regression and mixed Poisson regression. Can J Stat 1987;15:209–55.
15. Krueger PM, Bond Huie SA, Rogers RG, Hummer RA. Neighbourhoods and homicide mortality: an analysis of race/ethnic differences. J Epidemiol Community Health 2004;58:223–30.

**APPENDIX 000248**

16. Hsieh C, Pugh M. Poverty, income inequality, and violent crime: a meta-analysis of recent data studies. Crim Justice Rev 1993;18:182–202.
17. Cubbin C, Pickle LW, Fingerhut L. Social context and geographic patterns of homicide among U.S. black and white males. Am J Public Health 2000;90:579–87.
18. Karpati A, Galea S, Awerbuch T, Levins R. Variability and vulnerability at the ecological level: implications for understanding the social determinants of health. Am J Public Health 2002;92:1768–72.
19. McDonald A, Wang N, Camargo C. U.S. emergency department visits for alcohol-related diseases and injuries between 1992 and 2000. Arch Intern Med 2004;164:531–7.
20. Moore GM, Robertson AR. Suicide attempts by firearms and by leaping from heights: a comparative study of survivors. Am J Psychiatry 1999;156:1425–31.
21. Branas CC, Nance ML, Elliott MR, Richmond TS, Schwab CW. Urban-rural shifts in intentional firearm death: different causes, same results. Am J Public Health 2004;94:1750–5.
22. Fingerhut LA, Ingram DD, Feldman JJ. Homicide rate among U.S. teenagers and young adults. JAMA 1998;280:423–7.
23. Kposowa A. Marital status and suicide in the National Longitudinal Mortality Study. J Epidemiol Community Health 2000;54:254–61.
24. Miller M, Azrael D, Hemenway D. Household firearm ownership and suicide rates in the U.S. Epidemiology 2002;13:517–24.
25. Land K, McCall P, Cohen L. Structural covariates of homicide rates: are there any invariances across time and social space? Am J Sociol 1990;95:922–63.
26. Romero MP, Wintemute GJ. The epidemiology of firearm suicide in the U.S. J Urban Health 2002;79:39–48.
27. Harper S, Lynch J, Burris S, Smith GD. Trends in the black–white life expectancy gap in the U.S., 1983–2003. JAMA 2007;297:1224–32.
28. U.S. Bureau of the Census. Statistical abstract of the U.S. www.census.gov/prod/www/statistical-abstract-2001_2005.html.
29. National Institute on Alcohol Abuse and Alcoholism website. Per capita ethanol consumption for states, census regions, and the U.S., 1970–2004. www.niaaa.nih.gov/Resources/DatabaseResources/QuickFacts/AlcoholSales/consum03.htm.
30. Federal Bureau of Investigation website. Crime in the U.S. (Table, 2002, -03,-04). www.fbi.gov/ucr/ucr.htm#cius.
31. Miller M, Lippmann SJ, Azrael D, Hemenway D. Household firearm ownership and rates of suicide across the 50 United States. J Trauma 2007;62:1029–35.
32. Shenassa ED, Catlin SN, Buka SL. Lethality of firearms relative to other suicide methods: a population based study. J Epidemiol Community Health 2003;57:120–4.
33. Mock C, Pilcher S, Maier R. Comparison of the costs of acute treatment for gunshot and stab wounds: further evidence of the need for firearms control. J Trauma 1994;36:516–21.
34. Saltzman LE, Mercy JA, O'Carroll PW, Rosenberg ML, Rhodes PH. Weapon involvement and injury outcomes in family and intimate assaults. JAMA 1992;267:3043–7.
35. Wright JD, Rossi PH. Armed and considered dangerous: a survey of felons and their firearms. 2nd ed. Hawthorne NY: Aldine de Gruyter, 1994.
36. Cook PJ, Ludwig J, Venkatesh S, Braga AA. Underground gun markets. National Bureau of Economic Research Working Paper No. W11737. October 2005.
37. To improve the National Instant Criminal Background Check System, and for other purposes, H.R.2640, 110th Congress. 2007. http://thomas.loc.gov/cgi-bin/bdquery/z?d110:HR02640:@@@D&summ2=m&.
38. Hahn RA, Bilukha OO, Crosby A, et al. First reports evaluating the effectiveness of strategies for preventing violence: firearms laws. MMWR Recomm Rep 2003;52(RR14):11–20. www.cdc.gov/mmwr/preview/mmwrhtml/rr5214a2.htm.

**Have you seen the *American Journal of Preventive Medicine* website lately?**
**Visit www.ajpm-online.net today to see what's new online!**

**APPENDIX 000249**

**8**

# Preventing the Diversion of Guns to Criminals through Effective Firearm Sales Laws

Daniel W. Webster, Jon S. Vernick, Emma E. McGinty, and Ted Alcorn

### Weaknesses in Federal Gun Laws Which Enable Criminals to Get Guns

Preventing individuals who are deemed too risky or dangerous from obtaining firearms is arguably the most important objective of gun control policies. Many perpetrators of gun violence are prohibited by federal law from purchasing firearms from a licensed dealer due to prior felony convictions or young age. Other contributions to this book provide compelling evidence that existing conditions for disqualifying someone from legally possessing firearms are justifiable and should be expanded (Vittes, Webster, and Vernick, in this volume). Wintemute (chap. 7 in this volume) and Zeoli and Frattaroli

Daniel W. Webster, ScD, MPH, is a professor in the Department of Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health. Jon S. Vernick, JD, MPH, is an associate professor and associate chair in the Department of Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health. Emma E. McGinty, MS, is a research assistant and fourth-year PhD candidate in Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health. Ted Alcorn, MA, MHS, is a senior policy analyst in the Office of the Mayor of New York City.

(in this volume) provide evidence that laws which prohibit firearm possession by persons convicted of violent misdemeanors and those who are subject to restraining orders for domestic violence can reduce violence.

Some prohibited persons will voluntarily refrain from having a firearm in order to avoid criminal sanctions. But policies that enhance firearm seller and purchaser accountability are likely to determine how effectively gun control laws prevent prohibited individuals from acquiring guns. The federal Brady Law serves as a foundation, albeit incomplete, for preventing prohibited persons from acquiring firearms by making firearm purchases from federally licensed firearm dealers contingent upon the prospective purchaser passing a background check (Cook and Ludwig, in this volume). Licensed dealers must check purchasers' IDs, submit purchase applications to the FBI's National Instant Check System (NICS), and maintain records of all firearms acquisitions and sales so that ATF auditors can assess the dealers' compliance with gun sales laws.

Data on guns recovered by police and traced by the U.S. Bureau of Alcohol, Tobacco and Firearms (ATF) have indicated that about 85% of criminal possessors were not the retail purchaser (Bureau of Alcohol, Tobacco and Firearms 2002). This is consistent with our analysis of data from the most recent (2004) Survey of Inmates in State Correctional Facilities (SISCF) to determine the source for the handguns acquired by the 1,402 inmates incarcerated for an offense committed with a handgun. The largest proportions of offenders got their handguns from friends or family members (39.5%) or from street or black market suppliers (37.5%), sales for which there are no federal background check requirements. Licensed gun dealers were the direct source for 11.4% of the gun offenders. One in 10 offenders in our sample reported that they had stolen the handgun that they used in their most recent crime. Handgun acquisitions by offenders at gun shows and flea markets were rare (1.7 %).

It is easy to understand why offenders would prefer private sellers over licensed firearms dealers. Under federal law and laws in most states, firearm purchases from unlicensed private sellers require no background check or record keeping. The lack of record keeping requirements helps to shield an offender from law enforcement scrutiny if the gun were used in a crime and recovered by police. Indeed, of the offenders in the SISCF who were not prohibited from possessing a handgun prior to the crime leading to their incarceration, two-thirds had obtained their handguns in a transaction with a private seller.

That only 11% of handgun offenders reported acquiring their handguns from a licensed gun dealer does not mean that licensed dealers play a negligible role in the diversion of guns to criminals. Federal gun trafficking investigations indicate that corrupt licensed dealers represent one of the largest channels for the illegal gun market (Bureau of Alcohol, Tobacco and Firearms 2000), and a national phone survey of gun dealers found a willingness to make gun sales likely to be illegal relatively common (Sorenson and Vittes 2003). As articulated by Vernick and Webster (in this volume) and Braga and Gagliardi (in this volume), current federal laws provide many protections to licensed firearm sellers, and the Bureau of Alcohol, Tobacco, Firearms and Explosives lacks the resources and political power to serve as a robust deterrent to illegal gun sales.

## Prior Evidence That Better Regulation of Gun Sellers Reduces Diversions of Guns to Criminals

Weaknesses in federal gun sales laws may cause skepticism about whether gun control can work in the United States. However, states vary greatly in the nature of their gun sales laws. For example, many states extend conditions for firearm prohibitions beyond those covered in federal law to include additional high-risk groups and place additional regulations on firearm sales to prevent illegal transfers. Twelve states require retail firearm sellers to be licensed by state or local governments and allow law enforcement to conduct audit inspections of gun dealers (Vernick, Webster, and Bulzachelli 2006). Fifteen states extend firearms sales regulations to sales by private, unlicensed sellers, and two additional states require background checks for firearms sold at gun shows. Nine states have some form of licensing system for handgun purchasers, five require applicants to apply directly with a law enforcement agency and be photographed and fingerprinted, and three allow agencies to use their discretion to deny an application if they deem it to be in the interest of public safety. Additional laws enacted by states to keep guns from prohibited persons include mandatory reporting of loss or theft of private firearms, limiting handgun sales to one per person per month, and banning the sale of low-quality "junk guns" that are overrepresented in crime (Wintemute 1994; Wright, Wintemute, and Webster 2010).

A study which used crime gun trace data from 53 U.S. cities for the years 2000–2002 examined the association between state gun sales regulations and

the diversion of guns to criminals (Webster, Vernick, and Bulzacchelli 2009). Diversion of guns to criminals was measured by the number of guns recovered by police within one year of retail sale unless the criminal possessor was the legal retail purchaser. In addition to examining state laws, this study also surveyed state and local law enforcement officials to ascertain their policies for conducting compliance inspections or undercover stings of licensed dealers. Strong regulation and oversight of licensed gun dealers—defined as having a state law that required state or local licensing of retail firearm sellers, mandatory record keeping by those sellers, law enforcement access to records for inspection, regular inspections of gun dealers, and mandated reporting of theft of loss of firearms—was associated with 64% less diversion of guns to criminals by in-state gun dealers. Regulation of private handgun sales and discretionary permit-to-purchase (PTP) licensing were each independently associated with lower levels of diversion of guns sold by in-state dealers. The finding on private sales regulations is consistent with the results of a systematic observational study of gun sales at gun shows that found anonymous undocumented firearms sales to be ubiquitous and illegal "straw man" sales more than six times as common in states that do not regulate private sales compared with California that does regulate such sales (Wintemute 2007; Wintemute, chap. 7 in this volume).

## Diversions of Guns to Criminals Following Missouri's Repeal of Permit to Purchase Licensing

The associations between state gun sales laws and diversions of guns to criminals cited above are cross-sectional and therefore do not capture changes in gun diversions following changes in state gun sales laws. The strong association between at least some forms of PTP licensing and lower rates of gun diversions to criminals could potentially be confounded by some variable omitted from the analyses that distinguishes states that enact the most comprehensive firearm sales regulations from those that do not. There have been few noteworthy changes in gun sales laws during a period when crime gun tracing practices were more common and the data were available to track changes over time. An exception is the repeal of Missouri's PTP law effective August 28, 2007. This law had required handgun purchasers to apply for a PTP through their local county sheriff's office and required a PTP for all handgun sales, whether by licensed or unlicensed sellers. Following the repeal, handgun

purchasers could purchase handguns without a background check or record keeping if the seller was not a licensed dealer, and licensed gun dealers rather than sheriff's deputies processed applications to purchase handguns.

Using annual state-level data on crime guns recovered by police in Missouri and traced by the ATF for the period 2002–2011, we examined changes in commonly used indicators of illegal gun diversion—the number and proportion of guns with short sale-to-crime intervals—before and after the state repealed its PTP law. If Missouri's PTP law had been curtailing the diversion of guns to criminals, the repeal of the law should result in more short sale-to-crime guns recovered by police, and the shift in increasing crime guns should coincide with the length of time between the repeal of the law and a crime gun's recovery by police.

Such a pattern is clearly evident in the data presented in Table 8.1. The percentage of traced crime with a sale-to-crime interval of less than three months begins to increase from a pre-repeal stable mean of 2.8% to 5.0% in 2007 when the repeal was in effect for four months, and then jumps up to a mean of 8.5% for 2008 through 2011. The percentage of crime guns with sale-to-crime intervals of three to twelve months increased sharply beginning in 2008 from a pre-repeal mean of 6.2% to 14.0% for 2008–2011 when all such guns were purchased after the law's repeal. If the PTP repeal increased the diversion of guns to criminals, the percentage of crime guns recovered at a

*Table 8.1*   Percentage of Missouri Crime Guns with
Short Time Intervals between Retail Sale and Recovery
by Police for Years 2002–2011

| Year | Up to 3 months (%) | 3–12 months (%) | 1–2 years (%) |
|------|------|------|------|
| 2002 | 2.9 | 5.2 | 5.2 |
| 2003 | 3.2 | 5.3 | 6.1 |
| 2004 | 2.1 | 5.6 | 5.7 |
| 2005 | 3.3 | 5.1 | 6.6 |
| 2006 | 3.2 | 7.5 | 7.2 |
| 2007 | 4.5 | 7.9 | 7.1 |
| 2008 | 9.4 | 12.6 | 6.7 |
| 2009 | 8.1 | 15.0 | 12.7 |
| 2010 | 7.6 | 13.7 | 13.0 |
| 2011 | 8.5 | 14.3 | 12.7 |

one to two years sale-to-crime interval should increase beginning in 2009. Indeed, that is what happened. These guns increased sharply from a mean of 6.4% to 13.0%. The sharp increase in very short sale-to-crime intervals for guns in Missouri was not part of a national trend; in fact, the average sale-to-crime interval increased nationally from 10.2 years in 2006 to 11.2 years in 2011.

Because states with stronger gun sales laws tend to attract guns originating in states with weaker gun laws (Cook and Braga 2001; Webster, Vernick, and Hepburn 2001), we also compared trends in the proportion of Missouri's crime guns that were initially purchased in Missouri versus those that had been purchased outside of the state. Consistent with our hypotheses that Missouri's PTP had been preventing guns from being diverted to criminals, the share of crime guns originating from Missouri increased from a mean of 55.6% when the PTP law was in place to 70.8% by 2011, while the proportion that had originated from out of state gun dealers decreased from 44.4% before the repeal, began dropping in 2008, and was 29.2% in 2011. This is a remarkable change for an indicator that tends to change very little over time.

### Effects of State Gun Sales Laws on the Export of Guns to Criminals across State Borders

In 2009, 30% of crime guns traced by the ATF were recovered in states other than the state where they were originally sold; however, there is great variation across states with respect to the proportion of crime guns which were originally sold by gun dealers in other states. Mayors Against Illegal Guns (2010) published a report showing great disparities across states in the number of crime guns exported per capita. Bivariate analyses indicated that each of ten selected gun control laws were associated with exporting fewer guns per capita that were used by criminals in other states. In a National Bureau of Economic Research (NBER) working paper, Knight used an index of eleven laws developed by MAIG to examine the flow of guns to and from states with strong versus weak gun laws and found that states with weak gun laws tended to export guns to states with strong gun laws (Knight 2011).

The present study adds to this literature by using crime gun trace data from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) to examine the cross-sectional association between state gun laws and the per capita rate of exporting crime guns across the 48 contiguous U.S. states. The following state gun sales laws were considered: strong regulations of retail

gun dealers[1]; permit-to-purchase (PTP) licensing; private sales regulations (mandatory background checks of sellers or valid PTP); handgun registration; mandatory reporting to law enforcement of theft and loss of firearms by private owners; whether the state has criminal penalties for dealers who fail to conduct background checks or has penalties for illegal straw purchasers; one-gun-per-month restrictions; assault weapon bans; and junk gun bans. Three variations of PTP laws were examined: (1) discretionary PTP laws which give law enforcement the discretion to refuse to issue permits; (2) PTP with fingerprinting which requires applicants to appear at the law enforcement agency that issues the permits to be photographed and fingerprinted; and (3) nondiscretionary PTP laws which require a permit to purchase a firearm but do not require applicants to go to agencies to be fingerprinted.

