# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
DICK ANTHONY HELLER, *et al.*,      )
                                                    )
                        Plaintiffs,          )
                                                    )        Civil Action No. 08-01289 (JEB)
            v.                                     )
                                                    )
DISTRICT OF COLUMBIA, *et al.*,      )
                                                    )
                        Defendants.       )
_____ )

<u>DECLARATION OF MARK D. JONES</u>

Pursuant to 28 U.S.C. § 1746, I, Mark D. Jones, declare and state as follows:

1.   I am over the age of eighteen (18) years, competent to testify to the matters contained

herein, and testify based on my personal knowledge and information.

2.   I was retained by the District of Columbia to provide my opinions in this matter. I

submitted an expert report on January 18, 2013, and was deposed by plaintiffs' counsel on June

13, 2013. The views I state herein are drawn from my professional experience, my previous

report, and deposition testimony.

3.   I am currently employed by the University of Chicago Crime Lab in the capacity of

Senior Law Enforcement Advisor on a part-time basis and have been so employed since August

2012. Prior to that I spent the majority of my career (from September 8, 1991 until November 30,

2011) with the U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), where I

worked on a range of issues involving firearms. My *curriculum vita* is attached hereto. I retired

from ATF as the U.S. Department of Justice's Regional Firearms Advisor to the governments of

Central America; prior to that position, I served as a program manager in ATF headquarters

(HQ) assigned to the FBI Counter Terrorism and Criminal Investigations Divisions; supervisor

of the Arson and Explosives Intelligence group in ATF HQ; supervisor of Washington Group II investigating firearms trafficking in the Washington, D.C. field division; Deputy Division Chief of the ATF HQ Arson and Explosives Division; the Division Operations Officer in the Chicago Field Division; supervisor of Chicago Group I investigating street gangs in the Chicago Field Division, and as a special agent in the Kansas City Field Division conducting criminal investigations. During my career with ATF, I was assigned to the District of Columbia for more than 7 years in several of the positions set forth above. I have participated in over 100 federal, state and/or local law enforcement arrests involving unlawful firearms possession, illegal firearms trafficking, misuse of firearms, and firearms-related violence. I conducted, supervised, or participated in investigations in the District of Columbia, and the states of California, Florida, Georgia, Illinois, Iowa, Kansas, Nebraska, North Carolina, Maryland, Missouri, New Jersey, New York, Ohio, South Dakota, Texas, and Virginia in the United States as well as in the countries of Barbados, Belize, Bolivia, Costa Rica, Egypt, EI Salvador, Guatemala, Honduras, Lebanon, Nigeria, and Panama.

4.   During my final assignment with ATF, I was responsible for developing and implementing the United States government's strategy to aid the governments of Central America in reducing firearms violence. While based in EI Salvador, I led a team of experts who conducted detailed assessments of the regulatory and enforcement environments in six of the seven countries of Central America (Belize, Costa Rica, EI Salvador, Guatemala, Honduras and Panama). Through those assessments I was able to formulate a training plan to help the public security agencies in each of those countries to better focus and use their resources to deter illegal small-arms trafficking.

5.  In my career at ATF I worked with numerous domestic and international law-enforcement and intelligence agencies to train their personnel to conduct investigations of illicit small-arms trafficking, investigations of explosives-related crimes, and investigation of violent gangs. I was selected as the ATF representative during national-level explosives policy meetings at the White House; I also negotiated the first interagency agreement to bring the ATF's small-arms expertise to FBI-sponsored Joint Terrorism Task Forces nationwide, and drafted ATF's national policy to implement that agreement.

6.  Prior to ATF, I worked for the U.S. Department of State, Diplomatic Security Service (DSS) where I conducted internal-affairs investigations; served as the Supervisory Special Agent in charge of security for the U.S. Ambassador to Lebanon; and served as supervisor of a specially trained team of agents conducting high-risk dignitary protection operations and training missions, both within the United States and abroad. During my employment with DSS, I travelled extensively, both domestically and in foreign countries, to conduct sensitive criminal and national security investigations, several involving criminal misuse of firearms.

