# EXHIBIT F

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DICK ANTHONY HELLER, *et al.*,   )
                                 )
                    Plaintiffs,  )
                                 )          Civil Action No. 08-01289 (JEB)
            v.                   )
                                 )
DISTRICT OF COLUMBIA, *et al.*,  )
                                 )
                    Defendants.  )

**PLAINTIFFS' ANSWERS TO DEFENDANTS' INTERROGATORIES**

Explanatory Note.  Individual plaintiffs have responded to factual interrogatories as specified in their signature pages below.  Plaintiffs' counsel have provided answers to interrogatories concerning matters of law beyond the personal knowledge of plaintiffs.

1. For each Plaintiff, please state your full name, present home and work addresses and phone numbers, your date of birth, the name of your employer, and your title/position.

RESPONSE:

a.      Heller:

Dick A. Heller
263 Kentucky Ave. S.E.
Washington, DC 20003-2317
(202)  544-0632

Born December 10, 1941

Employed by Watkins Security Agency
5325 E. Capitol St. S.E.
Washington DC 20019
(202)  581-2871

1

Title/Position is Armed Special Police Officer


b.      Jordan:

Absalom Frederick Jordan Jr.
4335 4th Street, S.E.  Apartment 3
Washington, DC  20032
(202) 574-5657 home
(202) 905-6813 cell

Born May 14, 1941

Retired; receiving Social Security; work address is not applicable.


c.      Carter:

William Carter
2004 11th St., N.W., Apt. # 334
Washington, D.C., 20001
(202) 344-5498

Born June 10, 1952

Employed by Disabled American Veterans

1722 I Street, N.W.
Washington, DC 20421
Title/Position is Transitional Service Officer


d.      Snyder:

To be supplemented.


e.      Scott:

William L. Scott
1425 N St., N.W., #801
Washington, D.C. 20005
(202) 518-2715

Born December 7, 1944

Retired; work address is not applicable.


f.      Mustafa:

Asar M. Mustafa
1211 5th St., N.E.
Washington, DC 20002
(202) 285-7898

Born June 8, 1963

I am unemployed at this time.



2.  For each Plaintiff, please state the total amount of annual income that you received in each

year of the relevant time period from all sources, including any Federal, State or District of Columbia

benefits for disability, unemployment, retirement, health care, or welfare benefits.

RESPONSE:

This information is relevant only as to plaintiffs Scott, Mustafa, and Jordan.  Objection to

providing information as to other plaintiffs as such information is not relevant and does not appear

reasonably calculated to lead to the discovery of admissible evidence.

b.      Jordan: Approx. $11,500/yr (2008-2010); approx. $12,500/yr (2011)

e.      Scott:   $12,696 (2011)

f.      Mustafa: $5208 (2011)


3.  Identify all persons who have knowledge or possess information regarding your claims,

and indicate what events, occurrences, or damages about which each of those persons is knowledgeable.  To the extent not identified in response to the previous inquiry, identify all persons upon whom you rely, or may rely, to support your allegations and state briefly those matters about which each may testify.

RESPONSE:

a.      Heller:

Wife:

      Yaohui (Jane) Liu
      263 Kentucky Ave. SE
       Washington, DC  20003-2317
      (202) 544-0632
      ChinaLawDC@aol.com

My wife would know of the registration events and have access to the same receipts for the processes that I have.

Business Associate:

      Dane vonBreichenruchardt
      P.O. Box 64,894
      Virginia Beach, VA 23467-4894
      (202) 427-8078
      USBOR@aol.com

Mr. vonBreichenruchardt was a witness to some of my attempts, successful and unsuccessful, to register firearms in the District.

b.      Jordan:

Daughter:

      Melanie Jordan
      1240 Savannah Street, S.E.
      Washington, DC  20032

Ms. Jordan has personal knowledge of the problems incurred in transporting my firearms to the MPD Headquarters. She can testify about my experience of waiting outside of the MPD Headquarters for transportation to my home.


c.      Carter:

None.


d.      Snyder:

To be supplemented.


e.      Scott:

None.


f.      Mustafa:

Friend:

Ms. Margaret A. Smith
Same contact information as for Asar Mustafa.



