IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DICK ANTHONY HELLER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:08-cv-01289 (JEB) |
| | ) | |
| THE DISTRICT OF COLUMBIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE**

**Registration and crime**

1.      The District of Columbia requires all handguns and long guns (shotguns and rifles) possessed by a private individual to be registered, without drawing a distinction between the two types of firearms.  D.C. Code § 7-2502.01.

2.      The vast majority of applicants to register firearms are law-abiding people with no disqualifying factors.  Def. Ex. B. (Shelton Dec.) ¶ 8.  It is almost always the case, according to Lt. Shelton, that applications for registrations are submitted by law-abiding people.  Pl. Ex. 1 (Shelton Dep.) 137.

3.      In the last two years of reported data (2011 and 2012), no rifle or shotgun applications, and only two handgun applications, were denied.  Pl. Ex. 2 at 9 (Inter. 11);  Pl. Ex. 1 (Shelton Dep.) 132-36.

4.      Just because a firearm is recovered by the police from a crime scene does not necessarily mean that the firearm was actually used in the commission of a crime; it could be present for some other reason.  Pl. Ex. 1 (Shelton Dep.) 78; Pl. Ex. 7 (Pl. Ex. 7 (Kleck Dec.)) ¶

61.

5.      Guns left at crime scenes usually are unregistered.  Pl. Ex. 1 (Shelton Dep.) 76.

6.      From 2007 through early 2013, the MPD recovered more than 12,000 unregistered firearms.  Pl. Ex. 3 (Lanier Dep.) 9-11.  During a roughly similar time period, MPD recovered only 37 guns that were registered. Pl. Ex. 3 (Lanier Dep.) 11; Def. Ex. J at 2.  The number of illegal firearms recovered as of October 2013 now exceeds 13,000.  Def. Ex. G (Lanier Dec.) ¶5.

7.      The District has provided documentation as to incidents involving 36 of the 37 registered firearms that were recovered over this period  Pl. Ex. O.  Less than half (17) involved charges against the registered firearm owner.  *Id*.  Of those seventeen, only two resulted in convictions of the registered gun owner of an actual crime of violence apparently involving a firearm (Nos. 12 and 29) and only seven others resulted in *any* kind of conviction or sentence of probation against the registered gun owner (Nos. 2, 4, 19, 20, 21, 28, 35).  *Id*.

8.      The District's witnesses cited no studies showing that firearm registration requirements prevent illegal possession of firearms or use of firearms in crime.  Pl. Ex. 5 (Vince Dep.) 54, 57-58, 62-63, 102; Pl. Ex. 6 (Jones Dep.) 36; Pl. Ex. 1 (Shelton Dep.) 202-04**.**

9.      Instead, empirical assessments conducted over a period of decades have unanimously indicated that registration laws have no measurable effect on rates of crime or violence (Geisel, Roll, and Wettick 1969, p. 676; Murray 1975, p. 88; Magaddino and Medoff 1984, pp. 235-238; Kleck and Patterson 1993, pp. 267-271, 274; Langmann 2012; Kleck, Kovandzic, and Bellows 2013).   Pl. Ex. 7 (Kleck Dec.) ¶ 87.

10.     The Geisel, Roll, and Wettick study, the Murray study, the Magaddino and Medoff study, and the Kleck and Patterson study all found no effect of government

recordkeeping of gun possession or gun sales on the various types of violent crime examined in those studies.  Pl. Ex. 7 (Kleck Dec.) ¶ 87-92.

11.    Kleck, Kovandzic and Bellows (2013) used the largest sample heretofore analyzed to test effects of gun laws on violence:  1,078 U.S. cities with a population of 25,000 or larger.  They simultaneously tested for the effects of nineteen different types of gun control laws, enacted at both city and state levels, on rates of total homicide, firearms homicide, total robbery, and total aggravated assault.  They found no evidence of beneficial effects of laws requiring that the transfer or sale of guns must be registered with a governmental agency.  The only possible effect detected was a counterproductive positive effect on robbery rates.  Pl. Ex. 7 (Kleck Dec.) ¶ 93.

12.    The results of this body of U.S.-based cross-sectional research regarding the effects of gun registration on reducing crime are unanimous.  Firearms registration laws show no statistically significant violence-reducing effect on any type of violence.  To be specific, gun registration does not appear to have any detectable effect on rates of total homicide, gun homicide, long gun homicide, total robbery, gun robbery, total aggravated assault, gun aggravated assault, rape, total suicides, gun suicides, or fatal gun accidents in the U.S. Pl. Ex. 7 (Kleck Dec.) ¶ 94.

