# Exhibit 1

9

1           In addition, the officers under Diaz have to

2   testify to the authenticity of those.  So those

3   officers also testify in court as to the authenticity

4   of the documents that they've traced and run the

5   firearms.

6       Q    When you say "authenticity of documents,"

7   what documents are you referring to?

8       A    We do two documents for the -- for a case,

9   depending on the charges.  Carrying a pistol would be

10  one charge that a document is for.  And an

11  unregistered firearm is the, I believe, the PD-32.

12  And the PD-36 is for carrying the pistol --

13      Q    Okay.

14      A    -- or rifle or shotgun illegally.

15      Q    All right.  And as a branch commander, how

16  long have you been in that position?

17      A    Well, I was the sergeant there since 1994.

18  And when I got promoted to lieutenant.  I maintained

19  that.  The then chief at the time wanted my expertise

20  in that to remain there, so I've been the lieutenant

21  in charge of that for 12 years.  So 20 years,

22  basically.

Capital Reporting Company
Shelton, Lieutenant Jon  07-29-2013

32

1   person --

2       A    It's also the law.

3       Q    Right.  Sure.  Certainly.  But --

4       A    Your indulgence, for a quick second?

5       Q    Sure.

6       A    Thank you.  Go ahead.

7       Q    To the best of your knowledge and in your

8   experience --

9       A    Sure.

10      Q    -- has the District had a problem with

11  people presenting false or forged identification

12  documents in an attempt to register a firearm?

13      A    I'm trying to see how I want to word this to

14  you so that it's as direct to your question as I

15  possibly can without deviating.

16      Q    Sure.  Okay.

17      A    Okay?  I would say that in my office, at the

18  security officers management branch, which licenses

19  people to carry firearms, that we do have problems

20  with people falsifying information on a regular basis

21  that is captured by the live scan machine.  People

22  that are coming into the firearms registration section

33

1  do not have a lot of documents that they need to

2  present.  So my answer to that would be, probably no.

3      Q      "Probably no" on the firearms registration

4  section side of things; is that right?

5      A      That's correct.

6      Q      Okay.  Do you recall any instance at all

7  where someone came into the firearms registration

8  section -- and now I'm referring to a private

9  individual --

10     A      Correct.

11     Q      -- and tried to use a false or a forged

12  identification document to register a gun?

13     A      I do not recall.

14     Q      Okay.  As part of the -- well, first of all,

15  when a person comes in -- and unless I tell you

16  otherwise, when I'm referring to this whole process,

17  I'm only concerned with the firearms registration

18  section and the registration by private individuals

19  and not security officers.  I may ask you a question

20  or two about security officers, but I'll try to make

21  that clear.

22     A      I understand.

## Capital Reporting Company
### Shelton, Lieutenant Jon  07-29-2013

42

1      Q    Okay.  And when you say that's done in a

2  different way, is that done by the District in a

3  different way?  At the time of a background check, do

4  you check mental health records?

5      A    Yes, we do.

6      Q    Okay.  And what type of mental health

7  records do you check when you do a background check?

8      A    What type?

9      Q    What database?

10      A    Oh, we get them -- we get them submitted

11  from D.C. Superior Court to us.

12      Q    Okay.

13      A    And then we -- we maintain them in a

14  relatively simple Excel spreadsheet.

15      Q    Okay.

16      A    And submit that to the FBI.

17      Q    You submit that to the FBI.  So if you're

18  doing -- at the -- I'm focusing on the point where the

19  District is doing a background check on an individual

20  for purposes of registering a firearm.

21           Do you check the spreadsheet?  Or do you

22  check the spreadsheet information that has somehow

57

1      Q      Okay.

2             MR. PETERSON:  Then let's mark one more.

3             THE WITNESS:  I'd like to point out that

4    they change the names of these databases on a regular

5    basis, so...

6    BY MR. PETERSON:

7      Q      Okay.  Has the name Courtview changed?  Do

8    you know?

9      A      I believe it's a relatively new database.

10     Q      Okay.

11            MR. PETERSON:  And then we'll have another

12   one we'll mark as Exhibit S4.

13            (S Exhibit Number 4 was marked for

14            identification.)

15   BY MR. PETERSON:

16     Q      And this one appears to be an e-mail from

17   Sergeant Hall to yourself --

18     A      Correct.

19     Q      -- dated November 30th, 2011.  And at the

20   top it states that, "In order to conduct checks for

21   CPOs" -- and CPO -- by the way, I'm stopping for the

22   court reporter -- I think is civil protective order;

58

1    is that right?

2        A    Correct.

3        Q    -- "we check the CPO list about ever two

4    weeks provided by the Superior Court domestic violence

5    section.  If we find any matches in our gun database,

6    we began to work on retrieving the firearms from the

7    registrant."

8        A    Correct.

9        Q    Okay.  So is that still being done, as far

10   as you know?

11       A    That was the way I was under the impression

12   that it was done.  I did not know that Courtview

13   provided that.

14       Q    Okay.  All right.

15       A    This was my -- this is what -- this is what

16   my understanding was how we were getting them.

17       Q    All right.

18       A    And I was comfortable with this.

19       Q    Okay.

20       A    I -- you know.

21       Q    I guess my point is that certain databases

22   can be checked frequently to update it to determine if

59

1  a person is still eligible to possess a registered

2  firearm in the District; is that right?

