Exhibit 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DICK ANTHONY HELLER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:08-cv-01289 (JEB) |
| | ) | |
| THE DISTRICT OF COLUMBIA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF GARY KLECK, PH.D.

I, Gary Kleck, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1.      I am over eighteen years of age, am fully competent to make this Declaration, and make the statements herein based on my personal knowledge and information.

2.      I have been retained by the plaintiffs in this case to offer expert testimony on their behalf.  I am being compensated for my work at the rate of $350 per hour.

3.      On May 20, 2013, I submitted expert rebuttal reports relating to the reports of Cathy Lanier, Daniel Webster, Mark Jones, and Joseph Vince.  My deposition was taken by counsel for the District on July 2, 2013.

4.      If called to testify in this case, I would testify substantially as described below.

5.      Section 1 of this Declaration describes my academic and other qualifications. Section 2 contains a point-by-point rebuttal of the Declaration of Daniel Webster, followed by a note regarding the lack of training and qualifications on the part of Mr. Jones, Mr. Vince, and Chief Lanier to offer expert opinion on the research studies and factual matters at issue in this case.  Section 3 contains a rebuttal of the Declaration of Chief Lanier.  Sections 4 and 5 provide rebuttals to Messrs. Jones and Vince, respectively.  Section 6 summarizes why the studies relied

upon by the declarations of these four witnesses do not address the matters at issue in this case (protection of police officers and crime control), and notes that empirical assessments that have addressed the effect of registration laws on crime have unanimously indicated that registration laws have no measurable effect on rates of crime or violence.

**Section 1 – My Qualifications**

6.      I am a Professor of Criminology and Criminal Justice at Florida State University. I received my doctorate in Sociology from the University of Illinois in 1979, where I received the University of Illinois Foundation Fellowship in Sociology.  I am currently the David J. Bordua Professor of Criminology at Florida State University, where I have been on the faculty since 1978.  I have been doing research in the field of guns and violence since 1976, and have been called "the dominant social scientist in the field of guns and crime" (Vizzard, 2000, p. 183).

7.      I am the author or co-author of four books on guns and violence.  These books constitute the most comprehensive reviews of evidence concerning guns and violence in the scholarly literature, and they inform and serve as part of the basis of my opinions.  More specifically, I am the author of Point Blank: Guns and Violence in America, which won the 1993 Michael J. Hindelang Award of the American Society of Criminology, awarded to the book of the previous several years which "made the most outstanding contribution to criminology."  In addition, I have authored Targeting Guns (1997) and, with Don B. Kates, Jr., The Great American Gun Debate (1997) and Armed (2001).

8.      I have also published scholarly research in all of the leading professional journals in my field. Specifically, my articles have been published in the American Sociological Review, American Journal of Sociology, Social Forces, Social Problems, Criminology, Journal of Criminal Law and Criminology, Law & Society Review, Journal of Research in Crime and

Delinquency, Journal of Quantitative Criminology, Law & Contemporary Problems, Law and Human Behavior, Law & Policy Quarterly, Violence and Victims, Journal of the American Medical Association, and many other scholarly journals.

9.      In particular, I have authored or co-authored the most methodologically sophisticated analyses in the published scholarly literature on: (1) the impact of gun ownership levels on rates of homicide and other crimes (Kleck and Patterson 1993; Kovandzic, Schaffer, and Kleck 2012; Kovandzic, Schaffer, and Kleck 2013), (2) the impact of gun control laws on rates of homicide and other crime (Kleck and Patterson 1993), (3) the effect of defensive use of guns by victims on victim injury and property loss (Kleck and Sayles 1990; Kleck and DeLone 1993; Tark and Kleck 2004), (4) the frequency of defensive gun use (Kleck and Gertz 1995), (5) the frequency of gun carrying for protection (Kleck and Gertz 1998), (6) the impact of offender gun possession or use on the likelihood of attack, injury, or death in crime incidents (Kleck and McElrath 1991; Kleck and DeLone 1993), and (7) the extent of gun trafficking and its impact on crime rates (Kleck and Wang 2009).

10.     I have testified before Congress and state legislatures on gun control issues, and worked as a consultant to the National Research Council, National Academy of Sciences Panel on the Understanding and Prevention of Violence; as a member of the U.S. Sentencing Commission's Drugs-Violence Task Force; as a consultant to the Department of Justice of Canada; and, most recently, as a member of the Institute of Medicine and National Research Council Committee on Priorities for a Public Health Research Agenda to Reduce the Threat of Firearm-Related Violence. I am also a referee for over a dozen professional journals, and serve as a grants consultant to the National Science Foundation.

11.     Finally, I teach doctoral students how to do research and evaluate the quality of research evidence, and have taught graduate courses on research design and causal inference, statistical analysis of data, and survey research methodology.  My current curriculum vitae is attached as Exhibit K-1.

**Section 2 – Rebuttal of the Declaration of Daniel Webster**

12.     This section is a point-by-point rebuttal of the Declaration of Daniel W. Webster. Page references are to pages in that document unless otherwise noted.  Before making specific points, however, I note generally that most of Professor Webster's report is not even relevant to the issues that I understand to be at stake in this litigation.  I have reviewed the opinion of the United States Court of Appeals (*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)), and understand that the District of Columbia identified two interests that the registration requirements are said to support: to protect police officers and to aid in crime control.  Not one of the studies cited by Webster bears on the protection of police officers.  As to crime control, almost all of the studies cited by Webster concerns topics such as "diversion" of guns and firearms "trafficking," which Webster never empirically links with crime rates or crime control.

13.     Further, most of the studies on which Webster relies pertain to handguns, or do not distinguish between handguns and long guns.  Thus, they do not provide evidence, as the Court of Appeals required in the *Heller v. District of Columbia* decision, to support any conclusions about long guns specifically.  None of the studies he cites in support of his claims examined long guns separately.  Instead, every single study pertains either to only handguns or pertains to all types of guns combined.

14.     I do not comment on Webster's description of his qualifications (Points 1-8) or his description of the D.C. gun control legislation (Point 9).

15.     On p. 2 (Webster's Point 10) Professor Webster cites a study stating that licensed firearm dealers did not question the validity of fake IDs offered by undercover agents posing as prospective gun buyers.   Webster appears to infer from this study that firearm registration applications should be submitted in person, and that this will result in fewer guns in the hands of prohibited persons.   This inference does not logically follow from the evidence in the cited study because it assumes that some significant number of criminal purchase attempts are currently made using fake IDs, and that therefore blocking such attempts in future would prevent a significant number of criminals from getting guns in D. C.   This inference is wrong for two reasons.

16.     First, the best available evidence indicates that criminals *virtually never* acquire guns by using a fake ID.   The largest, most nationally representative sample of criminals ever asked about how they obtained guns was studied in the U.S. Census Bureau's 2004 Survey of Inmates in State and Federal Correctional Facilities (SISFCF).   Inmates were asked if they possessed a weapon during the crime for which they were sentenced to prison, and what type of weapon was possessed.   Of 1,818 (unweighted) inmates who reported possessing guns during this offense, only 10.4% had purchased the gun from a gun shop or pawnshop, would therefore have been subject to a background check, and thus would have had a reason to provide false ID. Of these, nearly all purchased the gun under their own name, presumably because they did not have a disqualifying conviction at the time.   Of all the 1,818 total criminals' gun acquisitions, only 14 (*0.8%*) were obtained by a purchase using a false name, and presumably false identification (author's analysis of ICPSR 2013, attached as Exhibit K-2.   Webster speculates (Point 11) that other criminals might have used false identification without using a false name, e.g. by using a misspelled version of their true name or an inaccurate birth date, but there is not a

shred of empirical evidence to support this notion.  As he often does, Webster appears to give as much weight to his own speculations as to hard evidence.  The actual evidence indicates that Webster is conjuring up an imaginary benefit of D.C.'s registration requirements – a dubious solution to a nearly nonexistent problem.

17.     Second, most criminals have multiple sources they can use to obtain guns (Sheley and Wright, p. 27; May and Jarjoura, pp. 37, 47).  Thus, it is likely that most, perhaps all, of the handful of criminals (0.8% of those who used guns) who acquired guns via the use of fake ID at a gun store would also have been able to acquire guns from other sources such as friends or family.  Indeed, there is no affirmative evidence, cited by Webster or otherwise, that there are *any* criminals who obtain guns using false ID and who could not get a gun from other sources if this mode of acquisition were not available to them.

18.     Webster's Point 12 likewise proffers a completely speculative benefit of D.C.'s registration system – that it "could" mitigate the "potential" negative consequences of negligent sales practices by gun dealers (p. 3).  His very phrasing is overtly speculative.  Without any factual support, Webster implies that there is a significant problem of "negligent sales practice by gun dealers" (p. 3), and notes that a small share of gun dealers sell most of the guns later linked to crimes, as if this fact supports his speculation.  What he does not share with readers is that a small share of gun dealers also sell most of *all* guns, whether crime-involved or not.  This is just the nature of the firearms business – a few high-volume dealers sell most of the guns.  The share of guns later traced in connection with crimes that were originally sold by these few dealers is virtually identical to their share of total gun sales – exactly what one would expect if all the dealers were operating in completely lawful and responsible ways.  He claims that the large share of crime guns claimed by these few dealers cannot be "*fully* explained" [emphasis

added] by "sales volume," but this is a very misleading phrasing.  In the Wintemute, Cook, and Wright (2005) study on which Webster relies, the authors did indeed report that 11.7% of California firearms retailers accounted for 85.5% of traced (purportedly crime-involved) handguns, but they also reported that these same high-volume dealers also accounted for *81.5%* of *all* handgun sales.  In short, the top-selling dealers accounted for only slightly more traced "crime" handguns than one would expect based solely on their share of the handguns sold, even if none of the dealers engaged in a single criminal act or negligent business practice. Dealers who sell more guns to lawfully eligible buyers can expect more guns being traced back to them simply because a larger number of the guns they legally sold to legally eligible buyers will later be stolen from those buyers, otherwise acquired by criminals, recovered by law enforcement personnel, and traced.  Furthermore, "traced" guns are not at all the same thing as guns used to commit crimes.  See paragraphs 21-24, below.  In sum, sales volume may not explain absolutely all of the large share of "crime guns" claimed by high-volume gun dealers, but the data in the cited study indicate that it does explain *almost* all of this share, and the difference is negligible.

19.    Leaving aside the overwhelming influence of sheer sales volume on dealer traced-gun counts, Webster is also wrong when he claims that local crime rates do not explain this large share (p. 3, Point 13).  Lawful and responsible licensed gun dealers who operate in areas with higher rates of gun theft will have larger number of crime guns traced back to them merely because more of their legally eligible customers will have their guns stolen, used in crimes, recovered by police, and traced back to the dealers – even if the dealers never did a single illegal or irresponsible thing.  The only type of crime responsible for large numbers of gun thefts is burglary, specifically residential burglary (U.S. Bureau of Justice Statistics 2012, p. 2).  Thus, in order for a study to rule out local crime rates as an explanation for some dealers having high

trace counts, it would have to control for local burglary rates.  The study relied upon by Webster (Wintemute, Cook and Wright 2005, cited in Webster's fn. 3) did not do this.  Instead, the authors introduced controls only for a conspicuously irrelevant kind of crime, robbery (Wintemute et al. 2005, Table 4, p. 360) - a crime that is rarely responsible for moving guns into criminal hands (U.S. Bureau of Justice Statistics  2012, p. 2).  Although county burglary data were available to the authors, they inexplicably chose not to use these data.  Thus, Webster was wrong in claiming that the Wintemute et al. research showed that high sales volume and local crime rates could not fully explain licensed firearms dealers' high gun trace counts, since the cited research never actually tested this possibility by controlling for the most relevant local crime rate.  In sum, high-volume gun dealers' large share of total sales accounts for nearly all of the large share of traced guns claimed by high-volume gun dealers, and what little is not explained by sales volume may be explained by higher local burglary rates.  Consequently, there is, as far as we know, no remaining unexplained share of traced gun counts to be attributed to any kind of dealer misconduct, and Webster does not factually demonstrate any such misconduct.

20.     Webster also claims (p. 3, Point 13) that his study of undercover stings of licensed guns dealers (cited in fn. 4) showed that "many" dealers were susceptible to facilitating illegal straw sales."  These stings actually only found a tiny handful of dealers *might*  have been willing to engage in straw sales (the evidence was highly ambiguous). As Kleck and Wang (2009) noted, Webster, Vernick, and Bulzacchelli (2006) thought that licensed dealers were involved in straw sales because the undercover stings had supposedly produced a decrease in trafficked crime guns.  The problem was that these authors overinterpreted gun trace data, labeling *all* guns with (a) a time to crime under one year, and (b) whose criminal possessor was not the original retail

purchaser as "new trafficked crime guns" (p. 779).   In fact, virtually all of these guns may simply have been stolen from their lawful buyers within a year of purchase.   Thus, they had no foundation for judging trends in trafficked guns or straw sales, and therefore had no way of telling if stings reduced gun trafficking or straw sales.   Webster appears to believe that this handful were but the tip of the iceberg, and were representative of a much larger number of corrupt dealers in the full population of dealers.   This inference, however, would be valid only if the set of dealers subject to these stings were a representative sample of licensed gun dealers. They were not.   Police specifically targeted dealers they knew to be among the few dealers with high trace counts or that they had received complaints about.   The sample was completely biased.   Thus, even if only a fraction of one percent of all licensed dealers were willing to sell to straw purchasers, by including *only* those "high-risk" dealers in the universe of dealers examined, it would be possible—indeed, nearly inevitable--to find that a high percentage of a small group suspected of misconduct might be willing to engage in misconduct.   Consequently, the cited study can tell us nothing about whether "many" licensed dealers are "susceptible to facilitating straw sales."

21.    For most of his other conclusions, Webster relies heavily on data concerning traces of guns performed by the Bureau of Alcohol, Tobacco and Firearms (ATF).   Therefore, it is important to first explain some of the ways in which Webster misinterprets trace data.   Most crucial of all, he shows no awareness of the fact that the set of guns traced by ATF is not a complete or representative sample of crime guns, but rather a nonrandom subset of police-recovered guns that (a) are nonrandomly *selected* by police for tracing, and (b)  ATF is able to successfully trace (Wellford et al. 2005; Kleck and Wang 2009).   At this late date, there is no way an honest scholar could fail to understand this point, as ATF has repeatedly and explicitly

stated that trace data cannot be used to draw conclusions about crime guns in general.  The misuse of trace data to support erroneous conclusions has become so widespread that the following disclaimer now appears on ATF's trace data reports: "Firearms selected for tracing are not chosen for purposes of determining which types, makes or models of firearms are used for illicit purposes.  The firearms selected do not constitute a random sample and should not be considered representative of the larger universe of all firearms used by criminals, or any subset of the universe" (U.S. Bureau of Alcohol, Tobacco, and Firearms 2013).  Therefore, regardless of how he analyzed trace data, Webster had no basis for drawing conclusions about "crime guns" because traced gun samples can tell us nothing about crime guns in general, but instead reflect *the kinds of guns police choose for ATF to trace and that ATF is able to trace* (Kleck and Wang 2009).

22.    Thus, if police believe, however wrongly, that criminals in their jurisdiction obtain guns from interstate gun traffickers, they will be especially likely to request ATF traces on guns that they believed came from out of state (e.g., guns seized from suspects with out-of-state driver's licenses).  Likewise, if police believe, however wrongly, that new guns are especially likely to have been handled by gun traffickers, they will be especially likely to ask ATF to trace guns that appear to be new – even if the initial premise was completely false (Kleck and Wang 2009).

23.    To try to justify his claim that the Wintemute, Cook, and Wright (2005) study (Par. 18, above) supports an inference that there is a significant problem of "negligent sales practice by gun dealers," Webster misleadingly claims that "a relatively small portion of gun dealers sell the majority of *guns recovered by police from criminals*" (p. 3, emphasis added).  The data to which he refers, however, actually pertain only to the subset of guns recovered by

police *that they chose to submit for tracing*.  Thus, Webster actually had no basis for drawing conclusions about even crime guns recovered by police, never mind all crime guns.

24.    Webster also misunderstands what kinds of guns are included in samples of traced guns, describing them as "crime guns."  While ATF does indeed claim that traced guns are "crime guns," this is based on a highly eccentric definition of crime guns – they include not just (a) guns used to commit crimes (e.g., in a threat or an attack), but also (b) guns that were the object of a crime, such as a gun theft, (c) guns whose mere possession constituted the crime, and (d) guns with no known connection at all to any specific crime and that were merely *suspected* to have been somehow linked with crime (BATF 1997).  This is not a minor quibble, since the vast majority of traced guns in fact are not known to have been used to commit any crime.  For example, among the 1,421 guns from the District of Columbia traced in 2011, only 141 (9.9%) were associated with homicide, robbery, aggravated assault, or simple assault.  Most commonly, these traced guns were associated only with unlawful possession of a gun (537, or 37.8%) or were merely recorded as being "under investigation" (482, or 33.9%) – presumably guns merely suspected to somehow be linked with crime (BATF 2013).  Thus, *most* traced guns are not crime guns in any meaningful sense, and analyses of samples of traced guns therefore cannot be used, as Webster does, to infer anything about crime guns, in the sense of guns used to commit crimes.

25.    Webster grossly mischaracterizes the 2000 *Following the Gun* report by the Bureau of Alcohol, Tobacco and Firearms (p. 3, Point 13 and fn. 2).  He claims that this report indicated "that straw purchasers and corrupt licensed dealers represent the most prominent channels for [moving?] guns into the illegal market."  This is a flagrant distortion, since this report did not present a single statistic bearing on the prominence of any channels for illegal guns.  Instead, it was concerned only with ATF *criminal investigations.*  Thus, its data concerned

only those gun sources and channels on which ATF chose to focus its investigative efforts, and did not contain a shred of evidence on which channels were "the most prominent" sources of illegal guns.  ATF itself made this point explicit in the report, stressing that the investigations described in the report "do not necessarily reflect typical criminal diversions of firearms" (Bureau of Alcohol, Tobacco, and Firearms 2000, p. 53).  Webster simply ignored this caveat and drew conclusions about guns going into the illegal market that had no logical connection with these data, which merely reflected where ATF chose to concentrate its limited investigative resources.  Indeed, it is perfectly consistent with the evidence in this report to assert precisely the opposite of what Webster believes – that virtually no crime guns are acquired through "corrupt licensed dealers."  The data reflect only where investigations were aimed, not where flows of illegal guns were heaviest.

26.     Far more direct and relevant evidence bearing on this point comes from the 2004 Census Bureau survey of prison inmates, the largest, most nationally representative sample of criminals ever asked about how they obtained their guns (U.S. Bureau of the Census 2013a). This study revealed that criminals almost *never* acquire guns via straw purchases from licensed gun dealers.  Among 1,818 felons armed with guns during the offense that got them sent to prison, only 32 (1.8%) of them had (a) acquired a gun by buying it from a gun store or pawnbroker and (b) used another person to buy the gun for them (author's analysis of ICPSR 2013, attached as Exhibit K-2.  And, again, most of these few criminals almost certainly had other sources of guns they could have exploited.  Thus, contrary to Webster, straw purchases from licensed gun dealers should more accurately be described as one of the *least* prominent sources of criminals' guns rather than one of the most prominent sources.  More generally, illegal or negligent actions of corrupt or negligent licensed dealers appear to have virtually

nothing to do with the flow of guns into criminals' hands (Kleck and Wang 2009). Instead, thefts (mostly connected with burglaries), and purchases from friends, family, and acquaintances are the major means by which criminals obtain guns (Wright and Rossi 1986, pp. 181-188). We can be sure that Webster knew about the authoritative and far more relevant Census Bureau survey (U.S. Bureau of the Census 2013a), since he cites it elsewhere in his declaration (p. 9, fn. 13). Thus, he drew a conclusion directly contradicted by the best evidence known to him.

27.     Webster's analysis of Missouri's permit-to-purchase licensing law is based on a fundamental misunderstanding of ATF trace data. He claims that the time from when a gun was first sold at retail to when it is recovered by police ("time-to-crime", or TTC) is "indicative of possible trafficking" (p. 4, Point 14). It is not. First, trace data cannot tell us whether a gun has been trafficked or otherwise "diverted." As a National Research Council panel concluded, "trace data cannot show whether a firearm has been illegally diverted from legitimate firearms commerce" (Wellford et al. 2005, p. 40). Second, and more specifically, the trace-based "short TTC" measure has been empirically shown to *not* be correlated with another, more widely accepted indicator of gun trafficking, the prevalence of obliterated serial numbers. In places where a large share of traced guns have obliterated serial numbers, one is actually slightly *less* likely to find that a large share of those guns also had a short TTC. Thus, short TTC is not an indicator of gun trafficking. In fact, the share of traced guns with a short TTC is actually far more strongly correlated with gun theft rates (Kleck and Wang 2009, p. 1283). While gun theft is a form of gun "diversion," it is one that is quite different from gun trafficking, and does not involve any kind of misconduct by licensed gun dealers. D.C.'s registration laws do nothing to affect rates of gun theft. Likewise, out-of-state origins for traced guns are more likely to be the result of gun owners changing their residence across state lines, followed by the theft of their

guns in their new home state, than the product of interstate gun trafficking (Kleck and Wang 2009).

28.   Webster's analysis is therefore distorted by an outdated, discredited interpretation of the meaning of short TTC.   It is not a valid indicator of gun trafficking or misconduct by corrupt licensed gun dealers, and the only kind of "illegal gun diversion" it relates to is gun theft – a type of "diversion" that licensed gun dealers have nothing to do with.   Therefore, Webster's analysis of the Missouri permit-to-purchase (PTP) law (Points 15-18, pp. 4-5) can tell us nothing about changes in gun trafficking or dealer misconduct before and after the law's repeal.

29.   A more plausible interpretation of his Table 1 data than Webster's interpretation is that gun thefts, especially thefts of relatively new locally sold guns, increased after the permit law was repealed.   If the repeal of an onerous gun control law (or other factors) led to a burst in lawful gun sales, one would also expect an increase in thefts of those new guns, and thus more locally sold guns with a short TTC being seized by police.    This is precisely what Webster's Table 1 data indicate.

30.   There is good reason to believe there was indeed a burst of lawful gun sales during this period, since Bureau of Justice Statistics data indicate that there was a 14% increase in background checks for firearms transfers from 2007 to 2008 and another 9% increase from 2008 to 2009 in the U.S. (U.S. Bureau of Justice Statistics 2013, p. 4, Table 1; no data specific to Missouri are available).    Gun sales were increasing sharply at precisely the time an increased share of Missouri's traced guns were showing short TTCs.   And Missouri's increase could have been even larger than this national trend.   If there were more new guns to be stolen, then more new guns were likely to be stolen – and show up in gun trace samples as short TTC guns.   Thus, the trends that Webster guessed were indicating increased gun trafficking and illegal dealer sales

were more likely just a result of an increase in gun sales that lead to increased gun theft – a form of gun "diversion" that does not involve licensed gun dealers.  In any case, Webster had no measure of "diversion of guns to criminals" and thus had no way of judging whether it increased after Missouri repealed its PTP law.

31.     Webster claims to have somehow divined from trends in firearms homicide data that Missouri's repeal of its PTP law caused the increase in the gun homicide rate that occurred after 2007 (pp. 5-6, Point 19).  This is pure guesswork.  Webster's case for an impact of the repeal on homicide relies almost entirely on a single datum – the short-lived elevation of the gun homicide rate in 2008.  Beyond this chronological coincidence, Webster has no foundation for linking the repeal of the PTP law to the increase in gun homicides.  He appears to believe that the fact the Missouri experienced an increase in firearm homicide at a time when the U.S. as a whole and Midwest states experienced decreases in firearm homicide can somehow tell us *why* the increase occurred.  It cannot.   Nor does it even significantly narrow down the possible explanations.  Literally any variable that changed in Missouri after 2008 might be at least partly responsible for the gun homicide increase.  It is totally arbitrary to attribute the change to repeal of the PTP law.   In his deposition (p. 117), Webster mentions that he expanded the analysis reported in his Declaration by controlling for a few other variables – burglary rates, unemployment rates, law enforcement officers, incarceration rates, and the presence of "Stand Your Ground" self-defense laws.  He offers no explanation why he controlled these and not others known to influence homicide rates.  Thus, the choice of control variables appears to have been essentially arbitrary.

32.     The dubious character of Webster's research design can be illustrating by applying it to a nearby state that did *not* change its gun laws, and examining how its firearms

homicide rates changed. The firearms homicide rate (measured using the same vital statistics homicide data that Webster relied on) in Iowa, the state on Missouri's northern border, nearly doubled from 2007 to 2008, from 0.639 to 1.197 firearms homicides per 100,000 population (author's analysis of CDC dataset provided by Webster), an 87% year to year increase, at the same time Missouri's rate increased only by 35%. Comparing the average rates for 1999-2007 to 2008, as Webster did, shows a 34% increase in Missouri, and a 25% increase in Iowa—barely a difference at all. Exhibit K-3. This was a much larger proportional increase in gun homicide than occurred in the U.S. as a whole or in the Midwest. Applying Webster's logic, this 87% increase could be attributed to the repeal of a PTP law or some other gun control law – except for the fact that Iowa did not repeal any gun control laws. *For the entire time period relevant to Webster's Missouri study, Iowa had a PTP law similar to Missouri's, and did not alter or repeal it.* Iowa Code § 724.15 et seq. The simple point is that large percentage year-to-year increases or decreases in state-level firearm homicide rates are nothing special, and certainly can occur without any changes in firearms law being responsible.

33.     Webster also offers no reason for why he compared trends in firearms homicide rates in Missouri with those trends in the U.S. as a whole or the Midwest as a whole, i.e. why he chose those as his control areas. The choice of comparison areas appears to be arbitrary. Why not study trends in *all* states? Scholars have concluded that a more methodologically sound procedure is to study *all* jurisdictions that have passed a given type of law, and compare their crime trends with those of *all* jurisdictions that had not passed such laws (e.g. Marvell and Moody 1995). Missouri's trend in gun homicide looks bad when compared to trends in the entire Midwest, but why use the entire Midwest as a control area? The Midwest encompasses states that are nowhere near Missouri, like Minnesota, Wisconsin, Michigan, Indiana, Ohio,

North Dakota, and South Dakota, while excluding states that actually *border* Missouri, such as Arkansas, Oklahoma, Tennessee, and Kentucky.  Choosing different comparison areas would clearly make a difference in results since, as previously noted, the increase in the firearms homicide in Iowa from 2007 to 2008 was much worse than the increase in Missouri when it repealed its PTP law.  Put another way, if Iowa had been used as the control area, Webster would have found that the jump in firearms homicide in Missouri between 2007, when it repealed its PTP law, and 2008 was actually less than the jump in Iowa, which did not repeal its PTP law.   If one applied Webster's logic to this comparison, one would have to conclude that repealing the PTP law saved lives, since Missouri experienced less of a firearm homicide increase than Iowa did. It would, however, be as misguided to draw this conclusion as the one Webster drew, since the research design is simply too crude to permit even the most tentative conclusions about the impact, if any, of repealing the Missouri PTP law.

34.    Webster's analysis of Missouri firearm homicides (p. 5, Point 19) also makes no distinction between handgun homicides and long gun (rifle and shotgun) homicides.  Since the PTP law applied only to handguns, any effect of its repeal should have been found among handgun homicides.  Thus, Webster's data do not allow him to know how much of an increase there was in handgun homicide after Missouri's PTP law was repealed.

35.    Webster not only has no empirical foundation for linking the increase in gun homicides with the repeal of the permit law, but he also withholds one crucial piece of information – the  *total* homicide rate did not increase after the law was repealed.   (Contrary to the label on Table 2, its data do not refer to [total] homicide rates of Missouri metropolitan areas; the data actually pertain only to gun homicide rates – see the text accompanying the table, Point 21, p. 6).  While the gun homicide rate in Missouri did happen to increase after the PTP law was

repealed in 2007, the total homicide (gun homicides plus nongun homicides) rate was basically unchanged, fluctuating from 7.1 homicides per 100,000 population in 2005 to 6.9 in 2006, 6.4 in 2007, 7.9 in 2008, 7.1 in 2009, and 7.2 in 2010 (author's analysis of CDC Wonder database, available at http://wonder.cdc.gov/cmf-icd10.html)  Exhibit K-4.  Thus, the total homicide rate had quickly returned to its pre-repeal level (in 2006) of 6.9  by 2009.  If the repeal of the permit law actually had made it easier for homicide-prone persons to acquire guns in 2008, it should have continued to do so in 2009-2011, since the same gun control regime (and lack of PTP law) continued to prevail.  Even if one were willing to believe that the repeal of the PTP law was driving changes in *firearm* homicide, the data indicate no increase in the *total* homicide rate after the repeal.   In short, the data that Webster chose not to share with his readers support the conclusion that *repeal of Missouri's PTP law had no effect on the risk of its citizens being murdered*.  Since neither Webster nor anyone else argues that it is more socially harmful for people to be murdered by firearms than to be murdered by other means, there is no foundation in his research for believing that the repeal of the PTP law increased the crime of homicide, or that the presence of that law had, before its repeal, reduced homicides.

36.    Webster's (Point 20) very brief discussion of his unpublished analysis of state firearm homicide rates is far too sketchy to evaluate.   Without the underlying data and computations, it is impossible to comment on it, except to note (again) that there was no increase in overall homicide in Missouri, and there is no basis for assuming that repeal of PTP was the causative factor in any increase in firearms homicide.

