# Exhibit 12



HOUSE OF COMMONS
CHAMBRE DES COMMUNES
CANADA

# Standing Committee on Public Safety and National Security

SECU   •   NUMBER 011   •   1st SESSION   •   41st PARLIAMENT

**EVIDENCE**

# Tuesday, November 15, 2011

———

## Chair

**Mr. Kevin Sorenson**

# Standing Committee on Public Safety and National Security

**Tuesday, November 15, 2011**

● (1100)

[*English*]

**The Chair (Mr. Kevin Sorenson (Crowfoot, CPC)):** Good morning, everyone.

We will call this meeting to order. This is meeting number 11 of the Standing Committee on Public Safety and National Security, Tuesday, November 15, 2011.

This morning we begin our consideration of Bill C-19, An Act to amend the Criminal Code and the Firearms Act. We will be hearing from the Hon. Vic Toews, Minister of Public Safety.

Before we proceed to the panel of witnesses in our second hour, I'll just remind our committee that we're going to pause for about five minutes to do some committee business and ratify our steering committee report. Then we will move to our first panel of witnesses on this very important study that we begin this morning.

Our committee welcomes the minister and thanks him for appearing this morning and for the many times he has appeared before our committee in the past. We certainly look forward to his presentation this morning.

Mr. Minister, we invite you to make your opening comments, and then we'll move into a number of rounds of questions.

**Hon. Vic Toews (Minister of Public Safety):** Thank you very much, Mr. Chair.

My comments this morning will be relatively brief, and if there are no questions after that I'll be out of here very quickly.

I want to thank all of the honourable committee members for the invitation to appear here before you today to help with your deliberations on Bill C-19, the Ending the Long-gun Registry Act. So if there are any committee members with some questions about where they stand on this bill, I'd be more than happy to answer those.

For too long, law-abiding farmers, duck hunters, and sports shooters have been criminalized by the wasteful and ineffective long-gun registry. Bill C-19 is fulfilling our government's long-standing commitment to scrap this failed boondoggle once and for all.

For many years it has been clear that the long-gun registry does not work, does nothing to prevent crime or protect front-line officers. We have, on record, testimony after testimony by police officers who have told us in no uncertain terms that they do not trust the accuracy of the registry, and they openly question its value as a tool to protect police officers responding to a house call. These witnesses have provided eye-opening accounts of how truly flawed the registry is. One officer went so far as to say that he wouldn't risk the lives of his own staff, based on the results of a registry search. That is very troubling, Mr. Chair.

Furthermore, we know that the long-gun registry has no ability to prevent crime, and there is no evidence that it has stopped a single crime or saved a single life. It does not prevent anyone from using a firearm for violence and it does not keep guns out of the hands of criminals. It is clear that on all fronts it is a failure.

Our government believes in measures that actually protect law-abiding Canadian families. As committee members are aware, we have taken decisive action to ensure that those who commit serious crimes face serious consequences. This includes putting in place tough punishment for gun-related crimes such as drive-by shootings and gang-related violence. It includes increasing the minimum penalties for specific offences involving firearms, including attempted murder, sexual assault, and kidnapping, among others.

We have also introduced legislation that requires people charged with serious firearms offences to show the court why they shouldn't be kept in jail while awaiting their trial. They will not benefit from a presumptive entitlement to bail.

We believe that these amendments are starting to have a positive impact on homicide rates in this nation. The fact remains, however, that even one murder a year is too many and we must continue to work hard to improve our laws and focus on the most effective measures to crack down on crime.

It's telling that in a place like Winnipeg, which has the highest per capita murder rate in Canada, the provincial NDP government does not support the long-gun registry and views it as a waste of time, a waste of resources. And it's clearly onboard with our government in respect to the amendments that we're bringing forward in Bill C-10, which police officers admit would do a much better job of focusing on criminals and preventing crime.

It is our belief that laws should protect and not burden law-abiding citizens. That is why, with Bill C-19, we are moving to scrap the failed long-gun registry once and for all.

First of all, Bill C-19 will eliminate the requirement for firearm owners to register their long guns—in other words, their rifles and shot guns.

The second part of Bill C-19 would see the destruction of all records related to the registration information on long guns in the Canadian Firearms Registry and under the control of the chief firearms officers. This item has been the subject of much discussion since we tabled this legislation, but we have plainly stated that we will not share the personal and private information of more than seven million Canadians who have registered their long guns.

These, in simple terms, are the proposed changes to the Firearms Act and the Criminal Code.

I'd like to take just a moment to mention what will not change under Bill C-19.

What will not change, Mr. Chair, is the current and strict licensing system that is in place for controlling firearms. Firearm owners will still require a valid licence to purchase or possess firearms and to purchase ammunition. They will still be required to undergo background checks, pass the Canadian firearms safety course, and comply with firearm safe storage and transportation requirements. We believe this to be a reasonable requirement for those who want to legally acquire and use firearms. Moreover, owners of restricted and prohibited firearms will still be required to register their firearms with the RCMP.

●(1105)

We believe that this is the most effective measure of control regarding restricted and prohibited firearms such as handguns. Handguns are the firearms of choice in homicide crimes in Canada. It's time to stop burdening legal long gun owners with red tape. When you step back and think about it, the long-gun registry isn't actually targeting criminals. Rather, it targets the law-abiding Canadians who own long guns and who have to jump through various bureaucratic hoops to register a rifle or shotgun for which they already have a legal licence. It's an unfair burden, and it does nothing to stop criminals from using illegal or smuggled handguns to commit violent crimes in our community.

In closing, I would urge all committee members to consider carefully the important amendments we are proposing to this bill. After a legacy of waste that has lasted almost 17 years, it is time to swiftly and decisively end the long-gun registry once and for all.

Thank you, and if there are questions, I will take them now.

**The Chair:** Thank you, Minister.

We'll move into the first round of questioning.

Ms. Hoeppner.

**Ms. Candice Hoeppner (Portage—Lisgar, CPC):** Thank you, Mr. Chair.

Minister Toews, I want to thank you personally for your persistent support for those like me in our caucus who stand against the long-gun registry.

Bill C-391 and C-19 are both straightforward bills that end the requirements for individuals and businesses to register non-restricted, non-prohibited firearms. I was concerned this morning when I read media reports of an analysis done by officials. A certain official thought that both C-391 and C-19 could have a number of unintended consequences, including the trafficking of firearms at the border.

I was concerned about this report. Is it accurate? Can you comment on this official's opinion?

**Hon. Vic Toews:** I had a chance to take a look at that article. I wasn't familiar with the memorandum, which an official in my department had prepared, I assume, for internal purposes. But now that I've seen it, it's clear that the analysis presented by this official is factually flawed; it's incorrect. I've asked my deputy minister to look into the matter.

Contrary to the suggestion made in the analysis, neither Bill C-19 nor Bill C-391 removes any controls on the importation of firearms. In fact, we have increased penalties for the illegal importation of firearms. Canadians gave our government a strong mandate to end this wasteful, ineffective long-gun registry once and for all. That's exactly what we're doing. We're not getting into the areas this memorandum suggested we might get into. I think the memorandum is phrased to suggest that if we did something else, the repercussions would be such and such. But we're not going down that road.

●(1110)

**Ms. Candice Hoeppner:** Just to be clear, C-19 doesn't change the way our border officials are able to monitor, track, or stop legal guns from coming into the country.

**Hon. Vic Toews:** No. The analysis of whether or not something is a prohibited or non-restricted firearm has nothing to do with the registry. That's an analysis that the officers make at the border and elsewhere throughout the country. Tying that to C-19 is a bit of a red herring. As I said, the analysis is quite flawed.

**Ms. Candice Hoeppner:** Thank you for clarifying that. I'm sure it will be clarified in future media reports as well.

**Hon. Vic Toews:** Don't bet on it.

**Ms. Candice Hoeppner:** I also want to ask you about something else that's been discussed a lot.

Bill C-391, my private member's bill, did not explicitly contain a provision for destroying all of the data. Whenever I was asked if we were going to destroy the data, my answer was that we were ending the long-gun registry, of course we were going to end the data.

You've been criticized, our government has been criticized, for explicitly saying that we will destroy the data contained in the long-gun registry. Can you explain how the long-gun registry is not just a concept or something that happens in the future? It actually is the data. Can you explain why we're destroying the data and how it represents the long-gun registry?

**Hon. Vic Toews:** I don't know how much clearer I can be. The suggestion—and I think it's an artificial distinction without a difference—that somehow the registry is separate from the data.... The registry is the data; without the data there is no registry. So when our government and our party made the very clear commitment that we would scrap the long-gun registry, that we would end it, implicit in that, indeed explicit, is that we would be destroying the information that's been collected under the authority of that legislation. There's simply no other answer to that.

It's disingenuous for someone to say to Canadians that when we were going to end the registry, we were actually going to keep the information. I think if any politician had made that claim on the campaign trail, they would have been thoroughly discredited. This is a revisionist type of excuse that some are making in order to try to justify flipping their position on the registry.

**Ms. Candice Hoeppner:** We've been told that the data is extremely flawed, and we're going to be hearing testimony later today from front-line officers who will tell us that they have great concerns about the data. Can you talk a little bit about your understanding of how accurate it is, in terms of how many long guns are actually in the country as opposed to how many are contained in the registry?

Can you talk a bit about the accuracy of the data as it is right now?

**Hon. Vic Toews:** I can only agree that the information is quite inaccurate. Indeed, the premise of the former government about the numbers of long guns in the country.... You'll notice that over the years it kept on reducing its numbers for how many long guns were actually in the country was increasing more and more. If you say at one point that there are 14 million long guns, and you have only one million registered, you obviously have a low compliance rate. But if you lower the number of long guns, which you saw the former government doing consistently— and I don't know what number they eventually ended up with—you could then show a much higher compliance rate. So it doesn't give you any indication of how many long guns there actually are in this country.

What we can say with accuracy is that when we license individuals, we know those individuals are licensed owners and that they are the ones who are qualified to own and use firearms. That is a much better system, a much better tool, and more accurate than the long-gun registry, which we know is not utilized by criminals. That being said, criminals don't license themselves either. However, I think that licensing is a much better screen of individuals who may, for various reasons, want a firearm, but perhaps because of a medical or other condition should not own a firearm. We can have that discussion in a very appropriate way in the licensing process.

The registry doesn't assist in that respect.

● (1115)

**The Chair:** Thank you very much, Mr. Minister.

We'll now move to the official opposition.

Mr. Harris, welcome.

**Mr. Jack Harris (St. John's East, NDP):** Thank you, Chair, and I want to thank the minister for coming to the meeting today.

Minister, we've heard from you and your government consistently over the past several years about your concern for victims and the importance of the position of victims in this country. Now, even allowing for a certain amount of hyperbole—you tell us that the opposition could care less about victims and they're really more interesting in helping criminals, etc.—this has been the general tone of some of your comments.

