# Exhibit 22

# Testimony of Prof. David B. Kopel
# before the
# District of Columbia Council,
# Committee on the Judiciary

2012 FEB 13 AM 10: 10

COUNCILMEMBER MENDELSON

# Testimony on
# Bill 19-614, Firearms Amendment Act of 2011

Written Testimony, Feb. 13, 2012, for Committee hearing held Jan. 30, 2012

Presented by David B. Kopel

Adjunct Professor of Advanced Constitutional Law, Denver University, Sturm College of Law

Research Director, Independence Institute, Denver, Colorado

727 E. 16th Ave.
Denver, Colo. 80203

Attachments:

Bureau of Alcohol, Tobacco, Firearms & Explosives, 2010 Firearms Trace Reports for the District of Columbia (#113605), Maryland (#113579), and Virginia (#113610).

FBI, Uniform Crime Reports, Table 20. For 2009 and for 2010.

HELLER DC 000197

Bill 19-614 contains many improvements in the District's firearms registration law. These are commendable, and bring the District closer to compliance with the Second Amendment of the Constitution of the United States of America. There are some provisions, however, in which the Bill does not go far enough in reforming inappropriate provisions of existing statutes.

# I.   Discrimination against people with visual impairments

The Council is considering eliminating the law that forbids gun ownership by people whose eyesight is not good enough to obtain a driver's license.[1] This is commendable, and eliminates an irrational law. In order to drive safely, a person must be able to read road signs and to see objects that may be dozens or hundreds of yards away. A person engaged in long-distance hunting, without any guide or companion, might need similar visual acuity in order to shoot safely at a target that might be 500 yards away, and might be partially concealed by vegetation.

### A. Vague and excessive standard for vision

Unfortunately, there is a proposal to replace the first visual ban with a narrower, but still inappropriate, visual ban: on persons who are defined as "blind" according to D.C. law.

To understand the defects of the D.C. definition, particularly as applied to firearms owners in the home, let us start with the federal definition, which is precise:

[T]he term "blindness" means central visual acuity of 20/200 or less in the better eye with the use of a correcting lens. An eye which is accompanied

---

1 The District's firearms registration law currently provides that to register a firearm an applicant must demonstrate "vision better than or equal to that required to obtain a valid driver's license under the laws of the District of Columbia . . . ." § 7-2502.03(a)(11).

   A common line of argument is that issuance of a driver's license requires a vision test, so registration of firearms should be limited to persons who meet vision requirements. The analogy is inapt. A driver's license is required to *operate* a motor vehicle. There is no vision requirement in order to *own* or *possess* a motor vehicle, and any such requirement would surely be discriminatory and illegal. As noted above, there will be many instances in which residents of the District have a perfectly legitimate reason to *own* or *possess* a firearm in the home, but may never have any reason or intention to fire it.

HELLER DC 000198

by a limitation in the fields of vision such that the widest diameter of the visual field subtends an angle no greater than 20 degrees shall be considered for purposes in this paragraph as having a central visual acuity of 20/200 or less.

42 U.S.C. § 416(i)(1)(B).

In other words, the person sees at 20 feet about as well as a person with perfect vision would see at more than 200 feet. There are nearly one million Americans aged 40 or over in this category.[2] Of the persons defined as "legally blind," only about 10% have no vision (that is, they are "blind" in the common usage of the word). "The rest The rest have some vision, from light perception alone to relatively good acuity."[3]

The proposed D.C. amendment to § 7-2502.03(a)(11) adopts the definition of "blind" contained in § 7-1009(1):

"The term 'blind person' means, and the term 'blind' refers to, a person who is totally blind, has impaired vision of not more than 20/200 visual acuity in the better eye and for whom vision cannot be improved to better than 20/200, or who has loss of vision due wholly or in part to impairment of field vision or to other factors which affect the usefulness of vision to a like degree."

The D.C. and federal definitions have the same standards for a person who has trouble seeing things clearly at a distance. The D.C. and federal definitions diverge for persons whose distance vision is fine, but who have a narrow field of vision. The federal definition is that "legally blind" includes people whose field of vision is 20 degrees or less. The D.C. definition fails to specify what field of vision is so narrow that a person will lose her Second Amendment rights.

For a person with perfect eyesight, the total field of vision is commonly said to be 160 to 208 degrees. What if a person has a 100 degree field of vision? Can that person be refused a D.C. firearm registration? The proposed language does not tell us.

---

2 National Eye Institute, National Institutes of Health, *Prevalence of Blindness Data*, http://www.nei.nih.gov/eyedata/pbd_tables.asp.

3 *When are you Legally Blind*, Disability World (2007/12/06), http://www.disabled-world.com/artman/publish/legally-blind.shtml.

HELLER DC 000199

Peripheral vision is very important for driving. It is of much less significance for firearm defense in the home, because focusing on the gun's sights and on the target takes place in the center of the field of vision.

The proposed language about "other factors which affect the usefulness of vision to a like degree" is also vague, and does not provide the registering officials with appropriate guidance.

## B. The Americans with Disabilities Act

Discrimination against individuals who have the misfortune to be actually or "legally" blind is a straightforward violation of the Americans with Disabilities Act ("ADA"), and perhaps of other laws aimed at securing to disabled persons the full enjoyment of societal rights—of which the most important are, by definition, "fundamental" constitutional rights. Advocates of a law to completely outlaw the exercise of constitutional rights by a person merely because the person has a physical handicap carry a very heavy burden of proof.

The ADA, 42 U.S.C. ch. 26, comprehensively prohibits discrimination against disabled individuals by state and local governments, including the District of Columbia. In Subchapter II of the ADA, relating to public services, 42 U.S.C. § 12132 provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or *be subjected to discrimination by any such entity*." Yet that is what the District of Columbia is currently doing, and what some propose to continue doing.

Individuals who are legally blind are clearly protected by the ADA. Section 12102(1) of the ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual," and defines "major life activities" to include "seeing." Presumably, the District has prohibited blind or visually impaired persons from possessing firearms precisely because they are "disabled," in the sense that their impairment "limits" their ability to perform life activities such as "seeing," and thus, by inference, they are assumed to be unable to safely own a firearm. There would seem to be no other reason for enacting such a prohibition.

4

The District's ban against the mere possession of firearms by visually impaired persons is absolute: "no person...in the District shall possess or control any firearm, unless the person...holds a valid registration certificate for the firearm...." § 7-2502.01(a). The current ban on possession is for anyone who cannot pass the vision test for driving, and under the Act would still include many individuals protected by the ADA.

The District's current, and proposed, discrimination against persons with visual disabilities is a particular easy case under the ADA. No-one is requesting that the District make any "reasonable accommodation" in its employment practices, or make any modification of its buildings or other facilities. The only request is that the District *not* practice deliberate, targeted discrimination against the visually handicapped *regarding something in their own home, and not in public.*

It is well-established that the ADA provides statutory federal protection against state or local government policies which discriminate against the disabled based on stereotypes or generalizations. The assertion that the District discrimination against the visually handicapped is necessary for public safety, is ludicrous. Not a single state in the Union prohibits firearms ownership in the home by the legally blind. Over the course of three centuries—from the early colonial period to the present—not one state has *ever* discriminated against the visually impaired regarding gun ownership in the home. After three centuries, in fifty states, in a nation of more than 300 million people and just as many firearms, the D.C. City Council has not been presented with a scintilla of evidence that non-discrimination against the visually disabled has harmed public safety.

Of course under the ADA, it takes considerably more than a scintilla in order to make discrimination lawful. Putting the ADA aside, discriminating against the disabled simply because of "vague, undifferentiated fears" is a violation of the Fourteenth Amendment. *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985).

## C. Prohibition on various forms of firearms ownership or use

The discrimination seems premised on the notion that the only possible reason to own a firearm is to shoot someone with it in self-defense. This reason is the "core" of the Second Amendment right, according to *District of*

HELLER DC 000201

*Columbia v. Heller* and *McDonald v. Chicago*; but according to those same cases, the right is not limited to defensive shooting, but instead compasses legitimate uses in general, including hunting.

Many individuals own firearms without ever firing them for any purpose, and without any intention of ever firing them. Some of these individuals are heavily engaged in the hobby of gun collecting. Others simply enjoy owning their firearms, showing them to visitors to their home, and so on. By analogy, the First Amendment protects people who buy the leatherbound editions of the *Library of America*, regardless of whether those people read any of those books, or simply enjoy owning them.

Like leather-bound books, firearms are often handed down from generation to generation; they may be financially valuable, have sentimental value, or simply be part of the family's inheritance. Although Grandpa may never read his leather-bound edition of Frederick Douglass's autobiography (and even if he cannot read it because he is totally blind), he keeps it in the family for his children and grandchildren, who may read it one day. The same is true for a firearm. Merely because an individual does not want to or cannot use something today is no reason to outlaw his ownership of it for his descendants.

It is not unusual that when an individual passes away, any firearms he possessed will remain in possession of the surviving spouse. Should the surviving spouse be automatically barred from such possession, and be subject to financial loss and criminal penalties, solely because he or she happens to be visually impaired or blind? By banning mere ownership or possession because of disability, the District's law cuts far too wide a swath.

Additionally, people who are legally blind can and do *use* firearms safely and responsibly. With appropriate assistance, they can engage in target shooting at a range, or in another safe location. Some states have programs so that legally blind persons can hunt—if accompanied by someone to provide visual assistance. Persons in the District of Columbia have the right to own firearms so that they can use them in states where they can lawfully practice target shooting or hunting.

HELLER DC 000202

### D. Defensive Use

In addition, firearms are highly useful in connection with the core Second Amendment right of self-defense, even if they are not fired. Indeed, in the large majority of defensive uses, they are *not* fired. Professor Gary Kleck has conducted numerous studies regarding the use of firearms for self-defense. While there are academic disputes about Kleck's findings regarding *how often* guns are used defensively, there has never been a dispute regarding his findings about *how* guns are used defensively. Kleck's research about the *how* of defensive gun use has not even been disputed by the gun prohibition lobbies.

Kleck found that in approximately 76% of defensive gun uses (DGUs), no shot is fired. Merely displaying the gun (or the criminal hearing the distinctive sound of shotgun being racked, or the hammer of a gun being cocked) was sufficient to frighten away the attacker. Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun,* 86 JOURNAL OF CRIMINAL LAW & CRIMINOLOGY 150 (1995).

Thus, even if defensive gun use were the *only* lawful purpose for gun ownership, the data show even for the 10% of the "legally blind" population which is totally blind, that in 3/4 of the cases when *they* would use guns, no shot is fired, and hence there is no issue of public safety.

As for that minority of situations in which a shot is fired, the person who is legally blind will be in her home (pursuant to District law), and therefore in familiar surroundings. She will not be a police sniper who has to pick someone out of a crowd at a distance. To the contrary, she will be reacting to a sudden, violent, entry into the home by an intruder. Her defensive gun use will be against a target just a few feet away. The vast majority of defensive gun uses take place at distances of five feet or less. Even a person with very poor eyesight (who can see at 20 feet what a person with perfect vision can see at 200) can see well enough to aim at a violent attacker five feet away.

The notion that a legally blind person would fire wildly at targets he or she could not properly identify is supported by no evidence. It is mere prejudice and fear. The ADA and the Constitution both stand firm against irrational fears that because a person has a physical handicap, he must be morally or emotionally defective, and therefore dangerous. Simply because an individual is blind or visually challenged does not mean that he or she is careless, irresponsible, negligent, or lacking in good judgment. Such persons

HELLER DC 000203

are aware of their disabilities and as responsible citizens would no more start firing a weapon at an unidentified target than a person with perfect vision would fire when lighting conditions did not permit proper identification.

When Congress passed the ADA, it expressly found that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, . . . overprotective rules and policies, failure to make modifications to existing facilities and practices, [and] exclusionary qualification standards and criteria. . . ." 42 U.S.C. § 12101(a)(5). The "exclusionary qualification standards and criteria" in both the current and proposed versions of § 7-2502.03(a)(11) are "overprotective rules and policies" which fail to recognize that persons who are blind or visually challenged are capable of responsible firearm ownership, and that they cannot be discriminated against as a class in the exercise of their fundamental constitutional rights.

