IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DICK ANTHONY HELLER, *et al.,*      )
                                    )
    Plaintiffs,                     )
                                    )
       v.                          )      No. 1:08-cv-01289 (JEB)
                                    )
THE DISTRICT OF COLUMBIA, *et al.,* )
                                    )
    Defendants.                     )

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

    The following sets forth the facts, reasons, and authorities in support of Plaintiffs' Motion for Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment.

## INTRODUCTION

    This is a challenge to the District of Columbia's firearm registration laws under the Second Amendment to the U.S. Constitution, which provides that "the right of the people to keep and bear arms, shall not be infringed." *District of Columbia v. Heller,* 554 U.S. 570 (2008), held the District's handgun ban to violate the Second Amendment. Prior District law required the registration of long guns, *i.e.*, rifles and shotguns. The District responded to *Heller* by making registration of all firearms more restrictive than ever before.

    This lawsuit was filed shortly after the Supreme Court decided *Heller*. The District amended its laws several times in the wake of *Heller*, resulting in amendments to the complaint. *See* Defendants' Memorandum of Points & Authorities in Support of Their Motion for Summary

Judgment ("DC Br.") 1-5 (citing amendments to the law).  The district court rendered summary judgment in favor of the District, and plaintiffs appealed.

The Court of Appeals upheld basic registration requirements, D.C. Code § 7–2502.01(a), including the submission of certain information, § 7–2502.03(b), but "only as applied to handguns. With respect to long guns they are novel, not historic." *Heller v. District of Columbia,* 670 F.3d 1244, 1254-55 (D.C. Cir. 2011) (hereafter "*Heller II*").  These requirements as applied to long guns were remanded for further evidentiary proceedings. *Id.* at 1260.

The Court also found the following not to be longstanding, and remanded them for further evidentiary proceedings: the ballistics-identification provision, D.C. Code § 7–2502.03(d); the one–pistol–per–30–days rule, § 7–2502.03(e); the requirements that applicants appear in person, § 7–2502.04(c), and re-register each firearm after three years, § 7–2502.07a(a)–(c); and the requirements that an applicant demonstrate knowledge about firearms, § 7–2502.03(a)(10), be fingerprinted and photographed, § 7–2502.04(a)–(b), take a firearms training or safety course, § 7–2502.03(a)(13)(A), meet a vision requirement, § 7–2502.03(a)(11), and submit to a background check every six years, § 7–2502.07a(d). *Heller II*, 670 F.3d at 1255, 1260.

The Court stated that all of the above requirements and all requirements as applied to long guns "also affect the Second Amendment right because they are not *de minimis*," "make it considerably more difficult for a person lawfully to acquire and keep a firearm," and thus "impinge upon that right . . . ." *Id.* at 1255-56 (noting as an example "the mandatory five hours of firearm training and instruction").

Remand was required to remedy deficiencies in the evidentiary record, such as the fact that "the record is devoid of information concerning the application of registration requirements

to long guns.  On remand and with the benefit of additional evidence, the district court will be better able to address this question in the first instance."  *Id*. at 1255 n.**.  As neither "the District nor the plaintiffs present any evidence at all concerning application of the registration requirements to long guns," the Court found a "significant deficiency in the present record."  *Id*. at 1259.

After the case was remanded, the District passed further amendments, resulting in the 2012 Firearms Amendment Act.  Plaintiffs' Third Amended Complaint challenged this final revision and is before the Court.

## FACTS

A full statement of facts is set forth in Plaintiffs' Statement of Material Facts As to Which There Is No Genuine Issue, filed herewith.  Certain key facts that bear emphasis are set forth below, while others appear in the Argument, *infra*.

The vast majority of applicants to register firearms are law-abiding people with no disqualifying factors.  Def. Ex. B. (Shelton Dec.) ¶ 8.  It is almost always the case, according to the head of the Metropolitan Police Department's (MPD) firearm registration unit, that applications for registrations are submitted by law-abiding people.  Pl. Ex. 1 (Shelton Dep.) 137. During 2011 and 2012, no rifle or shotgun applications, and only two handgun applications, were denied.  Pl. Ex. 2 at 9, No. 11;  Pl. Ex. 1 (Shelton Dep.) 132-36.

From 2007 through early 2013, the MPD recovered more than 12,000 unregistered firearms.  Pl. Ex. 3 (Lanier Dep.) 9-11.  During a roughly similar time period, MPD recovered only 36 registered guns. Pl. Ex. 3 (Lanier Dep.) 11; Def. Ex. J at 2.  The number of illegal firearms recovered between 2007 and  October 2013 exceeds 13,000.  (Def Ex. G Lanier Dec.) 2, ¶5.

Of the 36 registered firearms that were recovered over this period, less than half (17) involved charges against the registered firearm owner.[1]  Pl. Ex. 4.  Of those seventeen, only two resulted in convictions of the registered gun owner of an actual crime of violence apparently involving a firearm (Nos. 11 and 28) and only seven others resulted in *any* kind of conviction or sentence of probation against the registered gun owner (Nos. 1, 3, 18, 19, 20, 27, 34).

The District's witnesses cited no studies showing that firearm registration requirements prevent illegal possession of firearms or use of firearms in crime.  Pl. Ex. 5 (Vince Dep.) 54, 57-58, 62-63, 102; Pl. Ex. 6 (Jones Dep.) 36; Pl. Ex. 1 (Shelton Dep.) 202-04**.**  Empirical studies conducted over several decades unanimously indicate that registration laws have no measurable effect on rates of crime or violence (Geisel, Roll, and Wettick 1969, p. 676; Murray 1975, p. 88; Magaddino and Medoff 1984, pp. 235-238; Kleck and Patterson 1993, pp. 267-271, 274; Langmann 2012; Kleck, Kovandzic, and Bellows 2013).   Pl. Ex. 7 (Kleck Dec.) ¶ ¶ 87-96.

Such research shows that gun registration does not appear to have any detectable effect on rates of total homicide, gun homicide, long gun homicide, total robbery, gun robbery, total aggravated assault, gun aggravated assault, rape, total suicides, gun suicides, or fatal gun accidents in the U.S. Pl. Ex. 7 (Kleck Dec.) ¶ 94.

The District concedes: "It is not clear (to the District) how firearms' registration records could be used to 'prevent' a crime." Def. Ex. J 1.  Further, "Lt. Shelton cannot recall any specific instance where registration records were used to determine who committed a crime," except for possession offenses.  Def. Ex. J 1.

Chief Lanier testified that she could not provide any example where registration records were used to solve a crime (defined as a non-possessory offense) committed with a long gun.  Pl.

---

[1]  The District stated in response to discovery that 37 firearms were recovered, but supplied documentation for only 36.  All descriptions in this Memorandum and associated filings relate to the 36 firearms for which Plaintiffs have documentation.

Ex. 3 (Lanier Dep.) 99.  The District's registration records have never been used to foil a terrorist attack, and no foiled terrorist plots have involved firearms that were registered in the District. Pl. Ex. 3 (Lanier Dep.) 13-15.

Data provided by the District to the FBI for 2009 show that only two out of 144 murders in the District were known to have been committed with long guns (one rifle and one shotgun). In 2010, out of 131 murders in the District, not one is reported to have been committed with a rifle or shotgun, according to data submitted by the District to the FBI.  In 2011, only one murder in the District was reported to have been committed with a long gun (a shotgun), out of 108 murders total.  *See*  Pl. Ex. 8; *see also* Pl. Ex. 3 (Lanier Dep.) 103-04.  For the three years in which data is available, only three murders were committed with long guns of any kind, or one per year, less than 1% of the 383 total murders.

For the same time period of 2009-2011, 96 homicides were reportedly committed with knives, non-firearm weapons, and hands, fists and feet, which is 32 times as many as were committed with shotguns and rifles combined.  Pl. Ex. 8.

From July 17, 2008, to October 19, 2012, no registered rifles and only two registered shotguns were recovered from crime scenes in the District. Def. Ex. J at 2; Pl. Ex. 1 (Shelton Dep.) 85-86.

The District has cited no studies, data, or other evidence to show that any of the District's specific registration requirements regarding rifles and shotguns, or registration of rifles and shotguns generally, actually reduce crime or protect police officers.

Chief Lanier testified that she could not identify any "studies or data that indicate that registration of long guns specifically as opposed to handguns aids in crime control or promotes officer safety." Pl. Ex. 3 (Lanier Dep.) 105-06.

Contrary to assertions in the previous proceedings in this case, registration is not "critical" to protect officer safety when responding to calls.  MPD officers responding to calls for service are not informed in advance if there is a registered firearm at the location.  Pl. Ex. 2, Resp. No. 6.  Police squad cars or vehicles are not equipped with a computer that can access the firearms registry.  Pl. Ex. 1 (Shelton Dep.) 66-67; Pl. Ex. 3 (Lanier Dep.) 66. When dispatch directs a vehicle or officers to a location, they do not tell the officers over the radio or telephone whether there are firearms at that location, because the dispatchers do not have the ability to check the registration database.  Pl. Ex. 1 (Shelton Dep.) 67-68.

There has been no instance known to the Chief of Police in which an individual with a registered firearm shot or shot at a District police officer.  Pl. Ex. 3 (Lanier Dep.) 75.

## ARGUMENT

## I.  THE DISTRICT HAS THE BURDEN TO SHOW A NARROWLY-TAILORED, TIGHT FIT BETWEEN REGISTRATION AND PROTECTION OF POLICE OFFICERS AND CRIME CONTROL

### A.  The Decision of the Court of Appeals

The Court of Appeals held that intermediate scrutiny applies, under which "the District must establish a tight 'fit' between the registration requirements and an important or substantial governmental interest, a fit 'that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective.'"[2] *Heller II*, 670 F.3d at 1258, quoting *Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989).[3]  "The requirement of

---

[2] Plaintiffs preserve their prior argument that a categorical approach and/or strict scrutiny apply.

[3] The District asserts that "'narrow tailoring' in this context is not the same as narrow tailoring for strict-scrutiny purposes."  DC Br. 16 n.11, citing *Fox*, 492 U.S. at 480.  Yet *Fox* does not say that "narrow tailoring" means anything different in these two contexts, it only states that it is "not necessarily the least restrictive means . . . ." *Id.* at 480.

narrow tailoring is satisfied so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation, and the means chosen are not substantially broader than necessary to achieve that interest." *Ward v. Rock Against Racism*, 491 U.S. 781, 782-83 (1989).[4]

The District advanced two government interests for registration, i.e., "to protect police officers and to aid in crime control." *Heller II*, 670 F.3d at 1258. For instance, the 2008 Committee Report claimed that registration "is critical" because it "allows officers to determine in advance whether individuals involved in a call may have firearms . . . ." *Id*. As shown below, this claim turns out to be untrue. The Court placed the burden on the District "to explain in greater detail how these governmental interests are served by the novel registration requirements." *Id*. n.*.[5] "[S]ince the State bears the burden of justifying its restrictions, it must affirmatively establish the reasonable fit we require." *Fox*, 492 U.S. at 480.

The Court of Appeals held that, under the record before it, "the novel registration requirements—or any registration requirement as applied to long guns" failed intermediate scrutiny "because the District has not demonstrated a close fit between those requirements and its governmental interests." *Heller II*, 670 F.3d at 1258. The Committee Report, testimony, and written statements did not show the registration requirements to be narrowly tailored. *Id*. References were made to what "studies show," but the Report "neither identifies the studies relied upon nor claims those studies showed the laws achieved their purpose . . . ." *Id*. at 1258-

---

[4] *Ward* involved speech exercised in a public forum with public impact (where reasonable time, place, or manner restrictions applied), and even then the restrictions must be "narrowly tailored to serve a significant governmental interest . . . ." *Ward*, 491 U.S. at 791. By contrast, this case involves mere possession of a firearm in one's home.

