UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————————— )
)
DICK ANTHONY HELLER, *et al.*, )
)
Plaintiffs, )
) Civil Action No. 08-01289 (JEB)
v. )
)
DISTRICT OF COLUMBIA, *et al.*, )
)
Defendants. )
———————————————————————— )

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Defendants (collectively, "the District"), through undersigned counsel, hereby submit this Reply in further support of their Motion for Summary Judgment (Doc No. 73) and in opposition to plaintiffs' Motion for Summary Judgment (Doc No. 75). As required by LCvR 7(h), the District herein provides its Opposition to Plaintiffs' Statement of Material Facts As to Which There is No Genuine Issue ("PSMF"), as well as its response to Plaintiffs' Response to the District's SMF, and a proposed Order.

## PRELIMINARY STATEMENT

Plaintiffs' brief is a house of cards; it rests unsteadily on their erroneous conception of the District's burden here. Plaintiffs contend that the District must prove that its firearms-regulation scheme is empirically effective, *i.e.*, affirmatively causes crime to go down and public safety to improve. This is incorrect—the District need only show that the Council's conclusions were reasonable and supported by substantial evidence. *See Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 211 (1997)) ["*Turner II*"] ("The question is not whether [the legislature], as an

1

objective matter, was correct to determine [that the disputed law] is necessary to prevent [the feared harms]. Rather, the question is whether the legislative conclusion was reasonable and supported by substantial evidence in the record . . . .") (quoting *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 665–66 (1994) ("*Turner I*")).

Plaintiffs' fundamentally flawed conception of the District's burden is exemplified in an early sentence: "The District's witnesses cited no studies showing that firearm registration requirements *prevent* illegal possession of firearms or use of firearms in crime." P.Mem. at 4 (emphasis added).[1] This standard of proof to which plaintiffs would hold the District misses the point. By way of example, there are likely no studies showing that vehicle registration laws *prevent* illegal operation of vehicles or use of vehicles in crime. The point is not that the District's laws *will* have these effects, but that the Council could reasonably believe that the laws will assist in reducing the likelihood of gun crime and violence, and contribute to public safety. To expect the laws to be perfect is illogical, and not required by the Constitution. The laws reflect the Council's public-policy decisions based on the evidence at hand, not experiments conducted in a Petri dish. As the Supreme Court explained in *Turner II*, the courts' "sole obligation" in reviewing a legislature's "predictive judgments" is "to assure that, in formulating its judgments," the legislature "has drawn reasonable inferences based on substantial evidence." 520 U.S. at 195 (internal quotation marks omitted).

The District has amply met this burden.

---

[1]      Plaintiffs begin by attempting to cloud history. *See* P.Mem. at 1. This lawsuit was filed 12 days after the District took the first of many subsequent steps to conform its laws to *District of Columbia v. Heller*, 554 U.S. 570 (2008) ("*Heller I*"), which fact suggests that any attempt to regulate firearms, no matter how reasonable, will result in a lawsuit.

**ARGUMENT**

I.     **THE FACTUAL RECORD DEVELOPED ON REMAND DEMONSTRATES THAT SUMMARY JUDGMENT FOR THE DISTRICT IS WARRANTED.**

The District's copious evidence on remand clearly demonstrates a substantial relationship between the District's important governmental interests in public safety, crime prevention, and the protection of police officers, and the minimal burden imposed on law-abiding gun owners by the District's firearms-registration scheme.

This Court has already correctly stated what the Circuit expects here:

> [T]he D.C. Circuit remanded this case 'to develop a more thorough factual record,' to allow the District to 'present some meaningful evidence . . . to show a substantial relationship between . . . the novel registration requirements and an important governmental interest,' and to present similar testimony regarding registration requirements for long guns.

*Heller v. District of Columbia*, ___ F.Supp.2d ___, 2013 WL 3376909, *8 (D.D.C. July 8, 2013) (citations omitted). This Court should therefore decline to consider plaintiffs' reliance on Justice Breyer's dissent in *District of Columbia v. Heller*, 554 U.S. 570 (2008) ("*Heller I*") and Judge Kavanaugh's dissent in *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*"). *See* P.Mem. at 8–9.

Similarly, in assessing the "fit" between the District's proffered evidence and the important governmental objectives here, the Court must afford "substantial deference to the predictive judgments" of the Council because, "[i]n the context of firearm regulation, the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Schrader v. Holder*, 704 F.3d 980, 990 (D.C. Cir. 2013) (quoting *Turner I*, 512 U.S. at 665, and *Kachalsky v. County of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012)); *Nat'l Ass'n of Mfrs v. Taylor*, 582 F.3d 1, 15 (D.C. Cir. 2009) (while the legislature "'must base its

conclusions upon substantial evidence' . . . that 'substantiality is to be measured' by a 'deferential' standard . . . 'lest [the courts] infringe on traditional legislative authority to make predictive judgments.'") (quoting *Turner II*, 520 U.S. at 195–96). *See also Nat'l Cable & Telecomm. Ass'n v. FCC*, 555 F.3d 996, 1002 (D.C. Cir. 2009) ("The government does not have to show that it has adopted the least restrictive means for bringing about its regulatory objective."). *Cf. New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, ___ F.Supp.2d ___, 2013 WL 6909955, *1 (W.D.N.Y. Dec. 31, 2013) (rejecting Second Amendment challenge to state firearms law amended in the wake of the Sandy Hook massacre: "In resolving the pending motions, this Court notes that whether regulating firearms is wise or warranted is not a judicial question; it is a political one. This Court's function is thus limited to resolving whether New York's elected representatives acted within the confines of the United States Constitution in passing the [legislation].").[2] Thus, notwithstanding any incidental burden on plaintiffs' Second Amendment rights, the Council here was entitled to make the exact policy judgment it did in enacting the District's firearms-registration requirements.

As the Court rules on plaintiffs' motion for summary judgment, "the evidence of the [District] is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Branch Banking & Trust Co. v. Rappaport*, ___ F.Supp.2d ___, 2013 WL 5630261, *2 (D.D.C. Oct. 16, 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). On such a motion, "the Court must 'eschew making credibility determinations or weighing the evidence.'" *Id*. (quoting *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007)).

---

[2]    The law challenged in *Cuomo* also prohibited sales of ammunition over the Internet, and requires purchasers to appear "face-to-face" and present valid photo identification. *Id*. at *4. Plaintiffs did not challenge this "in person" requirement under the Second Amendment, but under the Commerce Clause; their challenge was rejected. *Id.* at *26.

Plaintiffs also appear to contend that their facial challenge does not require them to demonstrate that the law is "unconstitutional in all of its applications." P.Mem. at 10. But the Supreme Court requires such a showing, notwithstanding plaintiffs' characterization of that test as "inconsistently applied." *Id.*; *see Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008); *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 699–700 (1995).

The District has met the burden articulated by the Circuit by presenting testimony from many well-qualified expert witnesses as well as objective evidence from respected academics and federal government agencies. Accordingly, the Court should award summary judgment to the District because plaintiffs have failed to rebut the District's showing that there exists substantial evidence from which the Council could reasonably conclude that the challenged firearms-registration requirements will further important interests of the District.

### A.  Plaintiffs Overstate the District's Evidentiary Burden.

Plaintiffs seek to hold the District to an impossible evidentiary standard—and one that is contrary to settled law. Indeed, plaintiffs repeatedly take the position that, in order to sufficiently justify the challenged firearms-registration requirements, the District must definitively prove— with empirical data—that the requirements will actually reduce crime or protect police officers. *See, e.g.*, P.Mem. at 18 ("[T]he District has cited no publicly available studies, data, or other evidence to show that any of the District's registration requirements regarding rifles and shotguns *actually* reduce crime or protect police officers"); *id.* at 28–29 (arguing that preventing diversion of firearms to criminal "even if it were to be *proved*, is not the same as causing *any*

*actual reduction in violent crime*") (emphasis added); *id.* at 32 ("no studies show that in-person registration would prevent criminals from circumventing the registration process"); *id.* at 34 ("The District's own witnesses *cite no studies showing* that periodic registration renewal or reporting requirements reduce crime or protect police officers.") (emphasis added); *id.* at 37 ("The District provides no evidence that . . . instruction and testing *actually causes* people to safely store their firearms when otherwise they would not.") (emphasis added); *id.* at 38 ("No studies show that firearm registration requirements prevent illegal possession of firearms or use of firearms in crime."). This grossly overstates the District's evidentiary burden.

