IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DICK ANTHONY HELLER, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:08-cv-01289 (JEB) |
| | ) | |
| THE DISTRICT OF COLUMBIA, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION
TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**Introduction**

This case was remanded because the District failed to submit evidence to justify its registration laws. "We cannot conclude . . . that the novel [handgun] registration requirements—or any registration requirement as applied to long guns—survive intermediate scrutiny based upon the record as it stands because *the District has not demonstrated a close fit* between those requirements and its governmental interests." *Heller v. District of Columbia,* 670 F.3d 1244, 1258 (D.C. Cir. 2011) ("*Heller II*") (emphasis added). The record contained only "cursory rationales" for some requirements, and even on those "the *District fails to present any data or other evidence* to substantiate its claim that these requirements can reasonably be expected to promote either of the important governmental interests it has invoked . . . ." *Id.* at 1259 (emphasis added). The Court therefore remanded for "further evidentiary proceedings," *id.* at 1260, warning that the requirements "will be deemed constitutional *only if the District shows they serve* its undoubtedly important governmental interests in preventing crimes and protecting police officers." *Id* at 1267  (emphasis added).

The District has failed to meet these standards. It has no "data or other evidence" that its registration requirements prevent crimes or protect police officers, much less that those requirements provide a "close fit" that is narrowly tailored to serving those interests.

## I.  THE DISTRICT IS NOT ENTITLED TO SUMMARY JUDGMENT ON EITHER THE FACTS OR THE LAW

### A.  The District has not produced the kind of evidence required by the D.C. Circuit to substantiate its registration requirements.

The D.C. Circuit made it clear that this remand was to be an "evidentiary proceeding[]," *id.* at 1260, at which "the benefit of additional evidence" would be brought to bear. *Id.* at 1255 n**.   Only "data or other evidence" can "substantiate [the District's] claim that these requirements can reasonably be expected to promote either of the important governmental interests it has invoked." *Id.* at 1259.  Those two interests are "preventing crimes and protecting police officers." *Id.* at 1267.  But the District has produced no evidence or data that any of the following requirements or combination thereof prevents crime or protects police officers:

- Registration of firearms in general

- Registration of long guns

- Ban on registering more than one handgun per month

- Requiring in-person appearance at law enforcement offices

- Requiring fingerprints and photographs in addition to NICS checks

- Requiring renewal of registration periodically, such as every three years

- Requiring reporting of loss, sale, or theft of firearms

- Requiring display of one's registration to a police officer on demand

That is because the District has no such evidence.  That lack is not because the effects of firearms registration have not been studied.  Eminent criminologist Dr. Gary Kleck reviewed

numerous studies on registration laws and violence and concluded: "The results of this body of U.S.-based cross-sectional research are extremely consistent regarding gun registration; indeed, they are unanimous. *Firearms registration laws show no statistically significant violence-reducing effect* on any type of violence." *See* Pl. Ex. 7 (Kleck. Dec.) ¶ 94; ¶¶ 87-96 (emphasis added). The District cites irrelevant studies that address speculative side issues like "diversion" instead of the actual effect of registration laws on violent crime.[1] *See* Part IV, below.

The District's law enforcement officials admit that its registration laws are useless for preventing or solving violent crime. The District conceded in discovery: "It is not clear (to the District) how firearms' registration records could be used to 'prevent' a crime." Def. Ex. J 1. The District has provided no evidence of even a single use of registration records to prevent a crime. Asked for evidence of the use of registration records to *solve* crimes, the District responded: "Lt. Shelton cannot recall any specific instance where registration records were used to determine who committed a crime," except for possession offenses. Def. Ex. J 1.[2] Nor has the District provided evidence of any cases in which registration records were used to solve violent crimes.

Protection of police officers who are dispatched on calls was the most important interest cited by the District for maintaining a registration database of individuals or locations with registered firearms. However, the District admitted flatly that the registration database is virtually never used for this purpose. Pl. Ex. 2, Resp. No. 6. Squad cars are not equipped with a computer that can access that information. Pl. Ex. 1 (Shelton Dep.) 66-67; Pl. Ex. 3 (Lanier

---

[1] The *only* study cited by the District in which a change in violent firearm homicide rates was purportedly linked to handgun registration is based on "cherry picked" data and showed no overall increase in homicide as a result of repeal of registration. Def. Ex. Q. D. Webster, *Effects of Missouri's Repeal of Its Handgun Purchaser Licensing Law on Homicides*, Journal of Urban Health (forthcoming). *See* Part IV.B., below.

[2] Similarly, Chief Lanier testified that she could not provide any example where registration records were used to solve a crime (defined as a non-possessory offense) committed with a long gun. Pl. Ex. 3 (Lanier Dep.) 99.

Dep.) 66.  Neither do dispatchers have the ability to check the registration database. Pl. Ex. 1 (Shelton Dep.) 67-68.  *See P.Mem.* 14 (quoting District discovery response that "MPD [Metropolitan Police Department] officers that are responding to a call for service are not informed in advance if there is a registered firearm at the location." Pl. Ex. 2 (Resp. No. 6)).

The District still asserts, as if it is actually policy, that registration "allows officers to determine in advance whether individuals involved in a call may have firearms . . . ."  DC Opp. 11, quoting 2008 Report at 3.  The District now admits that "the MPD does not *routinely* check registration records prior to responding to a call for service. . . ." *Id.*, citing Pl. Ex. 1 (Shelton Dep.) at 72/1–72/22; Def. Ex. N (Shelton Dep.) at 73/1–73/22. That is a gross understatement -- Lt. Shelton recalled less than a dozen such instances in the twelve years he had been at the Security Officers' Management Branch.  Def. Ex. N at 72.

The Council hearing records include no testimony by MPD stating that the registration records are ever checked before police respond to calls.  Instead, the drafters of the 2008 Committee Report simply lifted this claim almost word-for-word, without attribution, from the testimony of a lobbyist for the Legal Community Against Violence (LCAV).[3]  The Report misled the D.C. Circuit into believing that this was actually MPD policy. *Heller II*, 670 F.3d at 1258; also *id.* at 1294-95 (Kavanaugh, J., dissenting).  After the remand, the drafters of the 2012 Committee Report quoted the prior LCAV statement verbatim,[4] again not divulging that this is not MPD policy at all.