We used negative binomial regression models with robust standard errors to estimate the association between state gun laws and the per capita rate of crime guns exported to criminals in other states after controlling for potential confounders. Key confounders controlled for in the analyses were the prevalence of gun ownership, out-of-state population migration, and the number of people living near the border of states with strong gun laws. State population served as an offset variable so that transformed regression coefficients could be interpreted as incident rate ratios (IRR) and percentage reductions in risk.

Data on crime gun exports were obtained from the 2009 state-level crime gun trace data posted on the ATF's website. ATF defines crime guns as recovered firearms that were "illegally possessed, used in a crime, or suspected to have been used in a crime." In 2009, 61% of the guns that police submitted to ATF were successfully traced to the first retail sale.

Data on state gun laws were obtained through legal research and from ATF and U.S. Department of Justice Publications. Oak Ridge National Laboratory's LandScan global population distribution data was used with arcGIS Version 10 to calculate state border population variables used as control variables in statistical models. These control variables included population within 50 miles of a bordering states with the strongest gun control laws[2] and states with medium level of gun control.[3] Household prevalence of firearm ownership was obtained from the Behavioral Risk Factor Surveillance System 2001 survey (Centers for Disease Control and Prevention 2001), and measures of state migration[4] were obtained from the American Community Survey (ACS) 2005–2009 five-year estimates. Finally, we measured two variables indicating that a state borders Canada or Mexico, respectively.

States that exported the most crime guns per 100,000 population were Mississippi (50.4), West Virginia (47.6), Kentucky (35.0), and Alabama (33.4). Of these four states, three (Mississippi, West Virginia, and Kentucky) had none of the state gun laws we examined. Alabama penalized gun dealers who failed to conduct background checks but had no other laws of interest in place. States that exported the fewest crime guns per capita—New York (2.7), New Jersey (2.8), Massachusetts (3.7), and California (5.4)—each had strong gun dealer oversight, regulated private sales, and handgun registries. New York, New Jersey, and Massachusetts also had discretionary PTP and required reporting of firearm theft/loss.

Data from the regression analysis are presented in Table 8.2. Due to high collinearity (Variance Inflation Factor > 10), assault weapons bans and handgun registration laws were dropped from the final models. Statistically significant lower per capita export of crime guns across state borders was found for

*Table 8.2*    Estimates of association between state gun laws and crime gun exports

|  | IRR | Robust SE | *p* value |
|---|---|---|---|
| State gun laws |  |  |  |
| Discretionary purchase permits | 0.24 | 0.10 | .001 |
| Purchase permits with fingerprinting | 0.55 | 0.15 | .02 |
| Nondiscretionary permits | 0.75 | 0.15 | .15 |
| Strong dealer regulation[a] | 1.45 | 0.30 | .07 |
| Penalty for failure to conduct background checks | 0.76 | 0.12 | .07 |
| Penalty for straw purchasers | 1.46 | 0.30 | .07 |
| Junk guns banned | 0.68 | 0.13 | .04 |
| Private sales regulated | 0.71 | 0.11 | .03 |
| Firearm theft/loss reported | 0.70 | 0.10 | .02 |
| One gun per month | 0.81 | 0.26 | .51 |
| Covariates |  |  |  |
| Household gun ownership | 6.05 | 4.20 | .009 |
| Border population in states with strong gun laws[b] | 1.00 | 1.82E-08 | .50 |
| Border population in states with medium gun laws[c] | 1.00 | 2.57E-08 | .14 |
| Migration out of state | 0.99 | 5.04E-07 | .50 |
| Borders Canada | 0.68 | 0.065 | <.001 |
| Borders Mexico | 0.84 | 0.19 | .43 |

*Note:* IRR = incidence rate ratio. Model also includes state population offset term.
    [a]States were considered to have strong dealer regulation if they require licensing of gun dealers, allow inspection of dealer records, and penalize dealers who falsify records.
    [b]States were considered to have strong gun laws if they have a discretionary permit-to-purchase law.
    [c]States were considered to have medium gun laws if they regulate private sales, require licensing of gun dealers, and allow inspections of dealer records.

discretionary PTP laws (IRR=0.24, lowered risk 76%), nondiscretionary PTP laws requiring fingerprinting at a law enforcement agency (IRR=0.55, −45%), junk gun bans (IRR=0.68, −32%), regulation of private sales (IRR=0.71, −29%), and required reporting of firearm theft or loss by private gun owners (IRR=0.70, −30%) were each associated with statistically significantly lower rates of crime gun exports. Effects for penalties for gun dealers' failure to conduct background checks (IRR=0.76) and penalties for straw purchases (IRR=1.24) approached statistical significance at the .05 level but in opposite directions. Although billed as a deterrent to interstate gun trafficking, one-gun-per-month restrictions were unrelated to trafficking and neither were strong dealer regulations, penalties for failure to conduct background checks, or penalties for straw purchasing. Household gun ownership (IRR=6.05) was associated with higher crime gun export rates and bordering Canada was associated with lower crime gun exports (IRR=0.84). States bordering other states where gun laws are relatively strict was unrelated to the rate of exporting crime guns after controlling for gun sales laws and other factors.

## Conclusions and Policy Implications

Data presented here provide compelling evidence that the repeal of Missouri's permit-to-purchase (PTP) law increased the diversion of guns to criminals. The timing of the effects on our indicator of diversion, short intervals between sales, and recovery in crime was in exact correspondence with the timing of the law's repeal. The changes observed in gun diversions in Missouri are likely related to the substantial change in how guns were sold following the law's repeal. Prospective purchasers of handguns being sold by private individuals no longer had to pass a background check and sellers were no longer required to document the sale. Prospective purchasers, including illegal straw purchasers, interested in buying handguns from licensed dealers applied to purchase the gun at the place that profited from the sale rather than at a law enforcement agency. Repealing the PTP law made it less risky for criminals, straw purchasers, and persons willing to sell guns to criminals and to their intermediaries, and these individuals appear to have taken advantage of the opportunities afforded to them by the repeal.

In our study of state gun sales laws in the 48 contiguous states, discretionary PTP laws were the most dramatic deterrent to interstate gun trafficking. This finding is consistent with prior research showing a negative association

between these laws and intrastate diversion of guns to criminals; however, the effects were either mediated by or explained by lower levels of gun ownership in states with these laws (Webster, Vernick, and Bulzachelli 2009). Discretionary permitting procedures such as in-depth and direct scrutiny by law enforcement, longer waiting times, higher fees, and stricter standards for legal ownership may depress gun ownership and reduce opportunities for criminals to find individuals who have guns that they would be willing to sell or who would be targets for gun theft. The strong negative association between nondiscretionary PTP laws and exporting guns to criminals in other states after statistically controlling for gun ownership levels, geography, and other gun laws suggests that PTP laws deter gun trafficking.

Perhaps most relevant to current debates about federal gun policy, we found that states which regulated all handgun sales by requiring background checks and record keeping, not just those made by licensed dealers, diverted significantly fewer guns to criminals in other states. This finding is consistent with the results of a prior study of intrastate diversions of guns to criminals (Webster, Vernick, and Bulzachelli 2009) and the findings of an observational study of sales practices gun shows (Wintemute 2007; chap. 7 in this volume). The importance of fixing this flaw in current gun law is highlighted by data first reported here which indicate that nearly 80% of handgun offenders incarcerated in state prisons reported purchasing or trading for their handgun from an unlicensed seller who, in most states, was not legally obligated to ensure that the purchaser passed a background check or to keep a record of the transaction.

Our examination of state firearms regulations and the interstate diversion of guns to criminals considered a larger array of laws than prior studies. Laws requiring private gun owners to promptly report theft or loss of firearms to police are intended to increase private gun seller accountability and provide law enforcement with a tool to combat illegal straw purchases when such purchasers accept no responsibility for the gun being in the hands of a prohibited person with dubious claims of unreported gun theft. Having this measure of accountability significantly reduced interstate gun trafficking, as did bans of junk guns. Junk guns are the least expensive guns, and their low price enables traffickers to invest relatively little money in guns that can sell for nearly five times more than retail prices on the streets in states with the most restrictive gun laws. Prior research on the effects of Maryland's ban of junk guns found the banned guns used much less in Baltimore, Maryland, than in cities with-

out such bans, seven years after Maryland's law was enacted (Vernick, Webster, and Hepburn 1999), and gun homicides were 9% lower than projected had the law not been enacted (Webster, Vernick, and Hepburn 2002).

Interestingly, a policy designed specifically to deter interstate gun trafficking—one-gun-per-month limits for gun buyers—was not associated with the export of guns to criminals in other states. Strong gun dealer regulations were also unrelated to exporting of crime guns across state lines. A prior study of intrastate trafficking found that strong dealer regulations by themselves were not effective unless law enforcement reported that they had a policy of regular compliance inspections. Unfortunately, we had no measure of enforcement for the current study.

Our assessment of the effects of state gun control laws on the export of guns to criminals in other states had several limitations. First, the cross-sectional study design precludes an assessment of whether changes in gun control laws prompt subsequent changes in crime gun exports. Longitudinal crime gun trace data could not be obtained, as many of the state laws of interest were in place before crime gun tracing become common practice. The sharp increase in diversions of guns to criminals following the repeal of Missouri's law, however, lessens this concern. Second, our outcome data does not include all crime gun exports. Not all crime guns are submitted to the ATF for tracing. In 2009, gun traces could not be completed for nearly 40% of crime guns due to insufficient or incorrect data. Third, although reducing the diversion of guns to criminals is a key objective of some gun control laws, there is currently insufficient research to discern the degree to which reductions in diverted guns affects gun violence, and it appears as though some have had no impact.

In spite of these limitations, our study is the first to estimate independent associations between a number of state gun control laws and crime gun export rates while controlling for confounders, and it is the first longitudinal assessment of the impact of permit-to-purchase licensing that regulates all handgun sales. Our findings on cross-state diversions of crime guns underscores the importance of having more comprehensive federal regulation of firearm sales because lax laws in many states facilitate the arming of criminals beyond state borders. At a minimum, federal law should require background checks and record keeping for all firearms sales. Regulating many private sellers is a challenge, yet the data suggest that it is necessary to deter the diversion of guns to criminals, and requiring gun owners to report theft or loss of firearms provides additional accountability to prevent illegal sales.

120     *Daniel W. Webster, Jon S. Vernick, Emma E. McGinty, and Ted Alcorn*

ACKNOWLEDGMENTS

Funding for this research was provided by grants from the Joyce Foundation and Bloomberg Philanthropies.

NOTES

1. Licensing of gun dealers, inspection of dealer records allowed, and criminal penalties for dealers who falsified records.

2. PTP laws or in the District of Columbia with what could be considered a ban on firearm ownership until 2008.

3. Regulate private sales, require licensing of gun dealers, and allow inspections of dealer records.

4. The number of people who moved out of each state between 2005 and 2009.

REFERENCES

Bureau of Alcohol, Tobacco and Firearms (ATF). 2000. *Following the Gun*. Washington, DC: U.S. Department of the Treasury.

Bureau of Alcohol, Tobacco and Firearms (ATF). 2002. *Crime Gun Trace Reports (2000): The Youth Crime Gun Interdiction Initiative.* Washington, DC: U.S. Department of the Treasury.

Bureau of Justice Statistics. 2004. *Survey of Inmates in State Correctional Facilities (SISCF)*. Washington, DC: U.S. Department of Justice.

Centers for Disease Control and Prevention (CDC). 2001. *Behavioral Risk Factor Surveillance System Survey Data.* Atlanta, GA: U.S. Department of Health and Human Services.

Cook, Philip J., and Anthony A. Braga. 2001. "Comprehensive Firearms Tracing: Strategic and Investigative Uses of New Data on Firearms Markets." *Arizona Law Review* 43 (2): 277–309.

Cook, Philip J., Jens Ludwig, and Anthony A. Braga. 2005. "Criminal Records of Homicide Offenders." *Journal of the American Medical Association* 294: 598–601.

Environmental Systems Research Institute (ESRI). 2011. ArcGIS Desktop: Release 10. Redlands, CA.

Knight, Brian G. 2011. "State Gun Policy and Cross-State Externalities: Evidence from Crime Gun Tracing." National Bureau of Economic Research Working Paper no. 17469. Cambridge, MA.

Mayors Against Illegal Guns. 2010. *Trace the Guns: The Link Between Gun Laws and Interstate Gun Trafficking*. http://www.mayorsagainstillegalguns.org/downloads/pdf/trace_the_guns_report.pdf.

Sorenson, Susan B., and Katherine A. Vittes. 2003. "Buying a Handgun for Someone Else: Firearm Dealer Willingness to Sell." *Injury Prevention* 9:147–150. doi:10.1136/ip.9.2.147.

Vernick, Jon S., Daniel W. Webster, and Maria T. Bulzacchelli. 2006. "Regulating Firearms Dealers in the United States: An Analysis of State Law and Opportunities for Improvement." *Journal of Law, Medicine & Ethics* 34: 765–775.

Vernick, Jon S., Daniel W. Webster, and Lisa M. Hepburn. 1999. "Effects of Maryland's Law Banning Saturday Night Special Handguns on Crime Guns." *Injury Prevention* 5: 259–263.

Vittes, Katherine A., Jon S. Vernick, and Daniel W. Webster. 2012. "Legal Status and Source of Offenders' Firearms in States with the Least Stringent Criteria for Gun Ownership." *Injury Prevention.* Published Online First: 23 June. doi:10.1136/injuryprev-2011-040290.

Webster, Daniel W., Jon S. Vernick, and Maria T. Bulzacchelli. 2009. "Effects of State-Level Firearm Seller Accountability Policies on Firearms Trafficking." *Journal of Urban Health* 86: 525–537.

Webster, Daniel W., Jon S. Vernick, and Lisa M. Hepburn. 2001. "The Relationship between Licensing, Registration and Other State Gun Sales Laws and the Source State of Crime Guns." *Injury Prevention* 7: 184–189.

Webster, Daniel W., Jon S. Vernick, and Lisa M. Hepburn. 2002. "Effects of Maryland's Law Banning Saturday Night Special Handguns on Homicides." *American Journal of Epidemiology* 155: 406–412.

Wintemute, Garen J. 1994. *Ring of Fire: The Handgun Makers of Southern California*. Sacramento, CA: Violence Prevention Research Program.

Wintemute, Garen J. 2007. "Guns Shows across a Multistate American Gun Market: Observational Evidence of the Effects of Regulatory Policies." *Injury Prevention* 13: 150–155. Erratum in: *Injury Prevention* 13: 286.

Wright, Mona A., Garen J. Wintemute, and Daniel W. Webster. 2010. "Factors Affecting a Recently Purchased Handgun's Risk for Use in Crime under Circumstances That Suggest Gun Trafficking." *Journal of Urban Health* 87: 352–364.

Journal of Urban Health: Bulletin of the New York Academy of Medicine, Vol. 87, No. 3
doi:10.1007/s11524-010-9437-5
© 2010 The Author(s). This article is published with open access at Springerlink.com

# Factors Affecting a Recently Purchased Handgun's Risk for Use in Crime under Circumstances That Suggest Gun Trafficking

Mona A. Wright, Garen J. Wintemute, and Daniel W. Webster

**ABSTRACT**  *While many handguns are used in crime each year in the USA, most are not. We conducted this study to identify factors present at the time of a handgun's most recent retail sale that were associated with its subsequent use in crime under circumstances suggesting that the handgun had been trafficked—purchased with the intent of diverting it to criminal use. Handguns acquired in multiple-gun purchases were of particular interest. Using data for 180,321 handguns purchased from federally licensed retailers in California in 1996, we studied attributes of the handguns, the retailers selling them, the purchasers, and the sales transactions. Our outcome measure was a handgun's recovery by a police agency, followed by a gun ownership trace, conducted by the Bureau of Alcohol, Tobacco, Firearms and Explosives, that determined (a) that the recovery had occurred within 3 years of the handgun's most recent purchase from a licensed retailer and (b) that the person who possessed the gun when it was recovered by police was not its most recent purchaser. Altogether, 722 handguns were recovered and had trace results that met the additional criteria. Handguns acquired in multiple-gun, same-day transactions were more likely to be traced than were single-purchase handguns (odds ratio [OR] 1.33, 95% confidence intervals [CI] 1.08 to 1.63). This was not the case for multiple-purchase handguns defined more broadly as multiple handguns purchased by one individual over any 30-day period as used in "one-gun-a-month" laws. Bivariate regressions indicated increased risk of a handgun being traced when it sold new for $150 or less (OR 4.28, 95% CI 3.59 to 5.11) or had been purchased by a woman (OR 2.02, 95% CI 1.62 to 2.52). Handguns sold by retailers who also had a relatively high proportion (≥2%) of purchases denied because the prospective purchasers were prohibited from owning firearms were more likely to be traced than were those sold by other retailers (OR 4.09, 95% CI 3.39 to 4.94). These findings persisted in multivariate analyses. Our findings suggest specific strategies for intervention to prevent gun violence.*

**KEYWORDS**  *Crime, Violence, Firearms*

## INTRODUCTION

Approximately 280 million firearms are now in civilian hands in the USA.[1] Most firearms are not used in crime. Yet an estimated 315,000 violent crimes

Wright and Wintemute are with the UC Davis Medical Center, Sacramento, CA, USA; Webster is with the Johns Hopkins Bloomberg School of Public Health, Baltimore, MD, USA.