7.  I have provided training to law enforcement and public security officials and agencies throughout the United States, Europe, Central and South America, Africa, Asia and the Middle East, on how to recognize and interdict illicit small-arms trafficking and conduct explosives-related investigations. During my law-enforcement career, I received extensive training involving firearms, use of force, evidence collection, explosives, and many additional subjects. In 1988, I was trained as a firearms instructor by DSS and subsequently trained many public security and law enforcement personnel both in the United States and in foreign countries in the safe use, care and storage of firearms. Following my appointment by ATF, I received additional training as a firearms instructor, this time at the Federal Law Enforcement Training Center, and

subsequently trained numerous federal, state and local law enforcement officers in the proper use, handling, and maintenance of firearms, and did so until I retired in 2011. I was certified as a use-of-force instructor-trainer, and conducted training for federal, state and local law enforcement officers from numerous agencies until I retired. I have read many studies on firearms possession, lawful use and criminal or negligent misuse of firearms. I make an effort to review new studies on those subjects as they are published. I have a Master of Science Degree in Management from Johns Hopkins University.

8. In preparing to present my opinions here, I reviewed the following materials:

    a. Plaintiffs' Third Amended Complaint (For Declaratory Judgment, Injunctive Relief, and Writ of Mandamus) July 31, 2012.

    b. The parties' written responses and documents provided in discovery in this case.

    c. D.C. Official Code §§ 7-2501.01 *et seq.* (2012 Supp.), as amended.

    d. Title 24, D.C. Municipal Regulations, Ch. 23, as amended.

    e. The materials found at the Metropolitan Police Department's website regarding firearms registration, *http://mpdc.dc.gov/service/firearm-registration-district-columbia*, including the Online Firearms Safety Training Course and "Firearms Registration: General Requirements and Study Guide" (available at *http://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/firearms_ reg_req.pdf*).

    f. *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011), affirming in part *Heller v. District of Columbia*, 698 F.Supp.2d 179 (D.D.C. 2010).

    g. David Hemenway, *Risks and Benefits of a Gun in the Home*. American Journal of Lifestyle Medicine, Vol. 5, No. 6 (Feb. 2011).

    h. Erin G. Richardson & David Hemenway, *Homicide, Suicide, and Unintentional Firearm Fatality: Comparing the United States with Other High-Income Countries, 2003*, Journal of Trauma-Injury Infection & Critical Care (Jan. 2011, Vol. 70, Iss. 1).

9. In summary, based on my experience in law enforcement and my review of all the materials cited herein, I believe that the registration requirements currently in place in the District serve the goals of enhancing public safety and reducing firearm-related crime.

**Firearm Registration**

10. In my experience, firearm-registration requirements help to prevent criminals or others who pose a safety risk to themselves or the public from easily obtaining firearms. The District's

4

firearms-registration law, like others in my experience, has and will achieve those benefits. I have lived in (and registered my firearms in) Chicago, Omaha, San Salvador, and Beirut.

11. I believe the District's firearms-registration system is well-constructed, logical, and easy to follow and understand. Based on my experience, firearm registration provides necessary information for public safety agencies and first responders such as presence of documented firearms and ammunition in homes and businesses to which they answer calls for service, and the identity of citizens who legally possess firearms and ammunition at those homes and businesses. In my opinion, registration requirements also provide a framework within which public safety agencies may formulate firearms safety, training, and education programs focused on the needs of their constituent legal firearms owners. In my observation, a well-regulated firearms registration process also increases the likelihood that law enforcement may successfully trace guns they recover.

12. Additionally, information maintained in municipal gun registration records may be used to investigate possible illegal transactions, providing law-enforcement officers with critical information to identify straw-man purchasers when investigating firearms crimes and gun smuggling.

13. The type of firearm being discussed is largely irrelevant for purposes of registration and other regulatory efforts. All firearms, be they rifles, shotguns or handguns, pose a similar threat to public safety in the wrong hands and, in my opinion, should be regulated similarly.