4.   For each Plaintiff, identify each and every firearm that you have registered or attempted

to register in the District during the relevant period.  For each such firearm, identify the date that

each such firearm was registered in the District, or, if not registered, the reasons that Plaintiff was

unable to register the firearm in the District.

RESPONSE:

Additional information about registrations or attempted registrations by plaintiffs Heller, Jordan, Carter, and Snyder is contained in Exhibits 1 through 4 previously filed in connection with summary judgment motions in 2009 in this case.  Relevant information in those Exhibits is

incorporated in the answers to this interrogatory as if set forth at length herein.

a.      Heller:

7/18/2008       .22 Hi Standard Revolver

3/05/2009       .223 Bushmaster Semi-Auto Rifle
                Rejected:   Defined by DC as an "Assault Weapon" (rejection letter is dated
                3/19/2009)

3/05/2009       .45 ACP Semi-Auto Handgun, Colt, 1911, Series-70
                Rejected:   Not on "California Roster" because of age (rejection letter is dated
                3/19/2009)

3/05/2009       9 mm  Sig Sauer  Semi-Auto Handgun
                Rejected:  "Large Capacity" 15-round Magazine (rejection letter is dated 3/19/2009)

3/05/2009       9 mm  Israeli Military Industries  Semi-Auto Handgun
                Model:   Baby Eagle Uzi
                Rejected:   With the "UZI" brand name stamped on the side, DC considered this to
                be an "Assault Weapon" (rejection letter is dated 3/19/2009)

8/19/2011       .22  Marlin  Semi-Auto  Rifle

4/19/2012       .38  Charter Arms  Revolver

10/18/2012      .22  Charter Arms Revolver


b.      Jordan:

8/8/2008        Smith & Wesson Model 66

2/17/2009       Garand M1

2/18/2009       Smith & Wesson Model 59
                Rejected:  not on approved list

2/18/2009       Armalite AR 180
                Rejected: considered an "assault weapon"

2/19/2009       Smith & Wesson Model 41

6

| | |
|---|---|
| 2/19/2009 | Remington 700 BDL |
| 7/6/2009 | Smith & Wesson Model 59<br>(Registration successful; same pistol as above) |
| 7/6/2009 | Charles Daly O/U shotgun |
| 7/6/2009 | Charles Daly Auto Pointer semi-auto shotgun |

c.      Carter:

| | |
|---|---|
| 9/30/2008 | 9mm Beretta semi-auto |
| 2/24/2009 | .223 cal LMT Defender 2000<br>Rejected: considered an "assault weapon" |
| 11/6/2008 | 9mm Glock 17 |
| 10/06/2009 | .45 ACP Springfield Armory 1911A1 |
| 4/9/2010 | Remington 870 shotgun |
| 4/8/2011 | .45 ACP Smith & Wesson Military and Police |
| 11/1/2011 | .45 ACP Heckler & Koch 45C |
| 7/11/2012 | .40 cal Walther PPQ |

d.      Snyder:

To be supplemented.

e.      Scott:

| | |
|---|---|
| 10/17/1977 | Iver Johnson pump shotgun |
| 10/17/1977 | .22 cal. Winchester bolt action |
| 10/17/1977 | Astra .22 semi-auto |

12/28/1990      Remington Model 11-87

7/17/2012       .38 cal Charter Arms Undercover


f.      Mustafa:

1/28/2009       .45 cal Glock 21
                Rejected: prior arrests

3/23/2012       .22 cal Hi Standard model R-103 Revolver




        5.  Please identify all facts that support, contradict, or relate to your contention in paragraph

22 of the Third Amended Complaint that "[t]he requirement that a person must register a firearm to

possess or control it is a novel, not historic, requirement."

RESPONSE:

        "The requirements that are not longstanding . . . include . . . all the requirements as applied
to long guns . . . ." *Heller v. District of Columbia*, 670 F.3d 1244, 1255 (D.C. Cir. 2011).  Neither
the United States nor any State required the registration of any firearms when the Second
Amendment was adopted in 1791 or when the Fourteenth Amendment was adopted in 1868.
Neither the United States nor any State (other than Hawaii) currently requires the registration of all
firearms.