13.    In a response to Plaintiffs' Interrogatories, the District stated that "It is not clear (to the District) how firearms' registration records could be used to 'prevent' a crime."  Def. Ex. J 1. [1]

14.    The District further stated that "Lt. Shelton cannot recall any specific instance where registration records were used to determine who committed a crime," except for

---

[1] The District agreed that the information set forth in Def. Ex. J could be treated as a supplementary interrogatory response under oath.  Pl. Ex.23.

possession offenses.  Def. Ex. J 1.

15.     Chief Lanier testified that she could not provide any example where registration records were used to solve a crime (defined as a non-possessory offense) committed with a long gun.  Pl. Ex. 3 (Lanier Dep.) 99.

16.     No  studies show that firearm registration requirements reduce suicide.  Pl. Ex. 6 (Jones Dep.) 47.  Pl. Ex. 7 (Kleck Dec.) ¶ 94.

17.     The District's registration records have never been used to foil a terrorist attack, and no foiled terrorist plots have involved firearms that were registered in the District. Pl. Ex. 3 (Lanier Dep.) 13-15.

18.     The 1981 assassination attempt on President Reagan involved a handgun illegally possessed in the District.  Pl. Ex. 3 (Lanier Dep.) 25. Would-be assassin John Hinckley was not a District resident.  Pl. Ex. 3 (Lanier Dep.) 25.  D.C. registration laws did not have anything to do with solving the case.  Pl. Ex. 3 (Lanier Dep.) 25-26.

19.     Incidents involving shots fired at or near the White House did not involve District residents or guns registered in the District.  Pl. Ex. 3 (Lanier Dep.) 23-26.  District registration laws did not have anything to do with solving these cases.  *Id.*

20.     The 2009 Holocaust Museum murder did not involve a District resident or a firearm registered in the District.  Pl. Ex. 3 (Lanier Dep.) 96-97.  The attacker was a convicted felon and ineligible to possess firearms under federal law.  Pl. Ex. 3 (Lanier Dep.) 97.

**Burdens of registration**

21.     MPD currently charges $35 to take and process an applicant's fingerprints, and  $13  per firearm for the registration itself. Def. Ex. B. (Shelton Dec.) ¶ 8.

22.     Other monetary burdens include:

4

Case 1:08-cv-01289-JEB   Document 75-3   Filed 12/10/13   Page 5 of 23


a.      Money spent for travel to and from MPD using public transit or a private vehicle;

b.      Money spent for parking;

c.      Income forgone by taking time off work.  The Firearms Registration Section at MPD is the only place at which an applicant may register a firearm, and it is open only from 9:00 am to 5:00 p.m., Monday through Friday.  *See* MPD Firearms Registration Webpage at http://mpdc.dc.gov/node/177912.  Individuals who work during normal business hours will have to take one or more days off work in order to register a firearm.

d.      Transfer fees (currently $125) paid to Mr. Sykes (Carter Dec. ¶ 16), the only licensed firearms dealer in the District who deals commercially with the public, (Pl. Ex. 1 (Shelton Dep.) 114-16) and also shipping and transfer fees that may be paid to out-of-state dealers.

23.     Some of these are recurring expenses, in that more than one trip to MPD may be required to register a single firearm.

24.     Time burdens of registration include:

a.      Time spent picking up forms at MPD headquarters, including travel time to and from MPD headquarters (Jordan Dec. ¶ 6a);

b.      Traveling to MPD headquarters (Jordan Dec. ¶ 6e; Heller Dec. ¶¶ 5-8; Scott Dec. ¶ 5; Carter Dec. ¶ 8);

c.      Time spent looking for parking, because parking is scarce near MPD headquarters (Jordan Dec. ¶ 4);

d.      Time spent walking several blocks from a parking spot to MPD

headquarters (Jordan Dec. ¶¶ 4, 6f; Carter Dec. ¶ 10);

     e.     Time filling out the registration application (Jordan Dec. ¶ 6b; Heller Dec. ¶ 5);

     f.     Time spent being escorted in and out of the building with a firearm, taking an instruction course, a test, being fingerprinted, having a background check run, and actually registering and standing in line at the cashiers' office to pay for the registration (Jordan Dec. ¶¶ 6g, 6h; Heller Dec. ¶ 5; Carter Dec. ¶ 10);

     g.     Time spent dealing with Mr. Sykes, both before the transaction and to consummate the purchase (Carter Dec. ¶¶ 6, 9);

     h.     Time spent returning to vehicle or waiting to be picked up (Jordan Dec. ¶ 6i; );

     i.     Time spent returning home (Jordan Dec. ¶ 6i; Heller Dec. ¶ 5; Carter ¶ 11);

     j.     Time spent traveling to a dealer out of the District, because there is no licensed dealer in the District who carries an inventory of firearms (Carter Dec. ¶ 5);

     k.     Ten day waiting period between purchase and the time the gun can be registered (Carter Dec. ¶ 12; Scott Dec. ¶ 7).