3       A    Well, as far -- yes.

4       Q    Okay.

5       A    Are we done with this one (indicating)?

6       Q    Yes.  And here's sort of an earlier version.

7  That was late 2011.  I'll just get this on the record.

8  This will be S5.

9            (S Exhibit Number 5 was marked for

10           identification.)

11  BY MR. PETERSON:

12      Q    And this is a little bit older e-mail from

13  Morgan Kane to Chief Lanier.  It looks like it was

14  just forwarded, maybe.  But certainly it contains an

15  e-mail discussing various things from people below,

16  but the sentence I'm interested in is after the

17  heading from Nicholas Breul -- I guess B-R-E-U-L --

18  right up near the top there.

19      A    That's the appropriate pronunciation.

20      Q    Okay.  And he states to Chief Lanier, "That

21  there have been no arrests of any of the registered

22  firearms owners for any gun-related crimes or

60

1   violations.  Further, the gun registry unit monthly

2   checks the registered owners for any CPO/TPO

3   violations or domestic violence-related charges."

4           So I guess what we're doing here is just

5   taking this back a little bit further in time.  They

6   were apparently checking back in 2010 as well as in

7   late 2011 in terms of CPO violations; is that right?

8       A    Correct.

9       Q    Okay.

10          MR. PETERSON:  Okay.  I'm going to mark this

11  as Exhibit S6.

12          (S Exhibit Number 6 was marked for

13          identification.)

14  BY MR. PETERSON:

15      Q    And, again, I guess this is kind of a

16  confirmation of the same subject, might be bringing

17  coals to Newcastle as they say, but this one also

18  indicates that Sergeant Hall and his staff are,

19  "constantly checking for CPOs issued to our gun

20  registrants," correct?

21          MR. SAINDON:  Objection.  Foundation.

22          You can answer it.

61

1           THE WITNESS:   Yeah.   This was not -- when

2    he's referring to lieutenant here, he's not referring

3    to me.

4    BY MR. PETERSON:

5        Q     No.  No.  No.

6        A     Okay.  He's referring to Lieutenant Breul.

7        Q     Right.  Right.

8        A     Okay.  So, yes.  As I stated earlier, we get

9    the -- the CPOs.  I did not know that they were in

10   Courtview.  I am not familiar with Courtview like I am

11   the other databases.  But, of course, a CPO would

12   prohibit you from having firearms, so it was my

13   impression that we were getting them.  And we were and

14   are getting them directly from the courts --

15       Q     Okay.

16       A     -- submitted similarly in the fashion that

17   we were getting the mental health records.

18       Q     Okay.  And I'm not sure if we've covered

19   this, but what about mental health commitments?  Is

20   there a database or a set of records that can be

21   queried by MPD frequently to determine mental health

22   commitments?

62

```
 1      A    Yes.

 2      Q    Okay.  And was that the spreadsheet that you

 3 were referring to?

 4      A    Correct.

 5      Q    Okay.

 6      A    It's very prehistoric.  I mean, there's

 7 no -- it's not a high-tech database.

 8      Q    Okay.

 9      A    We take the names and we enter them in.  And

10 that's one of the first things that we check.

11      Q    Do you know if those are checked on a

12 regular ongoing basis after the initial registration?

13      A    I believe -- I don't know the answer to

14 that.

15      Q    Okay.

16      A    We've checked every time somebody comes in

17 to register a gun.  That's one of the first checks

18 that we do.

19      Q    Okay.  But there wouldn't be anything that

20 would prevent you from looking at that updated

21 spreadsheet to determine if a person was still

22 eligible?
```

Capital Reporting Company
Shelton, Lieutenant Jon  07-29-2013

63

1      A      Absolutely not.  No, sir.

2      Q      Okay.

3             MR. PETERSON:  Okay.  I see Andy looking at

4   his watch.

5             MR. SAINDON:  I like to check after an hour

6   to see how my witness is feeling and if he wants to

7   take a break.

8             MR. PETERSON:  We can take a five-minute

9   break, if you would like to.

10            MR. SAINDON:  It's up to you.

11            THE WITNESS:  That would be nice.

12            MR. PETERSON:  Okay.  Let's take a break.

13            MR. SAINDON:  Thanks.

14            (Brief recess.)

15            MR. PETERSON:  Let's mark the next exhibit

16  as S7.

17            (S Exhibit Number 7 was marked for

18            identification.)

19  BY MR. PETERSON:

20      Q      And, Lieutenant Shelton, I'll represent to

21  you that these are the responses by the District to

22  the plaintiff's first set of interrogatories.  And did

Capital Reporting Company
Shelton, Lieutenant Jon  07-29-2013

64

1   you help prepare some of those responses?

2        A    Yes, I did.

3        Q    Okay.  I'll ask you mostly about the ones

4   you worked on.

5        A    Okay.

6        Q    Interrogatory number 6 -- this would be on

7   page 7 of that document -- asked about whether police

8   officers are informed or can determine in advance

9   whether a person at a location or dwelling or building

10   may have firearms when they are called there for

11   police business.  And in the response, it states that,

12   "MPD officers that are responding to a call for

13   service are not informed in advance if there is a

14   registered firearm at the location.  Although

15   specialized units will sometimes contact the firearms

16   registration section to determine whether any firearms

17   are registered at an address or to a person prior to

18   executing a search or arrest warrant, these checks are

19   not captured by MPD."

20            Is that a correct statement?

21        A    That's completely correct.

22        Q    Okay.  And the registration information

66

1   And I inquired if I could get it there.  And I still

2   don't have an answer to that.  So it is held within

3   one unit only.