37.    Webster uses his study of Missouri gun homicide trends (Webster et al. 2013) as "evidence that firearm purchaser licensing and firearm registration requiring applicants to appear before law enforcement and be fingerprinted reduces the diversion of guns to criminals (p. 4,

heading of section containing Points 14-26).   His assessment of the impact of repealing the

Missouri law, however, can tell us nothing about the effects of any of these three requirements,

since his methods only allowed him to, at best, evaluate the overall impact of the entire PTP law

being repealed.   Thus, even if one believed that repeal of the law somehow caused an increase in

gun homicide, it is perfectly possible that both the requirement for the applicant to appear in

person and the fingerprinting requirement in Missouri law were useless but that some other

element of the law had benefits that were eliminated when the law was repealed, such as any

optional background inquiries that sheriffs could carry out at their discretion (Missouri 571.090,

subsection 3).   And even if either of these two requirements did have any benefit, Webster's

methods do not allow him to separately establish the benefits of any one of the requirements.   He

can only, at best, test for the effects of all of the elements of the law as a package. Consequently,

the 2013 Webster et al. study of the repeal of the Missouri law can tell us nothing about the

merits of D.C.'s requirements that registrants appear in person or that they be fingerprinted.   And

they certainly can tell us nothing about the impact of a requirement that the applicant be

photographed, since the Missouri law had no such requirement.   Likewise, none of the other

studies cited by Webster had any evidence bearing on the merits of these three requirements.

Thus, Webster's endorsement of these provisions is not actually based on any relevant research

evidence, but instead appears to be based solely on optimistic speculations about benefits that

*might* result from such requirements**.**

38.   Webster claims (p. 7, Point 22) that firearm death rates are lower in states with

PTP licensing, but since his crude "analysis" does not control for any other variables that affect

rates of violent death, there is no foundation for attributing the lower firearm mortality rates in

these states to PTP licensing.   Webster's attribution of the lower gun death rates to these laws is

therefore little more than a guess.   More sophisticated research that *did* control for numerous other factors that affect crime, including all other major types of gun control laws, and that studied *all* large U.S. cities rather than just a cherry-picked few areas, found no impact of permit-to-purchase laws on rates of homicide, suicide, aggravated assault, robbery, or rape (Kleck and Patterson 1993, p. 274).   Thus, Webster, in contravention of customary scholarly standards, chooses to base his conclusions on some of the weakest available research evidence rather than the strongest.  (He does not rebut the findings of the Kleck and Patterson study, nor claim that his research was methodologically stronger; he simply ignores it).

39.    On pp. 7-8 (Points 23-26) Webster returns to his erroneous interpretation of gun trace data, attributing a mistaken significance to the share of traced guns that originated in a state different from the one which the gun was recovered by police.   He claims that if, in states with PTP laws and handgun registration, a higher percentage of a city's traced guns come from out-of-state, this must mean that PTP and registration laws were at least partly responsible, by effectively discouraging criminals from getting in-state guns.   This is a complete *non sequitur* – Webster does not provide any logical links that connect his observations about out-of-state guns with the effects of these kinds of gun control.   The analysis he cites to support his claim (Webster, Vernick, and Hepburn 2001) did nothing to rule out a far more likely alternative explanation of these patterns.   It is politically harder to get stricter gun laws passed in states where a large share of the electorate are gun owners, so the presence of gun laws effectively serves as an indirect indicator of low gun ownership in a given state.   In such states, where there are fewer in-state guns for criminals to steal, a larger share of traced guns will necessarily come from out-of-state – even if the state's gun control laws have no effect whatsoever on criminal gun acquisition.

40.     For example, if state X has a lower rate of gun ownership than the rest of the U.S., then migrants from other states will, on average, own guns at a higher rate than the residents of state X.  Since people bring their possessions with them when they change residences, this means that migrants to state X will bring their guns with them.  Then, when some of these migrants are later victims of residential burglaries and their guns are stolen, these guns, if later recovered by police and traced, will obviously show out-of-state origins, since the migrants purchased the guns in their home states.  Consequently, a large share of traced guns in state X will have out-of-state origins, but for mundane reasons having nothing to do with gun trafficking or the presence or absence of in-state gun laws intended to reduce gun trafficking.  The higher out-of-state share of traced guns merely reflects the higher rate of gun ownership among migrants to state X relative to persons native to the state.  Webster and his colleagues (2001) did nothing to rule out this mundane alternative explanation of the patterns they observed in their data, e.g. by using easily obtained data on interstate migration and state gun ownership rates to control for guns brought into each state via simple cross-state migration (U.S. Bureau of the Census 2013b).

41.     In a later study of gun "exports" based on trace data,  Webster and his colleagues tried to control for state gun ownership rates, but chose to rely on questionable surveys done by the Centers for Disease Control (Webster et al. 2013, pp. 115-116).  The survey data pertained to 2001 even though the trace data patterns the authors were trying to explain pertained to 2009 (p. 115).  More importantly, the CDC surveys have yielded highly implausible estimates of state gun prevalence.  For example, if one takes their results at face value, Texas, Arizona, Florida, and Virginia all have gun ownership rates substantially *below* the national average (Okoro et al. 2002) – results that are sharply at variance with both popular perceptions that gun ownership is higher in Southern states and with data using alternative indicators of gun prevalence.  For

example, the percent of suicides committed with guns (PSG) is widely accepted as a valid indicator of differences in gun prevalence across areas (Kleck 2004).  For the period 1999-2003, the national average PSG was 55.3%, and the PSGs for the aforementioned states were all well above this average: 59.7% in Texas, 61.4% in Arizona, 54.0% in Florida, and 60.5% in Virginia (author's analysis of CDC Wonder database at   http://wonder.cdc.gov/cmf-icd10.html). (These rates are computed by dividing deaths reported in "Gun Suicides 1993-2003" by deaths in "Total Suicides 1999-2003" in Exhibit K-5.  Thus, the CDC estimates of gun prevalence appear to be substantially in error, which means that Webster's use of these data did not effectively control for true differences in gun prevalence.  Webster and his coauthors did not explain why they did not simply use PSG measures instead of the dubious CDC measures.

42.     The 2009 Webster study (cited p. 7, Point 24, fn. 10) adds nothing to our understanding of the impact of gun laws on gun trafficking because it merely repeated the errors of the 2001 study – Webster studied unrepresentative samples of traced guns, wrongly assumed that his findings applied to crime guns in general, and ignored the more banal alternative explanations of patterns in his trace data.  He and his colleagues claimed to have measures of "diversion of guns" but in fact measured nothing of the kind.  Instead, they arbitrarily interpreted any traced gun with a TTC of under a year, recovered from a possessor who was not the legal purchaser of record as a "trafficked gun."  The ratio of (a) traced guns that were supposedly "trafficked" over (b) traced guns with a TTC longer than three years was their measure of the "diversion of guns."  As previously noted, a short TTC is not a valid indicator of a gun having been trafficked, so the "diversion of guns" measure used in this study was meaningless, and the associations of gun laws with this measure cannot be legitimately interpreted as an association between the presence of gun laws and rates of gun trafficking.

43.     The 2013 study cited on pp. 7-8 (Point 25, fn. 11) is likewise flawed by a misunderstanding of the meaning of gun trace data and of how guns are moved across state lines. Webster appears to believe that the sole reason, or at least the main reason, that guns are first sold at retail in one state but end up being used to commit crimes in a different state is because gun traffickers, aided by weak gun sales laws in the origin state, purchase guns in the origin state, then sell them to criminals in the destination state.   A more plausible explanation, which Webster and his colleagues did not control for and did nothing to refute, is simply that many Americans change residence across state lines each year, and move their possessions, including guns, with them.   If they are burglarized or their guns are otherwise stolen in the destination state, these guns are then, by definition, in the hands of criminals, and many of them will later be used in crimes, recovered by police, and traced.   Millions of guns like these will show out-of-state origins, but obviously for reasons having nothing to do with gun trafficking or weak gun sales laws.

44.     Webster refers to states that "export" large numbers of guns to other states, with the word "export" hinting at some deliberate commercial enterprise being responsible for the movement.   Rather than gun smugglers moving these guns, the more mundane explanation described above, based on the well-documented high volume of cross-state migration of Americans, is simply that people move their guns with them when they move.   For example, from 2010 to 2011, an estimated 6,987,416 Americans changed their residence across state lines, presumably taking their possessions with them (U.S. Bureau of the Census. 2013b).   Since there is now roughly one gun per U.S. resident (Kleck 2013), this implies that roughly 7 million guns are moved across state lines each year purely as a byproduct of ordinary migration.   Over a human lifetime of 70 years, it is therefore likely that *most* of the U.S. gun stock is moved across

state lines (Kleck and Wang 2009).  When some of these guns are later stolen or otherwise acquired by criminals, used in crimes, recovered by police, and traced, they will show up as guns with an out-of-state origin.

45.     From this standpoint, states that "export" large numbers of guns are merely those with high gun ownership rates, such that a high fraction of their out-migrants own guns.  Given obvious political realities, it is politically harder to pass stricter gun control laws in states with more gun-owning voters, i.e. states with high gun ownership rates.  Thus, the same states that "export" large numbers of guns (because they have high gun ownership rates) are also likely, for the very same reason, to have weaker gun laws - even if the weakness of those laws had absolutely no impact on illegal gun sales or gun trafficking.  Webster's own data actually confirm this interpretation, since he found that the strongest predictor of a state's rate of "crime gun export" was its gun ownership rate (Webster et al. 2013, p. 116 - see Table 8.2, IRR column, row labeled "Household gun ownership").

46.     Unlike in Webster's previous studies, the authors of the 2013 study controlled for "out-of-state population migration," but this was merely a crude measure of *overall* outmigration (Webster et al. 2013, pp. 115, 116).  This control cannot rule out the migration explanation because it does not control for flows of migrants between specific pairs of states.  A given state may have a fairly low rate of overall outmigration, yet have a high flow of migrants into a few high-crime states, in which residents are more likely to have their guns stolen.  The result would be a high rate of what Webster would mislabel "crime gun export," largely attributable to perfectly ordinary migration, but not to a high rate of *overall* outmigration.  Since Webster et al. only controlled for overall outmigration, their methods cannot rule out the foregoing migration explanation of the association between gun laws and interstate movement of guns.

47.     The 2013 study was also flawed by how the authors coded states' gun laws. Rather than relying on careful reading of original statutes, compiled in authoritative sources like the Bureau of Alcohol, Tobacco and Firearms' State Laws and Published Ordinances, as other scholars have done (e.g., Kleck and Patterson 1993; Kleck, Kovandzic and Bellows 2013), Webster and his colleagues chose to rely on a report produced by a gun control advocacy organization, Mayors Against Illegal Guns (MAIG), the creation of New York City's billionaire mayor, Michael Bloomberg (Webster et al. 2013, p. 114).   (This is the same Michael Bloomberg who is the namesake of Professor Webster's employer, the Bloomberg School of Public Health at Johns Hopkins University, whose renaming followed Bloomberg's gift of $35 million dollars to the school (http://www.jhsph.edu/news/news-releases/2001/bloomberg-name.html ).

48.     Webster's misinterpretation of his own research findings, from both the 2013 study and the others on which he relies, is to a great extent a by-product of this fundamental misunderstanding of how most guns move across state lines, i.e. of how guns are legally purchased in one state but end up being used in crimes in another.   He misattributes the undramatic but massive cross-state movement of guns associated with ordinary migration of millions of America's citizens to the actions of undocumented interstate gun smugglers, misleadingly describing this movement as "exporting guns to criminals across state borders" and the "diversion of guns to criminals" (p. 11).

49.     Webster is also highly selective, in his Declaration, in his reporting of the findings of his 2013 study.  Five of the ten firearms sales laws he and his colleagues studied showed no significant association with rates of crime gun "export," including laws specifically aimed at curtailing gun trafficking, such as limits of one handgun purchase per month, "strong dealer regulations," penalties for dealers who fail to conduct background checks, and state penalties for

straw purchasing (Webster et al. 2013, p. 116, Table 8.2).  Worse still, states with strong dealer regulation and state penalties for straw purchases actually had *higher* rates of crime gun "export" than states without such laws, though the associations were not quite statistically significant at the .05 level (see incident rate ratios [IRRs] larger than 1 on p. 116).  In short, Webster's findings were, on the whole, not supportive of the proposition that state laws regulating gun sales reduce the rate of crime gun "export."

50.     Webster, however, chose to focus in his Declaration (Point 26, p. 8) on the findings regarding PTP laws.  In this light, Webster's narrow focus on the finding for "discretionary permit-to-purchase (PTP)" laws (p. 9) appears to be the product of an arbitrary *ex post facto* emphasis on one kind of gun law for which he had some superficially supportive evidence, rather than a representative portrayal of the full set of his findings that had a bearing on the District of Columbia's challenged gun control measures.

51.     Conversely, one of the gun laws that Webster cites as affecting crime gun "export" rates in fact has nothing to do with attempts to restrict interstate gun trafficking – "junk gun" bans.  Given no sound basis for believing that these kinds of laws were aimed at interstate gun trafficking, Webster's citation of his findings concerning "junk gun" bans seems to be little more than an effort to pad out the list of findings that are supposedly supportive of the elements of the D.C. gun regulations.

52.     Curiously enough, Webster and his colleagues did not report any findings regarding the impact of *handgun registration* laws on gun "exports."   Thus, their reported findings failed to address the kind of control that is at the very heart of the current legal case. Webster claims (Point 25, p. 8) that "handgun registry laws were too highly correlated with permit-to-purchase licensing to include in the statistical model."  This is misleading since the

mere existence of high correlations among predictor variables (called "multicollinearity" by statisticians) does not preclude including both variables in a statistical model.  Further, dropping one of the correlated variables from the analysis, if the variable truly does affect the dependent variable (i.e., is a "relevant" variable), is an unacceptable way of responding to multicollinearity (Maddala 1992, p. 291).  If handgun registration actually affected gun "exports," it would have been wrong for the authors to do what they did, i.e. drop the handgun registration variable from the model, since omitting a relevant variable biases estimates of the effects of the other variables retained in the model with which the omitted variable is correlated, such as other gun control laws (Wooldridge 2009, pp. 89-94).  Worse still, this distortion is especially severe when the wrongly omitted variable is highly correlated with the predictor variables retained in the model, which is exactly the situation Webster et al. faced.  Thus, Webster's estimates of the effects of PTP laws were distorted by the decision to drop the handgun registration variable, to the extent that the former type of gun control is correlated with the latter type.  Since states whose populations are favorable to one type of gun control are likely to be favorable to other types, the presence of a given type of gun control is almost certain to be positively correlated with the presence of other types of gun control.

53.    Either handgun registration affects gun "export" or it does not.  If it does (i.e., it is a "relevant" variable), the authors made a serious error, omitting a relevant variable and biasing their estimates of the effects of the other gun control variables, including the PTP law.  This would mean that Webster's claims about the effect of the PTP law cannot be relied upon.  On the other hand, if handgun registration does *not* affect gun exports, then the authors should have reported this unsupportive finding, and Webster, in his Declaration, should have admitted that his 2013 study failed to support the handgun registration elements of D.C.'s new gun laws.  The one

option that was clearly illegitimate was to simply decline to report an unsupportive finding regarding the effect of handgun registration.

54.     As it happens, there are at least six published scholarly studies that empirically assessed the impact of firearms registration laws on crime rates, none of which Webster chose to cite.  Collectively these studies found that firearms registration laws had no measurable impact on rates of any kind of crime or violence (Geisel, Roll, and Wettick 1969, p. 676; Murray 1975, p. 88; Magaddino and Medoff 1984, pp. 235-238; Kleck and Patterson 1993, pp. 267-271, 274; Langmann 2012; Kleck, Kovandzic, and Bellows 2013).  These studies are discussed in detail in paragraphs 85-94 below.

55.     Further, Webster claimed (p. 8, Point 26) that his findings support the proposition that PTP licensing systems "requiring in-person applications to local law enforcement" would reduce "cross-state diversion of guns to criminals," but not a single one of the studies he cites in support actually distinguished jurisdictions with PTP laws requiring in-person applications from those that did not. The distinction he actually made in his 2013 study was between states with PTP laws requiring fingerprinting and those that did not (Webster et al. 2013, p. 116, Table 8.2). While fingerprinting would incidentally entail an in-person appearance, nothing in Webster's methods allowed him to distinguish the effects of the in-person appearance from the effects of fingerprinting, which might have effects of its own. Likewise, the Webster et al. (2001) study (cited in Point 25) and the Webster et al. (2009) study cited in his footnote 10 had no evidence bearing on the effects of requiring an in-person application on "cross-state diversion of guns to criminals." Thus, he had no direct empirical foundation whatsoever for his endorsement of a requirement for an in-person appearance of applicants.  Instead, this conclusion is little more than a guess, at best only very indirectly connected with his own research findings on PTP laws

in general, and at worst contrary to the findings of methodologically stronger research (Kleck and Patterson 1993).

56.     The 2013 Webster et al. study is in any case irrelevant to the challenged D.C. measures.  This study investigated only the impact of various gun control measures on rates of crime gun "export," but neither Webster nor any other authority known to me has claimed that there is a problem with D.C. being an exporter of crime handguns to other states.  Consequently, even if one accepted his dubious conclusions regarding measures that reduce gun "exports," they have nothing to do with the D.C. registration requirements or other elements of its gun control regime.  The far more relevant and important findings would have been estimates of the effects of gun control measures on *crime rates*, but Webster et al., for unexplained reasons, did not report any such findings.

57.     Notwithstanding this lack of relevance, Webster asserts that this study also showed that "having a law requiring private gun owners to promptly report theft or loss of firearms was associated with a 30 percent lower rate of exporting guns to criminals across state borders" (p. 9, Point 29).  He does not, however, offer any logical reason *why* such a measure should have any impact on interstate gun trafficking.  He does not, for example, cite any evidence that gun traffickers gain their supply of guns by either stealing them or buying them from others who have stolen them.  Further, Webster does not cite any evidence that these laws have ever been enforced, or that even a single violator has ever been punished for failing to report a theft or loss of a firearm.  Since anyone accused of such an offense could easily claim, without fear of being decisively contradicted, to have been unaware of the theft or loss of their gun, it is difficult to even imagine how the law could be enforced.

58.     Since it is so implausible that these laws affect gun trafficking, alternative explanations are more likely to account for Webster's findings.  As noted before, places with more restrictive gun laws usually also have lower gun ownership rates, so the presence of a law requiring the reporting of stolen or lost guns, like other gun control laws, serves as an indirect indicator of relatively low gun ownership.  A state with lower gun ownership rates will "export" few guns to other states simply because a smaller fraction of that state's out-migrants own guns, and thus few of them will have guns to be stolen once they have moved to their destination state. Since Webster never controls for specific state-to-state patterns of interstate migration, he has no basis for concluding that weak gun laws in the origin states had anything to do with the lower rates of gun "exports" prevailing in some states.  He therefore has no credible empirically based foundation for endorsing D.C.'s requirement that lost or stolen guns be reported.

59.     Point 28 contains no empirical evidence that pertains to the effectiveness of the types of gun controls implemented in the District of Columbia, so I do not comment on it.  In his Point 29 Webster cites his 2013 study in connection with the duty to report gun thefts, but that research did not have any findings bearing on either crime reduction or police officer safety, and thus is irrelevant to the current case

60.     Webster endorses the D.C. requirement to reregister guns every three years, but does not even attempt to support the endorsement with any evidence that such frequent reregistration reduces crime, including violent gun crime and gun trafficking (p. 9, Point 30). Indeed, he does not cite any evidence that firearms registration of *any* kind reduces crime.  This is not surprising, since prior research has unanimously found that gun registration has no detectable effect on rates of homicide, suicide, rape, robbery, aggravated assault, or gun accidents (see Section 6 for a detailed review of the evidence).   Nor does he explain why the

authorities could not detect persons who had acquired a disqualifying conviction since after they originally registered their guns simply by periodically checking (a) computer files of persons convicted of crimes against (b) computerized lists of gun registrants.   It is not necessary for gun owners to repeatedly re-register their guns to accomplish this goal.

61.     Webster argues that reregistration requirements would somehow deter illegal transfers, but does not cite any evidence that persons likely to make illegal transfers ever register their guns in the first place.  If only law-abiding persons obey registration requirements, how would such requirements deter illegal transfers by criminals?  Webster neither explains this nor cites any evidence that criminals, including those who make illegal firearm transfers, register their guns.

62.     D.C. police have also found that virtually no registered guns are used to commit crimes in D.C.   During a period of over four years, D.C. police recovered a grand total of 37 guns registered to private individuals used in crimes – only about nine per year (plaintiff's Exhibit J, p. 2, table titled "Registered Firearms Used to Commit Crimes").  Further, many of this handful of registered guns were not actually used to commit violent crimes.  I have reviewed a chart of 36 of the 37  registered firearms for which information was supplied that were recovered in the District between 7/17/2008 and 10/19/2012, which I understand will be submitted as an exhibit in this case.  This chart indicates that a considerable proportion of these registered guns were connected only to firearms regulatory offenses (unlawful possession of a firearm, unlawful possession of ammunition, carrying a pistol without a license), which derive from the District's restrictive firearms regulatory regime itself, where the conduct would be legal in most jurisdictions depending on circumstances, and which do not involve traditional crimes such as murder, rape, assault, or other crimes of violence.  In addition, although disposition

information is lacking for many of the entries, there is enough to show that quite a few of the charges were dismissed; that is, there may have been no crime at all. Further, several of the firearms were recovered in situations where the firearm itself was not even pertinent to the charged offense (e.g., assault on a police officer with elbows; firearm was in a safe).

63.     Webster also endorses the D.C. requirement that registrants take a safety training course, but cites no evidence that existing safety courses have prevented harm (p. 10, Point 31). Instead, he can only cite *recommendations* of various organizations concerning gun storage practices and a methodologically primitive study finding a statistical association between storage practices and self-inflicted and unintentional gun injuries – which did not, however, address the effects of safety training (p. 10, Point 32; Grossman et al. 2005).

64.     Even this study's findings regarding the effect of storage practices on gun injuries were meaningless, as the authors of this study made no serious effort to control for confounding variables – factors affecting gun injuries that are also correlated with gun storage practices. Thus, there was no sound basis for concluding that "safe" storage practices caused lower injury risks. The practice of keeping guns loaded and unlocked appears to be almost entirely confined to persons who have guns for self-protection, who are disproportionately found in high-crime, low income areas (Kleck 1997, Chapter 9). The higher injury rates of persons who keep guns loaded and unlocked may therefore be due to the higher rates of risk-taking behavior found in such areas. Likewise, if persons with more reckless personalities are more likely to keep guns loaded and unlocked, this personality syndrome will itself increase involvement in accidents, even if gun storage practices themselves had no effect of their own. In any case, this study had no bearing on whether gun safety training reduces gun injury or even affects firearm storage

practices.  The same problems afflicted the Miller et al. (2005) study (cited p. 11, Point 33), which like the Grossman study, had no evidence bearing on the impact of gun safety training.

65.     As it happens, there is strong evidence that laws mandating "safe" storage of guns have no detectable effect on rates of unintentional firearms injury – the type of gun injury most likely to be influenced by such laws.  Child Access Protection (CAP) laws require that guns be stored securely if a young person (typically a person under age 16 or so) might otherwise access them.  The best available evidence indicates that these laws had no effect on gun accidents among youth.  The most extensive study of CAP law impact was done by Hepburn and her colleagues (2006), who studied all 17 states that had enacted CAP laws by the time of their study.  They found no significant impact on unintentional firearm deaths among persons under age 15 in any but two of the states.  One of the two states that experienced significant drops in these kinds of deaths was California, but the authors concluded that since the drops did not occur until five years after the enactment of the CAP law, "it is likely that other factors" besides the CAP law caused the drops (p. 427).  This left Florida as the only state of the first 17 to pass CAP laws that experienced significant drops in fatal gun accidents among young people that might be attributed to the CAP law.  Florida, however, was unique in that it was the first state to pass a CAP law, and its enactment was accompanied by massive publicity about the dangers of keeping guns stored in an unsafe manner.  In light of the absence of any impact in the other 16 CAP states, it is more likely that the Florida drop was due to this massive news media blitz, rather than the enactment or enforcement of the law itself.  Since there could only be one first-in-the-nation CAP law, this publicity-generated impact cannot be expected to accompany subsequent implementations of CAP laws.  Hence, Webster's optimistic assessment was not grounded in the best available evidence, but rather was drawn in contradiction to what that evidence indicated.

But again, it should be stressed that this research has no direct bearing on the issue of the impact one could reasonably expect from gun safety training programs, and thus is irrelevant to the D.C. gun law's requirement of gun safety training.

66.     Finally, Webster cites a 1992 study by Kellermann et al. to support his conclusion that keeping guns locked up prevents suicides (p.  11, Point 34).   This study contained no evidence whatsoever that firearms safety training increased the likelihood of gun owners keeping their guns locked up, or that such training discouraged suicide.   Nor did it, or any of the other studies cited by Webster, have any evidence on the effects of knowledge about firearms laws. Thus, the Kellermann suicide study has no bearing on the merits of the District of Columbia's requirement that gun owners complete a firearms safety training course or its requirement that gun owners be knowledgeable about its firearms laws.

67.     To summarize, Professor Webster's Declaration is composed almost entirely of references to research, both his own and that of others, that is simply irrelevant to the issues in dispute in this case.  *None* of the evidence cited by Webster bears at all on the protection of police officers, while the few studies that purportedly relate to crime control mostly concern matters like the "diversion" of guns and firearms "trafficking."   These phenomena could be, at best, only very indirectly related to crime rates or crime control, but Webster does not even document any indirect links.  As it happens, the best available evidence, which Webster makes no attempt to rebut, indicates that levels of gun trafficking have no effect on crime rates (Kleck and Wang 2009).  Thus, even Webster's evidence on "the diversion of guns to criminals" has no actual relevance to the question of whether D.C.'s gun control measures have any realistic potential for controlling crime in the city.  Finally, and most tellingly, Webster is utterly silent on the question of what research has had to say about the impact of gun registration on rates of

crime and violence.  As established in Section 6 of this Declaration, this body of research has uniformly found no detectable impact of gun registration on crime and violence.

## Comments About Defense Witnesses Lanier, Jones, and Vince

68.     The following comments pertain to all three of the remaining defense "expert" witnesses.  None of them are experts on the effectiveness of gun control measures.  The qualifications that are genuinely relevant to evaluating these measures would include formal training in multivariate statistical analysis, including coursework in ordinary least squares regression, logistic regression, two-stage least-squares methods, fixed effects panel designs, and similar statistical techniques.  Likewise, one would need a thorough knowledge of the different kinds of research designs that would allow one to make stronger causal inferences as to the effects of gun laws, to establish causal order (does X cause Y, or does Y cause X?), and to rule out alternative explanations of statistical associations.  This knowledge would enable a genuine expert to both conduct effective research and to distinguish strong research from weak research among other scholars' work, so as to know which studies can be most strongly relied upon in drawing conclusions.  Further, one would need a thorough knowledge of the methods and findings of prior research on this topic, especially of the most methodologically sophisticated research done in the field, to draw conclusions about whether gun control measures have beneficial effects.  The bulk of the more technically sound work has been published in criminological and social science academic journals, so those qualified to assess the effectiveness of gun control and other crime control policies would be able to demonstrate their mastery of the stronger prior research by knowledgably discussing and citing these more advanced research reports.  Neither Cathy Lanier, Joseph Vince, nor Mark Jones show even the most superficial acquaintance with the relevant research in this field, or evince any knowledge of

the methods used in research in the field, or demonstrate any ability to distinguish good research from bad.

**Section 3 - Rebuttal of the Declaration of Cathy Lanier**

69.     Cathy Lanier has undoubted expertise in the administration of a big city police department.  This expertise, however, has no relevance to the factual issues involved in this case.  She has never done any research on the effects of firearms restrictions on crime, gun trafficking, officer protection, suicide, or gun accidents, and shows no evidence of being familiar with the body of research done by others.  Her discussion of her qualifications (pp. 2-3) reveals no training in research methods or statistics that would enable her to distinguish methodologically sound research from unsound, unreliable research on these topics.  In general, she simply refers to her law enforcement experience as a foundation for her "professional opinion" that various elements of the new D.C. gun controls will help "secure the Nation's Capitol" (p. 7).

70.     By itself, experience in law enforcement cannot provide expertise on issues like the impact of gun purchase permits, requiring guns to be registered, requiring theft or loss of guns to be reported, or the other factual issues at stake in this case.  It is impossible to directly observe crime-reducing effects of gun control provisions (or any other crime-control policies or practices), either in the course of law enforcement experience or of any other kind of personal experience, for the simple reason that one cannot directly observe crimes or other acts of violence <u>not</u> occurring.  One cannot "observe" X number of crimes not occurring, or know, through personal experience, that these X crimes did not occur because of the presence of a particular policy or practice aimed at reducing crime.  Likewise, knowledge of instances of violence that did occur can tell us nothing, by themselves, about whether the same or similar acts would have occurred in the absence of particular gun control provisions.  These effects can only

be indirectly detected using scientific research methods, and Chief Lanier lacks the training and knowledge that would enable her to either conduct such research herself, or be able to judge the relative technical merits of research done by others.

71.     Lanier's opinions do not rely to any significant degree on research, since she only cites research at two or three points in her Declaration.  Her lack of relevant research expertise is evident regarding one of few times she does cite research evidence.  She cites a study by Douglas Weil, an employee of the Brady Campaign to Prevent Gun Violence, and a colleague to support the claim that "laws restricting the registration or purchase of multiple firearms in a given period are effective in disrupting illegal interstate trafficking of firearms" (p. 6).  Chief Lanier apparently did not realize that this study, contrary to the claims of its authors, did not actually have any measures of interstate trafficking of firearms, and thus could not shed any light on the impact of a one-gun-a-month law on such trafficking.

72.     Lanier describes a number of incidents of gun violence, but does not cite any evidence that any of the incidents would have been prevented had gun control measures like those adopted by D.C. been in place (pp. 4, 6).   She discusses the need to do something about violence, but presents no evidence that D.C.-style measures are among the policies that would reduce violence (pp. 4-5).   Her opinion that "the District's firearms-registration laws significantly aid MPD's effort to prevent crime" etc. (p. 5, Point 16) is a total *non sequitur*- it comes out of nowhere, with no logical connection to any of facts cited elsewhere in her declaration.