So I want to ask you why you don't listen to victims when it comes to the protection they're seeking, that they believe is received

by having strict control of and registration of non-prohibited and non-restricted weapons, such as the long guns you talk about, but also semi-automatics and other guns? I'm speaking here of Sue O'Sullivan, the Federal Ombudsman for Victims of Crime, who says the majority of victims' groups they have spoken with continue to support keeping the long-gun registry; the victims of the École Polytechnique in Montreal, including individual survivors and their families, who are strongly supportive of strong gun control, including the ability to track guns and the registration of guns; the Dawson College victims; and Priscilla de Villiers, a well-known gun violence activist whose daughter, Nina, was abducted and killed with an unrestricted, legally owned rifle in 1991, who is also very concerned about a gun control law, including registration and rigorous implementation, making it harder for dangerous people to get firearms and for firearms to fall into the wrong hands.

Recently, Elizabeth Pousoulidis, the president of the Association of Families of Persons Assassinated or Disappeared, who appeared before the Standing Committee on Justice and Human Rights last week in support of certain aspects of Bill C-10, is also adamantly in favour of the long-gun registry.

Why aren't you listening to those kinds of victims who say they are concerned and fearful of an unrestricted and unregulated system? Why aren't you adopting instead some of the approaches that were suggested by the NDP to achieve balance with the one-time, no-fee registration forever? It's not a massive red tape situation, as you've suggested. Why aren't you trying to achieve some balance in this to ensure the safety of Canadians as victims of gun violence, victims of domestic violence, and victims of others, with a registry that the chiefs of police, of course, have stated is a useful tool?

Why aren't you trying to fix it? Why aren't you trying to improve it? Why aren't you listening to victims?

**The Chair:** Thank you, Mr. Harris.

Mr. Minister.

**Hon. Vic Toews:** Let's first look at your preamble to the question and then the question itself. You'll notice, whether it's deliberate or not, a mixing of terms. You talk about gun control and the registry interchangeably. You talk about it being unrestricted. It depends on what type of question you ask of victims' groups.

If you were to ask victims' groups, do you believe in gun control, they obviously all believe in gun control. I believe in gun control. I believe in effective gun control, and I listen to the victims who have indicated to me the best way of achieving an appropriate gun control system. But you're confusing—again, deliberately or not—the registry and gun control.

For example, I see gun control as including the reverse onus on bail applications when individuals are caught with an illegal firearm in downtown Surrey or Vancouver. The onus then is shifted onto them to demonstrate why they should get bail, as opposed to the crown doing it. That's a much more effective version of gun control than the registry itself. The fact that individuals who now smuggle firearms into the country are met with a much more serious penal sanction is a much more effective gun control measure than a registry that, again, does nothing to prevent the illegal acquisition of firearms, including those smuggled into the country, as many of them are, especially the hand guns.

I've listened very carefully and closely. I've worked with provincial governments. Your colleagues in the NDP government in Manitoba have clearly indicated that this is not an effective gun control measure. They oppose the long-gun registry and have specifically instructed their conservation officers not to enforce the registry, and have specifically instructed the RCMP in those ridings in that province that these are not effective mechanisms for focusing on the crime situations they're facing.

● (1120)

**Mr. Jack Harris:** Mr. Toews, you're the Minister of Public Safety. We have the national police force, the RCMP, saying in a report last February that firearms registration is a critical component of the entire firearms program, and talking about it as an important tool for law enforcement.

In fact, as I'm sure you're aware, one particular aspect of firearms registration is the ability to trace firearms. In the unfortunate and tragic loss of four RCMP officers in Mayerthorpe, Alberta—which was devastating to them and to everybody aware of this—the guns that were used were basically traced through the firearms registry, leading to the capture and conviction of two individuals. The Canadian Association of Chiefs of Police have talked about the registry and the tracing element as an important investigative tool, a tool that they would use if someone, as you suggested, might be incapable of carrying a gun because of a mental disability or a court order prohibiting them from doing it. The police officials have the ability to find the guns, because they are required to be registered. They know what guns are available and can trace guns and do all of the other associated investigative work.

As Minister of Public Safety, why are you discounting that when it has in fact been used to prosecute people who've killed Mounties?

**The Chair:** We're already 20 seconds over the time on the NDP's question.

Make it a quick answer, please.

**Hon. Vic Toews:** Let me very quickly state and quote the Canadian Police Association, which said:

> We're quite satisfied with the efforts this government has made to work on behalf of front-line police officers, specifically with respect to the comprehensive justice legislation that has been a priority since the last election.

We're working on issues and on legislation that actually works, as opposed to that which does not.

**The Chair:** Thank you, Mr. Minister.

We'll move to the second questioner.

Mr. Rathgeber, please, for seven minutes.

**Mr. Brent Rathgeber (Edmonton—St. Albert, CPC):** Thank you, Mr. Chair.

Thank you, Minister, for your attendance here today and for your good work on this and other bills.

I always shake my head in disbelief when my friends on the opposite side of the table raise Mayerthorpe as somehow being an example of success with the long-gun registry. Although it is true that there was a weapon traced to the grandfather of an individual who was subsequently convicted of aiding and abetting four homicides, it was done through a very elaborate "Mr. Big" sting operation, which was the likely real cause of that conviction—and a debate for another day. But the reality is that the long-gun registry did nothing to save the lives of four brave mounted police on that March morning in Mayerthorpe, Alberta.

My friend, Mr. Harris, in his premise to his question also referred to your preference for a so-called unregulated system. There's much confusion, and I suspect it's deliberate, from the opponents of this legislation, the people who support the long-gun registry, on the whole issue between licensing and registration.

As you know, Mr. Minister, I come from Alberta. In western Canada support for the long-gun registry is perhaps the lowest you'll find anywhere in Canada. Even in my province, some media sources, some bloggers and others, have envisioned people walking down the streets of Edmonton with concealed weapons or rifles, shooting them up in the air in a sort of wild-west scenario. But I think you and I know that nothing could be further from the truth.

For the people who are watching at home, I was wondering if you could once again clarify the issues as between registration and licensing.

● (1125)

**Hon. Vic Toews:** Thank you.

I'm glad that you also caught that seemingly careless use of very important terms in the control of firearms. The licensing is one aspect; the gun registry is a different issue altogether.

Every individual, before they can acquire a firearm, whether it's restricted or non-restricted, must obtain a licence. You go through the testing process, and then there are other applications that you have to make, and your background is checked to ensure that we can, as much as humanly possible, weed out those who should not have firearms for one reason or another. I think those reasons are clear, and I don't need to go into them.

The gun registry has nothing to do with that. The gun registry is after the fact. It is about somebody who has a licence already and registers that firearm, or somebody who doesn't register the firearm at all and doesn't use the licensing provisions either. Most of the homicides are in that category, by individuals who are using handguns illegally and causing the concern that many citizens feel.

My wish is that we would have a clear discussion on the tremendous steps that we have taken as a government in terms of gun control and actually controlling guns from coming into the hands of criminals or of those who are otherwise unfit to own a firearm. It's disappointing that for political purposes, the distinction between the various components of gun control on the one hand and the registry on the other hand are blurred. That does nothing to forward a proper discussion about what the most effective mechanisms are for ensuring that gun crime is reduced.

**Mr. Brent Rathgeber:** For further clarification, Bill C-19 does nothing to affect the licensing provisions that are currently in place?

**Hon. Vic Toews:** No, it does nothing to affect the licensing provision.

As I look at this memo that was produced for a newspaper in the last day or so, perhaps in anticipation that I would be here at committee, even it is based on pretty inaccurate assumptions that somehow the jobs of CBSA officers at the border are going to be changed by Bill C-19. Their jobs remain exactly the same. If you came across the border and you had a firearm, you would have to have a licence for it, whether it was registered or not. The registry has no impact on that scenario.

Unfortunately, it's a misleading discussion paper, which I saw only this morning.

**Mr. Brent Rathgeber:** Mr. Harris also talked about the police association's support for the registry—or which we anticipate, based on the experience with Ms. Hoeppner's bill and other attempts to get rid of this boondoggle.

I'm always perplexed by the following. When we talk to front-line officers—and as you know, I sat on this committee when Bill C-391 was here just over a year ago—they tell us that they cannot rely on the registry. It doesn't matter what situation they go into, they always have to assume the worst; they have to assume that there are firearms in a residence or a vehicle, and they have to be prepared. If they're not prepared for the existence of firearms, they do so at their own peril.

Why do you think the police association takes a contrary view when front-line officers invariably tell us that they cannot and will not rely on the accuracy of the long-gun registry?

**Hon. Vic Toews:** Your experience is the same as mine.

I've never met a police officer who has seen registry data come up in his patrol car indicating that no firearm is associated with an individual in a stopped car, such that he would then approach the car as if there were no firearm in that car. It's simply foolish. No one would put their own life at risk by relying on the registry—or in fact put the life of their partner or a civilian at risk by doing that. It's simply foolish. In the same way, you don't go into a domestic disturbance and say, "Well, we're pretty safe here because there's no firearm licence or registry here". Whether there's a licence or a registry is quite irrelevant. You go into a home expecting a firearm. That's the prudent and the proper thing for any officer to do.

I have met with officers on a daily basis who have talked to me about the issue. One thing they point out to me is that long-gun registry has created a division between law officers on the one side and ordinary law-abiding Canadian citizens who may own firearms

on the other side. There's a mistrust of police officers because somehow people feel that the police are out to get their guns. It's really unfortunate because most of these people are exactly the kind of people who should be assisting the police in investigations of crime and yet now this long-gun registry has created a barrier between police and law-abiding citizens. That should never be the intent or result of the law.

● (1130)

**The Chair:** Thank you very much, minister.

We'll now move to Mr. Scarpaleggia.

Mr. Scarpaleggia, you have seven minutes, please.

**Mr. Francis Scarpaleggia (Lac-Saint-Louis, Lib.):** Thank you, Chair.

A few weeks ago, the RCMP recalled 50 long guns it had allowed into Canada as non-restricted weapons, only to change its mind after the fact, reclassify them as restricted, and then send letters to the 50 people who bought those guns that were later reclassified. Without the registry, how would the police know where to address those letters? Are you saying that from this point on it is absolutely impossible that the RCMP could make an error or decide after the fact to change the classification of a long gun—in other words, to second-guess its original decision? Are you saying that is impossible from now on?

**Hon. Vic Toews:** No.

**Mr. Francis Scarpaleggia:** So how would the RCMP contact people who bought guns into the country as non-restricted weapons but then became restricted because the RCMP realized the guns could be converted into more dangerous weapons and wanted those guns back? How could it do that without the addresses of the gun owners who are in the gun registry?

**Hon. Vic Toews:** They can still do that through the records of the shop that sold the firearms, the importer to whom that gun was sent. In the case you're mentioning, most of those guns would probably never even have been sold in that brief period of time.

Gun shops, in fact, keep records of their sales and those records can be accessed through a warrant or other appropriate provisions. You don't need the registry for that.

**Mr. Francis Scarpaleggia:** You're saying that the shop owners are now the ones keeping the gun registry?

**Hon. Vic Toews:** No. They keep records on their own. They do that for various purposes, including the Income Tax Act, but the access to that is through an appropriate legal search warrant.

**Mr. Francis Scarpaleggia:** After the Dawson shooting, the police seized a weapon from someone they thought could be a copycat killer and commit the same horrible crime. They seized the weapon, which means there was a possibility that the person could have killed someone with it. It's not a certainty, but a possibility.