Putting the ADA aside, it is irrational and unconstitutional under the Fourteenth Amendment for governments motivated by fear and prejudice to discriminate against people with disabilities. *Cleburne Living Center, supra.*

Putting aside the Fourteenth Amendment, it is a violation of the Second Amendment for a city government to completely law-abiding, responsible citizens from exercising a "fundamental" constitutional right when there is *no* factual predicate to indicate that such persons are a menace to society, and especially when the experience of centuries in the rest of the United States of America proves that such persons are, as a class, responsible and safe, rather than dangerous and wild.

## II. The Registration System is Aberrational, Extreme, and Calculated to Suppress the Exercise of Constitutional Rights

The District's current law, and Bill 19-614's failure to sufficiently reform the current law, force one to address the question raised by Justice Breyer in *McDonald*: "When do registration requirements become severe to the point that they amount to an unconstitutional ban?"

HELLER DC 000204

## A. Repetitive Re-registration

Not one state in the Union requires that gun owners periodically —re-register their firearms, and that they pay an additional tax/fee for doing so. Every state which has some form of gun registration requires that the gun be re-registered only when ownership is transferred to another person.

A very few cities, most notably Chicago, do require periodic re-registration. To state the obvious, Chicago is not exactly a model for cities which are trying to enact gun laws compliant with the Constitution of the United States of America. *See McDonald v. Chicago*, 561 U.S. 3025 (2010); *Ezell v. Chicago*, 651 F.3d 684 (7th Cir., 2011).

To require a registered owner to re-register over and over again, and pay a fee every time he does so, amounts to unending bureaucratic harassment for its own sake. The repetitive charges for registration amount to a tax particularly aimed at the exercise of constitutional rights, rather than a generally-applicable tax for raising revenue for government operations. As such, the current law's unending collection of money from gun-owners simply for continuing to own their already-registered guns is unconstitutional. *Grosjean v. American Press Co.*, 297 U.S. 233 (1936) (special tax on First Amendment rights).

## B. Long gun registration in the United States

The only state in the Union which registers long guns as a general class is Hawaii. California will start doing so in July 1, 2012—simply by retaining data on dealer sales from that date forward. The state was already collecting that data as part of its background checks. Thus, no action is required on the part of the gun purchaser to complete the registration.[4]

So as of early 2012, the only evidence, based on experience, about the benefits of comprehensive long gun registration in the United States, would be those from Hawaii.

Notably, not a single witness at the January 30 Committee hearing presented *any* evidence specifically about Hawaii. If there were data showing that Hawaiian long gun registration were beneficial to public safety, one may

---

4 Cal. Penal Code §§ 11106, 26905, as amended by Assembly Bill 809 (2011).

HELLER DC 000205

presume that at least one witness from the many gun control organizations which testified would have presented that data.

Not one state in America today, nor ever in the history of the United States, has required long gun purchasers to make multiple trips to a police station for every single long gun purchase. To the extent that any local governments, such as Chicago, have done so, they have done so based on the explicit and incorrect premise that the Second Amendment did not apply to their anti-gun laws.

In *Lamont v. Postmaster General*, 381 U.S. 301 (1965), the Supreme Court held that requiring a person to go to the post office to pick up "communist political propaganda", rather than have the propaganda delivered to his home, was too great a burden on freedom of the press. Surely under the Constitution today, a person who wishes to acquire a firearm for lawful self-defense is not supposed to be treated far worse than a person who wishes to acquire communist political propaganda.

# III. Empirical Information

## A. Trace Data

If the instructions for a computer printer warn "Do not submerge the printer in water," then a reasonable person will not put the printer in his bathtub. Printed warnings and cautions exist for a reason.

Some advocates of the long gun registration plan, however, do not seem to pay attention to printed warnings.

The Bureau of Alcohol, Tobacco, Firearms & Explosives provides a printed warning to accompany its firearms tracing information:

"Firearms selected for tracing are not chosen for purposes of determining which types, makes or models of firearms are used for illicit purposes. The firearms selected do not constitute a random sample and should not be considered representative of the larger universe of all firearms used by criminals, or any subset of that universe."

HELLER DC 000206

In other words, just because a type of firearm appears in a particular number or percentage in the ATF report does not mean that those firearms were used for an illicit purpose, or that the percentage is representative of use in crime.

Yet surprisingly, some of the oral testimony about long gun registration at the Committee's hearing on January 30 was apparently based on BATFE traces—heedless of BATFE's own warnings. A prudent person should not take advice about how to use guns from a person who ignores the printed warnings in the owner manual that comes with the gun. A prudent legislator should not take advice about gun policy from a person who ignores BATFE's printed warning about gun traces.

One witness, Mr. Daniel Webster, of the Center for Gun Policy and Research, presented some testimony about the percentage of firearms "recovered" by the Metropolitan Police Department (MPD) in the "past year" were long guns. Although he provided no citation in his oral testimony, his figures appear to be based on BATFE traces in 2010. (Which is not technically the "past year.")[5]

As such, his testimony makes precisely the error which BATFE warned about: conflating traced guns with illicit or criminal guns. His figure that 17% of "recovered" guns in the District were long guns is actually the percentage of *traced* guns that were long guns. But about a third of the guns "recovered" by the MPD were never submitted for tracing.[6]

Moreover, just because a firearm is "traced" (or "recovered) does not mean that it is an illicit or criminal gun. In fact, most of the recovered firearms were not reported as being associated with any of the categories of crimes of violence specifically listed in the ATF report. The largest category was "possession of weapon" (571 firearms), which is not a crime in most states, but is a crime in the District if the gun is not registered, is of a type that the District bans, or is possessed outside the home (possession by felons or other

---

5 Mr. Webster said that 17% of guns recovered in the past year in D.C. were long guns, as were 40% in Maryland, and 34% in Virginia. These figures are close to the BATFE 2010 data (the most recent available) on the types of firearms traced in the respective jurisdictions: 16.8% for the District, 40.6% for Maryland, and 33.9% for Virginia. The BATFE reports for the three jurisdictions for 2010 are attached to this testimony.

6 According to ATF, 1,545 firearms from the District were recovered and submitted for tracing in 2010. That is significantly different from total firearms recovered, because not all recovered guns are submitted to the ATF for tracing (the MPD Annual Report for 2010, at page 23, shows 2,248 firearms recovered). Of the 1,545 submitted to ATF, 260 were shotguns or rifles, or approximately 17%.

HELLER DC 000207

disqualified persons is a federal offense). Citing violation of restrictive registration and possession requirements as a reason to support restrictive registration and possession requirements is circular reasoning.

The next two largest categories were "firearm under investigation" (433 firearms) and "found firearm" (318 firearms). Only 206 recovered firearms submitted for tracing were associated with the categories "dangerous drugs, aggravated assault, homicide, robbery, family offense, burglary, and simple assault." It is unknown what percentage of these were rifles or shotguns, but other evidence, discussed below, indicates that the number of long guns actually used in violent crimes in the District is minimal.

### B. Police and FBI Data on long gun use in crime in the District

According to the FBI's Uniform Crime Reports ("UCR"), the number of shotguns and rifles used in the commission of homicides in the District in 2010 was zero. Table 20 of the UCR for 2010 is attached. For 2009, according to the UCR, there was one homicide committed in the District with a rifle and one with a shotgun. Table 20 of the UCR for 2009 is attached. For the years 1995-2008, the UCR did not provide a breakdown of the use of handguns or long guns in homicides in the District, because the District did not submit that supplemental data, the data was incomplete, or it did not meet UCR guidelines. The UCR does record one homicide with a shotgun in the District in 1997. See summary with links, attached. For both 2009 and 2010, according to the UCR, the number of homicides in the District committed with knives or cutting weapons exceeds the number of long gun homicides. For both years, the number of homicides using weapons other than firearms or knives exceeds the number of long gun homicides. For both years, the number of homicides committed using hands, fists, and feet exceeds the number committed using shotguns and rifles combined. See Table 20 for each year.

### C.    Anecdotes

The rarity of use of long guns in crime in the District is underscored by Chief Lanier's testimony. Rather than presenting statistics on the use of long

HELLER DC 000208

guns in crime, Chief Lanier offered some anecdotes of long gun misuse. These anecdotes do not have anything to do with the D.C. registration system:

- The Holocaust museum shooter was James W. von Brunn, an 88 year old man who was a mentally deranged, anti-Semitic, white supremacist. He was a convicted felon, and was thus legally forbidden from possessing a firearm. He was a resident of Maryland, not the District.[7] It is thus unclear how registration of long guns in the District would have prevented this shooting, through verifying Von Brunn's eligibility to possess the firearm, or tracking the firearms after the crime was committed, or otherwise helping solve the crime.

- The individual who fired a rifle at the White House last fall was Oscar Ortega-Hernandez, a resident of Idaho.[8] Again, a requirement to register rifles in the District, which is already in effect, did not prevent and could not have prevented this shooting, through verifying Ortega-Hernandez's eligibility to possess the firearm, or tracking the firearms after the crime was committed, or otherwise helping solve the crime

- The person who shot at military facilities five times was Yonathan Melaku, a naturalized citizen from Ethiopia, who was a resident of Virginia, and who shouted "God is great" in Arabic as he fired at military facilities, all of which were located in Virginia.[9] It is again unclear how this incident supports registration requirements for long guns in the District of Columbia.

- A shotgun was used several years ago in a street battle several years ago on E Street, and in a robbery in the 4th District. Chief Lanier's testimony did not explain whether either of these shotguns was registered, or how registration would have prevented or led to the solution of these two crimes.

---

7 Nafeesa Syeed & David Espo, *Holocaust Museum Shooting In Washington D.C.*, HUFFINGTON POST, June 11, 2009; http://www.huffingtonpost.com/2009/06/10/holocaust-museum-shooting_n_213831.html; *Guard killed during shooting at Holocaust museum*, CNN.com, June 10, 2009; http://articles.cnn.com/2009-06-10/justice/museum.shooting_1_holocaust-museum-von-brunn-security-guard?_s=PM:CRIME.
8 *Accused White House shooter pleads not guilty*, REUTERS, Jan. 24, 2012, http://www.reuters.com/article/2012/01/24/us-usa-security-whitehouse-idUSTRE80N24I20120124.
9 Associated Press, *Pentagon shooter pleads guilty, agrees to 25 years*, FOXNEWS.COM, Jan. 26, 2012, http://www.foxnews.com/us/2012/01/26/accused-pentagon-shooter-former-marine-melaku-pleads-guilty/.

HELLER DC 000209

### D. Social Science

Mr. Webster is the author of a comparative state-level study which concludes that state gun licensing and registration laws are associated with lower crime levels. Taking the study at face value, the study offers nothing to bolster the District's odd laws. At the time of the study, Hawaii was the only state which had long gun registration. Accordingly, whatever the study found about registration was a finding about *handgun* registration, which, as the Court of Appeals observed in *Heller II*, is much more prevalent than long gun registration.

More relevant to the purposes of Bill 19-614 is another study which actually included the District of Columbia, and compared its laws to other cities. The largest, most detailed comparative study of the effects of various firearms laws was conducted by Florida State University criminologist Gary Kleck, and published in his book *Point Blank: Guns and Violence in America.* That book was awarded the highest honor by the American Society of Criminology: the Michael Hindelang Book Award "for the greatest contribution to criminology in a three-year period."

The Kleck study examined many years for crime data for the 75 largest cities in the U.S., including the District of Columbia. The study controlled for numerous variables such as poverty, race, arrest rates, and so on. Kleck's study found *no* crime-reductive benefits from gun registration.[10]

Another study examined the overall strength of gun control in the 50 states and D.C., and its effects on crime. The measure for control strength was a

> "comprehensive index, published by the Open Society Institute, covering 30 different facets of state gun laws, enforcement effort, and the stringency of local gun ordinances. The index weights upstream measures such as gun registration more heavily than downstream measures such as safe storage laws. It also weights regulations governing handguns more heavily than those on long guns."

---

10 This is not a novel finding. A 1958 comparative examination (although much less sophisticated than Kleck's), also found no benefits from registration. William C. Shead, Comment, *Do Laws Requiring Registration of Privately Owned Firearms Lower Murder Rate?* 3 S. TEX. L.J. 317 (1957-1958).

HELLER DC 000210

At the time of the study, the District of Columbia's handgun ban and ban on home self-defense was in effect.

The multivariate study found no crime reductive benefits from a higher score on the gun control index. John C. Moorhouse and Brent Wanner, *Does Gun Control Reduce Crime Or Does Crime Increase Gun Control?* 26 CATO JOURNAL 103 (Winter 2006). Unlike the Kleck study, the Moorhouse and Wanner study did not specifically examine registration in isolation; but it did find that in a scoring system in which many points were awarded for registration, high scores did not yield positive results for public safety.