[5] The Committee claimed other benefits for registration, such as that it "permits officers to charge individuals with a crime if an individual is in possession of an unregistered firearm . . . ." *Id*. The D.C. Circuit emphatically rejected that and similar rationales: "These rationales are circular, however, and do not on their own establish either an important interest of the Government or a substantial relationship between the registration of firearms and an important interest." *Id*.

59 (regarding multiple handgun sales).  The Court noted that the District had offered only "cursory rationales" and had failed "to present any data or other evidence to substantiate its claim that these requirements can reasonably be expected to promote either of the important governmental interests it has invoked . . . ."  *Id.* at 1259 (safety training and demonstrating knowledge of gun laws).

The Court stressed that on remand the District must present "meaningful evidence, not mere assertions, to justify its predictive judgments."  *Id.*  First, it had not shown "a substantial relationship between any of the novel registration requirements and an important governmental interest."  *Id.*  Secondly, the Committee Report did not include "even a single reference to the need for registration of rifles or shotguns," and thus the law's provisions "that deal specifically with registration of long guns might have been written in invisible ink."  *Id.*  "Accordingly, those registration requirements will be deemed constitutional only if the District shows they serve its undoubtedly important governmental interests in preventing crimes and protecting police officers."  *Id.* at 1267.

The Court of Appeals reiterated the Supreme Court's rejection of Justice Breyer's "interest-balancing" inquiry, which "would have had us weigh this governmental interest against 'the extent to which the District's law burdens the interests that the Second Amendment seeks to protect . . . .'"  *Id.* at 1264-65, quoting *Heller*, 554 U.S. at 706 (Breyer, J., dissenting).  Instead of asking "whether the Government is promoting an important interest by way of a narrowly tailored means, as we do here," that approach would ask whether a statute "imposes burdens that, when viewed in light of the statute's legitimate objectives, are disproportionate."  *Id.* at 1264 (same citation).  The District's arguments here are based on the rejected interest-balancing approach, not on a narrowly-tailored approach.

The "judge-empowering 'interest-balancing inquiry'" that must be avoided would allow "arguments for and against gun control" and the upholding of a handgun ban "because handgun violence is a problem . . . ." 554 U.S. at 634.  Justice Breyer would have relied on the District's 1976 committee report, *id*. at 693-96 (Breyer, J., dissenting), and empirical studies about the alleged role of handguns in crime, rejecting contrary studies questioning the effectiveness of the ban and focusing on lawful uses of handguns.  *Id*. at 696-702.  Similarly, *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010), which held the Second Amendment to apply to the states through the Fourteenth Amendment and invalidated Chicago's handgun ban, barely mentioned Chicago's legislative finding and accorded it no deference or even discussion. 130 S.Ct. at 3026 (quoting Journal of Proceedings of the City Council).

As in *Heller*, in *Heller II* the District relied on a committee report which the Court of Appeals held did not suffice.  Now, once again, it places primary reliance on yet another committee report, that of 2012.  It appeals to deference to legislative judgments, DC Br. 16, but the Court of Appeals has already responded to that argument by requiring "meaningful evidence," which the District had not produced.  *Heller II*, 670 F.3d at 1259.[6]  Even where relaxed scrutiny applies, a municipality cannot "get away with shoddy data or reasoning."  *Los Angeles v. Alameda Books, Inc*., 535 U.S. 425, 438-39 (2002) (adult bookstores).

While this case involves mere possession of firearms in the home by law-abiding citizens, the District would rely on cases involving persons convicted of crimes punishable by more than one year's imprisonment, *Schrader v. Holder*, 704 F.3d 980, 990 (D.C. Cir. 2013), and the carrying of handguns outside the home, *Kachalsky v. County of Westchester*, 701 F.3d 81, 97 (2d

---

[6] See *Landmark Commcns. v. Virginia*, 435 U.S. 829, 843 (1978) ("Deference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake.").

Cir. 2012).[7]  Given that the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *Heller,* 554 U.S. at 635, restrictions on that right are subject to the most rigorous narrow-tailoring analysis.

## B.  Summary Judgment Standards

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  F.R.Civ.P. 56(c).  "Material facts are those that might affect the outcome of the suit under governing law; genuine issues are those in which the evidence before the court is such that a reasonable trier of fact could find for the moving party."  *Hendricks v. Geithner*, 568 F.3d 1008, 1012 (D.C. Cir. 2009).[8]  A court may not consider wholly conclusory statements for which no supporting facts are offered.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

Plaintiffs allege that the District's firearm restrictions violate the Second Amendment facially and as applied.  The District cites cases on the inconsistently-applied rule that a facial challenge must show a law to be unconstitutional in all of its applications.[9]  DC Br. 19. However, the District fails to pursue any such argument in the rest of its brief.  The Supreme Court decided that the District's handgun ban was facially unconstitutional.  *Heller,* 554 U.S. at 635.  The Court of Appeals remanded this case for resolution of whether, based on actual data and evidence, the challenged provisions are narrowly-tailored, tight-fitting means to protect

---

[7] The circuits differ on the extent of the right to "bear arms" outside the home, see *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) (invalidating prohibition), and the D.C. Circuit has not spoken on the issue.

[8] "[T]he movant has the initial burden of demonstrating the absence of a genuine issue of material fact. Upon such demonstration, the burden shifts to the opposing party to 'come forward with "specific facts showing that there is a *genuine issue for trial.*"'" *Id.*

[9] *See Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999) (rejecting the rule).

police officers and control crime. *Heller II*, 670 F.3d at 1258-59. Thus, as remanded, this case does not pose issues involving whether the provisions might be unconstitutional only in some, but not all, applications.

## II. THE DISTRICT'S FIREARM REGISTRATION REQUIREMENTS VIOLATE THE SECOND AMENDMENT

The District requires that a person register to exercise Second Amendment rights: "no person or organization in the District shall possess or control any firearm, unless the person or organization holds a valid registration certificate for the firearm." D.C. Code § 7-2502.01(a). Possession of an unregistered firearm is punishable by imprisonment for one year and a $1,000 fine, and by imprisonment for five years and a $5,000 fine for a second offense. § 7-2507.06.

After the Supreme Court decided *Heller*, the District made it much more difficult to register any firearm, including long guns, imposing additional restrictions which had not previously been seen as necessary. "After *Heller*, . . . D.C. seemed not to heed the Supreme Court's message. Instead, D.C. appeared to push the envelope again, with . . . its broad gun registration requirement." *Heller II*,  670 F.3d at 1271 (Kavanaugh, J., dissenting). The Court of Appeals held as much when it remanded this case.

Although disregarded by the Supreme Court in *Heller*, the District seeks to resurrect the D.C. Council's findings in 1975 that it was necessary to require registration of all firearms. DC Br. 20, citing 2012 Report at 5-6 (Def. Ex. A at 124-25) (quoting the 1975 Act , D.C. Law 1-85, § 2). But the 1975 Report focused on handguns, Def. Ex. A at 3-5, and included no reasons or evidence whatever regarding why registration of long guns was necessary.

The District asserts that at that time, "the courts did not recognize any individual, Second Amendment right to a handgun," that "explicit findings" supporting intermediate scrutiny were unnecessary, and that the legislative history justified the law. DC Br. 20-21. But the

Amendment's text mandated that "the right of the people to keep and bear arms, shall not be infringed," and "broad constitutional requirements [may be] 'made specific' by the text . . . ." *United States v. Lanier*, 520 U.S. 259, 271 (1997) (citation omitted).  The D.C. Circuit had never held, contrary to ordinary language, that "the people" did not mean the people and that "arms" did not include long guns or handguns.  *See Fraternal Order of Police v. United States*, 173 F.3d 898, 905-06 (D.C. Cir. 1999).[10]

The 2008 Committee Report notes the lack of a federal firearm registration system and the prohibition on use of the National Instant Criminal Background Check System (NICS) to register firearms and firearm owners.  DC Br. 21 n.17.  Indeed, gun registration is explicitly prohibited by the Gun Control Act, 18 U.S.C. § 926(a), including in the provisions of the Brady Act creating the NICS.  § 103(i)(2), P.L. 103-159, 107 Stat. 1536 (1993) (prohibiting "any system for the registration of firearms, firearm owners, or firearm transactions").  That is the norm nationwide, and at the state level registration is the rare exception, not the rule.  Once a person passes the background check, no governmental interest remains in retaining the person's identity or in making it difficult for law-abiding citizens to keep firearms.

The District itself suggests the poor fit between its objectives and its laws when it points to the failure of its onerous restrictions that disarm the law-abiding: "The District's age-adjusted rate of firearms deaths (intentional and unintentional) for 2010 was 14.62 per 100,000, considerably higher than the national rate (10.07) and the rate in neighboring jurisdictions (9.26 for Maryland, and 10.69 for Virginia)."  DC Br. 22 (citation omitted).  Yet the District deems it

---

[10] The District cites *Drake v. Filko*, 724 F.3d 426, 437-38 (3d Cir. 2013), which suggested that the New Jersey legislature could not have foreseen that its restrictions on carrying handguns "could run afoul of a Second Amendment that had not yet been held to protect an *individual* right to bear arms . . . ."  DC Br. 21 n.16.  Perhaps this could have been foreseen by reading the text, which "suggests that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments," are one and the same.  *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990).  See *Drake*, 724 F.3d at 454 (Hardiman, J., dissenting) ("Our role is to evaluate the State's proffered evidence, not to accept reflexively its litigation position," citing *Heller II*, 670 F.3d at 1259).

ironic that Plaintiff Jordan complained about gun violence in his neighborhood, given that allegedly "making guns *easier* to get and register will *not* have a positive impact on a city that records an average of 17 gunshots fired *per day*."   DC Br. 45, citing "Guns in America," *Washington Post*, A1, A18.   This demonstrates the utter failure of decades of gun registration in the District, which has not prevented criminals from acquiring guns.   MPD seizes around 2000 unregistered guns a year.  Pl. Ex. 3 (Lanier Dep.) 9-11.

Criminals, not law-abiding registrants, are discharging those 17 shots per day.   Making it easier for law-abiding citizens to get guns for deterrence and self-defense, rather than making gun possession the nearly exclusive province of criminals, would help reduce this senseless violence to a level closer to that in the neighboring jurisdictions, which have no gun registration requirements.

### A.   The District's Foremost Purported Reason for Registration – To Allow Police to Determine if Firearms are Present When Responding to a Call – Turns Out to Be False

As it stated in the 2008 Committee Report, the first and foremost reason the District claimed that registration "is critical" was because it "allows officers to determine in advance whether individuals involved in a call may have firearms . . . ."  *Heller II*, 670 F.3d at 1258.   The Court of Appeals highlighted this justification in explaining how the District sought to advance the government interests "to protect police officers and to aid in crime control." *Id*.   Judge Kavanaugh was skeptical:

> D.C.'s articulated basis for the registration requirement is that police officers, when approaching a house to execute a search or arrest warrant or take other investigative steps, will know whether the residents have guns. But that is at best a Swiss-cheese rationale because police officers obviously will assume the occupants might be armed regardless of what some central registration list might say. So this asserted rationale leaves far too many false negatives to satisfy strict or intermediate scrutiny with respect to burdens on a fundamental individual constitutional right.