Under the D.C. Circuit's decision, the District is required only to provide "some meaningful evidence" demonstrating that the challenged registration requirements "can reasonably be expected to promote" an important government interest. *Heller II*, 670 F.3d at 1259. It is well-settled in the First Amendment context that a government's evidentiary burden under intermediate scrutiny is minimal. *See City of Los Angeles v. Alameda Books*, 535 U.S. 425, 451 (2002) (Kennedy, J., concurring in judgment) (noting that "very little evidence is required" to demonstrate furtherance of an important government interest); *84 Video/Newsstand, Inc. v. Sartini*, 455 Fed. Appx. 541, 548 (6th Cir. 2011) (noting that, under intermediate scrutiny, the "legislature's evidentiary burden is slight"); *Imaginary Images, Inc. v. Evans*, 612 F.3d 736, 742 (4th Cir. 2010) (noting that, to survive intermediate scrutiny, the government "need not settle the matter beyond debate or produce an exhaustive evidentiary demonstration") (citing *Alameda Books*, 535 U.S. at 438); *National Ass'n of Mfrs. v. SEC*, ___ F.Supp.2d ___, 2013 WL 3803918, *28 (D.D.C. July 23, 2013) (noting that the Supreme Court has "permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even . . . based solely on history, consensus, and simple common sense.") (quoting

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) and *Fla. Bar v. Went For It, Inc*., 515 U.S. 618, 628 (1995)).

Contrary to plaintiffs' position, the District is not required to justify its registration requirements with empirical data, but rather may rely on any evidence that is "reasonably believed to be relevant" for demonstrating a connection between constitutionally protected activity and an important government interest. *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51–52 (1986); *see also Turner II*, 520 U.S. at 187 (holding that "must-carry" provisions were constitutional based upon a record comprised of "material acquired during Congress' three years of preenactment hearings . . . additional expert submissions, sworn declarations and testimony, and industry documents," as well as "anecdotal evidence").[3]

Moreover, where the record contains evidence supporting conflicting predictions concerning the effect of a challenged law or regulation, the Court must "give considerable deference, in examining the evidence, to [legislative] findings and conclusions[.]" *Turner II*, 520 U.S. at 199; *see also Alameda Books*, 535 U.S. at 437 (noting that the government "does not bear the burden of providing evidence that rules out every theory . . . that is inconsistent with its own").

_____

[3]        Indeed, the Supreme Court has recognized that requiring municipalities to prove that regulations *will* successfully achieve their intended objectives in order to satisfy constitutional review would undermine the settled position that "municipalities must be given a 'reasonable opportunity to experiment with solutions'" to address admittedly serious problems, even where such solutions touch upon constitutionally protected activity. *Alameda Books*, 535 U.S. at 439 (quoting *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 71 (1976)); *see id.* at 439–40 ("A municipality considering an innovative solution may not have data that could demonstrate the efficacy of its proposal because the solution would, by definition, not have been implemented previously."); *see also Renton*, 475 U.S. at 51–52 ("The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.").

Plaintiffs have not cited—and the District is not aware of—any case law suggesting that a law must be perfect, catching *only* "bad actors" without having any impact on the actions of the innocent and law-abiding. The Constitution does not require such perfection. Plaintiffs have not—and cannot—describe how any law could be written to capture only the truly criminal, while having no impact whatever on the law-abiding. Plaintiffs' "all or nothing" approach must be firmly rejected. *See United States v. Miller*, 604 F.Supp.2d 1162, 1172 n.13 (W.D. Tenn. 2009):

> '[M]ost legislation will assert broad safety concerns and broad gun control measures to match, covering both 'good' and 'bad' gun possessors and 'good' and 'bad' guns. Such legislation cannot be narrowly tailored to reach only the bad people who kill with their innocent guns.' [D]ue to the intensity of public opinion on guns, legislation is inevitably the result of hard-fought compromise in the political branches. To expect such legislation to reflect a tight fit between ends and means is unrealistic.'

*Id.* (quoting Donald Dowd, *The Relevance of the Second Amendment to Gun Control Legislation*, 58 MONT. L. REV. 79, 111 (1997) and Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683, 731 (2007)).

"Only the law-abiding register their guns." P.Mem. at 29. This tired argument must finally be put to pasture. *Heller I* itself explicitly held that the District could impose registration requirements on an otherwise law-abiding citizen. Plaintiffs' *reductio ad absurdum* argument is that we should not have *any* registration requirements, because criminals are not going to comply anyway; we cannot make "bad" people comply with the law, so we should not have any firearms laws because any burden is too much on the law abiding. To simply state the argument reveals its central flaw. By definition, criminals do not abide by the law. *Every* citizen starts as law-abiding, until they fail to be so.

II.     **PLAINTIFFS FAIL TO DEMONSTRATE THAT THE DISTRICT'S
        REGISTRATION REQUIREMENTS IMPERMISSIBLY BURDEN THEIR
        SECOND AMENDMENT RIGHTS.**

Not only has the District met its burden of demonstrating that the Council reasonably

relied on substantial evidence in the record, the plaintiffs have failed to put forth any credible

evidence demonstrating that the District's registration requirements "meaningfully jeopardize

their right to self-defense," *Cuomo*, 2013 WL 6909955, at *13, much less "significantly burden"

their Second Amendment rights.

At bottom, there is no dispute that plaintiffs have all been able to legally register at least

one—and in many cases, multiple—firearms under the challenged registration requirements. DC

SMF ¶ 15; TAC ¶ 78.a; DEx. F [Pltfs' Responses to Def's Interrogatories], Response No. 4.

Further, plaintiffs do not allege that any of their registrations have been, or are likely to be,

revoked as a result of any challenged registration requirement. Although plaintiffs, without

explanation or analysis, contend that these facts are "irrelevant to the issue of the extent of the

burden," they demonstrate that the challenged registration requirements must be upheld as

constitutional because they do not "meaningfully jeopardize [plaintiffs'] right to self-defense,"

*Cuomo*, 2013 WL 6909955, at *13.

Plaintiffs argue that the District has impermissibly infringed their Second Amendment

rights by making it marginally more difficult and expensive to exercise those rights. But the

Supreme Court has rejected a similar argument. *See Planned Parenthood of SE Pa. v. Casey*, 505

U.S. 833, 874 (1992) (*plurality op.*) ("The fact that a law which serves a valid purpose, one not

designed to strike at the right itself, has the incidental effect of making it more difficult or

expensive to [exercise that right] cannot be enough to invalidate it."); *Nordyke v. King*, 644 F.3d

776, 787–88 (9th Cir. 2011) (rejecting Second Amendment challenge to a law prohibiting the

possession of firearms on county property: "[A] law does not substantially burden a constitutional right simply because it makes the right more expensive or more difficult to exercise.") (citing *Gonzalez v. Carhart*, 550 U.S. 124, 174 (2007)). *Cf. Kovacs v. Cooper*, 336 U.S. 77, 88–89 (1949) (upholding city ordinance prohibiting sound trucks: "That more people may be more easily and cheaply reached by sound trucks . . . is not enough to call forth constitutional protection").

Plaintiffs appear to suggest that *any* burden on their right to keep and bear arms violates the Second Amendment. Plaintiffs are wrong. As demonstrated herein (and previously) plaintiffs fail to demonstrate that the District's registration requirements meaningfully jeopardize their right to self-defense or significantly burden their Second Amendment rights.

### A. There Is Substantial Evidence From Which The Council Could Reasonably Conclude That The Challenged Requirements Further Important Government Interests.

Not only do plaintiffs seek to apply an erroneous evidentiary standard against the District, they mistakenly think that *any* financial or time burden violates the Constitution. But all the "burdens" that plaintiffs discuss (like traveling to government offices, finding parking, and taking time off work) are simply incidental burdens of many different types of government licensing schemes, and are constitutionally permissible.[4] The act of registration itself, like registering to vote, is not impermissible unless it "severely restrict[s]" the exercise of the right. *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 204 (2008) (Scalia, J., concurring)

---

[4]     A number of the "burdens" cited by plaintiffs, like "dealing with" the sole FFL in the District and traveling to dealers outside the District, *see* P.Mem. at 43, are, of course, not attributable to the District.

(citing *Burdick v. Takushi*, 504 U.S. 428, 433–34 (1992)).[5] *See also, e.g., Cox v. New Hampshire*, 312 U.S. 569, 576–77 (1941) (First Amendment freedoms are not infringed by the requirement of a parade permit). *Cf. United States v. Freed*, 401 U.S. 601, 605 (1971) (gun-registration requirement does not violate Fifth Amendment right against self-incrimination).