The District's last resort is to attempt to water down the intermediate scrutiny standard, so that neither data nor evidence regarding the effectiveness of registration laws, nor a close fit

---

[3] Testimony of Juliet A. Leftwich, Legal Community Against Violence, Bill 17-843, "Firearms Control Amendment Act of 2008," Committee on Public Safety & the Judiciary Council of the District of Columbia (Oct. 1, 2008), at 2. Def. Ex. A at 63.
[4] 2012 Committee Report at 6, Def. Ex. A at 126.

between the registration requirements and the governmental interests, is necessary.  The District

spends the first part of its brief attempting to contradict and wriggle out from under the clear test

imposed by the D.C. Circuit.  *See* Part I.B. below.

The District has not produced a single relevant study, body of evidence, or even

anecdotal evidence showing that registration requirements either prevent crime or protect police

officers.[5]  District police officials admit that the registration database is useless in 1) preventing

crime, 2) solving crime, and 3) protecting officer safety when dispatched on calls.  Therefore the

District seeks to recast the legal standard, because it cannot meet the standard enunciated by the

D.C. Circuit.  Those arguments are addressed in Part I.B., below.  The lack of proof on the

specific registration issues is then addressed in Parts III-IV.

### B.  The District attempts to distort and evade the standards of constitutional review laid down by the D.C. Circuit.

#### 1.  The test for whether there is a tight fit between a law and a government interest must have an evidentiary basis and is not merely subjective.

"The District must establish a tight 'fit' between the registration requirements and an

important or substantial governmental interest, a fit 'that employs . . . a means narrowly tailored

to achieve the desired objective.'" *Heller II,* 670 F.3d at 1258 (citation omitted).  A "tight fit"

that is narrowly tailored means that the requirements must objectively serve the governmental

interest, not just that the Council members might subjectively imagine that it does.

Put otherwise, narrow tailoring means that "the regulation *promotes*"—not just that the

legislature surmises that it promotes—"a substantial governmental interest that *would be*

---

[5] The only anecdotes cited by the District's witnesses involved the *failure* of D.C. registration laws to prevent or solve crimes.  Chief Lanier cites anecdotal instances in which crimes of violence or terrorism were committed or attempted using firearms or other devices.  Def. Ex. G (Lanier Decl.) ¶ ¶ 12, 18, 32, 34.  For each instance, she admitted either that the act took place outside the District, or that the registration laws had no effect on either prevention or solution of the crime.  Pl. Ex. 3 (Lanier Dep.) 14-15, 23-26, 96-97; Pl. Ex. 24 (Lanier Dep.) at 19.  A shooting on South Capitol Street in 2010 involved a type of firearm that it is illegal in the District  *See* Pl. Ex. 3 (Lanier Dep.) 107.

*achieved* less effectively absent the regulation, and the means chosen are not substantially broader than *necessary* to achieve that interest."  *Ward v. Rock Against Racism*, 491 U.S. 781, 782-83 (1989) (emphasis added).

Yet the District denies that evidence must exist that "its firearms regulation scheme is empirically effective, *i.e.*, affirmatively causes crime to go down and public safety to improve." DC Opp. 1, citing *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 211 (1997) ("*Turner II*").  But in stating that "the question is whether the legislative conclusion was reasonable and *supported by substantial evidence* in the record," *id.* (emphasis added), *Turner II* relied on extensive evidence, including "studies," that "'clearly establis[h] the importance of cable television to broadcast television stations.' . . ."  *Id.* at 209-10.

The District would shift the issue from whether "the District's laws *will* have these effects," or would even stand a good chance of doing so, to the subjective question of what "the Council could reasonably believe . . . ."  DC Opp. 2.[6]  The District suggests that Plaintiffs mistake its burden in stating: "The District's witnesses cited no studies showing that firearm registration requirements *prevent* illegal possession of firearms or use of firearms in crime." DC Opp. 2, quoting P.Mem. at 4.  Yet the 2008 Committee Report was found inadequate for asserting that "studies show" various benefits without more: "The Report neither identifies the studies relied upon *nor claims those studies showed the laws achieved their purpose* . . . ."  *Heller II*, 670 F.3d at 1258-59 (emphasis added).  Plainly, for a law to be narrowly tailored, it must actually achieve the governmental interest to a significant degree.

The District complains that "an impossible evidentiary standard" would exist if it must "prove – with empirical data – that the requirements will actually reduce crime or protect police

---

[6] Plaintiffs do not "expect the laws to be perfect," *id.*, but the District has failed to show the required tight fit between the laws and a substantial government interest. Not a single state has laws as restrictive as the District.

officers." DC Opp. 5, citing P.Mem. at 18. That is not because the evidentiary standard is too high, but because no evidence exists to support the District's claim that registration reduces crime. The District has been able to meet this evidentiary standard in other cases in which sufficient evidence supported its legislative judgment. *See Hutchins v. District of Columbia*, 188 F.3d 531, 543 n.5 (D.C. Cir. 1999) (*en banc*) (holding that police "statistics on total juvenile arrests and juvenile arrests during . . . proposed curfew hours" justified a youth curfew).[7]

The District argues that it "is required only to provide 'some meaningful evidence' demonstrating that the challenged registration requirements 'can reasonably be expected to promote' an important government interest." DC Opp. 6, quoting *Heller II*, 670 F.3d at 1259. But this omits crucial language from the quote, which stated more fully that the District "*fails to present any data or other evidence to substantiate its claim* that these requirements can reasonably be expected to promote either of the important governmental interests it has invoked . . . ." *Id*. (emphasis added).[8] The test is evidentiary and objective, and is not dependent on unsupported "expectations."