Correspondence: Mona A. Wright, MPH, UC Davis Medical Center, Sacramento, CA, USA. (E-mail: mawright@ucdavis.edu)

APPENDIX 000263

involving guns, including 10,886 homicides, were committed in the USA in 2008.[2,3]

Few large-scale studies have been done of potential risk factors for firearms being used in crime. One risk factor is well known; handguns are overrepresented among crime guns, particularly in urban areas. Previous studies further suggest that specific gun type, cost, and concealability are associated with a handgun's risk of involvement in crime, as are purchaser age and sex, and several attributes of the licensed retailer who sells the handgun.[4–7]

Interventions to prevent gun violence by reducing the supply of guns to dangerous people often focus on *gun trafficking*, the rapid and intentional diversion of guns from legal to illegal commerce. The median interval between a gun's retail sale and its recovery in crime in the USA is 5.7 years, but trafficked guns are often used in crime within a few years of purchase, by someone other than the original retail purchaser.[4,8–10] Several lines of evidence suggest that guns used in crime are often bought in multiple-gun transactions,[6,8–10] but the evidence is mixed.[5] A Maryland study found that these multiple-sale handguns were at increased risk of recovery by law enforcement agencies in that state for the first 2 years following purchase, but not thereafter.[6] This increase in risk persisted for at least 5 years for handguns sold in Maryland but recovered by police in nearby Washington, DC, which had banned the purchase of handguns.

Using detailed data for handguns sold in 1996 by federally licensed retailers in California, we examine attributes of the handguns, retailers, purchasers, and sales transactions to identify those that affect the likelihood a handgun will be recovered by a law enforcement agency and subjected to gun ownership tracing by the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). These traces, done at the request of law enforcement agencies, are a widely used surrogate measure for a gun's use in crime.[5,6,10,11] To focus the results on handguns that may have been trafficked, we specify further that the trace must have occurred within 3 years of the handgun's most recent retail sale and that, at the time of its recovery by a law enforcement agency, the handgun must have been in the possession of someone other than the person identified by the trace as the gun's buyer in 1996.

Our objective is to identify risk factors for use in crime among handguns sold by federally licensed firearms dealers that are amenable to law enforcement or public policy interventions. Given the prior evidence, we were particularly interested in handguns acquired in multiple-gun purchases. We apply two definitions of this term: (1) multiple-gun, same-day transactions and (2) purchases of multiple handguns, one at a time, by the same individual in transactions spread over up to 30 days—a definition used in "one-gun-a-month" laws. Simultaneously, we determine the importance in this large population of risk factors identified in previous studies.

## METHODS

### Datasets

Data on study handguns and their sellers, purchasers, and sales transactions were obtained from the Dealer's Record of Sale (DROS) file for 1996, provided by the California Department of Justice (CDOJ). Files for later years were used to identify any subsequent sales (see below). All gun tracing records for 1996 through 1999, regardless of the location of the requesting law enforcement agency, were made available by ATF. With few exceptions, guns for which traces are requested have

been recovered in a criminal context.[12] ATF attempts to reconstruct the chain of ownership of the gun from its manufacture to its first retail sale; records for completed traces include information on both the seller and buyer in that transaction.

## Forming the Study Population and Identifying Outcome Events

We identified all handguns sold in 1996 from the DROS file, using data from the most recent sale for guns that were sold more than once that year. We then searched DROS records for 1997–1999 to identify subsequent sales of handguns sold in 1996, using manufacturer, serial number, handgun type, and caliber as linking variables. Handguns resold during this follow-up period were omitted from analysis since attributes of the buyer, the transaction, and the retailer would change with the subsequent sale.

Handgun characteristics were then used to link sales records to tracing data. An exact replication of manufacturer, serial number, handgun type, and caliber constituted a successful match. If the handgun matched on manufacturer, serial number, and either caliber or type (but not both), a manual comparison of the records was done, using additional handgun information such as model and barrel length, to determine whether a true match existed.

Our outcome measure was a handgun's recovery by a police agency, followed by a gun ownership trace, conducted by the Bureau of Alcohol, Tobacco, Firearms and Explosives, that determined (a) that the recovery had occurred within 3 years of the handgun's most recent purchase from a licensed retailer and (b) that the person who possessed the handgun when it was recovered by police was not its most recent purchaser. We omitted from analysis those handguns that were not recovered by law enforcement but had been purchased by an individual who had bought at least one traced handgun due to the increased likelihood that an untraced gun purchased by such an individual may also have been used in crime but not recovered by police.

## Explanatory Variables

In accordance with the law in several states, we defined a multiple purchase as the purchase of more than one handgun from one or more licensed retailers by an individual within any 30-day period. We identified each handgun as being purchased singly or as part of a multiple sale by linking DROS records using the buyer's last name, first four letters of the first name, date of birth, date of sale, and a unique weapon number assigned by CDOJ. Among multiple-purchase handguns, we identified the subset bought in same-day, multiple-gun transactions. Over the course of 1996, an individual buyer could have bought guns in both single and multiple purchases.

We grouped handguns by type as semi-automatic pistols, revolvers, or derringers and single-shot guns, and categorized caliber as small (.22, .25, .32), medium (.38, .380, 9 mm), or large (.357, .40, .44, .45, .50, 10 mm). Barrel length was defined as short (≤3 in.) or long (>3 in.). We classified handguns as inexpensive if their retail price as a new gun was ≤$150, based on manufacturer. There were eight gun manufacturers that sold only handguns with retail prices of $150 or less in 1996 (Bryco Arms, Davis Industries, Hi-Point Firearms, Jennings Firearms, Lorcin Engineering, Phoenix Arms, Raven Arms, and Sundance Industries). All handguns from these manufacturers were classified as inexpensive. To our knowledge, no other major manufacturers produced handguns in this price range.

Retailer type—dealer, pawnbroker, or importer/manufacturer—was obtained from the DROS data. Retailers were categorized by their total number of handgun

sales during 1996 (1–249, 250–999, ≥1,000) and the percentage of purchase applications that were denied because the prospective purchasers were prohibited from possessing firearms (<1%, 1% to <2%, ≥2%).[5,13] The highest category for the percentage of handgun purchase applications denied is higher than the national average.[14] Most denials stem from previous criminal convictions,[15–17] and a high denial percentage might therefore reflect a clientele at increased risk for committing crimes.[3,8,13] Finally, retailers were grouped according to their proximity to a Youth Crime Gun Initiative (YCGI) city (within 25 mi or farther away). YCGI is an ATF initiative to comprehensively trace all crime guns; participating cities agree to trace all guns recovered from criminal suspects and crime scenes.[4]

Handgun purchaser attributes included gender; age; and an occupation, such as law enforcement officer or firearms instructor, which exempted the purchaser from completing a California Basic Firearms Safety Course. (Proof of completion was otherwise mandatory.)

We hypothesized that gun traffickers who sell many guns illegally might be inclined to purchase multiple handguns of the same make, model, and caliber. To capture the number of handguns purchased in 1996 and purchases of essentially identical types of handguns by individual purchasers, we created a variable to describe the number and uniformity of the handguns bought. All handguns purchased by a single individual were compared on manufacturer, handgun type, and caliber classification. Guns had to match on all three variables to be considered alike. We then determined if all, some, or none of each individual's purchased handguns were alike, and all handguns purchased by that individual were assigned to that category.

### Statistical Analysis

We performed separate analyses for all handguns (single- and multiple-purchase) and for multiple-purchase handguns only. Unadjusted odds ratios and their 95% confidence intervals were calculated for each explanatory variable. We then performed a sequence of logistic regression models, adding groups of variables in stages to those already in the model to estimate adjusted odds ratios for a handgun being recovered and traced. The first stage included only the purchase timing variable (single purchase, same-day multiple purchase, or 30-day multiple purchase) and handgun attribute variables. The second stage added retailer variables, and the third stage added purchaser variables. All analysis was done using PC SAS version 8.[18]

This study was approved by the Institutional Review Board of the University of California, Davis.

### RESULTS

The DROS file identified 209,485 handgun sales in California in 1996 by licensed retailers (Figure 1). After exclusions (see figure legend), data for 180,321 handguns (86.1% of all handguns sold in 1996) were available for analysis. Of these handguns, 135,192 (75.0%) were bought singly and 45,129 (25.0%) were part of multiple-handgun purchases. Of the multiple-purchase handguns, nearly half (45.7%) were part of same-day purchases. Among all guns, 722 (0.4%) were traced by ATF following recovery of the gun by the police from someone other than the retail purchaser within three years of the purchase.



**FIGURE 1.** Study subject flow chart. Prior to assigning purchase timing (single or multiple), we excluded sale records that were not for handguns, that were duplicate or invalid entries, or were missing key variables. Following purchase timing assignment, we excluded sales to other retailers, earlier sales of guns sold more than once in 1996, and all guns resold within 3 years after purchase. We identified 182,814 handguns; 136,185 (74.5%) acquired in single purchases and 46,629 (25.5%) in multiple purchases. Among the multiple purchase handguns, nearly half (21,686 guns, 46.5%) were bought on the same day with others. Among handguns not recovered by a law enforcement agency, we excluded those which had been purchased by a buyer who had also purchased a traced gun. We also excluded ATF traced handguns where the possessor of the weapon at the time of the trace was the purchaser of the gun. Our final sample was 180,321 handguns (86.1% of all handgun sales in 1996).

In a bivariate analysis for all handguns (Table 1), multiple-purchase handguns bought on the same day with others were more likely to be traced than were single-purchase handguns (odds ratio [OR] 1.33, 95% confidence interval [CI] 1.08 to 1.63). Conversely, handguns purchased by the same individual within 30 days of

**TABLE 1**  Tracing within 3 years of purchase, following recovery by law enforcement from a person other than the gun's purchaser, for handguns purchased legally in California in 1996

| Explanatory variable | Number (%) of guns | | OR[a] | 95% CI[b] | p value |
|---|---|---|---|---|---|
| | Traced N=722 | Not traced N=179,599 | | | |
| **Related to purchase** | | | | | |
| Timing | | | | | |
| Same-day multiple | 111 (0.5) | 20,492 (99.5) | 1.33 | 1.08–1.63 | <0.0001 |
| 30-day multiple | 62 (0.3) | 24,464 (99.8) | 0.62 | 0.48–0.81 | <0.0001 |
| Single purchase | 549 (0.4) | 134,643 (99.6) | 1.00 | (Referent) | – |
| **Related to handgun** | | | | | |
| Type | | | | | |
| Derringer and single shot | 47 (0.4) | 11,114 (99.6) | 1.36 | 0.98–1.88 | 0.3900 |
| Semi-automatic pistol | 511 (0.4) | 115,828 (99.6) | 1.42 | 1.19–1.69 | 0.0381 |
| Revolver | 164 (0.3) | 52,648 (99.7) | 1.00 | (Referent) | – |
| Caliber | | | | | |
| Small (.22, .25, .32) | 105 (0.3) | 32,741 (99.7) | 1.11 | 0.87–1.40 | 0.0587 |
| Medium (.38, .380, 9) | 421 (0.5) | 79,229 (99.5) | 1.83 | 1.55–2.17 | <0.0001 |
| Large (.357, .40, .44, .45, .50, 10) | 196 (0.3) | 67,593 (99.7) | 1.00 | (Referent) | – |
| Barrel length | | | | | |
| Short (≤3 in.) | 278 (0.6) | 49,515 (99.4) | 1.65 | 1.42–1.92 | <0.0001 |
| Long (>3 in.) | 439 (0.3) | 129,000 (99.7) | 1.00 | (Referent) | – |
| Price | | | | | |
| ≤$150 | 159 (1.4) | 11,115 (98.6) | 4.28 | 3.59–5.11 | <0.0001 |
| >$150 | 563 (0.3) | 168,484 (99.7) | 1.00 | (Referent) | – |
| **Related to retailer** | | | | | |
| License type | | | | | |
| Importer or manufacturer | 46 (0.7) | 6,227 (99.3) | 2.01 | 1.49–2.71 | 0.0152 |
| Pawnbroker | 80 (0.7) | 11,707 (99.3) | 1.86 | 1.47–2.35 | 0.0468 |
| Dealer | 595 (0.4) | 161,638 (99.6) | 1.00 | (Referent) | – |
| Within 25 mi of YCGI[c] city | | | | | |
| Yes | 500 (0.5) | 93,725 (99.5) | 2.06 | 1.76–2.42 | <0.0001 |
| No | 222 (0.3) | 85,874 (99.7) | 1.00 | (Referent) | – |
| Number of gun sales in 1996 | | | | | |
| ≥1,000 | 302 (0.5) | 59,241 (99.5) | 1.86 | 1.54–2.26 | <0.0001 |
| 250–999 | 263 (0.4) | 63,000 (99.6) | 1.53 | 1.25–1.86 | 0.1597 |
| 1–249 | 157 (0.3) | 57,358 (99.7) | 1.00 | (Referent) | – |
| Denials, % of sales+denials | | | | | |
| ≥2% | 167 (1.1) | 15,556 (98.9) | 4.09 | 3.39–4.94 | <0.0001 |
| 1 to <2% | 244 (0.5) | 45,625 (99.5) | 2.04 | 1.72–2.41 | 0.9295 |
| <1% | 311 (0.3) | 118,418 (99.7) | 1.00 | (Referent) | – |
| **Related to purchaser** | | | | | |
| Gender | | | | | |
| Female | 89 (0.8) | 11,698 (99.2) | 2.02 | 1.62–2.52 | <0.0001 |
| Male | 633 (0.4) | 167,844 (99.6) | 1.00 | (Referent) | |
| Age, years | | | | | |
| 21–24 | 186 (1.0) | 18,136 (99.0) | 4.86 | 3.97–5.95 | <0.0001 |
| 25–29 | 140 (0.6) | 23,429 (99.4) | 2.83 | 2.28–3.52 | 0.0043 |
| 30–39 | 202 (0.4) | 46,035 (99.6) | 2.08 | 1.71–2.53 | 0.0889 |
| 40+ | 194 (0.2) | 91,969 (99.8) | 1.00 | (Referent) | – |
| Safety course exemption | | | | | |
| Law enforcement | 36 (0.2) | 17,632 (99.8) | 0.49 | 0.35–0.69 | <0.0001 |

**TABLE 1**   *(Continued)*

| | Number (%) of guns | | | | |
| | Traced | Not traced | | | |
| Explanatory variable | $N = 722$ | $N = 179,599$ | OR[a] | 95% CI[b] | *p* value |
| --- | --- | --- | --- | --- | --- |
| Professional | 55 (0.5) | 10,656 (99.5) | 1.24 | 0.94–1.63 | 0.0004 |
| None | 631 (0.4) | 151,311 (99.6) | 1.00 | (Referent) | – |
| Number and uniformity of all handguns purchased in 1996 | | | | | |
| >1 handgun: all alike | 42 (0.7) | 6,152 (99.3) | 1.58 | 1.15–2.18 | 0.0002 |
| >1 handgun: some alike | 41 (0.4) | 11,652 (99.7) | 0.82 | 0.60–1.13 | 0.1072 |
| >1 handgun: none alike | 196 (0.3) | 59,014 (99.7) | 0.77 | 0.65–0.91 | 0.0008 |
| Purchased only 1 handgun | 443 (0.4) | 102,779 (99.6) | 1.00 | (Referent) | – |

Missing data—handgun type: 9 not traced; caliber: 36 not traced; barrel length: 5 traced, 1,084 not traced; retailer license type: 1 traced, 27 not traced; gender: 57 not traced; age: 30 not traced; number and uniformity of guns purchased: 2 not traced

[a]Odds ratio
[b]Confidence interval
[c]Youth Crime Gun Initiative

another handgun purchase, but not on the same day, were less likely to be traced (OR = 0.62, 95% CI 0.48 to 0.81). Pistols, handguns of medium caliber, and those with short barrels were more likely than other handguns to be traced. Handguns selling new for $150 or less were four times as likely to be traced as were more expensive handguns (OR 4.28, 95% CI 3.59 to 5.11).