14. A recent example is found in the December 24, 2012 murder of two firefighters in Webster, New York. According to the federal complaint, Dawn Nguyen bought a rifle and

shotgun that she subsequently provided to the accused murderer, William Spengler.[1] The firearms were traced back to Nguyen and she has been charged with violations of federal law for making a false statement in the acquisition of the firearms, and for giving or selling the firearms to someone not legally entitled to possess them.

15. The foregoing example shows how the illegal transfer and eventual malevolent use of a so-called long gun, particularly the rifle, poses a distinct type of threat within the confines of the Nation's capital. Rifles, by their nature, are designed to deliver longer range, generally more accurate fire than handguns. The type of rifle used by Spengler, (an AR15-style, semi-automatic rifle manufactured by Bushmaster Firearms of Madison, North Carolina)[2] closely approximates the weapon issued to United States military forces and is routinely fired accurately from distances up to 500 yards.[3] Firearms with such capabilities greatly increase the risk of a "standoff" assassination attempt against political and government leaders, and are thus of great concern to those entities charged with protection of such persons. In my opinion the District bears a unique responsibility to provide a safe and secure environment to carry out the Nation's business of government, and the regulation of firearms—especially those demonstrably more effective at longer ranges—is integral to that effort.

---

[1]    David Andreatta, *Spengler was with Greece woman when she bought his guns, court papers allege*, Rochester Democrat and Chronicle, Dec. 29, 2012; available online at *http://www.democratandchronicle.com/article/20121228/NEWS01/312280028/Webster-suspect-speaks-arrest-imminent.*

[2]    *Id.*

[3]    United States Marine Corps Order 3574.2K, Appendix S (August 1, 2007); available online at *http://community.marines.mil/news/publications/Documents/MCO% 203574.2K.pdf.*

16. In my experience jurisdictions like the District, with well-developed and implemented firearms regulatory and enforcement strategies, including registration of legal firearms, offer clear expectations and guidelines for responsible firearms ownership by its citizens and provide a strong deterrent against thoughtless or malicious firearms possession by potential violators.

**Restricting Handgun Registration to One Per 30-Day Period**

17. In my opinion, the most effective method of limiting misuse of firearms, including homicide, suicide and accidental injuries, is to limit the number of firearms present in a home. Through experience and research I believe that the single greatest risk factor for being murdered with a firearm, committing suicide with a firearm, or being injured by unintentional discharge of a firearm, is the easy availability of a firearm.[4] Many studies have concluded that U.S. residents in homes that contain a firearm are statistically more likely to die by gunshot than their neighbors who live in homes without a gun present.[5] American children are at particular risk, specifically those between the ages of 5 and 14, who are eleven times more likely to die by unintentional gunshot than their peers in other developed countries.[6] Finally, the number of deaths involving

---

[4]     David Hemenway, *Risks and Benefits of a Gun in the Home*. American Journal of Lifestyle Medicine, Vol. 5, No. 6 (Feb. 2011) (accessed Dec, 21, 2012); available online at *http://www.comedsoc.org/images/Risk%20Guns%20at%20Home%20Hemenway%20Am%20J%20Lifestyle%20Med%206-12_copy1.pdf.*

[5]     *Id.*

[6]     Erin G. Richardson & David Hemenway, *Homicide, Suicide, and Unintentional Firearm Fatality: Comparing the United States with Other High-Income Countries, 2003*, Journal of Trauma-Injury Infection & Critical Care (Jan. 2011, Vol. 70, Iss. 1); accessed online Dec. 21, 2012; available online at *http://journals.lww.com/jtrauma/Abstract/2011/01000/Homicide,_Suicide,_and_Unintentional_Firearm.35.aspx.*

firearms represent only a portion of the problem, since for every person killed with a firearm, twenty are wounded, require emergency medical attention and often extensive follow-up care.[7]

18. In my experience, laws that limit the quantity of firearms that can be purchased or registered during a given time period make it more difficult for firearms traffickers to acquire and resell guns from that municipality or state. Illegal gun sellers must then travel farther to obtain their goods, limiting their ability to employ local straw purchasers and generally reducing or removing the illegal seller's capacity to profit from his or her gun sales.