        6.  Please identify all facts that support, contradict, or relate to your contention in paragraph

22 of the Third Amended Complaint that the effect of the "requirement that a person must register

a firearm . . . on the exercise of Second Amendment rights is not *de minimis*."

RESPONSE:

        "The requirements that are not longstanding, which include, in addition to those listed in the

8

prior paragraph, all the requirements as applied to long guns, also affect the Second Amendment right because they are not *de minimis*." *Heller v. District of Columbia*, 670 F.3d 1244, 1255 (D.C. Cir. 2011). The term "*de minimis*" is defined as "pertaining to minimal or trivial things; small, minor, or insignificant; negligible," but the registration at issue here requires significant effort, time, and money because a potential registrant must demonstrate knowledge concerning the firearms laws of the District (§ 7-2502.03(a)(10)); must not have impaired vision of not more than 20/200 visual acuity in the better eye, or not to have loss of vision due wholly or in part to impairment of field vision (*sic*) or to other factors which affect the usefulness of vision to a like degree (§ 7-2502.03(a)(11)); must complete a firearms training and safety class, or provide evidence of any of other forms of training (§ 7-2502.03(a)(13)); must disclose present business or occupation and the address and phone number of the employer, report where each firearm will be kept, and report other information determined by the Chief (§ 7-2502.03(b)); must be fingerprinted (and pay a $35 fee), photographed, and make a personal appearance with the firearm sought to be registered (§ 7-2502.04), necessitating multiple trips to the FRS; must pay a registration fee established by the Mayor (§ 7-2502.05(b)); must renew the registration after three years and pay a fee (§ 7-2502.07a); and must notify the Chief in writing (A) immediately of the loss, theft, or destruction of a firearm, (B) of any change in name or address, and (C) of the sale, transfer or other disposition of the firearm within 2 business days (§ 7-2502.08(a)).

7. Please identify all facts that support, contradict, or relate to your contention in paragraph 26 of the Third Amended Complaint that "[t]he test requirement is a novel, not historic, registration requirement."

RESPONSE:

"Certain portions of the law that are more akin to licensing the gun owner than to registering the gun are also novel; these include the requirement that an applicant demonstrate knowledge about firearms, § 7–2502.03(a)(10) . . . ." *Heller v. District of Columbia*, 670 F.3d 1244, 1255 (D.C. Cir. 2011). When the Second Amendment was adopted in 1791 and when the Fourteenth Amendment was adopted in 1868, neither the United States nor any State required that a person take a test to demonstrate knowledge about firearms in order to possess a firearm. Neither the United States nor any State currently requires that a person take a test to demonstrate knowledge about firearms in order to possess a firearm.

8. Please identify all facts that support, contradict, or relate to your contention in paragraph

33 of the Third Amended Complaint that "[t]he prohibition on registering a firearm unless the

applicant has complied with the training requirements of § 7-2502.03(a)(13) is a novel, not historic,

registration requirement."

RESPONSE:

"Certain portions of the law that are more akin to licensing the gun owner than to registering the gun are also novel; these include the requirement that an applicant . . . take a firearms training or safety course, § 7–2502.03(a)(13)(A) . . . ."   *Heller v. District of Columbia*, 670 F.3d 1244, 1255 (D.C. Cir. 2011).   When the Second Amendment was adopted in 1791 and when the Fourteenth Amendment was adopted in 1868, neither the United States nor any State required that a person have training in order to possess a firearm.   Neither the United States nor any State currently requires that a person have training in order to possess a firearm.


9.   Please identify all facts that support, contradict, or relate to your contention in paragraph

35 of the Third Amended Complaint that "[t]he prohibition on registering a firearm unless the

applicant has provided the information required by § 7-2502.03(b), including his/her present business

or occupation and the address and phone number of the employer, where the firearm will generally

be kept, and '[s]uch other information as the Chief determines is necessary,' is a novel, not historic,

registration requirement."