25.     Some of these time burdens may also be increased when multiple trips to MPD are involved.   Heller Dec. ¶¶ 5, 6.   Sometimes extra trips are required due to bureaucratic decisions or breakdowns, such as an insistence on an original of a training class certificate rather than a photocopy (Carter Dec. ¶ 17),  a requirement that the stock must be on the firearm when it is brought to MPD (Heller Dec. ¶ 6), or an inability to perform fingerprinting (Scott Dec. ¶ 6). Two trips were generally required early in the process post-*Heller* (see generally Carter Dec. and

Jordan Dec.), and two trips are required now if the firearm is not transferred through a dealer (e.g., firearms already owned outside the District), because the gun itself must be brought to MPD headquarters.  Pl. Ex. 1 (Shelton Dep.) 117-122.

26.     Plaintiff Jordan has registered several firearms, and estimates that the number of hours to register each firearm was six to nine hours for him.  Jordan Dec. ¶ 8.  The time to register his firearms would have been greater had he not been exempt from the training requirement due to prior military firearms training.  Jordan Dec. ¶ 8.  The times to register handguns would have also been greater had he not previously owned those firearms and stored them outside of the District, because he would have been required to travel out of the District to view and select firearms to purchase, and then transfer them through licensed dealers into the District.  Jordan Dec. ¶ 8.

27.     Plaintiff Carter estimated that the time it took to register each firearm was 7 to 8 hours, not counting delays between the various steps.  Carter Dec. ¶ 12.

28.     Plaintiff Heller estimated that his first registration took about five hours.  Heller Dec. 5.  Subsequent registrations tended to run 2-3 hours.  Plaintiff Heller's transactions tended to be shorter in some instances since he had already complied with some of the one-time requirements, was exempt from others, did not have to travel out of state for some registrations, and sometimes already owned the firearm out of state.  Heller Dec. ¶¶ 5-10.

29.     Plaintiff Scott stated that in July of 2012 he had to make two trips to MPD to register his revolver.  Each visit to MPD took several hours counting travel time.

30.     Other burdens include the risk of being attacked and having guns stolen, being stopped and/or arrested, or even shot when on the streets near MPD headquarters with a gun, when District law or procedures require a registrant to physically bring in a firearm in for

registration.  Jordan Dec. ¶ 4; Carter Dec. ¶ 14.

31.     All of these burdens are particularly severe on persons, such as several of the plaintiffs, who are in poverty.  Plaintiffs Jordan and Scott live in subsidized housing.  Plaintiff Jordan's annual income is approximately $16,880, Plaintiff Scott's annual income is $ 13,368, and Plaintiff Mustafa's income in 2011 was $5,208.  Jordan Dec. ¶ 10; Scott Dec. ¶ 9; Def. Ex. F, Resp. No. 2(f).

32.     All of these burdens may also be increased because of wrongful denials by MPD. Plaintiff Jordan was wrongfully denied the registration of a Smith & Wesson Model 59 handgun in 2009.  Thereafter, he had to reapply and go through the entire process again, after which the registration was finally issued.   Pl. Ex. 21 (First Declaration of Absalom Jordan, dated 7/31/2009) ¶¶ 4, 5.

33.     Plaintiff Mustafa was wrongfully denied permission to register a handgun, and had to go through an administrative appeals process in order to have the wrongful rejection overturned.   Def. Ex. F, Resp. No. 15(f).    He estimated the total time for his first, denied registration and his second, successful registration at 31 hours.  *Id.*

34.     The burdens of re-registration will be even greater than the initial burdens of registration. Although it will burden all registrants heavily, it will impose a severe burden on individuals who own several firearms in the District.   Under the proposed rule,[2] a registrant would be required every three years to appear in person at MPD headquarters; submit fingerprints; and confirm possession of previously-registered firearms, home address, and continued compliance with the Act's registration requirements.  A fee of $13, presumably per firearm, would have to be paid every three years, plus fingerprinting fees of $35, and perhaps

---

[2] *See* MPD, Notice of Proposed Rulemaking, Renewal of Firearm Registration, § 2326, at 14-15 (Nov. 15, 2013), http://dcregs.dc.gov/Gateway/RuleHome.aspx?RuleID=1258495.

other fees.   Should the re-registration be late for any reason, fees would double.   If the re-registration is more than 90 days late, the prior registration would be cancelled and the registration treated as a new application.   There does not appear to be any provision that would prevent a cancelled registrant from being charged with possession of unregistered firearms, which can result in jail time, being listed in the Gun Offender Registry, and loss of the ability ever to own firearms in the District.  *See* Pl. Ex. 16 (Heller Dec.) ¶ 12.

35.    As noted by Plaintiff Carter, "it will be an even harsher burden on me because I own more than half a dozen firearms.  If the regulation proposed in November 2013 relating to re-registration goes into effect, every three years I will have to pay something in excess of $100 at the current fee structure, and possibly more, merely to keep the firearms I already own and have already registered."  Pl. Ex. 17 (Carter Dec.) ¶ 18.