4       Q    Okay.  In fact, I think we have a statement

5   from your lawyers to that effect.  And I just want to

6   confirm that this is correct.

7            MR. PETERSON:  So this will be Exhibit S8.

8            (S Exhibit Number 8 was marked for

9            identification.)

10  BY MR. PETERSON:

11      Q    And at the bottom of the first page, the

12  carryover paragraph, the attorneys state that the

13  database "can only be accessed by authorized personnel

14  from terminals within the firearms registration

15  section; i.e., the database is not accessible through

16  the MPD's intranet or the Internet."

17           So is that correct?

18      A    Yes, sir.

19      Q    Okay.  And just to kind of follow up,

20  there's not a computer in police department squad cars

21  or vehicles that could access this information; is

22  that right?

Capital Reporting Company
Shelton, Lieutenant Jon  07-29-2013

67

1      A      Absolutely not.

2      Q      Okay.  And I need to --

3      A      Well, now if a gun is recovered on the

4  street, they can -- in a crime --

5      Q      Uh-huh.

6      A      -- it can be run by a serial number --

7      Q      Uh-huh.

8      A      -- but not -- you cannot access anything

9  that's related to the personal information by running

10  it through that terminal.

11      Q      Okay.

12      A      Okay.  Just to clarify that.

13      Q      So it's only -- it's kind of the reverse.

14  You can't --

15      A      That's correct.

16      Q      Okay.

17      A      Yes, sir.

18      Q      So when dispatch directs a vehicle or

19  officers to a location, do they tell them over the

20  phone or anything or over a radio whether or not there

21  are firearms at that location?

22      A      Dispatchers don't have the ability to do it

68

1   as well.

2        Q     Okay.

3        A     In fact, I --

4              MR. PETERSON:  All right.  I guess this will

5   be Exhibit S9.

6              (S Exhibit Number 9 was marked for

7              identification.)

8   BY MR. PETERSON:

9        Q     This one, I'm going to have to kind of

10  connect it up with another document here in just a

11  second.  But this is apparently an e-mail to you and

12  then a response from you to Sergeant Hall relating to

13  a list of 11 states that have registration like ours

14  for Hibbard's project.  And it -- then it's a little

15  obscure as to what it is that's being checked, but

16  apparently he is trying to check some type of

17  information relating to those 11 states, correct?

18       A     It would appear.

19       Q     Yes.  Okay.  And now I think maybe we can

20  clarify that with another document, which is going to

21  be Exhibit S10.

22             (S Exhibit Number 10 was marked for

69

1            identification.)

2   BY MR. PETERSON:

3       Q    And this is dated, oh, about 11 days after

4   the previous e-mail.  Again, an e-mail from Sergeant

5   Hall to yourself regarding Hibbard's project.  And it

6   states that, "Hibbard checked all the states you

7   requested him to, and none dispatched firearms

8   registration information to officers in the field when

9   responding to calls."

10           Do you remember this series of e-mails on

11  Mr. Hibbard's project?

12      A    Vaguely.

13      Q    Okay.  But apparently his research indicates

14  that the other jurisdictions are like the District in

15  which firearms registration information is not

16  dispatched to officers when responding to the call; is

17  that correct?

18      A    That's correct.  I was opposed to that ever

19  happening.

20      Q    Okay.  You were opposed to it, you say?

21      A    Yes.

22      Q    Why is that?

71

1   grips and not, you know, out where it could be -- be

2   possibly abused.

3        Q    Okay.  Is it correct that police officers

4   are trained to treat situations where there might be a

5   crime in progress or domestic dispute or some other

6   situation possibly involving violence as always having

7   a potential to have a dangerous weapon present?

8             MR. SAINDON:  Objection.  Relevance.

9             THE WITNESS:  I would say of course.

10  BY MR. PETERSON:

11       Q    Right.  Okay.

12       A    Yes.

13       Q    Thank you.  I think we already marked

14  Exhibit S8.  This is the December 5th letter from the

15  District's attorneys to counsel for the plaintiff.  If

16  you could get that in front of you, please.

17            And on page 2 of that document -- and it's

18  the one, two, three, fourth paragraph down -- and it's

19  the one that begins, "Regarding your complaint as to

20  the District's response to interrogatory number 21."

21            Do you see that paragraph?

22       A    Yes, I do.

Capital Reporting Company
Shelton, Lieutenant Jon  07-29-2013

72

1       Q     Then there's a statement that says that,

2   "According to Lieutenant Shelton, there have been less

3   than a dozen instances since he's been at SOMB where

4   certain police agencies, like MPD-Narcotics or the

5   U.S. Park Police, have contacted the firearms

6   registration section prior to executing a search

7   warrant in an effort to determine if there were any

8   registered firearms associated with a particular

9   address."

10            Is that a true statement, first of all?

11      A     Yes.

12      Q     Okay.  And how long have you been at SOMB?

13  I'm not sure of that.

14      A     Twelve years.

15      Q     Twelve years.  Okay.  And it states that

16  there's been less than a dozen.  Can you recall some

17  specific instances for us when this has taken place?

18      A     Yeah.  Yes, I can.

19      Q     Okay.  Why don't you give us a couple of

20  those.

21      A     Examples?

22      Q     Yeah.

76

1   the registration records and finds that the gun is

2   registered to John Jones at such and such an address.

3   And then they go to the address, and there's

4   Mr. Jones, and it turns out that he has powder residue

5   on his hands and is identified by other witnesses.

6           But that scenario just doesn't occur much at

7   all, does it?