73.     Lanier also confuses objectives or goals with actual accomplishments.   She appears to believe that if firearm registration was *intended* to serve various objectives (listed on p. 6, Point 17), then this is basically the same as actually achieving those objectives.  The mere

fact that the designers of D.C.'s gun laws had good intentions is treated as if this is a social good in and of itself.

74.     Lanier states that "individuals who legally register their firearms are much less likely to use those firearms for criminal purposes" (p. 8).   It is clear from context that she believes that (a) registering a gun *causes* individuals to be less likely to use guns for criminal purposes, rather than (b) registration of one's gun is merely an outward indicator of one's law-abiding nature.   She does not cite any supporting evidence or explain how she can distinguish which of these two positions is correct.   She also does not cite any evidence that any significant number of persons willing to "use firearms for criminal purposes" are also willing to register their firearms.   Indeed, she admitted in her deposition that very few criminals in the District register their guns (Lanier 2013, p. 12).   This raises the question, How, then, would registration improve "the safety of police officers and the public"?

75.     Likewise, Lanier does not explain how her department could enforce the requirement that gun registrants report theft or loss of a gun (p. 9, Point 28), given that any violator could simply claim they were unaware of the loss.   More tellingly, she does not cite a single instance of anyone in D.C. being arrested and convicted of violating this requirement, consistent with the hypothesis that this requirement is not actually enforced.

76.     In general, Chief Lanier's Declaration is little more than an evidence-free series of personal opinions that the D.C. gun law is a good thing simply because she can imagine ways in which violence *might be* prevented by its elements.   This is not evidence, expert or otherwise. It is safe to say that one can imagine hypothetical benefits flowing from even the most ineffective or even counterproductive policies.   And merely labeling a guess as a "professional opinion" does not make it any more than opinion.

**Section 4 - Rebuttal of the Declaration of Mark D. Jones**

77.    Although Mark Jones is undoubtedly expert in the enforcement of federal gun control laws, none of the qualifications he lists on pp. 1-3 of his Expert Report qualify him to judge the merits of key elements of the District of Columbia's gun control law or, more specifically, to assess the degree to which they "serve the goals of enhancing public safety and reducing firearm-related crime" (p. 5).  He has never done any research on the effects of firearms restrictions – either those of D.C. or other places - on crime, gun trafficking, officer protection, suicide, or gun accidents, and shows no evidence of being familiar with the considerable body of research done by others.  He also has no training in research methods or statistics that would enable him to distinguish methodologically sound research from unsound research done by others on these topics.  In general, he simply mentions his "experience in law enforcement" (p. 5), and asks the reader to take on faith that this somehow enables him to judge the merits of D.C. gun controls.

78.    By itself, experience in law enforcement cannot provide expertise on issues like the impact of gun purchase permits, requiring guns to be registered, requiring theft or loss of guns to be reported, or the other factual issues at stake in this case.  One cannot directly observe effects of gun control provisions, in connection with law enforcement experience or any other kind of personal experience, since one cannot directly observe, in the course of professional experience, crimes or other acts of violence not occurring.  Likewise, knowledge of instances of violence that do occur can tell us nothing, by themselves, about whether the same or similar acts would have occurred in the absence of particular gun control provisions.  These effects can only be indirectly detected using scientific research methods, such as those used in the research by Kleck and Patterson (1993) or Kleck, Kovandzic, and Bellows (2013).  Mr. Jones lacks the

training and knowledge that would enable him to either conduct such research himself, or be able to judge the relative technical merits of research done by others (such as the research cited in his footnotes 4-6).  His ignorance of the relevant scholarly research is demonstrated by his claim (p. 10) that "academic studies have repeatedly shown that the risk of injury or death by gunshot is dramatically increased in homes with firearms present," as he does not cite which studies support this claim, and appears to be unaware of the doubt that has been cast on studies making this claim (Kleck 2001).  His opinion that safety training would mitigate the risk of injury or death by gunshot is sheer speculation, unsupported by either his own research or that of anyone else.

79.    The same applies to Jones' opinion that requiring gun owners to report the theft or loss of their guns to police will reduce firearms trafficking (p. 11).  He does not even offer any logical reason why traffickers would be impeded if all gun thefts were reported to police.  He offers no evidence that firearms traffickers obtain guns by theft, nor any evidence their activities would be impaired if some "erstwhile gun owners whose weapons have been recovered by the police" no longer could avail themselves of "the most common excuses (loss and theft)" for why their guns were later recovered by police.  Indeed, he does not even explain why gun owners would no longer have that excuse now that D.C. requires the reporting of the theft or loss of guns – any gun owner could still claim that he did not *know* his gun had been stolen or lost, and thus did not know there was anything to report.  Under any reasonably foreseeable circumstances, no prosecutor would be able to prove otherwise.  In this connection, Jones offers no evidence that this sort of legal obligation has ever been effectively enforced in jurisdictions that have previously implemented such a policy.

80.    In general, the arguments Mr. Jones offers are speculative, anecdotal (e.g., pp. 5-6 citation of two individual incidents of violent crime), and unscientific, and can reveal nothing

about the likely consequences of the District's restrictions on guns.  Consequently, the "expert opinions" proffered by Mr. Jones amount to nothing more than personal opinions, unsupported by scientific evidence, and relabeled as "professional opinions."

**Section 5 - Rebuttal of the Declaration of Joseph Vince**

81.     Re. p. 1, "Background and Qualifications," Mr. Vince has undoubted expertise in the enforcement of federal gun control laws, in connection with his employment with the federal Bureau of Alcohol, Tobacco, and Firearms.  This expertise, however, has no relevance to the factual issues involved in this case.  He has never done any research on the effects of firearms restrictions on crime, gun trafficking, officer protection, suicide, or gun accidents, and shows no evidence of being familiar with research done by others.  He also has no training in research methods or statistics that would enable him to distinguish methodologically sound research from unsound, unreliable research on these topics.  He cites not a single scholarly article in support of his views.  In general, he simply mentions his "experience in law enforcement" (p. 3), and asks the reader to take on faith that this somehow enables him to judge the effects of key elements of D.C. gun controls.

82.     By itself, experience in law enforcement cannot provide expertise on issues like the impact of gun purchase permits, requiring guns to be registered, requiring theft or loss of guns to be reported, or the other factual issues at stake in this case.  One cannot directly observe effects of gun control provisions, in connection with law enforcement experience or any other kind of personal experience, since one cannot directly observe crimes or other acts of violence not occurring.  Likewise, knowledge of instances of violence that do occur can tell us nothing, by themselves, about whether the same or similar acts would have occurred in the absence of particular gun control provisions.  These effects can only be indirectly detected using scientific

research methods like those previously cited, and Mr. Vince lacks the training and knowledge that would enable him to either conduct such research himself, or be able to judge the relative technical merits of research done by others.  The arguments and evidence Mr. Vince cites are anecdotal (e.g., pp. 3-4 citations of individual incidents of violent crime) and unscientific, and can reveal nothing about the likely consequences of the District's restrictions on guns.

83.      Consequently, the "expert opinions" proffered by Mr. Vince amount to nothing more than personal opinions, unsupported by scientific evidence.   A prime example is his assertion that the registration of machine guns "has proved highly effective in reducing the use of automatic weapons in crime" and that registration of long guns and hand-guns likewise offer the benefits of "enhanced public safety, violence prevention"  (p. 4).  Leaving aside the merits of this claim, Vince offers no scientific evidence in support, and appears unaware of the extensive evidence that registration of firearms does *not* enhance public safety or prevent violence (Geisel et al. 1969; Magaddino and Medoff  1984; Kleck and Patterson 1993, p. 274; Murray 1975; Langmann 2012).  Likewise, he can only vaguely allude to unnamed "studies" that supposedly showed that restricting purchases of guns to one a month "are highly effective in disrupting illegal interstate trafficking of firearms" (p. 5), and can only cite his "opinion" and unspecified "experience" that somehow indicates that requiring registrants to appear in person prevents "the diversion of firearms for illegal purposes" (p. 5).

84.      Most remarkably, Mr. Vince insists that he has "seen first-hand how failing to notify police agencies of the theft of a weapon has *resulted in* homicides that could have been prevented with proper notification" (p. 7, emphasis added).  He does not bother to cite even a single specific homicide that fits this description, and certainly does not explain how he could know that a given homicide would not have occurred in the absence of a gun owner reporting the

theft of his gun.  He does not even explain the logic that links notification of the theft to homicide avoidance.  Assuming that the identity of a gun thief is usually unknown, how would police knowledge that a gun had been stolen by an unknown person prevent that unknown person (or another person to whom the thief transferred the gun) from committing a homicide?

85.     Likewise, Mr. Vince does not explain why a registration system like that of Michigan or D.C. is necessary for citizens to be "able to properly report the correct description of their stolen firearms" (p. 7).  Any gun owner can easily record the make, model, serial number, and other salient attributes of each of his firearms, store the information in a safe place, and use the information to inform police only if and when the gun is stolen – without the information having been previously provided to police.  Mr. Vince does not explain how registration adds anything in this regard.

86.     In sum, Mr. Vince offers only personal opinions on the key elements of the new D.C. gun control measures – opinions that bear no logical connection with his law enforcement experience, and that do not derive from (and in some cases are in contradiction of) the best available research bearing on those control measures.

## Section 6 - Empirical Evidence on the Impact of Gun Registration on Crime and Violence Rates

87.     The most conspicuous omission from the District's expert witnesses is that they are utterly silent regarding the extant evidence concerning the impact of gun registration on crime.  This is understandable, since *empirical assessments have unanimously indicated that registration laws have no measurable effect on rates of crime or violence* (Geisel, Roll, and Wettick 1969, p. 676; Murray 1975, p. 88; Magaddino and Medoff 1984, pp. 235-238; Kleck and Patterson 1993, pp. 267-271, 274; Langmann 2012; Kleck, Kovandzic, and Bellows 2013).

Table 1 summarizes all six empirical studies of the impact of gun registration laws on rates of violence that are known to me. Five of the six are studies of U.S. registration laws; the lone Canadian study (Langmann 2012) will be discussed separately.

88.     These studies examined a variety of registration laws, but all of the laws entailed governmental record keeping of the acquisition of firearms. The studies have examined the impact on rates of homicide, robbery, aggravated assault, suicide, fatal gun accidents, and (in just one study, (Kleck and Patterson 1993) rape. Some separately assessed the impacts on rates of violent incidents involving firearms, others examined "total" rates, i.e. gun violence and nongun violence considered together. Each of the studies' methods and findings are summarized below.

89.     Geisel and his colleagues (1969) performed multiple regression analyses of data describing the 50 U.S. states as of 1960, those states as of 1965, and a set of 94 cities of 100,000 population or larger as they were in 1960. They controlled for eight possible confounding variables, and coded the presence of as many as 17 different kinds of gun controls. They measured gun control strictness in two different ways: (1) using a global measure of overall strictness that combined all the separate gun law measures into a single "total index value", and (2) estimating regression equations in which dummy variables separately representing the presence/absence of each kind of gun control were included. The first method can tell us nothing about the effects of any one kind of gun control such as registration. The more useful second type of analysis yielded "no significant or even meaningful results" (p. 676), *i.e.* it found no significant negative associations between any gun control dummy variable, including the one representing laws requiring "government record-keeping by government agencies … of handgun sales," and any crime or violence rate.

90.     Murray (1975) performed a multiple regression analysis of data describing the 50 states as they existed in 1970, controlling for 16 possible confounding variables.  He coded for seven different types of gun control, including whether "handgun sales [are] reported to the police."  His dependent (outcome) variables were rates of firearm homicide, firearm suicide, firearm robbery and firearm aggravated assault.  He found no significant associations between any of the gun laws, including registration of handgun sales, and any of the rates of firearms violence.

91.     Magaddino and Medoff (1984) performed multiple regression analysis on cross-sectional data describing the 50 states as they were in 1960 and as they were in 1970, controlling for nine other possible confounding factors, in addition to the seven types of gun control laws included.  In 42 tests of possible effects of gun laws on violence rates (3 kinds of violence x 2 different years x 7 law types = 42 tests), they did not find a single significant negative association of a state gun law with rates of homicide, robbery, or aggravated assault, in either 1960 or 1970.  More specifically, they found no evidence of any effect of "government record keeping" on any of the three kinds of violent crime.  No further description of this kind of registration was provided.

92.     Kleck and Patterson (1993) used two-stage least-squares procedures to estimate the effects of 19 different types of gun control laws, both at state and city levels, and gun ownership rates on all major forms of crime and violence that involve firearms.  They found no significant effect of laws requiring that a government agency receive records of gun sales and/or possession on rates of total homicide, firearm homicide, total aggravated assault, firearm aggravated assault, total robbery, firearm robbery, rape, fatal gun accidents, total suicide, and firearm suicide.

93.     Kleck, Kovandzic and Bellows (2013) used two-stage least-squares methods to estimate models of violence using data on the largest sample heretofore analyzed to test effects of gun laws on violence - 1,078 U.S. cities with a population of 25,000 or larger.   They simultaneously tested for the effects of 19 different types of gun control laws, enacted at both city and state levels, on rates of total homicide, firearms homicide, total robbery, and total aggravated assault.   They found no evidence of beneficial effects of laws requiring that the transfer or sale of guns must be registered with a governmental agency.   The only possible effect detected was a counterproductive positive effect on robbery rates.   Exhibit K-6.

94.     The results of this body of U.S.-based cross-sectional research are extremely consistent regarding gun registration; indeed, they are unanimous.   Firearms registration laws show no statistically significant violence-reducing effect on any type of violence.   To be specific, gun registration does not appear to have any detectable effect on rates of total homicide, gun homicide, long gun homicide, total robbery, gun robbery, total aggravated assault, gun aggravated assault, rape, total suicides, gun suicides, or fatal gun accidents in the U.S.

95.     There has been only one serious empirical assessment of the impact of Canada's requirement that long guns (rifles and shotguns) be registered.   Langmann (2012) used a variety of time series methods to assess whether there were any favorable changes in the trends of total homicide, firearms homicide, long gun homicide, spousal homicide, or spousal long gun homicide, in the period from 1995, when the long gun registration requirement was enacted as part of the C-68 firearms law, to 2003 when the requirement that all long guns be registered finally went into effect.   Complicating matters further, there was an amnesty announced in 2006 for those who had not yet registered their long guns.   Langmann found no evidence that the law had any beneficial effects, either immediate or lagged, on any of the aforementioned outcome

variables.  Although firearm violence declined in the years following implementation of C-68, it was no greater than would have been expected due to the continuation of trends already underway prior to C-68.

96.     In sum, research indicates that gun registration does not appear to reduce any form of violence.  It is rare for evidence on the impact of crime-control policies to be this consistent, but it is fair to say that the District of Columbia had no basis, rooted in empirical research, to expect any improvement in public safety to be produced by implementing gun registration in the District.  While it is easy enough to imagine a variety of reasons why registration *might* hypothetically reduce crime and violence, there is no foundation based on past experience with actual gun registration systems to expect any measurable decline in crime or violence.

I declare under penalties of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on _December 6_, 2013

_____
Gary Kleck

# References

Author's unpublished analysis of Inter-university Consortium for Political and Social Research (ICPSR). 2013.  Study 4572 - 2004 Survey of Inmates in State and Federal Correctional Facilities.  Machine-readable dataset.  Ann Arbor, MI: ICPSR.

DeZee, Matthew R. 1983. "Gun control legislation: impact and ideology." *Law and Policy Quarterly* 5:367-379.

Geisel, Martin S., Richard Roll, and R. Stanton Wettick. 1969.  "The effectiveness of state and local regulations of  handguns."  *Duke University Law Journal* 4:647-76.

Grossman, David C., Beth A. Mueller, Christine Riedy, M. Denise Dowd, Andres Villaveces, Janice Prodzinski, Jon Nakagawara, John Howard, Norman Thiersch, and Richard Harruff. 2005. :Gun storage practices and risk of youth suicide and unintentional firearm injuries." *Journal of the American Medical Association* 293(6):707-714.

Hepburn, L., Deborah Azrael, Matthew Miller, and David Hemenway.  2006.  "The effect of child access prevention laws on unintentional child firearm fatalities, 1979-2000. *Journal of Trauma* 61:423-428.

Kleck, Gary. 1991.  *Point Blank: Guns and Violence in America.*  NY: Aldine de Gruyter.

Kleck, Gary. 1997.  *Targeting Guns: Firearms and their Control.*  NY: Aldine de Gruyter.

Kleck, Gary. 2004. "Measures of gun ownership levels for macro-level crime and violence research." *Journal of Research in Crime and Delinquency* 41(1):3-36.

Kleck, Gary. 2013  "An overview of gun control policy in the United States."  Pp. 562-579 in *The Criminal Justice System*, 10th edition, Edited by George F. Cole and Marc G. Gertz. Wadsworth.

Kleck, Gary, and Marc Gertz. 1995.  "Armed resistance to crime: the prevalence and nature of self-defense with a gun."  *Journal of Criminal Law & Criminology* 86(1):150-187.

Kleck, Gary, and Marc Gertz. 1998. "Carrying guns for protection: results from the National Self-Defense Survey." *Journal of Research in Crime and Delinquency* 35(2):193-224. Kleck, Gary, Tomislav Kovandzic, and Jon Bellows. 2013.  "Does Gun Control Reduce Violent Crime?"  Unpublished paper.  College of Criminology and Criminal Justice, Florida State University, Tallahassee, Florida.

Kleck, Gary, and Don B. Kates. 1997.  *The Great American Gun Debate.*  San Francisco: Pacific Research Institute.

Kleck, Gary, and Don B. Kates. 2001.  *Armed*.  Buffalo, NY: Prometheus Books.

Kleck, Gary, Tomislav Kovandzic, and Jon Bellows.  2013.  "Does gun control reduce violent crime?"  Unpublished paper, College of Criminology and Criminal Justice, Florida State University, Tallahassee, Florida.

Kleck, Gary, and E. Britt Patterson. 1993. "The impact of gun control and gun ownership levels on violence rates." *Journal of Quantitative Criminology* 9:249-288.

Kleck, Gary, and Shun-Yung Wang.  2009. "The myth of big-time gun trafficking and the overinterpretation of gun tracing data." *UCLA Law Review* 56(5):1233-1294.

Kovandzic, Tomislav, Mark E. Schaffer, and Gary Kleck. "Gun prevalence, homicide rates and causality: A GMM approach to endogeneity bias."  Chapter 6, pp. 76-92 in *The Sage Handbook of Criminological Research Methods*, edited by David Gadd, Susanne Karstedt, and  Steven F. Messner.  Thousand Oaks, CA: Sage.

Kovandzic, Tomislav, Mark Schaffer, and Gary Kleck. 2013. "Estimating the causal effect of gun prevalence on homicide rates: A local average treatment effect approach." *Journal*

*of Quantitative Criminology* 28(4): 477-541.

Langmann, Caillin.  2012.  "Canadian firearms legislation and effects on homicide 1974 to 2008."  *Journal of Interpersonal Violence* 27(12):2303-2321.

Lanier, Cathy. 2013.  Deposition of Cathy Lanier, chief of the Washington, D.C. Metropolitan  Police Department, June 12, 2013.

Maddala, G. S. 1992. *Introduction to Econometrics, Second Edition.*  N.Y.: Macmillan.

Magaddino, Joseph P., and Marshall H. Medoff. 1984. "An empirical analysis of federal and state firearm control laws." Pp.225-258 in *Firearms and Violence: Issues of Public Policy*, edited by Don B. Kates, Jr. Cambridge, Mass.: Ballinger.

May, David C. and G. Roger Jarjoura, 2006.  *Illegal Guns In The Wrong Hands.*  Lanham, MD: University Press of America.

Murray, Douglas R. 1975. "Handguns, gun control laws and firearm  violence." *Social Problems* 23:81-92.

National Rifle Association.  2010.  *Compendium of State Laws Governing Firearms 2010.* Fairfax, VA: NRA Institute for Legislative Action.

Sheley, Joseph and James D. Wright. 1996.  *In The Line of Fire*.  NY: Aldine de Gruyter.

Tark, Jongyeon, and Gary Kleck. 2004. "Resisting crime: the effects of victim action on the outcomes of crimes." *Criminology* 42(4):861-909.

Tark, Jongyeon, and Gary Kleck. 2014. "Resisting rape: the effects of victim self-protection on rape completion and injury." *Violence Against Women* 23(3): (forthcoming March 2014).

U.S. Bureau of Alcohol, Tobacco and Firearms (ATF). 2000.  *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers.*  Washington, D.C.: U.S. Government Printing Office.

U.S. Bureau of Alcohol, Tobacco and Firearms (ATF).  2013. *ATF: District of Columbia.*  http://www.atf.gov/files/statistics/download/trace-data/2011/2011-trace-data-district-of-columbia.pdf.

U.S. Bureau of the Census. 2013a.  2004 Survey of Inmates in State and Federal Correctional Facilities.  Inter-university Consortium for Political and Social Research    (ICPSR). Study 4572 - Machine-readable dataset.  Ann Arbor, MI: ICPSR.

U.S. Bureau of the Census. 2013b.  "State-to-State Migration Flows Table 2011," available at Census Bureau website, http://www.census.gov/hhes/migration/data/acs/state-to-state.html.

U.S. Bureau of Justice Statistics. 2012.  *Firearms Stolen During Household Burglaries and Other Property Crimes, 2005–2010.*  NCJ 239436.  Washington, D.C.: U.S. Government Printing Office.

U.S. Bureau of Justice Statistics. 2013.  *Background Checks for Firearm Transfer, 2010 – Statistical Tables.*  Available online at http://www.bjs.gov/content/pub/pdf/bcft10st.pdf.

U.S. FBI.  2013. Uniform Crime Reports website at http://www.fbi.gov/stats-services/crimestats.

Webster, Daniel W., Jon S. Vernick, and Maria T. Belzacchelli.  2009.  "Effects of state-level firearm seller accountability policies on firearms trafficking."  *Journal of Urban Health* 86:523-537.

Webster, Daniel W., Jon S. Vernick, and Lisa M. Hepburn.  2001.  The relationship between licensing, registration, and other state gun sales laws and the source state of crime guns. *Injury Prevention* 7:184-189.

Webster, Daniel W., Jon S. Vernick, Emma E. McGinty, and Ted Alcorn. 2013.  "Preventing the

diversion of guns to criminals through effective firearm sales laws."  In *Reducing Gun Violence in America.*  Edited by Daniel W. Webster and Jon S. Vernick.  Baltimore: Johns Hopkins.

Wellford, Charles F., John V. Pepper, and Carol V. Petrie (eds.). 2005. *Firearms and Violence: A Critical Review.*  Washington, D.C.: The National Academies Press.

Wintemute, Garen J., Philip J. Cook, and Mona A. Wright.  2005.  "Risk factors among handgun retailers for frequent and disproportionate sales of guns used in violent and firearm-related crimes.  *Injury Prevention* 11:357-363.

Wooldridge, Jeffrey M. 2009.  *Introductory Econometrics: A Modern Approach.*  Mason, OH: South-Western Cengage Learning.

Wright, James, and Peter H. Rossi. 1986. *Armed and Considered Dangerous.*  N.Y.: Aldine.

**Table 1.  Studies of the Impact of Firearms Registration on Violence Rates**

| Study | Place | Study Period | Type of Registration Evaluated | Violence Rate | Findings |
|---|---|---|---|---|---|
| Geisel et al. (1969) | 50 U.S. states; 129 large cities | 1960, 1965 | "Record keeping by government agencies … of handgun sales" | Total Homicide | No |
| | | | | Firearms Homicide | No |
| | | | | Total Suicide | No |
| | | | | Firearms Suicide | No |
| | | | | Fatal gun accidents | No |
| | | | | Total Agg. Assault | No |
| | | | | Firearms Agg. Assault | No |
| | | | | Total Robbery | No |
| Murray (1975) | 50 U.S. states | 1970 | "Handgun sales reported to police" | Firearms Homicide | No |
| | | | | Firearms Agg. Aslt. | No |
| | | | | Firearms Robbery | No |
| | | | | Firearms Suicide | No |
| Magaddino and Medoff (1984) | 50 U.S. states | 1960 | "Government record keeping" | Total Homicide | No |
| | | | | Total Robbery | No |
| | | | | Total Agg. Assault | No |
| | | 1970 | | Total Homicide | No |
| | | | | Total Robbery | No |
| | | | | Total Agg. Assault | No |

**Table 1.  Studies of the Impact of Firearms Registration on Violence Rates (continued)**

| Study | Place | Study Period | Type of Registration Evaluated | Violence Rate | Findings |
|---|---|---|---|---|---|
| Kleck and Patterson (1993) | 170 large U.S. cities | 1980 | Governmental agency received report of gun sales, possession | Total Homicide | No |
| | | | | Firearm Homicide | No |
| | | | | Total Agg. Assault | No |
| | | | | Firearm Agg. Assault | No |
| | | | | Total robbery | No |
| | | | | Firearm Robbery | No |
| | | | | Rape | No |
| | | | | Fatal Gun Accidents | No |
| | | | | Total Suicide | No |
| | | | | Firearm Suicide | No |
| Langmann (2012) | Canada | 1978-2008 | Bill C-68 – long gun registration, plus other elements | Total Homicide | No |
| | | | | Firearm Homicide | No |
| | | | | Long Gun Homicide | No |
| | | | | Spousal Homicide by Firearm | No |
| | | | | Spousal Homicide By Long Gun | No |
| Kleck et al. (2013) | 1,078 U.S. cities | 1990 | State laws requiring transfer/sale of guns to be registered with government agencies | Total Homicide | No |
| | | | | Firearm Homicide | No |
| | | | | Total Robbery | No |
| | | | | Total Agg. Assault | No |

# Kleck Declaration Exhibit K-1

CURRICULUM VITAE

GARY KLECK

(Updated February 15, 2013)

PERSONAL

Place of Birth:             Lombard, Illinois

Date of Birth:              March 2, 1951

Address:                    College of Criminology and Criminal Justice
                            306 Hecht House
                            The Florida State University
                            Tallahassee, Florida 32306-1127

Telephone Numbers:          Office:        (850) 644-7651
                            Office FAX:    (850) 644-9614
                            Home:          (850) 894-1628

e-mail Address:             gkleck@fsu.edu


CURRENT POSITION

    David J. Bordua Professor of Criminology, Florida State University

COURTESY APPOINTMENT

    Professor, College of Law, Florida State University

PROFESSIONAL MEMBERSHIPS

    American Society of Criminology

    Academy of Criminal Justice Sciences

EDUCATION

    A.B.        1973 - University of Illinois, with High Honors and with Distinction in
                      Sociology

    A.M.        1975 - University of Illinois at Urbana, in Sociology

    Ph.D.       1979 - University of Illinois at Urbana, in Sociology

ACADEMIC HONORS

National Merit Scholar, 1969

Freshman James Scholar, University of Illinois, 1969

Graduated from University of Illinois with High Honors and with Distinction in Sociology, 1973

University of Illinois Foundation Fellowship in Sociology, 1975-76

1993 Winner of the Michael J. Hindelang Award of the American Society of Criminology, for the book that made "the most outstanding contribution to criminology"   (for Point Blank: Guns and Violence in America).

TEACHING POSITIONS

| | |
|---|---|
| Fall, 1991 to present | Professor, College of Criminology and Criminal Justice, Florida State University |
| Fall, 1984 to Spring, 1991 | Associate Professor, School of Criminology, Florida State University. |
| Fall, 1979 to Spring, 1984 | Assistant Professor, School of  Criminology, Florida State University. |
| Fall, 1978 to Spring, 1979 | Instructor, School of Criminology, Florida State University. |

COURSES TAUGHT

Criminology, Applied Statistics, Regression, Introduction to Research Methods, Law Enforcement, Research Methods in Criminology, Guns and Violence, Violence Theory Seminar, Crime Control, Assessing Evidence, Survey Research, Research Design and Causal Inference.

DISSERTATION

Homicide, Capital Punishment, and Gun Ownership:  An Aggregate Analysis of U.S. Homicide Trends from 1947 to 1976.  Department of Sociology, University of Illinois, Urbana.  1979.

PUBLICATIONS (sole author unless otherwise noted)

BOOKS

1991,   Point Blank: Guns and Violence in America.  Hawthorne, N.Y.: Aldine de
2005    Gruyter.  Winner of the 1993 Michael J. Hindelang award of the American
        Society of Criminology.  Republished in 2005 in paperback by Transaction
        Publishers.

                Reviewed in Contemporary Sociology, American Journal of Sociology,
                Social Forces, Journal of Criminal Law and Criminology, The
                Criminologist, The Public Interest, Criminal Law Forum, Social
                Science Review, Criminal Justice Abstracts, Crime, Criminal Justice and
                Law Enforcement, Newsletter of Public Policy Currents, Commonweal,
                Choice, and others.

1997    Targeting Guns: Firearms and their Control. Hawthorne, N.Y.: Aldine de Gruyter.

1997    The Great American Gun Debate: Essays on Firearms and Violence (with Don B.
        Kates, Jr.).  San Francisco: Pacific Research Institute for Public Policy.

2001    (with Don B. Kates) Armed: New Perspectives on Gun Control.  N.Y.:
        Prometheus Books.

        Selected to Choice: Current Reviews for Academic Libraries' 39th annual
        "Outstanding Academic Title List," awarded for "excellence in scholarship and
        presentation, the significance of their contribution to their field, and their value as
        an important treatment of their topic."  Awarded to less than one percent of
        books.

RESEARCH MONOGRAPH

1979    Bordua, David J., Alan J. Lizotte, and Gary Kleck. Patterns of Firearms
        Ownership, Use and Regulation in Illinois.  A Report to the Illinois Law Enforce-
        ment Commission, Springfield, Illinois.

ARTICLES IN PEER-REVIEWED JOURNALS

1979    "Capital punishment, gun ownership, and homicide."  American Journal of
        Sociology 84(4):882-910.

1981    "Racial discrimination in criminal sentencing: A critical evaluation of the
        evidence with additional evidence on the death penalty." American Sociological

Review 46(6):783-804.