How can you make the categorical statement, the sweeping statement, that the registry could not possibly have saved even one life over the course of 10 years, when the police went and got a gun from a possible copycat? How can you make such a sweeping statement? I know it's very hard to come up with anecdotal, 100% certain evidence that a life has been saved. I could say I'm not here today because of the 100-kilometre-an-hour speed limit. I could say there's no proof that the 100 kilometre-an-hour-speed limit has saved my life, but we know that in the aggregate, the speed limit does save lives.

How can you make such categorical sweeping statements?

● (1135)

**Hon. Vic Toews:** I'm not familiar with the case you mention. I don't see how the police were alerted through the registry that this individual would be a dangerous person. That doesn't even make any sense.

**Mr. Francis Scarpaleggia:** Let me ask you another question. How many firearms licences have been repealed in the last five or ten years? Is it thousands? Is it hundreds?

**Hon. Vic Toews:** I could get those figures for you through official —

**Mr. Francis Scarpaleggia:** You came to committee without those figures? That's a very important piece of information. The question becomes, if you're repealing licences—

**Hon. Vic Toews:** No. We're not repealing—

**Mr. Francis Scarpaleggia:** —it means that you think that person is dangerous with a gun.

**Hon. Vic Toews:** We're not repealing licences. I don't know why you get that idea. We're not repealing licences.

**Mr. Francis Scarpaleggia:** The government has never repealed a gun owner's licence?

**Hon. Vic Toews:** Nothing in this legislation affects the process of repealing licences.

**Mr. Francis Scarpaleggia:** But have you ever repealed a gun licence because you feel that someone is no longer fit to own a gun?

**Hon. Vic Toews:** I have never.

**Mr. Francis Scarpaleggia:** If your department has ever done that, wouldn't it want to get its hands on the guns owned by the person whose license was repealed? And how could it do that without the gun registry?

**Hon. Vic Toews:** They were doing that long before the gun registry.

**Mr. Francis Scarpaleggia:** It seems to me, Mr. Chair, that without a registry, we have no idea how many guns that person owns.

Even if you were doing it before, the registry gives you some added information about what you're looking for.

**Hon. Vic Toews:** How many guns are there in Canada, now that we have the registry? How many guns are there?

**Mr. Francis Scarpaleggia:** I'll be asking the questions, Minister.

**Hon. Vic Toews:** But that's—

**Mr. Francis Scarpaleggia:** I'd like to ask you how many gun licences have been revoked.

**Hon. Vic Toews:** But that's—

**The Chair:** Just let the minister finish.

**Hon. Vic Toews:** That's the problem: You have no idea. Your predecessor ministers in the Liberal Party kept on reducing the number of long guns in this country because they had no idea how many long guns there were, and so they reduced the number very deliberately to say, "Oh, we had a 30% compliance rate"—

**Mr. Francis Scarpaleggia:** But now you're saying that—

**Hon. Vic Toews:** —"and now a 40% compliance rate."

**Mr. Francis Scarpaleggia:** —that no information—

**Hon. Vic Toews:** That was playing games.

**Mr. Francis Scarpaleggia:** But now you're saying that no information—

**Hon. Vic Toews:** Wait, wait, wait. That was playing games.

**Mr. Francis Scarpaleggia:** You're saying that no information is better than imperfect information.

I think that describes the ideology of this government on many issues, Mr. Chair—

**The Chair:** Mr. Scarpaleggia, your time is almost up. You have a little time left; you have a choice of whether you want to use it or allow the minister—

**Mr. Francis Scarpaleggia:** Now, I would like to say that—

**The Chair:** —but we can't have two people speaking at the same time.

**Mr. Francis Scarpaleggia:** The minister must know that the demographics of gun ownership are changing. We all know that farmers need to have guns to run their farms, to kill gophers and animals that are impeding the growth of their crops. No one has any problems with rural hunters passing on time-honoured traditions to their children. But the demographics of gun ownership are changing. People now are not necessarily rural. They're urban people buying knock-offs of weapons they see in video games and in movies such as *Call of Duty*.

How much do we know about that new demographic?

**The Chair:** Very quickly—

**Hon. Vic Toews:** What I can say is that this bill has nothing to do with the classification of firearms.

**The Chair:** Thank you very much. Our time is up.

I'll just remind committee members to bring your questions through the chair, and likewise, we'll bring the answers through the chair back to the member.

We'll now move to Madame Boivin.

[*Translation*]

You have five minutes.

**Ms. Françoise Boivin (Gatineau, NDP):** Thank you, Mr. Chair.

I am sure that those listening to us, especially the victims, feel some sadness. And today I am thinking about the victims. Mr. Minister, you have reminded us that the gun registry was created under the Liberal government at a very high price, and I agree. As a result, police forces and hunters have been divided. Perhaps because the Conservative government has been relentlessly opposed to this registry for years now, even before being elected, the victims, the Conservative government, hunters, police forces and other groups are unfortunately working against each other instead of working together as they would normally do.

Why is that? You are saying that it is to provide more safety. That is what the government has been telling us all along. But instead, it has managed to pit victims, hunters and police officers against each other. The victims want to feel safe and confident, and they thought they would get that with the registry. The hunters did not want to pay the fees for a registry and they felt they were being criminalized, although I don't think anyone intended to criminalize them. And the police officers have a tough job on a daily basis and their lives are on the line.

Here we are with a tool that may appear to be a lame duck to some. We could work on improving it and removing the irritants. Let us remember what the Conservatives keep saying. They say that we are using law-abiding hunters and citizens of Canada and that we want to criminalize them.

● (1140)

But if we made improvements to this, we would get all police associations on the same side. I understand that there could be views to the contrary.

Sir, you are the Minister of Public Safety. Your top priority should be public safety and communicating this feeling of safety to Canadians.

I have a a bit of trouble when I get emails, as we all do, from Ms. Thibeault, one of the survivors of the École Polytechnique massacre. She is making a heartfelt appeal to us. She is asking us to keep the long gun registry and to make sure that victims will not have to go through what those women have needlessly experienced.

Mr. Minister, I am looking at the types of weapons that are going to be excluded from the registry. When we are talking about non-restricted firearms, such as a Ruger Mini-14, a Steyr HS.50 M1 and a L115A3, we are talking about long range sniper rifles. We are not talking about shotguns that people use to hunt deer or moose. We are talking about rifles that can have rather dangerous consequences.

Previous bills have always included a provision for licence verification when firearms are transferred. Bill C-19 does not include any obligation of verification, which means that the person transferring the gun must simply have no reason to believe that the person they are giving it to is not authorized to have it. But verification is optional, Mr. Minister.

How can we go back to our ridings and tell people that we are feeling any safer by passing Bill C-19?

[English]

**The Chair:** Thank you.

[Translation]

Thank you, Ms. Boivin.

[English]

Mr. Minister.

**Hon. Vic Toews:** Thank you.

I think the problem the member illustrates is her concern that people feel they are safe. We're not only concerned about their feeling safe, but are also actually concerned about them being safe. That I think is the distinction between the NDP and my government. We actually take measures that increase public safety, that will result in people feeling safe, and we do not simply say we're going to do something that is ineffective, that is wasteful in terms of money, because we think you might feel safe. It's irresponsible to go down that road.

There are many more cost-effective measures that we can take to ensure that crime is reduced, and we are taking those. I mentioned some of those in my speech and opening remarks, and we are committed to doing that, including in Bill C-10.

Again, the member talks about the issue of the classification. This has nothing to do with the classification of firearms; this has to do with the registry of non-restricted firearms. If the member has a concern about classification, about whether a firearm should be restricted or prohibited rather than unrestricted, that's another issue. She should address that in legislation or a motion, or elsewhere. Again, this has nothing to do with the classification.

You see, Mr. Chair, the NDP is trying to confuse the issues of registration, licensing, classification, and to jumble all of that up to make people feel safe.

[Translation]

**Ms. Françoise Boivin:** I would like to ask you another question.

[English]

**The Chair:** Let him....

**Hon. Vic Toews:** The last thing is the issue of licence verification. This has nothing to do with licensing. I don't know how many times I can say that, Mr. Chair.

This has to do with non-restricted firearms, which would then be owned by people who are licensed.

● (1145)

**The Chair:** Madame, you have 30 seconds.

[Translation]

**Ms. Françoise Boivin:** Okay, thank you.

You talk a lot about the confusion in the debate. But you also talk about working together with the provinces. The Province of Quebec has bluntly told you that it wants to get the registry data. But you want to destroy them. I can see that the feds no longer want the data to be available, but if a province decides to use the data from the registry, why would access be denied when it is entirely legitimate according to the Information Commissioner?

[English]

**The Chair:** Thank you, Madame Boivin.

We'll now move to Mr. Norlock please.

**Mr. Rick Norlock (Northumberland—Quinte West, CPC):** Thank you, Mr. Chair. Through you, I want to say to the witness, thank you for coming.

Minister, there were so many questions that I wanted to ask, but I do want to perhaps assist my Liberal friend by telling her that it is the police who actually instigate section 100 orders. In other words, when they find....

**Hon. Vic Toews:** This is in respect of a licence.

**Mr. Rick Norlock:** Yes, when they find a person who shouldn't own a firearm, they can make an application before the court. To suggest that a minister of the crown who comes before any committee and doesn't have every statistic available in their department.... Well, I'll just leave it as it is.

Wouldn't you agree with me, Minister, that the real filter, the real ability of the state to make sure that only the people who should own firearms do is that they be put through a process—and we already have that process—to make sure they're not mentally ill, to make sure they're not spousal abusers, to make sure they don't have a violent criminal background? That would be my first question. In particular, does this revocation of the firearms registry have any effect on that?

The other question, Mr. Minister, is this. You were talking to us about giving the police the tools to do their job. Would you not agree that most police officers agreed with or lobbied our government to hire more police officers, both provincial and municipal, as well as RCMP? I'd like to talk about whether the government is delivering on that.

Also, with regard to the registry and its accuracy, I can tell you, Minister, that shortly after being elected I had a constituent come to me with an envelope. They had registered their firearm, and attached to it, on a page stuck to it—and I represent a riding in Ontario—was all the personal information of someone who had registered two firearms through the Province of Quebec. Doesn't that indicate how inaccurate the firearms registry is? Why would we want to perpetrate an inaccurate registry and give that inaccurate information to a province for them to instigate something that doesn't work anyway?

I wonder if you could make comment on those questions, Mr. Minister.

**Hon. Vic Toews:** Well, those are all very good questions.

First of all, of course I agree that it's important not to confuse licensing with registration, in the same way that we should not confuse gun control generally with the issue of registration. You'll see the proponents of the registry talking about gun control and trying to use studies from gun control matters generally on licensing and the like, and attributing those characteristics to the registry when they're quite frankly not attributable.

Secondly, our government took huge steps in hiring and facilitating the hiring of police officers by local jurisdictions—provinces and municipalities. That was a commitment our government made, and we delivered on that commitment. It was not only in the context of provincial and municipal police forces, but also in the context of the RCMP, which of course has an impact on many

provinces who choose to have the RCMP as their provincial police or municipal police forces.

Back in 1998 when I was the attorney general of Manitoba, the former Liberal government shut down Depot, shut down the training of RCMP officers in this country, at a time when half of the RCMP officers would be eligible for retirement within five years. It was one of the most foolish things that could ever have been done, causing us huge problems in actually going after the bad guys and getting criminals. They shut down the police training.