. The Centers for Disease Control, and the National Academies of Science each conducted comprehensive meta-studies of firearms control laws. (A meta-study is a study of a collection of studies on a topic.) Examining all the research, both studies reported that there was insufficient evidence to determine that gun control in general, and, specifically, firearm registration, had beneficial effects. NATIONAL RESEARCH COUNCIL OF THE NATIONAL ACADEMIES, FIREARMS AND VIOLENCE: A CRITICAL REVIEW (National Academies Press 2004); Task Force on Community Preventive Service, Centers for Disease Control, *First Reports Evaluating the Effectiveness of Strategies for Preventing Violence: Firearms Laws*, 52 MORBIDITY AND MORTALITY WEEKLY REPORT 11 (OCT. 3, 2003).

## E. Long gun registration in other nations.

There are substantial differences between the United States and other nations, including the fact that gun laws in other nations do not have to comply with the Second Amendment. Even so, they are of some interest because they illustrate the great potential for failure for the long gun registration project on which the District is embarking.

### 1. Canada

Across the spectrum of Canadian political observers, it is widely expected that Canada's long run registration system is going to be repealed. The system was enacted in 1995, with the promise that the registry would cost only $2 million (Canadian). Instead, the cost has reached over $2 billion and

HELLER DC 000211

is still climbing.[11] (To put this in perspective, the total annual expenditures on policing nationwide are less than 8 billion.) The $2 billion that was wasted on the registry could have been spent on putting police on the street (rather than shuffling paperwork). Or it could have upgraded forensics laboratories. Or it could have paid for social worker outreach to potentially violent people.

Rather than improving public safety, the long gun registry has been a gigantic waste of limited resources, a notorious fiasco. Allan Rock, then Justice Minister, claimed that universal firearm registration would reduce criminal violence, total suicides, and domestic abuse. He spoke forcefully against the use firearms for self-defense, except by police and military, and said that the strict gun laws would distinguish Canada from the US. (Put another way, Mr. Rock was saying that his long gun registry was the opposite of the Second Amendment.)

The Canadian gun prohibition lobby contends that the registry helps police know when they are entering a home that contains a firearm. But since violent criminals rarely register their guns, a prudent police officer must assume that any home could contain an unregistered gun.

### 2. New Zealand

New Zealand's Arms Act of 1983, enacted at the request of the police, abolished the registration of rifles and shotguns. Rifle registration had been the law since 1920, and shotgun registration since 1968. The New Zealand Police explained that long gun registration was expensive and impractical, and that the money could be better spent on other police work. The New

---

11 Auditor General of Canada, *Costs of Implementing the Canadian Firearms Program* (2002), http://www.oag-bvg.gc.ca/domino/reports.nsf/html/20021210ce.htm; Philip C. Stenning, *Long Gun Registration: A Poorly Aimed Longshot*, 45 CANADIAN JOURNAL OF CRIMINOLOGY AND CRIMINAL JUSTICE (no. 4, October 2003); Gary A. Mauser, *The Failed Experiment: Gun Control and Public Safety in Canada, Australia, England and Wales*, 71 PUB. POL'Y SOURCES 4 (2003), http://www.fraserinstitute.ca/admin/books/files/FailedExperiment.pdf ("The final costs are unknown but, if the costs of enforcement are included, the total cost could easily reach $3 billion."); Gary A. Mauser, *After the Gun Registry*, FRASER FORUM (May 2006): 18-20; Gary Mauser & W.T. Stanbury, *Can the Canadian Firearm Registry Reduce Gun Deaths?* FRASER FORUM (July 2003): 26-27; Jason Fekete, *Redirect Gun Registry Funds*, THE OTTAWA CITIZEN, July 8, 2003, *available at* http://lufa.ca/news/news_item.asp?NewsID=2226 ("The federal government should abolish the $2-billion firearms registry for long guns and redirect the tax dollars to municipalities, health care, education and law enforcement, says a report to be presented to a city committee.").

HELLER DC 000212

Zealand Police pointed out that data base management is an enormously difficult and expensive task, that the long gun registration data base was a mess, and that it yielded virtually nothing of value to the police. Superintendent A.G. McCallum, *Firearm registration in New Zealand*, NZ Police, Sept. 1982.

Instead, New Zealand now has a system for the licensing of gun owners (as do a few U.S. states). Once the license is issued, the police do not waste their time, or the gun owners' time, trying to keep a record of every single long gun possessed by the licensed owner.

Although some gun control advocates began pushing in 1997 to revive the registry, since, supposedly, computers would make it work this time, the plan was rejected after extensive debate and analysis over several years.

# Conclusion

From 2008 until the present, advocates of the District's onerous system of long gun registration have failed to produce what they have failed to produce a single example, from anywhere in the world, in which a long gun registration system like that in the District has been shown to reduce crime.

According to the Constitution, when a substantial burden (such as D.C.'s onerous and aberrational registration system) is imposed on the exercise of fundamental constitutional rights, that there be substantial benefits, not speculative ones, and not ones that are contrary to present body of social science evidence and of experience. After four years of trying, the advocates of highly repressive gun laws in the District have still failed to demonstrate what *Heller II* called "a close fit between those requirements" and important or compelling governmental interests.

HELLER DC 000213

# WRITTEN TESTIMONY OF EMILY MILLER
## Before the District of Columbia Council Committee on the Judiciary
## Hearing regarding Bill 19-614, Firearms Amendment Act of 2011

## JANUARY 30, 2012

COUNCILMEMBER MENDELSON
2012 FEB -9 PM 3:40

**Table of Contents**

Recommendations to the Committee for Amending the Bill   Page 2

Oral Testimony at Hearing (Summary of Points)   Pages 3 - 4

Addendum to Testimony: Gun Ownership and Firearm Sales   Page 5

Fully Written Testimony on Current Registration Process

- Introduction   Pages 6 - 7
- Registry Office and Paperwork   Pages 8 - 15
- Firearms Safety Course   Pages 16 - 21
- Purchasing & Transferring Guns   Pages 22 - 28

HELLER DC 000249

## ORAL TESTIMONY OF EMILY MILLER (Summary points)

Mr. Chairman and committee members, thank you for giving me this opportunity to share my experiences with you.

My name is Emily Miller. I'm a District resident, and I want to get a gun to protect myself. As I've been going through the gun registration, I've documented every detail in my newspaper, The Washington Times. But today, I'm here to testify as a private citizen of D.C. about my personal views and experiences trying to get a legal gun in this city.

I always knew getting a legal gun would be a challenge, but I had no idea it would be this frustrating, time-consuming, expensive and complicated. As of now, I'm in the 10-day waiting period to see if my registration application is approved for a handgun. Or as I've tracked it, I've completed 14 of the 17 steps the city requires to register a gun.

For me, the safety class has been the biggest barrier to gun ownership - in time, expense and my personal safety.

It took me a long while to find an instructor for the course - it seemed the District was making it as difficult as possible. As you know, the police give out the list of certified instructors with only their names and phone numbers. I called every single one of the 47 people on that list. And only found four instructors willing and able to teach the class. The prices were mostly in the range of $200 to $250.

It doesn't say it in the registration packet, but from making all these calls, I quickly learned that the instructors are not allowed to teach the course within the District city limits. I just don't understand how it can be constitutional that I have to go outside Washington in order to exercise my Second Amendment right to keep and bear arms in D.C.

All of the instructors are in Maryland and Virginia and teach the class out of the their homes - or more specifically, as one man said, in his basement. They all live from 30 minutes to an hour drive each way. None were near a Metro stop. I don't know what a D.C. resident who doesn't have a car would do to take the mandatory class.

Above all that, the biggest problem is being a woman and trying to find a way to feel safe while taking a class at a strange man's house. Since the list only gives the instructors' phone numbers - but no important details such as address, website or business affiliation- they are almost impossible to investigate.

I don't believe it is right that the DC police require me to go to an armed stranger's house - in another state - for any reason. I already don't feel safe. That's why I wanted a gun in the first place.

Another huge hurdle in the gun registration process is buying the gun. Nowhere in the 22-page packet does it say that Charles Sykes is the only gun dealer in DC. And since it is mandatory to use his services - because we aren't allowed to pick up guns ourselves from stores in neighboring states - I think you should tell people in the instructions that they will have to pay his $125 transfer fee.

Which brings me to the astronomical cost of registering a gun in DC. On top of Sykes's fees, I paid $225 for the class. $35 for range fees and ammunition. The passport photos cost $20. Then I paid the city $35 for fingerprints, $13 for gun registration and $12 for a ballistics test. So I have spent a total of $465 in fees. And that doesn't include the cost of the gun!

I had no idea registering a gun would be this expensive. I think the registration packet should state these costs up front. This is a lot of money for me, and I have a good job. So I don't know how a lower-income DC resident could afford almost $500 in fees to have a legal gun.

Mr. Chairman, I was pleased to see your bill would have the police take photos instead of our having to buy passport photos. And you would eliminate the ballistics test. Those things would save us $32 in fees, but it helps more in saving time.

And that's the other and final huge hurdle I want to mention today. It takes way too much time to get a gun legally in D.C. From taking the written test, the five-hour class, waiting in line at the DMV to pay the fees, getting fingerprinted, meeting with Sykes to transfer the gun and on and on. No one can register a gun in DC without taking at least two or three days off work. And as you know, the registry office is closed on weekends.

Members of the committee, in my opinion, this complicated registration process doesn't stop people from getting guns, it just drives them to get guns illegally because it's faster and cheaper and a lot less frustrating.

I think you should encourage people like me -- who are trying to abide by the law -- by making this gun registration process less burdensome on the citizen.

I've only touched on some of my main issues with the registration process. My written testimony will give you a complete perspective of what we go through.

Thank you for your time.

HELLER DC 000251

# GUN MANUFACTURING AND OWNERSHIP STATISTICS

- Gun manufacturing has increased by 45% between 2000 and 2009 (the most recent date for which data is available)

  *The Bureau of Alcohol, Tobacco, Firearms, and Explosives, 2011 Report, http://www.atf.gov/publications/firearms/121611-firearms-commerce-2011.pdf*

- Gun ownership has increased: 47% of Americans report having a gun on their property, the highest recorded since 1993, up from 41% a year ago.

  *Gallup Report, published October 26, 2011, http://www.gallup.com/poll/150353/self-reported-gun-ownership-highest-1993.aspx*

- Another indicator of ownership is the number of FBI background checks conducted for potential gun owners. The FBI recorded that background checks have increased every year since 2002, reaching a record high of 14.4 million checks last year.

  *FBI Total NICS Background Checks, November 30, 1998-April 30, 2011, http://www.fbi.gov/about-us/cjis/nics/reports*

- Daniel Vice of the Brady Campaign to Prevent Gun Violence cited the Violence Policy Center's (VPC) interpretation of a General Social Survey (GSS) by the National Opinion Research Center (NORC). The study examines the shift in data from 1973 through 2010. The Gallup Poll, conducted in 2011, shows more current data and trends.

  *http://www.vpc.org/studies/ownership.pdf*

HELLER DC 000252

## COMPLETE WRITTEN TESTIMONY

## MOTIVATION FOR BUYING A GUN

I want a gun. I don't feel safe living in Washington, D.C. and want to protect myself. I'm starting today by going down to City Hall to find the gun permit office to tell them, "I want a gun." This series will follow me as I navigate the city bureaucracy and outdated rules in order to legally buy a firearm.

My desire for a gun started when I had to face down over a dozen criminals on an empty cul de sac in Washington, D.C., armed only with a Blackberry.

It was New Year's Day 2010, and I'd been staying in the house to dog sit for friends who were on vacation. I'd returned from walking the dog when I saw a man coming from the house. "What are you doing?" I asked, sensing something was off with the situation. The Golden Retriever just stood next to me with a slack leash.

"We're here to clean the pool," the man said. He looked nervous and his eyes were blood-shot.

I was pretty sure my friends hadn't called in a swimming pool emergency during the middle of winter. "No, we didn't call for you," I said.

"Oh, then it must be the house next door," he said, smiling nervously. He turned and walked away quickly.

I'd left the front door unlocked since I was walking the dog for less than ten minutes. (I know, lesson learned.) After the man left, I was still suspicious so I went inside, grabbed my Blackberry and clicked on the icon for the camera. I walked down the street, and as I turned the corner, I saw about 15 scruffy young men standing around two pickup trucks. We were at the end of a woody, dead-end road.