*Id.* at 1294-95 (Kavanaugh, J., dissenting).  Like the panel majority, Judge Kavanaugh assumed the truth of the District's representations that MPD actually checked registration records.

It turns out that MPD officers responding to calls *do not* check registration records to determine if a firearm is present.

The District flatly admitted: "MPD officers that are responding to a call for service are not informed in advance if there is a registered firearm at the location." Pl. Ex. 2 (Resp. No. 6). Furthermore, neither MPD dispatchers nor officers being dispatched on calls for service have direct access to the firearms registry database.  Pl. Ex. 1 (Shelton Dep.) 66-68.  It can only be accessed by authorized personnel from terminals within the Firearms Registration Section -- the database is not accessible through the MPD's intranet or the Internet.  Pl. Ex. 1 (Shelton Decl.) ¶ 13; Def.  Ex. J at 1-2.  Police department squad cars or vehicles are not equipped with a computer that can access the firearms registry.  Pl. Ex. 1 (Shelton Dep.) 66-67; Pl. Ex. 3 (Lanier Dep.) 66.

Accordingly, when dispatchers direct a vehicle or officers to a location, they do not tell the officers over the radio or telephone whether there are firearms at that location because the dispatchers do not have the ability to do that.  Pl. Ex. 2 (Resp. No. 6); Pl. Ex. 1 (Shelton Dep.) 67-68. Officers being dispatched to an address do not routinely query the database to find out if there are registered firearms at that location.  Pl. Ex. 3 (Lanier Dep.) 67; Pl. Ex. 1 (Shelton Dep.) 64.  Lt. Shelton, who has been branch commander over the Firearms Registration Section for approximately 20 years (Pl. Ex. 1 (Shelton Dep.) 9), reports fewer than a dozen instances in which police agencies contacted his office to check registration records for an address before executing a search warrant.  Def. Ex. J at 2; Pl. Ex. 1 (Shelton Dep.) 72.

Other jurisdictions do not routinely check registrations when dispatching officers.  Pl. Ex. 1 (Shelton Dep.) 68-69; Pl. Ex. 6 (Jones Dep.) 69.   Nor do MPD officers investigating an individual routinely check whether the individual has firearms registered to him. Pl. Ex. 3 (Lanier Dep.) 67; Pl. Ex. 1 (Shelton Dep.) 64; Pl. Ex. 9; Pl. Ex. 10.   Instead, police officers responding to calls are trained to treat potentially violent situations as always having the potential for presence of weapons.  Pl. Ex. 1 (Shelton Dep.) 71; Pl. Ex. 6 (Jones Dep.) 68.

In short, the linchpin of Defendants' argument--that registration is necessary to protect the safety of police officers by alerting them to the presence of firearms when they are dispatched on a call--is simply and admittedly false.

This argument was initially put forth in the Committee Report (2008), which stated that "Registration is critical because it . . . allows officers to determine in advance whether individuals involved in a call may have firearms…." Def. Ex. A, Comm. Rep. 2008 at 3-4.  That reason for registration was cited in DC Orig. MSJ Mem. Dkt No. 25 at 4.  It was also relied upon by the trial court in the initial decision in this case.  Dkt. No. 32 at 18.  On appeal, the District argued that registration is justified because it "allows officers to determine in advance whether individuals involved in a call may have firearms,"  Appellees Br. at 8, 57.  The D.C. Circuit expressly relied on this alleged fact proffered by the District in support of its registration laws. *Heller II*, 670 F.3d at 1258.

But it is plainly false, and the District's contention that registration allegedly protects officer safety collapses without it.

### B.  Requiring Registration of Long Guns is Not a Narrowly-Tailored Means to Achieve the Goals of Protection of Police Officers and Crime Control

Having banned handguns and having had a milder system of registration of long guns for over thirty years, the District now reverses course and argues that handguns and long guns

should be equally subject to the same, newly-minted and more onerous registration requirements. DC Br. 23.  Saying that long guns and handguns "pose a similar threat to public safety in the wrong hands" (Pl. Ex. 6 (Jones Dec.) ¶ 13) ignores that (1) handguns are overwhelmingly used by criminals, but rifles and shotguns are rarely used in crime, (2) the District banned the rifles and shotguns it considered to be overly dangerous "assault weapons,"[11] and (3) long guns are not a threat to public safety at all in the *right* hands, i.e., the hands of law-abiding citizens, regardless of whether they are registered.[12]

The District's own data show beyond dispute that long guns are hardly ever used in crime.  In 2009, data provided by the District to the FBI show that only two out of 144 murders in the District were known to have been committed with long guns (one rifle and one shotgun). Pl. Ex. 8.  The sole rifle homicide was the one in which James Von Brunn, a deranged Maryland resident who was a felon and ineligible legally to possess firearms, used a .22 caliber rifle to commit a homicide at the Holocaust Memorial Museum.  Pl. Ex. 3 (Lanier Dep.) 97.  In 2010, out of 131 murders in the District, not one was reported to have been committed with a rifle or shotgun, according to data submitted by the District to the FBI.  In 2011, only one murder in the District was reported to have been committed with a long gun (a shotgun), out of 108 murders total.  *See*  Pl. Ex. 8; *see also* Pl. Ex. 3 (Lanier Dep.) 103-04.  Thus, these data show that over a

---

[11] The District bans mostly large numbers of rifles as "assault weapons," which are defined to include firearms of some 75 specified makes and models, or having certain generic features.  § 7-2501.01(3A)(A).  The Chief of Police may ban any other firearm she deems similarly dangerous.  *Id.* subpara. (iii).  See § 7-2502.02(a)(6) (such guns not registerable).

[12] The recent Navy Yard murders were committed partly with a shotgun, DC Br. 24 n.20, but it was an illegal sawed-off shotgun, and the perpetrator also used a handgun taken from a murdered security guard.   See http://usnews.nbcnews.com/_news/2013/09/25/20694290-chilling-navy-yard-surveillance-video-shows-shooter-stalking-hallways (visited Dec. 3, 2013).  It goes without saying that the killer was not deterred by the District's registration laws.

period of three years, only three murders were committed with long guns of any kind, or one per year, which is less than 1% of the 383 total murders.[13]

By contrast, for those three years, the following numbers of murders were committed in the District using knives, other (non-firearm) weapons, and hands, fists, and feet:

|  | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|
| Knives and cutting instruments | 19 | 20 | 21 | 60 |
| Other (non-firearm) weapons | 9 | 7 | 9 | 25 |
| Hands, fists, and feet | 5 | 5 | 1 | 11 |
| Total | 33 | 32 | 31 | 96 |

Thus, the number of homicides committed with knives, non-firearm weapons, and hands, fists and feet was 96, which is 32 times as many as were committed with shotguns and rifles combined (3), and constituted over a quarter of all murders.  Pl. Ex. 8.

Any suggestion of a need to require registration of long guns possessed by law-abiding citizens to reduce crime is conclusively refuted when the lack of use of registered long guns in crime is examined.  From July 17, 2008, to October 19, 2012, no registered rifles and only two registered shotguns were recovered from crime scenes in the District. Def. Ex. J at 2; Pl. Ex. 1 (Shelton Dep.) 85-86.[14]  During a time period only slightly longer than this (2007 to very early 2013), MPD recovered *more than 12,000 unregistered firearms*.  Pl. Ex. 3 (Lanier Dep.) 9-11.

---

[13] The District did not furnish adequate data to the FBI to allow for a breakdown by weapon type for the years preceding 2009, or for 2012.  The District asserted that it does not capture the type of firearm used for any category of crime. Pl. Ex. 2, Resp. Nos. 1 and 2.  However, the District did report to the FBI a breakdown by firearm type for homicide for 2009-2011.

[14] Recovery of a firearm at a crime scene does not necessarily mean that the firearm was itself used in a crime.  Pl. Ex. 1 (Shelton Dep.) 78.

Plaintiffs requested the District to produce "all studies, data, and other evidence" that show that particular registration requirements at issue in this case, as applied to rifles and/or shotguns, reduced the use of rifles and/or shotguns in crime, protected police officers, or promoted any other important governmental interest.  In each case, the District responded, "The District does not have any independent studies on this topic, i.e., any studies that are not otherwise publicly available."  Def. Ex. C. Req. Nos. 12, 14, 16, 18, 21, 23, 25, 27, 29, 33, 35, 37, 39, 41, 43.  See Pl. Stmt. Facts ¶ 40-41.  Since then, the District has cited no publicly available studies, data, or other evidence to show that any of the District's registration requirements regarding rifles and shotguns actually reduce crime or protect police officers.

Plaintiffs also requested regarding "basic registration" of long guns: "All studies, data, and other evidence that show that laws requiring registration of rifles and/or shotguns, as in D.C. Code § 7–2502.01(a) and 7–2502.03(b), reduced the use of rifles and/or shotguns in crime, protected police officers, or promoted any other important governmental interest." Def. Ex. C Req. No. 45.  Once again, the District responded that it did not have "any independent studies on this topic, i.e., any studies that are not otherwise publicly available," and since that time has not cited any publicly available studies, data, or evidence showing that registration of rifles and/or shotguns reduced crime or protected police officers.

Chief Lanier testified that she could not identify any "studies or data that indicate that registration of long guns specifically as opposed to handguns aids in crime control or promotes officer safety." Pl. Ex. 3 (Lanier Dep.) 105-06.

As noted by Dr. Kleck, most of the studies on which the District's witness Daniel Webster relies pertain to handguns, or do not distinguish between handguns and long guns. Thus, they do not provide evidence to support any conclusions about long guns specifically.

None of the studies he cites in support of his claims examined long guns separately.  Instead, every study pertains either to only handguns or pertains to all types of guns combined.  Pl. Ex. 7 (Kleck Dec.) ¶ 13.

Though asserting that rifles are the "preferred tool of political assassins" (D.C. Br. 25), the District has not cited one assassination that occurred in the District involving a rifle.  As a matter of fact, the vast majority of assassinations and assassination attempts in the United States have involved handguns or other devices, not rifles.  *See* Pl. Ex. 11. And even if long guns were the preferred tool of assassins, the District suggests no nexus with registration.  Assassins are not deterred by gun registration laws.  The law-abiding people who register guns (Def. Ex. B (Shelton Dec.) ¶ 8; Pl. Ex. 1 (Shelton Dep.) 137) are not the kinds of people who would commit assassinations if not required to register.  That said, in the District's history -handguns, and never rifles, have been most frequently used by actual or would-be assassins.[15]  Pl. Ex. 11.

The District next irrelevantly points out that rifles and shotguns are often used for hunting, but that hunting is prohibited in the District.  DC Br. 24.  District residents use rifles and shotguns to hunt deer in the woods and ducks in the flyways of Virginia, Maryland, and other states.  Subjecting such hunters to incarceration for not having their long guns registered does not protect police officers or control crime.

---

[15] Every political assassination or credible assassination attempt in the District's history was committed with a weapon other than a rifle or shotgun.  They range from the murders of Presidents Abraham Lincoln and James Garfield and the attempts on President Harry Truman and Ronald Reagan by assailants with pistols, to the car bomb murder of exiled Chilean official Orlando Letelier.  More presidential assassinations and attempted assassinations in the U.S. have involved aircraft or biological weapons than have involved rifles or shotguns. Pl. Ex. 11.  Even the legislative history relied on by the District makes clear that rifles are a rare threat.  *See* Council Of The District Of Columbia, Committee On Public Safety & The Judiciary, *Report On Bill 19-614*, at 4 (Feb. 29, 2012) ("2012 Report") (citing assassinations and assassination attempts primarily committed with handguns, as well as incidents and conspiracies involving explosive devices). District officials have also conceded that recent high-profile incidents involving long guns did not involve District residents or firearms registered in the District.  *See* Pl. Ex. 3 (Lanier Dep.) 23-25 (shots fired at White House), 96-97 (murder by convicted felon at Holocaust Memorial Museum).