Plaintiffs begin their substantive arguments with a straw man, asserting that the District's "first and foremost reason" advanced for registration "turns out to be false." P.Mem. at 13. Not so. One among many of the benefits of registration is that the information obtained "allows officers to determine in advance whether individuals involved in a call may have firearms . . . ." *Heller II*, 670 F.3d at 1258 (quoting 2008 Report at 3). But the District never asserted that this was the primary reason for requiring registration, nor is it false. It is true that the MPD does not *routinely* check registration records prior to responding to a call for service; such a check is a tool available for use in appropriate circumstances. (And if the District did habitually check firearms-registration records, plaintiffs would likely argue that the practice infringed on gun owners' privacy). The evidence revealed that pre-call checks do occur, when the situation warrants it. *See* PEx. 1 (excerpts of Shelton Depo.) at 72/1–72/22; DEx. N (excerpt of Shelton Depo.) at 73/1–73/22. That routine checks of the firearms-registration database prior to *every* call for service would be cumbersome and wasteful of resources does not mean that the District's desire to check before some calls is a "false" reason for enacting the law.

---

[5]     Plaintiffs cite *Crawford* for the proposition that "[t]he requirement to present a photo identification issued by the government when voting was held not to be 'excessively burdensome.'" P.Mem. at 46. That assertion completely supports the District here.

### 1.   The Minimal Fees Charged to Register Firearms are Constitutional.

Plaintiffs argue that "[a] state may not impose a charge for the enjoyment of a right granted by the federal constitution." P.Mem. at 46 (quoting *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943)). But fees may be charged for the "enjoyment" of a variety of constitutional rights, provided that the fees are tied to the government's administrative costs. *See, e.g., M.L.B. v. S.L.J.*, 519 U.S. 102, 123–24 & n.14 (1996) ("a State may exact fees from its citizens for many different kinds of licenses.") (quoting *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 668 (1966)). The minimal fees charged here, because they "reimburse the District for the cost of services provided," D.C. Official Code § 7-2502.05(b), do not unconstitutionally burden plaintiffs' exercise of their Second Amendment rights.[6]

Moreover, while the minimal fees charged by the District may have a disproportionate impact on "the poor," that distinction is not constitutionally material here. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 25–26 (1973) (the poor are not a "suspect class."). *See also Kadrmas v. Dickinson Public Sch.*, 487 U.S. 450, 458 (1988) ("We have previously rejected the suggestion that statutes having different effects on the wealthy and the poor should on that account alone be subjected to strict equal protection scrutiny.") (citing cases).

### 2.   Plaintiffs Have Not Presented Any Evidence That the Requirement of Basic Registration for Long Guns Imposes More Than a *De Minimis* Burden on Their Second Amendment Rights.

---

[6]       Marriage licenses in the District cost $35. *See* www.dccourts.gov/ internet/public/aud_marriage/marriage.jsf (last visited Jan. 10, 2014). It costs $7.00 per year for a District resident to get a fishing license, which must be purchased annually. 19 D.C.M.R. §§ 1501, 1505. The District's annual license fee for a dog is $15.00 if neutered or spayed, or $50.00 otherwise. D.C. Official Code § 8-1804(e) (2008 Repl.). Residents of the District may purchase residential parking permit stickers for $35 annually. 18 D.C.M.R. § 2415.3. Considering that the cost of a cheap new handgun is around $300, *see* http://www.basspro.com/Shooting-Guns-Shotguns-Guns/_/N-1z0ux63, the amounts that plaintiffs complain of are truly *de minimis*.

The Court should uphold the constitutionality of basic registration as applied to long guns because plaintiffs have not demonstrated that requiring the registration of long guns burdens their Second Amendment rights any more than requiring the registration of handguns. The D.C. Circuit recognized that "basic registration requirements are self-evidently de minimis, for they are similar to other common registration or licensing schemes, such as those for voting or for driving a car, that cannot reasonably be considered onerous." *Heller II*, 670 F.3d at 1254–55. The Circuit further noted that:

> The requirement of basic registration as applied to long guns may also be de minimis. For now, however, we assume this requirement, too, impinges upon the Second Amendment right because, as we discuss below, the record is devoid of information concerning the application of registration requirements to long guns. On remand and with the benefit of additional evidence, the district court will be better able to address this question in the first instance.

*Heller II,* 670 F.3d at 1256 n. __.

Despite having had a full opportunity at discovery on remand, plaintiffs do not present any evidence that demonstrates *any* salient difference between long guns and handguns for registration purposes, nor do they show that long gun registration gives rise to a greater Second Amendment burden than handgun registration. As a result, the Court should uphold the constitutionality of the District's requirement of basic registration as it applies to long guns.

Plaintiffs argue that the Second Amendment prohibits the District from treating long guns like handguns by requiring their registration because (1) long guns, unlike handguns, "are rarely used in crime," (2) the District has already banned the registration of "assault weapons," and (3) "long guns are not a threat to public safety at all in the *right* hands, i.e., the hand of law-abiding citizens[.]" P.Mem. at 16 (emphasis in original). But plaintiffs have failed to present any persuasive, affirmative evidence in support of their arguments, to say nothing of rebutting the

District's showing. In short, long gun registration should be upheld because there is no difference between long guns and handguns for registration purposes and because, as the evidence demonstrates, long gun registration is no more burdensome than handgun registration.

Plaintiffs argue that the Supreme Court in *Heller* "disregarded" the legislative history behind the 1975 legislation requiring registration of all firearms, *see* P.Mem. at 11, and that the 1975 Report "included no reasons or evidence whatever regarding why registration of long guns was necessary." *Id*. Plaintiffs are wrong on both counts. The Supreme Court did not *disregard* the 1975 evidence in the sense of ignoring it entirely; they merely found it to be outweighed by other concerns. The 1975 Report (in the Appendix at p. 1) repeatedly references shotguns and rifles, strongly suggesting—if not actually stating—that they should be regulated similarly to handguns. *See* 1975 Report at 4, 5, 11, 21, 28. Here, too, there is a glaring hole in plaintiffs' arguments; plaintiffs have never articulated *any* cogent reason to treat long guns differently than handguns. Both types of weapons are portable lethal instruments that may be used for a variety of legitimate and illegitimate purposes, and both are capable of inflicting serious injury or death. There is simply no credible reason to regulate them differently, and plaintiffs have proffered none.[7]

---

[7]   *Cf.* DEx. M (Kleck Depo. excerpt) at 27/2 to 28/9:

Q Do you think, Dr. Kleck, that handguns and long guns should be regulated differently?

A It depends on the regulation you're talking about. Generally speaking, I think background checks, for example, ought to cover both handguns and long guns. So my general position would be I wouldn't say it applies necessarily to every single kind of regulation, but my general position would be, yes, they ought to apply to the full array of firearms.

*Id*.

Plaintiffs also assert that "long guns are not a threat to public safety at all in the *right* hands, i.e., the hands of law-abiding citizens, regardless of whether they are registered." P.Mem. at 16 (emphasis in original) (footnote omitted). But they offer no evidence or analysis to support this position. Moreover, this assertion makes no sense. Does this mean that long guns can *never* be dangerous or worthy of regulation? After all, the number of murders committed annually by explosive devices in the District is infinitesimally small, yet plaintiffs would not suggest that the District need not regulate bombs, because they are not a threat to public safety "in the right hands." To be sure, the District's data shows that long guns "are hardly ever used in crime." P.Mem. at 16. But "hardly ever" is not the equivalent of "never," and the victims of those crimes would not see the distinction that appears so clear to plaintiffs here.

As a general matter, a firearm held by a "responsible" person can indeed be safe and not threaten public safety. But, just like motor vehicles, *every* firearm has the potential to cause serious injury or death, hence it is reasonable for the government to register those implements/devices and license their users by attempting to assure some minimal level of knowledge and competence at use.

In support of their assertion that long guns "are rarely used in crime," plaintiffs cite data suggesting that between 2009 and 2011 only three murders were committed in the District using a long gun. P.Mem. at 16. Even if this data were accurate—and the record suggests that it is not[8]—it does nothing to cast doubt upon the evidence relied upon by the Council that long-guns are regularly used in serious crimes in the District and the United States, generally. *See* 2012

---

[8]    Chief Lanier questioned the accuracy of this data during her deposition based upon her own familiarity with District homicides during the referenced years. PEx. 3 (Lanier Tr.) at 104–105. Indeed, this data is inconsistent with evidence received by the Committee. *See* 2012 REPORT at 20 (noting the March 30, 2010, shooting involving a rifle and shotgun, which killed three).

REPORT at 19 (noting that between 2006 and 2010, "over 4,000 murders in the United States occurred through the use of rifles and shotguns") (citing testimony of Daniel R. Vice and Daniel W. Webster); *id.* (discussing shootings at the White House in 2011 and the Holocaust Museum in the 2009 involving long-guns). This alone is enough to justify the minimal burden of registration.