Similarly, the District seeks to avoid its evidentiary burden by asserting that the District "is not required to justify its registration requirements with empirical data," but may rely on what it "'reasonably believed to be relevant' . . . ." DC Opp. 7, citing *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51-52 (1986). But *Renton* made clear that empirical evidence is required, stating:

> The First Amendment does not require a city, before enacting such an ordinance, to conduct *new* studies or *produce evidence independent* of that already generated by other cities, so long as whatever *evidence the city relies upon* is reasonably believed to be relevant to the problem that the city addresses.

---

[7] Unlike here, *Hutchins* did not involve a fundamental right. *See id*. at 538, 541.
[8] The phrase "some meaningful evidence" came from a separate passage which emphasized that actual *evidence* and not "mere assertions" is required to justify its predictions that the registration laws would reduce crime or protect officer safety. *Id.* at 1259.

*Id.* (emphasis added.)  Of course, evidence is only relevant if it addresses the government interest under consideration (*e.g.*, crime control) and should only be "reasonably believed" if it shows that the measure shows some actual effect in achieving that interest.[9]

### 2. The D.C. Circuit required that the District demonstrate that its laws are narrowly tailored, and provide a "tight" or "close" fit with the interest sought to be achieved.

The second part of the District's attempt to evade the D.C. Circuit's standard is to deny that its laws must be narrowly tailored  to control crime and protect police officers.  "[T]he District must establish a tight 'fit' between the registration requirements and an important or substantial governmental interest," that employs a means that is "narrowly tailored to achieve the desired objective." *Heller II*, 670 F.3d at 1258.  *See also id.* (District must establish "close fit" between registration requirements and its governmental interests).[10]  The District responds with the straw-man claim that no law can "capture only the truly criminal, while having no impact whatever on the law-abiding. Plaintiffs' 'all or nothing' approach must be firmly rejected."  DC Opp. 8.  But Plaintiffs advocated nothing of the kind.  Instead, they have pointed to the more narrowly-tailored approaches set forth in the laws of the United States and virtually every state, including the National Instant Criminal Background Check System (NICS) conducted when a firearm is purchased and other regulations that do not include an onerous system of registration.

### C.  The District mischaracterizes the burdens of proof.

For registration of long guns, and for all registration requirements applied to handguns other than the basic, minimal requirement that handguns be registered, the D.C. Circuit found

---

[9] *See United States v. Playboy Entmt. Grp., Inc.*, 529 U.S. 803, 822 (2000) ("the Government must present more than anecdote and supposition").

[10]  The District seeks to rely on law review articles that predate *Heller* and contradict *Heller II*.  DC Opp. 8, quoting Donald Dowd, *The Relevance of the Second Amendment to Gun Control Legislation*, 58 Mont. L. Rev. 79, 111 (1997) (asserting that "broad gun control" legislation "cannot be narrowly tailored"); Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 731 (2007) (to "expect [gun control] legislation to reflect a tight fit between ends and means is unrealistic").

such requirements to be "novel, not historic" and accordingly not *de minimis* burdens on plaintiffs' Second Amendment rights. *Heller II*, 670 F.3d at 1255. The Court held that on remand the "*District must show*" its registration laws are "substantially related to an important governmental objective," and "the *District must establish*" a tight "fit" between the registration requirements and the governmental objective. *Id*. at 1258 (emphasis added).

Plaintiffs have produced a substantial body of evidence to show that the burdens imposed on Plaintiffs' Second Amendment rights are heavy and substantial, not *de minimis*. *See, e.g.,* Parts II-III below; Part II.I. of P.Mem.; and Pl. Ex. 16, 17, 19, and 20.

The District appears to believe that it is entitled to win just because it is the District: "As the Court rules on plaintiffs' motion for summary judgment, 'the evidence of the [District] is to be believed, and all justifiable inferences are to be drawn in [its] favor.'" DC Opp. 4, quoting *Branch Banking & Trust Co. v. Rappaport*, 2013 WL 5630261, *2 (D. D.C. Oct. 16, 2013). That decision referred to "the nonmovant[s]," which the District changed to "the [District]."

But here there are cross-motions for summary judgment. Both parties are movants, but the District bears the burden of proof to show that its registration requirements are narrowly tailored to achieve the governmental interests asserted.

The District has failed to produce data or evidence to support the claim that its laws promote the asserted governmental interests. The anecdotal evidence regarding shootings in the District demonstrates the complete failure of the District's registration laws. *See* p. 5 n.5. Instead, their top law enforcement officials admit that registration is worthless in preventing crime, solving crimes, and protecting police officers. *See* Part I.A., above. The District has not produced a single study purporting to show that registration laws actually reduce crime, whereas

Plaintiffs have produced a unanimous body of scholarly studies demonstrating that registration laws have not been shown to reduce crime. Pl. Ex. 7 (Kleck Dec.) ¶¶ 87-95.

The District complains that Plaintiffs have not "raised issues of genuine fact" regarding DC's evidence.  DC Opp. at 17 n.11, 26 n.23, 27.  That assumes that the District has introduced material factual evidence sufficient to show that its registration laws are closely tied to reducing crime.  It has not done so.  It has admitted that its registration laws do not prevent crime, help solve it, or protect officer safety.  That entitles Plaintiffs to summary judgment.

## II. THE DISTRICT'S REGISTRATION LAWS IMPOSE HEAVY BURDENS ON PLAINTIFFS' SECOND AMENDMENT RIGHTS

According to the D.C. Circuit, to pass constitutional muster, a burden on Second Amendment rights must be *de minimis* or must survive intermediate scrutiny.  *Heller II*, 670 F.3d at 1255-56.[11]  While "basic registration requirements" for handguns are "self-evidently *de minimis*," *id*. at 1254-55, the same is not true of the registration requirements for handguns that "are not longstanding," including the one-gun-a-month rule, in-person registration, re-registration, knowledge testing, fingerprinting and photographing.  Those requirements "make it considerably more difficult for a person lawfully to acquire and keep a firearm."  *Id*.  Only with respect to the "novel" requirement of "basic registration" of long guns did the Court of Appeals leave open the question of whether the restriction was *de minimis*.  *Id*. at 1255 n.**.[12]

The burdens imposed on Plaintiffs are more than *de minimis* in practical terms, both for handgun and for long gun registration.  In their declarations, Plaintiffs have amply documented

---

[11] Whether a burden is *de minimis* must not be confused with whether a constitutional right may be violated on the basis that the violation is *de minimis*.  The Second Amendment declares that the right therein "shall not be infringed."  "There are no *de minimis* violations of the Constitution – no constitutional harms so slight that the courts are obliged to ignore them."  *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 36-37 (2004) (O'Connor, J., concurring).