Handguns sold by a pawnbroker or importer/manufacturer were twice as likely to be traced as handguns sold by gun dealers. Handguns sold by retailers with denial percentages of 2% or greater were four times as likely to be traced as were handguns sold by retailers with denial percentages of 1% or less (OR 4.09, 95% CI 3.39 to 4.94). Handguns sold by dealers with high sales volume and handguns sold by dealers in close proximity to a city that participated in the YCGI gun tracing program had higher risk of being traced than other handguns. Handguns purchased by females were twice as likely to be traced as were those purchased by males (OR 2.02, 95% CI 1.62 to 2.52), and risk that a handgun would be traced decreased as the age of the purchaser increased. Handguns purchased by individuals who bought more than one gun during the year, and whose purchased handguns were all alike, were more likely to be traced than were handguns purchased by single-gun purchasers (OR 1.58, 95% CI 1.15 to 2.18).

A sequence of logistic regression models for all handguns, with related variables added in stages, is shown in Table 2. Across all models, a handgun's having been purchased on the same day with others, a low selling price, the retailer variables mentioned above, the gender and age of the buyer, and uniformity among all handguns purchased by the buyer were associated with an increase in risk for being traced. We tested for interactions between purchase timing and selected variables (price, gender, number and uniformity of purchases, denial percentage of retailer, number of retailer gun sales); none were identified.

Findings for multiple-purchase handguns only were similar (results not shown; available on request). Handguns that were part of same-day multiple purchases were twice as likely to be traced as were those from purchases spread over 30 days (OR 2.1, 95% CI 1.57 to 2.92).

**TABLE 2  Multivariate regression results for all handguns**

| Variable | Handgun variables | | | Handgun and retailer variables | | | Handgun, retailer, and purchaser variables | | |
|---|---|---|---|---|---|---|---|---|---|
| | OR[a] | 95% CI[b] | p value | OR | 95% CI | p value | OR | 95% CI | p value |
| **Related to purchase** | | | | | | | | | |
| Timing | | | | | | | | | |
| Same-day multiple | 1.29 | 1.03–1.56 | 0.0247 | 1.22 | 0.99–1.50 | 0.0587 | 1.29 | 0.97–1.71 | 0.0840 |
| 30-day multiple | 0.70 | 0.54–0.91 | 0.0076 | 0.72 | 0.55–0.93 | 0.0125 | 0.83 | 0.61–1.15 | 0.2610 |
| Single purchase | 1.00 | (Referent) | | 1.00 | (Referent) | | 1.00 | (Referent) | |
| **Related to handgun** | | | | | | | | | |
| Type | | | | | | | | | |
| Derringer and single shot | 0.87 | 0.62–1.22 | 0.4106 | 0.92 | 0.65–1.29 | 0.6174 | 0.87 | 0.62–1.23 | 0.4238 |
| Semi-automatic pistol | 1.11 | 0.91–1.35 | 0.3097 | 1.08 | 0.88–1.31 | 0.4728 | 0.95 | 0.78–1.16 | 0.6162 |
| Revolver | 1.00 | (Referent) | | 1.00 | (Referent) | | 1.00 | (Referent) | |
| Caliber | | | | | | | | | |
| Small | 0.59 | 0.45–0.77 | 0.0001 | 0.56 | 0.43–0.74 | <0.0001 | 0.62 | 0.47–0.82 | 0.0007 |
| Medium | 1.39 | 1.16–1.67 | 0.0005 | 1.28 | 1.06–1.54 | 0.0106 | 1.25 | 1.04–1.51 | 0.0187 |
| Large | 1.00 | (Referent) | | 1.00 | (Referent) | | 1.00 | (Referent) | |
| Barrel length | | | | | | | | | |
| ≤3 in. | 1.29 | 1.08–1.54 | 0.0048 | 1.25 | 1.05–1.49 | 0.0134 | 1.30 | 1.09–1.56 | 0.0042 |
| >3 in. | 1.00 | (Referent) | | 1.00 | (Referent) | | 1.00 | (Referent) | |
| Price | | | | | | | | | |
| ≤$150 | 4.25 | 3.44–5.26 | <0.0001 | 3.64 | 2.92–4.54 | <0.0001 | 3.12 | 2.50–3.90 | <0.0001 |
| >$150 | 1.00 | (Referent) | | 1.00 | (Referent) | | 1.00 | (Referent) | |
| **Related to retailer** | | | | | | | | | |
| License type | | | | | | | | | |
| Importer or manufacturer | | | | 1.99 | 1.46–2.71 | <0.0001 | 2.01 | 1.47–2.73 | <0.0001 |
| Pawnbroker | | | | 1.56 | 1.20–2.02 | 0.0009 | 1.49 | 1.14–1.93 | 0.0032 |
| Gun dealer | | | | 1.00 | (Referent) | | 1.00 | (Referent) | |
| Within 25 mi of YCGI[c] city | | | | | | | | | |
| Yes | | | | 1.70 | 1.43–2.03 | <0.0001 | 1.69 | 1.41–2.01 | <0.0001 |

| | OR[a] | CI[b] | p | OR[a] | CI[b] | p |
|---|---|---|---|---|---|---|
| No | 1.00 | (Referent) | | 1.00 | (Referent) | |
| **Number of gun sales in 1996** | | | | | | |
| 1,000+ | 1.79 | 1.43–2.24 | <0.0001 | 1.62 | 1.29–2.03 | <0.0001 |
| 250–999 | 1.69 | 1.37–2.08 | <0.0001 | 1.57 | 1.27–1.94 | <0.0001 |
| 1–249 | 1.00 | (Referent) | | 1.00 | (Referent) | |
| **Denials, % of sales + denials** | | | | | | |
| ≥2% | 3.05 | 2.48–3.76 | <0.0001 | 2.71 | 2.20–3.34 | <0.0001 |
| 1 to <2% | 1.59 | 1.34–1.89 | <0.0001 | 1.50 | 1.26–1.79 | <0.0001 |
| <1% | 1.00 | (Referent) | | 1.00 | (Referent) | |
| **Related to purchaser** | | | | | | |
| **Gender** | | | | | | |
| Female | | | | 1.50 | 1.19–1.90 | 0.0005 |
| Male | | | | 1.00 | (Referent) | |
| **Age, years** | | | | | | |
| 21–24 | | | | 4.01 | 3.25–4.94 | <0.0001 |
| 25–29 | | | | 2.49 | 1.99–3.11 | <0.0001 |
| 30–39 | | | | 1.92 | 1.57–2.35 | <0.0001 |
| 40+ | | | | 1.00 | (Referent) | |
| **Safety course exemption** | | | | | | |
| Law enforcement | | | | 0.53 | 0.38–0.76 | 0.0004 |
| Professional | | | | 1.32 | 1.00–1.74 | 0.0541 |
| None | | | | 1.00 | (Referent) | |
| **Number and uniformity of all handguns purchased in 1996** | | | | | | |
| >1 handgun: all like this gun | | | | 1.54 | 1.06–2.26 | 0.0250 |
| >1 handgun: some like this gun | | | | 1.03 | 0.69–1.52 | 0.8958 |
| >1 handgun: none like this gun | | | | 0.91 | 0.73–1.14 | 0.4104 |
| Purchased only 1 handgun | | | | 1.00 | (Referent) | |

Groups of variables were added to the model in stages: (1) related to handgun; (2) related to retailer; (3) related to purchaser. Purchase timing was included throughout.
[a]Odds ratio
[b]Confidence interval
[c]Youth Crime Gun Initiative

The effect of applying several risk factors serially is shown in Figure 2. Only 0.4% of all handguns in the study were traced under the conditions that met our definition of an outcome event. Among the 1,783 handguns that were purchased on the same day as others, and from a retailer with an increased percentage of denials (Level 2 in Figure 2), 25 (1.4%) were recovered by police and traced to a purchaser different from the possessor—a risk ratio of 3.5.

## DISCUSSION

For handguns sold by licensed dealers in California in 1996, several specific factors predicted a greater likelihood that a handgun would be later recovered by police within three years of its sale and that the gun's purchaser and its possessor at the time of its recovery would not be the same person. Multiple-purchase handguns bought on the same day with others were at greater risk of being traced than were single-purchase handguns. This was not true for multiple purchase handguns bought over a period of up to 30 days. Gun traffickers may purchase several guns at once, on the same day, to maximize operational efficiency.



**FIGURE 2.**   Effect of applying several risk factors serially. *LEVEL 1* same-day multiple purchase; *LEVEL 2* same-day multiple purchase and retailer with denials ≥2% of all prospective purchases; *LEVEL 3* same-day multiple purchase, increased denials, and purchaser age <30; *LEVEL 4* same-day multiple purchase, increased denials, purchaser age <30, and price of gun ≤$150.

Handguns purchased by individuals who bought multiple similar guns were 58% more likely to be used in crime than were handguns purchased by individuals who purchased only one handgun in 1996. This is a substantial difference. A case from our data illustrates the point: One purchaser bought 100 handguns in three transactions (two same-day multiple purchases and one single purchase). All handguns were Lorcin 9 mm pistols, costing $150 or less when purchased new. Nine of these handguns were traced by ATF within three years following purchase; another 10 appeared in a separate California database of guns recovered and held as evidence.

Koper[6] identified an increase in risk of tracing for multiple-purchase handguns, irrespective of the timing of the multiple purchase, in the first two years following purchase. Our study considered additional factors relating to the retailer and the purchaser, and one year of sales data with a three-year follow-up. These variations may explain the differences between the two studies. Webster and colleagues have recently shown that one-gun-a-month statutes are not associated with less intrastate gun trafficking.[19] Studies in other jurisdictions would be useful in identifying subsets of multiple-purchase handgun transactions that are disproportionately associated with guns that are later used in crime.

Several of the factors we associated with handguns' risk for being traced have been identified previously. These include a low selling price,[20,21] a female purchaser,[5] a younger buyer,[4,5] and a high percentage of denied sales and sales volume for the retailer.[5,13]

Others of our findings have not previously been reported. Risk for being traced was nearly twice as great for handguns sold by retailers licensed as manufacturers and importers as for those sold by gun dealers. We conducted a post hoc analysis of trace completion rates by retailer type to investigate the possibility that some traced handguns were linked to these firms only because the retailer actually selling the gun had not been identified. Completion rates were the same for traces for all three categories of retailers. Some of those licensed as manufacturers or importers have been the subject of site visits conducted by one of the authors for another study,[13] and all of these were functioning as retail sellers. This remains a subject for further investigation.

Our findings are subject to several limitations. We used a handgun's appearance in ATF's trace records, a proxy for use in crime, as our measure of outcome. To help focus our findings on activities associated with gun trafficking, we defined outcome events restrictively as traces occurring within three years of purchase and involving purchasers and possessors who were different people. ATF estimates the median time from sales to trace is nearly twice as long,[4] and our results should not be generalized to the larger population of recovered crime guns. Studies of that larger population have yielded similar results, however.[3,10]

Handgun sales records did not include the selling price or distinguish new from used guns. Our classification of guns as to cost was necessarily based on their selling price as new guns. We were not able to identify handguns that were sold used at much less than their original price, resulting in misclassification of some inexpensive guns as expensive.

The handguns in this study were purchased nearly 13 years ago. However, recent tracing data are not available, and it is unlikely that gun markets have changed substantially since that time. Four states—California, Maryland, Virginia, and New Jersey—now restrict handgun purchases to no more than one within a 30-day period. The remaining states do not limit the number of guns that can be purchased at one time; our findings likely reflect the current situation in those states.

Legitimate gun collectors may also buy many guns over the course of a year, and California's handgun sales records do not differentiate these purchasers from others. Our uniformity variable was devised in part in the belief that collectors would be less likely than purchasers for gun trafficking operations to buy many essentially identical handguns at once, but this belief has never been empirically tested. The mixed results that we and Koper have obtained may be due in part to an inability to distinguish multiple purchases by legitimate collectors from other multiple purchases.

Our findings provide some specific directions for future intervention and research. Handguns that are bought on the same day with others, are inexpensive, are purchased by young people or women, are acquired in purchases that involve multiple identical guns, or are sold by retailers whose clienteles include a disproportionate number of persons with significant criminal histories appear to be more likely than others to be used in crime. Law enforcement agencies and policymakers may wish to take such patterns into account in designing future monitoring and intervention programs and violence prevention policies. For example, some local and state law enforcement agencies have units that combat illegal gun sales and rely upon the same type of data used in this study—archives of handgun sales records and ATF traces of crime guns. ATF requires licensed retailers to report the sale of multiple handguns to the same individual within five business days, and these reports are already used to develop leads for gun trafficking investigations. Our findings should help these units to consider which of the thousands of crime gun traces to follow up with an investigation of possible trafficking.

Our findings are relevant to potential legislative initiatives as well. A ban on the sale of low-quality (and therefore inexpensive), highly concealable handguns, for example, has been associated with a decrease in firearm homicides.[21] In addition, a large gun dealer's voluntary decision to discontinue sales of these low-quality handguns led to a dramatic reduction in the rate at which guns sold by that dealer were diverted to the criminal market.[22] Future research efforts should examine further the relationship between multiple-gun purchases, particularly guns bought on the same day, and risk for use in crime, and should seek data directly from persons involved in illegal gun commerce.

### ACKNOWLEDGEMENTS

This journal article was supported by grants from The California Wellness Foundation (#20000130, #2007-151), The Eli & Edythe L. Broad Foundation, The Joyce Foundation, The David and Lucille Packard Foundation (#99-8827, #2001-17381), and the Richard and Rhoda Goldman Fund.

**OPEN ACCESS**   This article is distributed under the terms of the Creative Commons Attribution Noncommercial License which permits any noncommercial use, distribution, and reproduction in any medium, provided the original author(s) and source are credited.

### REFERENCES

1. Hepburn LM, Miller M, Azrael D, Hemenway D. The US gun stock: results from the 2004 national firearms survey. *Inj Prev.* 2007;13:15-19.
2. Rand MR. *Criminal Victimization, 2008*. Washington DC: Bureau of Justice Statistics; 2009. NCJ 227777.

3. Crime in the United States 2008. Washington DC: Federal Bureau of Investigation; 2009. Available at http://www.fbi.gov/ucr/cius2008/index.html.

4. Bureau of Alcohol, Tobacco and Firearms. *Crime Gun Trace Reports (2000)—National Report*. Washington (DC): Bureau of Alcohol, Tobacco and Firearms; 2002.

5. Wintemute GJ, Cook PJ, Wright MA. Risk factors among handgun retailers for frequent and disproportionate sales of guns used in violent and firearm related crimes. *Inj Prev.* 2005;11:357-363.

6. Koper CS. Purchase of multiple firearms as a risk factor for criminal gun use: implications for gun policy and enforcement. *Criminol Public Policy.* 2005;4:749-778.

7. Bureau of Alcohol, Tobacco and Firearms. *Operation snapshot: an analysis of the retail regulated firearms industry*. Washington DC: Bureau of Alcohol, Tobacco and Firearms; 2000.

8. Bureau of Alcohol, Tobacco and Firearms. *Following the gun: enforcing federal laws against firearms traffickers*. Washington DC: Bureau of Alcohol, Tobacco and Firearms; 2000.

9. Braga AA, Cook PJ, Kennedy DM, Moore MH. The illegal supply of firearms. In: Tonry M, ed. *Crime and justice: a review of research*. Chicago, IL: The University of Chicago Press; 2002:319-352.

10. Pierce GL, Braga AA, Hyatt RRJ, Koper CS. Characteristics and dynamics of illegal firearms markets: implications for a supply-side enforcement strategy. *Justice Q.* 2004;21:391-422.

11. Webster DW, Bulzacchelli MT, Zeoli AM, Vernick JS. Effects of undercover police stings on gun dealers on the supply of new guns to criminals. *Inj Prev.* 2006;12:225-230.

12. Cook PJ, Braga AA. Comprehensive firearms tracing: strategic and investigative uses of new data on firearms markets. *Arizona Law Rev.* 2001;43:277-309.

13. Wintemute GJ. Disproportionate sales of crime guns among licensed handgun retailers in the United States: a case control study. *Inj Prev.* 2009;15:291-299.

14. Bureau of Justice Statistics. *Background Checks for Firearm Transfers, 2008—Statistical Tables*. Washington DC: Bureau of Justice Statistics; 2009. NCJ 227471.

15. Violence Prevention Research Program. *Handgun commerce in California, 2000*. Sacramento, CA: Violence Prevention Research Program; 2004.

16. Wright MA, Wintemute GJ, Claire BE. People and guns involved in denied and completed handgun purchases. *Inj Prev.* 2005;11:247-250.

17. Bowling M, Lauver G, Hickman M, Adams DB. *Background checks for firearm transfers, 2003*. Washington, DC: Bureau of Justice Statistics; 2004. NCJ 210117.