19. For example, when I worked in the District of Columbia for the ATF's Firearms Trafficking Group, Virginia prohibited the purchase of more than one gun per month. During my time in the District, we investigated many more recovered crime guns from Maryland, which did not have a similar scheme. Virginia's one-gun-per-month law—which has since been repealed— in my experience was effective in reducing the number of Virginia-derived crime guns recovered in the District.

20. I believe that the District's current robust regulatory scheme permitting registration of just one pistol every 30 days will successfully control the potential trafficking of firearms out of the District and help identify the sources of illegal firearms encountered there.

**In-Person Registration**

21. It is also my opinion that the District's requirement that a registrant appear in-person is entirely logical and in the public interest. Requiring an individual to present him or herself to register a firearm allows District authorities to make a more thorough evaluation of that person, including an on-the-spot evaluation of behavior that might indicate the applicant is not being

---

[7] *Id.*

truthful. Thirty years in law enforcement have confirmed for me that it is more difficult for someone to lie "in person," as opposed to simply submitting false or incomplete documents.

22. An additional advantage to in-person registration is the indisputable identification of the aspiring registrant as the actual owner of the firearm in question, thus limiting the ability of one person to impersonate another to defeat the legal registration program. Simply stated, programs that do not require in-person registration and ID verification are potentially less effective at preventing the diversion of firearms from legitimate to illegal purposes.

**Three-Year Renewal of Registration**

23. In my opinion, requiring firearms registrants to periodically renew their firearms registrations, every three years in the case of the District, has important benefits for public safety in that it compels a systemic review of all legally registered firearms and registrants. This means that should a gun owner in the District become ineligible to possess firearms (*e.g.*, being convicted of a crime; committed to a mental health facility; becoming subject to an order of protection) then the change of status will be revealed during the renewal process and give District authorities an opportunity to suspend or revoke the registration(s) temporarily until the situation is resolved or permanently if necessary.

24. I believe the District's three-year renewal requirement offers important mandatory accountability to both public safety officials and residents, since many individuals who become ineligible to possess firearms do not necessarily voluntarily report their disqualification to the authorities. In Cook County, Illinois, for example, the sheriff's office has identified nearly 5000

9

residents whose state Firearm Owners Identification Card has been revoked but who have failed to turn in their card as required by law.[8]

**Demonstrated Knowledge of District Firearm Law and the Safe Use and Storage of Firearms/Completed Firearms Training or Safety Course**

25. In my opinion, requiring potential firearms owners to take a safety course addressing the safe handling, use, and storage of their firearms is a fundamental requirement encouraging responsible gun ownership. Understanding the risks inherent to firearms ownership is common sense and may assist in reducing unintentional discharges and injuries.

26. I have observed or studied countless instances of unintentional discharge of firearms by trained law enforcement officials and every one of those individuals had received far more training in safe firearms use than the vast majority of civilian firearms owners, yet they still had accidents. I personally completed the District's mandatory, on-line Firearms Safety Training Course, which took approximately one hour, and believe it to be a positive first step towards responsible firearms ownership. The District's on-line course is, in my opinion, minimally burdensome on firearms owners and certainly less burdensome than other jurisdictions which require hands-on, live-fire training at a shooting range.

27. I believe that instructing District registrants in the widely accepted methods of safe storage, particularly in homes with children, is vitally important to both limiting access to the firearms only to authorized users and reducing theft, accidents, and other unintended consequences of bringing a firearm into the home. Academic studies have repeatedly shown that the risk of injury or death by gunshot is dramatically increased in homes with firearms present,

---

[8]     Personal conversation with Margaret Egan, Director of Policy and External Affairs for Cook County Illinois Sheriff's Office (Jan. 22, 2013).