RESPONSE:

When the Second Amendment was adopted in 1791 and when the Fourteenth Amendment was adopted in 1868, neither the United States nor any State required that a person provide his/her present business or occupation and the address and phone number of the employer, where the firearm will generally be kept, and other information that a police chief determines is necessary in order to possess a firearm.   Neither the United States nor any State currently requires that a person provide his/her present business or occupation and the address and phone number of the employer, where the firearm will generally be kept, and other information that a police chief determines is necessary in order to possess a firearm.

10. Please identify all facts that support, contradict, or relate to your contention in paragraph 37 of the Third Amended Complaint that "[t]he prohibition on registering not more than one pistol per registrant during any 30-day period is a novel, not historic, registration requirement."

RESPONSE:

"Several other of the District's registration requirements are not longstanding, including . . . the one–pistol–per–30–days rule, § 7–2502.03(e) . . . ."  *Heller v. District of Columbia*, 670 F.3d 1244, 1255 (D.C. Cir. 2011).  When the Second Amendment was adopted in 1791 and when the Fourteenth Amendment was adopted in 1868, neither the United States nor any State prohibited a person from acquiring more than one pistol within 30 days.   Neither the United States nor any State (other than California) currently prohibits a person from acquiring more than one pistol within 30 days.

11. Please identify all facts that support, contradict, or relate to your contention in paragraph 40 of the Third Amended Complaint that "[t]he prohibitions on registering a firearm unless the applicant has been fingerprinted, photographed, appeared in person, brought the firearm with him, and paid the fee for fingerprinting are novel, not historic, registration requirements."

RESPONSE:

"Several other of the District's registration requirements are not longstanding, including . . . the requirement[] that applicants appear in person, § 7–2502.04(c) . . . . Certain portions of the law that are more akin to licensing the gun owner than to registering the gun are also novel; these include the requirement that an applicant . . . be fingerprinted and photographed, § 7–2502.04(a)–(b) . . . ." *Heller v. District of Columbia*, 670 F.3d 1244, 1255 (D.C. Cir. 2011). When the Second Amendment was adopted in 1791 and when the Fourteenth Amendment was adopted in 1868, neither the United States nor any State required a person to be fingerprinted, photographed, appear in person, bring a firearm with him, and pay a fee for fingerprinting in order to possess a firearm.  Neither the United States nor any State (other than Hawaii) currently requires all firearms to be registered.  To register a firearm, Hawaii does not require a person to be fingerprinted, photographed, appear in person, bring a firearm with him, and pay a fee for fingerprinting.

12.  Please identify all facts that support, contradict, or relate to your contention in paragraph 42 of the Third Amended Complaint that "[t]he prohibition on registering a firearm unless a fee is paid is a novel, not historic, registration requirement."

RESPONSE:

When the Second Amendment was adopted in 1791 and when the Fourteenth Amendment was adopted in 1868, neither the United States nor any State prohibited a person from registering a firearm unless a fee was paid.  Neither the United States nor any State (other than Hawaii) currently requires all firearms to be registered, and Hawaii imposes no fee for registration of a firearm.

13.  Please identify all facts that support, contradict, or relate to your contention in paragraph 48 of the Third Amended Complaint that "[t]he requirement to renew a registration is a novel, not historic, registration requirement."

RESPONSE:

"Several other of the District's registration requirements are not longstanding, including . . . the requirement[] that applicants . . . re-register each firearm after three years, § 7–2502.07a(a)–(c)." *Heller v. District of Columbia*, 670 F.3d 1244, 1255 (D.C. Cir. 2011).  When the Second Amendment was adopted in 1791 and when the Fourteenth Amendment was adopted in 1868, neither the United States nor any State required a person to register a firearm or to renew a registration of a firearm.  Currently, Hawaii is the only State to require all firearms to be registered, but it does not require the renewal of a registration.

14.  Please identify all facts that support, contradict, or relate to your contention in paragraphs 50 and 52 of the Third Amended Complaint that "[t]he requirements of § 7-2502.0[8] are novel, not historic, registration requirements."

RESPONSE:

When the Second Amendment was adopted in 1791 and when the Fourteenth Amendment was adopted in 1868, neither the United States nor any State required a person to register a firearm or to do any of the things set forth in paragraphs 49 and 51 of the Third Amended Complaint. Currently, Hawaii is the only State to require all firearms to be registered, but it does not require a registrant to do any of the things set forth in paragraphs 49 and 51 of the Third Amended Complaint, except to notify authorities of the transfer of a firearm and the person to whom it was transferred.