**Long Gun Registration**

36.    In 2009, data provided by the District to the FBI show that only two out of 144 murders in the District were known to have been committed with long guns (one rifle and one shotgun).  The sole rifle homicide was the one in which James Von Brunn, a deranged Maryland resident who was a felon and ineligible to possess firearms under DC and federal law, used a .22 caliber rifle to commit a homicide at the Holocaust Museum.  Pl. Ex. 3 (Lanier Dep.) 97.  In 2010, out of 131 murders in the District, not one is reported to have been committed with a rifle or shotgun, according to data submitted by the District to the FBI.  In 2011, only one murder in the District was known to have been committed with a long gun (a shotgun), out of 108 murders total.  *See*  Pl. Ex. 8; *see also* Pl. Ex. 3 (Lanier Dep.) 103-04.  In other words, these data show that over a period of three years, only three murders were committed with long guns of any kind,

or one per year, less than 1% of the 383 total murders.[3]

37.     By contrast, for those three years, the following number of murders were committed in the District using knives, other (non-firearm) weapons, and hands, fists, and feet:

|  | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|
| Knives and cutting instruments | 19 | 20 | 21 | 60 |
| Other (non-firearm) weapons | 9 | 7 | 9 | 25 |
| Hands, fists, and feet | 5 | 5 | 1 | 11 |
| Total | 33 | 32 | 31 | 96 |

In sum, the number of homicides reported to have been committed with knives, non-firearm weapons, and hands, fists and feet was 96, which is 32 times as many as were committed with shotguns and rifles combined (3), and constitutes more than a quarter of all murders.  Pl. Ex. 8.

38.     Registered long guns are just as powerful and accurate as unregistered long guns. Pl. Ex. 3 (Lanier Dep.) 98.

39.     From July 17, 2008, to October 19, 2012, no registered rifles and only two registered shotguns were recovered from crime scenes in the District. Def. Ex. J at 2; Pl. Ex. 1 (Shelton Dep.) 85-86.

40.     Specifically regarding rifles and shotguns, requests for production were submitted by Plaintiffs to the District to produce "all studies, data, and other evidence" that show that laws requiring:

---

[3] The District did not furnish adequate data to the FBI to allow for a breakdown by weapon type for the years preceding 2009, or for 2012.  The District repeatedly asserted that it does not capture the type of firearm used for any category of crime. Pl. Ex. 2, Resp. Nos. 1 and 2.  However, the District did report to the FBI a breakdown by firearm type for homicide for 2009-2011.

a.      that registrants of rifles and/or shotguns re-register each rifle or shotgun periodically (such as every three years as in D.C. Code § 7–2502.07a(a)–(c)),

b.      that applicants for registration of rifles and/or shotguns demonstrate a knowledge of the jurisdiction's firearms laws, as in D.C. Code § 7-2502.03(a)(10),

c.      applicants for registration of rifles and/or shotguns to demonstrate a knowledge of the safe and responsible use, handling, and storage of firearms in accordance with training, tests, and standards prescribed by police, as in D.C. Code § 7-2502.03(a)(10),

d.      applicants for registration of rifles and/or shotguns to be fingerprinted, as in D.C. Code § 7–2502.04(a),

e.      applicants for registration of rifles and/or shotguns to be photographed, as in D.C. Code § 7–2502.04(b),

f.      applicants for registration of rifles and/or shotguns to appear in person, as in D.C. Code § 7–2502.04(c),

g.      that applicants for registration of rifles and/or shotguns take and pass a written test, as the Chief of Police has prescribed pursuant to D.C. Code § 7-2502.03(a)(10) and D.C. Municipal Regulations § 24-2311.3,

h.      applicants for registration of rifles and/or shotguns not to be "blind" (as defined as defined in D.C. Code § 7-1009(1))

i.      applicants for registration of rifles and/or shotguns to complete a firearms training and safety class, as in D.C. Code § 7–2502.03(a)(13)(A),

j.      applicants for registration of rifles/shotguns to provide on a form, inter alia, his/her present business or occupation and the address and phone number of the