8       A   The scenario that you just laid out to me,

9   no.

10      Q   No.  Okay.  All right.  Usually there's

11  witnesses or other ways of finding the individual

12  other than a firearm left at the scene, correct?

13      A   I would say that's a safe assumption, yes.

14      Q   Okay.  And in the few instances where

15  firearms are left at the scene -- I'm just asking you

16  based on your experience -- is it true as a general

17  matter that usually those are unregistered firearms as

18  opposed to registered firearms?

19      A   Yes, sir.

20      Q   Okay.  I'd like to show you now the answer

21  to interrogatory 13, which is on, again, Exhibit S7.

22          And did you help prepare the answer to this

Capital Reporting Company
Shelton, Lieutenant Jon  07-29-2013

78

1      Q     Okay.  And just to -- and I'm not going to

2   ask you to check my math here.  I've added them

3   together, and just eyeballing it here, I came up with

4   the number 6,046 for handguns for all of those years

5   put together, 473 for rifles, 612 for shotguns.  I'm

6   not asking you to check my math.  If I've done it

7   wrong, the attorneys will check me.  But adding those

8   three together, I came up with something over 7,000

9   firearms.

10            Does that look about right, just eyeballing

11   the thing?

12      A     It does.

13      Q     Okay.  Now, these are guns that are

14   recovered from crime scenes, it says.

15            But does that necessarily mean that the gun

16   was actually used to commit a crime if it's recovered

17   from a crime scene?

18      A     No.

19      Q     Okay.  The gun could be present for some

20   other reason other than the fact that it was actually

21   used in the commission of a crime; is that right?

22      A     Absolutely.

85

1    day with that firearm without deviation.

2        Q    Okay.

3        A    I have a detective unit that investigates

4    all of these.  And they're almost always stolen from

5    the individual at their home and eventually used in

6    the commission of crimes.

7        Q    All right.  Okay.

8        A    Is that adequate?

9        Q    Yes, that explains it.  I was just

10   wondering.  It seemed like a fairly significant

11   number, and I was just wondering.

12       A    Well, there's many, many, many people that

13   are armed that are carrying that are working in the

14   security industry here in the District of Columbia.

15       Q    All right.  So you don't -- I mean, looking

16   at this chart again over the period 2008 through

17   2012 -- and I'm on Exhibit S8 -- a striking fact is

18   the lack of rifles and shotguns that are recovered

19   from crime scenes.

20            It looks like during that four or five-year

21   period, there were no rifles and only two shotguns

22   recovered, correct?

Capital Reporting Company
Shelton, Lieutenant Jon  07-29-2013

86

1     A     Correct.

2     Q     They're not used in crime or associated with

3   crime scenes very much in the District; is that right?

4            MR. SAINDON:  Objection.  Foundation.

5            THE WITNESS:  Well, are we going to stick

6   with just the private, or do we want to talk about

7   both of these?  I mean, I'm not sure what you're

8   asking about.

9   BY MR. PETERSON:

10    Q     Okay.  Well, if you put them both together,

11  security companies even more --

12    A     Well, that's because they don't use them.

13    Q     They don't use them, correct.

14    A     Right.  There are some that have them, but

15  for the most part, they're not used.

16    Q     Okay.  But for private individuals, there

17  are fairly large numbers of rifles and shotguns

18  registered in the District, correct?

19    A     Yes, sir.

20    Q     Okay.  But over this roughly five-year

21  period, only two shotguns -- two registered shotguns

22  and zero registered rifles were associated in any way

97

1  correct?

2      A      You're going to have to rephrase your

3  question.

4      Q      Okay.  Fingerprints are used to positively

5  identify, you testified, that the person is indeed the

6  person that he's representing himself to be on the

7  application, correct?

8      A      That's correct.

9      Q      Okay.  Does information regarding residence

10  positively identify that person beyond what

11  fingerprints would identify them?

12     A      No.

13     Q      Okay.  Does the information regarding prior

14  residence lead to any additional databases being

15  searched during the registration process beyond the

16  ones we've mentioned, WALES and NCIC and NICS and so

17  forth?

18     A      I'm not aware of any.

19     Q      Okay.  So the five-year list of residences

20  doesn't really provide any additional information

21  regarding eligibility to possess a firearm, does it?

22     A      No, sir.  None at all.

Capital Reporting Company
Shelton, Lieutenant Jon  07-29-2013

98

1        Q     Okay.  Can you identify any instances in

2   which having that information about a prior list of

3   residences over five years either prevented a crime or

4   led to the identification of an individual who

5   committed a crime?

6        A     One more time, sir.

7        Q     Okay.  Can you identify any instances in

8   which having the information about a person's

9   residences during the prior five years either

10  prevented a crime from occurring or led to the

11  identification of an individual who committed a crime?

12       A     No, sir, I cannot recall.

13       Q     Okay.  In your opinion, could the District

14  have an effective registration system if this question

15  about residences during the prior five years was not

16  included on the application?

17       A     Yes.

18             MR. SAINDON:  Objection.  Calls for opinion.

19             But you can answer.

20             THE WITNESS:  I'm sorry.

21  BY MR. PETERSON:

22       Q     Your answer was yes?

Capital Reporting Company
Shelton, Lieutenant Jon  07-29-2013

99

1      A     Yes, sir, I do.

2      Q     Okay.  And, similarly, code section

3  7-2502.03(b)(3) requires the applicant to furnish

4  information regarding the registrant's present

5  business or occupation and the address and phone

6  number of the employer, correct?