1982    "On the use of self-report data to determine the class distribution of criminal
        behavior." American Sociological Review 47(3):427-33.

1983    (with David Bordua) "The factual foundation for certain key assumptions of gun
        control."  Law and Policy Quarterly 5(3):271-298.

1985     "Life support for ailing hypotheses:  modes of summarizing the evidence on
        racial discrimination in criminal sentencing."  Law and Human Behavior
        9(3):271-285.

1986     "Policy lessons from recent gun control research." Law and Contemporary
        Problems 49(1):35-62.

1986    "Evidence that 'Saturday Night Specials' not very important for crime."
Sociology
        and Social Research 70(4):303-307.

1987     "American's foreign wars and the legitimation of domestic violence."
        Sociological Inquiry 57(3):237-250.

1988    "Crime control through the private use of armed force."  Social Problems 35(1):1-
        21.

1988    "Miscounting suicides." Suicide and Life-Threatening Behavior 18(3):219-236.

1990    (with Susan Sayles) "Rape and resistance."  Social Problems 37(2):149-162.

1991    (with Karen McElrath) "The effects of weaponry on human violence."  Social
        Forces 69(3):669-92.

1993    (with Miriam DeLone) "Victim resistance and offender weapon effects in
        robbery."  Journal of Quantitative Criminology 9(1):55-82.

1993    (with E. Britt Patterson)  "The impact of gun control and gun ownership levels on
         violence rates."  Journal of Quantitative Criminology 9(3):249-287.

1993    "Bad data and the 'Evil Empire': interpreting poll data on gun control."  Violence
        and Victims 8(4):367-376.

1995    "Guns and violence: an interpretive review of the field."  Social Pathology
        1(1):12-47.

1995   "Using speculation to meet evidence." Journal of Quantitative Criminology 11(4):411-424.

1995   (with Marc Gertz) "Armed resistance to crime: the prevalence and nature of self-defense with a gun." Journal of Criminal Law & Criminology 86(1):150-187.

1996   "Crime, culture conflict and sources of support for gun control: a multi-level application of the General Social Surveys." American Behavioral Scientist 39(4):387-404.

1996   (with Chester Britt III and David J. Bordua) "A reassessment of the D.C. gun law: some cautionary notes on the use of interrupted time series designs for policy impact assessment." Law & Society Review 30(2):361-380.

1996   (with Chester Britt III and David J. Bordua) "Avoidance and misunderstanding." Law & Society Review 30(2):393-397.

1997    (with Marc Gertz) "The illegitimacy of one-sided speculation: getting the defensive gun use estimate down." Journal of Criminal Law and Criminology 87(4):1446-1461.

1997   (with Tomislav Kovandzic and Marc Gertz) "Defensive gun use: vengeful vigilante imagery vs. reality: results from the National Self-Defense Survey." Journal of Criminal Justice 26(3):251-258.

1998   (with Marc Gertz) "Carrying guns for protection: results from the National Self-Defense Survey." Journal of Research in Crime and Delinquency 35(2):193-224.

1998   "What are the risks and benefits of keeping a gun in the home?" Journal of the American Medical Association 280(5):473-475.

1998   (with Charles Crawford and Ted Chiricos) "Race, racial threat, and sentencing of habitual offenders." Criminology 36(3):481-511.

1999   (with Michael Hogan) "A national case-control study of homicide offending and gun ownership." Social Problems 46(2):275-293.

1999   "BATF gun trace data and the role of organized gun trafficking in supplying guns to criminals." St. Louis University Public Law Review 18(1):23-45.

2001   "Can owning a gun really triple the owner's chances of being murdered?" Homicide Studies 5:64-77.

2002   (with Theodore Chiricos) "Unemployment and property crime: a target-specific

assessment of  opportunity and motivation as mediating factors."
<u>Criminology</u> 40(3):649-680.

2004    "Measures of gun ownership levels for macro-level crime and violence research."
        <u>Journal of Research in Crime and Delinquency</u> 41(1):3-36.

2004    (with Jongyeon Tark) "Resisting crime: the effects of victim action on the
        outcomes of crimes." <u>Criminology</u> 42(4):861-909.

2005    (with Brion Sever, Spencer Li, and Marc Gertz) "The missing link in general
        deterrence research." <u>Criminology</u> 43(3):623-660.

2006    (with Jongyeon Tark and Jon J. Bellows) "What methods are most frequently
        used in research in criminology and criminal justice?" <u>Journal of Criminal Justice</u>
        34(2):147-152.

2007    "Are police officers more likely to kill African-American suspects?"
        <u>Psychological Reports</u> 100(1):31-34.

2007    (with Shun-Yung Wang and Jongyeon Tark) "Article productivity among the
        faculty of criminology and criminal justice doctoral programs, 2000-2005."
        <u>Journal of Criminal Justice Education</u> 18(3):385-405.

2008    (with Jongyeon Tark, Laura Bedard, and Dominique Roe-Sepowitz) "Crime
        victimization and divorce." <u>International Review of Victimology</u> 15(1):1-17.

2009    "The worst possible case for gun control: mass shootings in schools."
        <u>American Behavioral Scientist</u> 52(10):1447-1464.

2009    (with Shun-Yung Wang) "The myth of big-time gun trafficking." <u>UCLA Law
        Review</u> 56(5):1233-1294.

2009    (with Tomislav Kovandzic)  "City-level characteristics and individual handgun
        ownership: effects of collective security and homicide." <u>Journal of Contemporary
        Criminal Justice</u> 25(1):45-66.

2009    (with Marc Gertz and Jason Bratton)  "Why do people support gun control?"
        <u>Journal of Criminal Justice</u> 37(5):496-504.

2010    (with James C. Barnes)  "Article productivity among the faculty of criminology
        and criminal justice doctoral programs, 2005-2009."  <u>Journal of Criminal Justice
        Education</u> 22(1):43-66.

2011    (with Tomislav Kovandzic, Mark Saber, and Will Hauser).  "The effect of

perceived risk and victimization on plans to purchase a gun for self-protection." <u>Journal of Criminal Justice</u> 39(4):312-319.

2013    (with James C. Barnes)  "Deterrence and macro-level perceptions of punishment risks: is there a "collective wisdom?"  <u>Crime and Delinquency</u> 59(2): (forthcoming, April 2013).

2013    (with Tomislav Kovandzic and Mark Schaffer) "Estimating the causal effect of gun prevalence on homicide rates: A local average treatment effect approach."  <u>Journal of Quantitative Criminology</u> 28(4): (forthcoming c. September 2013).

2013    "Gun control after Heller and McDonald: what cannot be done and what ought to be done."  <u>Fordham Law Review</u> (forthcoming).

2013    (with Jongyeon Tark) "Resisting rape: the effects of victim self-protection on rape completion and injury."  <u>Violence Against Women</u> (forthcoming).

2014    (with James C. Barnes)  "Do more police generate more crime deterrence?"  <u>Crime and Delinquency</u> 59(4): (forthcoming c. January 2014).

2014    (with Will Hauser) "Guns and fear: A one-way street?"  <u>Crime and Delinquency</u>.


OTHER PUBLISHED ARTICLES

1992    "Assault weapons aren't the problem." <u>New York Times</u> September 1, 1992, p. A15.  Invited Op-Ed page article.

1993    "The incidence of violence among young people." <u>The Public Perspective</u> 4:3-6.  Invited article.

1994    "Guns and self-protection." <u>Journal of the Medical Association of Georgia</u> 83:42. Invited editorial.

1998    "Using speculation to meet evidence: reply to Alba and Messner." <u>Journal on Firearms and Public Policy</u> 9:13-49.

1998    "Has the gun deterrence hypothesis been discredited?" <u>Journal on Firearms and Public Policy</u> 10:65-75.

1999    "There are no lessons to be learned from Littleton." <u>Criminal Justice Ethics</u> 18(1):2, 61-63.  Invited commentary.

1999   "Risks and benefits of gun ownership - reply."  Journal of the American Medical Association 282(2):136-136.

1999   "The misfire that wounded Colt's."  New York Times October 23, 1999.  Invited Op-Ed page article.

1999   "Degrading scientific standards to get the defensive gun use estimate down."  Journal on Firearms and Public Policy 11:77-137.

2000   "Guns aren't ready to be smart."  New York Times March 11, 2000.  Invited Op-Ed page article.

2000   (with Chester Britt III and David J. Bordua) "The emperor has no clothes: Using interrupted time series designs to evaluate social policy impact."  Journal on Firearms and Public Policy 12:197-247.

2001   "School lesson: armed self-defense works."  Wall Street Journal March 27, 2001.  Invited opinion article.

2001    "Impossible policy evaluations and impossible conclusions: a comment on Koper and Roth."  Journal of Quantitative Criminology 17(1):75-80.

2001   "Absolutist politics in a moderate package: prohibitionist intentions of the gun control movement."  Journal on Firearms and Public Policy 13:1-43.

2002   "Research agenda on guns, violence, and gun control."  Journal on Firearms and Public Policy 14:51-72.

2006   "Off target."  New York Sun January 5, 2006.  Invited opinion article.

2009   "How not to study the effect of gun levels on violence rates."  Journal on Firearms and Public Policy 21:65-93.

2011   "Mass killings aren't the real gun problem --- how to tailor gun-control measures to common crimes, not aberrant catastrophes."  Wall Street Journal January 15, 2011.  Invited opinion article.

2011   "The myth of big-time gun trafficking."  Wall Street Journal May 21, 2011.  Invited opinion article.

BOOK CHAPTERS

1984   (with David Bordua) "The assumptions of gun control."  Pp. 23-48 in

Don B. Kates, Jr. (ed.) <u>Firearms and Violence: Issues of Regulation</u>. Cambridge, Mass.: Ballinger.

(Also appeared in <u>Federal Regulation of Firearms</u>, report prepared by the Congressional Research Service, Library of Congress, for the Committee on the Judiciary, United States Senate, 1982).

1984   "The relationship between gun ownership levels and rates of violence in the U.S." Pp. 99-135 in Kates, above.

1984   "Handgun-only gun control: a policy disaster in the making."  Pp. 167-199 in Kates, above.

1996   "Racial discrimination in criminal sentencing."  Pp. 339-344 in <u>Crime and Society</u>, Volume III – Readings: Criminal Justice, edited by George Bridges, Robert D. Crutchfield, and Joseph G. Weis.  Thousand Oaks, Calif.: Pine Forge Press.

1996   "Gun buy-back programs: nothing succeeds like failure."  Pp. 29-53 in <u>Under Fire:
Gun Buy-Backs, Exchanges and Amnesty Programs</u>, edited by Martha R. Plotkin. Washington, D.C.: Police Executive Research Forum.

2000   "Firearms and crime."  Pp. 230-234 in the <u>Encyclopedia of Criminology and Deviant Behavior</u>, edited by Clifton D. Bryant.  Philadelphia: Taylor & Francis, Inc.

2001   (with Leroy Gould and Marc Gertz) "Crime as social interaction."  Pp. 101-114 in <u>What is Crime?: Controversy over the Nature of Crime and What to Do About It</u>, edited by Stuart Henry and Mark M. Lanier.  Lanham, Md.: Rowman and Littlefield.

2003   "Constricted rationality and the limits of general deterrence."  Chapter 13 in <u>Punishment and Social Control: Enlarged Second Edition</u>, edited by Thomas G. Blomberg.  New York: Aldine de Gruyter.

2004   "The great American gun debate: what research has to say."  Pp. 470-487 in <u>The Criminal Justice System: Politics and Policies</u>, 9th edition, edited by George F. Cole, Marc Gertz, and Amy Bunger.  Belmont, CA: Wadsworth-Thomson.

2008   "Gun control." Article in <u>The Encyclopedia of Social Problems</u>, edited by Vincent N. Parrillo. Thousand Oaks, CA: Sage.

2009   "Guns and crime." Invited chapter.  Pp. 85-92 in <u>21st Century Criminology: A</u>

Reference Handbook, edited by J. Mitchell Miller. Thousand Oaks, CA: Sage.

2012    Kovandzic, Tomislav, Mark E. Schaffer, and Gary Kleck. "Gun prevalence, homicide rates and causality: A GMM approach to endogeneity bias."  Chapter 6, pp. 76-92 in The Sage Handbook of Criminological Research Methods, edited by David Gadd, Susanne Karstedt, and  Steven F. Messner.  Thousand Oaks, CA: Sage.

2012    "The Great American Gun Debate: What Research Has to Say."  Chapter in The Criminal Justice System, 10th edition, Edited by George F. Cole and Marc G. Gertz. Wadsworth.

2012    (with Kelly Roberts) "What survey modes are most effective in eliciting self-reports of criminal or delinquent behavior?"  Chapter in Handbook of Survey Methodology, edited by Lior Gideon.  NY: Springer.

2013    "Deterrence: actual vs. perceived risk of punishment.  Article in Encyclopedia of Criminology and Criminal Justice. Berlin: Springer Verlag.


BOOK REVIEWS

1978    Review of Murder in Space City: A Cultural Analysis of Houston Homicide Patterns, by Henry Lundsgaarde.  Contemporary Sociology 7:291-293.

1984    Review of Under the Gun, by James Wright et al. Contemporary Sociology 13:294-296.

1984    Review of Social Control, ed. by Jack Gibbs.  Social Forces 63: 579-581.

1988     Review of Armed and Considered Dangerous, by James Wright and Peter Rossi, Social Forces 66:1139-1140.

1988     Review of The Citizen's Guide to Gun Control, by Franklin Zimring and Gordon Hawkins, Contemporary Sociology 17:363-364.

1989    Review of Sociological Justice, by Donald Black, Contemporary Sociology 19:261-3.

1991    Review of Equal Justice and the Death Penalty, by David C. Baldus, George G. Woodworth, and Charles A. Pulaski, Jr.  Contemporary Sociology 20:598-9.

1999     Review of Crime is Not the Problem, by Franklin E. Zimring and Gordon Hawkins.  American Journal of Sociology 104(5):1543-1544.

2001    Review of <u>Gun Violence: the Real Costs</u>, by Philip J. Cook and Jens Ludwig. <u>Criminal Law Bulletin</u> 37(5):544-547.

2010    Review of  <u>Homicide and Gun Control: The Brady Handgun Violence Prevention Act and Homicide Rates</u>, by J. D. Monroe. <u>Criminal Justice Review</u> 35(1):118-120.


## LETTERS PUBLISHED IN SCHOLARLY JOURNALS

1987    "Accidental firearm fatalities."  <u>American Journal of Public Health</u> 77:513.

1992    "Suicide in the home in relation to gun ownership." <u>The New England Journal of Medicine</u> 327:1878.

1993    "Gun ownership and crime."  <u>Canadian Medical Association Journal</u> 149:1773-1774.

1999    "Risks and benefits of gun ownership."  <u>Journal of the American Medical Association</u> 282:136.

2000    (with Thomas Marvell) "Impact of the Brady Act on homicide and suicide rates."

<u>Journal of the American Medical Association</u> 284:2718-2719.

2001    "Violence, drugs, guns (and Switzerland)."  <u>Scientific American</u> 284(2):12.

2002    "Doubts about undercounts of gun accident deaths." <u>Injury Prevention Online</u> (September 19, 2002). Published online at <u>http://ip.bmjjournals.com/cgi/eletters</u> /8/3/252.

2005    "Firearms, violence, and self-protection."  <u>Science</u> 309:1674. September 9, 2005.

## UNPUBLISHED REPORT

1987    <u>Violence, Fear, and Guns at Florida State University: A Report to the President's Committee on Student Safety and Welfare</u>. Reports results of campus crime victimization survey and review of campus police statistics on gun violence (32 pages).

## RESEARCH FUNDING

1994    "The Impact of Drug Enforcement on Urban Drug Use Levels and Crime Rates."

$9,500 awarded by the U.S. Sentencing Commission.

1997    "Testing a Fundamental Assumption of Deterrence-Based Crime Control Policy."
        $80,590 awarded by the Charles E. Culpeper Foundation to study the link
        between actual and perceived punishment levels.

## PRESENTED PAPERS

1976    "Firearms, homicide, and the death penalty:  a simultaneous equations analysis."
        Presented at the annual meetings of the Illinois Sociological Association,
Chicago.

1979    "The assumptions of gun control."  Presented at the Annual Meetings of the
        American Sociological Association, New York City.

1980    "Handgun-only gun control:  A policy disaster in the making."  Presented at the
        Annual Meetings of the American Society of Criminology, Washington, D.C.

1981    "Life support for ailing hypotheses:  Modes of summarizing the evidence on
        racial
        discrimination."  Presented at the Annual Meetings of the American Society of
        Criminology, Toronto.

1984    "Policy lessons from recent gun control research."  Presented at the Duke
        University Law School Conference on Gun Control.

1985    "Policy lessons from recent gun control research." Presented at the Annual
        Meetings of the American Society of Criminology, San Diego.

1986    "Miscounting suicides."  Presented at the Annual Meetings of the American
        Sociological Association, Chicago.

1987    (with Theodore G. Chiricos, Michael Hays, and Laura Myers) "Unemployment
        and crime: a comparison of motivation and opportunity effects."  Annual
        meetings of the American Society of Criminology, Montreal.

1988    "Suicide, guns and gun control."  Presented at the Annual Meetings of the Popular
        Culture Association, New Orleans.

1988    (with Susan Sayles)  "Rape and resistance."  Presented at the Annual Meetings of
        the American Society of Criminology, Chicago, Ill.

1989    (with Karen McElrath)  "The impact of weaponry on human violence."
        Presented at the Annual Meetings of the American Sociological Association, San

Francisco.

1989     (with Britt Patterson)  "The impact of gun control and gun ownership levels on
         city violence rates."  Presented at the Annual Meetings of the American Society
         of Criminology, Reno.

1990     "Guns and violence: a summary of the field."  Presented at the Annual Meetings
         of the American Political Science Association, Washington, D.C.

1991     "Interrupted time series designs: time for a re-evaluation."  Presented at the
         Annual Meetings of the American Society of Criminology, New Orleans.

1993     (with Chester Britt III and David J. Bordua) "The emperor has no clothes: Using
         interrupted time series designs to evaluate social policy impact." Presented at the
         Annual Meetings of the American Society of Criminology, Phoenix.

1992     "Crime, culture conflict and support for gun laws: a multi-level application of the
         General Social Surveys."  Presented at the Annual Meetings of the
         American Society of Criminology, Phoenix.

1994     (with Marc Gertz) "Armed resistance to crime: the prevalence and nature of self-
         defense with a gun."   Presented at the Annual Meetings of the American Society
         of Criminology, Miami.

1995     (with Tom Jordan) "The impact of drug enforcement and penalty levels on urban
         drug use levels and crime rates."  Presented at the Annual Meetings of
         the American Society of Criminology, Boston.

1996     (with Michael Hogan) "A national case-control study of homicide offending and
         gun ownership." Presented at the Annual Meetings of the American Society of
         Criminology, Chicago.

1997     "Evaluating the Brady Act and increasing the utility of BATF tracing data."
         Presented at the annual meetings of the Homicide Research Working Group,
         Shepherdstown, West Virginia.

1997     "Crime, collective security, and gun ownership: a multi-level application of the
         General Social Surveys."  Presented at the Annual Meetings of the American
         Society of Criminology, San Diego.

1998     (with Brion Sever and Marc Gertz) "Testing a fundamental assumption of
         deterrence-based crime control policy."  Presented at the Annual Meetings of the
         American Society of Criminology, Washington, D.C.

1998    "Measuring macro-level gun ownership levels." Presented at the Annual Meetings of the American Society of Criminology, Washington, D.C.

1999    "Can owning a gun really triple the owner's chances of being murdered?" Presented at the Annual Meetings of the American Society of Criminology, Toronto.

2000    "Absolutist politics in a moderate package: prohibitionist intentions of the gun control movement."  Presented at the Annual Meetings of the American Society of Criminology, San Francisco.

2001    (with Tomislav V. Kovandzic) "The impact of gun laws and gun levels on crime rates."  Presented at the Annual Meetings of the American Society of Criminology, Atlanta.

2001    "Measures of gun ownership levels for macro-level violence research."  Presented at the Annual Meetings of the American Society of Criminology, Atlanta.

2001    "The effects of gun ownership levels and gun control laws on urban crime rates." Presented at the Annual Meetings of the American Society of Criminology, Chicago.

2003    (with Tomislav V. Kovandzic) "The effect of gun levels on violence rates depends on who has them." Presented at the Annual Meetings of the American Society of Criminology, Denver.

2003    (with KyuBeom Choi) "Filling in the gap in the causal link of deterrence." Presented at the Annual Meetings of the American Society of Criminology, Denver.

2004    (with Tomislav Kovandzic) "Do violent crime rates and police strength levels in the community influence whether individuals own guns?"  Presented at the Annual Meetings of the American Society of Criminology, Nashville.

2004    (with Jongyeon Tark) "Resisting crime: the effects of victim action on the outcomes of crime."  Presented at the Annual Meetings of the American Society of Criminology, Nashville.

2004    (with Jongyeon Tark) "The impact of self-protection on rape completion and injury."  Presented at the Annual Meetings of the American Society of Criminology, Nashville.

2004    (with Kyubeom Choi) "The perceptual gap phenomenon and deterrence as psychological coercion." Presented at the Annual Meetings of the American

Society of Criminology, Nashville.

2005    (with Jongyeon Tark) "Who resists crime?" Presented at the Annual Meetings of the American Society of Criminology, Toronto.

2005    (with Jongyeon Tark and Laura Bedard) "Crime and marriage."  Presented at the Annual Meetings of the American Society of Criminology, Toronto.

2006    (with Shun-Yang Kevin Wang)"Organized gun trafficking, 'crime guns,' and crime rates."  Presented at the Annual Meetings of the American Society of Criminology, Los Angeles.

2006    "Are police officers more likely to kill black suspects?"  Presented at the Annual Meetings of the American Society of Criminology, Los Angeles.

2007    (with Shun-Yang Kevin Wang) "The myth of big-time gun trafficking. "Presented at the Annual Meetings of the American Society of Criminology, Atlanta.

2007    (with Marc Gertz and Jason Bratton)  "Why do people support gun control?" Presented at the Annual Meetings of the American Society of Criminology, Atlanta.

2008    (with J.C. Barnes)  "Deterrence and macro-level perceptions of punishment risks: Is there a "collective wisdom?"  Presented at the Annual Meetings of the American Society of Criminology,  St. Louis.

2009    "The myth of big-time gun trafficking."  Presented at UCLA Law Review Symposium, "The Second Amendment and the Right to Bear Arms After DC v. Heller."  January 23, 2009, Los Angeles.

2009    (with Shun-Yung Wang) "Employment and crime and delinquency of working youth: A longitudinal study of youth employment."  Presented at the Annual Meetings of the American Society of Criminology, November 6, 2009, Philadelphia, PA.

2009    (with J. C. Barnes)  "Do more police generate more deterrence?"  Presented at the Annual Meetings of the American Society of Criminology, November 4, 2009, Philadelphia, PA.

2010    (with J. C. Barnes) "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2005-2009."  Presented at the annual Meetings of the American Society of Criminology, November 18, 2010, San Francisco, CA.

2010    (with Will Hauser) "Fear of crime and gun ownership."  Presented at the annual
        Meetings of the American Society of Criminology, November 18, 2010, San
        Francisco, CA.

2010    "Errors in survey estimates of defensive gun use frequency: results from national
        Internet survey experiments."  Presented at the annual Meetings
        of the American Society of Criminology, November 19, 2010, San Francisco, CA.

2010    (with Mark Faber and Tomislav Kovandzic)  "Perceived risk, criminal
        victimization, and prospective gun ownership."  Presented at the annual Meetings
        of the American Society of Criminology, November 19, 2010, San Francisco, CA.

2011    (with Shun-young Wang) "The impact of job quality and career commitment on
        delinquency: conditional or universal?"  Presented at the annual Meetings
        of the American Society of Criminology, November 17, 2011.

2011    (with Moonki Hong) "The short-term deterrent effect of executions on homicides
        in the United States, 1984-1998."  Presented at the annual Meetings
        of the American Society of Criminology, November 16, 2011.

2011    (with Kelly Roberts)  "Which survey modes are most effective in getting people
        to admit illegal behaviors?"  Presented at the annual Meetings of the American
        Society of Criminology, November 17, 2011.

2011    (with Will Hauser)  "Pick on someone your own size: do health, fitness, and size
        influence victim selection?" Presented at the annual Meetings
        of the American Society of Criminology, November 18, 2011.

2011    (with Tomislav Kovandzic) "Is the macro-level crime/punishment association
        spurious?"  Presented at the annual Meetings of the American Society of
        Criminology, November 18, 2011.

2012    (with Dylan Jackson) "Adult unemployment and serious property crime: a
        national case-control study."  Presented at the annual Meetings of the American
        Society of Criminology, November 15, 2012.

CHAIR

1983    Chair, session on Race and Crime.  Annual meetings of the American Society of
        Criminology, Denver.

1989    Co-chair (with Merry Morash), roundtable session on problems in analyzing the
        National Crime Surveys.  Annual meetings of the American Society of
        Criminology, Reno.

1993   Chair, session on Interrupted Time Series Designs. Annual meetings of the American Society of Criminology, New Orleans.

1993   Chair, session on Guns, Gun Control, and Violence. Annual meetings of the American Society of Criminology, Phoenix.

1994   Chair, session on International Drug Enforcement. Annual meetings of the American Society of Criminology, Boston.

1999   Chair, Author-Meets-Critics session, More Guns, Less Crime.  Annual meetings of the American Society of Criminology, Toronto.

2000   Chair, session on Defensive Weapon and Gun Use.  Annual Meetings of the American Society of Criminology, San Francisco.

2002   Chair, session on the Causes of Gun Crime. Annual meetings of the American Society of Criminology, Chicago.

2004   Chair, session on Protecting the Victim.  Annual meetings of the American Society of Criminology, Nashville.

DISCUSSANT

1981   Session on Gun Control Legislation, Annual Meetings of the American Society of Criminology, Washington, D.C.

1984   Session on Criminal Sentencing, Annual Meetings of the American Society of Criminology, Cincinnati.

1986   Session on Sentencing, Annual Meetings of the American Society of Criminology, Atlanta.

1988   Session on Gun Ownership and Self-protection, Annual Meetings of the Popular Culture Association, Montreal.

1991   Session on Gun Control, Annual Meetings of the American Statistical Association, Atlanta, Ga.

1995   Session on International Drug Enforcement, Annual Meetings of the American Society of Criminology, Boston.

2000   Session on Defensive Weapon and Gun Use, Annual Meetings of the American Society of Criminology, San Francisco.

2004    Author-Meets-Critic session on Guns, Violence, and Identity Among African-American and Latino Youth, by Deanna Wilkinson.  Annual meetings of the American Society of Criminology, Nashville.

2007    Session on Deterrence and Perceptions, University of Maryland 2007 Crime & Population Dynamics Summer Workshop, Aspen Wye River Center, Queenstown.
MD, June 4, 2007.

2009    Session on Guns and Crime, at the DeVoe Moore Center Symposium On The Economics of Crime, March 26-28, 2009.


PROFESSIONAL SERVICE

Editorial consultant -
        American Sociological Review
        American Journal of Sociology
        Social Forces
        Social Problems
        Law and Society Review
        Journal of Research in Crime and Delinquency
        Social Science Research
        Criminology
        Journal of Quantitative Criminology
        Justice Quarterly
        Journal of Criminal Justice
        Violence and Victims
        Violence Against Women
        Journal of the American Medical Association
        New England Journal of Medicine
        American Journal of Public Health
        Journal of Homicide Studies

Grants consultant, National Science Foundation, Sociology Program.

Member, Gene LeCarte Student Paper Committee, American Society of Criminology, 1990.

Area Chair, Methods Area, American Society of Criminology, annual meetings in Miami, November, 1994.

Division Chair, Guns Division, American Society of  Criminology, annual meetings in

Washington, D.C., November, 1998.

Dissertation evaluator, University of Capetown, Union of South Africa, 1998.

Division Chair, Guns Division, American Society of Criminology, annual meetings in Washington, D.C., November, 1999.

Member of Academy of Criminal Justice Sciences selection committee for Editor of Justice Quarterly, 2007.

## UNIVERSITY SERVICE

Member, Master's Comprehensive Examination Committee, School of Criminology, 1979-1982.

Faculty Advisor, Lambda Alpha Epsilon (FSU chapter of American Criminal Justice Association), 1980-1988.

Faculty Senate Member, 1984-1992.

Carried out campus crime survey for President's Committee on Student Safety and Welfare, 1986.

Member, Strategic Planning and Budgeting Review Committee for Institute for Science and Public Affairs, and Departments of Physics and Economics, 1986.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology, Summer, 1986.

Member, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology, Summer, 1986 to present.

Chair, Committee on Graduate Assistantships, School of Criminology, Spring, 1987.

Chair, Ad Hoc Committee on Computers, School of Criminology,  Fall, 1987.

Member, Recruitment Committee, School of Criminology,  Spring, 1988; Spring, 1989; and 1989-90 academic year.

Member, Faculty Senate Committee on Computer-Related Curriculum, Spring, 1988 to Fall, 1989.

Chair, Ad Hoc Committee on Merit Salary Distribution, School of Criminology, Spring, 1988.

Chair, Ad Hoc Committee on Enrollment Strains, Spring, 1989.

Member, Graduate Handbook Committee, School of Criminology,  Spring, 1990.

Member, Internal Advisement Committee, School of Criminology Spring, 1990.

University Commencement Marshall, 1990 to 1993.

Member, School of Criminology and Criminal Justice Teaching Incentive Program award committee.

Chair, Faculty Recruitment Committee, School of Criminology and Criminal Justice, 1994-1995.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology and Criminal Justice, 1994-1995.

Member, University Computer and Information Resources  Committee, 1995-1998.

Member, University Fellowship Committee, 1995 to present.

Member, University Library Committee, 1996 to 1999.