When we came into government, on average we were only producing 300 officers out of Depot every year. I think to reach a break-even point there have to be around 1,000. We ramped this up to 1,800 coming out in the first year, because of the neglect of the prior government in actually getting police officers. They stressed things such as the gun registry and said that it was going to protect the public—that it was going to "make them feel safe", as the NDP said—but they neglected to actually put officers out on the street.

Our government has consistently put out many troops through Depot, and we've encouraged provincial and municipal governments to hire more officers as well in order to meet the true criminal safety needs of Canadians.

● (1150)

**The Chair:** Thank you, Minister.

We'll now move back to the official opposition.

We'll go to Mr. Harris, please, for five minutes.

**Mr. Jack Harris:** Thank you, Chair.

Mr. Toews, I've heard you say in the House, for example, that this is not about the changes that are going to affect the categorization of arms. Nevertheless, some of the consequences of your bill I find frankly irresponsible. There is the straight-up destruction of the registry and the destruction of the data when, first of all, the Canadian Association of Chiefs of Police say they want it and provincial governments such as Quebec's want it in the interests of public safety, and when the chiefs of police across this country have an important role to play in that.

You are also weakening the international obligation on tracing. That is also necessary for our own public safety, and the chiefs of police have pointed that out.

Thirdly, you are weakening the transfer requirements. That's what my colleague, Madame Boivin, was getting at—the weakening of the licensing verification requirements for transfer, thereby allowing guns to fall into the wrong hands. This is in clause 11 of the bill.

Importantly, you're also ignoring the consequences of no longer having merchants required to keep track of the guns they're selling, who they're selling them to, and the serial numbers and all of that, which was in place before the registry was there. By destroying the registry, you're not putting back that requirement.

You are going to be allowing semi-automatics such as the Ruger Mini-14. We're going to be allowing sniper rifles. We even have a sawed-off shotgun for sale that's manufactured as a sawed-off shotgun with a twelve-and-a-half-inch barrel so that it's not illegal. It's actually marketed as the Outlaw shotgun and is a double-barrelled 12-gauge shotgun on sale in this country for $325. These will not be restricted weapons; these will not be prohibited weapons. They will not be required to be registered or tracked in any way.

That, sir, is irresponsible. I'd like you to respond to those comments.

**The Chair:** Thank you, Mr. Harris.

Mr. Minister, please.

**Hon. Vic Toews:** All I can say is that if you have concerns about firearms that should be restricted and are not, that is outside the context of this bill. This bill does not change the classification system.

I don't know about all of the firearms you're talking about, but it is something that the experts do in classifying firearms. If you think there is a problem with that classification, we can have that discussion, but it has nothing to do with Bill C-19, and we shouldn't confuse the registry and the classification of firearms.

**Mr. Jack Harris:** They're now required to be registered.

**Hon. Vic Toews:** On the issue, though, of the registry, if that's what the question is, we have made our position very clear on the registry's ineffectiveness. But we're not changing the classification of that firearm or the necessity of someone obtaining a licence to possess that firearm.

**The Chair:** Quickly, Mr. Harris.

**Mr. Jack Harris:** Yes, Mr. Chair.

Very quickly, you've complained about the inaccuracy of the registry, yet you've had an amnesty in place for a number of years and, therefore, the records are obviously incomplete. You've also discouraged, through your political activity, people taking seriously the need for gun control, so it's not a surprise that the registry would not be complete. That's your fault. You have to take responsibility for that.

**The Chair:** Thank you, Mr. Harris.

● (1155)

**Hon. Vic Toews:** All I can say is that we made our position clear on the registry. There were certain amnesties that were put in place, and at least you're being frank with the committee in admitting that not only is the registry incomplete, it's inaccurate.

**The Chair:** Thank you, Minister.

We'll now move to the last question of the day and go back to Ms. Hoeppner for five minutes.

**Ms. Candice Hoeppner:** Thank you.

I'm quite surprised by the opposition members' lack of understanding of the Canadian firearms program and the classification of firearms. If you saw off a shotgun, it becomes an illegal weapon. If you change a semi-automatic firearm into an automatic firearm, it becomes a prohibited, restricted firearm automatically. The long-gun registry deals with non-restricted, non-prohibited firearms.

Mr. Scarpaleggia talked about licensing. When an individual has his licence revoked, police officers are able to go in and apprehend the firearms in that individual's home. If two individuals have a licence to own firearms, the registered firearms can be transported between both places. So police officers could go out to a home where there are five firearms registered, and those firearms may not be legally stored at that individual's home. That's why police officers are telling us that when they go to someone's home, they don't look at the registry and say, "Well, there are two guns, so we'll go and apprehend those two guns from this individual whose licence was revoked, and then we'll know we're clear". No, they sweep the home and make sure that all weapons, all firearms, are accounted for.

I'm wondering, Minister, if you can talk a little bit about what front-line officers are doing when it comes to gun crime and what they're telling you when you meet with them. We have 11 police officers in our own caucus.

Can you tell us what they are actually doing when it comes to fighting crime and why they're asking us for, because the registry is not helping them? It's inaccurate. They can't count on it. And the way the system is set up, firearms can be stored at different locations.

**Hon. Vic Toews:** The point you make about the presence of 11 police officers in our own caucus is a good one. It's not a coincidence that police officers, generally speaking, support our political party because of the effective measures that we take on crime and gun control. This is a caucus of 11 that I consult with regularly, because they are the experts. They have that background and they have their ears to the ground in ways that I simply cannot match.

I hear on a regular basis from law enforcement officers who strongly support the legislative initiatives we have taken. Bill C-10 is generally supported by the police officers, the police chiefs. They are frustrated that for years this legislation has been stalled in the House of Commons because, prior to the last election, the Liberals and New Democrats consistently found ways to thwart the passage of legislation that would not just make people feel safe but would actually make them safer.

**Ms. Candice Hoeppner:** Thank you. That's all.

**The Chair:** You have another minute.

**Ms. Candice Hoeppner:** That's all I have.

**The Chair:** All right, does anyone else want to conclude in that minute left? I think our time is coming to an end.

Ms. Young, please make just a summary comment.

**Ms. Wai Young (Vancouver South, CPC):** Minister, thank you for coming here today and being clear about the differences between classifications, licensing, and the long-gun registry, which is Bill C-19.

I'm from Vancouver, and we've had several drive-by shootings in my own riding. In your experience, can you tell me whether criminals register their guns?

**Hon. Vic Toews:** That hasn't been the practice. Not only do they not register their guns, but they're also rarely licensed gun-owners. I think licensing can be justified as a means of qualifying people. It's a serious offence to have a firearm without a licence.

● (1200)

**Ms. Wai Young:** So the registry does not prevent people from being shot?

**Hon. Vic Toews:** No, it doesn't, because those are issues that are far removed from the registry. The last thing a young gang member is thinking about when he acquires a firearm is whether or not it is registered.

**Ms. Wai Young:** Thank you.

**The Chair:** Thank you, Minister, for coming and highlighting some parts of Bill C-19. This committee looks forward to continuing this study and reporting back to the House.

**Hon. Vic Toews:** Thank you.

**The Chair:** To the committee, we do want to ratify the steering committee report that is before you right now. Your steering committee met the week before break week. We came up with the report that you see before you today. I'll quickly go through it.

The report recommends that the committee allocate five meetings to the consideration of Bill C-19, An Act to amend the Criminal Code and the Firearms Act, including its clause-by-clause consideration.

Also, the minister was to appear that day, November 3. If the committee remembers, we had votes that day, so the minister was unable to appear. He was here today because of it. That's taken up in the next part of the report.

The report also recommends that the committee adduce the evidence from the consideration of Bill C-391, An Act to amend the Criminal Code and the Firearms Act (repeal of long-gun registry), heard in the third session of the 40th Parliament. In the last Parliament, a short Parliament, we did a lot of this work, so the report recommends that this be referenced as well.

Mr. Garrison.

**Mr. Randall Garrison (Esquimalt—Juan de Fuca, NDP):** Thank you, Mr. Chair.

With regard to the five sessions, the NDP believes these are inadequate to deal with this bill. I know the other side says that this bill has been dealt with many times, but it's not the same bill. There are things in this bill, such as the destruction of data, that were not in the previous bill. There are serious omissions in the bill. There is no provision for restoring business tracking and licence verification.

As well, a very large number of witnesses would very much like to appear before this committee. And as I always remind the committee, nearly a third of the members of this House are new and have not had a chance to have the full benefit of these kinds of things.

We still do believe that five sessions will be inadequate and will not do justice to this bill, so we will be voting against this.

**The Chair:** All right.

Ms. Hoeppner.

**Ms. Candice Hoeppner:** Mr. Chair, I move that we accept this report.

**The Chair:** The question has been called.

All in favour of the steering committee report, please signify that.

(Motion agreed to [See *Minutes of Proceedings*])

**The Chair:** It is carried.

In our second hour today, we will continue our consideration of Bill C-19, An Act to amend the Criminal Code and the Firearms Act.

Appearing before us on this panel, from the Ontario Federation of Anglers and Hunters, is Greg Farrant, manager of government affairs and policy.

From the Canadian Labour Congress, we have Barbara Byers, executive vice-president; and Vicky Smallman, national director of the CLC women's and human rights department.

We have two people appearing as individuals: Sergeant Murray Grismer of the Saskatoon Police Service is master instructor for the Canadian firearms safety courses; and Ontario criminal defence lawyer Solomon Friedman created and maintains the firearmslaw.ca blog, a legal resource site devoted to Canadian firearms law and policy.

I invite each one of you to make a brief opening statement. We're going to try to hold these statements to about seven or eight minutes, if possible. Likewise, we'll try to get in as many questions as possible.

Welcome to the public safety and national security committee. We look forward to your input into this important work that we're conducting.

Perhaps I'll begin with Ms. Byers.

**Ms. Barbara Byers (Executive Vice-President, Canadian Labour Congress):** Thank you very much. On behalf of the 3.2 million members of the Canadian Labour Congress, we want to thank you for this opportunity to be here.

As you know from our previous appearances, we represent Canada's national and international unions and provincial and territorial federations of labour and 130 district labour councils. Our members work in virtually all sectors of the Canadian economy in all occupations in all parts of Canada.

The CLC opposes Bill C-19 and urges the standing committee to ensure that the long-gun registry is maintained. We support the long-gun registry as an effective tool for workplace and community safety. Eliminating it will put workers and Canadians at risk. Our brief to you outlines some of the legislative and political context, but in the interests of time, I'm not going to repeat all of that. I think you're certainly aware of some of the background.

As we stated 15 years ago to the parliamentary committee of that day, there are compelling arguments in favour of a gun registry: to ensure safe storage requirements, to ensure that gun owners are held accountable for the guns they purchase, to compel gun owners to report missing or stolen firearms, to reduce the illegal trade in rifles and shotguns, to give the police and first responders modern tools to take preventive action, and to trace stolen guns to their rightful owners.

After a decade of use, we've seen crimes solved and criminal prosecutions because of the registry. For example, two people were convicted as accessories in the 2005 killings of four RCMP officers in Mayerthorpe, Alberta, in part because a registered rifle left at the scene was traced back to its owner through the registry. That's a real example of law and order results. That's going after the bad guys.