I nervously held up my Blackberry to take a quick photo of them and the license plates. Suddenly, the blood-shot-eyed guy darted out, blocking the shot. "What are you doing?" he asked. I looked around at all the men staring at me and was suddenly scared. "Nothing, I'm um, just going now," I said as I put my Blackberry down instead of taking the picture around him and went home.

Hours later, I was at a New Year's Day party when my phone rang. It was my credit card company asking if my card was in my possession because there were odd charges on it. I looked at my wallet and saw that all my cash was gone and the cards. It suddenly dawned on me that the "pool guy" had been inside the house.

I called 911 and the D.C. police met me at the house. When they heard the story, they called in a detective. I got a long lecture about facing down criminals alone. They searched the big house top-to-bottom to look for windows or doors left unlocked by the bad guys to come back for more. Now I was scared. I had promised to watch my friend's dog, which meant I was spending the night.

I was alone in an empty house with a useless dog. I spent the night in the master bedroom with a dresser pushed up against the inside of the door. I didn't sleep much. I kept thinking how safer I would feel if I had a gun next to the bed.

The next day, I took to Twitter to ask about how to get a gun. The replies were disappointing: "No 2nd amend in D.C." "Only one guy can sell weapons in DC- good luck with that." "Call the

NRA." I knew that the Supreme Court had recently overturned the Washington's gun ban, so I didn't understand why gun owners were so down on my idea. My friends came back the next day, but I sill wondered why I couldn't get a gun.

The following summer, D.C. mayoral candidate and then-city council Chairman Vincent Gray was at my neighborhood picnic. I approached Mr. Gray as he was glad-handing in the basketball courts and told him that I wanted two things: to stop the parking ticket assault in this city and a gun.

His smile faded. "A what?" he asked, leaning down to hear me.

"A GUN. I want a gun." I said emphatically. "I don't know what's going on in this city, but apparently no one is listening to the Supreme Court."

"Well, um, Emily is it? Let me introduce you to my campaign chairman," Mr. Gray said, leading me away toward a guy with a clipboard. That would be the politician's equivalent of "talk to the hand." Mr. Gray went on to be elected mayor of D.C.

Recently, current city council chairman Kwame Brown came to The Washington Times for a roundtable interview. After he'd been asked about the budget, lottery, ethics and education, I raised my hand. "Can I ask you about guns in DC?"

"You say guns?" the chairman asked.

"Guns," I replied as I held up both of my hands in the shape of a handgun, like they do in "Charlie's Angels."
"Oh you used both your fingers," Mr. Brown said, laughing. "You're a shooter, you use both of them."

I didn't laugh with him. "Well, I'm trying to get a gun," I said.

"You're trying to get a gun?" he repeated.

This is not going to be easy.

I want a gun to protect myself, but it seems my city government officials may work against me. There's only one way to find out if that's the case and that by going through all the hoops.

## GUN REGISTRY OFFICE

The D.C. Gun Registry office is not where you go for help getting a legal gun; it's where you go to get more confused by bureaucracy.

After going thorough the magnetometers at D.C Police headquarters on Wednesday, the first door I saw said "GUN REGISTRY." That was easy, I thought. I went through the glass doors and entered a narrow office with a desk in front manned by a single female unformed police officer.

"I'm here to get a gun," I told her. I was the only one there. Her name tag said "D.A. Brown."

"You want to register your gun?" Officer Brown asked.

"No, no, I don't have a gun yet. I mean I'm here to get a gun permit," I said.

"This is D.C., you can't get a gun permit. You can't be carrying a gun around with you. It's for home protection," she said. I was totally confused. I asked what was the difference. "You can't carry it around like I do," she said, pointing at the gun in her holster. "You can't get a license. You can buy a gun and register it."

She started putting piles of paper on the desk between us. "Here's everything you need to know," she said. "You fill out this form. This one has a trick question so be careful. This one you give to Sykes."

"What do I do first?" I asked picking up all the papers.

"You get a gun and then get it registered," she said.

"Oh, okay, well where do I go to buy the gun?" I asked.

The officer seemed very annoyed with my questions. "You can go to any licensed dealer in another state or on the internet," she said. "But you can only get a gun on the DC approved list."

"Where do I see the list? And can I get any gun?"

"You can get a Glock if that's what you want," she said. I'd heard of a Glock on TV. "You just buy it. Then give the form to Charles Sykes downstairs and he'll go pick it up for you and transfer it. And if you get a semi-automatic, you can only get a 10-round magazine."

"A ten what?"

"Magazine, magazine, where the ammunition is," she said, clearly tired of the question. "Look it's all in the packet here. I'm only telling you these things to help you, but you need to go through the packet."

I thanked her and sat outside her door for a while to go through the piles of paper. A few minutes later, Officer Brown came out and handed me another piece of paper. "Here, you need to take a safety class, these people teach them. It's all in your packet but here are some names."

I added the paper to the pile and kept reading. In all the time I was there, only one other person came into the office. It seems there is no rush in Washington to register legal guns. At 3:15pm, she walked briskly out of the office, carrying a large black folder. She locked the door and posted a sign that said: "OUT OF OFFICE BE BACK SHORTLY."

HELLER DC 000255

## A 17-POINT CHECKLIST FOR THE REGISTRY PROCESS

My quest to get a legal handgun in Washington, D.C. feels daunting. I went to the D.C. Firearms Registration office two weeks ago to start the process of getting a legal gun by picking up a 22-page packet of forms and instructions.

Since then, I've been overwhelmed by all that is required before I can take legal possession of a purchased gun.

I needed to get organized, so I made a checklist of the required steps, bringing order to the complicated mess of instructions given by the city.

I'm going to work my way down this list:

1) Fill out the eligibility form and get it notarized

2) Find a D.C.-certified instructor to sign up for a firearms safety course

3) Take four hours of classroom instruction and one hour of range instruction on safety and have the instructor fill out the compliance form

4) Provide proof that my vision is okay (my driver's license suffices, one down!)

5) Provide proof of residency (my license works, two down!)

6) Get two passport photos

7) Study D.C.'s laws and regulations for firearms (guide provided in the packet)

8) Pass a 20-question multiple choice test on No. 7

9) Be fingerprinted

10) Pay fees totaling $60

11) Buy the gun

12) Arrange with D.C.'s only legal gun broker, Charles Sykes, to transfer the gun (cost $125) to him

13) Have Mr. Sykes fill out the his section in the application for firearms registration certificate

14) Take all the applications requirements from above to the registration office

15) After the application is in, wait five days for the application to be approved

16) After the five days are up, wait another 5 days for Mr. Sykes to be legally allowed to release the firearm

17) Pick up the gun from Mr. Sykes and take it to the police department for a ballistics test

If I pass all these tests, then I get the gun, but have to go straight home since it's illegal to carry in the city.

So far, I've completed No. 4, 5, half of No. 1 (not yet notarized) and started on No. 2 by calling some instructors to sign up for a class.

At this rate, I should be an owner of a legal handgun about the same time I'm eligible for Social Security.

## THE ELIGIBILITY FORM AND NOTARY PUBLIC

The right to keep and bear arms only applies to certain people in the nation's capital. One of the 17 steps that I still have in order to register a gun in Washington, D.C. is filing out a "Statement of Eligibility." The form contains 10 yes-or-no questions intended to weed out those ineligible to legally possess a pistol.

Some of the barriers to gun ownership are expected. It's easy to choose 'no' for: conviction (or indictment) of a violent crime or weapons offense; conviction in the past five years of serious drug charge, assault, threat to do bodily harm; acquitted of a criminal charge by reason of insanity or alcoholism; or committed to a mental hospital in the past five years.

The five-year limit makes me wonder. Can Marion Barry -- the former D.C. mayor and current councilman -- register a gun? He was charged with smoking crack cocaine. But the conviction was just a misdemeanor and 20 years ago, so he's in the clear.

Moving on: "Do you suffer from any physical defect which makes it unsafe for you to possess and use a firearm safely and responsibly?" What about a bad knee from running? Long hair? What about being only 5'2" tall? I checked off 'no.'

Number 7: "Have you ever been found negligent in any firearm related mishap causing death or injury to another human being?" Since I have never owned a gun, this one was easy. But I wondered if this meant that you could shoot yourself in the foot and still get a gun? Plaxico Burress would benefit from this wording.

The next qualification makes it clear that D.C. doesn't want to give guns to non-violent but seedy characters. If you've been convicted of prostitution or "operating a bawdy house", which I Googled to learn means running a brothel. So the pimps can't get guns, but the D.C. Madam may be allowed to bear arms since her conviction is outside the statute of limitations. (Correction: The D.C. Madam died in 2008.)
Also, if you've ever been convicted of "vagrancy", you're out of luck. I'm not sure why hanging around the 7-Eleven parking lot too long makes you unqualified to have a gun, but someone in the city government does.

I went back to Google to figure out what "abrogating strikes" means. I went through three page of search results, and I still don't know. It's something union-related so as a conservative, I'm sure I haven't done it.

Straight check marks in the "no" column down the page. When I picked up the big packet of paperwork at the DC Firearms Registry, the police officer told me to be careful filling out the eligibility form because there was a "trick question" on it. I've reading the questions slowly to be sure that I could get to the next stage in this process.

Next question 9 asks, "Have you provided accurate and true facts on your application for a Firearms Registration Certificate?" Bingo! The trick question is found second to last. I check my first "yes".

The last question was easy. I've never been in the military so not dishonorably discharged either.

I sign my name to affirm that I have given accurate information on the document. I'm about to check this off my to-do list when I read the bottom, which requires the signature of a notary public.

Now my to-do list is back to 17 steps to do. They just keep putting up more walls to getting a legal handgun in D.C. I'm off to the bank to get this notarized so I can move on to the next form in the stack of paperwork.

## RETURNING TO THE REGISTRY OFFICE FOR MORE PAPERWORK

Like every time I've been to the gun registry office, I was the only one. People aren't lining up to be put through the hassle and expense needed to legally register a firearm. I approached the counter that comes up to my chest and saw a female police officer sitting at her desk. When she looked up, I recognized Officer Brown.

"Hi, I bought a gun, but it hasn't come in yet to Sykes, so I want to take the written test while I'm waiting," I said, referring to Charles Sykes, D.C. only gun dealer, who transfers the firearms into the city.

In the mandatory ownership class, four of the five hours are spent going over the gun-control law in D.C. which are also written out in the registration packet. This mind-numbing exercise more than prepared me for this written test on the District's gun laws, but I'd studied my papers on the Metro just as a refresher of the more obscure regulations.

"You get your paperwork from him, and then you come up and start the process," Officer Brown responded.

"I can't take the test in the meantime?" I asked.

"You can't do anything until that 219 is filled out by him," she said holding up a form from about ten feet away from me.

"I called yesterday and talked to an officer, and he said come in anytime between 9am and 5pm," I protested.

"Did he know you didn't fill out your 219 yet?" she asked.

"No, as I told you, I don't have the gun yet," I said.

"You're not going to do anything until I get the 219 from Charles Sykes. He needs to fill this out to start the process," she answered.

"Why?" I asked, frustrated by this nonsensical conversation.

"That's the process," she said.

I pulled out the registration packet list of instructions that she was quoting from and said, "It doesn't say that in here. It doesn't say you have to do these things in order."

"But it is the process," she said. (I am not exaggerating this conversation.)

"But it doesn't say that anywhere," I protested.

"You're going to go to Sykes and get this all filled out," she said as if I'd said nothing. "Because I need to check your gun to be sure we can approve your weapon."

"Why do you need to check my gun before anything else?"

"The process," she said again. "We may not approve it. I have to look at it and be sure it's on the list."

"What if it's not? I just wasted $250 on a safety class?" I said, referring to the mandatory five-hour gun ownership class. "Because I was required to do that to get the form signed before coming in here, isn't that right?"

"At this time, I'm not trying to fuss over the issue," she said. "Before you spend any money with us, I have to be sure the weapon..."

"I already spent $250...."

"Not with us, that's not my part of it," she said. "I'm talking about the process."

She picked up the phone and asked someone to come talk to me.

"That's fine, I'll leave," I said.

"That is the process," she said again as I walked out the glass doors.