"With respect to long guns they [registration laws] are novel, not historic." *Heller II*, 670 F.3d at 1254-55.  The District seeks to re-litigate that holding in claiming that "[t]he historic record contains numerous references to registration laws applying to long guns," but it cites only three purported instances.  DC Br. 26.  The oldest was an 1866 Georgia law imposing a tax of $1 for every firearm owned over the number of three.  DC Br. 27 n.23, citing 1866 Ga. Law 27, §3. "Blacks were routinely disarmed by Southern States after the Civil War."  *Heller,* 554 U.S. at 614.  Most former slaves would not have been able to afford such a tax.

The District also relies on an 1893 Florida statute empowering officials to grant a license to carry a pistol or repeating rifle.  DC Br. 25-26, citing Fla. Stat. ch. 4147 (1893).  That law did not require a license to possess such firearms, and so is irrelevant here.  *Watson v. Stone*, 148 Fla. 516, 521-23, 4 So.2d 700 (1941).  Even so, one of the Justices stated its well-known purpose: "[T]he Act was passed for the purpose of disarming the negro laborers . . . . The statute was never intended to be applied to the white population . . . ."  *Id.* at 524 (Buford, J., concurring).

The District further cites an 1896 law of the Republic of Hawaii requiring a license to possess a firearm.  DC Br. 25, citing Act 64, Laws of 1896.  The U.S. Bill of Rights had no application to that independent country, which was undemocratic.  *See* Noenoe K. Silva, *Aloha Betrayed: Native Hawaiian Resistance to American Colonialism* (Duke Univ. Press 2004) (detailing rule of native Hawaiians by white oligarchy).  When Hawaii became a U.S. territory in 1900, specified penal laws concerning "Firearms," possibly including this one, were repealed. An Act to provide a government for the Territory of Hawaii, Ch. 339, § 7, 31 Stat. 141, 142-43 (1900).  Hawaii did not become a State until 1959.

The District next suggests that "laws requiring the registration of certain types of long guns at the federal level has [*sic*] proven 'highly successful' in reducing the use of such long-guns in crime."  DC Br. 27, citing Vince Decl. ¶ 14.  No data or study is cited.[16]   The only pertinent federal law has no application to long rifles and shotguns, and applies only to "sawed-off" rifles and shotguns.  The National Firearms Act (NFA) requires registration of rifles with barrels under 16", shotguns with barrels under 18", or a weapon made from either with overall length of less than 26".  26 U.S.C. §§ 5841 (registration), 5845(a)(1)-(4).[17]   The NFA in no way requires the registration of "long guns" as that term was used in *Heller* or *Heller II.*

But the Supreme Court's holdings on the NFA, which was originally passed in 1934, 48 Stat. 1236 (1934), demonstrate that registration of constitutionally-protected firearms violates the Second Amendment.  In *United States v. Miller*, 307 U.S. 174, 175 (1939), the defendants were charged with having an unregistered short-barreled shotgun.[18]   The issue was thus whether the

---

[16] Plaintiffs previously moved to strike the expert reports of Vince, Jones, and Lanier.  (Dkt. Nos. 60, 61, 62.)  The Court treated those motions as motions in limine, and denied them by Memorandum Opinion dated July 8, 2013. (Dkt. No. 68.)  The Court noted that "It is not proper . . . for the Court to exclude expert testimony 'merely because the factual bases for an expert's opinion are weak,'" and that "[e]ven though the testimony of an expert witness may carry little weight and little persuasiveness because of the weakness of its factual underpinnings, that fact in and of itself does not render the testimony inadmissible." *Id.* at 9 (citations omitted).  The Court noted that the validity of the experts' opinions could be addressed on cross-examination, or raised on summary judgment. *Id.* at 12-13.  The opinions of these three individuals regarding the efficacy of D.C.'s registration laws are generally based on no facts whatsoever, and they apply no recognized methodology to arrive at their conclusions.  As their declarations show, their opinions are mere assertions without any grounding in data or fact, except the occasional anecdote.  As Dr. Kleck points out, formal training in statistical analysis and research design is necessary to evaluate the effectiveness of gun control measures, as is a thorough knowledge of the methods and findings of prior research on this topic.  Pl. Ex. 7 (Kleck Dec.) ¶ 68.  These witnesses have neither that training nor that knowledge.  Plaintiffs accordingly suggest that the Court should give little or no weight to the unsupported personal opinion testimony of these three witnesses.

[17] D.C. bans these firearms.  D.C. Code §§ 7-2501.01(15), (17), 7-2502.02(a)(1), (3).

[18] The NFA registration included the registrant's name, address, place of storage, and place of business, and the required transfer order included identification of the transferee, fingerprints, photograph, and the identification mark of the firearm.  *Miller*, 307 U.S. at 175 n.1.

registration requirement was consistent with the Second Amendment – the firearms at issue were not banned outright.

Based on "the absence of any evidence" of whether the weapon was "ordinary military equipment," "we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument." *Id*. at 178.  "Had the Court believed that the Second Amendment protects only those serving in the militia, it would have been odd to examine the character of the weapon . . . ." *Heller*, 554 U.S. at 622.  Similarly, had the *Miller* Court believed that the Second Amendment is consistent with registration, it would have been odd to examine the character of the weapon rather than simply note that registration does not violate the Second Amendment.

*Heller* continues: "We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Id*. at 625.  Protect such weapons from what?  Registration, as required by the NFA, 26 U.S.C. § 5841(a).  The premise again is that registration of common firearms would violate the Second Amendment.[19]

While the Court of Appeals held that handguns were historically subject to certain basic registration requirements, intermediate scrutiny as applied to long guns should take seriously that "the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right." *Heller*, 554 U.S. at 625.  "If the exercise of the rights of free speech and free assembly cannot be made a crime, we do not think this can be accomplished by the device of requiring previous registration as a condition for exercising them . . . ." *Thomas v. Collins,* 323 U.S. 516, 539-40 (1945). *See Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S.

---

[19] "After all, if registration could be required for all guns, the Court could have just said so and ended its analysis." *Heller*, 670 F.3d at 1294 (Kavanaugh, J., dissenting).  The opinion of the majority in *Heller II* precludes that argument only as applied to basic handgun registration.

150, 169 (2002) (finding it "unlikely that the absence of a permit would preclude criminals" from violating the law and invalidating a canvassing registration requirement).[20]   Similarly, requiring law-abiding citizens to register firearms does not prevent criminals from committing crimes with firearms.

No State requires registration of all firearms, with the exception of Hawaii.[21]   The District is an outlier jurisdiction, with forty-nine states not deeming registration of long guns to have any nexus to protection of police officers or crime control.  Despite that nearly-universal experience, the District avers: "To date, Plaintiffs have not articulated any pertinent reasons to treat handguns differently than long guns for registration purposes."   DC Br. 27.  But it is the District's burden to justify its restrictions, and yet the 2008 Committee Report did not include "even a single reference to the need for registration of rifles or shotguns," the justification for which "might have been written in invisible ink."  *Heller II*, 670 F.3d at 1259.

In 1998-2012, Canada had a long gun registry that was a complete failure in achieving any important law enforcement purpose, resulting in its abolition.[22]   At hearings on the bill to repeal the registry, Vic Toews, Canadian Minister of Public Safety, stated:  "For many years it has been clear that the long-gun registry does . . . nothing to prevent crime or protect front-line officers."   Pl. Ex. 12 at 1.  He also stated that "there is no evidence that it [the registry] has stopped a single crime or saved a single life."  *Id.*

---

[20] *See also Near v. Minnesota,* 283 U.S. 697, 722 (1931) (rejecting prior restraint based on the possibility that unlicensed speech could "provoke assaults and the commission of crime.").

[21] "Hawaii and the District are the only states [*sic*] that require all firearms to be registered."  2008 Committee Report at 3, DC App. at 35.  *See* Haw. Rev. Stat. § 134-2.

[22] House Government Bill C-19, An Act to Amend the Criminal Code and the Firearms Act, First Session, Forty-first Parliament, 60-61 Elizabeth II, 2011-2012 (Statutes of Canada 2012, Chapter 6).  The Act's  history may be accessed at: http://www.parl.gc.ca/LegisInfo/BillDetails.aspx?Language=E&Mode=1&Bill=C19&Parl=41&Ses=1

The above is confirmed by the only academic study on the subject. Dr. Kleck explains that:

> There has been only one serious empirical assessment of the impact of Canada's requirement that long guns (rifles and shotguns) be registered. Langmann (2012) used a variety of time series methods to assess whether there were any favorable changes in the trends of total homicide, firearms homicide, long gun homicide, spousal homicide, or spousal long gun homicide, in the period from 1995, when the long gun registration requirement was enacted as part of the C-68 firearms law, to 2003 when the requirement that all long guns be registered finally went into effect. . . . Langmann found no evidence that the law had any beneficial effects, either immediate or lagged, on any of the aforementioned outcome variables.

Pl. Ex. 7 (Kleck Dec.) ¶ 95.

Finally, the District seeks support in regulations that require firearm registration on military bases, asserting: "If registration is good enough for American soldiers, it should be good enough for District residents." DC Br. 27 n.24. Yet members of the Armed Forces sacrifice Bill of Rights freedoms that are guaranteed to civilians. "The essence of military service is the subordination of the desires and interests of the individual to the needs of the service." *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986) (quotation marks and citation omitted) (upholding Air Force ban on religious headgear). "[D]emonstrations, picketing, sit-ins, protest marches, political speeches and similar activities" may be banned at military bases. *Greer v. Spock*, 424 U.S. 828, 831 (1976). A commissioned officer who uses "contemptuous words against the President" is subject to court-martial. 10 U.S.C. § 888. Non-judicial punishment, including incarceration and reduced rations, may be imposed for minor offenses. 10 U.S.C. § 815. Perhaps the District thinks that mandatory fitness testing, grooming standards, or a host of other restrictions on personal freedoms would also be "good enough for District residents."

**C. The Registration Requirements Significantly Burden Second Amendment Rights**

The District argues that registration requirements are *de minimis*, and thus this Court need not go further in its analysis. DC Br. 28-30. Besides begging the question, that would short circuit the remand order of the Court of Appeals that the District "present some meaningful evidence, not mere assertions, to justify its predictive judgments." *Heller II*, 670 F.3d at 1259.

Curiously, the District relies on a decision upholding a prohibition on possession of a firearm with an obliterated serial number, which was "arguably *de minimis* because it did not ban any type of firearm or impose any other restriction." DC Br. 28, quoting *United States v. Marzzarella*, 614 F.3d 85, 94 (3rd Cir. 2010). The law in that case was narrowly tailored based on the following: "While the intent of the District of Columbia's ban was to prevent the possession of handguns, [18 U.S.C.] § 922(k) permits possession of all otherwise lawful firearms." *Id*. at 97.