Further, plaintiffs fail to cast doubt upon the record evidence concerning the *potential* public safety and national security dangers that long guns pose to the District.[9] For example, plaintiffs do not contest that long guns are more lethal than handguns, DEx. M (Kleck Tr.) at 27:5–21), giving them the potential to cause greater mayhem when they are used in crime, or otherwise irresponsibly—particularly in a densely populated urban jurisdiction like the District. *See* 2012 REPORT at 20 (noting that the "most violent incident in this city in over a decade involved both a rifle and a shotgun: the March 30, 2010 shooting of eight young persons . . . which killed three"); Ashley Halsey III, Peter Hermann & Clarence Williams, *D.C. Navy Yard gun attack kills 12, injures 8*, WASH. POST., Sept. 16, 2013 (discussing the recent mass shooting at the Navy Yard, which was committed with a shot gun).[10]

Plaintiffs also do not dispute that rifles are designed to be more accurate over a longer range, and thus "pose[] a special threat to government officials, diplomats, and motorcades." 2012 REPORT at 20 (quoting Testimony of Daniel R. Vice, at 5 (App. at 169); *see also* Jones

---

[9]     Plaintiffs fail to develop their argument that the registration of long guns is somehow unconstitutional because the District has already banned "assault weapons," and the Court should therefore disregard it. *See* P.Mem. at 16. In any case, however, the record evidence concerning the potential public safety dangers of long guns effectively rebuts this argument.

[10]     Plaintiffs attempt to downplay the Navy Yard shootings on the grounds that the weapon used in those murders was "an illegal sawed-off shotgun." P.Mem. at 16. This fact, however, does nothing to suggest that the D.C. Council could not reasonably conclude that giving law enforcement a "modicum of . . . oversight" over long guns that are legally possessed in the District will further public safety interests. 2012 REPORT at 19.

Decl. ¶ 15 (noting that firearms with accurate long-range capabilities "greatly increase the risk of a 'standoff' assassination attempt against political and government leaders"). Instead, plaintiffs merely assert that "the District has not cited one assassination that occurred *in the District* involving a rifle," and that "recent high-profile incidents involving long guns did not involve *District residents or firearms registered in the District*."[11] P.Mem. at 19 & n. 15 (emphasis added). But this assertion is immaterial, not to mention overly narrow, as the District is "entitled to rely on the experiences of . . . other cities" in justifying its registration requirements, *Renton*, 475 U.S. at 51, and thus it is insufficient to cast doubt upon the D.C. Council's rationale for requiring the registration of long-guns as well as hand guns.

Plaintiffs also argue that the registration of long guns is unconstitutional because they are not a threat to public safety in "the hands of law-abiding citizens." P.Mem. at 16–17 (noting that between July 17, 2008 and October 19, 2012, "no registered rifles and only two registered shotguns were recovered from crime scenes in the District"). The District does not contest this rather obvious point, but it does not support plaintiffs' position. If anything, this argument supports the reasonable conclusion that the District has an important interest in ensuring that individuals who legally possess long guns, and other firearms, are law-abiding, responsible citizens—which is one of the central purposes of the District's registration regime. *See Heller I*,

---

[11]   Plaintiffs assert that "the vast majority of assassinations and assassination attempts in the United States have involved handguns or other devices, not rifles." P.Mem. at 19. In support of this assertion they cite to an unsworn and unverified purported list of "U.S. political assassinations and attempts." *See* P.Mem. Ex. 11. As plaintiffs do not indicate the source of such information, this Exhibit does not constitute evidence upon which the Court may rely for purposes of the resolving the instant motions. *See* Fed. R. Evid. 201 (Court may only take judicial notice of a fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned")*;* Fed. R. Civ. P. 56(c)(2) (allowing objections when material cited to dispute a fact is not admissible in evidence). In any case, even if plaintiffs were correct, this "evidence" does not raise a genuine dispute of fact concerning the potential national security dangers posed by long guns in the District.

535 U.S. at 635 (noting that the core right protected by the Second Amendment is the right of "*law-abiding, responsible citizens* to use arms in defense of hearth and home") (emphasis added).

Moreover, the fact that only two registered long guns were recovered from crime scenes between July 2008 and October 2012 suggests that registration, in fact, is effective at *actually* achieving this legitimate purpose.[12] *See Alameda Books*, 535 U.S. at 437–38 (holding that regulations survived intermediate scrutiny where the record was consistent with the theories of both the plaintiffs and the government).[13] Indeed, one could reasonably expect that criminals would shift to the use of long guns, if the District were to exclude these weapons from the same registration requirements imposed on handguns.

Plaintiffs cite to a single study that purportedly found "no evidence" that a long gun registry that was employed by Canada until 2012 "had any beneficial effects" with respect to trends in certain homicides. P.Mem. at 23–24; Kleck Decl. ¶ 95. This limited finding, however,

---

[12]     Indeed, plaintiffs' argument that registration does not further important government interests would be far more compelling if the record showed that legally registered firearms were *frequently* used in crime.

[13]     Beginning in 2014, the State of California requires that purchase and transfer records relating to long guns—as well as handguns—be retained by the California Department of Justice and entered into a central registry system. CAL. PENAL CODE § 11106. The Sheriff of Los Angeles stated that this law will:

> increase the safety of law enforcement by providing better information regarding the guns we may face . . . . Many long guns put officers at greater risk because of their firepower and their ability to shoot through protective vests. Moreover, even a poorly aimed shotgun could greatly injure a law enforcement officer or anyone else.

Bill Analysis AB 809 (Feuer), Cal. Senate Comm. on Public Safety (Jun. 20, 2011) (*available online at* http://www.leginfo.ca.gov/pub/11-12/bill/asm/ab_0801-0850/ab_809_cfa_20110620_121728_sen_comm.html) (last visited Jan. 13, 2014).

is insufficient to "cast doubt on the entire body of evidence" in the record supporting the D.C. Council's determination that long gun registration will advance important government interests. *See Sartini*, 455 Fed. Appx. at 552. *See also Turner II*, 520 U.S. at 199 (noting that Court must give deference to legislature in evaluating conflicting evidence). Moreover, the irrelevance of plaintiffs' two brief paragraphs regarding Canada's recent repeal of its long-gun registry is evident. Canada—one of the most sparsely populated countries in the world—cannot meaningfully be analogized to the dense, urban District of Columbia. *See, e.g.*, Population Density 2011 (The World Bank) (*available online at* http://data.worldbank.org/ indicator/EN.POP.DNST?order=wbapi_data_value_2011+wbapi_data_value&sort=asc (last visited Jan. 10, 2014) (Canada is the tenth least densely populated country in the world).

Plaintiffs advance another meritless argument when they assert that "[a]ssassins are not deterred by gun registration laws." P.Mem. at 19.[14] Are tax cheats deterred by the IRS? Are speeders and parking scofflaws deterred by speed limits and parking regulations? These laws certainly "burden" the law-abiding, but plaintiffs provide no viable alternative, less-restrictive or otherwise, except to implicitly suggest no regulation at all.

Plaintiffs also argue that the burden of long gun registration impermissibly impacts hunters: "Subjecting such hunters to incarceration for not having their long guns registered does not protect police officers or control crime." P.Mem. at 19.[15] This misses the point; as discussed

---

[14]    *See also* P.Mem. at 38 ("No studies show that firearm registration requirements prevent illegal possession of firearms or the use of firearms in crime."). The question, obviously, is not whether the requirements absolutely *prevent*, but whether they *deter*. If guns must be registered, it stands to reason that those who want to use them illegally will be discouraged (or at least think twice about it) before doing so in the District, if for no other reason than that severe penalties may attach afterwards.

[15]    Here, and elsewhere in their brief, *see* P.Mem. at 7, plaintiffs seem to suggest that the District has only proffered two interests that firearms-registration advances—protection of

*supra*, every firearm is potentially deadly, hence it is reasonable for the government to register them, no matter their intended use. *See Romero v. NRA*, 749 F.2d 77, 83–84 (D.C. Cir. 1984) (opinion of Scalia, J., for the court) (the fact that "very few guns used in crimes and recovered by the police are registered" suggests "that registered owners are rarely criminals.").

Plaintiffs erroneously refer to "constitutionally-protected firearms" P.Mem. at 21, but there is no such thing. Individual rights are protected under the Constitution, not weapons. Plaintiffs appear to argue that long gun registration is impermissible under *Heller*, because it was not discussed explicitly (as opposed to handgun registration) and because "if registration could be required for all guns, the Court could have just said so and ended its analysis." *Heller II*, 670 F.3d at 1294 (Kavanaugh, J., dissenting). But this approaches the analysis from the wrong angle, and thus obtains the wrong result. *Heller* itself did not categorically rule *out* such registration, implicitly or explicitly. And the Circuit found that registration could be presumed constitutional for handguns because of its historic pedigree, and that it *might* be constitutionally permissible for long guns, provided there was additional evidence, applying intermediate scrutiny. *Heller II*, 670 F.3d at 1256–57. The District has presented that additional evidence.