[12] The District claims that the Supreme Court upheld the registration requirements.  DC Opp. 8, 21.  The Court never considered that issue, but simply noted that the District denied Heller's application to register a handgun, and ordered that he be permitted to register it.  *District of Columbia v. Heller*, 554 U.S. 570, 575, 635 (2008).

the impact of registration, fingerprinting, transfer and shipping fees, as well as time spent completing paperwork, traveling to and from MPD headquarters and to stocking firearms dealers outside the District, and otherwise navigating the registration process.   The time burden has amounted to at least several hours per firearm, sometimes requiring multiple days off work, a challenge given Plaintiffs' limited incomes.  P.Mem. at 42-45.[13]

The consequences of failure to comply with the requirements, even inadvertently, are far from being *de minimis* – they can be catastrophic.  The possession or control of a firearm without a valid registration certificate is punishable by imprisonment for one year and a $1,000 fine for a first offense, and by imprisonment for five years and a $5,000 fine for a second offense under certain circumstances. D.C. Code §§ 7-2502.01(a), 7-2507.06.   Civil fines of up to $1,000 and temporary or permanent prohibitions on possessing firearms may also result.  *See* § 7-2502.08(e). Violators must also register with the Metropolitan Police Department as "gun offenders," bearing the stigma and the risk of additional penalties for non-compliance with that requirement.  *See* § 7-2508.01 *et seq*.

Conviction of a firearm possession offense punishable by more than one year's imprisonment prohibits a person from possessing a firearm not only in the District, *see* § 22-4503(a)(1), but anywhere in the United States.  *See* 18 U.S.C. § 922(g)(1).  Depending on the nature of the conviction, additional collateral consequences may apply, including the loss of voting rights, D.C. Code § 1-1001.07, the right to serve on a jury, § 11-1906, and debarment from numerous public offices, private occupations, and public benefits.[14]

---

[13] That Plaintiffs have doggedly endured the process to register at least one firearm each does not, as the District suggests, make the requirements permissible.  DC Opp. 9.  Getting one's writings approved by a censor, or taking a literacy test before voting, would not make such requirements constitutional.

[14] *See* http://www.abacollateralconsequences.org/search/?jurisdiction=13 (last visited Jan. 29, 2014).

Completion of registration, and maintenance of a valid registration certificate through re-registration, require satisfaction of all the novel prerequisites at issue, as well as others not contested. *See generally* Third Amended Complaint at 4-9. Any failure to comply with those requirements will result in rejection of the owner's registration or re-registration, exposing the person to all the same risks as if she had never registered the firearm in the first place.

### III.  BASIC REGISTRATION OF LONG GUNS IMPERMISSIBLY BURDENS SECOND AMENDMENT RIGHTS

The D.C. Circuit held that "the basic registration requirements are constitutional only as applied to handguns. With respect to long guns they are novel, not historic." *Heller II,* 670 F.3d at 1255. While basic registration of long guns may be *de minimis*, the Court assumed that "this requirement, too, impinges upon the Second Amendment right . . . ." *Id*. at 1256 n.**. On the record as it stood, "the District has not demonstrated a close fit between those requirements and its governmental interests." *Id*. at 1258.[15] Now, after remand, no such close fit has been shown.

The District suggests that basic registration is no more burdensome for long guns than for handguns. DC Opp. 13. But the calculus of burdens is not equal given the lack of any demonstrated need to register long guns, a conclusion reflected in federal law and the laws of every state except Hawaii.[16] The District deems it irrelevant that long guns are rarely used in crime, that many long guns are banned as "assault weapons," and that law-abiding persons who possess long guns would not commit crimes with them without regard to whether they are

---

[15] "Nowhere in the [Committee] Report is there even a single reference to the need for registration of rifles or shotguns." *Id*. at 1259. The 2012 Committee Report mentions long guns, but fails to demonstrate the need for registration thereof.

[16] When Illinois preempted local regulation of handgun regulation, Chicago—the only U.S. city that had firearms restrictions comparable to the District's—repealed its registration requirements not only for handguns, but for rifles and shotguns as well. *See* Firearm Concealed Carry Act, Ill. Pub. Act. 98-63, § 90 (July 9, 2013); City of Chicago Substitute Ord. SO2013-6015 (Sept. 11, 2013). As in the District, some Chicago officials maintained that registration was necessary to protect police officers, but the system was never made available for that purpose. John Byrne, *Bill could spell end to Chicago gun registry*, Chicago Tribune, June 9, 2013, http://articles.chicagotribune.com/2013-06-09/news/ct-met-chicago-gun-registry-0608-20130609_1_gun-registry-gun-rights-advocates-gun-control

registered.  *Id*.  But similar reasons are deemed decisive, as reflected in the laws of jurisdictions throughout the United States.

The District states that the 1975 Committee Report mentions shotguns and rifles, supposedly implying "that they should be regulated similarly to handguns."  DC Opp. 14.  It implied no such thing – handguns were banned.  That long guns and handguns can be used for legitimate and illegitimate purposes is no reason to regulate them the same.  DC Opp. 14.  So can scissors and dynamite.[17]

The District agrees that its data show that long guns "are hardly ever used in crime."  DC Opp. 15.  Incidents are so rare that they can be counted with the fingers of one hand, yet for the District "[t]his alone is enough to justify the minimal burden of registration."  *Id*. at 16.  But registration was irrelevant to the cited instances – a non-resident felon murdered someone at the Holocaust Museum in 2009, three were murdered in 2010, a non-resident shot at the White House in 2011, and a non-resident committed the Navy Yard murders in 2013, all without using registered long guns, and all without being prevented or solved by D.C.'s registration requirements.  DC Opp. 15-16.