18. SAS Institute. *SAS system for Windows, version 9.1*. Cary, NC: SAS Institute; 2003.

19. Webster DW, Vernick JS, Bulzacchelli MT. Effects of state-level firearm seller accountability policies on firearm trafficking. *J Urban Health*. 2009;86:525-537.

20. Wintemute GJ. *Ring of fire: the handgun makers of Southern California*. Sacramento, CA: Violence Prevention Research Program; 1994.

21. Webster D, Vernick J, Hepburn L. Effects of Maryland's law banning "Saturday night special" handguns on homicides. *Am J Epidemiol.* 2002;55:406-412.

22. Webster DW, Vernick JS, Bulzacchelli MT. Effects of a gun dealer's change in sales practices of the supply of guns to criminals. *J Urban Health*. 2006;83:778-787.

# Brief Reports ▮

# Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms

Douglas S. Weil, ScD; Rebecca C. Knox, MPH, MSW

**Objective.**—To determine the effect of limiting handgun purchases to 1 per month on the illegal movement of firearms across state lines.

**Design.**—Data from the Bureau of Alcohol, Tobacco, and Firearms firearms trace database were obtained for traces requested for firearms recovered in connection with criminal investigations. The analysis incorporates data on date and location of purchase for 14 606 firearms purchased prior to (September 1989 through June 1993) and after (July 1993 through March 1995) enactment of a Virginia law limiting handgun purchases to 1 per month.

**Main Outcome Measures.**—Odds of tracing a firearm acquired prior to implementation of the law to Virginia vs another state in the Southeast compared with the odds for firearms acquired after the law took effect.

**Results.**—For firearms recovered anywhere in the United States, 3201 (27%) of 11 876 acquired prior to the implementation of the law and 519 (19%) of 2730 purchased after the law was enacted were traced to Virginia (odds ratio [OR], 0.64; 95% confidence interval [CI], 0.58-0.71). For traces initiated in the northeast corridor (New York, New Jersey, Connecticut, Rhode Island, and Massachusetts), 1103 (34.8%) of 3169 of the firearms acquired before the 1-gun-a-month law took effect and 142 (15.5%) of 919 firearms purchased after implementation were traced to Virginia (OR, 0.34; CI, 0.28-0.41).

**Conclusion.**—Gun control policies involving licensing, registration, and restricting the number of purchases represent efforts to limit the supply of guns available in the illegal market. This study provides evidence that restricting handgun purchases to 1 per month is an effective means of disrupting the illegal interstate transfer of firearms.

*(JAMA. 1996;275:1759-1761)*

IN JULY 1993, a Virginia law limiting handgun purchases by an individual to 1 gun in a 30-day period took effect.[1] Prior to the 1-gun-a-month law, individuals were able to purchase an unlimited number of handguns from licensed dealers. The law was passed in response to Virginia's growing reputation as a principal supplier of guns to the illegal market in the northeastern United States.[2] The Bureau of Alcohol, Tobacco, and Firearms (ATF) reported that 41% of a sample of guns seized in New York City in 1991 were traced to Virginia gun dealers.[3] Virginia also has been a primary out-of-state source of recovered crime guns traced in Washington, DC,[4] and Boston, Mass.[5]

Virginia is not the only out-of-state source of firearms illegally trafficked along the eastern seaboard. The ATF has identified the illegal movement of firearms from states in the Southeast to states

From the Center to Prevent Handgun Violence, Washington, DC.

Reprints: Douglas S. Weil, ScD, Center to Prevent Handgun Violence, 1225 I St NW, Suite 1100, Washington, DC 20005.

north along interstate highway I-95 (sometimes referred to as the "Iron Pipeline"[5]), as 1 of 3 principal gun-trafficking routes in the country (oral communication, Joe Vince, July 18, 1995). The ATF also reported that Virginia, Florida, and Georgia accounted for 65% of all successfully traced firearms used in crimes in New York City.[3] In a separate report, investigators found that 25% of successfully traced firearms recovered in Baltimore, Md, were originally purchased in the southeastern United States.[6]

Interstate gun trafficking occurs, in part, because of the disparity in state laws governing gun sales. As a result, the illegal market price of firearms in localities with restrictive gun laws is significantly greater than the retail price for the same types of guns purchased in states in which laws are less stringent.[7] The ability to buy many guns at a retail price to be sold elsewhere at a higher illegal market price suggests that the purchase of multiple firearms in a single transaction is an important aspect of the profit motive that supports the illegal gun mar-

ket. The objective behind passage of the 1-gun-a-month law in Virginia was to undermine the economic incentive created by the disparities in gun laws among the states. This study assesses the effect of Virginia's 1-gun-a-month law on gun-trafficking patterns across state lines.

## Methods

The data used in the analysis come from the firearms trace database compiled by ATF and were obtained by the Center to Prevent Handgun Violence through the Freedom of Information Act. Law enforcement agencies can request that ATF trace a gun that has been recovered in connection with a criminal investigation. The ATF staff at the National Tracing Center contact the manufacturer of the firearm to identify the wholesaler or retail dealer who received the gun. Staff at the National Tracing Center then contact each consecutive dealer who acquired the firearm until the gun is either traced to the most recent owner or until the gun can be traced no further. There is no requirement that records of gun transfers be maintained by nongun dealers who sell a firearm. Consequently, the tracing process often ends with the first retail sale of the gun.

As part of the tracing process, information is collected on several variables, including the location of the gun dealer or dealers who handled the gun (by state and region); when the gun was purchased; when and where the trace was initiated; and the manufacturer, model, and caliber of the firearm being traced. The firearms trace database contained records pertaining to approximately 295 000 firearms (September 1989 through March 1995). Since 1990, the number of traces conducted each year has more than doubled, and in 1994 was approximately 85 000.

The principal analysis was to estimate the odds ratio (OR) for tracing a firearm to any gun dealer in Virginia relative to gun dealers in the other southeastern states, for guns purchased prior to the effective date of Virginia's 1-gun-a-month law (September 1989 through June 1993) compared with guns purchased after the law was implemented (July 1993 through March 1995). The Southeast region was

Downloaded from jama.ama-assn.org at Johns Hopkins University on December 15, 2011
Interstate Transfer of Firearms—Weil & Knox   **1759**

APPENDIX 000276

Estimated Odds Ratios That a Firearm Purchased After Implementation of the Virginia 1-Gun-a-Month Law Would Be Traced to a Virginia Gun Dealer Relative to a Gun Dealer in Another Southeastern State Compared With Firearms Purchased Prior to the Law*

| Firearms Recovered In | Guns Traced to Dealer in | Guns Purchased Prior to Law, No. (%) | Guns Purchased After Law Implemented, No. (%) | Odds Ratio (95% Confidence Interval) |
|---|---|---|---|---|
| All states (n=14 606) | Virginia | 3201 (27.0) | 519 (19.0) | 0.64 (0.58-0.71) |
|  | Southeast | 8675 (73.0) | 2211 (81.0) |  |
| Northeast (n=4088) | Virginia | 1103 (34.8) | 142 (15.5) | 0.34 (0.28-0.41) |
|  | Southeast | 2066 (65.2) | 777 (84.5) |  |
| New Jersey (n=729) | Virginia | 154 (28.7) | 34 (17.7) | 0.53 (0.35-0.80) |
|  | Southeast | 537 (71.3) | 192 (82.3) |  |
| New York (n=2991) | Virginia | 888 (38.2) | 102 (15.3) | 0.29 (0.23-0.36) |
|  | Southeast | 2324 (61.8) | 567 (84.7) |  |
| Connecticut (n=53) | Virginia | 15 (34.1) | 3 (33.3) | 0.96 (0.21-4.39) |
|  | Southeast | 44 (65.9) | 9 (66.7) |  |
| Rhode Island (n=14) | Virginia | 1 (7.1) | NA | NA |
|  | Southeast | 14 (92.9) | NA |  |
| Massachusetts (n=301) | Virginia | 45 (18.0) | 3 (5.9) | 0.28 (0.08-0.94) |
|  | Southeast | 250 (82.0) | 51 (94.1) |  |

*Southeast includes the following states: North Carolina, South Carolina, Mississippi, Georgia, Florida, Tennessee, and Alabama. NA indicates not applicable. Period prior to law is September 1989 through June 1993; period after law is July 1993 through March 1995.

identified as the comparison group for Virginia because the region has long been identified as a principal source of out-of-state firearms for the eastern seaboard. As defined by ATF, the Southeast region includes Virginia, North Carolina, South Carolina, Georgia, Florida, Alabama, Mississippi, and Tennessee. The origin of a gun that had been transferred from a dealer in 1 state to a dealer in a second state was considered to be the last dealer's location.

The ATF no longer traces firearms manufactured prior to 1985 without being specifically requested to do so. Results are reported in this analysis only for guns purchased since January 1985. However, the results of a sensitivity analysis incorporating data for all firearms for which date of purchase information were available were essentially unchanged from the principal analysis. In another sensitivity analysis conducted excluding guns purchased more than 1 full year after the Virginia law took effect to rule out the influence of seasonal variation, the results were not significantly different from those of the principal analysis.

Date of purchase information was not available for all guns in the firearms trace dataset. Of the 9217 traced firearms acquired in the Southeast region and recovered in the Northeast, the date of purchase was known in 4088 cases (42%). A proxy variable for the date of purchase (the date the trace was initiated) was created so that the analysis could be replicated using the firearms for which the date of purchase was unknown under the assumption that all guns traced prior to implementation of the law would have been purchased before the law took effect, and that guns traced after the law was implemented could have been ac-

quired before or after implementation. The results of this analysis also were consistent with the principal results of the study.

Odds ratios were estimated for firearm traces initiated (1) anywhere in the United States; (2) in the northeast corridor (New Jersey, New York, Connecticut, Rhode Island, and Massachusetts); and (3) for each of these Northeast states individually. For each estimate, the hypothesis being tested remained the same: the odds of a gun purchased after enactment of Virginia's 1-gun-a-month law being traced to any Virginia gun dealer relative to a gun dealer in another part of the Southeast were significantly lower than for guns purchased prior to enactment of the law.

## Results

The date a gun was purchased and the date the trace request was made were available for 55 856 (19%) of the guns in the ATF database. Of these guns, 17 082 (30.6%) were traced to dealers located in the Southeast region; 14 606 guns were acquired after 1989.

A total of 3201 (27%) of 11 876 guns purchased prior to passage of the 1-gun-a-month law, which were traced to gun dealers in the Southeast, were acquired from Virginia gun dealers. A total of 519 (19%) of 2730 guns purchased after the law went into effect and similarly traced to dealers in the Southeast were acquired in Virginia. The likelihood that a traced gun recovered anywhere in the nation was acquired in Virginia relative to another southeastern state, for firearms purchased after the 1-gun-a-month law took effect compared with guns purchased prior to enactment of the law, was reduced 36% (OR, 0.64; 95% confidence interval [CI], 0.58-0.71) (Table).

The magnitude of the association between when and where a gun was acquired was greater when the analysis focused on gun traces initiated in the northeast corridor (New Jersey, Connecticut, Rhode Island, or Massachusetts). For gun traces originating in the Northeast, the likelihood that a gun would be traced to Virginia relative to gun dealers elsewhere in the Southeast for guns purchased after the 1-gun-a-month law took effect when compared with guns purchased prior to the law's effective date was reduced 66% (OR, 0.34; 95% CI, 0.28-0.41).

Associations were apparent for gun traces initiated in individual states. For instance, among the guns from the Southeast recovered in New York, 888 (38%) of 3212 guns purchased prior to implementation of the Virginia law were traced to Virginia gun dealers compared with 102 (15%) of 869 guns from the Southeast purchased after the law took effect (OR, 0.29; 95% CI, 0.23-0.36).

## Comment

There is little published research on the effectiveness of gun laws. Most studies have focused on the association between gun laws and rates of injury or violence. With little dissent,[8] these studies are generally supportive of the thesis that well-tailored gun laws can have a beneficial impact on gun violence, whereas laws that increase access to firearms may have the opposite effect.[9-12] For example, restrictive licensing of handguns in Washington, DC, was associated with a "prompt decline in homicides and suicides by firearms in the District of Columbia."[13] Conversely, in a study of 5 large urban areas, easing restrictions on carrying concealed weapons was associated with an increase in gun-related homicide and was not offset by a decrease in homicides committed by other means.[14]

In 1993, 1.1 million violent crimes were committed with handguns.[15] Approximately 30% to 43% of criminals identified the illegal market as the source of their last handgun.[16,17] The illegal market exists for several reasons: would-be criminals may be unable to buy handguns because prior criminal records disqualify them from legal purchases, the gun laws in their states prevent them from obtaining a handgun quickly and easily, and would-be criminals do not want to make legal purchases because the handgun eventually can be traced back to them.

Local and state legislative bodies have created a variety of weak and strong laws regulating handgun sales across the country. In some jurisdictions purchasers may need a permit to possess a handgun[18,19] or may be required to wait several days before the firearm transfer is authorized.[20]

Downloaded from jama.ama-assn.org at Johns Hopkins University on October 7, 2009 Implementation of Gun Laws/Firearms—Weil & Knox

In other jurisdictions, there are no restrictions on the sale of handguns beyond the few imposed by federal law. Consequently, jurisdictions with weaker gun retail laws may attract gun traffickers who buy handguns in these jurisdictions and transport their purchases illegally to areas with stronger regulation. The guns can then be sold illegally to ineligible buyers (eg, felons or minors) or to people who want guns that cannot be traced to them.

In an ATF study on gun trafficking in Southern California where a 15-day waiting period applies, 179 (30.5%) of 587 guns recovered in crimes in that region, which could be traced to a gun dealer, came from outside California.[21] Almost a third (58 [32.4%] of 179) of these out-of-state guns were sold initially by dealers in Nevada, Arizona, and Texas, states in which the most exacting rules concerning handgun sales are the minimum restrictions set forth in federal law.[21] The experience in New York City is similar. The ATF reports that 66% of a sample of all guns recovered in crime in New York City in 1991 and traced by ATF were originally obtained in Virginia, Florida, Ohio, and Texas, all of which have relatively weaker gun laws compared with New York City.[3]

The ability to purchase large numbers of firearms that have a street value that is much higher than their commercial price enables gun traffickers to make large profits and keep costs to a minimum. The ATF field division for Southern California recently reviewed more than 5700 instances of multiple gun sales. Almost 18% (1026 [17.9%] of 5743) of these multiple sales involved individual purchases of 3 or more guns.[21(pp16-17)] Theoretically, prohibiting multiple purchase transactions should be an effective policy means to disrupt established gun-trafficking patterns while ultimately reducing the supply of firearms in the illegal market.

The results of our study provide evidence that restricting purchases of handguns to 1 per month is an effective way to disrupt the illegal movement of guns across state lines. The analysis of the firearms trace database shows a strong, consistent pattern in which guns originally obtained in the Southeast are significantly less likely to be recovered as part of a criminal investigation and traced to Virginia if they were purchased after the Virginia law went into effect.

While evidence generated from this study is consistent with the theory behind a prohibition on multiple gun sale transactions, a change in the laws governing gun purchases that makes more permissive the laws in the comparison states (eg, Florida or Georgia) after July 1993 could provide an alternative explanation for the findings. We surveyed state laws looking for changes in limits on multiple sales, gun bans, background checks and waiting periods required for the purchase of a gun, regulation of secondary sales, license to purchase requirements, and registration of sales. Laws governing private gun ownership in the southeastern region revealed no relevant changes, although Georgia adopted an instant check system and preempted local gun laws effective January 1996.

Our study has several limitations. First, additional research is needed to clarify what, if any, displacement effects were created by the Virginia law (eg, to what extent gun traffickers shift their activities to the next most attractive state for acquiring firearms). Second, with the ATF data we used, it was not possible to determine the effect of the Virginia law on gun violence rates. Third, all types of firearms are included in our analysis, even though the Virginia law only restricts the purchase of handguns. The prohibition on multiple handgun purchases could have an incidental effect on illegal trafficking of long guns (eg, rifles) as gun traffickers either stop or limit their operations in Virginia or shift from trafficking in handguns to long guns. If there is no incidental impact on trafficking of long guns, their inclusion in the analysis would bias the results toward the null hypothesis.

Fourth, because ATF does not trace all firearms recovered by law enforcement as part of a criminal investigation, firearms included in the firearms trace database may not be representative of all recovered guns. However, the origin and date of purchase of a gun (the 2 key variables in our study) are not known by the requesting agency until a trace is completed, making it unlikely that the sample of guns traced will differ significantly from the larger pool of recovered guns with respect to these 2 variables.