*see* n.4,  and that risk, in my opinion, may be somewhat mitigated if gun owners are trained and their firearms are properly stored.

**Notification to the Police of Theft, Loss, Destruction, Sale, or Transfer of Firearms**

28. The requirement in District law that firearms owners must immediately notify the police of any theft, loss, destruction, sale, or other transfer of their firearm(s) is another common sense facet of responsible gun ownership. Such requirements, in my opinion, require that the owner always be aware of where his or her firearms are, how they are stored, and in what condition. It also requires that a gun owner have sufficient knowledge of his or her firearms to report any change of status to the police. Finally, in my observation and experience, a requirement to report the loss/theft/transfer of registered firearms is an important step in reducing firearms trafficking because it eliminates the most common excuses (loss and theft) offered by erstwhile gun owners whose weapons have been recovered by the police. In other words, requiring this from firearms owners takes away an excuse commonly used by straw purchasers—that the guns just purchased were later stolen or lost. These reporting requirements mandate that a gun owner be responsible for his or her firearms at all times and that, in my estimation, is the definition of conscientious firearms ownership.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on ___9/22/2013___          _____
                                      MARK D. JONES

11

# Mark D. Jones

mjones674@gmail.com                                                                (312) 434-4411

**OBJECTIVE** Draw upon my many years of public service to make an enduring difference in society

**EXPERTISE**

- Proven innovator and strategic problem solver with outstanding analytical skills
- Superior adult educator who successfully trained hundreds of public safety officials in the US and abroad
- Recognized by colleagues and superiors as gifted multi-cultural communicator
- Collaborative leadership style; experience successfully managing diverse multi-national work groups
- Skilled at change management and organizational development
- Experience building high performing, results oriented, international and domestic teams
- National level policy expertise related to illicit small arms trafficking, explosive ordnance disposal, and use of force matters

**ACCOMPLISHMENTS:**

**2009 – Present:**

Served as subject matter expert for the University of Illinois Crime Lab; the Inter-American Development Bank; National Public Radio - This American Life; The Chicago Sun Times; and The Today Show

Established a new office in U.S. Embassy San Salvador with responsibility for seven countries. Created a highly successful public security information and intelligence program throughout Central America allowing, for the first time, the exchange of information between U.S. and Central American public security agencies related to small arms trafficking investigations.

Uncovered the lack of improvised explosive device render safe expertise in several Central American countries and successfully negotiated with the State Department, Bureau of International Narcotics and Law Enforcement for funding of equipment and training necessary to create or improve bomb squads in those countries.  Saved U.S. taxpayers hundreds of thousands of dollars by using economies of scale when purchasing bomb squad tools and training.

Successfully conceived and managed multiple, simultaneous international public security initiatives in several countries; trained public safety officials from Central American and African countries to recognize and interdict illicit small arms trafficking schemes.

**2001 – 2009:**

Successfully negotiated and implemented first ever, interagency agreement to bring ATF small arms expertise to FBI sponsored Joint Terrorism Task Forces nationwide. Guided the successful effort to seek first-ever congressional funding to support that initiative.

Established group equipment purchasing initiative for the ATF National Response Teams, Explosives Enforcement Officer and Certified Explosive Specialist programs that realized several million dollars of savings in FY 2006.

Conceived and implemented a new system for tracking the investigative efficiency and time management for ATF's explosive incident investigative program thus permitting the Bureau to effectively track the work of all specialists and remove those that were inefficient or inactive from the program. Taught explosives investigative techniques classes to public safety officials at the ATF National Academy and the International Law Enforcement Academies in Budapest, Gaborone and Bangkok

Mark D. Jones

Mjones674@gmail.com                                                           (312) 434-4411

**EXPERIENCE**

University of Illinois Crime Lab (2011 – Present)

- Senior Law Enforcement Advisor providing subject matter expertise and guidance on an array of public policy issues being studied by the Crime Lab

United States Department of Justice – Bureau of Alcohol, Tobacco, Firearms and Explosives (1991- 2011)