15.  Please identify all facts that support, contradict, or relate to your contention in paragraph

55 of the Third Amended Complaint that "the District's registration requirements . . . cost [Plaintiffs]

an inordinate amount of time to exercise the constitutional right to keep and bear arms." In your

response, please estimate, for each Plaintiff, the amount of time required to comply with each of the

District's registration requirements at issue.

RESPONSE:

Additional information about registrations or attempted registrations by plaintiffs Heller, Jordan, Carter, and Snyder is contained in Exhibits 1 through 4 previously filed in connection with summary judgment motions in 2009 in this case.  Relevant information in those Exhibits is incorporated in the answers to this interrogatory as if set forth at length herein.

Because records are not generally kept of the specific number of hours or minutes devoted to each aspect of registering a firearm, the answers below are estimates based on plaintiffs' recollections.

a.    Heller:

7/18/2008    .22 High Standard Revolver "Buntline" - during amnesty period.

This firearm was kept at my brother's residence in Maryland and a friend's house in Maryland because DC had previously banned handguns.  Two trips to the MPD were required to register this firearm, during which I was fingerprinted and took a written test.  Round trips to the MPD take about 30-40 minutes on my bicycle. I went by bicycle on my first trip.  Time spent at MPD headquarters was approximately 45 minutes on the first trip, and 30 to 45 minutes on the second trip.  The second trip required a subway ride to Maryland to pick up the firearm and to return to the MPD.  Subway trip took about two hours.  Obtaining a passport photo took about half an hour.  Filling out the

13

application itself may have taken 15 minutes.  Total time is in the vicinity of five hours.

| | |
|---|---|
| 3/05/2009 | .223 Bushmaster Semi-Auto Rifle |
| 3/05/2009 | .45 ACP Semi-Auto Handgun,  Colt,  1911,  Series 70 |
| 3/05/2009 | 9 mm  Sig Sauer  Semi-Auto Handgun |
| 3/05/2009 | 9 mm  Israeli Military Industries  Semi-Auto Handgun |
| | Model:   Baby Eagle Uzi |

Applications for these four firearms were submitted on the same day.  I picked up applications at the MPD, and returned home and filled them out.  I then returned to MPD, submitted the applications, and they were verbally disapproved.  I then returned home.  The process took three hours or more, I would say.  Rejection letters were dated 3/19/2009.

8/19/2011      .22  Marlin  Semi-Auto  Rifle.

This registration required two trips to the District Building, because MPD required the wooden stock to be attached.  On the first trip, I had taken the stock off to not look like a firearm in my backpack traveling to MPD registration unit on my bicycle.  Approximately two hours or so, total.

4/19/2012     .38 cal Charter Arms "Goldfinger"  Revolver

Shipped from the factory to DC FFL for pickup.   About 2 hours registration time and travel time.

10/18/2012      .22  Charter Arms  Revolver "Pathfinder"

Shipped from the factory to DC FFL for pickup.   Over 3 hours registration and travel time on bicycle.

b.      Jordan:

I am a person who is in poverty.  I reside in Section 8 subsidized housing and am on Medicaid health plan.  There is no parking for persons attempting to register a firearm at the MPD Headquarters so it means that I either have to park and walk several blocks with the firearms in public or have someone take me to the headquarters and pick me up.  I have experienced long waits outside of the headquarters waiting for my ride with the firearms in cases in view.  At my age, 71, it is difficult to carry the firearms from a parking space blocks away from the headquarters and there is the threat of someone taking the firearms from me.

The steps and estimated time taken to register the firearm were as follows for each firearm:

14

1.      I obtained the new registration forms from the MPD Headquarters.  Travel-30 minutes; application-15 minutes.

2.      I filled out the registration forms at home.  20 minutes for each form.

3.      Located a notary public to notarize the required form.  To locate- 45 minutes to 1 hour; to notarize, including travel and waiting time - 45 minutes.