11

employer, where the firearm will generally be kept, and "[s]uch other information as the Chief determines is necessary to carry out the provisions of this unit," as in D.C. Code § 7-2502.03(b),

      k.    applicants for registration of rifles and/or shotguns to disclose any business or occupation in which the applicant has engaged the previous five years, as in D.C. Code § 7-2502.03(b),

      l.    registrants of rifles and/or shotguns to notify law enforcement in writing immediately of the loss, theft, or destruction of a firearm, as in D.C. Code § 7-2502.08(1),

      m.    registrants of rifles and/or shotguns to notify law enforcement in writing of any change in name or address, as in D.C. Code § 7-2502.08(a),

      n.    registrants of rifles and/or shotguns to notify law enforcement in writing of the sale, transfer or other disposition of the firearm within 2 business days, as in D.C. Code § 7-2502.08(a),

      o.    a registrant to have in his/her possession, whenever in possession of a registered rifle/shotgun, the registration certificate, or exact photocopy thereof, for such firearm, and exhibit the same upon the demand of a law enforcement officer, as in D.C. Code § 7-2502.08(c),

reduced the use of rifles and/or shotguns in crime, protected police officers, or promoted any other important governmental interest.  In each case, the District responded, "The District does not have any independent studies on this topic, i.e., any studies that are not otherwise publicly available." Def. Ex. C. Req. Nos. 12, 14, 16, 18, 21, 23, 25, 27, 29, 33, 35, 37, 39, 41, 43.

      41.    The District has cited no publicly available studies, data, or other evidence to

show that any of the above-listed registration requirements regarding rifles and shotguns actually reduce crime or protect police officers.

42.    In their Request for Production of Documents, Plaintiffs requested "All studies, data, and other evidence that show that laws requiring registration of rifles and/or shotguns, as in D.C. Code § 7–2502.01(a) and 7–2502.03(b), reduced the use of rifles and/or shotguns in crime, protected police officers, or promoted any other important governmental interest." Def. Ex. C (Req. No. 45).

43.    The District responded that "The District does not have any independent studies on this topic, i.e., any studies that are not otherwise publicly available."

44.    The District and its witnesses have not cited any publicly available studies, data, or evidence that that showed that registration of rifles and/or shotguns reduced crime or protected police officers.

45.    Chief Lanier testified that she could not identify any "studies or data that indicate that registration of long guns specifically as opposed to handguns aids in crime control or promotes officer safety." Pl. Ex. 3 (Lanier Dep.) 105-06.

46.    Most of the studies on which the District's witness Daniel Webster relies pertain to handguns, or do not distinguish between handguns and long guns. Thus, they do not provide evidence to support any conclusions about long guns specifically. None of the studies he cites in support of his claims examined long guns separately. Instead, every single study pertains either to only handguns or pertains to all types of guns combined. Pl. Ex. 7 (Kleck Dec.) ¶ 13.

47.    Though asserting that rifles are the preferred tool of political assassins (Def. Ex. G (Lanier Dec.) ¶ 32), the District has not cited one assassination that has occurred in the District involving a rifle. The vast majority of assassinations and assassination attempts in the United

States have involved handguns or other devices, not rifles.  Pl. Ex. 11.

**Officer Safety**

48.    MPD officers that are responding to a call for service are not informed in advance if there is a registered firearm at the location.  Pl. Ex. 2**,** Resp. No. 6.  Neither MPD dispatchers nor officers being dispatched on calls for service have direct access to the firearms registry database.  Pl. Ex. 1 (Shelton Dep.) 66-68.  It can only be accessed by authorized personnel from terminals within the Firearms Registration Section (i.e., the database is not accessible through the MPD's intranet or the Internet).  Def. Ex. B (Shelton Dec.) ¶ 13;  Def.  Ex. J at 1-2.  Police department squad cars or vehicles are not equipped with a computer that can access the firearms registry.  Pl. Ex. 1 (Shelton Dep.) 66-67; Pl. Ex. 3 (Lanier Dep.) 66.

49.    When dispatch directs a vehicle or officers to a location, they do not tell the officers over the radio or telephone whether or not there are firearms at that location because the dispatchers do not have the ability to check the registration database.  Pl. Ex. 1 (Shelton Dep.) 67-68.

50.    Officers being dispatched to an address do not routinely query the database to find out if there are registered firearms at that location.  Pl. Ex. 2 (Interrog. No. 6); Pl. Ex. 3 (Lanier Dep.) 67; Pl. Ex. 1 (Shelton Dep.) 64.  The Lieutenant in charge of the Firearms Registration Section reports fewer than a dozen instances in which police agencies contacted his office to check registration records for an address before executing a search warrant.  Def. Ex. J at 2; Pl. Ex. 1 (Shelton Dep.) 72.  Lt. Shelton has been branch commander over the Firearms Registration Section for approximately 20 years.  Pl. Ex. 1 (Shelton Dep.) 9.

51.    Other jurisdictions do not routinely check registrations when dispatching officers. Pl. Ex. 1 (Shelton Dep.) 68-69; ; Pl. Ex. 9; Pl. Ex. 10; Pl. Ex. 6 (Jones Dep.) 69.

52.     Officers investigating an individual do not routinely check whether the individual has firearms registered to him. Pl. Ex. 3 (Lanier Dep.) 67; Pl. Ex. 1 (Shelton Dep.) 64.

53.     Police officers responding to calls are trained to treat potentially violent situations as always having the potential for presence of weapons.  Pl. Ex. 1 (Shelton Dep.) 71; Pl. Ex. 6 (Jones Dep.) 68.