7      A     I'm sorry, sir.  One more time.  I was

8  looking at the interrogatory.

9      Q     Okay.  I've mentioned the code section

10 already, but --

11     A     Right.

12     Q     -- it requires an applicant to furnish

13 information regarding the registrant's present

14 business or occupation and the address and phone

15 number of the employer, true?

16     A     Yes.

17     Q     Okay.  Let's turn to Exhibit S7, and that

18 will be interrogatory number 17 which is on page 12.

19 And this interrogatory asks the District to identify

20 the purposes for which MPD needs that information

21 regarding present business or occupation and address

22 or phone number of the employer.  And you can take a

Capital Reporting Company
Shelton, Lieutenant Jon  07-29-2013

105

1   done, I mean, you would know that that's for a

2   security company then, correct?

3       A    Correct.

4       Q    Okay.  Why do you need to know the employer

5   of a private individual?

6       A    I have no clue.

7       Q    Fair enough.  And then turning to the next

8   sentence, it says that -- and again, I'm on

9   interrogatory number 17, the answer on page 12.  It

10  states that, "The information regarding employer is

11  also used to determine if the purchaser is a member of

12  MPD and registering an off-duty service weapon."

13      A    Correct.

14      Q    Okay.  Well, first of all, why is that

15  important to know?

16      A    Metropolitan police officers are only

17  permitted to carry certain types of off-duty

18  weapons --

19      Q    Okay.

20      A    -- that we have to qualify on and be trained

21  on.

22      Q    Okay.  Could you just have a box again,

Capital Reporting Company
Shelton, Lieutenant Jon  07-29-2013

108

1    information is used to possibly try and locate him and

2    let him know that the firearm has been recovered or

3    lost and recovered, or --

4        Q    Okay.

5        A    -- involved in a crime or whatever the case

6    may be.

7        Q    And I'm not questioning your good faith on

8    privacy issues.

9        A    Sure.  Right.  No.

10       Q    But I did ask you if there's a written

11   policy or procedure and protocol saying it's not to be

12   discussed with the employer.

13       A    We don't discuss it with anybody.

14       Q    Okay.  Anything in writing that says that,

15   though?

16       A    Not that I'm aware of.

17       Q    Okay.  And then next section that we have

18   here has to do with section 7.2502.03(b)(6) which

19   requires a statement on the application regarding

20   whether the United States, a state, or subdivision has

21   ever revoked or denied an applicant's license,

22   registration, or permit for a firearm.

109

1              And in answer to interrogatory number 18,

2    which is on page 13 of Exhibit S7, it said that,

3    "Although it is difficult to verify this information

4    if the applicant provides a false statement, MPD

5    attempts to verify it.  And any information may be

6    used as part of the background investigation."

7              Does MPD attempt to verify that for every

8    application?

9        A    I don't ever recall seeing an application

10   where the person said -- answered yes to that.

11       Q    Okay.

12       A    How's that?

13       Q    All right.

14       A    Will that work?

15       Q    So in that case, there -- if they didn't

16   answer yes, there would be no need to attempt a

17   verification, right?

18       A    Correct.

19       Q    Okay.

20       A    You wouldn't even know where to begin.

21       Q    Okay.  Well, I guess that -- maybe that was

22   my next question.

110

1          How would you even attempt to verify it?

2     A     (Gesturing.)

3          MR. SAINDON:  You have to answer verbally.

4          THE WITNESS:  I'm sorry.  I thought we were

5     just, you know -- I'm sorry.  For a minute there, I

6     thought it was just me and you in there.

7          All right.  Do the question one more time.

8     BY MR. PETERSON:

9     Q     The question is, how would you ever even

10    attempt to verify that information?

11    A     You would not be able to.

12    Q     Okay.  And so since you don't recall any

13    instances where it's been attempted, I take it that

14    you don't recall any instance where the applicant had

15    lied that you know of.

16    A     Not that I know of.

17    Q     Right.  Okay.  Similarly -- and now we're on

18    interrogatory number 19, which is on that same page of

19    S7 -- down at the bottom of page 13, section

20    7.2502.03(b)(7) requires the applicant to disclose his

21    role in any mishap involving a firearm, including the

22    date, place, time, circumstances and names of the

112

1      Q    Okay.  But you do recall some instances in

2   which it has been reported?

3      A    Yes.  And then -- and then reported it and

4   scratched out and said it didn't happen.

5      Q    Oh, okay.  So do you recall any final

6   applications that were not scratched out that reported

7   mishaps?

8      A    One more time.

9      Q    You said that they were scratched out and

10   then --

11      A    I remember one very -- one right now that

12   I'm dealing with.

13      Q    Okay.  All right.  It was scratched out and

14   the person changed his mind and said there was no

15   mishap, right?

16      A    That's correct.

17      Q    Okay.  So do you recall any in which people

18   reported mishaps and they did not scratch it out or

19   continued to report the mishap and that was the final

20   version on the application.  Do you recall any of

21   those?

22      A    I believe so.

113

1    Q    Okay.

2    A    Just one, maybe two --

3    Q    Okay.

4    A    -- that I recall.

5    Q    Do you recall if the application was denied

6  on that basis?

7    A    No.  I don't recall if it was, but I do

8  not -- I do not believe it was.

9    Q    Okay.  All right.  If it resulted in a

10  criminal charge, that might be a basis for turning it

11  down, correct?