Chair, Electronic Access Subcommittee, University Library Committee, 1998 to 1999.

Member, Ad Hoc Committee on Merit Salary Increase Allocation, School of Criminology and Criminal Justice, 1998-1999.

Member, Academic Committee, School of Criminology and Criminal Justice, 2000-present.

Member, Recruiting Committee, School of Criminology and Criminal Justice, 2000-2001.

Member, Promotion and Tenure Committee, School of Criminology and Criminal Justice, 2000-present.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology and Criminal Justice, 2000-2002.

Chair, Promotion and Tenure Committee, School of Criminology and Criminal Justice, 2001-2002.

Faculty Adviser, School of Criminology and Criminal Justice Graduate Student Association, 2001-present.

Member, ad hoc committee on survey research, School of Criminology and Criminal Justice, 2002.

Coordinator of Parts 2 and 4 of the School of Criminology and Criminal Justice Unit Review, 2002.

Chair, Academic Committee, School of Criminology and Criminal Justice, 2002-2003.

Director, Honors Programs, School of Criminology and Criminal Justice, 2002-present.

Member, University Promotion and Tenure Committee, Fall, 2003 to present.

Member of University Graduate Policy Committee, Fall 2003 to present.

Director of Graduate Studies, School (later College) of Criminology and Criminal Justice, April 2004 to May 2011.

Chair, Promotion and Tenure Committee, College of Criminology and Criminal Justice, 2005-2006


## PUBLIC SERVICE

Television, radio, newspaper, magazine, and Internet interviews concerning gun control, racial bias in sentencing, crime statistics, and the death penalty.  Interviews and other kinds of news media contacts include Newsweek, Time, U.S. News and World Report, New York Times, Washington Post, Chicago Tribune, Los Angeles Times, USA Today, Boston Globe, Wall Street Journal, Kansas City Star, Philadelphia Inquirer, Philadelphia News, Atlanta Constitution, Atlanta Journal, Arizona Republican, San Antonio Express-News, Dallas Morning News, Miami Herald, Tampa Tribune, Jacksonville Times-Union, Womens' Day,   Harper's Bazaar, Playboy, CBS-TV (60 Minutes; Street Stories) ABC-TV (World News Tonight; Nightline), NBC-TV (Nightly News), Cable News Network, Canadian Broadcasting Company, National Public Radio, Huffington Post, PolitiFact.com, and many others.

Resource person, Subcommittee on Crime and Justice, (Florida House) Speaker's Advisory Committee on the Future,  February 6-7, 1986, Florida State Capitol.

Testimony before the U.S. Congress, House Select Committee on Children, Youth and Families, June 15, 1989.

Discussant, National Research Council/National Academy of Sciences Symposium on the Understanding and Control of Violent Behavior, April 1-4, 1990, Destin, Florida.

Colloquium on manipulation of statistics relevant to public policy, Statistics Department, Florida State University, October, 1992.

Speech to faculty, students, and alumni at Silver Anniversary of Northeastern University College of Criminal Justice, May 15, 1993.

Speech to faculty and students at Department of Sociology, University of New Mexico, October, 1993.

Speech on the impact of gun control laws, annual meetings of the Justice Research and Statistics Association, October, 1993, Albuquerque, New Mexico.

Testimony before the Hawaii House Judiciary Committee, Honolulu, Hawaii, March 12, 1994.

Briefing of the National Executive Institute, FBI Academy,        Quantico, Virginia, March 18, 1994.

Delivered the annual Nettler Lecture at the University of Alberta, Edmonton, Canada, March 21, 1994.

Member, Drugs-Violence Task Force, U.S. Sentencing Commission, 1994-1996.

Testimony before the Pennsylvania Senate Select Committee to Investigate the Use of Automatic and Semiautomatic Firearms, Pittsburgh, Pennsylvania, August 16, 1994.

Delivered lectures in the annual Provost's Lecture Series, Bloomsburg University, Bloomsburg, Pa., September 19, 1994.

Briefing of the National Executive Institute, FBI Academy,        Quantico, Virginia, June 29,
1995.

Speech to personnel in research branches of crime-related State of Florida agencies, Research and Statistics Conference, sponsored by the Office of the State Courts Administrator, October 19, 1995.

Speech to the Third Annual Legislative Workshop, sponsored by the James Madison Institute and the Foundation for Florida's Future, February 5, 1998.

Speech at the Florida Department of Law Enforcement on the state's criminal justice

research agenda, December, 1998.

Briefing on news media coverage of guns and violence issues, to the Criminal Justice Journalists organization, at the American Society of Criminology annual meetings in Washington, D.C., November 12, 1998.

Briefing on gun control strategies to the Rand Corporation conference on "Effective Strategies for Reducing Gun Violence,"  Santa Monica, Calif., January 21, 2000.

Speech on deterrence to the faculty of the Florida State University School of Law, February 10, 2000.

Invited address on links between guns and violence to the National Research Council Committee on Improving Research Information and Data on Firearms, November 15-16, 2001, Irvine, California.

Invited address on research on guns and self-defense to the National Research Council Committee on Improving Research Information and Data on Firearms, January 15-16, 2001, Washington, D.C.

Invited address on gun control, Northern Illinois University, April 19, 2002.

Invited address to the faculty of the School of Public Health, University of Alabama, Birmingham, 2004.

Invited address to the faculty of the School of Public Health, University of Pennsylvania, March 5, 2004.

Member of Justice Quarterly Editor Selection Committee, Academy of Criminal Justice Sciences, Spring 2007

Testified before the Gubernatorial Task Force for University Campus Safety, Tallahassee, Florida, May 3, 2007.

Gave public address, "Guns & Violence: Good Guys vs. Bad Guys," Western Carolina University, Cullowhee, North Carolina, March 5, 2012.

Invited panelist, Fordham Law School Symposium, "Gun Control and the Second Amendment,"  New York City, March 9, 2012.

Invited panelist, "Covering High-Profile Court Cases: Controversial Laws (Stand Your Ground – with a focus on the Trayvon Martin case),"  2012 Reporters' Workshop, sponsored by the Florida Bar Association.  Florida Supreme Court Building, Tallahassee, FL, September 25, 2012.

OTHER ITEMS

Listed in:

Marquis Who's Who, 2009
Marquis Who's Who in the South and Southwest, 25th edition
Who's Who of Emerging Leaders in America, 1st edition
Contemporary Authors
Directory of American Scholars, 10th edition, 2002
Writer's Directory, 20th edition, 2004.

Participant in First National Workshop on the National Crime Survey, College Park, Maryland, July, 1987, co-sponsored by the Bureau of Justice Statistics and the American Statistical Association.

Participant in Second National Workshop on the National Crime Survey, Washington, D.C., July, 1988.

Participant, Seton Hall Law School Conference on Gun Control, March 3, 1989.

Debater in Intelligence Squared program, on the proposition "Guns Reduce Crime." Rockefeller University, New York City, October 28, 2008.  Podcast distributed through National Public Radio.  Further details are available at
 http://www.intelligencesquaredus.org/Event.aspx?Event=36.

Subject of cover story, "America Armed," in Florida State University Research in Review, Winter/Spring 2009.

Grants reviewer, Social Sciences and Humanities Research Council of Canada, 2010.

Kleck Declaration Exhibit K-2

**Kleck – Analysis of Survey of 2004 Survey of Inmates in State and Federal Correctional Facilities**

Word version of SPSS Output

```
[DataSet5] F:\SPSSWIN\SISFC2004-Pt1.sav
USE ALL.
COMPUTE filter_$=(v1073 = 01).
VARIABLE LABELS filter_$ 'v1073 = 01 (FILTER)'.
VALUE LABELS filter_$ 0 'Not Selected' 1 'Selected'.
FORMATS filter_$ (f1.0).
FILTER BY filter_$.
EXECUTE.
FREQUENCIES VARIABLES=v1100
  /ORDER=ANALYSIS.
FREQUENCIES VARIABLES=v1101
  /ORDER=ANALYSIS.
```

**Frequencies – How many criminals got gun from a gun shop, store, or pawn shop?**

**Statistics**

S5Q17H_1: GUN(S) CAME FROM WHERE

| N | Valid | 1818 |
|---|---|---|
|   | Missing | 262 |

**S5Q17H_1: GUN(S) CAME FROM WHERE**

|  |  | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | From a gun shop or store | 154 | 7.4 | 8.5 | 8.5 |
|  | From a pawnshop | 63 | 3.0 | 3.5 | 11.9 |
|  | At a flea market | 10 | .5 | .6 | 12.5 |
|  | At a gun show | 19 | .9 | 1.0 | 13.5 |
|  | From the victim(s) | 54 | 2.6 | 3.0 | 16.5 |
|  | From a friend/family member | 736 | 35.4 | 40.5 | 57.0 |

|  | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| | From a fence/black market source | 133 | 6.4 | 7.3 | 64.3 |
| | Off the street/from a drug dealer | 468 | 22.5 | 25.7 | 90.0 |
| | In a burglary | 38 | 1.8 | 2.1 | 92.1 |
| | Other | 143 | 6.9 | 7.9 | 100.0 |
| | Total | 1818 | 87.4 | 100.0 | |
| | Don't know | 134 | 6.4 | | |
| Missing | Refused | 24 | 1.2 | | |
| | Blank | 104 | 5.0 | | |
| | Total | 262 | 12.6 | | |
| Total | | 2080 | 100.0 | | |

```
USE ALL.
COMPUTE filter_$=(v1073 = 01 & (v1101 = 1 | v1101 = 2)).  [Selects for offenders who
possessed guns, got them from gun shop or store]
VARIABLE LABELS filter_$ 'v1073 = 01 & (v1101 = 1 | v1101 = 2) (FILTER)'.
VALUE LABELS filter_$ 0 'Not Selected' 1 'Selected'.
FORMATS filter_$ (f1.0).
FILTER BY filter_$.
EXECUTE.
FREQUENCIES VARIABLES=v1103 v1102
  /ORDER=ANALYSIS.
```

## Frequencies

[DataSet5] F:\SPSSWIN\SISFC2004-Pt1.sav

## Frequency Table

**Among criminals who got gun from gun shop, store, or pawnshop, how many**

used false identity to buy gun?

**S5Q17H2: GUN(S)) BOUGHT UNDER OWN NAME**

|         |            | Frequency | Percent | Valid Percent | Cumulative Percent |
|---------|------------|-----------|---------|---------------|--------------------|
| Valid   | Yes        | 140       | 64.5    | 90.3          | 90.3               |
|         | No         | 14        | 6.5     | 9.0           | 99.4               |
|         | Don't know | 1         | .5      | .6            | 100.0              |
|         | Total      | 155       | 71.4    | 100.0         |                    |
| Missing | Blank      | 62        | 28.6    |               |                    |
| Total   |            | 217       | 100.0   |               |                    |

If criminal got gun from gun shop, store, or pawnshop, did he buy gun directly for himself, or did someone buy it for him?

**S5Q17H1: GUN(S) BOUGHT/GIFT**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Brought it directly | 155 | 71.4 | 82.9 | 82.9 |
| | Someone brought it for me | 32 | 14.7 | 17.1 | 100.0 |
| | Total | 187 | 86.2 | 100.0 | |
| Missing | Blank | 30 | 13.8 | | |
| Total | | 217 | 100.0 | | |

Kleck Declaration Exhibit K-3

|      | Missouri           |           |                |                          |                              |
|------|--------------------|-----------|----------------|--------------------------|------------------------------|
| Year | AA firearm homicides |         |                |                          |                              |
| 1999 | 4.40085            |           |                |                          |                              |
| 2000 | 4.91786            |           |                |                          |                              |
| 2001 | 4.92388            |           |                |                          |                              |
| 2002 | 4.51222            |           |                |                          |                              |
| 2003 | 3.88053            |           |                |                          |                              |
| 2004 | 4.46112            |           |                |                          |                              |
| 2005 | 5.13375            |           |                |                          |                              |
| 2006 | 5.11663            | sum 99-07 | avg rate 99-07 |                          |                              |
| 2007 | 4.59977            | 41.94661  | 4.660734444    | % increase 07 to 08      | % increase avg 99-07 to 08   |
| 2008 | 6.22816            |           |                | 35.40155269              | 33.63044117                  |
| 2009 | 5.51107            | sum 08-10 | avg rate 08-10 | % increase 99-07 to 08-10 |                             |
| 2010 | 5.72499            | 17.46422  | 5.821406667    | 24.90320434              |                              |

|      | Iowa               |           |                |                          |                              |
|------|--------------------|-----------|----------------|--------------------------|------------------------------|
| Year | AA firearm homicides |         |                |                          |                              |
| 1999 | 0.97816            |           |                |                          |                              |
| 2000 | 0.879301           |           |                |                          |                              |
| 2001 | 0.822847           |           |                |                          |                              |
| 2002 | 1.0188             |           |                |                          |                              |
| 2003 | 0.845337           |           |                |                          |                              |
| 2004 | 1.02855            |           |                |                          |                              |
| 2005 | 0.81557            |           |                |                          |                              |
| 2006 | 1.33123            | sum 99-07 | avg rate 99-07 |                          |                              |
| 2007 | 0.639631           | 8.359426  | 0.928825111    | % increase 07 to 08      | % increase avg 99-07 to 08   |
| 2008 | 1.19742            |           |                | 87.20481027              | 28.9177032                   |
| 2009 | 0.661624           | sum 08-10 | avg rate 08-10 | % increase 99-07 to 08-10 |                             |
| 2010 | 1.14582            | 3.004864  | 1.001621333    | 7.837451997              |                              |

Kleck Declaration Exhibit
K-4

```
                              MOtotalhoms, 1999-2010
"Notes"  "Year"  "Year Code"    Deaths  Population      Crude Rate
         "1999"  "1999"         381     5561948         6.9
         "2000"  "2000"         393     5595211         7.0
         "2001"  "2001"         430     5641142         7.6
         "2002"  "2002"         362     5674825         6.4
         "2003"  "2003"         318     5709403         5.6
         "2004"  "2004"         363     5747741         6.3
         "2005"  "2005"         410     5790300         7.1
         "2006"  "2006"         405     5842704         6.9
         "2007"  "2007"         379     5887612         6.4
         "2008"  "2008"         470     5923916         7.9
         "2009"  "2009"         421     5961088         7.1
         "2010"  "2010"         432     5988927         7.2
"Total "                        4764    69324817        6.9
"---"
"Dataset: Compressed Mortality, 1999-2010"
"Query Parameters: "
"ICD-10 Codes: X85-Y09 (Assault)"
"Race: All"
"States: Missouri (29)"
"Year: All, 1999 to 2010"
"Query Date: Dec 4, 2013 12:39:10 PM"
"---"
"Suggested Citation: Centers for Disease Control and Prevention, National Center for
Health Statistics. Compressed Mortality File"
"1999-2010 on CDC WONDER Online Database, released January 2013. Data are compiled
from Compressed Mortality File 1999-2010"
"Series 20 No. 2P, 2013. Accessed at http://wonder.cdc.gov/cmf-icd10.html on Dec 4,
2013 12:39:10 PM"
"---"
Caveats:
"1. The population figures used in the calculation of death rates for the age group
'under 1 year' are the estimates of the"
"resident population that is under one year of age. More information:
http://wonder.cdc.gov/wonder/help/cmf.html#Age Group."
"2. About sub-national population figures: population figures for 1999 are from the
1990-1999 series of bridged-race intercensal"
"estimates of the July 1 resident population; population figures for 2000 and 2010
are bridged-race April 1 census counts; and"
"population figures for 2001-2009 are from the revised 2000-2009 series of
bridged-race intercensal estimates of the July 1"
"resident population. "
```

Kleck Declaration Exhibit K-5

GunSuicides1999-2003

Firearms Suicides, 1999-2003

| "Notes" | "State" | "State Code" | Deaths | Population | Crude Rate |
|---|---|---|---|---|---|
| | "Alabama" | "01" | 2029 | 22328455 | 9.1 |
| | "Alaska" | "02" | 387 | 3176176 | 12.2 |
| | "Arizona" | "04" | 2478 | 26334551 | 9.4 |
| | "Arkansas" | "05" | 1267 | 13447574 | 9.4 |
| | "California" | "06" | 7464 | 171975312 | 4.3 |
| | "Colorado" | "08" | 1792 | 21972104 | 8.2 |
| | "Connecticut" | "09" | 513 | 17167886 | 3.0 |
| | "Delaware" | "10" | 217 | 3978461 | 5.5 |
| | "D.C." | "11" | 64 | 2858436 | 2.2 |
| | "Florida" | "12" | 5966 | 81792220 | 7.3 |
| | "Georgia" | "13" | 3112 | 41740505 | 7.5 |
| | "Hawaii" | "15" | 136 | 6138552 | 2.2 |
| | "Idaho" | "16" | 642 | 6593341 | 9.7 |
| | "Illinois" | "17" | 2287 | 62348320 | 3.7 |
| | "Indiana" | "18" | 2056 | 30605819 | 6.7 |
| | "Iowa" | "19" | 809 | 14652188 | 5.5 |
| | "Kansas" | "20" | 907 | 13505457 | 6.7 |
| | "Kentucky" | "21" | 1802 | 20334999 | 8.9 |
| | "Louisiana" | "22" | 1732 | 22425971 | 7.7 |
| | "Maine" | "23" | 425 | 6429896 | 6.6 |
| | "Maryland" | "24" | 1178 | 26862344 | 4.4 |
| | "Massachusetts" | "25" | 551 | 31903847 | 1.7 |
| | "Michigan" | "26" | 2716 | 49883542 | 5.4 |
| | "Minnesota" | "27" | 1175 | 24848263 | 4.7 |
| | "Mississippi" | "28" | 1204 | 14253053 | 8.4 |
| | "Missouri" | "29" | 2121 | 28182529 | 7.5 |
| | "Montana" | "30" | 571 | 4537960 | 12.6 |
| | "Nebraska" | "31" | 526 | 8602798 | 6.1 |
| | "Nevada" | "32" | 1211 | 10454015 | 11.6 |
| | "New Hampshire" | "33" | 351 | 6262246 | 5.6 |
| | "New Jersey" | "34" | 875 | 42420658 | 2.1 |
| | "New Mexico" | "35" | 965 | 9191701 | 10.5 |
| | "New York" | "36" | 2165 | 95255759 | 2.3 |
| | "North Carolina" | "37" | 3069 | 40957498 | 7.5 |
| | "North Dakota" | "38" | 209 | 3202506 | 6.5 |
| | "Ohio" | "39" | 3128 | 56918675 | 5.5 |
| | "Oklahoma" | "40" | 1543 | 17348873 | 8.9 |
| | "Oregon" | "41" | 1513 | 17344077 | 8.7 |
| | "Pennsylvania" | "42" | 3593 | 61549518 | 5.8 |
| | "Rhode Island" | "44" | 129 | 5283200 | 2.4 |
| | "South Carolina" | "45" | 1527 | 20309781 | 7.5 |
| | "South Dakota" | "46" | 260 | 3786977 | 6.9 |
| | "Tennessee" | "47" | 2492 | 28722508 | 8.7 |
| | "Texas" | "48" | 6535 | 106450918 | 6.1 |
| | "Utah" | "49" | 864 | 11405318 | 7.6 |
| | "Vermont" | "50" | 227 | 3059033 | 7.4 |
| | "Virginia" | "51" | 2397 | 35930901 | 6.7 |
| | "Washington" | "53" | 2104 | 29878871 | 7.0 |
| | "West Virginia" | "54" | 916 | 9039333 | 10.1 |
| | "Wisconsin" | "55" | 1538 | 27027541 | 5.7 |
| | "Wyoming" | "56" | 331 | 2483689 | 13.3 |
| "Total " | | | 84069 | 1423164155 | 5.9 |

"---"
"Dataset: Compressed Mortality, 1999-2010"
"Query Parameters: "
"
"ICD-10 Codes: X72 (Intentional self-harm by handgun discharge), X73 (Intentional self-harm by rifle, shotgun and larger firearm"
"discharge), X74 (Intentional self-harm by other and unspecified firearm discharge)"
"Year: 1999, 2000, 2001, 2002, 2003"
"Query Date: Dec 4, 2013 3:04:31 PM"

GunSuicides1999-2003

"Suggested Citation: Centers for Disease Control and Prevention, National Center for Health Statistics. Compressed Mortality File"
"1999-2010 on CDC WONDER Online Database, released January 2013. Data are compiled from Compressed Mortality File 1999-2010"
"Series 20 No. 2P, 2013. Accessed at http://wonder.cdc.gov/cmf-icd10.html on Dec 4, 2013 3:04:31 PM"

Total Suicides1999-2003

Total suicides, 1999-2003

| "Notes" | "State" | "State Code" | Deaths | Population | Crude Rate |
|---------|---------|-------------|--------|------------|------------|
| | "Alabama" | "01" | 2681 | 22328455 | 12.0 |
| | "Alaska" | "02" | 590 | 3176176 | 18.6 |
| | "Arizona" | "04" | 4035 | 26334551 | 15.3 |
| | "Arkansas" | "05" | 1815 | 13447574 | 13.5 |
| | "California" | "06" | 15460 | 171975312 | 9.0 |
| | "Colorado" | "08" | 3363 | 21972104 | 15.3 |
| | "Connecticut" | "09" | 1392 | 17167886 | 8.1 |
| | "Delaware" | "10" | 443 | 3978461 | 11.1 |
| | "D.C." | "11" | 160 | 2858436 | 5.6 |
| | "Florida" | "12" | 11048 | 81792220 | 13.5 |
| | "Georgia" | "13" | 4515 | 41740505 | 10.8 |
| | "Hawaii" | "15" | 659 | 6138552 | 10.7 |
| | "Idaho" | "16" | 974 | 6593341 | 14.8 |
| | "Illinois" | "17" | 5307 | 62348320 | 8.5 |
| | "Indiana" | "18" | 3504 | 30605819 | 11.4 |
| | "Iowa" | "19" | 1563 | 14652188 | 10.7 |
| | "Kansas" | "20" | 1607 | 13505457 | 11.9 |
| | "Kentucky" | "21" | 2588 | 20334999 | 12.7 |
| | "Louisiana" | "22" | 2433 | 22425971 | 10.8 |
| | "Maine" | "23" | 792 | 6429896 | 12.3 |
| | "Maryland" | "24" | 2327 | 26862344 | 8.7 |
| | "Massachusetts" | "25" | 2111 | 31903847 | 6.6 |
| | "Michigan" | "26" | 5130 | 49883542 | 10.3 |
| | "Minnesota" | "27" | 2346 | 24848263 | 9.4 |
| | "Mississippi" | "28" | 1604 | 14253053 | 11.3 |
| | "Missouri" | "29" | 3488 | 28182529 | 12.4 |
| | "Montana" | "30" | 859 | 4537960 | 18.9 |
| | "Nebraska" | "31" | 934 | 8602798 | 10.9 |
| | "Nevada" | "32" | 2046 | 10454015 | 19.6 |
| | "New Hampshire" | "33" | 723 | 6262246 | 11.5 |
| | "New Jersey" | "34" | 2850 | 42420658 | 6.7 |
| | "New Mexico" | "35" | 1696 | 9191701 | 18.5 |
| | "New York" | "36" | 5970 | 95255759 | 6.3 |
| | "North Carolina" | "37" | 4791 | 40957498 | 11.7 |
| | "North Dakota" | "38" | 392 | 3202506 | 12.2 |
| | "Ohio" | "39" | 5764 | 56918675 | 10.1 |
| | "Oklahoma" | "40" | 2480 | 17348873 | 14.3 |
| | "Oregon" | "41" | 2581 | 17344077 | 14.9 |
| | "Pennsylvania" | "42" | 6584 | 61549518 | 10.7 |
| | "Rhode Island" | "44" | 428 | 5283200 | 8.1 |
| | "South Carolina" | "45" | 2239 | 20309781 | 11.0 |
| | "South Dakota" | "46" | 499 | 3786977 | 13.2 |
| | "Tennessee" | "47" | 3703 | 28722508 | 12.9 |
| | "Texas" | "48" | 10938 | 106450918 | 10.3 |
| | "Utah" | "49" | 1574 | 11405318 | 13.8 |
| | "Vermont" | "50" | 385 | 3059033 | 12.6 |
| | "Virginia" | "51" | 3961 | 35930901 | 11.0 |
| | "Washington" | "53" | 3864 | 29878871 | 12.9 |
| | "West Virginia" | "54" | 1297 | 9039333 | 14.3 |
| | "Wisconsin" | "55" | 3090 | 27027541 | 11.4 |
| | "Wyoming" | "56" | 478 | 2483689 | 19.2 |
| "Total " | | | 152061 | 1423164155 | 10.7 |

"Dataset: Compressed Mortality, 1999-2010"
"Query Parameters:"
"ICD-10 Codes: X60-X84 (Intentional self-harm)"
"Year: 1999, 2000, 2001, 2002, 2003"
"Query Date: Dec 4, 2013 3:08:23 PM"
"Suggested Citation: Centers for Disease Control and Prevention, National Center for Health Statistics. Compressed Mortality File"
"1999-2010 on CDC WONDER Online Database, released January 2013. Data are compiled from Compressed Mortality File 1999-2010"

Total Suicides1999-2003
"Series 20 No. 2P, 2013. Accessed at http://wonder.cdc.gov/cmf-icd10.html on Dec 4, 2013 3:08:23 PM"

Kleck Declaration Exhibit K-6

Does Gun Control Reduce Violent Crime?

Gary Kleck

College of Criminology and Criminal Justice

Florida State University

Tallahassee, Florida 32306-1127


Tomislav Kovandzic

Program in Criminology

University of Texas at Dallas

Richardson, Texas 75080-3021


Jon Bellows

Trial Court Administrator

18th Judicial District of North Carolina

P.O. Box 3008 Greensboro, NC 27402

September 18, 2013

Keywords: Gun Control, Violent Crime

Does Gun Control Reduce Violent Crime?


Do gun control laws reduce violence?  To answer this question, a city-level cross-sectional analysis was performed on data pertaining to every U.S. city with a population of at least 25,000 in 1990 (n=1,078), assessing the impact of 19 major types of gun control laws, controlling for gun ownership levels.  Models were estimated using instrumental variables regression to address possible endogeneity of gun levels due to reverse causality.  Results indicate that gun control laws generally show no evidence of effects on crime rates, possibly because gun levels do not have a net direct positive effect on violence rates.  A minority of laws show effects, but they are as likely to increase violence as to decrease it.

The United States has higher rates of violent crime, both fatal and nonfatal, than all but a handful of the industrialized nations of the world (Killias et al., 2001).  Many of these crimes are committed by offenders armed with guns.  In 2005, 68.0 percent of homicides, 26.3 percent of robberies, 6.7 percent of assaults, and 8.9 percent of all violent crime incidents were committed by criminals with guns (U.S. Federal Bureau of Investigation, 2006; U.S. Bureau of Justice Statistics, 2006a, Table 66).  The U.S. also has a higher rate of private gun ownership than any other industrialized nation (Killias et al., 2001).   This combination of facts has lead many to conclude that America's high rate of gun ownership must be at least partially responsible for the nation's high rates of violence, or at least its high rate of homicide  This in turn has lead many to conclude that stricter gun laws can reduce violent crime, especially the homicide rate (e.g., Cook and Ludwig, 2000).

## THEORY

Why should gun levels influence rates of crime or violence? And if gun levels do have effects, how might gun control laws decrease crime rates?  If a gun is available to a prospective aggressor, it can encourage attacks, especially by weaker attackers on stronger or more numerous victims, and can facilitate attacks from a distance, or attacks by persons too squeamish to attack with messier weapons like knives or too timid to attack at close quarters.  Similarly, guns may enable some people to attempt robberies they could not complete unarmed (Newton and Zimring, 1969; Cook, 1976; Kleck, 1997, pp. 215-240).  The sight of a gun also might trigger attacks by angered persons, due to the learned association between guns and violence.  On the other hand, research on real-world crime incidents indicates that aggressor possession of guns is generally associated with a lower likelihood of attack and injury to the victim (Kleck and McElrath, 1991). Once an injury is inflicted, however, it is more likely to result in death if a gun was used, due to the weapon's greater lethality (Newton and Zimring, 1969; Block, 1977; Kleck and McElrath, 1991). Part of the higher fatality rates of gun attacks,

however, is probably due to greater deadliness of intent on the part of attackers choosing guns, rather than just the deadliness of the weapon itself (Cook, 1982, pp. 247-248; Wright, Rossi. and Daly, 1983, pp. 189-212).

Gun control laws, in turn, are intended to reduce crime and violence rates by restricting the availability of firearms among persons believed to be at higher risk of committing acts of violence. Although some laws hypothetically might do this by reducing gun levels in the general population, no state has ever banned the ownership of guns or even any large subset of guns, such as handguns, and existing laws do not affect general gun ownership levels (Kleck and Patterson 1993).  Instead, gun laws are intended to block acquisition, possession, and criminal use of guns by members of high-risk subsets of the population, such as convicted criminals, alcoholics, drug addicts, or minors.  Further, some gun laws are designed to reduce violence in ways that do not require reducing gun ownership in any subset of the population.  For example, some gun controls are intended to reduce unlicensed carrying of concealed guns through public spaces, reducing gun possession in situations likely to erupt in violence.  Other controls try to deter criminal use by imposing enhanced penalties for gun use in crimes.

On the other hand, critics argue that gun control laws could increase crime, by disarming prospective victims, reducing their ability to effectively defend themselves and possibly reducing any deterrent effect that victim gun possession might have on offenders.  This could happen even with laws narrowly aimed at disarming subsets of the population at high risk of offending, since such groups often are also at high risk of victimization (Kleck, 1997, Ch. 5; Tark and Kleck, 2004).  For example, since few mentally ill people commit violent acts, but mentally ill people are at higher risk of victimization (Friedman, 2006), banning sales of guns to this group could reduce defensive and deterrent effects of their gun ownership more than it reduced its violence-elevating effects.  If this happened, the net effect on violence rates could be positive.