The CLC has a long history of support for campaigns to end violence against women. Women's equality is a fundamental component of trade union policy in Canada. For more than 20 years, we have joined with women's organizations to commemorate December 6 and to propose actions to reduce violence against women. Our support of the gun registry has always included an understanding of its importance as a tool to help reduce violence against women. It was the massacre of 14 young women at l'École Polytechnique on December 6, 1989, that prompted the creation of a federal gun registry.

Gun violence is one very dangerous component of the issue of violence against women. More women are killed by their intimate partners than by strangers. Sixty-five percent of women are murdered by intimate partners compared to 15% of men. Most are killed in their homes. In 1991, before the first restrictions were introduced, one-third of the women who were murdered were killed with guns, and 88% of the guns used were long guns. A study conducted between 2005 and 2007 of rural domestic violence in Prince Edward Island and New Brunswick showed that 66% of the women interviewed felt that having a firearm in their home made them fearful for their safety.

Since the Firearms Act was introduced, the rate of women murdered with firearms by their intimate partner has decreased by 69%. That's not just making women feel safe, it's helping them be safe. There's no question that the gun registry has helped save women's lives. This government has said that one of its priorities is to reduce violence against women, yet this legislation will have the opposite effect by putting women's lives at risk.

Rifles and shotguns are the guns most available in people's homes. They are the guns most often used to kill police officers. Rifles and shotguns are the guns most often used in suicides, particularly those involving youth. In communities where there is high gun ownership rates, you see higher youth suicide rates. However, since the gun registry and its related requirements for safe storage of guns were introduced, youth suicide rates by firearms have declined in relation to suicide rates by other means.

Also because rifles and shotguns are the firearms that are most readily available, they also figure prominently in workplace violence involving guns. In 1999, a devastating incident of workplace violence occurred right here in Ottawa at the OC Transpo bus yard

on St. Laurent Boulevard. Those murders were committed by a gunman with a high-powered hunting rifle.

● (1205)

Increasingly, as we learn more about the challenges of maintaining healthy and safe workplaces, we are paying more attention to the importance of understanding the risk factors associated with both suicide and interpersonal violence. The risk factors for suicide and violence are closely linked. Access to a firearm coupled with a personal or a job crisis is a lethal combination. We need to promote more awareness of the real risks associated with any firearm in the hands of a depressed or stressed individual. We need to ensure that police, who are the first responders to these situations, know as much about the situation as possible, including what kind of gun is involved.

Everyone on this committee knows how useful the registry is to our nation's police forces and first responders. The registry provides police with vital knowledge of the number of guns and, more importantly, the types of guns owned. That vital knowledge allows them to assess risk to themselves and to others and to remove guns from homes in situations that are a risk to the home and the public. It lets firefighters know when guns and ammunition are likely to be stored on a property, which is a lifesaving piece of information when you're about to enter a burning building.

For law enforcement, firefighters, emergency personnel, and social workers—like I was—information about potential risks is crucial in ensuring their safety on the job. Like any worker, they have a right to a safe workplace. By denying them access to information about the possibility of guns in a home, this legislation puts their safety at risk.

Destroying the data is the real boondoggle. Most of the costs associated with setting up the registry were incurred a long time ago and will never be recovered. The taxpayers of Canada will never get their money back. The annual costs of maintaining the registry today are cost-effective for the job that it does—and the registry is even more efficient now that it no longer receives a revenue stream from licence renewals. Most of the costs of the registry frequently cited by its opponents are in fact costs related to licensing, including background criminal checks of applicants.

Over 7.4 million guns are registered to date, with long gun—

● (1210)

**The Chair:** We're coming to the end. We're actually over our time, so if you wouldn't mind, just draw everything very quickly to a close.

**Ms. Barbara Byers:** Okay, I'll just point out a couple of things.

First off, the database is consulted over 17,000 times a day by police across the country. We know that, and it can't be dismissed.

The proposal to throw out the data will absolutely put the lives of people at risk, not just in their communities but also in their workplaces—and for many people, these workplaces are other people's homes.

Our taxes have been spent on the registry. We believe that we need to keep the registry and to make sure that people's lives and communities and workplaces are safe.

Thank you.

**The Chair:** Thank you very much.

We'll maybe just move down the line here.

Mr. Farrant, welcome, and we look forward to your comments.

**Mr. Greg Farrant (Manager, Government Affairs and Policy, Ontario Federation of Anglers and Hunters):** Thank you very much, Mr. Chair.

Good afternoon, members of the committee, and my fellow panellists. On behalf of the Ontario Federation of Anglers and Hunters, one of the oldest and largest non-profit conservation-based organizations in Canada, we appreciate this opportunity to appear before you today to comment on Bill C-19.

Although we've provided the clerk with a longer written presentation, it will not meet the seven-minute test, so I'll use my time to home in on a few specific issues referred to in that document.

As I noted during my appearance before this committee last year in support of Ms. Hoeppner's private member's legislation, Bill C-68, as has been noted by Ms. Byers, was born partly out of tragedy attributable to public concerns in the aftermath of the horrific 1989 shooting at École Polytechnique. There's no doubt that the impact of that event on the families of the victims and the survivors cannot be underestimated or understood by those of us who have not experienced such loss. However, that loss cannot be used to justify a system that has been an abysmal failure, and we strongly support the fact that the Harper government has moved quickly to introduce a bill to address this issue.

When Bill C-68 was created, the Coalition for Gun Control attempted to explain the need for this registry and other components in the bill, and I quote:

> The argument for gun control has never been based on individual cases.... [It] has always been based on the general principle that if you have adequate control of all guns you reduce the chances that dangerous people will gain access to them.

At best the coalition was being disingenuous. The entire debate over gun control and the creation of a long-gun registry under Bill C-68 was in fact a direct result of the misguided actions of a lone individual. Prior to that, gun control in Canada was not a major public policy issue, and the creation of a regime to regulate legal firearms, particularly non-restricted long guns, as a means of protecting the public from individuals with a grudge was flawed from the start.

A paper trail of trained, legal, licensed firearm owners does not address the real problem. Even a well-run registry, which this is not, will not prevent random violent crime. Believing in that ignores the glaring reality that the vast majority of criminals don't register firearms; and in the rare case when they do, a piece of paper and the creation of a system where possibly 50% of the firearms in Canada are not included does nothing to anticipate the actions of an individual, nor do anything to prevent such actions in the first place.

It also ignores the fact that police in this country have noted repeatedly that anywhere from 70% to 90% of illegal guns in Canada are smuggled in from south of the border. Despite this, we hear little from gun control advocates about the need to address this serious problem, which is indeed directly linked to dangerous people gaining access to these guns.

The OFAH represents a large number of hunters and recreational sport shooters in Ontario, responsible firearms owners who believe in effective gun control. In the early 1960s, we called upon the provincial government of the day to create a formal structure for the delivery of hunter education. For more than 26 years, we have delivered some form of hunter education on behalf of the provincial government, and since 1998 we have done so under formal agreement.

The success of that program is readily apparent: 310 hunter education instructors, most of whom are also firearm safety instructors, have trained over 170,000 first-time hunters. The program has an admirable safety record, as do the majority of responsible firearms owners in this country who understand how to use them safely, how to store them safely, and how to transport them safely and use them precisely for what they are intended for—recreational shooting and hunting.

As a conservation-based organization, the OFAH is involved in a vast number of conservation programs based on the best available science. Science relies on fact. Scientific theory is tested, and if the facts are found wanting, a theory is rejected and the search continues for a rational explanation. In the case of the long-gun registry, there's a glaring absence of fact-based evidence to support its existence. Suggestions that gun crime in Canada has declined since the introduction of the long-gun registry under Bill C-68 ignores the fact that gun crime, particularly gun crime using long guns, has been on the decline in this country since the 1970s, two decades before this registry ever came into being. Crimes committed with long guns have fallen steadily since 1981. Bill C-68 was not introduced until 1985 and wasn't mandatory until 2005.

Noted academics like Rosemary Gartner of the University of Toronto have recently commented that experts have had difficulties in accounting for the decrease, and Dr. Ron Melchers, professor of criminology right here at the University of Ottawa, recently stated that the decline cannot be attributed to Canada's gun registry.

● (1215)

Believing that something works without evidentiary material to support that belief is nothing more than supposition and conjecture.

The present system focuses all of its efforts on law-abiding firearms owners and includes no provisions for tracking prohibited offenders, who are most likely to commit gun crimes. Witness the recent arrest of an individual in Newfoundland for gun crimes, an individual who has been under a prohibition order for 10 years.

This should be about who should not have guns rather than about who does. We strongly support the creation of a prohibited persons registry to focus on real, not perceived, threats to public safety.

Another prominent argument we've already heard here today is how many times per day the system is used by police. Some say 9,000 times. Some say 5,000. We've recently heard 14,000 and 17,000. Liberal leader Bob Rae has suggested 11,000. The vast majority of so-called hits on the registry have little or nothing to do with gun crime. The majority of these are cases of an officer maybe stopping a vehicle for a plate identification or an address identification, which automatically touches all databases, including the long-gun registry, despite the fact that the check has nothing to do with firearms in the first place.

The Canadian Labour Congress, with all due respect to my colleagues here on the panel today, suggests that social workers, paramedics, firefighters, and other first responders use the information to keep themselves safe on the job. These groups and individuals do not have access to the database. So unless the CLC is suggesting that each and every time a social worker, firefighter, or paramedic responds to a call, they first contact police and have the database queried specifically to determine if firearms may be present, it's difficult to understand how this happens. In fact, for police to share the information on the database may well be a breach of privacy.

Over the last few years, public support for the registry has eroded. While this confidence has waned, the level of rhetoric from supporters of the registry has increased exponentially. This has resulted in an increase in unfounded generalizations, devoid of factual evidence. For instance, on second reading of Bill C-19, members of the official opposition who voted with the government were punished. The irony of this is not lost on us, nor is the discrediting of these two members—which is interesting given that when Bill C-68 was created, eight of nine NDP members at the time voted against the bill that they so vigorously defend today.

Recently some media sources, members of the official opposition, members of the third party, and registry apologists have suggested that the introduction of Bill C-19 will do various things. For example, they say that scrapping the registry will involve delisting various guns and sniper rifles; that lawlessness will rule the day; that solving gun crimes will end, because police will have no more tools at their disposal; and that this is a Conservative plot to undermine a Liberal-created program.

● (1220)

**The Chair:** Mr. Farrant, your time is pretty well over.

**Mr. Greg Farrant:** I'll be as quick as I can, Mr. Chairman. I appreciate that.

**The Chair:** Yes, just conclude, please.

**Mr. Greg Farrant:** The facts do not support that. The bill has nothing to do with delisting anything. Other components, as you've heard today, remain in place. Police, such as OPP Inspector Ed Medved, have said that losing the registry is not going to shut them down. There are innumerable registration databases across this country—I could list them all for you if I had time—that are still in use by police.

When the bill was created, five provinces challenged the constitutionality of it, including three Liberal governments, which undermines the partisan argument.

**The Chair:** Thank you, Mr. Farrant. We have to leave it there.

**Mr. Greg Farrant:** Sure.

**The Chair:** Maybe you can provide some of the other information in response to questions that will be asked.

**Mr. Greg Farrant:** Thank you, Mr. Chair.

**The Chair:** We'll go to Mr. Friedman, please.

**Mr. Solomon Friedman (Criminal Defence Lawyer, As an Individual):** Mr. Chair, vice-chairs, honourable members, good afternoon.