## TRANSFER FOR APPLICATION DOCUMENTS, NOTARY PUBLIC

Once my gun was delivered by UPS at the office of D.C.'s only legal gun dealer, Charles Sykes, I was able to finalize the paper work. Mr. Sykes handed me a couple of papers to fill out, including the 219 that Officer Brown wanted so much. At the bottom of the form in all caps and bold, it said: "THIS IS NOT A LICENSE TO CARRY A CONCEALED FIREARM." No mistaking that I have no right to bear arms in this city.

I'd already filled out the D.C. eligibility form, but it needed to be notarized. Mr. Sykes once told me that he was a notary and would take care of that form, gratis, which he does this for all his clients. While I was there, he called the FBI to do a background check. I passed. He gave me the receipt for the gun from the box.

After filling out the papers, it was time to pay him $125. I was about to write a check, until he said he only accepts cash and money orders. Thankfully, there's an ATM machine in the hallway outside ticket payments so I was able to pay him on the spot. It was almost 3pm, so with my completed forms in hand, I headed back to the police station.

## DC GUN LAWS: THE WRITTEN TEST

Officer Brown was gone when I got back, replaced by a female civilian staffer and Officer Hall, who seemed to be the boss of the registry office. The woman was extremely polite and clearly new to her job, as Officer Hall directed her every move. "How has the registration process been for you? It is as easy as you like?" she asked, without any sarcasm.

I felt bad hurting her feelings, but I said, "It's been horrible. So much worse then I expected."

"Are you from another state where it's easier?" she asked innocently. I told her that I'd never owned a gun before.

She took my papers and handed me the gun test, which consisted of 20 multiple-choice questions covering the laws in D.C. While there were two ridiculously difficult questions about some obscure facets of the regulations -- one about antique guns -- the rest were easy after mandatory four hours of study.

Check, sawed-off shotguns are illegal here. It was easy to remember that there's no right to bear arms in the nation's capital - not open carry and certainly not concealed carry.

If I transport my gun, I need to put both the gun and ammunition in the trunk. Since I have an SUV, the gun has to be inside a locked container in the far back and seperate from the ammunition. (I don't understand where I should then put the ammunition. It has to be in a separate location, out of reach, but specifically not in the glove compartment or console. I'll figure that out when I want to take it to shoot outside the city limits to shoot.)

It is illegal to posses ammunition that is not the same caliber as my registered gun. It's also illegal to buy ammunition in the city unless from a licensed firearms dealer, and our only dealer, Mr. Sykes doesn't sell it. I'm not sure how or where to get ammo for my gun.

I have to keep my registration certificate with me at all times if I have my gun. (It would be easier to do this if it came in a card-size for my wallet instead of a large paper form. I will just have to put the certificate next to the gun to remember to take with me when I leave the city.) Also, if anyone under the age of 18 could gain access to my gun, I have to have it in a locked box or carry it on me at all times.

## D.C. REGISTRY OFFICE OFFICER: "MOVE SOMEWHERE ELSE"

I checked all the boxes on the test, only to be handed more forms to sign. I only skimmed the "Background Investigation release form" and the "Notification of fingerprinting services fee" because I was drowning in paper.

While I was sitting out of sight behind the counter filling out the papers, I overheard a phone conversation with Officer Hall and a District resident who was clearly frustrated with the gun registration process.

The police officer was trying to calm the person down, but clearly having the opposite effect. "Some states are even tougher than D.C. - California I believe," he told the caller. I wanted to yell out, but held my tongue. I kept writing my name while Officer Hall continued to politely listen to the caller and answer his questions, but ceded no ground regarding the difficulty of the process.

After he hung up, he said to the woman in the office, "I always say, 'When in Rome, do what the Romans do. And if you don't like Rome, move somewhere else.'"

I was appalled. I stood up and held out the forms. "All done, now what?" I yelled out. "You passed your test," the woman told me. "You got one wrong, so that's a 95 percent. Good job." I confirmed that the question I got wrong was about the antique guns.

## GO TO DMV TO PAY MORE FEES

Officer Hall handed me a slip of multi-sheet paper. "Here are your fees. Take it to room 1157 and pay this and bring back the receipt to get your fingerprints done. The forms checked off the box for $35 for fingerprints, $13 for gun registration, $12 for ballistics.

Once again, I walked around the building to the DMV and got in line with everyone else there to pay parking tickets. After getting through the first line, I got in another line for the cashier, but there was no one at the desk.

After ten minutes, I asked the teller next to the empty desk if anyone was working there. She said he was on break and would be back "soon."

Others were mumbling, looking around irritably, pacing. Finally I found someone who looked to be a manager. I told her the problem. She went to the back,  and suddenly a man appeared at his desk to take our money. When it was my turn, I handed him the paper and $60 in cash (the DMV also doesn't take credit cards or checks) and got my receipt for payment.

For the third time in one day, I headed back to the police department. Entering the registry office at 4:30pm, I was worried that they wouldn't finish the process with the office hours ending soon. As I was still the only person in the office, Officer Hall knew where I was in the process. "Got the receipt now?" he asked. I handed him the yellow paper, and he told me to follow him into the back of the office.

## FINGERPRINTS AND "COOL DOWN LAW"

In the back of the office, past the Keurig coffee maker and the police jacket on a hook, was a computer with a foot pedal. Officer Hall held my right thumb onto the computer and slid it side-to-side until my thumbprint was clear on the screen.

The machine dinged "good print" and he tapped the foot pedal and held my right index finger to the screen. We did this for all my fingers plus all four fingers at once. I thought, if I ever commit a crime, they sure will find me now.

Back at the front, they went through my papers. "Do you have your passport photos?" the woman asked.

Oh no, I thought, they aren't going to accept my application. I apologized and explained I'd forgotten to take them. Officer Hall, to my surprise, said it was okay to just bring the photos "next time."
What's next? "Now we have the 'Cool Down Law'" said the police officer. "You have ten days for us to approve your registration."

I'd been working on getting a gun for months. If I cooled down any further, my body would be frozen in suspended animation like Walt Disney.

He paused, and I thought we were finished. "But If you have your receipt and it shows you bought your gun earlier, we can count those days to the cool down," said Officer Hall. Now I know why Mr. Sykes gave me the receipt instead of leaving it in the box. I showed it to him.

"Says here you bought it on Monday, so that means your period ends, the 26th, 27th..." As he counted out the days in the month, I wondered what he would do if I'd let the gun sit in Mr. Sykes

office for two weeks an then handed him the receipt. Would Officer Hall have to approve my registration on the spot?

"February 3rd," he said. "So you have eight days. You can call on the 2nd and find out if we approved your registration, but don't come back until the 3rd."

At a little before 5pm, I left police headquarters with less paper, but no gun. Frankly the seven days left of cooling off is just getting me more fired up about D.C.'s gun-control laws.

## A MAJOR OBSTACLE: ENROLLING IN A GUN SAFETY COURSE

To legally own a gun in the nation's capital, you have to take a gun safety class from a D.C.-certified instructor. Whether you have owned your guns (in another state) for 20 years or never touched one before (like me), you must take four hours of classroom instruction and one hour at the shooting range before Washington will let you register your gun.

This requirement has become my biggest source of frustration in getting a legal handgun because the city makes finding a class so difficult.

The safety class is not offered by the police so you have to find a "certified firearms instructor" to teach it.

In the large stack of papers handed to me at the D.C. Gun Registry office, there were two pages listing certified instructors. At the top of the page is a clarification: "It should be noted that these individuals do not work for, nor do they represent the Metropolitan Police Department."

So who are these people?  I have no idea.

## TRYING TO FIND AN INSTRUCTOR

The list has 47 random names with phone numbers. The numbers are mostly D.C.'s 202 area code, which doesn't help to figure out where they are located because the city's laws ban the class from being taught inside the Beltway. The list does not give the instructor's address, background information, website or certification. It is less informative than a phone book.

As a woman facing the prospect of going alone to this class in neighboring states of Virginia or Maryland, I'd like to find someone who seems legit. The way I see it, I'm calling a strange man and saying, "I'm unarmed. I know you are armed. And yes, I'd like to meet you in a strange place." Feeling safe is the reason I want the gun in the first place.

I looked through this list for weeks for a hint as to where to start. I searched Google for all the names with a 703 area code (Virginia is closer), but none came back with any results.

I called Christopher Miller because at least a shared last name was a hint. The number went to a security company and the receptionist said Mr. Miller was teaching a class. She gave me his cell phone number and email. He never returned any of my messages.

A little more searching and I found that the city posted the same paper list online with some affiliations given. However, of the 45 instructors, 20 were listed as "independent." I Googled several of the local companies but found nothing. So the online list wasn't any more informative.

The police department was no help. When I started this gun ownership process, I got my paperwork from Officer Brown at the registry office. She gave me a piece of paper with copies of business cards on it and told me that the names were good instructors for the gun safety course.

The card for Atlantic Guns gave the president of the company, Stephen Schneider, and in handwriting the name "Art Keiser" scratched out. Neither of these men are on the list of certified instructors.

I called the store and was told that no one affiliated with them teaches a class, but referred me to a company called Worth-A-Shot owned by Donna Worthy, which may have D.C.-certified instructors. However, Mrs. Worthy's name isn't on police lists, which haven't been revised since

HELLER DC 000263

September 9, 2009. The other names on the business cards were Ricardo Royal, Larry Wheeler and Eric Sahota, but only Mr. Royal is on the list of certified instructors.

## REGISTRY OFFICE INFORMATION ABOUT THE INSTRUCTORS

I called the gun registry office and asked about finding an instructor from their paper handout. Officer Harper told me that "all of the names on that sheet are also on that list that was given to you." Not true, but I was looking for answers, not conflict.

So I asked the officer about my safety when going to meet the other men on the list. "We give them a license to say it's okay for them to teach firearms safety. They are licensed through the Metropolitan Police Department," he said, which told me absolutely nothing.

But he helpfully added that, "At some point, there was a criminal background check done on them."

What about knowing their location? "If they have an address, you can go on the Internet and Google it," he said. Of course, the list doesn't have addresses. He said that it didn't matter since they mostly would teach the class at a shooting range. That was helpful.

I added that I'd Googled about 10 names for general information, but found no results. "That's why we put that list together, ma'am. We try to make it convenient for you." Huh?

As for picking an instructor from the list of 47, he suggested "calling several of them, writing down the prices and location, then pick the one that best fits your pocket and your time." What's the appropriate price range for the class? "That I don't know," he replied, before correcting himself.

"Well, I can't say that I don't know," Officer Harper said. "I don't give the information out. That's between you and them. We don't set the prices." I don't know if I should be charged $30 or $300 for the class.

Then I called on the big guns. When I was at the National Rifle Association (NRA) to learn how to shoot at their awesome firing range, I discussed the safety class hurdle with ILA Executive Director Chris Cox.

I explained to Mr. Cox how a woman alone going to a gun safety class at a known place like the NRA would go far to helping ease this difficult D.C. registry process. But, I told him, the D.C. course was not available at the NRA range. He was surprised and started talking to his staff about getting someone certified to teach the course, possibly free of charge.

In the meantime, I still need to find someplace safe to take this class. I'm calling Worth-A-Shot because, I figure, it's worth a shot.

## MORE TROUBLE FINDING A SAFE 'SAFETY CLASS'

In all my struggles so far with the red tape the District requires before I can get my hands on a legal gun, the safety class requirement was the most time-consuming, expensive and difficult to fulfill. I finally took a class and have the signed form. But the more I dig into this regulation, the more I wonder: How can it be constitutional for D.C. residents to be forced to go to another state to exercise their 2nd Amendment right to keep and bear arms?

In order to register a gun for self defense in the home, the city requires residents to take four hours of classroom instruction and one hour on the shooting range with one of the firearms instructors they have certified.

But, here's the kicker: the instructors aren't allowed to teach any part of it -- even the classroom -- within the city limits.

Therefore, residents must go to another state - at their own expense - in order to fulfill the requirements of D.C.'s gun laws. Also, D.C. citizens have to take a day off work to do it since the whole trip and class time takes at least seven hours to complete.

The District also makes finding an instructor as difficult as possible. At the gun registry office, the police give out a two-page sheet listing the 47 firearm instructors approved to teach this class. I called them all.

Over half -- 27 -- went straight to voice mail. Most were individual cell phones and not a company that could set up the appointment. For the voice mails that were corporate sounding, none gave an option to get in touch with the instructor listed on the D.C. forms.

On the bottom of the police phone list, it says "Revised on September 9, 2009." This two-year lag was apparent when 7 of the 47 numbers I called were out of service. Two instructors, Michael Morgan and John Cutler, told me that they no longer teach the course and shouldn't still be listed on the form. Going through the list, three said they don't have a class scheduled for the next few months.