The District notes that the Plaintiffs have been able to register firearms, Br. 28, but that is irrelevant to the issue of the extent of the burden.[23] That none of their registrations have been revoked, that none of the Plaintiffs are (for now) blind, and that the re-registration process is still in the (not-too-distant) future, DC Br. 28-29, do not mean these are not burdens, given the need to plan for eventualities and to avoid uncertainty.

The suggestion that each requirement "may be completed in a matter of minutes," DC Br. 29, is inaccurate and ignores the overall burden of all of the requirements, which run from several hours to a day or more. The Court of Appeals included "the mandatory five hours of

---

[23] The District also states that 99% of applicants have been able to register their handguns and long guns. DC Br. 45. That begs the question of the extent of the burden to those applicants, not to mention the people who lack the resources even to apply. It also shows that people who undergo the burden of registering firearms are law-abiding. Criminals and others who are disqualified merely bypass the system, and obtain their guns illegally.

firearm training and instruction"[24] as among the requirements that "affect the Second Amendment right because they are not *de minimis*," "make it considerably more difficult for a person lawfully to acquire and keep a firearm," and thus "impinge upon that right . . . ." *Heller II*, 670 F.3d at 1255-56.  The concrete burdens on the Plaintiffs here are set forth below.

### D. The Requirements of In-Person Appearance, Photographing, Fingerprinting, Bringing the Firearm to the MPD and Re-Registration are Unnecessary to Verify An Applicant's Eligibility to Possess Firearms

#### *1. The National Instant Criminal Background Check System (NICS)*

The nationwide standard to determine eligibility to purchase a firearm was established in 1998 by the National Instant Criminal Background Check System (NICS), 18 U.S.C. § 922(t), rendering local background checks obsolete.  All persons who purchase a firearm from a federally-licensed dealer are screened by NICS,[25] which authorizes transfer of a firearm only if the transfer would not violate federal[26] or State law, which is defined to include the District.[27]  § 922(t)(2).  As established by the Attorney General, NICS is contacted by dealers to ensure that prospective firearm purchasers are eligible under federal and State law.  Brady Handgun Violence Prevention Act, § 103(b), P.L. 103-159, 107 Stat. 1536 (1993).[28]  NICS does not retain a record of the identity of the purchaser, and any system of registration of firearms or firearms owners is prohibited.  § 103(i).

---

[24] While that requirement was amended, it makes clear that the Court of Appeals considered five hours to be a burden.

[25] Except for guns already owned by them outside the District, District residents may lawfully obtain firearms only from federally-licensed dealers.  *See* 18 U.S.C. § 922(a)(3) (prohibition on transfer from out-of-state), (b)(3) (receipt of long gun from another state must be from dealer).

[26] Federal law prohibits receipt of firearms by convicted felons and domestic-violence misdemeants, fugitives from justice, drug addicts, persons committed to mental institutions, illegal aliens, persons subject to domestic restraining orders, persons under indictment, and others.  18 U.S.C. § 922(g), (n).

[27] § 921(a)(2).

[28] See also NICS Improvement Amendments Act, P.L. 110-180, 121 Stat. 2559 (2008).

NICS accesses records maintained in the National Crime Information Center (NCIC), the nationwide computerized information system of criminal justice data established by the FBI as a service to local, state, and Federal criminal justice agencies; the Interstate Identification Index (III), which includes criminal history records; and the NICS Index, which includes records on persons disqualified from possessing firearms under federal law.  28 C.F.R. §§ 25.2, 25.4.

The identity of a firearm transferee, who appears in person, is established for NICS checks in part by presentation of a government-issued photo identification card.  18 U.S.C. § 922(t)(1)(C).  NICS conducts the check based on name, sex, race, date of birth, state of residence, identifiers such as the transferee's Social Security number, and physical description. 28 C.F.R. § 25.7.  The FBI conducts NICS checks without charging a fee.[29]

The NICS renders the District's background checks for firearm acquisition redundant. The District states that, besides NCIC, it checks for outstanding warrants and restraining orders in the Washington Area Law Enforcement System ("WALES").  DC Br. 10.  It also checks D.C. Superior Court records for mental-health commitments and domestic-violence convictions.  DC Br. 10.  Again, given that NICS authorizes transfer of a firearm only if it would not violate federal or State (including D.C.) law, 18 U.S.C. § 922(t)(2), NICS checks for these same categories of persons.

Even if the District wishes to conduct its own background checks, that does not require the permanent registration of the gun buyer, nor does it require recordation of the firearm.  More than 20 states, including Virginia, do that every day for some or all firearm transfers.[30]  In all of

---

[29] § 103(f), NICS Improvement Amendments Act.

[30] *See* NICS Participation Map, *available at* http://www.fbi.gov/about-us/cjis/nics/general-information/participation-map (last viewed Dec. 4, 2013).

the other states, NICS checks are conducted directly by the FBI.  See 28 C.F.R. § 25.2 (defining

"POC" as state or local Point of Contact for checks), § 25.6 (checks conducted by FBI or POCs).

While it is not necessary to subject persons who passed the background check already to

perpetual background checks in the future, even that could be done without any record of the

specific firearms the person purchased.  In short, the District's registration scheme is anything

but narrowly tailored.

### 2.  In-Person Appearance, Fingerprinting, Photographing, and Bringing the Firearm to the MPD

As provided by federal law, in-person appearance and positive identification at the

premises of the federally-licensed firearm dealer together with the NICS check adequately

screens out ineligible persons.  When a person receives a firearm from a District dealer (of which

there is only one), the checking of additional databases may be required.

To register a firearm, the District requires an applicant to appear in person and be

fingerprinted and photographed.  D.C. Code § 7-2502.04(a), (b).[31] Contrary to the District, these

requirements are not narrowly tailored. DC Br. 31-32. No such requirements exist under the laws

of any state but Hawaii.

The District attempts to justify the firearm registration requirement on several grounds.

First, relying on a study by Webster, it argues that "permit to purchase" laws that require in-

person application are effective in preventing "diversion" to criminals.  DC Br. 30.    But

---

[31] This treats persons who exercise Second Amendment rights like gun offenders and sex offenders.  "Gun offenders," persons convicted of various crimes involving firearms, § 7-2508.01, must register, but only for a period of two years.  §§ 7-2508.02(a), 7-2508.03.  They must appear in person and give personal information, including fingerprints. *Id.*

 Sex offenders include persons convicted of rape, child sex abuse, and murder while engaging in a sexual act, as well as sexual psychopaths.  D.C. Code § 22-4001.  Registration may endure for various periods.  § 22-4002.  A sex offender must register, provide personal information, be photographed and fingerprinted, and periodically verify information.  § 22-4014.[24]  Knowing violation subjects a sex  offender to a $1000 fine and imprisonment for 180 days, § 22-4015, which is only half the incarceration period for possession of an unregistered firearm, § 7-2507.06.

prevention of "diversion," even if it were to be proved, is not the same as causing an actual reduction in violent crime.   Webster's study, moreover, is deeply flawed.   As Dr. Kleck comments:

> Webster's analysis of Missouri's permit-to-purchase licensing law is based on a fundamental misunderstanding of ATF trace data.   He claims that the time from when a gun was first sold at retail to when it is recovered by police ("time-to-crime", or TTC) is "indicative of possible trafficking" (p. 4, Point 14).   It is not. First, trace data cannot tell us whether a gun has been trafficked or otherwise "diverted."   As a National Research Council panel concluded, "trace data cannot show whether a firearm has been illegally diverted from legitimate firearms commerce" (Wellford et al. 2005, p. 40).   Second, and more specifically, the trace-based "short TTC" measure has been empirically shown to not be correlated with another, more widely accepted indicator of gun trafficking, the prevalence of obliterated serial numbers . . . .
>
> In fact, the share of traced guns with a short TTC is actually far more strongly correlated with gun theft rates (Kleck and Wang 2009, p. 1283). . . . D.C.'s registration laws do nothing to affect rates of gun theft . . . .Webster's analysis is therefore distorted by an outdated, discredited interpretation of the meaning of short TTC.

Pl. Ex. 7 (Kleck Dec.) ¶¶ 27-30.

The District next argues that requiring an in-person appearance will deter the use of false identification or other attempts by unauthorized persons to circumvent the registration requirements."  DC Br. 31.   However, the officer in charge of the Firearms Registration Section for nearly 20 years, Lt. Shelton, candidly admitted that his unit has not had a problem with false IDs on the firearms registration side for private individuals.  Pl. Ex. 1 (Shelton Dep.) 32-33. Further, criminals already circumvent the process, by purchasing guns on the street and bypassing registration altogether.   Only the law-abiding register their guns.  Pl. Ex. 1 (Shelton Dep.) 137.   That is why in the last two years of reported data (2011 and 2012), no rifle or shotgun applications, and only two handgun applications, were denied.  Pl. Ex. 2 at 9, No. 11; Pl. Ex. 1 (Shelton Dep.) 136.

To attempt to justify its fingerprinting requirement, the District notes that a study by the U.S. General Accounting Office stated that "the instant background checks [required by federal law] do not positively identify purchasers of firearms," and "cannot ensure that the prospective purchaser is not a felon." DC Br. 31.  This involved a deliberate attempt by the government to deceive firearm dealers by using fake IDs offered by undercover agents posing as prospective gun buyers. U.S. Gen. Accounting Office, "Firearms Purchased from Federal Firearms Licensees Using Bogus Identification," GAO-01-427 (Mar. 2001) ("GAO Report").  The sample of FFLs involved was tiny: five stores in five states, with the purchase or attempted purchase of seven firearms.  With only one possible exception, the FFLs behaved lawfully and processed the transactions in accordance with state and federal law, based on the apparently proper (though forged) identification documents presented by the federal agents.  *Id*. at 5-12.

The fact that the federal government was able to forge identification documents sufficient to deceive an ordinary business is unremarkable.  This deception took place in 2000, with the report being issued in 2001.[32]  The forged documents were allegedly created with  "off-the-shelf software, a scanner, a laminator, and a color laser printer," which strongly suggests that the driver's licenses were paper.  *Id*. at 2.  Since the attacks on 9/11, and the passage of the Real ID Act P.L. 109-13, 119 Stat. 302 (2005), driver's licenses are now highly resistant to forgery, since holograms and other high tech anti-forgery devices are built into them    Pl. Ex. 13 (Webster Dep.) 23-27.

But even if identification documents could still be easily forged —which is probably not a valid assumption--the inference that fingerprinting will reduce the number of prohibited

---

[32] Webster repeatedly gives the date of this report as "2011" rather than 2001, giving the impression that it post-dates, rather than antedates, the incorporation of anti-forgery devices into the driver's licenses of most states.  Def. Ex. I (Webster Dec.) 3-4.

persons receiving firearms does not logically follow from the evidence in the cited study. The study could only be important if some significant number of criminal purchase attempts are currently made using fake IDs.  This inference is wrong for two reasons.

First, criminals virtually never acquire guns by using a fake ID.  The largest, most nationally representative sample of criminals ever asked about how they obtained guns was studied in the U.S. Census Bureau's 2004 Survey of Inmates in State and Federal Correctional Facilities (SISFCF).  Inmates were asked if they possessed a weapon during the crime for which they were sentenced to prison, and what type of weapon was possessed.  Of 1,818 inmates who reported possessing guns during this offense, only 10.4% had purchased the gun from a gun shop or pawnshop, would therefore have been subject to a background check, and thus would have had a reason to provide false ID.  Of these, nearly all purchased the gun under their own name, presumably because they did not have a disqualifying conviction at the time.  Of all the 1,818 total criminals' gun acquisitions, only 14 (0.8%) were obtained by a purchase using a false name, and presumably false identification (discussing Kleck's analysis of ICPSR 2013).  *See* Pl. Ex. 7 (Kleck Dec.) ¶ 16

Second, most criminals have multiple sources they can use to obtain guns.  Thus, it is likely that most, perhaps all, of the handful of criminals (0.8% of those who used guns) who acquired guns via the use of fake ID at a gun store would also have been able to acquire guns from other sources such as friends or family.  There is no affirmative evidence, cited by Webster or otherwise, that there are any criminals who obtain guns using false ID and who could not get a gun from other sources if this mode of acquisition were not available to them.  Pl. Ex. 7 (Kleck Dec.) ¶ 17.