Finally, oddly, plaintiffs assert that *Heller I* read *United States v. Miller*, 307 U.S. 174 (1939), to say that the Second Amendment "protects" common weapons from registration. P.Mem. at 22. This is backward: "protection" in this context means that dangerous and unusual weapons are *not* shielded by the Second Amendment from government regulation, not that common weapons are "protected" from regulation. Indeed, that is the *opposite* of the conclusion

---

the police and crime reduction. This is incorrect. The District's firearms laws also advance the unassailable interest in protecting public safety. *See* Doc. No. 25 (District's first Motion for Summary Judgment) at 18, 30 ; Doc. No. 73 at 22–24, 27, 30, 32, 33, 35, 37. Indeed, safety was a prime concern of Congress when it prohibited hunting in the District over a century ago. *See* S.Rep. No. 59-4338, at 3 (1906) (law will promote "freedom from accident from indiscriminate discharge of firearms").

reached by the Supreme Court. *Heller* expressly upheld registration of handguns, even though they are "'the most preferred firearm in the nation to 'keep' and use for protection of one's home and family,'" *Heller I*, 554 U.S. at 628–29 (quoting *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007)).

As plaintiffs have failed to provide evidence raising a genuine dispute as to whether the D.C. Council could have reasonably concluded that requiring the registration of long guns, as well as handguns, will further important government interests, the District is entitled to summary judgment that requiring such registration does not violate the Second Amendment.

### 3.   The Record Demonstrates That In-Person Registration, Fingerprinting and Re-Registration Are Substantially Related to Important District Interests.

The D.C. Circuit recognized that "basic registration requirements are self-evidently de minimis, for they are similar to other common registration or licensing schemes, such as those for voting or for driving a car, that cannot reasonably be considered onerous." *Heller II*, 670 F.3d at 1254–55. In-person registration and re-registration, if not fingerprinting, are part of the "other common registration or licensing schemes" referenced by the D.C. Circuit.

Plaintiffs argue that firearms-registration is not common nationally, *see* P.Mem. at 12 (citing federal law and the National Instant Criminal Background Check System ("NICS")). Even if it is true, however, the point is irrelevant to the law's constitutionality. That other States have taken a different approach is meaningless. Simply because other places take *less* restrictive measures to protect public safety does not mean that the District's laws violate the Second Amendment.

*i.  In-Person Registration and Fingerprinting*

In another straw man argument, plaintiffs assert that the use of fingerprints and photographs will not reduce illegal gun trafficking. P.Mem. at 32. But they have offered no evidence that this is so. Common sense at least indicates that those methods *may* deter the use of false identification to register a weapon, and they certainly *will* ensure that the person registering is who they say they are. And plaintiffs cannot refute the common-sense requirement that individuals must appear in person to register a lethal weapon.

Plaintiffs do not dispute that the District has an important interest in ensuring that criminals and other prohibited persons do not obtain firearms. Nor do they dispute that in-person registration and a fingerprint-based background check is "more effective than relying simply on a name and social security number, as is done with the background checks conducted by federally license firearms dealers." 2012 REPORT at 9 (citing Testimony of Chief Lanier). *See also* Vince Decl. ¶ 19–20; US GAO Report at 2 (App. at 226) (finding that "the instant background checks [performed by federal gun dealers] do not positively identify purchasers of firearms," and "cannot ensure that the prospective purchaser is not a felon").[16] Instead, plaintiffs contend that the District's in-person registration and fingerprinting requirements are unnecessary to verify the eligibility of an individual to possess a firearm because there is no evidence that a "significant number of criminal purchase attempts are currently made using fake IDs." P.Mem. at

---

[16]     Plaintiffs attack this GAO study on the grounds that it "involved a deliberate attempt by the government to deceive firearm dealers by using fake IDs offered by undercover agents posing as prospective gun buyers." P.Mem. at 30. They further assert—without any evidentiary support—that it is "probably not a valid assumption" that identification can "still be easily forged" in light of changes to laws post-9/11. Neither of these bare assertions is sufficient to demonstrate that the D.C. Council could not have reasonably relied upon this federal government study to conclude that a fingerprint-based background check would further District's interest in ensuring that criminals and other prohibited persons do not obtain firearms. *See Renton*, 475 U.S. at 51–52.

29, 31–32. Plaintiffs' argument misses the mark because federal courts have routinely upheld even prophylactic government action under intermediate scrutiny.

For example, in *Barry v. City of New York*, 712 F.2d 1554 (2d Cir. 1983), the plaintiffs challenged a New York City regulation requiring disclosure of personal financial information by public officials. Because cognizable privacy interests were involved, the Second Circuit applied intermediate scrutiny. *See id.* at 1559. Although the plaintiffs successfully showed that the New York City department in question had a "virtually corruption-free history," *id.* at 1561, the Court nonetheless sustained the regulation, finding it sufficient that New York City had a general concern about corruption and that financial disclosure would alleviate such a concern. *Id.* Similarly, even if the instant plaintiffs were correct that, currently, "criminals virtually never acquire guns by using a fake ID," P.Mem. at 31, the District's in-person registration and fingerprinting requirements would still survive intermediate scrutiny based upon the uncontested record evidence that prohibited individuals may be able to circumvent the federal background check process, and that in-person registration and fingerprinting will alleviate that concern.

Plaintiffs' argue that the federal background check conducted prior to the purchase of a firearm "adequately screens out ineligible persons" P.Mem. at 28, and renders local background checks like the District's "obsolete" and "redundant." *See* P.Mem. at 26–27. They offer no support for these bald statements, nor can they.

Moreover, plaintiffs ignore the studies (noted by the District) that suggest that federal background checks alone are insufficient,[17] but, luckily, the federal legislation cited by the

---

[17]     *See* Steven A. Sumner, *et al.*, *Firearm Death Rates and Association with Level of Firearm Purchase Background Check*, AM. J. PREV. MED. (July 2008); 35(1) 1–6, *available at* http://www.ajpmonline.org/article/S0749-3797(08)00310-3/fulltext (last visited Jan. 8, 2014). *See also* App. at 225 (GAO Study). Plaintiffs feign outrage that the GAO Study was "a deliberate attempt to deceive firearms dealers by using fake IDs . . . ." P.Mem. at 30. But that is usually

plaintiffs does not prohibit the States or the District from attempting to provide further protections for their citizens.

Simply put, the local-level checks conducted by the District encompass information *not* included in the federal systems. *See* DEx. B (Shelton Decl.) ¶12; DEx. O (Hall Decl.) ¶¶ 5–9. Hence, the local check is more comprehensive, and thus provides more protection than the federal background check to attempt to ensure that firearms are not in the hands of prohibited persons.[18]

The D.C. Council's conclusion that in-person registration and fingerprinting will further important government interests is additionally supported by a recent study the District's expert, Daniel W. Webster, finding that the repeal of Missouri's "permit-to-purchase" law[19] resulted in a substantial increase in the number of guns diverted to criminals and the number of firearm homicides. Webster Decl. ¶¶ 14–18; *see also* D. Webster, C.K. Crifasi, J.S. Vernick, *Effects of Missouri's Repeal of Its Handgun Purchaser Licensing Law on Homicides* (Dec. 17, 2013) (unpublished manuscript).[20] Plaintiffs attack the methodology of Dr. Webster's study through the declaration of their own expert, Dr. Gary Kleck, who disagrees with Webster regarding the

---

how sting operations are conducted. In any event, plaintiffs have not refuted the GAO's conclusions.

[18]    Oddly, plaintiffs subsequently contend that "local background checks are not at issue in this litigation." P.Mem. at 33. Of course they are—plaintiffs insist that all of the District's registration requirements are burdensome and onerous.

[19]    Like the District's registration process, Missouri's "permit-to-purchase" law required that individuals appear in person before a law enforcement agency and undergo a locally administered background check before being able to legally purchase a handgun. MO. REV. STAT. § 571.090 (2006) (Repealed by L.2007, S.B. Nos. 62 & 41, § A).

[20]    Since the District filed its initial moving papers, Dr. Webster's study has been accepted for publication by the peer-reviewed Journal of Urban Health. A copy of the manuscript that has been accepted for publication is attached as DEx. Q.

appropriate indicators of possible firearms trafficking. P.Mem. at 29; PEx. 7 ¶¶ 27–30. Such criticism concerning methodology, however, is not sufficient to create a genuine issue of fact concerning the constitutionality of the District's laws. *See Sartini*, 455 Fed. Appx. at 551 ("A mere difference of opinion about the conclusions to be drawn from a body of evidence cannot invalidate the legislature's decision.").

Accordingly, in light of the above, the District is entitled to summary judgment that its requirements of in-person registration and fingerprinting do not violate the Second Amendment.[21]

### ii.  Re-Registration

It is true, as plaintiffs suggest, that the District "could conduct new background checks at any time without causing the registrations to expire." P.Mem. at 34.[22] There are an infinite number of things the District *could* do, but the Constitution does not require this "least restrictive means" to achieve the District's goals. *Heller II*, 670 F.3d at 1258 (quoting *Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)).