Faced with the utter lack of any nexus between the crimes and the registration of long guns, the District avoids the issue by asserting that it is "entitled to rely on the experiences of . . . other cities" for its requirements.  DC Opp. 17, quoting *Renton*, 475 U.S. at 51.  Unlike Renton, the District fails to identify these other cities or the studies on which it relied.

The District does not contest that between July 17, 2008 and October 19, 2012, "no registered rifles and only two registered shotguns were recovered from crime scenes in the

---

[17] The District notes the testimony of Prof. Gary Kleck that both long guns and handguns should be treated the same for certain purposes, such as background checks, but Dr. Kleck "wouldn't say it applies necessarily to every single kind of regulation . . . ."  DC Opp. 14 n.7.  To imply that Dr. Kleck favors registration of long guns, when he has filed a lengthy Declaration that demonstrates the failure and futility of registration systems, including specifically long gun registration (Pl. Ex. 7 (Kleck Dec.) ¶ 95), borders on the frivolous.

District . . . ."  DC Opp. 17.  This supposedly "suggests that registration, in fact, is effective at *actually* achieving this legitimate purpose."  *Id*. at 18.  But the same law-abiding citizens who possessed registered long guns in the District during that period and who committed no crimes with their guns would not have used them in crimes had they lived in Maryland or Virginia, where registration is not required.

The District assumes that, but for the registration laws, many of these citizens would have committed crimes.  It asserts that "plaintiffs' argument that registration does not further important government interests would be far more compelling if the record showed that legally registered firearms were *frequently* used in crime."  DC Opp. 18 n.12.  That assumes a cause-and-effect relation that simply does not exist.  In fact, Chief Lanier testified that causation works in the opposite direction:

> Q . . .  Do most people who regularly engage in criminal activities in the District register their  guns?
> A No.
> Q Drug dealers, people who engage in shootings outside nightclubs, that sort of thing, gang members?
> A No.
> Q Would be it correct to call the proportion of folks like that who commit those crimes and also register their guns a very tiny percentage probably?
> A That would be correct.

Pl. Ex. 3 (Lanier Dep.) 12.

The District speculates "that criminals would shift to the use of long guns, if the District were to exclude these weapons from the same registration requirements imposed on handguns."  DC Opp. 18.  But it is unimaginable that those who commit serious crimes punishable with heavy penalties would forego concealable handguns and substitute long guns, which can be easily seen and may lead to their apprehension, to avoid misdemeanor non-registration charges.

The same goes for the District's argument that registration deters use of firearms in crime

14

because "severe penalties may attach afterwards" (DC Opp. 19 n.14) – far more severe penalties exist for the serious felonies such criminals are willing to commit.

The *only* study cited in this litigation about the efficacy of long gun registration found "no evidence" that a long gun registry that was employed by Canada until 2012 "had any beneficial effects" with respect to trends in certain homicides.  DC Opp. 18, citing P.Mem. at 23–24; Kleck Decl. ¶ 95.  The District denied its relevance because the D.C. Council thought otherwise, even though nothing in the record shows any nexus between registration and the governmental objectives.  DC Opp. 19.  The District's sole rejoinder to the failed Canadian experiment: "Canada – one of the most sparsely populated countries in the world – cannot meaningfully be analogized to the dense, urban District of Columbia."  *Id*.  But in 2011, Toronto alone had a population of 5,583,064, and several other Canadian cities had much higher population counts than the District.[18]

The District finds "meritless" the point that "[a]ssassins are not deterred by gun registration laws."  DC Opp. 19.  Yet it makes no showing that they are so deterred.[19]  It continues: "These laws certainly 'burden' the law-abiding, but plaintiffs provide no viable alternative, less-restrictive or otherwise, except to implicitly suggest no regulation at all."  *Id*.  To the contrary, alternatives include the National Instant Criminal Background Check System and the fact that forty-nine states have regulations that are less intrusive than registration of long guns.

---

[18] http://www12.statcan.gc.ca/census-recensement/2011/dp-pd/hlt-fst/pd-pl/Table-Tableau.cfm?LANG=Eng&T=201&S=3&O=D&RPP=150 (visited Jan. 21, 2014).

[19] To counter the District's false assertion that rifles are the "preferred tool of political assassins" (D.C. Br. 25), Plaintiffs produced a chart of famous U.S. assassinations and attempts showing that rifles are nearly never used, and that no assassination with a rifle has ever occurred within the District. P.Mem. 19; Pl. Ex. 11. The District complains of a lack of source citations. DC Opp. 17 n.11. Judicial notice may be taken of these facts because they are "generally known" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.  A revised Ex. 11 including citations to sources is attached herewith.

The 1976 Committee Report (at 5) "points out that very few guns used in crimes and recovered by the police are registered, . . . but again, that seems . . . to suggest that registered owners are rarely criminals." *Romero v. NRA*, 749 F.2d 77, 83-84 (D.C. Cir. 1984) (opinion of Scalia, J., for the court).  The District implies that because the guns are registered, the owners are not criminals –committing the logical fallacy of *post hoc, ergo propter hoc*.  DC Opp. 20.  The suggestion that these owners, which include Plaintiffs, would be more likely to be criminals if their guns were not registered is plainly wrong.

## IV.  THE NOVEL REQUIREMENTS VIOLATE THE SECOND AMENDMENT

### A.  Charging Fees to Exercise the Core Right to Possess Firearms Violates the Second Amendment.

"A state may not impose a charge for the enjoyment of a right granted by the federal constitution."  *Murdock v. Com. of Pennsylvania*, 319 U.S. 105, 113 (1943).  The District disagrees.  DC Opp. 12.  But just as "wealth or fee paying has . . . no relation to voting qualifications," *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 670 (1966), it has no relation to possession of a firearm in one's home.  See *M.L.B. v. S.L.J.*, 519 U.S. 102, 123-24 (1996) (distinguishing fees for driver's licenses from rights that "cannot hinge on ability to pay," because they are "preservative of all rights.").  *Id.* at 124 n.14 (citation omitted).