Finally, other unidentified factors associated with when and where a gun was acquired and the likelihood that a gun trace would be requested (eg, a decision to stop or start tracing 1 type of firearm that can only be acquired in Virginia) may have been present at the time the law took effect. Such factors could lead to results that are inappropriately attributed to implementation of the law. However, the observation of a consistent set of results in several different regions decreases the possibility that such an unidentified confounding factor is responsible for the outcome of our analysis.

## Conclusion

Most gun control policies currently advocated in the United States (eg, licensing, registration, and 1-gun-a-month) could be described as efforts to limit the supply of guns available in the illegal market. However, once such laws are enacted, it is important to demonstrate that they are effective. This study provides evidence that limiting the purchase of handguns to no more than 1 per month per person is an effective means of disrupting the illegal interstate transfer of firearms.

This work was supported in part by the Overbrook Foundation, New York, NY, and the Educational Foundation of America, Westport, Conn.

We thank David Hemenway, PhD, and Eric Rimm, ScD, of the Harvard School of Public Health for their assistance with the development of this article. We also thank Mark Polston, JD,Rick Bielke, Richard Aborn, JD, Dennis Henigan, JD, Bob Walker, JD, Diana Weil, ScM, and James Willmuth for their comments.

**References**

1. Va Code Ann. §18.2-308.2:2(Q) (Michie 1994).
2. Larson E. *Lethal Passage: How the Travels of a Single Handgun Expose the Roots of America's Gun Crisis.* New York, NY: Crown Publishers Inc; 1994:104.
3. Bureau of Alcohol, Tobacco, and Firearms, Project Lead. Memorandum to special agent in charge, NYPD: firearms/homicide statistics. June 16, 1992:1.
4. Edds M. The pipeline to the streets of New York. *Virginia-Pilot.* January 3, 1993:A9.
5. Montgomery B. Guns bought in Georgia arm northern criminals. *Atlanta Constitution.* October 11, 1993: A1, A4.
6. Bureau of Alcohol, Tobacco, and Firearms and the Baltimore Police Dept. *1994 Baltimore Trace Study.* Baltimore, Md: Bureau of Alcohol, Tobacco, and Firearms; 1994:Appendix X.
7. Freedman A. Fire power: behind the cheap guns flooding the cities is a California family. *Wall Street Journal.* February 23, 1992:A1, A6.
8. Centerwall BS. Homicide and the prevalence of handguns. *Am J Epidemiol.* 1991;134:1245-1260.
9. Sloan JH, Kellermann AL, Reay DT, et al. Handgun regulations, crime, assault, and homicide: a tale of two cities. *N Engl J Med.* 1988;319:1256-1262.
10. Sloan JH, Rivara FP, Reay DT, Ferris JA, Kellermann AL. Firearm regulations and rates of suicide. *N Engl J Med.* 1990;322:369-373.
11. Killias M. International correlations between gun ownership and rates of homicide and suicide. *Can Med Assoc J.* 1993;148:1721-1725.
12. Houser HB. Invited commentary: common wisdom and plain truth. *Am J Epidemiol.* 1991;134:1261-1263.
13. Loftin C, McDowall D, Wiersema B, Coffey MS. Effects of restrictive licensing of handguns on homicide and suicide in the District of Columbia. *N Engl J Med.* 1991;325:1615-1620.
14. McDowall D, Loftin C, Wiersema B. Easing concealed firearm laws: effects on homicide in three states. *J Criminal Law Criminol.* Fall 1996;86:193-206.
15. Zawitz M. *Firearms, Crime, and Criminal Justice: Guns Used in Crime: Bureau of Justice Statistics: Selected Findings.* Washington, DC: US Dept of Justice, Bureau of Justice Statistics; July 1995:1.
16. Sheley JF, Wright JD. *Gun Acquisition and Possession in Selected Juvenile Samples.* Washington, DC: National Institute of Justice and Office of Juvenile Justice and Delinquency Prevention; December 1993:6. Research in Brief.
17. Beck A, Gilliard P, Greenfeld L, et al. *Survey of State Prison Inmates, 1991.* Washington, DC: National Institute of Justice, Bureau of Justice Statistics; March 1993:19.
18. New York Penal Law. §265.01, 265.20(f)(3) (McKinney 1989).
19. New York City, NY Code. §10-131.
20. Cal Penal Code. §12071(b)(3)(A) (West 1992).
21. Bureau of Alcohol, Tobacco, and Firearms. *Sources of Crime Guns in Southern California.* Los Angeles, Calif: Bureau of Alcohol, Tobacco, and Firearms; April 1995:21-22.

APPENDIX 000278

Author's personal copy

Journal of Urban Health: Bulletin of the New York Academy of Medicine
doi:10.1007/s11524-012-9681-y
© 2012 The New York Academy of Medicine

# Interpreting the Empirical Evidence on Illegal Gun Market Dynamics

Anthony A. Braga, Garen J. Wintemute, Glenn L. Pierce,
Philip J. Cook, and Greg Ridgeway

**ABSTRACT** *Thousands of Americans are killed by gunfire each year, and hundreds of thousands more are injured or threatened with guns in robberies and assaults. The burden of gun violence in urban areas is particularly high. Critics suggest that the results of firearm trace data and gun trafficking investigation studies cannot be used to understand the illegal supply of guns to criminals and, therefore, that regulatory and enforcement efforts designed to disrupt illegal firearms markets are futile in addressing criminal access to firearms. In this paper, we present new data to address three key arguments used by skeptics to undermine research on illegal gun market dynamics. We find that criminals rely upon a diverse set of illegal diversion pathways to acquire guns, gun traffickers usually divert small numbers of guns, newer guns are diverted through close-to-retail diversions from legal firearms commerce, and that a diverse set of gun trafficking indicators are needed to identify and shut down gun trafficking pathways.*

**KEYWORDS** *Gun violence, Gun policy, Gun trafficking, Injury prevention*

Gun violence remains a serious problem in the USA, with some 10,226 gun homicide victims[1] and 326,090 victims[2] of nonfatal violent firearms crimes in 2009. Rates of murder, robbery, and aggravated assault are much higher in large cities than elsewhere.[1,2]

Much of this serious violence is generated by guns that end up in the wrong hands. Research suggests that only about one of every six firearms used in crime was obtained legally[3] and that most serious gun violence is committed by a relatively small number of very active criminals.[4–7] Clearly, the USA has a large problem with the illegal acquisition of guns by high-risk individuals who should not have access to them. One broad class of gun-control policy instruments are those designed to influence who has access to different kinds of firearms.[8] The intuitive notion here, which is backed by empirical evidence,[9,10] is that if we could find a way to keep guns out of the hands of "bad guys" without denying access to the "good guys," then gun crimes would fall without infringing on the legitimate uses of guns.

Braga is with the School of Criminal Justice, Rutgers University, Newark, NJ, USA; Braga is with the Program in Criminal Justice Policy and Management, Harvard University, Cambridge, MA, USA; Wintemute is with the Violence Prevention Research Program and Department of Emergency Medicine, University of California, Davis, CA, USA; Pierce is with the School of Criminology and Criminal Justice, Northeastern University, Boston, MA, USA; Cook is with the Sanford School of Public Policy, Duke University, Durham, NC, USA; Ridgeway is with the RAND Corporation, Santa Monica, CA, USA.

Correspondence: Anthony A. Braga, School of Criminal Justice, Rutgers University, Newark, NJ, USA.
(E-mail: anthony_braga@harvard.edu)

Published online: 06 June 2012

Author's personal copy

In maintaining legal firearms commerce for law-abiding citizens, there is the serious problem of preventing illegal transfers. That task is currently being done very poorly indeed. Loopholes in existing gun laws weaken accountability of licensed gun dealers and private sellers; this facilitates illegal transfers by scofflaw licensed gun dealers, generates difficulty in screening out ineligible buyers, and, most important, results in a vigorous and largely unregulated secondary market—gun sales by private individuals— in which used guns change hands.[8] Nonetheless, those who support "supply-side" measures directed at reducing access by those who are legally proscribed suggest that it is feasible to increase the transaction costs in illegal firearm markets and thereby reduce the prevalence of illegal gun possession by criminals.[11–14]

Much of the evidence in support of supply-side interventions comes from recent analyses of Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) firearm trace data and firearms trafficking investigations that indicate some percentage of the guns used in crime were recently diverted from legal firearms commerce.[4,13–21] Firearm tracing makes it possible, at least in principle, to determine the chain of commerce for a firearm from the point of import or manufacture to the first retail sale (and beyond, in states that maintain records of gun purchases).[22] Unfortunately, not all firearms can be traced and firearm trace data have some widely recognized limits.[11,23] The National Academies' Committee to Improve Research Information and Data on Firearms, however, suggests that the validity of conclusions drawn from firearm trace data research depends on the care taken in the application and analyses of these data.[23]

Among the main findings of these research studies are: (1) New guns are recovered disproportionately in crime;[11,13,16–18,22] (2) Some licensed firearm retailers are disproportionately frequent sources of crime guns; these retailers are linked to more guns traced by ATF than would be expected from their overall volume of gun sales;[24] (3) Under test conditions, significant proportions of licensed retailers and private party gun sellers will knowingly participate in illegal gun sales;[25,26] (4) On average, about one third of guns used in crime in any community are acquired in that community, another third come from elsewhere in the same state, and a third are brought from other states;[11,13,16–18,22] (5) There are longstanding interstate trafficking routes for crime guns, typically from states with weaker gun regulations to states with stronger ones. The best known of these is the "Iron Pipeline" from the Southeast to the Middle Atlantic and New England.[11,13,16–18,22]

Research studies based on analyses of firearm trace data and firearms trafficking investigations have been greeted with a healthy dose of skepticism. Gun rights groups, such as the National Rifle Association,[27,28] and certain academics, most notably Professor Gary Kleck of Florida State University,[29,30] suggest that firearm trace data cannot be properly used to understand the illegal supply of guns to criminals. These criticisms are then followed by arguments that regulatory and enforcement efforts designed to disrupt illegal firearms markets are futile in addressing criminal access to firearms. In this paper, we present new data to address three key arguments used by skeptics to undermine research on illegal gun market dynamics and associated approaches to limit the illicit acquisition of guns diverted from legal firearms commerce.

## THE SCALE OF GUN TRAFFICKING: BIG-TIME ORGANIZED GUN RUNNERS OR DIVERSE BLEND OF ILLEGAL DIVERSION PATHWAYS?

One strategy used to refute a proposition is to setup a "straw man" argument. To "attack a straw man" is to create the illusion of having refuted a proposition by

*Author's personal copy*

substituting a superficially similar proposition (the "straw man"), and refuting it, without ever having actually refuted the original position.[31] In a recent *UCLA Law Review* article, Kleck and Wang set forth the straw man argument that advocates of the proposition that criminals acquire guns through a variety of gun trafficking pathways assert a central role for high-volume gun traffickers, usually involving corrupt or negligent licensed dealers, in supplying guns to criminals.[30] Kleck and Wang define a large-scale trafficker as a person who sold 100 guns or more annually and then incorrectly characterize the picture presented by ATF and selected scholars of illegal gun markets as relatively organized markets with significant numbers of high-volume traffickers.[30]

The academic studies that Kleck and Wang used as reference do not argue, however, that organized high-volume gun traffickers dominate illegal transfers of guns to criminals. Rather, these studies highlight the importance of a flow of new guns to criminal consumers and implicate close-to-retail diversions from licensed dealers as generating a noteworthy minority of recovered crime guns.[4,11–13,15,19,20,32] ATF publications make the case that gun trafficking enterprises of many shape and sizes play an important role in supplying crime guns to criminals and do not claim that high-volume, organized gun runners are the modal form of illegal gun diversion in the USA.[16–18]

In fact, two ATF reviews of gun trafficking investigations explicitly contradict the organized big-time gun trafficking characterization. A 1999 report examining 314 ATF gun show trafficking investigations found that 41% of these cases involved the diversion of 10 or fewer firearms.[33] A 2000 report examining 1,530 gun trafficking investigations made by ATF between July 1, 1996 and December 31, 1998 found that 61% of the cases involved the diversion of 20 or fewer firearms and concluded that most but not all gun trafficking investigations involve relatively small number of firearms.[17]

When the existing data are considered, Kleck and Wang's definition of a large-scale trafficker as someone who has been caught illegally selling 100 or more firearms seems to be set artificially high to support their straw man argument. Guns are durable goods that can remain in the hands of criminals for many years. The illegal diversion of 20, 30, or 50 guns to criminals by one individual in 1 year generates a considerable public safety threat. Clearly, putting this individual out of business and shutting down this more modest pipeline of guns to criminals would increase public safety. It is also important to consider that the number of guns diverted in ATF gun trafficking investigation is based solely on diversions known to the case agent. A gun trafficker caught selling 10 guns to a violent street gang would not be classified as a large-scale gun trafficker under Kleck and Wang's definition. However, this gun trafficker may have been funneling hundreds of guns to street gangs for many years without being caught by ATF doing so. Kleck and Wang's use of this definition to make generalizations about the structure of illegal gun markets is highly problematic given the limits of ATF gun trafficking investigation data.

**New Data**

To shed additional insights on the nature of illegal gun market dynamics, we present new data on 2,608 ATF gun trafficking investigations made between January 1, 1999 and December 31, 2002. These data were collected by ATF as an update to their 2000 *Following the Gun* report on gun trafficking in the USA. Following the same methodology, a survey instrument was sent to each of ATF's 23 field divisions requesting information for each gun trafficking investigation made by special agents and the disposition of investigations referred by ATF for prosecution during the

Author's personal copy

study time period. Because these analyses are based on a survey of ATF special agents, they reflect what ATF encountered and investigated in trafficking investigations. As such, they do not necessarily reflect typical criminal diversions of firearms or the typical acquisition of firearms by criminals. A majority of these investigations were still ongoing at the time the survey was distributed; only 40.5% were fully adjudicated (1,056 of 2,608).

Table 1 presents the gun trafficking pathways identified by ATF agents in the 2,608 investigations. Many gun trafficking investigations involved close-to-retail diversions of guns from legal firearms commerce. A plurality (41.3%) of investigations involved straw purchasing from federally licensed dealers (Federal Firearms Licensees—FFLs), with firearms trafficked by straw purchasers either themselves or indirectly. The investigations also involved trafficking by unlicensed sellers (27.1%), by FFLs (6.3%), illegal diversions at gun shows (7.1%), and illegal diversions from flea markets and other secondary market sources (4.3%). When aggregated into one category, firearms stolen from FFLs, residences, and common carriers were involved in 22.5% of the trafficking investigations.

Though 117,138 firearms were involved altogether, most investigations involved relatively small numbers of guns (Table 2).The mean and median were 45.3 and eight guns per case, respectively; a majority involved 10 firearms or less. Large-scale trafficking was uncommon; roughly 5% of investigations involved more than 100 firearms. One investigation involved 30,000 firearms. Different trafficking pathways were associated with large differences in the numbers of guns linked to the investigations (Table 3). FFLs, including pawnbrokers, have access to a large volume of firearms, so a corrupt licensed dealer can illegally divert large numbers of firearms. FFL traffickers were involved in only 6% of investigations, but had by far the largest mean number of guns per case (348.7) and accounted for 47% of all guns linked to the investigations (55,088 of 117,138 firearms). If the investigation involving 30,000 diverted firearms is excluded as an outlier, the mean number of guns per case involving a corrupt FFL drops to only 159.8, this further suggests that large-scale trafficking is a rare event. With or without the investigation involving 30,000 diverted firearms, the median number of guns per FFL trafficker case was 50.