- Responsible for developing and implementing the U.S. Government's firearms violence reduction strategy in Central America – a new position without precedent in the government that includes leading the effort to bring modern forensic science based evidence collection methodologies to the public security entities from Belize to Panama.
- Responsible for managing national explosives and arson-related policies and programs; conceived and successfully implemented numerous policies, programs and inter-agency agreements affecting other government and regulated private sector business entities. Successfully managed a multi-million dollar budget and 75 employees.
- Represented ATF: during White House national explosives policy development meetings following September 11, 2001; at Interpol, Lyon, France during multi-lateral, international small arms trafficking policy meetings; at the Federal Bureau of Investigation Counter terrorism Center; and at curriculum development conferences for the International Law Enforcement Academies – Bangkok, Thailand and Federal Law Enforcement Training Center
- Managed State Department-funded explosives training program for foreign public security officials; successfully managed the multi-million dollar annual budget to effectively train more than 250 investigators in the United States and in international venues.
- Certified Explosives Specialist since 1997; Certified national-level Use of Force Instructor/Trainer since 1988
- Top Secret/SCI clearance

**US Department of State/Diplomatic Security Service Washington, DC and Beirut, Lebanon - Supervisory Special Agent (1985–1991)**
- Agent in Charge of US Ambassador's security detail and physical security of official residence complex. (Beirut, Lebanon 1988 – 1989)
- First line supervisor of specially trained tactical response and training team (Mobile Security Division 1989 – 1991)
- Conducted sensitive national security and internal affairs investigations (Special Investigations Branch 1986- 1988)
- Extensive foreign and domestic travel in support of US foreign policy objectives
....
**Department of Public Safety, Glencoe, IL (1980–1985)**
- Police Officer (state certified); Detective; Fire fighter (state certified)
- Conducted general criminal investigations.
- Received specialized training in a variety of topics including evidence collection and handling; fire fighting and arson investigation
- Conducted police patrol, fire fighting and emergency medical operations.

2

Mark D. Jones

Mjones674@gmail.com                                                                                            (312) 434-4411

**EDUCATION**

JOHNS HOPKINS UNIVERSITY, M.S., Management (6/2005) GPA 3.98
  - Police Executive Leadership Program (Certificate)

UNIVERSITY OF ILLINOIS AT CHICAGO, B.A., Criminal Justice  (6/1985)

WILBUR WRIGHT COLLEGE, A.A. Law Enforcement (8/1977)

**PRESENTATIONS AND TRAINING**

Between 1985 and the present day I have provided training or made presentations to public security organizations, college classes and private sector entities in the following locations:

**Central American Integration System (SICA); Organization of American States; International Law Enforcement Academies, (El Salvador, Budapest, Hungary Bangkok, Thailand and Gaborone, Botswana); International Explosives Symposium Canberra, Australia; American Embassy Greece; American Consulate Thessaloniki; Chamber of Commerce, Athens, Greece; Greek National Police Academy; American Embassy Amman, Jordon; American Embassy Abu Dhabi, United Arab Emirates; American Embassy Kuwait City, Kuwait; American Embassy Khartoum, Sudan; American Embassy Islamabad, Pakistan; American Consulates Peshawar and Karachi Pakistan; American Embassy Guatemala City, Guatemala; American Embassy La Paz, Bolivia; American Embassy Beirut, Lebanon; American Embassy Tegucigalpa, Honduras; US Nuclear Regulatory Commission, Washington, D.C.; Nebraska State Patrol Academy Grand Island, Nebraska; University of Iowa, Council Bluffs, Iowa; University of Nebraska, Omaha; Omaha Police Academy, Omaha, Nebraska; Central Intelligence Agency, Langley, Virginia; National Security Agency Fort Meade, Maryland; United States Army, JSOC Fort Bragg, North Carolina; Federal Bureau of Investigation, National Academy, Quantico, VA and various other locations.**

Professional image; physically fit; bilingual; references and salary requirements available upon request

3