4.      Obtain passport size photograph when needed - 30 minutes

5.      Arranged for transportation to the MPD Headquarters or drove to the headquarters.  Travel - 30 minutes to 1 hour

6.      If I drove, I walked from the parking space to the headquarters.  Locating space - 20 to 30 minutes; walking to headquarters - 25 minutes.

7.      Waited at the gun registration entrance for an officer to assist me - 10 minutes.

8.      Submitted the application forms.

9.      Waited for the ballistics testing of the pistol.

10.     Went to the cashier to pay for the registration.

11.     Returned to the gun control office and waited for the processing to be completed.

12.     Was informed that the firearm was either registered or denied registration.  For completion of steps 7 through 11- from 1 hour to 1 hour 40 minutes.

13.     Escorted to the front entrance by an officer - 5 minutes.

14.     Either waited for my transportation of walked back to the vehicle I was using.  Waiting for transportation - 30 minutes to 1 hour; walking to parking space - 25 minutes.


c.      Carter:

Because of the District's restrictive laws relating to firearms, there is no licensed dealer in the District who carries an inventory of firearms.  Therefore, it was necessary for me to go to a dealer in Maryland to pick out and pay for a firearm to purchase.

For each firearm, the estimated time spent and burdens include the following:

1.  Notify Mr. Charles Sykes, the only licensed firearm dealer in the District, of the gun selected at an out of state dealer.  Mr. Sykes then goes and picks up the firearm.  Time spent is perhaps 15 minutes to talk with Mr. Sykes, and a delay of one to several days for Mr. Sykes to pick up the firearm and bring it back to his place of business.

2.  Drive over to Mr. Sykes' dealership and pay him a processing fee and complete certain paperwork.  Complete registration application.  Time spent is perhaps an hour to an hour and a half, round trip.

3.  Drive to MPD headquarters, park, and deal with MPD officials to get preliminary approval for firearm.  Submit application and photo, and pay fees.  Time spent may be estimated at an hour and a half.

4.  Drive to Mr. Sykes' dealership to pick up firearm.  Complete federal paperwork and background check at dealer's.  Drive to MPD headquarters that day or next day.  Time spent estimated at one to one and a half hours.

5.  Find parking at MPD headquarters and walk with firearm to MPD offices.  Present gun locked in case to security officials.  Get fingerprinted.  Have ballistic test done, when that was a requirement.  Wait while MPD processes paperwork and approves or rejects application.  Pay registration and fingerprint fees.  Be escorted out of building and have firearm returned to me.  Time spent estimated at one and a half to two hours at MPD.

6.  Walk to car carrying gun in case.  Drive home, park, remove gun from car, and immediately transport and store firearm in home.  Estimated time perhaps thirty minutes, depending on parking, time of day, traffic, and other factors.

7.  Total estimated time is perhaps 7 to 8 hours, not counting delays occurring between steps.

8.  I was also required to take a four hour training course to purchase some of my firearms.  Travel time and waiting time to complete the course in Virginia probably added an hour on each end, for a total of approximately six hours.

9.  I also consider it a burden to be required to carry my firearm to and from MPD headquarters.  While walking with it to or from the car, there is a risk that I will be attacked or the gun will be stolen, since it is required to be in a locked case and it cannot be used for defense.  While walking or driving, there is a risk that I will be stopped by an officer and arrested for having a firearm outside my home.  The District's procedures for registration cause these dangers that are not present in most other states.

10. Prior to the change in the law, I also had to get a passport size photo taken prior to completion of the application.

11. When I went to the Metropolitan Police Dept. to register my next handgun after the law had changed in 2009, I was told that I needed to take a training course. I informed the officer at MPD headquarters that I had completed the course at the NRA range in Virginia where I am a member. I showed the officer my certificate that was a copy. The officer said I needed to bring in the original and not a copy. I had to go home to get the original copy and return the next day. The officer then had a copy made from my original certificate to put into my file. I think that was an unnecessary delay and waste of time when I had shown the officer the certificate copy the day before.

d.      Snyder:

To be supplemented.

e.      Scott:

I had to make two trips to MPD to get my Charter Arms revolver registered. Each time I drove and had to look to find parking. On the first day, July 16, 2012, I had to take a course that lasted perhaps 15 minutes, and take an exam. I filled out an application, and paid the registration fee. I also was fingerprinted and paid for that on the 16th. I had to stop by the office of Mr. Sykes, the dealer, to have him complete some paperwork and to pay his fee. I also had to have my photograph taken. On the second day, I had to get the application approved, and to visit Mr. Sykes the dealer to pick up the firearm. They escorted me out of the building with the gun in a locked case and I went to my car to drive home. Each visit took probably took several hours counting travel time.