54.     There has been no instance known to the Chief of Police in which an individual with a registered firearm shot or shot at a District police officer.  Pl. Ex. 3 (Lanier Dep.) 75.

**Re-Registration**

55.     Three-year renewals and a formal re-registration process are not necessary in order to conduct periodic background checks on registrants.  Pl. Ex. 3 (Lanier Dep.) 43-46; Pl. Ex. 6 (Jones Dep.) 104-06; Pl. Ex. 1 (Shelton Dep.) 148-50.

56.     Databases available to MPD can be checked frequently or periodically to determine if a person is still eligible to possess a registered firearm in the District.  Pl. Ex. 1 (Shelton Dep.) 57-60.

57.     In addition to the National Crime Information Center, the District checks other databases such as the Washington Area Law Enforcement System ("WALES") to conduct background checks.  Pl. Ex. 1 (Shelton Dep.) 34; Pl. Ex. 3 (Lanier Dep.) 22.

58.     As of 2010, the gun registry unit conducted monthly checks of registered owners for protective order violations and domestic violence charges. Pl. Ex. 3 (Lanier Dep.) 48 (discussing Pl. Exs. 14 and 15; Pl. Ex. 1 (Shelton Dep.) 60 (discussing Def. Ex. J).  As of 2011, the District checked protective order records "about every two weeks,"  and that process is still in place.  Pl. Ex. 1 (Shelton Dep.) 57-59.

59.     Mental health commitment records are reported to MPD by the Superior Court.

Pl. Ex. 1 (Shelton Dep.) 42. Those commitments are maintained in a spreadsheet, and can be periodically reviewed to determine continued eligibility.  Pl. Ex. 1 (Shelton Dep.) 61-63.

60.     In response to a request for production asking the District to produce "All studies, data, and other evidence that show that laws requiring that registrants of handguns re-register each handgun periodically, such as every three years as in D.C. Code § 7–2502.07a(a)–(c), reduced the use of handguns in crime, protected police officers, or promoted any other important governmental interest, the District responded, "The District does not have any independent studies on this topic, i.e., any studies that are not otherwise publicly available."  Def. Ex. C. Req. No. 11.

61.     The District's experts cite no studies, data, or other evidence showing that periodic registration renewal or reporting requirements reduce crime or protect police officers. Pl. Ex. 3 (Lanier Dep.) 56; Pl. Ex. 6 (Jones Dep.) 113; Pl. Ex. 13 (Webster Dep.) 138-40; Def. Ex. I (Webster Dec.) ¶ 30.

62.     On November 15, 2013, MPD promulgated a proposed regulation regarding re-registration, scheduled to go into effect 30 days after promulgation.  MPD, Notice of Proposed Rulemaking, Renewal of Firearm Registration, § 2326, at 14-15 (Nov. 15, 2013), http://dcregs.dc.gov/Gateway/RuleHome.aspx?RuleID=1258495.  Among other things, the re-registration regulation would require each registrant to re-register each firearm every three years by appearing in person at the Firearms Registration Section, being fingerprinted, paying a fingerprinting fee (currently $35.00) and paying a re-registration fee (currently $13.00) for each firearm owned by the registrant.

**Test of knowledge of District firearms laws and gun safety**

63.     The District's gun safety test includes only one question about safe storage of

firearms within the home; the question is about the District's recommendation that firearms be kept unloaded, and either disassembled or locked.  Pl. Ex. 3 (Lanier Dep.) 59-60; Pl. Ex. 13 (Webster Dep.) 142-43; Pl. Ex. 18  2.

64.     D.C.'s    training    course    takes    about    30    minutes    to    complete.  https://dcfst.mpdconline.com/

65.     The District's witnesses cite no studies showing that mandatory training or testing in gun safety reduce unintentional discharges.  Pl. Ex. 3 (Lanier Dep.) 56-58, 62; Pl. Ex. 6 (Jones Dep.) 116-117; Def. Ex. I (Webster Dec.) ¶¶ 31-34; Pl. Ex. 13 (Webster Dep.) 144-45.

**Lost and Stolen Reporting**

66.     People can report stolen property without any legal mandate.  Pl. Ex. 3 (Lanier Dep.) 78-80.  People commonly report theft and loss of property, including guns, voluntarily without a legal mandate.   Pl. Ex. 13 (Webster Dep.) 136.

67.     Registration information on guns that are reported lost or stolen does not give information that is helpful in solving theft or identifying the thief.  Pl. Ex. 3 (Lanier Dep.) 79.  Registration is not needed to investigate gun theft if the gun has been reported as stolen to NCIC.  Pl. Ex. 6 (Jones Dep.) 73-74.

68.     Studies on theft and loss reporting do not include any analysis of whether the laws have been enforced.  Pl. Ex. 7 (Kleck Dec.) ¶ 57.