12    A    Yes, sir.

13    Q    Okay.  Or criminal conviction, I should say.

14    A    Correct.

15    Q    Now, section 2502.03(b)(10) requires a name

16  and address of a person or organization from whom the

17  firearm was obtained; in the case of a dealer, his

18  dealer's license number.  And this is addressed in

19  interrogatory number 20 on page 14 of Exhibit S7.

20         And the basic purpose there, if you'll bear

21  with me, on page 15 is that the MPD does verify the

22  dealer and license number, and the information is used

Capital Reporting Company
Shelton, Lieutenant Jon  07-29-2013

1   to determine if the transaction was a legal

2   transaction, correct?

3       A    Yes, sir.

4       Q    Okay.  Now, for a transaction inside the

5   District, only between two District residents, is it

6   legal for one individual to sell a firearm to another

7   privately without going through a dealer?

8       A    No, sir.

9       Q    Okay.  There's really only one dealer

10  commercially operating within the District, right?

11      A    Two.

12      Q    Two.  Okay.

13      A    One does not.  Well, no.  I retract that.

14  Operating within the District of Columbia.

15      Q    Yes.

16      A    He operates within the District of Columbia,

17  but he's not a commercial -- he does not deal

18  commercially with -- with District residents.

19      Q    Okay.

20      A    He's a federal firearms dealer that --

21      Q    Who is that?

22      A    He's a -- his name is Harry Fook, I believe.

Capital Reporting Company
Shelton, Lieutenant Jon  07-29-2013

115

1      Q      F --

2      A      F-O-O-K.

3      Q      F-O-O-K.

4      A      He may -- he could be retired right now.  I

5  haven't checked lately.  He's an older man that deals

6  strictly with overseas sales with ATF.

7      Q      Oh, okay.  Okay.  Overseas sales.

8      A      Yes, sir.

9      Q      Okay.  But --

10     A      But he does hold a license with me --

11     Q      Okay.

12     A      -- to do -- to sell firearms.

13     Q      Okay.  Does he have an FFL also?

14     A      Yep.  You have -- that's a pretty much have

15  to.

16     Q      You have to have one?

17     A      Yes, sir.  That comes first.

18     Q      Okay.  But as far as commercially operating

19  within the District --

20     A      He will not -- he will not sell to

21  residents, businesses or security companies.

22     Q      Okay.  There's only one dealer who does

116

1   that, right?

2       A     That's correct.

3       Q     And that's Mr. Charles Sykes?

4       A     Correct.

5       Q     Okay.  And where are his business premises

6   located?

7       A     300 Indiana Avenue on the first floor.

8       Q     Okay.  So if a transaction is within the

9   District between District residents, you already know

10  that the firearm is going to go through Mr. Sykes,

11  correct?

12      A     That's correct.

13      Q     Okay.

14      A     That's correct.

15      Q     So really for those types of transactions,

16  you could have it listed on the form, I suppose.  But

17  you already know it's going to be Mr. Sykes and what

18  his dealer number is, right?

19      A     That's correct.

20      Q     Okay.  Now, for transactions originating

21  outside the District where a firearm is coming into

22  the District, it's illegal under federal law to

Capital Reporting Company
Shelton, Lieutenant Jon  07-29-2013

117

1    transfer a handgun across state lines into the

2    District without going through an FFL, right?

3         A    No, not always.

4         Q    Okay.

5         A    Okay.

6         Q    What instance are you thinking of where it

7    would not be illegal?

8         A    If you already owned the gun in another

9    jurisdiction --

10        Q    Correct.

11        A    -- and you moved into the District of

12   Columbia --

13        Q    Yes.

14        A    -- you would not have to go through a

15   federal firearms dealer.

16        Q    Correct.  Okay.  But if someone were to be

17   purchasing a gun for the first time --

18        A    A new purchase.

19        Q    -- a new purchase.

20        A    Right.

21        Q    And it was a handgun.

22        A    Correct.

Capital Reporting Company
Shelton, Lieutenant Jon  07-29-2013

118

1      Q      And they were acquiring it outside the

2   District --

3      A      Yes.

4      Q      -- to be brought into the District and

5   possessed there, it would have to go through an FFL in

6   the District, right?

7      A      That's correct.

8      Q      Okay.  And, again, that's Mr. Sykes only,

9   correct?

10     A      That's correct.

11     Q      All right.  And so if it came in through

12   Mr. Sykes, you know that he's the dealer and what his

13   license number is and so forth for those types of

14   transactions, true?

15     A      That's correct.

16     Q      Okay.  In fact, if an FFL outside the

17   District attempted to transfer a newly purchased

18   handgun into the District to a District resident

19   without going through a District FFL, he could lose

20   his license, right?

21     A      He would lose his license from F -- well,

22   from ATF.

Capital Reporting Company
Shelton, Lieutenant Jon  07-29-2013

119

1      Q      Right.

2      A      Right.

3      Q      He could also be prosecuted for a felony,

4    correct?

5      A      Yes, sir.

6      Q      Okay.  So it's pretty unlikely that an FFL

7    outside the District is going to transfer a handgun

8    into the District without going through Mr. Sykes if

9    he values his freedom and his license.

10     A      That's correct.

11     Q      Okay.  Now, for long guns, they could be

12   transferred by an FFL outside the District to a

13   District resident without going through a dealer such

14   as Mr. Sykes; is that right?

15     A      That's correct.

16     Q      Okay.  So in that instance, why do you need

17   the dealer's name and license number?

18     A      Well, we -- the firearm does not need to be

19   brought to us.  Okay.