### PRIOR RESEARCH ON THE IMPACT OF GUN CONTROL LAWS ON CRIME

The number of macro-level studies of the impact of gun control laws on violent crime rates is in the dozens.[1] Most studies report no significant negative association between violent crime rates and the gun control law under study, but a few (e.g., Koper and Roth, 2001; Loftin et al., 1991) find evidence generally supportive of the gun law efficacy hypothesis.  All these studies, however, can be criticized on methodological grounds. The central problems have been the (1) the failure of analysts to properly account for omitted variable bias, (2) study of heterogeneous states rather than more homogenous cities or counties, (3) a failure to control for gun ownership levels, (4) a failure to take account of local gun ordinances, (5) the use of unreliable secondary sources of information on gun laws, (6) the use of gun control strictness factors that lump together heterogeneous mixtures of gun laws, and (7) the opposite problem of studying a single, arbitrarily chosen, instance of a given type of gun control, which precludes generalization of findings and risks confusing the effects of one gun law with the effects of other measures likely to accompany it.

**Spurious Association of Gun Control Laws and Crime Rates Due to Omitted Variable Bias**

<u>Interrupted Time-Series Studies</u>

The most commonly used research design to assess the impact of gun control laws on violence rates has been the interrupted time-series design (ITSD).  In the typical ITSD study, monthly violence rates for a single jurisdiction are analyzed to see if there is a significant downward shift in violent crime rates around the time a new gun law went into effect.  Although the ITSD design has enjoyed a great degree of success in the physical sciences, the design is not well-suited for assessing the effects of policy changes unless the researcher can convincingly rule out history as a plausible explanation for observed shifts in the time series (other than the event under study) (Campbell and Stanley, 1963). The problem of history is especially acute in time series studies of gun laws due to the fact that state

legislatures are almost continuously making large numbers of changes in the criminal law, often for the express purpose of reducing crime.[2]   For example, over the period 1973 to 1992, the Florida legislature passed an annual average of 381 general bills (this total excludes resolutions), including 2.45 gun control bills per year (Etten, 2002). Thus, almost every enactment of a new gun law is accompanied by dozens or hundreds of other changes in criminal law passed during the same legislative session, making it virtually impossible to separate the effects of one new law from those of others, enacted at the same time, also intended to reduce crime.   Regarding gun laws in particular, the same political conditions that favor passage of liberalized carry laws may also favor passage of similarly conservative measures such as add-on penalties for crimes committed with a deadly weapon, or discourage passage of measures favored by liberals, such as gun owner licensing.   Many gun law evaluations have relied on the ITSD to estimate the effect of gun laws.   Because analysts using the ITSD approach are unable to explicitly rule out even a single rival change in crime policy that might account for observed shifts in violent crime rates, parameter estimates for gun law variables are very likely to suffer from omitted variables bias.   That is, any observed relationship between violent crime rates and gun laws might be spurious.

Panel/Multiple Time Series Designs

        After 1997, ITSD of individual laws in single jurisdictions were largely replaced by panel designs in which violent crime rates in large numbers of areas with and without the law under study were tracked over time. For example, there are at least 14 recent panel studies that assess the impact of "right to carry" (RTC) laws using a county-level panel dataset first complied by Lott and Mustard (1997).   They are a highly overlapping set of analyses of the same fatally flawed body of data (see

---

[1] See Kleck (1997), Chapter 10 for an extensive review of the pre-1997 research.

[2]  A recent examination of the most common forms of gun control illustrates this very point.  Twenty two states enacted up to 4 different gun laws in the same year during the period 1977 to 2000 (Marvell and Moody, 2006, Table 3).

Kovandzic, Marvell, and Vieraitis 2005, pp. 294-302 for a summary).  The results of both the original

Lott-Mustard study and more than a dozen reanalyses of their dataset are all essentially uninterpretable

because they are, regardless of methodological variations, based on analyses of a meaningless set of

"crime rates."[3]  Better empirical evidence on the impact of these laws was provided by researchers

who gathered their own crime data rather than merely reanalyzing the flawed Lott-Mustard county

dataset.  The best evidence was produced by Kovandzic et al. (2005), whose panel dataset pertained to

189 large cities (covering the period 1980-2000) and thus did not have the problems associated with

the attempt to aggregate multiple local jurisdictions to create county violent crime rates.  They found

that RTC laws have no measurable effect on violent crime rates.  Kovandzic and Marvell (2003) also

found no impact of RTC laws on violence levels when using more reliable county-level crime data for

Florida counties and a more refined measure to measure the laws "treatment" effects - the number of

valid concealed carry permits in each county in each year.

　　　While panel studies (also referred to as multiple time series) are a substantial improvement

over ITSD studies because they exploit evidence concerning numerous instances of new gun laws in

multiple jurisdictions, they also suffer, albeit it to a much lesser degree, from potential bias due to

omitted variables.  The omitted variable bias problem occurs here because analysts fail to or are unable

to control for more than a few genuinely crime-related, substantive time-varying factors (e.g., other

_____

[3] Although Lott and Mustard (1997) represented their key data as county rates of crimes known to the police, their data in fact reflected only crimes within subsets of local police jurisdictions within each county that reported crime to state Uniform Crime Reports agencies – subsets of jurisdictions that frequently changed from year to year.  Their "crime rates" for a given county changed in this dataset merely because different sets of areas contributed crime statistics in one year compared to the previous year, rather than because rates of crime (or even crimes known to police) changed (Maltz and Targonski, 2002; see also Martin and Legault,(2005) re. similar problems in state-level crime data analyzed by Lott and Mustard). It is exactly as if a different set of counties were included in each wave of the panel.  Lott and Mustard did nothing to correct this critical problem, nor did critics who reanalyzed their unmodified dataset.

gun laws) that affect violence rates.[4]  It is important to note that the issue here is the lack of needed controls for time-varying factors likely to influence violent crime rates (such as the passage of other gun laws) because panel data sets estimated with a fixed effects model are based <u>solely</u> on the cross-temporal relationship between the gun law under study and violence rates.   There is a common misperception in the field of criminology that the inclusion of fixed effects minimizes the need to explicitly control for potential confounding time-varying factors.  This belief is patently false.  While fixed effects help immensely in creating ceteris paribus conditions by capturing all unobserved, time-invariant factors that affect violent crime rates and are correlated with the policy variable under study, they can still produce biased OLS estimates for the policy variable if other omitted variables are correlated with <u>changes</u> in the policy variable (Wooldridge, 2000).

How consequential can omitted variable bias be in panel studies with respect to conclusions about the effect of gun laws on violence rates?   A recent state panel study of 13 gun laws enacted between 1977 and 2000 by Moody and Marvell (2006) found that researchers analyzing any of the laws in isolation would have got their conclusions wrong for five of the 13 laws (see their Table 7).  Pioneers in the use of panel data for crime policy studies, Moody and Marvell conclude that "policy analysts must be careful to properly identify the coefficients in any policy analysis equation and to avoid omitted variable bias due to omitting other relevant laws which can lead to spurious results" (p.14).

Given the importance of controlling for potential confounding time-varying factors, why have researchers chosen to include so few in their violence models?  The answer is quite simple - the data simply do not exist or would be difficult to collect.  For example, the U.S. Census Bureau and other

---

[4] Lott and Mustard (1997, p. 38) controlled for just two other types of gun laws in their effort to assess the impact of "shall issue" carry laws while Ludwig and Cook (2000) controlled for none in their evaluation of the Brady law.

federal/state government agencies only compute intercensal estimates for a handful of potential crime-related variables (e.g., poverty), and even those estimates are only available for larger areas such as states. The problem with using larger aggregates such as states as a unit of analysis in a study of gun laws is obvious—states are more heterogeneous than cities and counties, which aggravates the problem of aggregation bias. Perhaps more importantly, the use of states leads to severe mismeasurement of gun control strictness to which residents of a given city are subject, since it precludes taking into account local gun control laws, the most restrictive in the nation. While cities and counties are the preferred unit of analysis for a study of gun laws, intercensal estimates for crime-related variables at this level of aggregation are virtually non-existent. With respect to gun laws, the most authoritative and comprehensive collection of state statutes and local ordinances is compiled by the U.S. Bureau of Alcohol, Tobacco, and Firearms (BATF) in a report entitled <u>Firearms State Laws and Published Ordinances</u>. Unfortunately, the report is only published a few times each decade and does not list the effective date for each law.

<u>Cross-Sectional Designs</u>

Cross-sectional designs (CX) compare legal jurisdictions, usually states, with each other to see if those with a gun law have lower levels of violence, other things being equal, than those lacking the law. Cross-sectional designs are judged by most scholars to be weaker than panel designs because it is inherently more difficult for researchers to establish ceteris paribus conditions. If, for example, there are factors unobserved to the researcher that affect violent crime rates and are likely to be correlated with the gun law under study then one is unlikely to get an unbiased estimator of the causal effect of the gun law on crime. The solution to the omitted variable bias problem is similar to that employed with ITSD or panel designs--the researcher must attempt to establish ceteris paribus conditions by controlling for as many possible confounding factors (in this case time-invariant factors) before attributing crime reduction effects to gun regulation. Of course, it is not possible to literally hold all

else equal because there is no way to know exactly which variables might either generate spurious

associations or suppress or distort genuine causal effects. Thus, the most sensible procedure is to hold

fixed as many relevant factors as available data allow.  Unlike ITSD or panel studies, however, CX

studies can take advantage of considerable data in census years for cities, counties, or states on macro-

level determinants of violent crime rates.  Likewise, in CX studies it is easier for researchers to control

for other types of gun laws by using, for example, the BATF report on state and local firearm

ordinances discussed above.[5]  Controlling for the presence of other pre-existing gun laws (as opposed

to the passage of other gun laws in ITSD or panel studies) is especially important for CX studies

because it is likely that places whose residents favor one type of gun control are likely to favor others

as well. Thus, failing to control for existing gun laws could lead to OLS estimates for gun laws under

study being biased in the negative direction due to the omission of other gun laws, and lead one to

conclude that certain gun laws are important when they are not.

Panel designs, then, are generally preferred to CX designs for purposes of establishing *ceteris

paribus* conditions and thus minimizing potential endogeneity bias.  Unfortunately, panel approaches

are not feasible in some situations, and this happens to be  one of them.  This is because (1) it is

essential to control for gun ownership levels to avoid biasing gun control law coefficients in a negative

direction, but (2) there are no known valid indicators of cross-temporal variation in gun levels, making

it impossible to control for gun levels in any kind of cross-temporal analysis.  The spurious association

problem derives from the simple political fact that larger numbers of gun-owning voters in a given area

make it politically more risky for legislators to vote in favor of additional gun control measures.  Thus,

while higher gun ownership might contribute to higher violence rates, it also has a direct negative

effect on the likelihood that a given area will have any given gun control law, thereby contributing to a

---

[5] As a point of reference, Kleck and Patterson (1993, pp. 259-260) controlled for up to 19 potential

spurious negative association between gun laws and violence rates.  Consequently, any analysis of gun

law impact that failed to control for gun ownership levels would yield misleading results.

It is, however, currently impossible to control for changes over time in gun control because

there are *no* valid measures of such changes.  Even proxy measures that are excellent indicator of

cross-area variation in gun levels, such as the percent of suicides that are committed with guns (PSG),

show no validity for measuring changes over time (Kleck 2004, pp. 19-25).  Although a few scholars

have claimed that their validity checks indicated validity of PSG for use in panel studies (Duggan

2001, p. 1093; Cook and Ludwig 2003; Moody and Marvell 2005), in fact the associations they

observed between PSG and direct survey measures of gun ownership (used as criterion measures) were

almost entirely attributable to cross-area covariation.  As we demonstrate later, there is virtually *no*

correlation over time between PSG and direct survey measures of gun prevalence.

We believe CX data can also be used to approximate *ceteris paribus* conditions given the

immense amount of macro-level data available to researchers for census years.  In fact, one might

argue that in the context of policy studies of violent crime that CX data might actually be preferred to

panel datasets as few macro-level determinants of violent crime are measured at regular intervals

between Census years, making it difficult (or at least as difficult for CX studies) for panel researchers

to rule out omitted variables bias.  In the next section we discuss another serious road block for

research designs relying on cross-temporal variation - the inability to control for perhaps the most

important time-varying factor related to the passage of gun laws, gun ownership levels.

**The Need to Control for Gun Ownership Levels**

Low or declining gun ownership may be part of what makes it politically feasible to pass new

restrictions on guns, but declines in gun levels could also independently reduce violence rates, even if

gun laws had no effect of their own on either gun levels or crime.  Likewise, in CX analyses, the

___

confounding gun laws in their CX analysis of gun laws.

strictness of gun controls is likely to be negatively correlated with gun ownership levels for the aforementioned political reasons. In our sample of over a thousand U.S. cities, a principle components factor of gun laws was correlated -0.52 with our measure of gun ownership. One of the main arguments for gun control is that gun levels, at least within some high-risk subsets of the population, affect at least some kinds of violent crime. If this were not true, it would be harder to argue that laws restricting access to guns affect violence rates. On the other hand, if gun levels do affect crime, and also affect whether gun controls are implemented, then gun ownership levels are an important confounding factor, which must be controlled to avoid spurious negative associations between gun law variables and violence rates. On the other hand, it should be stressed that virtually all gun control laws of the sort that actually exist in the U.S. are not designed to have their effects by reducing the level of gun ownership in the general population. Confirming this, past research indicates that gun laws in fact do not affect gun ownership levels in the general population (Kleck and Patterson, 1993). Rather, gun control laws are intended to reduce violence either by reducing gun levels within small high-risk subsets of the population, or by other means that do not entail reducing gun levels within any part of the population, such as discouraging the unlicensed carrying of guns in public places or their use in crimes. Thus, gun laws do not have their effects on violence by reducing gun levels in the general public; indeed, it is unlikely that it would be politically feasible to pass any gun control bills that were likely to significantly reduce gun ownership among the noncriminal majority.

Thus, general gun levels do not mediate the relationship between gun laws and violence rates, so we do not include gun levels in our models to test for the indirect effects of gun laws on violence via their effects on general gun ownership levels. The measure of gun levels that we use, the percent of suicides committed with guns, is a measure of gun prevalence in the general population, and has been validated against estimates drawn from surveys of the general population. Instead, the reason we control for general gun levels is because the gun ownership level within the general population is a

confounding factor that may affect violence rates but is also likely to influence the degree of gun control strictness, thereby contributing to a spurious negative association between gun laws and violence rates.  In addition, of course, the impact of gun levels on violence rates is a subject of considerable importance in and of itself.

A recent evaluation of the validity of 21 previously used proxies for gun levels shows that while some are quite valid for purposes of cross-sectional comparisons, none show even minimal evidence of validity as a cross-temporal proxies for gun ownership.  The cross-sectional correlation between the percent of suicides committed with guns (PSG) and General Social Survey measures of household gun prevalence at the state-level was 0.92, while the correlation was 0.95 with similar cross-sectional survey estimates for nations.  On the other hand, when evaluated for the U.S. across years, the correlations for this proxy were exactly .00 with the survey-measured prevalence of handgun ownership, and actually <u>negative</u> with survey-based measures of ownership of all guns (Kleck, 2004).  Moody and Marvell (2005) used first-differences on state level panel data and a combination of a direct measures of gun levels derived from the General Social Survey (GSS) with interpolations using a proxy; they find no effect of gun levels on homicide rates.  Cook and Ludwig (2004;2006) used fixed effects on county-level panel data and a different gun proxy, and reported a positive impact of gun levels on homicide rates. All claim to have validated their chosen proxy again the direct GSS measure of gun levels.

We briefly examine each study in turn and show in each case how the claim to have used a validated proxy is unfounded.  We consider first the study by Moody and Marvell (2005), who have kindly made their data publicly available.[6] The authors start with a state-level panel dataset covering 1977-98 based on direct survey measures of gun levels taken from the GSS. They then use state-level

---

[6] The data were downloaded from http://cemood.people.wm.edu/research.html.

data on PSG, generally acknowledged to be the best cross-sectional proxy for gun levels, to impute values of state-level gun prevalence, thereby nearly doubling the number of observations available to them. Their analysis used both IV methods and Granger causality tests to detect whether changes in gun levels led to changes in violence rates or visa-versa, and finds no connection between the two.

The problem with their approach becomes apparent if we examine and extend the validation exercise the authors used to justify imputing missing state-level GSS data on percent of households with a gun (HHG) or handgun (HHHG) for a given year using state-level data on PSG. The authors report that PSG is highly correlated with both HHG and HHHG in their state-level panel (their Table 1, p. 723), and much more correlated than alternative proxies such as gun magazine subscriptions. What the authors failed to note was that this correlation is driven entirely by the <u>cross-sectional</u> correlation between PSG and the GSS gun measures; the cross-temporal correlations are negligible.  This can be easily seen by examining separately the cross-sectional and cross-temporal correlations of HHG and PSG using their data. The left-hand panel of Figure 1 shows that state-average PSG and state-average HHG are highly correlated – the $R^2$ is 69%. The left-hand panel, on the other hand, shows that the correlation of annual changes (first-differences, as used in most of the authors' estimations) in state PSG and state HHG is essentially nil, with an $R^2$ of approximately zero. Note also that the very small GSS state sample sizes mean that most of the annual changes in GSS state-level gun prevalence are implausibly large (the standard deviation is 18). The authors' analysis is based entirely on intertemporal variation in HHG or HHGG, with missing values imputed from the intertemporal variation in PSG.  Since this variation is essentially noise, their null findings on the guns/violent crime link are not surprising and their analysis says little about the merits of the guns-cause-violent crime hypothesis.

Cook and Ludwig (2004; 2006) relied entirely on the same proxy, PSG, to capture changes in gun levels. They used county-level data for 1980-99 to estimate a panel model with county fixed

effects, regressing the log of the homicide rate on lagged log PSG and various control variables. Since, as we have just seen, changes in PSG are not correlated with changes in GSS gun levels at the state level, there is no basis for interpreting their estimates of the PSG coefficient as estimates of the impact of changes in gun levels on changes in the homicide rate. The authors assert in their 2004 paper (pp. 13-14 and Table 2, p. 43) that PSG is a good proxy for gun levels, on the basis of regressions of various GSS gun level measures on PSG, and fixed effects for nine Census regions, and in some specifications, time dummies. Examination of these results, however, shows that the reported correlations are in fact very weak – the t-statistics[7] vary from 1.94 to 3.02, which correspond to partial $R^2$s of about 3-7%.[8] This is unacceptably low for a proxy. We do not have their data available to us, but by supplementing the Moody-Marvell dataset with additional GSS data we can come close to replicating their results. In their validation using Census Division and year fixed effects, the highest t-statistic they obtained was 2.66, using HHG as the GSS gun level measure; in a regression with the same specification using the augmented Moody-Marvell data, we obtain a slightly higher t-statistic of 2.77 (the difference is most likely because the Moody-Marvell dataset has nine fewer observations (117 vs. 126) because it is missing data for 1981). When we run the identical regression but using state instead of Census region fixed effects, the t-statistic drops to 1.89. The scatterplots in Figure 2 show, once again, that PSG cannot be justified as a time series proxy for gun levels. The left-hand panel corresponds to the Cook-Ludwig specification, and shows the relationship between PSG and HHG

---

[7] Cook and Ludwig do not state whether the standard errors have small sample adjustments. We assume that they do, i.e., that these are t-statistics.

[8] The "partial $R^2$" is the $R^2$ that would be obtained in a residual regression after partialling-out the other explanatory variables. Here, we would first regress the GSS gun level measure on all the fixed effects and obtain the residuals; then regress PSG on all the fixed effects and obtain the residuals; and finally obtain the $R^2$ from a regression of one set of residuals on the other. It is directly comparable to the $R^2$s reported for the scatterplots in Figure 1. As is well known, the coefficient from the residual regression is identical to the coefficient from the full regression. For a simple textbook discussion of the partialling-out interpretation of multiple regression, see, e.g., Wooldridge, 2000, pp. 76-77.

after the year and Census Division fixed effects have been partialled out of both variables; the correlation between the two is barely visible (the corresponding partial $R^2$ is 7%). The right-hand panel corresponds to year and state fixed effects specification, and again shows HHG vs. PSG after partialling out the fixed effects. The correlation is now so weak as to be invisible (partial $R^2$ =1%).

Figure 1: PSG and General Social Survey HHG, State-level Data 1977-98



Figure 2: PSG and General Social Survey HHG, Census Division and State-level Data, 1980-98, With Year and Location Fixed Effects Partialled-out

Figure 3: GAR and General Social Survey HHG, State-level Data 1980-98



The exact same problems afflict the effort of Duggan (2001) to establish that the rate of subscriptions to Guns & Ammo magazine (GAR) is a valid proxy for changes in gun levels. As shown in Figure 3, the association he documented between state-level survey estimates of household gun prevalence and GAR is entirely attributable to cross-sectional covariation. Across years, there is no significant correlation between GAR and the survey-based criterion measure (R-squared=.002).

Because there are no known valid cross-temporal proxies for gun ownership available, *it is, at present, impossible to control for gun levels using <u>any</u> kind of time-series design, including the otherwise preferable panel design*. In the absence of valid time-series proxies for gun levels, researchers who want to isolate the effect of gun laws from the effects of gun ownership levels presently have no choice but to rely on cross-sectional data. For this and other reasons already discussed above, we use a CX approach in this paper.

**DATA**

Our study assesses the impact of gun control laws on violent crime rates using CX data from all U.S. cities with a 1990 population of 25,000 or more (n=1,078). These cities accounted for roughly three-quarters of the violent crime in the U.S. in 1990 (U.S. Federal Bureau of Investigation 1991, pp. 150-151). We use a double-log model in which both dependent and independent variables (except for

gun law dummy variables) are expressed in their natural logs.  Because the dependent variables are logged, the coefficients for the gun law dummy variables can be interpreted as elasticities.  The coefficient, when multiplied by 100, is the percent difference in rates of violent crime in cities with a particular gun law versus those without the law, holding all other factors fixed.  Heteroscedasticity was detected using the Pagan-Hall (Pagan and Hall, 1983) statistic, and was handled by using the Huber-White robust estimator of standard errors, which is valid in the presence of heteroscedasticity of unknown form (Woolridge, 2006).

**Violent Crime Rate Variables**

The dependent variables are the rates per 100,000 population of total homicide, gun homicide, nongun homicide, total robbery, and total aggravated assault.[9]  Data on the total number of homicides, robberies, and aggravated assaults for each city were taken from the FBI Uniform Crime Reports (UCR) for 1989 to 1991 (U.S. Federal Bureau of Identification 1990-1992).  Gun and nongun homicide data were taken from the FBI Supplementary Homicide Reports (SHR) computer dataset (Fox, 2001).[10]  To estimate the number of gun homicides for each city in each year, we multiplied the total number of homicides in the published UCR reports for that year by the ratio of the number of SHR-recorded gun homicides to the total number of SHR-recorded homicides for the corresponding year.  Nongun homicides were estimated using the same procedure.

––––––––––––––––––––––––

[9] We did not study the effects of gun ownership and gun laws on rape rates. Because less than three percent of rapes involve offenders armed with guns (U.S. Bureau of Justice Statistics. 2006a), it is unlikely that gun ownership or gun laws could exert a detectable effect on the rape rate.

[10] It would be desirable to separately assess rates of all types of violent crime with and without guns, to provide sharper tests of the hypotheses that gun levels and gun laws affect violence rates. Unfortunately, close examination of UCR data on gun vs. nongun varieties of robbery and aggravated assault revealed that the data often covered less than twelve months of the year, were often coded incorrectly (e.g., all robberies were coded as gun robberies), or there were implausibly large or small numbers of crimes reported as involving guns.  Consequently, we could reliably distinguish gun and nongun crimes only for homicide, by using SHR data.

Following convention for cross-sectional studies, violence rates were averaged over three years, 1989-1991, to reduce the influence of random year-to-year aberrations.[11]  For cities missing crime count data for a given year, we estimated missing values by computing the average crime rate for that year in cities in the same Census region and same population group (e.g., 25,000-99,999), among cities with valid crime data.

**Gun Law Variables**

Cities were coded for the presence of 19 major forms of gun law restrictions that were in existence as of 1989 at either the state or city level.  Descriptions of the laws, variable names, means, and standard deviations are provided in Table 1.  Gun law coding for most laws was based on State Laws and Published Ordinances – Firearms - 1989, an authoritative and comprehensive verbatim collection of state statutes and local ordinances compiled by the U.S. Bureau of Alcohol, Tobacco, and Firearms (1989).

The coding for most gun laws was 1 if the law was present at either the state or city level, regardless of whether the law applied to all types of guns or, as was often the case, only to handguns, and 0 if it was absent.  Most of the gun laws fall into one of six categories: (1) bans on gun possession by members of "high-risk" groups such as criminals and minors, (2) restrictions on sale/transfer/purchase of guns to or by members of these groups, (3) restrictions on the carrying of guns in public places, (4) laws requiring the licensing of gun owners or registration of guns in order for a gun to be legally owned or possessed, (5) restrictions or bans on special gun types such as handguns, and (6) laws requiring a state or local license to be in the business of selling guns, in addition to the

---

[11] Several low population cities reported zero homicides for the 1989-1991 study period.  Because the logarithm of zero is undefined, a one was added to the average annual number of total, gun, and nongun homicides before we computed the rates and then took the natural logs of those rates.  The procedure was applied to all cities, not just those with zero homicides, to maintain relative homicide levels.

license required by the federal government.[12]   Gun laws that were too minor or technical to be likely to have any detectable effect on violence rates were not coded, nor were laws that were either universal (or nearly so) across states (e.g., federal laws, or bans on machinegun possession), or that were unique to a single jurisdiction.  In either of the latter two situations, there was too little variation across cities to reliably detect effects of the laws.  The complete gun law coding protocol may be obtained from the senior author.

These state and local laws do not merely duplicate or overlap similar controls at the federal law. The scope of state controls is often considerably broader than seemingly similar federal controls. Thus, a state ban on acquisition or possession of guns by convicted criminal may apply to certain misdemeanants as well as felons, while the federal ban does not.  Likewise, some state restrictions on juvenile acquisition or possession of long guns apply to 18-to-20 year-olds as well as those under 18, while federal law prohibits acquisition only by those under 18.  Further, state and local capacity to effectively administer their controls is often considerably greater than that of the federal government. Even after the Brady Act was passed in 1994 (after our study period), background checks in connection with the federal Brady law could not make any significant use of records concerning mental illness – in 2005 over 4.9 million people applied to buy a gun from a federally licensed dealer, 66,705 were rejected via an FBI records check, but only one half of one percent of these FBI rejections were for reasons of mental illness.  In contrast, some states like Illinois have registries of persons admitted to psychiatric hospitals in the state, while local enforcement agencies have access to local mental health sources.  Consequently, much higher shares of the rejections by state and local agencies

---

[12]  For the gun carrying law variable (CARYHIDN), 1 indicated that gun carrying was either completely unlawful or required a license that was rarely issued, and 0 indicated that either the city was located in a nondiscretionary "shall-issue" state where authorities were required to issue carry permits to applicants meeting certain objective criteria, or no license was required at all to carry guns.

were for reasons of mental illness (U.S. Bureau of Justice Statistics, 2006b, pp. 2, 5; Bordua, Lizotte,

and Kleck, 1979).  Likewise, the requirements for state and local dealer licenses are stricter than those

imposed by the federal government for issuance of its license.  For example, while many states and

localities required a criminal background check to become a licensed gun dealer, the federal

government did not, as of 1989 (U.S. Bureau of Alcohol, Tobacco and Firearms, 1989).

**Gun Ownership Levels**

Gun levels were measured using the percent of suicides committed with guns (PSG), which

recent research has shown to be the best proxy to use in cross-sectional research (Kleck, 2004).  Vital

statistics data for 1987-1993 do not identify locations of deaths for cities with populations smaller than

100,000, so it was not possible to compute city-level measures of PSG for most of our cities.

Therefore, we used PSG for the county in which the city was located as a proxy for city-level gun

availability. Some of the smaller counties had few suicides per year, so misclassification of a few

suicides as homicides or accidents in small counties could produce substantial measurement error in a

single year's count.  Therefore, PSG was computed for the seven year period from 1987 to 1993,

bracketing the census year of 1990.  Data were derived from special Part III Mortality Detail File

computer tapes (not the general public use tapes) made available by the National Center for Health

Statistics (U.S. National Center for Health Statistics, 1997).

**Control Variables**

In addition to the gun levels measure and gun law dummies, we included eleven city-level

control variables that prior macro-level crime research have shown to be reliable predictors of crime.

Decisions as to which control variables were included in the violent crime models were based on a

review of previous macro-level studies linking violent crime to structural characteristics of ecological

units.  Most of these control variables account for the causal effects emphasized by variants of

motivational, opportunity, and compositional theories of criminal behavior (see Kovandzic et al., 1998;

Sampson, 1986; Vieraitis, 2000 and the studies reviewed therein).  Thus for each gun control law we control for 18 other gun laws and 11 of the most important structural covariates of violent crime as determined by theory and prior research.  While it is impossible to know for sure if any important time-invariant confounding factors have been omitted, we suggest by holding constant 29 potential relevant factors that we can satisfactorily test the gun law efficacy hypothesis.  Table 1 lists and provides a brief description of each control variable along with their means, standard deviations, and data sources.

(Table 1 about here)

Fortunately, correlations between the gun law variables and the control variables were generally weak in almost all cases.  Of the 209 bivariate correlations between the gun law variables and control variables (19 gun laws x 11 control variables), none exceeded 0.5, and only one reached 0.4. The conclusion of no serious collinearity between gun law variables and control variables was confirmed by examination of condition indices and variance-decomposition proportions (Belsley et al., 1980).