My name is Solomon Friedman. I'm a criminal defence lawyer in private practice with the Ottawa firm of Edelson Clifford D'Angelo LLP. Although I maintain a comprehensive criminal law practice, I specialize in defending persons charged with firearms offences. My clients, and I as their counsel, experience on a regular basis the onerous and deleterious effects of the long-gun registry.

You will no doubt hear in the coming days and weeks from various interest groups about how the long-gun registry is a minor inconvenience, merely a matter of paperwork. We register our dogs, our cats, and our cars, they say. Why not register our shotguns and rifles, as well?

As you know, the registration scheme for non-restricted long guns, and for prohibited and restricted firearms as well, is enacted as federal legislation under the Criminal Code and under the Firearms Act.

The Supreme Court of Canada, in the Firearms Act reference, held that the Firearms Act is valid federal legislation, because it is enacted pursuant to the federal criminal law power. Indeed, this very aspect of the Firearms Act that makes it valid federal legislation ensures that those who fail to comply, inadvertently or otherwise, are punished harshly and in many cases unjustly. With the criminal law power comes criminal law procedure and, most importantly, for the nearly two million law-abiding licensed gun owners in Canada, criminal law penalties. Unlike a failure to register a pet or a motor vehicle, any violation of the firearms registration scheme, even the mislaying of paperwork, carries with it the most severe consequences: a criminal charge, a potential criminal record, detention, and sometimes incarceration. This is hardly comparable to the ticket under the Provincial Offences Act or the Highway Traffic Act that goes along with the failure to register a vehicle.

In addition, registry violations are often grounds for colourable attempts on the part of police, the crown, and the chief firearms officer to confiscate firearms and revoke lawfully obtained gun licences. As defence counsel, I have seen time and time again alleged long-gun registry violations used as a pretext to detain individuals, search their belongings and their homes, and secure evidence to lay additional charges. It is absurd to think that through the requirement to register long guns and possess and carry registration certificates, it is the law-abiding citizen who is subject to greater police scrutiny than the unlicensed individual, who is truly in unlawful possession of a firearm.

Next, the long-gun registry is simply one more layer of paperwork and complexity in a system of firearms regulation that is already overwrought with process and procedure. I have two law degrees. I clerked at the Supreme Court of Canada, and I practise criminal law for a living. Even I at times find the provisions of the Firearms Act and the gun control portions of the Criminal Code convoluted, complex, and confusing. The long-gun registry is simply one more trap for the unwary, a stumbling block for the blind.

Parliament ought not to be in the business of transforming licensed, law-abiding, responsible citizens into criminals, especially not for paper crimes. Should this piece of paper really determine the difference between lawful possession of a rifle or shotgun and an illegal act punishable by criminal sanction?

I am certain that you will hear about the symbolism of the long-gun registry. Enacted as a knee-jerk reaction in the aftermath of tragedy, the gun registry, like much of the current gun control scheme, was seen as a tribute to individuals who lost their lives at the hands of gun wielding madmen. Honourable members, I can tell you firsthand, from my vantage point in courtrooms across eastern Ontario, laws make terrible memorials. They fail to honour the dead and instead punish only the living, in this case the law-abiding and responsible. In fact, I hope that Bill C-19, the repeal of the long-gun registry, will itself be a symbol. It will be symbolic to millions of licensed gun owners and stand for the proposition that the government will no longer punish the law-abiding for the acts of the lawless.

I hope, and I know many of my clients share this hope, that Bill C-19 will serve as a memorial of sorts, a tombstone marking the final resting place of wrong-headed policy-making. There are millions of Canadian gun owners who will be glad to know that in the halls of Parliament Hill, hysteria and hyperbole no longer trump reason, facts, and empirical evidence. The long-gun registry has been used as a means to target licensed gun owners for too long. I urge you to pass Bill C-19 without amendment, and end it.

● (1225)

Honourable members, long guns are tools used lawfully and peaceably by Canadians countless times a day without incident. Responsible citizens do not cease to act responsibly due merely to the presence of tools. Similarly, the registration of firearms, aside from having no discernible impact on crime or public safety, has merely alienated law-abiding firearms owners and driven a deep wedge between gun owners and law enforcement.

Gun owners have long been the whipping boys of Canadian politics. I hope that this bill symbolizes a change in attitude by our parliamentarians.

Thank you very much.

**The Chair:** Thank you very much, Mr. Friedman.

We'll now to move to Mr. Grismer, please.

**Det Sgt Murray Grismer (Sergeant, As an Individual):** Mr. Chairman, honourable committee members, and fellow witnesses, it's an honour and a privilege to appear before you today to assist you in your deliberations regarding Bill C-19.

I'm a sergeant with the Saskatoon Police Service, with almost 25 years of service protecting the citizens of Saskatoon and Saskatchewan. I supervise a team of 10 constables, front-line men and women responsible for policing the second-largest geographic area in the city of Saskatoon. The courts of Saskatchewan have qualified me as an expert witness, enabling me to give opinion evidence on firearms. In that capacity, I've provided assistance in over 50 cases to both federal and provincial prosecutions. I'm a master instructor for both Canadian firearms safety courses and an approved verifier certified by the registrar of the Canadian firearms program.

I want to make it clear from the onset that my comments here today are mine, and mine alone. They do not reflect the opinion or opinions of my employer, the chief of police or police service. That said, I am the appointed spokesperson for the Saskatoon Police Association on the Firearms Act and the firearms registry. Further, until the fall of 2002, I was a spokesperson for the Saskatchewan Federation of Police Officers on the issues of the Firearms Act and the firearms registry.

I understand that this august committee will have opportunity to hear from other police officers who share my belief that the registry for non-restricted rifles and shotguns, commonly referred to as long guns, should be abolished. Thousands of police officers across Canada, who are in my opinion the silent or silenced majority, also share this position.

To say that the police community is divided on support of the registry is an understatement. When the Canadian Police Association initially endorsed the registry, they adopted their position without ever formally having polled their membership. The CPA's position is not that of the Saskatchewan Federation of Police Officers, nor that of the Saskatoon Police Association. The Saskatchewan federation is the only provincial police association that polled its entire membership on the issue of the registration of firearms. When polled, the Saskatoon Police Association was 99.46% against the registry, while our compatriots in many of the other Saskatchewan police forces were 100% in opposition to the registry.

There are some who would arrogantly or foolishly consider those opposed to the registry as uninformed or uneducated. Nothing could be further from the truth. Instead, we recognize that the true cornerstone of public safety is training, screening, and the licensing of owners, not the registration of non-restricted rifles and shotguns.

Although the mantra of the former government, the CACP, and the CPA was "gun control is crime control", the registry misses the target of the criminal use of firearms. Instead, it targets millions of lawful, legitimate firearms owners in the name of crime control. The fact is, the registry can do nothing to prevent criminals from obtaining or using firearms. École Polytechnique, Mayerthorpe, Spiritwood and Dawson College are synonymous with tragic events involving firearms. However, the firearms registry for long guns would not, could not, and did not stop these tragic events. The retention of the firearms registry or records will do nothing to prevent any further such occurrences. Training, enhanced screening and licensing of firearms owners, as we see today, may have prevented those individuals from being able to obtain a firearm in the first instance. However, even Canada's strict licensing regime and firearms registry cannot prevent random acts of violence. The best example of this failure is the shooting rampage at Dawson College by Kimveer Gill.

The CACP contends that Canadians continue to support a registry that costs over $2 billion and which cannot be shown in over a decade to have prevented even one death. Unfortunately, public opinion polls do not support their position. The CACP and others will attempt to convince you that retention of the registry is an officer safety issue. Further, they will advocate for the retention of the records accessible on a database to police investigators if the registry is abolished. To the layperson having little or no knowledge of firearms or the registry, this may appear reasonable. However, once one knows and understands the failing of the registry, the issue of officer safety takes on a far more sinister meaning. For the officers using the registry, trusting in the inaccurate, unverified information contained therein, tragedy looms at the next door.

The argument to retain the registry for investigative purposes is disingenuous or specious at best. Once the registry is abolished, the information contained therein is immediately stale-dated. The limited evidentiary value of such erroneous information deteriorates by the minute as firearms across Canada are acquired, sold, altered, or destroyed.

● (1230)

Knowing what I do about the registry, I cannot use any of the information contained in it to square with a search warrant. To do so would be a criminal act. Thus, I cannot in good conscience tell any officer—junior or senior—to place any faith in the results of a query to the Canadian Firearms Registry.

Projections from within the Canadian Firearms Centre privately state that it will take 70 years of attrition to eliminate all of the errors in the registry and to have all of the firearms currently in Canada registered. This level of inaccuracy is unacceptable for any industry, let alone law enforcement. Police officers deserve better. The public and the courts demand better. If the National DNA Data Bank or the automated fingerprint identification system had the same potential error, the public and the courts would be outraged, and with just cause. Every entry in these latter databases is empirical—a level of accuracy that the registry has not attained.

As a team leader for the Olympics security force, I had the opportunity to speak with officers from across Canada. The vast majority of those I spoke to do not support the registry. They do not trust the information it contains, and see it as a waste of time and money.

Again I take you back to the issue of officer safety. Police across Canada cannot and must not place their trust in, or risk their lives on the basis of, the inaccurate, unverified information contained in the registry. From my perspective, if doing away with the registry saves one of Canada's front-line police officers, it's elimination is worth it. Retaining the registry at the risk of one police officer's life is too great a price to pay.

In closing, I wish to thank you for your attention and will leave you with these thoughts. Polls indicate that the majority of Canadians want the registry for non-restricted rifles and shotguns abolished. This position is supported by a majority of front-line police officers in Canada. Further, this government ran on a platform of ending the long-gun registry. The last election represented a referendum on that platform, and a majority of Canadians voted to support it.

Bill C-19 is worthy of your consideration and support, for it brings to an end a registry that represents the largest and most contentious single waste of taxpayer dollars. It is full of errors and inaccurate data. It is a registry that front-line police officers do not trust, use, or support. More importantly, it risks the safety of front-line police officers across Canada.

Thank you.

**The Chair:** Thank you very much.

I want to thank all our presenters today for presenting their perspectives. They did a good job.

We'll now move to the government side for seven minutes.

Mr. Leef, please.

**Mr. Ryan Leef (Yukon, CPC):** Thank you, Mr. Chair, and thank you to all our witnesses here today.

This line of questioning will be for Mr. Grismer.

We've heard some conflicting testimony today. It's indicative of what we've heard throughout the debate on the long-gun registry itself and what the community feels about it. Maybe you can clarify one question I have, to see if we can bring some resolution to the conflicting information before us.

I was formerly a conservation officer in the Yukon territory. I checked hunters all the time and hundreds of firearms in a season. I never had access to the firearms registry. I never felt that put me at greater risk, because we used universal precautions training to protect ourselves. We didn't have a great deal of faith in the registry anyway. The point is that we did not have access to the registry.

We heard Ms. Byers indicate that firefighters and social workers have access to it. Mr. Front said that was absolutely inaccurate. Can you give us the facts on that? Do social workers and firefighters have direct access to the registry, or are they able to call the police and just access registry information?

● (1235)

**Det Sgt Murray Grismer:** The registry is a police-access database. To the best of my knowledge, firefighters do not have access to it, paramedics do not have access to it, social workers do not have direct access to it.