The most absurd conversation I had was with instructor Stuart Asay, whose cell phone number begins with a Colorado area code. He said that his company taught the class in the Rocky Mountain State and Atlanta, but he had no plans to teach the class in D.C. any time soon.

I was utterly confused and asked why he would teach a class for D.C. residents to register a gun only in those far away states. He told me that the classes were "in demand" in those places.

Since less than 500 guns are registered a year in D.C., I can't imagine how there would be a demand for flying so far to take a class that is available in neighboring Virginia and Maryland. I asked him repeatedly to explain his rationale to me, but to no avail. If I happen to be in Georgia or Colorado and want to take the class with him, he charges $150 for it.

I finally found four instructors -- all in Maryland -- who were willing to teach the gun class. I would have to drive anywhere from 30 minutes to an hour each way to take the class.

I've yet to find a class offered near a Metro stop. I don't know what a D.C. resident without a car would do to take the class.

Of these four, the cheapest class I found cost $130. The others range from $175 for a group or $200 to $250 for individual.

All the instructors teach out of their own homes, or more specifically, as one said, "in my basement." The police do a criminal background check on everyone appearing on their list, but I still don't feel safe going alone to an armed stranger's basement.

It seems the D.C. politicians who came up with this requirement never considered the impact on a woman trying to register a gun. Forcing us to go to a strange man's house in another state to take a gun safety class is not something the police should be requiring.

For men who have a lot of experience with guns, I'd suggest taking the class with Ricardo Royal. He's near Annapolis and charges $200. He seems the most well-versed on knocking out this class requirement. He told me he's been petitioning local politicians for years to let him teach the class within the city limits.

"I just keep asking them to at least let me teach the classroom part in D.C., not even the firing range," Mr. Royal told me. But the city officials won't allow him.

In the end, I went back to a referral from a gun store to take the class with Donna Worthy, who isn't on the list at all. When I met her, she told me that the police at the registry office "said they were adding me on the next update, that was last year." She has called repeatedly to ask to be included, to no avail.

I am going to ask local officials in D.C. how this gun safety class requirement can be constitutional if it can't be completed within the city.

## TAKING THE GUN SAFETY CLASS SAFELY

It took weeks of research and dozens of phone calls to finally find a suitable place to take the required gun safety class to register a handgun in the nation's capital. Thanks to a referral from Atlantic guns, I found Donna Worthy -- even though she's not on the list of certified instructors given out by Metropolitan Police Department.

Mrs. Worthy is a retired Baltimore police firearms training instructor. She is now the owner of Worth-A-Shot , which is located in Millersville, Maryland, about a 45 minute drive from Northwest D.C., without traffic. When I pulled up to her office, I immediately liked that it had a bright and clearly marked storefront.

Inside, Mrs. Worthy and two other employees greeted me, wearing uniforms with the company logo. I'd talked to a lot of possible instructors for this course, and they all taught in their homes and seemingly without any business structure. In contrast, Worth-A-Shot is a real, professional, storefront business. Unlike the option of taking the class in some stranger's basement, I felt safe.

This safety issue wouldn't be a concern for most men, but for many women, it feels as if the city forces us into uncomfortable and possibly unsafe environment to take this "safety" class. Clearly, the D.C. politicians who came up with this half-baked process weren't concerned about women or their particular needs. Fortunately, Mrs. Worthy's well-run business addresses these concerns.

Mrs. Worthy led me to her large classroom, with rows of desks and the course lesson on overhead projector. She taught my class herself, but she has a team of male and female instructors for the various classes she offers.

Her specific methodology had been honed through years of teaching. The first thing she asked me was why I wanted the gun. "Self defense," I told her. She explained that she would tailor the class to my needs, which would be different than someone who was registering a gun for, say, hunting.

It's noteworthy that D.C. gun class requires everyone to master shooting a handgun, even if you are registering a shotgun. This makes absolutely no sense, but then, what does in this maze of D.C. gun restrictions?

We started with D.C.'s mandatory part, which was reading over the gun ownership rules, restrictions and laws. This same packet of paper was given to me by the registry office, so I don't

know why the city makes the instructors read it out loud and review with me like it's new, but it does. We went through the packet word-for-word. There are a bunch of convoluted rules that I will need to memorize for the written test the District forces all applicants to take.

There is just no way to stretch the packet of paper and the simple rules to fill the required four hours. I'm quite sure that most instructors sign the forms and let you off with less time. Mrs. Worthy makes up the extra time by throwing in her basic firearms fundamental course, which she normally charges for $100 in the class and $100 at the range. She charged me $225 for the D.C. course ($150 if I waited for a group class). I learned a lot from this bonus lesson.

After the paper work, Mrs. Worthy turned to the required fundamentals. She had five guns lined up on the table - a Glock 17 9mm, a plastic model of the Glock 17, a Glock 26 9mm, an old Smith and Wesson 38 caliber revolver and her own pink concealed carry weapon - a Ruger LCP in 380 caliber. She pointed out that her guns did not have the D.C.-mandated, ten-round limit on the magazine, as mine must have.

First she taught me how to load and unload the gun. She corrected me repeatedly when I picked up the magazine off the floor after releasing it from the gun. "What you are trained to do is what you will do under a high-stress situation," she said. "We've had police officers on duty who stopped to pick up their shell casings because that was their habit from the range. You just have to let the mag drop."

She taught me to rack the slide three times to make sure there was no bullet in the chamber. (The second time is to make sure a second bullet isn't stuck on the side. The third time is in case you mistook a bullet flying out.)

I'd already mastered the basics from my editor's lesson, so the new things I learned from her included loading the gun while holding it upright in front of me. "No one can see if the slide is open from in front of you. So if you're caught with an unloaded gun, the bad guy doesn't know it until you have loaded," she explained.

She taught me how to hold the gun with the sides of my hands pushed together in a line. She had me practice not holding all the pressure in my dominant right hand, but to balance evenly. "Let me see your right hand," she said. I held out my palm, and she laughed at the telltale red waffle marks. Also, she showed me to hold the gun by pulling backward with my right hand, while pushing forward with my left.

Mrs. Worthy had me stand with two feet forward, shoulders straight, chin up (the hardest part, I kept lowering it later at the range), arms straight from the shoulder. She taught me to shoot higher or lower by moving my wrists, not my arms. We practiced this over and over by aiming at a bullseye on the projector screen.

"Your eyes can only focus on one thing at a time. Keep focused on the white dot on the front sight. The rear sight and the target should be out of focus," she said. "And when you're at the range, don't stop to look at your target, just keep focusing on the front sight and shooting." After four long hours in the classroom, we were ready to go to the firing range.

She packed up the guns on the class table. We drove separately about 15 minutes to a range in a strip mall that she uses for her class. Inside, Mrs. Worthy said that D.C. tells the instructors that they need to verify that the resident can safely handle a gun. "That means you can basically hit the paper," she told me. "But, I want more for the people I teach. I want you hitting bullseyes."

She did just that. The target was 25 feet away and, at first, I was hitting a lot of white. She had me switch guns with every five or so rounds to help figure out what kind of gun I wanted to buy. I

hated the small carry gun because it had a lot of kick and was hard to handle. I was terrible with the revolver, barely hitting the silhouette at all.

But after going back and forth with the two Glocks, I was much improved. She kept correcting my mistakes - keeping my chin up, slowing down trigger pulls for a "surprise" and balancing the gun in both hands to avoid the telling waffle marks. After an hour, I was feeling good. And I felt comfortable with the gun. I hit almost all in the center of the red, some well grouped in the dead center.

By the time I shot all the bullets in the box, I'd decided that I liked the full-size Glock best because it was easiest to control and gave me the best results. Mrs. Worthy recommended that gun for me because it is doesn't have a lot of bells and whistles that I might forget about in the middle of the night.

(She had repeatedly told me that accuracy goes down 70 percent from the static environment at the range to the real-life, life-or-death situations.)

Mrs. Worthy filled out the D.C. safety class form, copied it and put it in a red Worth-A-Shot folder. I felt like I'd just graduated from... well a long bureaucratic test.

## FINDING A GUN WITH A TEN-ROUND MAGAZINE

After careful consideration, I have decided to buy the Sig Sauer P229 two-tone. I knew I wanted a full-size 9mm that I could handle well and that felt comfortable in my hands (click to watch a video of me shooting it.)

To help with the final decision, The Washington Times launched a poll seeking input from gun enthusiasts. The Sig Sauer won with 27 percent of the vote. The Springfield Armory XD(M) was a close second with 23 percent, and the Glock 17 came in a distant third at 15 percent.

Along the way, I realized I should choose one made in the USA. This narrowed down my options significantly, but I discovered that the P229 was manufactured at Sig's plant in Exeter, NH. Plus I think their guns look cool -- especially the two-tone (black and stainless) version.

Quality guns are expensive. As I am new to the gun world, I thought it would cost maybe $400. So I was surprised to find that a new ones ranges from about $600-$1,200.

To find the best price, I called two local gun stores. Atlantic Guns in Maryland and Virginia Arms, but neither had what I wanted in stock. Sharpshooters Small Arms Range in Virginia could get it in a couple days, but the price was higher than online dealers.

I asked around for suggestions of well-priced online stores and also googled the model number. In the end, I looked at about 18 dealers and found the best price at BudsGunShop.com, CheaperThanDirt.com and GrabaGun.com - all about $750.

Before I made the purchase, I checked the paper packet from D.C. Gun Registry to be sure I was getting a gun eligible for registration. Three pages explain the firearms that cannot be legally owned in the nation's capital. The list of prohibited guns didn't seem to apply to mine, including things like sawed-off shotguns, automatic firearms, short-barrelled rifles and .50 BMG rifles.

The city also has a whole page of illegal "assault" weapons, which lists specific makes and models, as well as prohibited features that range from a grenade launcher to a grip that protrudes conspicuously beneath the action of the weapon or a gun that can accept a threaded barrel.

The end of the document explains that guns eligible for registration must be on the California Roster of Handguns Certified for Sale. That list is conspicuously missing from the registration packet.

However, on the city's website, there is a list of firearm makes and models, which appears to be the California roster with the D.C logo stuck on the top. One of the regulations to getting a gun registered is proving you have good eyesight, which the city must be testing by posting a 13-page list of guns in about 6pt font.

Squinting at my laptop screen, I scrolled down to the Sigs and found my gun listed: "P229 (Two-Tone)/Stainless Steel, Alloy, P, 3.9", 9m." Yes, the District actually believes it's important to approve the gun's color scheme.

But still, I was nervous about making such a big purchase without being 100 percent sure it was legal. I called the city's only legal gun dealer, Charles Sykes. He had some news since we last spoke. "Remember I told you that you could buy any gun on the three state lists- Maryland, Massachusetts and California - but only ones that had been on the lists since 2009?" It rang a quiet bell. "Well they upgraded it, now you can buy any gun that is on those lists as of today."

"Really? I'm surprised D.C. would do something like that. When did this happen? Did they tell you" I asked.

"Nope," he replied and was silent for a moment. "Why would they be to informative to me? What time, when, how this happened - I have no idea. It just happened."

I asked him for more help on having the gun sent from the online dealer to him. "Ask if they have my new address," Mr. Sykes said referring to his new office in the same building as police headquarters. "Make sure they have my licence on file. If not, get their name and fax number for me to send it."

He added, "Try to get them to send UPS or, second, FedEx but not the postal service because they don't deliver at police headquarters, and I want my guns passing through as few hands as possible." The post office doesn't deliver to the police department? This city never ceases to amaze me.

Anything else? "You know to make sure they only send the 10-round magazine and keep the 'high-capacity' at the store."

Gulp. I quickly thumbed through the three pages of guns that are illegal in D.C. and saw no reference to the legal-limit magazine. But near the front of the 22-page packet, there was one line that said, "Please note that it is illegal to posses a magazine that holds more than ten rounds of ammunition in the District of Columbia." So now what?

I asked Mr. Sykes, "Can they just swap out the magazine at the stores?"

"'Doesn't matter to me," said Mr. Sykes. "Just make sure they don't send me a gun with a high-capacity magazine because you can't register it."

I was back at square one. I called the three stores where I'd found the best prices to ask to switch out the magazines. After explaining the situation to a man at CheaperThanDirt.com, he said they can't switch the magazine, and, anyway, "we don't ship to D.C." I explained that it's legal to send to Mr. Sykes, but he refused. I called GrabaGun.com twice in two days, but kept getting voicemail.