Indeed, the District's witnesses were not aware of any case of a private individual trying to use a false identification document to register a gun.  Pl. Ex. 1 (Shelton Dep.) 33; Pl. Ex. 13 (Webster Dep.) 27-28.  In addition, fingerprinting can only lead to "biometric identification," and being "sure that MPD is performing a background check on the correct person" (DC Br. 30) if the applicant's fingerprints are already on file with the FBI.  The District's expert, Daniel Webster, admitted that requiring photographs and fingerprinting has not substantially reduced illegal trafficking into the District, and that requiring in-person application has not substantially reduced illegal trafficking into the District.  Pl. Ex. 13 (Webster Dep.) 108.  As the District's witnesses admitted, no studies show that in-person registration would prevent criminals from circumventing the registration process.  Pl. Ex. 5 (Vince Dep.) 75-76, 80, 82; Pl. Ex. 6 (Jones Dep.) 100.  Indeed, that is exactly what happens.  Law-abiding persons are subjected to burdens such as in-person registration and fingerprinting, whereas criminals simply ignore the entire process.  The potential use of false ID to register a firearm in the District is a non-issue, and thus the intrusive requirements for in-person registration, and being photographed and fingerprinted, are unnecessary and are not narrowly tailored requirements that serve any important interest.

The District's contention that local level background checks have been shown to be more effective at reducing firearm related crime than just the federal background check is both irrelevant and unsupported by credible evidence.  DC Br. 31 (citing Lanier Dec. ¶ 19, which in turn relies on Steven A. Sumner, *et al., Firearm Death Rates and Association with Level of Firearm Purchase Background Check,* Am J. Prev. Med. (July 2008) ("Sumner study").  First, the issue in this case is registration.  Background checks can be done without registration of the purchaser or firearm, or any of the other burdensome requirements imposed by the District.  As Chief Lanier admitted, the study does not even purport to demonstrate that local background

checks reduce the total number of suicides or homicides.  Pl. Ex. 3 (Lanier Dep.) 29-40.  The

Sumner study does not indicate that homicide or suicide declined after local background checks

were first implemented, which the authors of the study themselves recognized as a deficiency.

*Id.*  There is no way to know whether the lower rates in states with local background checks

existed before the local background checks were instituted.  *Id.*  The study did not control for

other gun control laws in those jurisdictions, or for gun ownership rates.  *Id.* In short, the Sumner

study, which did not control for some of the basic potential confounding variables, does not

establish any effect of local background checks—and local background checks are not at issue in

this litigation.

Along with the in-person appearance, a person "may be required to bring with him the

firearm for which a registration certificate is sought, which shall be transported in accordance

with § 22-4504.02."[33]  D.C. Code § 7-2502.04(c).  The District has offered no reason for this

requirement. Requiring the gun to be taken to MPD creates the risk that the gun may be stolen en

route, that the person may be arrested under the laws of the District, Maryland, or another State,

or that the person may be confronted, wrongly detained or arrested, or even shot by a police

officer seeing a "man with gun" (or a gun case).

### 3.  Expiration and Re-registration

"Registration certificates shall expire 3 years after the date of issuance unless renewed in

accordance with this section for subsequent 3-year periods."  § 7-2502.07a(a).  To renew a

registration, the applicant must submit a statement attesting to the registrant's possession of the

registered firearm, address, and "continued compliance with all registration requirements set

---

[33] If transported by vehicle, the firearm may not be readily or directly accessible, or must be in a locked container.  § 22-4504.02(b).  If not in a vehicle, it must be in a locked container.  § 22-4504.02(c).  A locked container would always be required, even in the case of vehicle transport, for the firearm must be carried from a parking area to the MPD building.

forth in § 7-2502.03(a)."  § 7-2502.07a(c).  This information duplicates information already in the original registration and in any notice of changed information filed pursuant to § 7-2502.08(a).  Possession of an unregistered firearm is punishable by imprisonment for one year and a $1,000 fine.  § 7-2507.06.

It is unclear why this provision suddenly became compelling after the Supreme Court decided *Heller* in 2008, given that the District had required registration for decades without re-registration. The District's own witnesses cite no studies showing that periodic registration renewal or reporting requirements reduce crime or protect police officers.  Pl. Ex. 3 (Lanier Dep.) 56; Pl. Ex. 6 (Jones Dep.) 113; Pl. Ex. 13 (Webster Dep.) 138-40; Def. Ex. I (Webster Dec.) 9-10.  Hawaii, the only state that requires registration of all firearms, does not provide that registrations expire and must be renewed.  Haw. Rev. Stat. § 134-3.  Not even the National Firearms Act, which mandates registration of machineguns, requires re-registration.  26 U.S.C. § 5841.

The District could conduct new background checks at any time without causing the registrations to expire. District officials have conceded as much in their depositions in this case. See Pl. Ex. 3 (Lanier Dep.) 43-46; Pl. Ex. 6 (Jones Dep.) 104-06; Pl. Ex. 1 (Shelton Dep.) 148-50.  And in fact, the District does exactly this right now, conducting checks for protective order violations and domestic violence charges at least monthly.  See Pl. Ex. 3 (Lanier Dep.) 48, discussing Pl. Ex. 14 and 15; Pl. Ex. 1 (Shelton Dep.) 57-60, discussing Pl. Ex. 14. The chance that a person who passed the NICS check has become ineligible to own a firearm is too remote to justify this burden on all lawful firearm owners, and any risk that might exist can be addressed, and in fact is already being addressed, without re-registration appearances.

To renew registrations, the District has proposed a rule that a registrant must appear in person at MPD headquarters, submit fingerprints again, and confirm possession of the registered firearm, home address, and continued compliance with the registration requirements.   MPD, Notice of Proposed Rulemaking, Renewal of Firearm Registration, § 2326, at 14-15 (Nov. 15, 2013), http://dcregs.dc.gov/Gateway/RuleHome.aspx?RuleID=1258495.   While not yet adopted, the re-registration regulation would require each registrant to re-register each firearm every three years by appearing in person at the Firearms Registration Section, being fingerprinted, paying a fingerprinting fee (currently $35.00) and paying a re-registration fee (currently $13.00) for each firearm owned by the registrant.

If the re-registration is more than 90 days late, the prior registration would be cancelled and the registration treated as a new application.   There does not appear to be any provision that would prevent a cancelled registrant from being charged with possession of unregistered firearms, which can result in imprisonment, being listed in the Gun Offender Registry, and loss of the ability ever to own firearms in the District.   *See* Pl. Ex. 16 (Heller Dec.) ¶ 12.

Although the re-registration requirement will burden all registrants heavily, it will impose a severe burden on individuals who own several firearms.   As noted by Plaintiff Carter, "it will be an even harsher burden on me because I own more than half a dozen firearms.   If the regulation proposed in November 2013 relating to re-registration goes into effect, every three years I will have to pay something in excess of $100 at the current fee structure, and possibly more, merely to keep the firearms I already own and have already registered."  Pl. Ex. 17 (Carter Dec.) ¶ 19.

In short, the burdens of money, time, time off work, and other efforts described below will be repeated again and again, with the risk of criminal liability and loss of Second

Amendment rights thrown in for good measure.   There is no conceivable need for re-registration that cannot be met in some other way—indeed, those ostensible needs are already being met—and the re-registration provision should be struck down as an unconstitutional infringement of plaintiffs' Second Amendment rights.

### E. The Requirements to Demonstrate Knowledge of Firearm Laws and Complete a Safety and Training Course Do Not Protect Police Officers or Control Crime

Registration of a firearm requires an applicant "to demonstrate satisfactorily, in accordance with a test prescribed by the Chief, a knowledge of the laws of the District of Columbia pertaining to firearms and, in particular, the requirements of this act, the responsibilities regarding storage, and the requirements for transport . . . ." § 7-2502.03(a)(10).[34] Further, the Chief must determine that the applicant has "completed a firearms training and safety class" by the Chief, or has submitted evidence of training from the U.S. military, another state, or otherwise by an instructor.  § 7-2502.03(a)(13).[35]

No state requires training or a written test for the mere possession of a firearm. Some states require training or an exam for issuance of a permit to carry a concealed handgun, or even to purchase a handgun.  See DC Br. 32-33.  But people exercise the right to "keep arms" for other reasons, *e.g.*, for home defense, hunting, to sell, or as an inheritance. *Heller*, 554 U.S. at 583 & n.7.

No evidence exists that training or the test protects police officers or controls crime.[36] Even if "crime" were read so broadly as to include firearm accidents, the District's experts cite

---

[34] "[T]he type of test and its content shall be at the sole discretion of the Director [the commanding officer or acting commanding officer of the Identification and Records Division of the Metropolitan Police Department]."   D.C. Municipal Regulations § 24-2311.3.

[35] Training is required even for a person who wishes merely to possess a firearm as an inheritance, a collector's item, to preserve for descendants, or other lawful purpose, and not for discharge or other actual use.

no studies showing that mandatory training or testing in gun safety reduce unintentional discharges.  Pl. Ex. 3 (Lanier Dep.) 56-58, 62; Pl. Ex. 6 (Jones Dep.) 116-17; Def. Ex. I (Webster Decl.) ¶¶ 10-11; Pl. Ex. 13 (Webster Dep.) 144-45.

D.C.'s training course takes about 30 minutes to complete.  *See* https://dcfst.mpdconline.com/.  The District's gun safety test includes only one question about safe storage of firearms within the home; the question is about the District's recommendation that firearms be kept unloaded, and either disassembled or locked.  Pl. Ex. 13 (Webster Dep.) 142-43; (discussing Pl. Ex. 18); Pl. Ex. 3 (Lanier Dep.) 59-60 (same). The District provides no evidence that this scanty instruction and testing actually causes people to safely store their firearms when otherwise they would not.    Indeed, even in states that mandate "safe storage" (which the District does not) "there is strong evidence that laws mandating 'safe' storage of guns have no detectable effect on rates of unintentional firearms injury – the type of gun injury most likely to be influenced by such laws."  Pl. Ex. 7 (Kleck Dec.) ¶ 64; *see generally id.,*  ¶¶ 63-66. Although Jones may believe it is "common sense" to have such mandatory training and testing (DC Br. 33), that unsupported opinion is not evidence that this requirement actually achieves its desired effect.

### F.  Ability to Display a Registration Certificate Does Not Promote Officer Safety

Each registrant must "have in the registrant's possession, whenever in possession of a firearm, the registration certificate, or exact photocopy thereof, for such firearm, and exhibit the same upon the demand of a member of the Metropolitan Police Department, or other law

---

[36] *See Crawford v. Marion County Election Bd.*, 553 U.S. 181, 189 (2008) ("even rational restrictions on the right to vote are invidious if they are unrelated to voter qualifications"); *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 83 (1980) (Stevens, J., concurring) ("practices such as poll taxes or literacy tests that deny individuals access to the ballot").

enforcement officer."   § 7-2502.08(c).   A registrant may be penalized and may lose his or her Second Amendment rights altogether for failure to exhibit a registration certificate upon the demand of a law enforcement officer.[37]   That is not a narrowly tailored requirement or penalty.