---

[21]     Plaintiffs further assert that the District has failed to justify why an individual "may be required to bring with him the firearm for which a registration certificate is sought[.]" P.Mem. at 33. Yet, the purpose of this requirement is self-evident: to allow MPD to verify that the firearm is not prohibited from being registered in the District.

[22]     Plaintiffs also note that the District does something like this now, regularly checking for violations of local protective orders and domestic-violence matters. P.Mem. at 34. But the District does this because it is clearly information that can have an immediate negative impact on eligibility to possess a firearm. Plaintiffs apparently want gun owners themselves to have no responsibility for reporting on their own eligibility, and simply require the government to ferret out the information if it has the time and resources to do it. Neither the Second Amendment nor the government's police powers require this, however.

Moreover, the District's re-registration scheme serves an important purpose. While ensuring that firearms owners have not fallen into a prohibited category is certainly an important purpose of re-registration,[23] the system of periodic, MPD-initiated background checks that plaintiffs suggest would fail to serve several other key purposes of the requirement.

*First*, merely conducting periodic background checks of firearms registrants would not address the problem of registrants failing to notify MPD of changes to their registration status. As the Committee noted, "[t]housands of registrants have moved, died, disposed of their guns (perhaps lost them) and have not notified MPD. MPD has told the Committee that many registrants cannot be located. Since keeping the registration records up to date is best, it makes sense to overlay a re-registration requirement." 2012 REPORT at 10. Surely it is reasonable for firearms owners to have some accountability for their continued eligibility and the whereabouts of their weapons.

*Second*, the Committee determined that the re-registration requirement will further the District's interest in tracking lost or stolen firearms by requiring owners to periodically account for their firearms, and affirm their continued possession. 2012 REPORT at 11. Simply conducting periodic background checks of firearms registrants will do nothing to further this goal.

Plaintiffs also attack the recently adopted regulation implementing the re-registration requirement[24] on the grounds that it imposes a financial burden to the extent it requires "paying a re-registration fee (currently $13.00) for each firearm owned by the registrant." P.Mem. at 35;

---

[23]     Plaintiffs assert in their brief—without providing any evidentiary support—that "[t]he chance that a person who passed the NICS check has become ineligible to own a firearm is too remote to justify th[e] burden [of re-registration] on all lawful firearms owners." P.Mem. at 34. This unsupported, conclusory statement is not sufficient to raise an issue of fact warranting denial of summary judgment to the District.

[24]     METROPOLITAN POLICE DEP'T, NOTICE OF FINAL RULEMAKING, 60 D.C. Reg. 55 (Dec. 27, 2013).

Carter Decl. ¶ 19. On this point, plaintiffs are factually incorrect. The re-registration regulation adopted by MPD requires a $13.00 re-registration fee *per person* rather than *per firearm*. Accordingly, individuals re-registering firearms will be required to pay a total of $48.00 (which includes a registration fee of $13.00 and a fingerprinting/FBI background check fee of $35) regardless of the number of firearms being re-registered. *See* METROPOLITAN POLICE DEP'T, FIREARMS REGISTRATION RENEWAL: COMPLETE RENEWAL PROCEDURES, *available at*, http://mpdc.dc.gov/page/firearms-registration-renewal-complete-renewal-procedures; *see also* "Notice of Firearms Registration Renewal," WASH. TIMES, Jan. 6, 2014, at A7. As a result, plaintiffs are simply incorrect that this regulation "will impose a severe burden on individuals who own several firearms." P.Mem. at 35. Moreover, as previously discussed, plaintiffs failed to demonstrate that the $48 registration fee meaningfully jeopardizes their Second Amendment rights.

In light of the above, plaintiffs have failed to raise a genuine dispute that there is substantial evidence upon which the D.C. Council could reasonably conclude that re-registration will further important government interests.

**4. Plaintiffs Fail to Rebut the District's Showing that Demonstrated Knowledge of Firearms Laws and Completion of a Training Course Will Further the District's Interest in Public Safety.**

On remand, the District has supplemented the record with the declarations of three law enforcement experts—with more than 70 years of combined experience—all of whom are of the opinion that the District's requirements that an individual demonstrate knowledge of the District's firearm laws (§ 7-2502.03(a)(10)) and complete a firearms safety and training course (§ 7-2502.03(a)(13)) will further the District's interest in public safety and reduce accidental

firearms discharges. *See* Vince Decl. ¶23; Jones Decl. ¶ 25–26; Lanier Decl. ¶ 23–24. Plaintiffs do not seriously contest these opinions, but contend that these requirements cannot withstand constitutional scrutiny because such "unsupported opinion is not evidence that th[ese] requirement[s] actually achieves [their] desired effect[.]" P.Mem. at 36–37.

Plaintiffs claim that "[n]o evidence exists that training or the test protects police officers or controls crime." P.Mem. at 36. But they cannot explain why, if this is true, every law enforcement agency trains its officers on the safe handling and use of firearms, *see* DEx. D ¶ 26, or why such training is mandatory in the armed forces and recommended by groups such as the NRA and by firearms manufacturers themselves. *See, e.g.*, *NRA Gun Safety Rules* and *Education and Training Programs*, National Rifle Association (*available online at* training.nra.org/nra-gun-safety-rules.aspx) (last visited Jan. 10, 2014); *Firearms Safety for Responsible Citizens* at 16, Sturm, Ruger & Co., Inc. (*available online at* http://www.ruger.com/pdf/blueBook.pdf) (last visited Jan. 10, 2014); *Firearms Safety and Gun Training* (online course), Glock USA (*available online at* http://us.glock.com/confidence/university) (last visited Jan. 10, 2014); *Glock S.A.F.E. Training*, Glock USA ("a class designed for new shooters, teaching the fundamentals of responsible gun ownership and safety.") (*available online at* https://www.glocktraining.com/GlockSAFE.aspx) (last visited Jan. 10, 2014); "[T]here is no substitute for training and education. With our Right to Keep and Bear Arms comes a responsibility to keep and bear them safely. Firearms safety is your responsibility and your duty[.]" Taurus Int'l (*see* www.taurususa.com/child-safety.cfm).

As discussed above, however, the District is not required to "demonstrate empirically that [its] [firearms-registration requirements] will or are likely to successfully ameliorate adverse secondary effects" of firearms possession. *See Sartini*, 455 Fed. Appx. at 551. Rather, the

District may justify its registration requirements with other types of evidence, including "history, consensus, and simple common sense." *Went For It, Inc.*, 515 U.S. at 628. Here, the Council could certainly rely upon the opinions of the District's law enforcement experts to reasonably conclude that the training and knowledge requirements will further the District's interest in public safety and reducing accidental discharges.[25]

Particularly, in light of the minimal burden imposed by these two requirements,[26] which is not specifically contested by the plaintiffs, the District is entitled to summary judgment that they do not violate the Second Amendment. *See Heller II*, 670 F.3d at 1257 ("[A] regulation that imposes a less substantial burden should be proportionately easier to justify.").

### 5. The Requirement That an Individual Exhibit a Firearms Registration Certificate Is Narrowly Tailored to Achieve the Substantial Government Interest of Protecting Law Enforcement.

In their Brief, plaintiffs appear to contend that the District's requirement that an individual exhibit a registration certificate upon demand of law enforcement (D.C. Official Code § 7-2502.08(c)) is unconstitutional because it "is not a narrowly tailored requirement or penalty." P.Mem. at 38.

As discussed in the District's motion, the D.C. Circuit has already determined that the requirements and penalties set forth in § 7-2502.08(c) are "lawful insofar as the underlying regime is lawful and hence enforceable." *Heller II*, 670 F.3d at 1249 n.*. Plaintiffs do not

---

[25]    The Council could also rely upon the fact that several other States require safety training or a safety exam prior to issuance of a firearms license or permit. D.Mot. [Doc. No. 73] at 32.

[26]    *See* DEx. K (Heller Tr.) at 54:16–55:3 (stating that it took plaintiff Heller 10–15 minutes to complete a written test to demonstrate his knowledge of the District's firearm laws); DEx. D (Jones Decl.) ¶ 26 (the required safety training course, which is provided by MPD free of charge, may be completed online and takes approximately one hour to complete).

address this determination or provide any ground upon which the Court could find this provision unconstitutional independent of the underlying registration regime. Accordingly, plaintiffs' arguments against this provision are unpersuasive.

In any case, however, plaintiffs do not rebut the District's evidence that presenting a registration certificate with a photograph allows law enforcement to quickly and safely identified an individual as the owner of a registered firearm. *See* 2012 REPORT at 9; App. at 160 (written testimony of Cathy L. Lanier). Plaintiffs assert that this is the same circular reasoning previously rejected by the D.C. Circuit, but they are incorrect.