Conceding that the "fees charged by the District may have a disproportionate impact on 'the poor,'" the District finds that "not constitutionally material."  DC Opp. 12, citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 25-26 (1973) (the poor are not a "suspect class").  But the basis of that decision was that education "is not among the rights afforded explicit protection under our Federal Constitution."  *Id.* at 35.[20]  The right to have arms is, and

---

[20] *See Kadrmas v. Dickinson Public Sch.*, 487 U.S. 450, 458 (1988) (rejecting suggestion that laws with "different effects on the wealthy and the poor should *on that account alone* be subjected to strict equal protection scrutiny," but distinguishing situation where a "fundamental right" is involved).

the impact of fees on the poor or anyone else is constitutionally relevant.[21]  Requiring fees to be

paid not just when registering the gun, but every three years thereafter, imposes a lifetime tax on

exercise of a fundamental right.  See Part IV.C., below (re-registration).

### B. No Narrowly-Tailored, Tight Fit Has Been Shown Between In-Person Registration, Fingerprinting, Photographing, and Important District Interests.

The District argues that it is constitutionally irrelevant that its outlier registration

requirements are not common nationwide.  DC Opp. 22.  But the federal NICS law and the laws

of forty-nine states demonstrate that the District's registration requirements are not narrowly

tailored and lack the required tight fit, as does even the less-restrictive registration system of the

single state (Hawaii) that requires registration of all firearms.

The District has the burden of showing that requiring fingerprints and photographs, and

appearing in person at the MPD, are narrowly tailored means with the required tight fit.  Yet it

turns the burden upside down by arguing that plaintiffs "have offered no evidence" that these

requirements "will not reduce illegal gun trafficking."  DC Opp. 22.  The District's own expert

witness, Daniel Webster, testified that these requirements do not reduce illegal gun trafficking:

> Q . . . Requiring the applicant to be photographed, requiring the applicant to show
> up in person, and the fingerprinting requirements, I'm wondering if it's your
> opinion that those measures have reduced in some substantial measure the
> trafficking of illegal guns into the District?
>
> A No.

Pl. Ex. 13 (Webster Dep.) 108.  The District has offered no evidence that in-person registration

and a fingerprint-based background check is "more effective" in reducing use of false

identification than the NICS background check system, which relies on a government-issued

---

[21] The proper analogy here is to impermissible poll taxes, not to the examples cited by the District of marriage and fishing licenses.  DC Opp. 12 n.6.

identification with photograph and other identification such as social security number.[22]   DC

Opp. 22.  Lt. Shelton testified that attempted use of false ID to register a firearm in the District

has not been a problem.  Pl. Ex. 1 (Shelton Dep.) 32-33.  Sending fingerprints to the FBI will

only verify identity if the FBI already has the fingerprints on file.  Requiring weekly in-person

visits to MPD similar to reporting to a parole officer, and allowing unannounced police visits to

inspect the firearms at registrants' homes, might also be "more effective," but that would violate

constitutional rights.[23]

The District argues that even if "criminals virtually never acquire guns by using a fake

ID," in-person registration and fingerprinting requirements are still constitutional, even though

the sole purpose thereof is to preclude using fake ID.  DC Opp. 23.  That entirely divorces the

requirements from the tight fit mandated by the D.C. Circuit.[24]

The District claims that "the local-level checks conducted by the District encompass

information *not* included in the federal systems."  DC Opp. 24.  Yet the NICS checks eligibility

under federal and state law, including that of the District.  18 U.S.C. §§ 921(a)(2), 923(t)(2).  If

the District deems that insufficient, it is free to join the NICS as a Point of Contact and conduct

background checks through its own records and the NICS records when a person acquires a

---

[22] The judgment of Congress that the NICS system achieves the proper balance is not overridden by an agency report based on a statistically-insignificant sample with hypothetical assumptions that NICS checks do not always identify gun purchasers.  DC Opp. 22, citing US GAO Report at 2.  The District objects that Plaintiffs' rebuttal of this report, see P.Mem. 30, does not offer "evidentiary support" for the proposition—readily apparent in most Americans' wallets—that in the wake of post-9/11 reforms, drivers' licenses have become much harder to forge. *See* American Association of Motor Vehicle Administrators, 2012 AAMVA DL/ID Card Design Standard at 31-46, available   at   http://www.aamva.org/WorkArea/linkit.aspx?LinkIdentifier=id&ItemID=2458&libID=2444   (last viewed Jan. 30, 2014) (describing options for physical security features).

[23] "The right to keep and bear arms . . . is not the only constitutional right that has controversial public safety implications. All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category."  *McDonald v. City of Chicago*, 130 S.Ct. 3020, 3045 (2010).

[24] The District relies on a decision upholding a requirement that public officials disclose financial information, even though no history of corruption existed.  DC Opp. 23, citing *Barry v. City of New York*, 712 F.2d 1554, 1561 (2d Cir. 1983).  But that case did not implicate an explicit constitutional right, and at any rate "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom."  *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).

firearm.  28 C.F.R. § 25.2 ("POC").  The District is free to conduct more extensive background checks than are required by federal law without requiring a person's appearance at the police department or registering the person after he or she passes the checks.[25]

The District relies on studies by Daniel Webster claiming that the repeal of Missouri's "permit-to-purchase" law resulted in an increase in locally-sold guns diverted to criminals and firearm homicides.  DC Opp. 24.  Webster's  "diversion" analysis "is based on a fundamental misunderstanding of firearms trace data." Pl. Ex. 7 (Kleck Decl.) ¶¶ 27, 28. Its homicide analysis is based on a brief increase in the total firearm homicide rate in one state, ignoring homicides with long guns that were not affected by the law and also ignoring a larger temporary firearms homicide increase in a neighboring state that did not change its own, similar, law.  *Id.* ¶¶ 31-35.