TABLE 1   Gun trafficking pathways identified in ATF investigations

| Source | Number | Percent |
|---|---|---|
| Firearms diverted by straw purchaser or straw purchasing ring | 1,078 | 41.3 |
| Firearms diverted by unregulated private sellers[a] | 708 | 27.1 |
| Prohibited persons lying and buying firearms | 364 | 14.0 |
| Diverting firearms stolen from residence or vehicle | 338 | 13.0 |
| Diverting firearms stolen from FFL | 239 | 9.2 |
| Diverting firearms at gun shows | 185 | 7.1 |
| Firearms diverted by licensed dealer, including pawnbroker | 163 | 6.3 |
| Diverting firearms at flea markets, auctions, or want ads and gun magazines | 112 | 4.3 |
| Diverting firearms stolen from common carrier | 28 | 1.1 |
| Diverting firearms over the Internet | 22 | 0.8 |
| Other | 5 | 0.2 |

$N = 2,608$

Sum exceeds 100% since investigations may be included in more than one category. Gun trafficking investigations can be very complex and involve a variety of sources of illegal guns

[a] As distinct from straw purchasers and other traffickers

*Author's personal copy*

INTERPRETING THE EMPIRICAL EVIDENCE ON ILLEGAL GUN MARKET DYNAMICS

**TABLE 2   Number of firearms involved in ATF trafficking investigations**

| Range | Number of investigations | Percent |
|---|---|---|
| <5 | 962 | 36.9 |
| 5–10 | 516 | 19.8 |
| 11–20 | 427 | 16.4 |
| 21–50 | 374 | 14.3 |
| 51–100 | 165 | 6.3 |
| 101–250 | 89 | 3.4 |
| 251 or greater | 54 | 2.1 |
| Unknown | 21 | 0.8 |

$N = 2,608$

## NEW CRIME GUNS: AN INDICATOR OF ILLEGAL GUN DIVERSION OR THEFT?

ATF and academic analyses of firearms trace data typically focus on a critical dimension of the illegal firearms market: the time between a firearm's first sale at retail and its subsequent recovery by a law enforcement agency, most often in connection with a crime ("time-to-crime"). Law enforcement investigators consider a traced firearm with short time-to-crime as possibly having been recently and illegally diverted from a retail outlet.[18] For investigative and tactical purposes, guns with quick time-to-crime offer law enforcement an opportunity to identify illegal gun transfers soon after they occur. Newer guns have also passed through fewer hands, making it much easier for law enforcement to investigate illegal gun trafficking and to mount prosecutions. Records are likely to be more complete and more available; individuals listed on paperwork are easier to find; guns are less likely to have been resold, given away, or stolen; and the chain of transfers to illicit consumers is likely to be shorter.[4]

**TABLE 3   Volume of firearms diverted, by trafficking pathway**

| Source | N (%) | N firearms | Mean | Median |
|---|---|---|---|---|
| Firearms diverted by straw purchaser or straw purchasing ring | 1,074 (41.5) | 38,032 | 35.4 | 12 |
| Firearms diverted by unregulated private sellers[a] | 697 (26.9) | 38,734 | 55.6 | 7 |
| Prohibited persons lying and buying firearms | 364 (14.1) | 8,192 | 22.5 | 3 |
| Diverting firearms stolen from residence or vehicle | 337 (13.0) | 7,758 | 23.0 | 5 |
| Diverting firearms stolen from FFL | 238 (9.2) | 6,694 | 28.1 | 16 |
| Diverting firearms at gun shows | 182 (7.0) | 30,471 | 167.4 | 72 |
| Firearms diverted by licensed dealer, including pawnbroker | 158 (6.1) | 55,088 | 348.7 | 50 |
| Diverting firearms at flea markets, auctions, or want ads and gun magazines | 110 (4.3) | 23,164 | 210.6 | 69 |
| Diverting firearms stolen from common carrier | 28 (1.1) | 994 | 35.5 | 14 |
| Diverting firearms over the Internet | 21 (0.8) | 6,335 | 301.7 | 50 |

N investigations = 2,587
N firearms included = 117,138
Sum exceeds 100% since the investigations may be included in more than one category. Table excludes 22 cases with an unknown number of diverted firearms
[a] As distinct from straw purchasers and other traffickers

Author's personal copy

Franklin Zimring first documented the disproportionate representation of new guns among those recovered by the police.[20] More recently, Kennedy, Piehl, and Braga analyzed comprehensive trace data for firearms recovered from Boston youth ages 21 and under between 1991 and 1995.[4] They documented that 26% of traced firearms were recovered in crime within 2 years of their first retail sale and none of these new guns were recovered in the possession of the first retail buyer.[4] Cook and Braga analyzed comprehensive trace data on handguns recovered in 32 US cities participating in ATF's YCGII program in 1999.[11] They found that 32% of traced handguns were recovered within 3 years of their first retail purchase and only 18% of these new guns were recovered in the possession of the first retail buyer. A California study of crime guns recovered from adolescents and young adults in 1999 emphasized the link between time to crime and policies regulating the purchase of firearms.[22] A time-to-crime of less than 3 years was observed for 17.3% of guns recovered from persons younger than 18 years, who cannot purchase guns themselves, but 34.6% of guns recovered from persons ages 21–24.

While survey research highlights the importance of theft and secondary market acquisitions in supplying adult criminals and juveniles with guns,[34–36] these studies also suggest a fairly substantial role, either direct or indirect, for retail outlet sales in supplying criminals with guns. About 27% of state prisoners in a US Bureau of Justice Statistics survey said they acquired their most recent handgun from a retail outlet.[36] Similarly, Wright and Rossi reported that 21% of male prisoners had acquired their most recent handgun from a licensed dealer.[35] Sheley and Wright found that 32% of juvenile inmates had asked someone, typically a friend or family member, to purchase a gun for them in a gun shop, pawnshop, or other retail outlet.[34] This purchasing arrangement, known as a "straw purchase," is likely to result in relatively short times-to-crime. All three survey studies also find that "street" and "black market" sources are important sources that may well include traffickers who are buying from retail outlets and selling on the street.[4,21] Regrettably, since surveys of criminals only ask about proximate sources of illegal firearms, these research studies are limited in establishing the role of gun trafficking in criminal acquisition of firearms as they do not ascertain how guns are diverted into these "street" and "black market" sources.[4,21]

Critics suggest that a short average time-to-crime among traced crime guns in a given area may serve more as an indirect indicator of property crime, especially burglary, in that area rather than of widespread firearms trafficking. Kleck and Wang, for instance, argue that many guns move quickly into criminal hands because they were stolen from their owners shortly after retail purchase.[30] Their basic thesis is that new crime guns are usually stolen because (1) criminals prefer new guns to older guns and (2) criminals who steal guns disproportionately retain newer guns for later personal use.

Unfortunately, there is little survey research evidence to support their overall thesis. Neither the Wright and Rossi survey of convicted felons[35] nor the Sheley and Wright survey of juvenile inmates and high school students[34] asked whether respondents preferred new guns. In those studies, convicted felons and juveniles report as some of the "very important" characteristics of desirable handguns that they be accurate, untraceable, well made, easy to shoot, concealable, easy to get (both the gun and ammunition), and have sufficient firepower.[34,35] Stolen guns that had these traits were more likely to be kept by criminals who stole them. These desirable traits are not linked to the age distinctions (such as a time-to-crime of 3 years or less) that most academic analyses of firearm trace make in characterizing a crime gun as new or old.[4,11,13,14]

Author's personal copy

There is some evidence that certain criminal consumers do have preferences for newer guns. In Boston, interviews with youthful probationers in the mid-1990s revealed that they preferred modern and stylish semiautomatic pistols that were "new in the box."[4] The preference for newer semiautomatic pistols that were still in the original packaging by the manufacturer arose from "street wisdom" that older, less expensive firearms may have a "body" on it, and they wished to avoid being caught and charged with crimes they did not personally commit.[4] Similarly, in Maryland, Webster et al. found that older teens had a strong preference for guns which were new due to their concerns about being linked through ballistics imaging to crimes that may have been committed with secondhand guns.[37] New pistols that are still in the original packaging are usually acquired through FFLs or directly from manufacturers rather than stolen from their owners' residences. To the extent that gun age may matter, desire for new guns in the manufacturers' original packaging would support the perspective that close-to-retail diversions are an important source of guns for certain young criminals.

Theft risk varies by source and type of firearm. Residential theft is the most frequent source of stolen guns for gun thieves, with between 500,000 and 600,000 guns stolen from residences each year.[32,38] This yearly estimate dwarfs the number of stolen guns reported in ATF investigations involving thefts from FFLs (6,694 guns) and common carriers (994 guns) over a 4-year period (Table 3). To understand the age distribution of stolen guns, therefore, it is important to examine the age distribution of privately held guns in gun-owning households.

The most detailed national survey on the private citizen gun stock is the National Survey of the Private Ownership of Firearms (NSPOF) conducted in 1994.[38] According to the NSPOF, the average firearm was acquired 13 years earlier and 22.4% were acquired within the past 2 years.[38] Only 64% of firearms acquired within the past 2 years were reported as new when the respondent first acquired it. This suggests that, if recovered in crime, 14.3% of firearms in private hands ($0.224 \times 0.64 \times 100$) would be traced by ATF and characterized as having a time-to-crime of 2 years or less. In contrast, analyses of ATF trace data for crime guns recovered in 32 US cities participating in the YCGII program in 1999 found that the median time-to-crime for all recovered crime guns was 5.7 years, and 25.9% of crime guns had a time-to-crime of 2 years or less.[39] If property crime, especially burglary, were the predominant generator of traced crime guns with short time-to-crime, the age distribution of the private gun stock would more closely match the age distribution of recovered crime guns.

Finally, there is a growing body of evaluation evidence that challenges Kleck and Wang's assertion that most short time-to-crime guns are obtained through theft by demonstrating a clear link between interventions focused on retail sales practices and subsequent reductions in new guns recovered in crime. In Detroit and Chicago, the number of guns recovered within a year of first retail sale from someone other than the original purchaser was sharply reduced after undercover police stings and lawsuits targeted scofflaw retail dealers.[40] In Boston, a gun market disruption strategy focused on the illegal diversion of new handguns from retail outlets in Massachusetts, southern states along Interstate 95, and elsewhere resulted in a significant reduction in the percentage of handguns recovered in crime by the Boston Police Department that were new.[14] In Milwaukee, the number of guns recovered within a year of first retail sale from someone other than the original purchaser dramatically decreased after voluntary changes in the sales practices of a gun dealer

Author's personal copy

that received negative publicity for leading the USA in selling the most guns recovered by police in crime.[41]

### New Data

Another way to examine the role of theft in supplying guns to criminals is to compare the age distribution of crime guns and the age distribution of legally owned firearms in the USA over a similar time period. If theft is the predominant source of crime guns, the age distribution of crime guns should follow the age distribution of legally owned firearms—the broader pool of guns at risk for theft. Thieves stealing firearms would not know the age of the firearms they were stealing; the selection of guns would resemble a random selection process with respect to the age of the stolen guns. Conversely, if close-to-retail illegal diversions of guns from licensed dealers contribute to the supply of guns to criminals, then the age distribution of crime guns should be disproportionately concentrated among newer guns relative to the age distribution of all legally owned firearms. The following new data are used to examine this proposition.

We compare the age distribution of 85,511 crime guns recovered by US law enforcement agencies and traced by ATF in 1999 to the production history of all firearms manufactured or imported for sale in the USA between 1979 and 1998. We selected 1999 because this was the first year that ATF traced all firearms to their first retail sale regardless of the length of time between the first retail sale and subsequent recovery in crime. ATF also maintains data on the number of firearms produced by US manufacturers, the number of firearms exported by US manufacturers, and the number of firearms imported by foreign manufacturers for a given calendar year.[42] (The data were collected through a National Institute of Justice grant to study illegal gun markets that was completed prior to the 2003 passage of the Tiahrt Amendment that greatly restricts the use of such data by non-law enforcement personnel.[43])

Table 4 presents annual aggregate handgun data for 1979–1998. Firearm manufacturers produced an average of 2,264,000 handguns each year and 45,275,000 handguns in total. Only 3.8% of these handguns were produced for sale in 1998. However, 17.3% of recovered crime guns in 1999 were first sold at retail in 1998. One-year-old handguns are overrepresented by a factor of nearly 4.6 times when the handgun production history age distribution and time-to-crime distribution are compared.

We fit a binomial regression model to the annual aggregate crime gun recovery data to assess the relationship between the year the gun was manufactured and the probability of it being recovered in crime. As Figure 1 shows, there is a sharp increase in the rate of recovery for guns manufactured after 1994. To allow the model to capture this, we allowed the coefficient on year to change in 1994. The model has the form:

$$\log P(\text{recovered}|\text{year}) = \beta_0 + \beta_1 \text{year} + \beta_2 \text{year} \times I(\text{year} 1994). \qquad (1)$$

For years prior to 1994, the value of $\exp(\beta_1) - 1$ gives the percent increase in the probability of a gun's recovery in crime relative to the prior year. After 1994, $\exp(\beta_1 + \beta_2) - 1$ gives the percent increase in the probability of a gun's recovery in crime relative to the prior year. Note that this is essentially a logistic regression model; however, we model the log probability rather than the log odds. Since the recovery probabilities are small, the log and the logit are nearly identical.

INTERPRETING THE EMPIRICAL EVIDENCE ON ILLEGAL GUN MARKET DYNAMICS

**TABLE 4   The age distribution of handguns produced for the US market, 1979–1998, and the time-to-crime age distribution of traced handguns recovered in crime**

| Year | Annual *N* handguns produced for US market | % Distribution of handguns produced | % Distribution of traced 1999 crime handguns first retail sale |
|------|------|------|------|
| 1979 | 2,171 | 4.80 | 1.54 |
| 1980 | 2,449 | 5.41 | 1.88 |
| 1981 | 2,591 | 5.72 | 1.92 |
| 1982 | 2,708 | 5.98 | 1.84 |
| 1983 | 2,219 | 4.90 | 1.80 |
| 1984 | 1,905 | 4.21 | 1.94 |
| 1985 | 1,684 | 3.72 | 1.97 |
| 1986 | 1,538 | 3.40 | 2.23 |
| 1987 | 1,842 | 4.07 | 2.60 |
| 1988 | 2,236 | 4.94 | 2.97 |
| 1989 | 2,353 | 5.20 | 3.60 |
| 1990 | 2,110 | 4.66 | 4.27 |
| 1991 | 1,941 | 4.29 | 5.29 |
| 1992 | 2,803 | 6.19 | 7.63 |
| 1993 | 3,881 | 8.57 | 9.01 |
| 1994 | 3,324 | 7.34 | 6.86 |
| 1995 | 2,199 | 4.86 | 7.30 |
| 1996 | 1,821 | 4.02 | 8.36 |
| 1997 | 1,773 | 3.92 | 9.70 |
| 1998 | 1,727 | 3.81 | 17.30 |

The annual number of handguns produced for US markets equals the total of the number of handguns produced by US manufacturers, minus the number of firearms exported by US manufacturers to foreign countries, plus the number of handguns imported to the US by foreign manufacturers for a given calendar year. While guns are durable goods, a small number of firearms are removed each year from the private stock of guns due to various forms of depreciation such as confiscation by law enforcement agencies and disposal by owners. Research suggests that some 200,000 guns are confiscated by law enforcement agencies each year and some 36,000 guns are thrown away by their owners each year.[12,34] We ran the same analyses presented here with various adjustments for depreciation; there were no substantive differences in the results of these analyses. These analyses are available upon request from the authors
   Numbers are reported in thousands

However, relative rates, which the model in (1) estimates, are generally easier to understand than relative odds. Under the hypothesis that the age of the gun is unrelated to its probability of being recovered, we would expect $\beta_1$ and $\beta_2$ to be 0.

Table 5 shows the parameter estimates. For guns manufactured prior to 1994, the newer guns are more likely to be recovered in crime with each additional year increasing the probability of recovery by 9%. The recovery rate accelerates after 1994; with each additional year, the recovery rate increases by 37%. The curve plotted in Figure 1 shows the model fits closely to the data. This analysis provides strong evidence that the newer guns are disproportionately recovered in crime relative to their prevalence among guns in circulation.

The age distributions of many specific types of crime guns are disproportionately concentrated among newer guns. Table 6 presents overrepresentation ratios for the basic firearm types (handguns, rifles, and shotguns) and for selected manufacturers featured in ATF trace reports as the makers of frequently recovered crime guns.[16,18]

Author's personal copy

BRAGA ET AL.



**FIGURE 1.** Guns recovered as a fraction of guns in circulation by year manufactured. *Points* computed from the raw data. The *horizontal line* is what we would expect if the recovered guns were a random sample from the guns in circulation. The *curve* is the fit from the binomial regression model.

Overall, firearms produced in 1998 were overrepresented by a factor of 3.7 times among recovered crime guns that were traced in 1999. Overrepresentation was greater for handguns (ratio of 4.6) than for rifles (2.2) or shotguns (2.8). Selected semiautomatic pistols generally had higher overrepresentation ratios than did revolvers. The highest overrepresentation ratio for guns included in the analysis (6.0) was seen for Bryco Arms pistols.