For registrations in the 1970s and in 1990, each registration probably took several hours. In 1990 for the Remington shotgun they couldn't fingerprint me when I was there, and I had to wait a couple of days and come back for that.

f.      Mustafa:

In January of 2009, I purchased a Glock 21 .45 caliber, model 21 from Realco Guns Shop located in Forestville, MD. After I purchased the Glock 21, I notified Charles Sykes (gun dealer in Washington, DC) that my firearm was ready to be picked up from Realco Gun Shop. Mr. Sykes picked up my firearm on 1-15-09 and notified me that my firearm was at his office (then located in SE Washington, DC). After Mr. Sykes notified me that my firearm was ready to take to the Firearm Registration Section (at 300 Indiana Ave NW), I met with Mr. Sykes at his office and filled out the Application for a Firearms Registration Certificate. Also, Mr. Sykes and I filled out paperwork for the FBI and ATF, and I was approved to proceed with the purchase of my firearm. After meeting

17

with Mr. Sykes, I traveled to the Firearm Registration Section to pay the fees for ballistics testing ($12.00), fingerprinting ($35.00), two full face photographs ($15.00), and the $13.00 application fee. Also, I had to pay Mr. Sykes a $125.00 fee for his services for retrieving my firearm from Realco Gun Shop and taking my firearm to the Firearm Registration Section. The amount of time it took me to meet with Mr. Sykes and go to the Firearm Registration Section and pay the fees was about 14 hours. After the Firearm Registration Section did the background investigation, they denied my application because of prior criminal charges. I appealed the decision and the District conceded, while the appeal was pending in the Court of Appeals, that I was eligible to register a firearm in the District of Columbia. As I did not have the resources to purchase a firearm, I borrowed $150.00 to purchase my firearm. I did not have to pay the fees for this firearm because of my previous attempt to purchase the Glock 21. All I had to do was purchase the firearm with the money I borrowed. Before I could retrieve my firearm, I had to pay a $125.00 fee for training at the Maryland Small Arms Gun Range in Upper Marlboro, MD (on 02-27-12). After I completed my training, I purchased a High Standard Model R-103 .22 LR Revolver, serial number 1289243, for $185.00 from the Maryland Small Range Inc. The firearm was given to Mr. Sykes and he transported it to his office (at 300 Indiana Ave NW Room 1140A). The next day, I traveled to 300 Indiana Ave NW to take the 20 question test at the Firearm Registration Section. I passed the test and proceeded to Mr. Sykes office to retrieve my firearm and transport it to my residence. The total time was about 17 hours.


16. Please identify all facts that support, contradict, or relate to your contention in paragraph 56 of the Third Amended Complaint that "[d]isclosure of registration information could expose Plaintiffs to increased risk of burglary, identity theft, and armed intrusion."

RESPONSE:

It is common sense that disclosure of registration information could expose Plaintiffs to increased risk of burglary, identity theft, and armed intrusion. Criminals with knowledge of the identities and addresses of firearm owners may commit burglary or armed robbery in order to steal firearms, or may simply use the personal information for identity theft. Instances have been reported in which registration information was stolen or published, and firearms were stolen, or persons feared that their firearms may be stolen. E.g., "Fears that NSW is under the gun," The Daily Telegraph (New South Wales), June 1, 2012, http://www.dailytelegraph.com.au/news/sydney-news/fears-that-nsw-is-under-the-gun/story-fn7y9brv-1226377827009 ("Fifty firearms and thousands of rounds of ammunition have been stolen from registered NSW gun owners in the past 16 days, prompting fears the firearms registry has been compromised."); "City published personal information of some gun owners," Philadelphia Inquirer, Oct. 22, 2012, http://articles.philly.com/2012-10-22/news/34655309_1_gun-owners-uniform-firearms-act-gun-rights-advocates.