**Trafficking/One Gun a Month**

69.     Firearms trace data is not necessarily representative of all guns recovered by law enforcement or all guns used in crime.  Pl. Ex. 3 (Lanier Dep.) 9.

70.     Not all guns recovered by law enforcement agencies are traced.  Pl. Ex. 13 (Webster Dep.) 83.  Guns that aren't recovered can't be traced.  Pl. Ex. 13 (Webster Dep.) 82-83.

ATF trace reports only include successful traces.  Pl. Ex. 13 (Webster Dep.) 83-84.  It is easier to trace more recently sold firearms.  Pl. Ex. 13 (Webster Dep.) 84;.

71.    Guns recovered at crime scenes weren't necessarily used in crime.  Pl. Ex. 1 (Shelton Dep.) 78.  Firearm trace data provides no breakdown of whether traced guns were actually pointed, brandished, or used as weapons.  Pl. Ex. 5 (Vince Dep.) 24-25.

72.    Trace reports do not show whether a firearm has been trafficked or illegally diverted.  Pl. Ex. 7 (Kleck Dec.) ¶ 27.

73.    Guns are trafficked primarily into the District, not out of the District.  Pl. Ex. 13 (Webster Dep.) 106-07.

74.    The majority of illegal firearms recovered in the District are illegally trafficked from other states.  Def. Ex. H (Vince Dec.) ¶ 18; Def. Ex. G (Lanier Dec.) ¶ 29.

75.    In response to a document production request for "All studies, data, and other evidence that show that laws requiring a person who registered a pistol to wait 30 days, or other specified time period, to register another one, as in D.C. Code § 7-2502.03(e), reduced the use of pistols in crime, protected police officers, or promoted any other important governmental interest," the District responded that "The District does not have any independent studies on this topic, i.e., any studies that are not otherwise publicly available." Def. Ex. C. Req. No. 10.  The District has produced or cited no studies, data, or evidence showing that such statutes requiring a 30 day wait reduce the use of handguns in crime or protect police officers.

76.    The Weil/Knox study on the effectiveness of Virginia's one-gun-a-month law did not examine whether guns were illegally trafficked interstate.  Pl. Ex. 3 (Lanier Dep.) 87-89.

77.    ATF research on the effectiveness of the Virginia one-gun-a-month law included no analysis of effects in the District in particular.  Pl. Ex. 5 (Vince Dep.) 67-69.

78.     No studies show whether the repeal of the Virginia one-gun-a-month law affected armed crime in the District.  Pl. Ex. 6 (Jones Dep.) 92.

79.     The 30-day purchase limit does not limit the number of guns in a home.  Pl. Ex. 6 (Jones Dep.) 84-85.

80.     No studies show that limiting the number of guns in a home prevented murder, suicide, accidental injury or intimidation.  Pl. Ex. 6 (Jones Dep.) 85-88.

81.     Daniel Webster's studies of the repeal of Missouri's permit-to-purchase law did not account for the concurrent increase in firearms sales.  Pl. Ex. 7 (Kleck Dec.) ¶¶ 28-30.

82.     Around the time the D.C. registration laws were changed in 2009, Plaintiff Jordan stored outside the District two other pistols which he wished to apply to register at the same time he submitted an application for registration of a S & W Model 59 handgun. He could not do so because of the one pistol per 30 days limitation in D.C. Code § 7-2502.03(e).   Instead, his only available means to register these pistols was to undertake the effort and expense of submitting registration applications on two more occasions, with a minimum 30-day period between the dates on which the Chief registers each pistol.  Pl. Ex. 21 (Jordan Decl. 7/31/2009) ¶ 6.

83.     Plaintiff Heller currently owns several handguns that are kept out of state, and he is prevented from transferring them into the District at one time because of the "one handgun per month" law.  Pl. Ex. 16 (Heller Dec.) ¶ 11.

**In-Person Application, Photographs and Fingerprinting**

84.     No studies show that in-person registration would prevent criminals from circumventing the registration process.  Pl. Ex. 5 (Vince Dep.) 75-76, 80, 82; Pl. Ex. 6 (Jones Dep.) 100.

85.     In a survey of felons incarcerated in state prison for offenses during which they

were armed with firearms, only 10.4% of respondents reported acquiring firearms from gun shops or pawnshops.  Pl. Ex. 7 (Kleck Dec.) ¶ 16.

86.     Only 0.8% of unlawful firearm acquisitions reported by incarcerated armed felons were made by use of a false name.   Pl. Ex. 7 (Kleck Dec.) ¶ 17.   No studies show that any criminals obtain guns using false identification and could not get guns from other sources if false identification were unavailable.  *Id*.

87.     The officer in charge of the Firearms Registration Section stated they have not had a problem with false IDs on the firearms registration side for private individuals.  Pl. Ex. 1 (Shelton Dep.) 32-33.