20     Q      Uh-huh.

21     A      So if you're buying a new firearm from

22   Atlantic Guns in Silver Spring, you come to us and get

120

1    the application.

2        Q    Uh-huh.

3        A    The application is just one part of the

4    process.

5        Q    Right.

6        A    You take the application back to Atlantic

7    Guns.  They put their information -- and they are

8    attesting to the fact that the specifications on that

9    gun are what they are:  The length of the barrel, the

10   action, the serial number.  They are attesting to

11   that.  We don't have to see that firearm.

12            Once they bring that application back from

13   Atlantic Arms, Atlantic Arms signs off on that.  It is

14   now their ATF license that is on the line if that

15   information is inaccurate when the application comes

16   back to us.

17       Q    Okay.

18       A    We then review that, approve it when the

19   fingerprints come back.  Then he can take that gun

20   back to Atlantic Firearms and take it directly home.

21       Q    Uh-huh.  Okay.  And under those

22   circumstances, you don't require the individual to

Capital Reporting Company
Shelton, Lieutenant Jon  07-29-2013

121

1   bring the gun down to --

2        A    No, sir.

3        Q    -- MPD?

4        A    No.

5        Q    Okay.  You don't check for folding stocks?

6        A    We check the firearm when the firearm is

7   brought to us.  We will research it to make sure that

8   the firearm is legal in the District of Columbia.

9        Q    Okay.  When it's brought to you, what do you

10  mean by that?

11       A    If he -- well, I meant the application is

12  brought to us.

13       Q    Okay.  All right.

14       A    If he alters the firearm thereafter, then

15  he's committing a crime.  If he takes off the full

16  stock and puts pistol grips on it or something along

17  the line -- you said folding -- then he has committed

18  a crime.

19            But when the gun is bought and approved

20  through firearms registration, the newly purchased

21  firearm, we're basing it on the fact that a licensed

22  ATF dealer where he bought it from is attesting to the

122

1    facts that go on that application.

2         Q    Okay.  So you want that information about

3    the out-of-state dealer for purposes of an attestation

4    as to the legality of the firearm; is that it?

5         A    Correct.

6         Q    Okay.

7         A    Since we don't have to see it.

8         Q    Okay.  So that, I suppose, helps comply with

9    District registration laws, right?

10        A    Correct.

11        Q    Does it in any way, apart from the

12   registration laws of the District, help prevent or

13   solve crime?  And, again, I'm talking about not

14   regulatory stuff, but violent crime and that type of

15   thing.

16        A    No, sir.

17        Q    Okay.

18        A    Not that I would construe.

19        Q    Sure.

20        A    I'd like to apologize, but I had a cup of

21   coffee before I came here.

22        Q    Sure.

129

1        Q     Sure.

2              (Discussion off the record.)

3   BY MR. PETERSON:

4        Q     Okay.  Turning again to Exhibit S7, which is

5   the interrogatories, interrogatory 21 on page 15 asks

6   for all instances from 2008 to the present in which

7   the information described in the interrogatories

8   number 16 through 20 has been obtained from the

9   firearms registration information basically and has

10  been used to reduce the use of firearms in crime,

11  protect police officers or promote any other important

12  governmental interest.

13             And just to recap, I think we've been

14  through all of these.  Sixteen related to the

15  five-year residence, 17 related to the employer

16  information, 18 related to denials or revocation of

17  prior licenses, 19 related to mishaps?

18       A     Right.

19       Q     And 20 related to the name or address of the

20  dealer or person.

21       A     Uh-huh.

22       Q     And so we asked the District to identify all

130

1   instances in which that specific information has been

2   used to reduce the use of firearms in crime other than

3   registration offenses or protect police officers.

4           Can you think of any instance in which that

5   specific information has actually been used to reduce

6   crime other than registration or to protect police

7   officers?  That specific information I'm only talking

8   about now.

9       A    Can we go through each individual one one

10  more time?

11      Q    Yes.  You can look at them.  It's there in

12  front of you.

13      A    Oh, I'm sorry.

14      Q    It's okay.  Sixteen is the five-year

15  residence period.

16      A    Right.  No.

17      Q    Seventeen is the present business or

18  occupation and address and phone number of the

19  employer.

20      A    No.

21      Q    Eighteen is denials or revocations of

22  previous licenses or permits.

131

1    A    No.

2    Q    Nineteen is mishaps.

3    A    No.

4    Q    And 20 is the person from whom the firearm

5  was obtained and the dealer's name and license?

6    A    No.

7    Q    Okay.  All right.  And turning to

8  interrogatory number 22, which is again on page 15

9  there -- and we have a number of objections, but the

10  question was to identify all instances from 2008 to

11  the present where the information about where a

12  registered firearm will generally be kept as required

13  by D.C. law has been -- where that information has

14  simply been used by MPD.

15          Do you know of instances where that has been

16  used for any purpose?

17    A    Well, regarding security companies, we want

18  to know where they're storing their firearms.

19    Q    Okay.

20    A    Okay.

21    Q    All right.

22    A    Where they're keeping them at.

137

1   with these particular denials.

2       Q    Oh, right.  You don't know the basis for

3   these --

4       A    For these denials.

5       Q    -- for these denials?

6       A    Correct.

7       Q    Right.  But I guess what I'm saying is the

8   number of denials is very small, whereas the number of

9   applications for handguns, that's running close to

10  1,000 a year.  So most of those 922 applications

11  submitted in 2012, for instance, were not submitted by

12  people with disqualifying information that would be

13  revealed by background check?