## ANALYTIC PROCEDURES

As discussed above, it is important to control for gun levels to isolate the effect of gun laws, but this introduces a complication in estimation of the models.  There is a strong theoretical basis, and a large body of empirical support, for the belief that while higher gun ownership levels could lead to higher violence rates, higher violence rates drive up gun ownership levels, as more people acquire guns for self-protection (Kleck, 1979; 1984; Clotfelter, 1981; Bordua, 1986; McDowall, 1986; Kleck and Patterson, 1993; Southwick, 1997; Rice and Hemley, 2002; Rosenfeld, Baumer and Messner, 2006; Kleck and Kovandzic, 2007).  Cities with higher violence rates, therefore, may tend to have higher gun ownership levels, even if gun availability reduces or has no effect on violence rates.  When explanatory variables such as gun ownership are endogenous, the OLS estimator is biased and

inconsistent (Wooldridge, 2000).

The most common estimation procedure used to address potential endogeneity bias, and the procedure used here, is instrumental variables (IV) regression.  The key challenge in using IV methods is finding a source of identifying variation: here, variables that are correlated with gun ownership ("instrument relevance"), are exogenous with respect to violent crime ("instrument validity") and that *a priori* reasoning and evidence suggest should be excluded from the violent crime equations. In the terminology of IV estimation the instruments used for guns levels are "excluded instruments," and the control variables are "included instruments."  If appropriate instrumental variables can be found for gun levels, the method of instrumental variables will produce consistent estimates of the effect of gun levels on violent crime (Wooldridge, 2000).

The excluded instrumental variables used in this paper to instrument gun levels are the percent of the 1992 Presidential vote for the Republican candidate (PCTREP92), and the 1990 county rate of Vietnam-era veterans per 100,000 population (VIETNAM).  Both excluded instrumental variables are theoretically important determinants of gun ownership that are plausibly otherwise unrelated to levels of violence.  VIETNAM serves as a measure of military training or service, while PCTREP92 serves as a measure of political conservatism.  Prior research suggests both variables are significant predictors of gun ownership (Cook and Ludwig, 1997, p. 35; Kleck, 1997, pp.70-72; Lizotte and Bordua, 1980). In contrast to past research, we carried out extensive specification testing to demonstrate that our excluded instrumental variables VIETNAM and PCTREP92 are relevant and valid.  In addition, we also show how to use prior information about the violation of the assumption of instrument exogeneity to improve inferences about the gun ownership-violent crime relationship.

**Tests of the Relevance and Validity of the Instruments**

We test for instrument relevance using a heteroscedastic-robust $F$ test of the joint significance of the excluded instruments VIETNAM and PCTREP92 in an OLS estimation of the first-stage

equation of gun levels (PSG), and we also examine the significance of VIETNAM and PCTREP92 separately using conventional t-statistics. Research by Bound et al. (1995) and Staiger and Stock (1997) indicates that an $F$ test is useful for examining the explanatory power of the excluded instrumental variables, and that $F$ statistics below 10 indicate weak instruments (Staiger and Stock, 1997, p. 557). The results of the $F$ test for VIETNAM and PCTREP92 are reported at the bottom of column 2 in Table 2. The second column in Table 2 also reports the estimated coefficients of the excluded instrumental variables and the remaining exogenous regressors in the first-stage equation of gun levels. The first-stage $F$ statistic reported in column 2 is 38.9, well above the Staiger-Stock rule-of-thumb value of 10. Both of the excluded instruments are correlated with gun levels in the expected directions and at the 0.1% significance level: cities in counties with a greater proportion of Vietnam veterans and persons voting for the Republican candidate in the 1992 Presidential election have higher gun ownership levels. We conclude that our excluded instruments in this estimation are relevant and not "weak."

The second requirement for excluded instrumental variables is that they be orthogonal to (i.e. uncorrelated with) the error process in the violent crime equations. Because the violence equations are overidentified, we are able to assess the validity of the excluded instruments with an overidentification test.[13] While several such tests exist, we use the $J$ statistic of Hansen (1982) because it is robust in the presence of heteroscedasticity.[14] Hansen's $J$ statistic tests the null hypothesis that the excluded instruments and/or control variables (i.e., included instruments) are exogenous (Baum et al., 2003). For our instrumental variables to be valid, we should fail to reject the null hypothesis. This test is especially valuable because it fails to have power only if <u>all</u> excluded instrumental variables are

---

[13] That is, the number of excluded instruments exceeds the number of endogenous regressors.

[14] The J statistic for the IV estimator is numerically equivalent to Sargan's (1958) $NR^2$ overidentification statistic.

invalid, i.e. are not exogenous.[15]   As long as even <u>one</u> of our excluded instruments is valid, the *J*-test is effective in detecting the invalidity of the instruments.   We also make use of a procedure proposed by Cook and Ludwig (2003) and Schaffer, Kovandzic, and Kleck (2007) that allows us to still make inferences about the guns-violence relationship even if both of instruments are not exogenous, as long as prior theory and/or evidence allow us to determine the likely sign of the correlation of the instruments with the error term in the violent crime equations.   As we discuss in Appendix A, if any correlation with the error term exists, prior theory and/or evidence imply an upward bias in our estimates of the impact of gun levels on violence rates.

The results of the *J* test for each violent crime model are reported at the bottom of Table 2.   The J statistics are all both small and statistically insignificant.   We therefore cannot reject the null that VIETNAM and PCTREP92, and the control variables are exogenous.   Thus, the evidence suggests that both of our excluded instrumental variables are exogenous and are correctly excluded from the violent crime equations.   To summarize, VIETNAM and PCTREP92 easily pass the relevance (*F* test) and validity requirements (J test) for instruments.   No other instrumental variables research published on the link between guns and violent crime has used excluded instruments that passed such tests.

It might be argued that gun control laws should also be treated as endogenous because the passage of laws intended to reduce violent crime is affected by violent crime.   That is, coefficients on the gun laws variables might be biased upwards due to another form of endogeneity bias—simultaneity bias attributable to higher violent crime rates leading to passage of gun laws.   We consider this to be unlikely, for several reasons.   First, most major guns laws in effect in 1989 were originally enacted decades earlier (compare Newton and Zimring, 1970, Appendix G with U.S. Bureau of Justice Statistics, 1996), so their enactment obviously could not have been influenced by violent crime rates in

---

[15] Where the test will lack power is if all the instruments fail the requirement of exogeneity and, in

1989-1991, or indeed in any recent years.

The probable source of the belief that crime affects passage of gun laws is the fact that highly publicized individual acts of violence, such as mass shootings, sometimes trigger the enactment of new gun control laws. Strictly speaking, the effect of news coverage of crime is irrelevant to whether <u>crime rates</u> affect the enactment of gun laws unless one assumes a significant correlation between crime rates and <u>news coverage</u> of crime. Past research, however, indicates that there is virtually no correlation between crime and the amount of news coverage of crime (Garafalo, 1981; Marsh, 1989; Dorfman and Schiraldi, 2001).

Likewise, there is little reason to believe that higher violent crime rates increase public support for gun control, since survey research shows that public support for gun control is not affected by prior victimization, fear of crime, or higher crime rates in the area where a person resides, but instead derives from more stable cultural determinants not directly related to crime (Kleck, 1996; Kleck and Kovandzic, 2007). If higher crime rates do not increase the likelihood that people support more gun laws, there is little reason to expect that higher crime rates, in the past or the present, would increase the level of gun control strictness. Further, leaving aside some short-term instability, levels of public support for gun control have remained remarkably stable over the past half century, despite huge variation in violent crime rates (Wright et al. 1983; Kleck 1997). In sum, there is no sound *a priori* basis for regarding gun control laws as endogenous or influenced by violent crime rates.

## RESULTS

### Effects of Gun Ownership on Crime

Estimates of the impact of gun ownership levels (as proxied by PSG) on crime can be found in Table 2, in the first row of each column referring to a crime. For example, the coefficient on PSG in the total homicide equation using instrumental variables methods is -0.57 and it is not statistically

---

addition, they all imply the same bias in the estimate of gun levels.

significant at the 5% level.  The basic finding in Table 2 is that when gun levels are treated as endogenous and instrumented with VIETNAM and PCTREP92, gun levels show no net significant positive effect on violence rates. As discussed in Appendix A, our instrumental variables strategy probably overstates the violence-elevating effects of gun levels on violent crime.  Yet, it still produces estimates suggesting net negative (albeit not significant) or null effects.  Thus, our findings of a null or negative impact of guns on homicide are strengthened because the potential bias in estimation is likely to be positive.  The implication is that our coefficient estimate is an upper bound.

(Table 2 about here)

One problem with using city-level data is that cities in the same state may share unobservable characteristics that could lead to intra-state correlation of error terms.  In such a situation, standard errors are underestimated, leading to inflated t-ratios on PSG and the gun law variables.  Therefore, we re-estimated the regressions in Table 3 using robust standard errors corrected for clustering by state (which allow for arbitrary within-state correlation), and the *t*-ratios for PSG and the gun law variables became much smaller.

Similar results were also obtained when we re-estimated regressions analogous to those in Table 2 using the two-step efficient generalized method of moments (GMM) estimator instead of the IV estimator.  The benefit of the GMM estimator relative to the traditional IV estimator is that it produces parameter estimates that are both consistent and efficient in the presence of heteroscedasticity of unknown form, while the IV estimator is consistent but inefficient (Woolridge, 2000). The coefficients obtained for PSG using the GMM estimator were as follows (t-ratios in parentheses): -.56 (1.16) for total homicide, .42 (0.79) for gun homicide, -.14 (0.33) for nongun homicide, -.91 (-1.68) for robbery, and .54 (1.09) for assault.  Thus, the results once again indicate no significant positive effect of gun ownership on crime.

To summarize, we have strong evidence that gun levels are not positively associated with

crime.  One implication of these findings is that general gun ownership could not mediate the effect of

gun control laws on crime.  Consequently, if gun laws were ever passed that were intended to reduce

violent crime by reducing  general gun ownership levels, they would fail because even if they did

reduce general gun levels, this would not lead to a reduction in violent crime.

### Effects of Gun Control Laws on Gun Ownership Levels

Results of the first-stage estimation for PSG are presented in Column 2 of Table 2.  Seven of

the 19 gun laws showed an apparent negative effect on gun ownership levels, while four others showed

an apparent positive effect.  This mix of signs on the coefficients suggest the operation of random

chance in generating the estimates, in the absence of any compelling reasons to expect some gun laws

to increase gun ownership and others to reduce it.  Significant negative estimates should in any case be

viewed with caution, since they may reflect negative effects of gun levels on the passage of gun

control laws - larger numbers of gun-owning voters discourage legislators from supporting new gun

controls.

### Effects of Gun Control Laws on Violence Rates

As seen in Table 2, most gun control measures appear to have no significant negative direct

effect on total violence rates (i.e. total homicide, total robbery, total aggravated assault), and if the

results are taken at face value, some laws appear to increase violence rates.  Of the 57 possible effects

examined (19 laws, paired with each of three violent crime types), results for two effects were strongly

supportive of gun control effectiveness, while five others were at least weakly supportive.  There were

20 gun law coefficients significant at the .05 level (counting total homicide results, but not those for

gun homicide and nongun homicide), which is scarcely surprising for city-level associations based on

a sample exceeding a thousand.  The eight negative coefficients, however, were outnumbered by

twelve positive ones. There is no clear pattern of these "effects" by either type of gun control or type

of violent crime affected.   Thus, while it is possible that some gun laws really do increase violent

crime while others reduce it, some of these significant coefficients may reflect nothing more than random chance operating with a large number (57) of hypothesis tests, each based on a large sample.

There was nevertheless solid support for two effects of gun control laws on violent crime. First, we found that state laws forbidding the purchase of guns by, or sale of guns to, alcoholics or persons under the influence (ALCBUY) reduced homicide.  This is a relatively strong finding because the law not only showed significant negative effects on total (gun plus nongun) homicide, but also showed a significant negative effect on gun homicide and a weaker effect on nongun homicide.

Second, the results provide relatively strong evidence that state or local laws requiring a license to possess a gun in the home reduce homicide (LICENSE).  This impact may reflect the consequences of more extensive state-level background checks conducted in connection with licensing.  Like the results for laws restricting gun sales to alcoholics, these results showed a strongly supportive pattern of results by gun involvement – a significant negative effect on gun homicide, combined with no significant effect on nongun homicide.

Only weaker evidence is available for gun law effects on robbery and assault, since flaws in available data made it impossible to reliably compare gun law effects on gun violence with their effects on nongun violence (e.g., gun robbery vs. nongun robbery).  These weaker findings suggest that robbery may be reduced via state bans on purchases of guns by convicted criminals (CRIMBUY), bans on gun purchases by alcoholics (ALCBUY), and requiring a license to possess a gun (LICENSE). Confidence is increased in the results concerning the latter two laws because our evidence indicated these laws also may reduce gun ownership (some portion of which is ownership by criminals) and appear to reduce homicide, suggesting some capacity to deny guns to criminals.  On the other hand, the finding regarding bans on sales to criminals is weaker - although supported by the finding that such laws reduce gun ownership, it was not supported by any finding suggesting they affect homicide.

Two types of gun control laws appear to reduce aggravated assault, though again the findings

should be viewed as tentative, for the same reasons stated with connection with findings bearing on

robbery.   First, state or local bans on the purchase of guns by criminals (CRIMBUY) may reduce

aggravated assaults.  Second, the results suggest that bans on possession of guns by mentally ill

persons may reduce aggravated assault.  This latter interpretation, however, is unlikely in light of the

finding of a significant <u>positive</u> association between bans on <u>purchase</u> of guns by mentally ill persons

and aggravated assault.

## Using a More Limited Set of Gun Laws

Because we could not know in advance which of the 19 gun law measures affected violent

crime, we initially specified all 19 gun control variables to be included in each violent crime equation.

 As discussed above, close examination of collinearity diagnostics did not reveal a harmful degree of

collinearity among the gun law variables.  Nevertheless, there is <u>some</u> collinearity among the gun law

variables that could inflate standard errors somewhat and thereby bias hypothesis tests in favor of the

null hypothesis. Therefore, each violent crime equation was re-estimated with just nine stronger gun

laws thought to be especially likely to show effects - bans on the possession of guns by criminals and

minors (CRIMPOS, MINORPOS) and bans on sale/transfer of guns to criminals and minors

(CRIMBUY, MINORBUY), laws requiring a permit and/or license to purchase a gun (BYPERMIT,

BYAPLIC), laws requiring a license to possess a gun in a home (LICENSE), laws controlling the

concealed carrying of loaded handguns in public places (CARYHIDN), and bans on the sale of

"Saturday Night Specials" (SNSBAN).  We obtained results virtually identical to those obtained using

the full set of 19 gun law variables except that the coefficient for CRIMBUY was no longer significant

and negative in the assault equation.  Gun levels still showed no positive effect on violence rates

(estimates are available from the senior author).

## Using Lagged Violent Crime as a Proxy Variable for Omitted Historical Variables

As noted above, it is impossible to control for literally all potential time-invariant (or time-

varying) confounding factors, even though CX data are widely available from a variety of sources, especially for Census years.  Despite our best attempts to control for the most likely confounding factors, we cannot rule out the possibility that the gun law variables are correlated with one or more omitted variables.  One way to address potential endogeneity bias due to omitted historical variables in the context of CX data is to control for the value of the dependent variable from a previous time period. As Wooldridge (2000) notes "using a lagged dependent variable in a CX equation increases the data requirements, but it also provides a simple way to account for historical factors that cause current differences in the dependent variable that are difficult to account for in other ways" (p.289).  If, for example, cities with high historical violent crime rates were also more likely to have stricter gun laws we would fail to get an unbiased estimator of the causal effect of gun laws on violent crime rates. Consequently, we followed the recommendation of Wooldridge (2000) and reestimated the violence equations in Table 2, but also included the natural log of the violent crime rate for 1980 as an additional independent variable in an attempt to control for city unobservables that affect violent crime and may be correlated with the gun law variables.  By including the violent crime rate for 1980 in the violence equations we are examining whether cities with similar previous violent crime rates in 1980 and 1990 values for the socio-demographic control variables had lower violent crime rates in 1990 due to the presence of any of the 19 gun laws studied here.  To conserve space the results of these analyses are not shown, but are available upon request from the senior author.  Not surprisingly, the homicide, robbery, and assault rates for 1990 were strongly related to the past violent crime rate.  With respect to the gun law variables, the results were largely similar to those reported in Table 2.  The only exception occurred in the robbery equation where the coefficient for the gun law variable denoting the presence of a law banning the sale of handguns (HGBYBAN) was positive but no longer statistically significant.  Thus, there is little evidence that estimates for the gun law variables were biased upwards due to the omission of historical factors responsible for differences in violent crime rates across cities in 1990.

**OLS Estimates with Gun Ownership Treated as Exogenous**

Although prior research suggests OLS estimates of gun ownership on homicide rates are likely to be biased, the possibility that these biases are small or negligible cannot be ruled out.  If this were indeed the case, then gun ownership could be treated as an exogenous regressor, and estimation by OLS would be preferred to IV because it is the more efficient (lower variance) estimator. The standard approach to this question is to conduct a test of the endogeneity of gun ownership.  Such a test relies implicitly on a comparison of an estimation in which gun ownership is treated as exogenous and one in which it is treated as endogenous. For the test to have any meaning, it is therefore essential that the OLS estimation be contrasted with a well-specified IV estimation, i.e. one that uses instruments for gun ownership that are both relevant and valid.  Testing for the endogeneity of gun ownership by comparing OLS to a misspecified IV estimation cannot provide evidence that OLS is acceptable.  Having shown that our instruments satisfy the requirements of both validity and reliability, we turn to the issue of whether gun ownership (again as proxied by PSG) is endogenous.

We tested for the endogeneity of gun ownership using the $C$ test, which detects the impact of adding a restriction, in this case assuming that violence rates have zero immediate effect on gun ownership (thus treating gun levels as exogenous), has on parameter estimates (Baum et al., 2003). The impact should be small if both equations (with and without the restriction) are valid.  On the other hand, if there is a large change in the estimates of parameters, it suggests that the equation with the extra restriction (assuming gun ownership to be exogenous) is wrong.

The results of the $C$ test for the endogeneity of PSG are presented in the bottom half of Table 3. The C statistic suggests gun ownership may be endogenous in the total homicide and robbery equations, although it is only significant at the .10 level.  Additionally, the results indicate that, while gun ownership may also be endogenous to gun homicide and assault, the C statistic in these equations is not significant at conventional significance levels.  In light of the mixed C test results, we re-

estimated the violence rate equations presented in Table 3, but treated gun ownership as exogenous to rates of violence and estimated models with OLS.  These results are shown in Table 3.

(Table 3 about here)

The OLS estimates indicate that gun ownership has a positive association with total homicide that is barely significant at the 5% (one-tailed) level ($t=1.77$), but is still not significantly related to robbery or assault rates.  Thus, we have consistent findings regarding robbery and assault – gun ownership has no significant positive effect.  But we have mildly contradictory findings regarding the impact of gun ownership on the homicide rate.  The IV results, which are appropriate if homicide rates affect gun acquisition, indicate that gun ownership has no significant net effect on homicide rates, while the OLS results, which are appropriate if homicide rates have no effect on gun acquisition, indicate a marginally significant positive effect of gun ownership on homicide rates.

We doubt that gun ownership can be treated as exogenous, given the prior evidence of individual-level survey studies indicating that violent crime rates affect gun ownership. These studies are critical for breaking the deadlock concerning causal order because they are not subject to the same uncertainties concerning exogeneity and model identification that may afflict the numerous aggregate-level studies that have found an effect of violent crime rates on gun ownership. The survey studies relate the gun ownership of individual persons or households to the violent crime rates of the areas in which the individuals reside.  Because it is highly unlikely that the gun ownership of any one person or household could materially affect the violent crime rates of an entire city or county, it is reasonable to assume that the violent crime/gun ownership relationship in such studies is unidirectional.

These studies find that violent crime rates of surrounding areas increase, directly or indirectly, the likelihood that a person or household owns a gun (Lizotte et al. 1981, p. 501; Smith and Uchida, 1988; Kleck and Kovandzic, 2007).  Therefore, we think it is advisable, in macro-level studies, to treat gun ownership as endogenous, on the assumption that violent crime rates affect levels of gun

ownership, especially handgun ownership.  Thus, on the basis of prior information, the IV estimates of models assuming gun levels to be endogenous should be regarded as more reliable than the OLS estimates of models that assume violent crime rates have no effect on gun levels.

When gun levels were treated as exogenous (Table 3), nine effects of gun laws on violence rates substantially changed (i.e. coefficients changed from significant to nonsignificant, or the reverse). Five changes were in a direction favorable to the hypothesis that gun control reduces violent crime: the previously significant positive (counterproductive) effects of bans on gun possession among alcoholics (ALCPOS) became nonsignificant, while four previously nonsignificant negative effects became significant (BYAPLIC ---> HOMICIDE, BYAPLIC ---> ROBBERY, DRUGPOS--->ASSAULT, ALCBUY--->ASSAULT).  The remaining four changes were unfavorable to the gun control efficacy hypothesis: the previously significant negative effect of gun owner licensing became nonsignificant, while three previously nonsignificant positive (counterproductive) effects became significant.

For the rest of the potential effects, resolution of the exogeneity issue turned out not to materially affect the results of primary interest, the impact of gun laws on violence rates - the OLS results were qualitatively identical to those obtained using IV methods. On net, results were no more supportive of gun control than those obtained when gun ownership was treated as endogenous. Considering the OLS estimates as a whole, the ten significant negative associations were counterbalanced by 14 significant positive coefficients.  This pattern suggests, as did the IV results, that if one interprets these associations as causal effects, gun control laws are more likely to increase violent crime than to decrease it.  We also estimated models with gun ownership omitted altogether, and results for gun law variables were essentially identical to those produced when gun ownership was included, but as an exogenous variable.

Given the inevitable uncertainties of even the most careful nonexperimental research, it cannot be stated with certainty that gun ownership levels have no effect on violent crime rates.  If they do not,

gun ownership is not a confounder that needs to be controlled to isolate the effects of gun laws, but one of the most important underlying premises of gun control is undercut.  On the other hand, if the level of gun ownership does affect violence rates, then it is a confounder that must be controlled if estimates of gun control effects are to be given much credence.  Our results are therefore stronger than those of past research because we could rule out the possibility of a spurious negative association between gun laws and violent crime rates attributable to the negative association of gun control strictness with gun ownership levels.

**Discussion and Conclusions**

For the most part, the evidence fails to support the hypothesis that gun control laws reduce violent crime.  The absence of any apparent impact may be partly because most laws do not disarm significant numbers of violence-prone persons in the first place.    It is also possible that gun laws have both violence-reducing and violence-increasing effects, the latter due to disarming of prospective victims.  Opposite-sign effects may counterbalance each other, yielding no net effect.

There were nevertheless some findings that point to possible gun law effects on violent crime rates, both desirable and undesirable (summarized in Table 4).  Of 57 possible effects of a type of gun law on a type of violent crime, 20 were significantly different from zero – eight negative, twelve positive.  Some of these findings may be the product of chance, operating in combination with the very large number of tests for effects that were performed, but this would probably produce no more than around three coefficients significant at the five percent level (.05 x 57=3).  Taken at face value as causal effects, these findings indicate that gun control laws are at least as likely to increase violent crime as to decrease it, though on net gun control laws as a whole do not affect violent crime rates.

(Table 4 about here)

Along with the two strong findings (the effect of bans on purchase by alcoholics and gun license requirements on homicide rates) and five moderate-to-weak findings supportive of gun control

efficacy, Table 5 also shows twelve possible <u>positive</u> effects of gun laws on violent crime rates. Unlike our tests of violence-reducing effects of gun laws on homicide, no sharp tests of violence-increasing effects are possible because such effects could influence rates of either gun violence or nongun violence.  That is, reduction of gun levels among prospective victims could increase violent crime committed with guns and crime committed without guns.  Thus, findings pointing to violence-elevating effects are necessarily weaker than findings pointing to violence-reducing effects on homicide.  If interpreted as causal effects, the positive associations would indicate violence-increasing effects of gun control measures, perhaps due to potential victims (many within high-risk prohibited groups) being disarmed, making crime less risky for offenders.  Among the more intriguing apparent counterproductive effects was that of laws restricting the concealed carrying of guns on homicide.  To they extent that these laws reduce gun carrying by prospective victims more than by offenders, the laws could increase violent crime by reducing any deterrent effects generated by victim gun carrying. The strongest prior research on this question, however, indicates that replacing restrictive carry laws with more lenient "shall issue" licensing has no impact on violent crime rates (Kovandzic et al., 2005).  Further, laws reducing the carrying of guns outside the home should have their strongest influence on crimes typically committed in nonresidential locations, such as robberies, but our results indicated no effect on the robbery rate.

It is possible that still other laws, implemented since 1989 or not yet implemented, might have effects not produced by the older laws.  Perhaps gun control strictness has not yet reached some unknown threshold level, below which no measurable crime reductions can be achieved.  The laws enacted since 1989, however, are generally weaker than those passed earlier.  The single possible exception is the federal Brady Act, but preliminary evaluation indicates that this law, at least in the first few years after its passage, was ineffective (Ludwig and Cook, 2000).  In any case, this sort of speculation is nonfalsifiable, since one could continue to entertain it no matter how strict controls

became in the future, and no matter how negative the results of research continued to be.  It is also possible that some laws have effects, but they are too small to be statistically detectable using our models and data, despite a sample size exceeding a thousand.

The main policy implication of this research is that the past performance of existing gun laws does not justify much optimism that new gun laws will reduce violent crime.  Support for even the least promising strategy can be sustained by ultimately nonfalsifiable speculations about what might be achieved by the next, heretofore untried, variant of the strategy, but this is not a very practical way to set priorities for the allocation of limited resources for reducing social problems.  This does not imply that we should not explore new variants of gun control, but it does imply that such efforts have less *a priori* potential for measurable impact on crime rates than alternatives such as programs to reduce poverty or rehabilitate criminals (Walker, 2001).

REFERENCES

Baum, Christopher F., Mark E. Schaffer, and Steven Stillman.  2003. "Instrumental variables and

GMM: Estimation and testing." Stata Journal 3:1-31.

Belsley, David A., Edwin Kuh, and Roy E. Welsch. 1980.   Regression Diagnostics. New York:

John Wiley.

Block, Richard. 1977. Violent Crime. Lexington, Mass.: Lexington Books.

Bound, John, David A. Jaeger, and Regina M. Baker. 1995. "Problems with instrumental

variables estimation when the correlation between the instruments and the endogenous

explanatory variable is weak." Journal of the American Statistical Association 90:443-450.

Bordua, David J. 1986. "Firearms ownership and violent crime: a  comparison of Illinois  counties."

Pp. 156-88 in The Social Ecology of Crime,  edited by James M. Byrne and Robert J. Sampson.

N.Y.: Springer-Verlag.

Bordua, David J., Alan J. Lizotte, and Gary Kleck. 1979.  Patterns of Firearms Ownership,

Regulation, and Use in Illinois.  A report to the Illinois Law Enforcement Commission.

Springfield, IL: Illinois Law Enforcement Commission.

Campbell, D. T. & Stanley, J. 1963.  Experimental and quasi-experimental designs for research.

Boston: Houghton Mifflin Company.

Clotfelter, Charles T. 1981. "Crime, disorders, and the demand for handguns." Law & Policy

Quarterly 3:425-446.

Cook, Philip J.  1976.  "A Strategic Choice Analysis of Robbery."  Pp. 173-87 in Sample

Surveys of the Victims of Crime, edited by Wesley Skogan.  Cambridge: Ballinger.

_____. 1982. "The role of firearms in violent crime."   Pp.236-91 in Criminal Violence, edited

by Marvin E. Wolfgang and Neil Alan Weiner. Beverly Hills: Sage.

Cook, Philip J., and Jens Ludwig. 1997. Guns in America. Washington, D.C.: Police Foundation.

_____. 2000. <u>Gun Violence: The Real Costs</u>. N.Y.: Oxford.

_____. 2003. "Guns and burglary." Pp. 74-107 in <u>Evaluating Gun Policy</u>, edited by Jens Ludwig
and Philip J. Cook. Washington, D.C.: Brookings Institution.

_____. 2004. "The social costs of gun ownership." NBER Working Paper 10736.
http://www.nber.org/papers/w10736.

_____. 2006. "The social costs of gun ownership." *Journal of Public Economics* 90:379-391.

Dorfman, Lori, and Vincent Schiraldi. 2001. <u>Off Balance: Youth, Race & Crime in the News</u>.
Building Blocks for Youth website at www.buildingblocksforyouth.org.

Duggan, Mark. 2001. "More guns, more crime." <u>Journal of Political Economy</u> 109:1086-1114.

Etten, Tamryn. 2002. <u>Gun Control in Florida</u>. Unpublished doctoral dissertation draft, School
of Criminal Justice, Rutgers University.

Fox, James Alan. 2001. Uniform Crime Reports [United States]: Supplementary Homicide
Reports 1976-1999 [Computer file]. ICPSR version. Boston, MA: Northeastern
University, College of Criminal Justice [producer], 2001. Ann Arbor, MI: Inter-university
Consortium for Political and Social Research [distributor].

Friedman, Richard A. 2006. "Violence and mental illness – how strong is the link?" <u>New
England Journal of Medicine</u> 355(20):2064-2066.

Garofalo, James. 1981. "Crime and the mass media." <u>Journal of Research in Crime and Delinquency</u>
18:319-350.

Hansen, Lars P. 1982. "Large sample properties of generalized method of moments estimators."
<u>Econometrica</u> 50:1029-1054.

Killias, Martin, John van Kesteren, and Martin Rindlisbacher. 2001. "Guns, violent crime, and
suicide in 21 countries." <u>Canadian Journal of Criminology</u> 43:429-448.

Kleck, Gary. 1979. "Capital punishment, gun ownership, and homicide." <u>American Journal of Sociology</u> 84:882-910.

_____. 1984. "The relationship between gun ownership levels and rates of violence in the United States." Pp. 99-135 in Firearms and Violence: Issues of Public Policy, edited by Don B. Kates, Jr. Cambridge, Mass.: Ballinger.