From my experience and my position when I was in professional standards, to divulge any information contained in that database to any unauthorized person is a breach of security, and a breach of the Privacy Act in regard to the individual to whom that information pertains.

**Mr. Ryan Leef:** Being in a rural part of Canada, so to speak, I'm sure at some point in your career you have worked with other agencies like the Canadian Wildlife Service, conservation officers, and Fisheries and Oceans officers.

**Det Sgt Murray Grismer:** I've worked with the wildlife officers within our jurisdiction. I don't come into much contact with federal fisheries and wildlife officers.

**Mr. Ryan Leef:** Okay.

So when we're talking about officer safety, which is one of the things that is unfortunately really being spread out across the public, to the masses.... On this, I've spoken with numerous front-line police officers—and not to run my resumé, but I've been a member of the Royal Canadian Mounted Police—I know that the members I worked with daily have no confidence in the registry and don't support it.

But let's talk about the safety. When you're called to a residence, would the absence of firearms or a hit on that registry provide any greater measure of safety for an officer?

**Det Sgt Murray Grismer:** Universal precautions are used any time any one of my people go to a residence. I try to get to as many domestic disturbances as I can, because I find that the presence of a supervisor there, someone of senior rank, tends to help people out. And to the best of my knowledge, I know of no front-line police officer in Saskatoon who queries the registry en route to a call. It's just not anything that happens. Their first priority is to get there. They use precautions in approaching a residence.

As for a hit on that registry, if they were to query that registry and they were to believe the information saying there were no firearms there, they would be placing themselves at great jeopardy in proceeding further if they didn't take precautions in approaching that residence. If you go there with the thought process in mind that there are no firearms there—that's what I've tried to convey—you're putting yourself at risk. You are doomed to some kind of terrible tragedy.

We take every precaution. Once we find there's a firearm there, or if we have any indication there are firearms there, we seek to cordon off the area to secure it so that we can bring in qualified people, people from our emergency response team, who have the tools and the ability to deal with armed or barricaded individuals.

**Mr. Ryan Leef:** In respect to weapons across the board, which ones are really of most concern to front-line police officers?

**Det Sgt Murray Grismer:** Handguns.

**Mr. Ryan Leef:** Handguns?

**Det Sgt Murray Grismer:** Handguns and knives.

**Mr. Ryan Leef:** And knives?

● (1240)

**Det Sgt Murray Grismer:** Knives are a far more predominant as weapons than rifles, shotguns, and handguns.

**Mr. Ryan Leef:** When you're searching a detained or arrested individual, what would you say would be the greatest issue of concern for an officer going hands on with a detained or arrested individual in terms of weapons or objects that would be a safety issue for officers?

**Det Sgt Murray Grismer:** Mostly we encounter knives—

**Mr. Ryan Leef:** Knives—

**Det Sgt Murray Grismer:** —because they are secreted on the person, and often when they are found, they are found in various places like.... For some people we've transported to our detention centre, when they get searched really closely or skin-searched in our detention area, we end up finding weapons on them, and generally they are knives, cutting instruments.

**Mr. Ryan Leef:** Would you say that, on a daily basis, street checks, vehicle checks, and person checks are more frequent than residence-based checks? This may be a rough figure.

**Det Sgt Murray Grismer:** Oh, by far.

**Mr. Ryan Leef:** When you're doing a street check, would you have an immediate and accurate access to the registry that would provide a greater measure of safety for front-line officers?

**Det Sgt Murray Grismer:** We don't do that on street checks. When we're doing a street check of an individual, that's not something that my people do: we query CPIC. Through CPIC, running somebody's licence plate will automatically generate a CPIC query on the individual. That will bring up whether he has wants or warrants and that kind of thing.

**Mr. Ryan Leef:** And that's something that would happen thousands of times a day across this country, in checking—

**Det Sgt Murray Grismer:** Absolutely.

**Mr. Ryan Leef:** —cars.

**Det Sgt Murray Grismer:** Yes.

**Mr. Ryan Leef:** Would officers ever stop a vehicle and proceed with a check without accessing a registry? If so, how do they stay safe doing that?

**The Chair:** Thank you, Mr. Leef—

**Det Sgt Murray Grismer:** I have one question for Mr. Leef.

**The Chair:** Yes, go ahead.

**Det Sgt Murray Grismer:** When you say "accessing a registry", what are you asking?

**Mr. Ryan Leef:** The firearms registry.

**Det Sgt Murray Grismer:** Well, they don't. The point that I've tried to make—and I speak for my jurisdiction—is that we conduct checks on CPIC and on the individual just in running the plate. That may not be the individual in the vehicle; that's just to whom it is registered. Those queries come back, and from there on, if an officer feels the need, he can delve deeper into the individual he's dealing with.

**The Chair:** Thank you, Mr. Grismer.

We'll now move to the official opposition.

Mr. Harris, go ahead, please, for seven minutes.

**Mr. Jack Harris:** Thank you, Mr. Chair.

Thank you to all of the presenters here today. It was most interesting to hear the various views.

Sergeant Grismer, first of all, I take it that when you were certified as an expert in firearms and you dealt with prosecutions in the Saskatchewan court, it was in relation to the operation of firearms and training. You weren't certified as an expert in firearms control and registration policies? So it was related to ballistics or the use of firearms in a particular criminal act. Is that correct?

**Det Sgt Murray Grismer:** When they qualified me, the courts gave me very broad latitude. In addition to the operation and classification of firearms, I also provide the crown with opinions on aspects of the law pertinent to a particular case at hand.

**Mr. Jack Harris:** So it wasn't in terms of policy. For example, when the paper you gave us says that the registry can do nothing to prevent the criminals from obtaining or using firearms, that's not part of your expertise in terms of an opinion you would offer to a court, for example.

**Det Sgt Murray Grismer:** That's true. I've not been qualified by the court with it. That comes from 25 years of being on the street as a front-line police officer and as a person who worked in major crimes for a period of time.

**Mr. Jack Harris:** I take it then, from that statement and your comment, that you would disagree with the Royal Canadian Mounted Police firearms program evaluation, which says that "without registration there is a failure of accountability on behalf of the owner, and it is registration that drives accountability. Without registration, anyone can buy and sell firearms privately and there would be no record."

You disagree with that. In your opinion, that it is a false statement and, based on your experience, that is not accurate.

● (1245)

**Det Sgt Murray Grismer:** I disagree with their statement.

**Mr. Jack Harris:** Okay. Thank you.

They also say "registration further helps to reduce the general proliferation of firearms. This is very useful in investigating licensed owners in the trafficking of firearms to unlicensed owners. Without the registry it becomes almost unenforceable."

Do you disagree with that?

**Det Sgt Murray Grismer:** I submit, sir, that there are other tools by which to do that.

**Mr. Jack Harris:** When they say, "Firearms registration is a critical component of the entire firearms program," you disagree with that as well?

**Det Sgt Murray Grismer:** I do. As I said in my presentation, I believe that training, screening, and licensing of owners are the cornerstones of it.

**Mr. Jack Harris:** Yes, and I wanted to get to that actually. So the training, screening, and licensing are the cornerstones of it, but as a police officer, wouldn't you be concerned about the proliferation of firearms? Wouldn't you be concerned about the smuggling of firearms? Wouldn't you be concerned about all sorts of firearms in use throughout the country? Wouldn't that be a cornerstone of public safety when it comes to firearms?

Training is for those who seek it. Licensing and public education are also for those who seek it. These are useful, but if you're saying you'd ignore the other aspects of enforcement and proliferation, the present legislation—and I assume that you read it—says that a person may transfer a firearm that's neither prohibited nor restricted if the transferee holds a licence. There's no mechanism for enforcement. In fact, if one actually voluntarily goes to the registrar to see whether there's any particular issues with respect to the proposed licensee, there's a provision that says that "neither the Registrar or his or her delegate nor a designated person shall retain any record of a request made under subsection (1)".

So it seems that this legislation is designed to ensure that firearms can be transferred without being traced, without being tracked. They can go anywhere. Even though there's a voluntary requirement here, there's no mechanism to enforce it, and we're talking about this ability with regard to unrestricted and not prohibited firearms, including semi-automatics and sawed-off shotguns that are manu-factured as sawed-off shotguns. In other words, they're not manufactured big and cut short.

These can proliferate without any restriction whatsoever. In your opinion, that's okay because licensing, training, and public education are really all that's necessary.

**Det Sgt Murray Grismer:** I want to take you back to the first part of your dissertation. You talked about the traffic in firearms and firearms being smuggled. The firearms that are being smuggled into Canada from the United States are not long guns, rifles, and shotguns, but handguns.

The gangster on the street doesn't want a big, unwieldy firearm. He wants something small, something he can hide, and it becomes a status symbol to him to have that in his possession.

Those firearms, sir, are restricted and have been restricted since 1934. We still see a huge proliferation of them on our streets. We still do drug raids and find unregistered handguns and firearms that have been smuggled into this country from the United States. We're not finding rifles and shotguns smuggled in. Those are not what the gang underworld uses.

If I run into firearms, by far handguns or prohibited weapons are what I encounter most—things that have been sawed-off and chopped up, and some very crudely done.

So do I think the registry is going to stop any of that stuff? No. Do I think the registry of long guns will stop any of that? Absolutely not.

**The Chair:** Jack, you have five seconds.

**Mr. Jack Harris:** I'm done?

**The Chair:** Yes. Thank you very much.

We'll now move to Ms. Hoeppner, please.

**Ms. Candice Hoeppner:** Thank you very much, Mr. Chair.

I just have a few minutes so I'm going to try to go rather quickly.

Mr. Friedman, I'm wondering if you could comment on previous testimony on Bill C-391, which will be part of this study.

We heard that certain studies have shown that if you are a licensed gun owner, you're actually 50% less likely to commit a homicide or a gun crime because, by and large, that means you are a law-abiding individual who complies with rules and regulations as they are established.

We heard testimony from Mr. Grismer that the best way to prevent gun crime is education, training, and licensing, all of which—as even Mr. Harris acknowledged—would be complied with by somebody who had agreed to be trained, to be educated, and to be licensed. As well, those would be individuals who would agree to register their firearms. All of this has to do with compliance, with people who are complying with the laws.

Mr. Friedman, approximately a year and a half ago, the Toronto police department did a sweep of the city and they looked at who had a licence and who had a registration. They ended up spreading about 1,500 long guns on a table, saying, "Look at all the guns we got off the street." I asked them, "Did you arrest one drug dealer, one person who had been domestically violent, one person who was involved in gang activity, or did you make any arrest for criminal activity?" The answer was "No."

Can you explain, Mr. Friedman, who was being targeted and what kind of effect that had on the law-abiding gun owners in Canada?

● (1250)

**The Chair:** Mr. Friedman.

**Mr. Solomon Friedman:** Absolutely.

I think the very first point you raised is the answer to your question, which is that we already have a wonderful database in this country of law-abiding citizens. It is the firearms licensing system.

Those individuals are pre-approved through rigorous background checks. In fact, if I were to compare the screening I underwent to obtain a secret security clearance for the Government of Canada with the screening that a law-abiding firearm owner goes through to obtain a possession and acquisition licence, without a doubt the licence screening is far more rigorous. We have a list of individuals who have been pre-cleared as law-abiding citizens, who are legitimate gun users. They are not the ones who are trafficking in firearms; they are not the ones who are smuggling firearms.