A nice man at BudsGunShop.com checked the Sig Sauer model list and explained to me that the manufacturer doesn't make the two-tone model with a lower-round magazine. I thought they were interchangeable, but I guess not. He had an all-black model in a 9-round capacity - marked "California legal" - for $833.

I pulled up the websites of eight online stores look for the 10-round version of the P229 in black. It seemed I'd have to pay anywhere from $50-$75 more to get a gun with a magazine holding 3 fewer rounds. And I couldn't buy the two-tone style I preferred.

I was so frustrated at this point, I considered giving up trying to buy American and just getting the Glock or Beretta I liked, but I wanted to figure this out for other residents who hit this same wall.

## PURCHASING A GUN ELIGIBLE TO REGISTER IN D.C.

After days of calls, emails, tweets, comments and posts, I finally bought the exact gun I wanted, the two-tone version of the Sig Sauer P229 9mm. I'm so excited to shoot my new purchase, but in the nation's capital, it's not that simple. Buying a gun doesn't mean you get to have the gun.

HELLER DC 000270

Washington, D.C. has a list of firearms that are eligible to be registered. The make, model and even the color (two-tone) of the gun I wanted was on the list, but I had a bear of a time finding one with a D.C.-legal 10-round magazine. The standard version has a 13-round capacity.

I called Sig Sauer's customer service number to ask for help finding a dealer who had the model I wanted in the lower-capacity magazine.

The agent, Andy, said that he could not help me find a dealer. I asked if the the P229 was made with the 10-round magazine or could be switched out to it. He said, no.

Andy was wrong, and many people following my story called the company to complain about the incorrect information.

Luckily, kind Second Amendment supporters came to the rescue, sending links to guns that matched my needs. In calling the stores, I found they were out of stock or would take a week or weeks to get, and I've waited long enough. Some, like GrabAGun.com, were at the SHOT show all week and got back to me too late.

At the same time, gun enthusiasts at the Las Vegas gun convention discussed my plight, talked to dealers and sent advice.

Through comments on our website, Facebook and Twitter, I was assured that the low- and regular-capacity magazines were interchangeable on this model.

The two magazines are almost impossible to tell apart unless you look inside and see the one has space for three less rounds.

Nevertheless, without the 10-round magazine inserted into my gun, I can't have it sent to Charles Sykes, D.C.'s one gun dealer. So I needed to find a dealer willing to make the switch before sending.

While the best prices were available from online dealers, I learned that they often just ship boxes from warehouses and are unable to do any kind of modifications to an order, even something as simple as switching out a magazine.

## TRANSFERRING A GUN INTO D.C.

Room 1140 on the DMV hallway is marked with a small sign "CS Exchange" and a taped-up paper that warns away anyone who might be looking to fight parking ticket.  Behind the nondescript brown door is the private office of Washington D.C.'s only legal gun broker: Charles Sykes.

You can't just go out and legally buy a gun in the nation's capital. If you purchase a pistol from another state, whether in person or over the Internet, you can't ship it to your residence in the District, nor can you drive it back over the Potomac river.

In the 21-page packet of papers given to potential gun owners from the Firearm Registration Section, there is not a single word to explain how one would go about bringing a purchased gun into the city after registering it. The one clue the police do provide is a Xerox copy of Mr. Sykes's business card stapled to the registration form.

Last week, I went to find his office, which is also in the same massive government building as police headquarters. The door was closed and locked. I waited in the hallway awhile until a gruff man came up to me and asked, "What are you doing?"

"I'm just waiting to talk to Mr. Sykes about getting a gun," I said. He stared at me hard.

"Do you have an appointment?" he asked. I said that I did not, but I was just hoping to talk to him briefly.

"I am Charles Sykes," he said. "I only see people who have an appointment. But you're here, so come in for a minute." He led me into his run-down government office.

I asked him about the gun ownership process, and, after a few minutes, he relaxed and spoke more openly. A dealer since 1994, Mr. Sykes is all too familiar with the rules and regulations put in place to slow or stop law-abiding citizens from owning guns. "I don't understand why they try to make it so difficult for the honest people from getting a gun the right way," he told me.

Until the District's gun ban was repealed by the U.S. Supreme Court in 2008, Mr. Sykes's business was limited to transferring guns for police officers and security businesses. He said that since the high court's decision in the Heller case, the city has only registered about 1,500 guns, about half of which were new purchases. So while gun sales have been skyrocketing in the rest of the country, D.C. residents have been buying at a rate of about 250 a year.

Despite having a complete monopoly on gun transfers in the District, Mr. Sykes said, "I'm not making much." He charges $125 to pick up the gun and do the transfer. The demand is not there for Mr. Sykes to devote an entire day to the work of selling or transferring guns. He works by appointment for about four hours in the midday. He does other work in the evenings to supplement his income.

During the 45 minutes that we spoke, no one else came to the office. "You don't see a big line outside that door? It's not like it's a sale on iPads or iPhones where people camp out the night for the door to open in the morning to get in here," he said, laughing.

Last May, Mr. Sykes lost his lease when his office building was sold. The city then took advantage of a stray word in the law to classify his business as a "firearms retail sales establishment," which made it almost impossible for him to relocate. The designation meant he couldn't be within a football field's distance from a school, church, apartment, house or library. In this tightly packed city, that left no reasonably priced options. The city gave him a small-scale map of where he could set up shop, but the map didn't even have street names on it.

Thanks to a pending lawsuit, however, city officials realized the court could rule against them for wholly denying residents the ability to buy a gun within the law. When Mr. Sykes proposed the idea of leasing government space, they relented and agreed to a spot downstairs from the police headquarters. There are six newly framed licenses on his wall that showcase what was required to set up shop inside the government building. He re-opened in August with a one-year lease.

Recently, I asked D.C. City Council Chairman Kwame Brown whether he supported the Second Amendment. "I don't support having more guns in the District of Columbia," he replied "I don't think we need more guns in our streets."

Mr. Sykes shook his head when he heard this. "In all other cities, you can have guns. Why do they say, 'We don't want guns in the nation's capitol?' They are here. And you can go a lot of different places and get them just like that," he said, snapping his fingers.

HELLER DC 000272

Clearly, the city's political leaders have deliberately made owning a legal handgun a difficult process. But, I'm determined to get through all their barriers. My next step is to tackle the paperwork and forms required by the registration office.

## TRANSFERRING MY GUN INTO D.C.

At this point, I'd done enough research to write a Ph.D. thesis on finding a D.C.-legal P229. It is absurd that the District's registration system makes things this complicated.  If it weren't for this platform and the generosity of gun enthusiasts , I am sure that I would have bought the wrong gun and not been able to return it. I'm grateful for the help.

Three dealers, however, realized that making a sale would just mean offering to get the magazine and the gun quickly and do the swap for me. They all contacted me through my Facebook page. I called Kyle's Gunshop in Cincinnati  and two Virginia stores, Guns & Ammo Warehouse in Manassas and Immortal Arms in Culpeper.

In the end, I went with Immortal Arms because it is local and the price was the best, $781, which included switching the two 13-round magazines for two 10-round ones and shipping.

The owner, Mark Attanasio, is a disabled U.S. Army veteran, who started the appointment-only business in 2010. He'd been following my series on getting a legal gun in D.C. and posted to my wall when he saw my troubles in the search for a D.C.-legal Sig.

Mr. Attanasio said he'd have the gun in in two days. He apparently assumes that speed of delivery would be a selling point, as it is for Virginia citizens, but it doesn't matter much for a D.C. resident.

And, that is the "but" in this story. Although I have paid and ordered the gun, I can't take possession of it until it is transferred to Mr. Sykes, and I get an approved registration certificate.

In order to get this certificate, I still have to do the following: take a written test on the city's firearm laws; get Mr. Sykes to fill out the application form; have the eligibility form notarized; get two passport photos and prove that my eyesight is better or equal to the driver's license requirement (20/70 in best eye and field of vision of at least 140 degrees).

Next, I have to take all the forms to the registry office; pay $60 in fees; wait five days for the application to be approved; wait an additional five days for Mr. Sykes to be able to release my gun; and take the gun to the police for a ballistics test.

Finally, if I pass all of these steps, I should be able to take possession of the gun that I already bought.

I bought my new 9mm Sig Sauer from a dealer in Virginia and needed to get it to into the District. When it comes to firearms, a distance of 70 miles might as well be thousands of miles across international borders.

There is no open-carry right in the nation's capital. It is against the law to posses a firearm in a public space unless traveling directly to or from a lawful, firearm-related activity, such as registering, hunting, shooting with it at a practice range. So a D.C. resident must use the city's one legal gun dealer, Charles Sykes, to physically transfer the gun into the city.

HELLER DC 000273

Mr. Sykes works about four hours a day to handle transferring the few hundred new guns registered each year. He charges the same transfer fee - $125 - whether he picks up your gun at a local store or he receives it in the mail. Either way, he holds the gun until you can provide the certified registration certificate.

His business is located inside the same building as Metropolitan Police Department, which is convenient for residents, though inconvenient when it comes time to mail the gun. The U.S. postal service does not deliver to the police headquarters in D.C. Mr. Sykes, therefore, recommends guns be sent to him via UPS or FedEx, so that the guns are "passing through as few hands as possible."

I bought my gun from Mark Attanasio of Immortal Arms in Culpeper Virginia. When I made the purchase on the phone, the dealer offered to deliver the gun to Mr. Sykes. I had a feeling that he couldn't do that, but he believed that his Federal Firearms License (FFL) would suffice.

After sorting through the D.C. gun laws, Mr. Attanasio called me back. "I'm a FFL licensed dealer and I can't drive it into the city to Sykes, another licensed dealer," he told me, astounded. "But I can send it to him and pass through who-knows-how-many unlicensed hands." I'm watching first-hand how gun-control restrictions aren't based on common sense.

Mr. Attanasio was supposed to switch the standard 13-round magazine in my gun for a D.C.-legal, 10-round one and convert to E2 grips. Then he sent the gun to Mr. Sykes through UPS. It cost $43 to ship the short distance because guns have to be sent overnight delivery and require "adult signature."

After my gun gets to Mr. Sykes, I still need to pass a written test, get paper work filled out and signed, get approved for the registration and endure a 10-day waiting period. It is illegal for Mr. Sykes to release the gun to me before all of these steps have been completed.

I wondered what would happen if I didn't pass the registration requirements? I paid $781 for a gun and, generally, such purchases are non-refundable. Mr. Sykes has seen this happen before.

"Registration is not 100 percent. The FBI may say yes, but D.C. says no. Or D.C. says yes, and the FBI says no," the long-time gun dealer explained. "I just send it back to where it came from. Then it's up to you to work it out to get your money. But I'll tell you, the average company is not going to want to talk about returning a gun that's been out of their possession for three or four months."

When I first went to the gun registry office and was told about the written test on the laws, I asked the officer what happens to the gun if you don't pass the test. "That doesn't happen very often," she said. "And we let you take it over once without paying." This was not very reassuring. So if you fail anywhere along the line in the registration process, you're out hundreds of dollars and the right to keep arms.

I put a lot of thought and effort into making sure my purchase was exactly what I wanted for another reason. You are stuck with what you picked as long as you live in the city.

The law in D.C. says you can't pawn a gun or sell to anyone who isn't a licensed dealer. That sounds like standard practice until you realize that the only licensed gun dealer in the city is Charles Sykes, and he doesn't buy and sell. He only transfers. If you buy a gun in this town, there's no returns or exchanges. So you better be sure you will like it.

While my new gun was being transferred to the District from Virginia, I returned to D.C.'s Gun Registry Office to turn in my registration application. As you will see in what follows, this

should have been simple step, but it took all day. Like everything else in my effort to get a legal handgun in this city has been far more complicated and time-consuming that it needed to be.

My gun dealer in Virginia provided the UPS tracking number of my package so I knew that it was going to be delivered to our one gun dealer, Charles Sykes, sometime on Wednesday. Late morning, I took the Metro down to Judiciary Square and walked over to the Metropolitan Police headquarters.

# Bill 19-614, "Firearms Amendment Act of 2011": Supplemental Testimony

**Statement of Charles H. Cunningham, Director of State and Local Affairs**
**National Rifle Association of America**
**11250 Waples Mill Road; Fairfax, Virginia 22030-7400**
**(703) 267-1228**

2012 FEB 13  PM 4:43

COUNCILMEMBER MENDELSON

In response to testimony at the January 30 hearing on this bill, we would like to offer the following additional information.