As the District notes, persons who register firearms are unlikely to use them in crime. DC Br. 34.   Nor are the overwhelming number of American gun owners, who are not subject under the laws of their states to registration requirements. No studies show that firearm registration requirements prevent illegal possession of firearms or use of firearms in crime.   Pl. Ex. 5 (Vince Dep.) 54, 57-58, 62-63, 102; Pl. Ex. 6 (Jones Dep.) 36; Pl. Ex. 1 (Shelton Dep.) 202-04.

The District says that the registration certificate enables a police officer to "distinguish between a registered owner legally transporting a firearm, and someone transporting an illegal firearm . . . ."   Br. 35.   Given that generally an "illegal firearm" just means an unregistered firearm, this is just a variation of the District's circular rationale that making unregistered guns illegal allows police to arrest persons for possessing illegal guns.   *Heller II*, 670 F.3d at 1258 n*. Any concern over officer safety resulting from persons who have registered their guns is fanciful, given the fact that there has been no instance known to the Chief of Police in which an individual with a registered firearm has ever shot or shot at a District police officer.   Pl. Ex. 3 (Lanier Dep.) 75.   Once again, this provision imposes requirements and inflicts penalties on the

---

[37] Besides being arrested on the spot, a registrant is subject to "a civil fine of $100 for the first violation or omission of the duties and requirements imposed by this section"; (2) for the second violation or omission, a civil fine of $500, revocation of the registration, and prohibition of possessing or registering a firearm for five years; and (3) for the third violation or omission, a civil fine of $1,000, revocation of the registration, and a permanent prohibition on possessing or registering any firearm.   § 7-2502.08(e).

law-abiding persons who have registered their firearms, not on criminals whose guns are not registered.[38]

### G.  Reporting Requirements Are Not Substantially Related to Protection of Police Officers and Crime Control

A registrant is required to notify the Chief in writing (A) immediately of the loss, theft, or destruction of a firearm, (B) of any change in name or address, and (C) of the sale, transfer or other disposition of the firearm within 2 business days.  § 7-2502.08(a).  Failure to do so is subject to the same penalties as not having the registration certificate in one's possession.  § 7-2502.08(e).  Thus, one may be deprived of Second Amendment rights for failure to notify the Chief of a change in the registrant's name or address.

The District claims: "The notification requirements set forth in § 7-2502.08(a) are substantially related to the government's interest in preventing the diversion of firearms to prohibited persons."  DC Br. 36.  But the types of persons who register firearms would not divert them to prohibited persons, without regard to any notification requirement. As the District's witnesses admit, people can, and normally do, report theft and loss of property, including guns, voluntarily without any legal mandate to do so.  Pl. Ex. 3 (Lanier Dep.) 78-80; Pl. Ex. 13 (Webster Dep.) 136.  Furthermore, the Chief of Police admitted that registration information on guns that are reported lost or stolen does not give information that is helpful in solving theft or identifying the thief.  Pl. Ex. 3 (Lanier Dep.) 79.  One of the District's witnesses also stated that registration is not needed to investigate gun theft if the gun has been reported as stolen to NCIC.

---

[38]  The observation that Plaintiff Heller has never been asked by a District official to present any of his firearm registration certificates is unsurprising and proves nothing.  DC Br. 34.  Mr. Heller is a special police officer licensed by the District, and when carrying a firearm in his capacity as such is unlikely to be challenged by District officials.  Ordinary citizens are not allowed to carry firearms at all outside of their dwelling (or sometimes, place of business), but may only transport them, unloaded, locked, and cased. D.C. Code § 22-4504.02.

Pl. Ex. 6 (Jones Dep.) 73-74. Once again, this requirement achieves nothing, while making potential criminals out of otherwise law-abiding gun owners.

The District's citation to a report cited in Webster's Declaration at ¶ 27 (actually ¶ 28) is completely irrelevant. D.C. Br. 36, citing U.S. Dep't of Justice, Bureau of Justice Statistics, *Survey of Inmates in State Correctional Facilities* (SISCF) (2004). The report is cited for the proposition that 80% of guns used by criminals come from "private" sources rather than licensed dealers. Def. Ex. I (Webster Dec.) ¶ 28. The reasoning, apparently, is that registered gun owners will sell their guns to criminals absent a reporting requirement. But private sales between individuals are illegal in the District. D.C. Code § 7-2505.01. The scenario that a registered gun owner would illegally sell his firearm, and then report that disposition to the police, strains credulity.

The District cites to Webster's Declaration ¶ 28 (actually ¶ 29) for the proposition that "jurisdictions with laws requiring private gun owners to promptly report theft or loss of firearms have been associated with a 30% lower rate of exporting guns to criminals across state borders." DC Br. at 37 That finding came from a 2013 study by Webster himself. But that study is irrelevant at best. As Dr. Kleck notes:

> The 2013 Webster et al. study is in any case irrelevant to the challenged D.C. measures. This study investigated only the impact of various gun control measures on rates of crime gun "export," but neither Webster nor any other authority known to me has claimed that there is a problem with D.C. being an exporter of crime handguns to other states. Consequently, even if one accepted his dubious conclusions regarding measures that reduce gun "exports," they have nothing to do with the D.C. registration requirements or other elements of its gun control regime. The far more relevant and important findings would have been estimates of the effects of gun control measures on *crime rates*, but Webster et al., for unexplained reasons, did not report any such findings.

> Notwithstanding this lack of relevance, Webster asserts that this study also showed that "having a law requiring private gun owners to promptly report theft or loss of firearms was associated with a 30 percent lower rate of exporting guns

to criminals across state borders" (p. 9, Point 29). He does not, however, offer any logical reason *why* such a measure should have any impact on interstate gun trafficking. He does not, for example, cite any evidence that gun traffickers gain their supply of guns by either stealing them or buying them from others who have stolen them. Further, Webster does not cite any evidence that these laws have ever been enforced, or that even a single violator has ever been punished for failing to report a theft or loss of a firearm. Since anyone accused of such an offense could easily claim, without fear of being decisively contradicted, to have been unaware of the theft or loss of their gun, it is difficult to even imagine how the law could be enforced.

DC's laws relating to reporting of lost or stolen firearms are supported only by speculation, not by evidence, and there is nothing to show that they reduce crime in the District.

### H. The District's Prohibition on Registering More Than One Pistol in Thirty Days Does Nothing to Prevent Illegal Trafficking

"The Chief shall register no more than one pistol per registrant during any 30-day period," with an exception for new residents. § 7-2502.03(e). The District claims that this is necessary to prevent the "trafficking of firearms," a government interest "supported by the fact that the vast majority of illegal firearms found in the District are illegally trafficked from other states." DC Br. 38. But why would a person bring in a firearm from another state, register it, and then "traffic" it, instead of just bringing it in and "trafficking" it directly? Chief Lanier testified that, absent the 30-day limitation, it is not a likely scenario that anyone would purchase multiple guns, register them in the District, and then traffic those guns illegally. Pl. Ex. 3 (Lanier Dep.) 82-84.

The fact that criminals just import guns illegally is clearly shown by the District's own evidence. *See* D.C. Br. at 38 (citing police reports showing guns traced to sources outside the District); *see also* Pl. Ex. 13 (Webster Dep.) 106-07. Guns are trafficked primarily into the District, not out of the District. Pl. Ex. 3 (Webster Dep.) 106-07. Any limitation on registration of guns legally coming into the District would not prevent illegal trafficking of guns into the

District.  In fact, the prevalence of thousands of guns coming into the District illegally from other states conclusively demonstrates the futility of this law in preventing "trafficking."  This law has been in effect since 2009.  If it had any beneficial effects in stemming illegal trafficking, they are difficult to detect.

### I.  The Effort, Expenses, Time Consumed, and Other Burdens of Registration Are Significant

The District argues that the financial burden to register and re-register firearms is insignificant.  DC Br. 41-42.  Yet the expenses include not only the formal fees to register, be fingerprinted, and meet other requirements, but also those stemming from transportation costs of repeated trips to the MPD, time off work, and similar expenses.

MPD currently charges $35 to take and process an applicant's fingerprints, and $13 per firearm for the registration itself. Def. Ex. B. (Shelton Dec.) ¶ 8.  But other monetary burdens include money spent for travel to and from MPD using public transit or a private vehicle, money spent for parking; and income forgone by taking time off work.  The Firearms Registration Section at MPD is the only place at which an applicant may register a firearm, and it is open only from 9:00 am to 5:00 p.m., Monday through Friday.  *See* MPD Firearms Registration Webpage at http://mpdc.dc.gov/node/177912.  Plaintiff Carter, who works during normal business hours, had to take multiple days off work in order to register his firearms  Pl. Ex. 17 (Carter Dec.) ¶ 18.

In addition, registrants generally incur transfer fees (currently $125) paid to Mr. Sykes (Pl. Ex. 17 (Carter Dec.) ¶ 16), the only licensed firearms dealer in the District who deals commercially with the public, (Pl. Ex. 1 (Shelton Dep.) 115-16) and also shipping and transfer fees that may be paid to out-of-state dealers.

Time burdens of registration include time spent picking up forms at MPD headquarters,

including travel time to and from MPD headquarters (Jordan Dec.) ¶ 6a); traveling to MPD headquarters (Jordan Dec. ¶ 6e; Heller Dec. ¶¶ 5-8; Pl. Ex. 20 (Scott Dec.) ¶ 5; Carter Dec. ¶ 8); time spent looking for parking, because parking is scarce near MPD headquarters (Jordan Dec. ¶ 4); time spent walking several blocks from a parking spot to MPD headquarters (Jordan Dec. ¶¶ 4, 6f; Carter Dec. ¶ 10); time filling out the registration application (Jordan Dec. ¶ 6b; Heller Dec. ¶ 5); time spent being escorted in and out of the building with a firearm, taking an instruction course, a test, being fingerprinted, having a background check run, and actually registering and standing in line at the cashiers' office to pay for the registration (Jordan Dec. ¶¶ 6g, 6h; Heller Dec. ¶ 5; Carter Dec. ¶ 10); time spent dealing with Mr. Sykes, both before the transaction and to consummate the purchase (Carter Dec. ¶¶ 6, 9); time spent returning to vehicle or waiting to be picked up (Jordan Dec. ¶ 6i;); time spent returning home (Jordan Dec. ¶ 6i; Heller Dec. ¶ 5; Carter ¶ 11); and time spent traveling to a dealer out of the District, because there is no licensed dealer in the District who carries an inventory of firearms (Carter Dec. ¶ 5). In addition, there is a ten day waiting period between purchase and the time the gun can be registered (Carter Dec. ¶ 12; Scott Dec. ¶ 7).

Some of these time burdens may also be increased when multiple trips to MPD are involved.  Heller Dec. ¶¶ 5, 6.  Sometimes extra trips are required due to bureaucratic decisions or breakdowns, such as an insistence on an original of a training class certificate rather than a photocopy (Carter Dec. ¶ 17),  a requirement that the stock must be on the firearm when it is brought to MPD (Heller Dec. ¶ 6), or an inability to perform fingerprinting (Scott Dec. ¶ 6). Two trips were generally required early in the process post-*Heller* (see generally Carter Dec. and Jordan Dec.), and two trips are required now if the firearm is not transferred through a dealer (e.g., firearms already owned outside the District), because the gun itself must be brought to

MPD headquarters.  Pl. Ex. 1 (Shelton Dep.) 117-122.