Here, the District has a legitimate interest in allowing law enforcement to easily identify those individuals in possession of a firearm who have successfully completed the registration process—including passing a locally conducted background check—and thus very likely do not pose a safety threat to the officer. Lanier Decl. ¶ 27–28; *see also* PEx. 3 (Lanier Tr.) at 75 (noting that she is not aware of any instance in which the owner of a registered firearm fired at law enforcement). Plaintiffs do not suggest any less burdensome means to accomplish this important objective. *See Heller II*, 670 F.3d at 1258 ("The requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation . . . .") (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 782–83 (1989)).

In light of the above, the District is entitled to summary judgment that D.C. Official Code § 7-2502.08(c) does not violate the Second Amendment.

6.    **The District's Reporting Requirements Further Important Government Interests in Preventing the Diversion of Guns.**

As with the requirement to display a registration certificate, plaintiffs do not address the fact that the D.C. Circuit previously determined that the reporting requirements in D.C. Official Code §7-2502.08(a) are "lawful insofar as the underlying regime is lawful and hence enforceable." *Heller II*, 670 F.3d at 1249 n.*. Rather, plaintiffs assert—without any evidentiary support—that "the types of persons who register firearms would not divert them to prohibited persons, without regard to any notification requirement." P.Mem. at 39. This is truly a meaningless claim; if nobody transferred firearms to prohibited persons, there would be no need for registration requirements in the first place.

The record, as supplemented on remand, contains substantial evidence upon which the Council could reasonably conclude that these types of reporting requirements will further the government's important interest in preventing the diversion of guns into the illegal market. *See* Jones Decl. ¶ 28 (reporting requirements "take[] away an excuse commonly used by straw purchasers—that the guns just purchased were later stolen or lost"); Vince Decl. ¶ 24 (discussing triple homicide he investigated at ATF where "the gun had been stolen, but the owner didn't report it because his daughter was dating one of the criminals and he didn't want to make trouble for them"); Webster Decl. ¶ 28 & App. 225–58 (requirement of promptly reporting theft or loss of firearms has been associated with a 30% lower rate of exporting guns to criminals across state borders).[27] This evidence is entirely consistent with the undisputed fact that registered firearms are rarely used in crime in the District. *See* PSMF ¶¶ 5–7.

---

[27]    Plaintiffs attack this study as "irrelevant" because it deals with rates of crime gun "exports." P.Mem. at 40. Plaintiffs, however, do not explain why the Council could not reasonably conclude that a law that has effect of reducing rates of crime gun exports will also reduce the diversion of guns to criminals within the District. *See Renton*, 475 U.S. at 51–52

In light of the above, the District is entitled to summary judgment that D.C. Official Code § 7-2502.08(a) does not violate the Second Amendment.

      **7.**   **The D.C. Council Could Reasonably Conclude that a Prohibition on Registering More Than One Handgun in a 30-Day Period Will Reduce Trafficking.**

Plaintiffs attack the District's prohibition on registering more than one handgun in a 30-day period by asserting—without evidentiary support—that "[a]ny limitation on registration of guns legally coming into the District would not prevent illegal trafficking of guns into the District." P.Mem. at 41–42.

In making this assertion, plaintiffs entirely ignore the "ample analysis" and empirical studies relied upon by the Committee demonstrating that laws restricting the number guns that an individual can legally obtain in a given time-period are highly effective at frustrating firearms trafficking. 2012 REPORT at 16. *See also* Mona Wright, et al., *Factors Affecting a Recently Purchased Handgun's Risk for Use in Crime Under Circumstances That Suggest Gun Trafficking*, 87 J. URBAN HEALTH: BULL. OF THE NEW YORK ACAD. OF MED. 352, 356 (2010) (finding that handguns involved in bulk purchases were 33% more likely to be used in crime that those purchased individually); Douglas Weil & Rebecca Knox, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275 J. AM. MED ASS'N 1759, 1760 (1996) (concluding that one-gun-per-month restriction is an effective means of disrupting the illegal interstate transfer of firearms); Douglas Weil & Rebecca Knox, *Evaluating the Impact of Virginia's One-Gun-A-Month Law*, The Ctr. to Prevent Handgun Violence 1, 4–6 (Aug. 1995); Christopher S. Koper, *Crime Gun Risk Factors: Buyer, Seller, Firearm, and Transaction Characteristics Associated with Gun Trafficking and Criminal Gun Use*, REPORT TO THE

NATIONAL    INSTITUTE    OF    JUSTICE    6,    83    (2007),   *available    at*
https://www.ncjrs.gov/pdffiles1/nij/grants/221074.pdf (lasted visited Jan. 13, 2014); Bureau of

Alcohol, Tobacco and Firearms, U.S. Department of the Treasury, *Youth Crime Gun Interdiction*

*Initiative, Crime Gun Trace Reports (2000) National Report* 52 (Jul. 2002), *available at*

http://www.atf.gov/files/publications/download/ycgii/2000/ycgii-report-2000-general-

findings.pdf (last visited Jan. 13, 2014); Bureau of Alcohol, Tobacco and Firearms, U.S.

Department of the Treasury, *Youth Crime Gun Interdiction Initiative, Crime Gun Trace Reports*

*(1999)    National    Report*    40,    *available    at*    http://www.atf.gov/files/publications/

download/ycgii/1999/ycgii-report-1999-general-findings.pdf (last visited Jan. 13, 2014).

     The rhetorical questions posed by plaintiffs in their Brief fall far short of casting doubt

upon this robust body of evidence. Accordingly, the District is entitled to summary judgment that

D.C. Official Code § 7-2502.03(e) does not violate the Second Amendment.

### B. Plaintiffs' Expert Fails to Cast Doubt on the Substantial Evidence Supporting the Council's Reasonable Conclusions.

     The prolix declaration provided by plaintiffs' rebuttal expert, Dr. Gary Kleck, is

profoundly unhelpful, consisting of 96 paragraphs of conclusory assertions and *legal*

conclusions, with little credible (much less objective) evidence to support his categorical

statements. He focuses entirely on the alleged unavailability of any conclusive evidence to prove

that firearms regulations proximately cause a reduction in crime and violence, and his

disagreements about the validity and results of studies conducted by other academics.

     Dr. Kleck asserts, regarding the District's experts Chief Cathy Lanier, Mark Jones, and

Joe Vince:

None of them are experts on the effectiveness of gun control measures. The qualifications that are genuinely relevant to evaluating these measures would include formal training in multivariate statistical analysis, including coursework in ordinary least squares regression, logistic regression, two-stage least-squares methods, fixed effects panel designs, and similar statistical techniques. [T]his knowledge would enable a genuine expert to both conduct effective research and to distinguish strong research from weak research among other scholars' work, so as to know which studies can be most strongly relied upon in drawing conclusions. [N]either Cathy Lanier, Joseph Vince, nor Mark Jones show even the most superficial acquaintance with the relevant research in this field, or evince any knowledge of the methods used in research in the field, or demonstrate any ability to distinguish good research from bad.

PEx. 7 ¶ 68.

This complete rejection of real-world experience as a basis for expert opinion goes against common sense, not to mention extensive case law and the previous ruling of the Court. *See* Doc. No. 68 at 10 ("Each of the experts here uses the same methodology, one that has been approved by courts in a variety of cases involving experts whose experience forms the basis of their opinions."). *But cf.* P.Mem. at n.16 (District's experts "apply no recognized methodology to arrive at their conclusions.").

Nor are Dr. Kleck's conclusions based on sound methodology. Of the 41 references Dr. Kleck provides at the conclusion of his declaration, he cites his *own* research some 16 times. However, most (10) of those cites were to studies/articles that were *not* subject to the formal process of peer review, like books, unpublished articles, or articles published in non-peer-reviewed publications, like law reviews. In fact, one of the authorities he relies on most frequently is G. Kleck and S. Wang, *The myth of big-time gun trafficking and the overinterpretation of gun tracing data*, 56 UCLA L. REV. 1233 (2009), a non-peer-reviewed article. As Dr. Kleck acknowledged at his deposition, articles that appear in peer-reviewed journals are more likely to be accepted by a person's colleagues. DEx. P (Kleck Depo. excerpt) at 14/7–14/10. *See also, e.g., Patteson v. Maloney*, ___ F.Supp.2d ____, 2013 WL 5133495, *4

(D.D.C. Sep. 16, 2013) ("The rigors of peer review and publication, then, suggest that [the proffered expert evidence] is reliable.") (applying four-factor analysis of *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)).[28]

The District will focus here on only the most egregious of Dr. Kleck's errors.[29]

Dr. Kleck takes issue with the use of "time-to-crime" ("TTC") as an indicator of illegal gun trafficking, asserting categorically that TTC "is not" indicative of possible gun trafficking. PEx. 7 ¶ 27. But federal law-enforcement authorities still rely on that measure[30] and, more importantly, Dr. Kleck's conclusions on trafficking have previously been persuasively refuted in the literature. In a study provided in the District's Appendix (at p. 279), *Interpreting the Empirical Evidence on Illegal Gun Market Dynamics*, 89 J. URBAN HEALTH: BULL. OF THE NEW YORK ACAD. OF MED. 779 (2012) ("*Empirical Evidence*"),[31] a number of academics in the field

---

[28]     The District notes, again, that the evidence presented in this case is not (and cannot be) subject to a rigorous scientific causation analysis. *See* Doc. No. 68 at 7 (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (applying *Daubert*'s holding to non-scientific expert testimony)).