Finally, the District suggests that requiring an applicant to bring the firearm to the MPD is necessary to verify that the firearm is not prohibited.  DC Opp. 25 n.21.  But that is known from the application form, which has a description of the firearm, including the make, model, barrel length, and number of shots.  *E.g.*, Jordan Dec., Doc. 23-5.  Earlier in this litigation, that was the basis of the District denying plaintiffs' registrations as "assault weapons" and large capacity magazines.  *Heller II,* 670 F.3d at 1249.  Requiring the applicant to carry the firearm to the MPD creates risks such as being arrested en route for carrying a firearm, or being robbed.

## C.  No Narrowly-Tailored, Tight Fit Has Been Shown Between Re-Registration and the Goals of Preventing Crime and Protecting Police Officers.

When the District first required re-registration, it claimed it was necessary to allow MPD to determine "whether a registered gun owner has become ineligible to own a firearm . . . ." 2008 Committee Report 4.  The District now concedes that it "could conduct new background

---

[25] That renders irrelevant the District's reliance on Steven A. Sumner, et al., *Firearm Death Rates and Association with Level of Firearm Purchase Background Check,* Am. J. Prev. Med. (July 2008), which in any event contains grave methodological flaws and fails to establish any benefits of local background checks. *See* P.Mem. 32-33.

checks at any time without causing the registrations to expire."  DC Opp. 25.  The only other reason given was "to better track where firearms are located . . . ."  *Id.*  But registrants were already required to give notice of changed information.  D.C. Code § 7-2502.08(a).

The District now seeks to justify re-registration because "registrants have moved, died, disposed of their guns (perhaps lost them) and have not notified MPD."  DC Opp., quoting 2012 Report at 10.  If some registered firearms are no longer in the District, it is unclear what harm that causes.  The District also states that it wishes to keep track of lost or stolen firearms.  *Id.*, citing 2012 Report at 11.  But gun owners have an incentive to report lost or stolen firearms in hopes of getting them back.  It is unclear how re-registration would have any impact.

The District originally promised that "reregistration may be relatively easy. The attestation of address and firearms in possession could be done by mail or on-line."  2008 Committee Report at 4.  The District later repeated that "the re-registration process is simple – the Chief of Police will provide a form for renewal, and submission can occur either online via MPD's website, by mail, or in person."  2012 Committee Report at 11.  It added that "fingerprinting is a mandatory, one-time requirement," and that "additional fingerprinting" would not be required.  *Id.* at 8.

These commitments were broken.  For re-registration, which began on January 1, 2014, the District requires that, besides paying $48 in fees, one must appear in person at MPD headquarters, submit fingerprints yet again, and confirm possession of the registered firearm, home address, and continued compliance with the registration requirements.  DC Opp. 26-27; 24 Metropolitan Police Dep't, Notice of Final Rulemaking, 60 D.C. Reg. 55 (Dec. 27, 2013).

Outweighing the District's superficial interests in re-registration are the Second Amendment rights of gun owners, who are unnecessarily burdened by undergoing the same

process over and over for their entire lives, and by the threat that, if they fail to re-register because of illness, extended travel, or mistake, they will suffer penalties and potential loss of Second Amendment rights.

Military personnel, diplomats, civilian contractors, government employees, and private employees are often assigned for extended periods to posts in other cities or overseas.  Mailed notices may not arrive on time or at all.  Over time, thousands of individuals will become so aged or debilitated that they cannot travel to MPD headquarters, have no automobile or other transportation, have difficulty reading and dealing with practical affairs, are in an assisted living or other care facility, or simply cannot afford the continuing fees.[26]

Such persons will become inadvertent criminals in possession of firearms that they registered in good faith but which the District de-registers for reasons it keeps changing.  Lawful property kept for any number of legitimate reasons, including to pass to future generations, will become contraband, and countless law-abiding people become criminals, often at the end of their lives.  No state imposes such impermissible burdens on exercise of Second Amendment rights that appear to be designed to entrap lawful gun owners, while having no effect on crime.

### D. No Showing Has Been Made that the Training and Test Requirements Protect Police Officers or Control Crime.

The District has failed to show a tight fit between its training and test requirements and the objectives to protect police officers and to prevent crime.  In response, the District asks why law enforcement agencies and the military train personnel in the safe handling and use of firearms, and why the NRA and firearm manufacturers recommend such training.  DC Opp. 28.

---

[26] Little solace is offered by the obscure provision that the Director "may" waive the requirement for personal appearance in an emergency, and even then the application "shall not be approved until the applicant appears in person."  24 D.C.M.R. § 2313.3.

Those who use firearms professionally need training in accord with job requirements. Training in safe handling is indeed recommended for everyone as a general matter.  However, a governmental entity may not dictate what it decides for training and testing for a person merely to possess a firearm, any more than it could do so for voting or free speech.  The District's claim that some States require training or a safety exam for certain firearm licenses, DC Opp. 29 n.25, fails to note that such licenses are typically to carry a concealed handgun in public, not just to possess a long gun or handgun at home.

Requirements may indeed be based on "history, consensus, and simple common sense." DC Opp. 29, quoting *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995) (commercial speech).  That was repeated in *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001), which added: "This burden is not satisfied by *mere speculation or conjecture*; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and *that its restriction will in fact alleviate them to a material degree*."  *Id.* (citation omitted & emphasis added).

The District loses on history and consensus, since no State has ever required taking a test and having training as a condition for mere possession of any kind of firearm.  And common sense suggests no link between the District's requirements and protection of police officers and prevention of crime.

### E. The Requirement to Exhibit a Registration Certificate Is Not Narrowly Tailored to Protect Law Enforcement.

Since "the right of the people to keep and bear arms" is constitutionally recognized, no presumption may exist that a person in possession of a firearm, without more, possesses it unlawfully.  "[T]here is a long tradition of widespread lawful gun ownership by private individuals in this country." *Staples v. United States*, 511 U.S. 600, 610 (1994). "[O]wning a

gun is usually licit and blameless conduct. Roughly 50 percent of American homes contain at least one firearm of some sort . . . ." *Id*. at 613-14.