## SHOULD OBLITERATED SERIAL NUMBERS BE THE ONLY INDICATOR OF GUN TRAFFICKING?

ATF and gun trafficking researchers suggest that an obliterated serial number on a recovered crime gun is a very strong indicator of illegal gun trafficking.[4,11,14,18,39] Since defacing the serial numbers on a firearm is itself a crime, obliterated serial numbers establish that a criminal possessed the gun at some time and also constitute strong evidence that some past possessor wanted to obstruct tracing and prevent the firearm from being linked to a past transfer. Despite the obvious advantage in avoiding detection by law enforcement agencies, most gun traffickers do not obliterate the serial numbers on their guns. In the 2,608 ATF gun trafficking investigations described earlier, agents reported violations of Federal Law 18 USC § 922(k) barring possession of and commerce in firearms with obliterated serial

**TABLE 5**  Estimates of the average year-to-year percent increase in recovery rates

|  | Model parameter | Estimate (%) | 95% CI |
|---|---|---|---|
| Before 1994 | $\exp(\beta_1)-1$ | 9.3 | 9.0%, 9.5% |
| After 1994 | $\exp(\beta_1+\beta_2)-1$ | 37.1 | 36.3%, 37.9% |

Years of data=20
Null deviance=34,542.8, with $df$=19
Model deviance=1,345.9, with $df$=17

Author's personal copy

INTERPRETING THE EMPIRICAL EVIDENCE ON ILLEGAL GUN MARKET DYNAMICS

**TABLE 6   Overrepresentation ratios for selected firearm types and manufacturers**

| Firearm | % Distribution produced in 1998 | % Distribution 1999 crime guns first sold in 1998 | Overrepresentation ratio |
|---|---|---|---|
| Firearms, all manufacturers | 4.4 | 16.3 | 3.7 |
| Handguns, all manufacturers | 3.8 | 17.3 | 4.6 |
| Rifles, all manufacturers | 5.3 | 11.8 | 2.2 |
| Shotguns, all manufacturers | 4.5 | 12.7 | 2.8 |
| Selected revolvers | | | |
| Colt revolvers | 5.6 | 10.5 | 1.9 |
| Smith & Wesson revolvers | 1.9 | 6.4 | 3.4 |
| Sturm Ruger revolvers | 6.5 | 11.7 | 1.8 |
| Selected semiautomatic pistols | | | |
| Bryco pistols | 5.7 | 34.0 | 6.0 |
| Lorcin pistols | 7.1 | 25.3 | 3.6 |
| Smith & Wesson pistols | 4.7 | 19.9 | 4.2 |
| Sturm Ruger pistols | 6.7 | 23.6 | 3.5 |

All figures are rounded to the first decimal place. Over-representation ratios were calculated by dividing the percentage of a particular gun produced for sale in 1998 into the percentage of 1999 traced crime guns of that type that were first sold at retail in 1998

numbers in only 7.8% ($N=203$) of cases. This proportion varied little by the specific trafficking channel involved, except for cases involving trafficking over the Internet (18.2%; Table 7).

The small proportion of obliterated serial numbers may reflect the presence of lax gun laws and weak penalties for making illegal gun sales as well as low risks of detection, arrest, and prosecution for gun trafficking across many jurisdictions in the USA. In these low-risk environments, the obliteration of serial numbers to conceal illegal purchases of firearms may not be necessary. As such, it may not be surprising

**TABLE 7   Firearms diversion channels identified in ATF investigations by reported violations of Federal Law 18 USC § 922(k) barring possession and commerce of firearms with obliterated serial numbers**

| Source | 922(k) violation N reported | % of Channel N |
|---|---|---|
| Firearms diverted by straw purchaser or straw purchasing ring | 45 | 4.2% of 1,078 |
| Firearms diverted by unregulated private sellers[a] | 66 | 9.3% of 708 |
| Prohibited persons lying and buying firearms | 15 | 4.1% of 364 |
| Diverting firearms stolen from residence or vehicle | 10 | 2.9% of 338 |
| Diverting firearms stolen from FFL | 17 | 7.1% of 239 |
| Diverting firearms at gun shows | 12 | 6.5% of 185 |
| Firearms diverted by licensed dealer, including pawnbroker | 10 | 6.1% of 163 |
| Diverting firearms at flea markets, auctions, or want ads and gun magazines | 7 | 6.3% of 112 |
| Diverting firearms stolen from common carrier | 2 | 7.1% of 28 |
| Diverting firearms over the Internet | 4 | 18.2% of 22 |

Sum exceeds 100% since the investigations may be included in more than one category
[a]As distinct from straw purchasers and other traffickers

Author's personal copy

to find low overall rates of serial number obliteration violations in these ATF gun trafficking investigations.

Data on obliterated serial numbers are very limited and must be used with great caution to avoid incorrect conclusions about illegal gun market dynamics. In particular, while obliterated serial numbers are an important indicator of illegal gun trafficking, they are insufficient in themselves; other indicators must also be used to determine whether gun trafficking has occurred. Kleck and Wang, in contrast, use obliterated serial number data as their sole measure to develop a tentative estimate of the trafficking share of crime guns.[30] Based on their own interpretation of published ATF data on crime guns recovered from 46 US cities in 2000,[18] they posit that only 1.6% of handguns with time-to-crime of 1 year or less had obliterated serial numbers. It is important to note that the column of a key ATF table contained information on only 52 handguns.[18] Without any supporting evidence or analytic rationale, Kleck and Wang then argued that some guns with obliterated serial numbers were probably not trafficked and estimated that the trafficked share of crime guns is probably less than 1%.

Kleck and Wang misinterpreted a key ATF table that explored possible links between guns with obliterated serial numbers and multiple handgun sales.[18] To be included in that table, an obliterated serial number gun had to be traced, which requires the serial number to be restored. Many handguns with obliterated serial number cannot be traced, and the guns in the table therefore represent a selective undercount of guns with obliterated serial numbers. Kleck and Wang's estimate is therefore incorrect.

ATF does not report the success rate of serial number restoration attempts; therefore, it is very difficult to make a grounded calculation of the true prevalence of handguns with obliterated serial numbers and a time-to-crime of 1 year. However, since 2,705 handguns with obliterated serial numbers were included in the obliterated serial number section of the ATF report,[18] the 52 handguns with restored serial numbers that form the basis of Kleck and Wang's estimate are almost certainly a sizeable underestimate of the true prevalence of recovered handguns with obliterated serial numbers and short times to crime.

Kleck and Wang also use obliterated serial number data in two exploratory multivariate analyses.[30] The first uses principal components techniques to understand the relationship among various potential gun trafficking indicators, such as median time-to-crime, gun sold by first retail dealer located over 250 miles away, and the percent of recovered guns with obliterated serial numbers. They find that many of their indicators load on factors separate from the factor that mainly reflects the prevalence of guns with obliterated serial numbers; since they regard obliterated serial number guns as a strong trafficking indicator, they conclude that the other indicators must be measuring something other than gun trafficking and are probably not good trafficking indicators.[30] The second analysis uses multiple regression models to examine the causal effects of the percent of recovered guns with obliterated serial numbers on criminal gun possession (measured as the percent of homicides committed with guns), murder rates, robbery rates, and assault rates. They find that the prevalence of obliterated serial number guns is not significantly related to criminal gun possession or violent crime rates.

Unfortunately, the ATF report from which Kleck and Wang collected their obliterated serial number data clearly states that these data were seriously limited: they were reported from just eight cities, did not include long guns, and did not include older guns.[18] The flaws in the data raise serious doubts about the reliability and validity of Kleck and Wang's conclusions.

*Author's personal copy*

## CONCLUSION

It is important to note that the empirical data used in this article to refute wrong-headed claims by Kleck and Wang on illegal gun market dynamics have some noteworthy limitations. As described earlier, ATF firearms trace data may not be representative of firearms possessed and used by criminals; furthermore, a substantial proportion of recovered firearms cannot be traced to the first known retail sale.[7] ATF gun trafficking investigation data only provide information on gun trafficking investigations that come to the attention of ATF agents.[12] These gun trafficking enterprises may not be representative of broader gun trafficking pathways at work in the USA. The trace- and investigation-based information that results is biased to an unknown degree by these factors. These concerns certainly apply to the trace and investigation data used in the empirical analyses presented here. However, as suggested by the National Research Council's Committee to Improve Research Information and Data on Firearms, these data can provide policy relevant insights on illegal gun market dynamics when conclusions are based on careful analyses that are coupled with clear acknowledgments of the data limitations.[23]

The research presented here identifies three important points about how criminals acquire guns. First, they rely on a diverse set of illegal pathways, including corrupt licensed dealers, unlicensed sellers, straw purchasers, residential theft, and theft from licensed dealers, common carriers, and firearm manufacturers. Organized, large-scale trafficking exists, but it is not predominant. Where they occur, high-volume gun trafficking operations are attractive targets for regulatory and enforcement efforts. (Certain trafficking routes, such as those supplying firearms to large criminal organizations in Mexico, may behave differently.) Second, new guns are disproportionately recovered in crime, suggesting an important role for close-to-retail diversion of guns in arming criminals. Third, given the diversity of channels through which criminals can acquire guns, law enforcement agencies need to consider a variety of gun trafficking indicators that go well beyond whether a crime gun is recovered with an obliterated serial number or not.

Our findings refute three key arguments against the proposition that interventions aimed at curtailing illegal transfers of firearms could be used to good effect in reducing gun availability to criminals and gun crime. The case for a supply-side approach to gun violence is well supported by the empirical evidence on illegal gun market dynamics. To date, however, there is little empirical evidence that such an approach reduces rates of gun crime. We believe that it is time to develop experimental evidence on whether interventions designed to limit illegal transfers of firearms can reduce gun violence.

## REFERENCES

1. US Federal Bureau of Investigation. *Crime in the United States, 2009.* Available at http://www2.fbi.gov/ucr/cius2009. Accessed March 18, 2011.
2. Truman JL, Rand MR. *Criminal victimization, 2009.* Washington: Bureau of Justice Statistics; 2010. NCJ231327.
3. Reiss AJ, Roth J. *Understanding and preventing violence.* Washington: National Academy Press; 1993.
4. Kennedy DM, Piehl AM, Braga AA. Youth violence in Boston: gun markets, serious youth offenders, and a use-reduction strategy. *Law & Contemp Probl.* 1996; 59: 147–196.

5. Braga AA. Serious youth gun offenders and the epidemic of youth violence in Boston. *J Quant Criminology.* 2003; 19: 33–54.
6. Braga AA, Hureau DM, Winship C. Losing faith? Police, black churches, and the resurgence of youth violence in Boston. *Ohio St J Crim Law.* 2008; 6: 141–172.
7. Cook PJ, Ludwig J, Braga AA. The criminal records of homicide offenders. *JAMA.* 2005; 294: 598–601.
8. Cook PJ, Braga AA, Moore MH. Gun control. In: Wilson JQ, Petersilia J, eds. *Crime and public policy.* New York, NY: Oxford University Press; 2011: 257–292.
9. Wintemute GJ, Wright MA, Drake CM, Beaumont JJ. Subsequent criminal activity among violent misdemeanants who seek to purchase handguns: risk factors and effectiveness of denying handgun purchase. *JAMA.* 2001; 285: 1019–1026.
10. Wright MA, Wintemute GJ, Rivara F. Effectiveness of a program to deny legal handgun purchase to persons believed to be at high risk for firearm violence. *Am J Public Health.* 1999; 89: 88–90.
11. Cook PJ, Braga AA. Comprehensive firearms tracing: strategic and investigative uses of new data on firearms markets. *Arizona Law Rev.* 2001; 43: 277–309.
12. Braga AA, Cook PJ, Kennedy DM, Moore MH. The illegal supply of firearms. In: Tonry M, ed. *Crime and justice: a review of research*, vol. 29. Chicago: University of Chicago Press; 2002: 229–262.
13. Pierce GL, Braga AA, Hyatt RR, Koper CS. The characteristics and dynamics of illegal firearms markets: implications for a supply-side enforcement strategy. *Justice Q.* 2004; 21: 391–422.
14. Braga AA, Pierce GL. Disrupting illegal firearms markets in Boston: the effects of operation ceasefire on the supply of new handguns to criminals. *Criminol Publ Pol.* 2005; 4: 717–748.
15. Koper CS. Purchase of multiple firearms as a risk factor for criminal gun use. *Criminol Publ Pol.* 2005; 4: 749–778.
16. Bureau of Alcohol, Tobacco and Firearms (ATF). *Crime gun trace analysis reports (1997): the illegal firearms market in 17 communities.* Washington: Bureau of Alcohol, Tobacco and Firearms; 1997.
17. Bureau of Alcohol, Tobacco and Firearms (ATF). *Following the gun: enforcing federal laws against firearms traffickers.* Washington: Bureau of Alcohol, Tobacco and Firearms; 2000.
18. Bureau of Alcohol, Tobacco and Firearms (ATF). *Crime gun trace analysis (2000): national report.* Washington: Bureau of Alcohol, Tobacco and Firearms; 2002.
19. Moore MH. Keeping handguns from criminal offenders. *Annals.* 1981; 452: 22–32.
20. Zimring FE. Street crime and new guns: some implications for firearms control. *J Crim Justice.* 1976; 4: 95–107.
21. Wachtel J. Sources of crime guns in Los Angeles, California. *Policing.* 1998; 21: 220–239.
22. Wintemute GJ, Romero MP, Wright MA, Grassel KM. The life cycle of crime guns: a description based on guns recovered from young people in California. *Ann Emerg Med.* 2004; 43: 733–742.
23. Wellford C, Pepper JV, Petrie CV, eds. *Firearms and violence: a critical review.* Washington: The National Academies Press; 2005.
24. Wintemute GJ. Risk factors among handgun retailers for frequent and disproportionate sales of guns used in violent and firearm related crimes. *Inj Prev.* 2005; 11: 357–363.
25. Sorenson SB, Vittes KA. Buying a handgun for someone else: firearm retailer willingness to sell. *Inj Prev.* 2003; 9: 147–150.
26. Wintemute GJ. Firearm retailers' willingness to participate in an illegal gun purchase. *J Urban Health.* 2010; 87: 865–878.
27. National Rifle Association. *Firearm traces: The anti-gunners' big lie.* Available at: http://www.nraila.org/Issues/Articles/Read.aspx?id=12&issue=014. Accessed January 2, 2010.
28. Blackman PH. The limitations of BATF firearms tracing data for policymaking and homicide research. In: *Proceedings of the Homicide Research Working Group meetings,*

Author's personal copy

INTERPRETING THE EMPIRICAL EVIDENCE ON ILLEGAL GUN MARKET DYNAMICS

*1997 and 1998*. Washington: National Institute of Justice, US Department of Justice; 1999: 58–113.

29. Kleck G. BATF gun trace data and the role of organized gun trafficking in supplying guns to criminals. *St Louis Univ Publ Law Rev.* 1999; 18: 23–45.

30. Kleck G, Wang S-YK. The myth of big-time gun trafficking and the overinterpretation of gun tracing data. *UCLA Law Rev.* 2009; 56: 1233–1294.

31. Pirie M. *How to win every argument: the use and abuse of logic*. UK: Continuum International Publishing Group; 2007.

32. Cook PJ, Molloconi S, Cole T. Regulating gun markets. *J Crim Law Criminol.* 1995; 86: 59–92.

33. US Department of the Treasury and U.S. Department of Justice. *Gun shows: Brady checks and crime gun traces*. Washington: US Department of the Treasury and US Department of Justice; 1999.

34. Sheley JF, Wright JD. *In the line of fire: youth, guns, and violence in urban America*. New York: Aldine de Gruyter; 1995.

35. Wright JD, Rossi PH. *Armed and considered dangerous*. 2nd ed. New York: Aldine de Gruyter; 1994.

36. US Bureau of Justice Statistics (BJS). *Survey of state prison inmates, 1991*. Washington: Bureau of Justice Statistics, US Department of Justice; 1993. NCJ 136949.

37. Webster DW, Freed LH, Frattaroli S, Wilson MH. How delinquent youth acquire guns: initial versus most recent gun acquisitions. *J Urban Health.* 2002; 79: 60–69.

38. Cook PJ, Ludwig J. *Guns in America: results of a comprehensive national survey on firearms ownership and use*. Washington: Police Foundation; 1996.

39. Bureau of Alcohol, Tobacco and Firearms (ATF). *Crime gun trace analysis (1999): national report*. Washington: Bureau of Alcohol, Tobacco and Firearms; 2000.

40. Webster DW, Zeoli AM, Bulzacchelli MT, Vernick JS. Effects of police stings of gun dealers on the supply of new guns to criminals. *Inj Prev.* 2006; 12: 225–230.

41. Webster DW, Vernick JS, Bulzacchelli MT. Effects of a gun dealer's change in sales practices on the supply of guns to criminals. *J Urban Health.* 2006; 83: 778–787.

42. Bureau of Alcohol, Tobacco and Firearms (ATF). *Commerce in firearms in the United States*. Washington: US Department of the Treasury; 2000.

43. Pierce GL, Braga AA, Koper CS, et al. *The characteristics and dynamics of gun markets: report submitted to the US National Institute of Justice*. Boston: Northeastern University; 2003.