17.  Please identify all facts that support, contradict, or relate to your contention in paragraph 58 of the Third Amended Complaint that "requiring registration of rifles and shotguns . . . , including basic registration, is novel, not historic."

RESPONSE:

"The requirements that are not longstanding . . . include . . . all the requirements as applied to long guns . . . ." *Heller v. District of Columbia*, 670 F.3d 1244, 1255 (D.C. Cir. 2011). When the Second Amendment was adopted in 1791 and when the Fourteenth Amendment was adopted in 1868, neither the United States nor any State required a person to register rifles and shotguns. Currently, Hawaii is the only State that requires registration of rifles and shotguns.

18.  Please identify all facts that support, contradict, or relate to your contention in paragraph 77 of the Third Amended Complaint that "provisions of law [requiring record checks in order to obtain firearms] are more than adequate to ensure that Plaintiffs and other persons are eligible lawfully to exercise their constitutional right to keep and bear arms."

RESPONSE:

The laws of the United States and of the District of Columbia define with specificity the persons who are ineligible to receive and possess firearms.  See 18 U.S.C. § 922(g), (n), & (x); D.C. Code § 22-4503.

The laws of the United States provide for the National Instant Criminal Background Check System (NICS) to determine the legal eligibility of persons to receive and possess firearms.  See 18 U.S.C. § 922(t); Brady Handgun Violence Protection Act, Pub. L. 103-159, 107 Stat. 1536 (1993); An Act to Improve the National Instant Criminal Background Check System, P.L. 110-180, 122 Stat. 2559 (2008).  The FBI conducts NICS checks in every State (defined to include the District) unless such State wishes to conduct the background checks directly as a Point of Contact ("POC").  28 C.F.R. §§ 25.2 ("POC") & 25.6(d)-(i).  Moreover, transfer of a firearm in the District requires an application to the Chief of Police, who may conduct a further background check.  D.C. Code § 22-4508.  Conducting background checks does not require the registration of firearms.

The laws of the United States and of the District of Columbia provide severe criminal penalties for the receipt and possession of firearms by persons who are not legally eligible to do so. See 18 U.S.C. § 924; D.C. Code § 22-4503.

19.  Do you contend that there are any less restrictive alternatives to the firearms-regulation scheme enacted by the District? If so, please detail them.

RESPONSE:

Less restrictive alternatives include the National Instant Criminal Background Check System, see response to No. 18 *supra*.  Less restrictive alternatives are also found in the laws of the following thirty-two States: Alabama, Alaska, Arizona, Arkansas, Colorado, Florida, Georgia, Idaho, Kansas, Kentucky, Louisiana, Maine, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Mexico, North Dakota, Ohio, Oklahoma, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, West Virginia, Wisconsin, and Wyoming.  Although more restrictive in some particulars than may be justified given the existence of a constitutional right, less restrictive alternatives may also be found in the laws of all of the other eighteen States.

20.  Identify each expert witness that you expect to call at the trial of this action, including the witness's qualifications, the subject matter on which the expert will testify, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds of each such opinion.

RESPONSE:

No expert witnesses have been identified or selected as of this time.

Respectfully submitted,

Dick Anthony Heller
Absalom F. Jordan, Jr.
William Carter
Mark Snyder
William Scott
Asar Mustafa

By counsel


/s/ Richard E. Gardiner
Richard E. Gardiner
D.C. Bar No. 386915

/s/Stephen P. Halbrook
Stephen P. Halbrook
D.C. Bar No. 379799

Suite 403
3925 Chain Bridge Road
Fairfax, VA 22030
(703) 352-7276
(703) 359-0938 (fax)

<u>CERTIFICATE OF SERVICE</u>

     I hereby certify that a copy of the foregoing PLAINTIFFS' ANSWERS TO DEFENDANTS' INTERROGATORIES was sent, via email, to Andrew J. Saindon and Chad A. Naso, Assistants Attorney General, this 2d day of November, 2012.


                        <u>/s/Richard E. Gardiner    </u>
                        Richard E. Gardiner