88.     The dealer attestation by the transferring dealer assists in enforcement of D.C. registration laws.   It does not help prevent or solve non-regulatory violent crime. Pl. Ex. 1 (Shelton Dep.) 122.

89.     The District's witnesses were not aware of any case of a private individual trying to use a false identification document to register a gun.  Pl. Ex. 1 (Shelton Dep.) 33; Pl. Ex. 13 (Webster Dep.) 27-28.   Although Prof. Webster speculated that prospective purchasers from licensed dealers might avoid denials by using variant names or false dates of birth, he was not aware of any instances where this has happened, and did not have any data about this occurring. Webster Dec. 3, ¶ 11; Pl. Ex. 13 (Webster Dep.) 39-40.

90.     Requiring photographs and fingerprinting has not substantially reduced illegal trafficking into the District.  Pl. Ex. 13 (Webster Dep.) 108.

91.     Requiring in-person application has not substantially reduced illegal trafficking into the District.  Pl. Ex. 13 (Webster Dep.) 108.

**Registrant Information Requirements (§ 7-2502.03(b))**

92.     The listing of residences for the prior five years doesn't provide any additional information regarding eligibility.  Pl. Ex. 1 (Shelton Dep.) 97.  The list of residences does not provide any positive identification beyond the fingerprinting requirement.  *Id.*  It does not result in any additional databases being searched.  *Id.*

93.     The lieutenant in charge of the MPD's Firearm Registration Section could not identify any instances in which information about past residences had prevented a crime or led to identification of an individual who committed a crime.  Pl. Ex. 1 (Shelton Dep.) 98.  Lieutenant Shelton believes that the District could have an effective registration system if the question about residences during the prior five years was not included on the application.  Pl. Ex. 1 (Shelton Dep.) 98-99.  He could recall no instance in which the reporting of past residences has been used to reduce crime or protect officers.  Pl. Ex. 1 (Shelton Dep.) 129-30; Pl. Ex. 2, (Inter. 16).

94.     The officer in charge of the MPD Firearms Registration Section, Lt. Shelton, had "no clue" why the District would need to know the employer of private individuals not purchasing for use by security companies, Pl. Ex. 1 (Shelton Dep.) 105, and could recall no instance in which the reporting of employment information had been used to reduce crime or protect officers.  Pl. Ex. 1 (Shelton Dep.) 130 (discussing Pl. Ex. 2 (Inter. 21)).  He admitted there is no written policy against discussing this information with an applicant's employer.  Pl. Ex. 1 (Shelton Dep.) 108.

95.     Lt. Shelton was unaware of any case in which an applicant admitted having a previous firearms license or registration denied, and was therefore unaware of any case in which the MPD had tried to verify such a revocation or denial.  Pl. Ex. 1 (Shelton Dep.) 108-10.  He could recall no instance in which the reporting of past license or permit denials had been used to reduce crime or protect officers.  Pl. Ex. 1 (Shelton Dep.) 130-31; Ex. S7.

96.     Lt. Shelton could only recall one or two cases in which applicants reported firearm mishaps, and none in which the admission resulted in a denial of registration.  Pl. Ex. 1 (Shelton Dep.) 112-13.  He could recall no instance in which the reporting of past mishaps had been used to reduce crime or protect officers.  Pl. Ex. 1 (Shelton Dep.) 129-31; Ex. S7.

97.     Lt. Shelton could recall no instance in which the reporting of the identity of a transferring dealer had been used to reduce crime or protect officers.  Pl. Ex. 1 (Shelton Dep.) 131; Ex. S7. He testified that identification of out-of-state dealers helps compliance with registration laws, but does not help prevent or solve crime.  Pl. Ex. 1 (Shelton Dep.) 122.

**Blind People**

98.     The District's expert had no experience with blind persons possessing firearms, and was not aware of any studies showing that blind people are more dangerous with firearms than sighted persons.  Pl. Ex. 6 (Jones Dep.) 101.

Respectfully submitted,

Dick Anthony Heller
Absalom F. Jordan, Jr.
William Carter
William Scott
Asar Mustafa

By Counsel

 /s/ Stephen P. Halbrook
STEPHEN P. HALBROOK
D.C. Bar No. 379799
3925 Chain Bridge Road, Suite 403
Fairfax, VA  22030
Telephone: (703) 352-7276
Facsimile: (703) 359-0938
Email:  PROTELL@aol.com

 /s/ Dan M. Peterson
DAN M. PETERSON
D.C. Bar No. 418360

Dan M. Peterson, PLLC
3925 Chain Bridge Road, Suite 403
Fairfax, VA  22030
Telephone: (703) 352-7276
Facsimile: (703) 359-0938
Email: dan@danpetersonlaw.com

Counsel for Plaintiffs