14      A    That's -- that's accurate.

15      Q    Okay.  So in short, they're basically

16  law-abiding people who were submitting these

17  applications?

18      A    I find that to be almost always the case.

19      Q    Okay.  But you don't know what the basis was

20  for denying the two handgun applications in 2011 and

21  2012?

22      A    No, sir, I don't.

## Capital Reporting Company
### Shelton, Lieutenant Jon  07-29-2013

148

1    Q    Right.  Right.

2    A    Sure.  Eyewitness account, perhaps a shell

3  casing.

4    Q    Right.

5    A    But that may be, you know, in a different

6  report.

7    Q    Okay.  That would typically go into a police

8  report?

9    A    Of course.

10   Q    Okay.  You've mentioned the reregistration

11  process a few times.

12   A    Uh-huh.

13   Q    And you've also -- we've discussed several

14  databases that can be queried, whether it's NCIC,

15  Courtview, WALES, NICS, those types of things.

16   A    Right.

17   Q    Are there any databases that can't be

18  queried unless there's a formal reregistration process

19  going on?

20   A    I don't understand your question.  I'm

21  sorry.

22   Q    Okay.  Of the types of databases we've

149

1   discussed, Courtview --

2       A    Right.

3       Q    -- there was evidence I think that it's

4   queried every couple of weeks in terms of CPOs and

5   that type of thing, and all these other databases.   If

6   the District wanted to -- I'm not saying it's their

7   current policy, but if they wanted to, is there

8   anything that prevents them from querying those

9   databases outside of a formal reregistration process?

10      A    I do not know the answer to that.

11      Q    Well, let me make it more concrete through

12  an example.

13      A    Okay.

14      Q    If you wanted -- if the appropriate

15  personnel within the District, authorized personnel --

16      A    Right.

17      Q    -- wanted to say, today we're going to check

18  100 registered firearms owners, we're going to run

19  them through all these databases, see if they're still

20  qualified to possess a firearm, is there anything that

21  would stop the District from doing that, that would

22  prevent them from doing that?

150

1      A      No, I do not believe so.

2      Q      Okay.

3      A      In fact -- no.

4      Q      No.  Okay.  All the things that you

5   typically check in connection with a registration you

6   could recheck at a later date if you wanted to?  I

7   mean, if it was appropriate to do that?

8      A      I think that was the goal of the

9   reregistration process.

10     Q      Okay.  All right.  What's the status of the

11  implementation of the three-year renewal?

12     A      It has to be in effect by January 1st of

13  2014.

14     Q      Okay.

15     A      Well, I'm sorry.  It must be implemented.

16     Q      Okay.

17     A      Did I say something different than that?

18            MR. SAINDON:  In effect, I think.

19            THE WITNESS:  All right.

20  BY MR. PETERSON:

21     Q      In effect?  Implemented?

22     A      Implemented, right.

202

1     Q     -- to finish up on.

2     A     Are we done with 33?

3     Q     Yes.  Have you or anybody that you supervise

4   as a branch commander ever done any studies of any

5   kind to actually try to determine whether the

6   District's registration laws actually reduce crime or

7   protect police officers?

8     A     I have -- I have not.

9     Q     Okay.

10    A     Whether anybody that I supervise did it on

11  their own -- on their own in their own time for their

12  own curiousness of knowledge, I do not know.

13    Q     Okay.

14    A     I have not, nor have I discussed that, to

15  the best of my recollection, with Sergeant Hall.

16    Q     Okay.

17    A     Who is -- we work very close together, as

18  you can see.

19    Q     Sure.  Sure.  To the best of your knowledge,

20  have either you or Sergeant Hall been asked to perform

21  any such studies?

22    A     We have done some research on other

203

1   registration issues with other jurisdictions, but not

2   to the question that you asked me, if firearms

3   registration protects -- however you worded it.

4       Q     Protects police officers or reduces crime.

5       A     Correct.

6       Q     You have not looked into that?

7       A     No.

8       Q     Okay.  In the other jurisdictions, what was

9   it that you were looking at?

10      A     At their processes for the -- for what

11  states had registrations, how they -- you know, what

12  were some of the requirements.  For example, Hawaii,

13  you know, you have to have a hunting license or --

14  they're very close to our registration, things of that

15  nature.

16      Q     Okay.  So are those studies still in

17  existence someplace in your files?

18      A     Well, it wasn't anything that he put in

19  writing, so to speak.  We just did some research to

20  see what other states did, you know, when we were

21  making our amendments, going through our amendments.

22      Q     Okay.  It wasn't written up, per se?

## Capital Reporting Company
### Shelton, Lieutenant Jon  07-29-2013

204

1     A     No.

2     Q     Okay.

3     A     It was probably discussed in multiple

4  meetings during these amendment acts.

5     Q     Okay.

6     A     Who's got what, who does what.

7     Q     Okay.  Are you aware of any studies at all

8  by anyone that look at the effectiveness of the D.C.

9  registration laws in terms of protecting officer

10  safety or reducing crime?

11     A     No, sir, I'm not.

12     Q     Okay.

13         MR. PETERSON:  Let's go off the record just

14  one second.

15         (Discussion off the record.)

16         MR. PETERSON:  Back on the record.  As far

17  as I'm concerned, we're done, unless counsel has

18  questions.

19         MR. SAINDON:  No, I don't have any.  Thank

20  you.  We would like to review and sign, please.

21         (Whereupon, at 5:25 p.m., the deposition of

22         LIEUTENANT JON SHELTON was concluded.)