_____. 1996. "Crime, culture conflict and the sources of support for gun control." <u>American Behavioral Scientist</u> 39(4):387-404.

_____. 1997. <u>Targeting Guns: Firearms and their Control</u>. N.Y.: Aldine.

_____. 2004. "Measures of gun ownership levels for macro-level crime and violence research." <u>Journal of Research in Crime and Delinquency</u> 41:1-34.

Kleck, Gary, and Tomislav Kovandzic. 2007. "Crime, collective security and gun ownership: a multi-level application of the General Social Surveys." Unpublished paper.

Kleck, Gary, and Karen McElrath. 1991. "The effects of weaponry on human violence." <u>Social Forces</u> 69:669-92.

Kleck, Gary, and E. Britt Patterson. 1993. "The impact of gun control and gun ownership levels on violence rates." <u>Journal of Quantitative Criminology</u> 9:249-288.

Kleck, Gary, and Tomislav V. Kovandzic. 2007 "Homicide, collective security, and handgun ownership." Paper in press.

Koper, Christopher S., and Jeffrey A. Roth. 2001. "The impact of the 1994 federal assault weapon ban on gun violence outcomes." <u>Journal of Quantitative Criminology</u> 17:33-74.

Kovandzic, Tomislav V., and Thomas B. Marvell. 2003. "Right-to-carry concealed handguns and violent crime." <u>Criminology and Public Policy</u> 2:363-396.

Kovandzic, Tomislav V., Thomas B. Marvell, and Lynne M.Vieraitis. 2005. "The impact of 'shall-issue' concealed handgun laws on violent crime rates." <u>Homicide Studies</u>

9(4):292-323.

Kovandzic, Tomislav, Lynne M. Vieraitis, and Mark R. Yeisley. 1998. "The structural covariates of
urban homicide." *Criminology* 36:569-600.

Lizotte, Alan J., and David J. Bordua.  1980. "Military socialization, childhood socialization, and
current situations: Veterans' firearms ownership."  Journal of Political and Military
Sociology 8(2):243-256.

Lizotte, Alan J., David J. Bordua, and Carolyn S. White. 1981. "Firearms ownership for sport and
protection: two not so divergent models. American Sociological Review 46:499-503.

Loftin, Colin, David McDowall, Brian Wiersema, and Talbert J. Cottey. 1991.  "Effects of
restrictive licensing of handguns on homicide and huicide in the District of Columbia."
New England Journal of Medicine 325:1615-21.

Lott, John R., Jr., and David B. M. Mustard. 1997. "Crime, deterrence and right-to-carry
concealed handguns." Journal  of Legal Studies 26:1-68.

Ludwig, Jens, and Philip Cook. 2000. "Homicide and suicide rates associated with
implementation of the Brady Handgun Violence Prevention Act."  Journal of the
American Medical  Association 284:585-591.

Maltz, Michael D., and Joseph Targonski. 2002. "A note on the use of county-level UCR data."
Journal of Quantitative Criminology 18:297-318.

Marsh, Harry L. 1989. "Newspaper crime coverage in the U.S.,1983-1988." Criminal Justice
Abstracts 21:506-514.

Martin, Robert A., Jr., and Richard L. Legault. 2005. "Systematic measurement error with state-level
crime data." Journal of Research in Crime and Delinquency 42(2):187-210.

McDowall, David. 1986. "Gun availability and robbery rates: a panel study of large U.S. cities,
1974-1978." Law & Policy   8:135-48.

Moody, Carlisle E., and Thomas B. Marvell. 2005. "Guns and crime." Southern Economic Journal 71:720-736.

_____. 2006. "Gun control, homicide, and collinearity." Unpublished manuscript.

Newton, George D., and Franklin Zimring. 1969. Firearms and Violence in American Life. A Staff Report to the National Commission on the Causes and Prevention of Violence. Washington, D.C.: U.S. Government Printing Office.

Pagan, A. R., and D. Hall. 1983. "Diagnostic tests as residual analysis." Econometric Reviews 29:229-256.

Rice, Douglas C., and David D. Hemley. 2002. "The market for new handguns." Journal of Law and Economics 45:251-265.

Rosenfeld, Richard, Eric Baumer, and Steven F. Messner. 2006. "Social trust, firearm prevalence, and homicide." Annals of Epidemiology, in press.

Sampson, Robert J. 1986. "Crime in cities." Pp. 271-311in Albert J. Reiss Jr. and Michael Tonry (eds.), Communities and Crime. Chicago: University of Chicago Press.

Sargan, D. 1958. "The estimation of econometric relationships using instrumental variables." Econometrica 26:393-415.

Schaffer, Mark E., Tomislav V. Kovandzic, and Gary Kleck. 2007. "Gun Prevalence, Homicide Rates and Causality: A GMM Approach to Endogeneity Bias." Unpublished paper.

Smith, Douglas A., and Craig D. Uchida. 1988. "The social organization of self-help." American Sociological Review   53:94-102.

Southwick, Lawrence, Jr. 1997. "Do guns cause crime?  Does crime cause guns?: a Granger test." Atlantic Economic Journal 25:256-273.

Staiger, Douglas and James H. Stock. 1997. "Instrumental variables regression with weak instruments." Econometrica 65:557-586.

Tark, Jongyeon, and Gary Kleck. 2004. "Resisting crime." <u>Criminology</u> 42(4):861-909.

U.S. Bureau of Alcohol, Tobacco and Firearms. 1989. <u>Firearms State Laws and Published</u>

> <u>Ordinances – 1989</u>.  Washington, D.C.: U.S. Government Printing Office.

U.S. Bureau of the Census. 1994. <u>1990 Census of the Population. Volume I: Characteristics of the</u>

> <u>Population</u>.  Washington, D.C.: U.S. Government Printing Office.

U.S. Bureau of Justice Statistics. 1996. <u>Survey of State Procedures Related to Firearm Sales</u>.

> Washington, D.C.: Office of Justice Programs, U.S. Department of Justice.

> _____. 2006a.  <u>Criminal Victimization in the United States - Statistical</u>

> <u>Tables</u>.  Tables available online at http://www.ojp.usdoj.gov/bjs/abstrat/cvusst.htm.

> _____. 2006b.  <u>Background Checks for Firearm Transfers, 2005</u>.

U.S. Federal Bureau of Investigation (FBI). 1990-1992. <u>Crime in the United States 1989 [1990,</u>

> <u>1991] – Uniform Crime Reports</u>  Washington, D.C.: U.S. Government Printing Office.

> _____. 2006.  <u>Crime in the United States 2005 – Uniform Crime Reports</u> at

> http://www.fbi.gov/ucr/05cius/.

U.S. National Center for Health Statistics. 1997.  Part III versions of Mortality Detail File tapes

> covering 1987 to 1993, which include county of death for all counties.

> Rockville, MD: National Center for Health Statistics.

Vieraitis, Lynne M. 2000. "Income inequality, poverty, and violent crime: a review of the

> empirical evidence." <u>Social Pathology</u> 6(1):24-45.

Walker, Samuel.  2001.  <u>Sense and Nonsense about Crime and Drugs: A Policy Guide</u>. Belmont,

> CA: Wadsworth.

Woolridge, Jeffrey M. 2000.  <u>Introductory Econometrics</u>.  South-Western College Publishing.

Wright, James D., Peter H. Rossi, and Kathleen Daly.  1983. <u>Under the Gun: Weapons, Crime</u>

> <u>and Violence</u>.  New York: Aldine.

Table 1.  Descriptive Statistics[a]

| | Mean | SD | Source[b] |
|---|---|---|---|
| **Crime Rates** (1989-1991 average, rates per 100,000 residents) | | | |
| CRMUR, Total homicides | 8.02 | 10.30 | A |
| CRGUNMR, Gun homicides | 4.80 | 7.64 | B |
| CRNGUNMR, Nongun homicides | 3.19 | 3.31 | B |
| CRROB, Total robberies | 242.85 | 282.17 | A |
| CRASLT, Total aggravated assaults | 454.61 | 405.73 | A |
| **Gun Ownership Proxy** | | | |
| PSG, % of suicides with guns, 1987-1993, county | 55.67 | 12.96 | C |
| **Excluded Instrumental Variables (Used to Instrument for Gun Ownership)** | | | |
| PCTREP92, % vote cast for Republican presidential candidate, 1992, County | 36.87 | 7.87 | D |
| VIETNAM, Vietnam veterans per 100,000 population, county | 3343.2 | 889.91 | D |
| **Gun Law Variables** | | | |
| *Bans on Possession of guns* | | | |
| CRIMPOS, Prohibit possession, criminals | 0.80 | 0.40 | E |
| MINORPOS, Prohibit possession, minors | 0.50 | 0.50 | E |
| DRUGPOS, Prohibit possession, drug addicts | 0.66 | 0.47 | E |
| ALCPOS, Prohibit possession, alcoholics | 0.51 | 0.50 | E |
| MENTPOS, Prohibit possession, mentally ill | 0.63 | 0.48 | E |
| *Restrictions on transfer of guns* | | | |
| CRIMBUY, Ban on gun purchase by criminals | 0.78 | 0.42 | E |
| MINORBUY,  Ban on gun purchase by minors | 0.95 | 0.22 | E |
| DRUGBUY, Ban on gun purchase by drug addicts | 0.74 | 0.44 | E |
| ALCBUY, Ban on gun purchase by alcoholics | 0.61 | 0.48 | E |
| MENTBUY, Ban on gun purchase by mentally ill | 0.71 | 0.46 | E |
| BYPERMIT, Permit required to purchase gun | 0.19 | 0.39 | E |
| BYAPLIC, Application required to purchase gun | 0.42 | 0.49 | E |
| WAITPERH, Waiting period to receive handgun | 0.50 | 0.50 | E |
| REGISTER, Transfer/sale of guns must be registered with a governmental agency | 0.43 | 0.50 | E |
| CARYHIDN, Concealed carrying of loaded handgun prohibited or permit hard to get | 0.82 | 0.39 | F |
| *Restrictions on ownership/home poss.* | | | |
| LICENSE, License required to possess gun in home | 0.13 | 0.34 | E |
| *Restrictions on special gun types* | | | |
| HGBYBAN, Handgun sales ban | 0.00 | 0.06 | E |
| SNSBAN, Ban on sale of cheap handguns | 0.12 | 0.32 | E |
| *Regulation of dealing in Firearms* | | | E |
| DEALER, State or city license required for gun dealers | 0.53 | 0.50 | E |
| **Control Variables** | | | |
| PCTBLACK, % resident pop. Black | 11.66 | 15.60 | D |
| LIVLONE, % persons living alone | 25.92 | 6.77 | D |
| PCTHISP, % resident pop. Hispanic origin | 10.59 | 15.55 | D |

| | | | |
|---|---|---|---|
| DENSITY, persons per square mile | 3783.2 | 3440.8 | D |
| PCTDIV, % resident population 15 and older divorced | 9.23 | 2.27 | D |
| PCT18T24, % resident pop. age 18 to 24 | 12.32 | 6.60 | D |
| PCT25T34, % resident pop. age 25 to 34 | 18.12 | 2.91 | D |
| PCTPOOR, % resident population < poverty | | | D |
| line, 1989 | 13.21 | 8.14 | |
| OWNEROCC, % housing units owner-occupied | 58.23 | 12.79 | D |
| PCTVACAT, % housing units vacant | 7.16 | 3.99 | D |
| PCTHIGH, % persons 25 and up with H.S. degree | 77.54 | 10.65 | D |

a. Unless otherwise noted, each variable refers to a city, as of 1990.  In variable descriptions, "county" indicates variable refers to county in which city is located.

b. A = U.S. Federal Bureau of Investigation (1990-1992); B = Fox (2001); C = U.S. NCHS (1997); D = U.S. Bureau of the Census (1994); E= U.S. Bureau of Alcohol, Tobacco, and Firearms (1989); F = Thomas Marvell, personal communication (2001).

Table 2.  The Estimated Impact of Gun Availability and Gun Laws on City-Level Violence Rates: Instrumental Variables Estimates, Gun Ownership Treated as Endogenous

|  | First-Stage Regression | IV Estimation: Dependent Variables: Natural Log of the Violent Crime Rate per 100,000 Persons | | | | |
|---|---|---|---|---|---|---|
|  | Gun Ownership | Total Homicide | Gun Homicide | Nongun Homicide | Total Robbery | Total Assault |
| PSG | - | -0.57 | -0.39 | -0.14 | -0.92 | 0.55 |
|  |  | (1.17) | (0.72) | (0.35) | (1.69) | (1.10) |
| CRIMINAL | 0.02 | -0.05 | -0.06 | -0.04 | 0.09 | 0.10 |
|  | (1.25) | (0.64) | (0.76) | (0.66) | (1.29) | (1.27) |
| CRIMBUY | -0.08 | -0.03 | -0.15 | 0.10 | -0.32 | -0.30 |
|  | (3.22)** | (0.31) | (1.25) | (1.08) | (2.83)** | (2.54)* |
| MINORPOS | -0.08 | -0.06 | -0.11 | 0.04 | -0.04 | 0.01 |
|  | (4.20)** | (0.73) | (1.25) | (0.60) | (0.46) | (0.06) |
| MINORBUY | 0.02 | 0.13 | 0.09 | 0.15 | 0.30 | -0.09 |
|  | (0.66) | (1.25) | (0.78) | (1.58) | (2.61)** | (0.77) |
| DRUGPOS | -0.19 | -0.14 | -0.11 | 0.01 | -0.05 | -0.11 |
|  | (5.89)** | (1.00) | (0.70) | (0.08) | (0.29) | (0.79) |
| DRUGBUY | 0.27 | 0.59 | 0.54 | 0.29 | 0.53 | 0.13 |
|  | (9.26)** | (3.45)** | (3.00)** | (2.02)* | (2.92)** | (0.73) |
| ALCPOS | 0.17 | 0.26 | 0.26 | 0.03 | 0.16 | 0.46 |
|  | (5.41)** | (2.00)* | (1.86) | (0.27) | (1.10) | (3.46)** |
| ALCBUY | -0.27 | -0.61 | -0.57 | -0.30 | -0.56 | -0.19 |
|  | (10.11)** | (3.63)** | (3.11)** | (2.13)* | (3.13)** | (1.13) |
| MENTALPOS | -0.02 | -0.05 | -0.06 | -0.02 | -0.00 | -0.19 |
|  | (1.26) | (0.57) | (0.67) | (0.34) | (0.03) | (2.22)* |
| MENTBUY | 0.02 | -0.20 | -0.11 | -0.16 | 0.12 | 0.20 |
|  | (0.84) | (2.04)* | (1.05) | (1.90) | (1.11) | (2.00)* |
| BYPERMIT | -0.14 | -0.15 | -0.12 | -0.05 | -0.19 | 0.32 |
|  | (5.86)** | (1.29) | (0.95) | (0.53) | (1.50) | (2.48)* |
| BYAPLIC | 0.10 | -0.13 | -0.02 | -0.24 | -0.13 | 0.15 |
|  | (3.51)** | (1.17) | (0.20) | (2.42)* | (1.04) | (1.21) |
| REGISTER | 0.05 | 0.15 | 0.12 | 0.08 | 0.26 | 0.06 |
|  | (1.96) | (1.74) | (1.38) | (1.11) | (3.10)** | (0.70) |
| WAITPERH | -0.05 | 0.05 | 0.07 | 0.02 | -0.16 | 0.13 |
|  | (1.59) | (0.46) | (0.63) | (0.21) | (1.23) | (1.09) |
| CARYHIDN | 0.08 | 0.25 | 0.23 | 0.12 | -0.02 | 0.03 |
|  | (4.64)** | (2.91)** | (2.50)* | (1.66) | (0.28) | (0.38) |
| LICENSE | -0.18 | -0.31 | -0.34 | -0.11 | -0.52 | 0.11 |
|  | (7.45)** | (2.25)* | (2.32)* | (0.96) | (3.37)** | (0.78) |
| HGBYBAN | 0.13 | 0.52 | 0.69 | 0.19 | 0.54 | 0.30 |
|  | (1.59) | (1.40) | (1.43) | (0.92) | (3.69)** | (1.64) |
| SNSBAN | -0.07 | 0.03 | 0.02 | 0.12 | 0.01 | 0.01 |
|  | (2.21)* | (0.31) | (0.15) | (1.32) | (0.08) | (0.05) |
| DEALER | -0.04 | 0.24 | 0.16 | 0.24 | 0.24 | 0.04 |
|  | (1.78) | (3.15)** | (2.19)* | (3.64) ** | (3.22)** | (0.55) |

| | | | | | | |
|---|---|---|---|---|---|---|
| PCTBLACK | -0.00 | 0.25 | 0.27 | 0.16 | 0.38 | 0.20 |
| | (0.92) | (14.89)** | (14.31)** | (10.51)** | (21.27)** | (9.55)** |
| PCTHISP | -0.03 | 0.00 | 0.02 | 0.02 | 0.11 | 0.13 |
| | (6.46)** | (0.13) | (0.59) | (0.66) | (3.72)** | (4.13)** |
| PCT18T24 | 0.02 | -0.22 | -0.12 | -0.32 | -0.16 | -0.26 |
| | (0.95) | (2.19)* | (1.16) | (3.41)** | (1.42) | (2.52)* |
| PCT25T34 | -0.11 | -0.13 | -0.21 | -0.02 | -0.34 | 0.14 |
| | (2.98)** | (0.73) | (1.18) | (0.13) | (1.91) | (0.82) |
| PCTPOOR | 0.13 | 0.35 | 0.27 | 0.30 | 0.20 | 0.38 |
| | (8.44)** | (3.79)** | (2.71)** | (3.73)** | (1.97)* | (4.10)** |
| OWNER | 0.10 | 0.00 | 0.05 | -0.23 | 0.05 | 0.03 |
| | (2.47)* | (0.01) | (0.26) | (1.53) | (0.26) | (0.21) |
| PCTVACAT | 0.02 | 0.22 | 0.11 | 0.15 | 0.02 | 0.21 |
| | (1.73) | (3.43)** | (1.63) | (2.67)** | (0.27) | (3.01)** |
| LIVLONE | -0.16 | -0.31 | -0.39 | -0.06 | 0.04 | -0.04 |
| | (5.70)** | (2.01)* | (2.35)* | (0.41) | (0.26) | (0.31) |
| PCTHIGH | 0.03 | -1.39 | -1.31 | -0.66 | -1.45 | -0.84 |
| | (0.64) | (6.83)** | (6.09)** | (3.21)** | (6.42)** | (3.75)** |
| DENSITY | -0.05 | 0.04 | 0.05 | -0.00 | 0.28 | 0.07 |
| | (5.89)** | (0.77) | (0.98) | (0.03) | (4.40)** | (1.31) |
| PCTDIV | 0.13 | 0.49 | 0.47 | 0.25 | 0.73 | 0.15 |
| | (4.45)** | (3.05)** | (2.92)** | (1.85) | (4.31)** | (1.04) |
| *First-stage regression* | | | | | | |
| F statistic | 39.76** | | | | | |
| VIETNAM | 0.18 | | | | | |
| | (7.62)** | | | | | |
| PCTREP92 | 0.07 | | | | | |
| | (3.02)** | | | | | |
| *Overidentification test* | | | | | | |
| J statistic | - | $\chi^2(1)=0.02$ | $\chi^2(1)=0.16$ | $\chi^2(1)=1.47$ | $\chi^2(1)=0.32$ | $\chi^2(1)=0.16$ |
| p value | | 0.88 | 0.69 | 0.22 | 0.57 | 0.69 |
| $R^2$ | 0.709 | 0.605 | 0.840 | 0.852 | 0.705 | 0.550 |
| N | 1,078 | 1,078 | 1,078 | 1,078 | 1,078 | 1,078 |

Notes:  Standard errors are computed using Huber-White robust estimate of variance.  Robust *t* statistics in parentheses. Excluded instruments are VIETNAM and PCTREP92.
* significant at 5%; ** significant at 1%

Table 3.  The Estimated Impact of Gun Levels and Gun Laws on City-Level Violence Rates: Ordinary Least Squares Estimates, Gun Ownership Treated as Exogenous

| | OLS Estimation: | | | | |
| | Dependent Variables: Natural Log of the Violent Crime Rate per 100,000 Persons | | | | |
| | Total Homicide | Gun Homicide | Nongun Homicide | Total Robbery | Total Assault |
| PSG | 0.23 | 0.39 | -0.00 | -0.06 | -0.17 |
| | (1.77) | (2.98)** | (0.00) | (0.41) | (1.15) |
| CRIMINAL | -0.06 | -0.07 | -0.04 | 0.08 | 0.12 |
| | (0.83) | (0.95) | (0.70) | (1.12) | (1.39) |
| CRIMBUY | 0.03 | -0.09 | 0.11 | -0.26 | -0.35 |
| | (0.29) | (0.82) | (1.30) | (2.52)* | (3.13)** |
| MINORPOS | -0.00 | -0.05 | 0.05 | 0.02 | -0.05 |
| | (0.06) | (0.70) | (0.86) | (0.31) | (0.60) |
| MINORBUY | 0.12 | 0.08 | 0.15 | 0.28 | -0.07 |
| | (1.14) | (0.67) | (1.56) | (2.43)* | (0.67) |
| DRUGPOS | 0.00 | 0.04 | 0.04 | 0.11 | -0.24 |
| | (0.04) | (0.33) | (0.35) | (0.94) | (2.22)* |
| DRUGBUY | 0.38 | 0.34 | 0.25 | 0.31 | 0.31 |
| | (3.50)** | (3.02)** | (2.55)* | (2.64)** | (2.71)** |
| ALCPOS | 0.14 | 0.14 | 0.01 | 0.02 | 0.57 |
| | (1.36) | (1.28) | (0.08) | (0.22) | (5.43)** |
| ALCBUY | -0.39 | -0.35 | -0.26 | -0.32 | -0.38 |
| | (4.00)** | (3.36)** | (2.94)** | (3.07)** | (3.75)** |
| MENTALPOS | -0.02 | -0.03 | -0.02 | 0.03 | -0.22 |
| | (0.20) | (0.33) | (0.26) | (0.40) | (2.60)** |
| MENTBUY | -0.23 | -0.14 | -0.16 | 0.09 | 0.23 |
| | (2.40)* | (1.35) | (1.99)* | (0.83) | (2.35)* |
| BYPERMIT | -0.03 | 0.00 | -0.03 | -0.05 | 0.21 |
| | (0.29) | (0.03) | (0.38) | (0.58) | (2.14)* |
| BYAPLIC | -0.20 | -0.10 | -0.25 | -0.21 | 0.21 |
| | (1.96)* | (0.95) | (2.66)** | (1.86) | (2.02)* |
| REGISTER | 0.12 | 0.10 | 0.07 | 0.23 | 0.08 |
| | (1.50) | (1.17) | (1.07) | (3.00)** | (1.00) |
| WAITPERH | 0.10 | 0.12 | 0.03 | -0.11 | 0.09 |
| | (0.89) | (1.07) | (0.30) | (0.89) | (0.81) |
| CARYHIDN | 0.18 | 0.17 | 0.11 | -0.09 | 0.09 |
| | (2.54)* | (2.12)* | (1.68) | (1.24) | (1.14) |
| LICENSE | -0.15 | -0.18 | -0.08 | -0.34 | -0.04 |
| | (1.54) | (1.83) | (0.99) | (3.34)** | (0.36) |
| HGBYBAN | 0.46 | 0.63 | 0.17 | 0.48 | 0.36 |
| | (1.36) | (1.42) | (0.91) | (3.10)** | (2.32)* |
| SNSBAN | 0.08 | 0.06 | 0.13 | 0.05 | -0.03 |
| | (0.69) | (0.55) | (1.41) | (0.50) | (0.27) |
| DEALER | 0.26 | 0.19 | 0.24 | 0.26 | 0.03 |
| | (3.45)** | (2.53)* | (3.68)** | (3.58)** | (0.33) |
| PCTBLACK | 0.25 | 0.27 | 0.16 | 0.39 | 0.20 |

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  | (15.66)** | (14.93)** | (10.60)** | (22.22)** | (9.44)** |
| PCTHISP | 0.04 | 0.05 | 0.02 | 0.15 | 0.10 |
|  | (1.67) | (2.07)* | (1.16) | (6.45)** | (4.18)** |
| PCT18T24 | -0.25 | -0.14 | -0.32 | -0.19 | -0.24 |
|  | (2.51)* | (1.43) | (3.49)** | (1.71) | (2.30)* |
| PCT25T34 | -0.05 | -0.13 | -0.01 | -0.25 | 0.07 |
|  | (0.30) | (0.79) | (0.04) | (1.49) | (0.43) |
| PCTPOOR | 0.25 | 0.17 | 0.28 | 0.09 | 0.48 |
|  | (3.71)** | (2.44)* | (4.52)** | (1.23) | (7.01)** |
| OWNER | -0.08 | -0.03 | -0.25 | -0.04 | 0.10 |
|  | (0.47) | (0.17) | (1.65) | (0.21) | (0.63) |
| PCTVACAT | 0.19 | 0.08 | 0.15 | -0.02 | 0.24 |
|  | (3.12)** | (1.28) | (2.67)** | (0.26) | (3.41)** |
| LIVLONE | -0.15 | -0.23 | -0.03 | 0.21 | -0.19 |
|  | (1.25) | (1.83) | (0.25) | (1.73) | (1.65) |
| PCTHIGH | -1.44 | -1.36 | -0.67 | -1.51 | -0.79 |
|  | (7.31)** | (6.61)** | (3.27)** | (6.87)** | (3.68)** |
| DENSITY | 0.09 | 0.10 | 0.01 | 0.34 | 0.02 |
|  | (2.23)* | (2.47)* | (0.24) | (7.08)** | (0.56) |
| PCTDIV | 0.36 | 0.34 | 0.23 | 0.59 | 0.27 |
|  | (2.56)* | (2.48)* | (1.91) | (3.98)** | (2.08)* |
| *Endogeneity test* |  |  |  |  |  |
| C statistic | 2.86 | 2.58 | 0.09 | 2.82 | 2.29 |
| p-value | 0.09 | 0.11 | 0.76 | 0.09 | 0.13 |
| $R^2$ | 0.619 | 0.555 | 0.497 | 0.716 | 0.562 |
| N | 1,078 | 1,078 | 1,078 | 1,078 | 1,078 |

Notes:  Standard errors are computed using Huber-White robust estimate of variance.  Robust t statistics in parentheses.
* significant at 5%; ** significant at 1%

Table 4.  Summary of Effects of Gun Control Laws on Crime Rates

| Type of Gun Control Law | Types of Violent Crime Affected |
|---|---|
| **Violence-Reducing Effects** | |
| *Strongly Supported* | |
| Ban on gun purchase by alcoholics | Homicide |
| License required to possess gun in home | Homicide |
| | |
| *Moderately Supported* | |
| Ban on gun purchase by alcoholics | Robbery |
| License required to possess gun in home | Robbery |
| | |
| *Weakly Supported* | |
| Ban on gun purchase by criminals | Robbery, Assault |
| Prohibit possession, mentally ill | Assault |
| | |
| **Violence-Increasing Effects** | |
| *(All Weakly Supported)* | |
| Ban on gun purchase by minors | Robbery |
| Ban on gun purchase by drug addicts | Homicide, robbery |
| Prohibit possession, alcoholics | Homicide, assault |
| Ban on gun purchase by mentally ill | Assault |
| Permit required to purchase gun | Assault |
| Transfer/sale of guns must be registered with a governmental agency | Robbery |
| Concealed carrying of loaded handgun prohibited or permit hard to get | Homicide |
| Handgun sales ban | Robbery |
| State or city license required for gun dealers | Homicide, robbery |

**Appendix A: The Likely Direction of Error in the Estimates of Gun Levels**

Cook and Ludwig (2003, Appendix B) and Schaffer, Kovandzic, and Kleck (2007) show that one can use priors about the possible failure of instrument exogeneity in making inferences about the effect of gun ownership on violence rates.  In the case of a single instrument $Z$, the asymptotic bias in the IV estimator of $\hat{b}_1$ is $\text{cov}(Z_i, e_i)/\text{cov}(Z_i, p_i)$ (Wooldridge, 2000, p. 465).  If $Z$ is an exogenous instrument, the numerator, and thus the asymptotic bias, are zero. If $Z$ is not exogenous, but we have priors about its likely correlation with the error, then we can sign the bias.  For the instruments used in this study, $\text{cov}(Z_i, p_i)>0$, and so the sign of the bias will be given by $\text{sign}\{\text{cov}(Z_i, e_i)\}$. Evidence, for example, that the instrument will be either uncorrelated or positively correlated with the error means that the IV estimator using the instrument can be interpreted as providing an upper bound on gun ownership.  In effect, we can make use of inequality moment conditions to improve our inferences about gun ownership.  Note that a J test of instrument exogeneity could indicate that one or more instruments are not exogenous, but we may still be able to make inferences about gun ownership if our priors allow us to sign the bias.

We are able, to some extent, to establish priors about the sign of the correlation of our two instruments with the error term in the violence equations.  If reverse causality is operating with respect to PCTREP92, it could be because high crime rates may make residents more likely to vote for "law and order", i.e., Republican.  This would generate an upward bias and make the estimate of PSG an upper bound. There *is*, however, a modest literature indicating that military veterans are not only more likely to own guns in civilian life, but also are more likely to be violent after leaving the military (Kleck and Hogan, 1999, p. 285).  Thus, this instrument might well be positively correlated with the "violence proneness" of the population, an unobservable with an obvious link to violence rates.  Here we have some evidence for an inequality moment condition; if VIETNAM is

used as an instrument, it is likely to generate estimates of gun ownership that are either unbiased or that provide an upper bound on the impact of gun ownership.

The credibility of our instruments for gun ownership is also enhanced by the fact that they come from different sources and are each capturing different aspects of a population's willingness to possess guns: political conservatism and prior experience with guns.  This strengthens the power of the J test to detect any failure of the assumption that one or more is exogenous.