When we talk about the abolition of the registry and perhaps allowing firearms owners to transfer their firearms without a record, these are individuals who have already been pre-qualified by the Government of Canada as law-abiding citizens. They are not the ones who have anything to do with the proliferation of illegal firearms into this country.

The answer, of course, as you alluded to, is drug dealers—individuals with lengthy criminal records that would make them ineligible for a firearms licence, and in many cases, individuals with outright firearms prohibitions imposed by our courts, meaning that under no circumstances could they lawfully possess a firearm, transfer one legitimately, or obtain a licence. That has absolutely nothing to do with the registry. The registry targets one group, and one group alone, and that's law-abiding firearms owners.

**Ms. Candice Hoeppner:** Thank you very much.

Sergeant Grismer, in regard to the police using the registry—or not using it, because it's so unreliable—you referred very briefly to our current fingerprint database as well as our DNA database, and the reliability of both those databases as compared to the long-gun registry.

If we do truly depend on it, and if you can get warrants based on the fingerprint database or the DNA database, can you explain a little further why you can't you get a warrant based on the long-gun registry database? That's a huge gap.

**Det Sgt Murray Grismer:** My presentation says I cannot and will not swear out a warrant based on the information contained in it. For me to obtain a search warrant, I have to swear before a judge or justice that I invariably believe the information contained in it to be true. If I include anything from the firearms registry, I can't swear out the warrant. That would be a false declaration.

I can't do that because I know of the errors. I know that in excess of a million guns and other firearms in Canada aren't in the registry. I know of the tens of thousands of firearms that are registered using patent and model numbers, and I know of the number of firearms in the registry that hold multiple registration certificates.

It's a database that, by all accounts from people within the registry, will take 70 years of attrition in order to be anywhere near accurate. I'm not going to swear before a judge, justice, or court that I believe information from it be true. I can't do that.

**Ms. Candice Hoeppner:** Thank you.

Mr. Farrant, you spoke briefly about something that is very disturbing to me and, I think, to all Canadians. That's the fact that two NDP members of Parliament who represented their constituents—whom you also represent with your organization in Ontario, because these two NDP MPs are from Ontario—were penalized severely by their party for consistently representing the constituents' views on this issue. They say they were never told this was a whipped vote. No one ever went to them and advised them of the consequences.

Bruce Hyer and John Rafferty have consistently stood up for their constituents, and they have now been severely penalized by the NDP, which would rather hear from some union representatives than their own members of Parliament who represent their party.

Can you please explain to all of us on this panel what message that sends to the people you represent in Ontario about how well respected their views are by the NDP?

● (1255)

**The Chair:** Thank you.

**Mr. Greg Farrant:** Thank you very much, Ms. Hoeppner, for the question.

Quite clearly, members of Parliament are sent here to represent constituents. They're elected by people locally to come to Ottawa to represent the views of the people in the community in which they reside. The two individuals in question have consistently represented the views of our members and the vast majority of legal, law-abiding hunters and recreational sport shooters in the Thunder Bay area. In the process they have been told they are not allowed to do that; they're supposed to toe the party line.

The message that sends back to our members in Thunder Bay, and indeed all legal, law-abiding firearms owners, is that when you send somebody to Ottawa to represent your interests, don't count on it if they don't fall within the party paradigm. I think that's a dangerous message to deliver.

**The Chair:** Thank you very much.

We'll now go to the final question of the day.

Mr. Scarpaleggia, you have seven minutes, please.

**Mr. Francis Scarpaleggia:** Thanks very much.

There has been very interesting testimony by individuals who have a lot of experience and knowledge of this issue.

Mr. Friedman, you quoted the Supreme Court. There's another quote from the case Regina v. Wiles, which I guess you're familiar with. The court said that the possession and use of firearms—I'm translating here—was a heavily regulated privilege. I don't think we can make a case against the registry based on the fact that gun owners have rights maybe tantamount to what exists in the United States.

On that note, I'd like to say for the record that the gun owners I know in my community happen to be the pillars of the community. So we're not impugning gun owners by being in favour of the registry. I don't think that long-gun owners should be made to feel like criminals because they have to register their guns. I believe the government has torqued that rhetoric. Previous governments never

suggested they were criminals, but over time the government has told them they should feel like criminals if they register their rifles, and it snowballed from there. That's a bit of a tangent.

I understand your point about a gun owner perhaps feeling that they're breaking the law because some paper has been misplaced, or they haven't done their homework properly, or whatever. Our party recommended decriminalizing the failure to register the first time. I think if you fail to register two or three times, there might be a problem that needs to be addressed—maybe through the Criminal Code.

If we decriminalize the need to register the first time, would that not satisfy a lot of people who feel that maybe it's a little heavy-handed?

**Mr. Solomon Friedman:** Thank you very much for the question.

The reason I mentioned the Firearms Act reference, the Supreme Court case, was that it's the case in which the validity of the law, in fact the federal regulation of firearms, was disputed by several provinces.

The way the Supreme Court solved this issue, and it's key to your point, was by saying that the federal government has jurisdiction to regulate personal property that is otherwise under the jurisdiction of the provincial governments, because it does so using the criminal law power. Not testifying as a constitutional expert here, but as a criminal defence lawyer, I would in fact question whether or not Parliament would be allowed to enact simple regulatory provisions regarding private property such as firearms.

The issue of firearms' owners feeling targeted by Parliament, being treated as criminals, is why they end up at my door. I'm a criminal defence lawyer and this is a strong segment of my practice.

● (1300)

**Mr. Francis Scarpaleggia:** Well, the thing is—

**Mr. Solomon Friedman:** I wish that segment of my practice would disappear. The end result is that firearms owners are targeted; they're charged and they're prosecuted to the fullest extent of the law.

The question of whether or not that could occur by decriminalizing it doesn't take it out of the realm of criminal jurisdiction. You're telling gun owners, "You are governed under the same statute"—the Criminal Code—"that governs assault, murder, etc., simply because you've licensed your gun and have complied voluntarily with this scheme." That's the targeting of gun owners.

**The Chair:** The last word is yours, Mr. Scarpaleggia. You get to conclude for the day.

**Mr. Francis Scarpaleggia:** There were a couple of points made that I would like to address. One is that this registry was a reaction to a media story and that there's no evidence the registry is useful. We see that a lot in Parliament. For example, the government introduced anti-smuggling legislation in response to a highly sensationalized story about the arrival of a boat of refugees on the west coast. Respectfully, we also see the government constantly harping on about minimum sentences when there is no real evidence to suggest they work.

For the sake of consistency, I thought I'd mention that, Mr. Chair.

**The Chair:** Thank you very much, Mr. Scarpaleggia.

On behalf of this committee, I want to thank all of the witnesses for coming here and bringing their perspective. We have a number of other meetings and we'll hear from many other witnesses. We want to thank you for the presentations you've made today.

The meeting is adjourned.

**MAIL ➣ POSTE**

Canada Post Corporation / Société canadienne des postes

| Postage paid | Port payé |
|---|---|
| **Lettermail** | **Poste–lettre** |
| **1782711** | |
| **Ottawa** | |

*If undelivered, return COVER ONLY to:*
Publishing and Depository Services
Public Works and Government Services Canada
Ottawa, Ontario K1A 0S5

*En cas de non-livraison,*
*retourner cette COUVERTURE SEULEMENT à :*
Les Éditions et Services de dépôt
Travaux publics et Services gouvernementaux Canada
Ottawa (Ontario) K1A 0S5

**Published under the authority of the Speaker of the House of Commons**

## SPEAKER'S PERMISSION

Reproduction of the proceedings of the House of Commons and its Committees, in whole or in part and in any medium, is hereby permitted provided that the reproduction is accurate and is not presented as official. This permission does not extend to reproduction, distribution or use for commercial purpose of financial gain. Reproduction or use outside this permission or without authorization may be treated as copyright infringement in accordance with the *Copyright Act*. Authorization may be obtained on written application to the Office of the Speaker of the House of Commons.

Reproduction in accordance with this permission does not constitute publication under the authority of the House of Commons. The absolute privilege that applies to the proceedings of the House of Commons does not extend to these permitted reproductions. Where a reproduction includes briefs to a Committee of the House of Commons, authorization for reproduction may be required from the authors in accordance with the *Copyright Act*.

Nothing in this permission abrogates or derogates from the privileges, powers, immunities and rights of the House of Commons and its Committees. For greater certainty, this permission does not affect the prohibition against impeaching or questioning the proceedings of the House of Commons in courts or otherwise. The House of Commons retains the right and privilege to find users in contempt of Parliament if a reproduction or use is not in accordance with this permission.

---

Additional copies may be obtained from: Publishing and Depository Services
Public Works and Government Services Canada
Ottawa, Ontario K1A 0S5
Telephone: 613-941-5995 or 1-800-635-7943
Fax: 613-954-5779 or 1-800-565-7757
publications@tpsgc-pwgsc.gc.ca
http://publications.gc.ca

Also available on the Parliament of Canada Web Site at the following address: http://www.parl.gc.ca

**Publié en conformité de l'autorité du Président de la Chambre des communes**

## PERMISSION DU PRÉSIDENT

Il est permis de reproduire les délibérations de la Chambre et de ses comités, en tout ou en partie, sur n'importe quel support, pourvu que la reproduction soit exacte et qu'elle ne soit pas présentée comme version officielle. Il n'est toutefois pas permis de reproduire, de distribuer ou d'utiliser les délibérations à des fins commerciales visant la réalisation d'un profit financier. Toute reproduction ou utilisation non permise ou non formellement autorisée peut être considérée comme une violation du droit d'auteur aux termes de la *Loi sur le droit d'auteur*. Une autorisation formelle peut être obtenue sur présentation d'une demande écrite au Bureau du Président de la Chambre.

La reproduction conforme à la présente permission ne constitue pas une publication sous l'autorité de la Chambre. Le privilège absolu qui s'applique aux délibérations de la Chambre ne s'étend pas aux reproductions permises. Lorsqu'une reproduction comprend des mémoires présentés à un comité de la Chambre, il peut être nécessaire d'obtenir de leurs auteurs l'autorisation de les reproduire, conformément à la *Loi sur le droit d'auteur*.

La présente permission ne porte pas atteinte aux privilèges, pouvoirs, immunités et droits de la Chambre et de ses comités. Il est entendu que cette permission ne touche pas l'interdiction de contester ou de mettre en cause les délibérations de la Chambre devant les tribunaux ou autrement. La Chambre conserve le droit et le privilège de déclarer l'utilisateur coupable d'outrage au Parlement lorsque la reproduction ou l'utilisation n'est pas conforme à la présente permission.

---

On peut obtenir des copies supplémentaires en écrivant à : Les Éditions et Services de dépôt
Travaux publics et Services gouvernementaux Canada
Ottawa (Ontario) K1A 0S5
Téléphone : 613-941-5995 ou 1-800-635-7943
Télécopieur : 613-954-5779 ou 1-800-565-7757
publications@tpsgc-pwgsc.gc.ca
http://publications.gc.ca

Aussi disponible sur le site Web du Parlement du Canada à l'adresse suivante : http://www.parl.gc.ca