In-Person Registration and False Identification

In his January 30 testimony, Prof. Daniel Webster of the Johns Hopkins Bloomberg School of Public Health argued that requiring in-person application by registrants will prevent the use of fraudulent identification to purchase firearms. To support his view, Prof. Webster pointed to a study by the United States General Accounting Office.[1]

All that study demonstrated, though, is that retail store clerks could be fooled by government agents using "counterfeit driver's licenses with fictitious names and identifiers."[2] This provides little support for the requirement that gun owners apply to register in person. If registrants could apply by mail, the Metropolitan Police—unlike a retail store—would have the ability to verify the authenticity of a driver's license or other identification document through driver's license databases.

In addition, anti-forgery technology for government-issued identification documents has developed considerably since the GAO investigation occurred more than 10 years ago. Licenses today have features such as holograms, microscopic printing, bar codes, dot codes and other characteristics that make it far harder to fool even a casual eye.[3]

---

[1] *See* United States General Accounting Office, *Firearms Purchased from Federal Firearm Licensees Using Bogus Identification*, GAO-01-427 (March 2001), *available at* http://oversight-archive.waxman.house.gov/documents/20040608093000-01743.pdf (last visited Feb. 13, 2012).

[2] *Id.* at 5.

[3] *See* American Association of Motor Vehicle Administrators, *Personal Identification – AAMVA North American Standard – DL/ID Card Design* (July 2011), *available at* http://www.aamva.org/aamva/DocumentDisplay.aspx?id={28D7CA91-8FDA-404D-A88E-A5B6457804E9} (last visited Feb. 13, 2012).

1

HELLER DC 000280

Murders of Police Officers

Chief Lanier stated that nationally, 71 police officers had been killed with firearms in 2011. While the recent increase in attacks on officers is outrageous, it also is not a result of gun possession by law-abiding people in the District or elsewhere.

The final FBI data for 2011 have not been released, but a preliminary analysis by the Department of Justice's Community Oriented Policing Services Office noted that 73 percent of shooting deaths analyzed "were the result of ambush or surprise attacks."[4]

Assailants who would deliberately target officers this way are surely the least likely individuals to register firearms under the District's system or any other system. A major FBI study of violent attacks on law enforcement officers, which featured interviews with the officers as well as the assailants, found that "Of 33 handguns used to assault the officers ... 32 (97 percent) were obtained illegally."[5]

Firearms Accidents

Chief Lanier also testified that there are "a couple of dozen" accidental firearms discharges causing injury in the District each year. Fortunately, there appears to be little correlation between the prevalence of lawfully possessed firearms and the number of fatal accidents. The number of firearms Americans own has risen by about 5.3 million annually in recent years, to an all-time high of roughly 275 million.[6] At the same time, the firearm accident death rate is down 95 percent from the all-time high recorded in 1904. The annual number of firearm accident deaths has decreased by an estimated 83 percent since 1930, while the U.S. population has more than doubled and the number of firearms has quintupled.[7]

---

[4] Kevin Johnson, *More police officers die in ambush attacks*, USA Today, Dec. 22, 2011, *available at* http://www.usatoday.com/news/nation/story/2011-12-21/police-officer-ambush-deaths/52147034/1 (last visited Feb. 13, 2012).

[5] Anthony J. Pinizzotto, Edward F. Davis and Charles E. Miller III, *Violent Encounters* 50 (2006).

[6] Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearm Commerce in the United States 2011* 11-15, available at http://atf.gov/publications/firearms/121611-firearms-commerce-2011.pdf (last visited Feb. 13, 2012); total number projected based on Police Foundation, *Guns in America* (1996), *available at* www.policefoundation.org/pdf/GunsinAmerica.pdf (last visited Feb. 13, 2012), plus ATF production data.

[7] National Safety Council, *Injury Facts 2011 Edition* 48; Centers for Disease Control and Prevention Wisqars data query system, www.cdc.gov/injury/wisqars/fatal_injury_reports.html; Gary Kleck, *Targeting Guns* 96 (1997), with estimate for 1930 firearm number projected from the figure for 1945.

2

HELLER DC 000281

Rates of Gun Ownership

In his Jan. 30 testimony, Daniel Vice of the Brady Center to Prevent Gun Violence claimed that "gun ownership rates have been steadily dropping and that they're at their lowest rates in decades."

However, Mr. Vice's testimony relied on the General Social Surveys (GSS) conducted by the National Opinion Research Center. As Professor Gary Kleck, a criminologist at Florida State University, has noted, these

> ... are among the few national surveys done-face-to-face in the [respondents'] homes, a format where [respondents] necessarily are identifiable. Since 1990, the GSS has yielded gun prevalence estimates three to 6 percentage points lower than other surveys done at the same time, a difference that cannot be entirely attributed to sampling error.[8]

Comparing GSS data to a comparably phrased question on gun prevalence in the home, that gap has persisted or widened since Prof. Kleck's 1997 observation. In biennial surveys from 2000 to 2010, the GSS showed household ownership rates lower than the Gallup survey:[9]

|      | Gallup | GSS  |
|------|--------|------|
| 2000 | 39     | 34.3 |
| 2002 | 41     | 36.4 |
| 2004 | 38     | 37.3 |
| 2006 | 43     | 34.5 |
| 2008 | 42     | 36   |
| 2010 | 39     | 32.3 |

More recently, Gallup (reporting on a slightly more broadly worded question) reports that:

> Forty-seven percent of American adults currently report that they have a gun in their home or elsewhere on their property. This is up from 41% a year ago and is the highest Gallup has recorded since 1993, albeit marginally above the 44% and 45% highs seen during that period.[10]

---

[8] Kleck, *Targeting Guns* at 65.

[9] *See* "Guns," *Gallup*, http://www.gallup.com/poll/1645/Guns.aspx (last visited February 13, 2012); GSS results from query of "General Social Survey 1972-2010 Cumulative Datafile," National Opinion Research Center, The University of Chicago, http://sda.berkeley.edu/cgi-bin/hsda?harcsda+gss10 (last visited Feb. 13, 2012).

[10] Lydia Saad, "Self-Reported Gun Ownership in U.S. Is Highest Since 1993," *available at* http://www.gallup.com/poll/150353/Self-Reported-Gun-Ownership-Highest-1993.aspx (last visited Feb. 13, 2012).

HELLER DC 000282

Multiple Firearm Sales

Mr. Vice also defended the District's one-gun-a-month law based on the claim that "20 percent of handguns sold and traced were sold in multiple sales." Like any attempt to draw broad policy conclusions from firearm trace data, this claim should be disregarded.

As the Congressional Research service has noted, "Neither the Federal Bureau of Investigation (FBI)—the principal federal agency charged with the collection of national crime statistics, nor the ATF have endorsed the use of firearm trace data for purposes other than assisting in ongoing criminal investigations." This is because "there are significant questions about the consistent and unbiased collection of ATF firearm trace data," which therefore "may not be representative of the types of firearms recovered by police and, hence, may not be representative of guns used in crime."[11]

Long Gun Registration in Canada

Mr. Vice discussed a study on the supposed law enforcement benefits of long gun registration in Canada. That study claimed that police are safer because they can determine in advance whether a suspect may be armed.[12] Modern police training, however, teaches officers that anyone the police encounter may be armed—regardless of whether the suspect is legally authorized to possess any firearms at all. The study also claimed that the registry is useful in helping seize firearms from registered owners who violate the law by (for instance) threatening coworkers. But this reasoning is circular; if there were no registration requirement, officers would most likely be able to seize all firearms possessed by a suspect who was arrested in such a case.

Mr. Vice also suggests in his written testimony that long gun registration is especially necessary in the District because "It is crucial that law enforcement know, for example, if a person overlooking a government building, embassy, or motorcade route is stockpiling long-range rifles." The idea that a would-be assassin would buy or rent an apartment overlooking his intended target's travel route, then register his intended murder weapons, is simply absurd.

More generally, in Canada's most recent experiment in restrictive gun control that nation prohibited over half of registered handguns, required the licensing of gun owners, and imposed a long gun registration requirement that took effect in 1998. Since 1997, however, while the U.S. murder rate has decreased 29 percent, Canada's murder rate has decreased only 17 percent.[13]

---

[11] William J. Krouse, *CRS Report for Congress: Semiautomatic Assault Weapons Ban* 13 (Dec. 16, 2004), *available at* http://www.gunbanfacts.com/Documents/CRS_AWReport2004.pdf (last visited Feb. 13, 2012).

[12] Royal Canadian Mounted Police, *Canadian Firearms Program Evaluation* 45 (Feb. 2010), available at http://www.rcmp-grc.gc.ca/pubs/fire-feu-eval/eval-eng.pdf (last visited Feb. 13, 2012).

[13] Gary Mauser, "After the Gun Registry," *Fraser Forum*, May 2006 at 19; for U.S. murder rates, *see* FBI Uniform Crime Report data tool *at* http://www.ucrdatatool.gov/Search/Crime/Crime.cfm; Canadian murder rate, *see*

HELLER DC 000283

Ballistic Testing

Mr. Vice referred to a case in Maryland in which the prosecutor said ballistics testing was crucial. However, while the prosecutor did make that claim, the "state police contend that the database didn't reveal a match" and that "Prince George's County police didn't even check it."[14]

Vision Testing

Mr. Vice incorrectly suggested that the District's one-of-a-kind vision testing requirement is defensible because firearm use in the District is limited to the home. This ignores the possibility that a visually impaired gun owner in the District might want to use his firearm outside the District (for hunting or target shooting with assistive technology, for example). Visually impaired or even blind persons may also be interested in possessing firearms for non-shooting purposes, such as gun collecting or simply to retain a valuable family heirloom.

Even for self-defense in the home, people with little or no vision may be able to use firearms effectively for self-defense in extreme circumstances, such as a contact-distance struggle in which aiming is not necessary. In those circumstances, cases of mistaken identity are highly unlikely.

In addition, District law currently allows for the possibility of lawful recreational shooting activities in the District.[15] If a suitable shooting range opens in the District in the future, people with visual handicaps should not be prevented from possessing firearms for safe and responsible use in the District itself.

Long Gun Use in Crime

In our previous testimony, we noted that for many years the District had not reported to the FBI the types of firearms used in murders and non-negligent manslaughter. It has since been called to our attention that the District resumed reporting this information in 2009 and continued reporting it in 2010.  We apologize for that error.

---

Statistics Canada, "Homicide Rate Canada, 1961-2010," *available at* http://www.statcan.gc.ca/pub/85-002-x/2011001/article/11561/c-g/desc/desc01-eng.htm (last visited Feb. 13, 2012).

[14] *House Panel Could Soon Vote on Ballistics Database*, WBAL (Baltimore, Md.) April 4, 2005, *available at* http://www.wbaltv.com/r/4345170/detail.html (last visited Feb. 13, 2012).

[15] *See, e.g.*, D.C. Code § 2502.01(b)(3) (authorizing nonresidents to possess unregistered firearms while "participating in any lawful recreational firearm-related activity in the District" ); D.C. Code § 22-4504.01 (authorizing registrants to carry a firearm "[w]hile it is being used for lawful recreational purposes").

HELLER DC 000284

Notably, though, in 2009 (the first full year after the *Heller* decision), only one criminal homicide was known to have been committed in the District with a rifle and one with a shotgun.[16] No criminal homicides were known to have been committed with long guns in 2010.[17]

The sole homicide committed with a rifle in 2009 was the murder of a security guard at the United States Holocaust Memorial Museum. That crime was committed by a Maryland resident who was also a convicted felon. Therefore, he could not have registered any firearm even if he had lived in the District. Even if the rifle had been registered in the District, the registration system would have provided little or no help in investigating the crime, because the murderer was shot and apprehended at the scene.[18]

---

[16] *See* FBI, *Crime in the United States 2009*, Table 20, *available at* http://www2.fbi.gov/ucr/cius2009/data/table_20.html (last visited Feb. 13, 2012).

[17] *See* FBI, *Crime in the United States 2010*, Table 20, *available at* http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/tables/10tbl20.xls (last visited Feb. 13, 2012).

[18] Cam Simpson and Gary Fields, *Gunman Kills Holocaust Museum Guard*, *Wall Street Journal*, June 11, 2009.

HELLER DC 000285