Plaintiff Jordan has registered several firearms, and estimates that the number of hours to register each firearm was six to nine hours for him.  Jordan Dec. ¶ 8.  The time to register his firearms would have been greater had he not been exempt from the training requirement due to prior military firearms training.  Jordan Dec. ¶ 8.  The times to register handguns would have also been greater had he not previously owned those firearms and stored them outside of the District, because he would have been required to travel out of the District to view and select firearms to purchase, and then transfer them through licensed dealers into the District.  Jordan Dec. ¶ 8.

Plaintiff Carter estimated that the time it took to register each firearm was 7 to 8 hours, not counting delays between the various steps.  Carter Dec. ¶ 12.

Plaintiff Heller estimated that his first registration took about five hours.  Heller Dec. ¶ 5.  Subsequent registrations tended to run 2-3 hours.  Plaintiff Heller's transactions were shorter in some instances since he had already complied with some of the one-time requirements, was exempt from others, did not have to travel out of state for some registrations, and sometimes already owned the firearm out of state.  Heller Dec. ¶¶ 5-10.

Plaintiff Scott stated that in July of 2012 he had to make two trips to MPD to register his revolver.  Each visit to MPD took several hours counting travel time. Scott Dec. ¶ 5.

Other burdens include the risk of being attacked and having guns stolen, or being detained and arrested, because District law or procedures require a registrant physically to bring in a firearm in for registration.  Jordan Dec. ¶ 4; Carter Dec. ¶ 14.

All of these burdens are particularly severe on persons, such as several of the plaintiffs, who are in poverty.  Plaintiffs Jordan and Scott live in subsidized housing.  Plaintiff Jordan's

annual income is approximately $16,880, Plaintiff Scott's annual income is $13,368, and Plaintiff Mustafa's income in 2011 was $5,208.  Jordan Dec. ¶ 10; Scott Dec. ¶ 9; Def. Ex. F. Resp. No. 2(f).

All of these burdens may also be increased because of wrongful denials by MPD. Plaintiff Jordan was wrongfully denied the registration of a Smith & Wesson Model 59 handgun in 2009.  Thereafter, he had to reapply and go through the entire process again, after which the registration was finally issued.   Pl. Ex. 21 (First Declaration of Absalom Jordan, dated 7/31/2009) ¶¶ 4, 5.

Plaintiff Mustafa was wrongfully denied permission to register a handgun, and had to go through an administrative appeals process in order to have the wrongful rejection overturned. Def. Ex. F, Resp. No. 15(f.   He estimated the total time for his first, denied registration and his second, successful registration at 31 hours.  *Id.*

Written testimony submitted by Emily Miller at the 2012 hearing also showed, in great detail, the confusing and burdensome nature of the District's registration process. Pl. Ex. 22.

The District relies on a decision upholding New York City's $340 fee for a three-year residential handgun license.  *Kwong v. Bloomberg*, 723 F.3d 160, 169 (2d Cir. 2013), citing, *inter alia*, *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941).  *Cox* only held that fees were required for a parade permit for the "public expense of policing the spectacle" and "the maintenance of public order."  *Id.*  However, a law which prohibited the distribution of literature "at any time, at any place, and in any manner without a permit," would "strik[e] at the very foundation of the freedom of the press by subjecting it to license . . . ."  *Id*. at 577 (citation omitted).  The District prohibits possession of a firearm at any time, at any place, and in any manner without registration.

"A state may not impose a charge for the enjoyment of a right granted by the federal constitution." *Murdock v. Com. of Pennsylvania*, 319 U.S. 105, 113 (1943). "[W]ealth or fee paying has . . . no relation to voting qualifications; the right to vote is too precious, too fundamental to be so burdened or conditioned." *Harper v. Virginia State Board of Elections*, 383 U.S. 663, 670 (1966) (poll tax). The same applies to exercise of the right to keep arms.[39] The requirement to present a photo identification issued by the government when voting was held not to be "excessively burdensome." *Crawford v. Marion County Election Board,* 553 U.S. 181, 202 (2008). Similarly, federal law requires presentation of a photo identification issued by the government when purchasing a firearm from a dealer. 18 U.S.C. § 922(t)(1)(C). By contrast, the District's registration requirements are unnecessary and are excessively burdensome.

It goes without saying that the District's fees are for "services" that are wholly unnecessary. Persons who purchase firearms after checks by NICS, which charges no fee, are capable of quietly keeping their firearms in their homes without any expense to the public. The District may not condition exercise of a fundamental constitutional right in one's home on the creation of a burdensome registration regime and then justify imposing "administrative costs" to pay for it.

As far as the particularized pieces of information required on the application are concerned, see § 7-2502.03(b), Lt. Shelton testified that they largely serve no function, and certainly do not reduce crime. According to Lt. Shelton, the listing of residences for the prior five years does not provide any additional information regarding eligibility. Pl. Ex. 1 (Shelton

---

[39] While invidious voting restrictions were historically based on race, so too were firearms restrictions. *Code of Laws for the District of Columbia* 290-91 (1819) ("No slave shall . . . keep nor carry away any gun"), 300 ( same applied to any "negro or mulatto"). *See* Letitia W. Brown, *Free Negroes in the District of Columbia, 1790-1846*, at 140 (1972) (free blacks were "prohibited from voting . . . and from bearing arms.").

Dep.) 97.   The list of residences does not provide any positive identification beyond the fingerprinting requirement. *Id.*  It does not result in any additional databases being searched.   *Id.*

He could not identify any instances in which information about past residences had prevented a crime or led to identification of an individual who committed a crime.  Pl. Ex. 1 (Shelton Dep.) 98.   Lieutenant Shelton believes that the District could have an effective registration system if the question about residences during the prior five years was not included on the application.   Pl. Ex. 1 (Shelton Dep.) 98-99.   He could recall no instance in which the reporting of past residences has been used to reduce crime or protect officers.  Pl. Ex. 1 (Shelton Dep.) 129-30; Pl. Ex. 2 (Resp. No. 16).

Even though he is in charge of the Firearms Registration Section, Lt. Shelton had "no clue" why the District would need to know the employer of private individuals not purchasing guns for use by security companies, Pl. Ex. 1 (Shelton Dep.) 105, and could recall no instance in which the reporting of employment information had been used to reduce crime or protect officers.  Pl. Ex. 1 (Shelton Dep.) 130 (discussing Pl. Ex. 2).   He admitted there is no written policy against discussing this information with an applicant's employer.  Pl. Ex. 1 (Shelton Dep.) 108.

Lt. Shelton was unaware of any case in which an applicant admitted having a previous firearms license or registration denied, and was therefore unaware of any case in which the MPD had tried to verify such a revocation or denial.  Pl. Ex. 1 (Shelton Dep.) 108-110.   He could recall no instance in which the reporting of past license or permit denials had been used to reduce crime or protect officers.  Pl. Ex. 1 (Shelton Dep.) 130-31.

Lt. Shelton could only recall one or two cases in which applicants reported firearm mishaps, and none in which the admission resulted in a denial of registration.  Pl. Ex. 1 (Shelton

Dep.) 112-113.  He could recall no instance in which the reporting of past mishaps had been used to reduce crime or protect officers.  Pl. Ex. 1 (Shelton Dep.) 130-31 (discussing Pl. Ex. 2 (Resp. No. 19)).

Lt. Shelton could recall no instance in which the reporting of the identity of a transferring dealer had been used to reduce crime or protect officers.  Pl. Ex. 1 (Shelton Dep.) 130-31 (discussing Pl. Ex. 2 (Resp. No. 20)). He testified that identification of out-of-state dealers helps compliance with registration laws, but does not help prevent or solve crime.  Pl. Ex. 1 (Shelton Dep.) 122.

In sum, the District has failed to show that registration of long guns protects police officers or controls crime.  Even if a simple registration requirement for handguns passes constitutional muster, the District's complex procedures do not.  No State imposes requirements as onerous as the District's.  These burdensome requirements appear calculated to discourage persons from registering firearms at all and, for those who do so, to snare them with expiration and re-registration deadlines that, if missed, would turn them into criminals.

For a measure to be a tight fit that is narrowly tailored, it first has to actually advance the governmental interest.  Only if it actually advances the governmental interest does it make sense to examine whether some means with a tight fit that is narrowly tailored could have been adopted instead.  But the District has failed to present data or evidence to show that the governmental interest of protecting police officers or reducing crime is served.  Because the District's laws impose burdens without advancing the governmental interests at all, they cannot be a tight fit that is narrowly tailored.  Accordingly, the District has failed to sustain its burden required by the Court of Appeals in its remand order.  *Heller II*, 670 F.3d at 1258-59, 1267.

### III.  DISMISSAL OF COUNT II AND PART OF COUNT I

The District correctly points out that, pursuant to the Court of Appeals ruling, this Court must dismiss Count II, which challenges the prohibition on certain firearms and magazines, and the portions of Count I challenging the basic registration requirements for pistols.  DC Br. 41-42.  Plaintiffs retained these challenges in their Third Amended Complaint to preserve their entitlement to review of that ruling.

### IV. PLAINTIFFS HAVE STANDING TO CHALLENGE THE VISION REQUIREMENT

The District argues that Plaintiffs lack standing to challenge the provision requiring that, to register a firearm, an applicant "[i]s not blind."  § 7-2502.03(a)(11)).  DC Br. 43.  In "remanding other registration requirements to the district court," the Court of Appeals referred in part to the "vision standard" and added that "we see no reason to foreclose *these particular plaintiffs* from fleshing out their arguments as well as supplementing the record . . . ."  *Heller II*, 670 F.3d at 1256 n.* (emphasis added).

The District argues that, "[a]s none of the Plaintiffs are blind, none of them have been or will be injured by the application" of this provision.  DC Br. 44.  Yet because of age and other factors, Plaintiffs may well face blindness, and need to plan accordingly for the uncertainties that condition may entail.

On the merits, the District relies on the Committee's assertion of the "correlation between not being blind and being able to handle a firearm safely, especially for defense in the home."  DC Br. 44 n.41, quoting 2012 Committee Report, at 17.  But registration is required for possession, not handling, of a firearm, and a blind person is entitled to possess a firearm, even if it is just locked in a safe to keep for a grandchild.  The District is not entitled to confiscate

private property because a person turns blind, whether it is a car stored in a garage or a firearm stored in a safe.

## CONCLUSION

This Court should grant Plaintiffs' motion for summary judgment and deny Defendants' motion for summary judgment.

Respectfully submitted,

Dick Anthony Heller
Absalom F. Jordan, Jr.
William Carter
William Scott
Asar Mustafa

By Counsel

 /s/ Stephen P. Halbrook
STEPHEN P. HALBROOK
D.C. Bar No. 379799
3925 Chain Bridge Road, Suite 403
Fairfax, VA  22030
Telephone: (703) 352-7276
Facsimile: (703) 359-0938
Email:  PROTELL@aol.com

 /s/ Dan M. Peterson
DAN M. PETERSON
D.C. Bar No. 418360
Dan M. Peterson, PLLC
3925 Chain Bridge Road, Suite 403
Fairfax, VA  22030
Telephone: (703) 352-7276
Facsimile: (703) 359-0938
Email: dan@danpetersonlaw.com

Counsel for Plaintiffs