[29]     It is worth noting that some of Dr. Kleck's published conclusions, which he appears to disagree with in his expert testimony, are not all unreasonable. *See* Gary Kleck, *Gun Control After Heller and McDonald: What Cannot be Done and What Ought to be Done*, 39 FORDHAM URB. L.J. 1383, 1419–20 (Oct. 2012) ("Gun owner license laws and purchase permit laws may reduce homicides and gun accidents[.] [I]mproved background screening may reduce gun violence. Since background checks on dealer transfers appear to be beneficial, extending them to cover private transfers of guns is a reasonable next step.") (citations omitted).

[30]     *See, e.g., Fact Sheet—National Tracing Center*, ATF (Feb. 2013) ("ATF views recovery of one or more firearms used in crimes that were part of a multiple purchase as an indicator of firearms trafficking, particularly if one of the firearms was recovered a short time after the multiple sale occurred (known as a short time-to-crime).") (*available online at* www.atf.gov/publications/factsheets/factsheet-multiple-sales-reporting.html) (last visited Jan. 10, 2014).

[31]     *Available online at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3462834/ (last visited Jan. 8, 2014).

have directly challenged Dr. Kleck's conclusions (and recent research) regarding the alleged improper use of firearms trace data to understand the illegal gun market, and the subsequent futility (according to him) of efforts to reduce criminal access to firearms. The study directly addresses the flaws in the Kleck and Wang law-review article from 2009 that Dr. Kleck cites repeatedly as a basis for his conclusions in his declaration.

In *Empirical Evidence*, the authors present numerous criticisms of Dr. Kleck's research and conclusions. Specifically, the authors refute Dr. Kleck's categorical statement that "short TTC is not an indicator of gun trafficking." P.Ex. 7 ¶ 27. As the authors note, "Law enforcement investigators consider a traced firearm with short time-to-crime as possibly having been recently and illegally diverted from a retail outlet." *Empirical Evidence*, App. at 283 (citing *Crime gun trace analysis* (2000): *national report*, Bureau of Alcohol, Tobacco and Firearms (2002)). While Kleck and Wang claim that most short TTC guns were acquired through theft because criminals prefer new guns, *id.* at 284; P.Ex. 7 ¶ 27, "there is little survey research evidence to support their overall thesis." *Empirical Evidence*, App. at 284.

The authors of *Empirical Evidence* then analyzed the data and concluded that there is "strong evidence" that newer guns are disproportionately recovered in crime (relative to their prevalence in all guns), directly refuting Dr. Kleck's conclusions. *Id.* at 287.[32]

Similarly, Dr. Kleck criticizes Dr. Webster's studies of state permit-to-purchase laws, for their failure to control for cross-state migration of gun owners (Kleck's "mundane" reason for higher rates of out-of-state traced guns). PEx. 7 ¶ 40. But Dr. Webster did, in fact, control for cross-state migration. This fact was mentioned in his expert report, noted in his declaration at

---

[32]     The authors of *Empirical Evidence* also criticize Dr. Kleck's use of data regarding obliterated serial numbers on recovered crime guns, and his misinterpretation of ATF data to attempt to explain illegal gun trafficking. *See Empirical Evidence*, App. at 290. "The flaws in the data raise serious doubts about the reliability and validity of Kleck and Wang's conclusions." *Id.*

least twice, and, of course, in the studies themselves. *See* DEx. I (Webster Decl.) ¶¶ 25, 29. This is likely no more than sloppy reading, but it should cause the Court to view Dr. Kleck's entire presentation with a healthy skepticism.

Even if Dr. Kleck were correct, expert "criticism of the validity of studies by other researchers . . . is insufficient to create a genuine issue of material fact [because it] fail[s] to cast doubt on the entire body of evidence relied on by the [legislature]." *84 Video/Newsstand, Inc. v. Sartini*, 455 Fed. Appx. 541, 552 (6th Cir. 2011). *See also id.* at 551 ("A mere difference of opinion about the conclusions to be drawn from a body of evidence cannot invalidate the legislature's decision.") (citing *Alameda Books*, 535 U.S. at 438).

Even leaving aside the "wrongheaded claims by Kleck" *Empirical Evidence*, App. at 291, and the fact that the bulk of the evidence supports the District's reasonable conclusions here, the very most plaintiffs can claim is that there is conflicting evidence regarding the "success" of firearms registration in reducing crime, preventing violence, or protecting public safety. As such, the Court should defer to the Council's conclusions. *See, e.g., Gonzalez*, 550 U.S. at 163 ("The Court has given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty." (citing cases); *Baze v. Rees*, 553 U.S. 35, 90 (2008) (Scalia, J., concurring) ("It is simply not our place to choose one set of responsible empirical studies over another in interpreting the Constitution. Nor is it our place to demand that state legislatures support their criminal sanctions with foolproof empirical studies, rather than commonsense predictions about human behavior."). *See also, e.g. Woollard v. Gallagher*, 712 F.3d 865, 881 (4th Cir. 2013) ("[i]t is the legislature's job, not ours, to weigh conflicting evidence and make policy judgments.") (quoting *Kachalsky v. County of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012)).

**III.    PLAINTIFFS DO NOT IDENTIFY ANY BASIS THAT GIVES THEM
STANDING TO CHALLENGE THE DISTRICT'S VISION REQUIREMENT.**

Finally, it is undisputed that none of the named plaintiffs are "blind" for purposes of D.C. Official Code § 7-2502.03(a)(11), and thus have not suffered injury by the application of that provision. SMF ¶ 14. Plaintiffs vaguely suggest, nonetheless, that they have standing to challenge this requirement because they "may well face blindness, and need to plan accordingly for the uncertainties that condition may entail." P.Mem. at 49.[33] Yet, as plaintiffs have put forth no evidence concerning the likelihood that they will, in fact, become blind, their assertion of injury is, at best, "conjectural" or "hypothetical," rather than "actual or imminent." *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations omitted). Accordingly, plaintiffs' challenge to D.C. Official Code § 7-2502.03(a)(11) must be dismissed for lack of Article III standing.

**CONCLUSION**

For the reasons discussed herein and previously, the Court should grant summary judgment to the District on all claims.

Date: January 15, 2014                       Respectfully submitted,

                                             IRVIN B. NATHAN
                                             Attorney General for the District of Columbia

                                             ELLEN A. EFROS
                                             Deputy Attorney General
                                             Public Interest Division

---

[33]    Plaintiffs also suggest that they may be permitted to litigate the constitutionality of the District's vision requirement because the D.C. Circuit stated in *Heller II* that "we see no reason to foreclose *these particular plaintiffs* from fleshing out their arguments as well as supplementing the record[.]" P.Mem. at 49 (quoting *Heller II*, 670 F.3d at 1256 n.* (emphasis added)). Plaintiffs cannot rely upon this language, notwithstanding that plaintiffs failed to supplement the record on this point, as neither plaintiffs' standing nor the current version of D.C. Official Code § 7-2502.03(a)(11) were before the D.C. Circuit.

/s/ Grace Graham

GRACE GRAHAM, D.C. Bar No. 472878

Chief, Equity Section

441 Fourth Street, NW, 6th Floor South

Washington, DC 20001

Telephone: (202) 442-9784

Facsimile: (202) 741-8892

Email: grace.graham@dc.gov


/s/ Andrew J. Saindon

ANDREW J. SAINDON, D.C. Bar No. 456987

Assistant Attorney General

Equity Section

441 Fourth Street, N.W., 6th Floor South

Washington, D.C. 20001

Telephone: (202) 724-6643

Facsimile: (202) 730-1470

andy.saindon@dc.gov


/s/ Chad A. Naso

Chad A. Naso [1001694]

Assistant Attorney General

Office of the Attorney General, DC

441 Fourth Street, NW

Sixth Floor South

Washington, DC 20001

(202) 724-7854 (o)

(202) 741-8951 (f)

chad.naso@dc.gov