Absent the "circular reasoning" of making it unlawful to possess an unregistered firearm so that police can arrest persons with unregistered firearms, *Heller II*, 670 F.3d at 1258 n.*, no legitimate interest exists in requiring presentation of a registration certificate so police can identify "an individual as the owner of a registered firearm." DC Opp. 30. Given that no State in the continental United States requires registration of all firearms, no reasonable presumption can exist that a person without registration papers is a danger to law enforcement officers.

### F. No Nexus Exists Between the Reporting Requirements and Preventing the Diversion of Guns.

The District claims that no evidence exists that "the types of persons who register firearms would not divert them to prohibited persons, without regard to any notification requirement." DC Opp. 31, quoting P.Mem. at 39. Ignoring that the D.C. Circuit imposed the burden of justifying its restrictions with evidence on the District, the District cannot answer the basic question: why would a person who intends to divert a gun to a prohibited person register it in the first place? And if the person is not deterred from such diversion by the registration requirement, why would he or she be deterred by a notification requirement?

A law-abiding person would not divert a firearm to a prohibited person with or without the registration requirement, much less without the notification requirement. The District has presented no evidence that, in the forty-nine states that do not have universal registration and related notification requirements, gun owners are more likely to divert guns.

Notification requirements are supposedly associated with a "lower rate of exporting guns to criminals across state borders" and "reducing rates of crime gun exports . . . ." DC Opp. 31 &

n.27.  But again, why would anyone import a gun into the District, register it, and then export it,

rather than just taking it directly to its out-of-state destination?

### G.  No Evidence Exists that Prohibiting Registration of More Than One Handgun Within Thirty Days Reduces Trafficking.

Banning registration of more than one handgun per thirty days has no relation to

trafficking of firearms.  The District has offered no explanation for why a person who wished to

obtain a gun in State X to traffic it in State Y would have any incentive whatever to register it in

the District in between obtaining and transferring it.  DC Opp. 32-33.  The problem in DC does

not related to trafficking guns from DC to other jurisdictions.  As Chief Lanier testified:

> Q I'm going to engage in a little understatement here. D.C. has not generally been accused of being a high-volume exporter into other states of guns legally purchased in the District, has it?
>
> A No.

Exhibit P-24 (Lanier Dep.) 81.

Supposedly gun traffickers buy multiple guns in a jurisdiction with weaker laws and

resell them in jurisdictions with stronger laws.  2008 Committee Report at 10; see also 2012

Committee Report at 14.  Why would such a person register any gun in the latter state before

reselling it?  According to Chief Lanier, that would be an implausible scenario:

> Q Let's say that there was no gun a month law.  All the rest of the laws stayed in place. Is this a likely scenario, in your opinion, that someone would purchase multiple guns through Mr. Sykes, register them all with you, and then turn around and sell those guns illegally?
>
> A No, that is not a likely scenario.

*Id.* at 84.  Chief Lanier further testified that it "is not a likely scenario" that a  person "willing to

violate federal law by transferring [a] handgun illegally across state   lines" is "likely to turn

around and try to register that gun in the District."  *Id*. at 86.

The District's supposed "robust body of evidence" fails to answer that question—nor could it, because the studies cited addressed firearm sales either in individual states that do not have even "basic registration" for firearm possession, or in multiple states without regard to the existence of registration laws.[27]   DC Opp. 32-33.  A study relied on by the District saw no "significant benefit" to one-gun-a-month laws.  Sumner et al., *Firearm Death Rates* at 1.

In arguing that multiple gun sales facilitate trafficking across state lines, the District disputes Dr. Kleck's conclusion that a short "time-to-crime" ("TTC") is not indicative of possible gun trafficking.   DC Opp. 35-36; see Kleck et al., *The Myth of Big-Time Gun Trafficking and the Overinterpretation of Gun Tracing Data*, 56 UCLA L. Rev. 1233, 1258-59 (2009).[28]   "TTC" is a misnomer to describe the time between when a gun is sold at retail and when it becomes the subject of a trace. "Not all firearms used in crime are traced and not all firearms traced are used in crime."   § 621, Science, State, Justice, Commerce, & Related Agencies Appropriations Act, 2006, Pub. L. 109–108, 119 Stat. 2342, 2341-42 (2005).

But this debate is moot.  Until the District explains why traffickers would register their guns, its quibbles about TTC data are irrelevant.  No reason exists to prohibit law-abiding citizens such as Plaintiff Jordan from registering more than one handgun in a thirty-day period.

## CONCLUSION

This Court should grant Plaintiffs' motion for summary judgment and deny Defendants' motion for summary judgment.

---

[27] DC Opp. 32-33, citing, e.g., Mona Wright, et al., *Factors Affecting a Recently Purchased Handgun's Risk for Use in Crime Under Circumstances That Suggest Gun Trafficking*, 87 J. Urban Health: Bull. of the New York Acad. of Med. 352, 352 (2010) (sales in California); Douglas Weil & Rebecca Knox, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275 J. Am. Med. Ass'n 1759, 1759 (1996) (sales in Virginia).

[28] The District criticizes this study because law review articles are not peer reviewed.   DC Opp. 34-35.  But peer review is "not dispositive," and a court should consider "the known or potential rate of error," "standards controlling the technique's operation," and "a particular degree of acceptance within that [scientific] community."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594 (1993).

Respectfully submitted,

Dick Anthony Heller
Absalom F. Jordan, Jr.
William Carter
William Scott
Asar Mustafa

By Counsel

 /s/ Stephen P. Halbrook
STEPHEN P. HALBROOK
D.C. Bar No. 379799
3925 Chain Bridge Road, Suite 403
Fairfax, VA  22030
Telephone: (703) 352-7276
Facsimile: (703) 359-0938
Email:  protell@aol.com

 /s/ Dan M. Peterson
DAN M. PETERSON
D.C. Bar No. 418360
Dan M. Peterson, PLLC
3925 Chain Bridge Road, Suite 403
Fairfax, VA  22030
Telephone: (703) 352-7276
Facsimile: (703) 359-0938
Email: dan@danpetersonlaw.com

Counsel for Plaintiffs